1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3  BALLARD, ET AL           :
                              :
 4                            :
                              :
 5      vs                    :    3:18-CV-121
                              :
 6                            :
                              :
 7  NAVIENT CORPORATION, ET   :
    AL                        :
 8                            :

 9      BEFORE:      THE HONORABLE MALACHY E. MANNION

10      PLACE:       COURTROOM NO. 3

11      PROCEEDINGS:  ORAL ARGUMENT

12      DATE:        MONDAY, JANUARY 7, 2019

13
    APPEARANCES:
14
    For the Plaintiff:
15
    DANIEL A. EDELMAN, ESQ.
16  EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
    120 S. LASALLE ST.
17  #1800
    CHICAGO, IL 60603
18
    ANTHONY J. FIORENTINO, ESQ.
19  180 N. LASALLE STREET SUITE 2440
    CHICAGO, IL 60601
20
    CARLO SABATINI, ESQ.
21  SABATINI FREEMAN, LLC
    216 N. BLAKELY STREET
22  DUNMORE, PA 18512

23  FOR THE DEFENDANT:
    LISA M. SIMONETTI, ESQ.
24  VEDDER PRICE (CA), LLP
    925 CENTURY PARK EAST, SUITE 1900
25  LOS ANGELES, CA 90067
```

2

1          THE COURT:  We're here on Ballard, Varno and Pokorini

2  on behalf of themselves and class members against Navient

3  Corporation, Navient Solutions, Inc., and Navient Solutions, L.

4  L. C.  The civil number is 3:18-121.  Pending before the Court

5  are motions to dismiss effectively the case in its entirety and

6  responses from the plaintiffs, and counsel have requested oral

7  argument.

8          I will note that I have received and reviewed the

9  motion to dismiss, the brief in support, the brief in

10  opposition and the reply brief as well.  And for counsel, I see

11  Mr. Sabatini here for the plaintiff.  I assume we have Mr.

12  Fiorentino and Mr. Edelman?

13          MR. EDELMAN:  Yes, Your Honor.

14          THE COURT:  For the defendants we have Ms. Simonetti?

15          MS. SIMONETTI:  Yes, Your Honor.

16          THE COURT:  I feel bad you all have come from a

17  distance.  Coming from Chicago you can get in here two ways,

18  either United or American without stopping anyplace.  But

19  coming from California, you have to go -- I'm not -- Chicago,

20  Philadelphia, Atlanta or someplace to get here --

21          MS. SIMONETTI:  Charlotte.

22          THE COURT:  You did American, okay.  You are all

23  scheduled to go back out tonight?

24          MR. EDELMAN:  Yes, Your Honor.

25          MS. SIMONETTI:  I am not, Your Honor.  I can't get

3

1    back tonight.  I am waiting for the sleet and snow to melt.

2         THE COURT:  Well, you know, you never know what we're

3    actually going to get.  They are usually pretty good at the

4    airport.  Are you flying back to Charlotte or Philadelphia.

5         MS. SIMONETTI:  Charlotte.

6         THE COURT:  The 6 a.m.?

7         MS. SIMONETTI:  11:30 I think.

8         THE COURT:  That's good because even if there is bad

9    weather, they'll have time to have clean the runways.  And then

10   since you're going to Charlotte where the weather is not

11   supposed to be bad theoretically going in that direction, you

12   will be able to get through.  You gentleman -- did you take

13   United or American?

14        MR. EDELMAN:  We went through Philadelphia and drove.

15        THE COURT:  So are you flying back to Philadelphia or

16   directly back to Chicago?

17        MR. EDELMAN:  Driving back to Philadelphia.

18        THE COURT:  Oh, you drove.  Well, we will begin with

19   the defense since it's your motion.  Now, I know that I --

20   there are a number of different issues obviously on here.

21   You're welcome to speak to any or all of those that you wish to

22   draw my attention with more specificity.  I did want to mention

23   and ask you a question, Ms. Simonetti.  It's my understanding

24   that Navient is also a defendant in a relatively similar matter

25   in front of Judge Mariani in this Court; is that correct?

4

1          MS. SIMONETTI:  Would you like me to speak from here?

2          THE COURT:  From there.  You can pull the microphone

3   down.  Everyone, you can speak sitting, standing, running,

4   jumping or laying.  Whatever makes you comfortable is okay with

5   me.  There's no formalities here.

6          MS. SIMONETTI:  All right.  I am very familiar with

7   the matters pending before Judge Mariani.  There is a matter

8   that is brought by the CFPB and another state attorneys general

9   and also one proposed class action.  But those matters are not

10  similar to this.  I will disagree with that.  The primary

11  theory that runs through those cases is that the defendants can

12  properly steer borrowers into forbearance when they should

13  otherwise be put into the various forms of income driven

14  repayment programs that are available.

15          So that is a different theory than the companies

16  failed to process these applications that were submitted for

17  the IDR programs.  And there -- just in terms of status, there

18  has been motion practice in the government actions before Judge

19  Mariani, and there is a pending motion to dismiss and a motion

20  to strike in the private class action that's been pending for

21  quite a while.  And that is the status.  But I don't agree they

22  are similar.

