# **EXHIBIT L**

```
                  UNITED STATES DISTRICT COURT

                 MIDDLE DISTRICT OF PENNSYLVANIA

JILL BALLARD, REBECCA VARNO,
and MARK POKORNI on behalf of
themselves and the class members
described herein,

         Plaintiffs,            Civil No.

vs.                             3:18-cv-00121-MEM-MCC

NAVIENT CORPORATION,
NAVIENT SOLUTIONS, INC., and
NAVIENT SOLUTIONS, LLC,

         Defendants.

_____




              Deposition of JEFFREY A. STINE

                     June 24, 2022
```

Misty Klapper, RMR, CRR and Notary Public.
484458





(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs     (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas        (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson        (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany           (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai         001+1+800 222 1231 Hong Kong

```
 1    to facilitate the renewal process of an IDR plan,
 2    was that a fairly common occurrence?
 3         A.    I wouldn't say it's neither common
 4    nor uncommon.  I mean, it's a scenario that
 5    happens.  There's multiple scenarios that kind of
 6    occur throughout the, you know, IDR initial
 7    enrollment and reenrollment, recertification.
 8         Q.    Now, discretionary forbearances can
 9    be requested either in writing or orally over the
10    phone; is that right?
11         A.    That's correct.
12         Q.    And as a general practice, has
13    Navient permitted borrowers who have not
14    defaulted on their loans to enroll in
15    discretionary forbearances based on oral
16    affirmation?
17         A.    We have, yes.
18         Q.    Would you agree that when a -- I'm
19    sorry -- when a discretionary forbearance is
20    processed over the phone, that usually involves
21    the IDR renewal process?  Is that fair to say?
22         A.    No, I don't think that's accurate.
23         Q.    Is there another scenario that's more
24    common where someone will request a discretionary
25    forbearance over the phone for a different kind
```

1    of reason?
2        A.    They may request it, you know, on its
3    own just to resolve their current outstanding
4    delinquency without going into an IDR plan. They
5    may request it for, you know, other scenarios if
6    they're going to go into a particular deferment
7    enrollment or if they're looking to consolidate
8    their loans. Generally any time they're talking
9    to the customer service agent, you know, if they
10   are trying to attempt to resolve their
11   delinquency, that -- that could be a solution.
12       Q.    Okay. But based on the scenario you
13   were generally describing earlier, is it fair to
14   say that the IDR renewal process is one of the
15   more common reasons a person might request a
16   discretionary forbearance over the phone?
17       A.    Yes.
18       Q.    When a hardship forbearance -- I'm
19   sorry -- a discretionary forbearance is requested
20   in writing, in your experience, is that also
21   involved with the IBR renewal process or is it
22   less likely that a discretionary forbearance
23   requested in writing has anything to do with the
24   IBR renewal process?
25       A.    That could occur. Generally if it's

```
 1    people's loans balances don't increase while
 2    their loan servicer is doing routine paper
 3    processing; is that your understanding?
 4         A.    Yes.  So the loan balances do not
 5    increase so the customer does not, you know,
 6    incur additional delinquency during that time
 7    period as well.
 8         Q.    Now, the 60-day administrative
 9    forbearance is also different from a
10    discretionary forbearance because the 60-day
11    administrative forbearance does not need to be
12    specifically requested by the borrower.  It
13    should be applied automatically, correct?
14         A.    It does not need to be requested
15    specifically by the customer, no.
16         Q.    And I'm guessing there would be no
17    need to enroll a borrower in a discretionary
18    forbearance during the same period when they're
19    enrolled in a 60-day administrative forbearance;
20    is that right?
21         A.    That is correct.
22         Q.    If that happened, that would cancel
23    out the benefit of the administrative
24    forbearance, correct?
25         A.    Well, you cannot have, you know, two
```

