# EXHIBIT B

Exhibit B

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL BALLARD, REBECCA VARNO, and MARK POKORNI, on behalf of themselves and the class members described herein, | ) ) ) ) ) | Docket 3:18-cv-00121-MEM-MCC |
| Plaintiffs, | ) ) | (Judge Malachy E. Mannion) |
| v. | ) ) | (Magistrate Judge Daryl F. Bloom) |
| NAVIENT CORPORATION, NAVIENT SOLUTIONS, INC., and NAVIENT SOLUTIONS, LLC, | ) ) ) | ELECTRONICALLY FILED |
| Defendants. | | |

### (Proposed) THIRD AMENDED COMPLAINT – CLASS ACTION

1.      Plaintiffs Jill Ballard, Rebecca Varno, and Mark Pokorni bring suit against Defendants, NAVIENT CORPORATION, NAVIENT SOLUTIONS, INC., and NAVIENT SOLUTIONS, LLC, alleging that Defendants 1) breached their servicing contract with the federal government, of which Plaintiffs were third party beneficiaries; 2) breached and/or tortiously interfered with written agreements between the federal government and Plaintiffs; and 3) violated various state and federal laws in connection with the servicing of Plaintiffs' federal student loans.  Plaintiffs allege the following upon personal knowledge as to themselves, and upon information and belief as to all other matters, based on, among other things, the investigation of their counsel.

## NATURE OF THE ACTION

2.     Student loan debt is now the largest category of non-housing related consumer debt in the United States with more than $1.34 trillion outstanding at the end of June 2017. The overwhelming majority of student loans in the United States are owned or guaranteed by the federal government through the U.S. Department of Education.

3.     Since June 2009, Defendant Navient Corp. and its predecessors in interest, through their subsidiaries, Navient Solutions, LLC ("NSL") and Navient Solutions, Inc. ("NSI") acting in the capacity of agents on behalf of their principal, Navient Corp., have served as one of four primary servicers of federal student loan debt.

4.     Loan servicers who contract with the Department of Education perform all tasks associated with loan repayment, such as collecting payments, responding to customer service inquiries, providing loan documents to borrowers, handling applications for loan deferment or forbearance based on financial hardship, and administering repayment programs designed to help borrowers effectively manage the increasing cost of higher education. These programs include the various Income-Driven Repayment Plans ("IDR plans") offered by the federal government, which provide qualifying borrowers with relief from student loan debt by adjusting their payments to a reasonably affordable amount based on

their income, occupation, and family size. Borrowers enrolled in IDR plans can also apply to have their federal loans forgiven after a certain number of payments.

5.      Navient Corp. and its predecessors in interest, and/or their duly appointed agents, NSL and NSI, received and continue to receive monthly servicing fees for the federal loans that they administer.  Thus, Navient Corp. has a strong financial interest in keeping loans active for as long as possible to continue collecting these monthly fees.  To that end, Navient Corp. and its predecessors in interest, through their duly appointed agents, NSL and NSI, delayed or failed to process IDR plan applications in order to generate additional monthly servicing fees.  Because loan payments only count toward forgiveness once a borrower's application is processed, this practice extended the duration of loans in the various IDR programs, and injured borrowers who were required to make additional payments on loans that otherwise would have been forgiven at an earlier date.

6.      Navient Corp. and its predecessors in interest, through their duly appointed agents, NSL and NSI, also improperly placed borrowers making timely loan payments into deferment or forbearance status – a designation typically reserved for situations where the borrower seeks relief from its payment obligations due to financial hardship. Borrowers who are in deferment or forbearance cannot make qualifying payments that count towards loan forgiveness under the various IDR plans, even though Navient Corp. continues to collect fees

3

for servicing their loans.   Thus, Navient Corp.'s abuse of the deferment and forbearance process, through its agents, NSL and NSI, improperly increased Navient Corp.'s revenue and extended the duration of the borrowers' loans in the various IDR programs. Moreover, at the conclusion of each forbearance, any accrued interest is "capitalized," or added to the borrower's principal loan balance, which may increase the borrower's debt considerably.   Thus, Navient Corp.'s abuse of the forbearance process, through its agents, NSL and NSI, improperly increased the principal loan balance of its borrowers, putting them deeper and deeper into debt.

      7.     Navient Corp. had a financial incentive to increase its borrowers' loan balances because two of its subsidiaries – Pioneer Credit Recovery ("Pioneer") and General Revenue Corporation ("GRC") – provide collection and rehabilitation services on defaulted federal student loans.   Under the current compensation structure for companies that provide such rehabilitation services, collectors earn nearly $40 in compensation for every $1 in cash recovered through certain rehabilitations. *See* Annual Report of the CFPB Ombudsman, October 2016, p.5 available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/102016_cfpb_Transmittal_DFA_1035_Student_Loan_Ombudsman_Report.pdf (last visited May 11, 2018). Federal law also permits collectors to recover "reasonable collection costs" from a borrower by assessing a fee of up to 16

percent of the unpaid principal and accrued interest. *Id*. In other words, the higher the principal balance is on a defaulted loan, the more Pioneer and GRC are paid for collecting that loan. Thus, Navient Corp. had a financial incentive to increase borrowers' loan balances, making its collection and rehabilitation services more profitable if and when borrowers went into default.

8.    According to an analysis by the Consumer Federation of America, more than 3,000 borrowers default on their federal student loans every day. *See* Tom Anderson, *More than 1.1 million borrowers defaulted on their federal student loans last year*, CNBC, available at https://www.cnbc.com/2017/03/14/more-than-11-million-borrowers-defaulted-on-their-federal-student-loans-last-year.html (last visited May 11, 2018). Moreover, the number of people who have defaulted on their federal student loans increased by seventeen percent from 2015 to 2016. *Id*. Thus, by increasing student loan balances across the board, Navient Corp., through its agents, NSL and NSI, was able to generate far higher collection fees on the many loans that defaulted. Accordingly, the CFPB has raised the question of "whether the economic incentives that drive collector and servicer practices throughout the default-to-IDR transition are properly aligned." *See* Annual Report of the CFPB Ombudsman, October 2016, available at https://www.consumerfinance.gov/about-us/blog/cfpb-ombudsmans-office-2016-annual-report/ (last visited May 3, 2018).

5

9.     Reports published by the Consumer Financial Protection Bureau ("CFPB") describe complaints from borrowers nationwide of identical, widespread misconduct by Navient in its exploitation of the various IDR programs. Specifically, the Student Loan Ombudsman of the Consumer Financial Protection Bureau ("CFPB") received 3,900 complaints from federal student loan borrowers between March 1, 2016 and August 31, 2016 relating to problems managing or repaying federal student loans. *See* Annual Report of the CFPB Ombudsman report, October 2016, available at https://www.consumerfinance.gov/about-us/blog/cfpb-ombudsmans-office-2016-annual-report/ (last visited May 3, 2018). An analysis of these complaints found that consumers with student loans identified a range of problems with customer service, borrower communications, and IDR plan enrollment. *Id.*

10.     An analysis of 1,062 consumer complaints made against the top ten student loan servicers found that the most commonly cited issue was problems involving the processing and management of IDR plans. *Id.* Indeed, 12% of all borrower complaints filed against Navient between March 1, 2016 and August 31, 2016 related to the processing and management of IDR plans. *Id.*

11.     Between March 1, 2016 and August 31, 2016, the CFPB received more complaints from federal student loan borrowers against Navient than against any other loan servicer, with a total of 812 complaints. *Id.*

6

12.     Between September 1, 2016 and August 31, 2017, the CFPB handled approximately 12,900 federal student loan complaints.  *See* Annual Report of the CFPB Ombudsman report, October 2017, available at https://www.consumerfinance.gov/data-research/research-reports/annual-report-cfpb-student-loan-ombudsman-2017/. According to the CFPB's report of these complaints, *"*borrowers seeking to enroll in IDR plans submitted complaints to the Bureau describing a range of servicing practices that delayed or deterred access to promised payment relief."  *Id*.  A recurring complaint detailed in the report was student loan servicers' "unfair practice of denying, or failing to approve, IDR applications that should have been approved on a regular basis." *Id.* One specific example of this was Navient's practice of rejecting forms income documentation that were acceptable under federal guidelines.

