# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NO. 3:18-CV-121-MEM

- - -

JILL BALLARD, REBECCA VARNO, and    :
MARK POKORNI, on behalf of
themselves and the class members    :
described herein,
                                    :

        Plaintiffs,
                                    :

  - vs -
                                    :

NAVIENT CORPORATION, NAVIENT        :
SOLUTIONS, INC., and NAVIENT
SOLUTIONS, LLC,                     :

        Defendants.
                                    :


- - -


DEPOSITION UPON ORAL EXAMINATION OF
CORPORATE DESIGNEE, PATRICK THEURER
Virtual Videoconference
December 19, 2023
- - -
REPORTED BY:
EDWARD J. RUGGERI, RPR, CCR, FPR-C
- - -
MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



- - -

Oral Deposition of

CORPORATE DESIGNEE, PATRICK THEURER, taken

pursuant to notice, was held via Virtual

Videoconference, commencing at 10:00 a.m.,

on Tuesday, December 19, 2023, before

Edward J. Ruggeri, Registered Professional

Reporter, Certified Court Reporter and

Notary Public.

- - -



Page 3

```
 1   A P P E A R A N C E S:

 2

 3

 4   FIORENTINO LAW OFFICES
     BY:  ANTHONY FIORENTINO, ESQUIRE
 5     432 N. Clark Street
       Suite 202
 6     Chicago, IL 60654
       anthony@fiorentinolaw.com
 7        Counsel for the Plaintiffs

 8

 9
     EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
10   BY:  CASSANDRA P. MILLER, ESQUIRE
            INGRID HOFELDT, ESQUIRE
11     20 S. Clark Street
       Suite 1500
12     Chicago, IL 60603
       cmiller@edcombs.com
13        Counsel for the Plaintiffs

14

15
     GREENBERG TRAURIG, LLP
16   BY:  LISA M. SIMONETTI, ESQUIRE
       1840 Century Park East
17     Suite 1900
       Los Angeles, CA 90067
18     simonettil@gtlaw.com
          Counsel for the Defendants

19

20

21   A L S O   P R E S E N T:

22   Matthew Sheldon, Esquire

23

24
```



Page 120

1   "In NSL's system, the reason for the

2   addition of capitalized interest on an

3   account in a particular instance is not

4   reflected in a manner that allows for

5   systematic identification.  Capitalized

6   interest may be imposed for many different

7   reasons, including but not limited to

8   requirements that pertain to IDR plans."

9           Do you see that, Mr. Theurer?

10  A.      Yes, I do.

11  Q.      Okay.

12          Give me just one second because

13  I've got to scroll back up here.  Okay.

14          So that first part -- the first

15  two sentences which are "Upon passage of

16  the annual renewal deadline, a borrower's

17  payments in IDR program are not canceled.

18  The payments are calculated under the

19  standard repayment plan," that part of the

20  objection refers to the same event that

21  was clarified by the footnote to part C,

22  correct?

23          MS. SIMONETTI:  What are you

24      talking about?  First of all, it's



Page 121

```
 1        not an objection, again, Tony.  So
 2        it's a response.
 3             MR. FIORENTINO:  Let me
 4        rephrase the question.
 5             MS. SIMONETTI:  Okay.
 6  BY MR. FIORENTINO:
 7        Q.    Mr. Theurer, we can resolve --
 8  this issue that's pointed out here, we can
 9  resolve that by rephrasing part of C so
10  that it reads as follows.  Quote, On or
11  after passage of the renewal deadline, the
12  borrower's partial financial hardship
13  status expired and the borrower's payments
14  were recalculated under the standard
15  repayment plan, closed quote.  If we
16  rephrase it that way, that would address
17  that objection there in those first few
18  sentences, right?  Because it seems like
19  it's more of a semantical point that's
20  being raised?
21             MS. SIMONETTI:  And, again,
22        Tony, it's not an objection.  It's a
23        response.  I don't know why you call
24        it an objection.
```



Page 122

```
 1              MR. FIORENTINO:  If I say
 2        "objection," I'm really just talking
 3        about your response here.
 4              MS. SIMONETTI:  Okay.
 5              MR. FIORENTINO:  I would phrase
 6        it the way you stated it just now for
 7        it to make sense for us to turn it
 8        into a valid query.
 9   BY MR. FIORENTINO:
10        Q.    Okay.
11              So that rephrasing would
12   resolve the first two sentences of the
13   issue raised in NSL's response to part C,
14   right?
15        A.    It appears so, yes.
16        Q.    Now, let's look at the
17   remainder of NSL's response to part C. It
18   reads, also "In NSL's system, the reason
19   for the addition of capitalized interest
20   on an account in a particular instance is
21   not reflected in a manner that allows for
22   systematic identification.  Capitalized
23   interest may be imposed for many different
24   reasons, including but not limited to
```



Page 123

 1    requirements that pertain to IDR plans."

