## <u>APPENDIX OF UNPUBISHED OPINIONS</u>

1.  *Agrelo v. Meloni Law Firm*, No. 14-21192-CIV, 2017 WL 10636451 (S.D. Fla. Sept. 22, 2017)

2.  *Beach v. Guardian Life Ins. Co. of America*, Case No. 1:23-cv-2190-MLB, 2024 WL 3551132 (N.D. Ga. Jan. 26, 2024)

3.  *Emcyte Corp. v. XLMedica, Inc.*, No. 2:19-cv-769-JES-NPM, 2022 WL 394392 (M.D. Fla. Feb. 9, 2022)

4.  *Fulton Fin. Advisors, Nat'l Ass'n v. NatCity Invs., Inc.*, No. 09-4855, 2013 WL 5635977 (E.D. Pa. Oct. 15, 2013)

5.  *Graham Eng'g Corp. v. Slusarz*, No. 1:16-CV-2527, 2018 WL 1907124 (M.D. Pa. Apr. 23, 2018)

6.  *Lomma v. Ohio Nat'l Life Assurance Corp.*, No. 3:16-cv-2396, 2021 WL 772237 (M.D. Pa. Feb. 26, 2021)

7.  *Noramco LLC v. Dishman USA, Inc.*, No. CV 21-1696-WCB, 2022 WL 2817876 (D. Del. July 19, 2022)

8.  *Savage v. Temple Univ.*, No. 19-6026-KSM, 2020 WL 5602651 (E.D. Pa. Sept. 18, 2020)

9.  *Thomas v. Duvall*, No. 3:16-CV-00451, 2019 WL 8013742 (M.D. Pa. Oct. 3, 2019), *report and recommendation adopted by* 2019 WL 6769324 (M.D. Pa. Dec. 12, 2019)

10. *Westport Ins. Corp. v. Stevens & Lee, P.C.*, No. 2:16-cv-937, 2016 WL 9775023 (E.D. Pa. June 30, 2016)

11. *Wigley v. Powe*, No. 2:23-CV-46-TBM-RPM, 2024 WL 5353375 (S.D. Miss. Mar. 14, 2024)

12. *Wincovitch v. Edwin A. Abrahamsen & Assocs.*, No. 3:12-CV-01846, 2013 WL 1909578 (M.D. Pa. May 8, 2013)

1

Agrelo v. Meloni Law Firm, Not Reported in Fed. Supp. (2017)

2017 WL 10636451

2017 WL 10636451
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

Jorge A. AGRELO and Olga M.
Fernandez, individuals, Plaintiffs,
v.
The MELONI LAW FIRM, a/k/a
Edoardo Meloni, P.A., et al., Defendants.

Case Number: 14-21192-CIV-
MARTINEZ-GOODMAN
|
Signed 09/22/2017

**Attorneys and Law Firms**

Samuel Barclay Reiner, II, David P. Reiner, II, Reiner
& Reiner PA, Miami, FL, for Plaintiffs.

Joseph Charles Proulx, Dale Thomas Golden, Golden
Scaz Gagain, PLLC, Tampa, FL, for Defendants the
Meloni Law Firm, Edoardo Meloni.

Craig S. Hudson, Jean Anne Hanrahan, Marshall,
Dennehey, Warner, Coleman and Goggin, Fort
Lauderdale, FL, for Defendant Affinity Management
Services, LLC.

Joseph Francisco Valdivia, Akerman LLP, Rachel
Kate Beige, Eric C. Sprechman, Cole, Scott and
Kissane, P.A., Ryan Andrew Fogg, David Halberg,
P.A., West Palm Beach, FL, for Defendant Marbella
Park Homeowners' Association, Inc.

**ORDER**

JOSE E. MARTINEZ, UNITED STATES DISTRICT
JUDGE

**\*1** THIS CAUSE came before the Court upon
Plaintiffs' Motion to Strike Defendant Affinity
Management Services, LLC's ("Defendant Affinity")
Answer and Affirmative Defenses [ECF No. 115] (the
"Motion") [ECF No. 167]. The Motion seeks to strike
the following: (a) paragraphs 5-12, 26, 88, 91, and
94 of Defendant Affinity's Answer; and (b) all of
Defendant Affinity's Affirmative Defenses.

Plaintiffs note that paragraphs 5-12 of Defendant
Affinity's Answer initially deny Plaintiffs' allegations
and then immediately assert lack of knowledge.
Plaintiffs request that these responses be deemed
simple denials by the Court for the remainder of the
litigation. In its response, Defendant Affinity agrees.
Thus, paragraphs 5-12 of Defendant Affinity's Answer
are deemed simple denials.

Next, Plaintiffs argue that paragraph 26 of Defendant
Affinity's Answer is improper, because it is ambiguous
and includes the following language: "the document
speaks for itself." Plaintiffs request that such errors be
deemed admissions. Paragraph 26 states, "Admitted
that the 'Abdel Letter 1' speaks for itself. The
remaining allegations of this paragraph are hereby
denied." Defendant Affinity responds to the Motion as
follows:

> In terms of paragraph 26 ...
> Affinity agrees that its Answer
> could have been more specific.
> Affinity should have admitted
> that on April 3, 2013, it
> received by certified mail, the
> letter from the law offices
> of Abdel Jimenez, Esq., dated
> April 1, 2013 that is attached
> as Exhibit J to Plaintiffs'
> Complaint. Affinity also admits
> that Affinity did not send a
> written response to the law
> office of Abdel Jimenez, Esq.

Because Defendant Affinity included in paragraph 26
that it denies the remaining allegations, the Court will
not deem such paragraph an admission. *See Gomez v.
United States*, No. 09-22148-CIV, 2010 WL 3834211,
at \*2 (S.D. Fla. Sept. 28, 2010). However, to clarify
the ambiguity of paragraph 26 raised by Plaintiffs,
Defendant Affinity shall file an amended paragraph
26 that includes the aforementioned admissions (the
"Abdel Admissions").

With respect to paragraphs 88, 91, and 94 of Defendant
Affinity's Answer, Plaintiffs request that the Court

strike all references to "strict proof demanded," because the concept of "strict proof," is nowhere to be found in the Federal Rules of Civil Procedure. Defendant Affinity responds that Plaintiffs do not provide a citation as to why this is improper. The Court agrees with Plaintiffs and will strike all references to "strict proof demanded" in paragraphs 88, 91, and 94 of Defendant Affinity's Answer.

Regarding the Affirmative Defenses, Defendant Affinity responds that the First, Second, Third, Fourth and Fifth Affirmative Defenses are really denials and are not true affirmative defenses. As such, the Court strikes such defenses. *See Wiemer v. Felberbaum & Assocs., P.A.*, No. 07-80934-CIV, 2008 WL 299016, at *2 (S.D. Fla. Feb. 1, 2008). Additionally, Defendant Affinity withdraws the Sixth, Eight, Ninth, Tenth, Eleventh, Twelfth and Fourteenth Affirmative Defenses. The Court strikes such defenses.

 **\*2** With regard to the Seventh Affirmative Defense (statute of limitations), Plaintiffs argue that this defense should be stricken, because, among other things, Defendant Affinity fails to provide any factual allegations to support such defense. Courts in this district have developed two schools of thought regarding the pleading standard required for affirmative defenses, and the Eleventh Circuit does not appear to have resolved the split of opinion. *See Jones v. Kohl's Dep't Stores, Inc.*, No. 15-CIV-61626, 2015 WL 12781195, at *1 (S.D. Fla. Oct. 16, 2015). Some courts in this district have held that affirmative defenses are subject to the heightened pleading standard of Federal Rule of Civil Procedure 8(a). *See id.* Other courts in the district have concluded that affirmative defenses are subject to a less stringent standard under Rules 8(b) and 8(c). *See id.* In short, Defendant Affinity's Seventh Affirmative Defense would be sufficient for some courts in the district, but not others. As a result, the Court will not strike the Seventh Affirmative Defense. However, to give Plaintiffs fair notice, Defendant Affinity shall amend such defense to provide sufficient facts that satisfy the heightened pleading standard of Rule 8(a).

Lastly, Defendant Affinity concedes that the Thirteenth Affirmative Defense is not sufficient. As a result the Court will strike such defense. If Defendant Affinity wants to amend this affirmative defense, it may file a motion for leave to amend and the Court will consider such motion. Such motion should address the concerns raised by Plaintiffs in the Motion and their reply. After careful consideration, it is hereby:

**ORDERED AND ADJUDGED** that

1. Plaintiffs' Motion to Strike Defendant Affinity's Answer and Affirmative Defenses [1] [ECF No. 167] is **GRANTED IN PART AND DENIED IN PART.**

2. Paragraphs 5-12 of Defendant Affinity's Answer are deemed simple denials.

3. **On or before October 3, 2017**, Defendant Affinity shall file an amended paragraph 26 of its Answer that includes the Abdel Admissions.

4. References to "strict proof demanded" in paragraphs 88, 91, and 94 of Defendant Affinity's Answer are **STRICKEN.**

5. Defendant Affinity's First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth and Fourteenth Affirmative Defenses are **STRICKEN.**

6. **On or before October 3, 2017**, Defendant Affinity shall file an amended Seventh Affirmative Defense to provide sufficient facts that satisfy the heightened pleading standard of Rule 8(a).

7. If Defendant Affinity wants to amend its Thirteenth Affirmative Defense, it may file a motion for leave to amend such defense and the Court will consider such motion.

DONE AND ORDERED in Chambers at Miami, Florida, this 22nd day of September, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 10636451

**Agrelo v. Meloni Law Firm, Not Reported in Fed. Supp. (2017)**

2017 WL 10636451

### Footnotes

1       ECF No. 115.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2

2024 WL 3551132
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

James Alton BEACH, Plaintiff,

v.

The GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA, Defendant.

Case No. 1:23-cv-2190-MLB
|
Signed January 26, 2024

**Attorneys and Law Firms**

Henry Milton Quillian III, Casey L. Frew, Taylor English Duma LLP, Atlanta, GA, Robbin L. Wilder, Gordon Rees Scully Mansukhani, LLP, Atlanta, GA, for Plaintiff.

Ashlee Dee Riopka, Pro Hac Vice, Alexander Bunnen Feinberg, Maynard Nexsen, P.C., Birmingham, AL, Daniel L. Delnero, BGD Legal & Consulting LLC, Atlanta, GA, Stefanie Wayco, Duane Morris LLP, Atlanta, GA, for Defendant.

## ORDER

MICHAEL L. BROWN, UNITED STATES DISTRICT JUDGE

**\*1** For the reasons explained below, the Court denies Plaintiff James Alton Beach's motion to strike Defendant's answer. (Dkt. 14.)

### I. Background

Plaintiff worked as an executive for a company called American Computer Experience, Inc. until 2000 when he allegedly became disabled. (Dkt. 1 ¶¶ 7, 15, 16.) He filed a claim for long-term disability benefits under his company's employee benefit plan. (*Id.* ¶ 10.) Defendant Guardian Life Insurance— the company that underwrote and administered the plan—initially determined Plaintiff was disabled and provided benefits. (Dkt. 1 ¶ 19.) In May 2021, however, Defendant informed Plaintiff he was no longer eligible for those benefits. (Dkt. 1 ¶¶ 20–

21.) Plaintiff appealed Defendant's decision but to no avail. (Dkt. 1 ¶¶ 25–30, 65–66.) Plaintiff then sued Defendant under 29 U.S.C. § 1332, alleging Defendant wrongfully terminated his benefits. (Dkt. 1 ¶¶ 84–94.)

Defendant filed an answer and, in doing so, sometimes referred to certain documents or asserted Plaintiff's allegations called for legal conclusions. (Dkt. 10.) Plaintiff moves to strike Defendant's answer, saying it does not meet federal pleading standards. (Dkt. 14.) Defendant filed an amended answer, addressed some of Plaintiff's concerns (Dkt. 17), and opposes Plaintiff's motion (Dkt. 18).

### II. Standard

Rule 12(f) of the Federal Rules of Civil Procedure allows district courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). District courts have "broad discretion in considering a motion to strike under" Rule 12(f). *Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1317 (S.D. Fla. 2005). "Striking a pleading is a 'drastic remedy' that courts should use 'sparingly' and 'only when required for the purposes of justice.' " *Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, 2011 WL 5829674, at *2 (N.D. Ga. Aug. 1, 2011) (citation omitted); *see also Tsavaris v. Pfizer, Inc.*, 310 F.R.D. 678, 680 (S.D. Fla. 2015) ("[S]triking a defense from a pleading is a drastic remedy generally disfavored by courts."). For this reason, "courts should not exercise discretion to strike pleadings or portions of pleadings unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Carter v. Howard*, 2020 WL 9073531, at *7 (N.D. Ga. Nov. 23, 2020).

"A purpose of motions to strike is to prevent wasting unnecessary time and expense of the parties and the Court." *Certusbank N.A. v. Patrick Malloy Communities, LLC*, 2012 WL 12960828, at *1 (N.D. Ga. July 12, 2012). "Where a claim or defense is not utterly meritless, a motion to strike has the paradoxical effect of requiring extra time and expense by the parties in crafting and responding to the motion and depletion of precious Court resources in considering, researching, and ruling on the motion." *Id.* (emphasis in original). To that end, "[m]otions to strike

**Beach v. Guardian Life Insurance Company of America, Slip Copy (2024)**

2024 WL 3551132

affirmative defenses ... are often considered purely cosmetic or time-wasters." *City of Jacksonville, Fla. v. Mun. Elec. Auth. of Ga.*, 2019 WL 7819486, at *4 (N.D. Ga. Nov. 25, 2019) (internal quotation marks and citations omitted).

## III. Discussion

**\*2** Plaintiff claims Defendant's answer is insufficient because it fails to plead "the same level of specificity as Plaintiff's claims under the standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ... and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." (Dkt. 14-1 at 6.) Plaintiff is wrong. Rule 8 of the Federal Rules of Civil Procedure "sets a different standard for *responding* to a pleading." *F.D.I.C. v. Stovall*, 2014 WL 8251465, at *3 (N.D. Ga. Oct. 2, 2014) (emphasis in original). "In responding to a pleading, the responding party must 'state *in short and plain terms* its defenses to each claim' and 'affirmatively state any avoidance or affirmative defense.' " *Id.* (emphasis in original) (quoting Fed. R. Civ. P. 8(b), (1)(A), (c)(1)). This is a lower standard than the Rule's requirement that a plaintiff file a "short and plain statement *showing* that the pleader is entitled to relief[.]" *Id.* (emphasis in original) (quoting Fed. R. Civ. P. 8(a)). So the Court declines to hold Defendant's answer to the same pleading standard as Plaintiff's complaint. *See City of Jacksonville, Fla. v. Mun. Elec. Auth. of Ga.*, 2019 WL 7819486, at *4 (N.D. Ga. Nov. 25, 2019) (courts in this district "do not apply the heightened pleading requirements" of *Twombly* and *Iqbal* to responsive pleadings).

Beyond that general insufficiency allegation, Plaintiff says Defendants answer (or amended answer) is insufficient because it does not admit, deny, or assert a lack of knowledge for each paragraph in the complaint. (Dkt. 14-1 at 5–6.) They point to two categories of Defendant's responses: (1) ones in which Defendant says that certain documents speak for themselves and that it "denies any allegations inconsistent therewith" (Dkt. 14-1 at 8–13); and (2) ones in which Defendant responds that Plaintiff's allegations are "legal conclusions, to which no response is required," (Dkt. 14-1 at 14–15). [1] Plaintiff says these responses are improper because (1) the administrative record and benefits policy Defendant references have "not been acknowledged, agreed upon,

or established," (Dkt. 14-1 at 8); and (2) "[t]here is no Federal Rule permitting a defendant to disregard legal conclusions in a complaint," (Dkt. 14-1 at 14). Plaintiff next attacks the sufficiency of Defendant's pleadings regarding two affirmative defenses. The Court rejects all Plaintiff's arguments and concludes Defendant's pleading satisfies Rule 8.

### A. Answer Responses That Refer to Certain Documents from the Administrative Record

Plaintiff attacks Defendant's answer responses that refer to certain documents in the so-called "administrative record" and deny any allegations inconsistent with those documents. His argument fails for two reasons. First, Plaintiff's argument is largely mooted. Plaintiff contends these responses "disadvantage" him because they "direct[ ] [him] to a document, or documents, that [Defendant] does not provide." (Dkt. 14-1 at 8.) But Defendant represents (and Plaintiff does not dispute) that it has since given Plaintiff a copy of the complete administrative record, including the benefits policy, and "a list of specific bates-label cites to certain documents within the Administrative Record that are referenced in [Defendant's] Answer." (Dkt. 19 at 8.) So that should resolve that.

Second, even if Defendant had not provided Plaintiff with this information, its responses satisfy Rule 8 because they also specifically deny the allegations at issue. *See Saunders v. Postcard Factory, Inc.*, 2019 WL 13273203, at *4 (N.D. Ga. Sept. 23, 2019) ("[S]imply including the phrase 'the document speaks for itself,' does not require striking the answer as a violation of Rule 8; indeed, some courts have declined to strike an answer stating that the document 'speaks for itself' where the defendant has also either admitted or denied the allegations."); *Westgate Fin. Corp. v. Cotswold Indus., Inc.*, 2009 WL 10211922, at *5 (N.D. Ga. Dec. 31, 2009) (declining to strike response that document "speaks for itself" because defendants' response also "contain[ed] either an admission or denial ... therefore, their responses fully comply with Rule 8.").

**\*3** In arguing Defendant's answer is inadequate, Plaintiff points to *Stovall*, in which the court held certain responses referencing documents that speak

**Beach v. Guardian Life Insurance Company of America, Slip Copy (2024)**

2024 WL 3551132

for themselves were impermissible under Rule 8. (Dkt. 14-1 at 5–6 (citing *Stovall*, 2014 WL 8251465, at *3).) But in *Stovall*, the defendant's responses vaguely referred to "documents" without explaining the particular documents at issue. *Id.* at *12. That is not an issue here. Defendant not only identified the documents it relied on, it also produced those documents to Plaintiff and noted where in the documents Plaintiff can find the information he wants. So by way of one example, Plaintiff alleged Defendant first paid Plaintiff benefits but then "informed him by letter on May 20, 2021 that he would no longer receive benefits because he was no longer was eligible for benefits under the Plan." (Dkt. 1 ¶ 20.) Defendant admitted that it denied benefits by sending the letter and then stated "the May 20, 2021 letter, contained within the Administrative Record, speaks for itself, and denies any allegations inconsistent therewith." (Dkt. 17 ¶ 20.) Without accepting Plaintiff's characterization of the letter (or offering its own), Defendant referenced the precise letter that establishes the operative fact and denied anything beyond the letter. That is sufficient.

While Plaintiff says Defendant does not provide a precise record cite for "numerous specific allegations denied with reference to the 5,000-plus page record," the only example he cites is one in which Defendant says the administrative record "speak[s] for itself regarding the correspondence between Plaintiff and Defendant during the administrative process and evidence considered during Defendant's review of Plaintiff's claim," while denying any inconsistent allegation. (Dkt. 17 ¶ 63.) There is nothing wrong with that response. Defendant represents the administrative record is "complete," so it will reflect all the correspondence the parties had during the determination and appeals process and what Defendant looked at when assessing Plaintiff's request for long term disability benefits. And if something is missing, Plaintiff can ask for more in discovery. It seems like what Plaintiff really wants is for Defendant to take a premature position on what evidence from the administrative record it will rely on in contesting Plaintiff's claims. But Rule 8 does not require that level of specificity at this stage of the litigation.

**B. Responses That Refer to Legal Conclusions**

Plaintiff also complains about responses in which Defendant declined to address allegations that are "legal conclusions," arguing that "[t]here is no Federal Rule permitting a defendant to disregard legal conclusions in a complaint." (Dkt. 14-1 at 14.) Defendant says its responses are sufficient because, along with "taking the position that certain allegations contain legal conclusions not warranting a response, [Defendant] specifically denied or admitted the allegations at issue." (Dkt. 19 at 12.)

Courts in this circuit have recognized that while Rule 8 might not permit a defendant to merely respond that a plaintiff has alleged a legal conclusion, such responses are "sufficient under Rule 8(b)" when they "also state that the allegations are denied" or admitted. *Emcyte Corp. v. XLMedica, Inc.*, 2022 WL 394392, at *3 (M.D. Fla. Feb. 9, 2022). Each of Defendant's responses that challenge Plaintiff's allegations as legal conclusions also contain a specific admission or denial. Those responses are adequate under Rule 8.

In arguing otherwise, Plaintiff cites *Clarendon Am. Ins. Co. v. All Bros. Painting*, 2013 WL 5921538, at *3 (M.D. Fla. Nov. 4, 2013). (Dkt. 14-1 at 14.) But *Clarendon*—like *Stovall*—also involved responses that did not admit or deny the specific allegations at issue, and instead contained only a "general denial." *Clarendon*, 2013 WL 5921538, at *3. Again, Defendant's responses here are different: they specifically admit or deny each allegation. The Court will not strike these responses.

**C. Affirmative Defenses**

As a final argument, Plaintiff seeks to strike two of Defendant's affirmative defenses: its thirteenth defense, which says Defendant is not "required to respond to the allegations in Plaintiff's Complaint to the extent the allegations constitute legal conclusions," and its fourteenth defense, which says, "Defendant reserves the right to rely on the defense that Plaintiff's claims are barred in whole or part by the Plan's limitations provisions, if any, or the applicable statute of limitations." (Dkts. 14-1 at 17; 17 at 24.) Defendant says its thirteenth defense survives for the same reasons as its responses that challenge Plaintiff's allegations as legal conclusions. (Dkt. 19 at 15.) As

**Beach v. Guardian Life Insurance Company of America, Slip Copy (2024)**

2024 WL 3551132

for its fourteenth defense, Defendant says a statute-of-limitations defense is never insufficient as a matter of law. (Dkt. 19 at 15–16.)

**\*4** "A party is not required to make a 'plausibility' showing to successfully assert an affirmative defense." *Kinfe v. Canon Bus. Process Servs., Inc.*, 2019 WL 13268208, at \*4 (N.D. Ga. July 9, 2019). Instead, Rule 8 requires only that a defendant "affirmatively *state* any avoidance or affirmative defense." Fed. R. Civ. P. 8(c) (emphasis added). Courts review affirmative defenses only "to ensure that they provide fair notice of the nature of the defenses and the grounds upon which they rest." *United States v. Zak*, 2020 WL 11191759, at \*1 (N.D. Ga. July 16, 2020). A court should strike an affirmative defense only if: (1) the plaintiff would succeed despite any set of facts which could be proven to support the defense; (2) the affirmative defense does not present disputed and substantial questions of law which, if resolved, could support the defendant's claim; and (3) the plaintiff has shown it would be prejudiced if the affirmative defense is included. *PNC Bank, N.A. v. Haghighi Fam. & Sports Med., P.A.*, 2017 WL 7311870, at \*3 (M.D. Fla. June 2, 2017).

As for Defendant's thirteenth defense, the Court concludes it is appropriate for the same reasons as before: that Defendants may challenge Plaintiff's allegations as mere legal conclusions without factual support in the complaint (particularly because they also expressly admitted or denied those allegations). As to the fourteenth defense, Rule 8 explicitly allows a defendant to raise a statute-of-limitations defense. *See Schmidt v. Wells Fargo Bank, N.A.*, 2020 WL 1703801, at \*3 (M.D. Fla. Apr. 8, 2020) ("a statute of limitations defense is specifically enumerated in Rule 8(c)" and is not insufficient as a matter of law). So Defendant's affirmative defenses survive.

Ultimately, Plaintiff's motion to strike serves no useful purpose and is a merely a "time-waster." *City of Jacksonville*, 2019 WL 7819486, at \*4. And Plaintiff knew—or should have known—as much, especially given that Defendant identified several pleadings filed by Plaintiff's counsel's law firm that asserted similar or nearly identical responses to those Plaintiff challenges now. (Dkt. 19 at 6 n.1.) The goose and gander rule comes to mind. In any event, the Court declines to impose the "drastic remedy" of striking Defendant's answer, particularly when it is clear from Rule 8 and the case law that its responses are sufficient under federal pleading standards.

### IV. Conclusion

The Court **DENIES** Plaintiff's Motion to Strike Defendant's Answer to Plaintiff's Complaint or For a More Definitive Statement (Dkt. 14).

**SO ORDERED** this 26th day of January, 2024.

### All Citations

Slip Copy, 2024 WL 3551132

---

### Footnotes

1    Plaintiff also asks the Court to strike responses from Defendant that—along with denials—request "strict proof" of certain allegations. (Dkt. 14-1 at 15.) Defendant, however, "filed an Amended Answer that excludes the 'demands strict proof' language." (Dkts. 19 at 14; 17.)So that issue is moot.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

3

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

2022 WL 394392
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Fort Myers Division.

EMCYTE CORP., Plaintiff,
v.
XLMEDICA, INC., and Anna Stahl, Defendants,
XLMedica, Inc., and Anna
Stahl, Counter-Plaintiffs,
v.
EmCyte Corp., Counter-Defendant,
And
Patrick Pennie, Third Party-Defendant.

Case No: 2:19-cv-769-JES-NPM
|
Signed 02/09/2022

**Attorneys and Law Firms**

Kenneth G.M. Mather, Gunster, Yoakley & Stewart, PA, Alejandro J. Fernandez, Akerman LLP, Tampa, FL, Amanda Nicole Kreger, Jacksonville, FL, Stephen John Leahu, Keyport, WA, for Plaintiff.

Patricia M. Flanagan, Alex Louis Braunstein, Fox Rothschild LLP, West Palm Beach, FL, Brian A. Williamson, Pro Hac Vice, Callagy Law, P.C., Phoenix, AZ, Jeffrey Lewis Greyber, Callagy Law, PC, Boca Raton, FL, Michael J. Smikun, Callagy Law, P.C., Paramus, NJ, for Defendants.

Kenneth G.M. Mather, Gunster, Yoakley & Stewart, PA, Alejandro J. Fernandez, Akerman LLP, Tampa, FL, Amanda Nicole Kreger, Jacksonville, FL, Stephen John Leahu, Keyport, WA, for Counter-Defendant.

## OPINION AND ORDER

JOHN E. STEELE, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** This matter comes before the Court on review of plaintiff's Omnibus Motion to Dismiss Amended Counterclaims and Strike Affirmative Defenses, Immaterial, Scandalous Allegations, and Improper Answers (Doc. #124) filed on August 6, 2021. This

motion seeks to (1) strike portions of the Amended Answer; (2) strike all of the affirmative defenses; (3) strike portions of the Counterclaim; and (4) dismiss two counts of the Counterclaim. Defendants/Counter-Plaintiffs filed a Response in Opposition (Doc. #125) on August 17, 2021. For the reasons set forth below, the motion is granted in part and denied in part.

### I.

In a prior Opinion and Order (Doc. #109), the Court gave an overview of plaintiff's allegations in this case.

Plaintiff EmCyte Corporation (Plaintiff or EmCyte) initiated this lawsuit against defendants XLMedica, Inc., Anna Stahl, and Apex Biologix, LLC (collectively Defendants, or individually XLMedica, Stahl, or Apex). (Doc. #1). The Second Amended Complaint (Doc. # 22) (SAC) alleges that EmCyte is the world leader in Platelet Rich Plasma (PRP) and Progenitor Stem Cell Biologics. (Doc. #22, ¶ 1.) For over 20 years, EmCyte has manufactured blood concentrating systems, and develops, improves, and commercializes state-of-the-art devices used in preparing autologous platelet rich plasma from blood samples and bone marrow. (Id. at ¶¶ 12-13, 15.) The SAC alleges that Plaintiff's blood concentrating systems include the PURE PRP® SupraPhysiologic (PURE PRP) and PURE BMC™ SupraPhysiologic (PURE BMC) products, both of which are protected under federal, state, or common law trademark and unfair competition laws. (Id. at ¶¶ 14, 16(Figure 1), 17, 19(Figure 2), 20(Figure 3), 27.) Plaintiff has continuously and extensively promoted its trademarked products in interstate commerce in connection with blood concentrating products since March 13, 2012. (Id. at ¶¶ 22, 24.)

The SAC further alleges that defendant Stahl, a former EmCyte employee and distributor, founded XLMedica to directly compete with EmCyte. (Doc. #22, ¶¶ 38, 41-45.) Stahl and XLMedica undertook a multifaceted trademark infringement and unfair competition campaign squarely aimed at EmCyte and its customers by selling products offered under infringing marks, i.e. PURE PRP KIT and PURE BMA CONCENTRATION KIT, or confusingly similar variants (Infringing Marks) that usurp the

**EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)**

2022 WL 394192

goodwill associated with EmCyte's trademarks. (Id. at ¶¶ 43-45, 51 (Figures 6 and 7.))

The SAC sets forth the following remaining claims: trademark infringements in violation of 15 U.S.C. § 1114 (Count I); contributory trademark infringements under § 1114 and common law (Count II); unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count III); common law unfair competition (Count IV); infringement of Florida TM No. T19000001087 (Count V). Plaintiff seeks injunctive relief to prohibit XLMedica and Stahl from using the Infringing Marks and engaging in unfair competition, a declaratory judgment related to its trademarks, compensatory and punitive damages, and reasonable attorney's fees. (Id., pp. 24-26.)

**\*2** (Doc. #109, pp. 1-3.) This Opinion and Order denied a motion to dismiss the SAC.

In due course Defendants filed an Amended Answer and Counterclaim With Demand For Jury Trial and Injunctive Relief (Doc. #123), which included an Answer, a three-count First Amended Counterclaim (the Counterclaim), and nine affirmative defenses. Defendants' Counterclaim asserts counts alleging: (1) entitlement to a declaratory judgment of invalidity and cancellation; (2) tortious interference with advantageous business relationship; and (3) abuse of process. (Id., pp. 18-21.)

Plaintiff now moves to dismiss the second and third counts of the Counterclaim for failing to state a claim. Plaintiff also seeks to strike all of Defendants' affirmative defenses, and certain improper answers and immaterial facts contained in the Amended Answer. (Doc. #124, p. 2.) Defendants respond that they have adequately pled the counts in their Counterclaim, and that neither their affirmative defenses nor the other allegations should be stricken since they are neither frivolous nor invalid as a matter of law. (Doc. #125, pp. 2, 10-11.)

The Court will address Plaintiff's motion to strike portions of the Amended Answer, the affirmative defenses, and the Counterclaim, and then the motion to dismiss the Counterclaim.

**II.**

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). "An allegation is 'impertinent' or 'immaterial' when it is neither responsive nor relevant to the issues involved in the action." Sprengle v. Smith Mar. Inc., No. 3:20-cv-1348-MMH-JRK, 2021 WL 2003102 at *2, 2021 U.S. Dist. LEXIS 94974 at *6 (M.D. Fla. May 19, 2021). " 'Scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." Id. (citation omitted). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." Hutchings v. Fed. Ins. Co., No. 6:08-cv-305-Orl-19KRS, 2008 U.S. Dist. LEXIS 75334, 2008 WL 4186994, at *2 (M.D. Fla. Sept. 8, 2008). A motion to strike is often denied "unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." Bank of Am., N.A. v. GREC Homes IX, LLC, No. 13-21718, 2014 WL 351962, at *4, 2014 U.S. Dist. LEXIS 8316, at *14 (S.D. Fla. Jan. 23, 2014) (internal quotations and citations omitted).

**A. Improper Answers To SAC Allegations**

EmCyte argues that Defendants provided ambiguous answers to the allegations in paragraphs 21, 27, 29-32, 34-37, 40, 45, and 119 of the SAC. (Doc. #124, pp. 19-20.) Specifically, EmCyte takes exception to Defendants' answers stating that "to the extent an allegation sought to paraphrase or characterize the contents of a written document, the document speaks for itself and Defendants deny any allegations to the extent they are inconsistent with that document", or that certain allegations "state legal conclusions to which no answer is required" or "speak for themselves." Plaintiff argues that these answers should be stricken and properly amended. (Id.) Defendants respond that EmCyte's accusations overlook the entirety of Defendants' responses, which comply with Rule 8(b)(3). (Doc. #125, pp. 17-18.)

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 394392

**\*3** Rule 8(b) gives a party only three ways to respond to an allegation in a complaint: (1) admit the allegation; (2) deny the allegation; or (3) state that the party lacks knowledge or information sufficient to form a belief about the truth of the allegation. See Fed. R. Civ. P. 8(b)(1)(B), 8(b)(5); RE/MAX, LLC v. Prop. Professionals of Tampa Bay, Inc., No. 8:14-cv-419-T-33TGW, 2014 WL 2854991 at *1, 2014 U.S. Dist. LEXIS 55667 at *2 (M.D. Fla. Apr. 22, 2014). "A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted." Fed. R. Civ. P. 8(b)(3). "A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest." Fed. R. Civ. P. 8(b)(5). "An allegation ... is admitted if a responsive pleading is required and the allegation is not denied." Fed.R.Civ.P. 8(b)(6).

The Court finds EmCyte's motion to strike is not well-founded. While EmCyte may be correct that "Rule 8 does not permit a defendant to answer that an exhibit 'speaks for itself,' or that plaintiff has alleged a 'legal conclusion' ", Clarendon Am. Ins. Co. v. All Bros. Painting, No. 6:13-cv-934-Orl-22DAB, 2013 WL 5921538, at *3, 2013 U.S. Dist. LEXIS 157668, at *7 (M.D. Fla. Nov. 4, 2013), with one exception the offending paragraphs do not do just that. The paragraphs which state that a legal conclusion does not require an answer also state that the allegations are denied. See Doc. #123, ¶¶ 27, 34, 37, 45. This is sufficient under Rule 8(b). The paragraphs which state that a document speaks for itself go on to deny allegations which are inconsistent with the written document. See Doc. #123, ¶¶ 29, 30, 31, 32, 35, 36, 40, 119. The one exception is ¶ 21, which contains slightly different verbiage. In the context of the entire Answer, this too is sufficient to constitute a denial. Accordingly, EmCyte's motion to strike Defendants' answers to allegations in paragraphs 21, 27, 29-32, 34-37, 40, 45, and 119 of the Second Amended Complaint is denied.

### B. Immaterial and Prejudicial Allegations

EmCyte also argues that Defendants' Counterclaim is replete with immaterial and unfairly prejudicial allegations that must be stricken. (Doc. #124, p. 16.) EmCyte seeks to strike allegations in paragraphs 1, 2, 20, 27 through 29, and 58 (Doc. #123, pp. 13, 17, 21) of the Counterclaim because they assert an immaterial bankruptcy conspiracy theory or cast a derogatory

light on EmCyte and Mr. Pennie. (Doc. #124, pp. 17-20.) Specifically, EmCyte requests that following statements and/or paragraphs be stricken:

1. EmCyte's claims are designed and *intended to punish Anna Stahl*...EmCyte does not seek to vindicate legitimate rights but rather *is intent upon destroying Anna Stahl and XLMedica*...

2. *EmCyte's stratagem has already forced Anna Stahl and XLMedica into bankruptcy. Yet even this is not a sufficient pound of flesh*...EmCyte has continued to pursue *baseless claims* against Anna Stahl and XLMedica and *will not stop until [they] are ground into the dust*...

...

20. ...Because XLMedica and Anna Stahl were pursuing their own path separate and apart from EmCyte, EmCyte *retaliated by initiating legal action intended to punish Anna Stahl* for exercising independence from EmCyte.

...

27. While Plaintiff's claims have no merit, Patrick Pennie through EmCyte commenced this action based on insupportable and frivolous trademark infringement allegations in *a calculated attack designed to drive Anna Stahl and XLMedica from the industry*.

28. That Plaintiff and Mr. Pennie would take such an action is no surprise as *they have developed a reputation for such retaliatory lawsuits and anticompetitive conduct*.

**\*4** 29. Indeed, Plaintiff's relentless prosecution of this matter has already succeeded *in forcing Anna Stahl and XLMedica to seek bankruptcy protections*. Even so, *driving Ms. Stahl and XLMedica into bankruptcy* was not enough for Plaintiff, who had the bankruptcy stay lifted, so they *could continue their assault against Ms. Stahl and XLMedica* in this and a related state court lawsuit.

...

58. As previously mentioned, Counter-Defendant EmCyte initiated this lawsuit and a state action

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 15 of 106

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

before the Circuit Court of the 20th Judicial Circuit, Civil Division titled CASE NO.:19-CA-005819 *in an attempt to wrongfully leverage Anna Stahl and XLMedica into settling an unjust lawsuit and to force Counter-Plaintiffs into bankruptcy*.

(Doc. #123, ¶¶ 1-2, 20, 27-29, 58) (emphasis added).

The Court agrees that paragraphs 1 and 2 of the "Preliminary Statement" of the Counterclaim should be stricken since they are simply preliminary venting unrelated to the Counterclaim as a whole. The Court finds that the objected-to portions of ¶¶ 20, 27, 29, and 58 are sufficiently related to the abuse of process claim but that ¶ 28 is not. Accordingly, EmCyte's motion to strike portions of paragraphs 1, 2, and 28 is granted, but the motion to strike paragraphs 20, 27, 29, and 58 is denied.

**C. Affirmative Defenses**

EmCyte argues that all nine of Defendants' affirmative defenses should be stricken because they either do not provide fair notice of the grounds upon which the defense rests, are impermissible shotgun affirmative defenses, or are merely general defenses. (Doc. #124, pp. 14-16.)

Pursuant to Federal Rule of Civil Procedure 12(f), courts may strike "insufficient defense[s]" from a pleading, either upon a motion or sua sponte. Fed. R. Civ. P. 12(f); PK Studios, Inc., 2016 WL 4529323, at *2, 2016 U.S. Dist. LEXIS 116057, at *2; Morrison v. Executive Aircraft Refinishing, Inc., 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005) ("[A] court must not tolerate shotgun pleading of affirmative defenses, and should strike vague and ambiguous defenses which do not respond to any particular count, allegation or legal basis of a complaint." (citations omitted)).

Like counterclaims, affirmative defenses are subject to the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Daley v. Scott, No. 2:15-cv-269-FtM-29DNF, 2016 WL 3517697 at *1, 2016 U.S. Dist. LEXIS 83735 at *3 (M.D. Fla. June 28, 2016). Rule 8(b)(1)(A) requires a party to "state in short and plain terms its defenses to each claim asserted against it," and Rule 8(c) requires a party

to "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(b)(1)(A) and (c).

