## APPENDIX OF UNPUBLISHED OPINIONS

1. *Alexander v. Secore*, Civil Action No. 24-cv-00704, 2024 WL 5204176 (E.D. Pa. Dec 23, 2024)

2. *In re Fedloan Student Loan Servicing Litig.*, MDL No.18-2833, 2025 WL 539681 (E.D. Pa. Feb. 18, 2025)

3. *Nigro v. Penn. Higher Educ. Assist. Agency*, Civil No. 1:19-CV-02000, 2020 WL 5369980 (M.D. Pa. Sept. 8, 2020)

4. *U.S. ex rel. Hlywiak v. Great Lakes Educ. Loan Servs., Inc.*, No. 1:20-cv-13590, 2022 WL 787957 (D.N.J. Mar. 15, 2022)

1

2024 WL 5204176
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Lee ALEXANDER, Plaintiff,

v.

Jacob SECORE, Defendant

CIVIL ACTION NO. 24-cv-00704
|
Signed December 23, 2024

**Attorneys and Law Firms**

Patrick Howard, Simon Bahne Paris, Saltz Mongeluzzi
Barrett & Bendesky, Philadelphia, PA, for Plaintiff.

Beth A. Carter, Bennett, Bricklin and Saltzburg, LLP,
Philadelphia, PA, for Defendant.

**MEMORANDUM**

KENNEY, JUDGE

**I. INTRODUCTION**

\*1  Before the Court is a negligence claim arising
from a motor vehicle accident between Defendant
Jacob Secore ("Defendant" or "Secore") and Plaintiff
Lee Alexander ("Plaintiff" or "Alexander"). ECF No.
1, Ex. A ¶25 ("Complaint"). Plaintiff seeks diminution
in value damages not only from Defendant, but also
the "Defendant Class." *Id.* ¶¶ 69-73. Defendant moved
for judgment on the pleadings and to strike Plaintiff's
class action claim. ECF No. 36 (the "Motion"). For the
reasons stated below, the Court will grant Defendant's
Motion for Judgment on the Pleadings.

**II. FACTUAL BACKGROUND**

This case arises from simple facts that were presented
in detail previously by the Court. ECF No. 25 at 1-3.
In summary, Secore and Alexander were involved in
a motor vehicle accident. ECF No. 1-1, Compl. ¶ 25.
Alexander made a third-party claim to recover from
Secore's insurance company, Progressive Advanced
Insurance Company ("Progressive"). *Id.* ¶ 26. After
investigating, Progressive concluded that Secore was
at fault for the accident and provided an estimate of
$2,690.75 for covered repairs. *Id.* ¶ 28. Alexander

brought his vehicle to a repair shop, which fixed the
damages for $3,098.33. *Id.* ¶ 31. Progressive paid
that sum of money directly to the repair shop. *Id.*
Alexander, however, was not satisfied with only the
full repair. He hired an outside appraisal company
to determine how much value his vehicle had lost,
even after its full repair, simply by virtue of it being
in an accident. *Id.* ¶ 33. The appraisal company
opined that this particular vehicle had lost $5,228.18
in value, which Alexander then demanded from
Progressive. *Id.* Progressive would not provide further
compensation. *Id.* ¶¶ 36-38. Alexander, in response,
then sued Secore, the Defendant class, and Progressive
in the Philadelphia County Court of Common Pleas to
recover the alleged loss value in addition to the cost of
repairs already paid. *Id.* ¶ 41. Progressive and Secore
then removed the matter to federal court pursuant to the
Class Action Fairness Act of 2005. ECF No. 1 ¶¶ 1, 5.

Alexander's complaint brought several claims, all
seeking slightly different forms of relief for
Progressive's failure to cover diminution in value
damages, including Count I (Declaratory Judgment),
Count II (Breach of an Implied-in-Fact Contract),
Count III (Breach of an Express Contract), Count
IV (Negligence), Count V (Breach of Express
Warranty), and Count VI (Violation of Magnuson-
Moss Consumer Products Warranties Act). Except
for Count IV, which is brought against "Defendant
Secore and the Defendant Class," all other counts
were brought solely against Progressive. *See* Compl.
¶¶ 52-90.

The Court dismissed all claims against Progressive
such that the only remaining claim is Count IV
(Negligence) against Defendant Secore and the
Defendant Class. ECF No. 25 at 10. Progressive was
terminated as a defendant of the case. ECF No. 26.

Secore filed the instant Motion for Judgment on
the Pleadings and Motion to Strike Plaintiff's Class
Allegations on October 15, 2024, which is now fully
briefed. ECF Nos. 36, 41, 42. The Court heard
Argument on the Motion on November 25, 2024. ECF
No. 45.

**III. PROCEDURE**

\*2  Plaintiff challenges the procedural vehicles
Defendant employs in the Motion, namely, that Federal

2024 WL 5204176

Rule of Civil Procedure 12(c) does not permit the relief Defendant requests, ECF No. 41 at 5, and Rule 12(f) is unavailable to strike the class allegations, *id.* at 7.[1] The Court grants the Rule 12(c) motion for judgment on the pleadings.

Rule 12(c), or a motion for judgment on the pleadings, provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings will be granted [ ] if, on the basis of the pleadings, the movant is entitled to judgment as a matter of law. The court will accept the complaint's well-pleaded allegations as true, and construe the complaint in the light most favorable to the nonmoving party, but will not accept unsupported conclusory statements." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008) (citations omitted). "In deciding a Rule 12(c) motion, the court does not consider matters outside the pleadings." *Mele v. Fed. Reserve Bank of New York*, 359 F.3d 251, 257 (3d Cir. 2004).

Apart from a few procedural differences, the same standards apply as under Rule 12(b)(6). *See Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

> The Rule 12(c) motion may be employed by the defendant as a vehicle for raising several of the defenses enumerated in Rule 12(b) after the close of the pleadings.... In this context, Rule 12(c) is merely serving as an auxiliary or supplementary procedural device to determine the sufficiency of the case before proceeding any further and investing additional resources in it. Similarly, Rule 12(h)(3) states that whenever it appears that the federal court lacks jurisdiction over the subject matter the action may be dismissed, which, of course, means that the defense may be raised on a motion under Rule 12(c).

5C Wright & Miller, *Fed. Prac. & Proc. Civ.* § 1367 (3d ed. 2023).

Plaintiff cites to assorted non-binding caselaw to support the assertion that Rule 12(c) is an improper procedural vehicle to challenge the class allegations. ECF No. 41 at 5-7. He states that "Rule 12(c) is an improper vehicle for Secore's motion because the requested relief is limited to class allegations, not a full claim or cause of action asserted in the pleadings. The motion for judgment on the pleadings must be denied." *Id.* at 7. But that argument mischaracterizes the relief sought—Defendant seeks a judgment dismissing the class allegations in their entirety. ECF No. 42 at 3. Plaintiff also ignores examples of district courts in the Third Circuit analyzing class allegations under Rule 12(c). *See, e.g., Trunzo v. Citi Mortg.*, No. 2:11-CV-01124, 2014 WL 1317577, at *15 (W.D. Pa. Mar. 31, 2014); *White v. Rick Bus Co.*, 743 F. Supp. 2d 380, 384 (D.N.J. 2010). Accordingly, Rule 12(c) is an appropriate procedural vehicle to rule that Plaintiff does not have standing to sue the putative defendant class, discussed *infra*.

## IV. STANDARD OF REVIEW

**\*3** Article III of the Constitution "gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 154–55, (1990). The "irreducible constitutional minimum of standing" requires an injury in fact, a causal connection between the injury and the conduct complained of, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The party invoking jurisdiction bears the burden of establishing the elements and must support such elements "with the manner and degree of evidence required at the successive stages of litigation." *Id.* at 561. "[A] plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and "[t]he burden of establishing standing rests with the plaintiff," *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 576 (3d Cir. 2024).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for [ ] we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S at 561 (quotation omitted). To plead a facially plausible claim, the plaintiff must allege factual content that allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true the factual allegations contained in the complaint but "disregard[s] rote recitals of the elements of a cause of action, legal conclusions, and [ ] conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

Standing is a "threshold inquiry" that is distinct from class certification. *Hassine v. Jeffes*, 846 F.2d 169, 176 (3d Cir. 1988). An action must be dismissed for lack of jurisdiction if there is no standing. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016). "[T]he proper disposition of a case in which the putative class plaintiff lacks standing is to dismiss the complaint." *Hassine*, 846 F.2d at 176; *See O'Shea v. Littleton*, 414 U.S. 488, 494 n.3 (1974) ("There was no class determination in this case as the complaint was dismissed on grounds [the absence of standing] which did not require that determination to be made.")

"The requirements for standing do not change in the class action context. [N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (quotation omitted) (alteration in original). "That a suit may be a class action [ ] adds nothing to the question of standing." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976). Only after standing has been established can the Court proceed to class certification.

The Court notes that the Plaintiff pursues this present action through an exceedingly uncommon form of litigation—the defendant class action.[2] The infrequency of defendant class actions leaves the Court with scarce caselaw for guidance, particularly in the Third Circuit. Extreme caution is warranted in proceeding with defendant class actions. "Serious due process concerns arise whenever certification of a defendant class is sought because it potentially leads to liability while limiting their individual participation in the litigation." *Heffler v. U.S. Fid. & Guar. Ins. Co.*, Civ. A. No. 90-7126, 1992 WL 50095, at *4 (E.D. Pa. Mar. 10, 1992).

**\*4** The Defendant's Motion challenges Plaintiff's standing to bring the class action in addition to failing to meet the certification requirements under Rule 23. As the Court finds there is no standing as to the class, it will not address the inadequacies alleged pursuant to Rule 23.

Given the rarity of defendant class actions, it is unsurprising that the caselaw on this issue is sparse. Limited caselaw on standing in defendant class actions, however, does not hinder the Court's ability to conduct the same standing analysis that it completes for any other case. Because Plaintiff has failed to establish standing in this case against defendants other than Secore, discussed *infra*, the class certification analysis is unnecessary.[3]

## V. DISCUSSION

Count IV (Negligence) against Secore and the defendant class is the sole remaining claim in this case after the claims against Progressive were dismissed. ECF Nos. 25, 26. Prior to any class certification, Plaintiff must demonstrate he has standing to sue defendants as a "threshold" issue. *Hassine*, 846 at 176. Here, Plaintiff has failed to establish standing on the pleadings and no amount of discovery will demonstrate that the named Plaintiff has standing to sue the members of the putative class. As such, the Court grants the Rule 12(c) motion for judgment on the pleadings. The putative defendant class is terminated as a party in this case.

Alexander, the named Plaintiff, was involved in a car crash with Secore, the named Defendant. Yet somehow, Alexander seeks to maintain an action against a class of defendants who were involved in different crashes injuring different individuals simply because Plaintiff was not given the full amount in damages he requested. This stretches the constitutional

2024 WL 5204176

requirements of standing articulated in *Lujan* beyond recognition. The Court will not strain the common-sense application of the Article III standing to allow Plaintiff to use this simple crash to sue untold others using a mechanism with profound due process concerns.

**\*5** A plaintiff cannot maintain an action against a defendant that did not injure him. *Simon*, 426 U.S. at 40 n.20. While "general factual allegations of injury resulting from the defendant's conduct may suffice [at the pleading stage]," Alexander provides no allegations that the defendant class injured him personally in this negligence claim. *Knudsen*, 117 F.4th at 576. Alexander was allegedly injured by Secore in the car crash. No one else was involved. Ignoring the Article III requirements of injury that create the case or controversy would convert this simple tort claim between two individuals into complex litigation with profound ramifications for the due process rights of others.

In his Response, Plaintiff quotes Third Circuit caselaw to argue that the "law in the Third Circuit is unambiguous: unnamed, putative class members need not establish Article III standing." ECF No. 41 at 21-24 (quotation omitted). Each citation provided is an example of the more typical plaintiff class action. None discuss Plaintiff's requirement to establish Article III standing over unnamed defendant class members. Removing these quotations from the context of a plaintiff class action contorts Article III standing.

Rather than looking to quotations from inapposite caselaw in the Third Circuit, the Court finds the persuasive authority of a sister circuit in *Mahon v.*

*Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) directly on point and convincing. Plaintiff's "proposed interpretation of Article III—that it permits suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff—is unprecedented." *Id.* This Court agrees and will not adopt Plaintiff's interpretation of Article III standing.

Plaintiff's argument that a class action is appropriate is telling: "[t]he only issue is Progressive's uniform policy of denying diminution in value claims...." ECF No. 41 at 19. Progressive is no longer a party in this case. ECF Nos. 25, 26.[4] Alexander has standing to sue Secore and can litigate the damages he believes he is entitled to from Secore. But Alexander cannot use this negligence claim against Secore to seek damages from a party that was dismissed as a defendant or a whole class of defendants who did not cause him any injury.

Since Plaintiff has no standing against the defendant class which is evident on the pleadings, the class allegations in the Complaint cannot lie.

## VI. CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings (ECF No. 36) is **GRANTED,** and the negligence claim against the defendant class is dismissed for lack of standing. The case will now be re-scheduled for the judicial arbitration previously ordered. An appropriate Order will follow.

**All Citations**

Slip Copy, 2024 WL 5204176

---

### Footnotes

1    Plaintiff asserts that Rule 23(d)(1)(D) is the "only procedural vehicle for Secore's requested relief." ECF No. 41 at 8. The Court disagrees. *See generally* Timothy A. Daniels, *Challenging Class Certification at the Pleading Stage: What Rule Should Govern and What Standard Should Apply?*, 56 S. TEX. L. REV. 241, 248 (2014) (cataloging the use of other approaches under Rule 12 to challenge class certification at the pleading stage in each circuit while arguing that Rule 23 *should* govern).

Alexander v. Secore, Slip Copy (2024)

2024 WL 5204176

2    The Seventh Circuit described the rarity of the defendant class action: "suits against defendant classes [ ] are rare birds. We have called them 'exceptional,' *Channell v. Citicorp National Services, Inc.,* 89 F.3d 379, 387 (7th Cir. 1996), and Professor Coffee has with harmless exaggeration called them 'as rare as unicorns.' John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 COLUM. L.REV. 370, 388 (2000)." *CIGNA HealthCare of St. Louis, Inc. v. Kaiser,* 294 F.3d 849, 853 (7th Cir. 2002), amended (July 31, 2002).

While rare, the Rules seem to permit defendant class actions. *See* Fed. R. Civ. P. 23(a) ("One or more members of a class may *sue or be sued* as representative parties on behalf of all members....") (emphasis added). But the language of Rule 23 is not clear, leading to differing treatment among the circuits. *Brown v. Kelly,* 609 F.3d 467, 477, 477 n.8 (2d Cir. 2010) (whether defendant classes can be certified under Rule 23(b)(2) "does not admit of an easy answer") (collecting cases).

Examples where a defendant class action may be appropriate are local government officials acting under a state-wide policy, *see, e.g., Brown,* 609 F.3d at 471; *Nelson v. Warner,* 336 F.R.D. 118, 121 (S.D.W. Va. 2020); *Mental Disability Law Clinic v. Hogan,* 2008 WL 4104460, at *3 (E.D.N.Y. Aug. 29, 2008), certain securities cases, *see, e.g., In re Itel Sec. Litig.,* 89 F.R.D. 104, 114 (N.D. Cal. 1981) (certifying defendant class of underwriters); but see *Akerman v. Oryx Commc'ns, Inc.,* 609 F. Supp. 363, 375-76 (S.D.N.Y. 1984) (noting that no unified policy linked defendant underwriters sufficient to support class certification), aff'd, 810 F.2d 336 (2d Cir. 1987), and intellectual property, *see, e.g., Tilley v. TJX Cos., Inc.,* 345 F.3d 34, 36 (1st Cir. 2003); *Contra Piracy v. Does,* 1-2919, 2013 WL 2403589, at *1 (N.D. Cal. May 31, 2013); *Webcraft Techs., Inc. v. Alden Press, Inc.,* 1985 WL 2270, at *1 (N.D. Ill. Aug. 9, 1985).

3    Even if Plaintiff established standing to sue the defendant class, the Court would then dismiss the claim as to the defendant class under Rule 23(d)(1)(D). The dismissal would be appropriate on the pleadings without the discovery Plaintiff requests. *See, e.g., Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim...."). Striking the class allegations is appropriate where "no amount of discovery will demonstrate that the class can be maintained." *Semenko v. Wendy's Int'l, Inc.,* No. 2:12-cv-0836, 2013 WL 1568407, at *11 (E.D. Pa. Apr. 12, 2013)

In the present putative defendant class action, the defendant class allegations fail to meet the requirements of Rule 23, which is evident from the pleadings alone. The Court finds fatal flaws with nearly all the Rule 23(a) requirements that would merit dismissal of the class allegations.

The Court will exercise restraint and not generate unnecessary dicta on the complicated topic of defendant class actions since the lack of standing resolves this case. *See Clark v. McDonald's Corp.,* 213 F.R.D. 198, 217-221 (D.N.J. 2003) (summarizing the of treatment of defendant class actions in sister circuits and treatises as well as listing the caselaw to date in the Third Circuit). To that end, the Court would dismiss the class allegations on the same reasoning as *Clark* on the typicality requirement of Rule 23(a)(3). *Id.* at 221 ("[T]he 'typicality' requirement of Rule 23(a)(3) prohibits the maintenance by Plaintiff [ ] of a Rule 23(b)(3) class action in damages against [defendants] against whom he enjoys no cause of action in his own right.").

4    Even so, Plaintiff's Response to the Motion mentions "Progressive" one hundred times. ECF No. 41.

**Alexander v. Secore, Slip Copy (2024)**

2024 WL 5204176

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2

KeyCite Blue-Striped Flag

Appeal Filed by  Arielle Anderson, et al v. PHEAA, et al,  3rd Cir., March 27, 2025

2025 WL 539681
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE: FEDLOAN STUDENT
LOAN SERVICING LITIGATION

MDL NO. 18-2833 ALL CASES
|
Signed February 18, 2025

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, District Judge

## INTRODUCTION

*1  Plaintiffs, a group of thirty-three federal student loan borrowers, filed these putative class actions against the *United States Department of Education and the Secretary of Education* (together, the "Department") and one of the Department's contractual student loan servicers, the *Pennsylvania Higher Education Assistance Agency* ("PHEAA") (collectively, "Defendants"), based on alleged administration and servicing errors relating to three federal student borrower benefit programs: (1) the *Teacher Education Assistance for College and Higher Education Grant* Program (the "TEACH Program"), (2) the *Public Service Loan Forgiveness* Program (the "PSLF Loan Forgiveness Program"), and (3) *the income driven repayment* ("IDR") plans. [1] Plaintiffs bring federal claims against the Department under the Administrative Procedure Act (the "APA") and the Fifth Amendment Due Process Clause and bring common law breach of contract claims premised on various contracts governing the plaintiffs' federal student loans. Against PHEAA, Plaintiffs assert various state common law claims and claims for violations of various state consumer protection statutes.