23          In fact, if you look at the order that was recently

24  submitted by plaintiffs in the Pennsylvania case, much of it

25  has to do with preemption, which is not an issue here.  There

1  are a number of distinctions even in the claims setting aside

2  legal theory --

3           THE COURT:  Now, but that last one you're speaking of

4  is the attorneys general action, which is a somewhat of a

5  different entity in and of itself because of the party that's

6  involved in case.  The other action -- class action -- the

7  underlying meat of the action appears to be that Navient

8  somehow was -- I don't know the verbiage I will use here --

9  somehow, as you put, steering people into forbearance as

10 opposed to -- just steering people into forbearance.

11          When I look at this action, not necessarily the way

12 it's pled by the parties or the other action where it's pled by

13 counsel since they are different counsel and plead things in

14 different ways -- the allegations are here generally to me

15 similar.  That is, that somebody applies for IDR and that --

16 allegedly timely applies for either IDR or to re-up their IDR

17 after a period of time and it's delayed and the result of the

18 delay is people get put into forbearance.  And the argument on

19 both sides are Navient benefits from that to the extent that

20 accrued interest now becomes capitalized as principle and they

21 made money on that.

22          I mean, it looks to me like the -- however it's being

23 -- whatever the verbiage is by different counsel in the case,

24 it strikes me the underlying activity relates to whether or not

25 somebody should be in the IDR program and whether or not

1 instead of that occurring or continuing to occur that

2 forbearance takes place and the result is allegedly, you know,

3 more ability for Navient to service and, therefore, a longer

4 period of time for them to collect fees and things of that

5 nature.  Is that --

6          MS. SIMONETTI:  I agree the programs are the same

7 you're talking about.  But the theory is different in that in

8 those other actions before Judge Mariani the primary allegation

9 is this steering, which means that forbearance would always be

10 offered and IDR would not be offered.  This is different in

11 that these borrowers are applying for IDR believing that they

12 might be entitled to it or they are renewing IDR because they

13 have already been entitled to it, they need to recertify their

14 entitlement.  So I think the theories are different.  I don't

15 think the lawyers necessarily would agree on the plaintiffs

16 side the theories are the same.  I think they would point those

17 differences as well.

18          The defense raised in the Mariani class action are

19 different as noted.  There's preemption defenses not raised

20 here and different contractual theories and other issues.  So I

21 agree with you that the programs are the same, but the theory

22 is actually not the same from my point of view.

23          THE COURT:  Let me ask you, are you handling these

24 matters for -- it was surprising to me that in the Middle

25 District of Pennsylvania -- more particularly in Scranton that

1   there would be effectively three cases that -- the attorney

2   general's case to the extent one wants to call that a class

3   action -- the private case that Mariani has and then this one

4   that I have.  I was surprised at that, and I am --

5            MS. SIMONETTI:  That's because there's a servicing

6   center for Navient Solutions in Wilkes-Barre.  I'm probably not

7   saying that right.

8            THE COURT:  No, you did.  That was good.

9   Wilkes-Barre.

10            MS. SIMONETTI:  Yes, that's the reason we have cases

11   pending here.  I am counsel for the companies in just the

12   private class action.  There are other firms involved in the

13   state versus federal case.

14            THE COURT:  All right.  Why don't I let you speak to

15   the issues that you wish to speak to?

16            MS. SIMONETTI:  So there's a lot of extensive

17   briefing.  Overall I think this matter calls out for a

18   practical result.  On the motion to strike, I think this is one

19   of the unique circumstances where individualized issues are

20   plain from the pleading.  We don't often make motions to

21   strike.  I understand they are disfavored in most

22   circumstances, but this is one of those rare factual allegation

23   circumstances where it is an appropriate motion.  We have

24   discussed the plaintiff's particular facts in the briefing, so

25   I won't go over that with you again.  I think the best evidence

1  in support of those arguments is the application form itself,

2  which we have attached to our reply.  It's docket number 48-1.

3  It's a very extensive ten-page form.  It asks for certification

4  of various -- you know, marital status, family status, what's

5  your income.  You have to submit documentation with respect to

6  income, tax information.  And the last section before the

7  signature, there's a number of certifications.  And the first

8  one says, if I do not provide my loan holder with this

9  completed form and other required documentation, I will not be

10  placed on the plan that I requested or my request for

11  recertification or recalculation will not be processed.

12      So I think that clearly contemplates that these forms

13  won't be submitted properly or won't be submitted completely,

14  may not be submitted on time and that the companies will have

15  to work through with borrowers when they send the

16  documentation, what they sent, where did they send it, you

17  know, was it complete, did they apply for the right program.

18  And I think that's why the motion to strike is appropriate and

19  should be granted.

20      And the same thing with respect to the motion to

21  dismiss, practical way to look at this is the Higher Education

22  Act does not contain a private right of action and these

23  contract claims in effect would circumvent the structure of the

24  law to allow for these causes of action incorporating the terms

25  of the Higher Education Act where those claims can be brought.

9

1  If congress wanted to include a private right of action, it

2  could have.  It could do so now, but it hasn't.  And so the

3  structure of the law, I think, does not permit the claims that

4  are being brought here on contractual basis.  And then

5  meanwhile with respect to the -- what's called the Consumer

6  Protection Law claims, the state law claims, New York,

7  California, Illinois, there are no misrepresentations that are

8  alleged in the complaint with respect to the fact -- any fact

9  -- for example, there's no allegation that says there was

10  representation to the plaintiff from Illinois that there would

11  be processing within a certain time frame.  And that doesn't

12  appear in the regulations either.  If you notice in the amended

13  complaint, the time for completion of the applications is a bit

14  of a moving target.