48

```
 1   removed.
 2        Q.    Do you know why that would have
 3   happened?
 4        A.    I'm not sure exactly why that would
 5   have happened, other than the discussion with the
 6   customer as to the period of time to be covered
 7   by that forbearance.
 8        Q.    Now, the 60-day administrative
 9   forbearance was applied in this situation because
10   she was in the process of trying to apply for a
11   change in repayment plan, correct?
12        A.    Correct.
13        Q.    So that administrative forbearance
14   probably should have stayed in place.
15              Would you agree?
16        A.    Yeah, it means she was still
17   intending to submit that documentation.
18        Q.    We talked earlier about whether these
19   verbal forbearances would ever overlap with an
20   administrative forbearance and I know you've
21   testified that that's not typically the case.
22              I mean, considering that it seems to
23   have happened here to some degree, have you ever
24   seen this situation before or is this the first
25   time you've seen this?
```

1      A.     Yeah.  And one thing I would like to
2  correct as well is a previous statement I made
3  with regards to policies and procedures
4  associated with the customer submitting one
5  paystub.
6             And so I incorrectly stated that we
7  would have required or that we should have
8  required two consecutive paystubs.  That would
9  only be necessary in the case where we could not
10 determine the frequency of the pay.
11            But in that case, when you do look
12 closely at the paystub, there is a pay period
13 listed on the paystub.  And so that paystub would
14 have been sufficient for us to determine that
15 there would have been 26 pay periods in a year
16 and determine what a monthly income would have
17 been.
18     Q.     Okay.  So does that mean that looks
19 like another -- a processing error, that that --
20 based on the fact that the pay frequency was
21 indicated on the paystub, that should have been
22 accepted?
23     A.     Correct.
24     Q.     And, Mr. Stine, I actually -- because
25 now we're talking about a paystub that we spoke

145

JEFFREY A. STINE

BARKLEY
Court Reporters

1   about before we took lunch.  So it might be
2   easier to just -- and thank you for correcting
3   the record.  I do appreciate you doing that.
4           Would that have been -- that would
5   have been the first paystub that we looked at
6   during today's -- this might be the easiest way,
7   without having to go back.
8       A.   Yeah.
9       Q.   What you're referring to is the first
10  paystub that she submitted of her husband's
11  income; is that right?
12      A.   That's correct.
13      Q.   Okay.  Then we don't have to go back.
14           MR. FIORENTINO:  Can you display
15      that page again, Cassandra?
16           BY MR. FIORENTINO:
17      Q.   And while we're waiting for that,
18  Mr. Stine, I just want to clarify.  The way that
19  you document pay frequency for the
20  income-sensitive repayment plan, it's basically
21  the same way that you would document it for the
22  income-based repayment plan generally?
23      A.   Generally, yes.  The calculation on
24  income-sensitive is done on a monthly basis.  The
25  calculation for the income-driven repayment plans

146

1   is a little bit differently and usually based on
2   annual salary.  But generally, yes.
3           Q.    Okay.  So we're now on --
4                 MR. FIORENTINO:  Do we need to
5           label this one, Cassandra, or are we still
6           on the same document?
7                 MS. MILLER:  Is this -- if you're
8           still on 186 -- what page number?
9                 MR. FIORENTINO:  Yeah, still on
10          1864.
11                MS. MILLER:  Okay.  So then this is
12          part of Number 26 that was previously
13          marked.
14                BY MR. FIORENTINO:
15          Q.    Okay.  So this is a letter Navient
16  sent to Varno on March 25, 2015.  And this seems
17  to inform her that her income documentation was
18  not acceptable because the borrower has to
19  provide two consecutive paystubs.
20                Now, I think you were just explaining
21  that's only if the paystub on its face does not
22  indicate the pay frequency; is that right?
23          A.    Correct.
24          Q.    Okay.  Do you -- do you feel that the
25  use of this letter in this instance was

```
 1    inappropriate or maybe misapplied, given the
 2    nature of the income documentation she submitted?
 3         A.    Yes, I would agree.
 4               MR. FIORENTINO:  All right.  Let's
 5         go to -- let's go to NSL_VARNO_0002304.
 6               MS. MILLER:  And this is part of
 7         the previously marked Exhibit Number 25.
 8               BY MR. FIORENTINO:
 9         Q.    So here there's an entry in the
10    account history dated April 6, 2015.  Can you
11    just explain that entry, Mr. Stine?
12               There are actually a few.  One of
13    them says, IBR submitted.  Awaiting documentation
14    review.
15               Could you start with that one?
16         A.    Sure.  So looking at that in the
17    entry, it would appear that -- there's nothing
18    that you have before that in addition to the
19    4-6 -- any other 4-6-15 entries associated?  I
20    don't know if you have that.
21               MR. FIORENTINO:  Thank you,
22         Cassandra.
23               THE WITNESS:  Okay.  Yeah, that's
24         fine.  So nothing -- nothing else.  You
25         can scroll forward.
```