13.     Between September 1, 2016 and August 31, 2017, the federal loan servicer that generated the highest number of written complaints from its borrowers was "Navient," with a total 6,274 complaints, which accounted for 61% of all complaints made by federal student loan borrowers.  *Id*.

14.     The CFPB's 2017 report also noted the following: "Borrowers report experiencing servicing obstacles when trying to enroll in an IDR plan, such as unexpected delays, lost paperwork, poor customer service, and inconsistent application processing. Borrowers describe how these obstacles can increase loan

costs, reduce benefits, and extend repayment terms for consumers." *Id*.

15. The aforementioned practices caused borrowers to suffer measurable financial harm when: (a) the duration of their loans was extended; (b) interest accrued on the principal balance of loans during unnecessary periods of deferment or forbearance; (c) monthly payments under IDR programs were billed at inaccurate levels; and (d) borrowers were charged additional fees due to the delay in processing their applications for IDR programs. As a result, Plaintiffs and the Class have: lost out on months or years of qualifying loan payments that would have brought them closer to loan forgiveness under their IDR programs; been overcharged; or been otherwise disadvantaged when they were unable to utilize federal programs designed to make their education more affordable.

16. Based on the continuing complaints described by the CFPB and pervasive nature of the misconduct set forth herein, Plaintiffs believe that further evidentiary support for their claims will be revealed after a reasonable opportunity for discovery.

## PLAINTIFF – JILL BALLARD

17. Jill Ballard is a resident of San Diego, California, where she resided at all times relevant hereto. Between 2004 and 2008 she took out a series of federal "Stafford" loans. Each of these loans is governed by a federal promissory note,

attached as Exhibit A.  The promissory note states that it is to be governed by applicable federal law, as well as state law that is not preempted by federal law.

### PLAINTIFF – REBECCA VARNO

18.    Rebecca Varno is a resident of Schenectady, New York, where she resided at all times relevant hereto.  In 2006, she combined her multiple federal student loans into a federal consolidation loan.  The terms of the consolidation loan are set forth in a federal promissory note, attached as Exhibit B.  The note provides that it is to be governed by applicable federal law, as well as state law that is not preempted by federal law.

### PLAINTIFF – MARK POKORNI

19.    Mark Pokorni is a resident of Chicago, Illinois, where he resided at all times relevant hereto.  In 2006, he combined his multiple federal student loans into a federal consolidation loan.  The terms of the consolidation loan are set forth in a federal promissory note, attached as Exhibit C. The note provides that it is to be governed by applicable federal law, as well as state law that is not preempted by federal law.

### DEFENDANTS

20.    In 1972, Congress created a government sponsored enterprise ("GSE"), the Student Loan Marketing Association (commonly referred to as "Sallie Mae"), to support the guaranteed student loan program created by the

Higher Education Act of 1965 ("HEA"). In 1984, Sallie Mae became a publicly-traded company, trading under the ticker symbol SLM.

21.   In or around 1997, SLM Holding Corporation was established, marking the beginning of Sallie Mae's transition from a GSE to a private company. As part of that process, SLM Holding Corporation eventually became SLM Corp.

22.   By 2004 Sallie Mae had become fully privatized, with SLM Corp. as the parent company of Sallie Mae Inc., a subsidiary that was responsible for most of the company's federal loan servicing and collections businesses.

23.   From 2004 until April 2014, SLM Corp. and its subsidiaries operated through one corporate structure that originated loans issued under the Federal Family Education Loan Program ("FFELP"). SLM Corp. developed and implemented lending policies; marketed student loan packages to schools and students; funded and distributed loans; and serviced and collected loans. In 2014, however, these business activities were split into two separate corporate structures.

24.   In April of 2014, the former SLM Corporation separated into two publicly-traded entities: Defendant Navient Corporation ("Navient Corp."), a loan servicing and debt collection business, and a new SLM Corporation, a private student lending business.

25.     According to Navient Corp.'s Section 10-K filings with the Securities and Exchange Commission, SLM Corp. was merged into a limited liability company and became a subsidiary of Navient Corp., changing its name to "Navient, LLC."  On October 16, 2014, Navient, LLC was merged with and into Navient Corp., which became the surviving corporation.

26.     Navient Corp. is an independent, publicly traded company that operates the loan management, servicing and asset recovery businesses previously operated by SLM Corp.

27.     According to Navient Corp.'s Section 10-K filings with the Securities and Exchange Commission, Navient Corp. is comprised primarily of a portfolio of education loans that were previously held by SLM Corp., as well as servicing and asset recovery activities related to those loans.

28.     Pursuant to the terms of the 2014 split, Navient Corp. assumed responsibility for liabilities resulting from the pre-reorganization conduct of SLM Corp. and its subsidiaries related to the servicing of federal student loans.

29.     The 2014 corporate split provided for the transfer of Sallie Mae, Inc. – which had previously been responsible for most of SLM Corp.'s loan servicing and collections businesses – to Navient Corp. and its subsidiaries. Sallie Mae, Inc. then changed its name to Navient Solutions, Inc. (''NSI'').

11

30.     According to Navient Corp.'s Section 10-K filings with the Securities and Exchange Commission, NSI, which is a wholly owned subsidiary of Navient Corp., serviced substantially all of the latter's education loans.

31.     As of January 31, 2017, in connection with an internal corporate reorganization, NSI changed its name to Navient Solutions, LLC ("NSL").

32.     Navient Corp.'s 2014 10-K filings with the SEC, available at https://www.sec.gov/Archives/edgar/data/1593538/000119312515070145/d832950 d10k.htm (last visited May 3, 2018), includes the following statements regarding Navient Corp.'s loan servicing operations:

a.      "Since the second quarter of 2009, we have been one of four large servicers awarded a servicing contract by ED to service federal loans owned by ED. We service approximately 6.2 million accounts under this servicing contract as of December 31, 2014. The servicing contract spans five years with the possibility of one five-year renewal at the option of ED. On August 27, 2014, ED extended its servicing contract with Navient to service federal loans for five more years." *Id*. at 8.

b.      "Navient services its own portfolio of education loans, as well as those owned by banks, credit unions, non-profit education lenders and ED. Navient is one of four large servicers to ED under its Direct Student Loan Program ("DSLP")." *Id.*

12

c.    "Navient services loans for more than 12 million [Direct Student Loan Program] Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts serviced under Navient's contract with ED." *Id* at 4.

d.    "We have been a partner in ED's campaign to inform federal student loan customers about income-driven repayment plans, and have played a leadership role in helping customers understand their options and make an informed choice." *Id*.

e.    "Navient is currently the largest servicer and collector of loans made under the FFELP program, and the majority of our income has been derived, directly or indirectly, from our portfolio of FFELP Loans and servicing we have provided for FFELP Loans." *Id*. at 6.

## JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of proposed classes each in excess of 100 members; the aggregate claims of the Class members exceed $5 million exclusive of interest and costs; and one or more of the members of each Class is a citizen of a different state than one or more Defendants.

13

**PERSONAL JURISDICTION**

34.    SLM Corp. was a signatory to a 2009 servicing contract with the Department of Education, under which Plaintiffs' federal student loans were serviced.    *See* Exhibit D, page 1 (designating "SLM Corporation" as the "contractor/offeror.")    On the contract, SLM Corp. listed its address as, "c/o Monetary Processing, P.O. Box 4600, Wilkes Barre, PA 187734600." *See id*.

35.    As part of SLM Corp.'s 2014 corporate reorganization, SLM Corp. was merged into a limited liability company and became a subsidiary of Navient Corp., changing its name to "Navient, LLC."