 2              Do you see that, where it says

 3    that?

 4         A.    Yes.

 5         Q.    Okay.

 6              Now, as I mentioned earlier,

 7    Mr. Stine testified that whenever a

 8    borrower's IDR plan is not timely renewed

 9    and the PFH status expires, the borrower

10    incurs an interest capitalization.  And

11    that's on page 55 of the Stine transcript.

12              And I believe you agreed with

13    that point to the extent that the borrower

14    subsequently reenters repayment, correct?

15         A.    I agree that to change in to

16    repayment status is what triggers the

17    interest capitalization event, that there

18    are certain limitations that may be

19    applied, including a limitation of how

20    much interest may be capitalized relative

21    to the borrower's outstanding unpaid

22    principal at the time they entered the IDR

23    plan.

24         Q.    Okay.



Page 124

1              So when a PFH status expires

2      because somebody didn't timely renew their

3      plan, that is an interest capping event as

4      Mr. Stine testified, correct?

5          A.    I would say it could be.

6          Q.    Okay.

7              And you're saying it is so long

8      as that person reenters repayment at some

9      later point, correct?

10         A.    And has not had interest

11     capitalization on that account in excess

12     of the set limitations or equal to the set

13     limitations of the IDR plan.

14         Q.    Okay.

15             I want to pull up Exhibit-B, if

16     we could.

17                  - - -

18             (At this time, a document was

19         marked for identification as

20         Exhibit-B.)

21                  - - -

22     BY MR. FIORENTINO:

23         Q.    So, Mr. Theurer, this is

24     "Federal Regulation 34 CFR 682.215," which



Page 129

```
 1   capitalization because of that event,

 2   right, without getting in to amounts?

 3        A.    That is the most likely

 4   outcome, yes.

 5        Q.    Okay.

 6              Now, can we pull up Exhibit-C?

 7                 - - -

 8              (At this time, a document was

 9        marked for identification as

10        Exhibit-C.)

11                 - - -

12   BY MR. FIORENTINO:

13        Q.    So this is very similar,

14   Mr. Theurer.  This is Federal Regulation

15   34 CFR 685.221.  This governs the terms of

16   the income-based repayment plan, but this

17   is just the analogous regulation for

18   Federal Direct loans.  Each loan program

19   has their own regulation.

20              MR. FIORENTINO:  So can you

21        scroll down, Ingrid, please, to page

22        5.

23              MS. SIMONETTI:  We can't see

24        that at all again.
```



Page 130

1  BY MR. FIORENTINO:

2       Q.    So do you see where it says,

3  "accrued interest is capitalized at the

4  time a borrower chooses to leave the

5  income-based repayment plan or no longer

6  has a partial financial hardship."

7            Do you see that, Mr. Theurer?

8       A.    Yes, I do.

9       Q.    So apparently this is an

10 automatic interest capping event which

11 works the same across both types of loans.

12           You would agree with that,

13 right?

14      A.    I agree it reads very

15 similarly, if not identical.

16      Q.    And it appears that this is an

17 automatic kind of interest cap, correct?

18 If your PFH status expires because you

19 didn't timely renew the plan, that

20 interest cap is going to be automatic,

21 correct?

22      A.    I think it reads as it reads,

23 right.  It says that you are going to have

24 accrued interest capitalized except as



Page 131

1    provided in paragraph (b)(3).

2        Q.    Okay.

3              But that would also be

4    consistent with your experience, correct?

5    In your experience, if someone's PFH

6    status expires because they didn't renew

7    the plan in time, they incur an interest

8    cap, correct?  That's very standard?

9        A.    Yes.

10       Q.    Okay.

11             So basically -- the reason I'm

12   showing these -- and we can go back to the

13   exhibit now, Exhibit-A, is because if

14   there are issues with this search,

15   Mr. Theurer, I don't think it was your

16   fault.  I think our reference to

17   capitalized interest might not have been

18   necessary since it's an automatic interest

19   cap.