Compliance with Rule 8(c) requires a defendant to set forth "some facts establishing a nexus between the elements of an affirmative defense and the allegations in the complaint," so as to provide the plaintiff fair notice of the grounds upon which the defense rests. PK Studios, Inc. v. R.L.R. Invs., LLC, No. 2:15-cv-389-FTM-99CM, 2016 WL 4529323 at *2, 2016 U.S. Dist. LEXIS 116057 at *4-5 (M.D. Fla. Aug. 30, 2016) (quoting Daley, 2016 WL 3517697, at *3, 2016 U.S. Dist. LEXIS 83735, at *7). Boilerplate pleading — merely listing the name of the affirmative defense without providing any supporting facts — does not satisfy Rule 8(c) because it fails to provide notice sufficient to allow the plaintiff to rebut or properly litigate the defense. See Grant v. Preferred Research, Inc., 885 F.2d 795, 797 (11th Cir. 1989); Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988).

**\*5** In addition to pleading some facts tying the allegations in the complaint to the affirmative defenses asserted, a defendant must "identify the [specific] claim to which [each] defense applies." Lee v. Habashy, No. 6:09CV671ORL28GJK, 2009 U.S. Dist. LEXIS 99766, 2009 WL 3490858, at *4 (M.D. Fla. Oct. 27, 2009). Indeed, the Eleventh Circuit has routinely criticized shotgun pleading of affirmative defenses, that is, "affirmative defenses address[ing] the complaint as a whole, as if each count was like every other count," instead of each defense being directed at specific counts in the complaint. Byrne v. Nezhat, 261 F.3d 1075, 1129 (11th Cir. 2001); see also Ledford v. Peeples, 657 F.3d 1222, 1242 n.63 (11th Cir. 2011).

With these standards in mind, the Court turns to the nine challenged affirmative defenses.

**(1) Affirmative Defense One – Failure to State a Claim**

Defendants' first affirmative defense alleges that Plaintiff's Second Amended Complaint fails to state a claim on which relief may be granted. (Doc. #123, p. 12.) This is a "general" defense properly raised in a Rule 12(b) motion, not an "affirmative" defense to be asserted in a responsive pleading. See Roth v. Nationstar Mortg., LLC, No. 2:15-cv-783-FtM-29MRM, 2016 WL 7094023, at *2, 2016 U.S.

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

Dist. LEXIS 168025, at *4 (M.D. Fla. Dec. 6, 2016) (citing In re Rawson Food Serv., Inc., 846 F.2d 1343, 1349 & n.9 (11th Cir. 1988)). In any event, this affirmative defense is without merit on its face. Accordingly, the Court grants EmCyte's request to strike this defense. PK Studios, Inc., 2016 WL 4529323, at *2, 2016 U.S. Dist. LEXIS 116057, at *4-5.

**(2) Affirmative Defense Two – Statute of Limitations**

The second affirmative defense states that "the statute of limitations period for a trademark claim is four years, pursuant to Fla. Stat. § 95.11(3)" and that EmCyte's claim was not filed within the allotted time. (Doc. #123, p. 12.) EmCyte argues the second affirmative defense should be dismissed as it is nothing more than a boilerplate defense with no facts connecting the elements of the defense with the allegations in the Second Amended Complaint. (Doc. #124, p. 14.)

The statute of limitations defense is a specifically enumerated affirmative defense, Fed. R. Civ. P. 8(c)(1), which "must be specifically pled." Navarro v. Santos Furniture Custom Design, Inc., 372 F. App'x 24, 26 (11th Cir. 2010). While terse, this is sufficiently pled because it alleges the specific statute of limitations provision and references EmCyte's trademark claim, thus providing fair notice. Cf. Bowes v. Haymore, No. 13-14304-CIV-GRAHAM/LYNCH, 2014 WL 12862646, at *2–3, 2014 U.S. Dist. LEXIS 202692, at *7 (S.D. Fla. July 8, 2014) (striking a statute of limitations affirmative defense where no statutory provision or claim in the complaint was identified). EmCyte's motion to strike affirmative defense two is therefore denied.

**(3) Affirmative Defense Three - Trademark Consent**

In order to succeed on the merits of a trademark infringement claim under 15 U.S.C. § 1114, a plaintiff must show "(1) its mark was used in commerce by the defendant without the [plaintiff's] consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007). The Second Amended

Complaint alleges that defendants used Plaintiff's mark without its consent (Doc. #22, ¶¶ 38-45), and Defendants have denied that allegation. (Doc. #123, p. 6.)

As their third affirmative defense, Defendants state they "were authorized to utilize Plaintiff's marks and other content in the marketing of Defendants' goods and services, thus any and all use of Plaintiff's claimed trademarks was by consent." (Doc. #123, p. 12.) This is not an affirmative defense because it is simply a denial of an element Plaintiff must prove in its trademark infringement claim. In re Rawson Food Serv., 846 F.2d at 1349 & n.9. EmCyte's motion to strike the third affirmative defense is granted.

**(4) Affirmative Defense Four - Consent and No Rights to Descriptive Terms**

**\*6** The fourth affirmative defense states:

> Plaintiff has no rights to the exclusive use of the purely descriptive terms "Pure PRP," "Pure BMC," or "Pure BMA" because such terms are the proper scientific description of the function of the products created by Plaintiff, Apex, and other producers.

(Doc. #123, p. 12.) EmCyte moves to strike the defense on the ground that it is simply alleging a defect in its prima facie case (Doc. #124, p. 16), which Defendants do not deny. (Doc. #125, p. 12.) The Court finds that Defendants are in essence asserting that no trademark infringement occurred because EmCyte has no rights to the words "Pure PRP" and "Pure BMC." As previously mentioned, "point[ing] out a defect in the plaintiff's prima facie case is not an affirmative defense." Williamceau v. Dyck-O'Neal, Inc., No. 2:16-cv-855-FtM-29CM, 2017 WL 2544872 at *3, 2017 U.S. Dist. LEXIS 90244 at *6 (M.D. Fla. June 13, 2017). Accordingly, the Court will strike the fourth affirmative defense.

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

### (5) Affirmative Defense Five – Attorney's Fees Due To Bad Faith

In their fifth affirmative defense, Defendants assert that EmCyte's claims were made in bad faith and without a reasonable basis in fact or law, therefore Defendants are entitled to attorney's fees under § 688.005, Florida Statutes. (Doc. #123, p. 12.) EmCyte argues this affirmative defense must be stricken because it does not explain how this defense applies to each claim. (Doc. #124, p. 15.)

A claim for attorney fees is not an affirmative defense. "A determination that a plaintiff brought a claim in bad faith...is necessarily dependent upon the outcome of the plaintiff's case." Schmidt, 2015 WL 997828, at *2, 2015 U.S. Dist. LEXIS 27020, at *6. Therefore, whether Defendants are entitled to attorney's fees pursuant to § 688.005 is not an issue to be litigated prior to the resolution of EmCyte's case, nor is it a means for Defendants to avoid liability. If Defendants prevail, they may pursue their claim for attorney's fees and costs via an appropriate motion. EmCyte's motion to strike the fifth affirmative defense is granted.

### (6) Affirmative Defenses Six, Seven and Eight — Unclean Hands Doctrine, Trademark Misuse, Equitable Doctrine of Laches

Affirmative defenses six, seven, and eight simply state that each and every claim asserted in the Second Amended Complaint are either barred by the unclean hands doctrine, trademark misuse, or the equitable doctrine of laches, but with no supporting facts. (Doc. #123, p. 13.)

Plaintiff asserts that affirmative defenses of unclean hand and laches may be generally alleged and do not require extensive factual assertions. (Doc. #125, p. 13.) While extensive factual assertions may not be necessary, "such a defense, which does not provide any information connecting it to Plaintiff's claims, is precisely the type of bare-bones conclusory allegation" that is insufficient under Rule 8(c). Bartholomew v. Pollack & Rosen, P.A., No. 2:15-CV-135-FTM-29, 2015 U.S. Dist. LEXIS 80576, 2015 WL 3852944, at *2 (M.D. Fla. June 22, 2015); see, e.g., J.G.G. Tobacco Holding Co. v. Antigua Esteli Tobacco, No. 19-23732-Civ-COOKE/GOODMAN, 2020 WL 4926582, at *2–3, 2020 U.S. Dist. LEXIS 155129, at

*7 (S.D. Fla. May 20, 2020) (striking unclean hands defense where no facts were alleged that plaintiff used a trademark to deceive consumers); **\*7** SE Property Holdings, LLC v. McElheney, No. 5:12-cv-00164-RS-CJK, 2015 U.S. Dist. LEXIS 14647, 2015 WL 507188, at *3 (N.D. Fla. Feb. 6, 2015) (noting that "the party seeking to apply the unclean hands doctrine must describe with precision the 'egregious facts' that justify application of the doctrine); Groves v. Patricia J. Dury, M.D., P.A., No. 2:06-CV-338-FTM-99SPC, 2006 U.S. Dist. LEXIS 62540, 2006 WL 2556944, at *2 (M.D. Fla. Sept. 1, 2006) (striking unclean hands defense containing no facts); FDIC v. Bayer, No. 2:13-cv-752-FtM-29DNF, 2015 WL 686952, at *4, 2015 U.S. Dist. LEXIS 19265, at *10 (M.D. Fla. Feb. 18, 2015)(striking an affirmative defense that stated "the complaint was barred by the doctrine of laches" because "[l]aches...requires some basic factual allegations."); Fine's Gallery, Ltd. Liab. Co. v. From Eur. to You, Inc., No. 2:11-cv-220-FtM-29SPC, 2011 WL 5583334, at *——— ———, 2011 U.S. Dist. LEXIS 132257, at *4-6 (M.D. Fla. Nov. 16, 2011) (striking an affirmative defense where the defendants alleged no facts as to any theories of a plausible laches defense – that plaintiff delayed asserting a right or claim, the delay was not excusable, and there was undue prejudice).

The same is true for the trademark misuse affirmative defense. Although "courts uniformly allow trademark misuse...as an affirmative defense to a trademark infringement action", Whitney Info. Network, Inc. v. Gagnon, 353 F. Supp. 2d 1208, 1212 (M.D. Fla. 2005) (citing cases), the defense must "specifically allege how Plaintiff[ ] [has] allegedly misused the[ ] trademark." Sprint Sols., Inc. v. 4 U Cell, LLC, No. 2:15-cv-605-FtM-38CM, 2016 WL 3543512, at *3, 2016 U.S. Dist. LEXIS 84464, at *7 (M.D. Fla. June 29, 2016).

Here, by asserting that each and every claim asserted by Plaintiff is barred by trademark misuse (Doc. #123, p. 13), Defendants fail to provide any "facts establishing a nexus between the elements of [trademark misuse] and the allegations in the complaint."[1] PK Studios, Inc., 2016 WL 4529323, at *2, 2016 U.S. Dist. LEXIS 116057, at *4-5. Accordingly, EmCyte's motion to strike the sixth, seventh, and eighth affirmative defenses is granted.

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 394392

**(7) Affirmative Defense Nine – Reservation of "Right"**

Affirmative defense nine states that Defendants "reserve the right to assert additional defenses as they may be discovered." (Doc. #123, p. 13.) "[A] reservation of the right to assert additional defenses through the course of discovery is not a defense at all and may be stricken." Bruce v. Ocwen Loan Serv., LLC, 2012 U.S. Dist. LEXIS 147897, 2012 WL 4867224, *2 (M.D. Fla. 2012). The Court therefore strikes the reservation of rights from Defendants' Amended Answer.

## III.

**\*8** Counterclaim defendants move to dismiss two counts of the Counterclaim for failure to state a claim upon which relief may be granted and as a shotgun pleading. The Court agrees in part.

### A. Shotgun Pleading

EmCyte argues that Defendants' second and third counterclaims must be dismissed because they violate the shotgun pleading rule. (Doc. #124, pp. 13-14.) Shotgun pleadings violate Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a) (2), by "fail[ing] to one degree or another... to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Weiland v. Palm Beach Cnty. Sheriff's Ofc., 792 F.3d 1313, 1323 (11th Cir. 2015) (defining the four types of shotgun pleadings). [2] Courts in the Eleventh Circuit have little tolerance for shotgun pleadings. See generally Jackson v. Bank of Am., 898 F.3d 1348 (11th Cir. 2018) (detailing the unacceptable consequences of shotgun pleading). A district court has the "inherent authority to control its docket and ensure the prompt resolution of lawsuits," which includes the ability to dismiss a complaint on shotgun pleading grounds. Weiland, 792 F.3d at 1320. In a case where a defendant files a shotgun pleading, a court "should strike the [pleading] and instruct counsel to replead the case — if counsel could in good faith make the representations required by Fed. R. Civ. P. 11(b)." Byrne v. Nezhat, 261

F.3d 1075, 1133 n.113 (quoting Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997)).

Here, the second and third counts of the Counterclaim constitute a shotgun pleading because the first paragraph in each count incorporates the allegations of all preceding allegations. (Doc. #123, ¶¶ 44, 57.) "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1295 (11th Cir. 2002). Doing so makes it nearly impossible for EmCyte and the Court to determine which factual allegations give rise to which claims for relief. Accordingly, the second and third counts are dismissed on shotgun pleading grounds, with leave to amend. Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1296 (11th Cir. 2018).

### B. Failure to State a Claim

**\*9** "Counterclaims, like claims for relief in a complaint, must contain a short and plain statement showing an entitlement to relief, and the statement must give the opposing party fair notice of what the claim is and the grounds upon which it rests." Boat Owners Ass'n of the United States v. Flagship Towing LLC, No. 2:15-cv-197-FtM-29CM, 2015 WL 4548698, at *2, 2015 U.S. Dist. LEXIS 98315, at *3 (M.D. Fla. July 28, 2015) (citing Fed. R. Civ. P. 8(a) (2)); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, (2007). A motion to dismiss a counterclaim under Fed. R. Civ. P. 12(b) (6) is evaluated in the same manner as a motion to dismiss a complaint. Whitney Info. Network, Inc. v. Gagnon, 353 F.Supp.2d 1208, 1210 (M.D. Fla. 2005); Fabricant v. Sears Roebuck, 202 F.R.D. 306, 308 (S.D. Fla. 2001).

Counterclaims therefore must consist of "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. at 555, 127 S.Ct. 1955; see also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more

than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a counterclaim as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." Mamani v. Berzaín, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. "Factual allegations that are merely consistent with a [Plaintiff's] liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.

### (1) Counterclaim II — Tortious Interference With Advantageous Business Relationship

EmCyte asserts that Defendants' second count fails to allege a cognizable claim for tortious interference that demonstrates any liability for alleged misconduct. (Doc. #124, p. 5.)

"The elements of tortious interference with a business relationship are (1) the existence of a business relationship (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994) (citation omitted); see also Duty Free Americas, Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1279 (11th Cir. 2015) (stating the same). "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the

defendant had not interfered." Ethan Allen, Inc., 647 So. 2d at 815.

**\*10** EmCyte argues that one fundamental problem with Defendants' tortious interference counterclaim is the absence of any allegation that EmCyte or Patrick Pennie[3] induced a third party to breach a contract or relationship with Defendants. (Doc. #124, p. 6.) "One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or *by preventing a third person from continuing a business relation with another*." Smith v. Ocean State Bank, 335 So. 2d 641, 643 (Fla. 1st DCA 1976) (emphasis added).

Here, Defendants allege that on October 27, 2018, XLMedica entered into a distribution agreement with Apex, which required XLMedica to sell Apex Biologix products and those obtained through Apex's distributor agreements, including EmCyte. (Doc. #123, ¶ 19.) Defendants further allege that Mr. Pennie and EmCyte released a letter to XLMedica and Apex's customers about the present lawsuit and that Apex's XCell brand devices were unsafe. (Id., ¶¶ 45, 49.) Finally, Defendants allege that "Plaintiff's actions have disrupted and harmed the professional relationship between XLMedica and Apex." (Id., ¶ 30.) Accepting the factual allegations as true and viewing them in a light most favorable to Defendants, the allegations set forth a plausible claim that Plaintiff interfered with business relationship between XLMedica and Apex by causing a disruption in the ongoing business relationship. Smith, 335 So. 2d at 643. Accordingly, EmCyte's motion to dismiss on this basis is denied.

Next, EmCyte argues that Defendants' tortious interference count must be dismissed because the claim does not include an actual, identifiable group with whom there was interference. (Doc. #124, p. 7.) EmCyte is correct that the party "allegedly interfered with must be actual and identifiable, and not just a large group such as the community at large." Allegiance Healthcare Corp. v. Coleman, 232 F. Supp. 2d 1329, 1336 (S.D. Fla. 2002) (citing Ethan Allen, Inc., 647 So. 2d at 815). However, Defendants allege that EmCyte and Mr. Pennie's statements in the letter were intended to interfere with and harm the relationship between XLMedica and Apex, as well as their mutual

customers. (Doc. #123, ¶¶ 52-53.) The allegations taken as true, are sufficient to plausibly identify actual parties with whom Plaintiff allegedly interfered, and not just a large group. Cf. Scanz Techs., Inc. v. JewMon Enters., LLC, No. 20-22957-cv-Scola, 2021 WL 65466, at *9, 2021 U.S. Dist. LEXIS 2651, at *32 (S.D. Fla. Jan. 6, 2021) (finding an actual and identifiable business relationship was inadequately pled where it was alleged there were "numerous business relationships with clients in Florida, located throughout the United States and ... the world.").

Finally, EmCyte moves for dismissal because Defendants did not provide details about "what precisely" was published that intentionally and unjustifiably tortiously interfered.[4] (Doc. #124, p. 8, citing Maale v. Kirchgessner, No. 08-80131-CIV, 2009 WL 10669000 at *3, 2009 U.S. Dist. LEXIS 135041 at *12 (S.D. Fla. June 5, 2009)). Defendants respond that they provided specific allegations of fact about EmCyte and Mr. Pennie's publication of the letter, which was sent to XLMedica's customers, asserting the products sold by XLMedica were unsafe. (Doc. #125.)

*11 The Court agrees with Defendants. Unlike Maale, Defendants allege specific "factual content that would allow the court to draw the reasonable inference that the [Plaintiff] is liable for the misconduct alleged." Maale, 2009 WL 10669000 at *3, 2009 U.S. Dist. LEXIS 135041, at *13. For example, Defendants allege that EmCyte's letter suggested that Apex's XCell brand devices were unsafe, and had "questionable sterility and biocompatibility with human tissue." (Doc. #123, ¶¶ 49-50.) Defendants further allege that as a result of the letter being sent to its customers, as well as EmCyte's customers, there was interference between Defendant and its customers and Apex. (Id., ¶¶ 53.) Taking the allegations as true and viewing them in a light most favorable to Defendants, the allegations are sufficient to show the precise nature of the publication that interfered with XLMedica's business relationship with Apex. Accordingly, the Court finds that Defendants' have alleged a plausible tortious interference with an advantageous business relationship counterclaim.

**(2) Count III — Abuse of Process**

EmCyte moves to dismiss Defendants' abuse of process claim because it "lacks any allegation of misuse of process after the process issued." (Doc. #124, p. 9.)

To state a claim for abuse of process, Defendants must allege facts showing "(1) an illegal, improper, or perverted use of process by [EmCyte]; (2) an ulterior motive or purpose in exercising the illegal, improper, or perverted process; and (3) damages to the [Defendants] as a result." Keehnle v. Charter Elec. Experts, LLC, No. 8:18-cv-2880-T-23CPT, 2019 U.S. Dist. LEXIS 30818, at *2 (M.D. Fla. Feb. 27, 2019) (citing Valdes v. GAB Robins N. Am. Inc., 924 So.2d 862 (Fla. 3d DCA 2006)). The tort of abuse of process is concerned with the use of process *after it issues*. Marty v. Gersh, 501 So. 2d 87, 89 (Fla. 1st DCA 1987). "The usual case of abuse of process involves some form of extortion." S & IInvestments v. Payless Flea Market, Inc., 36 So. 3d 909, 917 (Fla. 4th DCA 2010) (internal marks omitted).

In their third count, Defendants allege that "EmCyte initiated this lawsuit and a state action ... in an attempt to wrongfully leverage Anna Stahl and XLMedica into settling an unjust lawsuit and to force Counter-Plaintiffs into bankruptcy." (Doc. #123, ¶ 58.) Defendants further allege that the actions described above "were not initiated" for any proper purpose, but were conducted for "improper ulterior purposes." (Id., ¶¶ 60, 63.) Taking these allegations as true, Defendants have failed to allege that process was abused *after* this action was commenced. The "mere filing of a complaint and having process served is not enough to show abuse of process." Della—Donna v. Nova Univ., Inc., 512 So.2d 1051, 1055 (Fla. 4th DCA 1987). Furthermore, an improper motive by itself is not sufficient. See, e.g., Miami Herald Pub. Co., Div. of Knightridder Newspapers, Inc. v. Ferre, 636 F. Supp. 970, 975 (S.D. Fla. 1985); Cazares v. Church of Scientology of Cal., Inc., 444 So. 2d 442, 444 (Fla. Dist. Ct. 1983) ("[t]he maliciousness or lack of foundation of the asserted cause of action itself is actually irrelevant to the tort of abuse of process."); Peckins v. Kaye, 443 So. 2d 1025, 1026 (Fla. Dist. Ct. 1983) (threat of causing party "undue and inordinate expenditures of their time and money" or "ulterior motive of harassment" is not sufficient). Accordingly,

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

Defendants have not set forth a plausible abuse of process counterclaim.

EmCyte also argues that Defendants' third count should be dismissed with prejudice because the allegations only pertain to initiating and prosecuting the present case and, therefore, further amendment would be futile. (Doc. #124, p. 13.) The Court will allow an opportunity to amend this claim, if possible. Defendants' abuse of process counterclaim is dismissed without prejudice.

Accordingly, it is now

ORDERED:

1. Plaintiff's Omnibus Motion to Dismiss Amended Counterclaims and Strike Affirmative Defenses, Immaterial, Scandalous Allegations, and Improper Answers (Doc. #124) is **GRANTED IN PART and DENIED IN PART** as follows:

   **\*12** (a) EmCyte's Motion to Strike paragraphs 21, 27, 29-32, 34-37, 40, 45, and 119 of Defendants' Amended Answer to the SAC is **DENIED**.

   (b) EmCyte's Motion to Strike paragraphs 1, 2, and 28 of the Counterclaim is **GRANTED** and these paragraphs are **stricken**. The motion is otherwise **DENIED** as to paragraphs 20, 27, 29, and 58.

   (c) EmCyte's Motion to Strike Affirmative Defenses is **GRANTED** as to Affirmative Defenses 1, 3, 4, 5, 6, 7, 8, and 9. The Motion is **DENIED** as to Affirmative Defense 2.

   (d) EmCyte's Motion to Dismiss Defendants' Counterclaim is **GRANTED** as to Count 2 and Count 3, which are **dismissed without prejudice**.

2. Defendants/Counter-Plaintiffs may file Second Amended Affirmative Defenses and a Second Amended Counterclaim within **FOURTEEN (14) DAYS** of this Opinion and Order.

**DONE** AND **ORDERED** at Fort Myers, Florida, this 9th day of February, 2022.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 394392

---

## Footnotes

1    While portions of Defendants' answer may generally include factual support for the defenses of unclean hands, trademark misuse, and laches, it is not clear which facts may apply to each defense so that EmCyte has fair notice of the grounds upon which the defenses rest. See Island Co. Ltd. Liab. Co. v. Abercrombie & Fitch Co., No. 13-80333-CIV, 2014 WL 12488575, at \*2, 2014 U.S. Dist. LEXIS 188794, at \*5 (S.D. Fla. Feb. 18, 2014) (striking general defenses of unclean hands, trademark misuse, and laches where the Answer had general factual support, but were not alleged with each affirmative defense in such a manner as to provide fair notice to the plaintiff).

2    The four "rough" types or categories of shotgun pleadings identified by the Eleventh Circuit in Weiland are:

     The most common type — by a long shot — is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of realleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any

EmCyte Corp. v. XLMedica, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 394392

particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

Weiland, 792 F.3d at 1322-23.

3       Mr. Pennie is the CEO of EmCyte. (Doc. #123, p. 14.)

4       Defendants also allege that Mr. Pennie and EmCyte

communicated with Anna Stahl and XLMedica's customers and distributors about the conduct [EmCyte] alleges in this lawsuit." (Doc. #123, ¶ 45.) EmCyte argues that because communications pertaining to judicial proceedings are expressly privileged, any communications about this case cannot form the basis of a tortious interference claim. (Doc. #124, p. 8.) Drawing all reasonable inferences in favor of Defendants, the allegations do not suggest that Defendants are relying upon communications relating to this present proceeding; rather, they only allege that EmCyte's letter discussed Defendants' conduct giving rise to this lawsuit. Dismissal on this basis is therefore inappropriate.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 24 of 106

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

2013 WL 5635977
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

FULTON FINANCIAL ADVISORS,
NATIONAL ASSOCIATION, Plaintiff,

v.

NATCITY INVESTMENTS, INC., Defendant.

Civil Action No. 09–4855.
|
Oct. 15, 2013.

**Attorneys and Law Firms**

James H. Thomas, Blakinger, Byler & Thomas, P.C.,
Lancaster, PA, Catherine Grantier Cooley, Robert
J. Lane, Jr., Hodgson Russ LLP, Buffalo, NY, for
Plaintiff.

Christopher S. Underhill, Hartman Underhill &
Brubaker LLP, Lancaster, PA, James J. Restivo, Jr.,
Joseph P. Pohl, III, Reed Smith LLP, Pittsburgh, PA,
for Defendant.

*MEMORANDUM*

STENGEL, District Judge.

*1 Plaintiff, Fulton Financial Advisors, National
Association ("Fulton"), brought this action in the
Court of Common Pleas of Lancaster County against
Defendant NatCity Investments, Inc. ("NatCity")
alleging violations of the Pennsylvania Securities Act
("PSA") sections 1–402 (Count I), 1–401 (Count
II), and 1–403 (Count III), as well as state law
claims for equitable rescission (Count IV), negligent
misrepresentation (Count V), negligence (Count VI),
breach of fiduciary duty (Count VII), common law
fraud (Count VIII), and aiding and abetting common
law fraud (Count IX). The case, which was removed
to this court on October 22, 2009 based on diversity
jurisdiction, arises out of the collapse of the market for
Auction Rate Securities ("ARS"). Presently before the
Court is NatCity's Motion to Dismiss the Complaint,
filed pursuant to Fed.R.Civ.P. 12(b)(6). NatCity
contends that Fulton has failed to plead its fraud-

based claims with sufficient particularity, and that
Fulton cannot have reasonably relied upon NatCity's
alleged misrepresentations. For the following reasons,
I will grant NatCity's Motion to Dismiss the three
PSA claims, the negligent misrepresentation claim,
the claim for common law fraud, and the claim for
aiding and abetting fraud. I will deny the Motion as to
the negligence claim and the breach of fiduciary duty
claim. Finally, I will grant the Motion as to the claim
for equitable rescission, since that is a remedy for fraud
and not a separate cause of action, and I will strike the
request for attorneys' fees and costs.

**I. BACKGROUND** [1]

ARS is a category of securities that include bond-
like financial instruments issued by municipalities and
student loan entities (generally known as "auction rate
certificates" ("ARCs")), and preferred stock issued
by closed-end mutual funds (generally known as
"auction preferred shares"). Compl. ¶ 4. This case
involves student loan ARCs, which are interest bearing
certificates backed by pools of student loans. They
have long-term nominal maturities that pay interest
rates set and reset by auctions conducted at pre-
determined intervals, usually seven, twenty-eight, or
thirty-five days. *Id.* A RCs enable investors to secure
long-term debt, while paying interests rates only
slightly higher than the rates applicable to short-term
debt. *Id.* at ¶ 5. Investors were led to believe that A RCs
could be readily disposed of at par through periodic
auctions and that they were purchasing low-risk, safe,
liquid and secure investments with reliable short-term
liquidity. *Id.* at ¶¶ 5–6.

A number of actors participate in the creation and
issuance of ARS. The "issuer" is the borrower that
issues the ARS and, as the debtor, assumes the
obligation to pay principal and interest owing on the
ARS. The issuer engages an "underwriter" to distribute
the issue and an "auction agent" to conduct the auctions
at which interest rates are reset. *Id.* at ¶ 7. The issuer
also selects a broker-dealer ("BD") whose purpose is
to solicit bids from existing ARS owners and potential
investors. *Id.* at ¶ 8. Those BDs that have entered
into a broker-dealer agreement with respect to an ARS
issue are "Contractual BDs" ("CBDs"). *Id.* Unless they
are CBDs, BDs have no direct access to the auction
process. *Id.* BDs must submit their customers' buy and

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 25 of 106

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

sell orders through a CBD. *Id.* The CBD acts as broker for the ARS owner and potential purchaser in the auction process, thereby allegedly imposing fiduciary duties on the CBD in favor of the customer. *Id.* Through a "Dutch auction" process, investors specify the number of shares they wish to purchase and the lowest interest rate they are willing to accept. *Id.* at ¶ 10. Existing ARS holders specify the number of shares they wish to sell, either on an unqualified basis or at a specific interest rate, and the number of shares they wish to continue to hold. *Id.* The bids and offers are conveyed to an auction agent, who ranks each bid and offer according to the interest rate. *Id.* The lowest bid rate at which all shares offered for sale can be sold establishes the interest rate to be paid until the next auction. *Id.* A "failed auction" occurs when there is a lack of demand and no clearing bid is established. *Id.* at ¶ 11. If this occurs, the holders will keep their position at the maximum interest rate until the next auction has a successful clearing bid. *Id.*

**\*2** For a number of years prior to 2006, Fulton maintained an institutional investment account with NatCity, for which NatCity acted as Fulton's securities broker. *Id.* at ¶ 12. Around 2005, NatCity allegedly recommended to Fulton that it invest in ARS, in keeping with Fulton's desire to invest in only the highest quality and safest debt investments. *Id.* at ¶ 14. An unspecified portion of these ARS were from NatCity's own inventory. *Id.* Fulton currently holds $175 million in ARS. *Id.* at ¶ 15. NatCity also allegedly acted as a CBD for a number of the ARS issues it recommended to Fulton, for which NatCity typically earned a yearly fee of 0.25 percent of the value of the transaction.[2] *Id.* at ¶ 18. For transactions where NatCity was not the CBD, it received a portion of the CBD's fee, a fact not disclosed to Fulton, for directing the Fulton trade to the CBD. *Id.*

The country's major securities firms earned fees as the principal underwriters and marketers of ARS and ARCs, acting as CBDs. *Id.* at ¶ 19. These fees were so lucrative that securities firms became secret "guarantors" of the success of the auctions. *Id.* at ¶ 20. If there was insufficient investor interest in a particular auction, such that there were not enough buyers to match the sellers, then the auction was at risk of failure. *Id.* This threatened the entire market, which was based on investor confidence in access to short-term liquidity

on demand. *Id.* To protect the broader market from seizing up, and to protect their stream of underwriting fees and auction management fees, securities firms, including NatCity, allegedly entered proprietary bids for their own accounts ("support bids") to ensure that the auctions succeeded, thereby creating the illusion of an efficient, completely liquid market. *Id.* at ¶¶ 20, 21. NatCity made proprietary support bids to prolong the life of the ARS market that was generating lucrative underwriting and BD fees. *Id.* at ¶ 22. It also stood to lose money on its own ARS if the auction market failed. *Id.* Fulton alleges that these purchases were intended to manipulate the markets for ARS by creating the false appearance that those markets were broad-based, sustained by investor demand for ARS by third parties with true investment intent, and that the ARS markets were active, efficient and independent, when there was far from sufficient real demand by disinterested parties with true investment intent to keep the auction markets from failing.*Id.* at ¶ 23. NatCity never informed Fulton of its role in the ARS markets or that it was placing support bids for its own account to support the auction markets; thus its interests conflicted with Fulton's interests. *Id.* at ¶ 28. NatCity never disclosed material information to Fulton that the success of auction markets was entirely dependent upon support bids; that it had no true investment intent in making proprietary ARS purchases; that the purpose of its purchases was to generate fees and protect the value of its own holdings; that true investment demand was far lower than necessary to maintain liquid ARS markets; and that NatCity and the other CBDs could withdraw their support at any time causing widespread auction failures resulting in total illiquidity and loss in value to Fulton's ARS. *Id.* at ¶ 29.

**\*3** This was the practice until the summer of 2007 when the credit crisis struck, and demand for ARS collapsed. *Id.* at ¶¶ 30–32. Securities firms allegedly reacted with enormous increases in their proprietary ARS purchases to conceal the fact that the markets had become illusory and were near failing. *Id.* at ¶¶ 31, 34, 35. In February and March 2008, the ARS auction markets failed entirely. *Id.* at ¶¶ 38, 39. Fulton alleges that, during this time period, NatCity was aware of these failures and understood the materiality of this information, but failed to disclose this information to Fulton, even as it continued to sell ARS to Fulton while

also selling its own inventory of ARS. *Id.* at ¶¶ 34, 36, 37.

Fulton's student loan ARCs were not redeemed for the most part, because their maximum rates were below market rates. *Id.* at ¶¶ 40–41. Fulton currently holds ARS purchased between 2005 and 2008 from NatCity for a price of more than $175 million. *Id.* at ¶ 15. It has been required to write down the value of its ARS by an amount in excess of $10 million. *Id.* at ¶ 43. Fulton makes numerous allegations that state and federal regulators have determined that NatCity and the other major underwriters of ARS manipulated the ARS markets and deceived ARS investors. *Id.* at ¶¶ 44–53. It also alleges that NatCity had special knowledge and expertise in the ARS auction markets that it did not possess. *Id.* at ¶¶ 54–56. Because of its superior knowledge and role in the auction markets as Fulton's BD, Fulton alleges that NatCity owed it fiduciary duties, as well as duties of fairness, honesty, disclosure of material information, and undivided loyalty. *Id.* at ¶¶ 57–62.

Attached to the Complaint are excerpts of regulatory decisions issued by the SEC and various state regulatory bodies imposing penalties upon several ARS market participants. *See* Compl. Ex. P. On March 13, 2009, the Financial Industry Regulatory Authority and NatCity entered into a "Letter of Acceptance, Waiver and Consent," in which NatCity conceded that, during the period from May 31, 2006 through February 28, 2008, it had engaged in activities in violation of SEC, NASD and Municipal Securities Rulemaking Board rules concerning its sales and marketing of ARS. *Id.* NatCity conceded that it had created marketing materials for ARS that were unfair and did not provide a sound basis for its customers to evaluate the facts in regard to purchases of ARS because the materials did not contain adequate disclosure of the risks of ARS, including the risks that ARS auctions could fail, that investments could become illiquid, and that customers might be unable to obtain access to funds invested in ARS for substantial periods of time. *Id.* at 2.

## II. STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir.2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *DelRio–Mocci v. Connolly Props., Inc.,* 672 F.3d 241, 245 (3d Cir.2012) (citing *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 84 (3d Cir.2011). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (cited with approval in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

**\*4** A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), which gives the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Twombly,* 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The complaint must contain " 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.' " *Warren Gen. Hosp.,* 643 F.3d at 84 (quoting *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 556). In the end, we will dismiss a complaint if the factual allegations in the complaint are not sufficient " 'to raise a right to relief above the speculative level.' " *West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,* 712 F.3d 165, 169 (3d Cir.2013) (quoting *Twombly,* 550 U.S. at 555).

In addition to the fundamental requirements of Rule 8(a), complaints alleging fraud must also satisfy the heightened pleading requirements of Rule 9(b). A complaint "must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b).

The United States Court of Appeals for the Third Circuit has determined that in order to comply with the particularity requirement of a fraud claim, the following elements must be pled: (1) A specific false representation of material facts; (2) knowled by the person who made it or its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) the plaintiff acted upon it to his damage. *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 99 (3d Cir.1983). "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." *In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1348 (N.D.Ga.2000) (citing *Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997)).

Rule 9(b) applies "not only to fraud actions under federal statutes, but to fraud claims based on state law." *Christidis,* 717 F.2d at 99. Rule 9(b) requires the plaintiff plead "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of Am.,* 361 F.3d 217, 223–24 (3d Cir.2004) (quoting *Seville Indus. Mach. Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984)). "[A]llegations of 'date, place or time' fulfill these functions," but plaintiffs may also "use alternate means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp.,* 742 F.2d at 791. In addition, where plaintiffs allege a fraud scheme, courts have "recognized the impracticality of requiring the plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several years." *United States ex rel. Singh v. Bradford Reg'l Med. Ctr.,* Civ. A. No. 04–186, 2006 WL 2642518, at *4 (E.D.Pa. Sept. 13, 2006) (quoting *United States ex rel. Landsberg v. Argentis Med., P.C.,* Civ. A. No. 03–1263, 2006 WL 1788381, at *4 (E.D. Pa. June 27, 2006)). [3]

**\*5** The requirements of the Private Securities Litigation Reform Act do not apply to this action. The Act only applies to private actions arising under the federal securities laws. *See* U.S.C. § 78u–4(b) (stating "In any private action arising under this chapter ..."). Fulton's claims only assert violations of the Pennsylvania Securities Act, as well as common law claims.

### III. DISCUSSION

#### a. Failure to Plead Fraud with Specificity
In its Motion, NatCity argues that each of Fulton's claims are premised upon concl usory allegations that NatCity fraudulently manipulated the ARS market through its placement of proprietary support bids and the failure to reveal this activity, thereby creating the illusion of an efficient, completely liquid market. It argues that the Complaint fails to plead fraudulent conduct with the sufficient particularity required by Rule 9. It contends that Fulton has not alleged any specific instances in which NatCity placed a proprietary bid in support of an ARS auction, let alone the time, place, and personnel involved in placing such a bid. It contends that Fulton has attempted to create the appearance of a fraud by making generalized allegations of the activities of unidentified market participants, and then merely aver that NatCity acted in the same manner.