Presently before the Court are Defendants' motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), in which Defendants argue that Plaintiffs' claims must be dismissed because, *inter alia*, Plaintiffs lack standing and/or the claims are moot. For the reasons set forth herein, Defendants' motions are granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The *Higher Education Act* of 1965 (the "HEA") was enacted to increase educational opportunities and "assist in making available the benefits of postsecondary education to eligible students ... in institutions of higher education ...." 20 U.S.C. § 1070(a). To make the cost of higher education more affordable for students who otherwise could not afford it, Congress established several federal financial aid programs under Title IV of the HEA, 20 U.S.C. § 1001 *et seq.* Under the HEA, the Department has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1070–1099c. Initially, the federal government guaranteed privately issued loans through the *Federal Family Education Loan* Program (the "FFEL Program"). Beginning in 1994, the federal government began originating loans under the *William D. Ford Direct Loan Program* (the "Direct Loan Program"). *See* 20 U.S.C. §§ 1087a–1087j. In 2010, Congress discontinued the FFEL Program, meaning that all new federal student loans since that time have been Direct Loans.

The Department, through its Office of Federal Student Aid, is responsible "for managing the administrative and oversight functions" of the Title IV student financial aid programs. 20 U.S.C. § 1018(a)(1). Direct Loans are governed by standardized *Master Promissory Notes* ("MPNs") constituting contracts between the federal government and the borrower. 20 U.S.C. §§ 1802(m)(1)(D), 1087e(a)(1). Key provisions of the MPNs require the Department to interpret the terms of the MPNs in accordance with applicable federal statutes and regulations. The Direct Loan Program is highly regulated by the Department, including the administration of loan repayment (34 C.F.R. §§ 682.209 and 685.208), income-based repayment plans (34 C.F.R. §§ 682.215 and 685.209), and deferments and forbearances (34 C.F.R. §§ 682.210–211 and 685.204–205).

In re Fedloan Student Loan Servicing Litigation, Slip Copy (2025)

2025 WL 539681

*2 The HEA requires the Department to contractually delegate Direct and FFEL Loans servicing functions to third parties. 20 U.S.C. § 1086(a). Since 2009, the Department has contracted with PHEAA as one of several loan servicers to service its FFEL and Direct Loans. In 2012 and 2013, the Department also awarded PHEAA an exclusive contract to manage the PSLF Loan Forgiveness and TEACH Grant Programs, respectively. PHEAA's loan servicing contract requires it to "maintain[ ] a full understanding of all federal and state laws and regulations and FSA requirements," "ensure[ ] that all aspects of the service continue to remain in compliance as changes occur," and maintain "procedures and systems," including "a system of internal controls that ensures resource use is consistent with laws, regulations and policies."

Given the complexity of the FFEL and the Direct Loan Programs, PHEAA (and other servicers) are required to provide borrowers with the necessary information to best manage their loans. The Department instructs loan servicers to establish a relationship with the borrower, educate and inform borrowers regarding the tools and options available to assist them in the management of their student loans, and provide information on repayment options that best meet the borrower's financial situation.

### *The TEACH Grant Program*

In 2007, Congress created the TEACH Grant Program with the goal of attracting and retaining teachers in certain fields at low-income schools. 20 U.S.C. §§ 1070g–1070g-4. Through the TEACH Grant Program, participants may receive up to $4,000 per academic year for undergraduate, post-baccalaureate, and graduate programs. Undergraduate students may receive a maximum of $16,000 in grants, while graduate students are capped at $8,000 in grants. 20 U.S.C. § 1070g-1(d). In 2013, the Department contracted with PHEAA to be the exclusive servicer of the TEACH Grant Program.

To receive a TEACH grant, a student must sign an "Agreement to Serve" with the Department, by which the student agrees to teach for a total of at least four years in an eligible position at a low-income school within eight years of graduating. Included in the Agreement to Serve are a series of notices and rules established by the Department, providing, *inter alia*, that recipients must: (1) certify within 120 days of completing school that they are employed in a qualifying position or intend to satisfy the terms of service; and (2) certify annually that they intend to complete their service and are on track to do so within the permitted time frame.

If a recipient fails to satisfy the teaching service obligation, the Teach Grant will be converted to an interest-bearing Direct Loan (a "TEACH Loan") that the recipient must pay back. The Department's regulations identify specific situations in which this conversion may occur, including, at the request of the recipient, when a recipient ceases enrollment in an eligible program, when the recipient is not able to meet the teaching requirement within the eight-year timeframe, and when the recipient does not actively confirm his or her intention to satisfy the agreement to serve at least annually. According to the TEACH Plaintiffs, PHEAA routinely converts grants to loans for reasons not authorized by statute or regulation or, otherwise, after failing to comply with the Department's rules, including conversions: (1) based on hyper-technical mistakes on the Certification form, such as a missing signature or the inadvertent omission of the start and end dates for the qualifying academic year; (2) after PHEAA failed to provide sufficient notice of the annual deadline for submitting the required paperwork by posting it only to a paperless inbox on PHEAA's website; and (3) after PHEAA failed to provide recipients with sufficient time to submit their annual paperwork.

*3 After several public reports of the problems with the TEACH Grant Program, including reports by the U.S. Government Accountability Office ("GAO"), the Treasury Department, and the Department itself, the Department implemented the TEACH Grant Reconsideration Program in February 2019, wherein recipients could apply to have their TEACH Loans reconverted to TEACH Grants. According to the TEACH Plaintiffs, under the reconsideration program, some recipients were improperly denied, and others were not fully refunded the amount of principal and interest they paid toward their loans.

### *The Public Service Loan Forgiveness Program (the "PSLF Program")*

2025 WL 539681

In 2007, Congress authorized the Department to administer a number of loan forgiveness programs, including the Public Service Loan Forgiveness Program (the "PSLF Program"). *See* 20 U.S.C. § 1087e(m). The PSLF Loan Forgiveness Program provides an opportunity for student borrowers with Direct Loans to seek forgiveness of their student loan balance after satisfaction of several conditions. *See id.*; *see also* 34 C.F.R. § 685.219. Federal law provides that to be eligible for forgiveness, the borrower must (1) make 120 separate, on-time monthly qualifying payments on a Direct Loan (2) while enrolled in a qualifying repayment plan (3) while working full-time (4) for a qualifying public-service employer. 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219(c). Only some repayment plans are PSLF qualifying. 34 C.F.R. § 685.219(c)(1)(iv). These include the Standard Repayment Plan and the IDR Plans. *Id.* Since 2012, the Department has contracted with PHEAA as its sole servicer for borrowers pursuing PSLF relief. Only loans made under the Direct Loan Program are eligible to be forgiven under PSLF. Borrowers with other types of loans, such as FFEL Loans, are not eligible for PSLF, but may consolidate these other types of loans into a Direct Consolidation Loan to become eligible.

Borrowers may, but need not, submit an interim **Employment Certification Form** ("ECF") to receive confirmation that their employer qualifies and to track their progress toward PSLF forgiveness. To track one's progress towards loan forgiveness, the Department recommends that borrowers submit an ECF to determine the number of qualifying payments made so far and certify the borrower's employer as a qualifying employer. The Department delegates the ECF determination process to PHEAA, as the exclusive loan servicer of the PSLF Program. Accordingly, when a borrower expresses interest in the PSLF Program, his or her loans are transferred to PHEAA for servicing.

In 2018, Congress created the **Temporary Expanded Public Service Loan Forgiveness** **Program** (the "TEPSLF Program"), which extended PSLF loan forgiveness to Direct Loan borrowers who were enrolled in an ineligible repayment plan for some or all of their payments, but otherwise satisfied the requirements of PSLF. *See* Consolidated

Appropriations Act, Pub. L. No. 115-141, § 315, 132 Stat. 348, 752–53 (2018).

### *Income Driven Repayment Plans*

To address the financial difficulties students faced in repaying their student loans, Congress required the Department to offer borrowers repayment plans that base the monthly repayment amount on the borrower's income and provide other benefits that traditional repayment plans do not, including loan forgiveness after a period of 20 or 25 years. The federal government offers four *income-driven* *repayment plans* ("IDR Plans") designed to make the repayment of federal student loans less onerous and to help borrowers better manage their student loan debt: (1) *Income-Contingent Repayment* ("ICR"); (2) *Income-Based Repayment* ("IBR"); (3) *Pay-As* *- You-Earn* ("PAYE"); and (4) *Revised Pay-As-You-* *Earn* ("REPAYE") (collectively, the "*IDR Plans*"). Payments on an IDR Plan can result in forgiveness of any remaining loan balance after twenty or twenty-five years, depending on the plan. *See* 34 C.F.R. §§ 685.209(a)(6); 685.209(c)(5); 682.15(f); 685.221(f). Periods of forbearance do not count towards the qualifying repayment period. If a borrower chooses to switch repayment plans or is obligated to switch repayment plans due to a change in eligibility, federal regulations require that outstanding interest be capitalized, *i.e.*, added to the principal balance of the loan. *See* 34 C.F.R. §§ 682.215(b)(5); 685.221(b)(4); 685.209(a)(2)(iv)(A); 685.209(c)(2)(iv).

**\*4** Borrowers enroll in an IDR plan by submitting an IDR Request form, which according to Department guidance, should be processed within fifteen days. If additional time is necessary, the Department may place the borrower's loans into an "administrative forbearance" for a period up to sixty days. During this forbearance period, interest may not be capitalized.

A borrower's enrollment in an IDR plan is effective for a one-year period. Therefore, borrowers must submit documentation of their income and family size for each year they wish to remain on an IDR Plan. Generally, if a borrower does not submit his or her annual recertification paperwork within ten days of the deadline, the borrower's repayment amount will be recalculated at the Standard Repayment amount and any accrued interest will be capitalized.

However, certain regulatory exceptions may apply, including, when the Department is able to determine the borrower's new repayment amount before the end of the borrower's current annual payment period. In these circumstances, a borrower's payment will not be recalculated under the Standard Repayment plan and any accrued interest will not be capitalized. Upon receipt of a recertification request, the Department must process the request "promptly," or within ten days, and maintain a borrower's current payment until their new payment can be determined. If a deficiency is identified in the enrollment or recertification paperwork, PHEAA is required to contact the borrower several times by phone and email to provide "high touch servicing" and "a clear expectation of what is needed to complete their enrollment or re-enrollment so they can stay on track." (Compl, ECF 49, at ¶ 440).

The Department is required to provide borrowers with notice of the recertification obligation, the consequence for failing to comply, and the deadline. The MPNs require that the Department send all required notices "by first-class mail," "by electronic means to an email address [the borrower has] provided," or "by any other method of notification that is permitted or required by applicable law and regulations." Notice of the recertification obligation, however, was routinely posted to a "paperless inbox" on PHEAA's website. (*Id.* at ¶¶ 452-43).

Borrowers may change repayment plans, including to an IDR Plan, at any time. Although the Department tells borrowers that they can do so "for free," changing from an IDR plan to another plan has harsh financial consequences, *i.e.*, all outstanding interest is capitalized. (*Id.* at ¶¶ 461-62). Without regard to a borrower's specific need, and without sufficiently disclosing that interest will capitalize, the Department includes a blanket recommendation on the form used for the annual recertification process to choose the option that allows the Department to change the borrower's repayment plan to the plan with the lowest monthly payment.

### *The Consolidated Class Action Complaint*

As noted, Plaintiffs are thirty-three federal student loan borrowers and grant recipients from seventeen jurisdictions, bringing claims on behalf of themselves and three putative classes. Against PHEAA, Plaintiffs

assert claims for (1) violations of the consumer protection statutes of fourteen state jurisdictions and (2) state common-law claims for: (a) breach of contract; (b) breach of fiduciary duty; (c) constructive fraud; (d) unjust enrichment; (e) negligence; (f) negligence per se; and (g) negligent misrepresentation. Against the Department, Plaintiffs assert claims under the APA and the Fifth Amendment Due Process clause, and for breach of various contracts governing the Plaintiffs' student loans. The factual basis for each named plaintiff's claim(s) varies depending on which student loan program applies to their loans. Plaintiffs are divided into three (sometimes overlapping) sub-groups, each raising claims pertaining to one of the three student loan programs described above.

### *1. The TEACH Plaintiffs*

**\*5** Eight plaintiffs (the "TEACH Plaintiffs") bring TEACH-related claims on behalf of themselves and a putative class.[2] The TEACH Plaintiffs allege that they were harmed by the inappropriate conversion of their TEACH Grants to TEACH Loans after: (1) PHEAA rejected certification paperwork for "hyper-technical" errors; and/or (2) PHEAA failed to give appropriate notice of certification deadlines. All eight TEACH Plaintiffs applied for reconsideration of their conversions through the Department's reconsideration process. At the time the operative complaint was filed: (a) Plaintiff Asby's application for reconsideration had been denied; (b) Plaintiff Meyers' application for reconsideration was pending; and (c) Defendants had approved the applications for reconsideration of the other six TEACH Plaintiffs but had not refunded all of the principal and/or interest that these TEACH Plaintiffs had paid toward their TEACH Loans. As of the date of this opinion, all of the TEACH Plaintiffs have received full relief with respect to their TEACH-related claims: all TEACH Grants have been reinstated, all accrued interest has been removed, all payments on the loans have been refunded, and all TEACH Plaintiffs have been advised that they satisfied their service obligations.

### *2. The PSLF Plaintiffs*

Fifteen Plaintiffs (the "PSLF Plaintiffs") bring PSLF-related claims on behalf of themselves and a putative class.[3] The PSLF Plaintiffs allege that they have

been harmed by PHEAA's undercounting their PSLF-qualifying payments and by the Department's improper administration and oversight of the PSLF Programs, such that they claim to be either already eligible for PSLF forgiveness or are closer than Defendants' disclosed figures would indicate. At the time the operative complaint was filed, however, ten of the fifteen PSLF Plaintiffs — even if credited with the PSLF-qualifying payments that they say PHEAA has not counted — were at least a full year away from potentially qualifying for PSLF forgiveness. [4] As of the date of this opinion, all of the PSLF Plaintiffs have received full relief with respect to their PSLF-related claims: the balances of all of the PSLF Plaintiffs' eligible loans have either been forgiven under the PSLF Loan Forgiveness Program or the PSLF Limited Waiver or have been fully paid by the Plaintiff prior to meeting the 120 payment requirement.

### 3. The IDR Plan Plaintiffs

Nineteen plaintiffs (the "IDR Plaintiffs") assert IDR-related claims on behalf of themselves and a putative class. [5] The IDR Plaintiffs' claims arise from allegations that PHEAA failed to: (1) disclose the availability of IDR plans; (2) disclose that accrued interest would capitalize after periods of forbearance or when a borrower switched IDR plans; (3) timely process IDR applications; and (4) give adequate notice of annual IDR recertification deadlines; and by the Department's improper administration and oversight of the IDR Plans. The IDR Plaintiffs allege they were harmed by having to pay higher monthly amounts, losing eligibility for future forbearances, and losing the opportunity to make qualifying payments toward IDR forgiveness. As of the date of this opinion, the balances on all but three of the nineteen IDR Plaintiffs' federal student loans have been fully paid and/or forgiven. Only IDR Plaintiffs Anderson, Arany, and Leone have remaining student loan balances. Each of these three IDR Plaintiffs has earned additional months of progress toward IDR and/or PSLF forgiveness.

### STANDARD OF REVIEW

**\*6** As noted, Defendants move to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) on the basis that this Court lacks subject-matter jurisdiction because some of the Plaintiffs lack Article III standing to assert their

claims and some or all of the claims have been mooted by undisputed events that occurred after Plaintiffs filed the operative complaint.

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.' " *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Submitting a signed declaration or otherwise presenting competing jurisdictional facts presents a factual challenge. *Davis*, 824 F.3d at 346. When a party presents a factual challenge to the Court's jurisdiction, a court is not limited to the pleadings in resolving the challenge. *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 251 (3d Cir. 2002) ("When a Rule 12(b)(1) motion is evaluated as a 'factual attack' on the Court's subject matter jurisdiction, the court may consider evidence outside the pleadings in evaluating that attack."). Here, Defendants have made a factual challenge, and all parties have submitted jurisdictional evidence.

### DISCUSSION

Though federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), Article III of the Constitution limits the federal judiciary's authority to exercise its "judicial Power" to resolving "Cases" and "Controversies." U.S. Const. Art. III, § 2. This case-or-controversy limitation is "essential to our system of separated powers," *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009). It "ensur[es] that the Federal Judiciary respects the proper — and properly limited — role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted). Federal courts enforce this limitation "through the several justiciability doctrines that cluster about Article III," including "standing, ripeness, [and] mootness ...." *Toll Bros.*, 555 F.3d at 137 (internal quotation marks omitted).

## I. ARTICLE III STANDING

Defendants argue that many of the Plaintiffs falling into one or more of the three categories described above lack Article III standing because they have not suffered an injury in fact and, therefore, this Court lacks subject-matter jurisdiction over these Plaintiffs' claims. Before addressing any of Plaintiffs' claims, this Court must determine whether Plaintiffs have Article III standing to assert their claims. *Biden v. Nebraska*, 600 U.S. ——, 143 S. Ct. 2355, 2365, 216 L.Ed.2d 1063 (2023). Under Article III, Plaintiffs must have a "personal stake" in the case. *Id.* at 2365. To meet this requirement, a "plaintiff must have suffered an injury in fact — a concrete and imminent harm to a legally protected interest, like property or money — that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Id.*; *see also Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 268 (3d Cir. 2020). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing Article III standing. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020).

**\*7** To satisfy Article III standing, a plaintiff must allege facts sufficient to show: (1) an injury in fact that is concrete and particularized, as well as actual and imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In a class action, named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003).

The first element, injury in fact, "is often determinative." *Toll Bros.*, 555 F.3d at 138. "To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.' " *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)). "A harm is 'actual or imminent' rather than 'conjectural or hypothetical' where it is presently or actually occurring, or is sufficiently imminent ... [P]laintiffs relying on claims of imminent harm must demonstrate that they face a realistic danger of sustaining a direct injury from the conduct of which they complain." *Sherwin-Williams*, 968 F.3d at 269 (citation omitted). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Id.* (citation omitted).

"Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components, as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact." *Cottrell*, 874 F.3d at 162 (3d Cir. 2017) (citation omitted). However, "there is a significant difference between ... an actual harm that has occurred" and "a mere risk of future harm." *TransUnion*, 594 U.S. at 437, 141 S.Ct. 2190. The Supreme Court has repeatedly held that a risk of future injury must be "certainly impending" to constitute injury in fact, and that allegations of "*possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (emphasis in original). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2, 112 S.Ct. 2130.