15          But since there's no misrepresentation alleged, there

16  couldn't be any reliance.  That's my pitch for the practical

17  view of these claims here.  I think the briefing is complete,

18  especially the reply.

19          THE COURT:  Let me move to plaintiff's counsel.  I

20  will let you speak to whatever you would like to speak to.  I

21  am interested in the issue that was the first one that was

22  relayed, and that was on the application itself.  And looking

23  at the various -- you know, in your amended complaint you

24  indicate that there's potentially millions of people here,

25  hence millions of applications, all of which may have different

1   information, background that needs to be reviewed, needs to be

2   mentioned, brought in.  And I am concerned about that in

3   deciding whether or not there's a class that makes sense.

4          Before I get to that, I want to ask you on that

5   issue, based upon that certification that you referred to, is

6   it Navient's position that if somebody timely filed their

7   application but it didn't cross all of the T.s and dot all of

8   the I.s that in those circumstances that if they received an

9   application that for whatever reason Navient determined was

10  either incomplete that -- did that mean that at that point in

11  time they would consider the person at least temporarily either

12  ineligible or not having renewed their IDR and, therefore,

13  automatically go into forbearance pending receiving the

14  follow-up information or whatever it may be?

15         MS. SIMONETTI:  I think that what would happen -- it

16  would depend whether the application actually can be processed.

17  If there was enough information there that it could be

18  processed because there's a calculation, a formula that goes

19  into IDR entitlement on the application process itself.  And

20  it's a government program.  So the entitlements is driven by

21  the Department of Education.  So I think the issue would be

22  whether, in fact, an application just could not be processed --

23  not sort of a -- you know, there was some minor problem with

24  documentation or something like that that can't be processed

25  and then that's the problem.

1        THE COURT:  I should know this from reading the

2   documentation.  I can't remember exactly.  Wasn't there

3   initially some sort of time frame -- was it 25 days -- there

4   was some time frame within which if an applicant made an

5   application that it was supposed to be processed by Navient?

6        MS. SIMONETTI:  That was suggested by plaintiffs with

7   respect to a new application, I believe.  That's not a

8   requirement that appears in the regulations, and that was also

9   withdrawn.  If I can look back and confirm that's exactly

10  right.  But there's no firm timeline for completion of a new

11  application.

12       THE COURT:  So let must ask you, how does that

13  practically work then?  So I supply my reapplication after a

14  year, which is more of the circumstance that fit into the three

15  plaintiffs that we listed here, and I -- for some reason it's

16  not complete.  What does that mean then practically?  Like, can

17  Navient, for example, push it off to the side and say, okay,

18  that was not complete, we will put into the pile of not

19  completes, and that could be a week, could be a month, it could

20  be six months before all of that is done, is there any internal

21  -- are there any government regulations?  Are there any time

22  frames involved, and what are the time frames?

23       MS. SIMONETTI:  So if they are a new application, the

24  requirement is to process them promptly.  So that is -- that's

25  an open ended word.  Promptly.  It depends what is received.

12

1   And with respect to your renewal application, my understanding

2   it would be processed before the time for expiration, you know,

3   barring some sort of an issue with the documentation or --

4           THE COURT:  Is there a requirement or regulation as

5   to how long before the year renewal to submit the documentation

6   in order to be reviewed?

7           MS. SIMONETTI:  In the regulations, I don't recall

8   seeing that.

9           THE COURT:  Or any kind of writings or statements

10  that Navient sends out to people or any kind of information

11  about the IDR program or that you got to renew it each year?

12  Does it indicate you must -- there is some time frame within it

13  must be renewed?

14          MS. SIMONETTI:  There is a time frame.  I am sure

15  there's communication.  It is alleged here there's

16  communication, but we don't have that in the record.  It's not

17  attached to the complaint.

18          THE COURT:  Do you know what the time frame is?

19          MS. SIMONETTI:  I want to say something like 60 days,

20  but I can't swear to that.  There's communication that goes out

21  you're coming up for annual renewal, you have to submit the

22  information to recertify.  It's submitted.  But there's nothing

23  in the regulations that's been identified, and none of those

24  documents have been put forth here in the amended complaint.

25          THE COURT:  Okay.  Let me ask you -- okay.  Let me

1  ask you also on recertification.  Is there any writing that

2  you're aware of that goes out that indicates to people on

3  recertification that if you don't timely recertify that the

4  consequence is that you will be put into forbearance as opposed

5  to that you'll be -- you will continue on in IDR pending the

6  resolution of whatever the problems are?

7          In other words, is there communication between

8  Navient and the borrowers about what the consequences are of

9  failing to be timely or to not being complete in a renewal

10  application?

11          MS. SIMONETTI:  I don't want to swear to the content

12  of all of the disclosures that go out.  There are lots of

13  disclosures that go out in connection with these programs.

14  I've seen letters calling out various types of discrepancies

15  and problems with applications from -- frankly from -- more

16  from the other case because it involves IDR programs.  And I am

17  sure there's a communication.  Do I have it committed to

18  memory?  I don't.  But it's a stream of communication with

19  borrowers letting them know that this process is underway, they

20  have to do the annual recertification and if they don't do it,

21  obviously there will be consequences.  And I have seen certain

22  legal descriptions, but I don't want to swear this is when it

23  goes out and this is exactly what it says.