148

JEFFREY A. STINE

BARKLEY
Court Reporters

1   document, I recall that the previous verbal
2   forbearance was ending on 3-18.  It is now 4-13.
3   So they're processing this forbearance at that
4   time.
5        Q.    And this is basically to allow for
6   more time for her to gather and submit this
7   documentation to enroll in the repayment plan?
8        A.    Yeah, without -- my recollection is
9   she had not been making any payments.  And so on
10  4-13 she would have been delinquent for her
11  March -- or for her -- she would be coming due
12  for her 4-18 payment.
13       Q.    Now, if the -- if the 60-day
14  administrative forbearance that was put in place
15  on March 11, 2015, if that had remained in
16  effect, she would not have been delinquent at
17  all, right?
18       A.    That's correct.
19       Q.    So it looks like this verbal
20  forbearance, she really didn't need that, right,
21  if the 60-day administrative forbearance had been
22  used?
23       A.    The issue would have been that she
24  submitted the documentation -- yeah, if we apply
25  the administrative 60-day forbearance, the verbal

151

1  forbearance would not have been necessary.
2      Q.   Okay.  So given that this forbearance
3  here wasn't unnecessary, is it your understanding
4  that this might have caused her to incur
5  additional charges that were unnecessary?
6      A.   She would have incurred capitalized
7  interest at the expiration of this forbearance.
8          MR. FIORENTINO:  Let's go to
9      NSL_VARNO_0001869.
10         BY MR. FIORENTINO:
11     Q.   And while this is coming up,
12 Mr. Stine, I think you touched on this earlier,
13 but this whole issue of being enrolled in a
14 verbal forbearance when you're supposed to be in
15 a 60-day administrative forbearance, is this
16 still the first time you've ever seen this
17 situation or is this something you've ever seen
18 on a different account?
19     A.   No, I don't recall seeing this on any
20 other account.
21     Q.   Okay.
22         MR. FIORENTINO:  Is this a new
23     exhibit, Cassandra?
24         MS. MILLER:  Yes.  So this is going
25     to be Exhibit Number 27, which will

152

```
 1          A.      That's correct.
 2          Q.      And the letter -- it also states that
 3   he's going to be paid on a semi-monthly basis.
 4                  Do you see where it says that?
 5          A.      Yes.
 6          Q.      So the letter of hire indicates the
 7   frequency of pay, correct?
 8          A.      Correct.
 9                  MR. FIORENTINO:  Let's go to
10          NSL_VARNO_0002313.
11                  MS. MILLER:  This will be a page in
12          Exhibit Number 30, which was previously
13          marked.
14                  BY MR. FIORENTINO:
15          Q.      So this is another page from the
16   account records.  On May 26, 2016 there's an
17   entry where -- I think there's a typo.  I think
18   it means to says spouse.  It looks like it says
19   spose.  But I think it says, Spouse send in offer
20   letter not accepted, POI.
21                  Do you see where it says that?
22          A.      The date that entry was made again?
23   I'm sorry.
24          Q.      It would be May 26, 2016.
25                  MS. SIMONETTI:  We don't have May
```