36.    On August 27, 2014, Navient, LLC entered into a written agreement with the Department of Education, modifying and extending the 2009 servicing contract.    *See* 2014 Modification of Contract, attached as Exhibit E. On the contract, Navient, LLC listed its address as, "c/o Monetary Processing, P.O. Box 4600, Wilkes Barre, PA 187734600." *See id*.

37.    On October 16, 2014, Navient, LLC was merged with and into Navient Corp., which became the surviving corporation.  As a result of this merger, the assets and liabilities associated with the loan management and servicing businesses of SLM Corp. – and subsequently of Navient, LLC – were transferred directly to Navient Corp.  Thus, Navient Corp. is the direct successor of interest in

the 2009 servicing contract, as modified and extended in 2014, and is liable for any breaches thereof, both before and after, by its own acts or those of its agents.

38.    NSL and NSI are subsidiaries of Navient Corp. that acted in the capacity of agents on behalf of their principal, Navient Corp., in the performance of the latter's obligations under the servicing contract.

39.    Pursuant to their obligations under the servicing contract, Navient Corp. and/or its predecessors in interest, through their duly appointed agents, NSL and NSI, have purposefully availed themselves of the privilege of conducting business in this District in the following ways:

a.    servicing Plaintiffs' loans in this District;

b.    directing Plaintiffs to send account-related correspondence to this District;

c.    processing Plaintiffs' loan payments in this District;

d.    processing Plaintiffs' repayment plan applications in this District; and

e.    providing Plaintiffs with telephone customer assistance from this District.

40.    Plaintiffs' causes of action arise from the following commercial activities that Navient Corp. and/or its predecessors in interest have

purposefully directed to, and performed within, this District through their duly appointed agents, NSL and NSI:

a. Improperly delaying the processing of Plaintiff Jill Ballard's IDR plan renewal application in November and December of 2013 (*see* Jill Ballard's letter to "Sallie Mae" dated February 11, 2014, attached as Exhibit F);

b. Improperly cancelling Plaintiff Jill Ballard's income-driven repayment amount in 2014 in violation of federal law;

c. Improperly billing Plaintiff Jill Ballard an excessive amount of $902.55 in 2014 in violation of federal law;

d. Improperly delaying the processing of Plaintiff Rebecca Varno's IDR application in 2017 (*see* Rebecca Varno's IDR plan request dated April 18, 2017, attached as Exhibit G);

e. Improperly cancelling Plaintiff Rebecca Varno's income-driven repayment amount in 2017 in violation of federal law;

f. Improperly placing Plaintiff Rebecca Varno's loans into forbearance status pursuant to a phone call with a Navient representative that took place at a call center located in Wilkes-Barre, Pennsylvania, which was owned and operated by Navient Corp. and/or its agents, NSL and NSI; and

g.    Improperly delaying the processing of Plaintiff Mark Pokorni's IDR plan application  in February of 2016.

41.    In addition to the foregoing, Navient Corp. and/or its predecessors in interest, through their duly appointed agents, NSL and NSI, have maintained regular, continuous, and systematic contacts with citizens of this District in the following ways:

a.    operating a major national call center in Wilkes-Barre, Pennsylvania, where customer service representatives provide student loan borrowers with telephone assistance;

b.    maintaining offices in Wilkes-Barre, Pennsylvania, where loan servicing functions, such as the processing of payment and borrower applications, are performed; and

c.    receiving and processing mail in Wilkes-Barre, Pennsylvania, where borrowers are directed to send loan payments, repayment plan applications, and all account-related correspondence.

## **VENUE**

42.    Venue is proper in this District pursuant to 28 U.S.C. § 139l(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in this District, as set forth above.

17

## SUBSTANTIVE ALLEGATIONS

43.    The average annual cost of higher education in the United States has increased at a significantly greater rate than inflation for several decades. For example, a recent study by the College Board shows that the inflation-adjusted cost of attending a private four-year, public four year, or public two-year institution has more than tripled since 1970.  See *Tuition and Fees and Room and Board over Time*,  Table  2,  (Released  2017),  The  CollegeBoard,  available  at https://trends.collegeboard.org/college-pricing/figures-tables/tuition-fees-room-and-board-over-time (last visited May 3, 2018).

44.    Students have increasingly come to rely on student loans to pay for their higher education.  The overwhelming majority of student loans in the United States are owned or guaranteed by the federal government through the U.S. Department of Education.  They come with an array of repayment options to fit a student borrower's short-term and long-term needs.

45.    The "standard repayment plan" for federal student loans is the default payment plan.  Under the standard repayment plan, monthly payments are calculated such that the borrower's balance is fully paid within 10-30 years. Many borrowers who cannot afford payments under the standard plan enroll in various IDR plans that offer significantly lower monthly payments.  For instance, under the "Income Based Repayment" plan, the borrower's monthly payments are

capped at fifteen percent of discretionary income, and the remaining debt is discharged after twenty-five years of qualifying payments. Under some IDR plans, monthly payments can be as low as zero dollars per month.

46.    When borrowers enroll in an IDR plan, the plan is effective for a one-year period. To renew the plan for each subsequent year, borrowers must annually recertify their income by submitting a new IDR request form with proof of income to their loan servicer.

47.    Two to three months prior to the expiration of the IDR plan, the loan servicer must send the borrower a written notice of the "annual deadline" by which the borrower must recertify the plan in order to continuing making income-driven payments. This notice must include the consequences of failing to renew the IDR plan by the stated deadline. One of these consequences includes an increase in monthly payments from a low affordable amount to the amount dictated by the standard ten-year repayment plan. *See* 34 C.F.R. § 682.215 (e)(7). Additionally, any accrued interest is capitalized, or added to the borrower's principal loan balance, when an IDR plan is not timely renewed before its expiration. *See* 34 C.F.R. § 682.215 (b)(5).

48.    In view of these consequences, federal law provides certain protections for borrowers enrolled in IDR plans. First, when the loan servicer receives a borrower's timely request to renew the plan, the loan servicer is

prohibited from cancelling the borrower's income-driven payment amount while the request is being processed. Rather, the loan servicer "must maintain the borrower's current scheduled monthly payment amount" until the request has been fully processed. *See* 34 C.F.R. § 682.215 (e)(8)(ii). Second, the loan servicer must "promptly" determine the new monthly payment amount. *See* 34 C.F.R. § 682.215 (e)(8)(i). To that end, the Department of Education has directed loan servicers to process IDR requests within 10-15 business days. *See* Danielle Douglas-Gabriel, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*. Washington Post, Apr. 5, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/04/05/delays-backlogs-confusing-applications-obamas-latest-student-loan-plan-is-having-growing-pains/?utm_term=.194acfbabf88 (last visited May 21, 2018); *see also* U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on Policy Direction on Federal Student Loan Servicing (July 20, 2016), available at http://www2.ed.gov/documents/press-releases/loanservicing-policy-memo.pdf. (last visited May 3, 2018).

49.     In contrast to IDR plans, which provide affordable monthly payments, borrowers may have their loans placed into discretionary forbearance status. *See* 34 C.F.R. §682.211(a). This allows borrowers to temporarily cease making

payments during periods of hardship.[1]  *See id*.  A loan servicer may only apply a discretionary forbearance "upon receipt of a request and sufficient supporting documentation from a borrower." *See* 34 CFR § 682.211 (h)(2).

50.    The only time a discretionary forbearance may be applied *without* the borrower's written consent is after the borrower's loans have gone into default status, but before the loans have been transferred to collections. *See* 34 CFR § 682.211 (d)(1). In this situation, a limited, 120-day forbearance may be based on the borrower's "oral affirmation." *Id*. at (d)(2)(i).

51.    Discretionary forbearances, however, delay progress toward loan forgiveness and can be very costly for borrower.  This is because any unpaid interest that accrues during the forbearance gets "capitalized," or added to the borrower's loan balance.  *See* 34 C.F.R. 682.211(a)(4).