20             So part C could just be

21   rewritten to state as follows.  On or

22   after the passage of the renewal deadline,

23   the borrower's partial financial hardship

24   status expired, and the borrower's



Page 132

1    payments were recalculated according to

2    the standard replacement plan.

3              Now, if we rewrote part C to

4    read that way, it would still be the case

5    that anyone who satisfied part C of the

6    search would have incurred this automatic

7    interest cap, but then the search wouldn't

8    have to focus on the interest cap.  It

9    could just focus on the PFH status?

10             That would make part C more

11   searchable, correct?

12        A.    I believe so, yes.

13        Q.    Okay.

14             So I think the solution for

15   this search is just to omit the reference

16   to the interest cap.  So let's go to --

17   sorry.  If we use this language -- okay.

18   So let's go to part D.  Yeah.  That's

19   where we left off.  So we've now gone

20   through parts A, B, and C.  We agreed

21   there are no problems with A and B, and

22   now we've resolved the issue with part C.

23             MS. SIMONETTI:  We don't agree

24        there was no problem with C.  There



Page 133

```
1        was a conversation about it but, you
2        know, the response says what it says.
3        But keep going.
4              MR. FIORENTINO:  Well, I'm
5        talking about Mr. Theurer's prior
6        testimony a moment ago.  We
7        ascertained that parts A and B by
8        themselves are feasible.  Okay.  Now
9        we've rewritten C to be feasible.
10             MS. SIMONETTI:  As discussed.
11       As discussed.  And you've rewritten
12       the one, or in your mind you've
13       rewritten it, but keep going.  Keep
14       going.
15             MR. FIORENTINO:  Yeah.  I just
16       want to take these one piece at a
17       time.  Okay.  So now I'm going to
18       focus on D, "When the borrower's
19       application was thereafter processed,
20       it was deemed complete and timely,
21       and the IDR plan was recertified."
22       Okay.
23             So let's scroll down now to the
24       response to that.  It says, "This
```



Page 149

1    C, the borrower's partial financial

2    hardship status expired, at which time the

3    borrower's payments were recalculated

4    under the standard repayment plan.  Part

5    D, when the borrower's application was

6    processed, it was deemed complete.

7              So, Mr. Theurer, from a

8    technical standpoint, are there any

9    feasibility issues with this search as

10   written?

11      A.    Well, I would like a couple of

12   things further clarified.  But, again, I

13   would need to sit down and review this,

14   and we do this as a collective effort to

15   make sure we are all on the same page,

16   myself, Dennis, and counsel.

17      Q.    Sure.

18      A.    But for item B, I would love

19   the recertification window to be defined

20   as X -- starting on X number of days

21   before expiration, whatever you guys are

22   deeming that recertification window to be.

23      Q.    And you're talking about part

24   B, correct?



Page 150

```
 1        A.     Part B.
 2        Q.     Okay.
 3               So the reason I use the term
 4    "IDR" -- or the reason I use the term
 5    "recertification window" is because that
 6    specifies that period of 90 days prior to
 7    the deadline.  I believe that's what it
 8    is.
 9               But you're saying that if we
10    were to instead of using the words
11    recertification window, if we replaced
12    that with a specific date range, that
13    would fix part B?
14        A.     That would be fine.  I actually
15    think it would be even better if we said
16    recertification window defined as 90 days
17    prior to PFH expiration, through PFH
18    expiration, just to be really clear.  That
19    way we have a way to tie it all together.
20        Q.     Okay.
21               MR. FIORENTINO:  Ingrid, so can
22          you just cut the words "during the
23          recertification window," and just
24          replace it with 90 days or less prior
```



```
 1        to the renewal deadline.
 2    BY MR. FIORENTINO:
 3        Q.    Okay.
 4              Mr. Theurer, would that help
 5    clarify?
 6        A.    I believe that helps clarify,
 7    yes.
 8        Q.    Okay.
 9              In looking at the rest of the
10    search, do you see any other problems?
11        A.    Yes.
12        Q.    Go ahead.
13        A.    Part B, when the borrower's
14    application was processed, we will process
15    an application.  It could process at a
16    second or even a third time.  If we find a
17    flaw communicated to the borrower, they
18    rectify the flaw and bring it back, we
19    still consider that one application.
20        Q.    Okay.
21              So if I were to change D as, at
22    the time the borrower's application
23    received its first review, its first
24    review, it was deemed complete, would that
```



1   add clarification to part D?