In response, Fulton asserts that it has pled specifically how NatCity manipulated the ARS market. It has alleged that NatCity had insider access to the non-public information that there was a substantial gap between the true investment-motivated demand for ARS and the supply of ARS for sale. *Id.* ¶¶ 18, 20, 30–32. NatCity concealed and failed to disclose to Fulton that ARS auctions had failed in August 2007 because of insufficient demand and because underwriters and CBDs like NatCity had intentionally discontinued the placement of support bids. *Id.* ¶ 31. NatCity had motivation to maintain the appearance of liquidity in the ARS markets to satisfy its issuer clients, its retail brokerage customers, and to expand its customer bases in both groups, so as to continue generating underwriter and broker-dealer fees. *Id.* ¶ 20. NatCity had knowledge that, if ARS investors became aware that the market was in danger of failure, there would be a rush to sell, leading to widespread

failure of the ARS markets to NatCity's detriment; to avoid this from occurring, NatCity made large proprietary purchases for its own account to conceal the facts that the auction market was near failure, creating a false appearance of demand, and a false appearance that the auction markets were independent, functioning and active, despite its knowledge that the markets were illusory and entirely dependent upon the proprietary trading activities of itself and other CBDs. *Id.* ¶¶ 21, 27. NatCity failed to advise Fulton that ARS auctions had been prevented from failing only because NatCity and other CBDs had placed support bids for their own accounts, and failed to disclose that the risk that CBDs would discontinue their support bids had risen dramatically, and that such discontinuance was imminent. *Id.* ¶ 33. Throughout the fall of 2007 and into 2008, NatCity continued to recommend ARS purchases to Fulton without disclosing the increased risk of owning ARS and that ARS were no longer suitable for Fulton's investment goals, while simultaneously trading ARS for its own account on the basis of its insider knowledge. *Id* . ¶¶ 35–36. NatCity concealed from Fulton that in the fall of 2007 it was selling its own inventory of ARS, and taking action that favored its own proprietary interests on the basis of non-public information, in violation of its duty as Fulton's broker. *Id.* ¶ 37. Finally, Fulton asserts that NatCity's purpose was to maintain the market for sales of ARS at par prices which were materially inflated and did not reflect the increasing risk associated with owning ARS; that without proprietary purchases, investors would not have been willing to pay par for A RCs, the market value would have dropped substantially to reflect the true risk, and the interest rate paid by A RCs would have risen substantially. *Id.* ¶ 66.

**\*6** I find that Fulton has failed to meet its obligation under Rule 9 to plead the allegations of fraudulent conduct with the required specificity. Notwithstanding the allegations I have recited, Fulton has not alleged specific facts to support its conclusions that NatCity, directly or indirectly, unlawfully manipulated the market by creating the false or misleading appearance that the market for ARS was active in order to induce others to purchase ARC. A close examination of the Complaint reveals that Fulton has only made general averments that NatCity made support bids to prop up auctions that otherwise would have failed, without

offering any specific instances in which it did so. Fulton has alleged that NatCity materially aided other underwriters and CBDs in manipulating the market, and it alleges that the conduct of others had an effect upon the market, but Fulton does not state with any specificity how NatCity materially aided these unidentified other actors.

Fulton does not allege any specific auctions where NatCity acted as a CBD, and the allegation that NatCity was an "insider" states only a legal conclusion. Most importantly, Fulton does not allege any specific auction where NatCity placed a support bid to make an auction "appear to be legitimate," let alone how its specific actions constituted market manipulations. The allegation that NatCity made large proprietary purchases for its own account to conceal the fact that the auction market was near failure, to create a false appearance of demand, and a false appearance that the auction markets are independent, functioning and active, is completely unsupported by allegations of specific purchases during the relevant time frame. Fulton's conclusory allegation that NatCity knew that the markets were illusory and entirely dependent upon the proprietary trading activities of itself and other CBDs, also contains no factual basis.

Indeed, the documents that Fulton has appended to the Complaint contradict these legal conclusions. NatCity is not mentioned in 13 of the 14 regulatory decisions that Fulton appended to the Complaint to support its allegations, each of which concerns the activities of other market participants. Fulton's only Exhibit that specifically references NatCity—the March 13, 2009, the Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent, which states that NatCity had limited involvement in the functioning of the ARS market. The regulators stated that NatCity acted:

> primarily as a downstream firm,[4] although it did operate outside this traditional role on a few occasions. Specifically, NatCity had very limited involvement in two auction rate security underwritings: it was a co-senior manager in

Case 3:18-cv-00121-JFS-PJC   Document 148-1   Filed 02/20/25   Page 29 of 106

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

one and a co-manager in the other. Additionally, in four ARS issues, it was an authorized auction participant, which allowed it to directly participate in an auction instead of submitting its customers' bids through a third part broker-dealer.

**\*7** Compl. Ex. P at 4.

The gist of Fulton's fraud-based claims—as well as the claim for negligent misrepresentation—is that NatCity failed to disclose the deteriorating state of the ARS markets. Specifically, these omissions allegedly included that: ARC auctions in August 2007 had failed; that the risk that CBDs would stop making support bids to prop up the market was rapidly increasing; that the proprietary inventories of NatCity and other CB Ds were increasing; that the level of risk of investing in ARCs had changed; that auction failures on January 23, 2008 and during the first week in February 2008 resulted in a rapidly rising risk of total failure of the ARS market; that NatCity was trading for its own account on the basis of non-public information; and that NatCity had intentionally withdrawn from the ARC market. All of these allegations are unsupported by the type of factual matter required by both *Iqbal* and Rule 9. Fulton has failed to offer any specific allegations relating to NatCity's own alleged manipulation of the ARS market, focusing instead on broad statements of industry-wide fraud regarding the state of the market. Notably, Fulton claims that NatCity concealed and failed to disclose to Fulton the risk that *other* CBDs would choose to discontinue supporting the ARS markets, Compl. at ¶ 33, but never alleges any facts that show NatCity was aware of what other investors, broker-dealers, or auctioneers were planning to do in the context of the declining ARS market.

Instead, Fulton only makes generalized statements about the activities of a number of unnamed market participants and includes NatCity in the group, but alleges no instances where NatCity actually placed a proprietary bid or the effect of a particular bid on the market.[5] It alleges that NatCity concealed, *like other* Contractual BDs, that it was off-loading

its own inventory of A RCs, *see, e.g.,* Compl. ¶ 37, but there are no allegations of specific sales to support the conclusion that NatCity was "off-loading" its inventory. These allegations merely speculate about the knowledge and actions of NatCity regarding its participation in the ARS market. Fulton's sweeping claims about unidentified underwriters, CBDs and BDs, with no particularized facts regarding NatCity's placement of support bids, its decision to discontinue the practice of providing those bids, or any allegations to support that it had knowledge concerning the "unhealthy" state of the market, are insufficient to satisfy its pleading obligation under Rule 9. Since Fulton does not plausibly assert how NatCity was aware of the activities of other market participants, its fraud based claims fail.

**b. Failure to plead scienter.**

In the alternative, I find that the fraud-based claims must be dismissed because Fulton has failed sufficiently to allege scienter.[6] Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Where scienter is an element of a cause of action, plaintiffs must "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " *Burlington Coat Factory,* 114 F.3d at 1418. A plaintiff can satisfy the scienter requirement by alleging facts demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness." *Oran v. Stafford,* 226 F.3d 275, 288–89 (3d Cir.2000).[7] "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 535 (3d Cir.1999) (citing *McLean v. Alexander,* 599 F.2d 1190, 1192 (3d Cir.1979)); *see also In re Digital Island Sec. Litig.,* 357 F.3d 322, 332 (3d Cir.2004) (citing *In re Advanta,* 180 F.3d at 535).

**\*8** Count I of Fulton's Complaint alleges a violation of PSA section 1–402, 70 P.S. § 1–402, which declares

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 30 of 106

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

market manipulation to be a fraudulent and prohibited practice. Section 1–402(b) provides: "It is unlawful for any person, directly or indirectly, in this State: ... [t]o effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in the security or raising or depressing the price of the security for the purpose of inducing the purchase or sale of the security by others." [8] 70 P.S. § 1–402(b). Count II alleges a violation of § 1–401, which provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:

(a) To employ any device, scheme or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

70 P.S. § 1–401. Count III alleges a violation of § 1–403, which prohibits broker-dealers from inducing the sale of any security by means of "any manipulative, deceptive or other fraudulent scheme, device, or contrivance, fictitious quotation, or in violation of this act or any regulation or order hereunder." 70 P.S. § 1–403.

These provisions are similar to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F .R. § 240.10b–5, a rule promulgated by the Securities Exchange Commission to enforce section 10(b). [9] *See GFL Advantage Fund, Ltd., v. Colkitt,* 272 F.3d 189, 214 (3d Cir.2001) (holding that PSA sections are "modeled after Rule 10b–5 of the federal securities laws, and requires virtually the same elements of proof.") Therefore, the cases hold that the PSA is to be construed in the same manner as similar provisions of federal securities law. [10] *See also* 70 P.S. § 1–703(a) (stating that the PSA is to be construed "to coordinate the interpretation

and administration of this act with related Federal regulation").

In order to maintain a securities fraud claim under Rule 10b–5, a plaintiff must plausibly allege that "the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002). To plead the scienter element, a plaintiff must plead facts that plausibly show either (1) circumstantial evidence of either reckless or conscious behavior; or (2) establish a "motive and opportunity" to commit fraud. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276 (3d Cir.2006). "Therefore, the elements of [a cause of action under PSA §§ 1–401 and 1–403] are: (1) that the defendant made misstatements or omissions of material fact; (2) with scienter; (3) in connection with a purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the cause of its injury." *Fulton Bank, N.A. v. UBS Sec. LLC,* Civ. A. No. 10–1093, 2011 WL 5386376, at *8 (E.D.Pa. Nov.7, 2011) (Stengel J.) (*"Fulton I"*). The elements of a market manipulation claim under § 1–402 are also identical to the elements of a Rule 10b–5 claim. *Id.* at *13.

**\*9** Fulton argues that it need not allege scienter because its state securities law claims do not require it. *See* Doc. # 19 at 26–27. It argues that PSA § 1–501(a), which imposes civil liability for violations of §§ 1–401 and 1–403, and PSA § 1–501(c), which imposes civil liability for violations of § 1–402, contain no scienter requirement. [11] Alternatively, Fulton argues that it has adequately pled scienter by demonstrating the basis and source of NatCity's knowledge of the true state of the market, its intent to manipulate the market, the method by which it manipulated the market, and its purpose in manipulating the market. *Id.* at 28–30.

The issue of whether the PSA contains a scienter requirement is not settled. The Third Circuit has held that § 1–401 of the PSA is "functionally equivalent" to section 10(b). *See GFL Advantage Fund,* 272 F.3d at 214 (citing *Rosen,* 155 F.Supp.2d at 321 n. 14. Thus, the requirement of pleading and proof of scienter is arguably necessary. However, in *Gilliland*

*v. Hergert,* Civ. A. No. 05–1059, 2008 WL 2682587 (W.D.Pa. July 1, 2008), the court predicted that the Pennsylvania Supreme Court would recognize a distinct, separate cause of action under § 1–501 that does not require a plaintiff to prove scienter or reliance, but rather requires a plaintiff to only demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation. *Id.* at *6–7 (citing *Kronenberg v. Katz,* 872 A.2d 568, 598–99 (Del.Ch.2004)).

In *Fulton I,* I addressed Fulton's identical argument that a plaintiff need not plead scienter (as well as reliance) because PSA § 1–501 creates a separate cause of action that does not contain a scienter element. *Id.,* 2011 WL 5386376 at *7 n. 4 ("Plaintiffs contend that because of § 1–501 language to make out a § 1–401 claim, they do not need to prove: (1) that they reasonably relied on any alleged misrepresentations, (2) that UBS acted with scienter, or (3) that the misrepresentations and/or omissions were the proximate cause of their losses.") I thoroughly analyzed the relationship between § 1–501 and § 1–401, stating:

§ 1–501(a) of the Pennsylvania Act is modeled on § 410(a)(2) of the Uniform Act, which is in turn modeled on § 12(2) of the 1933 Act. Notably, § 1–501(a) is written in the disjunctive. Therefore, it definitively provides a civil remedy against "any person who [ ... ] offers or sells a security in violation of section § 401." Although there is some confusion as to whether § 1–501 creates a separate and additional cause of action under § 1–501 itself, it arguably provides that any person who "otherwise" violates the terms of § 1–501(a) "shall be liable to the person purchasing the security from him." Based on this disjunctive phraseology, the analysis in *Kronenberg* states that the Pennsylvania Supreme Court does recognize a stand-alone § 1–501 claim, but distinguishes it from a § 1–401 claim. *Kronenberg v. Katz,* 872 A.2d 568, 596 (Del.Ch.2004). In *In re Suprema Specialties,* 438 F.3d at 269–70, the court commented that § 77*I*(a) (2), from which § 1–501 is modeled, is a "virtually absolute liability provision that does not require an allegation that defendants possessed scienter." *Id.* To state a prima facie case under § 1–501, requires Plaintiffs to demonstrate some causal relationship between the misrepresentation and their purchase, but not loss causation, scienter or reliance. *Gilliland*

*v. Hergert,* 2008 U.S. Dist. LEXIS 51421, 2008 WL 2682587 (W.D.Pa. July 1, 2008).

**\*10** UBS argues that § 1–501 does not modify the private right of action for violations of §§ 1–401 or 1–403. Specifically, the Defendant notes that it has been acknowledged by courts "that section 501 provides an independent cause of action[;]" however, courts require that "section 401 claims brought under section 501 must satisfy the familiar elements of a 10b–5 claim, including scienter." .... *I agree with Defendants.*

*Id.* at *7 n. 4 (emphases added; citations omitted).

I conclude, consistent with *Fulton I,* that scienter is a requirement for Fulton's PSA claims here. While Fulton again posits that it is not required to allege scienter to state a claim under § 1–501, the Complaint does not attempt to state a claim under § 1–501. Rather, it premises claims only under §§ 1–401, 1–402, and 1–403. While, as I noted in *Fulton I,* there is casel aw that suggests that Section 1–501 creates a *distinct* cause of action from those created by the other sections, I ultimately determined that § 1–501 did not modify the private right of action for violations of § 1–401 and § 1–403. Since Fulton does not premise any of its claims upon § 1–501, the same arguments it raises here are largely inapposite. *Accord Fulton I* at *7 n. 4 (noting that "regardless of whether § 1–501 independently creates a cause of action other than through § 1–401, Fulton has not alleged a violation under § 1–501. Therefore, it must satisfy the elements of their § 1–401 claim, which is modeled after SEC Rule 10b–5.").

Because Fulton is required to plead scienter, the allegations of the Complaint are insufficient under Rule 9. Fulton alleges that NatCity "knew ... that the ARC auction markets were illusory, that there was no real liquidity in the market and that, absent support bids the auction markets would fail." Compl. at ¶ 27. However, Fulton fails to assert specific facts showing how NatCity had actual knowledge of information that it withheld from Fulton, upon which I may reasonably infer an intent to deceive, manipulate, or defraud. Specific facts are required to establish scienter and Fulton does not plead specific facts in support of its claim that NatCity made fraudulent material omissions.

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 32 of 106

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

Fulton makes only conclusory allegations regarding NatCity's motive for the alleged omissions, which focus principally upon NatCity's desire to earn fees and protect the value of its own proprietary ARS assets. *See* Compl. ¶ 22 (alleging NatCity made proprietary support bids to prolong the life of the ARS market that was generating lucrative underwriting and BD fees and to avoid losses on its own assets); *id.* ¶ 37 (alleging NatCity concealed that it was off-loading its own inventory of ARS). This type of conclusory allegation was specifically rejected by the court in *In re Citigroup Auction Rate Sec. Litig.,* 700 F.Supp.2d 294 (S.D.N.Y.2009), a case brought under Section 10(b) and Rule 10b–5. The court noted—albeit applying the more rigorous standard of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(2)—that the cases have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter. *Id.* at 305 (citing *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 227 (S.D.N.Y.2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute."); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.,* 501 F.Supp.2d 452, 489 (S.D.N.Y.2006) ( "Although an auditor's receipt of consulting fees inordinately disproportionate to its auditing fees may give rise to a proper inference of motive ... allegations of payment for services rendered are generally inadequate."); *Vogel v. Sands Bros. & Co., Ltd.,* 126 F.Supp.2d 730, 739 (S.D.N.Y.2001) ( "alleged desire to realize greater transaction fees and its close relationship with [financial services holding company client] are insufficient to show an improper motive [on part of the investment banking firm]"). Likewise, in *Ashland Inc. v. Morgan Stanley & Co., Inc.,* 700 F.Supp.2d 453, 459 (S.D.N.Y.2010), the court determined that scienter allegations centered on the insider's desire to increase or sustain demand for ARS, so that it could sell off its own holdings, was not plausible because such a theory—implying the simultaneous making of support bids and the dumping of ARS assets—would be "economically irrational." *Id.* at 469.

**\*11** The assertion that one has the motivation to make profits is not sufficiently concrete to infer scienter. *See e.g., Kalnit v. Eichler,* 246 F.3d 131, 140 (2d Cir.2001) (summarizing previous holdings, which articulated

motive to show profitability, which is common to all for-profit enterprises, is too generalized to support viable scienter claim); and *Defer LP v. Raymond James Fin., Inc.,* 654 F.Supp.2d 204, 217 (S.D.N.Y.2009) ("An allegation that defendants' motive was merely to increase or maintain profit such as this is insufficient"). Fulton's generalized accusations of NatCity's profit motive are insufficient to carry its burden to allege an inference of scienter with particularity. Therefore, its fraud-based claims are subject to dismissal for this reason as well.

**c. Failure to plead reasonable reliance.**

NatCity next argues that reasonable reliance is an element of Fulton's claims under the PSA, as well as its claims for negligent misrepresentation, common law fraud, and aiding and abetting fraud. It contends that Fulton has failed to allege in a plausible way that it reasonably relied upon NatCity's alleged misrepresentations and omissions. NatCity argues that, as early as May 2006, it became public knowledge that certain broker-dealers were placing proprietary bids in support of ARS auctions. Specifically, on May 31, 2006, the SEC announced the institution of administrative proceedings against, and a settlement with, fifteen broker-dealers for such activity, a group which did not include NatCity. NatCity asserts that the 2006 SEC Order[12] detailed to the public that certain broker-dealers intervened in the ARS market by bidding to prevent failed auctions, bidding to set a market rate, and bidding to prevent all-hold auctions. NatCity argues that this information was readily available to a diligent investor, especially a sophisticated financial institution investor such as Fulton.

Fulton asserts six arguments in response. It again responds that it simply need not plead reliance for Counts I, II, and III, because reliance is not an element of the cause of action provided by PSA §§ 1–501 and 1–503 for violations of §§ 1–401, 1–402, and 1–403. (Doc. # 19 at 32.) Second, it argues that the reasonableness of a plaintiff's reliance is an issue of fact not properly determined on a motion to dismiss. (*Id.* at 33.) Third, it asserts that, under Pennsylvania law, reliance is presumed in fraud-based claims and need not be specifically pled or proved. (*Id.*) Fourth, while NatCity relies upon the 2006 SEC Order, that

Order by its own terms states that the SEC "does not prohibit broker-dealers from bidding for their proprietary accounts *when properly disclosed.*" 2006 SEC Order at 6. NatCity does not contend that it properly disclosed to Fulton that it was making support bids. (Doc. # 19 at 34.) Fifth, what was publicly disclosed in the 2006 SEC Order is not the information that Fulton claims was fraudulently withheld by NatCity. Rather, Fulton's claims are based on NatCity's withholding of its knowledge that: (1) the August 2007 auction had failed and the relationship between supply and demand in the ARS market was out of balance through the Fall of 2007 and into 2008; (2) NatCity was placing support bids to conceal the lack of stability and liquidity; (3) other CBDs were placing support bids; (4) the increase of its own ARS inventory was unsustainable and that it would be unwilling to continue increasing its proprietary exposure to ARS risk; (5) the January 2008 auctions failed; and (6) the February 2008 catastrophic auction failures. (*Id.* at 34–36.) Finally, Fulton argues that the 2006 SEC Order, at most, operated as a precatory disclosure that CBDs and BDs *might* engage in proprietary bidding, and does not eliminate reliance upon omissions when a risk is, in fact, imminent or actual. (*Id.* at 36–37.)

**1. Reliance must be alleged.**

*\*12* Fulton's assertion that it need not allege or prove reliance to state a claim under § 1–501 of the PSA is both inapposite and legally incorrect. As discussed above, the Complaint asserts claims under sections 1–401, 1–402, and 1–403, not section 1–501. Even if section 1–501 creates a separate cause of action, Fulton has not asserted such a claim in the Complaint, and section 1–501 does not modify the private right of action for violation of sections 1–401 or 1–403. *FultonI* at \*7 n. 4. As for the claims actually raised, I find, consistent with *Fulton I,* that since the PSA sections are functionally equivalent to section 10(b) claims, Fulton is required to plausibly plead reliance. *See Fulton I* at \*8 (holding that the section 1–401 and 1–403 claims contain a reliance element); \* 12 (holding that the § 1–403 claim contains a reliance element).

In Pennsylvania, reasonable reliance is also an element of a claim for negligent misrepresentation, *see Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994) (holding that the elements of the negligent

misrepresentation include a misrepresentation of a material fact), and common law fraud. *Id.* (holding that common law fraud contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the misrepresentation; and (6) the resulting injury was proximately caused by the reliance); *see also Overall v. Univ. of Pa.,* 412 F.3d 492, 498 (3d Cir.2005). As with statutory claims under the PSA, allegations of common law fraud are subject to Rule 9(b)'s requirement of pleading with particularity, while the element must be plausibly pled under *Iqbal* to support the negligent misrepresentation claim.

**2. Reasonableness of reliance can be determined on a motion to dismiss.**

Fulton's argument that reasonableness of a plaintiff's reliance is an issue of fact not properly determined on a motion to dismiss is meritless. Numerous courts have held that the reasonableness of reliance may be determined as a matter of law. *See, e.g., Toy v. Metro. Life Ins. Co.,* 593 Pa. 20, 928 A.2d 186, 203–208 (Pa.2007) (holding that where a plaintiff alleges fraud in the inducement a court may undertake a legal analysis of the reasonableness of plaintiffs' alleged reliance); *Olivet Boys'Y Girls'Y Club of Reading v. Wachovia Bank, N.A.,* Civ. A. No. 08–4702, 2009 WL 1911049 (E.D.Pa. July 1, 2009) (Stengel J.) (dismissing fraud claim because allegation of reasonable reliance was insufficient as a matter of law); *WP 851 Assoc. L.P. v. Wachovia Bank, N.A.,* Civ. A. No. 07–2374, 2008 WL 114992 (E.D.Pa. Jan.10, 2008) (dismissing fraud claim for failure to adequately allege reliance upon defendant's representations); *Ishler v. Chase Home Fin. LLC,* Civ. A. No. 10–2117, 2011 WL 744538, at \*6 (M.D.Pa. Feb. 23, 2011) (dismissing fraud claim for failure to plead that reliance was reasonable); *Warden v. Crown Am. Realty Trust,* Civ. A. No. 96–25J, 1999 WL 476996 (W.D.Pa. July 6, 1999) (dismissing securities fraud class action because the plaintiffs had failed to plead reasonable and justifiable reliance). [13]

**3. Reliance may not be presumed.**

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

**\*13** In support of its assertion that, under Pennsylvania law, reliance may be presumed where a fraud claim is based upon omissions and failures to disclose information, Fulton cites *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 314 (3d Cir.1998) ("*Prudential*"). The citation to *Prudential* is taken completely out of context. Because it is clear that reliance cannot be presumed under the securities law, this argument has no merit.

The context of the discussion in *Prudential* concerned the predominance requirement of maintaining a class action under Fed.R.Civ.P. 23(b), not the pleading requirements for a fraud claim. *Id.* at 314. Further, the Third Circuit was merely restating the lower court's holding, not making its own legal conclusion. Nothing in *Prudential* stands for the proposition that reliance may be presumed under the present circumstances.

Under traditional securities fraud analysis, the plaintiff is required to plead and prove that he purchased or sold securities in reliance on the defendant's misrepresentations, i.e., that he was aware of and directly misled by a specific misrepresentation. *See Semerenko v. Cendant Corp.,* 223 F.3d 165, 178 (3d Cir.2000). Only where a plaintiff asserts a "fraud on the market" claim may reliance be presumed. *See, e.g., In re DVI Inc. Sec. Litig.,* 249 F.R.D. 196, 208 (E.D.Pa.2008) (holding that under a theory of "fraud on the market," plaintiffs may establish a presumption of reliance where they can show that misstatements or omissions may have affected the price at which they bought or sold a stock, where there is an efficient and impersonal market for the stock at the date and time of purchase or sale). An efficient market is defined as one in which "information important to reasonable investors ... is immediately incorporated into stock prices." *Burlington Coat Factory,* 114 F.3d at 1425 (citation omitted.) Fulton's allegations are the exact opposite of those required to state a fraud on the market claim since it asserts there was no efficient market for ARS. Thus, Fulton's suggestion that an element of a fraud claim need not be actually pled flies in the face of Rule 9's particularity requirement. *See e.g., Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982) (holding that a plaintiff cannot rely upon a presumption of fraud as a substitute for the specific requirements of Rule 9); *Howard v. Sun Oil Co.,* 294 F.Supp. 24, 27 n. 4 (D.Miss.1967) ("Fraud is never presumed but must be pled with particularity under Civil Rule 9(b), and proved by clear and convincing evidence.")

**4. The sufficiency of the reliance allegations.**

The "reasonable reliance" element of the fraud-based claims requires the pleading of specific facts establishing a causal nexus between the misrepresentation/omission and the plaintiff's injury, as well as specific facts demonstrating that the plaintiff exercised the due diligence that a reasonable person under all the circumstances would have exercised to protect his own interests. *Fulton I,* 2011 WL 5386376, at \*11 (citing *AES Corp. v. Dow Chem. Co.,* 325 F.3d 174, 178 (3d Cir.2003). In the context of Rule 10b–5, the Third Circuit has set forth a nonexclusive list of factors that a court should consider in determining whether a plaintiff's reliance was reasonable. *AES* at 178–79, (citing *Straub v. Vaisman & Co.,* 540 F.2d 591 (3d Cir.1976)); *see also Leder v. Shinfeld,* 609 F.Supp.2d 386, 397 (E.D.Pa.2009) (citing *Straub* ). Those factors include the existence of fiduciary relationships, plaintiff's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of a longstanding business or personal relationship, and the plaintiff's access to the relevant information. [14] *AES Corp.,* 325 F.3d at 178–79;*Straub,* 540 F.2d at 598.

**\*14** Fulton alleges that it "relied to its detriment on the false appearance, created by the manipulative conduct of NatCity and the other underwriter/ Contractual BDs, that the ARC markets were reliable, liquid, independent, and efficient that was created by the manipulative conduct of NatCity and the other underwriter/Contractual BDs [and] the accuracy and completeness of the information it was receiving from NatCity regarding ARCs." Compl. ¶ 42. It asserts that it relied upon NatCity's expertise in the recommendation and trading of ARS, the status of the market for ARS, in its ability to access the market for ARS. *Id.* ¶ 57. It also alleges that it relied on NatCity to disclose all material and relevant information about ARS, especially in connection with NatCity's recommendations as to which ARS Fulton should purchase. In particular, Fulton claims that it relied on NatCity to disclose, and not to conceal, all material and relevant information concerning the liquidity of ARS and the level of risk presented by

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

an investment in ARS. *Id.* ¶ 77. I find that these reliance allegations are insufficient in light of the 2006 SEC Order, which disclosed to the public that the ARS markets were not reliable, liquid, independent, or efficient, as well as the undisputed fact that Fulton is a sophisticated financial institution investor.

I find that Fulton's opportunity to detect the fraud, its sophistication, and its access to relevant information make an inference of reasonable reliance implausible. The omissions upon which Fulton claims to have reasonably relied all relate to NatCity's alleged concealment and failure to disclose that the ARS market was illusory because of the dependence on support bids, that the market had been historically prevented from failing only because of support bids, and the risk, following the August 2007 failed auction, that CBDs would stop making support bids. Thus, it is clear from the Complaint that Fulton attempts to base its reliance upon the same information disclosed by the 2006 SEC Order. This includes the assertions that the CBD's proprietary purchases were intended to manipulate the markets for ARS by creating the false appearance that those markets were broad-based, sustained by investor demand for ARS by third parties with true investment intent, and that the ARS markets were active, efficient and independent, when there was far from sufficient real demand by disinterested parties with true investment intent to keep the auction markets from failing. Given the content of the 2006 SEC Order, Fulton cannot show it reasonably relied to its detriment upon NatCity's alleged failure to inform it that the ARS market was not efficient and independent.

The allegations that NatCity and the CBDs participated in the ARS markets for their own accounts to support the auction markets, without disclosing that participation to Fulton or that the success of auction markets was dependent upon support bids, is precisely the type of information made public by the 2006 SEC Order. The SEC found that broker-dealers had intervened in the ARS market to prevent failed auctions, and to set the market interest rate for ARS. Based on this public information, the *Citigroup* court found that any reasonable inference of reliance upon market integrity was belied by a 2006 SEC Order because that Order described the conduct of broker-dealers, "including intervention in the auctions through bidding from their proprietary accounts ... to prevent

failed auctions, to set a 'market' rate, and to prevent all-hold auctions...." *Citigroup,* 700 F.Supp.2d at 301–02. The court went on to hold that the 2006 SEC Order, as well as language in the plaintiff's trade confirmations, and the official statements issued in connection with ARS specifically enumerated in the Complaint, "all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them.... These documents disclosed that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that they could be set by broker-dealers...." *Id.* at 307. Thus, the court concluded, plaintiffs could not have plausibly relied upon the alleged misrepresentations that broker-dealers had intervened in the ARS market to prevent failed auctions, and to set the market interest rate for ARS.

**\*15**  The same conclusion applies here as well. Fulton's reliance allegations all assert that proprietary purchases by NatCity and the other CBDs created the false appearance that the ARS market was "set by the 'natural interplay of supply and demand.' " Fulton's allegations concerning the August 2007 auction failure, and subsequent instability in the market due to CBDs deciding to stop making support bids leading to the ultimate failure in 2008, all depend upon an unreasonable assertion of reliance upon NatCity's failure to inform Fulton that a functioning market did not exist in the first place. The 2006 SEC Order placed investors—particularly sophisticated financial institution investors such as Fulton—on notice that they could not rely on an assumption of ARS market integrity, because it was in fact dependent upon the type of insider support bidding that forms the nucleus of Fulton's allegations. *Accord Merrill Lynch,* 704 F.Supp.2d at 400 ("Even assuming that the Plaintiffs' allegations are sufficient to form a basis for their alleged reliance on an assumption of the ARS market's integrity, however, the disclosures contained in the research reports, prospectuses, 2006 SEC Order, and Merrill Lynch ARS website render any reliance unjustifiable."); *In re UBS Auction Rate Sec. Litig.,* Civ. A. No. 08–2967, 2010 WL 2541166, at \*23 (S.D.N.Y. June 10, 2010) (holding that plaintiffs had not plausibly pled reliance because the 2006

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

SEC Order "detailed the fact that auction dealers had placed support bids to prevent failed auctions and specifically noted that such conduct was not prohibited as long as it was properly disclosed.... [C]ompany-specific disclosures in the prospectuses combined with the publicly available information discussing broker-dealer participation in the ARS market, generally, are sufficient to preclude Plaintiffs from establishing that they reasonably relied on an efficient market free of Defendants' intervention in UBS ARS auctions, as a matter of law."). [15] Accordingly, I conclude that the motion must be granted on the alternative ground that the reliance allegations are insufficient, in addition to my conclusion that the motion must be granted for failure to allege fraud and scienter with the required particularity.

**d. Failure to plead negligent misrepresentation.**

The elements of the tort of negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made under circumstances in which one ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 561 (Pa.1999); *Gibbs,* 647 A.2d at 889. [16] Whether Fulton has stated a claim for negligent misrepresentation is analyzed under Rule 8 and the *Twombly/Iqbal* standard, and not Rule 9, since it is not based in fraud. Thus, I ask whether Fulton has alleged sufficient facts to plausibly plead the claim.

**\*16** The problems identified above concerning Fulton's failure to plausibly plead the misrepresentation/omission element of its fraud-based claims, leads to the conclusion that Fulton has also failed to plausibly plead a misrepresentation upon which it asserts this negligence-based claim. More significantly, all of Fulton's allegations supporting its negligent misrepresentation claim assert failures to disclose information, rather than direct misrepresentations of fact. [17] The Third Circuit has recognized that, under Pennsylvania law, a negligent misrepresentation claim may not be made out on the basis of a mere failure to disclose a material fact, but rather must be based upon an affirmative misrepresentation. *Advance Capital Partners, LLC. v. Rossmann,* 495 Fed. App'x 235, 238 (3d Cir.2012)

(citing *Lazin v. Pavilion Partners,* Civ. A. No. 95–601, 1995 WL 614018 (E.D.Pa. Oct.11, 1995) ("Non-disclosure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation.") and *Lang v. Helios Capital Corp.,* No. 86–08031, 1989 WL 299241 (Pa.Com.Pl. Jan.20, 1989) ("nondisclosure would give rise to a cause of action only for fraudulent nondisclosure, and not for fraudulent or negligent misrepresentation.")). Accordingly, I grant NatCity's Motion with regard to this claim.

**e. The breach of fiduciary duty and negligence claims.**

Fulton also asserts claims of breach of a fiduciary duty and negligence. To state a breach of fiduciary duty under Pennsylvania law, a plaintiff must plausibly plead a confidential relationship and: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about the plaintiff's injuries. *Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, 414–415 (E.D.Pa.2006). A fiduciary relationship exists where there is a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other. *Antinoph v. Laverell Reynolds Sec., Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989). In determining whether a fiduciary relationship exists, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side. *eToll, Inc. v. Elian/Savion Adver., Inc.,* 811 A.2d 10, 23 (Pa.Super.Ct.2002). A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power. *Id.*

To make a claim under Pennsylvania law for negligence a plaintiff must plead (1) the existence of a duty or obligation recognized by law, (2) a failure on the part of defendant to conform to that duty or a breach thereof, (3) a causal connection between the

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

defendant's breach and the resulting injury, and (4) actual damages. *Wawrzynek v. Statprobe, Inc.,* 422 F.Supp.2d 474, 483 (E.D.Pa.2005).

**\*17** Fulton claims that NatCity owed it a fiduciary duty to act with the utmost good faith and individual loyalty. Compl. ¶ 105. It claims that NatCity breached a duty of reasonable care to learn and understand Fulton's investment goals and objectives, and failed to provide Fulton with true recommendations regarding the nature and goals for its investments. *Id.* ¶¶ 99–100. Because these state law claims for negligence and breach of a fiduciary duty do not implicate the heightened pleading standard of Rule 9(b), and they do not have a scienter or reliance requirement—and because NatCity does not discuss these claims in its motion, even though the motion seeks dismissal of the entire Complaint—I find that the arguments raised by NatCity in its motion do not apply to these claims.

Reading these two claims in the context of the complaint as a whole, and applying the *Twombly/Iqbal* pleading standard of Rule 8(a), the pleadings sufficiently allege a duty, its breach, and resulting damages. Fulton asserts that it communicated specific investment goals, and that NatCity acted as its securities broker, providing advice and counsel for financial investments. The allegations that NatCity was trading in ARS in a manner that was at odds with Fulton's investment interests are sufficient to plausibly plead a violation of its duty of good faith and fidelity to Fulton. Thus, I conclude that these claims must survive.

### f. The aiding and abetting common law fraud claim.

In *Fulton I,* I stated that "the Pennsylvania Supreme Court has not expressly adopted the Restatement (Second) Torts § 876(b), on which Fulton relies [to state a common law claim for aiding and abetting fraud].... Because this is an unsettled question of law, I will not dismiss the claims under the rationale that an aiding and abetting fraud claim does not exist in Pennsylvania." *Id.* at \*15 (internal citations and footnote omitted). However, I went on to determine that Fulton's allegations that the activity of other CBDs aided and abetted the defendant, "does not rise to the level of aiding and abetting because there is no allegation that UBS knew that PNC or

NatCity was perpetuating a 'fraud' on Fulton. Merely running an auction at the request of issuers and paying commissions to brokers does not rise to substantial assistance or encouragement of the specific fraud Fulton is alleging PNC and NatCity committed." *Id.*

The present complaint alleges that NatCity had sufficient knowledge concerning the market conditions, the auctions, and how the interest rates and securities values were set based on the bidding process. Compl. at ¶ 35. Fulton contends that NatCity's participation in the auctions was done in concert with the other CBDs, with the knowledge that the markets were deteriorating and risk was increasing. *Id.* ¶ 115.

I find that this claim fails for the same reasons that the other fraud claims fail, namely that Fulton has failed to plead it with the requisite particularity. Fulton makes no specific factual averments about what information NatCity actually possessed concerning other CBDs. Additionally, Fulton makes no mention of what specific actions NatCity took, which would have substantially assisted or encouraged any fraudulent behavior by other CBDs, or what actions other CBDs took to assist and encourage NatCity's fraudulent behavior. Accordingly, I grant the Motion to dismiss as to this claim.

### g. The equitable rescission claim.

**\*18** Fulton's claim for equitable rescission must also be dismissed because it is a remedy for fraud, and not a separate cause of action. *See Moffatt Enter., Inc. v. Borden, Inc.,* 807 F.2d 1169, 1174 (3d Cir.1986) (quoting *Scaife v. Rockwell–Standard Corp.,* 446 Pa. 280, 285 A.2d 451 (Pa.1971) ("A defrauded party may pursue several remedies including ... rescission ... based on fraud.")); *Prof'l Sys. Corp. v. OPEX Postal Techs.,* Civ. A. No. 05–2689, 2006 WL 573798 (E.D.Pa. Mar.8, 2006) (holding equitable rescission is a remedy for fraud, not a cause of action); *Germantown Mfg. Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138 (Pa.Super.Ct.1985); *Majer v. Sonex Research, Inc.,* 541 F.Supp.2d 693, 713 (E.D.Pa.2008). However, if a plaintiff alleges fraud in a transaction, a right of rescission is established. [18] *Baker v. Cambridge Chase, Inc.,* 725 A.2d 757 (Pa.Super.Ct.1999). Even if Fulton had properly pled rescission as a remedy for its fraud claim instead of as a separate cause of

action, it would also be dismissed for the reasons stated above regarding the deficiencies in Fulton's fraud-based claims.