When a plaintiff fails to establish Article III standing, the court lacks subject-matter jurisdiction, *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), and dismissal is required, *Goodmann v. People's Bank*, 209 F. App'x 111, 113 (3d Cir. 2006). Where the named plaintiff fails to establish Article III standing, the putative class action must also be dismissed for lack of subject-matter jurisdiction. *Finkelman*, 810 F.3d at 195.

### A. *The TEACH Plaintiffs*

Defendants argue that five of the eight TEACH Plaintiffs (hereinafter, the "Reconsideration TEACH Plaintiffs")[6] lack standing to bring their TEACH claims because they had not suffered an injury in fact as of the time of the operative complaint. Specifically, Defendants argue that because the Reconsideration TEACH Plaintiffs were provided a full remedy through the TEACH Program's Reconsideration process *prior* to the filing of the operative complaint, the Reconsideration TEACH Plaintiffs lack standing. This Court agrees with Defendants.

***8** At the core of the TEACH Plaintiffs' claims is their allegation that Defendants wrongfully converted the TEACH Plaintiffs' grants into interest-bearing repayable loans, effectively depriving the TEACH Plaintiffs of the benefits of the TEACH Grant Program. As remedy for the Defendants' alleged wrongdoing, the TEACH Plaintiffs seek injunctive relief in the form of "an order requiring the Department to (i) reconvert [their] ... TEACH Loans back to TEACH Grants, (ii) provide credit for all accrued but unpaid interest, (iii) provide a credit or refund for payments of principal and interest made towards the TEACH loans." (Compl., ECF 49, at ¶ 595). Notably, in the operative complaint, the Reconsideration TEACH Plaintiffs allege that Defendants approved their applications for reconsideration, resulting in the conversion of the repayable loans back into grants. (*See* Comp., ECF 55, at ¶¶ 58-59, 106, 165, 222-23, and 230). In addition, according to the unrebutted declaration of Christin Bulman, a loan analyst with the U.S. Department of Education, each of the Reconsideration TEACH Plaintiffs' requests for reconsideration was approved and each of the Reconsideration TEACH Plaintiffs was granted complete relief prior to the filing of the operative complaint. (*See* Bulman Decl., ECF 61-1, at ¶ 14(b)-(c), (e), (g)-(h)). Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other loan balances, prior to the filing of the complaint. (*Id.*). Each of the Reconsideration TEACH Plaintiffs has also been advised that they have fully satisfied their service obligation. (*Id.*). As such, each of the Reconsideration TEACH Plaintiffs obtained the remedies sought in the operative complaint *prior* to its filing. Because the Reconsideration TEACH Plaintiffs have not asserted an injury in fact, they lack Article III standing, and this Court lacks subject-matter jurisdiction over their claims.

Despite receiving the very remedies they sought in the operative complaint, the Reconsideration TEACH Plaintiffs now argue that they suffered an injury in fact in the form of having their payments credited to other school loan balances and the lost time value of their money. Notably, as argued by Defendants, the operative complaint does not contain any allegations to support these alleged injuries. (*See generally* Compl, ECF 49). Indeed, the Reconsideration TEACH Plaintiffs expressly sought as remedy "a credit or refund for payments of principal and interest made towards TEACH Loans." (Compl., ECF 49, at ¶ 595(iii); *see also id.* at ¶¶ 11, 43(a), 60(a), 107(a), 146(a), 167, 212(b)-(c), 224(a), and 231(a)) (alleging injuries from failure to refund and/or credit payments). The Reconsideration TEACH Plaintiffs each received either refunds or credits to their other school loan balances, the very remedies requested in the operative complaint. As such, the Reconsideration TEACH Plaintiffs have not alleged an injury in fact, and, thus, lack standing. Accordingly, the TEACH-related claims of Plaintiffs Charles, Jones, Musser, Wardlow, and Webb are dismissed for lack of standing.

### B. *The PSLF Plaintiffs*

Defendants argue that ten of the fifteen PSLF Plaintiffs (hereinafter, the "Pre-Forgiveness PSLF Plaintiffs")[7] lack standing to bring any of their PSLF claims because they have not suffered an injury in fact. Specifically, Defendants argue that because the Pre-Forgiveness PSLF Plaintiffs' alleged injuries are contingent on their successful completion of 120 qualifying loan payments and ten years of employment with a qualifying employer, the alleged injuries are not real and immediate but instead speculative. This Court agrees with Defendants.

Notably, this case is not the first in which federal student loan borrowers have brought suit against student loan servicers claiming they were wrongfully denied access to or the benefits of the PSLF Loan

Forgiveness Program. When adjudicating those cases, courts have held that the plaintiff borrowers do not have standing to sue until they have suffered the actual injury alleged, *i.e.*, making more than the required 120 payments while working in public service for ten years. *See e.g.*, *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070 (C.D. Cal. 2019); *Love v. Pa. Higher Educ. Assistance Agency*, 2020 WL 1545798 (N.D. Ga. Mar. 16, 2020). For example, in *Winebarger*, federal student loan borrowers alleged that their student loan servicers incorrectly calculated the number of qualifying payments they had made towards the 120 required for loan forgiveness under the PSLF Loan Forgiveness Program. 411 F. Supp. 3d at 1080. As for their alleged injuries, the *Winebarger* plaintiffs asserted that as a result of the servicer's mistakes, the plaintiffs would be required to make more student loan payments than necessary to qualify for forgiveness and had been unable to make informed decisions about whether to continue working in the public sector. *Id.* Adopting the standing argument made by Defendants in the case *sub judice*, the *Winebarger* court concluded that the plaintiffs lacked standing because they had not asserted an injury in fact since they had not yet met the statutory requirements for loan forgiveness. *Id.* at 1086-87. As for the alleged inability to make an informed decision between public and private employment, the court found such injury speculative and not "actual and imminent," particularly in the absence of any allegations that the plaintiffs had engaged in any private employment job search. *Id.* at 1087. Similarly, the court found the potential prolongation of payments beyond the necessary 120 payments was "purely hypothetical" because it was unknown whether the plaintiffs would eventually make all of the requisite 120 loan payments and/or remain employed by a qualifying employer. *Id.* "Thus, Plaintiffs' unfounded fear that they may need to make more than 120 qualifying payments to obtain PSLF loan forgiveness in five to seven years is wholly speculative and far too remote to confer standing." *Id.*

**\*9** Other district courts have held similarly. *See e.g.*, *Love*, 2020 WL 1545798, at \*4–5 (holding plaintiff student loan borrowers did not have Article III standing to bring claims against defendant PHEAA premised on the PSLF Loan Forgiveness Program because plaintiffs had not yet made the requisite 120 payments and plaintiffs may not remain eligible for the program in

the future); *Alexander v. Great Lakes Higher Educ. Corp*, No. 17-00253, slip op. at \*12 (N.D. Fla. June 19, 2021) (holding that while plaintiff loan borrowers had alleged sufficient facts to show misconduct on the part of loan servicer Great Lakes, those plaintiffs that had not yet made sufficient payments to apply for PSLF loan forgiveness had not suffered an Article III injury in fact, and any future injury was too speculative to confer standing); *Meenan v. Navient Corp.*, 2020 WL 5057654, at \*2 (D. Ariz. Aug. 27, 2020) (holding that student loan borrower would not have had Article III standing to bring suit for claim premised on PSLF Loan Forgiveness Program until the plaintiff had made more than 120 payments towards repaying her student loans); *Lyons v. Great Lakes Educ. Loan Serv., Inc.*, 2022 WL 602972, at \*9 (D. N.J. Mar. 1, 2022) (holding that student loan borrowers lacked Article III standing where "no injury would materialize until Plaintiffs have to pay a single dollar towards 'wrongfully' accrued student loan interest—which could be years in the future.").

Similar to the claims asserted by the plaintiffs in the above-referenced cases, here, the core of the Pre-Forgiveness PSLF Plaintiffs' claims is their anticipation/fear that at some point in the future — ***after*** they have made 120 qualifying payments and have worked for a qualified employer for 10 years — their applications for loan forgiveness will be wrongfully denied, resulting in a delay in PSLF forgiveness and/or unnecessary payments of principal and interest. Specifically, with respect to their requisite injury, the Pre-Forgiveness PSLF Plaintiffs allege that they have been denied "the opportunity to make qualifying [loan] payments, which delays loan forgiveness under PSLF....." (Comp., ECF 49, at ¶ 96; *see also* ¶¶ 20, 67, 81, 86, 91, 111, 122, 132, 136, 150, 158). The alleged "delay in loan forgiveness," however, is purely hypothetical. The Pre-Forgiveness PSLF Plaintiffs may or may not make all their loan payments on time over the next few years; they may or may not continue to work for a qualifying employer for the required time; and Defendants may correct any allegedly incorrect qualifying payment tally. [8] Indeed, the Pre-Forgiveness PSLF Plaintiffs have not applied for loan forgiveness nor have they alleged that they are currently eligible to do so.

This speculative chain of possibilities requires both assumptions that these ten PSLF Plaintiffs will fulfill all of the PSLF Loan Forgiveness Program requirements and guesswork regarding the Department's future decisions on each of these ten PSLF Plaintiffs' yet-to-be filed applications. This is the precise type of hypothetical injury that courts have found to be insufficient to confer standing. With respect to these ten PSLF Plaintiffs, no injury will materialize unless and until their loan forgiveness under the PSLF Loan Forgiveness Program has been delayed beyond the point when they have made the requisite 120 payments while working for a qualifying employer. Taking the Pre-Forgiveness PSLF Plaintiffs' allegations in the operative complaint as true, this Court finds that the feared denials of the Pre-Forgiveness PSLF Plaintiffs' future applications for loan forgiveness depend on future contingencies that may or may not occur and, therefore, are not "certainly impending." As such, the Pre-Forgiveness PSLF Plaintiffs do not have standing to bring their PSLF Loan Forgiveness Program claims. Accordingly, the Pre-Forgiveness PSLF Plaintiffs' claims are dismissed for lack of subject-matter jurisdiction.

### II. MOOTNESS

*10 Defendants argue that many of Plaintiffs' claims have been mooted by various programmatic and legislative initiatives that address and remedy many of Plaintiffs' alleged claims with respect to the three student loan programs at issue — the TEACH Grant Program, the PSLF Loan Forgiveness Program, and the IDR Program. The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit and is concerned with the court's ability to grant effective relief." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (internal quotations and citations omitted). A case is moot if "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief." *Id.* (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996)).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III —'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). Plaintiffs must maintain a personal stake in the resolution of the dispute throughout the litigation. *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013). "Therefore, 'if developments occurring during the course of adjudication eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss the case as moot.' " *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (citation omitted).

The party asserting mootness bears the burden of demonstrating mootness. *Freedom from Religion Found. Inc. v. New Kennsington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016). "The party asserting that a claim is moot must show that it is 'absolutely clear that the allegedly wrongful behavior [is] not reasonably [ ] expected to recur.' " *Id.* (quoting *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693). If a party claims that some development has mooted the case, it bears "[t]he 'heavy burden of persua[ding]' the court" that there is no longer a live controversy. *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693 (citation omitted). A case will be found moot if "(1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *N.J. Tpk. Auth/ v. Jersey Cent. Power and Light*, 772 F.2d 25, 31 (3d Cir. 1985) (internal citations omitted). "When a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct." *Hartnett*, 963 F.3d at 306.

### A. The PSLF Plaintiffs

As set forth above, this Court finds that the Pre-Forgiveness PSLF Plaintiffs (ten of the fifteen PSLF Plaintiffs) lack Article III standing to pursue the PSLF Loan Forgiveness Program claims asserted in this action because they failed to assert an injury in fact. Defendants further argue that the PSLF Loan Forgiveness Program claims of the five remaining PSLF Plaintiffs (PSLF Plaintiffs Bonham, Davis,

In re Fedloan Student Loan Servicing Litigation, Slip Copy (2025)

2025 WL 539681

Pruess, Shelley, and Wolff), as well as those of the Pre-Forgiveness PSLF Plaintiffs, are now moot because of the post-complaint programmatic changes to the PSLF Loan Forgiveness Program that have effectively cured the alleged failures in the program and have provided the PSLF Plaintiffs the remedies they seek in this action. This Court agrees with Defendants.

As described above, the PSLF Plaintiffs assert claims against Defendants premised on their allegation that, due to various systematic failures, Defendants effectively undercounted these plaintiffs PSLF-qualifying payments, thereby delaying and/or denying loan forgiveness under the PSLF Loan Forgiveness Program. As remedies, the PSLF Plaintiffs seek damages resulting from the undercounting and various injunctive relief, including "an order requiring the Department to (i) conduct a full accounting review of the qualifying payments made by PSLF Plaintiffs and members of the PSLF Class and provide explanation for any payment that is deemed a non-qualifying payment; (ii) provide additional credit for all payments made after Plaintiffs and members of the PSLF Class submitted PSLF Employment Certification Requests or otherwise expressed a documented interest in the PSLF Program, regardless of repayment plan; (iii) grant loan forgiveness for any PSLF Plaintiff or member of the PSLF Class who have made 120 qualifying payments and such additional payments; (iv) provide a credit or refund for any payment of principal and interest made after the date of the last qualifying or additional payment." (Compl., ECF 49, at ¶ 612; *see also* Prayer for Relief, at p. 231).

*11 In October 2021, the Department announced (and has since implemented) a series of actions that significantly affect the PSLF Loan Forgiveness Program. Acting under authority of the HEROES Act, 20 U.S.C. § 1098bb, the Department implemented a time-limited **waiver of many of the PSLF Loan Forgiveness Program's restrictions** (the "PSLF Waiver"). Under the PSLF Waiver, from October 2021 through October 2022, student loan borrowers (like the PSLF Plaintiffs here) were provided opportunity to obtain retroactive credit toward loan forgiveness for prior periods of repayment that would not have otherwise qualified under the original PSLF Loan Forgiveness Program. So long as applicable employment requirements are met, past periods

of repayment are counted toward loan forgiveness — even if the borrower was in a nonqualifying loan program or repayment plan, and even if past payments were not made in full or on time. *See generally* https://studentaid.gov/announcements-events/pslf-limited-waiver (last visited August 26, 2024).

As set forth in the various declarations attached to Defendants' briefs, and not disputed by Plaintiffs, every PSLF Plaintiff was eligible to request relief under the above-described PSLF Waiver. Further, of the five PSLF Plaintiffs who have standing to assert PSLF-based claims (PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff), all but Plaintiff Bonham have received complete forgiveness/discharge of their federal student loans pursuant to the PSLF Loan Forgiveness Program. To the extent any of these PSLF Plaintiffs made payments after the effective date of their forgiveness, those payments have been fully refunded. PSLF Plaintiff Bonham received a complete retroactive discharge of one of her federal student loans and has received credits toward forgiveness for additional qualifying payments on her remaining federal student loan under the PSLF Waiver and will be eligible for additional PSLF forgiveness after making eighteen more qualifying payments.

As a result of the systemic changes to the PSLF Loan Forgiveness Program, particularly the PSLF Waiver, all of the PSLF Plaintiffs who have standing have effectively received the remedies sought in this action. Specifically, these PSLF Plaintiffs have received complete forgiveness/discharge of their qualifying federal student loans, received refunds for overpayments, and/or have received credits for all qualifying payments made under the PSLF Loan Program. As such, these PSLF Plaintiffs' claims are moot. Accordingly, the PSLF-based claims of PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff are dismissed for lack of subject-matter jurisdiction.

### B. The TEACH Plaintiffs

As set forth above, this Court finds that the Reconsideration TEACH Plaintiffs (five of the eight TEACH Plaintiffs) lack Article III standing to pursue their TEACH Grant Program claims in this action

because they obtained full relief prior to the filing of the operative complaint. Defendants argue that the TEACH Grant Program claims of the three remaining TEACH Plaintiffs (*Plaintiffs Asby, Meyer, and Stevens*) (hereinafter, the "Remaining TEACH Plaintiffs") are moot because each of these TEACH Plaintiffs has similarly received full relief after the operative complaint was filed. This Court agrees.

As set forth in the unrebutted declaration of Ms. Bulman, each of the requests for reconsideration submitted by the Remaining TEACH Plaintiffs was approved, and each of these TEACH Plaintiffs was granted complete relief after the filing of the operative complaint. (*See* Bulman Decl., ECF 61-1, at ¶ 14(a), (d), and (f)). Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other loan balances, after the filing of the complaint. (*Id.*). In addition, the Remaining TEACH Plaintiffs have all been advised that they have fully satisfied their service obligation. (*Id.* at ¶ 14(a) and (d)) (*see also* Sup. Bulman Decl., ECF 80-1, at ¶ 8(m)). As such, each of the Remaining TEACH Plaintiffs obtained the remedies sought in the operative complaint after its filing. Accordingly, the Remaining TEACH Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### C. The IDR Plaintiffs

**\*12**  Defendants argue that the IDR Plaintiffs' claims are now moot because of post-complaint programmatic changes to the IDR Program (in combination with similar changes to the PSLF Loan Forgiveness Program) that have effectively cured the alleged failures in the program and provided the IDR Plaintiffs the remedies they seek in this action. This Court agrees with Defendants.

On April 19, 2022, the Department announced changes to the manner in which it counts qualifying payments for purposes of loan forgiveness available to borrowers on IDR Plans. To address concerns about servicers "steering" borrowers into forbearance, the Department explained that it would be conducting a review of accounts, and count toward IDR forgiveness certain periods of forbearance deemed to be excessive

(12 or more consecutive months or 36 or more cumulative months). Borrowers steered into shorter periods of forbearance may seek account review by filing a complaint with the FSA Ombudsman at StudentAid.gov/feedback. The Department also announced that it was taking other steps to address complaints that loan servicers were inappropriately steering borrowers into forbearance when other options were more in the borrowers' interests. *See id.*

As of the date of this opinion and as a result of these programmatic changes, the entire balances of sixteen of the nineteen IDR Plaintiffs' federal student loans have been fully forgiven and/or discharged under either the PSLF Loan Forgiveness Program or the IDR Program or other discharge/repayment options. Indeed, only IDR Plaintiffs Anderson, Arany, and Leone have remaining student loan balances. However, each of these three IDR Plaintiffs has received additional credits toward loan forgiveness under the IDR Programs and/or PSLF Loan Forgiveness Program since revisions have been made to those programs. [9] As such, all of the IDR Plaintiffs have received the remedies sought in the operative complaint for which they are currently eligible. Accordingly, the IDR Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### D. Exceptions to Mootness

While not disputing Defendants' jurisdictional facts with respect to mootness, Plaintiffs argue that various exceptions to the mootness doctrine apply. When applicable, these exceptions allow a class plaintiff to continue to represent a class in a class action. Contrary to Plaintiffs' arguments, however, none of the mootness exceptions apply here.