24          THE COURT:  I don't want to you do that.  My question

25  is, are you aware of whether or not that it indicates --

1  there's a signature difference between, for example, staying in

2  the IDR program if it turns out there's some, you know, minor

3  you know, problems, something didn't get there, whatever, and

4  going into forbearance changes significantly what happens to

5  their total loan and the amount they have to pay over time.

6          And so I am just wondering whether or not there's --

7  that you're aware of -- and if you're not, it doesn't mean it's

8  not -- I get that.  Is there an articulation of, if you don't

9  do this in time, there is a negative consequence to you, and

10  that is, you will the be kept in the same circumstance pending

11  your proper completion and if you don't properly complete, then

12  we will go back and then from the date you didn't complete,

13  then we'll, you know, forebear, and you will have additional

14  interest that goes to principle and a larger amount of loan to

15  pay as opposed to telling them that if you don't do this

16  timely, forbearance will kick in and that's the, you know, the

17  process we're using here.  If you're not aware --

18          MS. SIMONETTI:  That was a long disclosure.  I feel

19  like I can't sign on to that.  But I -- I would be -- there

20  probably is, Your Honor.  It's a very standardized process.

21  But, you know, again, that was a long disclosure.  I don't want

22  to sign on to that.  But there certainly is communication.  The

23  questions you're asking right now I think would go to the

24  motion to strike.  It's a very individualized process.  You're

25  working with people in all different types of status with

1   respect to their families and their jobs, and do they really

2   need a forbearance -- forbearance is a temporary thing -- do

3   they qualify for IDR.  They are highly individualized facts.

4   Let me move to you, Mr. Edelman.  Before I do, I want to start

5   with that same question.  It does seem like there are an awful

6   lot of individualized requirements or facts.

7               I know that if you look at it -- if we try to look at

8   it as a simpler case, we can say it's just a question of

9   whether or not when somebody applies how long it takes Navient

10  to do it and whether or not if they don't get it done in the

11  time frame that allows the person to be re-upped, then they are

12  sent into forbearance and this all sounds very simple, but it

13  sounds to me like the real determination of whether or not

14  somebody gets IDR and whether on each yearly basis they are

15  able to re-up for IDR depending on what their financial

16  circumstances are at that time is literally unique for every

17  person that applies and on top of that whether they apply 60

18  days in advance, 30 days in advance, a week in advance, on the

19  day they are supposed to, whether or not when they applied in

20  60 days in advance their application was complete or had other

21  matters and how long it took Navient to be able to determine

22  that there was missing information that needed to be there, you

23  know, it seems to me that I have a concern here as to what

24  appears to be a very individualized process in each one of the

25  potential millions, as you put it, of borrowers.  So I would

1  like you to address that first if you would.

2         MR. EDELMAN:  Yes, Your Honor.  The application is

3  actually fairly simple particularly for renewal.  The questions

4  ask a person to identify what plan you want, to provide some

5  information as to whether your income has changed and if it has

6  changed, submit essentially one piece of paper documenting what

7  your income is, a pay stub, documentation of that nature.

8         Navient takes the information, puts it into its

9  computers.  It is simply -- it is a simply administerial

10 process to identify from Navient's computer records whether an

11 application has been received and if Navient even claims

12 there's some problem with it.  The difficulty -- what happens

13 -- this case actually in effect presents the explanation for

14 the steering allegations in the Commonwealth's complaint.

15        The income based repayment applications, particularly

16 in the case of renewals are not processed properly.  The legal

17 requirement is one of prompt processing.  At one point --

18        THE COURT:  Now, is that for renewal or for --

19 counsel indicated for the defense, I believe that was for the

20 initial application but there was no language as to what the

21 timing is in renewal, is that correct or incorrect?

22        MR. EDELMAN:  The language applies to the initial

23 application for renewals, once they enter it into their

24 computers they received the renewal application, they don't

25 indicate anything wrong with it, they are supposed to continue

1    the program until the renewal application is processed.   In

2    fact, people wind up in forbearances, which are much more

3    detrimental to the borrowers and are not intended for use

4    except where, for example, you lose your job, you're ill,

5    there's some temporary problem.

6           THE COURT:  Let me ask you on that question.   So

7    you're saying that there is language that says that once they

8    receive your application that you are supposed to remain in the

9    program until it's processed?

10          MR. EDELMAN:  That's correct.   There's what is called

11   an administrative forbearance -- typically lasts 60 days in

12   which you basically continue in the program.   The key to the

13   administrative forbearance is that interest is not capitalized,

14   the detriment to the consumer is not there.   A number of -- a

15   proportion of persons, which is totally inappropriate given the

16   purpose of a hardship forbearance, it is placed in forbearance

17   status rather than income based renewal status.   That is what

18   our complaint concerns.

19          THE COURT:  Let me ask you, would it make a

20   difference if somebody -- if somebody applies and their

21   application is complete or complete enough that it can be

22   processed but it isn't processed in a prompt manner?   In other

23   words, that the person applies and let's for argument sake, you

24   know, they get -- Navient gets it a week before and then by the

25   time they finish processing, it's three weeks later so it's

1  going past that, is there a difference between that and

2  somebody who files their application a week before but it is

3  incomplete, they have not sent whether they are married or

4  single, whether their spouse or whoever else it is has income,

5  what the total income -- something of significance in the

6  calculation, is that a difference or not a difference in terms

7  of whether or not in that circumstance one would be entitled to

8  remain in the program or whether or not they would potentially

9  be in forbearance until such time as they had supplied the

10  proper information?