184

1          up here.  You have to move it down a
2     little bit.
3               THE WITNESS:  Yeah, I'm looking at
4     April.
5               MR. FIORENTINO:  We should be on
6     2313.
7               MS. MILLER:  Sorry about that.
8               MS. SIMONETTI:  It's okay.
9               MS. MILLER:  There.  That should be
10    the right page.
11              MR. FIORENTINO:  Okay.
12              BY MR. FIORENTINO:
13         Q.   So it's toward the middle of the
14    page, Mr. Stine.  It says spose.  I believe it's
15    supposed to say spouse, but it says, Spouse send
16    in offer letter not accepted, proof of income.
17              Do you see where it says that?
18         A.   Yes.
19         Q.   Can you explain that entry?
20         A.   It looks like they are not accepting
21    the offer letter as proof of income.  POI is an
22    acronym there used.
23         Q.   Do you know why they might have
24    rejected it?
25         A.   I do not.

185

```
 1         Q.    In your own estimation, do you think
 2   it should have been accepted?
 3         A.    I do.
 4         Q.    Okay.
 5               MR. FIORENTINO:  Let's go down
 6         to -- actually, let's just go to Varno
 7         0002389.  No, I'm sorry.  Let's skip that.
 8         I'm going to just try to skip ahead as
 9         much as I can.  I'm just trying to see
10         what I can skip in the interest of time,
11         so just give me one second.
12               Let's go ahead to
13         NSL_VARNO_0002314.
14               MS. MILLER:  This is also part of
15         Exhibit Number 30.  And this is page 2314.
16               BY MR. FIORENTINO:
17         Q.    So there's an entry in the account
18   history dated June 15, which states, IBR
19   submitted, awaiting documentation review.
20               Do you see that?  It's the very top
21   entry.
22         A.    Yes, I see that.
23         Q.    And, Mr. Stine, I just want to
24   clarify for the record, I skipped a bunch of
25   documents just in the interest of time, but just
```

186

```
 1    financial hardship.  Borrower agreed to terms
 2    orally.
 3         Q.   So do you know why this 60-day
 4    administrative forbearance was removed?
 5         A.   So in this case the forbearance was
 6    applied incorrectly.  That was an incorrect
 7    status to use.
 8         Q.   Okay.  But we had discussed earlier
 9    that at this point she's applying to switch her
10    repayment plan from the income-sensitive plan to
11    the income-based repayment plan.
12              And it's my understanding that
13    whenever you're switching repayment plans, you're
14    entitled to that 60-day administrative
15    forbearance.  So I'm just wondering, why was it
16    not appropriate here?
17         A.   Well, what we're referring to right
18    in this particular instance is the prior
19    delinquency that occurred.  So we don't use the
20    60-day administrative forbearance to resolve
21    prior delinquencies.
22         Q.   Okay.  But -- so if on -- on June 22,
23    2016, it was clear by then that she was switching
24    repayment plans, correct?
25         A.   Yeah, the prior -- yeah, we had the
```

190

JEFFREY A. STINE

BARKLEY
Court Reporters

```
 1                 But if they select recertification,
 2      the new payment plan would take effect once the
 3      current plan ends.
 4           Q.    So it's just a different box to check
 5      on the application?
 6           A.    Correct.  I believe it's the first
 7      question on the application, yep.
 8           Q.    And then I'm looking at May 22, 2017.
 9      It looks like there was another verbal
10      forbearance.
11                 Do you see that?
12           A.    Yeah.  I believe they were able to
13      explain to the customer they still had these
14      remaining payments under the current plan.  The
15      customer is not able to afford that payment
16      amount, so they went ahead and processed a verbal
17      forbearance for the remaining -- remaining terms.
18           Q.    If she had done a recalculation at
19      that point, would that have triggered an interest
20      capitalization?
21           A.    No.
22           Q.    Okay.  Because it looks like this was
23      kind of an expensive way to handle this.  If she
24      had said I want a recalculation, they would have
25      gone to zero dollar payments effective
```