52.    On the other hand, there is one type of forbearance that is specifically authorized when a non-defaulted borrower's IDR application is being processed: a 60-day administrative forbearance when the loan servicer is processing paperwork in connection with a borrower's request to make a "change in repayment plan." *See*

---

[1] Although the regulation does not use the word "discretionary," Navient uses the term "discretionary hardship" when referring to forbearances used when a borrower is "unable to make their payments" due to "financial hardship." (Stine dep., p. 33, ll. 2-12). Accordingly, Plaintiffs use the term "discretionary forbearance" when referring to forbearances based on the borrower's financial hardship.

34 CFR 682.211(f)(11). With an administrative forbearance, any interest that accrues during the 60-day forbearance period "is not capitalized." *Id*.

53. <u>Enrolling borrowers in discretionary forbearances is</u> highly lucrative for the loan servicer because they extend the period of repayment, generating additional monthly servicing fees.  Moreover, for loan servicers that also provide collection and rehabilitation services for defaulted loans, the capitalization of interest after a discretionary forbearance increases the collection costs that may later be assessed on the borrower if and when the loan goes into default.

### NAVIENT CORP.'S CONTRACT WITH THE DEPARTMENT OF EDUCATION

54. The Department of Education awarded SLM Corp. a servicing contract in 2009 ("servicing contract"). *See* servicing contract attached as Exhibit D.  The servicing contract continues to be in force to the present, subject to various modifications.  As a result of the 2014 corporate reorganization, Navient Corp. became the entity directly responsible for fulfilling the obligations owed to the Department of Education under the servicing contract.

55. The servicing contract requires Navient Corp. to maintain a full understanding of all applicable federal regulations, meet all statutory and legislative requirements, and ensure that all aspects of the service continue to remain in compliance as changes occur.  It also states that borrowers whose loans are not being serviced in compliance with the "requirements, policy and

22

procedures" for servicing federally held debt will not be billable to the Government from the initial point of non-compliance. *Id*. at page 12.

56.    Under the servicing contract, the Department of Education pays Navient Corp. and/or its agents, NSL and NSI, an average monthly fee for each of the borrowers that Navient Corp. services. That fee depends on the status of the loan and the total volume of loans from the category being serviced. For example, the contract's fee schedule is represented in the table below. This table includes a "unit price," or monthly payment due to the loan servicer, for loans in seven different status categories, including "in-school status," "grace or current repayment status," "deferment or forbearance," and varying durations of delinquency:

**FIGURE 1**

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in in-school status | N/A | N/A | $1.05 |
| Borrowers in grace or current repayment status | 1 | 3,000,000 | $2.11 |
| | 3,000,001 | UP | $1.90 |
| Borrowers in deferment or forbearance | 1 | 1,600,000 | $2.07 |
| | 1,600,000 | UP | $1.73 |
| Borrowers 31-90 days delinquent | N/A | N/A | $1.62 |
| Borrowers 91-150 days delinquent | N/A | N/A | $1.50 |
| Borrowers 151-270 days | N/A | N/A | $1.37 |

| delinquent | | | |
|---|---|---|---|
| Borrowers 270+ days delinquent | N/A | N/A | $0.50 |

57.     As illustrated in Figure 1, Navient Corp. and/or its agents, NSL and NSI, are compensated on a "per unit" basis, with a directly proportional relationship between revenue and the number of borrowers that maintain an active loan balance. This fee structure gives Navient Corp. a financial incentive to maintain or increase the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans. These loan programs are supposed to benefit borrowers by making higher education more affordable. However, helping borrowers get out of debt sooner directly conflicted with Navient Corp.'s own financial interest in keeping loans active for as long as possible to continue collecting monthly servicing fees.  In other words, while borrowers enroll in IDR plans to earn loan forgiveness, and maintain affordable monthly loan payments, Navient Corp. has the opposite incentive: to keep loans active for as long as possible to continue earning servicing fees.  From Navient Corp.'s perspective, every time a borrower repays her loan in full, or receives loan forgiveness under one of the federal programs it administers, Navient Corp. loses a loan from its servicer portfolio, a vital source of its revenue.

58.     The servicing contract also created a financial incentive to place borrowers into deferment or forbearance status to further increase servicing fees. For example, Figure 1 shows that the unit price paid to Navient Corp., and or its agents, NSL and NSI, for servicing each loan depends on its status (*e.g.*, current repayment, deferment, or forbearance) and the total number of loans in its portfolio that are part of the same category.  Under the fee schedule, once the total amount of loans in active repayment or grace period status exceeded 3,000,001, Navient Corp. received a *lower* unit price per loan than it did for loans in deferment or forbearance. Thus, once the 3,000,001-loan threshold was reached, each loan that Navient Corp. moved from active repayment or grace period status into deferment or forbearance generated additional revenue, even though this move prevented borrowers from making qualified payments toward loan forgiveness. (The Department of Education subsequently revised the contract in 2014 to remove this incentive by lowering the amount it paid for loans in deferment or forbearance to an amount below that of loans in active repayment.  However, it maintained the same overall structure of compensating Navient Corp. based on the number of loans in its portfolio, continuing to motivate Navient Corp. to ensure that borrowers remained in debt as long as possible.)

59.     The failure of Navient Corp., through its agents, NSL and NSI, to timely and properly process IDR plan applications deprived borrowers of the

opportunity to make qualifying monthly payments that count toward loan forgiveness. To accommodate these processing delays, and increase its own revenue, Navient Corp., through its agents, NSL and NSI, puts borrowers' accounts into deferment or forbearance status under circumstances that are not permitted by federal law, which prevented these borrowers from making monthly payments. These borrowers have therefore lost out on months or years that would otherwise count toward achieving loan forgiveness.

## CLASS REPRESENTATIVE ALLEGATIONS – JILL BALLARD

60.   Jill Ballard's college education was financed by federal loans issued pursuant to the FFELP program.  She completed her college education in 2008, and her loans went into deferment status until 2012, at which time she entered into repayment.  At or around that time, Ms. Ballard submitted an IDR request form and proof of income to her designated loan servicer, SLM Corp., which serviced her loans through its agent/subsidiary, Sallie Mae, Inc.  Ms. Ballard sent her IDR request to Post Office Box 9500 in Wilkes-Barre, Pennsylvania, the address designated as Sallie Mae's correspondence address.

61.   Sallie Mae processed Ms. Ballard's IDR request at its offices in Wilkes-Barre, Pennsylvania.  The request was approved, and Ms. Ballard was enrolled in the Income-Based Repayment Plan (IBR plan), with monthly payments based on her income level.  The IBR plan would remain in effect for one year, and

would expire on January 22, 2014 unless timely renewed.  The deadline to renew the plan for the following year was December 18, 2013.  Several weeks prior to the annual deadline, Ms. Ballard mailed in her IDR renewal form to Post Office Box 9500 in Wilkes-Barre, Pennsylvania.

62.  In early February of 2014, SLM Corp., through its agent, Sallie Mae Inc., sent Ms. Ballard a letter notifying her that her income-based payments were cancelled because she did not submit her IDR renewal request before the annual deadline.  The letter indicated that Ms. Ballard would now be required to make monthly payments of $902.55 (under the standard ten-year repayment plan) beginning on February 22, 2014.  Accordingly, Ms. Ballard sent a one-time payment of $902.55 to Sallie Mae Inc.'s "Borrower Payment Address" of Post Office Box 9533 in Wilkes-Barre, Pennsylvania, where said payment was processed.

63.  On February 11, 2014, Ms. Ballard sent an additional IDR request form to Post Office Box 9500 in Wilkes-Barre, Pennsylvania, the address designated as Sallie Mae's correspondence address.  The request form was accompanied by a letter explaining that Ms. Ballard had already mailed in these materials several weeks earlier.  *See* Jill Ballard's letter to "Sallie Mae" dated February 11, 2014, attached as Exhibit F.  SLM Corp. received and processed Ms.