2        A.    I think that adds some, yes,

3   much needed clarification.

4        Q.    Okay.

5              So, Ingrid, let's remove the

6   first clause up to the comma and replace

7   that with, at the time the application

8   received its first review, it was deemed

9   complete.  Okay.  Let's take another last

10  look at the search.

11             Do you see any other technical

12  obstacles to searching this on a

13  systemwide basis?

14       A.    I see nothing at this point,

15  but I would still want to review it with

16  my team to ensure I'm not missing

17  something.

18       Q.    Okay.

19             But as you see it at the

20  present moment, you don't see any other

21  technical obstacles, correct?

22       A.    I do not.

23       Q.    Okay.

24             Now, Mr. Theurer, as you know,



1    the court has ordered NSL to execute the

2    search queries to the extent are feasible.

3    I understand that it's largely our fault

4    that the first version we got you was not

5    feasible, but now I think we've ironed out

6    the kinks.  And based on the court's order

7    and your testimony at this time, we've got

8    a feasible search now.  NSL's still under

9    that court order, so what we're requesting

10   is that NSL go ahead and proceed --

11              MS. SIMONETTI:  Tony, can we

12        take that up offline?  We do not

13        agree with the order applied to this.

14        We've provided the responses to this

15        discovery.  And if you're going to

16        serve additional requests, you can,

17        you know, consider how to do that,

18        but we're not going to be responding

19        to these on an ad hoc basis.  We've

20        already provided the responses.

21              MR. FIORENTINO:  Lisa, I

22        understand, but it's just important

23        that I get on the record that we've

24        now made this request.  Obviously,



Page 157

 1          MS. SIMONETTI:  Just to be
 2      clear, that wouldn't resolve my
 3      issue, but you can put that in there
 4      if you want.  That's totally fine.
 5          MR. FIORENTINO:  Okay.
 6          MS. SIMONETTI:  Okay.  Perfect.
 7  BY MR. FIORENTINO:
 8      Q.    Mr. Theurer, part A by
 9  itself -- I think what your attorney is
10  saying is part A by itself doesn't pose
11  any problems, correct, in terms of
12  searchability?
13      A.    That is correct.
14      Q.    Okay.
15          Let's move to part B, and if
16  you could just scroll up to the actual
17  search.  Thanks, Ingrid.  It says, "The
18  income-driven payments were canceled when
19  the plan was not renewed before the annual
20  deadline."  And then, you know, we saw
21  this before, Mr. Theurer, that same
22  footnote, "For reference only, the intent
23  of this subsection is to refer to the
24  expiration of the borrower's partial



Page 158

1    financial hardship status."

2              Do you see that, where it says

3    that?

4         A.    Yes.

5         Q.    Okay.

6              Let's scroll down now to NSL's

7    response to part B.  So it states, "Upon

8    passage of the annual renewal deadline, a

9    borrower's payments in an IDR program are

10   not canceled.  The payments calculated

11   under the standard payment plan," closed

12   quote.  So just to clarify, this

13   objection, it's not stating any technical

14   or logistical obstacles to the computer

15   search.  This is more trying to clarify

16   the semantics about what actually happens

17   when the PFH status expires and give a

18   more accurate description.

19             Is that a fair account?

20        A.    Yes.  Similar to request one.

21        Q.    Okay.

22             So the best way to clarify this

23   issue would just be to restate part B as

24   follows.  Quote, The IDR plan was not



Page 159

1 renewed before the annual renewal

2 deadline, at which point the borrower's

3 PFH status expired and the payments were

4 recalculated under the standard repayment

5 plan, closed quote.

6            So that language would kind of

7 clarify that issue when it comes to that

8 part B, correct?

9      A.    That would address our concern,

10 yes.

11      Q.    Okay.

12            Let's go to part C, if you

13 could scroll up, Ingrid.  So it states,

14 quote, "Within 60 days thereafter, Navient

15 enrolled the borrower in a discretionary

16 forbearance," closed quote.  And then you

17 have the corresponding footnote.  It

18 states, "For reference only, the intent of

19 this subsection is to refer to the

20 forbearance described in 34 CFR

21 682.211(d)(2), and 34 CFR

22 685.205(a)(8)(ii)."  Now, let's scroll

23 down to NSL's response to that part.