### h. The request for attorneys' fees and costs.

The United States Supreme Court has made clear, in the absence of an agreement or statute providing for attorney's fees, the American rule is that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see also Pennsylvania v. Flaherty,* 40 F.3d 57, 60 (3d Cir.1994) (plaintiff cannot recover attorneys' fees from the opposing party unless there is a statute or agreement between the parties that provides for the awarding of attorney's fees). Generally, Pennsylvania state courts also follow the American Rule. *See Mrozek v. Eiter,* 805 A.2d 535, 538 (Pa.Super.Ct.2002) (quoting *Hart v. O'Malley,* 781 A.2d 1211, 1216 (Pa.Super.Ct.2001)) (citing *Merlino v. Delaware Cnty.,* 556 Pa. 422, 728 A.2d 949, 951 (Pa.1999) ("This Court has consistently followed the general, American rule that there can be no recovery of attorneys' fees from an adverse party, absent an express statutory authorization, a clear agreement by the parties or some other established exception.")).

Because Fulton does not state a statutory or other basis for its demand for attorneys' fees, and does not dispute in its Response to the Motion that its request for attorneys' fees and costs is improper, the request is stricken from the Complaint.

### i. NatCity's Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a court may order stricken any portion of a pleading that constitutes "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike are decided on the pleadings alone, and should not be granted unless the relevant insufficiency is "clearly apparent." *Cipollone v. Liggett Grp., Inc.,* 789 F.2d 181, 188 (3d Cir.1986); *see also N. Penn Transfer, Inc. v. Victaulic Co. of Am.,* 859 F.Supp. 154, 158 (E.D.Pa.1994) (motions to strike decided on the pleadings alone).

**\*19** While motions to strike serve the useful function of streamlining litigation, they are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Id.* (citing C. Wright & A. Miller, *Federal Practice and Procedure* § 1382 (1969)); *see also McInerney v. Moyer Lumber & Hardware, Inc.,* 244 F.Supp.2d 393, 402 (E.D.Pa.2002) ("The purpose of a motion to strike is to ... avoid unnecessary forays into immaterial matters"). In particular, courts have identified prejudice to one or more of the parties as a touchstone for deciding a motion to strike. *See, e.g ., Miller v. Grp. Voyagers, Inc.,* 912 F.Supp. 164, 168 (E.D.Pa.1996). Although courts exercise considerable discretion in deciding motions to strike, the Rule 12(f) prohibition on "redundant" pleadings "must be read in conjunction with the liberal pleading standards of Rule 8 in general and Rule 8(e)(2) in particular" (under which parties may plead alternative theories of relief). *Calloway Golf Co. v. Dunlop Slazenger Grp. Am., Inc. d/b/a Maxfli,* 295 F.Supp.2d 430, 438 (D.Del.2003); *see also Miller,* 912 F.Supp. at 168 (noting the discretion afforded in deciding motions to strike); *N. Penn Transfer, Inc.,* 859 F.Supp. at 158 (same).

NatCity argues that paragraphs 19, 24, 45–51 and 52(a)-(i) of the Complaint and Exhibits "A" through "O" reference other entities unrelated to NatCity and simply attempt to tarnish NatCity with the actions of others. Doc. # 22 at 15. I find no merit in this argument. These paragraphs and Exhibits do not contain immaterial, impertinent, or scandalous information. Rather they are included in the Complaint to provide background information on the remaining negligence and breach of fiduciary duty claims, and are not unduly prejudicial or scandalous to NatCity. Accordingly, I will deny NatCity' Motion to Strike.

### III. CONCLUSION

I find that Fulton has failed to allege specific facts to support the misrepresentation, scienter, and reliance elements of its fraud-based claims, and has also failed to plausibly allege the misrepresentation element of its negligent misrepresentation claim. Accordingly, I grant NatCity's Motion to dismiss Counts I, II, and III, asserting violations of Sections 1–401, 1–402, and 1–403 of the Pennsylvania Securities Act, as well as the claims for equitable rescission (Count IV),

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...
2013 WL 5635977

negligent misrepresentation (Count V), common law fraud (Count VIII), and aiding and abetting fraud (Count IX). I also find that the claim for attorneys' fees is subject to dismissal. I deny the Motion as to the negligence claim (Count V I) and breach of fiduciary duty claim (Count VII). Finally, I find that NatCity's motion to strike should be denied.

An appropriate Order follows.

### ORDER

**AND NOW**, this 15th day of October, 2013, upon consideration of the defendant's motion to dismiss (Document # 12), and all responses and replies thereto, IT IS HEREBY ORDERED that the motion is GRANTED in part and DENIED in part as follows:

  **\*20** 1. The motion is GRANTED as to the plaintiff's first, second, third, fourth, fifth, eighth, and ninth causes of action, asserting claims for violations of the Pennsylvania Securities Act, equitable rescission, negligent misrepresentation, common law fraud, and aiding and abetting fraud.

2. The motion is GRANTED as to the plaintiff's request for attorney's fees.

3. The motion is DENIED as to the plaintiff's sixth and seventh causes of action, asserting claims for negligence and breach of fiduciary duty.

4. The motion is also DENIED to the extent that it seeks to strike immaterial matter from the plaintiff's complaint.

IT IS FURTHER ORDERED that:

1. All discovery shall be completed by **Friday, January 3, 2014.**

2. A telephone status conference will be conducted on **Friday, December 13, 2013** at 11:30 a.m. Counsel for the plaintiff shall initiate the call, and include the law clerk (267–299–7764).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5635977

---

### Footnotes

1    The facts are gleaned from the complaint and the extrinsic documents upon which it is based. For the purposes of this motion, the allegations are presented in the light most favorable to Fulton as the non-moving party, and are accepted as true with all reasonable inferences drawn in its favor. *See GSC Partners, CDO Fund v. Washington,* 368 F.3d 228, 236 (3d Cir.2004).

2    Fulton asserts that for such transactions, NatCity "may have also acted as the underwriter for that issue." *Id.* ¶ 18.

3    Fulton argues that the requirements of Rule 9 should be relaxed under the circumstances of this case because its claims involve the inside, non-public information concerning NatCity's involvement in the ARS market, for which Fulton has no ability to obtain access prior to discovery. Doc. # 19 at 30–31 (*citing In re Craftmatic Sec. Litig.,* 890 F.2d 628, 645 (3d Cir.1989) (stating that "courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control") *and In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997)). This argument is meritless. In *Burlington Coat Factory* the Third Circuit stated that "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control.... But even under a relaxed application of Rule 9(b), boilerplate and concl usory allegations will not suffice.... Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Burlington*

*Coat Factory,* 114 F.3d at 1418 (internal citations omitted). The allegations of NatCity's fraud are not focused on its inside, non-public information, but rather on publicly available information regarding the alleged manipulation of the ARS market. NatCity's role in that alleged manipulation is the basis of the claims to which Rule 9 is applicable. I find, therefore, that Fulton is required to meet Rule 9's specificity requirement with regard to its allegations concerning NatCity's role in the market manipulation.

4    The regulators refer to "upstream firms" as those that actually conducted the ARS auctions by collecting orders from broker-dealers, determining the "clearing rate," and calculating the allocation of the securities among auction dealers. Compl. Ex. P. at 3. "In contrast to upstream firms, firms sometimes known as 'downstream' firms do not act as agents for issuers in any capacity. Instead, downstream firms act in the traditional broker role as agents for their customers and place bids with Auction Dealers and Remarking Agents on the customers' behalf to purchase and sell ARS." *Id.*

5    For example, Fulton alleges that, throughout the summer and fall of 2007, CBDs, including NatCity, continued to make proprietary support bids which resulted in increasing proprietary inventories of ARS. Compl ¶¶ 31–33. While it alleges with much detail the number of support bids placed by entities other than NatCity, *see* Compl. ¶ 24 (alleging that "UBS submitted support bids in 30,367 auctions" between January 1, 2006 and February 28, 2008), it does not allege specific instances of NatCity making support bids.

6    Although NatCity does not specifically argue that the Complaint should be dismissed because Fulton has failed to adequately allege scienter, since this is an obvious defect in Fulton's pleading, I conclude that a discussion of the issue is appropriate.

7    In *Dirks v. SEC,* 463 U.S. 646, 660, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Supreme Court held that the scienter requirement was adequately plead where the plaintiff alleged that defendant "knew or should have known" that he was trading on improperly obtained insider information. *Id.* However, the Supreme Court has never held that negligence is sufficient, and has yet to decide whether recklessness, in addition to willfulness, satisfies the scienter requirement. *See Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1323, 179 L.Ed.2d 398 (2011). The Third Circuit has held that scienter for securities fraud includes recklessness. *Oran,* 226 F.3d at 288–89;*Infinity Grp. Co.,* 212 F.3d at 192; *see also SEC v. Smart,* 678 F.3d 850, 857 (10th Cir.2012) ("Section 10(b) ... require[s] the SEC to establish at least recklessness...."); *United States v. Gansman,* 657 F.3d 85, 91 n. 7 (2d Cir.2011) (observing that civil liability under the misappropriation theory may attach if the SEC proves by a preponderance of the evidence that the defendant's conduct was merely reckless, rather than willful).

8    Section 1–402(c) provides it is also unlawful "to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of the security will or is likely to rise or fall[.]" 70 P.S. § 1–402(c).

9    Section 10(b) states in relevant part that "it shall be unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations" promulgated by the SEC. 15 U.S.C. § 78j. Rule 10b–5 provides in relevant part that "it shall be unlawful for any person ... to employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5. Section 9(a) prohibits individuals from effecting "a series of transactions in any security registered on a national securities exchange ... creating actual or apparent active trading in such security, or raising or

2013 WL 5635977

depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2).

10    *See, e.g., Fulton v. UBS Sec. LLC,* Civ. A. No. 10–1093, 2011 WL 5386376, at *7 (E.D.Pa. Nov.7, 2011) (Stengel J.) ("Fulton I"); *McFeeley v. Florig,* 966 F.Supp. 378, 382 & n. 8 (E.D.Pa.1997) (stating that "the anti-fraud provisions of the Pennsylvania Securities Act and the 1934 Securities Exchange Act are functionally identical" and that "Section 1–401 substantially echoes Rule 10b–5's language").

11    The statute provides in pertinent part:

> (a) Any person who ... offers or sells a security in violation of sections 401, 403, 404 or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from hi m....
>
> ...
>
> (c) Any person who wilfully [sic] participates in any act or transaction in violation of section 402 shall be liable to any other person who purchases or sells any security at a price which was affected by the act or transaction for the damages sustained as a result of such act or transaction

70 P.S. § 1–501(a), (c) (footnotes omitted).

12    In deciding a motion to dismiss, we may take judicial notice of matters of public record, such as the 2006 SEC Order concerning ARS practices and disclosure requirements. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 n. 1 (3d Cir.1994).

13    I note that other cases concerning the collapse of the ARS market have also been disposed of through motions to dismiss, though not necessarily on reliance grounds. *See, e.g., In re UBS Auction Rate Sec. Litig.,* Civ. A. No. 08–2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010); *In re Merrill Lynch Auction Rate Sec. Litig.,* 704 F.Supp.2d 378 (S.D.N.Y.2010); *Ashland Inc. v. Morgan Stanley & Co.,* 700 F.Supp.2d 453;*Ashland Inc. v. Oppenheimer & Co.,* 689 F.Supp.2d 874 (E.D.Ky.2010); *Healthcare Fin. Grp. ., Inc. v. Bank Leumi USA,* 669 F.Supp.2d 344 (S.D.N.Y.2009); *Defer LP,* 654 F.Supp.2d 204;*In re Citigroup,* 700 F.Supp.2d 294 (S.D.N.Y. Sept.11, 2009); *Aimis Art Corp. v. N. Trust Sec., Inc.,* 641 F.Supp.2d 314 (S.D.N.Y.2009).

14    Fulton alleges that NatCity, by virtue of its status as Fulton's ARS broker, owed it a fiduciary duty. This factor weighs in favor of finding reasonable reliance. While Fulton does not allege or argue that its relationship with NatCity was longstanding, I will assume for the purposes of this Motion that this factor also weighs in Fulton's favor.

15    I recognize that the cited cases each discuss the content of the 2006 SEC Order in conjunction with disclosure information contained on broker-dealer websites, and other disclosures, such as in the offering documents issued by broker-dealers. Neither party has provided copies of any disclosure material given by NatCity to Fulton, either before or after the 2006 SEC Order was

Fulton Financial Advisors, Nat. Ass'n v. NatCity Investments, Inc., Not Reported in...

2013 WL 5635977

issued. Thus, I am called upon to decide the reliance issue on the basis of the 2006 SEC Order alone.

I find from the almost unanimity of the case law, holding that the 2006 SEC Order constituted notice to the public that an investor could not rely on an assumption of ARS market integrity, Fulton's undisputed status as a sophisticated financial institution investor, as well as the absence of specific factual allegations demonstrating Fulton undertook any diligent effort to educate itself about the ARS market, that the Order alone constitutes sufficient disclosure to such a sophisticated investor. *Accord Schl aifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98–99 (2d Cir.1997) (holding that reliance is unreasonable as a matter of law where a sophisticated investor fails to take reasonable steps to access critical public information); *Landesbank Baden–Wurttemberg v. Goldman, Sachs & Co.,* 478 Fed. App'x 679, 683 (2d Cir.2012) (same); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.,* 450 Fed. App'x 32, 34–35 (2d Cir.2011) (holding that the district court correctly concluded that any reliance on defendants' alleged misrepresentations was unreasonable under the circumstances, where the plaintiffs were sophisticated investors, did not conduct any independent investigation prior to making their investments, and where information was not peculiarly within defendants' knowledge).

16    Pennsylvania draws its negligent misrepresentation claim from Restatement (Second) of Torts, § 552, which provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) The liability in subsection (1) is limited to loss suffered

(a) By the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) Through reliance upon it in a transaction that he intends the information to influence or know that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Restatement (Second) of Torts, § 552.

17    *See* Compl. ¶ 31 (alleging that NatCity "concealed and failed to disclose to Fulton that ARC auctions had failed [in August 2007] because of insufficient demand and because underwriters and Contractual BDs, like NatCity, had intentionally discontinued the placement of support bids."); *id.* ¶ 33 (alleging "NatCity failed to advise Fulton, and concealed, that ARC auctions had historically been prevented from failing only because NatCity and other underwriters/Contractual BDs had placed support bids for their own accounts, and NatCity further failed to disclose, and concealed, that the likelihood that underwriters and Contractual BDs would discontinue support bids had risen dramatically, and that such discontinuance was imminent."); *id.* ¶ 35 (alleging that "NatCity continued to recommend ARC purchases to Fulton ... without disclosing the risk of owning A RCs had increased ... and that A RCs were not suitable for Fulton's [investment goals]"); *id.* ¶ 36 (alleging that "NatCity concealed and failed to advise Fulton that there was a materially

increasing risk of loss"); *id.* ¶ 37 (alleging that NatCity concealed and failed to advise Fulton that, like other underwriters and Contractual BDs, NatCity was ... off-loading its own inventory of ARCs").

18    The purpose of equitable rescission is to return the parties as nearly as possible to their original positions where warranted by the circumstances of the transaction. *Gilmore v. Ne. Dodge Co., Inc.,* 278 Pa.Super. 209, 420 A.2d 504 (Pa.Super.Ct.1980).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

5

Graham Engineering Corp. v. Slusarz, Not Reported in Fed. Supp. (2018)

2018 WL 1907124

2018 WL 1907124
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

GRAHAM ENGINEERING CORP., Plaintiff

v.

Kevin SLUSARZ, Defendant

CIVIL ACTION NO. 1:16-CV-2527
|
Signed 04/23/2018

**Attorneys and Law Firms**

Richard L. Hackman, Harlan William Glasser, Saxton & Stump LLC, Lancaster, PA, for Plaintiff.

Andrew C. Whitney, SAP America, Inc., Newtown Square, PA, Jonathan S. Krause, Kendra L. Baisinger, Klehr Harrison Harvey Branzburg, LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

Christopher C. Conner, Chief Judge

**\*1** Plaintiff Graham Engineering Corporation ("Graham Engineering") commenced this action against defendant Kevin Slusarz ("Slusarz"), as well as six related actions against defendants Eric Adair, Doug Johnson, William Kramer, Jeff Lawton, Michael Perri, and Daniel Schilke (collectively, "defendants"), pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and state law. (Doc. 44.) Before the court is Graham Engineering's motion to strike portions of Slusarz's answer (Doc. 52) pursuant to Federal Rule of Civil Procedure 12(f). (Doc. 54.) The court will grant Graham Engineering's motion.

**I. Factual Background & Procedural History**

Graham Engineering is a Pennsylvania corporation that offers, *inter alia*, design and development expertise for plastic products. (Doc. 44 ¶¶ 2, 14). On January 1, 2016, Graham Engineering acquired American Kuhne, Inc. ("American Kuhne"), a Delaware corporation that employed defendants. (Id. ¶¶ 15, 17, 22, 24). As part of the acquisition, Graham Engineering acquired ownership of defendants'

employment and confidentiality agreements with American Kuhne. (Id. ¶¶ 26-28). Graham Engineering contends that defendants violated these agreements by accessing and retaining Graham Engineering's confidential information without permission. (See id. ¶¶ 43, 55, 79, 92, 109, 135, 155-56). Graham Engineering further avers that defendants utilized this information to form U.S. Extruders, a competitor incorporated in Rhode Island. (See id. ¶¶ 158, 187, 194).

Graham Engineering commenced the instant action on December 21, 2016, (Doc. 1), subsequently filing an amended complaint (Doc. 22) on March 31, 2017, and a second amended complaint (Doc. 44) on October 17, 2017. Slusarz filed his answer on November 21, 2017. (Doc. 52). In response to fifteen separate allegations in the second amended complaint, Slusarz responds that:

> The allegations in this paragraph appear to purport to characterize a document, the contents of which speak for themselves, and to which no responsive pleading is required. By way of further response, the allegations in this paragraph appear to characterize a document which Plaintiff accessed from Defendants without authorization and in violation of its statutory and common law legal obligations. To the extent a response is required, Defendant denies the allegations in this paragraph. Defendant denies that Defendants engaged in any unlawful conduct.

(Id. ¶¶ 168-70, 172-74, 176-82, 185-86). Graham Engineering moves to strike these fifteen responses pursuant to Federal Rule of Civil Procedure 12(f). (Doc. 54). The motion is fully briefed and ripe for disposition.

Graham Engineering Corp. v. Slusarz, Not Reported in Fed. Supp. (2018)

2018 WL 1907124

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(f), the court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). District courts have "considerable discretion" in resolving a Rule 12(f) motion. Krisa v. Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994) ). In general, such a motion will be denied unless the allegations are severely prejudicial to one of the parties and unrelated to the plaintiff's claims. Id.; see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed. 2016). A party is prejudiced when the challenged pleading "confuses the issues" or places an undue burden on the responding party. Karpov v. Karpov, 307 F.R.D. 345, 348 (D. Del. 2015).

## III. Discussion

*2  Graham Engineering contends that Slusarz's fifteen responses to the second amended complaint, set forth *supra*, should be stricken for failure to conform to Rule 8 of the Federal Rules of Civil Procedure. (Doc. 55 at 2, 9, 11). Specifically, Graham Engineering argues that the responses are "inappropriate" because they fail to apprise Graham Engineering as to whether Slusarz admits or denies the allegations. (Id. at 11).

The Federal Rules of Civil Procedure require a party responding to a pleading to "admit or deny the allegations asserted against it." FED. R. CIV. P. 8(b). A party's denial must "fairly respond to the substance of the allegation." FED. R. CIV. P. 8(b)(2). If the party denies only part of an allegation, the denial must specifically designate what is denied and what is admitted. FED. R. CIV. P. 8(b)(3)-(4).

A Rule 12(f) motion to strike may be used to address an improperly pleaded answer under Rule 8(b). See Sinclair Cattle Co., Inc. v. Ward, No. 1:14-CV-1144, 2015 WL 6125260, at *2 (M.D. Pa. Oct. 16, 2015) (Conner, C. J.). A motion to strike's purpose is to "clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002) (citing Garlanger v. Verbeke, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) ). A defendant should respond to a complaint in such a way that a plaintiff will not be burdened with "ferret[ing] out a straightforward answer." See Sinclair Cattle Co., 2015 WL 6125260, at *3.

The bare assertion that a document speaks for itself and that "no responsive pleading is required" falls short of the requirements of Rule 8(b)—even when followed by a general denial. See *In re* Richner, No. 5-12-BK-2881, 2018 WL 1165759, at *2-3 (Bankr. M.D. Pa. Mar. 1, 2018) (citing Kegerise v. Susquehanna Twp. Sch. Dist., 321 F.R.D. 121, 124 (M.D. Pa. 2016) ); see also Do It Best Corp. v. Heinen Hardware LLC, No. 1:13-CV-69, 2013 WL 3421924, at *5-6 (N.D. Ind. Jul. 8, 2013). Further, the response that a document speaks for itself is generally deemed an admission that the contents of a document are what they are purported to be. See Charleston v. Salon Secrets Day Spa, Inc., No. 08-5889, 2009 WL 1795529, at *1 (E.D. Pa. Jun. 24, 2009); see also *In re* Cotter, No. 08-12504, 2011 WL 5900811, at *8 (Bankr. D.N.J. Oct. 24, 2011).

Slusarz responds to fifteen paragraphs of the second amended complaint with an assertion that a document speaks for itself followed by a general denial. None of Graham Engineering's allegations in the paragraphs at issue *sub judice* explicitly or implicitly refer to documents, rendering Slusarz's responses ambiguous. (See Doc. 44 ¶¶ 168-70, 172-74, 176-82, 185-86). Thus, Slusarz's responses unduly burden Graham Engineering with the task of speculating as to which specific document Slusarz refers and what allegation he denies. (See Doc. 52 ¶¶ 168-70, 172-174, 176-82, 185-86). Accordingly, we will grant Graham Engineering's motion. Slusarz may amend his responses to paragraphs 168 through 70, 172 through 174, 176 through 182, 185 through 186 of Graham Engineering's second amended complaint. FED. R. CIV. P. 15(a)(2).

## IV. Conclusion

The court will grant Graham Engineering's motion (Doc. 54) to strike. An appropriate order shall issue.

## All Citations

Not Reported in Fed. Supp., 2018 WL 1907124

**Graham Engineering Corp. v. Slusarz, Not Reported in Fed. Supp. (2018)**

2018 WL 1907124

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

6

2021 WL 772237
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Nicholas LOMMA, et al., Plaintiffs,

v.

OHIO NATIONAL LIFE ASSURANCE
CORPORATION, et al., Defendants.

3:16-CV-2396
|
Filed 02/26/2021

**Attorneys and Law Firms**

Ethan C. Wood, Paul J. LaBelle & Associates, LLC,
Moosic, PA, Paul J. LaBelle, Law Offices of Paul J.
LaBelle, Scranton, PA, for Plaintiffs.

Luke A. Repici, White and Williams LLP,
Philadelphia, PA, for Defendants.

**MEMORANDUM OPINION**

Robert D. Mariani, United States District Judge

**I. INTRODUCTION**

**\*1** This matter is before the Court on remand
from the Third Circuit Court of Appeals following
Defendants' appeal of this Court's Order granting
summary judgment in favor of Plaintiffs on their
breach of contract claim. (Doc. 46). Following the
Third Circuit's October 8, 2019, judgment, Plaintiffs
requested that this Court hold further proceedings
on remand to address any unresolved issues. (Doc.
62). For the reasons that follow, the Court will
deny Plaintiffs Motion to Strike Defendants' Answer
and Affirmative Defenses to Plaintiffs' Complaint
(Doc. 41) and grant Defendants' Motion for Summary
Judgment on the breach of contract claim (Doc. 31).

**II. BACKGROUND AND
PROCEDURAL HISTORY**

In September of 1986, Pennsylvania National Life
Insurance Company issued Lora Marie Lomma a
universal life insurance policy (the "Original Policy")
for $25,000 in coverage. (Original Policy, Doc. 29-2 at
2). The Original Policy contained a suicide exclusion,
which states "SUICIDE: if within two years from the
Issue Date, the Insured, while sane or insane, commits
suicide, our liability will be limited to a refund of the
premium paid less any Policy Indebtedness and Partial
Withdrawals." (*Id.* at 15). In 1994, Defendants Ohio
National Life Assurance and/or Ohio National Life
Insurance Company assumed and began administering
Ms. Lomma's Original Policy. (*See* Mem. Op. Granting
in Part and Denying in Part Summ. J. to Lomma,
Doc. 45 at 3). In December of 1995, Ms. Lomma
increased the coverage amount of the Original Policy
from $25,000 to $100,000. (December 14, 1995, Letter
from Defendants to Lori Lomma, Doc. 29-3 at 3).

On June 6, 2007, Ms. Lomma applied for a renewable
term life insurance policy with Defendants for
$100,000 in coverage (the "Term Policy"). (Term
Policy, Doc. 31-3 at 1-34). On August 15, 2007,
Defendants issued the Term Policy to Ms. Lomma with
a benefit value of $100,000. The Term Policy, like the
Original Policy, contains a suicide exclusion, which
states:

> If the insured dies by suicide
> while sane or insane or
> by intentional self-destruction
> while insane, we will not pay
> any death proceed[s] payable
> on amounts of insurance which
> have been in effect for less
> than 2 years. If the suicide
> or intentional self-destruction is
> within the first 2 contract years,
> we will pay as death proceeds
> the premiums you paid.

(Term Policy, Doc. 31-3 at 13).

In May 2009, Ms. Lomma committed suicide. Shortly
after Ms. Lomma's death, Anthony Lomma filed a
claim for benefits on behalf of his children, the
beneficiaries under the Term Policy. Defendant Ohio
National Life Assurance informed Mr. Lomma they
would not pay the full benefit because an investigation

2021 WL 772237

revealed that Ms. Lomma's death occurred by suicide, and in accordance with the policy's suicide exclusion, "the death proceeds for death due to 'Suicide' within the first two contract years is a refund of premiums paid." (August 31, 2009, Letter from Defendants to Anthony Lomma, Doc. 31-3 at 36). The letter states that Defendants would instead pay "$285.12 plus interest at 4.5%," which represents the "premiums paid on the policy." (*Id.*).

**\*2** Plaintiffs sued Defendants in the Court of Common Pleas of Lackawanna County for the full $100,000 in coverage, alleging five causes of action: (1) breach of contract; (2) unjust enrichment; (3) promissory estoppel; (4) breach of implied covenant of good faith and fair dealing; and (5) statutory bad faith pursuant to 42 Pa. C.S.A. § 8371. (Doc. 1-4). Defendants subsequently removed the complaint to this Court. (Doc. 1).

On December 9, 2016, Defendants timely filed a motion to dismiss the claims against them. (Doc. 4). On September 6, 2017, the Court dismissed the unjust enrichment and promissory estoppel claims, and denied Defendant's motion with respect to the breach of contract, breach of implied covenant of good faith and fair dealing, and statutory bad faith claims. (Doc. 25).

On December 20, 2017, the parties each filed timely cross-motions for summary judgment. (Docs. 29, 31). On the same day, Plaintiffs also made a Request for Entry of Default pursuant to Federal Rule of Civil Procedure 55(a) (Doc. 32), a Motion for Default Judgment pursuant to Rule 55(b)(1) (Doc. 33), and a Motion for Default Judgment pursuant to Rule 55(b)(2) (Doc. 34). The next day, on December 21, 2018, Defendants filed their Answer and Affirmative Defenses to Plaintiffs' Complaint. (Doc. 36).

On January 4, 2018, the Court denied Plaintiffs' motions and directed the Clerk not to enter default against Defendants. (Doc. 37). Plaintiffs' subsequently filed a Motion to Strike Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint. (Doc. 41).

On June 28, 2018, the Court granted summary judgment to Plaintiffs on the breach of contract claim,

holding that (1) the Term Policy contains a latent ambiguity because Ms. Lomma could have interpreted the phrase "contract years" to mean the duration of her contractual relationship with Defendants, not simply the time period in the Term Policy, (2) the Notice and Illustration of Benefits have qualifying language and do not show that the suicide exclusion period began in 2007, and (3) Plaintiffs established that Ms. Lomma could have reasonably believed that the suicide exclusion expired two years after she initially began paying premiums on a $100,000 life insurance policy. (Mem. Op. Granting in Part and Denying in Part Summ. J. to Lomma, Doc. 45 at 16–25). The Court denied Plaintiffs' Motion for Summary Judgment in all other respects, and granted Defendant's Motion for Summary Judgment in part with respect to Plaintiff's breach of implied covenant of good faith and fair dealing claim and statutory bad faith claim (Counts IV and V of Plaintiffs' Complaint). The Court also denied Plaintiffs' Motion to Strike as moot. (Doc. 46).

Defendant appealed, and on October 8, 2019, the Third Circuit reversed this Court's Order granting summary judgment, holding that "[i]nterpreting 'contract years' in the context of the entire Term Policy therefore demonstrates that the phrase unambiguously refers to August 10th [2007], the Policy Date ... Accordingly, the District Court erred in determining that the Term Policy contains a latent ambiguity." *Lomma v. Ohio Nat'l Life Assurance Corp.*, 788 F. App'x 104, 108 (3d Cir. 2019). The Circuit Court further held that "Ms. Lomma also could not have reasonably interpreted the phrase 'contract years' to mean the duration of her contractual relationship with Ohio National Life Assurance and thus reasonably believed that the suicide exclusion expired two years after she obtained the $100,000 coverage under the Universal Policy in 1995." *Id.* The Court determined that "neither the communications surrounding Ms. Lomma's purchase of the Term Policy nor the language of the Term Policy supports a reasonable expectation of coverage." *Id.* at 109. Having reversed this Court's Order granting summary judgment in favor of Plaintiffs on the breach of contract claim, the Third Circuit remanded the case to this Court "for further proceedings consistent with this opinion." *Id.*

**\*3** Shortly after remand, the case was reopened. Following a status conference with the parties and a

Lomma v. Ohio National Life Assurance Corporation, Not Reported in Fed. Supp. (2021)

2021 WL 772237

request by Plaintiffs, the Court permitted Plaintiffs' counsel to file a written report with the Court concerning whether the matter would be subject to further proceedings. (Doc. 58). In their brief, Plaintiffs argue that "[i]n declining to enter judgment and remanding the case, the USCA obviously deemed that there are unresolved issues that must be decided." (Plaintiffs' Brief in Support of Further Proceedings on Remand, Doc. 62 at 3). Specifically, Plaintiffs ask the Court to reconsider their previous Motion to Strike, as well as the refund of premiums paid on the Policy plus interest. (*Id.* at 2). Defendants disagree, and argue that the Court is "required to enter judgment consistent with the Third Circuit's Opinion, and should therefore: (1) reverse the grant of summary judgment in favor of Plaintiffs on the Breach of Contract claim; and (2) enter judgment in favor of Ohio National. (Defendants' Brief in Opposition to Plaintiffs'' Request for Further Proceedings on Remand, Doc. 63 at 4).

## III. ANALYSIS

Upon the Third Circuit's reversal of this Court's Order granting summary judgment to Plaintiffs on the breach of contract claim, the Court will now consider the present procedural posture of the case. As to Plaintiffs' Motion to for Summary Judgment (Doc. 29), the Court concludes there is nothing further to consider. This is because the Court previously denied Plaintiffs' Motion for Summary Judgment on all claims other than the breach of contract claim, the grant of which the Third Circuit has since reversed. As to Defendants' Motion for Summary Judgment (Doc. 31), in light of the Third Circuit's decision, the Court must now reconsider its previous denial of Defendants' motion on the breach of contract claim. The Court must also consider the status of Plaintiffs' Motion to Strike Defendants' Answer and Affirmative Defenses to Plaintiffs' to Complaint (Doc. 41), as the Court previously deemed this motion moot in light of the favorable ruling on Plaintiffs' Motion for Summary Judgment. The Court will also consider whether any further action is necessary with regard to the refund of the premiums paid on the Term Policy plus interest. Based on this procedural posture, the Court will first address Plaintiffs' Motion to Strike.

### A. Plaintiffs' Motion to Strike

Several weeks after the parties filed their cross-motions for summary judgment, Plaintiffs moved to strike Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(f). (Doc. 41). Because the Court ruled in Plaintiffs' favor on their Motion for Summary Judgment on the breach of contract claim, the Court properly dismissed Plaintiffs' Motion to Strike as moot. (Mem. Op. Granting in Part and Denying in Part Summ. J. to Lomma, Doc. 45 at 32 (citing *United States v. Beeman*, 2010 WL 653062, at *13 (W.D. Pa. 2010) (granting motion for summary judgment by Plaintiffs and holding that Plaintiffs' "pending motion to strike [defendant's] answer to the complaint will be denied as moot."), *aff'd*, 388 F. App'x 82 (3d Cir. 2010))).

Plaintiffs now argue that because the Third Circuit reversed this Court's Order granting Plaintiffs' Motion for Summary Judgment, their Motion to Strike Defendants' Answer to Complaint is no longer moot. (Plaintiffs' Brief in Support of Further Proceedings on Remand, Doc. 62 at 3). Defendants disagree, arguing that "[t]he lack of a cross appeal by Plaintiffs on these issues means that the issues are waived." (Defendants' Brief in Opposition to Plaintiffs' Request for Further Proceedings on Remand, Doc. 63 at 6 (citing *EF Operating Corp. v. American Buildings*, 993 F.2d 1046, 1049 (3d Cir. 1993))). The Court concludes that Defendants' reliance on *EF Operating* is misplaced. In *EF Operating*, the Third Circuit addresses waiver of an issue on appellate review. Here, the right to appeal an issue to the Third Circuit is not at issue. This Court previously ruled that Plaintiffs' Motion to Strike was *moot* in light of the Court's summary judgment ruling in favor of Plaintiffs. Given the Third Circuit's reversal of the summary judgment ruling with the added instruction to hold "further proceedings consistent with this opinion," the Court concludes that the motion to strike is properly considered on remand and is ripe for decision. *Lomma*, 788 F. App'x at 109.

**\*4** Federal Rule of Civil Procedure 12 provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

Lomma v. Ohio National Life Assurance Corporation, Not Reported in Fed. Supp. (2021)

2021 WL 772237

District courts are afforded considerable discretion when addressing a motion to strike. Generally, motions to strike are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.

*Yellow Book Sales & Distrib. Co., Inc. v. White*, 2011 WL 830520, at *4 (E.D. Pa. 2011) (internal citations and quotation marks omitted). "[S]triking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record." *Wirt v. Bon-Ton Stores, Inc.*, 134 F. Supp. 3d 852, 857 (M.D. Pa 2015) (quoting *Dann v. Lincoln Nat'l Corp.*, 274 F.R.D. 139, 142 (E.D. Pa. 2011)); *see also DeLa Cruz v. Piccari Press*, 521 F.Supp.2d 424, 428 (E.D. Pa. 2007) (quoting *N. Penn Transfer, Inc.*, 859 F.Supp. at 158) ("Indeed, striking a pleading 'is a drastic remedy to be resorted to only when required for the purposes of justice' and should be used 'sparingly.' ")

Here, Plaintiff does not contend that Defendants' Answer contains any allegations that are redundant, immaterial, impertinent, or concern a scandalous matter. Rather, Plaintiffs seek to strike Defendants' pleading as untimely. In support of their motion, Plaintiffs cite to Fifth Circuit case *DirecTV, Inc. v. Young*, 195 F. App'x 212, 215 (5th Cir. 2006) for the proposition that Rule 12(f) empowers a court to strike a defendant's answer when it is filed outside of the time period mandated by Rule 12. The Court finds that this case is readily distinguishable from *DirecTV*. In *DirecTV*, the Fifth Circuit found that the District Court did not abuse its discretion when it granted the plaintiff's motion to strike the defendant's answer given that the defendant's failure to timely file was willful. *Id.* The Court found this was evidenced by the defendant's repeated failures to communicate with the plaintiffs counsel, respond to settlement demands, respond to the plaintiffs request for default, or otherwise litigate

the matter. *Id.* Here, however, there is ample evidence that Defendants were actively communicating with Plaintiffs' counsel and participating in the litigation, exemplified by Defendants' timely filing of a Motion to Dismiss (Doc. 4), a Reply Brief (Doc. 11), a Motion for Summary Judgment (Doc. 31), their participation in several telephone conferences before the Court (Docs. 13, 20), and their concurrence in multiple joint motions for extension of time (Docs. 22, 27).

Plaintiffs argue that they are "irreparably injured and harmed by Defendants filing their Answer and Affirmative Defenses out of time, without leave of the court and without showing good cause or excusable neglect, and are further harmed if said Answer and Affirmative Defenses are not stricken." (Doc. 62 at 5). Plaintiffs provide no analysis as to how they are so prejudiced by Defendants' late filing.

Although the motion to strike was determined moot, the Court acknowledged at summary judgment that "Plaintiffs have not pointed to any real prejudice resulting from Defendants' untimely answer, given that the parties apparently understood the legal and factual issues of the case sufficiently to file cross-motions for summary judgment before the answer was filed." (Mem. Op. Granting in Part and Denying in Part Summ. J. to Lomma, Doc. 45, at 33 n.5). Just as there was no basis upon which to find prejudice to Plaintiffs at the time the Motion to Strike was filed, Plaintiffs provide no basis to find prejudice now, in that they have not pointed to any change in circumstances in their most recent filing. Thus, the Court again finds that Plaintiffs have failed to demonstrate how Defendants' failure to file an Answer and Affirmative Defenses in a timely manner resulted in any prejudice to them in this matter. [1]

**\*5** As the Third Circuit has repeatedly stated, Courts prefer adjudications on the merits. *Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 51 (3d Cir. 2003) (citing *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) ("we have repeatedly stated our preference that cases be disposed of on the merits whenever practicable")). Plaintiffs have failed to demonstrate any reason why the Court should abjure this preference and strike Defendants' pleading for untimeliness. Therefore, the Court will deny Plaintiffs' Motion to Strike. [2]

Lomma v. Ohio National Life Assurance Corporation, Not Reported in Fed. Supp. (2021)

2021 WL 772237

### B. Defendants' Motion Summary Judgment on the Breach of Contract Claim

As set out previously, based on the Third Circuit's reversal of the Court's Order granting summary judgment in favor of Plaintiffs on the breach of contract claim, the Court must reconsider its previous denial of Defendants' Motion for Summary Judgment on this claim.

In their Motion for Summary Judgment, Defendants argued that the suicide exclusion unambiguously bars coverage for the full policy value of $100,000, as "the Policy was issued on August 15, 2007 and Ms. Lomma committed suicide on May 24, 2009, well within the first two Contract Years of the Ohio National Term Policy." (Brief in Support of Defendants' Motion for Summary Judgment, Doc. 31 at 16). Defendants further argue that "Plaintiffs have not adduced any evidence that the Insured had a subjective expectation of coverage beyond the terms of the Policy." (*Id.*).