When a plaintiff seeks to represent a class of similarly situated individuals, the general rule is that "the mooting of [the] named plaintiff's claim prior to class certification moots the entire case." *Richardson v. Bledsoe*, 829 F.3d 273, 286 (3d Cir. 2016) (citations omitted); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000); *Hering v. Walgreens Boots Alliance, Inc.*, 341 F. Supp. 3d 412, 418 (M.D. Pa. 2018). However, "Article III mootness is more 'flexible' than other

justiciability requirements, especially in the context of class action litigation." *Richardson*, 829 F.3d at 278 (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 400, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). "A plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class." *Rosetti v. Shalala*, 12 F.3d 1216, 1226 (3d Cir. 1993) (quoting *Geraghty*, 445 U.S. at 404, 100 S.Ct. 1202). Accordingly, the Third Circuit has "recognized that '[i]n the class action context, special mootness rules apply' for determining at what point in time a named plaintiff must still have a personal stake in the litigation to continue seeking to represent a putative class action." *Richardson*, 829 F.3d at 278-79 (quoting *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003)).

**\*13** Where a class has been certified, "mooting of the class representative's claims does not moot the entire action because the class 'acquire[s] a legal status separate from the interest asserted [by its named plaintiff].' " *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). The Third Circuit has also held that "so long as a plaintiff files a motion to certify a class when he still has a live claim, the mooting of that claim while the motion is pending precludes the court from reaching the merits but does not preclude it from deciding the certification motion." *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 305 (3d Cir. 2016) (citing *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000)). In such circumstances, a motion for class certification is said to "relate back" to the complaint, before the plaintiff's individual claims became moot. *Id.* at 306-07.

The Third Circuit has expanded the "relation back doctrine" in limited cases where, like here, the plaintiff's claims were mooted prior to the filing of a motion for class certification. *Richardson*, 829 F.3d 273, 288 (3d Cir. 2016). In *Richardson*, the Third Circuit cited "the general principle that 'the class action process should be able to "play out" according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues.' *Id.* at 281 (quoting *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004)).

The Court further explained that the mere "filing of a certification *motion*, rather than the entry of a certification *order* ... does nothing significant" and simply "indicates that the named plaintiff intends to represent a class if allowed to do so." *Richardson*, 829 F.3d at 285 (quoting *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 707-08 (11th Cir. 2014)). Because the filing of a class action complaint provides equal notice of the plaintiff's intent to represent a class, the absence of a motion seeking certification is not alone fatal. *Id.* at 288. The *Richardson* Court went on to recognize the so-called "relation back doctrine," which allows a class action lawsuit to proceed even when plaintiffs' claims were mooted prior to filing a motion for class certification when one of three mootness exceptions applies: the inherently transitory, capable of repetition yet evading review, and picking off exceptions. *Id.* at 279.

### 1. The Inherently Transitory Exception

Under the inherently transitory exception to mootness, the relation back doctrine may apply in class actions "where it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct and the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.' " *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013) (citations omitted). This exception was developed "to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." *Id.* This exception, however, "has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy." *Id.* at 76-77, 133 S.Ct. 1523. Plaintiffs carry the burden of showing that their claims fall within this exception. *See Richardson*, 829 F.3d at 283 n.4.

Plaintiffs have not met their burden of showing application of this exception. First, it is far from a certainty that potential class plaintiffs will continue to be subject to the complained of conduct in light of the undisputed changes to the underlying student loan

programs that have mooted Plaintiffs' claims. Second, the asserted claims are not so inherently transitory as to deprive a court of the time necessary to consider class certification. Indeed, as alleged, Defendants' conduct took place over a period of years. As such, Plaintiffs' claims do not meet this narrow exception to mootness.

### 2. The Capable of Repetition Yet Evading Review Exception

**\*14** The "capable of repetition yet evading review" exception is also "narrow" and "applies only in exceptional situations ...." *Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017)). "A dispute qualifies for that exception only 'if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.' " *United States v. Sanchez-Gomez*, 584 U.S. 381, 391, 138 S.Ct. 1532, 200 L.Ed.2d 792 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–440, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011)). "There must be more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Cnty. of Butler*, 8 F.4th 226 at 231 (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). It is the plaintiff's "burden to show that the 'capable of repetition yet evading review' exception applies." *Id.*

Plaintiffs have not met their burden of showing that this exception applies. The complained of actions by Defendants were not too short in duration to allow for full litigation, but rather occurred over multiple years. Further, Plaintiffs have all received or are eligible to receive the remedies sought in the operative complaint. Thus, there is not a reasonable expectation that Plaintiffs will be subject to the same conduct again. As such, this exception does not apply.

### 3. The Picking Off Exception

The "picking off" exception to mootness "permits courts to relate a would-be class representative's (now

moot) claim for relief back in time to a point at which that plaintiff still had a personal stake in the outcome of the litigation." *Duncan v. Governor of Virgin Islands*, 48 F. 4th 195, 204 (3d Cir. 2022) (quoting *Richardson*, 829 F.3d at 279). This mootness exception has been applied where a defendant "picks off" a named plaintiff by mooting the individual plaintiff's claims early in the litigation — such as through settlement offers — and thus cuts off the litigation before class action procedures progress. The *Richardson* Court limited its holding to permitting relation back in the absence of a certification motion "[w]hen an individual plaintiff's claim for relief is acutely susceptible to mootness and it is clear from the complaint that the plaintiff is seeking to represent a class." *Id.* at 286; *see also Duncan*, 48 F.4th at 204-05. The picking off exception, however, applies "only in situations where the mooting of the individual claim 'occurred at so early a point in litigation that the named plaintiff could not have been expected to file a class certification motion.' " *Id.* (quoting *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011)); *see also Smith v. Vision Solar LLC*, 2023 WL 2539017, at \*3 (E.D. Pa. Mar. 16, 2023).

Though the operative complaint makes it clear that Plaintiffs intended to seek class certification, for the same reasons set forth above with respect to the other mootness exceptions, Plaintiffs' claims for relief are not acutely susceptible to mootness. Defendants' alleged conduct occurred over a period of years. Indeed, most of the asserted claims were not mooted until years after Plaintiffs filed the operative complaint. As such, the claims were not mooted "at so early a point in litigation that the named plaintiff could not have been expected to file a class certification motion." Accordingly, the picking off exception does not apply.

### 4. The Voluntary Cessation Exception/Doctrine

Plaintiffs also argue that the TEACH Plaintiffs and PSLF Plaintiffs' claims should not be deemed mooted under the voluntary cessation exception. [10] "Voluntary cessation of challenged activity will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents*

Involved in *Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007)). The crucial issue is whether the defendant "could reasonably be expected to engage in the challenged behavior again." *Hartnett v. Pennsylvania State Education Assoc.*, 963 F.3d 301, 306 (3d Cir. 2020) (citation omitted). "[T]he focus is on whether the defendant made that change unilaterally and so may 'return to [its] old ways' later on." *Id.* at 307. (citations omitted). The party asserting mootness "bears the 'heavy burden' of showing that it will not 'revert to' its prior policy." *Fields*, 936 F.3d at 161 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017)). The Third Circuit has opined, however, that "[a]bsent any evidence to the contrary," a court " 'generally presume[s] that government officials act in good faith.' " *Parker v. Governor of Pa.*, 2021 WL 5492803, at *4 (3d Cir. Nov. 23, 2021) (quoting *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 230 (3d Cir. 2022)).

**\*15** This Court finds that Defendants have carried their burden of showing that it is absolutely clear that recurrences are not reasonably likely. The changes to the TEACH Grant Program that have now provided the TEACH Plaintiffs the remedies sought in the operative complaint are the result of President Biden's signing into law the Consider Teachers Act of 2021, Pub. L. 117-49, which amended statutory provisions pertaining to the TEACH Grant Program. These changes, codified into law, occurred in 2021 and remain in effect. Moreover, each TEACH Plaintiff has obtained the relief sought in the operative complaint and has completed his/her service obligation. There is no record evidence to overcome the presumption

of the Government's good faith in implementing these changes. Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the TEACH Plaintiffs' detriment.

Similarly, the changes to the PSLF Loan Forgiveness Program that have now provided the PSLF Plaintiffs the remedies sought in the operative complaint are the result of a series of regulatory actions taken by the Department under the authority of the HEROES Act, 20 U.S.C. § 1098bb. These regulatory changes began in 2021 and, though these changes included a Limited PSLF Waiver, that limited waiver was extended through June 30, 2024. Moreover, each PSLF Plaintiff has obtained, or is eligible to obtain, the relief sought in the operative complaint. There is no record evidence to overcome the presumption of the Government's good faith in implementing these changes. Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the PSLF Plaintiffs' detriment.

**CONCLUSION**

For the reasons set forth, this Court lacks jurisdiction over Plaintiffs' claims in this action because Plaintiffs either lack Article III standing or the claims have become moot. Accordingly, Defendants' motions to dismiss are granted. An Order consistent with this Opinion shall follow.

**All Citations**

Slip Copy, 2025 WL 539681

---

**Footnotes**

1    These and other programs are in bold to facilitate the reading of this memorandum opinion.

2    The TEACH Plaintiffs are Michael Asby, Jacquelynn Charles, Lindsey Jones, Steven Meyer, Megan Musser a/k/a Megan Holland, Chris Stevens, Katherine Wardlow, and Maggie Webb. (*See* Compl., ECF 49, at ¶ 242).

3    The PSLF Plaintiffs are Katie Bonham, Jamie Coleman, Andrea Davis, Arianne Gallagher, Dr. Garima Gupta, Nathan Harig, Brittany King, Yannet Lathrop, Adela Levis, Shon Meckfessel,

2025 WL 539681

Amanda Miller, Adam Morris, Heather Pruess, Seth Shelley, and Nicole Wolff. (*See* Compl., ECF 49, at ¶ 244).

4    Specifically, at the time of the operative complaint, these ten PSLF Plaintiffs had the following minimum repayment durations remaining: Coleman - 2 years (*Id.* at ¶ 62); Gallagher - 2 years (*Id.* at ¶ 74); Gupta - 3 years (*Id.* at ¶ 84); Harig - 1 year (*Id.* at ¶ 88); King - 6 years (*Id.* at ¶ 108); Lathrop - 2 years (*Id.* at ¶ 115); Levis - 3 years (*Id.* at ¶ 131); Meckfessel - 7 years (*Id.* at ¶ 134); Miller - 7 years (*Id.* at ¶ 149); Morris - 6 years (*Id.* at ¶¶ 154–55).

5    The IDR Plaintiffs are Arielle M. Anderson, Tanuja Goulet Arany, Laura Brady, Jamie Coleman a/k/a Jamie McFarland, Arianne Gallagher, Mark Hawkins, Seniqua Johnson, Brittany King, Yannet Lathrop, Amanda Leone, Shon Meckfessel, Adam Morris, Heather Pruess, Meagan Pryor, Stacey Puccini, Hannah Rockwell, Seth Shelley, Adele S. Turnage, and Nichole Wolff. (*See* Compl., ECF 49, at ¶ 243).

6    The Reconsideration TEACH Plaintiffs include the following: Plaintiffs Charles, Jones, Musser, Wardlow, and Webb.

7    The Pre-Forgiveness PSLF Plaintiffs are the following: Plaintiffs Coleman, Gallagher, Gupta, Harig, King, Lathrop, Levis, Meckfessel, Miller, and Morris.

8    Indeed, as discussed below with respect to Defendants' mootness arguments, *see infra* at Section II.A, Defendants have implemented changes to the PSLF Loan Forgiveness Program that have effectively fixed the alleged problems.

9    Notably, as of April 17, 2024, IDR Plaintiff Anderson needed only fifteen additional qualifying payments for loan forgiveness under the PSLF Loan Forgiveness Program.

10    This Court is aware that reference to voluntary cessation as an "exception to mootness" is not entirely accurate. *See Hartnett v. Pa. State Educ. Assoc.*, 963 F.3d 301, 307 (3d Cir. 2020). Notwithstanding, its requirements are well-settled. *Id.*

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

3

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 26 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

2020 WL 5369980
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Keith M. NIGRO, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, Defendant.

Civil No. 1:19-CV-02000
|
Signed 09/08/2020

**Attorneys and Law Firms**

Thomas A. Sprague, Sprague & Sprague, Philadelphia,
PA, William P. Murphy, Bala Cynwyd, PA, for
Plaintiff.

John C. Grugan, Thomas F. Burke, Ballard Spahr LLP,
Philadelphia, PA, for Defendant.

## MEMORANDUM

JENNIFER P. WILSON, United States District Court
Judge

**\*1** This case arises from alleged improprieties in
connection with the servicing of federal student loan
debt. Plaintiff Keith M. Nigro ("Nigro") alleges
that the servicer of his student loans, Defendant
Pennsylvania Higher Education Assistance Agency
("PHEAA"), is liable to him for unjust enrichment;
unfair and deceptive trade practices in violation of
the Consumer Financial Protection Act ("CFPA")
and Pennsylvania's Unfair Trade Practices and Consumer
Protection Law ("UTPCPL"); and violation of his
constitutional right to due process. The case is
presently before the court on PHEAA's motion to
dismiss. For the reasons that follow, the motion is
granted. Nigro's unjust enrichment, CFPA, and due
process clams are dismissed with prejudice, and his
UTPCPL claim is dismissed without prejudice.

## STATUTORY BACKGROUND

Under the Higher Education Act of 1968, Pub. L.
No. 89-329, 79 Stat. 1219 (codified as amended at
20 U.S.C. §§ 1001–1161aa-1) [hereinafter "HEA" or
"the act"], the United States Department of Education
("the Department") has the power to issue federal
loans to qualified student borrowers. *See* 20 U.S.C.
§§ 1078, 1078-2, 1078-3, 1078-8, 1087a. Although
such loans are issued by the Department, the HEA
requires the Department to "award contracts for
origination, servicing, and collection" of the loans "to
the extent practicable." *Id.* § 1087f(a)(1). Once the
Department has entered into a contract with a lender,
the Department may suspend or terminate the lender's
participation in the loan program if the lender has not
complied with applicable statutes and regulations. 34
C.F.R. §§ 682.705–682.706.

The Public Service Loan Forgiveness Program
("PSLF") was created as part of the HEA to provide
loan forgiveness to individuals working in qualified
public service jobs. *See* 20 U.S.C. § 1087e(m)(1).
Under the PSLF, the Department is directed to forgive
all principal and interest due on a federal direct loan
if the borrower (a) has made 120 qualified monthly
payments on the loan; (b) has worked in a qualified
public service job during the time in which those 120
payments were made; and (c) continues to work in
a qualified public service job at the time of the loan
forgiveness. *Id.*

## BACKGROUND AND
## PROCEDURAL HISTORY

This case was first filed as a petition for review
with the Commonwealth Court of Pennsylvania on
October 16, 2019, pursuant to that court's original
jurisdiction under 42 Pa.C.S. § 761(a). (Doc. 1-2.)
PHEAA removed the case to this district on November
21, 2019, pursuant to the federal officer removal
statute, 28 U.S.C. § 1442. (Doc. 1.) PHEAA filed an
answer on November 27, 2019, after which Nigro filed
an amended complaint on December 17, 2019. (Docs.
2, 8.)

According to the allegations in the amended
complaint, Nigro is a resident of Cumberland County,
Pennsylvania who has, since 2007, been employed
in public service positions sufficient to qualify him

for loan forgiveness under the PSLF. (Doc. 8 ¶ 2.) PHEAA is a "quasi-governmental entity" located in Harrisburg, Pennsylvania that serves as a contractor of the Department to service federal student loans. (*Id.* ¶¶ 3, 5.) PHEAA services many of those federal loans through its "alter ego," FedLoan Servicing ("FedLoan"). (*Id.* ¶ 7.)

\*2 In seeking relief before the Commonwealth Court, Nigro alleged, among other things, that PHEAA wrongfully initiated administrative forbearances[1] when servicing his loans between March 2012 and December 2012. (*Id.* ¶ 11.) During these forbearances, Nigro "was not only prevented from making timely payments, but was also prevented later from making up retrospectively payments to cover forced interruption of payments." (*Id.*)

In response to Nigro's filing before the Commonwealth Court, PHEAA asserted that it had not serviced Nigro's student loans prior to March 12, 2018 and demanded that Nigro withdraw his case before the Commonwealth Court on that basis. (*Id.* ¶ 13.) According to the amended complaint, however, the assertion that PHEAA had not serviced Nigro's loans prior to March 12, 2018 was factually inaccurate, as proven by statements that PHEAA had previously made to Nigro. (*Id.* ¶ 17.) The amended complaint asserts that contrary to PHEAA's contention, it had serviced Nigro's loans from February 10, 2010 to March 12, 2012, and accordingly was servicing Nigro's loans during the period when several of the administrative forbearances allegedly occurred. (*Id.* ¶ 23.)

The amended complaint alleges that at all times prior to February 10, 2010, Nigro's loans had been serviced by Affiliated Computer Services ("ACS"), which was an affiliate of the Xerox Corporation. (*Id.* ¶ 24.) PHEAA then serviced Nigro's loans from February 10, 2010 to March 12, 2012, at which point the loans were transferred back to ACS. (*Id.* ¶ 28.) The loans remained with ACS until July 4, 2013, when they were transferred to a company called Nelnet. (*Id.*) Nelnet continued to service the loans until March 2018, at which point it transferred them back to PHEAA. (*Id.* ¶ 29.)

The amended complaint alleges that PHEAA committed a series of wrongs during the period in which it was allegedly servicing Nigro's loans. According to the amended complaint, Nigro made a payment of $7,500 to PHEAA on December 13, 2010, which was purportedly allocated towards payment of interest. (*Id.* ¶ 31.) Despite that allocation, however, there was no documentation indicating that the $7,500 was actually applied to the interest on Nigro's loans. (*Id.* ¶¶ 33–34.)

The amended complaint alleges that PHEAA wrongfully increased the principal owed on Nigro's loans by $12,667.24 during the period spanning 2010 to 2012. (*Id.* ¶ 47.) This increase was due to a series of "administrative events and intrusions" by PHEAA "consisting of 11 documented instances of administrative capitalization of interest into larger principal; 10 administrative loan consolidations; and 8 administrative conversions." (*Id.* ¶ 48.)

Nigro's loans were then subjected to twenty additional month-long forbearances between March 2012 and early 2019, "which shut the payment process down, subtracted a month of qualified public service, and triggered capitalization of interest so as to raise the principal" of Nigro's loans. (*Id.* ¶ 52.) The majority of these forbearances were initiated not by Nigro's actions but rather by administrative actions of the loan servicer. (*Id.* ¶ 53.)