11          MR. EDELMAN:  First, whether that's the case should

12  be indicated by Navient's computer records.  At some point --

13  some discrepancies might result in their not being in the

14  program.  If Navient can -- let's say you're missing this and

15  it is promptly supplied, they should remain in.

16          THE COURT:  Is there some time frame?  What does that

17  mean?  Does that mean we reach out to you and you give it to me

18  a month later and you get to stay in because you gave it to us,

19  or if it is past a deadline for renewal and they haven't

20  supplied something that is required to be supplied, who's the

21  burden on then in terms of them staying in the program?  You

22  know, if I -- if my driver's license expires every four years

23  and I don't get it renewed and then I get a ticket because I

24  was busy or because I, you know, didn't have two forms of

25  identification or whatever it may be, it doesn't make any

 1 difference.

 2        The bottom line is I missed the deadline and so I

 3 didn't qualify after that period of time.  I got to pay my

 4 ticket even though if I am entitled to get a new driver's

 5 license, I just didn't get my photo taken.  I guess my question

 6 to you in that regard is -- I get your point if somebody

 7 applies in advance and it's not processed in a timely manner,

 8 meaning that's not their fault, they've got it to Navient and

 9 Navient had sufficient information to process the renewal, then

10 it seems to me -- I get your point there.  If they supplied the

11 information effectively in an untimely manner because even if

12 they get it in time but it's not complete for purposes of doing

13 whatever this algorithm is that this information that's fed

14 into the computer so it spits out whatever the percentage is

15 of, you know, your disposable income compared to whatever your

16 the loan is and it figures it out, then is -- is that something

17 that is Navient's fault so, therefore, they are required to

18 assume that somebody that hasn't filled out the application

19 properly or supplied the information -- are they required to

20 assume that they will and that, therefore, we just got to hold

21 it open even if they don't do it and if so how long?  Is that a

22 week, a month, two months?  What is it?

23        MR. EDELMAN:  It may not be Navient's fault, but

24 instances in which there's incomplete documentation can be

25 readily identified from Navient's own computer records.  And

20

1  those persons would not be part of the class or would not be

2  entitled to relief.  The problem is --

3        THE COURT:  Okay.  So you are saying here the class

4  you're identifying is only those who have properly filed the

5  information and by no fault of their own effectively, Navient

6  hasn't in a timely manner processed those and as a result at

7  some point after the theoretical expiration of the initial

8  filing, that they've been now put into forbearance and,

9  therefore, had interest which is capitalized on to principle

10 and the result is they are paying either a higher amount or a

11 -- over the course a longer period of time.

12        So you're only talking about those people that have

13 properly filed -- when I say properly filed, I don't mean every

14 box is checked.  I mean theoretically in Navient's entry into

15 the computer there is sufficient information for them prior to

16 the time of renewal to be able to make that determination

17 whether --

18        MR. EDELMAN:  Yes, Your Honor, and those persons we

19 believe can be identified from Navient's own computer system.

20        THE COURT:  Okay.  All right.

21        MR. EDELMAN:  Not only can they be readily

22 identified, but relief can be granted either in terms of money

23 or by requiring Navient to retroactively reprocess the

24 applications appropriately.  In other words, not putting the

25 people into administrative forbearance where interest -- so

21

1  that interest is being capitalized and the loans are being

2  extended.  So I think that a class can be readily identified

3  and certified and granted relief, and this can be done

4  essentially entirely on the basis of Navient's own computer

5  records.

6          It is not -- it does not require actual adjudication.

7  It simply requires an analysis of what Navient has in its own

8  computers.  With respect to the argument that there's no

9  private right of action, the Higher Education Act specifies

10 that the government is going to enter into loan agreements,

11 promissory notes with private individuals.

12         The notes are -- are then serviced by Navient.

13 Navient is required to adhere to various provisions of the

14 Higher Education Act and regulations in conducting its

15 servicing activities.  Where a statute requires the execution

16 of loan agreements or notes with private individuals, you don't

17 need a private cause of action.  That's why there isn't one.

18 The notes are legally enforceable contracts.  The question is,

19 enforceable for what?  The assumption -- they obviously impose

20 a financial obligation of some extent on the borrower.  The

21 issue is what extent.  And that is a question which is

22 inherently appropriate for adjudication by a Court.

23         If Navient is doing something to inappropriately

24 increase the balance that is owed, that's the kind of

25 allegation which Courts deal with all the time in creditor and

1  debtor situations, and the appropriate relief is to undo that

2  which caused the balance to increase.

3         By statute, any monetary relief is the responsibility

4  of Navient rather than the government.  So that if Navient has

5  done something of this nature, Navient is required to either

6  undo it or pay a sufficient amount of money on the obligation

7  to bring it into the status which it should have had.  That is

8  the relief which we are seeking.

9         THE COURT:  Let me ask you a different question.  I

10  noticed in the complaint that we have a plaintiff from

11  California, a plaintiff from Illinois, a plaintiff from New

12  York, and then we have a cause of action in Pennsylvania.

13  Who's the Pennsylvania plaintiff?

14         MR. EDELMAN:  We don't have a Pennsylvania plaintiff,

15  Your Honor.  We have a defendant who is conducting its

16  servicing operations in Pennsylvania, and our position is that

17  Pennsylvania has -- I believe it's supported by the

18  Pennsylvania decisions is that Pennsylvania's interest is in

19  preventing the use of facilities in Pennsylvania to overcharge

20  and misservice loans regardless of the state of residence of

21  the borrower.