Ballard's second IDR request at its offices in Wilkes-Barre, and the IDR plan was eventually renewed.

64.    On November 26, 2017, Navient sent Ms. Ballard an account summary which showed $15,295.10 in capitalized interest.  *See* November 26, 2017 statement, attached as Exbibit H.  This figure included $4,686.57 that was added to Ms. Ballard's principal loan balance as a result of Navient's processing delay in 2014.

65.    In or around November of 2017, Ms. Ballard called the customer service telephone line of Navient, which had since replaced SLM Corp. as her loan servicer, to inquire as to the basis of this charge. She spoke with a Navient representative employed at Navient's call center in Wilkes-Barre, Pennsylvania. The representative informed Ms. Ballard that she incurred an "interest capitalization" because her IDR plan was not renewed prior the annual deadline. The representative also advised that the IDR request form that Ms. Ballard submitted in 2013 was received on November 25, 2013, well before the renewal deadline.   Nonetheless, $4,686.57 was added to Ms. Ballard's principal loan balance because SLM Corp., through its agent, Sallie Mae. Inc., failed to timely process her IDR request.

66.    In or around December of 2017, Ms. Ballard sent a written complaint to Post Office Box 9600 in Wilkes-Barre, Pennsylvania, the correspondence

28

address for Navient's Office of Consumer Advocate.  The letter indicated that the interest capitalization in the amount of $4,686.57, which was processed on January 22, 2014, was in error.  *See* Jill Ballard's letter to Sallie Mae, attached as Exhibit F.

67.   Ms. Ballard's complaint was reviewed and processed at Navient's "Office of the Customer Advocate" in Wilkes-Barre, Pennsylvania.  On December 20, 2017, Jeri N. Russell, a representative from this office, informed Ms. Ballard in writing that the interest capitalization of $4,686.57 was determined to be improper, and that this amount would be deducted from her principal loan balance.  *See* Letter from Jeri N. Russell, attached as Exhibit I.  The refund was processed at Defendants' offices in Wilkes-Barre, Pennsylvania.

68.   On December 25, 2017, Navient Corp., individually or through its agent, NSL, sent Ms. Ballard a billing statement showing an unpaid principal balance of $85,852.85.  *See* December 25, 2017 Account Statement, attached as Exhibit J.  This amount reflected a reduction in principal of $4,276.70 as compared to her previous account statement.  Thus, Navient Corp. failed to refund the full $4,686.57 that it had promised to refund.  Moreover, Navient Corp. has not offered to refund Ms. Ballard's one-time payment of $902.55, for which she was improperly billed.

69.   Under federal law, if a loan servicer receives a borrower's IDR renewal application prior to the annual deadline, the loan servicer is prohibited

from switching the borrower to the standard ten-year plan while it processes the application.  Rather, the servicer must maintain the borrower's current scheduled monthly payment amount until the new monthly payment amount is calculated. *See* 34 C.F.R. § 682.215 (e)(8)(ii).  Ms. Ballard timely submitted her IDR renewal application, but her income-driven payments were nonetheless cancelled due to the processing delays of Navient Corp., through its agents, NSL and NSI, and/or Navient Corp.'s predecessors in interest.  This improper removal violated 34 C.F.R. § 682.215 (e)(8)(ii).

70.     By failing to promptly and efficiently process Ms. Ballard's IDR renewal application, Navient Corp., through its agents, NSL and NSI, and/or its predecessors in interest, violated 34 C.F.R. § 682.215 (e)(8)(i).

71.     Because the servicing contract requires compliance with all applicable federal regulations, the aforementioned violations also constitute a breach of the servicing contract, of which Ms. Ballard was an intended third-party beneficiary.

72.     Because Ms. Ballard's promissory note requires compliance with federal law, these statutory violations, committed by Navient Corp., through its agents, NSL and NSI, and/or its predecessors in interest, constituted intentional and tortious interference with the promissory note.

### CLASS REPRESENTATIVE ALLEGATIONS – REBECCA VARNO

73.    In 2016, Rebecca Varno applied to enroll in the Income-Based Repayment plan ("IBR plan") by sending an IDR request form to Navient Corp. and/or its agents, NSL and/or NSI, at their offices in Wilkes-Barre, Pennsylvania.

74.    Navient rejected Varno's application because it was accompanied by only by a single pay statement, rather than two consecutive paystubs. However, federal guidelines require only one piece of documentation per source of income.

75.    Because Varno's first application was improperly rejected, she submitted a second IDR request form with additional proof of income. The second request was approved, and Ms. Varno was enrolled in an IBR plan with monthly payments of approximately $710 per month.  The plan was to remain in effect for a one-year period.

76.    In April of 2017, Ms. Varno submitted an IDR renewal application to Navient's Department of Education Loan Servicing, Post Office Box 9760 in Wilkes-Barre, Pennsylvania, in order to renew her IBR plan for the following year. The IDR request was accompanied by proof of her and her spouse's income.  *See* Rebecca Varno's IDR plan request dated April 18, 2017, attached as Exhibit G. These materials were received by Navient Corp. and/or its duly appointed agent, NSL, prior to the annual renewal deadline.

77.     In May of 2017, Ms. Varno called the Navient customer service line to inquire as to the status of her IBR plan.  A Navient representative, speaking to Ms. Varno from Defendants' call center in Wilkes-Barre, Pennsylvania, informed Ms. Varno that her renewal application had been approved, but it would not be "applied to her account" for several more months.  Until such time, Ms. Varno's monthly payment amount would be increased to approximately $1,800 under the standard repayment plan. Because she could not afford payments in that amount, Navient Corp., through its duly appointed agent, NSL, placed Ms. Varno's loans into forbearance status until her IBR plan was renewed, even though she never submitted a written request for the forbearance.  This action was taken by Navient Corp., through its agent, NSL, at their offices in Wilkes-Barre, Pennsylvania.  All interest that accrued during this forbearance period was capitalized, or added to Ms. Varno's principal loan balance.

78.     Navient Corp., through its duly appointed agent, NSL, processed Ms. Varno's IDR request at their offices in Wilkes-Barre, Pennsylvania.  They did not, however, renew Ms. Varno's IBR plan until July 16, 2017 – nearly three months after her IDR request had been received – even though the Department of Education had previously directed federal loan servicers to process these requests within 10 business days.  *See* Memo from Ted Mitchell, Undersecretary of

Education, available at https://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf (last visited May 3, 2018).

79.    When a federal loan servicer receives a borrower's timely request to renew an IDR plan, the loan servicer is prohibited from cancelling the borrower's income-based payment amount while the request is being processed.  Rather, the loan servicer "must maintain the borrower's current scheduled monthly payment amount" until the request has been processed.  *See* 34 C.F.R. § 682.215 (e)(8)(ii). By failing to maintain Ms. Varno's income-driven payment amount while her IBR renewal request was under review, Navient Corp., through its agent, NSL, violated federal law.

80.    Navient Corp., through its agent, NSL, also violated federal law by placing Ms. Varno's loans into discretionary forbearance status while it processed her IDR renewal request.  Discretionary forbearances trigger costly interest capitalizations, which increase a borrower's loan balance significantly. Accordingly, such forbearances are not authorized simply to provide loan servicers with additional time to process a borrower's IDR application. Instead, that is when a 60-day administrative forbearance should be used, with no resulting interest capitalization.

81.    Under 34 C.F.R. §682.211(a), a discretionary forbearance is permitted only when the borrower is unable to make scheduled payments "due to poor health

33

or other acceptable reasons." *Id.*   Ms. Varno was willing and able to make scheduled payments toward her IBR plan, as evidenced by her timely request to renew the plan, but Navient Corp., through its agent, NSL, failed to process her application in a timely fashion, and improperly increased her payments.  Thus, the forbearance was in violation of 34 C.F.R. §682.211(a).