24 Okay.



 1                 So it states, "From a

 2    processing/system standpoint, the

 3    incorporation of 34 CFR, section

 4    682.211(d)2) and 34 CFR section

 5    685.205(a)(8)(ii), which govern

 6    forbearances based on default is not

 7    meaningful.  Plaintiffs do not specify a

 8    definition of 'default,' which can be

 9    viewed as 270 days of delinquency or,

10    alternatively, as 365 days of

11    delinquency."

12                 Do you see where it says that,

13    Mr. Theurer?

14         A.    Yes.

15         Q.    Okay.

16                 So just to clarify, these two

17    regulatory provisions set forth the

18    conditions under which a discretionary

19    forbearance may be based on the borrower's

20    oral affirmation as opposed to requiring a

21    written documentation from the borrower.

22    You probably knew that or discussed that

23    with Ms. Simonetti.

24                 MS. SIMONETTI:  Hang on, Tony.



Page 163

1    you're not aware --

2         A.    Yes.

3         Q.    -- of obstacles that that

4    modification would impose, correct?

5         A.    Correct.

6         Q.    Okay.

7               Let's move to part D of that

8    search 2.  Okay.  So it states, quote, "At

9    the time of enrollment in the

10   discretionary forbearance, the loan was

11   not in default and Navient had not

12   received a written request from the

13   borrower for a discretionary forbearance,"

14   closed quote.

15              Do you see where it says that?

16        A.    I do.

17        Q.    Okay.

18              Now, let's look at NSL's

19   response to part B of search 2.  Okay.  So

20   there are two sentences.  So first I just

21   want to focus on the first sentence.  It

22   states, quote, "Plaintiffs do not specify

23   a definition of default, which can be

24   viewed as 270 days of delinquency or,



Page 164

1   alternatively, as 365 days of

2   delinquency," closed quote.

3          I'm guessing the easiest way to

4   resolve this concern would just be to

5   specify that default for purposes of the

6   search is defined as 270 days of

7   delinquency.

8          Would that eliminate the

9   concern?

10         MS. SIMONETTI:  And you're

11      talking about -- so what would it

12      say?  What would you put in there?

13  BY MR. FIORENTINO:

14      Q.   So not the objection, the

15  response, the explanation as to why part D

16  of search 2 is not feasible is that the

17  word "default" is not defined.

18         So what I'm saying is if we

19  include the definition of "default" as

20  being 270 days and we include that

21  definition in part D, would that -- I'm

22  guessing that would eliminate this

23  concern, correct?

24      A.   It would eliminate the concern



Page 165

1   outlined in sentence one in that we would

2   have a clear definition of default to

3   apply into that query.

4        Q.    Okay.  Great.

5              Then there is this second

6   sentence.  "However, viewed either way,

7   plaintiffs seemingly assume that a

8   borrower would have been unable to make

9   payments under an IDR plan."  You know

10  what, actually, I think we can -- let's

11  get to that in a second.  Let's get to

12  this in a second.

13             Before we do, I just want to

14  clarify one other thing, because I think

15  the best way to go to make this search

16  feasible is to just define the definition

17  of "default," you know, put that in the

18  search.

19             But also if we just got rid of

20  the reference to default, since you're not

21  eligible to enroll in an IDR plan anyway

22  if you're in default status, that would be

23  another way to cure that, right, if we

24  just didn't mention default at all,



Page 166

 1   correct?

 2       A.    Let me read the -- again,

 3   similar to what I said before, I believe

 4   that would make more sense to us.

 5       Q.    More sense than defining

 6   default?

 7       A.    Than defining default, yes.

 8       Q.    Okay.

 9             And I can see why that would

10   make more sense, and here is why, because

11   I think this will clarify.  Can we pull up

12   Exhibit-E?

13                   - - -

14             (At this time, a document was

15       marked for identification as

16       Exhibit-E.)

17                   - - -

18             MS. SIMONETTI:  Are you

19       actually marking these or referring

20       to them, because they've not been --

21             MR. FIORENTINO:  Yeah.  I'm

22       sorry.  That's a good question.