Under Pennsylvania law, where contract language is clear and unambiguous, the Court must follow it. *Minn. Fire & Cas. Co. v. Greenfeld*, 579 Pa. 333, 855 A.2d 854, 861 (2004). Pennsylvania has also adopted the reasonable expectations doctrine, which "dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 905 (3d Cir. 1997) (citing *Collister v. Nationwide Life Insurance Co.*, 388 A.2d 1346 (Pa. 1978) and *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 521 A.2d 920 (Pa. 1987)). Under this analysis, courts must examine "the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured." *Moessner*, 121 F.3d at 903 (quoting *Dibble v. Sec. of Am. Life Ins. Co.*, 590 A.2d 352, 354 (Pa. Super. Ct. 1991)).

Interpreting the contract at issue here, the Third Circuit held that "the District Court erred in determining that the Term Policy contains a latent ambiguity." *Lomma*, 788 F. App'x at 108. In so holding, the Third Circuit determined that the term " 'contract years' in the context of the entire Term Policy demonstrates that the phrase unambiguously refers to August 10th

[2007], the Policy Date." *Id.* The Third Circuit further held that "neither the communications surrounding Ms. Lomma's purchase of the Term Policy nor the language of the Term Policy supports a reasonable expectation of coverage." *Id.* at 109. The Circuit Court also found that Ms. Lomma "could not have reasonably interpreted the phrase 'contract years' to mean the duration of her contractual relationship with Ohio National Life Assurance and thus reasonably believed that the suicide exclusion expired two years after she obtained the $100,000 coverage under the Universal Policy in 1995." *Id.* at 108.

**\*6** "The Court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Applying the standard here, the Third Circuit's holding indicates that Defendants are entitled to summary judgment on the breach of contract claim. Here, the undisputed facts show that the suicide exclusion in the Term Policy provides "[i]f the insured dies by suicide while sane or insane by intentional self-destruction while insane, we will not pay any death proceed[s] payable on amounts of insurance which have been in effect for less than 2 years." (Term Policy, Doc. 31-3 at 13). The facts also show that Ms. Lomma's death by suicide occurred in May of 2009, which was within two years of the August 10, 2007 contract date found by the Third Circuit. Therefore, the explicit language of the Term Policy's suicide exclusion unambiguously prevents Plaintiffs from recovering the full $100,000 in death benefits. Further, consistent with the Third Circuit's holding, Ms. Lomma had no reasonable expectation of coverage under the circumstances of this case, where the two policies "are entirely different policies, were issued under different policy numbers, and contain different terms, with the first policy providing universal life insurance and the second policy providing term life insurance." *Lomma*, 788 F. App'x at 109. For these reasons, this Court will grant summary judgment in favor of Defendants on the breach of contract claim.

### C. Refund of Premiums Paid

Plaintiffs further argue that "an issue regarding the refund of the premiums paid and the interest on those

premiums" remains in this matter. (Doc. 62 at 7). More specifically, Plaintiffs argue they are "entitled to the return of the paid premiums pursuant to the insurance policy and would be further entitled to interest on those paid premiums." *Id.* By contrast, Defendants assert that they have already paid Plaintiffs $285.12 plus interest at 4.5%. (Doc. 63 at 8–9). Defendants point to a copy of Ohio National's letter transmitting the check for the refund of premiums with interest, which is attached to Plaintiffs' Complaint as Exhibit E. (Doc. 1-4 at 69 ("[w]e are enclosing our checks made payable to you as natural guardian for the minor beneficiaries, Nicholas A. Lomma and James M. Lomma, in the amount of $144.27 and $144.27, respectively. These checks represent the premiums paid on the policy in the amount of $285.12 plus interest at 4.5%.")). The Court previously determined at summary judgment that this fact is undisputed. [3] Plaintiff has not indicated otherwise in any subsequent filings with this Court. Therefore, the Court does not find any further action on this matter is warranted.

## IV. CONCLUSION

For the above-discussed reasons, the Court will deny Plaintiff's Motion to Strike Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint (Doc. 41), grant Defendants' Motion for Summary Judgment on the breach of contract claim (Doc. 31), and enter judgment in favor of Defendants Ohio National Life Assurance Corporation and Ohio National Life Insurance Company on the breach of contract claim. Because this Court previously dismissed Plaintiffs' claims of unjust enrichment and promissory estoppel by Order dated September 6, 2017 (Doc. 25), and previously granted summary judgment in favor of Defendants on Plaintiffs' claims of breach of implied covenant of good faith and fair dealing and statutory bad faith by Order dated June 28, 2018 (Doc. 46), a separate Order will be issued granting summary judgment in favor of Defendants and closing the case.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 772237

## Footnotes

1    To fully understand the lack of prejudice to Plaintiffs, it is important to view this Motion to Strike in light of the circumstances at the time the motion was filed. The Court's Order ruling on Defendants' Motion to Dismiss was filed September 6, 2017. (Doc. 25). According to Rule 12, Defendants were required to file their Answer by September 20, 2017. Fed. R. Civ. P. 12(a)(4)(A). No filings were made by either party until November 16, 2017, when the parties concurred in a Joint Motion to Extend the deadline for filing dispositive motions. (Doc. 27). In this motion, Plaintiffs made no mention of Defendants' failure to file a timely answer, which was 57 days tardy at that point.

The next filings in this matter occurred on December 20, 2017, when both parties filed cross-motions for summary judgment. (Docs. 29, 31). Later that same day, Plaintiffs made several filings in support of entry of default and for default judgment against Defendants. (Docs. 32, 33, 34). The next day, December 21, 2017, Defendants filed their Answer and Affirmative Defenses to Plaintiffs' Complaint. (Doc. 36). On January 4, 2018, the Court denied Plaintiffs' motions for entry of default judgment and directed the Clerk not to enter default against Defendants. (Doc. 37). In denying Plaintiffs' motions, the Court made a similar assessment, noting that an entry of default would not be appropriate, as "Defendants have defended the suit by filing a timely motion to dismiss, a timely motion for summary judgment, and otherwise participated in the litigation process, including attending a status conference with the Court and conferring with Plaintiffs regarding discovery and other pretrial deadlines." (*Id.* at 2). Within a week of the Court's Order,

2021 WL 772237

Plaintiffs' filed their Motion to Strike Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint. (Doc. 41).

As the procedural history demonstrates, the numerous timely motions filed by each party indicate that the litigation process was steadily moving forward, despite Defendants' failure to file their Answer and Affirmative Defenses within 14 days of the Court's Order denying Defendants' Motion to Dismiss.

2    The propriety of this result is abundantly clear given the Third Circuit's assessment of the merits of Plaintiffs' breach of contract claim. If the Court were to grant Plaintiffs Motion to Strike Defendants' Answer to Complaint, and the allegations in Plaintiffs' Complaint were deemed admitted, it could not ultimately lead to a favorable outcome for Plaintiffs. As discussed in Part III.B. infra, the Third Circuit held on appeal that the Term Policy issued to Ms. Lomma unambiguously commenced on August 10, 2007, which, per the two-year suicide exclusion, prevents her beneficiaries from recovering full death benefits. *Lomma*, 788 F. App'x at 108. This Court is bound to follow the law of the Third Circuit. *See A.A. ex rel. E.A. v. Exeter Tp. School Dist.*, 485 F.Supp.2d 587 (E.D. Pa. 2007) ("[i]t is axiomatic that a district court is bound to apply its appellate court's precedent."). Thus, in applying the Third Circuit's decision, Plaintiffs cannot prevail on the merits of their breach of contract claim.

3    At summary judgment, the Court noted in the Statement of Undisputed Facts that "[o]n August 31, 2009, Defendants informed Mr. Lomma that they would not pay the full benefit value under the policy, but instead, pay '285.12 plus interest at 4.5%,' which represents the 'premiums paid on the policy.' " (Mem. Op. Granting in Part and Denying in Part Summ. J. to Lomma, Doc. 45 at 6–7).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

7

Noramco LLC v. Dishman USA, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 2817876

2022 WL 2817876
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

NORAMCO LLC, Plaintiff,

v.

DISHMAN USA, INC., Defendant.

Civil Action No. 21-1696-WCB
|
Signed July 19, 2022

**Attorneys and Law Firms**

Frederick Brian Rosner, Zhao Liu, The Rosner Law Group LLC, Wilmington, DE, Andrew J. Bayne, Pro Hac Vice, Haoying Zhu, Pro Hac Vice, Jennifer M. Mohamed, Pro Hac Vice, for Plaintiff.

Richard Charles Weinblatt, Stamatios Stamoulis, Stamoulis & Weinblatt LLC, Wilmington, DE, for Defendant.

**MEMORANDUM OPINION AND ORDER**

WILLIAM C. BRYSON, UNITED STATES CIRCUIT JUDGE

**\*1** Plaintiff Noramco LLC ("Noramco") has filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Noramco argues that it is entitled to judgment as a matter of law on its breach of contract claim against defendant Dishman USA, Inc. ("Dishman"), and on Dishman's affirmative defenses. Dkt. No. 38. For the reasons set forth below, Noramco's motion is GRANTED IN PART and DENIED IN PART.

**I. Background**

This case involves a contract dispute regarding a supply agreement (the "Agreement") between Noramco and Dishman.[1] Noramco, a manufacturer of active pharmaceutical ingredients ("APIs"), entered into the Agreement with Dishman, in which Dishman agreed to supply Noramco with olivetol, an ingredient used in the production of Noramco's APIs. The Agreement provided that Dishman would produce the olivetol and supply it to Noramco at Dishman's facility in Lodariyal, India. The Agreement further provided that the olivetol that Noramco supplied would comply with "current good manufacturing practices" ("cGMP" or "GMP") as required by standards promulgated by the U.S. Food and Drug Administration and the European Union. Dkt. No. 35 at ¶¶ 10–11.

In February 2020, while Dishman was manufacturing the olivetol to be supplied under the Agreement, the Swiss Agency for Therapeutic Products ("Swissmedic") and the European Directorate for the Quality of Medicines and HealthCare ("EDQM") inspected Dishman's facility in Lodariyal.[2] Following its investigation, Swissmedic issued a report indicating that it found several "major" deficiencies at the facility, one of which was "critical." *Id.* at ¶ 48. The report added that Dishman's "approach on Materials management ... was considered as not in compliance with EU GMP." *Id.*

In March 2020, Dishman manufactured six batches of olivetol. On or about March 24, 2020, the batches of olivetol were shipped from Dishman to Noramco. Dishman did not inform Noramco at that time of the Swissmedic and EDQM regulatory inspection of the Dishman facility that had occurred prior to the shipment of the olivetol to Noramco.

In April 2020, after learning of the Swissmedic and EDQM inspection, Noramco notified Dishman of its "concerns about the inspection and potential rejection of the [olivetol]." *Id.* at ¶¶ 41–42. The two parties then conferred for several months regarding the status of the olivetol. *See, e.g., id.* at ¶¶ 43–45, 49–54, 65–77. On or about August 11, 2020, Noramco requested that the olivetol be returned to Dishman's facility, and on August 19, 2020, Noramco notified Dishman in writing that the olivetol Dishman supplied to Noramco did not comply with the Agreement. *Id.* at ¶¶ 90–91.

Noramco's complaint alleges that following Noramco's rejection of the olivetol, Dishman agreed to return the olivetol and to issue a full refund for the material. Dishman disputes that assertion. *Id.* at ¶¶ 96–97; Dkt. No. 37 at ¶ 97. After Dishman failed to take the olivetol back and issue a refund, Noramco brought this lawsuit against Dishman in December 2021.

2022 WL 2817876

*2 Since filing its original complaint, Noramco has amended its complaint on two occasions. The operative pleading for purposes of the present motion is Noramco's Second Amended Complaint, Dkt. No. 35. Dishman filed an Answer to that complaint, Dkt. No. 37, and Noramco subsequently filed this motion for judgment on the pleadings, Dkt. No. 38. On July 19, 2022, I held oral argument on Noramco's motion.

## II. Legal Standard

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A Rule 12(c) motion "will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (internal quotation marks and citation omitted). The standard that applies to a Rule 12(b)(6) motion to dismiss for failure to state a claim also applies to motions brought under Rule 12(c); that is, in the common situation in which the defendant moves to dismiss the complaint, the court "must accept the truth of all factual allegations in the complaint and must draw all reasonable inferences in favor of the non-movant." *Revell v. Port Auth. of New York, New Jersey*, 598 F.3d 128, 134 (3d Cir. 2010). In the less common situation in which the plaintiff moves for judgment on the pleadings, the court must accept as true the factual allegations in the defendant's answer and construe the factual allegations in the light most favorable to the defendant.[3] *United States v. Blumenthal*, 315 F.2d 351, 352 (3d Cir. 1963); *Fanatics Retail Grp. (Dreams), LLC v. Truax*, No. 20-cv-0794, 2020 WL 7042873, at *2 (D. Del. Dec. 1, 2020). More generally, "[t]he purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 617 (D. Del. 2008).

## III. Discussion

### A. *Breach of Contract*

Noramco's principal argument in support of its motion is that Dishman's Answer "simply does not deny any essential allegation raised by Noramco." Dkt. No. 39 at 6. Specifically, Noramco argues that Dishman's statements in its Answer that certain documents speak for themselves amount to admissions of the corresponding allegations in the complaint. *See id.* at 6–7. Dishman responds by arguing that those statements do not constitute admissions and that there are substantial factual disputes to be resolved in this case.

Two examples of the allegations in Noramco's Second Amended Complaint and Dishman's responses in its Answer provide helpful context for assessing Noramco's argument. First, paragraph 56 of the Second Amended Complaint alleges that "[a]s a result of the EDQM/Swissmedic inspection Dishman was prohibited from distributing the [olivetol]." Dkt. No. 35 at ¶ 56. In its Answer, Dishman responded that the allegation was "[d]enied as to any legal conclusions" and "[a]s to factual allegations, the document [the Swissmedic report] speaks for itself." Dkt. No. 37 at ¶ 56.

*3 Second, paragraph 97 of the Second Amended Complaint alleges that "[o]n October 6, 2020, Dishman wrote to Noramco, and Dishman agreed in writing to provide a full refund to Noramco over time." Dkt. No. 35 at ¶ 97. In its Answer, Dishman responded as follows: "Denied. The document [a chain of emails between Noramco and Dishman representatives] speaks for itself." Dkt. No. 37 at ¶ 97.

In general, a statement in an answer that a document "speaks for itself" is permissible "if the answer also expressly includes an admission or denial of the allegation." *LumaSense Techs., Inc. v. Advanced Eng'g Servs.*, LLC, No. 20-CV-07905, 2021 WL 2953237, at *3 (N.D. Cal. July 14, 2021); *see also Pavlik v. FDIC*, No. 10-cv-816, 2010 WL 3937621, at *3 (N.D. Ill. Oct. 5, 2010) (declining to strike "document speaks for itself" responses in answer when the defendant "also either admitted or denied the[ ] allegations"); *Westgate Fin. Corp. v. Cotswold Indus., Inc.*, No. 09-CV-2627, 2009 WL 10211922, at *5 (N.D. Ga. Dec.

2022 WL 2817876

31, 2009) (same); *Eternal Invs., L.L.C. v. City of Lee's Summit, Mo.*, No. 05-0521-CV, 2006 WL 573919 (W.D. Mo. Mar. 8, 2006) (noting that "terms of art" such as "the document speaks for itself" and "legal conclusions," when included in responsive pleadings that also admit or deny the relevant allegations, do not "prevent plaintiff from understanding or comprehending defendant's Answer").

In this case, Dishman's Answer offers both a general denial and specific responses to the allegations where relevant. At the beginning of its answer, Dishman states that it "denies all allegations in Plaintiffs' Second Amended Complaint except those expressly admitted below." Dkt. No. 37 at 1. In addition to that general denial, many of the responses in the Answer specifically admit or deny the allegations before stating that "the document speaks for itself." *See, e.g.*, Dkt. No. 37 at ¶¶ 96–98, 100–01. Other responses state that the allegation is "[d]enied as to any legal conclusions," but "[a]s to factual allegations, the document speaks for itself." *See, e.g., id.* at ¶¶ 44–48. Those responses make clear that Dishman is not intending to admit to the allegations in the complaint in full. At most, the statements that a document "speaks for itself" can be understood as an admission that the corresponding document attached to the complaint is authentic and is quoted accurately in the complaint.

Noramco cites two cases, neither of which provides persuasive support for its position that the responses in Dishman's Answer constitute admissions of liability. In *Charleston v. Salon Secrets Day Spa, Inc.*, the court granted in part the plaintiff's motion to strike various responses from the defendant's answer. No. 08-cv-5889, 2009 WL 1795529, at *1 (E.D. Pa. June 24, 2009). The court struck paragraphs from the answer stating that a document "speaks for itself." *Id.* In that case, however, the defendant conceded that a statement indicating that a document "speaks for itself" was "equivalent to an admission." *Id.* No such concession has been made by Dishman in this case.

Similarly, in *In re Cotter*, the court held that "the Defendants' responses that the 'document speaks for itself' is deemed an admission" if "no response is provided" to the allegation in the complaint. No. 08-12504, 2011 WL 5900811, at *8 (Bankr. D.N.J. Oct. 24, 2011). In that case, the defendants did not

offer a general denial and did not otherwise respond to the allegations for which they stated that a document "speaks for itself." *See generally Cotter v. Skylands Cmty. Bank*, Adv. No. 11-1619, Dkt. No. 5 (Bankr. D.N.J. June 8, 2011). In this case, by contrast, Dishman has offered both a general denial and specific denials of many allegations in the complaint, including each of the allegations as to which Dishman's Answer stated that the document "speaks for itself."

**\*4** In *Kleiman v. Wright*, No. 18-cv-80176, 2020 WL 11420664, at *8 & n.10 (S.D. Fla. Nov. 8, 2020), the plaintiff relied on the *Charleston* and *Cotter* cases in support of its argument that the statement that certain documents "speak for themselves" in the defendant's answer constituted a judicial admission. The court noted that the defendant in that case denied "each and every allegation" except to the extent expressly admitted and did not concede that his responses were equivalent to an admission. *Id.* at *8 & n.10. The court concluded that "to the extent Defendant admitted anything, "it was not as to the documents' authenticity, interpretation, or correctness. *Id.* at n.10.

Similar circumstances are present here. Dishman issued a general denial as to all allegations not expressly admitted to, and added a specific denial accompanying each paragraph in which it stated that a document "speaks for itself." *See* Dkt. No. 37 at 1 & ¶¶ 10, 11, 17, 18, 19, 24, 26, 27, 28, 30, 33, 34, 44, 45, 46, 47, 48, 55, 60, 96, 97, 98 & 100. Moreover, it is clear from Dishman's Answer that Dishman did not intend to admit the substance of Noramco's allegations. And there is no risk of confusion about which documents Dishman's responses refer to. Accordingly, Dishman's responses in its Answer stating that a document "speaks for itself" do not constitute admissions to the allegations in the respective paragraphs of Noramco's Second Amended Complaint.

With that proposition established, it is apparent that the pleadings in this case point to several factual disputes. For instance, the parties dispute whether the Swissmedic report conclusively establishes that Dishman's olivetol production did not comply with cGMP, and whether the Swissmedic and EDQM inspection actually covered the facility where the olivetol was manufactured. *See* Dkt. No. 40 at 11; Dkt. No. 39 at 7. The parties also dispute whether

Noramco LLC v. Dishman USA, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 2817876

Noramco timely notified Dishman that the olivetol it supplied was non-conforming. *See* Dkt. No. 40 at 7–9; Dkt. No. 39 at 4–5. And the parties appear to dispute the amount of damages to which Noramco would be entitled if liability is established. *See* Dkt. No. 37 at 23. Therefore, this is not a case in which "no material issue of fact remains to be resolved" such that Noramco "is entitled to judgment as a matter of law" based on the pleadings alone. *See Jablonski*, 863 F.2d at 290 (internal quotation marks and citation omitted). Accordingly, Noramco's motion is denied as to its breach of contract claim.

### B. *Affirmative Defenses*

Noramco also argues that it is entitled to judgment as a matter of law on Dishman's affirmative defenses. The Third Circuit has held that the standards that apply to Rule 12(c) motions are the same as those that apply under Rule 12(b)(6). *Revell*, 598 F.3d at 134. Because Rule 12(b)(6) applies only to "claim[s]," courts have held that a request to dismiss an affirmative defense under Rule 12(b)(6) is more appropriately treated as a motion to strike under Rule 12(f). *See, e.g., Wyeth Holdings Corp. v. Sandoz, Inc.*, No. 09-cv-955, 2012 WL 600715, at *4 (D. Del. Feb. 3, 2012), *report and recommendation adopted*, 2012 WL 749378 (Mar. 1, 2012); *Huffman v. Remstar Int'l, Inc.*, No. 08-CV-157, 2009 WL 1445967, at *1 (E.D. Tex. May 21, 2009); *Cal. Expanded Metal Prods. Co. v. Klein*, No. 18-cv-0659, 2018 WL 6249793, at *7 (W.D. Wash. Nov. 29, 2018). Judge Stark has applied that same reasoning in construing a Rule 12(c) motion regarding affirmative defenses as a Rule 12(f) motion to strike. *Intell. Ventures I LLC v. Symantec Corp.*, No. 13-cv-440, 2014 WL 4773954, at *1 (D. Del. Sept. 24, 2014). Accordingly, I will treat Noramco's motion, as it applies to Dishman's affirmative defenses, as a motion to strike those defenses under Rule 12(f).

**\*5** Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." As a general matter, Rule 12(f) motions are "disfavored." *Fesnak & Assocs., LLP v. U.S. Bank Nat. Ass'n*, 722 F. Supp. 2d 496, 502 (D. Del. 2010). On a motion to strike, the court should construe all facts in favor of the nonmoving party and "should not grant a motion to

strike a defense unless the insufficiency of the defense is clearly apparent." *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp 353, 356 (D. Del. 2009) (internal quotation marks and citation omitted).

The basis for Noramco's motion to strike Dishman's affirmative defenses is essentially the same as the basis for its Rule 12(c) motion regarding its breach of contract claim. That is, Noramco contends that Dishman has admitted to the allegations in the Second Amended Complaint and therefore Dishman does not have any viable affirmative defenses. As noted above, Dishman's statements that a document "speaks for itself" do not constitute admissions, and there are substantial factual disputes to be resolved in this case. There are, however, some affirmative defenses as to which there is no genuine dispute of material fact.

First, Dishman does not contest Noramco's assertion that there is no dispute of material fact regarding Dishman's affirmative defenses of lack of privity and the statute of frauds. Dishman's failure to respond to those arguments in its brief constitutes a concession that there is no dispute of material fact with respect to those defenses. *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 334 F. Supp. 3d 665, 682 (E.D. Pa. 2018) ("By failing to respond to a majority of Defendant's arguments, Plaintiffs have conceded them, and thus, Plaintiffs' ... claims will be dismissed."); *Goodwin v. Keller*, No. 09-cv-1592, 2012 WL 4482793, at *1 (W.D. Pa. Sept. 26, 2012) ("Plaintiff fails to respond to Defendants' arguments in favor of dismissal and so has apparently conceded that, as a matter of law, Defendants are entitled to a finding of absolute or qualified immunity ...."). At the oral argument on the present motion, Dishman agreed to withdraw the defenses of lack of privity and statute of frauds. Accordingly, Noramco's motion is denied as moot with respect to those two defenses.

Second, Dishman's affirmative defense of unclean hands lacks a sufficient legal basis. In its responsive brief, Dishman argues that the doctrine of unclean hands applies because "had Noramco given timely notice of rejection, Dishman could have performed a risk analysis on the subject Olivetol to prove that it had not been contaminated." Dkt. No. 40 at 14. The doctrine of unclean hands, however, applies "in circumstances where the litigant's own acts offend the

Noramco LLC v. Dishman USA, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 2817876

very sense of equity to which he appeals." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998). In order for the unclean hands doctrine to apply, the allegedly wrongful conduct must be "knowing or intentional." *See Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 556 (3d Cir. 2003). Here, Dishman has not alleged that Noramco intentionally delayed in notifying Dishman of the olivetol's non-conformity in order to gain an inequitable advantage of some sort. Moreover, to the extent that Dishman argues that Noramco did not timely notify Dishman of the non-conforming product, that allegation does not raise an issue of unclean hands, but is covered by Dishman's defenses of laches, waiver, estoppel, and improper notice. Accordingly, I will grant Noramco's motion with respect to Dishman's unclean hands defense and strike that defense from Dishman's Answer.

**\*6** Dishman's remaining affirmative defenses are: failure to state a claim upon which relief can be granted, laches, waiver, estoppel, no breach by Dishman, the parol evidence rule, improper notice, substantial performance, and failure to mitigate. As noted, there are several disputed factual issues in this case, and the remaining defenses implicate those issues to various extents. Because the court "should not strike a defense unless the insufficiency is 'clearly apparent,' " *Fesnak*, 722 F. Supp. 2d at 502 (citation omitted), I will deny the portions of Noramco's motion that are directed to those defenses.

### IV. <u>Conclusion</u>

In summary, based on the pleadings, it appears that there are significant factual disputes to be resolved in this case. Noramco is therefore not entitled to judgment on the pleadings in its favor on its breach of contract claim. With respect to the affirmative defenses, I will grant Noramco's motion to strike the affirmative defenses of lack of privity, statute of frauds, and unclean hands. The remaining affirmative defenses will not be stricken from Dishman's Answer.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2817876

---

## Footnotes

1    The facts in this section are recited as alleged in Noramco's Second Amended Complaint, Dkt. No. 35.

2    Noramco alleges that Swissmedic is the "applicable Swiss surveillance authority for GMP compliance." Dkt. No. 39 at ¶ 15.

3    Noramco states that in this Rule 12(c) proceeding the court must accept all allegations of Noramco's complaint as true. Dkt. No. 41 at 6. That would be true if it were Dishman, the defendant, that had moved for judgment on the pleadings, but it is not true when it is Noramco, the plaintiff that has sought relief under Rule 12(c). When a plaintiff seeks judgment on the pleadings, the plaintiff is obviously not entitled to have the allegations in its complaint treated as true.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.



2020 WL 5602651
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Ricky SAVAGE, Plaintiff,

v.

TEMPLE UNIVERSITY – OF the
COMMONWEALTH SYSTEM OF
HIGHER EDUCATION, et al., Defendants.

CIVIL ACTION NO. 19-6026-KSM
|
Signed 09/17/2020
|
Filed 09/18/2020

**Attorneys and Law Firms**

Susan C. Keesler, Derek Smith Law Group PLLC,
Philadelphia, PA, for Plaintiff.

Dimitrios Mavroudis, Joe H. Tucker, Jr., Leslie Miller
Greenspan, Tucker Law Group, LLC, Philadelphia,
PA, for Defendants.

**MEMORANDUM**

MARSTON, District Judge

**\*1** Plaintiff Ricky Savage brings this suit against
his former employer, Defendant Temple University
of the Commonwealth System of Higher Education
and multiple Temple supervisors, for religious and
intersectional discrimination under various Federal
and Pennsylvania statutes. In a prior order and
opinion on the Defendants' Partial Motion to Dismiss,
the Court dismissed Counts I-XII of the amended
complaint to the extent those counts alleged race
discrimination, but denied the Motion to Dismiss
Savage's claim for injunctive relief. (*See* Doc. Nos.
22 & 23.) After the Court's ruling on the Motion
to Dismiss, the Defendants filed their answer to the
amended complaint, which included 30 affirmative
defenses. (Doc. No. 29 at pp. 23–28.) Twenty-one
days later, Savage filed a Motion to Strike, which
targeted 23 responsive paragraphs and 13 affirmative
defenses in the Defendants' answer. (Doc. No. 33.) The
Defendants have filed a response brief in opposition to
the Motion to Strike. (Doc. No. 34.) Having considered
the parties' arguments, the Court will grant the motion
in part and deny the motion in part.

*I. Legal Standard*
Federal Rule of Civil Procedure 12(f) states that the
"court may strike from a pleading an insufficient
defense or any redundant, immaterial, impertinent, or
scandalous matter." Fed. R. Civ. P. 12(f); *see also
Great W. Life Assur. Co. v. Levithan*, 834 F. Supp. 858,
864 (E.D. Pa. 1993) ("A motion to strike under Rule
12(f) of the Federal Rules of Civil Procedure is the
proper method to eliminate matters in pleadings which
are found to be redundant, immaterial, impertinent or
scandalous" or "to object to an insufficient defense.").
Although the "court possesses considerable discretion
in disposing of a motion to strike under Rule 12(f),"
*N. Penn. Transfer, Inc. v. Victaulic Co. of Am.*, 859
F. Supp. 154, 158 (E.D. Pa. 1994) (quotation marks
omitted), "motions to strike are generally viewed with
disfavor," *Great W. Life Assur. Co.*, 834 F. Supp. at 864;
*see also United States v. Marisol*, 725 F. Supp. 833,
836 (M.D. Pa. 1989) ("[M]otions to strike are often
viewed with disfavor because of their potential to be
used as a dilatory tactic."). A motion to strike "is a
drastic remedy to be resorted to only when required for
the purposes of justice." *N. Penn. Transfer, Inc.*, 859
F. Supp. at 158 (quotation marks omitted); *cf. Marisol*,
725 F. Supp. at 836 (noting that although motions to
strike are disfavored, "they do serve a useful purpose
by eliminating insufficient defenses and saving the
time and expense which would otherwise be spent in
litigating issues which would not affect the outcome of
the case").

"Motions to strike are to be decided on the basis of the
pleadings alone." *N. Penn. Transfer, Inc.*, 859 F. Supp.
at 159 (quotation marks omitted). "A motion to strike
will not be granted where the sufficiency of a defense
depends on disputed issues of fact" and "even when
the facts are not in dispute, Rule 12(f) is not meant
to afford an opportunity to determine disputed and
substantial questions of law." *Id.*; *see also Cipollone
v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986)
(requiring that "the insufficiency of the defense [be]
clearly apparent").

**\*2** "[T]o succeed on a motion to strike, the moving
party must show that the allegations being challenged

2020 WL 5602651

are so unrelated to the plaintiff's claims as to be unworthy of any consideration as a defense and that the moving party is prejudiced by the presence of the allegations in the pleading." *Great W. Life Assur. Co.*, 834 F. Supp. at 864; *see also N. Penn. Transfer, Inc.*, 859 F. Supp. at 158 (explaining that a motion to strike "usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues"); *Wilson v. King*, Civ. A. No. 06-CV-2608, 2010 WL 678102, at *4 (E.D. Pa. Feb. 24, 2010) ("[E]ven if a motion to strike is technically appropriate and well-founded, motions to strike defenses as insufficient are often denied in absence of a showing of prejudice to the moving party.").

**II. Defendants' Pleading**
Savage moves to strike paragraphs 4–7, 9, 10, 12, 13, 15, 16, 18–22, 27, 28–30, 36, 40, 62, and 63 of the Defendants' answer, along with affirmative defenses 1, 2, 5, 8, 9, 13, 14, 17, and 26–29. We review the responsive paragraphs before turning to the affirmative defenses.

**A. The responsive paragraphs**
Savage argues that paragraphs 4–7, 9, 10, 12, 13, 15, 16, 18–22, 27, 28–30, 36, 40, 62, and 63 of the Defendants' answer should be stricken because in those paragraphs, the Defendants state that Savage's allegations are legal conclusions to which no response is required. (Doc. No. 33 at pp. 5, 10.) Savage argues that the Defendants' responses are inadequate because these paragraphs of the amended complaint assert factual allegations that demand a full response. (*Id.*) The Defendants argue that their responses are proper because: (1) many of the identified paragraphs in the amended complaint state conclusions of law, and (2) the Defendants provided factual responses to those paragraphs that asserted facts. (Doc. No. 34 at p. 8.)

Federal Rule of Civil Procedure 8(b) governs responsive pleadings and requires the responding party to "admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B). "A denial must fairly respond to the substance of the allegation." Fed. R. Civ. P. 8(b)(2). If the party intends to "deny all the allegations of a pleading" it may "do

so by a general denial," but otherwise, a party "that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted." Fed. R. Civ. P. 8(b)(3).

We find that the Defendants have provided a sufficient response to most of the identified paragraphs. First, we agree with the Defendants that paragraphs 20–22 and 27–30 of the amended complaint state conclusions of law. For example, paragraph 20 states that the "Defendants were 'employers' and Plaintiff was an 'employee' within the meaning of the applicable law." (Doc. No. 18 at p. 4 ¶ 20.) That is a conclusion about the legal relationship between Savage and the Defendants. Similarly, paragraphs 28, 29, and 30 assert that this Court has jurisdiction, that venue is proper here, and that the Court has the authority to issue a declaratory judgment. (*Id.* at p. 5 ¶¶ 28–30.) Those are also clearly legal conclusions. The Court finds the Defendants' general denial of these paragraphs sufficient under Rule 8(b), and therefore, will deny the Motion to Strike as to paragraphs 20–22 and 27–30. [1]

**\*3** In addition, the Court will deny the Motion to Strike as to the Defendants' responses to paragraphs 4–6, 36, 40, and 63 of the amended complaint. Although we do not agree with the Defendants that these paragraphs state pure conclusions of law, the Defendants also provided a specific fact-based denial to Savage's allegations. For example, paragraph 4 of the amended complaint states that "Defendant TEMPLE UNIVERSITY-OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION is a domestic non-profit corporation duly existing under the laws of the Commonwealth of Pennsylvania." (Doc. No. 18 at p. 2 ¶ 4.) The Defendants deny this allegation as stated and respond that "Defendant Temple University is a corporation with an office at 1601 N. Broad Street, Philadelphia, PA 19122. The remaining allegations as set forth in this paragraph are denied." (Doc. No. 29 at p. 2 ¶ 4.)

Similarly, in paragraph 36, Savage alleges that "Defendant CASEY permitted Plaintiff to attend the services on Friday, June 8, 2018." (Doc. No. 18 at p. 5 ¶ 36.) In their response, the Defendants deny the allegation and state that "Plaintiff did not receive approval from Casey to be absent from work on Friday,

Savage v. Temple University – of Commonwealth System..., Not Reported in Fed....
2020 WL 5602651

June 8, 2018." (Doc. No. 29 at p. 7 ¶ 36.) Because the Defendants have sufficiently responded to the factual allegations raised in paragraphs 4–6, 36, 40, and 63 of the amended complaint, the Motion to Strike will be denied as to those paragraphs in the Defendants' answer.[2]

That leaves the Defendants' responses to paragraphs 7, 9, 10, 12, 13, 15, 16, 18, 19, and 62. The Court will grant the Motion to Strike as to those paragraphs because they do not adequately respond to the factual allegations in Savage's amended complaint. *See Great W. Life Assur. Co.*, 834 F. Supp. at 865 (In its responses to certain paragraphs of the complaint, "the Defendant alleges that Plaintiff's averments are conclusions of law and do not require a reply. Upon review of the above paragraphs in Plaintiff's Complaint, this Court finds that Plaintiff's averments in [those] paragraphs ... are not conclusions of law, but are factual allegations which require a response by the Defendant."); *see also Thomas*, 2019 WL 8013742, at *6 (finding that "the defendants' response here [did] not comply with Rule 8(b) because the allegations at issue are, plainly, factual allegations and not conclusions of law"); *Wells Fargo Bank, N.A. ex rel. Registered Holders v. 2600 E. Carson St. Assocs., L.P.*, No. 2:17-CV-00764-CRE, 2018 WL 183220, at *3 (W.D. Pa. Mar. 7, 2018) (finding that the Defendants "general denial" and assertion that the "allegations are conclusions of law to which no response is required" did not "fairly respond to the substance of the allegation," which was "entirely factual").

**\*4** Paragraph 7 of the amended complaint states that the "Defendants TEMPLE UNIVERSITY-OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION and TEMPLE UNIVERSITY-OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION d/b/a TEMPLE UNIVERSITY (hereinafter collectively referred to as Defendants and "TEMPLE") are joint and single employers of Plaintiff." (Doc. No. 18 p. 2 ¶ 7.) In response, the Defendants generally deny the allegation and state that Temple University is "a corporation with an office at 1601 N. Broad Street, Philadelphia, PA 19122." (Doc. No. 29 at p. 2 ¶ 7.) That response does not adequately address Savage's allegation that he was employed by the two identified Defendants. Although this paragraph may touch on legal issues, such as whether Savage

and the Temple Defendants entered an employer-employee relationship, we find that paragraph 7, at heart, states a fact: Savage was employed by the identified Defendants (whether as an employee, independent contractor, or any other classification). Similarly, paragraph 62 of the amended complaint, which states that the "defendants unlawfully upheld the unlawful termination of Plaintiff," includes both a conclusion of law (that the termination was unlawful) and an assertion of fact (that the Defendants upheld the termination). Last, we find that the remaining paragraphs — 9, 10, 12, 13, 15, 16, 18, and 19 of the amended complaint — also contain factual allegations — notably, that individual Defendants "held hiring and firing authority" and "supervisory authority" over Savage. (Doc. No. 18 at p. 3 at ¶¶ 9, 10, 12, 13, 15, 16, 18, 19.) Because the Defendants have not adequately responded to the factual allegations raised in these paragraphs, we will grant the Motion to Strike as to them. *Cf. Great W. Life Assur. Co.*, 834 F. Supp. at 865.

The Motion to Strike will be granted as to paragraphs 7, 9, 10, 12, 13, 15, 16, 18, 19, and 62 of the Defendants' answer. It is denied as to paragraphs 4–6, 20–22, 27–30, 36, 40, and 63.

### B. The affirmative defenses
Next, Savage argues that many of the Defendants' affirmative defenses are insufficient and should be stricken. (Doc. No. 33 at pp. 5–6.) Specifically, he argues that defenses 1, 2, 5, 8, 9, 13, 14, 17, and 26–29 should be stricken because the Defendants have "no valid basis or factual basis for these defenses, and they confuse the issues." (*Id.* at pp. 7–10.) Savage also argues that he will be prejudiced if these affirmative defenses are allowed to stand because he will have to engage in continued and burdensome discovery to discern how these defenses relate to his claims, necessitating further depositions and discovery requests. (*Id.* at p. 10.)