The amended complaint alleges that there were at least four payments made and received between 2012 and 2019 that were never properly credited towards Nigro's loans. (*Id.* ¶ 55.) Specifically, the amended complaint alleges that on May 6, 2014, Nigro made a payment of $86.90, which was double the amount owed, but that the payment was not credited as an eligible payment for purposes of Nigro's loan forgiveness. (*Id.* ¶ 56.) Payments made on May 18, 2015, January 6, 2017, and March 13, 2017, were similarly not credited as eligible payments under Nigro's loans. (*Id.* ¶¶ 57–59.) The amount of those payments were, respectively, $165.42, $177.33, and $120.00. (*Id.*) Similarly, the amended complaint alleges that on May 16, 2017, Nigro submitted a payment of $116.44 to cover the months of April 2017 and May 2017, and that the payment was treated as an eligible payment for

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 28 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

purposes of May 2017 but not for the purposes of April 2017. (*Id.* ¶ 60.)

**\*3** The alleged misapplication of funds continued into 2019, when PHEAA deemed two payments ineligible for debt relief purposes on the grounds that Nigro had purportedly failed to submit proper certification that he was working in a certified public service position. (*Id.* ¶ 62.) The amended complaint alleges that every forbearance led PHEAA to extend the term of Nigro's loans and extend the term in which he was required to work in public service. (*Id.* ¶ 63.)

As of November 2019, PHEAA had increased the amount of Nigro's monthly payment from $109.22 to $244.00 based on its conclusion that he had recently entered into an income-driven repayment plan. (*Id.* ¶¶ 70–71.) That conclusion, however, was erroneous, because Nigro had always been in an income-driven repayment plan and had not changed his status at any point leading up to the November 2019 increase. (*Id.*)

The amended complaint further alleges that the parties dispute the date on which Nigro's eligible public service began. PHEAA allegedly asserts that Nigro's eligible public service began in March 2012, while Nigro asserts that his eligible public service began in 2007. (*Id.* ¶ 74.)

In addition to the misapplied payments, the amended complaint alleges that PHEAA and the other servicers of his loan have erroneously listed some of his loan accounts under the misspelled name "Keith Nitro." (*Id.* ¶ 76.) The first such accounting error occurred in 2012 and was promptly corrected, but Nigro discovered another similar accounting error shortly before the amended complaint was filed, when he was "not allowed to proceed except as Keith Nitro" in recertifying information for his loans. (*Id.* ¶¶ 77–78.)

Although PHEAA did not service Nigro's loans during all relevant times, the amended complaint alleges that PHEAA acknowledged "full authority and responsibility" to equitably adjust the loans even for periods in which it was not the loan servicer when it recast two forbearances that occurred in 2015 and 2017 as one-day forbearances and restored two months of loan forgiveness time to Nigro's loans. (*Id.* ¶¶ 54, 81.)

The amended complaint raises three causes of action. In Count I, Nigro raises a cause of action for unjust enrichment. (*Id.* ¶¶ 97–107.) In Count II, Nigro raises a cause of action for unfair and deceptive trade practices in violation of the CFPA and the UTPCPL. (*Id.* ¶¶ 108–18.) In Count III, Nigro raises a cause of action under 42 U.S.C. § 1983 for violation of his right to due process under the United States Constitution. (*Id.* ¶¶ 119–29.)

PHEAA moved to dismiss the amended complaint on January 7, 2020, and filed a brief in support of its motion the next day. (Docs. 12–13.) PHEAA's primary arguments are that the complaint should be dismissed under the doctrine of derivative sovereign immunity and that the complaint should be dismissed for lack of subject matter jurisdiction because Nigro does not have standing to bring his claim until he has completed ten years of eligible loan payments. (Doc. 13 at 17–22.) PHEAA additionally argues that (1) Nigro's state law claims should be dismissed as preempted by federal law; (2) the amended complaint fails to state an unjust enrichment claim upon which relief may be granted; (3) Nigro fails to state a claim under the UTPCPL; (4) Nigro does not have standing to bring a CFPA claim; (5) PHEAA is not a proper defendant under 42 U.S.C. § 1983; and (6) the complaint should be dismissed because Nigro failed to join the Department, which is an indispensable party under Federal Rule of Civil Procedure 19. (*Id.* at 22–32.)

**\*4** Nigro filed a brief opposing the motion to dismiss on January 21, 2020, and PHEAA filed a reply brief on February 4, 2020. (Docs. 18–19.) With briefing on the motion having concluded, it is now ripe for the court's disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1442(a)(1), which allows a federal officer "or any person acting under that officer" to remove a case to federal court. 28 U.S.C. § 1442(a)(1); *see also Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (holding that federal court has jurisdiction over a case properly removed under § 1442(a)(1) "regardless of whether the suit could originally have been brought in a federal court").

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 29 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

For a federal contractor to remove a case under § 1442(a)(1), the contractor must establish that "(1) it is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a federal office." *Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998) (citing *Mesa v. California*, 489 U.S. 121, 129, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989)). Unlike the general removal statute, § 1442 must be "broadly construed" in favor of removal. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Assoc. of Phila.*, 790 F.3d 457, 466–67 (3d Cir. 2015) (quoting *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994)).

Here, PHEAA satisfies the elements necessary to remove a case under § 1442. First, as a corporate entity, PHEAA qualifies as a "person" under the statute. *Commonwealth's Motion to Appoint Counsel*, 790 F.3d at 467–68. Second, Nigro's claims against PHEAA are based on actions that PHEAA took while acting under a federal office, because, according to the amended complaint, PHEAA serviced Nigro's student loans pursuant to its contract with the Department. (*See* Doc. 8 ¶ 5.) Third, PHEAA raises a colorable federal defense. To satisfy this element, a federal defense does not have to be successful, it must only be colorable. *Willingham*, 395 U.S. at 406–07, 89 S.Ct. 1813. A federal defense is colorable, "if it is 'legitimate and can reasonably be asserted, given the facts presented and the current law.' " *Golden v. N.J. Inst. of Tech.*, 934 F.3d 302, 310 (3d Cir. 2019) (quoting *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 815 (3d Cir. 2016)). Here, although the court ultimately finds that PHEAA is not entitled to derivative sovereign immunity, that doctrine still qualifies as a colorable federal defense because it is legitimate and can reasonably be asserted in this case. *Id.* Finally, the requisite causal connection is established because all of Nigro's claims arise from actions that PHEAA took in its role as a federal contractor. Accordingly, the court has removal jurisdiction under § 1442. PHEAA's contention that the court lacks subject matter jurisdiction because Nigro does not have standing to bring his claims will be discussed in more detail below.

## STANDARD OF REVIEW
## UNDER RULE 12(b)(6)

In order to survive a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

**\*5** When considering a motion to dismiss, a district court "may not make findings of fact and, insofar as there is a factual dispute, the court may not resolve it." *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (citing *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011)). Any reasonable inferences must be drawn in favor of the party opposing dismissal. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 783 n.1 (3d Cir. 2016) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

## STANDARD OF REVIEW
## UNDER RULE 12(b)(1)

Whether a plaintiff has standing "is a question of subject matter jurisdiction." *Petroleos Mexicanos*

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 30 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

*Refinacion v. M/T King A (Ex-Tbilisi)*, 377 F.3d 329, 334 (3d Cir. 2004). Thus, motions to dismiss for lack of standing are analyzed as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *Long v. SEPTA*, 903 F.3d 312, 320 (3d Cir. 2018).

When considering a motion to dismiss under Rule 12(b)(1), a district court must determine whether the motion presents a facial or factual challenge to the court's subject matter jurisdiction. *Id.* (citing *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014)). A facial attack "considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court." *Id.* (quoting *Constitution Party*, 757 F.3d at 357). A factual attack, on the other hand, "contests the truth of the jurisdictional allegations." *Id.* (quoting *Constitution Party*, 757 F.3d at 358).

A district court applies a different standard of review depending on whether a motion to dismiss presents a facial or factual attack to the court's subject matter jurisdiction. *Id.* (citing *Constitution Party*, 757 F.3d at 357). "In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" *Constitution Party*, 757 F.3d at 357 (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). Thus, when reviewing a facial attack, the court applies "the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.,* construing the alleged facts in favor of the nonmoving party." *Id.* (citing *Schering Plough*, 678 F.3d at 243). When considering a factual attack, on the other hand, the court "may weigh and 'consider evidence outside the pleadings,'" *id.* (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)), and is not obligated to treat the plaintiff's allegations as true. *Long*, 903 F.3d at 320.

A factual attack on subject matter jurisdiction may only be brought after the moving defendant has answered the plaintiff's complaint. *Id.* Thus, any motion to dismiss under Rule 12(b)(1) that is filed before the defendant has answered the complaint is "by definition, a facial attack." *Id.* (quoting *Constitution Party*, 757 F.3d at 358).

## DISCUSSION

### A. PHEAA Is Not Entitled to Derivative Sovereign Immunity

PHEAA's first argument is that Nigro's amended complaint should be dismissed under the doctrine of derivative sovereign immunity. (Doc. 13 at 17–21.) The derivative sovereign immunity doctrine was first announced in *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), in which the Supreme Court held that a federal contractor was entitled to sovereign immunity where the federal government validly conferred authority on the federal contractor and the federal contractor was simply performing its duties under the contract. *Id.* at 19–23, 60 S.Ct. 413.

*6 PHEAA asserts that this case should be dismissed under the principles of derivative sovereign immunity announced in *Yearsley*. (Doc. 13 at 17–21.) Nigro disagrees, arguing that PHEAA's reliance on *Yearsley* is misplaced in light of *Campbell-Ewald Co. v. Gomez*, 577 U.S. ——, 136 S. Ct. 663, 672, 193 L.Ed.2d 571 (2016). (Doc. 18 at 14–17.)

In *Campbell-Ewald*, a federal contractor asserted that it was entitled to derivative sovereign immunity under *Yearsley*. *Campbell-Ewald*, 136 S. Ct. at 673. The Court acknowledged that federal contractors "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States," but held that such immunity "is not absolute." *Id.* at 672. The Court clarified that when a federal contractor allegedly "violates both federal law and the Government's explicit instruction, ... no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." *Id.*

The court agrees with Nigro that derivative sovereign immunity does not apply. As noted above, the amended complaint alleges that PHEAA violated federal law and violated its contractual obligations as a servicer of Nigro's federal student loans. (Doc. 8.) Given those allegations, PHEAA is not entitled to derivative sovereign immunity. *See Campbell-Ewald*, 136 S. Ct. at 672; *see also New York ex rel. James v. PHEAA*, 19-CV-09155, 2020 WL 2097640, at *5–8 (S.D.N.Y.

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 31 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

May 1, 2020) (denying federal loan servicer's motion to dismiss for derivative sovereign immunity).

## B. Questions of Fact Preclude Dismissal for Lack of Standing

The court will next address PHEAA's standing argument. Because PHEAA has not yet answered Nigro's complaint, the court will treat this as a facial attack on the court's subject matter jurisdiction. *See Long*, 903 F.3d at 320 (noting that a motion to dismiss under Rule 12(b)(1) that is filed before an answer is "by definition, a facial attack").

Because Article III of the United States Constitution only allows federal courts to decide cases and controversies, a plaintiff must have standing to bring a claim in federal court. *Dep't of Comm. v. New York*, 588 U.S. ——, 139 S. Ct. 2551, 2565, 204 L.Ed.2d 978 (2019). To establish standing, a plaintiff must show that he has "(1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. ——, 139 S. Ct. 1945, 1950, 204 L.Ed.2d 305 (2019) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 704, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013)). An injury is concrete and particularized if it "affects the plaintiff in a personal and individual way." *Gill v. Whitford*, 585 U.S. ——, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The plaintiff's injury "must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. ——, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016).

Here, PHEAA argues that Nigro does not have standing to bring his claims because his loans were consolidated in March 2012, meaning that he would not be eligible for loan forgiveness until at least 2022 and therefore has not suffered a concrete and particularized injury. (Doc. 13 at 21.) Nigro argues that this is incorrect because he has been engaged in qualified public service since 2007. (Doc. 18 at 18.) PHEAA responds that Nigro's March 2012 loan consolidation "reset the clock for purposes of loan forgiveness," meaning that he is more than two years away from completing his service for purposes of

PSLF, even if he makes all future payments on time and without any forbearances." (Doc. 19 at 9.)

**\*7** PHEAA's standing argument fails because it requires the court to make factual determinations that it may not make at this stage of litigation. Although the amended complaint acknowledges that a loan consolidation occurred on March 12, 2012, *see* Doc. 8 ¶ 46, the amended complaint alleges that the consolidation did not reset the clock on Nigro's eligibility for debt forgiveness. (*Id.* ¶ 74.) If that is true, which the court must assume at this stage, then Nigro could have been eligible for loan forgiveness as early as 2017, which would accordingly defeat PHEAA's standing argument. Therefore, since resolution of PHEAA's standing argument requires the court to resolve the question of whether Nigro's 2012 consolidation reset the clock on his eligibility for debt forgiveness, the court will deny PHEAA's motion to dismiss for lack of standing without prejudice to PHEAA re-raising the argument at a later stage of litigation.[2]

## C. Nigro's State Law Claims Are Not Preempted

PHEAA's next argument is that Nigro's state law claims should be dismissed because they are preempted by federal law. (Doc. 15 at 22–24.) Preemption of state law is based on the Supremacy Clause of the United States Constitution, which states that the laws of the United States are "the Supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Although they are not "rigidly distinct," three preemption doctrines have arisen from the Supremacy Clause: express preemption, field preemption, and conflict preemption. *Va. Uranium, Inc. v. Warren*, 587 U.S. ——, —— U.S. ——, 139 S. Ct. 1894, 1901, 204 L.Ed.2d 377 (2019) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)). The Third Circuit explains these preemption doctrines as follows:

Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. [*Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).] Field preemption applies where "the federal interest is so

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 32 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (internal quotation marks omitted). Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted).

**\*8** *Farina v. Nokia, Inc.*, 625 F.3d 97, 115 (3d Cir. 2010).

Here, PHEAA argues that Nigro's state law claims should be dismissed under the doctrines of express preemption and conflict preemption. (Doc. 15 at 22–24.) Specifically, PHEAA argues that Nigro's state claims are expressly preempted by the HEA's preemption provision under 20 U.S.C. § 1098(g), which states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] shall not be subject to any disclosure requirements of any State law." 20 U.S.C. § 1098(g). PHEAA argues that the state law claims are also conflict preempted by the HEA because the HEA was meant to achieve uniformity in the regulation of student loans. (Doc. 15 at 23–24.)

At the time that PHEAA filed its motion to dismiss, there was no controlling case law on the issue of whether Nigro's state law claims were preempted by federal law. Since that time, however, the Third Circuit squarely addressed this issue in *Pennsylvania v. Navient Corp.*, 967 F.3d 273 (3d Cir. 2020). That decision controls the court's analysis here and compels the court to deny PHEAA's preemption argument.

In *Navient*, the court considered a civil enforcement action brought by Pennsylvania's Attorney General against a federal student loan servicer for alleged violations of state and federal law. *Id.* at 282. The servicer moved to dismiss, arguing, among other things, that the Attorney General's state law claims were preempted by the HEA under both the express preemption and conflict preemption doctrines. *Id.* at 283. The district court denied the motion to dismiss, and the Third Circuit then considered the issue of preemption through a certified question from the district court. *Id.*

The Third Circuit held that the HEA expressly preempts state law only to the extent that the state law sets disclosure requirements and does not preempt state law governing affirmative misconduct. *Id.* at 287. In reaching this holding, the Third Circuit expressly relied on the reasoning of the Eleventh Circuit in *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908 (11th Cir. 2020), and the Seventh Circuit in *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639 (7th Cir. 2019). *See Navient*, 967 F.3d at 290.

Relying on *Lawson-Ross*, the court acknowledged that § 1098g expressly preempts state law that sets "disclosure requirements" and that the term "disclosure requirements" is not defined in the HEA, but noted that the HEA identifies what disclosures are required under the statute in 20 U.S.C. § 1083. *Id.* at 289 (quoting *Lawson-Ross*, 955 F.3d at 917). "Viewed in its statutory context, then, the term 'disclosure requirements' refers to the Education Act's requirements that certain information be communicated to borrowers during the various stages of a loan, as laid out in § 1083 of the statute. Thus, the domain § 1098g preempts is the type of disclosures to borrowers that § 1083 requires." *Id.* (quoting *Lawson-Ross*, 955 F.3d at 917). The HEA therefore expressly preempts claims based on a failure to disclose—that is, claims in which a plaintiff alleges "that there was a duty to speak and [that] the duty was breached"—but does not preempt claims based on affirmative misrepresentations. *Id.* (quoting *Lawson-Ross*, 955 F.3d at 918).

**\*9** The Third Circuit similarly concluded that the Attorney General's claims were not preempted under the conflict preemption doctrine. *Id.* at 293. The court again agreed with the reasoning of *Lawson-Ross* and *Nelson* that conflict preemption should not be inferred when a statute provides for express preemption of certain state laws. *Id.* Courts "need not infer congressional intent to pre-empt state laws by the Education Act.... When Congress has explicitly addressed preemption in a statute, an implication arises that it did not intend to preempt other areas of state law" through conflict preemption. *Id.*

The court acknowledged that the Ninth Circuit had reached a contrary conclusion in *Chae v. Sallie Mae*, 593 F.3d 936, 946–47 (9th Cir. 2010), where the court

concluded that some state law was conflict preempted by the HEA because regulatory uniformity was a goal of the HEA. The *Navient* court rejected this argument, however, agreeing with *Lawson-Ross*, *Nelson*, and *College Loan Corp. v. Sallie Mae*, 396 F.3d 588, 597 (4th Cir. 2005) that uniformity was not a goal of the HEA. *Navient*, 967 F.3d at 293.

Accordingly, because the Attorney General in *Navient* brought claims against the servicer for affirmative misconduct, the court held that the claims were not preempted by the HEA. *Id.* at 295. Thus, to the extent that a plaintiff's claims are based on "affirmative misconduct" they are not preempted by the HEA. *Id.* at 291.

The Third Circuit's decision in *Navient* controls the court's analysis here. Nigro's claims are not based on a breach of a duty to disclose information, but rather on alleged affirmative misconduct by PHEAA. Specifically, the amended complaint alleges misapplication of Nigro's payments, improper increases in the amount of his principal, improper increases in the amount of his monthly payments, and improper forbearances. (*See, e.g.*, Doc. 8 ¶¶ 31–34, 42–48, 52, 55–60, 62–63, 67, 70, 73.) Accordingly, his claims are not preempted by the HEA, and the court will deny that portion of PHEAA's motion to dismiss.

### D. The Amended Complaint Does Not State an Unjust Enrichment Claim Upon Which Relief May Be Granted

To state a claim for unjust enrichment under Pennsylvania law, a plaintiff must allege (1) that the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances in which it would be inequitable to do so without paying for the benefit. *Karden Constr. Servs., Inc. v. D'Amico*, 219 A.3d 619, 628 (Pa. Super. Ct. 2019).