22         THE COURT:  All right.  Ms. Simonetti, on that last

23  point, do you agree with that because Navient does business in

24  Pennsylvania that they have allowed themselves to be subject to

25  the laws of Pennsylvania and so, therefore, to the extent that

1  even if there is no Pennsylvania resident that's listed as a

2  named plaintiff in the case -- I assume that odds are if the

3  class action proceeded that there would be somebody from

4  Pennsylvania in the case -- but they are not a named plaintiff

5  in the case, that Pennsylvania fair trade law applies?

6          MS. SIMONETTI:  We did look at the jurisdictional

7  issue.  Because the allegations are that these applications are

8  processed here in Wilkes-Barre, we did not think that

9  jurisdiction could be brought.  That's the allegation.

10          THE COURT:  Did you want to respond to either the HEA

11  or the --

12          MS. SIMONETTI:  With respect to the class issues --

13  the class definitions I don't think actually comport with what

14  plaintiff described.  A nationwide class is all individuals who

15  are enrolled in an IDR plan, timely submitted a request to

16  renew, which was, nonetheless, cancelled due to defendant's

17  failure to process prior to the plan's expiration.  That would

18  require you to look at each and every one as to why that

19  happened that was the case.

20          And the second piece of it is, or submitted a request

21  for enrollment that was not processed within 25 business days.

22  That, again, raises the same issue of why wouldn't it have been

23  processed within 25 business days, even it that was the

24  standard, which it's not.  And then the California class and

25  New York class are the same.  All residents who are enrolled in

24

1   an IDR plan and timely submitted a request to renew and then

2   the plan was cancelled due to failure to process.  Again, the

3   question remains the same.  Somehow the Illinois class doesn't

4   contain the enrollment piece.  It only contains the renewal

5   piece -- I'm sorry -- renewal piece -- not the -- I had it

6   right the first time.  And again it's 25 business days.

7          So those classes as defined raise these individuals

8   issues.  If these allegations are true, why would a certain

9   application not have been processed within whatever time frame?

10  And I think if you want to appreciate how complex this

11  calculation really is, if you go to the definition section of

12  the application, which is docket 48-1, page 6, that's where the

13  definition starts.  And they are very complex with respect to

14  income, family size, the poverty index.

15         It's not really as straightforward.  All that

16  information would be derived from those conclusions.  With

17  respect to the HEA, I think the best authority is Astra.

18         THE COURT:  Let me stick with first the class.  So

19  let me go back to you, Mr. Edelman.  What is the response to

20  that?  In other words, are you saying that each person who

21  applied -- who timely applied and yet at some point in time

22  went into forbearance that we need to look at their entire

23  application to find out what was going on, or are you saying

24  that that you're assuming that if Navient had indicated in

25  their computer program that this person timely filed and it was

1  sufficient, that that's as far you will be looking at terms of

2  each individual application?

3         MR. EDELMAN:  That's correct, Your Honor.  We have --

4  it is our intention to base this on Navient's computer records,

5  and we allege there's a large number of persons who Navient

6  will show submitted a proper renewal request and who shortly

7  thereafter wound up in the type of forbearance where interest

8  is capitalized and the loan is extended.

9         THE COURT:  Ms. Simonetti, let me go back to that.

10  You want to take us back into the application.  What they are

11  saying is -- from what I gather is that we're going to rely on

12  your records that you -- we need to know did somebody timely

13  apply for it, and did you approve it effectively, and at some

14  point in time, you know, was there forbearance that occurred in

15  between a timely application that you had -- your records

16  indicate you took and is complete, and then by the time it was

17  actually processed in the manner that would allow them to

18  either continue in an IDR that in between there sometime they

19  were placed in forbearance?  So why is that so difficult?

20         MS. SIMONETTI:  First of all, I am not sure where Mr.

21  Edelman gets his knowledge Navient's system is from.  So

22  there's that.  Second --

23         THE COURT:  Navient's system, they would, I assume,

24  have or have to keep a record in their system of when an

25  application was made so you know whether it was timely or

1 untimely.

2          MS. SIMONETTI:  There are lots of records that are

3 kept for sure.  There would be indications of when --

4          THE COURT:  My question is that you would have a

5 record of whether or not an application for recertification was

6 timely made, in other words, before the prior recertification

7 had -- whether it's 60 days or whatever it may be.

8          MS. SIMONETTI:  I am sure there's a record when it's

9 received, sure.

10          THE COURT:  I assume that Navient keeps a record of

11 when they approved it.  I mean, there must be something if

12 somebody finally says, oh, this one is okay and --

13          MS. SIMONETTI:  Or denied, yes.

14          THE COURT:  Or denied, okay.  And then so we have a

15 record I assume of when people filed their application.  We

16 have a record of when it's approved.  We certainly have a

17 record of when it would have expired if it's not recertified,

18 and then we will have a record whether any of those people were

19 put on deferment for some reason.