82.    There were other occasions in 2015 and 2016 when Varno was improperly enrolled in discretionary forbearances, even though she was applying for a change in repayment plan, and was therefore entitled to a 60-day administrative forbearance, with no resulting capitalization of interest.

83.    Pursuant to the terms of its servicing contract, Navient Corp. agreed to refrain from any loan services that did not comply with the "requirements, policy and procedures" for servicing federally held debt.  By failing to process Ms. Varno's IDR request in a timely fashion, and unlawfully increasing her monthly payments while her application was being processed, Navient Corp., through its agent, NSL, breached the servicing contract.

84.    Because Navient Corp., through its agent, NSL, failed to process Ms. Varno's IDR request in a timely fashion, and placed her loans into forbearance status for approximately three months, she was unable to make any qualifying payments toward loan forgiveness, and the interest that accrued during this period was capitalized, increasing her principal loan balance significantly.

85.     Ms. Varno's federal promissory note required compliance with all applicable federal law.  By violating the Department of Education's regulations and guidelines for the servicing of federal loans, Navient Corp., through its agent, NSL, breached, and intentionally and tortiously interfered with the performance of, Ms. Varno's promissory note.

### CLASS REPRESENTATIVE ALLEGATIONS – MARK POKORNI

86.     On or before February 20, 2016, Mark Pokorni applied for enrollment in the Income-Based Repayment plan by electronically submitting an IDR plan application.  Navient received this application on or before said date.

87.     On February 22, 2016, Navient sent Mr. Pokorni an email stating that it could take between 22 and 25 days to process his IDR application.  *See* February 22, 2016 email, attached as Exhibit K.

88.     On March 11, 2016, Navient sent Mr. Pokorni an email stating, "We wanted to send you this quick update on your recent request for an Income-Driven Repayment Plan.  An unexpected increase in volume has caused us to fall behind on our completion date.  This means your form is still being processed."  *See* March 11, 2016 email, attached as Exhibit L.

89.     On or about April 5, 2016 – *45 days after Navient received Mr. Pokorni's IDR application* – Navient finally processed Mr. Pokorni's IDR plan application.  On or about April 6, 2016, Navient sent Mr. Pokorni an email stating

that he had been approved for enrollment in an IBR plan, and that his new monthly payment amount of $239.01 would be first due on April 13, 2016. *See* April 6, 2016 email, attached as Exhibit M.

90.    The Department of Education has directed loan servicers to process IDR requests within 10-15 days. See Danielle Douglas-Gabriel, *Delays. Backlogs. Confusing applications. Obama's latest student loan plan is having growing pains*. Washington Post, Apr. 5, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/04/05/delays-backlogs-confusing-applications-obamas-latest-student-loan-plan-is-having-growing-pains/?utm_term=.194acfbabf88 (last visited May 21, 2018); *see also* U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on Policy Direction on Federal Student Loan Servicing (July 20, 2016), available at http://www2.ed.gov/documents/press-releases/loanservicing-policy-memo.pdf. (last visited May 3, 2018). Thus, Navient's processing period of 45 days was *three to four times greater than the allowable processing period established by DOE guidelines*.

91.    By enrolling Mr. Pokorni in the Income-Based Repayment plan a month and a half after receiving his IDR plan application, Navient Corp., through its agents, NSI and NSL, prevented him from making a qualifying payment toward loan forgiveness in the month of March of 2016, which thereby extended the

36

duration of his loans.  In other words, because Navient delayed the processing of Mr. Pokorni's IDR plan application, the date on which Mr. Pokorni will become eligible for loan forgiveness has been delayed by a month.  This delay, however, also generated an additional monthly servicing fee for Navient Corp.

92.     Mr. Pokorni's loans were placed in forbearance status while his IDR application was being processed.  Because all interest that accrues during periods of forbearance is capitalized, a larger sum was added to Mr. Pokorni's principal loan balance than would have been added if the IDR application had been processed within the period established by the Department of Education's guidelines.

93.     Navient's servicing contract states that all loans must be serviced in compliance with the "requirements, policy and procedures" for servicing federally held debt.  *See* Exhibit D at page 12.  Because Navient Corp., through its agents, NSI and NSL, failed to process Mr. Pokorni's IDR application in accordance with the Department of Education's guidelines, it breached the servicing contract, of which Mr. Pokorni was an intended third-party beneficiary.

94.     Mr. Pokorni's promissory note requires that the servicing of his loans comply with all applicable federal regulations, including the Department of Education's guidelines pertaining to the appropriate processing period for IDR applications.  Thus, Navient's failure to process Mr. Pokorni's IDR application in

accordance with the Department's guidelines constitutes a breach of, and tortious interference with, Mr. Pokorni's promissory note.

**C**LASS **A**CTION **A**LLEGATIONS

95.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following proposed Classes:

**"Improper IDR Cancellation" Class:**

a.  On or after January 16, 2012, the borrower was enrolled in an IDR plan.

b.  The borrower submitted an IDR renewal application, which was received by NSL within 90 days or less prior to the renewal deadline.

c.  The borrower's partial financial hardship status expired, at which time the borrower's payments were recalculated under the standard repayment plan.

d.  At the time the application received its first review, it was deemed complete.

**California sub-class**: Members of the Class who were living in California when the events stated in subpart C occurred.

**"Forbearance without Written Consent" Class:**

a.  On or after January 16, 2012, the borrower was enrolled in an IDR plan.

b.  The IDR plan was not renewed before the annual renewal deadline, at which point the borrower's Partial Financial Hardship (PFH) status expired, and payments were recalculated under the standard repayment plan.

c.  After the expiration of the borrower's PFH status, NSL enrolled the borrower in a discretionary forbearance, based on the borrower's oral affirmation, and the posting date of the forbearance was within the 90-day period which began 30 days before the PFH status expired. (For example, if the PFH status expired on May 1, 2015, then the 90-day period would begin on April 1, 2015 and would end on June 30, 2015.)

d. At the time of enrollment in the discretionary forbearance, the loan was not in default, with "default" being defined as a period of 270 days without any payments.

**New York sub-class**: Members of the Class who were living in New York when the events stated in subpart C occurred.

**Illinois sub-class**: Members of the Class who were living in Illinois when the events stated in subpart C occurred.

**"No Administrative Forbearance" Class:**

a. On or after January 16, 2012, the borrower submitted an application to enroll in an IDR plan.

b. NSL enrolled the borrower in a 60-day, "non-capping" administrative forbearance, which was in effect while that application was under review.

c. During the 60-day administrative forbearance period, the borrower's account status changed from administrative forbearance status to discretionary forbearance status, and the discretionary forbearance was supported by oral affirmation.  .

**New York sub-class**: Members of the Class who were living in New York when the events stated in subpart B occurred.

**"Improper Delay" Class:**

a. On or after January 16, 2012, the borrower applied to enroll in, or to renew, an IDR plan.

b. The borrower submitted a completed IDR application, accompanied by proof of income, which was subsequently approved by Navient.

c. Navient did not fully process the application until 45 days or more after it was received.

**Illinois sub-class**: Members of the Class who were living in Illinois when the events in subpart c. occurred.

39

96.    The Classes exclude Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns. Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third degree of relationship living in the Judge's household, the spouse of such person, and the United States Government.

97.    The Classes are composed of tens to hundreds of thousands (if not millions) of individuals and thus are so numerous that joinder of all members is impracticable.

98.    The Classes can be readily ascertained through the records maintained by Defendants.

99.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

100.    Plaintiff's claims are typical of the claims of members of the Classes.

101.    As alleged herein, Plaintiff and members of the Classes sustained damages arising out of Defendants' common course of unlawful conduct.   The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein, and occurred in, and was directed from, this District.

102.   There are questions of law and fact common to the Classes, the answers to which will advance the resolution of the claims of all class members.