23       Yeah.  This is Plaintiff's Exhibit-E.

24       They'll all be attached.



Page 179

1   as a whole, and one of our points of view

2   was illustrated in that last sentence.

3               If we are -- you're proposing

4   to resubmit a request with changed

5   language that would remove the default

6   elements, we'd be happy to take a look at

7   it again and see if there's anything else.

8   But I struggle with trying to look at a

9   generalized query and then be asked to

10  apply to a specific borrower's

11  circumstances without having an

12  opportunity to go pull that specific

13  borrower and look at the data as it

14  relates to the specific query.

15      Q.      And that's totally fair.

16  That's why I wanted to summarize

17  Mr. Stine's testimony and ask you, only

18  assuming that his testimony is true, you

19  know, would this sentence apply.  And, you

20  know, I don't want to put you on the spot

21  and quibble with each sentence.  It

22  probably is easier to do what you're

23  suggesting, which is to just -- let's look

24  at the search.



Page 180

1          So let's pull up Exhibit-D

2  again and see if maybe we can modify it,

3  because I think the concerns you raised

4  are probably legit.  So let's go to

5  modified search 2 on Exhibit-D.

6          So I'm just going to read this

7  into the record, Mr. Theurer, and if there

8  are problems, let's see if we can fix

9  them.  So it says, part A, "On or after

10  January 16, 2012, the borrower was

11  enrolled in an IDR plan."  Part B, "The

12  IDR plan was not renewed before the annual

13  renewal deadline, at which point the

14  borrower's PFH status expired and payments

15  were recalculated under the standard

16  repayment plan."  C, "Within 60 days after

17  the expiration of the borrower's PFH

18  status, NSL enrolled the borrower in a

19  discretionary forbearance, based on the

20  borrower's oral affirmation."

21          So reviewing these tweaks, do

22  you see any technical obstacles to

23  performing this search on a systemwide

24  basis?



 1        A.    I would -- item C, there does

 2   present one element of are we saying

 3   within 60 days after the expiration

 4   enrolled, is that the date of the

 5   effective -- the effective date of the

 6   forbearance status or the applied date?

 7   Those are two potentially very different

 8   dates.

 9        Q.    It's a good question.  I guess

10   what I'm trying to get at is the date that

11   the forbearance was processed, the date

12   that it was requested, the date of the

13   telephone call.  So what's the best way to

14   word this if what we're trying to find out

15   is -- you know, if it's based on oral

16   affirmation there was a phone call.

17             So if we're trying to get to

18   within 60 days of the expiration -- that

19   was the date of the communication --

20   what's the best way to word that?

21        A.    I would use the word "the

22   posting date."

23        Q.    Okay.

24        A.    The posting date is the date a



Page 182

1   transaction is added to the system.  The

2   transaction separately has an effective

3   date which may be in the past.  So if you

4   are saying what date was the request for

5   the discretionary forbearance given to

6   Navient and Navient grant the forbearance,

7   that would be the posting date.  We could

8   have made that effective earlier in order

9   to clear any delinquency.

10           But it is a very real and very

11  necessary distinction when we talk about

12  transactions, that we are very clear about

13  whether we are talking about posting dates

14  or effective dates.

15      Q.    Okay.

16           So let me see if I can rephrase

17  this, and just listen closely because it's

18  not on paper yet.  But what if we went

19  like this.  After the expiration of the

20  borrower's PFH status, NSL enrolled the

21  borrower in a discretionary forbearance

22  which had a posting date which was within

23  60 days of -- or after the expiration of

24  PFH status.



Page 183

1              Would that remove the

2  ambiguity?

3      A.    I believe that would provide us

4  the, you know, definitions and clarity

5  that we're looking for.  But, again, I'd

6  like to do this with my other experts

7  involved so that we can jointly make sure

8  we have not missed anything.  But as of

9  right now based on what you had described,

10  I believe that would provide us what we

11  need.

12      Q.    That's fair.  Okay.

13           MR. FIORENTINO:  Let's just --

14           Ingrid, if you could cut the words

15           "Within 60 days," and then put comma

16           at the end of the sentence, and then

17           add "and the posting date of the

18           forbearance was within 60 days after

19           the date that PFH status expired."

20           Yeah.  And I would just put, the

21           posting date of the forbearance was

22           within.  Okay.

23  BY MR. FIORENTINO:

24      Q.    So at least for present



Page 184

1  purposes, Mr. Theurer, this looks like it

2  would enhance the feasibility of the

3  search?