In reviewing the challenged affirmative defenses, we do not apply the *Twombly/Iqbal* plausibility standard. *See Tyco Fire Prods. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 895 (E.D. Pa. April 12, 2011); *Alliance Indus. Ltd. v. A-1 Specialized Servs. & Supplies, Inc.*, Civ. A. No. 13-2510, 2014 WL 4548474, at *2 (E.D. Pa. Sept. 11, 2014) (adopting *Tyco Fire Products*' reasoning); *Weed v. Ally Fin. Inc.*, Civ. A. No. 11-2808, 2012 WL

2469544, *3 (E.D. Pa. June 28, 2012) (same) (finding that "many courts, including the majority of district courts in this Circuit, have persuasively argued that *Twombly/Iqbal* does not apply"). Instead, we look only to whether the affirmative defense provides "fair notice of the issue involved." *Id.* (explaining that this is "not an exacting standard even remotely approaching the type of notice required of a claim under *Twombly* and *Iqbal*"). "Providing knowledge that the issue exists, not precisely how the issue is implicated under the facts of a given case, is the purpose of requiring averments of affirmative defenses," and the court will strike defenses challenged on sufficiency grounds only if they fail to meet this low standard. *Id.* at 901; *see also Alliance Indus. Ltd.*, 2014 WL 4548474, at *3 (denying a motion to strike affirmative defenses where the defense "adequately puts Plaintiffs on notice that this is a defense that may be developed through factual discovery"); *Weed*, 2012 WL 2469544, at *4 (denying a motion to strike because "Defendant's affirmative defenses, though void of factual details, provide Plaintiffs with fair notice because Plaintiffs are now aware that the issue exists").

With this standard in mind, we begin with affirmative defenses 1 and 26–29. The Defendants' first affirmative defense states that Savage has "failed to state a cause of action upon which relief can be granted." (Doc. No. 29 at p. 23.) Similarly, affirmative defenses 26, 27, 28, and 29 state that Savage has failed to state a cause of action under the PHRA (Defense 26), under the PFPO (Defense 27), for declaratory relief (Defense 28), and for injunctive relief (Defense 29). (*Id.* at p. 27.) Savage argues that each defense is "insufficient" because the "Amended Complaint clearly stated a claim for relief." (Doc. No. 33 at pp. 7–9.) In addition, for affirmative defense 29, Savage argues that this defense must be stricken because "this Court found that Plaintiff's claim for injunctive relief survived Defendants' motion to dismiss." (*Id.* at p. 10.)

**\*5** To the extent Savage argues that these defenses fail because he has "stated a claim for relief," the Court declines to address the merits of these issues at this time. *See Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986) (explaining that "a court should restrain from evaluating the merits of a defense" at the motion to strike stage because "the factual background for a case is largely undeveloped"). "The Federal Rules

specifically permit an averment of failure to state a claim to be raised as an affirmative defense." *Cintron Beverage Grp., LLC v. Depersia*, No. Civ. A. 07–3043, 2008 WL 1776430, at *2 (E.D. Pa. Apr. 15, 2008); *see also N. Penn. Transfer, Inc.*, 859 F. Supp. at 164–65 (refusing to strike affirmative defense that the complaint fails to state a cause of action because "this defense is clearly appropriately asserted in the responsive pleading"); *Knit With v. Knitting Fever, Inc.*, Civ. A. Nos. 08-4221, 08-4775, 2009 WL 973492, at *7–8 (E.D. Pa. Apr. 8, 2009) (finding that the defendants did not waive their defense of failure to state a claim "by failing to present it in their original Motion to Dismiss" because "Federal Rule of Civil Procedure 12(h) not only exempts this defense from any type of waiver, but in fact explicitly permits it to be raised by pleading, Rule 12(c) motion, or at trial").

In addition to being permissible under the Rules, affirmative defenses 1 and 26–28 give Savage fair notice of the issues. *Weed*, 2012 WL 2469544, at *4. Therefore, the Motion to Strike will be denied as to those affirmative defenses. However, because we agree with Savage that our previous order denied the Defendants' Motion to Dismiss Savage's claim for injunctive relief (Doc. No. 23), the Motion to Strike will be granted as to affirmative defense 29.[3] *See United States v. CVS Caremark Corp.*, Civ. A. No. 09-4672, 2013 WL 1755214, at *4 (E.D. Pa. Apr. 24, 2013) (granting motion to strike affirmative defenses that merely reiterated arguments in the defendant's motion to dismiss, which the Court previously rejected).

Next, we address affirmative defenses 13 and 14, which state that the "Plaintiff's claim for religious discrimination and retaliation fails" because Savage "rejected Defendants proposed reasonable accommodation" (Defense 13) and because Savage "failed to engage in the interactive process" (Defense 14). (Doc. No. 29 at p. 25.) Savage argues that these defenses are "insufficient" because the depositions of individual Defendants show that they never offered Savage an accommodation and that Savage asked to engage in an interactive process. (Doc. No. 33 at pp. 8–9 (quoting deposition transcripts).) The Defendants argue that it would be improper to strike these paragraphs because these affirmative defenses rest on

Savage v. Temple University – of Commonwealth System..., Not Reported in Fed....

2020 WL 5602651

disputed issues of fact. (Doc. No. 34 at pp. 6–7.) We agree.

**\*6** As Savage's own argument demonstrates, the applicability of these affirmative defenses will turn on the specific facts of this case, including each Defendant's knowledge and the nature of their interactions with Savage about his request to attend religious services. Because there are disputed issues of fact, we will deny the Motion to Strike affirmative defenses 13 and 14. *See N. Penn. Transfer, Inc.*, 859 F. Supp. at 159 ("A motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact."); *see also Weed*, 2012 WL 2469544, at \*2 ("A motion to strike will not be granted where the sufficiency of the defense depends on disputed issues of facts or where it is used to determine disputed and substantial questions of law.").

Third, the Court turns to affirmative defenses 2 and 5, which contend that Savage's claims are barred by the applicable statute of limitations and that Savage has failed to exhaust administrative remedies. (Doc. No. 29 at pp. 23–24.) Savage argues that these defenses are "insufficient" because the amended complaint "expressly delineates the time period relevant to his claims" and shows that those claims were "timely filed" with the administrative agencies. (Doc. No. 33 at p. 7.) In their response, the Defendants argue that these defenses should stand, in part, because they rest on issues of fact, such as whether Savage raised his intersectional discrimination claim in his Charge of Discrimination. (Doc. No. 34 at pp. 5–6.)

The Court will deny the Motion to Strike as to these defenses. If, as the Defendants argue, Savage failed to raise a claim for intersectional discrimination before the relevant administrative agencies, then the Defendants could succeed on their failure to exhaust and statute of limitations defenses. *See Alliance Indus. Ltd.*, 2014 WL 4548474, at \*3 ("Defendant need not plead the factual basis of the [defense of substantial] performance *if some set of facts could support the defense*.") (emphasis added); *see also N. Penn. Transfer, Inc.*, 859 F. Supp. at 159 ("A motion to strike will not be granted where the sufficiency of a defense depends on disputed issues of fact."). Because affirmative defenses 2 and 5 rest on issues of fact, the Court will deny the Motion to Strike

as to those defenses. *Cf. id.* at 164 (finding that the defendant's statute of limitations "defense fairly presents a question of law and fact which cannot be decided at this point in the litigation").

Fourth, we evaluate affirmative defenses 8 and 17. Affirmative defense 8 contends that the Court "lacks jurisdiction over all claims not included in Plaintiff's Charge of Discrimination dual filed with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission." (Doc. No. 29 at p. 24.) Defense 17 states the "Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver." (*Id.* at p. 26.) Savage argues that both defenses should be stricken because they are "confusing" and "confuse the issues in this case." (Doc. No. 33 at pp. 7, 9.) Specifically, Savage argues that affirmative defense 8 is "insufficient" because it is unclear "which claim in particular Defendants are referring to, thereby providing no notice to Plaintiff as to which claims they are challenging on a jurisdictional basis." (*Id.* at p. 7.) Similarly, Savage argues that defense 17 is "insufficient" because the Defendants have not "presented any factual basis for this defense," rendering it impossible for Savage to "determine how the defense of waiver is applicable to this case." (*Id.* at p. 9.)

Contrary to Savage's assertions, the Defendants are not required to detail the "factual basis" for their defenses. [4] As we have explained, "[p]roviding knowledge that the issue exists, not precisely how the issue is implicated under the facts of a given case, is the purpose of requiring averments of affirmative defenses," and the court will strike defenses challenged on sufficiency grounds only if they fail to meet this low standard. *N. Penn. Transfer, Inc.*, 859 F. Supp. at 164 (noting that "applying the concept of notice to require more than awareness of the issue's existence imposes an unreasonable burden on defendants who risk the prospect of waiving a defense at trial by failing to plead it"; *see also Weed*, 2012 WL 2469544, at \*4 (denying a motion to strike because "Defendant's affirmative defenses, though void of factual details, provide Plaintiffs with fair notice because Plaintiffs are now aware that the issue exists"). The Court finds that defenses 8 and 17 meet this low standard and provide sufficient notice to Savage that the issues of exhaustion

Savage v. Temple University – of Commonwealth System..., Not Reported in Fed....
2020 WL 5602651

and waiver exist. Therefore, the Motion to Strike will also be denied as to affirmative defenses 8 and 17.

**\*7** Last, the Court will grant the Motion to Strike affirmative defense 9, which the Defendants have agreed to withdraw.

### III. Conclusion

In sum, the Motion to Strike is granted in part and denied in part. The Defendants' responses in

paragraphs 7, 9, 10, 12, 13, 15, 16, 18, 19, and 62 of their answer are stricken, and the Defendants required to submit new responses. Affirmative defenses 9 and 29 are also stricken. The remainder of the Motion is denied.

An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2020 WL 5602651

---

### Footnotes

1       Some district courts in this Circuit have read Rule 8(b) as permitting "only three ways to respond to an allegation: (1) admit it (2) deny it or (3) state that the party lacks knowledge or information sufficient to form a belief about the truth of the allegations." *Kegerise v. Susquehanna Twp. Sch. Dist.*, 321 F.R.D. 121, 124 (M.D. Pa. 2016); *see also, e.g., Thomas v. Duvall*, Civ. No. 3:16-cv-00451, 2019 WL 8013742, at \*6 (M.D. Pa. Oct. 3, 2019) (quoting *Kegerise*, 321 F.R.D. at 124). Based on this reading, the courts conclude that the Rule does not "permit a party to refuse to respond to an allegation by asserting it is a conclusion of law." *Kegerise*, 321 F.R.D. at 124. Unlike those cases, however, the Defendants in this case do not rest their response on the assertion that Savage's allegations are "legal conclusions to which no responsive pleading is required." The Defendants also explicitly "deny the allegations" in each paragraph. We find those general denials sufficient. *See* Fed. R. Civ. P. 8(b)(3) ("A party that intends in good faith to deny all the allegations of a pleading — including the jurisdictional grounds — may do so by a general denial.").

2       Paragraph 40 of the amended complaint states:

> Plaintiff at the time presented a six-page letter to Defendant CASEY requesting to attend the services and further stated that he would be willing to work on Christmas and recognized holidays for religions other than Islam so that his co-workers could have time off to observe their holidays as well. The letter also included citations to regulations from Temple's policies, the Commonwealth of Pennsylvania, and the U.S. EEOC pertaining to religious accommodation and employment law.

> (Doc. No. 18 at p. 6 ¶ 40.) In their answer, the Defendants "deny the allegations in this paragraph, which purport to characterize the contents of a written document that speaks for itself." The Court finds that this is a sufficient response, and therefore, denies the motion to strike as to this paragraph. *Cf. Great W. Life Assur. Co.*, 834 F. Supp. at 865 (denying motion to strike responses in which the "Defendant alleges that the writings speak for themselves" because "the Court finds that such responses are denials of the Plaintiff's characterization and representation of the writings").

3       The Defendants argue that striking this defense is improper because the Court's previous opinion found only that the Plaintiff had standing to assert a claim for injunctive relief. (Doc. No. 34 at pp. 7–8.) Although the Court's previous order rested on a finding that Savage had standing to

seek injunctive relief, the Court broadly denied the Defendants' motion to dismiss the claim for injunctive relief. (*See* Doc. No. 22 at p. 15.) The Defendants also argue that deposition testimony shows Savage had no intention of returning to work, meaning that disputes of fact remain about whether Savage can seek injunctive relief. (Doc. No. 34 at pp. 7–8.) But these fact issues have no bearing on whether the amended complaint fails to state a claim for injunctive relief. *See Marisol*, 725 F. Supp. at 836 ("As the Government correctly points out, however, the defense of failure to state a claim upon which relief can be granted challenges only the formal sufficiency of the claims set forth in the complaint.") Because affirmative defense 29 attacks the sufficiency of the amended complaint, and the Court previously found that the amended complaint stated a claim for injunctive relief, the defense will be stricken. However, we note that the Defendants are free to raise these fact-based issues at summary judgment, and to argue that Savage lacks standing to take his injunctive relief claim to trial. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) ("Although rulings on standing often turn on a plaintiff's stake in initially filing suit, Article III demands that an 'actual controversy' persist throughout all stages of litigation.") (quotation marks omitted).

4    Also, as noted above, the Defendants specifically argue in their response brief that Savage failed to assert a claim for intersectional discrimination in his Charge of Discrimination.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

9

2019 WL 8013742

2019 WL 8013742
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Angel Luis THOMAS, Plaintiff,

v.

Angela R. DUVALL, et al., Defendants.

CIVIL NO. 3:16-CV-00451
|
Signed 10/03/2019

**Attorneys and Law Firms**

Marianne Sawicki, Law Office of Marianne Sawicki
LLC, Huntingdon, PA, for Plaintiff.

Daniel J. Gallagher, Office of the Attorney General,
Harrisburg, PA, Maria G. Macus, Theron R. Perez,
Chief Counsel's Office Pennsylvania Department of
Corrections, Mechanicsburg, PA, for Defendants.

**REPORT AND RECOMMENDATION**

Susan E. Schwab, Chief United States Magistrate
Judge

**I. Introduction.**

*1    This is a civil rights case regarding an
inmate's placement in a particular prison and the
inmate's ability to confer with an attorney while
incarcerated in that prison. The plaintiff, Angel Luis
Thomas ("Thomas"), is a former inmate at the State
Correctional Institution in Huntingdon, Pennsylvania
("SCI Huntingdon" or "the prison") who has since
been released from custody. Thomas identifies as
African American and Hispanic. Thomas alleges that
his placement in SCI Huntingdon was based on a
policy of disproportionately placing African American
and Hispanic prisoners in that prison so as to impede
those prisoners from pursuing civil litigation. Thomas
raises eight claims against a variety of defendants
from SCI Huntingdon and from the central office of
the Pennsylvania Department of Corrections ("DOC"),
all of which arise from his placement in SCI
Huntingdon, his visits with his attorney while he was
incarcerated in SCI Huntingdon, or his ability to pursue
civil litigation while incarcerated in SCI Huntingdon.

The case is presently before the court on a motion
for summary judgment filed by the defendants.
The defendants argue they are entitled to summary
judgment because Thomas failed to exhaust his
administrative remedies, because his claims arising
from his placement at SCI Huntingdon are barred
by the applicable statute of limitations, because
Thomas cannot prove facts sufficient to establish a
violation of his rights, and because the defendants
are entitled to qualified immunity. This report and
recommendation addresses the defendants' motion for
summary judgment. For the reasons that follow, we
recommend that the motion for summary judgment
be granted as to Counts I and VI of Thomas's
amended complaint; that the motion be granted to the
extent that Thomas's amended complaint challenges
the conditions of his confinement; that the motion
be granted as to all claims against defendants Joanne
Torma, William Nicklow, and Shirley Moore Smeal;
and that the motion be denied in all other respects.

**II. Background and Procedural History.**

Thomas initiated this case by filing a complaint
on March 14, 2016. *Doc. 1.* Thomas's complaint
raised claims exclusively against defendants who
worked at SCI Huntingdon, including Corrections
Officer Angela Duvall ("Duvall"); Sergeant W.M.
Ritchey ("Sergeant Ritchey"); Captain Ron Smith
("Smith"); Corrections Officer Matthew Ritchey
("CO Ritchey"); [1] lieutenants Gill, Dixon, Wendle,
and Dunkle; Superintendent's Assistant Constance
Green ("Green"); and Superintendent James Eckard
("Eckard"). *Doc. 1* ¶¶ 4–13. The complaint focused
its allegations on four visits that attorney Marianne
Sawicki [2] made to SCI Huntingdon—three to visit
Thomas and one to visit Ivan White ("White"), [3]
another inmate at the prison. In each of Sawicki's visits,
staff at the prison allegedly interfered with her ability
to have a confidential conference with her client. In
the first visit, which occurred on August 14, 2014,
Duvall and CO Ritchey refused to allow Sawicki
to have a confidential visit with Thomas, allegedly
at the direction of Green, Dixon, Sergeant Ritchey,
and Smith. *Id.* ¶¶ 24–26. In the second visit, which
occurred on August 30, 2014, Duvall, CO Ritchey,
and Smith again allegedly interfered with Sawicki's
ability to speak confidentially with her client, which

in this instance was White. *Id.* ¶¶ 31–42. In the third visit, which occurred on October 30, 2014, Sawicki and Thomas attempted to speak confidentially, but were placed in a non-contact booth with inoperable phones, causing them to have to shout to be heard by one another and allowing other inmates and their visitors to hear them. *Id.* ¶¶ 49–53. In the fourth and final visit mentioned in the complaint, which occurred on May 23, 2015, Sawicki visited the prison to help prepare Thomas to testify in a federal hearing for a fellow inmate, Roberto Camacho, Jr. ("Camacho"). *Id.* ¶ 57. Prison staff placed Thomas and Sawicki in a non-contact booth that had open louvers in the door, which allowed staff outside the booth to hear their conversation. *Id.* ¶ 61. Duvall also repeatedly interrupted Thomas and Sawicki's conference by opening the door without announcing her presence and making "numerous threatening and disparaging comments." *Id.* ¶¶ 122–24. The complaint alleged that the defendants' actions and SCI Huntingdon's facilities for attorney-client visits deterred attorneys from visiting clients and that the defendants' actions were based on "a policy of discouraging attorneys from visiting Thomas and prisoners like Thomas for the purpose of discussing civil litigation and giving legal advice to the prisoners." *Id.* ¶¶ 75–77. The complaint alleged that the defendants' actions in the case were based on racial hostility towards Thomas and Camacho as Hispanic individuals and towards Thomas and White as African Americans. *Id.* ¶ 88. The complaint further alleged that inmates at other DOC prisons who were not classified as African American or Hispanic were allowed to have confidential visits with their attorneys. *Id.* ¶ 92. The complaint raised eight counts against the defendants,[4] including violation of Thomas's right to equal protection of the laws; violation of his right of access to the courts; conspiracy to violate his right of access to the courts; violation of his constitutional rights to privacy, free speech, and free association; conspiracy to violate his constitutional rights to privacy, free speech, and free association; conspiracy to violate his right to equal protection; conspiracy to deter from testifying under 42 U.S.C. § 1985; and neglect to prevent deterrence with his right to testify. *Id.* at 20–27. As relief, Thomas sought declaratory and injunctive relief as well as compensatory and punitive damages. *Id.* at 27.

**\*2** The defendants filed a motion to dismiss Thomas's complaint on May 10, 2016, raising a number of arguments for dismissal. *Doc. 5.* First, the defendants argued that Thomas's claims regarding Sawicki's visits with inmates at SCI Huntingdon were barred by collateral estoppel given the prior rulings denying preliminary injunctions in *Lane v. Tavares,* No. 14-CV-00991, and *Camacho v. Dean,* No. 1:14-CV-01428. *Doc. 5* ¶¶ 21–22. Second, the defendants argued that Thomas's access-to-courts claim should be dismissed because he had not alleged any actual injury to his access to court. *Id.* ¶¶ 33, 39, 42. Third, the defendants argued that Thomas's equal protection claim should be dismissed because Thomas had failed to plead the existence of similarly situated individuals who were treated differently from Thomas. *See id.* ¶¶ 43–56. Fourth, the defendants argued that Thomas's freedom of association and freedom of speech claims should be dismissed because Thomas could associate with Sawicki via telephone and letter even if his in-person visits were curtailed. *See id.* ¶¶ 57–61. Fifth, the defendants argued that Thomas did not have standing to bring claims arising out of Sawicki's visits with White. *Id.* ¶ 64. And finally, the defendants argued that all claims against Dunkle should be dismissed because the only allegations against Dunkle pertained to Sawicki's visits with White. *Id.* ¶ 65.

We addressed the defendants' motion to dismiss via report and recommendation on March 1, 2017, recommending that the court grant in part and deny in part the defendants' motion to dismiss. *Doc. 13* at 45. Specifically, we recommended that the court (1) grant the motion to the extent that it sought dismissal of all claims against Dunkle (*id.* at 20); (2) deny the motion to the extent that it sought dismissal on the basis of collateral estoppel (*id.* at 24); (3) grant the motion and dismiss Thomas's equal protection and conspiracy to violate equal protection claims without prejudice (*id.* at 29–31); (4) dismiss Thomas's access-to-courts claim with prejudice to the extent that it sought relief for his failure to testify in Camacho's case and dismiss it without prejudice in all other respects (*id.* at 38); (5) dismiss Thomas's conspiracy to violate his right of access to the courts claim without prejudice (*id.*); (6) dismiss Thomas's right-to-privacy claim and associated conspiracy claim without prejudice; and (7) deny the motion with respect to Thomas's First Amendment free speech

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 73 of 106

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

and free association claims (*id.* at 44). Judge Brann adopted our report and recommendation on July 10, 2017, dismissing Thomas's claims against Dunkle but otherwise granting Thomas leave to file an amended complaint. *Doc. 18* at 13.

Thomas filed an amended complaint on August 6, 2017. *Doc. 21*. The amended complaint removes Dunkle as a defendant but adds three additional defendants: Joanne Torma ("Torma"), the Director of the DOC's Office of Population Management ("OPM") between 2010 and 2014; William Nicklow ("Nicklow"), the Director of OPM from 2014 to the date of the amended complaint; and Shirley Moore Smeal ("Smeal"), the DOC's Executive Deputy Secretary. *Id.* ¶¶ 13–15. The other defendants who were named in the original complaint are also named as defendants in the amended complaint.[5] The amended complaint largely focuses on the four visits that were alleged in the original complaint but also contains additional allegations regarding Thomas's placement in SCI Huntingdon. The amended complaint alleges that "Inmates who are classified as 'Black or African American' by DOC are much more likely to be assigned to SCI Huntingdon than are inmates classified 'White or Caucasian.' " *Id.* ¶ 30. According to the amended complaint, "DOC statistics show that Black inmates are about 30% more likely than White inmates to be housed at SCI Huntingdon" and that inmates classified as Hispanic or Latino are 7.5% more likely to be assigned to SCI Huntingdon than are white inmates. *Id.* ¶¶ 30–31. The amended complaint alleges that the higher rates at which black and Hispanic inmates are housed in SCI Huntingdon is due to "discriminatory policies and practices developed by DOC's Office of Population Management ... and implemented by staff at SCI Huntingdon and other prisons throughout the Commonwealth." *Id.* ¶ 32. The amended complaint alleges that Torma, Nicklow, and Smeal are responsible for the OPM's policy and that this policy both led to Thomas's placement at SCI Huntingdon and "had the continuing effect of keeping him there for many years." *Id.* ¶¶ 33–36. According to the amended complaint, the policy of discriminatorily assigning black and Hispanic inmates to SCI Huntingdon was put in place and allowed to continue "with the intent and effect of insuring that Black and Hispanic prisoners, like the plaintiff, would have less access than White prisoners to facilities for confidential attorney conferences and to other modest amenities of prison life such as accessible worship and recreational spaces, vermin-free living space, and adequate ventilation." *Id.* ¶ 35.

**\*3** According to the amended complaint, the SCI Huntingdon defendants implemented and enforced the policies of unequal treatment of black and Hispanic inmates by interfering with attorney conferences and denying attorneys access to visit black and Hispanic inmates. *Id.* ¶¶ 44, 46. The amended complaint alleges that the "Huntingdon Defendants deprived Mr. Thomas and many other minority prisoners of access to confidential attorney conferences because of racial hostility toward African Americans, Hispanics, and men of mixed race." *Id.* ¶ 47.

Thomas raises eight counts in his amended complaint. In Count I, Thomas alleges that the defendants violated his right to equal protection. *Id.* ¶¶ 160–63. Specifically, Thomas alleges that Torma, Nicklow, and Smeal violated his right to equal protection when they "instituted or acquiesced in and implemented" a policy of disproportionately assigning minority inmates to SCI Huntingdon and that the defendants at SCI Huntingdon violated his right to equal protection when they "willingly implemented" that policy. *Id.* In Count II, Thomas alleges that the defendants violated his constitutional right of access to the courts—Torma, Nicklow, and Smeal by "causing him to be housed at SCI Huntingdon while knowing that he would be prevented from having confidential contact visits with any attorney there," and the SCI Huntingdon defendants by depriving him of confidential visits with his attorney. *Id.* ¶¶ 164–68. In Count III, Thomas alleges that the defendants engaged in a conspiracy to violate his right of access to the courts. *Id.* ¶¶ 169–72. In Count IV, Thomas alleges that the SCI Huntingdon defendants violated his constitutional rights to privacy, free speech, and free association by refusing to accommodate confidential visits with his attorney. *Id.* ¶¶ 173–76. In Count V, Thomas alleges that the defendants conspired to violate his rights to privacy, free speech, and free association. *Id.* ¶¶ 177–80. In Count VI, Thomas alleges that the defendants conspired to violate his right to equal protection. *Id.* ¶¶ 181–84. In Count VII, Thomas alleges that Duvall, Wendle, Green, and Eckard conspired to prevent Thomas from testifying in federal court in

2019 WL 8013742

violation of 42 U.S.C. § 1985. *Id.* ¶¶ 185–88. In Count VIII, Thomas alleges that Wendle, Green, and Eckard neglected to prevent the other defendants from deterring Thomas from testifying in federal court in violation of 42 U.S.C. § 1986. *Id.* ¶¶ 189–92.

Torma, Nicklow, and Smeal filed a motion to dismiss all claims against them on August 17, 2017 and a supporting brief on August 31, 2017. *Docs. 24, 27.* Torma, Nicklow, and Smeal argued that the claims against them should be dismissed because the court's grant of leave to amend did not allow the addition of new parties. *Doc. 27* at 3. They further argued that the claims against them were barred by the applicable statute of limitations. *Id.* at 4–6.

We addressed the motion to dismiss in a report and recommendation on January 29, 2018. *Doc. 32.* Although we found that Torma, Nicklow, and Smeal could be added to the case consistent with the court's grant of leave to amend, *id.* at 25, we found that the additional allegations in Thomas's amended complaint did not cure the defects that we previously identified with regard to his equal protection claim because the amended complaint still did not allege that Thomas was treated differently from other persons who were similarly situated to him. *Id.* at 28–29. Although the motion to dismiss was brought only by Torma, Nicklow, and Smeal, we *sua sponte* found that Thomas had failed to state an equal protection claim against the defendants named in the original claim. *Id.* at 31. Accordingly, we recommended that Thomas's equal protection claim and conspiracy to violate equal protection claims be dismissed. *Id.* at 50–51. We also recommended denying the motion to dismiss with regard to Thomas's access-to-courts claim, finding that the defendants had not sufficiently developed arguments warranting dismissal as to that claim. *Id.* at 34. Finally, we rejected the argument that the claims against Torma, Nicklow, and Smeal should be dismissed for violation of the statute of limitations, noting that the defendants had not adequately developed that argument. *Id.* at 49.

**\*4** Judge Brann adopted in part and rejected in part our report and recommendation on May 2, 2018. *Doc. 40* at 4. Judge Brann rejected our report and recommendation insofar as it recommended

dismissing Thomas's equal protection claim and conspiracy to deny equal protection claim, stating:

> Plaintiff's Amended Complaint alleges that the Additional Defendants violated Plaintiff's rights under the Equal Protection Clause by assigning him and other minority inmates to SCI Huntingdon, where conditions are allegedly 'antiquated and in deplorable condition.... For purposes of an Equal Protection Clause analysis, then, 'similarly situated' individuals would be non-minority inmates assigned to prisons other than SCI Huntingdon.

*Doc. 40* at 3–4. Judge Brann accordingly denied the motion to dismiss and directed all the defendants to file an answer in response to Thomas's amended complaint. *Id.* The defendants filed an answer and affirmative defenses to Thomas's amended complaint on May 31, 2018. *Doc. 41.* Following the conclusion of discovery, the defendants filed a motion for summary judgment on April 22, 2019. *Doc. 67.* The defendants filed a brief in support of their motion on May 6, 2019, Thomas filed a brief in opposition on May 28, 2019, and the defendants filed a reply brief on June 25, 2019. *Docs. 74, 83, 86.* We consider the parties' summary judgment arguments below.

### III. Summary Judgment Standard.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In a summary judgment motion, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party's claims and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**\*5** The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.' " *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry for the court "is the threshold inquiry

of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

### IV. Material Facts.

When filing a motion for summary judgment, the moving party must comply with Local Rule 56.1, which requires the party to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. Once the moving party has filed such a statement, the non-moving party is required to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the [moving party's] statement ... as to which it is contended that there exists a genuine issue to be tried." *Id.*

In this case, the defendants filed a statement of material facts in support of their motion for summary judgment on April 22, 2019. *Doc. 68.* Thomas filed a response to the defendants' statement of material facts on May 28, 2019. *Doc. 77.* We base the following statement of facts on those statements, Thomas's amended complaint, and the defendants' answer to the amended complaint. *See docs. 21, 41, 68, 77.* The following facts are either undisputed or construed in the light most favorable to Thomas as the non-movant.

Before we proceed with a statement of the facts relevant to the defendants' motion for summary judgment, however, we must consider an additional issue that has arisen as to whether the defendants admitted certain allegations that Thomas made in his amended complaint. In his response to the defendants' statement of material facts at the summary judgment stage, Thomas "disputes all statements that contradict ¶¶ 37 through 192 of the Amended Complaint." *Doc. 77* at 1. Thomas contends that the defendants "have admitted most of the factual allegations in the Amended Complaint" since they did not deny the allegations in accordance with Rule 8 of the Federal Rules of Civil Procedure. *Id.* at 1–2. In their reply brief, the defendants argue that "[t]he answers referenced denied the allegations as conclusions of law, and went on to deny that the Plaintiff's constitutional rights

2019 WL 8013742

were violated." *Doc. 86* at 8. The defendants assert that "[i]t could not be more clear that [the referenced allegations] were denied." *Id.* They further argue that Thomas "fails to persuasively set forth an actual allegation of fact that was admitted. Other than the allegations about identity of the parties, a search for a simple fact in this 200 paragraph pleading would be a fool's errand." *Id.* "As a result," the defendants argue, "since FRCP 8 only provides that *facts* are admitted, Plaintiff's desperate attempt to create a factual issue in order to make up for lack of evidence should be denied." *Id.* (citing *United States v. E.B. Hougham*, 364 U.S. 310, 317 (1960)).

**\*6** We find the defendants' arguments on this issue unpersuasive. In their answer to Thomas's amended complaint, the defendants responded to numerous paragraphs that were clearly allegations of fact by asserting that no response was necessary because the allegations were conclusions of law and then providing blanket denials that Thomas's rights were not violated. A representative example can be seen in Paragraph 37 of the amended complaint and the corresponding paragraph in the defendants' answer. In Paragraph 37 of his amended complaint, Thomas alleges that "Ms. Torma communicated with Ms. Moore Smeal about inmate placement on a regular basis while Torma was director of OPM between 2010 and 2014 and was making decisions about where to house individual inmates, including the plaintiff." *Doc. 21* ¶ 37. The defendants responded to this allegation as follows: "Denied as a conclusion of law to which no response is required. Defendants and Additional Defendants deny any violation of the Plaintiff's constitutional rights." *Doc. 41* ¶ 37. In another representative example, Paragraph 75, Thomas alleges that "Attorney Sawicki attempted to visit Thomas on August 14, 2014, to review his legal papers with him," to which the defendants responded: "Denied as a conclusion of law to which no response is required." *Doc. 21* ¶ 75; *doc. 41* ¶ 75. In yet another representative example, Paragraph 114 of the amended complaint alleges that "Thomas was called as a witness to testify in support of another Hispanic prisoner, Roberto Camacho, Jr., at a federal hearing in May 2015. Thomas wanted to testify." *Doc. 21* ¶ 114. The defendants responded: "Denied that the constitutional rights of the Plaintiff were violated." *Doc. 41* ¶ 114.

Under Rule 8(b) of the Federal Rules of Civil Procedure, a party responding to a pleading must "state in short and plain terms its defenses to each claim asserted against it ... and admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b). "A denial must fairly respond to the substance of the allegation," and "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." *Id.* "Rule 8(b) permits a party only three ways to respond to an allegation: (1) admit it (2) deny it or (3) state that the party lacks knowledge or information sufficient to form a belief about the truth of the allegation." *Kegerise v. Susquehanna Twp. Sch. Dist.*, 321 F.R.D. 121, 124 (M.D. Pa. 2016).

The defendants' responses to Paragraphs 37, 75, 114, and numerous other paragraphs fall well short of what is required by Rule 8.[6] To begin with, "[r]ule 8(b) does not permit a party to refuse to respond to an allegation by asserting it is a conclusion of law." *Id.* at 124. Furthermore, even if a party could assert that a response was not necessary because an allegation constituted a conclusion of law, the defendants' response here would still not comply with Rule 8(b) because the allegations at issue are, plainly, factual allegations and not conclusions of law. Under Rule 8(b), the defendants were required to either admit the factual allegations in the amended complaint, deny them, or state that they lacked sufficient knowledge or information to form a belief about their truth. Fed. R. Civ. P. 8(b); *Kegerise*, 321 F.R.D. at 124. Finally, the fact that the defendants denied "any violation of the Plaintiff's constitutional rights" is not a sufficient response under Rule 8 because it does not "fairly respond to the substance of the allegation." Fed. R. Civ. P. 8(b)(2). In responding to the factual allegations in the amended complaint, the defendants needed to either admit or deny the factual allegations. It is not enough to simply make the blanket statement that Thomas's constitutional rights were not violated.

The defendants' reliance on *Hougham*, 364 U.S. at 317, is also misplaced. In *Hougham*, the Supreme Court considered whether the government could amend its complaint under Rule 15 of the Federal Rules of Civil Procedure so as to plead a claim for damages under § 26(b)(2) of the Surplus Property Act of 1944. *See id.* At no point in its discussion did the Court

consider the adequacy of an answer under Rule 8. *See id.* To the extent that the defendants can rely on the Court's discussion in *Hougham* at all, it is only for the general proposition that "[t]he federal rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Hougham*, 364 U.S. at 317 (quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957)). That general proposition does not save the defendants' argument here. The defendants' blanket denials of factual allegations as conclusions of law were not simply procedural missteps; rather they actively hindered this court's ability to decide the case on the merits by obscuring the facts of the case.

**\*7** The defendants could have adequately responded to Thomas's factual allegations either through their own personal knowledge or through a reasonable investigation, and under Rule 8(b), they were required to provide such a response. The defendants cannot evade that responsibility by asserting that allegations of fact are conclusions of law or by simply stating that Thomas's constitutional rights were not violated. Accordingly, the factual allegations in Paragraphs 37–39, 45, 59, 72, 74–76, 81, 83–84, 86–87, 90–91, 93–97, 100, 108–111, 114–115, 118–120, 122, 126, and 133–134 of the amended complaint are deemed admitted for the defendants' failure to deny them. *See, e.g.*, *United States Use of Automatic Sprinkler Corp. v. Merritt-Chapman & Scott Corp.*, 305 F.2d 121, 123 (3d Cir. 1962) ("Since the Answer fails to deny the quoted allegations of the Complaint, they are deemed admitted."); *Federal Ins. Co. v. von Windherburg-Cordeiro*, No. 12-CV-02491, 2013 WL 6199253, at \*3 (D.N.J. Nov. 27, 2013) (deeming allegations admitted where defendant failed to deny them in answer); *Petrunich v. Sun Bldg. Sys., Inc.*, No. 3:04-CV-02234, 2006 WL 2788208, at \*4 (M.D. Pa. Sept. 26, 2006) (same). With that in mind, we turn now to a statement of facts relevant to the defendants' motion for summary judgment.

At all times relevant to this litigation, Thomas was incarcerated at SCI Huntingdon. *Doc. 21* ¶ 17; *doc. 41* ¶ 17. Black inmates are 30% more likely than White inmates to be housed at SCI Huntingdon, while Hispanic inmates are 7.5% more likely than White inmates to be housed at SCI Huntingdon. *Doc. 21*

¶¶ 30–31; *doc. 41* ¶¶ 30–31.[7] Thomas is black and Hispanic, and the defendants at SCI Huntingdon were aware of that fact. *Doc. 21* ¶ 45; *doc. 41* ¶ 45.

In 2014 and 2015, Thomas sought the assistance of counsel to litigate two cases that he was litigating *pro se. Doc. 21* ¶ 59; *doc. 41* ¶ 59. Thomas began corresponding with Sawicki about his two ongoing cases in 2014. *Doc. 21* ¶ 74; *doc. 41* ¶ 74. Sawicki attempted to visit Thomas on August 14, 2014 to review his legal papers. *Doc. 21* ¶ 75; *doc. 41* ¶ 75. Duvall and CO Ritchey, who were on duty in the visiting room at the time of Sawicki's visit, refused to allow Thomas and Sawicki to speak in a confidential booth and instead directed them to speak in the middle of the general visiting room. *Doc. 21* ¶ 81; *doc. 41* ¶ 81. At Sawicki's request, Duvall and CO Ritchey spoke with Green, Dickson, and Sergeant Ritchey via telephone. *Doc. 21* ¶ 80; *doc. 41* ¶ 80.[8] At the direction of Green and Dickson, Duvall and CO Ritchey told Thomas that he had to confer with Sawicki in the middle of the general visiting room. *Doc. 21* ¶ 81; *doc. 41* ¶ 81. After Sawicki asked Smith to intervene and allow her and Thomas to meet in a booth, Smith placed Thomas and Sawicki on either side of a glass wall in a non-contact booth and instructed Duvall and CO Ritchey to carry papers back and forth between them. *Doc. 21* ¶ 83; *doc. 41* ¶ 83. Duvall and CO Ritchey, however, did not comply with this order, rendering Thomas unable to have a conference with his attorney. *Doc. 21* ¶ 84; *doc. 41* ¶ 84. Sawicki informed Eckard of this incident via fax later that day. *Doc. 21* ¶ 86; *doc. 41* ¶ 86.