Here, PHEAA argues that the amended complaint fails to state an unjust enrichment claim upon which relief can be granted because it does not allege that Nigro conferred a benefit on PHEAA or that PHEAA appreciated that benefit. (Doc. 13 at 24–25.) Nigro disagrees, arguing that he conferred a benefit on PHEAA because PHEAA is paid fees and

compensation by the Department in exchange for servicing Nigro's loans. (Doc. 18 at 24–25.)

The court agrees with PHEAA that the amended complaint fails to state an unjust enrichment claim upon which relief may be granted. The amended complaint does not allege that Nigro conferred any benefit on PHEAA. Instead, the amended complaint's unjust enrichment claim is based on the fees that PHEAA receives for servicing Nigro's loans, *see* Doc. 8 ¶ 102, which, as Nigro admits, are paid by the Department and not Nigro. (Doc. 18 at 24–25.)

A loan servicer's receipt of fees from the Department for servicing student loans is not sufficient to state an unjust enrichment claim upon which relief may be granted. *See, e.g.*, *Hyland v. Navient Corp.*, No. 18-CV-09031, 2019 WL 2918238, at *14 (S.D.N.Y. July 8, 2019) (finding that plaintiff failed to state unjust enrichment claim where only benefit allegedly retained by defendant was servicing fees paid by the Department); *Olsen v. Nelnet, Inc.*, 392 F. Supp. 3d 1006, 1022–23 (D. Neb. 2019) (same).[3] Thus, because Nigro's unjust enrichment claim is based solely on PHEAA's receipt of fees from the Department, the court will dismiss the unjust enrichment claim with prejudice for failure to state a claim upon which relief can be granted.

### E. The Amended Complaint Does Not State a Claim Upon Which Relief May Be Granted Under the UTPCPL

**\*10** PHEAA next argues that the amended complaint fails to state a claim under the UTPCPL. (Doc. 13 at 26–28.) The UTPCPL allows a private cause of action for unfair or deceptive practices. 73 Pa.C.S. §§ 201-2, 201-3. Nigro's claim in this case is brought under the statute's catch-all provision, 73 Pa.C.S. § 201-2(4)(xxi), which prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." To state a claim for relief under the UTPCPL's catch-all provision, a plaintiff must allege "(1) a deceptive act that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance; and (3) that the plaintiff's justifiable reliance caused ascertainable loss." *McDonough v. State Farm Fire & Cas. Co.*, 365 F. Supp. 3d 552, 562 (E.D. Pa. 2019) (quoting *Hall*

*v. Equifax Info. Servs. LLC*, 204 F. Supp. 3d 807, 810 (E.D. Pa. 2016)).

A plaintiff is not required to plead the elements of common law fraud to plead a deceptive act under the UTPCPL's catch-all provision. *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396, 407 (Pa. Super. Ct. 2012). Nevertheless, a defendant still must have "knowledge of the falsity of [its] statements or the misleading quality of [its] conduct" to be held liable under the UTPCPL. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 498 (3d Cir. 2013) (citing *Wilson v. Parisi*, 549 F. Supp. 2d 637, 666 (M.D. Pa. 2008)). Thus, a deceptive act under the UTPCPL "is the act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it." *Wilson*, 549 F. Supp. 2d at 666; *see also Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399 (E.D. Pa. 2008) (holding that an act is deceptive under the UTPCPL if it intentionally misleads "by falsehood spoken or acted" and "has the capacity or tendency to deceive" (quoting *Christopher v. First Mut. Corp.*, No. 05-CV-01149, 2006 WL 166566, at *4 (E.D. Pa. Jan. 20, 2006))); *accord Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019). Courts must construe the UTPCPL liberally to effectuate the statute's goal of protecting consumers from unfairness and deception. *Commonw. ex rel. Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (Pa. 1974).

The amended complaint in this case fails to state a claim under the UTPCPL because it does not allege that PHEAA engaged in any deceptive act under the statute. Although the amended complaint alleges that PHEAA and the other servicers [4] of Nigro's loans have not properly credited payments made on his loans, have improperly deemed payments as unqualified for purposes of debt forgiveness, have improperly increased the amount of principal due on his loans, have improperly instituted forbearances of his loans, have improperly increased the amount of money owed in each monthly payment, and have improperly extended the term in which he is required to work in public service, *see, e.g.*, Doc. 8 ¶¶ 31–34, 42–48, 52, 55–60, 62–63, 67, 70, 73, the amended complaint does not allege that PHEAA intentionally gave Nigro a false impression, knowingly made a false representation to

Nigro, or recklessly made a false representation to Nigro. *Wilson*, 549 F. Supp. 2d at 666. The amended complaint therefore fails to state a claim under the UTPCPL's catch-all provision and Nigro's UTPCPL claim will be dismissed on that basis. The court will, however, grant Nigro leave to amend this claim because amendment of the claim would be neither inequitable nor futile. *Houle v. Walmart Inc.*, —— F. Supp. 3d ——, No. 3:19-CV-00514, 447 F.Supp.3d 261, 2020 WL 1491188, at *6 (citing *Phillips*, 515 F.3d at 225)).

## F. Nigro Does Not Have Standing Under the CFPA

**\*11** PHEAA argues that Nigro's CFPA claim should be dismissed for lack of standing because the CFPA does not allow private causes of action. (Doc. 13 at 28–29.) Nigro concedes this argument in his brief in opposition. (Doc. 18 at 30 n.7.) Accordingly, because the CFPA does not allow private causes of action, *see* 12 U.S.C. § 5564(a); *McMillan v. Nationstar Mortg. Co.*, No. 20-CV-01321, 2020 WL 4201605, at *3 (E.D. Pa. July 22, 2020), the court will dismiss Nigro's CFPA claim with prejudice.

## G. Nigro's § 1983 Claim Is Dismissed for Lack of State Action

The court will next address PHEAA's argument for the dismissal of Nigro's claim under 42 U.S.C. § 1983. PHEAA argues that the § 1983 claim must be dismissed because it is a state agency and therefore not a state actor subject to liability under § 1983. (Doc. 13 at 29. (citing *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 854 (3d Cir. 2014)).) Nigro responds by essentially raising an issue preclusion defense, arguing that prior court rulings in *United States ex rel. Oberg v. PHEAA*, 804 F.3d 646 (4th Cir. 2015), *PHEAA v. NC Owners, LLC*, 256 F. Supp. 3d 550 (M.D. Pa. 2017), and *Lang v. PHEAA*, 201 F. Supp. 3d 613 (M.D. Pa. 2016) require a ruling that PHEAA is a state actor. Both parties' arguments miss the mark.

Section 1983 provides in relevant part as follows:

>     Every who, under color of any statute, ordinance,

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 35 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

A claim under § 1983 requires "action taken under color of state, not federal law." *Davis v. Samuels*, 962 F.3d 105, 115 (3d Cir. 2020). Thus, where a defendant is alleged to be a federal actor or to have acted under color of federal law, a "1983 claim cannot stand." *Id.* That is precisely the case here. The amended complaint alleges that PHEAA was acting entirely under federal, not state law. (*See* Doc. 8 ¶¶ 4–6 (alleging that PHEAA "operates independently from the Commonwealth of Pennsylvania" and "serves as a contractor of the United States Department of Education" for purposes of servicing student loans).) Thus, Nigro's § 1983 claim "cannot stand." *Davis*, 962 F.3d at 115.

Furthermore, even if the court liberally construed the amended complaint as implicitly bringing a *Bivens* claim,[5] such a claim would still fail because PHEAA is a federal contractor, not a federal agent. As the Supreme Court has made clear, *Bivens* does not allow a private cause of action against a federal contractor. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Accordingly, the court will dismiss Nigro's § 1983 claim with prejudice.

## H. The Department Is Not a Necessary Party Under Rule 19

Finally, the court will address PHEAA's argument that the amended complaint should be dismissed for Nigro's failure to name the Department as a defendant. This argument is brought under Federal Rule of Civil Procedure 12(b)(7), which allows a party to move for dismissal of an action for failure to join a party. Whether joinder of a party is required is in turn governed by Federal Rule of Civil Procedure 19.

**\*12** A court reviewing a failure to join under Rule 19 conducts a two-part analysis. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). First, the court must determine whether joinder of the absent party is necessary under Rule 19(a)(1). *Id.* If the party should be joined but its joinder would defeat the court's jurisdiction, the court must move to the second part of the analysis, which requires a determination as to whether the party is indispensable under Rule 19(b). *Id.* If the absent party is both necessary under Rule 19(a)(1) and indispensable under Rule 19(b), the action must be dismissed. *Id.* (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993)). Conversely, if the court finds that an absent party is not necessary under Rule 19(a), it need not decide whether the party is indispensable under Rule 19(b). *Id.* The party seeking dismissal "bears the burden of showing that a non-party is both necessary and indispensable under Rule 19." *Eaton v. XPO Logistics Worldwide Inc.*, No. 1:19-CV-01518, 2020 WL 2847863, at \*2 (M.D. Pa. June 2, 2020).

A party is necessary under Rule 19(a)(1) if:

**(A)** in [the party's] absence, the court cannot accord complete relief among existing parties; or

**(B)** [the party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may:

    **(i)** as a practical matter impair or impede the [party's] ability to protect the interest; or

    **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Consistent with the language of the rule, courts treat subsections (a)(1)(A) and (a)(1) (B) disjunctively: if either subsection is satisfied, the absent party is necessary. *Gen. Refractories*, 500 F.3d at 312 (citing *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 158 F.3d 170, 175 (3d Cir. 1998)).

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 36 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

PHEAA argues that the Department is a necessary party because proceeding without it would "impair the Department's ability to protect its interests with respect to both PHEAA and Nigro's loans." (Doc. 13 at 29–30.) Additionally, PHEAA argues that it will be subjected to a "substantial risk of incurring inconsistent obligations" if the Department is not joined. (*Id.* at 30, 60 S.Ct. 413.)

Nigro argues that the Department is not a necessary party because all of the alleged wrongs relate to the servicing of his loans, "and no federal law or regulation is itself being challenged." (Doc. 18 at 33.) Nigro asserts that PHEAA has the power to correct past servicing wrongs without any need for the Department's presence. (*Id.*) Nigro then argues that the court should apply the same analysis that the court applied in *Commonwealth v. PHEAA*, No. 1784CV02682, 2018 WL 1137520, at *10 (Mass. Super. Ct. Mar. 1, 2018), in which the Massachusetts Superior Court held that the Department was not an indispensable party in a case regarding the servicing of loans because it was "not inevitable that the Department will have an interest in whatever judgment may be entered." 2018 WL 1137520, at *10. PHEAA argues in turn that *Commonwealth* is inapposite because, unlike the plaintiffs in that case, Nigro seeks to have his loans forgiven as a remedy for his unjust enrichment and § 1983 claims. (Doc. 19 at 20.) Since the decision of whether to forgive Nigro's loans is left to the Department, PHEAA argues that the court would not be able to accord complete relief between the existing parties if the Department were not joined. (*Id.* at 20–21, 60 S.Ct. 413.)

The court finds that the Department is not a necessary party to this action under Rule 19(a)(1). First, there is no indication that the court "cannot accord complete relief" in the absence of the Department. Fed. R. Civ. P. 19(a)(1)(A). Although PHEAA argues this is the case because Nigro seeks to have his loans forgiven, he only seeks such relief with respect to his unjust enrichment and § 1983 claims, *see* Doc. 8 ¶¶ 107, 118, 129, and neither one of those claims survives this opinion.

**\*13** Second, there is no indication that the case proceeding without the Department would "impair or impede" the Department's ability to protect its interests. Fed. R. Civ. P. 19(a)(1)(B)(i). PHEAA

advances two interests that the Department has that would purportedly be impaired if the case proceeded without the Department. (Doc. 13 at 31.) First, PHEAA asserts that the Department has "an actual property interest" in Nigro's loans. (*Id.*) Second, PHEAA asserts that "Nigro's pursuit of a judicial remedy is likely to impair the Department's ability to resolve this situation on its own terms, which it has plenary authority to do, and to administer the servicing of its loans in a consistent way across the country." (*Id.*)

The court disagrees that continuance of this case without the Department would harm the Department's property interest in Nigro's loans. The relief that Nigro seeks in this case is that he be "credited with all months in which he made payments, or was improperly prevented from making payments, since 2007," and that he be awarded damages from PHEAA for its improprieties in servicing his loans. (Doc. 8 ¶ 118.) The court does not see how the Department's interest would be harmed by a court order for PHEAA to correct its alleged improprieties in servicing Nigro's loans. Indeed, because the Department is tasked with administration of the PSLF, the Department's interests would, if anything, seem to be *advanced* by such an order. To hold otherwise would imply that the Department has an interest in its contractors committing malfeasance while servicing loans on its behalf, which is nonsensical.

Similarly, the court does not see how the case proceeding would harm the Department's interest in regulating student loans. To begin, there does not appear to be any support for the assertion that the Department has plenary authority to resolve the situation on its own. The only authority that PHEAA cites to support this proposition is 20 C.F.R. § 682.700, which plainly does not provide such support. *See* 20 C.F.R. § 682.700 (defining generally the purpose and scope of the Department's ability to limit, suspend, or terminate a lender's participation in direct loan programs). While the Department does have the power to suspend or terminate a lender's participation in the direct loan program, *see* 34 C.F.R. §§ 682.705–682.706, such power is not "plenary" and does not limit a court's ability to review the lender's actions. *Id.* Furthermore, while it may be true that the Department has an interest in consistent administration of student loans, the court does not see how that interest

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 37 of 53

Nigro v. Pennsylvania Higher Education Assistance Agency, Not Reported in Fed....

would be harmed by a court order for PHEAA to correct its alleged improprieties, since, as noted above, such an order would seem to advance the Department's interest as the administrator of the PSLF.

Finally, although PHEAA asserts that it is "at risk of multiple or inconsistent obligations" if the Department is not joined, *see* Doc. 13 at 31, it does not specify what those inconsistent obligations would be. PHEAA's argument in this regard provides only speculation as to the possibility of multiple or inconsistent obligations. *See id.* ("To the extent that Nigro seeks monetary and equitable relief that is at odds with the Department's view of an appropriate resolution for this matter, PHEAA will face multiple or inconsistent legal obligations that could be inequitable or mutually impossible to satisfy."). Such speculation

is not sufficient to satisfy PHEAA's burden under Rule 12(b)(7). Accordingly, the court concludes that the Department is not a necessary party under Rule 19(a)(1). Having reached such a conclusion, the court need not determine whether the Department is indispensable under Rule 19(b). *Gen. Refractories*, 500 F.3d at 312.

## CONCLUSION

**\*14** For the foregoing reasons, PHEAA's motion to dismiss is granted. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5369980

## Footnotes

1    A forbearance is a period of administrative suspension of a loan "when no loan payment is permitted and interest accumulated in that period is capitalized to increase principal." (Doc. 8 ¶ 8.)

2    PHEAA argues in a footnote that its standing argument could also be characterized as a ripeness argument. (*See* Doc. 13 at 22 n.8.) The court will not address this argument because it was raised only in a footnote. *See, e.g., John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Kitsock v. Baltimore Life Ins. Co.*, No. 3:12-CV-01728, 2014 WL 65302, at \*8 n.3 (M.D. Pa. Jan. 8, 2014) ("An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote.)" (quoting *Schmalz v. Sovereign Bancorp., Inc.*, 868 F. Supp. 2d 438, 457 n. 14 (E.D. Pa. 2012))). Several other arguments that PHEAA raises only in footnotes are rejected for the same reason. (*See* Doc. 13 at 18 n.7 (arguing that the derivative sovereign immunity argument can be analyzed under Rule 12(b)(6) in addition to Rule 12(b)(1)); *id.* at 25, 60 S.Ct. 413 n.9 (arguing that portions of Nigro's unjust enrichment claim are barred by the applicable statute of limitations); *id.* at 28, 60 S.Ct. 413 n.12 (arguing that damages for emotional distress are not recoverable under the UTPCPL); *id.* at 28, 60 S.Ct. 413 n.13 (arguing that portions of Nigro's UTPCPL claim are barred by the applicable statute of limitations).) Although PHEAA developed its statute of limitations arguments in its reply brief, *see* Doc. 19 at 10, 14, those arguments are still rejected because they were not properly raised in PHEAA's supporting brief. *See Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 328 F. Supp. 2d 522, 529 (M.D. Pa. 2004) ("It is improper for a party to present a new argument in [a] reply brief.") (quoting *United States v. Medeiros*, 710 F. Supp. 106, 109 (M.D. Pa. 1989)).

3    Although the unjust enrichment claims in *Hyland* and *Olsen* were not based on Pennsylvania law, the elements of unjust enrichment cited by the *Hyland* and *Olsen* courts are legally indistinguishable from the elements necessary to state a claim for unjust enrichment under Pennsylvania law. In both cases, the plaintiff needed to allege (1) that the plaintiff conferred a

benefit on defendant; (2) the defendant appreciated the benefit; and (3) the circumstances were such that it would be unjust for the defendant to retain the benefit. *See Hyland*, 2019 WL 2918238, at *13; *Olsen*, 392 F. Supp. 3d at 1022.

4    The amended complaint alleges that PHEAA is responsible for the actions of the other loan servicers. (*Id.* ¶¶ 54, 81.)

5    Under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a plaintiff may bring a private action for damages against a federal agent for alleged violations of the plaintiff's constitutional rights under certain circumstances.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 40 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

2022 WL 787957
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

UNITED STATES of America EX
REL. Shauna HLYWIAK, Plaintiff,

v.

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., et al., Defendants.

No. 1:20-cv-13590
|
Filed 03/15/2022

**Attorneys and Law Firms**

Noah Axler, Anderson Kill, P.C., 1760 Market St., Suite 600, Philadelphia, PA 19103, David M. Cedar, Williams Cedar, LLC, 8 Kings Highway West, Suite B, Haddonfield, NJ 08033, Gerald J. Williams, Williams Cedar, LLC, One South Broad St., Suite 1510, Philadelphia, PA 19107, On behalf of Plaintiff/Relator Shauna Hlywiak.

Jonathan Spells Krause, Corinne Samler Brennan, Klehr Harrison Harvey Branzburg, LLP, 1000 Lincoln Drive East, Suite 201, Marlton, NJ 08053, On behalf of Defendants Great Lakes Educational Loan Services, Inc., Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC; and Nelnet, Inc.

David G. Murphy, Diane A. Bettino, Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, NJ 08540, On behalf of Defendants Navient Corporation and Navient Solutions LLC.

Stephen M. Orlofsky, Nicholas C. Harbist, Blank Rome LLP, 300 Carnegie Center, Suite 220, Princeton, NJ 08540, Blair A. Gerold, Blank Rome LLP, 1 Logan Square, Philadelphia, PA 19103, On behalf of Defendant Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.