20          MS. SIMONETTI:  Yes, I am sure those dates could be

21 discerned.  I think the question is why.  So you're looking at

22 the person is approved, a person who is denied, a person who --

23 to use your words -- there's a time line -- and the question

24 becomes why for each one of those individuals.  If it's very

25 simple and straightforward and the person submits everything

27

1  timely and complete day one, maybe it's approved day two.  But

2  the question would be why for each and every person.  And I

3  think if you go back to even the named plaintiffs, I believe

4  it's the Illinois plaintiff -- no.  It's -- maybe -- I lost

5  track.

6           THE COURT:  That's okay.  One of the three

7  plaintiffs.

8           MS. SIMONETTI:  Correct.  She said she sends in her

9  application, she thinks it's complete, but she doesn't get a

10  response.  Then she sends it again with a letter that said, I

11  hope you received this, I didn't get a response --

12           THE COURT:  That's the California.  Isn't she the one

13  that then appealed it and it was reinstated --

14           MS. SIMONETTI:  I think that sort of begs the

15  question.  So where did she send that official application?

16  Was it, in fact, timely?  Was it complete?  Did she send it to

17  the right place when she sent it again?  Why did they have to

18  do that --

19           THE COURT:  Let me ask you this.  Why wouldn't that

20  be appropriate for a determination at a later time once there's

21  been discovery that's occurred on the issue of class and

22  perhaps a sampling that's done by both sides to try to figure

23  out where we're at in that regard rather than a statement of

24  just pulling out, you know, whether there's millions or not a

25  million of records, I don't know.  But it strikes me that --

1   wouldn't that make it appropriate for -- that this motion to be

2   somewhat premature, we ought to allow discovery on the question

3   of class to see exactly where we're at and perhaps sampling

4   would be a way to do that?

5          MS. SIMONETTI:  The allegation in the complaint is

6   there's six million loans being serviced on a federal program.

7   So that's a lot of loans.  I don't know how many persons within

8   that group would potentially qualify for this.  If you notice,

9   the Illinois class goes back ten years.  So --

10          THE COURT:  I notice each of state classes -- I

11   assume that relates to the statute of limitations.

12   Pennsylvania, I think, was six, and New York was two or three

13   or four whatever.  I assume there are breach of contract

14   statute of limitations or something that were used in those

15   states.

16          MS. SIMONETTI:  Right.  I'm sure that's correct.  And

17   I frankly I do believe this is the circumstance where you can

18   discern from this conversation from these allegations that the

19   burden of discovery is not actually justified.  So how many

20   would we sample?  How much would that cost?  What would the

21   burden be in terms of sifting through each and every account to

22   find these dates and look for correspondence?  The

23   correspondence that's attached to the first amended complaint

24   reflects this course of communication, you know.  The borrower

25   said she submitted it.  She didn't get a response.  She submits

1  it again.  You know, I think that's what you will be looking

2  for.  I think the application speaks to that as well.  And

3  that's why we made this motion to strike in this case

4  recognizing that it's a unique circumstance.

5              THE COURT:  Okay.

6              MS. SIMONETTI:  I think the best authority on the

7  point about the HEA is Astra, the U.S. Supreme Court decision.

8  The point of the Higher Education Act is that the Department of

9  Education creates this program, administers this program,

10  regulates the program top to bottom, can fire Navient.  That's

11  really why the preemption provision is in this as well.  It's a

12  pervasive regulation of these programs.

13              THE COURT:  Let me ask you -- the argument that is

14  being made that -- if that's the case, then Navient can --

15  right.  Their only remedy would be that the Department of

16  Education fires them, they can make $40 million on putting

17  people in deferment that shouldn't be in there, keep the money,

18  and then the reaction will be, well, there's no private cause

19  of action because it's really the Department of Education, they

20  are immune from any kind of suit related to that, so the only

21  remedy would be if the government decided, well, we will fire

22  Navient, so the individual borrower who has -- is out that

23  money would really have no remedy at all, right?

24              MS. SIMONETTI:  I don't know if the government is

25  immune from suits.  I haven't looked at that issue.  So I

30

1  wouldn't know that.  But the -- the structure of the law is

2  that all of the oversight responsibility, all of the

3  supervisory authority is given to the Department of Education.

4  And using contract theories or supposed misrepresentation

5  theories to circumvent the structure of the law is just

6  something that I think can be permitted.

7           THE COURT:  Anything else then, Mr. Edelman?

8           MR. EDELMAN:  With respect to Astra, Astra involves a

9  case where the federal government contracts with someone to

10  administer a public benefit program.  Here we have a case where

11  the -- you have notes, loan agreements between either the

12  government or in some cases a private entity and a borrower and

13  that note is being serviced by Navient.  Generally if one is

14  party to a note and there's a dispute between the parties as to

15  whether owe a million dollars or a hundred thousand dollars,

16  you can get a Court to decide that.  It's a justiciable

17  controversy.  It's the kind of thing which Courts determine all

18  the time.

19           That's in essence what happened here.  Navient is

20  taking applications which its own records will show are

21  appropriate, and that is why discovery is necessary.  We know

22  what Navient is required to keep in terms of records.  We have

23  not seen actual records.  We think the records will show that

24  people who are according to Navient's own records supposed to

25  be income based repayment plans are getting put into

1   forbearance when there's no indication that the -- their very

2   narrow circumstances essentially involve a temporary hardship

3   or inability to pay, which forbearances are supposed to be used

4   in exists.  That is the wrong.  We think it's a justiciable

5   wrong, and we think that this Court has the authority and

6   ability to provide relief for it.