103.   These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual class members, including, without limitation:

a.    Whether the Defendants have a common and pervasive practice of misprocessing and delaying applications for IDR plans;

b.    Whether the misconduct of Defendants caused injuries to Plaintiffs and the Class by causing them to pay unnecessary interest, fees, and other charges;

c.    Whether the misconduct of Defendants violates state consumer protection statutes;

d.    Whether the misconduct of Defendants violates the common law;

e.    Whether the misconduct of Defendants constitutes a breach of the servicing contract; and

f.    Whether the misconduct of Defendants constitutes a breach of, and/or tortious interference with, the promissory notes held by federal student loan borrowers.

104.   Plaintiffs will fairly and adequately represent and protect the interests of members of the Classes. Plaintiffs have no claims antagonistic to those of members of the Classes. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of members of the Classes.

105.   Class action status is also warranted under Rule 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

106. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I – BREACH OF CONTRACT

**(Nationwide Class against Defendants for
Breach of the Servicing Contract)**

107. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

108. Plaintiffs bring this Count on behalf of members of the Nationwide Classes.

109. For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

110. At all relevant times, Plaintiffs and members of the Nationwide Classes were intended third-party beneficiaries of the servicing contract entered into between Defendants and the Department of Education.

111. Pursuant to the terms of the servicing contract, Defendants agreed to comply with all applicable federal statutes, regulations, procedures, and policies.

112. Under the Department of Education's guidelines, IDR plan applications should be processed within 10-15 business days. Nonetheless, Defendants failed to process Plaintiff Mark Pokorni's IDR application until 45

days after the date on which it was received.  Defendants thereby breached the servicing contract, of which Plaintiff Mark Pokorni was an intended third-party beneficiary.

113.  Under federal law, if a loan servicer receives a borrower's IDR renewal application prior to the annual renewal deadline, the loan servicer is prohibited from billing the borrower under the standard ten-year plan while it processes those materials.  Rather, the servicer must maintain the borrower's current scheduled monthly payment amount until the loan holder determines the new monthly payment amount.

114.  Plaintiffs Jill Ballard and Rebecca Varno timely submitted their IDR renewal applications, but their income-driven payment amounts were nonetheless cancelled due to unreasonable processing delays that were the fault of Defendants. When this occurred, Defendants increased Plaintiffs' monthly payment amounts significantly, and capitalized the accrued interest.

115.  By cancelling Plaintiffs' income-driven payment amount while processing their IDR requests, despite timely submission of the same, Defendants violated 34 C.F.R. § 682.215 (e)(8)(ii).

116.  By failing to promptly and efficiently process Plaintiffs' IDR renewal applications, Defendants violated 34 C.F.R. § 682.215 (e)(8)(i).

44

117.   Because the servicing contract requires compliance with all applicable federal regulations, the aforementioned violations also constitute a breach of the servicing contract.

118.   Because Plaintiffs were intended third-party beneficiaries of the servicing contract, Defendants are liable to Plaintiffs for its breaches thereof.

119.   As a result of Defendants' breaches of the express terms of the servicing contract, Plaintiffs and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

120.   Alternatively, even if it is determined that the above misconduct did not constitute a breach of the express terms of the servicing contract, it nonetheless constituted a breach of the covenant of good faith and fair dealing implied in the servicing contract.  And, as a result of this breach, Plaintiffs and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to, (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii)

45

unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

## COUNT II – BREACH OF CONTRACT

### (Nationwide Class against Defendants for
### Breach of, and/or interference with, the Promissory Note)

121.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

122.   Plaintiffs bring this Count on behalf of members of the Nationwide Classes.

123.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

124.   At all relevant times, Plaintiffs and members of the Nationwide Classes were in a contractual relationship with the federal Department of Education by virtue of their legally binding promissory notes.

125.   The promissory notes require that federal student loans be serviced in accordance with all applicable federal statutes and regulations.

126.   Under the Department of Education's guidelines, IDR plan applications should be processed within 10-15 business days.   Nonetheless, Navient did not process the IDR application of Plaintiff Mark Pokorni until 45

days after the date on which Defendants received it.  Defendants thereby breached, and/o tortiously interfered with, the promissory note.

127.  Under federal law, if a loan servicer receives a borrower's IDR renewal application prior to the annual deadline, the loan servicer is prohibited from switching the borrower to the standard repayment plan while it processes those materials.  Rather, the servicer must maintain the borrower's scheduled monthly payment amount until the new monthly payment amount is determined.

128.  Plaintiffs Jill Ballard and Rebecca Varno made a timely submission of their IDR renewal applications, but their income-driven repayment amounts were nonetheless canceled due to Defendants' unreasonable processing delays.  When this occurred, Defendants billed Plaintiffs under the standard ten-year repayment plan, which imposed significantly higher monthly payments, and triggered costly interest capitalizations.  By failing to promptly and efficiently renew Plaintiffs' IDR plans, and cancelling their income-driven payment amounts in violation of federal law, Defendants breached, and/or tortiously interfered with, Plaintiffs' contracts with the federal government.

129.  The terms of the promissory notes are binding on Defendants.

130.  Even if the promissory notes were not binding on Defendants, Defendants intentionally, tortiously and improperly interfered with the federal government's performance of the promissory notes.

47

131.  As a result of Defendants' breach of, and/or tortious interference with, Plaintiffs' contracts with the federal government, Plaintiffs and members of the Nationwide Classes have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

132.  Alternatively, even if it is determined that the above misconduct did not constitute breach of, and/or tortious interference with, the express terms of the promissory note, it nonetheless constituted a breach of, and/or tortious interference with, the covenant of good faith and fair dealing implied therein.  And, as a result, Plaintiffs and members of the Nationwide Class have suffered the same sizeable damages, including, but not limited to (i) the difference in the amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

## <u>COUNT III - VIOLATIONS OF CONSUMER LEGAL REMEDIES ACT</u>

**California Civil Code § 1750 et seq ("CLRA")**
**(Jill Ballard, California Class, Against Defendants)**

133.   Plaintiff Jill Ballard repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

134.   Plaintiff Jill Ballard brings this Count on behalf of members of the California Class.

135.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

136.   Defendants are "persons" within the meaning of California Civil Code § 1761 (c).

137.   Section 1770(a)(14) of the CLRA prohibits representing that a transaction involves obligations that are prohibited by law.

138.   At all times relevant hereto, Defendants represented that their transactions with their borrowers involved obligations that, in fact, are prohibited by law, namely the obligation to make payments under the standard repayment plan when borrowers were under no such obligation.

139.   Section 1770(a)(5) of the CLRA prohibits representing that goods or services have sponsorship or approval that they do not have.  Defendants violated

the CLRA by falsely representing that the following actions had the sponsorship or approval of the federal Department of Education:

      a.    Cancelling Plaintiff's income-driven payment amount, and billing her under the standard repayment plan, because of Defendants' processing delays; and

      b.    capitalizing the accrued interest on Plaintiff's loans because of Defendants' processing delays.

140.  Defendants engaged in this conduct because it increased their revenue through additional monthly servicing fees as well as increased collection fees for defaulted student loans.

141.  As a result of Defendants' violations of the CLRA, Plaintiff and members of the California Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

142.  Plaintiff and members of the California Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practice, declaratory relief, attorney's fees, and any other just and proper relief available under the CLRA.

<u>**COUNT IV - VIOLATIONS OF THE PENNSYLVANIA**</u>
<u>**UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**</u>
**73 Pa. Stat. § 201-1 et seq.**

**(Plaintiffs, National Class, Against Defendants)**

143.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

144.   Plaintiffs bring this Count on behalf of members of the National Classes.

145.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

146.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits deceptive acts or practices in the conduct of any trade or commerce. This includes representing that goods or services have sponsorship or approval that they do not have.