4       A.    Appears reasonable.

5       Q.    Okay.  All right.

6            MR. FIORENTINO:  Let's go back

7       to Exhibit-A.  Can we scroll down to

8       search 3?

9  BY MR. FIORENTINO:

10      Q.    All right.

11            So search 3 states as follows:

12  "Navient received notice that the borrower

13  was applying for initial enrollment in an

14  IDR plan, or was changing repayment

15  plans," closed quote.

16            Do you see where it says that?

17      A.    Yes.

18      Q.    Okay.

19            Let's look at NSL's response.

20  It says, "In NSL's system, the type of

21  notice referenced is not tracked in a

22  searchable form.  A customer service agent

23  might document such notice in the

24  free-text notes associated with an



Page 186

```
 1   content of the notes are not always going

 2   to be searchable on a systemwide basis.

 3   But at the same time, there are certain

 4   transactions that occur perhaps during a

 5   phone call which are associated with a

 6   standard code, and those events as coded

 7   distinct from the content of the

 8   discussion, those transactions would be

 9   more searchable on a systemwide basis.

10            Is that fair?

11       A.   The events, as specified

12   earlier, are more searchable because they

13   have definitive codes associated with them

14   that we can look for.

15       Q.   Okay.  Great.

16            And so one of those events that

17   Mr. Stine talked about and you and I

18   talked a little bit about earlier was this

19   60-day administrative noncapping

20   forbearance that is applied to a

21   borrower's account when NSL receives

22   notice that the borrower is in the process

23   of applying for enrollment in an IDR plan.

24            Mr. Stine testified that when
```



Page 187

```
 1   that notice is received that there is that

 2   intent to apply for the plan, that that

 3   kind of forbearance is automatically

 4   applied.  That was pages 45 and 46 of the

 5   Stine transcript.

 6              And I think you said earlier

 7   you agree with that, correct?

 8        A.    In general, yes.  Okay.  When

 9   we say automatically, it is not -- I am

10   not aware that being triggered by anything

11   other than the agent actually assigning a

12   status change.  There are other things in

13   the system that -- and when you say

14   automatically to me, I believe it to be a

15   process that the system started because of

16   another independent action, just to be

17   clear there.  But as a matter of course,

18   if the agent is sending out an application

19   or the borrower has indicated that they're

20   going to go and complete the application,

21   they are offered the 60-day administrative

22   forbearance and that the agent will put

23   that on the system at that time.

24        Q.    Okay.
```



Page 188

```
 1                   And that's an important
 2      clarification.  I should not be using the
 3      word "automatic," because it's not a
 4      function of the computer system that
 5      triggers something without human
 6      intervention.  That's not what I mean.
 7                   What I mean is it's not the
 8      type of discretionary hardship forbearance
 9      where a person is requesting it.  It
10      should be applied based on the
11      circumstances.  So administrative would
12      have been a better word.  But, you know, I
13      think we clarified this earlier in the
14      dep.
15                   And just the fact that that
16      type of forbearance is applied, the 60-day
17      noncapping, at least that fact itself
18      would be searchable on a systemwide basis,
19      correct?
20          A.     It would be and -- however, I
21      would be leery of using that alone as
22      there may be other reasons for a 60-day-
23      or other-number-of-day administrative
24      forbearance to be applied to a borrower's
```


MAGNA
LEGAL SERVICES

Page 191

```
 1              MS. MILLER:  Tony, can we take
 2       a quick break, please?
 3              MR. FIORENTINO:  Yeah.  No
 4       problem.  Do you guys want to come
 5       back at 1:05, or 2:05 in
 6       Pennsylvania?
 7              MS. SIMONETTI:  Sure.  Yeah.
 8              MR. FIORENTINO:  Thanks.
 9                    - - -
10              (At this time, a short break
11       was taken.)
12                    - - -
13   BY MR. FIORENTINO:
14       Q.    Okay.
15              I'm really going to try to skip
16   ahead a little bit more in the interest of
17   time.  So let's just go ahead and skip to
18   Exhibit-D.
19                    - - -
20              (At this time, a document was
21       marked for identification as
22       Exhibit-D.)
23                    - - -
24   BY MR. FIORENTINO:
```



Page 192

1        Q.    And if you could scroll down to

2   modified search 3.  Mr. Theurer, based on

3   the conversation we were just having, I

4   just want to see if we can clean up

5   modified search 3 and just make it

6   feasible.  So let me read this one into

7   the record and then we'll talk about it.