**\*8** Sawicki went to the prison again on August 30, 2014 to visit White, another inmate at the prison. *Doc. 21* ¶ 87; *doc. 41* ¶ 87. Duvall, CO Ritchey, Sergeant Ritchey, and Smith were all on duty, and they all recognized Sawicki. *Id.* Duvall told Sawicki "we have a special place all ready for you," or words to that effect, and then directed Sawicki into non-contact booth #3 to wait for White. *Doc. 21* ¶¶ 90–91; *doc. 41* ¶¶ 90–91. Although Sawicki subsequently had a conference with White, the conference was repeatedly interrupted by Duvall striking the window next to Sawicki's head with a heavy radio phone. *Doc. 21* ¶ 94; *doc. 41* ¶ 94. These incidents were captured by video surveillance footage. *Doc. 21* ¶ 95; *doc. 41* ¶ 95. After the conference, White filed a grievance to complain

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 78 of 106

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

about what happened during the conference. *Doc. 21 ¶ 97; doc. 41 ¶ 97.* Sawicki also notified Eckard of the events that had transpired and requested preservation of the surveillance footage. *Doc. 21 ¶ 96; doc. 41 ¶ 96.*

On October 30, 2014, Sawicki again visited Thomas at SCI Huntingdon. *Doc. 21 ¶ 109; doc. 41 ¶ 109.* Although Sawicki had been informed that the facilities for attorney conferences had been renovated, Thomas and Sawicki were directed to occupy non-contact booth #1, where the renovations had not been completed. *Doc. 21 ¶ 109; doc. 41 ¶ 109.* The phones in non-contact booth #1 were inoperative, causing Thomas and his attorney to have to shout to be heard by one another. *Id.* As a result, other prisoners and their visitors could hear what Thomas and Sawicki were saying, and Thomas and Sawicki were therefore unable to discuss all the matters that they wished to discuss. *Doc. 21 ¶¶ 109–10; doc. 41 ¶¶ 109–10.* Sawicki informed Eckard of what happened during this visit by fax later that day. *Doc. 21 ¶ 111; doc. 41 ¶ 111.*

Sawicki went to SCI Huntingdon to visit Thomas again on May 23, 2015 to help him prepare to testify in Camacho's case and to discuss his own cases. *Doc. 21 ¶¶ 114–15, 117; doc. 41 ¶¶ 114–15, 117.* When Sawicki arrived at the prison, Duvall refused to allow her to use non-contact booth #1, which had previously been renovated, and instead placed her in non-contact booth #2, which "still had open louvers allowing conversation to be heard at the officers desk, which is about three feet away" from the booth. *Doc. 21 ¶¶ 117–18; doc. 41 ¶¶ 117–18.* At Sawicki's request, Duvall called Wendle—the ranking officer on duty at the time. Sawicki asked Wendle to move her conference with Thomas to non-contact booth #1, but Wendle refused to do so. *Doc. 21 ¶¶ 119–20; doc. 41 ¶¶ 119–20.* Duvall subsequently interrupted Thomas and Sawicki's conference by opening the door of the booth "without knocking or otherwise announcing her presence." *Doc. 21 ¶ 122; doc. 41 ¶ 122.* A partition in non-contact booth #2 prevented Sawicki and Thomas from reviewing documents together during the conference. *Doc. 21 ¶ 126; doc. 41 ¶ 126.* In addition, correctional officers outside of the booth could hear their conversation through the open louvers in the door. *Id.* Other than Sawicki's visits to the prison on August 14, 2014, October 30, 2014, and May 23, 2015, Thomas did not have any conferences with

attorneys in 2014 or 2015, despite repeated attempts to contact attorneys and request their assistance. *Doc. 21 ¶¶ 133–34, doc. 41 ¶¶ 133–34.*

## V. Discussion.

**\*9** The defendants raise a number of arguments at the summary judgment stage. First, the defendants argue they are entitled to summary judgment on Thomas's equal protection claims and conditions-of-confinement claims because Thomas failed to exhaust his administrative remedies as to those claims. *Doc. 74* at 10. Second, the defendants argue that Thomas's claims arising out of his placement in SCI Huntingdon are barred by the statute of limitations. *Id.* at 13. Third, the defendants argue they are entitled to summary judgment as to Thomas's access-to-courts claim because he cannot establish an actual injury to his access to court. *Id.* at 14. Fourth, the defendants argue they are entitled to summary judgment as to Thomas's First Amendment freedom of speech and freedom of association claims because the prison's visitation policies and procedures are reasonably related to legitimate penological interests. *Id.* at 15. Fifth, the defendants argue they are entitled to summary judgment as to Thomas's equal protection claim because he has not shown the existence of any similarly situated individuals who were treated differently from him and because there is no evidence of a policy to disproportionately place African American or Hispanic inmates at SCI Huntingdon. *Id.* at 17–20. Sixth, the defendants argue they are entitled to qualified immunity as to Thomas's constitutional claims. *Id.* at 20. Finally, the defendants argue that Duvall should be granted summary judgment because her actions were directed towards Sawicki, not Thomas. *Id.* at 23. We address the defendants' summary judgment arguments *seriatim.*

### A. Thomas Has Failed to Exhaust Administrative Remedies as to His Equal Protection and Conditions-of-Confinement Claims.

The Prison Litigation Reform Act ("PLRA") specifies that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.

2019 WL 8013742

§ 1997e(a). "[F]ailure to exhaust is an affirmative defense that [the defendants] must plead and prove." *Robinson v. Superintendent SCI Rockview*, 831 F.3d 148, 153 (3d Cir. 2016) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007)).

The PLRA "requires what is known as 'proper exhaustion,' meaning that inmates must comply with the rules and procedures of prison administrative systems." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). The procedural requirements that a prisoner must follow "are drawn from the policies of the prison in question rather than from any free-standing federal law." *Id.* (citing *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)).

DC-ADM 804, the DOC's grievance policy, provides for a three-stage grievance procedure. *See* DC-ADM 804. At the initial stage of the grievance procedure, the inmate is required to submit his grievance to the Facility Grievance Coordinator. *See id.* § 1.A.6. The grievance must include a statement of facts specifying "the date, approximate time and location of event(s) that gave rise to the grievance." *Id.* § 1.A.11. The grievance must also "identify individuals directly involved in the event(s)." *Id.*

Assuming an inmate's grievance has been properly submitted at the initial stage, the Facility Grievance Coordinator is required to designate a staff member at the prison as the Grievance Officer for that grievance. *See id.* § 1.B.5. The Grievance Officer reviews the grievance and submits a proposed response to the Facility Grievance Coordinator. *Id.* § 1.B.7. If the Facility Grievance Coordinator determines that the Grievance Officer's proposed response complies with the facility's policy and procedure, the Facility Grievance Coordinator is required to initial the grievance and return it to the Grievance Officer for distribution. *Id.* § 1.B.8. The Grievance Officer must then provide a written response to the inmate. *Id.* § 1.B.9.

At the second stage of the grievance procedure, the inmate may appeal the prison's initial decision to the Facility Manager. *Id.* § 2.A.1.a. An inmate may only appeal an issue if the inmate raised the issue in his initial grievance. *See id.* § 2.A.1.c. Assuming the

appeal complies with facility procedures, the Facility Manager is required to notify the inmate of his decision on the appeal within fifteen business days. *Id.* § 2.A.2.d.

At the third stage of the grievance process, an inmate may appeal the Facility Manager's denial of his grievance for final review. *Id.* § 2.B.1.b. At the final review stage, the appeal is reviewed by the SOIGA. *Id.* § 2.B.1.f. Assuming the appeal to final review complies with all necessary procedures, the SOIGA is required to respond directly to the inmate. *Id.* § 2.B.2.e.

**\*10** Here, the defendants argue that Thomas has failed to exhaust his administrative remedies as to his equal protection claim and as to any claims arising from the conditions of his confinement.[9] *Doc. 74* at 10–13. Thomas argues that he has "placed four grievances into evidence" that he has exhausted and that "set forth factual details, dates, names, times, and circumstances." *Doc. 83* at 27. Thomas further argues that all four of the grievances he has placed into evidence "point to continuing interference with Thomas's attempts to confer with his lawyer so he can avail himself of his constitutional and statutory rights." *Id.* In addition, Thomas argues that the grievances "include as much detail as Thomas could practicably know when they were filed," since Thomas "could not know about the larger systems of discrimination that caused him to be incarcerated in a manner that severely impeded his access to an attorney." *Id.* at 31. The defendants reply that exhaustion of Thomas's claims regarding attorney conferences at SCI Huntingdon do not act to exhaust his claims that he was placed in SCI Huntingdon based on his race. *Doc. 86* at 3.

Thomas filed eight prison grievances that he ultimately appealed to final review between July 14, 2014 and January 17, 2018. *Doc. 68-2* at 4. Four of those grievances are relevant to this case. Grievance number 523411, which Thomas initially filed on August 17, 2014, concerned the actions of Duvall and other staff members during his August 14, 2014 visit with Sawicki. *Doc. 68-2* at 12–24. Grievance number 534678, which Thomas initially filed on November 14, 2014, concerned the actions of staff members during his October 30, 2014 visit with Sawicki. *Doc. 68-2* at 32–42. Grievance number 539125 and grievance number 569897, both of which Thomas filed on May

30, 2015, concerned the actions of staff members during his May 23, 2015 visit with Sawicki. *See id.* at 43–67; *doc. 78-1* at 7–9. [10]

Thomas is correct that the grievances he produced "point to continuing interference with Thomas's attempts to confer with his lawyer so he can avail himself of his constitutional and statutory rights." *Doc. 83* at 27. Exhaustion of that issue, however, is not before the court. The defendants assert that Thomas failed to exhaust his administrative remedies only as to his equal protection claim and conditions-of-confinement claims.

*\*11* A review of Thomas's amended complaint makes clear that his equal protection claim is based on the theory that he was placed in SCI Huntingdon because of his race. Thomas alleges that Torma, Nicklow, and Smeal "instituted or acquiesced in and implemented a policy of assigning minority inmates like Plaintiff disproportionately to SCI Huntingdon so as to diminish their access to the means necessary to exercise their rights under the Petition Clause of the First Amendment, and their First, Fourth, and Fourteenth Amendment rights to privacy, free association, and free speech in the prison context." *Doc. 21* ¶ 161. Thomas further alleges that the SCI Huntingdon defendants "willingly implemented the racial policy of Moore Smeal, Torma, and Nicklow, by denying Plaintiff the means to exercise" his constitutional rights. *Id.* ¶ 162. Thus, exhaustion of Thomas's equal protection claim would require him to grieve his placement at SCI Huntingdon, since his equal protection claim is based on the theory that Torma, Nicklow, and Smeal implemented a policy of assigning inmates to SCI Huntingdon on the basis of race and the SCI Huntingdon inmates "willingly implemented that policy." *Id.* However, none of Thomas's grievances exhaust—or even mention—his assignment to SCI Huntingdon. *See generally doc. 68-2*; *doc. 78-1*. In fact, the only relevant grievances in this case concern, in Thomas's words, the defendants' "continuing interference with Thomas's attempts to confer with his lawyer." *Doc. 83* at 27. We therefore find that Thomas has failed to exhaust his administrative remedies as to his equal protection claim and recommend that the defendants motion be granted on that claim. [11] Furthermore, since the defendants should be granted summary judgment on

Thomas's equal protection claim, they should also be granted summary judgment as to Thomas's conspiracy to deny equal protection claim since there is no viable tort on which to base that claim. *See, e.g., Olick v. Pennsylvania*, 739 F. App'x 722, 727 (3d Cir. 2018) ("The established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability." (quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999))); *see also Dykes v. SEPTA*, 68 F.3d 1564, 1570 (3d Cir. 1995) (not considering issue of conspiracy based on conclusion that complaint failed to allege cognizable violation of constitutional rights).

We similarly find that Thomas has failed to exhaust his administrative remedies as to any claims challenging the conditions of his confinement. As the defendants aptly note (*doc. 74* at 11), none of Thomas's grievances pertain to the conditions of his confinement. *See generally doc. 68-2*; *doc. 78-1*. Thomas's only exhaustion argument with regard to a conditions-of-confinement claim does not respond to the defendants' contention that his grievances did not challenge the conditions of his confinement. *See doc. 83* at 27. In fact, Thomas's argument seems to suggest that the conditions-of-confinement claim is best understood as part of his equal protection claim. *See id.* ("There would be no EP claim here if all Pennsylvania prisoners were equally subjected to the decrepit conditions that men or [sic] color endure in disproportionate numbers at SCI Huntingdon in a facility that cannot accommodate attorney conferences as DOC's other prisons do."). As previously noted, however, Thomas has failed to exhaust his administrative remedies as to his equal protection claim. Accordingly, since none of Thomas's grievances challenged the conditions of confinement, we find that Thomas has failed to exhaust his administrative remedies as to his conditions-of-confinement claim.

### B. The Claims Against Torma, Nicklow, and Smeal Are Barred by the Statute of Limitations.

*\*12* The defendants argue that Torma, Nicklow, and Smeal should be granted summary judgment because the claims against them are barred by the applicable statute of limitations. *Doc. 74* at 13–14. Thomas argues that the claims against Torma, Nicklow, and Smeal are not time barred because the defendants' conduct

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 81 of 106

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)
2019 WL 8013742

constitutes a continuing violation. *Doc. 83* at 32–33. Thomas explains that "[t]he discriminatory practices" that led to him being placed in SCI Huntingdon "not only put [him] there but also kept him there." *Id.* at 32. The defendants reply that this argument fails because "[i]n order for there to be a continuing wrong, there must be a wrong in the first place," and Thomas cannot establish that his rights were violated when he was first placed in SCI Huntingdon. *Doc. 86* at 4.

"A section 1983 claim is characterized as a personal-injury claim and thus is governed by the applicable state's statute of limitations for personal-injury claims." *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d Cir. 2010). Pennsylvania, the applicable state in this case, mandates a two-year statute of limitations for personal injury claims. 42 Pa.C.S.§ 5524(2). Thus, a § 1983 claim arising in Pennsylvania is subject to a two-year statute of limitations. *Fitzgerald v. Larson*, 769 F.2d 160, 162 (3d Cir. 1985).

A § 1983 cause of action " 'accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages.' " *Dique*, 603 F.3d at 185–86 (quoting *Wallace v. Kato*, 549 U.S. 384, 391 (2007)). In other words, the cause of action accrues "when the plaintiff has 'a complete and present cause of action,' that is, when 'the plaintiff can file suit and obtain relief.' " *Wallace*, 549 U.S. at 388 (citations omitted). Thus, "[u]nder federal law, a cause of action accrues ' "when the plaintiff knew or should have known of the injury upon which the action is based." ' " *Montanez v. Sec'y Pennsylvania Dep't of Corr.*, 773 F.3d 472, 480 (3d Cir. 2014) (quoting *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009)).

Under the continuing-violation doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Id.* at 481 (quoting *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)). "The doctrine's focus 'is on affirmative acts of the defendants.' " *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014) (quoting *Cowell*, 263 F.3d at 293). "[T]he continuing violation doctrine does not apply when the plaintiff '[was] aware of the injury at the time it occurred.' " *Montanez*, 773 F.3d at 481 (quoting

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003)).

To establish a continuing violation, a plaintiff must establish that all acts alleged to be part of the violation are part of a pattern of behavior. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165–66 (3d Cir. 2013) (noting that a plaintiff seeking to establish a continuing violation in an employment discrimination case "must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002))). "[S]uch acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.' " *Id.* at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). "In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is 'more than the occurrence of isolated or sporadic acts.' " *Cowell*, 263 F.3d at 292 (quoting *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995)). To determine whether the defendant's actions are isolated or sporadic, a court should consider both the "subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation" and the "frequency—whether the acts are recurring or more in the nature of isolated incidents." *Cowell*, 263 F.3d at 292.[12]

**\*13** Thomas was first assigned to SCI Huntingdon on August 5, 1992. *Doc. 68* ¶ 11; *doc. 77* ¶ 11.[13] Thus, because his initial assignment to the prison was significantly more than two years before the date on which he filed his original complaint in this case, Thomas's claims against Torma, Nicklow, and Smeal are time barred unless he can show that his claim is timely under the continuing violation doctrine.

We find that the continuing violation doctrine does not apply in this case because Thomas has not established that the defendants' acts were part of a continuing pattern of behavior. *See Mandel*, 706 F.3d at 165–66. Specifically, Thomas has not shown that Torma, Nicklow, and Smeal were involved in any way in the denial of his requests to transfer out of SCI Huntingdon. To the contrary, Thomas asserts in his brief in opposition to the defendants' motion for

summary judgment that "when an inmate asks to transfer out, local staff control the process." *Doc. 83* at 11. Local staff "decide whether to submit a formal request to the DOC central office, and if they disapprove of a specific individual, they can block his request without creating any record of it." *Id.* "Defendant Moore Smeal confirmed that local staff have wide discretion to cause or to prevent transfers of inmates into and out of the individual prisons in the DOC system for various reasons, often without generating any record." *Id.* at 11–12. Thomas also acknowledges that his requests to be transferred out of SCI Huntingdon "were never processed." *Id.* at 8. Thus, even assuming that Torma, Nicklow, and Smeal could be held liable for Thomas's initial placement at SCI Huntingdon, the claims against them are still time barred because Thomas has not shown that they were involved in any decisions to keep him at SCI Huntingdon and there is therefore no continuing violation. Accordingly, we find that Torma, Nicklow, and Smeal should all be granted summary judgment.

### C. Summary Judgment Should Be Denied as to Thomas's Access-to-Courts Claim.

In their third summary judgment argument, the defendants argue they should be granted summary judgment as to Thomas's access-to-courts claim because Thomas cannot establish an actual injury. *Doc. 74* at 14. Thomas's access-to-courts claim is based on his allegations that the defendants hindered his ability to litigate two of his own cases *pro se* and hindered his ability to testify in Camacho's case. *See doc. 21* ¶¶ 152–56. The defendants note that under *Lewis v. Casey*, 518 U.S. 343, 349 (1996),[14] "actual injury is the loss of, or inability to pursue, a nonfrivolous claim that relates to a challenge, direct or collateral, to an inmate's conviction or relates to a challenge to the conditions of [his] confinement." *Doc. 74* at 14–15. The defendants assert that one of the cases for which Thomas sought Sawicki's assistance concerned a claim of illegally denied parole, while the other case was based on a retaliation claim, neither one of which, according to the defendants, could establish actual injury under *Lewis. Id.* at 15. The defendants further argue that Thomas cannot establish actual injury as to his claims arising out of his attempts to testify in Camacho's case because he was "not injured by being unable to fully prepare to testify at a hearing in a civil

action filed by another inmate." *Id.* Thomas argues that the motion for summary judgment as to his access-to-courts claim should be denied because the defendants' "bald conclusion" that he cannot suffer actual injury under *Lewis* is not sufficient to carry their burden for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Doc. 83* at 37. The defendants reply that Thomas has not established how the litigation of his civil cases was inhibited, and thus summary judgment is proper. *Doc. 86* at 6.

**\*14** At the outset, we note that Thomas's access-to-courts claim arising out of his testimony in Camacho's case has already been dismissed. In our March 1, 2017 report and recommendation addressing the defendants' first motion to dismiss, we found that Thomas failed to state an access-to-courts claim upon which relief could be granted. *Doc. 13* at 38. Although we recommended that Thomas be given leave to amend his access-to-courts claim, we found that any amendment to his access-to-courts claim arising out of his failure to testify in Camacho's case would be futile, and accordingly recommended that his access-to-courts claim be dismissed with prejudice to the extent that it was based on his testimony in Camacho's case. *See id.* at 38, 44. Judge Brann adopted our report and recommendation in its entirety on July 10, 2017, thereby dismissing Thomas's access-to-courts claim to the extent that it was based on his inability to testify in Camacho's case. *See doc. 18* at 13. We accordingly will not address that aspect of Thomas's access-to-courts claim any further since it has already been dismissed.

As for the other bases for Thomas's access-to-courts claim—his *pro se* litigation in *Thomas v. Pa. Dep't of Corr.*, No. 3:13-CV-02661 (M.D. Pa. filed Oct. 29, 2013), and *Thomas v. Hileman*, No. CP-31-CV-1376-2015 (filed Dec. 8, 2014)—we turn our attention to the subject matter of Thomas's underlying cases because the defendants' argument is based on the assertion that neither case could give rise to an actual injury to Thomas's access to court under *Lewis. See doc. 74* at 15. In *Thomas v. DOC*, No. 3:13-CV-02661, Thomas alleged, *inter alia*, that he was wrongfully given a misconduct report and sanctioned with fifteen days of cell restriction and the loss of two custody levels and that he was wrongfully moved out of the honor block at SCI Huntingdon on two occasions. *Doc. 68-5* at 3–4. In *Thomas v. Hileman*, CP-31-

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

CV-1376-2015, Thomas brought claims of retaliation against prison officials. *See doc. 68-6* at 4.

"Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008) (quoting *Lewis*, 518 U.S. at 346). "An inmate's right of access to the courts encompasses the right to contact visits with his or her attorney." *Lane v. Tavares*, No. 3:14-CV-00991, 2015 WL 435003, at *8 (M.D. Pa. Feb. 3, 2015) (quoting *Young v. Larkin*, 871 F. Supp. 772, 783 (M.D. Pa. 1994)). "Contact visitation with an attorney," however, "is merely one aspect of the broad and fundamental right of meaningful access to the courts.' " *Id.* (quoting *Casey*, 4 F.3d at 1523). "Moreover, this right does not 'entail unfettered or totally unrestricted visitation with counsel, for it must yield to legitimate penological interests.' " *Id.* (quoting *Moore v. Lehman*, 940 F. Supp. 704, 708 (M.D. Pa. 1996)). "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered 'an actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *Monroe*, 536 F.3d at 205 (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).

"[P]risoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement." *Monroe*, 536 F.3d at 205 (citing *Lewis*, 518 U.S. at 354–55). In *Lewis*, the Supreme Court analyzed this principle as it was applied in an earlier case, *Bounds v. Smith*, 430 U.S. 817 (1977). According to the *Lewis* Court:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates

> need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

**\*15** *Lewis*, 518 U.S. at 355 (emphasis in original). "Although *Casey* 'limits the types of cases in which the prison must provide affirmative assistance, it does not give free reign to prison authorities to interfere with and impede a prisoner's pursuit of other legal actions.' " *Sanders v. Rose*, 576 F. App'x 91, 94 (3d Cir. 2014) (per curiam) (quoting *Cohen v. Longshore*, 621 F.3d 1311, 1317 (10th Cir. 2010)); *accord Prater v. City of Philadelphia*, 542 F. App'x 135, 138 (3d Cir. 2013) (per curiam) (quoting *Cohen*, 621 F.3d at 1317).

In this case, the defendants are deemed to have admitted a number of facts [15] that could establish that they interfered with Thomas's ability to visit with his attorney. *See doc. 21* ¶¶ 81, 83–84, 86, 108–11. Most notably, Duvall and CO Ritchie made Thomas and Sawicki meet in the middle of the visiting room and then refused to carry papers back and forth between them after Smith placed them on either side of a glass wall. *Id.* ¶¶ 81, 83–84. The defendants also required Thomas and Sawicki to meet in a non-contact booth with inoperative phones, causing them to have to shout and allowing other inmates to hear their conversation. *Id.* ¶¶ 109–10. This is exactly the sort of interference that the Third Circuit contemplated in *Sanders* and *Prater*. *See Prater*, 542 F. App'x at 137 (noting plaintiff's allegations that his attorney's name was removed from a jail access phone list and that he was not allowed to meet with his attorney for over a year). Since Thomas's access-to-courts claim is based on intentional interference with his ability to litigate a claim as contemplated in *Sanders* and *Prater*, rather than a denial of affirmative assistance, his access-to-courts claim is not barred by *Casey*. Accordingly, the defendants' motion for summary judgment should be denied as to Thomas's access-to-courts claim since their only argument for summary judgment was that

Case 3:18-cv-00121-JFS-PJC    Document 148-1    Filed 02/20/25    Page 84 of 106

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

the claim was categorically barred under *Casey*. *See doc. 74* at 14–15.

### D. Summary Judgment Should Be Denied as to Thomas's First Amendment Freedom of Speech and Freedom of Association Claims.

In their fourth summary judgment argument, the defendants argue they should be granted summary judgment as to Thomas's First Amendment freedom of speech and freedom of association claims because the DOC "has legitimate penological interests in its visiting room policy and procedures." *Doc. 74* at 15–17. Thomas inaccurately responds that the defendants do not address his free speech and free association claims in their brief. *Doc. 83* at 38. Nevertheless, Thomas also argues that the defendants fail to articulate a legitimate penological interest that would justify the alleged violations of his constitutional rights. *See doc. 83* at 39.

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. 78, 89 (1987). "[F]our factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting *Turner*, 482 U.S. at 89–91).

**\*16** Under *Turner*, the burden is on the prisoner to disprove the validity of the regulation or decision. *Id.* "This burden is 'heavy' because plaintiffs must overcome the presumption that prison officials acted within their 'broad discretion.' " *Monroe*, 536 F.3d at 207 (citing *Shaw v. Murphy*, 532 U.S. 223, 232 (2001)). Although the prisoner bears the ultimate burden of proving that the prison's policy violated his constitutional rights, the prison bears the burden "to demonstrate that a rational connection exists between the policy and a legitimate penological interest." *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009)

(citing *Monroe*, 536 F.3d at 207). "This burden is slight, and in certain instances, the connection may be a matter of common sense." *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012) (citing *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002)). Although the burden is slight, the prison's showing "must 'amount to more than a conclusory assertion.' " *Wolf*, 297 F.3d at 308 (internal alterations omitted) (quoting *Waterman v. Farmer*, 183 F.3d 208, 217–18 n.9 (3d Cir. 1999)). "Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement." *Id.* If the government meets its burden, the court considers the other three *Turner* factors, and analysis of those factors is generally fact intensive. *Id.* at 310.

In this case, the defendants have not met their burden to show a rational connection between their actions and a legitimate penological interest. The defendants assert in conclusory fashion that "the DOC has legitimate penological interests – safety and security – for its visiting policies and procedures," *see doc. 74* at 14, but do not provide any arguments or evidence to establish that the defendants' actions were rationally connected to safety and security. Instead of providing evidence to establish a rational connection, the defendants simply quote Judge Caputo's decision denying preliminary injunctive relief in *Lane*, 2015 WL 435003, at \*11. *See doc. 74* at 16. The defendants' reliance on *Lane* ignores the fact that the defendants in that case "satisfied their slight burden by presenting evidence that the policy at issue [was] rationally connected" to the legitimate penological interests of safety, security, preventing escapes, and preventing the introduction of contraband into the prison.[16] *Lane*, 2015 WL 435003, at \*9. The defendants point to no such evidence in this case and instead simply assume that the court will rely on Judge Caputo's decision in *Lane*. *See doc. 74* at 16–17. Furthermore, the defendants' argument that the prison's visiting policies and procedures are based on legitimate penological interests ignores the numerous facts from which a jury could conclude that the defendants interfered with Thomas's ability to visit with his attorney. *See doc. 21* ¶¶ 81, 83–84, 86, 108–11. Because such interference could be found to violate the DOC's established policies and procedures, the defendants' argument that the policies and procedures are based on legitimate penological interests is insufficient to establish a rational connection. To establish a rational

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

connection, the defendants would need to show that the defendants' actual actions were rationally connected to a legitimate penological interest, since such actions were outside the DOC's established policies and procedures. It is not enough to say that the policies and procedures are rationally connected to legitimate penological interests when Thomas plausibly alleges that the defendants' conduct violated those policies and procedures. Accordingly, we find that the defendants' motion for summary judgment should be denied as to Thomas's First Amendment freedom of speech and freedom of association claims. [17]

### E. Duvall Should Not Be Granted Summary Judgment.

*17 The defendants argue that Duvall should be granted summary judgment as to all claims against her because her actions were directed towards Sawicki rather than Thomas. *Doc. 74* at 23. Here, again, the defendants rely on a decision from Judge Caputo in *Lane*, this time for the proposition that "*Lewis* requires that Plaintiff demonstrate injury to *him*, not his attorney." *Id.* (citing *Lane v. Tavares*, No. 3:14-CV-00991, 2019 WL 1620285, at *6 (M.D. Pa. Apr. 16, 2019)). Thomas asserts that reliance on *Lane* is improper in this case because, unlike Thomas, Lane "did not show sufficient evidence of setbacks in legal proceedings owing to interference with access to counsel." *Doc. 83* at 44.

We agree with Thomas's contention that *Lane* is distinguishable on its facts. Unlike Thomas, Lane's access-to-courts claims were based almost entirely on his inability to testify as a witness in another inmate's federal hearing. *See Lane v. Tavares*, No. 3:14-CV-00991, at *58 (M.D. Pa. Feb. 22, 2019) ("Other than his inability to testify in another inmate's hearing, Lane has not established that his access to the courts was affected in any way by the Commonwealth Defendants' conduct."), *report and recommendation adopted in relevant part*, No. 3:14-CV-00991 (M.D. Pa. Apr. 16, 2019). Here, by contrast, Thomas plausibly asserts that his ability to litigate his own *pro se* cases in *Thomas v. DOC* and *Thomas v. Hileman* was affected by the defendants' conduct. *Doc. 21* ¶¶ 59–69. The defendants' reliance on *Lane* is therefore misplaced.

We also reject the defendants' assertion that Duvall should be granted summary judgment because her actions were directed towards Sawicki rather than Thomas. The defendants have admitted factual allegations from which a jury could conclude that Duvall interfered with Thomas's ability to meet with his attorney. *See, e.g., doc. 21* ¶¶ 83–84. Since Thomas plausibly alleges that such interference hampered his ability to litigate his other cases, we find that Duvall should not be granted summary judgment.

### F. The Defendants Are Not Entitled to Qualified Immunity.

We next address the defendants' argument that they are entitled to qualified immunity. [18] *See doc. 74* at 20–23. Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity operates to ensure that, before they are subjected to suit, government officials are on notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. Government officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *District of Columbia. v. Wesby,* 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first given the circumstances of

2019 WL 8013742

the case. *Pearson*, 555 U.S. at 236. Under Third Circuit precedent, the defendants have the burden to prove that they are entitled to qualified immunity at the summary judgment stage. *E.g.*, *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014) (noting that "the burden of persuasion at a summary judgment proceeding" is "on the party asserting the affirmative defense of qualified immunity"); *Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011) ("The burden of establishing qualified immunity falls to the official claiming it as a defense." (citing *Harlow*, 457 U.S. at 819)).

*\*18* In this case, we find that the defendants are not entitled to qualified immunity since they have the burden of persuasion as to that issue and have failed to sufficiently develop their argument. The defendants do not specify the right at issue or raise any argument as to why the right was not clearly established. Instead, the defendants merely assert that "[a] reasonable person in the position of each DOC Defendant would have believed they were properly following their employer's orders and enforcing DOC policy and would not understand their actions as being in clear violation of established law." *Doc. 74* at 22–23. [19] The defendants' vague argument effectively shifts the burden of proof to Thomas to both specify what right is at issue and state why the right was clearly established. This is contrary to Third Circuit precedent placing the burden of persuasion as to issues of qualified immunity on the defendant asserting the immunity. *See, e.g., Halsey*, 750 F.3d at 288; *Burns*, 642 F.3d at 176. Accordingly, we find that the defendants are not entitled to qualified immunity.

### G. Summary Judgment Should Be Denied as to Counts VII and VIII.

Finally, we note that the defendants do not raise any arguments for summary judgment as to Counts VII and VIII of Thomas's amended complaint. Accordingly, summary judgment should be denied as to those claims.

### VI. Recommendation.

For the foregoing reasons, we recommend that the defendants' motion for summary judgment be granted in part and denied in part. Specifically, we make the following recommendations and observations:

1. The motion for summary judgment should be granted as to Counts I and VI of Thomas's amended complaint.

2. The motion for summary judgment should be granted to the extent that the amended complaint attempts to state a claim challenging the conditions of Thomas's confinement.

3. The motion for summary judgment should be denied as to Counts II, III, IV, V, VII, and VIII of the amended complaint.

4. The motion for summary judgment should be granted as to all claims against Torma, Nicklow, and Smeal, and those defendants should be dismissed from the case.

Accordingly, if our recommendations were adopted the case would proceed on the following claims: (1) Thomas's claim that the SCI Huntingdon defendants violated his right of access to the courts (Count II); (2) Thomas's claim that the SCI Huntingdon defendants conspired to violate his right of access to the courts (Count III); (3) Thomas's claim that the SCI Huntingdon defendants violated his rights to privacy, freedom of speech, and freedom of association (Count IV); (4) Thomas's claim that the SCI Huntingdon defendants conspired to violate his rights to privacy, freedom of speech, and freedom of association (Count V); (5) Thomas's claim that Duvall, Wendle, Green, and Eckard conspired to deter him from testifying in federal court (Count VII); and (6) Thomas's claim that Wendle, Green, and Eckard neglected to prevent others from deterring him from testifying in federal court (Count VIII).

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or

a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**\*19** Submitted this <u>3rd</u> day of **October, 2019**.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 8013742

## Footnotes

1    We note that Thomas spelled the last name of Sergeant Ritchey and CO Ritchey as "Ritchie" in his original complaint and changed the spelling to "Ritchey" in his amended complaint. *See doc. 1 ¶¶ 5, 7; doc. 21 ¶¶ 5, 7*. Because the amended complaint is the currently operative complaint in this case, we will defer to the spelling that Thomas uses in his amended complaint throughout this opinion. Additionally, we note that CO Ritchey was identified in the original complaint as "I. Ritchie," while in the amended complaint he is identified as "Matthew Ritchey." *See doc. 1 ¶ 7; doc. 21 ¶ 7*. The defendants do not appear to raise any objection that "I. Ritchie" and "Matthew Ritchey" are different people, and we will accordingly accept the new name that Thomas uses to refer to CO Ritchey in his amended complaint.

2    Sawicki represents Thomas in the present case.

3    White is identified in the original complaint as "I.W.," but is identified as "Ivan White" in the amended complaint. *See doc. 1 ¶ 31; doc. 21 ¶ 87*. We will defer to Thomas's usage in the amended complaint and refer to White by his full name rather than his initials throughout this opinion.

4    Not all defendants were named in each count.

5    We will collectively refer to these defendants—Duvall, Sergeant Ritchey, Smith, Gill, Dixon, Wendle, Green, and Eckard—as "the SCI Huntingdon defendants" throughout the rest of this opinion.

6    Specifically, we find the defendants' responses to the factual allegations in paragraphs 37–39, 45, 59, 72, 74–76, 81, 83–84, 86–87, 90–91, 93–97, 100, 108–111, 114–115, 118–120, 122, 126, and 133–134 insufficient under Rule 8(b).

7    In their answer, the defendants "specifically den[y] that assignments of inmates are based upon race," but do not dispute Thomas's allegations that black inmates are 30% more likely to be placed in SCI Huntingdon and that Hispanic inmates are 7.5% more likely to be placed in SCI Huntingdon. *See doc. 41 ¶¶ 30–31.*

8    As the defendants correctly note, the second sentence of Paragraph 80, in which Thomas alleges that "Green and Dickson instructed Duvall and Matthew Ritchey not to permit Thomas to speak with Attorney Sawicki in a confidential contact setting," is a legal conclusion. *See doc. 21 ¶ 80; doc. 41 ¶ 80.* In the first sentence of that paragraph, however, Thomas asserts that "Duvall and Matthew Ritchey consulted by phone with Defendants Green, Dickson, and William Ritchey at the request of Attorney Sawicki," which is a factual allegation that the defendants had to either admit or deny. *See doc. 21 ¶ 80.* That factual allegation is accordingly deemed admitted for the defendants' failure to deny it.

9    The defendants' argument as to Thomas's conditions-of-confinement claim is based on six paragraphs in Thomas's amended complaint in which he details the "antiquated and deplorable conditions" inside SCI Huntingdon. *See doc. 21 ¶¶ 21–26.* Thomas alleges that SCI Huntingdon continues to operate coal-burning furnaces or incinerators that do not comply with clean-air standards; that SCI Huntingdon has consistent problems with mold and vermin; that SCI Huntingdon's ventilation and heating systems are "outdated, inadequate, and poorly maintained"; that SCI Huntingdon "lacks facilities that are standard at DOC's other prisons, such as an infirmary"; and that SCI Huntingdon's "gymnasium and chapel are accessible only by steep, winding staircases that render those areas inaccessible for inmates who are injured or permanently disabled." *Id.* It is unclear from Thomas's amended complaint whether he actually raises any claims about these conditions, as he does not mention anything regarding the conditions of his confinement other than the lack of facilities available for attorney-client conferences in the eight counts that he raises. *See id.* at 36–43. Moreover, as Thomas notes in his response to the defendants' exhaustion argument, "[t]his litigation is not about 'coal dust.' " *Doc. 83* at 27. Nevertheless, the defendants do not argue that Thomas did not raise a conditions-of-confinement claim and instead argue that such a claim was unexhausted. We will accordingly confine our analysis of Thomas's conditions-of-confinement claim—to the extent that such a claim exists—to the issue of whether he exhausted his administrative remedies.