David Edward Dauenheimer, U.S. Department of Justice Office of the U.S. Attorney, 970 Broad St., Newark, NJ 07102, On behalf of Interested Party United States.

**OPINION**

O'HEARN, District Judge.

**INTRODUCTION**

**\*1** Plaintiff/Relator Shauna Hlywiak ("Relator") brings this *qui tam* action against Defendants Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc. (collectively, "Nelnet"), Navient Corporation and Navient Solutions LLC (collectively, "Navient"), and Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing ("PHEAA," and together with Great Lakes, Nelnet, and Navient, the "Defendants"), [1] alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). (Am. Compl., ECF No. 5, ¶ 1). In her Amended Complaint (ECF No. 5), Relator alleges that Defendants, which service federal student loans, are liable under the FCA for violating federal and state laws in breach of their servicing contracts ("Servicing Contracts") with the U.S. Department of Education ("DOE") by failing to apply student loan borrowers' payments to those borrowers' loans with the highest interest rate since the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") [2] was passed in March 2020. (Am. Compl., ECF No. 5, ¶¶ 5–9). Now, this matter comes before the Court upon PHEAA's Motion to Dismiss the Amended Complaint, (ECF No. 71), which Navient, Great Lakes, and Nelnet join (ECF No. 72; ECF No. 73). For the reasons that follow, the Court **GRANTS** Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72; ECF No. 73) and **DISMISSES** the Amended Complaint (ECF No. 5).

**I. BACKGROUND**

**A. Procedural History**

Relator instituted this *qui tam* action on September 30, 2020. (ECF No. 1). After an investigation into Relator's claims, the United States filed a Notice of Election to Decline Intervention on January 5, 2021. (ECF No.

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 41 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

3). Relator filed an Amended Complaint against the Defendants on January 7, 2021. (ECF No. 5).[3]

In their Joint Motion to Dismiss, Defendants argue that the Amended Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) because Relator fails to state a claim under the FCA as she fails to plausibly allege (i) that Defendants submitted false claims; (ii) that any alleged misrepresentations —which there were none—were material to DOE's decision to pay Defendants; (iii) that Defendants acted with the requisite scienter under the FCA; and (iv) that Defendants acted with the requisite particularity required by Rule 9(b). (ECF No. 71 at 1–4).

**\*2** Having considered the parties' arguments, the Court agrees with Defendants that Relator fails to state a claim and concludes that the Amended Complaint must be dismissed.

### B. Factual Background[4]

#### 1. Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), DOE has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, (ECF No. 5, ¶ 29). The Federal Student Aid ("FSA") office, a part of DOE, is responsible for managing these federal loan programs authorized under the HEA. (ECF No. 5, ¶ 29).

Congress directed DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, DOE awarded each Defendant a Servicing Contract with a five-year term, each of which has been extended numerous times. (ECF No. 5, ¶¶ 30, 32, 36). The Servicing Contracts require each Defendant to " 'be responsible for maintaining

a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.' " (ECF No. 5, ¶¶ 33, 44, 56).[5] DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (ECF No. 5, ¶¶ 48–51; Ex. A, § B.13). The Servicing Contracts guarantee a minimum annual revenue for each Defendant "provided that [they are] in compliance with the requirements for servicing federally held debt." (ECF No. 5, ¶ 31; Ex. A, § B.13). The Servicing Contracts also state:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer[s] (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

**\*3** (ECF No. 5, ¶ 46; Ex. A, § B.13).

Relator alleges that Defendants were not servicing loans in compliance with the Servicing Contracts because they violated federal and state law after the CARES Act was passed in March 2020.

#### 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance [6] until September 30, 2020, meaning that all payments due for certain student loans held by DOE were suspended, interest on these loans would not accrue after March 13, 2020, and the interest rates on the loans were temporarily reduced to 0% (the "CARES Act Forbearance Period"). Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education ("Secretary") to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum. [7] Since that first extension, the CARES Act Forbearance Period has been extended several times—most recently until May 1, 2022. [8]

Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a borrower has more than one loan.

### 3. Relator's Prepayments and Allegations against Defendants

**\*4** Relator Shauna Hlywiak, whose federal student loans are serviced by Great Lakes, made prepayments between March and August 2020 during the CARES Act Forbearance Period, (ECF No. 5, ¶¶ 112–22). Relator alleges that Great Lakes wrongfully applied her prepayments proportionally across her various loans, instead of allocating her prepayments to the loans with the highest interest rate. (ECF No. 5, ¶¶ 123–26). Relator argues that this proportional allocation method violates federal and state law because Great Lakes was required to allocate each prepayment to her loans with the highest interest rate, and that Great Lakes' website stated that it would apply prepayments to a borrower's highest interest rate loans. (ECF No. 5, ¶¶ 123–26).

An example of Defendants' proportional allocation method is instructive. Relator made a $1,300 prepayment toward her federal student loans during the CARES Act Forbearance Period on May 15, 2020. (ECF No. 5, ¶ 115). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, and her $1,300 prepayment was allocated proportionally among the principals of her federal student loans as follows:

| Loan Number | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Prior to the COVID Forbearance Period |
|---|---|---|---|---|
| 519 | $0.00 | $0.00 | $3,247.42 | 5.600% |
| 520 | $36.40 | $0.00 | $2,406.49 | 6.800% |
| 521 | $0.00 | $0.00 | $4,175.21 | 4.500% |
| 522 | $69.94 | $0.00 | $4,601.54 | 6.800% |
| 523 | $34.97 | $0.00 | $2,300.72 | 6.800% |
| 524 | $0.00 | $0.00 | $5,103.01 | 3.400% |

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

| 525 | $32.37 | $0.00 | $2,135.00 | 6.800% |
| 526 | $0.00 | $0.00 | $5,190.38 | 3.400% |
| 527 | $5.33 | $0.00 | $348.33 | 6.800% |
| 528 | $172.64 | $0.00 | $11,369.12 | 5.410% |
| 529 | $233.60 | $0.00 | $14,723.05 | 6.210% |
| 530 | $111.41 | $0.00 | $7,332.11 | 5.410% |
| 531 | $315.90 | $0.00 | $20,796.26 | 5.840% |
| 533 | $297.44 | $0.00 | $19,548.79 | 5.310% |

(ECF No. 5, ¶ 116). She asserts that Great Lakes violated federal and state law when it proportionally allocated her prepayment, as Great Lakes should have allocated her $1,300 prepayment only to her loans that had been assigned a 6.800% interest rate—the highest interest rate—prior to the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 123–125). Relator alleges that she "brought the misallocation to the attention of Great Lakes" via e-mail, and Great Lakes responded explaining that the interest rates for Relator's loans are not "taken into consideration" because all the interest rates of her loans had been lowered to 0% during the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 126–27). Therefore, the prepayments were prorated across her loans "based on the outstanding principal balance only."[9] (ECF No. 5, ¶ 127).

Relator alleges that after this "exchange" with Great Lakes, she contacted other individuals whom Relator knew were also continuing to pay their federal student loans during the CARES Act Forbearance Period, and that these individuals, whose loans were serviced by Great Lakes, Nelnet, Navient, and PHEAA, sent her "screenshots" showing that these Defendants were proportionally allocating these individuals' prepayments as well. (ECF No. 5, ¶ 128).

**4. Defendants' Website Representations**

Relator alleges that Great Lakes' website indicates that Great Lakes' default payment allocation method for prepayments is that the portion of the prepayment that is applied to principal will be applied to the principal of a borrower's highest-interest-rate loan, including those

that are in forbearance. (ECF No. 5, ¶¶ 94–95). Nelnet's website allegedly makes a similar representation that any prepayment will be allocated across a borrower's loans "starting with the highest interest rate," including those loans that are "not in repayment status," which Relator interprets to mean those loans in forbearance. (ECF No. 5, ¶¶ 96–97). Relator further alleges that Navient's website indicates the same default allocation method: where a borrower does not "provide special payment instructions," a prepayment will be allocated to a borrower's loan with the highest interest rate. (ECF No. 5, ¶ 98). Relator's allegations regarding PHEAA's website do not discuss PHEAA's payment allocation method, and instead allege that its website states that a prepayment could assist a borrower to "pay less interest over the life" of the borrower's loan by making prepayments. (ECF No. 5, ¶ 101).[10]

**5. Alleged Violations of Federal and State Law**

**\*5** In asserting that Defendants violated federal law, Relator relies on former President Obama's Presidential Memorandum ("Presidential Memorandum") issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "[a]s soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate ... unless otherwise instructed by borrowers."[11] Relator further asserts that Defendants violated the Consumer Financial Protection Act ("CFPA"), "which prohibits 'unfair, deceptive, or abusive acts or practices' in connection with any

transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," (ECF No. 5, ¶ 110 (citing 12 U.S.C. § 5531)), and briefly refers to a case where the Consumer Financial Protection Bureau ("CFPB") sued Navient under the CFPA "for making misrepresentations to borrowers and misallocating payments, in context other than those set forth in this Amended Complaint," (ECF No. 5, ¶ 110).

Relator alleges that Defendants also violated the following state laws: (1) New Jersey's Student Borrower Bill of Rights (N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*); (2) California's Student Borrower Bill of Rights (CAL. CIV. CODE § 1788.100 *et seq.*); (3) Colorado's Student Loan Servicers Act (COL. REV. STAT. ANN. § 5-20-101 *et seq.*); (4) North Carolina's Student Borrowers' Bill of Rights (H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019)); (5) Rhode Island's Student Loan Bill of Rights (19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.*); and (6) Virginia's law regulating education loan servicers, (2020 Va. Legis. Serv. ch. 1198 (West) (codified at VA. CODE ANN. § 6.2-2611(4))). (ECF No. 5, ¶¶ 58–63).

#### 6. Violation of the False Claims Act (Count I)

In a single Count in the Amended Complaint, Relator alleges that Defendants knowingly violated the Presidential Memorandum, the CFPA, and numerous state laws, and therefore, when Defendants knowingly failed to disclose to the Government that they had committed these violations when seeking to be paid for their services under the Servicing Contracts, Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval" and "knowingly made, used, or caused to be made or used a false record or statements material to false or fraudulent claims." (ECF No. 5, ¶ 131–32).

Relator alleges that the Government paid for these claims which would not otherwise have been allowed to be paid under the Servicing Contracts, and that the Government relied on the accuracy of Defendants' "claims, statements, and records," unaware of their false and fraudulent nature. (ECF No. 5, ¶ 133). Relator asserts that "Defendants acted with the requisite scienter" and that compliance with these laws

and contractual provisions were a "precondition of payment by the United States Government." (ECF No. 5, ¶ 134). Relator alleges that due to Defendants' proportional payment allocation method, borrowers' student loans will remain in repayment longer with Defendants receiving additional fees for an extended period of time, resulting in the Government paying more in servicing fees over the life of the loans. (ECF No. 5, ¶ 136).

**\*6** According to Relator, the Servicing Contracts permit the Government to order the return of all the servicing fees that were billed and paid "from the time of noncompliance with any applicable federal requirement." (ECF No. 5, ¶ 135). Consequently, every billing made to the Government for servicing the accounts of borrowers that made prepayments during the CARES Act Forbearance Period is an independent false claim under the FCA. (ECF No. 5, ¶ 135).

### II. <u>LEGAL STANDARD</u>

#### A. Motion to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. *Id.* at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When reviewing a plaintiff's complaint on a motion to dismiss under Rule 12(b)(6), the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi*, 696 F.3d

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 45 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

352, 358 n.1 (3d Cir. 2012). When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that form the basis of the claim. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## B. The False Claims Act

Under the FCA, it is unlawful to knowingly submit a fraudulent claim to the federal government. *In re Plavix Mktg., Sales Prac. & Prod. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 938 (D.N.J. 2017) (citing *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014)). The FCA includes a *qui tam* provision permitting private parties, known as relators, to bring suit on behalf of the United States against anyone who has submitted a false claim to the government. *Id.* at 938–39 (citing *Schumann*, 769 F.3d at 840). A violation of the FCA has four elements: (1) falsity, (2) causation, (3) knowledge, and (4) materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

There are two primary categories of false claims that can satisfy the falsity requirement: (1) factually false claims and (2) legally false claims. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Wilkins v. United Health Grp. Inc.*, 659 F.3d 295, 305 (3d Cir. 2011).

**\*7** Legally false claims are subcategorized into two theories of liability: (1) express false certification and (2) implied false certification. *United States v. Kindred Healthcare Inc.*, 469 F. Supp. 3d 431, 444–45 (E.D. Pa. 2020). A defendant is liable under the express false certification theory when they falsely certify that they have complied with a material statute, regulation, or contractual provision. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "By contrast, implied false certification

liability attaches when a claimant 'makes specific representations about the goods or services provided' and the claimant's 'failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.' " *United States v. Eastwick Coll.*, 657 F. App'x 89, 93–94 (3d Cir. 2016) (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016)).

Because FCA claims allege fraud, they are subject to the heightened pleading standards of Rule 9(b). *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d. Cir. 2014). For a relator to satisfy the standards of Rule 9(b) for purposes of FCA claims, the relator "must provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' Describing a mere opportunity for fraud will not suffice. Sufficient facts to establish 'a plausible ground for relief' must be alleged." *Id.* at 157–58 (citing *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) and *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)).

## III. DISCUSSION

Because Relator asserts that the Defendants violated the FCA by failing to disclose noncompliance with "material statutory, regulatory, or contractual requirements" when making "specific representations about the goods or services provided," Relator's claims are based on an implied false certification liability theory. *Eastwick Coll.*, 657 F. App'x at 93–94. Among Defendants' arguments for dismissal are that Relator fails to allege (a) that Defendants submitted false claims, (b) that such alleged misrepresentations were material to the Government's payment decisions, and (c) that the Defendants acted with the requisite scienter. The Court agrees and therefore grants their Joint Motion to Dismiss.

## A. Falsity

Relator bases her FCA claim on her allegation that Defendants failed to disclose that they violated the Presidential Memorandum, the CFPA, New Jersey's Student Borrower Bill of Rights, California's Student

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 46 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

Borrower Bill of Rights, Colorado's Student Loan Servicers Act, North Carolina's Student Borrowers' Bill of Rights, Rhode Island's Student Loan Bill of Rights, and Virginia's law regulating education loan servicers. [12] "The falsity element 'asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government.' " *United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, No. 19-18753, 2021 WL 1904735, at *5 (D.N.J. May 12, 2021) (quoting *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020)). The Court will address each of these alleged violations.

### 1. Alleged Violation of the Presidential Memorandum

**\*8** Defendants argue that the Presidential Memorandum places no direct obligation on servicers and was not law. Rather, the memorandum expressed the President's "policy preferences" and directed the Secretary to take further action; however, the Secretary never implemented the Presidential Memorandum's directive. (ECF No. 71 at 6–7, 16–18). Defendants are correct. The relevant portion of the Presidential Memorandum reads, "As soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." The Secretary, who has the authority to implement this change by promulgating regulations under 20 U.S.C. § 1082 (a)(1) of the HEA did not do so.

In Relator's Response in Opposition, Relator repeatedly refers to the Presidential Memorandum as "federal law," (ECF No. 80 at 5), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to argue that the President was acting through an "express or implied authorization of Congress" when issuing the Memorandum. (Case No. 21-09096, ECF No. 15 at 13–16). [13] However, Relator misses the mark. The Court need not determine whether former President Obama could issue the Presidential Memorandum—a fact no one disputes. Nor must the Court dive into the constitutional separation of powers because the HEA and the Presidential Memorandum do not conflict. Congress empowered the Secretary through

the HEA to "prescribe such regulations as may be necessary ... including regulations applicable to third party servicers." 20 U.S.C. § 1082(a)(1). The Presidential Memorandum instructed the Secretary to direct student loan servicers to allocate prepayments to a borrower's highest interest rate loan, through the Secretary's authority under the HEA, "[a]s soon as practicable." STUDENT AID BILL OF RIGHTS at 13476. The Secretary did not take the necessary action to transfer the President's policy objectives into law. This is unequivocally shown by two DOE publications, unenacted Congressional bills, and guidance issued by the FSA.

In July 2016, former Under Secretary of Education Ted Mitchell issued a memorandum ("Mitchell Memorandum") entitled "Policy Direction on Federal Student Loan Servicing" which "provide[d] policy direction for servicing of all federal student loans." U.S. DEP'T OF EDUC., POLICY DIRECTION ON FEDERAL STUDENT LOAN SERVICING [hereinafter MITCHELL MEMORANDUM] (2016) at 1. One of DOE's "policy directions" was to instruct servicers to apply prepayments to "the [borrower's] loan bearing the highest interest rate." *Id.* at 25. The Mitchell Memorandum intended the "policy choices" to be applied "to the ... extent feasible," and noted that some "aspects of this policy guidance" would need to be implemented through "future rulemakings," if "not currently allowable under [DOE's] regulations." *Id.* at 1 n.2. However, this "policy direction" was never implemented, and in April 2017, former Secretary Betsy DeVos formally withdrew the Mitchell Memorandum in a letter ("DeVos Letter") addressed to FSA. U.S. DEP'T OF EDUC., STUDENT LOAN SERVICER RECOMPETE [hereinafter DEVOS LETTER] (2017) ("As we move forward ... I am withdrawing ... the July 20, 2016 memorandum to you from former Under Secretary Ted Mitchell."). Congress also recognized that servicers were not required to allocate prepayments to a borrower's highest interest rate loan by introducing two bills in 2019 that would have amended the HEA to require servicers to do so; however, neither was passed. H.R. 5294, 116th Cong. § 2(g)(2) (2019); S. 1354, 116th Cong. § 3(a)(16)(G) (ii) (2019).

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 47 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

**\*9** Then, in February 2021, the FSA issued guidance ("FSA Guidance") confirming that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] at 1 (2021). Relator attempts to argue that the Court should ignore the FSA's "interpretation" of federal law (Case No. 21-09096, ECF No. 15 at 13), yet there are no regulations or statutes that cause the Court to question the statements in the FSA Guidance, nor have Plaintiffs identified any such regulations or laws.[14] The FSA Guidance simply confirms that, at the time it was issued, the HEA and DOE's regulations did not require loan servicers to allocate borrowers' prepayments to their highest-interest-rate loans. Therefore, the Amended Complaint fails to allege any violation of the HEA or DOE regulations, as the Presidential Memorandum was never implemented into law by the Secretary.

### 2. Alleged Violation of the CFPA

Relator next tries to ground Defendants' liability under the FCA in their alleged failure to disclose a supposed violation of the CFPA. Defendants argue that none of their website statements in the Amended Complaint reflects an "unfair, deceptive or abusive" act or practice as prohibited by the CFPA. (ECF No. 71 at 24–32). Defendants further note that they "are unaware of any court that has found a violation of the FCA based on a false certification of compliance with the CFPA." (ECF No. 71 at 25). The Court similarly has been unable to locate any case where a court has found a violation of the FCA based on non-compliance with the CFPA. Yet Relator's Response in Opposition wholly ignores each of Defendants' arguments regarding the CFPA and fails to mention the statute at all. Relator would have the Court find in her favor without providing a single case or argument while asking the Court to rule on a matter of first impression. Given Relator's apparent concession that the Amended Complaint fails to plausibly allege a violation of the CFPA, the Court declines to do so.