7           THE COURT:  What about the -- Navient brings up the

8   issue -- Navient is the signatory to the agreements, right, but

9   Navient, L. L. C., is the servicer in this case?  So there's a

10  question of whether or not there's an agency that's involved

11  here.  Now, I notice in looking at the case like Navient

12  Corporation, Navient Solutions, Inc. and Navient Solutions, L.

13  L. C -- I know both of you described in your introductions how

14  that historically has developed from Sallie Mae over the course

15  of time but --

16          MS. SIMONETTI:  Right --

17          THE COURT:  Your argument -- the defense argument

18  with respect to whether or not there's an agency -- if -- are

19  you in agreement that one of those three parties assuming there

20  is a proper party in this case that one of those three parties

21  is the proper property?  Is it you're just saying you've named

22  more than you are required to name and, therefore, the umbrella

23  corporation in your opinion shouldn't be in there, it's really

24  Navient Solutions, L. L. C., I assume that you would say would

25  be the actual servicer and, therefore, they are the proper

1  defendant -- and I understand you will believe --

2          MS. SIMONETTI:  That's correct.  If there's any

3  proper defendant in this matter, it's Navient Solutions, L.L.C.

4  L. C. and Navient Solutions, INC., which was simply the prior

5  name.  That incorporation is a holding company.  The legal

6  issue is agency.  We don't think that's sufficiently alleged.

7  And taking discovery of Navient Corporation, you know --

8          THE COURT:  What about the idea -- is Navient

9  actually the signatory to the agreement with the government

10  rather than Navient Solutions, L. L. C?

11          MS. SIMONETTI:  The signatory is -- I believe it's

12  the prior name of Navient Corp. Navient L. L. C., I believe is

13  the party to the contract, but that's just the servicing

14  contract.  With respect to the promissory note, just to be

15  clear, the parties --

16          THE COURT:  The master promissory note, are you

17  taking about --

18          MS. SIMONETTI:  Right.  The parties there are the

19  Department of Education, the lender, and the borrower.  There's

20  no Navient company that's party to that --

21          THE COURT:  So the master promissory note?

22          MS. SIMONETTI:  Right.

23          THE COURT:  I don't know whether you can all get

24  together in terms of whether there's some sort of agreement or

25  stipulation that could be entered into between the two sides as

1    to the appropriate parties so to speak assuming there was

2    liability, who that party would be, the responsible party.  The

3    reason I say that is I really don't like cases if at all

4    possible to go along just naming, you know, every iteration of

5    who they were, will be, can be and would be.  I usually like

6    the parties -- if there isn't a question of, hey, you got the

7    wrong entity, it's really AT&T you should be naming, not

8    Navient, we don't belong here at all -- if but if we're in

9    agreement that the proper party is named, whether or not there

10   is a suit or not is a different issue.  I would like the

11   parties to see if they can work out among themselves so we can

12   get rid of extraneous matter from the docketing from the case

13   that just doesn't need to be there.  It makes it easy for us in

14   the long run.  So I will encourage to you do that.

15           MR. EDELMAN:  We will take Your Honor's suggestion.

16   What's alleged in the complaint is that Navient Corp and its

17   predecessor signed the servicing agreement with the Department

18   of Education, the actual servicing is carried out by a

19   subsidiary, therefore, the only conceivable relationship

20   between the two is one of agency.

21           THE COURT:  I get your argument on that.  You put

22   that in there.  So that -- I just want you to see -- I have

23   this all the time with insurance companies.  Liberty Mutual is

24   part of Ohio Casualty, part of whatever, and so the question

25   becomes, did you name the L. L. C. or I.N.C., or whatever.  A

34

1  lot of times you'll have nine different names on there, and I

2  want to know the parties ought to be able to sit down and agree

3  whatever the present iteration is, we can stipulate to the fact

4  under this case at this time this is the proper defendant in

5  the case so that no one is in a position of having agreed to

6  something that is detrimental to them in the future by

7  surprise.  But the other side of coin is we get rid of

8  extraneous names we don't need and we don't worry about other

9  matters including discovery on things we don't need to have

10  discovery on in the sense we can get it from whatever the

11  proper party is.

12          I will encourage you to resolve that issue with you

13  can stipulate to is the appropriate party that will satisfy

14  both sides, okay.

15          MS. SIMONETTI:  Okay.

16          THE COURT:  Anything else then that we need to cover

17  here today?

18          MR. EDELMAN:  No, Your Honor.

19          THE COURT:  Okay.  I can't think of anything.  I

20  appreciate your time, effort and preparation.  And I'd like to

21  promise you this will be done very quickly, but I do not like

22  to give out fake news.  We will get to it as soon as we

23  reasonably can.

24          MS. SIMONETTI:  Understood.

25

35

REPORTER'S CERTIFICATE

      I, Laura Boyanowski, RMR, CRR, Official Court Reporter for
the United States District Court for the Middle District of
Pennsylvania, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a true and correct transcript of the
within-mentioned proceedings had in the above-mentioned and
numbered cause on the date or dates hereinbefore set forth; and
I do further certify that the foregoing transcript has been
prepared by me or under my supervision.

                         _____
                         Laura Boyanowski, RMR, CRR
                         Official Court Reporter

REPORTED BY:

      LAURA BOYANOWSKI, RMR, CRR
      Official Court Reporter
      United States District Court
      Middle District of Pennsylvania
      235 N. Washington Avenue
      Scranton, PA  18503

          (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)