147.   Defendants violated 73 Pa. Stats. § 201-1 et seq. by falsely representing that the following actions had the approval or sponsorship of the federal government:

a.   processing Mark Pokorni's IDR application 45 days after the date on which it was received;

b.   cancelling the income-driven payment amounts of Jill Ballard and Rebecca Varno because Defendants failed to process their IDR renewal

51

applications in a timely fashion;

      c.     delaying the processing and implementation of Plaintiffs' IDR plans;

      d.     increasing Jill Ballard's and Rebecca Varno's monthly payment amounts during Defendants' processing delays; and

      e.     improperly placing Rebecca Varno's loans into forbearance status during Defendants' processing delays.

148.  All of these actions were decided upon, and misrepresented from Defendants' offices in Pennsylvania.

149.  Defendants engaged in this conduct because it increased their revenue through additional monthly servicing fees as well as increased collection fees for defaulted student loans.

150.  As a result of Defendants' violations, Plaintiffs and members of the National Class have suffered the same sizeable damages, including, but not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled, or re-enrolled, in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

151.  The corresponding financial benefit to Defendants was received by

them at their offices in Pennsylvania.

152.   Plaintiff and members of the Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practice, declaratory relief, attorney's fees, and any other just and proper relief available.

## COUNT V - VIOLATIONS NEW YORK GENERAL BUSINESS LAW
### NY GBL Sec. 349

### (Rebecca Varno and the New York Class)

153.   Plaintiff Rebecca Varno repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

154.   Plaintiff Rebecca Varno brings this Count on behalf of members of the New York Classes.

155.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

156.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

157.   In the course of Defendants' business, they engaged in the following deceptive acts and practices:

a.   delaying the implementation of Plaintiff's IDR plan for several months, in violation of federal law, while representing that said actions had the approval of the federal government;

b.      increasing Plaintiff's monthly payment amount while her IDR renewal request was being processed, in violation of federal law, while representing that said action had the approval of the federal government; and

c.      applying a forbearance to Plaintiff's account during the processing of her IDR application, in violation of federal law, while representing to Plaintiff that said action had the approval of the federal government.

158.   Defendants engaged in this conduct because it increased their revenue through additional monthly servicing fees as well as increased collection fees for defaulted student loans.

159.   The actions set forth above occurred in the conduct of trade or commerce.

160.   Because Defendants' deception takes place within the context of the federal student loan program, its affects the public interest.  Further, Defendants' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

161.   Defendants' conduct proximately caused injuries to Plaintiff and the New York class members.

162.   As a result of these deceptive practices, Plaintiff and members of the New York classes have suffered the same sizeable damages, including, but

not limited to (i) the difference in amount paid under an IDR plan versus the amount paid when enrolled in a standard repayment plan; (ii) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (iii) the financial harm associated with delayed progress towards certain loan forgiveness programs.

163.   These injuries are the direct and natural consequence of Defendants' misrepresentations, omissions, and campaign to increase the likelihood of default to generate additional profit.

### COUNT VI - VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/2

### (Mark Pokorni and the Illinois Class)

164.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

165.   Plaintiff brings this Count on behalf of members of the Illinois Classes.

166.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

167.   Defendants are "person[s]" within the meaning of 815 ILCS 505/1(c).

168.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDBPA") prohibits "unfair or deceptive acts or practices, including but not

limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

169.  In the course of their business, Defendants committed the following unfair and/or deceptive acts or practices in violation of the ICFDBPA:

a.  Deceptively and unfairly representing to Mark Pokorni that his IDR application would be processed in 22-25 days when the Department of Education required that such applications be processed within 10-15 days; and;

b.  deceptively and unfairly representing to Mark Pokorni that the processing of his IDR application could be further delayed due to a "high volume" of applications when, in fact, the Department of Education's applicable guidelines make no such exception.

162.  Defendants knew or should have known that their conduct was unlawful.

163.  Defendants' unfair and deceptive practices were material to Plaintiff and members of the Illinois Classes.

56

164.   Plaintiff and members of the Illinois Classes suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' deceptive and unfair practices, including, but not limited to (i) unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same; and (ii) financial harm associated with delayed progress towards loan forgiveness, due to individuals not making qualifying payments that would count toward same.

165.   Defendants' violations present a continuing risk for financial harm to Plaintiff, members of the Classes, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

166.   Plaintiff and members of the Class seek damages under the ICFDBPA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct.

167.   Plaintiff and members of the Classes also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the ICFDBPA.

168.   Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

## COUNT VII - VIOLATIONS OF THE ROSENTHAL ACT
### California Civil Code § 1788.17

### (Jill Ballard and the California Class)

169.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

170.   Plaintiff brings this Count on behalf of members of the California Class.

171.   For purposes of this Count, any reference to "Defendants" includes all named Defendants as well as their predecessors in interest.

172.   Defendants are "debt collectors" under the Rosenthal Act.

173.   The Rosenthal Act prohibits the false representation that the consumer debt may be increased by the addition of any charges if, in fact, such fees or charges may not legally be added to the existing obligation.  The Rosenthal Act also prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

174.   On November 26, 2017, Navient sent Ms. Ballard an account summary which showed $15,295.10 in capitalized interest.  This figure included $4,686.57 that was unlawfully added to her principal loan balance as a result of Navient's processing delay in 2014.  Accordingly, this false representation violated the Act.

58

175.   In addition to the foregoing, the Rosenthal Act requires that every debt collector collecting or attempting to collect a debt comply with Sections 1692b through 1692j, inclusive, of Title 15 of the United States Code, commonly referred to as the Fair Debt Collections Practices Act ("FDCPA"), and shall be subject to the remedies in Section 1692k for violations thereof.

176.   Section 1692f of Title 15 of the United States Code prohibits the use of any unfair or unconscionable means to collect or attempt to collect any debt, including the attempt to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

177.   Because the November 26, 2017 statement included $4,686.57 in capitalized interest that was not authorized by the promissory note or permitted by law, it did not comply with 15 U.S.C. § 1692f, and therefore violated the Rosenthal Act.

178.   Section 1692e of Title 15 of the United States Code prohibits the communication to any person of credit information which is known or should be known to be false.  Upon information and belief, as recently as 2017, Defendants reported to credit reporting agencies that Plaintiff's principal loan balance included $4,686.57 which, in fact, was not permitted by law, thereby violating the Rosenthal Act.

179.   As a proximate result of Defendants' violations enumerated above, Plaintiff and members of the California Class have been damaged in amounts which are subject to proof.

180.   Because Defendants knowingly and willfully violated the Rosenthal Act, Plaintiff and members of the Class are therefore entitled to statutory damages; actual damages; attorney's fees; and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.    Declaring, adjudging, and decreeing the conduct alleged herein as unlawful;

C.    Enjoining Defendants from continuing to commit the above-cited violations of law;

D.    Awarding compensatory and punitive damages along with pre- and post-judgment interest;

E.    Granting Plaintiffs the costs of suit, including reasonable attorneys' fees and expenses; and

F.     Affording Plaintiffs with such other, further, and different relief as
the nature of the case may require or as may be determined to be just,
equitable, and proper by this Court.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

SABATINI LAW FIRM, LLC

_____
Carlo Sabatini, PA 83831
SABATINI LAW FIRM, LLC
216 N. Blakely St.
Dunmore, PA 18512
Phone (570) 341-9000
Facsimile (570) 504-2769
carlo@sabatinilawfirm.com
*Counsel for Plaintiff and the Classes*


EDELMAN, COMBS,
LATTURNER, & GOODWIN, LLC


_____
Daniel A. Edelman
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)
ARDC # 00712094
*Counsel for Plaintiff and the Classes*

61

FIORENTINO LAW OFFICES, LTD.

_____

Anthony Fiorentino
FIORENTINO LAW OFFICES LTD.
432 N. Clark St., Suite 202
Chicago, Illinois 60654
ARDC # 6281389
anthony@fiorentinolaw.com
*Counsel for Plaintiff and the Classes*