8   Modified Search 3, part A, "On or after

9   January 16, 2012, the borrower submitted

10  an application to enroll in an IDR plan."

11  B, "NSL enrolled the borrower in a 60-day

12  noncapping administrative forbearance

13  which was in effect while that application

14  was under review."  Part C, "Concurrent

15  with or during the 60-day administrative

16  forbearance, NSL also enrolled the

17  borrower in an interest-capping

18  discretionary forbearance based on the

19  borrower's oral affirmation."

20            So based on this language,

21  Mr. Theurer, are there any obstacles that

22  you can identify that would make this a

23  not feasible search?

24            MS. SIMONETTI:  Can you make it



Page 193

```
 1        a little bigger, please?
 2              THE WITNESS:  Yeah.  I would
 3        have to research for -- start with A.
 4        We've all seen the other ones.  A
 5        makes sense.  B, to -- no.  I think
 6        we could -- B appears reasonable.  C,
 7        there's no concurrent.  A loan has
 8        one status and one status only.
 9        Different loans for a borrower may
10        have different statuses, although
11        that may be somewhat unusual.  We
12        don't have concurrent statuses.  The
13        loans is in one status at a time.
14        I'm very confused by C.
15   BY MR. FIORENTINO:
16        Q.    I see.  Okay.
17              So suppose there is a situation
18   where somebody is first enrolled in the
19   60-day noncapping administrative
20   forbearance, but then a week later they're
21   enrolled in a discretionary hardship
22   forbearance based on oral affirmation.  So
23   what I'm trying to say is during the
24   60-day period of the administrative
```



Page 194

1    forbearance, at some time in that window,

2    they were also enrolled in a verbal

3    forbearance, hardship forbearance, based

4    on oral affirmation.  Now, maybe the

5    wording here is inaccurate because once

6    it -- maybe it's not concurrent.  It

7    shifts, then, from the admin forbearance

8    to the -- to another status, to a hardship

9    status.

10             Would that be why it would not

11   be concurrent, because then it's changing

12   status?

13        A.   Again, the loan can only have

14   one status, so it would have to change

15   status.  It would not be concurrent.  I'm

16   again...

17        Q.   Okay.

18             Do you understand --

19        A.   Can I ask you to give an

20   example?

21        Q.   Sure.  Sure.

22             So let's say on March 1st --

23   March 1st, somebody is enrolled in a

24   60-day admin forbearance, the noncapping



Page 195

1    time, in connection with their IDR plan

2    enrollment, and sometime in the next 60

3    days, so sometime in either March or

4    April, they're enrolled into a hardship

5    discretionary forbearance based on oral

6    affirmation.  Let's say that happens ten

7    days after, on March 10th.

8              So what I'm trying to get at is

9    a group of people, where before those 60

10   days were up, they were moved from one

11   kind of forbearance into another.

12             Before we figure out how to

13   phrase it, do you understand the scenario

14   I'm identifying?

15        A.    Now I understand the scenario

16   you are referring to.

17        Q.    Okay.

18             What would be the best way to

19   articulate that for search purposes?  I

20   can give you --

21             MS. SIMONETTI:  Are you going

22        to -- it is up to you to draft your

23        own discovery.

24             MR. FIORENTINO:  Okay.



Page 196

1              MS. SIMONETTI:  Yeah.

2              MR. FIORENTINO:  That's fair.

3         That's fair.

4    BY MR. FIORENTINO:

5         Q.    Let me give you an example and

6    just tell me if you think this would

7    enhance the feasibility.

8              During the 60-day

9    administrative forbearance period, the

10   borrower's status changed from admin

11   forbearance to discretionary forbearance

12   based upon a forbearance request supported

13   by oral affirmation.

14             Now, would that clarify the

15   part C?

16        A.    Again, I would want to talk to

17   my team.  But, yes, I believe the way you

18   phrased it there would be searchable.

19        Q.    Okay.

20             And let's just --

21             MR. FIORENTINO:  So, Ingrid, if

22        you could just delete all of C.  I

23        just want to -- just to be fair to

24        give Mr. Theurer a chance to see it


MAGNA
LEGAL SERVICES