10    Thomas also asserts that grievance number 620570, which he initially filed on April 5, 2016, is relevant to his claimed injuries in this case. *See doc. 77 ¶ 7.* That grievance, however, concerned an attorney-client conference that he attempted to have on March 31, 2016, which was after the date on which he filed the original complaint in this case, March 16, 2016. *See doc. 68-2* at 68–78; *doc. 1.*

11    Thomas also argues that his grievances regarding the SCI Huntingdon defendants' interference with Sawicki's visits act to exhaust his equal protection claim because he "could not know about the larger systems of discrimination that caused him to be incarcerated in a manner that severely impeded his access to an attorney." *Doc. 83* at 31. Under Thomas's reading of the PLRA's

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 8013742

exhaustion requirement, an inmate can grieve a series of discrete events and then, much later, allege the existence of some overarching policy that purportedly explained all the discrete events, and at that point the grieving of the discrete events is understood to exhaust administrative remedies as to the overarching policy. The consequence of this argument would be that an inmate would *never* have to exhaust his administrative remedies as to any claim that alleged the existence of a policy since exhaustion of any actions that purportedly followed from the policy would act to exhaust a claim as to the policy as a whole, no matter how attenuated the connection between the action and the policy. Even rudimentary examples illustrate the absurdity of such an argument. An inmate could have a book confiscated as contraband, grieve the confiscation, and then years later file suit alleging that the prison had a policy of systematically denying educational opportunities on the basis of race, and—according to Thomas's reading of the exhaustion requirement—his grieving of the confiscation of the book would be sufficient to exhaust his administrative remedies as to his claim alleging the existence of the policy, so long as he said in his complaint that they confiscated the book because of the policy. Thomas's reading of the PLRA's exhaustion requirement is unpersuasive and does not alter our conclusion that Thomas failed to exhaust his administrative remedies as to his equal protection claim.

12    *Cowell* also listed a third factor that courts should consider, the "degree of permanence," but the Third Circuit has since recognized that this factor does not need to be considered. *See Mandel*, 706 F.3d at 166 ("It is clear that there is no longer a permanency requirement under the continuing violation doctrine...."); *see also Cibula v. Fox*, 570 F. App'x 129, 136 n.7 (3d Cir. 2014) (noting that the degree of permanence factor was eliminated by the Third Circuit's holding in *Mandel*).

13    Thomas disputes Paragraph 11 of the defendants' statement of material facts "insofar as it distorts or misquotes the transcript" of his deposition, but does not dispute the factual assertion that he was first assigned to SCI Huntingdon on August 5, 1992. *See doc. 77* ¶ 11. Thomas also states in his brief in opposition to the defendants' motion for summary judgment that he was assigned to SCI Huntingdon on that date. *See doc. 83* at 8.

14    In this opinion, we cite both the Supreme Court's opinion in *Lewis v. Casey* and the Ninth Circuit's opinion in *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993), which concerned an earlier appeal in the same litigation. For the sake of clarity, we will cite the Supreme Court's opinion using the short form *Lewis*, 518 U.S. at 343, and we will cite the Ninth Circuit's opinion using the short form *Casey*, 4 F.3d at 1523.

15    See our above discussion in Section IV.

16    Specifically, the defendants in *Lane* presented testimony that contraband was often introduced via the visiting room of the prison and that allowing prisoners to have private visits could facilitate the introduction of contraband. *Lane*, 2015 WL 435003, at *9. The defendants also presented evidence that contact visits with attorneys could present a risk to the safety of prison staff and attorneys. *Id.*

17    We further note that the defendants have raised no arguments as to the privacy claim that Thomas raises in Count IV of his complaint. *See generally doc. 74*. Accordingly, summary judgment should also be denied as to that claim.

18    Because Thomas failed to exhaust his administrative remedies as to his equal protection claim, we will not address the defendants' argument that they are entitled to qualified immunity as to claims arising out of Thomas's placement at SCI Huntingdon.

**Thomas v. Duvall, Not Reported in Fed. Supp. (2019)**

2019 WL 8013742

19    To the extent that the defendants state what right is at issue at all, it is only in the context of Thomas's placement at SCI Huntingdon, not in the context of Thomas's other claims. *See doc. 74* at 6–7 ("Qualified Immunity would bar liability because the proposition that individual prisons must mirror the racial percentages in the DOC as a whole has *never* been announced as a constitutional principle.").

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 6769324

2019 WL 6769324
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Angel Luis THOMAS, Plaintiff,

v.

Angela R. DUVALL, et al., Defendants.

No. 3:16-CV-00451
|
Filed 12/12/2019

**Attorneys and Law Firms**

Marianne Sawicki, Law Office of Marianne Sawicki
LLC, Huntingdon, PA, for Plaintiff.

Daniel J. Gallagher, Office of the Attorney General,
Harrisburg, PA, Maria G. Macus, Theron R. Perez,
Chief Counsel's Office Pennsylvania Department of
Corrections, Mechanicsburg, PA, for Defendants.


**ORDER**

Matthew W. Brann, United States District Judge

**\*1** Angel Luis Thomas filed this amended civil rights
complaint alleging that several prison staff members
violated his rights by taking certain actions to inhibit
his access to an attorney.[1] In October 2019, Chief
Magistrate Judge Susan E. Schwab issued a Report
and Recommendation recommending that this Court
grant in part and deny in part Defendants' motion for
summary judgment.[2] Specifically, Chief Magistrate
Judge Schwab recommends granting the motion with
respect to Thomas' First and Fourteenth Amendment
Equal Protection claim based upon Thomas' failure
to exhaust his administrative remedies, and granting
the motion as to any claims against Joanne Torma,
William Nicklow, and Shirley Moore Smeal based on
the applicable statute of limitations.[3] However, Chief
Magistrate Judge Schwab recommends denying the
remainder of the motion for summary judgment based
primarily on Defendants' failure to sufficiently brief
any of the relevant issues.[4]

Defendants filed timely objections to the Report and
Recommendation.[5] "If a party objects timely to a
magistrate judge's report and recommendation, the
district court must 'make a de novo determination
of those portions of the report or specified proposed
findings or recommendations to which objection is
made.' "[6] Regardless of whether timely objections are
made, district courts may accept, reject, or modify—
in whole or in part—the magistrate judge's findings
or recommendations.[7] After reviewing the record de
novo, the Court finds no error in Chief Magistrate
Judge Schwab's conclusions that Defendants' motion
for summary judgment should, in large part, be
denied.[8]

Although the Court need not comment to any great
extent on the thorough Report and Recommendation,
some objections require a brief response—either
because the arguments were not addressed in the
Report and Recommendation, or because Defendants
misunderstand the relevant case law. In their
objections, Defendants contend that Thomas' Access
to the Courts claim fails because it is barred by
*Lewis v. Casey*, 518 U.S. 343, 355 (1996), and
because no attorney entered an appearance on Thomas'
behalf in his previous cases and Thomas failed to
appeal the dismissal of his earlier federal civil rights
action.[9] First, *Lewis* is inapplicable as, in that case,
the United States Supreme Court held that prisons
must affirmatively assist inmates only in certain
circumstances.[10] Nothing in *Lewis*, however, gives
carte blanche to prisons to interfere with a prisoner's
access to an attorney.[11] Second, the Court has found
no authority to support Defendants' assertion that
Thomas suffered no harm because an attorney never
entered an appearance on his behalf or because he
never filed an appeal of the dismissal of his earlier
federal case.[12]

**\*2** With regard to Defendants' assertion that they
are entitled to qualified immunity, the Court concludes
that, at this stage of the proceedings, they are not.
First, although Defendants correctly note that the
United States Supreme Court has never held that the
intra-corporate conspiracy doctrine does not apply to
constitutional claims[13], the United States Court of
Appeals for the Third Circuit more than four decades

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)

2019 WL 6769324

ago first held that such a defense does *not* apply to civil rights actions, particularly when an individual is not acting in his or her official capacity. [14] Moreover, Thomas has plausibly alleged that Defendants' actions violated its governing policies that require prison officials to honor attorney-client confidentiality, and which require that "[p]ersonnel will not be stationed in such a manner as to be able to overhear normal conversation." [15] Such a violation of the prison's own policies indicates that qualified immunity is not applicable. [16]

Consequently, **IT IS HEREBY ORDERED** that:

1. Chief Magistrate Judge Susan E. Schwab's Report and Recommendation (Doc. 87) is **ADOPTED**;

2. Defendants' motion for summary judgment (Doc. 67) is **GRANTED** in part and **DENIED** in part;

3. Thomas' Equal Protection claim (Count One) as well as all claims against Torma, Nicklow, and Smeal, are dismissed from this action. All remaining claims shall proceed; and

4. A telephonic status conference shall be scheduled shortly by separate Order.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6769324

## Footnotes

1    Doc. 21.

2    Doc. 87.

3    *Id.* at 26-38.

4    *Id.* at 38-51.

5    Docs. 89, 91.

6    *Equal Emp't Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)).

7    28 U.S.C. § 636(b)(1); Local Rule 72.31.

8    [missing]

9    Doc. 91 at 4-5.

10   *Lewis*, 518 U.S. at 355.

11   *Sanders v. Rose*, 576 F. App'x 91, 94 (3d Cir. 2014).

12   Notably, Thomas' failure to appeal would seem irrelevant to his current claim. Thomas' earlier civil case was dismissed because his claims were barred by the statute of limitations and because he failed to exhaust his administrative remedies. *Thomas v. Pa. Dep't of Corrs.*, 3:13-CV-02661 (M.D. Pa., Doc. 50). Both are issues that would conceivably have been prevented by competent counsel, and which would not have been rectified by any appeal. Rather, under those circumstances, an appeal would have been frivolous.

Thomas v. Duvall, Not Reported in Fed. Supp. (2019)
2019 WL 6769324

13    *See Ziglar v. Abassi,* 137 S. Ct. 1843, 1868 (2017).

14    *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1256-59 & n. 121 (3d Cir. 1978) (en banc), *vacated on other grounds,* 442 U.S. 366 (1979); *Robison v. Canterbury Village, Inc.,* 848 F.2d 424, 431 (3d Cir. 1988). *See United States v. Basroon,* 38 F. App'x 772, 781 (3d Cir. 2002) ("While the intra-corporate conspiracy doctrine has been applied by some courts to civil rights complaints brought pursuant to 42 U.S.C. [§] 1985, this court has specifically rejected the doctrine, even in the civil context").

15    DC-ADM 812 at p. 2-3. *See also* 37 Pa. Code § 93.3(c)(1) (same).

16    *See Hope v. Pelzer,* 536 U.S. 730, 743-44 (2002) (noting violation of regulations governing conduct of prison officials is relevant to determine whether prisoner's constitutional right was clearly established); *Young v. Martin,* 801 F.3d 172, 182 (3d Cir. 2015) (same).

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

10

Westport Insurance Corp. v. Stevens & Lee, P.C., Not Reported in Fed. Supp. (2016)

2016 WL 9775023

2016 WL 9775023
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

WESTPORT INSURANCE CORP.
v.
STEVENS & LEE, P.C. William W. Uchimoto

CIVIL ACTION NO. 2:16-cv-937
|
Signed 06/30/2016

**Attorneys and Law Firms**

Elit R. Felix, II, Margolis Edelstein, Philadelphia, PA, Robert P. Conlon, Ryan J. Rodman, Walker Wilcox Matousek LLP, Chicago, IL, for Westport Insurance Corp.

Ashley Lauren Turner, Joann M. Lytle, McCarter & English LLP, Philadelphia, PA, for Stevens & Lee, P.C. William W. Uchimoto.

William W. Uchimoto, Berwyn, PA, pro se.

ORDER

Legrome D. Davis, District Judge

*1  AND NOW, this 30th day of June 2016, upon consideration of Plaintiff Westport Insurance Corp.'s ("Westport") Motion to Dismiss Counts II & III of Defendant Stevens & Lee's ("S&L") counterclaim (Doc. No. 17), S&L's response in opposition (Doc. No. 21), Westport's motion to strike certain paragraphs and affirmative defenses of S&L's answer (Doc. No. 19), S&L's response in opposition (Doc. No. 22), Westport's reply in further support of its motion against S&L (Doc. No. 31), S&L's surreply in further opposition (Doc. No. 39), Westport's motion to strike certain paragraphs and affirmative defenses of Defendant Uchimoto's ("Uchimoto") answer (Doc. No. 20), Uchimoto's response in opposition (Doc. No. 23), Westport's reply in further support of its motion against Uchimoto (Doc. No. 32), and Uchimoto's surreply in further opposition (Doc. No. 40), it is hereby ORDERED that Westport's motion to dismiss is GRANTED IN PART, DENIED IN PART. It is

further ORDERED that Westport's motions to strike are DENIED in their entirety.

I. Background

Westport initiated this action on February 29, 2016, seeking rescission of the insurance contract between Westport and the law firm of S&L, as well as a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, that Westport has no duty to defend or indemnify S&L or Uchimoto. (Compl. ¶¶ 1–2, Doc. No. 1.) As alleged in the complaint, Westport issued an insurance policy to S&L, which included an exclusion for:

> any WRONGFUL ACT occurring prior to the effective date of the first lawyers professional liability policy issued by the Company to the NAMED INSURED ... if the INSURED at the effective date of the first lawyers professional liability policy issued by the Company to the NAMED INSURED knew or could have reasonably foreseen that such WRONGFUL ACT might be expected to be the basis of a CLAIM ....

(Compl. ¶¶ 9–11.) As part of the insurance application process for the period between December 12, 2012 to December 12, 2013, Westport required S&L to complete a Securities Supplement in addition to the renewal application. (Compl. ¶ 17.) One question on the supplement asked whether any of S&L's securities or securities-related clients had any claim or allegation of fraud, negligence, or breach of duty asserted against it. (Compl. ¶ 19.) In its answer dated "December 12, 2009,"[1] S&L did not indicate that any of its securities related clients had any claim or allegation of fraud, negligence, or breach of duty asserted against it. (Compl. ¶ 20.)

Previously, on October 18, 2011, a lawsuit was filed in the Middle District of Tennessee against AgFeed,

one of S&L's largest clients in terms of gross income. (Compl. ¶¶ 12, 21.) The lawsuit alleges that, between March 16, 2009 and August 2, 2011, AgFeed "made materially false and misleading statements regarding the company's financial health ... that caused its stock to trade at artificially inflated prices." (Compl. ¶¶ 12–13.) According to the complaint against AgFeed, these misrepresentations became apparent on August 2, 2011. (Compl. ¶ 14.)

**\*2** Stemming from the Middle District of Tennessee lawsuit, the AgFeed Liquidating Trust ("Trust") filed an adversary proceeding in the U.S. Bankruptcy Court for the District of Delaware against S&L, Uchimoto, and Buchanan Ingersoll & Rooney, PC ("Buchanan Ingersoll")[2] on July 15, 2015.[3] The Trust alleges, among other allegations, that Buchanan Ingersoll and Uchimoto were aware that AgFeed's published financial numbers might be inaccurate, and in some instances were intentionally false, as part of a strategy by AgFeed's management to inflate company earnings and stock price. (See Compl. ¶¶ 29–32.) The Trust further alleges that S&L, which became AgFeed's outside general counsel in early 2010, and Uchimoto were aware that AgFeed continued to receive information that clearly demonstrated that AgFeed could not affirm the accuracy of its financial reports. (Compl. ¶ 33.)

As a result of S&L's alleged failure to identify AgFeed as a client that has had an allegation of fraud, negligence, or breach of duty asserted against it, Westport now seeks rescission of the insurance policy and a judgment declaring that Westport has no duty to defend or indemnify S&L. (See Compl. ¶¶ 35–55.) Uchimoto filed an answer with affirmative defenses in response to Westport's present complaint. (See Def. Uchimoto's Answer, Doc. No. 11.) S&L also filed an answer with affirmative defenses, but included a three count counterclaim.[4] Specifically, S&L requests: a declaration that Westport is not entitled to rescind the policy (Count I); for damages resulting from Westport's breach of contract (Count II), and; for compensatory and punitive damages resulting from Westport's bad faith denial of coverage (Count III). (See S&L's Countercl. ¶¶ 34–70, Doc. No. 9.) S&L alleges that it timely notified Westport of the Trust's lawsuit and Westport agreed to defend S&L subject to a reservation of rights. (S&L's Countercl. ¶¶ 23–

24.) Westport also agreed to S&L's chosen independent counsel (S&L's Countercl. ¶ 25.) However, despite a tolling agreement and S&L's "belief that Westport was conducting an investigation into [S&L's] coverage under the Policy, Westport filed the instant declaratory judgment action on February 29, 2016 without requesting an extension of the tolling agreement or providing any notice to [S&L] that its investigation was complete." (S&L's Countercl. ¶ 26.) S&L alleges that Westport did not provide it with any information regarding the outcome of the investigation. (S&L's Countercl. ¶ 27.) This sequence of events, as alleged, has prejudiced S&L's ability to defend itself against the Trust's actions and Westport's "improper allegations of fraudulent conduct by [S&L] has resulted, and will in the future result, in harm to [S&L's] relationships with current and prospective clients." (S&L's Countercl. ¶¶ 32–33.)

Westport presently moves to dismiss the breach of contract and bad faith claim from S&L's counterclaim. This issue is now ripe and, for the reasons below, we shall dismiss S&L's bad faith claim (S&L Countercl. ¶¶ 56–70), but shall deny Westport's motion to dismiss S&L's breach of contract claim.

Westport also moves to strike numerous paragraphs and affirmative defenses from both S&L's and Uchimoto's answers. After exhaustive briefing on this issue, we shall deny Westport's motions to strike in their entirety for the reasons listed below.

## II. Westport's Motion to Dismiss

### a. Legal Standard

**\*3** When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court conducts a two-part analysis. Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). "First, the factual and legal elements of a claim should be separated." Id. The court will disregard any legal conclusions but accept all well-pleaded factual allegations as true for purposes of the motion. Id. at 210–11 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The court must interpret all allegations in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. PG Publ'g Co. v. Aichele, 705 F.3d 91,

2016 WL 9775023

97 (3d Cir. 2013). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Next, the court determines whether the factual matter in the complaint "state[s] a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[A] complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Rather, a plaintiff need only allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element" of their claim. Id. at 234 (citing Twombly, 550 U.S. at 556).

### b. Analysis

#### i. S&L's Bad Faith Counterclaim

Westport argues that S&L's claim for bad faith under 42 Pa. Cons. Stat. § 8371[5] should be dismissed because it "contains only unsupported, conclusory statements" without supporting facts. (Westport's Mot. to Dismiss 1, Doc. No. 17.) To establish bad faith, the plaintiff must allege facts that demonstrate: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)). An insurer's conduct need not be fraudulent to constitute bad faith; however, "mere negligence or bad judgment is not bad faith." Terletsky, 649 A.2d at 688. The plaintiff must instead demonstrate that the insurer has breached its duty "through some motive of self-interest or ill-will." Id. "[A]n insurer my defeat a claim of bad faith by showing that it had a reasonable basis for its actions." Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 179 (3d Cir. 2011); see also Victoria Ins. Co. v. Ren, No. CIV.A. 08-517, 2008 WL 2371850, at

*2 (E.D. Pa. June 9, 2008) ("As long as the insurer's positions are reasonable, they cannot support a claim of bad faith." (citations omitted)). "Even questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 523 (3d Cir. 2012) (citing J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 368 (3d Cir. 2004)).

The core of S&L's bad faith claim stems from the allegation that Westport filed the declaratory judgment action without informing S&L of the results of its investigation and did not extend the tolling agreement. (S&L's Countercl. ¶ 69.) However, S&L fails to allege sufficient facts to indicate bad faith. As Westport identifies, "[w]hile an insurance company has a duty to accord the interests of its insured the same consideration it gives its own interest, an insurer is not bound to submerge its own interest in order that the insured's interests be made paramount, and an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage." Hyde Athletic Indus., Inc. v. Cont'l Cas. Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997) (internal quotations and citations omitted); see also Post, 691 F.3d at 524 ("[A]ggressive protection of an insurer's interests is not bad faith." (citations omitted)). "[I]t is ... plain that an insurer does not act in bad faith merely by initiating a declaratory judgment action." Victoria Ins. Co., 2008 WL 2371850, at *2 (collecting cases). Without deciding the merits of Westport's claim against S&L, we find that Westport's filing of the declaratory judgment action was not unreasonable. Consequently, S&L's claim for bad faith must be dismissed.

#### ii. S&L's Breach of Contract Counterclaim

**\*4** S&L's breach of contract counterclaim alleges that Westport has breached and continues to breach its obligations by refusing to pay expenses incurred in defending against the Trust's lawsuit and by refusing to indemnify it from any amounts to be paid in the Trust's lawsuit. (S&L's Countercl. ¶¶ 50–51.) In its brief argument to dismiss this count, Westport argues that S&L has failed to allege sufficient facts to support its claim. (Westport's Mot. to Dismiss 11.)

Westport Insurance Corp. v. Stevens & Lee, P.C., Not Reported in Fed. Supp. (2016)

2016 WL 9775023

To establish a breach of contract under Pennsylvania law, a plaintiff must show: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. Omicron Sys. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004). As is relevant towards this particular case, "[a]n insurer may not justifiably refuse to defend a claim against its insured unless it is clear from an examination of the allegations in the complaint and the language of the policy that the claim does not potentially come within the coverage of the policy. In making this determination, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." Post, 691 F.3d at 517 (internal quotations and citations omitted).

Accepting S&L's factual allegations as true for purposes of this motion, we find that S&L has alleged sufficient facts to state a claim for breach of contract. Both S&L and Westport acknowledge there was a contract, and S&L directly alleges that there have been resultant damages. (See S&L Countercl. ¶¶ 32–33, 53–55.) As to the second element, S&L adequately alleges that Westport has "denied any contractual obligations to pay such Loss" and has refused to indemnify S&L. (S&L Countercl. ¶¶ 6, 50–51.) Consequently, Westport's motion to dismiss S&L's breach of contract claim is denied.

III. Westport's Motion to Strike

a. Legal Standard

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002). "Although '[a] court possesses considerable discretion in disposing

of a motion to strike under Rule 12(f),' such motions are 'not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.' " Ford-Greene v. NHS, Inc., 106 F. Supp. 3d 590, 615 (E.D. Pa. 2015) (quoting River Road Dev. Corp. v. Carlson Corp., No. Civ.A. 89–7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990)). "Striking a pleading or a portion of a pleading 'is a drastic remedy to be resorted to only when required for the purposes of justice.' " Id. (quoting DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007)).

b. Analysis

Westport argues that we should strike numerous paragraphs and affirmative defenses presented in both S&L and Uchimoto's answers. (Westport's motions to strike, Doc. Nos. 19 & 20.) After reviewing the pleadings at issue, Westport's motion is denied.[6] Westport has not adequately demonstrated how it is prejudiced by S&L's and Uchimoto's answers and affirmative defenses. See Great West Life Assur. Co. v. Levithan, 834 F. Supp. 858, 864 (E.D. Pa. 1993) ("In order to succeed on a motion to strike, the moving party must show that the allegations being challenged are so unrelated to the plaintiff's claims as to be unworthy of any consideration as a defense and that the moving party is prejudiced by the presence of the allegations in the pleading." (citations omitted)).

IV. Conclusion

**\*5** For the reasons discussed above, Westport's motion to dismiss is GRANTED IN PART, DENIED IN PART. S&L's bad faith counterclaim (¶¶ 56–70) is dismissed. Westport's motion to dismiss is otherwise DENIED. Westport's motions to strike are DENIED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 9775023

Westport Insurance Corp. v. Stevens & Lee, P.C., Not Reported in Fed. Supp. (2016)

2016 WL 9775023

## Footnotes

1    In context, it would appear as though this date is a typo. The complaint later provides that S&L completed the Securities Supplement in December 2012. (Compl. ¶ 36.) This distinction is not material to the present motions.

2    Uchimoto practiced law as a partner with Buchanan Ingersoll from approximately 2008 until January 2010, when he became a partner at S&L. (Compl. ¶ 28.) The law firm of Buchanan Ingersoll is not a party to the present action.

3    According to the present complaint, Westport had been defending S&L and Uchimoto in the Delaware bankruptcy court under a reservation of rights. (Compl. ¶ 2.)

4    S&L's counterclaim against Westport stems from the same factual scenario that is detailed in Westport's complaint. Although additional facts are provided in S&L's counterclaim regarding a tolling agreement between S&L and Westport, we shall only provide the additional facts that are relevant towards the present motions.

5    The statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of the interest plus 3%.

> (2) Award punitive damages against the insurer.

> (3) Assess court costs and attorney fees against the insurer.

> 42 Pa. Cons. Stat. § 8371.

6    It is clear from the parties' filings that communication between the parties and/or counsel is lacking. This is disconcerting. At this early stage of litigation, the parties are specifically directed to the Policies and Procedures for this Court, which clearly state: "While Judge Davis believes that the active participation of the Court in the pretrial process is an important factor in the prompt, efficient and fair resolution of disputes, it is expected that counsel will bring matters to his attention only after they have been discussed with opposing counsel." (J. Davis's Practices and Procedures 1–2 ¶ 6, https://www.paed.uscourts.gov/documents/procedures/davpol.pdf.) Henceforth, it is fully expected that counsel will have professional dialogues amongst themselves as we all look to bring about the fair and just resolution of this matter.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

11

2024 WL 5353375
Only the Westlaw citation is currently available.
United States District Court, S.D.
Mississippi, Eastern Division.

CARLEY WIGLEY PLAINTIFF

v.

TIMOTHY POWE et al DEFENDANTS

CIVIL ACTION NO. 2:23-CV-46-TBM-RPM
|
Filed 03/14/2024

## ORDER DENYING MOTION TO STRIKE ANSWER TO COMPLAINT

ROBERT P. MYERS, JR. UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court is Plaintiff Carley Wigley's [12] Motion to Strike Answer to Complaint, asking this Court to strike Defendants Timothy Powe's and Greer Enterprises, LLC's Answer. Defendants filed a Response opposing the motion, arguing their Answer complies with the Rules and provides an admission or denial to each allegation in Plaintiff's Complaint. Doc. [16].

Plaintiff contends that Defendants' Answer is an "evasive objection" which fails to comply with Federal Rules of Civil Procedure 8(b)(2) and 8(d)(1). Doc. [12]. "A party responding to a pleading must: '(A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party.' " *United States v. $40,000.00 United States Currency*, No. 1:22-CV-99-LG-RPM, 2022 WL 17814208, at \*4 (S.D. Miss. Nov. 30, 2022) (quoting Fed. R. Civ. P. 8(b)(1)). "A denial must fairly respond to the substance of the allegation." Fed. R. Civ. P. 8(b)(2).

A party that intends in good faith to deny all the allegations of a pleading—including the jurisdictional grounds—may do so by a general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted.

Fed. R. Civ. P. 8(b)(3). Additionally, "[a] party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest." Fed. R. Civ. P. 8(b)(4).

Plaintiff takes issue with Defendants' responses to paragraphs (2), (3), (4), (5), (6), (7), (8), (10), (11), (13), (14), (16), (17), (18), (20), (21), (23), (24), (25), (26), (28), (29), (31), and (32) of Plaintiff's Complaint. Doc. [12] at 2–6. Specifically, Plaintiff takes issue with Defendants' objections that Plaintiff's allegations "contain impermissible legal conclusions and/or issues of law." *Id.* at 2. In their Answer, Defendants admitted to some of the allegations in Plaintiff's Complaint. Doc. [6] at 2–4. But for some of their denials, they state that no response is required due to the allegations containing impermissible legal conclusions and/or issues of law. *Id.* at 2 – 10. In each of those instances, Defendants add that, "[t]o the extent a response is required, Defendants deny any and all allegations against them. All other allegations not expressly admitted herein are denied in their entirety." *Id.*

The purpose of the Rule 8(b) pleading requirements is "to ensure that, in preparation for discovery and trial, the plaintiff knows which allegations the defendant admits and which he contests." *Keller v. El Dorado Oil & Gas, Inc.*, No. 1:22-CV-42-HSO-RPM, 2023 WL 7995747, at \*6 (S.D. Miss. Apr. 10, 2023) (quoting *Maldonado v. GEO Grp., Inc.*, No. SA-19-CV-1390-FB (HJB), 2020 WL 10357002, at \*3 (W.D. Tex. Dec. 16, 2020)).

[D]efendants are only obligated to give reasonable notice of the allegations that they seek to put in issue: Rule 8(b) also must be read in conjunction with Rule 8(e), which makes

CARLEY WIGLEY PLAINTIFF v. TIMOTHY POWE et al DEFENDANTS, Slip Copy (2024)

2024 WL 5353375

it clear that in framing an answer a party need not adhere to any technical forms of pleading. As long as the answer give reasonable notice of those allegations sought to be put in issue, the pleading will be effective as a denial.

**\*2** *Ball v. Life Ins. Co. of North America*, No. 3:17-CV-2366-L, 2017 WL 6621539, at \*2 (N.D. Tex. Dec. 28, 2017) (quoting *Bruce v. Anthem Ins. Cos., Inc.*, No. 3:15-CV-353-D, 2015 WL 1860002, at \*2 (N.D. Tex. Apr. 23, 2015)). It is true that "[l]egal conclusions, like factual allegations, require a response." *State of Texas v. United States*, No. 1:18-CV-68, 2019 WL 10984476, at \*2 (S.D. Tex. Jan. 9, 2019); *see, e.g., Kegerise v. Susquehanna Twp. Sch. Dist.*, 321 F.R.D. 121, 124 (M.D. Pa. 2016) (stating that Rule 8(b) requires a party to admit or deny an allegation or state that the party lacks sufficient knowledge or information to admit or deny, that "Rule 8(b) does not permit a party to refuse to respond to an allegation by asserting it is a conclusion of law," and that "[t]his rule applies even when a party has made 'a sweeping conclusion of law,' as Defendants put it, meaning an allegation purely of law"); *Gulf Restoration Network v. EPA*, No: 18-1632, 2018 WL 5297743, at \*2–3 (E.D. La. Oct. 25, 2018); *see also State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 278 (N.D. Ill. 2001) (noting that "legal conclusions are an integral part of the federal notice pleading regime" and require a response). Although Defendants' Answer stated no response was required as to the allegations containing legal conclusions and/or issues of law, Defendants went a step further by denying each of those allegations and putting them at issue. Doc. [6] at 2–10. Therefore, Defendants' Answer satisfied the purpose of and complied with the Rule 8(b) pleading requirements.

Furthermore, Plaintiff states that Defendants' Answer consists of complex, lengthy, and redundant objections. Doc. [12] at 2. She argues that Defendants failed to comply with the requirement that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "[A]s is true of an affirmative pleading, a defensive pleading should be simple, concise, and direct." *State of Texas v. United States*, No. 1:18-CV-68, 2019 WL 10984476, at \*2 (S.D. Tex. Jan. 9, 2019) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1261 (3d ed. 2018)). As previously stated, however, in framing an answer a party need not adhere to any technical forms of pleading; the pleading will be effective as a denial as long as the answer gives reasonable notice of those allegations sought to be put in issue. *Id.*

The substance of Defendants' admissions and denials spans a mere 10 pages compared to the 11 pages of allegations in Plaintiff's Complaint. Doc. [1] at 1–11; Doc. [6] at 1–10. And the length of Defendant's Answer is partly attributable to Defendants' need to respond to the numerous subparts contained in paragraphs (13), (14), (16), (18) (20), (28), and (29) of Plaintiff's Complaint. In sum, Defendants have adequately put Plaintiff on notice of what they admit or deny.[1] Accordingly, Plaintiff's [12] Motion to Strike Answer to Complaint is denied.

IT IS THEREFORE ORDERED AND ADJUDGED that Plaintiff Carley Wigley's [12] Motion to Strike Answer to Complaint is DENIED.

SO ORDERED, this the 14th day of March 2024.

**All Citations**

Slip Copy, 2024 WL 5353375

---

## Footnotes

1    Having addressed the merits of Plaintiff's motion, the Court notes that the motion was styled as "Motion to Strike Defendants' Answer and Memorandum in Support." Doc. [12]. As such, Plaintiff

**CARLEY WIGLEY PLAINTIFF v. TIMOTHY POWE et al DEFENDANTS, Slip Copy (2024)**

2024 WL 5353375

did not file a separate memorandum brief in support of her motion, which violates the Local Rules. *See* L.U.Civ.R. 7(b)(2)(B) ("Other than discovery motions under Rule 37, a motion may not exceed four pages, excluding exhibits, may contain only the grounds for the request and may not contain legal argument or citations to case law or other secondary authority."); L.U.Civ.R. 7(b)(4) ("At the time a motion is served, other than motions or applications that may be heard ex parte or those involving necessitous or urgent matters, counsel for movant must file a memorandum brief in support of the motion."). Defendants also did not file a separate memorandum brief in support of their response.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

12

2013 WL 1909578

2013 WL 1909578
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Jill WINCOVITCH, Plaintiff
v.
EDWIN A. ABRAHAMSEN
& ASSOCIATES, Defendant.

No. 3:12–CV–01846.
|
May 8, 2013.

**Attorneys and Law Firms**

Craig Thor Kimmel, Kimmel & Silverman, Ambler, PA, for Plaintiff.

Michael F. Ratchford, Edwin A. Abrahamsen & Associates, Scranton, PA, for Defendant.

**MEMORANDUM**

WILLIAM J. NEALON, District Judge.

*1 On September 14, 2012, Plaintiff, Jill Wincovitch, filed a complaint against Defendant, Edwin A. Abrahamsen & Associates, P.C., alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.,* in Defendant's attempts in April and May of 2012 to collect a debt Plaintiff allegedly incurred on a Capitol One credit card. (Doc. 1). Defendant filed an answer and affirmative defenses to the complaint on November 21, 2012. (Doc. 4). On December 12, 2012, Plaintiff filed a motion to strike pursuant to Federal Rule of Civil Procedure 12(f) and brief in support moving to strike four of the eleven affirmative defenses raised by Defendant. (Docs. 5 & 6). On January 7, 2013, Defendant filed a brief in opposition. (Doc. 8). Defendant's motion to strike is now ripe for disposition and will be denied.

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 12(f), a court may strike, either *sua sponte* or by motion by a party, "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED.R.CIV.P. 12(f). Rule 12(f) is the primary procedure for objecting to an insufficient defense. *U.S. v. Marisol, Inc.,* 725 F.Supp. 833, 836 (M.D.Pa.1989) (Nealon, J.), *citing* 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1380, p. 782 (1st ed.1969). "A court possesses considerable discretion in disposing of a motion to strike under Rule 12(f)." *Krisa v. Equitable Life Assur. Soc.,* 109 F.Supp.2d 316, 319 (M.D.Pa.2000) (Vanaskie, J.), *quoting North Perm Transfer, Inc. v. Victaulic Comp. of America,* 859 F.Supp. 154, 158 (E.D.Pa.1994). However, motions to strike are disfavored and should be denied unless the allegations have no possible relation to the controversy, may cause prejudice to one of the parties, or confuse the issues. *Hanselman v. Olsen,* 2006 U.S. Dist. LEXIS 1715, *4, 2006 WL 47655 (M.D.Pa.2006) (McClure, J.); *see also McInerney v. Moyer Lumber & Hardware, Inc.,* 244 F.Supp.2d 393, 402 (E.D.Pa.2002), *citing Harleysville Mut. Ins. Co. v. GE Reinsurance Corp.,* Civ. A. No. 02–171, 2002 U.S. Dist. LEXIS 8064, *16, 2002 WL 922148 (E.D.Pa. May 6, 2002). Courts have required that the moving party demonstrate prejudice before the court will strike a pleading. *See United States v. Viola,* 2003 U.S. Dist. LEXIS 11692, 11699 (E.D.Pa.2003); *and see* 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1381, p. 94 n. 34 (3d ed. Supp.2012) (listing district court cases requiring a showing of prejudice). Striking a pleading is a drastic remedy and should be sparingly used by the courts. *Krisa,* 109 F.Supp.2d at 319; *North Penn Transfer, Inc.,* 859 F.Supp. at 158.

**DISCUSSION**

The following affirmative defenses are in question:

8. Defendant did not continuously call the Plaintiff.

9. Defendant did not intend to annoy, harass or abuse the Plaintiff.

10. Plaintiff is liable to the Defendant for all the Defendant's costs and attorneys' fees incurred in defending this within meritless lawsuit.

*2 11. Plaintiff has brought the within action in bad faith is liable for the Defendant's attorneys' fees pursuant to § 813(a)(3). (sic)

(Doc. 4, p. 4).

Wincovitch v. Edwin A. Abrahamsen & Associates, Not Reported in F.Supp.2d (2013)

2013 WL 1909578

Plaintiff argues that affirmative defenses 8 and 9 are mere denials of the allegations of the complaint and not affirmative defenses and should be struck because they are insufficient defenses. (Doc. 6, pp. 3–5), *citing DirectTV, Inc. v. Semulka,* 2006 U.S. Dist. LEXIS 15043, 2006 WL 825370 (W.D.Pa. Feb. 9, 2006) (striking affirmative defenses that are simple denials of allegations). It is fair to say that Defendant's affirmative defenses set forth in paragraphs 8 and 9 are more aptly described as denials. Further, they are repetitive of Defendant's denials in paragraphs 12, 13, and

23(c). (Doc. 4, pp. 3). These averments negating or pointing out a defect in Plaintiff's *prima facie* case are not affirmative defenses. *See In re Rawson Food Service, Inc.,* 846 F.2d 1343, 1349 (11th Cir.1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."). However, "Rule 12(f) is not to be used to police the form of a pleading or to correct any misdesignations it might contain." 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1381, p. 416 (3d ed.2004). Because Plaintiff has not shown that she will be prejudiced by these averments, the Court will not strike the assertions but will treat them as denials. *See Zeron v. C & C Drywall Corp.,* 2009 U.S. Dist. LEXIS 76640, *5–11 (S.D.Fl.2009) (treating denials incorrectly labeled affirmative defenses as denials).

Plaintiff argues that affirmative defenses 10 and 11 are simply not affirmative defenses and are inappropriate.

(Doc. 6, pp. 6–7). Defendant's affirmative defenses 10 and 11 request that Plaintiff should pay Defendant's attorney fees because the complaint is meritless and brought in bad faith. (Doc. 4, p. 4). These allegations are not affirmative defenses and the appropriate vehicle for a request for sanctions or attorney fees lies in a motion pursuant to Federal Rule of Civil Procedure 11(c)(2). However, placing Plaintiff and the Court on notice that the Defendant seeks to do so is not inappropriate. *See Zeron,* 2009 U.S. Dist. LEXIS 76640, *10–11 (denying a motion to strike a Wherefore Clause requesting the court reserve jurisdiction to consider a timely filed motion for attorney's fees). Accordingly, Defendant's affirmative defenses 10 and 11 will not be considered as affirmative defenses, but because they are in no way prejudicial, they will not be stricken.

### *ORDER*

**AND NOW,** this 8th day of May, 2013, in accordance with the Memorandum of the same date, **IT IS HEREBY ORDERED THAT** Defendant's averments labeled Affirmative Defenses 8, 9, 10, & 11 (Doc. 4, p. 4) are not stricken, but will not be treated as affirmative defenses, and Plaintiff's motion to strike (Doc. 5) is **DENIED.**

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1909578

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.