### 3. Alleged Violations of State Law

Relator next alleges that Defendants submitted false claims by failing to disclose supposed violations of six state laws. However, upon cursory review, Relator's allegations quickly and easily fail.

First, the California and Virginia state laws on which Relator relies were not even in effect in 2020 when the alleged misconduct in the Amended Complaint occurred. *See* CAL. CIV. CODE § 1788.100 *et seq.* (effective Jan. 1, 2021); VA. CODE ANN. § 6.2-2600 *et seq.* (effective July 1, 2021). And North Carolina's "law" is not a law at all, but a bill that was introduced in North Carolina's legislature in April 2019, yet never enacted. *See* H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019).

Next, the remaining three laws that Defendants allegedly violated—Colorado's Student Loan Servicers Act, New Jersey's Student Borrower Bill of Rights, and Rhode Island's Student Loan Bill of Rights—do not require that student loan servicers apply prepayments to a borrower's highest-interest-rate loan. *See* COL. REV. STAT. ANN. § 5-20-101 *et seq.*; N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*; 19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.* Instead, each contains a provision requiring that servicers "inquire of a student loan borrower" how to apply a prepayment to the borrower's student loans and to continue to implement the borrower's instructions on a go-forward basis. *See* COLO. REV. STAT. § 5-20-108(3)(a) (2019) ("[A] student loan servicer shall inquire of a borrower how to apply a[ ] [prepayment] to a student education loan.... A borrower's direction on how to apply a[ ] [prepayment] to a student education loan shall stay in effect for any future [prepayments]."); N.J. STAT. ANN. § 17:16ZZ-8(b) (2019) (similar); 19 R.I. GEN. LAWS § 19-33-8(g) (similar). The Amended Complaint includes no allegations that Defendants failed to request borrowers provide instructions on how to apply their prepayments, or that Defendants failed to follow their instructions.

**\*10** In her Response in Opposition, Relator attempts to assert new facts that Defendants failed to follow the borrower's explicit instructions which directed the

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 48 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

Defendants to allocate prepayments to their highest-interest-rate loans, (ECF No. 80 at 5), but the Amended Complaint is devoid of these allegations. Relator also attempts to incorporate new allegations that Defendants violated the New Jersey Consumer Fraud Act as a basis for her FCA claim (ECF No. 80 at 5), but these allegations are also not included in the Amended Complaint and will not be considered by the Court. *W. Penn Power Co.*, 147 F.3d at 259; *see Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 301 n.1 (E.D.N.Y. 2014) ("To the extent Plaintiff has any factual allegations sufficient to state a claim ... Plaintiff should include all of the necessary allegations in an amended complaint.").

The Amended Complaint fails to plausibly allege that Defendants violated any federal or state law or regulation to support the allegations that Defendants failed to disclose such supposed violations when submitting claims for payment. Accordingly, it must be dismissed.

### B. Materiality

Even if Relator did plausibly allege that Defendants violated a federal or state statute or regulation and submitted false claims by failing to disclose the supposed violation, Relator fails to allege sufficient facts to show that any supposed violations were material to the Government's payment decision.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 579 U.S. at 192. As set forth in *Escobar*, a misrepresentation is not material solely because compliance has been deemed a condition of payment, "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.

The FCA's materiality standard is "rigorous" and "demanding[,]" and the statute is not meant to be an "all-purpose antifraud statute ... or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 193–94. "[A] material misrepresentation is one that goes 'to the very essence

of the bargain.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5). Under the FCA, a misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citing 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)).

"[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194. Proof of materiality could include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 194–95. On the other hand, it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.* "[M]ateriality 'cannot be found where noncompliance is minor or insubstantial.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar* 579 U.S. at 178). Moreover, a plaintiff must plead claims of materiality with "plausibility and particularity" under Rule 9(b). *Id.* at 195 n.6.

Relator's claims fail under the *Escobar* standard because they contain no substantive allegations to support a finding of materiality. The Amended Complaint does not allege that DOE would have ceased payment to Defendants under the Servicing Contracts if it learned about the Defendants' proportional allocation method during the CARES Act Forbearance Period. It vaguely discusses a suit brought by the CFPB against Navient "for making misrepresentations to borrowers and misallocating payments," (ECF No. 5, ¶ 110) but offers no additional facts or analysis as to Relator's claims in this case, and instead only links the complaint from that suit in a footnote. (ECF No. 5, ¶ 110 n.10). These vague assertions fall far short of the requirement that materiality be pled with particularity. *Escobar*, 579 U.S. at 195 n.6. Further, Relator alleging that compliance with the Presidential Memorandum, the CFPA, or various state statutes was a condition of payment under the Servicing Contracts is insufficient

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 49 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

to demonstrate materiality. *Id.* at 194. While Relator alleges that the Servicing Contracts give DOE the option to decline to pay Defendants if it knew of Defendants' alleged wrongdoings, (ECF No. 5, ¶ 135), this is still insufficient for a finding of materiality. *Id.*

**\*11** In her Response in Opposition, Relator also relies on the FSA Guidance to argue that the Government did not have knowledge of Defendants' proportional allocation method until her FCA suit was filed, and that the Government having gained knowledge of Defendants' alleged misconduct is evidence of materiality. (ECF No. 80 at 7). However, Relator confuses what the Government *knew* with what is *material* to the Government's decision to pay Defendants under the Servicing Contracts. "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," and "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

Defendants highlight Relator's failure to plead facts showing that DOE halted payments to loan servicers based on any servicer's proportional allocation method (ECF No. 71 at 37), which Relator does not dispute, (ECF No. 80 at 6–8). Such failure "dooms [her] case." *Petratos*, 855 F.3d at 490. The Government is clearly aware of the Defendants' proportional allocation method by its issuance of the FSA Guidance, yet Relator fails to point to a single instance where the Government has refused to pay a federal student loan servicer for implementing a proportional payment allocation method. "Simply put, a misrepresentation is not material to the *Government's payment decision*," when the relator alleges the Government had knowledge yet provides no evidence that the Government stopped making payments or refused to make payments after gaining such knowledge. *Petratos*, 855 F.3d at 490 (emphasis in original; internal quotations omitted). Rather, this fact seems to establish conclusively the *lack* of materiality.

Relator next argues that the Government's having not moved to dismiss her Amended Complaint is evidence of materiality. (ECF No. 80 at 7–8). However,

considering that the Government would have to intervene in the case to file a motion to dismiss, as the Third Circuit recently held in *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 385 (3d Cir. 2021), Relator's assertion fails. Courts have often found where the Government declines to intervene in a *qui tam* FCA suit or take any action against a defendant after having notice of alleged misconduct to be evidence that the Government *does not* consider the alleged statutory, regulatory, or contractual violation to be "material" to the services that a defendant performs for the Government. *See Petratos*, 855 F.3d at 490; *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No. 13-05693, 2018 WL 1693349, at \*6 (E.D. Pa. Apr. 6, 2018). Additionally, as Defendants highlight in their Reply (ECF No. 83 at 13), courts often dismiss *qui tam* complaints for lack of materiality, despite the Government *not* having moved to dismiss the relator's complaint. *See Petratos*, 855 F.3d at 490–92; *Pioneer Educ.*, 2020 WL 4382275, at \*4–5; *In re Plavix*, 332 F. Supp. 3d at 949.

In sum, Relator fails to plead materiality to the heightened standard as set forth in *Escobar*, and therefore, her FCA claim must be dismissed. *Pioneer Educ.*, 2020 WL 4382275, at \*5 ("[F]ailure to plead materiality [is] a proper basis for a motion to dismiss." (internal quotations omitted)).

### C. Scienter

Even if Relator did plausibly allege that Defendants presented false claims to the Government and that those misrepresentations were material to the Government's payment decisions, the Amended Complaint fails to allege sufficient facts to allow the Court to "draw the reasonable inference" that Defendants knew that their claims were false or fraudulent. *Iqbal*, 556 U.S. at 678. The FCA imposes liability on a person who "knowingly" makes a false or fraudulent claim to the Government. 31 U.S.C. § 3729(a)(1)(A). The FCA defines "knowing" and "knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless disregard of information's truth or falsity. 31 U.S.C. § 3729(b) (1)(A). Specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B). *Escobar* emphasizes that, like the FCA's materiality requirement, the

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

scienter requirement is "rigorous." 579 U.S. at 182. " 'Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations.' " *United States v. Allergan, Inc.*, 746 F. App'x 101, 105–06 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (recognizing defense of reasonable, but erroneous, interpretation of ambiguous statute)).

**\*12** The Amended Complaint states that the Defendants "knowingly violated the Presidential Memorandum, the CFPA ... [and] state laws" and then "knowingly failed to disclose these violations" to the Government when servicing student loans. (ECF No. 5, ¶ 131). These are the only allegations to support Relator's legal conclusion that "Defendants therefore knowingly presented, or caused to be presented, false or fraudulent claims," (ECF No. 5 ¶ 132), and "acted with the requisite scienter" (ECF No. 5, ¶ 133). However, conclusory allegations are insufficient to plead knowledge under the FCA. *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760–61 (3d Cir. 2011). The Amended Complaint is otherwise devoid of facts supporting an inference that Defendants "knew, acted in reckless disregard, or deliberately ignored that [their] submissions were false." *Id.*

In Relator's Response in Opposition, she cites several CFPB reports, which Defendants rely on in their Joint Motion to Dismiss, to argue that because the CFPB has cited some student loan servicers in the past for misconduct and that servicers may have "mismatched incentives" when allocating prepayments, that these reports "surely support[ ] the allegation of the requisite scienter." (ECF No. 80 at 10–12). These arguments are unavailing. Even if Relator plausibly alleges that Defendants submitted false claims to the Government—which she does not—no information from the CFPB reports was alleged in the Amended Complaint to cure Relator's pleading deficiencies to lead to the "reasonable inference" that Defendants knowingly submitted false or fraudulent claims.[15] *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.' " (quoting *Twombly*, 550 U.S. at 545–46)).

Even if Relator plausibly alleged that Defendants knowingly submitted false or fraudulent claims, she must further plausibly allege that the Defendants *knew* compliance was material to the Government's payment decision, which the Amended Complaint again fails to do. *Escobar*, 570 U.S. at 181. Relator's conclusory allegation that "Defendants acted with the requisite scienter and [sic] compliance ... was a precondition of payment," (ECF No. 5, ¶ 134), is insufficient. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Further, "even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability." "What matters is not the label the Government attaches to a requirement, but whether the defendant *knowingly* violated a requirement that the defendant *knows is material* to the Government's payment decision." *Escobar*, 579 U.S. at 181 (emphasis added).

Relator fails to plausibly allege that Defendants knew they were submitting false claims to the Government, or that Defendants knew compliance was material to the Government's payment decisions. The Amended Complaint thus must be dismissed.

**\*\*\*\*\***

Relator has failed to plausibly allege that Defendants (a) were noncompliant with any federal or state statute or regulation violation rendering any claims submitted as false, (b) that Defendants submitted false claims that were material to the Government's payment decisions, or (c) that Defendants knowingly submitted false claims or knew noncompliance was material to the Government's payment decisions.[16] Because the Court finds that Relator has failed to state an FCA claim on each of these grounds, it need not address Defendants' remaining arguments regarding the applicability of the public disclosure bar or whether the HEA preempts any state laws.[17]

### IV. CONCLUSION

Case 3:18-cv-00121-JFS-PJC    Document 178-2    Filed 09/16/25    Page 51 of 53

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

**\*13**  For the foregoing reasons, Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72, ECF No. 73) is **GRANTED** and Relator's Amended Complaint (ECF No. 5) is **DISMISSED**. The Court will permit Hlywiak an opportunity to file a Motion for Leave to Amend within thirty (30) days, in which she explains how the deficiencies outlined herein may be cured through amendment. [18]  An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 787957

---

## Footnotes

1    "FedLoan Servicing" was originally named as a Defendant in the Amended Complaint (ECF No. 5), but per Relator and PHEAA's Stipulation of Dismissal (ECF No. 35), Relator withdrew all claims against "FedLoan Servicing" which was added as a "d/b/a" name of PHEAA, and the case caption was revised accordingly.

2    CARES Act, Pub. L. No. 116-136, §§ 3513(a)–(b), 134 Stat. 281, 404.

3    Shortly after Relator filed her Amended Complaint, several other federal student loan borrowers represented by the same counsel as Relator filed three putative class action complaints against the same Defendants, (Case No. 21-01047; Case No. 21-01052; Case No. 21-09096), asserting common law and state law claims based on substantially the same facts. This Opinion contains similar background as its recent Opinion in the putative class action cases, given the overlapping allegations across the four cases.

4    Because the Joint Motion to Dismiss before the Court is under Rule 12(b)(6), the Court accepts the factual allegations in the Amended Complaint (ECF No. 5) as true and will view all facts in the light most favorable to Plaintiffs as the non-moving parties. *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Relator attaches a "disclosure statement" to her Amended Complaint (ECF No. 5-1 at 80–83); however, the Court does not find that this is a "written instrument" to be considered part of the pleading under Rule 10(c), as "affidavits are not considered a 'written instrument' " and instead are considered "outside the pleading." *Barnard v. Lackawanna County*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016), *aff'd*, 696 F. App'x 59 (3d Cir. 2017); Fed. R. Civ. P. 10(c).

5    Relator alleges that the Servicing Contracts with all Defendants are "replicas" and attaches only the Servicing Contract with Great Lakes (ECF No. 5, ¶ 30 n.2), which Defendants do not contest.

6    34 C.F.R. § 685.205(a) (2020) (" 'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In Certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower ... due to a ... local or national emergency.").

7    Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

8    Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Amended Complaint being filed or the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 390 n.34 (D.N.J. 2010).

9    The Amended Complaint alleges that Great Lakes prorated Relator's prepayments across her unsubsidized loans only, and not her subsidized loans (Loan Nos. 519, 521, 524, and 526) (ECF No. 5, ¶ 127), but any material distinction between subsidized and unsubsidized loans is not explained in the Amended Complaint or raised by the parties in their Briefs related to this Motion. Therefore, the Court does not view any such distinction as material to its analysis of the Motion.

10   The Amended Complaint alleges that Defendants' websites defined other terms such as "excess payment" and "overpayment" to mean the portion of a payment received above the amount that was currently due. (ECF No. 5, ¶¶ 93, 99). For clarity's sake, the Court uses the codified term "prepayment," in this Opinion, as it finds all these terms to be substantially similar when referring to the amounts that Relator paid during the CARES Act Forbearance Period. *See* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.").

11   Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473, 13476 [hereinafter STUDENT AID BILL OF RIGHTS] (Mar. 13, 2015). Relator further asserts that although the Presidential Memorandum directed the Secretary to implement this change "as soon as practicable," the Secretary was to take action "no later than January 1, 2016." (ECF No. 5, ¶¶ 54–55). However, the Court takes judicial notice of the full text of the Memorandum, *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d at 390 n.34, and does not accept this statement as true because the Memorandum clearly instructed the Secretary to implement the change "[a]s soon as practicable," not by January 1, 2016. *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) ("[T]he Court need not accept Plaintiffs' allegations as true to the extent that they directly contradict the unambiguous text of [authentic documents or matters of public record]."). Rather, separate directives to the Secretary were to be completed "[b]y January 1, 2016." *Compare* STUDENT AID BILL OF RIGHTS at 13476 ("*By January 1, 2016*, the Secretary of Education shall require all Federal Direct student loan servicers to provide enhanced disclosures to borrowers and strengthened consumer protections." (emphasis added)) *with id.* ("*As soon as practicable*, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." (emphasis added)).

12   Relator also alleges that Defendants violated the "Master Promissory Notes" (ECF No. 5, ¶¶ 131–32), but the Amended Complaint contains no information on what part or provision of the Master Promissory Notes that Defendants may have violated, nor does Relator's Response in Opposition mention the Master Promissory Notes. Therefore, the Court will not accept these conclusory allegations as true. *Iqbal*, 556 U.S. at 679 ("[P]leadings that ... are no more than conclusions, are not entitled to the assumption of truth.").

13   Relator's legal analysis regarding the Presidential Memorandum was included in the Response in Opposition filed by the plaintiffs in the factually-related putative class actions discussed above, *see supra* note 3, and is only incorporated by reference in Relator's Brief in this case. (ECF No. 80 at 5). However, the Court's Scheduling Order clearly separated the briefing in the present

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

case from the putative class actions, and Relator was to "file a single brief in opposition to all arguments raised" in Defendants' Joint Motion to Dismiss. (ECF No. 67 at 5). The Court nevertheless addresses the issue.

14   Even if the HEA or 34 C.F.R. § 685.211 were ambiguous as to Defendants' obligations regarding applying prepayments—which they are not—the Court must give "substantial deference" to the DOE's reasonable interpretation of the HEA, and the DOE's interpretation of its own regulations is "controlling." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015) (stating that "[t]he Secretary's reasonable interpretation of the [HEA] is entitled to substantial deference" and the DOE's interpretation of its own regulations is "controlling" unless it is "(1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency's fair and considered judgment on the matter in question, or (3) represents a post hoc rationalization advanced by the agency seeking to defend past agency action against attack.").

15   Defendants further argue that their interpretation of legal requirements were objectively reasonable since it was DOE's own understanding of the law that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan." (ECF No. 71 at 40–42 (quoting FSA GUIDANCE at 1)). However, the Court does not reach this argument where it does not find Defendants' interpretation of federal law or DOE's regulations erroneous.

16   Defendants separately argue that Relator's allegations are not sufficiently particularized under the heightened pleading standard imposed on fraud claims by Federal Rule of Civil Procedure 9(b). *See Foglia*, 754 F.3d at 155–56 (acknowledging that the Rule 9(b) standard applies to FCA claims). The Court declines to address this argument because regardless of their relative *particularity*, the *plausibility* of Plaintiff's allegations regarding falsity, materiality, and scienter— or rather, the lack thereof—dooms her claim under Rule 12(b)(6).

17   The Court also does not reach Nelnet's argument that Nelnet, Inc. and Nelnet Diversified Solutions, LLC do not service any federal student loans at issue or present claims for payment to the Government (ECF No. 71-1 at 49 n.17), as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion where Relator's Amended Complaint fails to state an FCA violation under Rule 12(b)(6).

18   Any motion by Relator for leave to file a second amended complaint must attach a copy of the proposed amendment as well as a redline reflecting proposed changes. L. Civ. R. 15.1(a).

---

**End of Document**                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.