## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JILL BALLARD, REBECCA VARNO, and
MARK POKORNI, on behalf of themselves
and the class members described herein,

      Plaintiff,

    vs.

NAVIENT CORPORATION,
NAVIENT SOLUTIONS, INC., AND
NAVIENT SOLUTIONS, LLC,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:18-cv-00121-JFS-PJC

Judge Joseph F. Saporito, Jr.

**Magistrate Judge Phillip J. Caraballo**

ELECTRONICALLY FILED

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS <u>CERTIFICATION</u>

Anthony Fiorentino
**FIORENTINO LAW OFFICE**
6119 North Kenmore Ave., Ste. 410
Chicago, IL 60660
(312) 305-2850
anthony@fiorentinolaw.com

Carlo Sabatini, PA 838311
**SABATINI LAW FIRM, LLC**
216 N. Blakely St.
Dunmore, PA 18512
(570) 341-9000
ecf@bankruptcypa.com

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS,
LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
Phone (312) 739-4200
dedelman@edcombs.com
tgoodwin@edcombs.com

# **Table of Contents**

TABLE OF AUTHORITIES ................................................................. iv

I.      INTRODUCTION ...............................................................1

II.     STATEMENT OF QUESTIONS INVOLVED ........................1

III.    HISTORICAL BACKGROUND ...........................................1

        1. History of Loan Programs .............................................1

        2. Background of Plaintiffs ................................................3

        3. Background of Defendants .............................................3

        4. Applicable Contacts......................................................6

             A. Servicing Contract................................................6

             B. Master Promissory Note ......................................7

IV.     APPLICABLE REGULATIONS ...........................................7

        1. Repayment Plans ...........................................................7

        2. IDR Enrollment .............................................................8

        3. IDR Recertification .......................................................9

        4. Timely IDR Submissions..............................................10

        5. Payment Recalculation .................................................10

        6. Discretionary Forbearances ..........................................10

        7. Administrative Forbearances ........................................12

        8. Deferments....................................................................13

V.      CFPB FINDINGS AND PLAINTIFFS' ACCOUNT HISTORY................13

        1. CFPB's Data and Findings ...........................................14

        2. Improper Forbearance Enrollment ................................15

        3. IDR Processing Delays .................................................17

        4. IDR Renewal Issues......................................................19

        5. Improper Rejections and Forbearances .........................22

        6. Improper Renewal Notices ...........................................26

        7. Economic Incentives.....................................................28

             A. Companies servicing their own FFELP portfolios ...............28

B. Securitization of FFELP Loans ...........................................................30

C. Servicers engaged in debt collection .................................................31

8. Settlement with CFPB ..........................................................................32

VI.     ATTORNEYS GENERAL LAWSUIT..............................................................33

VII.    PROCEDURAL HISTORY ...........................................................................34

1. First Amended Complaint .....................................................................34

2. Written Class Discovery........................................................................34

3. Second Amended Complaint .................................................................35

4. Response to Computer Searches............................................................36

5. Third Amended Complaint ....................................................................37

6. Navient's Computer Search Results ......................................................38

7. ED's Search Results ..............................................................................38

VIII.  STATEMENT OF LAW ...............................................................................39

IX.     PLAINTIFFS' CLAIMS...............................................................................40

1. Breach of Contract ................................................................................40

2. Pennsylvania Claims.............................................................................43

3. California Claims...................................................................................44

4. New York Claims ..................................................................................44

5. Illinois Claims.......................................................................................45

6. Other Damages ......................................................................................45

X.      CLASS CERTIFICATION...........................................................................47

1. Proposed Classes ..................................................................................48

A. Improper IDR cancellation ..............................................................48

B. Improper forbearances .....................................................................49

C. IDR processing delay .......................................................................52

2. Numerosity ............................................................................................53

3. Typicality...............................................................................................53

4. Adequacy ...............................................................................................54

5. Commonality and Predominance...........................................................55

6. Superiority .............................................................................................57

7. Plaintiffs' Damages Model ........................................................................60

  A. Statutory damages for non-quantifiable injuries .................................60

  B. Damages for "Improper IDR Cancellation" class ..............................62

      *i.*   *Monetary relief* ..........................................................................62

      *ii.*  *Account corrections (Navient-owned loans* ..........................62

      *iii.* *Monetary relief (ED-owned loans)* .....................................62

  C. Damages for "Modified Forbearance Class" ........................................64

      *i.*   *Account corrections (Navient-owned loans)* ......................64

      *ii.*  *Monetary relief (ED-owned loans)* ...................................64

  D. Damages for the "Improper Delay Class" ............................................65

      *i.*   *Account corrections (Navient-owned loans)* ......................65

      *ii.*  *Monetary relief (ED-owned loans)* ...................................65

  E. Plaintiffs' expert will calculate damages ...........................................65

  8. Defendants' Expert is not Persuasive .....................................................66

  A. Ang contradicts the testimony, written statements, and computer

     searches of Defendants ........................................................................66

  B. Ang's argument that some borrowers were "unharmed" is based on

     false assumptions ...............................................................................68

  C. Differentials in damages do not militate against certification .............70

  D. Ang erroneously concludes that Plaintiffs' damages model is

     "speculative" ......................................................................................71

  E. Ang erroneously concludes that inflated payments did not cause

     harm ...................................................................................................72

  F. Ang erroneously concludes that Varno's class requires individualized

     liability determinations.......................................................................73

  9. Plaintiffs' Counsel will Provide Adequate Representation......................74

XI.     CONCLUSION...............................................................................77

# TABLE OF AUTHORITIES

Cases

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................58

*CFPB v. Navient Corp.*,
  No. 3:17-CV-101 (M.D. Pa.)........................................................ 14, 32

*Chakejian v. Equifax Info. Servs. LLC*,
  256 F.R.D. 492 (E.D. Pa. 2009) .........................................................61

*Coleman v. Gen. Motors Acceptance Corp.*,
  220 F.R.D. 64 (M.D. Tenn. 2004) ......................................................76

*Comcast Corp. cv. Behrend*,
  569 U.S. 27 (2013) ................................................................... 47, 60

*Danganan v. Guardian Prot. Servs.*,
  645 Pa. 181 A.3d 9 (2018)..................................................................60

*Gaidon v. Guardian Life Ins. Co. of Am.*,
  725 N.E.2d 598 (1999) .......................................................................44

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ..........................................................................39

*Hassine v. Jeffes*,
  846 F.2d 169 (3d Cir. 1988)...............................................................54

*Huber v. Simon's Agency, Inc.*,
  84 F.4th 132 (3d Cir. 2023)................................................................70

*In re Checking Account Overdraft Litigation*,
  286 F.R.D. 645 (S.D. Fla. 2012) ........................................................66

*In re Cmty. Bank of N. Virginia*,
  418 F.3d 277 (3d Cir. 2005).............................................................71

*In re Fedloan Student Loan Servicing Litig.*,
  No. MDL 18-2833 (E.D. Pa. Feb. 18, 2025) No. 25-1533,  (3d Cir. July 30,
  2025)................................................................................... 71,72

*In re Honeywell Intern Inc., Securities Litigation*,
  211 FRD 255 (D.N.J. 2002) ...................................................................60

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) .................................................................53

*In re Warfarin Sodium*,
  391 F.3d at 534 .....................................................................................57

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ...................................................... 58, 59

*Lewis v. Ford Motor Co.*,
  263 F.R.D. 252 (W.D. Pa. 2009) ...........................................................75

*Mace v. Van Ru Credit Corp.*,
  109 F.3d 338 (7th Cir. 1997) ................................................................59

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) .................................................................40

*Navient*,
  3:17-cv-1814 at ECF 98. .......................................................................33

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) .................................................................70

*New Directions Treatment Services v. City of Reading*,
  490 F.3d 293 (3d Cir. 2007) .................................................................74

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ..............................................................................58

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) .................................................................52

*Russell v. Educational Commission for Foreign Medical Graduates*,
  15 F.4th 259 (3d Cir. 2021) ..................................................................47

*Santos v. Healthcare Revenue Recovery Grp., LLC.*,
  90 F.4th 1144 (11th Cir. 2024)..............................................................61

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) .................................................................56

*Sheinberg v. Sorensen*,
  606 F.3d 130 (3d Cir. 2010) ..................................................................74

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003) ....................................................................55

*Soutter v. Equifax Information Services*, LLC,
  307 F.R.D. 183 (E.D. Va. 2015)............................................................56

*Steinberg v. Nationwide Mut. Ins. Co.*,
  224 F.R.D. 67 (E.D.N.Y. 2004)..............................................................53

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001) ..................................................................53

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011). ....................................................................... 39, 47

*Weisfeld v. Sun Chem. Corp.*,
  84 F. App'x. 257 (3d Cir. 2004) ............................................................52

*Zeno v. Ford Motor Co.*,
  238 F.R.D. 173 (W.D. Pa. 2006)............................................................55

## Statutes
20 U.S.C § 1078................................................................................................7
20 U.S.C. § 1085..............................................................................................12
20 U.S.C. §1087..................................................................................................2
26 U.S.C. § 61..................................................................................................69
Federal Practice and Procedure § 1769.1 (1986)......................................76
73 Pa. Stat. § 201 ..................................................................................... 45, 61
815 ILCS 505/10..............................................................................................45
Cal Civ. Code § 1788.30................................................................................45
California Civil Code §1788 ("The Rosenthal Act") ..............................44
New York's General Business Law (NY GBL § 349) ............................44

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),
    73 P.S. § 201 ................................................................................43

Other Authorities
Newberg on Class Actions, Fifth Ed., Vol. 2, § 4:88 .............................................58

Rules
Fed. R. Civ. P. 23 ("Rule 23") ........................................................... passim

Regulations
78 Fed Reg. 65 (Nov. 1, 2013)..................................................................12
34 C.F.R. § 682.202 (2009) ....................................................................13
34 C.F.R § 682.210 (2010) .....................................................................13
34 C.F.R § 682.211 ......................................................................... 23, 41
34 C.F.R. § 682.215 (2009) ............................................................... passim
34 C.F.R. § 682.405 (2013) ....................................................................31
34 C.F.R. § 685.205 (2013) ............................................................... passim
34 C.F.R. §§ 685.209, 685.221 ................................................................20

## I.    INTRODUCTION

Plaintiffs are individuals whose federal loans were serviced by Navient Solutions LLC ("NSL"), and its parent company, Navient Corp. ("Navient" collectively). They have brought claims for breach of contract and the violation of state consumer laws. Pursuant to Fed. R. Civ. P. 23 ("Rule 23"), they seek to certify three nationwide classes and three state-based subclasses.

## II.    STATEMENT OF QUESTIONS INVOLVED

1. **Should the classes be certified**? Yes, because they satisfy the requirements of commonality, numerosity, predominance, and superiority.

2. **Should Plaintiffs serve as class representatives**? Yes, because they satisfy the requirements of typicality and adequacy.

3. **Should Plaintiffs' counsel be appointed class counsel**? Yes, because they satisfy the requirement of adequate representation.

## III.    HISTORICAL BACKGROUND

### 1.    History of Loan Programs

The 1965 Higher Education Act ("HEA") established the Federal Family Education Loan Program ("FFELP"). Under this program, educational loans were funded by private lenders and insured by guaranty agencies, which were reinsured by the federal government. Loans originated under this program are called "FFELP Loans."

In 1994, Congress established the Federal Direct Loan Program, an alternative lending system that cut out the private-sector middlemen by authorizing the Department of Education ("ED") to issue loans directly to borrowers ("Direct Loans"). However, the FFELP program remained in effect and continued to be the dominant source of student lending. Between 2006 and 2009, more than 75% of new federal loans issued were FFELP Loans. *See* Exhibit 7-A, October 2015 CFPB Report, at 3.[1]

In 2008, Congress gave the government a larger role in the lending process by authorizing ED to purchase a large quantity of FFELP Loans from private lenders. This shift culminated in 2010, when Congress discontinued the FFELP program altogether. However, existing FFELP Loans still constitute a large proportion of outstanding federal loans.

Although Direct Loans and FFELP Loans were originated under different programs, they share "the same terms, conditions, and benefits." 20 U.S.C. §1087e(a)(1). Accordingly, Plaintiffs seek to represent borrowers with either type of loan.

---

[1] Exhibit citations refer to the document's original pagination. Per the Court's instructions, for voluminous documents, Plaintiffs have only attached relevant pages (*i.e.*, the first page and cited pages). Any publicly-available documents can be viewed in their entirety by using the links contained in the Table of Exhibits.

## 2. Background of Plaintiffs

Rebecca Varno was a New York resident at all times relevant. *See* Varno Dep. 17:1–7 (July 14, 2022) (Exhibit 13). She took out federal loans to get her master's degree. Varno Dep. 12:5–7; 13:20–22.

Jill Ballard was a California resident at all times relevant. *See* Ballard Dep. 21:10–22:8 (July 21, 2022) (Exhibit 14). She took out federal loans to get her law degree. Ballard Dep. 12:14–16; 13:4–7.

Mark Pokorni was an Illinois resident at all times relevant. *See* Pokorni Dep. 14:6–15:9 (July 18, 2022) (Exhibit 15). He took out federal loans for his undergraduate education. Pokorni Dep. 8:21–9:15.

## 3. Background of Defendants

In 1972, Congress created a government-sponsored enterprise called the Student Loan Marketing Association ("Sallie Mae") to support the FFELP program. However, with the advent of Direct Loans, and the resulting shift away from FFELP Loans, Sallie Mae gave up its governmental status and transitioned into a private company: SLM Corp. By 2004, the company was fully privatized and conducted the full spectrum of student lending activities.

In 2010, SLM Corp. published the following information in its 10-K filing with the Securities and Exchange Commission. *See* Exhibit 3, 2010 10-K Filing:

- As of 2010, SLM Corp. was the largest holder of FFELP Loans, with a portfolio valued at $148.6 billion. Ex. 3 at 3. Most of the company's revenue was interest income from this portfolio, which earned $1.37 billion in 2010 alone. Ex. 3 at 2.

- The interest earned from FFELP Loans is "relatively stable" because the government guarantee covers 98% percent of the loan's principal and accrued interest. Ex. 3 at 3, 6. Additionally, SLM Corp. earned "late fees on the loans in the portfolio." Ex. 3 at 6.

- In 2010, SLM Corp. was the largest servicer of federal loans, managing portfolios for guarantors and ED, as well as its own FFELP portfolio. Ex. 3 at 7. All servicing activities were conducted by the "Business Services Segment" at a servicing center in Wilkes-Barre, Pennsylvania. Ex. 3 at 7, 17.

- SLM Corp. was also the largest collector of defaulted federal loans. Ex. 3 at 7. In 2010, collection revenue from guarantors alone totaled $245 million. Ex. 3 at 2. Although this revenue would decline as FFELP Loans amortized, it was projected that these losses would be "offset" by revenue from a collections contract with ED because a "surge" of defaulted Direct Loans was expected "in the coming years." Ex. 3 at 7.

- Because termination of the FFELP Program would cause a decline in profits as FFELP loans amortized, SLM Corp.'s "major goal" in 2010 was to

4

"maximize the cash flow" from its FFELP Portfolio and acquire more FFELP Loans from third parties. Ex. 3 at 6, 26, 28.

In 2014, the company's student lending activities were split into two entities: Navient Corp., a holder and servicer of federal loans, and SLM Corp., a lender of private student loans. Under the terms of the split, Navient Corp. assumed any liabilities resulting from SLM Corp.'s prior loan servicing activities.

In 2014, Navient Corp. published the following information in its 10-K filing. *See* Exhibit 4, 2014 10-K Filing:

- In 2014, approximately 80% of the loans in Navient's FFELP portfolio were funded to term with "non-recourse, long-term securitization debt through the use of securitization trusts." Ex. 4 at 5. That year, Navient issued $5 billion of asset-backed securities, supported by its FFELP Loans. Ex. 4 at 42.

- Interest income from the FFELP portfolio was still Navient's "primary source of cash flow." Ex. 4 at 15. Accordingly, if Navient did not "develop new revenue streams" to replace the declining income from FFELP Loans, those losses could "adversely impact Navient's earnings." Ex. 4 at 14. To that end, Navient acquired $11.3 billion of FFELP Loans in 2014. Ex. 4 at 5.

## 4. Applicable Contacts

### A. Servicing Contract

Loan servicers are entities that contract with lenders to manage their loan portfolios. Their duties include collecting payments, responding to borrower inquiries, and administering repayment plans. In 2009, ED awarded Navient a "Servicing Contract" to manage a portfolio of Direct Loans and FFELP Loans owned by ED. *See* Exhibit 1, Servicing Contract. In pertinent part, the contract required Navient to:

- Ensure that all servicing activity was "consistent with federal laws, regulations, policies and authoritative guidance" (Ex. 1, Attachment A-1, at 7);

- Maintain a "full understanding of all federal and state laws and regulations and FSA[2] requirements" and ensure that "all aspects of the service continue to remain in compliance as changes occur." (Ex. 1 at 20);

- "Resolve customer complaints" and "escalate complaints to FSA and the Ombudsman." (Ex. 1, Attachment A-2, at 11); and

- "Process refund transactions to borrowers," including any "borrower overpayments." (Ex. 1, Attachment A-1, at 5).

---

[2] The Office of Federal Student Aid ("FSA") is the office within ED that regulates the federal loan programs.

The Servicing Contract remained in effect until October 2021, when ED's portfolio was transferred to another servicer.

B. <u>Master Promissory Note</u>

Federal loans are governed by a Master Promissory Note, or "MPN." *See* Group Exhibit 2, Plaintiffs' MPNs. It is a form contract between the borrower and lender. The MPN requires that federal loans be administered in accordance with the HEA, applicable federal regulations, and any state laws not preempted by federal law. *See*, *e.g.*, Ex. 2-B at 5.

## IV. APPLICABLE REGULATIONS

### 1. Repayment Plans

The "standard repayment plan" for federal loans requires borrowers to make fixed monthly payments and fully repay the loan in 10 years. *See* 20 U.S.C § 1078(b)(9)(A)(i). Those who cannot afford this payment schedule may qualify for an Income-Driven Repayment plan ("IDR plan"), which offers payments based on income and family size and provides loan forgiveness after 20-25 years of qualifying payments.

One popular IDR plan is the Income-Based Repayment Plan ("IBR plan"), which became available in 2009. *See* 34 C.F.R § 682.215 (2009). Borrowers are eligible if they have a partial financial hardship ("PFH"). *Id.* at (a)(4). A PFH

7

occurs when payments under the standard repayment plan would exceed 15% of the borrower's discretionary income.

For low-income borrowers, the IBR plan offers payments as low as $0. (Even though a $0 payment does not require an actual remittance, it still counts as a qualifying payment toward loan forgiveness.)

## 2. IDR Enrollment

To enroll in an IDR plan, borrowers must submit an application and proof of income to their loan servicer. *See* Exhibit 5, OMB No. 1845-0102:

The application instructs borrowers to provide "one piece of documentation for each source of taxable income." Ex. 5 at 3. To document income, borrowers may use "a pay stub or letter" from an employer, stating their gross pay. Ex. 5 at 3. Additionally, married borrowers who file joint income taxes must document their spouse's pay because – for joint filers – "income" includes spousal income. *See* 34 C.F.R. § 682.215(a)(4)(ii).

### 3. IDR Recertification

Once the IDR plan is approved, it remains in effect for one year. To renew the plan for each subsequent year, borrowers must "recertify" their income by submitting the same application to their loan servicer. *See* 34 C.F.R. § 682.215(e)(3). At least 60 days before the renewal application is due, the loan servicer must notify the borrower in writing of 1) the renewal deadline, and 2) the consequences of failing to timely renew the plan. *Id.*

There are two major consequences if the renewal application is not timely submitted: 1) Monthly payments increase to the standard repayment plan amount (which is often substantially higher); and 2) accrued interest is "capitalized," or added to the principal balance. *Id.* at (e)(3)(ii). Capitalization requires the borrower to pay interest *on that interest* for the remaining life of the loan.

Given these consequences, it is critical that borrowers receive proper notice of the renewal deadline. The required manner of service is prescribed by the MPN:

"Any notice required to be given to me will be effective if sent by first class mail to the latest address the lender has for me, or by electronic means to an electronic address that I have provided." Ex. 2-B at 5.

### 4. Timely IDR Submissions

If the renewal application is received before the deadline, but the application is not processed before the plan expires, the loan servicer must "prevent" the borrower's payments from increasing to the standard repayment plan amount. 34 C.F.R. § 682.215(e)(8)(ii). Additionally, the loan servicer must "promptly" process the application. *Id*. at (e)(8)(i). The regulation does not define "prompt," but by 2016, FSA was directing loan servicers to process IDR applications within 15 days. *See* Exhibit 7-B, August 2016 CFPB Report, at 17.

### 5. Payment Recalculation

After an IDR plan is approved, the payment amount generally remains in effect for one year. However, payments may be recalculated "at any time during the borrower's current annual payment period" if the borrower experiences a change in "financial circumstances." 34 C.F.R § 682.215(e)(2)(v).

### 6. Discretionary Forbearances

When borrowers are unable to make scheduled payments, they can request a discretionary forbearance, which temporarily suspends their payment obligations. *See* 34 C.F.R. § 685.205 (2013). Discretionary forbearances can assist borrowers

during times of emergency, but they are costly because any unpaid interest that accrues during the forbearance is capitalized. *Id.* at (a). Additionally, any time spent in forbearance does not count toward loan forgiveness.

ED has established detailed requirements for enrollment in a discretionary forbearance. The borrower must: 1) be unable to make scheduled payments "due to poor health or other acceptable reasons," and 2) provide "sufficient documentation to support this request." 34 C.F.R § 685.205(a)(1). The "General Forbearance Request" form is OMB No. 1845-0031. *See* Exhibit 6 (pictured below).[3]



---

[3] The terms "general forbearance" and "discretionary forbearance" are used interchangeably.

The form specifies that a discretionary forbearance is appropriate only when the borrower is experiencing a "temporary hardship," such as "medical expenses" or a "change in employment." Ex. 6 at 1. It includes a dedicated space where borrowers can explain the nature of their hardship. Ex. 6 at 1.

The applicable regulations describe only one circumstance in which a discretionary forbearance may be granted *without* supporting documentation: After a loan defaults, but before transfer to collections, the borrower may request a 120-day forbearance based on "oral affirmation." 34 C.F.R §§ 685.205(a)(8), 682.211(d). In this situation, an oral request expedites the process in order to help the borrower "avoid the negative consequences of default." 78 Fed Reg. 65,775 (Nov. 1, 2013). "Default" occurs after the borrower fails to make a scheduled payment for 270 days. 20 U.S.C. § 1085(l).

### 7. Administrative Forbearances

In contrast to a discretionary forbearance, borrowers are entitled to a 60-day "administrative forbearance" during periods when the loan servicer must "collect and process documentation supporting the borrower's request for a change in repayment plan," such as an IDR application. 34 C.F.R §§ 685.205(b)(9), 682.211(f)(11).

An administrative forbearance differs from a discretionary forbearance in two respects: 1) It may be granted "without requiring documentation from the

borrower" (*i.e.*, a forbearance request form), and 2) interest that accrues during the forbearance is "not capitalized." 34 C.F.R § 685.205(b); (b)(9). The obvious purpose of this provision is to prevent the capitalization of interest that accrues during periods of routine paperwork processing.

### 8. Deferments

During certain periods of financial hardship, borrowers may qualify for a deferment, which pauses their payment obligations. *See* 34 C.F.R § 682.210 (2010). A deferment is similar to a discretionary forbearance because any unpaid interest that accrues during the deferment is capitalized. *See* 34 C.F.R. § 682.202(b)(3) (2009). However, deferments are granted during hardships of a longer duration, such as parental leave, temporary total disability, and long-term unemployment. *See* 34 C.F.R § 682.210.

## V.    CFPB FINDINGS AND PLAINTIFFS' ACCOUNT HISTORY

From 2014 to 2017, the Consumer Financial Protection Bureau ("CFPB") conducted a wide-ranging investigation of federal loan servicers. Its findings were published in a series of reports by the Bureau's "Student Loans Ombudsman." *See* Group Exhibit 7, CFPB Reports. The investigation laid the groundwork for a 2017

lawsuit against Navient: *CFPB v. Navient Corp.*, No. 3:17-CV-101 (M.D. Pa.). *See* Exhibit 8, CFPB Complaint.



### 1. CFPB's Data and Findings

The CFPB's findings were obtained by analyzing thousands of complaints submitted to the Bureau by federal loan borrowers between 2014 and 2017. The following data samples were used:

| Report Date | Data sample | Complaint period |
|---|---|---|
| October 2015 | 2,300 complaints | October 2014–September 2015 |
| August 2016 | 2,400 complaints | March 2016–May 2016 |
| October 2016 | 3,900 complaints | March 2016–August 2016 |
| October 2017 | 12,900 complaints | September 2016–August 2017 |

Ex. 7-A at 2; Ex. 7-B at 2; Ex. 7-C at 3; Ex. 7-D at 2. Analyzing these data sets, the CFPB made the following findings:

- During all four reporting periods, Navient received more complaints from federal loan borrowers than any other company. Ex. 7-A at 10; Ex. 7-B at 10; Ex. 7-C at 54; Ex. 7-D at 9.

- From March 2016 to August 2016, Navient received 812 complaints from federal loan borrowers. Ex. 7-C at 54. An analysis of these complaints revealed that one of the most frequently cited issues was servicing practices related to IDR plans. Ex. 7-C at 10.

- From September 2016 to August 2017, Navient received 6,274 complaints from federal loan borrowers, which accounted for 61% of complaints against all servicers, and more than four times the number received by the servicer with the second-highest number of complaints. Ex. 7-D at 9.

**2. Improper Forbearance Enrollment**

Many borrowers reported to the CFPB that, when contacting their loan servicer to explore repayment options, servicing agents would enroll them in "temporary forbearance and deferment options" instead of an IDR plan. Ex. 7-C at 29. Some borrowers were advised to spend "years in forbearance." Ex. 7-D at 18.

The CFPB noted that a discretionary forbearance is intended only for "short-term periods of unemployment and financial hardship." Ex. 7-A at 32. It is "not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term." Ex. 8 at ¶ 35.

Improper forbearance enrollment was pervasive at Navient. According to the CFPB, between 2010 and 2015, Navient enrolled "hundreds of thousands" of borrowers in forbearances "for a period of two or three years, or more." Ex. 8 at ¶ 53. As a result, nearly *four billion dollars* of interest was added to their principal balances. Ex. 8 at ¶ 54.

One of Navient's methods for pushing forbearances was to reward servicing agents who had below-average call times. Ex. 8 at ¶ 43. The CFPB explained that assisting borrowers with IDR enrollment "requires multiple, lengthy conversations" about the submission process. Ex. 8 at ¶ 44. Thus, Navient's compensation policy incentivized servicing personnel to "push numerous borrowers to forbearance without adequately exploring income-driven repayment plans with those borrowers, and in some cases, without even mentioning income-driven repayment plans at all." Ex. 8 at ¶ 41.



### 3. IDR Processing Delays

The CFPB found that, when borrowers did apply for an IDR plan, they encountered "unexpected delays, lost paperwork, [and] poor customer service." Ex. 7-D at 11. These failures created "processing delays," which caused "substantial, unnecessary costs" for borrowers. Ex. 7-B at 25.

In a 2016 report, the CFPB explained the two different ways that borrowers can apply for an IDR plan: 1) by submitting an application online through www.studentloans.gov—an information system managed by ED—or 2) by submitting a paper application. Ex. 7-B at 16-17. The CFPB noted: "In both cases, servicers target processing IDR applications within 15 days." Ex. 7-B at 17.

When borrowers submit an online application, it is supplemented by tax information provided electronically by the IRS. Ex. 7-B at 3. Thus, a "servicer need only validate the information provided, and approve or deny the application." Ex. 7-B at 3. However, online applicants complained that their servicer took "months to process" their applications. Ex. 7-B at 18. Those submitting paper applications had the same experience. Ex. 7-D at 12.

The CFPB noted that these delays "result in extra interest charges." Ex. 7-B at 20. For example, if a borrower has "subsidized loans," any unpaid interest that

accrues during the first three years of IDR enrollment is waived. *See* 34 C.F.R. § 682.215(b)(4). However, because the subsidy takes effect only *after* the plan is approved, a processing delay causes the borrower to "forfeit the long-term protection against compounding unpaid interest." Ex. 7-B at 27–28.

In other words, "due to the daily accrual of interest," the borrower must pay "extra interest charges for each day that it takes her servicer to process her application." Ex. 7-B at 26. The CFPB found that, in some cases, "a single application processing delay can increase a borrower's loan balance by over $1,000." Ex. 7-B at 28.





### 4. IDR Renewal Issues

The CFPB found that processing delays were also common during the IDR renewal process, which "essentially functions as re-enrollment" because borrowers must "submit the same application and proof of income as they did when initially enrolling" in the IDR plan. Ex. 7-B at 25.

In a 2017 report, the CFPB explained that borrowers who timely submit a renewal application are "entitled under federal law to continue making income-driven payments at the same amount until their new payment is calculated," even if

the application is not processed before the plan's expiration. Ex. 7-D at 13 (citing 34 C.F.R. §§ 685.209(a)(5)(viii)(A), 685.221(e)(8)(i)).

However, many borrowers reported that their loan servicer would fail to process the renewal application before their plan expired, then require "their full, standard monthly payment amount, or direct them to enter forbearance." Ex. 7-D at 13. These individuals were essentially "forced" to choose between "missing a payment, requesting forbearance, or submitting a payment amount far greater" than what they actually owed. Ex. 7-A at 15.





### 5. Improper Rejections and Forbearances

Another common complaint was that servicers engaged in the "unfair practice of denying, or failing to approve, IDR applications that should have been approved on a regular basis." Ex. 7-D at 50. This often involved "erroneous" determinations that certain forms of income documentation were "not sufficient." Ex. 7-E at 22–23. The CFPB highlighted several examples:

- Erroneous determinations regarding what was needed to document the borrower's "pay frequency." Ex. 7-E at 23, n. 32.

- Erroneous determinations regarding "spousal income." Ex. 7-E at 23.

- Rejecting applications because the borrower checked "the wrong box." Ex. 7-B at 23.

The CFPB noted that "when servicers fail to approve valid IDR applications, borrowers can be injured by having to make higher payments, losing months that would count towards loan forgiveness, or being subjected to unnecessary interest capitalization." Ex. 7-D at 50.

For instance, if a borrower's IDR application was rejected, and the standard repayment amount was not "a realistic option," servicing agents would often apply a discretionary forbearance to the account. Ex. 7-D at 13. Borrowers would then "spend months in forbearance" while their next application was pending, impeding any progress toward loan forgiveness. Ex. 7-D at 13.







---

[4] *See* 34 C.F.R. § 682.215(e)(4)(iii).



**6. Improper Renewal Notices**

Another common complaint was that loan servicers were not providing adequate notice of the IDR renewal deadline. The CFPB found that this problem was systemic at Navient.

For borrowers who consented to electronic correspondence (in lieu of first class mail), Navient issued the renewal notice online. Ex. 8 at ¶ 66. However, these notices were not emailed directly to borrowers; they were posted to Navient's website. To view the notice, borrowers had to log in to their secure account with a user ID and password. Ex. 8 at ¶¶ 66–67.

The only step Navient took to alert borrowers of the notice was to send them an email with a hyperlink to the website, where the notice could be viewed after

logging in. Ex. 8 at ¶ 68. The subject line of these emails stated, "New document ready to view," and the body read: "A new education loan document is available. Please log in to your account to view it." Ex. 8 at ¶¶ 69–70. However, the email provided no indication as to the purpose of the notice. Ex. 8 at ¶ 68.

By contrast, during the same timeframe, Navient sent other emails to borrowers that described the content of the referenced document. For example, the subject line of one email read: "Your Sallie Mae–Department of Education Statement is Available," and its body stated: "Your monthly statement is now available. Please log in to your account at SallieMae.com to view and pay your bill." Ex. 8 at ¶ 71. Another email had the subject line: "Change in Loan Terms," and its body read: "The payment term for your loan(s) has changed. Please log in to your account to view the document with your updated payment schedule." Ex. 8 at ¶ 71.

The CFPB found that, because of Navient's improper notice procedures, between July 2011 and March 2015, over 60% of its borrowers did not timely renew their IDR plans, resulting in the capitalization of interest and a spike in monthly payments. Ex. 8 at ¶ 73.



**7. Economic Incentives**

The CFPB examined the economic incentives underlying the practices described above. Three main problems were identified:

A. <u>Companies servicing their own FFELP portfolios</u>

In a 2015 report, the CFPB noted that a loan servicer may have financial "disincentives" to assisting borrowers, even when the FFELP lender is "the same corporate entity as the student loan servicer." Ex. 7-A at n. 46 (p. 25). There are several reasons for this:

- For FFELP Loans owned and serviced by the same company, any event that triggers an interest capitalization boosts revenue because a higher

principal balance generates more interest. Thus, when a borrower enrolls in forbearance or fails to renew an IDR plan, the company benefits.

- When an IDR plan is not timely renewed, payments increase to the standard repayment amount. If the borrower makes these payments, the company receives a higher cash flow. Alternatively, if the borrower enrolls in forbearance, the resulting interest capitalization inflates the loan's value.

- If these actions ultimately drive the borrower to default, the inflated principal balance generates a higher reimbursement from the guarantor/government. Thus, the servicer is incentivized to increase the principal, regardless of the borrower's ability to repay the loan.

Accordingly, during a 2019 hearing before the Congressional House Committee on Financial Services, an official from the National Consumer Law Center testified that servicers often enroll borrowers in "forbearances and deferments that are profitable for servicers and costly for borrowers." Exhibit 9, Congressional Research Service Report, at n. 104 (p. 12).[5]

---

[5] Navient employed the same servicing personnel to service ED's portfolio and its own FFELP portfolio. Ex. 3 at 7. Thus, the same servicing practices were likely used on both portfolios.

### B. Securitization of FFELP Loans

Approximately 80% of Navient's FFELP portfolio was invested through "long-term securitization debt through the use of securitization trusts." Ex. 4 at 5. In other words, the loans served as collateral for asset-backed securities.

The CFPB noted that FFELP lenders have "a disincentive to facilitate enrollment in IDR plans—bonds backed by these student loans may default if loans are not paid on schedule." Ex. 7-A at p. 24 (n. 42). The prominent trade publication "American Banker" highlighted this issue in a June 2015 report. *See* Exhibit 10, Asset Securitization Report.

The report explained that holders of FFELP-backed securities invested on the assumption that the loans would mature within the "standard 10-year term." Ex. 10 at 2. Because the IBR plan extended repayment to 25 years, it put investors at risk of default; the loans would not "pay off by maturity." Ex. 10 at 1.

Accordingly, in May 2015, Moody's Investors Service and Fitch Ratings put several tranches of FFELP-backed securities under review for possible downgrade, citing the "growing popularity" of the IBR plan. Ex. 10 at 1. A majority of these securities had been "issued by SLM Student Loan Trusts in 2007 and 2008." Ex. 10 at 2. In response, Defendants offered to "help those tranches meet their maturity dates" by re-purchasing up to "10% of the initial pool balance" of FFELP Loans from six security trusts. Ex. 10 at 3.

The best way to help those tranches "meet their maturity dates" was to limit IDR enrollment. Accordingly, the CFPB warned about the "tension between borrowers' legal right to access alternative repayment plans and student loan trust issuers' economic incentive to ensure that bonds backed by these loans perform on schedule." Ex. 7-A at 26.

C. Servicers engaged in debt collection

Misaligned incentives can also arise when a loan servicer provides debt collection on defaulted loans. Defaulted borrowers have the right to "rehabilitate" their loans by making nine on-time payments. *See* 34 C.F.R. § 682.405(a)(2)(i) (2013). Once rehabilitation is complete, the borrower can enroll in an IDR plan. However, borrowers reported to the CFPB that, after rehabilitation, their loan servicer would direct them to "forbearance and deferment options" instead of IDR plans. Ex. 7-C at 29. Those who experienced obstacles to IDR enrollment would often fall into "subsequent delinquency and re-default." Ex. 7-C at 29.

According to the CFPB, the compensation structure for debt collectors was a contributing factor. The Bureau noted that "in some cases, collectors earn nearly $40 in compensation for every $1 in cash recovered through certain rehabilitations," and "reasonable collection costs" of 16% of unpaid principal and accrued interest. Ex. 7-C at 5, 37. Because these fees were paid "irrespective of borrower performance," collectors had "no skin in the game" when a borrower re-

defaulted. Ex. 7-C at 5. Thus, the CFPB questioned "whether the economic incentives that drive collector and servicer practices throughout the default-to-IDR transition are properly aligned." Ex. 7-C at 35.

Defendants offer a prime example of these perverse incentives. In 2010, they earned $245 million for collecting defaulted FFELP Loans on behalf of guarantors, and they assured investors that collection revenue would increase as the number of defaulted Direct Loans "surged" in the coming years. Ex. 3 at 2, 7. Because Defendants profited from defaults, they were disincentivized from facilitating IDR enrollment, which helps borrowers *avoid* default.

## 8. Settlement with CFPB

The CFPB's lawsuit against Navient settled in 2024. See *Navient Corp.*, No. 3:17-CV-101, ECF 580-1. The settlement required payment of a civil fine, and it permanently banned Navient from servicing federal loans or acquiring more FFELP Loans. *Id.* at ¶¶ 6–7. However, the court ordered that the settlement funds could be deposited in the U.S. Treasury if the CFPB determined "that redress to consumers is wholly or partially impracticable or inappropriate." *Id.* at ¶ 75.

As of this filing, Plaintiffs have not received any portion of the CFPB settlement funds. *See* Group Exhibit 11, Plaintiffs' Affidavits (Ex. 11-A at ¶ 3; Ex. 11-B at ¶ 3; Ex. 11-C at ¶ 3).

## VI.    ATTORNEYS GENERAL LAWSUIT

The CFPB was not the only government agency to take action against Defendants. In 2022, Navient settled a lawsuit filed by 39 state attorneys general, alleging that borrowers were enrolled in improper forbearances. *See Pennsylvania v. Navient*, Case No. 3:17-cv-1814 (ECF 98).

Borrowers were awarded $260 restitution if Navient had enrolled them in at least two years of consecutive forbearances prior to IDR enrollment. *See* "Navient Multi-State Settlement" at https://www.navientagsettlement.com. Pokorni was among the borrowers who received restitution. *See* Exhibit 21, Payment Confirmation.

The settlement order in *Pennsylvania v. Navient* did not release any claims of individual borrowers, but it permits Navient to offset the $260 restitution against any borrower's future recovery. *See Navient*, 3:17-cv-1814 at ECF 98, p. 4, ¶ I.

## VII.  PROCEDURAL HISTORY

### 1.  First Amended Complaint

Plaintiffs filed the First Amended Complaint ("FAC") in May 2018. It included two nationwide classes:

> A.  Borrowers whose IDR payments were canceled after Navient failed to process their timely-submitted renewal applications before the plan's expiration; and
>
> B.  Borrowers whose IDR applications were not processed within 25 days.

ECF 29 at ¶ 87. In July 2018, Navient filed a Motion to Dismiss and Strike the Class Allegations. ECF 39. The motion was fully briefed by September 2018, but due to docket congestion, the Court did not rule until April 2021. ECF 57. The Court ruled that Plaintiffs had stated claims for breach of contract and violations of four state consumer protection laws. ECF 57 at 1.

### 2.  Written Class Discovery

Defendants answered discovery in January 2022, producing over 7,000 pages of account records. *See* Exhibit 34, 1/17/22 Email. However, Defendants did not disclose the number of class members because, according to them, the class definition contained "an assumption as to 'timely' and complete

submission, which is improper." *See* Exhibit 23, NSL Responses to Written Discovery, at 29–30.

Mindful of docket congestion, Plaintiffs were not inclined to file a discovery motion and engage in additional motion practice. Instead, they spent the next four months reviewing the 7,000 pages of account records to prepare for the deposition of Jeffrey Stine, so that his testimony could provide a basis for alternative class definitions. *See* Exhibit 40, Fiorentino Affidavit, at ¶ 6(B).

### 3. Second Amended Complaint

In June 2022, Plaintiffs deposed Jeffrey Stine. Based on his testimony, Plaintiffs devised five potential classes, corresponding to the following groups:

| | |
|---|---|
| 1 | Borrowers who timely submitted a "complete" IDR renewal application, but whose plans were cancelled because the application was not processed before the plan expired. |
| 2 | Borrowers enrolled in a discretionary forbearance within 60 days of the expiration of their IDR plan. |
| 3 | Borrowers who applied for an IDR plan, but were enrolled in a discretionary forbearance during the 60-day period when an administrative forbearance should have remained in effect. |
| 4 | Borrowers whose IDR applications were not processed within 45 days of receipt. |

| 5 | Borrowers whose IDR applications were rejected because they used a single paystub to document income. |
|---|---|

On August 2, 2022, Plaintiffs served these definitions on Defendants and requested that Navient run computer searches to identify class members. *See* Exhibit 24-A, 8/2/22 Email, with Exhibit 24-B, Class Definitions, attached. However, during a Rule 37 conference, Defendants declined to run the searches, claiming that only two of the classes fell within the scope of the FAC. *See* Exhibit 25, 8/18/22 Email (summarizing the Rule 37 conference). To resolve this dispute, in September 2022, Plaintiffs filed a Motion to Amend the Complaint and Compel Class Discovery. ECF 80.

In June 2023, the Court granted leave to file the Second Amended Complaint (SAC), which contained the new classes, and ordered Navient to run the searches. ECF 89. Navient was given until September 14, 2023, to disclose whether the searches ("Searches 1–5") were feasible, and until September 28, 2023, to provide results for any searches deemed feasible. ECF 96.

### 4. Response to Computer Searches

On September 14, 2023, Defendants served a response to the computer search requests, verified by Patrick Theuer ("Theuer"), Navient's Vice President of Data Solutions. ████████████████████████████████



### 5. Third Amended Complaint



On December 22, 2023, Plaintiffs served Defendants with modified

versions of Searches 1–3, ███████████████████████████████

████████████████ *See* Exhibit 29-A, 12/22/23 Email, with Exhibit 29-B,

Modified Searches 1–3, attached. However, during a Rule 37 conference,

Defendants stated that they would not execute the modified searches because,

according to them, the search language no longer comported with the SAC's class definitions. *See* Exhibit 30, 1/8/24 Email (summarizing the conference).

To resolve this dispute, in March 2024, Plaintiffs sought leave to amend the pleadings. ECF 118. ████████████████████████████

████████████████████████████████████████████ *See* ECF 118-2 (redlined complaint). On December 19, 2024, Plaintiffs' motion to file the Third Amended Complaint (TAC) was granted. ECF 136.





- <u>SEARCH 1</u>: ▆▆▆▆ borrowers, ▆▆▆ California residents.

- <u>SEARCH 2</u>: ▆▆▆▆ borrowers, ▆▆▆▆ New York residents.

- <u>SEARCH 3</u>: ▆ borrowers, ▆ New York residents.

- <u>SEARCH 4</u>: ▆▆▆ borrowers, ▆▆▆ Illinois residents.

- <u>SEARCH 5</u>: ▆▆▆▆ borrowers, ▆▆▆ New York residents.

## VIII.  STATEMENT OF LAW

A district court must conduct a "rigorous analysis" to determine whether a case is suitable for class treatment. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Because this determination involves considerations that are "enmeshed in the factual and legal issues," the Court's analysis will often "entail some overlap with the merits of plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Accordingly, the court "must resolve all factual or legal

disputes relevant to certification, even if they overlap with the merits." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).

## IX.    PLAINTIFFS' CLAIMS

### 1.  Breach of Contract

The Servicing Contract required Navient to comply with applicable "federal laws, regulations, policies and authoritative guidance." Ex. 1, Attachment A-1, at 7. Similarly, the MPN required that Plaintiffs' loans be administered "in accordance with the applicable federal statutes and regulations." Ex. 2-B at 5. The following actions breached those contracts:

- IDR payments may not be canceled if the borrower timely submits a complete renewal application. *See* 34 C.F.R § 682.215(e)(8)(ii). ██████████
  ████████████████████████

- Under ED's policies, a borrower need only provide "one piece of documentation for each source of taxable income." OMB No. 1845-0102.
  ████████████████████████████████████████████████
  ████████████████████

- For married borrowers who file taxes jointly, "gross income" includes spousal income. *See* 34 C.F.R § 682.215(a)(4)(i). ████████████████
  ████████████████████████████████████████████████

40

- A borrower applying for a new repayment plan is entitled to an administrative forbearance while the application is being processed. *See* 34 C.F.R § 682.211(f)(11). ████████████████████████████████████
████████████████████████████████

- A discretionary forbearance may be granted only when the borrower is unable to make scheduled payments "due to poor health or other acceptable reasons." 34 C.F.R § 682.211(a)(2). ████████████████████████
████████████████████████████████████
████████████████████████

- Under ED's policies, a discretionary forbearance should be granted only when the borrower is unable to make payments because of a "temporary hardship," such as "medical expenses" or a "change in employment." OMB No. 1845-0031. ████████████████████████████████
████████████████████████████████████
████████████████

- A borrower in repayment status may be placed in a discretionary forbearance only if the borrower "provides sufficient documentation to support this request." 34 C.F.R § 685.205(a). ████████████████████████████
████████████████████████████████████

- Borrowers must receive written notice of the IDR renewal deadline. 34 C.F.R. § 682.215(e)(3). The MPN requires that notice be served by first class mail, or sent to an email address provided by the borrower. Ex. 2-B at 5. ██████████████████████████████████████████████████ ███████████████████████████████████

- The Servicing Contract required Navient to comply with all "FSA requirements." Ex. 1 at 20. Stine testified that, by 2016, FSA had instructed Navient to process IDR applications within 15 days. ████████████ ████████████████████████████████████

- The Servicing Contract required that Navient "escalate complaints to FSA and the Ombudsman" (Ex. 1, Attachment A-2, at 11) and "process refund transactions to borrowers," including "borrower overpayments" (Ex. 1, Attachment A-1, at 5). ██████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████

**2. Pennsylvania Claims**

The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq., prohibits the following:

- Any fraudulent or deceptive conduct that creates a likelihood of confusion or of misunderstanding. *Id*. at 201-2(4)(xxi); and

- Any representation that goods or services have characteristics that they do not have. *Id*. at § 201-2(4)(v).

The following conduct violated the act:



### 3. California Claims

Ballard was a California resident during the relevant transactions. California Civil Code §1788 ("The Rosenthal Act") prohibits any false representation that a debt may be subject to additional charges when those "fees or charges may not legally be added to the existing obligation." *Id*. at § 1788.13(e).



### 4. New York Claims

Varno was a New York resident during the relevant transactions. New York's General Business Law (NY GBL § 349) prohibits the use of any deceptive act, practice, representation or omission that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E.2d 598, 604 (1999). The following violated the statute:



### 5. Illinois Claims

Pokorni was an Illinois resident during the relevant transactions. The Illinois Consumer Fraud Act (815 ILCS 505/2) prohibits any unfair or deceptive practices, including the use of any deception, false pretense, misrepresentation, or the concealment or omission of any material fact. ████████████████████████

████████

### 6. Other Damages

The above statutes impose punitive, treble, and/or statutory damages for egregious or willful conduct. *See* 73 Pa. Stat. § 201-9.2(a); Cal Civ. Code § 1788.30; N.Y Gen. Bus. Law § 349(h); and 815 ILCS 505/10a(a). Such damages are owed because Navient's practices were designed to maximize profits at the expense of borrowers, as shown by the following:

- Most of Navient's revenue was interest from FFELP loans. The profitability of these loans did not depend on borrowers' ability to repay their debts because the government insures 98% of principal and interest.

- After Congress terminated the FFELP program, Navient's "major goal" was to "maximize the cash flow" from its FFELP Loans.

- The value of Navient's FFELP portfolio increased with every interest capitalization because an inflated principal balance generates more interest (and a higher reimbursement from the guarantor/government in the event of default). Thus, every time a borrower was enrolled in forbearance, or failed to timely renew an IDR plan, Navient profited.

- Navient rewarded servicing personnel who had below-average call times, incentivizing them to enroll borrowers in discretionary forbearances rather than IDR plans.

- Navient used a notice procedure that *prevented* borrowers from timely renewing their IDR plans.

- Navient allowed IDR payments to expire, despite the timely submission of a renewal application, resulting in interest capitalizations that inflated the value of Navient's FFELP Loans.

- By rejecting valid income documentation, Navient delayed the IDR processing period, allowing servicing agents to enroll borrowers in more forbearances that enriched Navient.

- 80% of Navient's FFELP portfolio served as collateral for asset-backed securities. When a spike in IDR enrollment caused rating agencies to downgrade these securities, Navient re-purchased many of these loans to help them "meet their maturity dates." The only way to do this was by limiting IDR enrollment.

- Because Navient was a debt collector on defaulted loans, it had a financial incentive to impede IDR enrollment, which helps borrowers *avoid* default.

## X.    CLASS CERTIFICATION

The party seeking class certification must demonstrate that the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To satisfy Rule 23(a), a plaintiff must prove that there are sufficiently numerous parties, common questions of law or fact, typicality of claims, and adequacy of representation. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Once beyond the prerequisites of Rule 23(a), the plaintiff must seek to certify the class under one of three "types" set forth in Rule 23(b). *Russell v. Educational Commission for Foreign Medical Graduates*, 15 F.4th 259, 265–66 (3d Cir. 2021).

Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. Proposed Classes

#### A. Improper IDR cancellation

Ballard seeks to represent borrowers whose IDR payments were improperly canceled. The TAC defines the class as follows:

| "Improper IDR Cancellation" | |
|---|---|
| a. | On or after January 16, 2012, the borrower was enrolled in an IDR plan. |
| b. | The borrower submitted an IDR renewal application, which was received by NSL within 90 days or less prior to the renewal deadline. |
| c. | The borrower's partial financial hardship status expired, at which time the borrower's payments were recalculated under the standard repayment plan. |
| d. | At the time the application received its first review, it was deemed complete. |
| California Sub-class: Members of the Class who were living in California when the events stated in subpart c. occurred. | |

██████████████████████████████████████████████

B. Improper forbearances

Varno seeks to represent two groups of borrowers: 1) Those placed in a discretionary forbearance to facilitate IDR enrollment, and 2) those placed in a discretionary forbearance to facilitate IDR renewal. The first group corresponds to the following class in the TAC:

| "No administrative forbearance" | |
|---|---|
| a. | On or after January 16, 2012, the borrower submitted an application to enroll in an IDR plan. |
| b. | NSL enrolled the borrower in a 60-day, "non-capping" administrative forbearance, which was in effect while that application was under review. |
| c. | During the 60-day administrative forbearance period, the borrower's account status changed from administrative forbearance status to discretionary forbearance status, and the discretionary forbearance was supported by oral affirmation. |
| New York Sub-class: Members of the Class who were living in New York when the events stated in subpart c. occurred. | |

49

███████████████████████████████████████

The second forbearance group corresponds to the following class definition

in the TAC:

| | **"Forbearance without Written Consent"** |
|---|---|
| a. | On or after January 16, 2012, the borrower was enrolled in an IDR plan. |
| b. | The IDR plan was not renewed before the annual renewal deadline, at which point the borrower's Partial Financial Hardship (PFH) status expired, and payments were recalculated under the standard repayment plan. |
| c. | After the expiration of the borrower's PFH status, NSL enrolled the borrower in a discretionary forbearance, based on the borrower's oral affirmation, and the posting date of the forbearance was within the 90-day period which began 30 days before the PFH status expired. (For example, if the PFH status expired on May 1, 2015, then the 90-day period would begin on April 1, 2015 and would end on June 30, 2015.) |
| d. | At the time of enrollment in the discretionary forbearance, the loan was not in default, with "default" being defined as a period of 270 days without any payments. |
| | New York Sub-class: Members of the Class who were living in New York when the events stated in subpart b. occurred. |

███████████████████████████████

To streamline the litigation, Plaintiffs seek to combine these classes into a single narrowed class:

| **"Modified Forbearance Class"** | |
|---|---|
| a. | On or after January 16, 2012, the borrower submitted an application to enroll in, or renew, an IDR plan. |
| b. | Within 60 days of Navient receiving the application, the borrower was enrolled in a discretionary forbearance, which was based on oral affirmation. |
| c. | At the time of enrollment in the discretionary forbearance, the borrower was not in default. |
| New York Sub-class: Members of the Class who were living in New York when the events stated in subpart b. occurred. | |

████████████████████████████

Combining these classes is a sensible approach because, as the CFPB noted, the IDR renewal process "essentially functions as re-enrollment; borrowers must submit the same application and proof of income as they did when initially enrolling." Ex. 7-B at 25.

51

Moreover, a narrowing of the class definition is consistent with class action jurisprudence in the Third Circuit. *See Weisfeld v. Sun Chem. Corp.*, 84 F. App'x. 257, 259 (3d Cir. 2004) ("[The Plaintiff] sought to narrow the definition of the class in his motion for class certification. The District Court considered this revised class definition in its analysis, and we will do the same. *See*, *e.g.*, *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (stating that a court 'is not bound by the class definition proposed in the complaint')").

C. IDR processing delay

Pokorni seeks to represent borrowers whose IDR applications were not timely processed. The TAC defines the class as follows:

| **"Improper Delay" Class** | |
|---|---|
| a. | On or after January 16, 2012, the borrower applied to enroll in, or to renew, an IDR plan. |
| b. | The borrower submitted a completed IDR application, accompanied by proof of income, which was subsequently approved by Navient. |
| c. | Navient did not fully process the application until 45 days or more after it was received. |
| Illinois Sub-class: Members of the Class who were living in Illinois when the events stated in subpart c. occurred. | |

███████████████████████████████████

### 2. Numerosity

Under Rule 23(a), class treatment is suitable when the "class is so numerous that joinder of all members is impracticable." Generally, if the plaintiff demonstrates that the class exceeds 40 persons, the numerosity prong is satisfied. *See Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). Thus, the classes are sufficiently numerous.

### 3. Typicality

Under Rule 23(a)(3), class representatives must have claims that are "typical" of the class. This requirement is satisfied when there is "factual similarity" and "similarity of legal claims" between the plaintiffs and class members. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

In this case, there is substantial factual similarity between the claims. ███
███████████████████████████████████

There is also similarity of legal claims because all borrowers have causes of action under the same contracts. *See Steinberg v. Nationwide Mut. Ins. Co.*, 224

F.R.D. 67, 75 (E.D.N.Y. 2004) (finding the typicality requirement satisfied because the relevant contracts were "uniform regarding the provisions pertinent to this litigation.").

### 4. Adequacy

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." This requires that the class representatives "demonstrate sufficient interest, willingness and ability to pursue the claims that were asserted on behalf of the class." *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988).

For seven years, Plaintiffs have dedicated themselves to this case. In 2017, they began working with their attorneys to investigate potential servicing errors. On multiple occasions, they called Navient's customer service department to make inquiries about their account history and took detailed notes of the relevant transactions. *See* Group Exhibit 22, Account History Notes, verified by Group Exhibit 11, Plaintiffs' Affidavits. Those notes enabled their attorneys to draft a detailed complaint, despite the absence of account records. *See* ECF 29 (FAC).

After this case was filed, Plaintiffs continued to actively participate in the litigation. They answered discovery in a timely fashion, produced all requested documents, and gave two depositions. *See* Ex. 11-A at ¶ 4; Ex. 11-B at ¶ 4; Ex. 11-

C at ¶ 4. When asked about their role as class representatives, they testified as

follows:

- Ballard: "I'm going to protect the rights of any potential class members if similar errors happened on other people's accounts…I'm going to protect the interest of the class members." Ballard Dep. 34:11–24.

- Varno: "I am using my voice to possibly help other people who may have had the same errors on their account and may be aware or not be aware of it, so I would be, sort of, speaking on their behalf." Varno Dep. 49:19–23.

- Pokorni: "My role as the class representative is to look out for the member of the class...for example, settlement offers come up, that the settlement offer is both fair to myself and fair to the members of the class." Pokorni Dep. 38:16–39:2.

Their testimony demonstrates that they understand the important duty to protect

absent class members. Accordingly, they meet the adequacy requirement.

### 5. Commonality and Predominance

Under Rule 23(a)(2), class treatment is appropriate when there are

"questions of law or fact common to the class." Under Rule 23(b)(3), a class action

may be maintained if "questions of law or fact common to class members

predominate over any questions affecting only individual members."

Common issues of fact and law are predominant in cases that involve

"interpretations of a form contract." *Zeno v. Ford Motor Co.*, 238 F.R.D. 173, 197

(W.D. Pa. 2006). Indeed, such cases "appear to present the classic case for

treatment as a class action, and breach of contract cases are routinely certified." *Id.*

*See also Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003)

(holding that common questions of liability predominated because the plaintiffs' claims were "based entirely on a standard form contract which the defendant used with every member of the class."). Because Navient's standardized practices violated the MPN and Servicing Contract, common issues predominate.

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████ *See*

*Soutter v. Equifax Information Services*, LLC, 307 F.R.D. 183, 214 (E.D. Va. 2015) ("Common issues will predominate if individual factual determinations can be accomplished using computer records," which render "unnecessary an evidentiary hearing on each claim.").

The existence of subclasses based on state law also supports a finding of predominance. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918 (9th Cir. 2019) (holding that common issues predominated in a case with multiple subclasses based on state law because the issue of whether those laws were violated was a common question for the subclasses).

In short, the predominance requirement is satisfied because the following common issues predominate over individualized issues:

- Whether Navient breached the MPN and Servicing Contract;

- Whether Navient violated federal regulations and FSA requirements;

- Whether Navient violated applicable state consumer laws.

### 6. Superiority

Under Rule 23(b)(3), a class may be certified if "a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy." This determination involves the "extent and nature of any litigation concerning the controversy already begun by class members," and the "class members' interests in individually controlling the prosecution of separate actions." *Id*. at (b)(3)(A-B).

Plaintiffs have surveyed the litigation currently pending against Navient in federal courts and found 17 cases, as of this filing. *See* Exhibit 36, Pending Litigation Table. Of those cases, only two are based on claims of improper loan servicing. *See* Ex. 36 at 1-2.

The absence of related litigation supports a finding of superiority. *See In re Warfarin Sodium*, 391 F.3d at 534 (holding that the "relatively small number of individual suits pending" against the defendant indicated that individual plaintiffs "lacked a compelling interest to control the prosecution of their own claims.").

The lack of individual cases is not surprising, given the amount of damages owed to class members. The Supreme Court has stated: "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the

relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997).

The key factor that determines whether individual lawsuits are a realistic alternative to a class action is whether the plaintiff's claims would enable contingent fee lawyers to undertake the cases on an individual basis. *See* Newberg on Class Actions, Fifth Ed., Vol. 2, § 4:88.

*See also Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004) ("The amounts in controversy would make it unlikely that attorneys working on a contingency fee basis would be willing to pursue the claims individually… especially when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings.").

████████████████████████████████████████████
████████████████████████████████████████ In an individual lawsuit seeking such damages, the cost of litigation would exceed recovery. Thus, there is insufficient incentive to file such cases, as shown by the lack thereof.

The absence of litigation also suggests that class members may be unaware of their rights. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985)

("The plaintiff's claims may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually.").

See also *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("True, the [Fair Debt Collections Practices Act] allows for individual recoveries of up to $1,000. But this assumes that the plaintiff will be aware of her rights, willing to subject herself to all the burdens of suing and able to find an attorney willing to take her case. These are considerations that cannot be dismissed lightly in assessing whether a class action or a series of individual lawsuits would be more appropriate for pursuing the FDCPA's objectives.").

Given the amount of damages involved, the costs of litigation, and the likelihood that class members are unaware of their claims, a class action would be superior to individual lawsuits.

The "superiority" factor also turns on whether it is desirable to concentrate the litigation in the forum where the case was filed. *See* Rule 23(b)(3)(C). This factor weighs in favor of certification if the forum has already handled preliminary matters in the litigation. *See Klay*, 382 F.3d at 1271 ("The value of concentrating litigation in this forum is great, as the Court has already made several rulings in this case thus far.").

This Court has already held that 1) Plaintiffs are third-party beneficiaries of the Servicing Contract; 2) that Navient may be held liable for breaches of the

MPN; and 3) that Plaintiffs have stated causes of action under four state consumer laws. ECF 57. These are significant rulings, weighing in favor of concentrating the litigation in this forum.

Additionally, the existence of class members in multiple states weighs in favor class treatment. *See In re Honeywell Intern Inc., Securities Litigation*, 211 FRD 255, 267 (D.N.J. 2002) (finding a class action to be a superior means of adjudication "given the size and geographical dispersion of the proposed class," the "likelihood that many [class members] will have sustained comparatively small losses," and "the unnecessary burden" that individual adjudications would place on the courts and parties).

### 7. Plaintiffs' Damages Model

The proponent of class certification must establish "that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 133. Damages calculations "need not be exact," so long as the plaintiff's method is "consistent with its liability case." *Id.* at 35.

### A. Statutory damages for non-quantifiable injuries

The UTPCPL applies to all class members because Navient's servicing activities were conducted in Wilkes-Barre, Pennsylvania. *See Danganan v. Guardian Prot. Servs.*, 645 Pa. 181, 179 A.3d 9 (2018) (holding that out-of-state plaintiffs may bring class actions under the statute).

60

The UTPCPL authorizes payment of "actual damages, or one hundred dollars, whichever is greater." 73 Pa. Stat. § 201-9.2(a). Thus, class members with actual damages less than $100, or whose injuries are not readily quantifiable, would receive $100. (Any such individuals who incurred multiple injuries, such as improper transactions during multiple recertification cycles, would receive $100 for each improper transaction.)

Because all class members are entitled to statutory damages, compensation can be awarded on a classwide basis. *See Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 501 (E.D. Pa. 2009) ("[S]tatutory damages may be awarded in any amount between $100 and $1,000…Given the nature of plaintiff's claims, this is not a case in which the amount of the damage award is likely to differ from consumer to consumer…Thus, I find that issues common to the class predominate over individual issues...").

*See also Santos v. Healthcare Revenue Recovery Grp., LLC.*, 90 F.4th 1144, 1158 (11th Cir. 2024) (holding that a class action complainant with claims under the Fair Credit Reporting Act "doesn't need to prove actual damages" because the statute "allows the consumer to recover a minimum amount of damages of not less than $100.").

B. Damages for "Improper IDR Cancellation" class

Even though Rule 23 does not require quantification of actual damages when statutory damages are available, Plaintiffs have proposed such a method to ensure the best remedy for class members. Damages for the "Improper IDR Cancellation" class would be calculated as follows:

### i. *Monetary relief*

Borrowers who made an inflated payment under the standard repayment plan amount would be reimbursed for the difference between that amount and their IDR payment. ████████████████████████████████████████ ████████████████████████████████████████ These damages would be paid to class members with loans in Navient's portfolio and ED's portfolio.

### ii. *Account corrections (Navient-owned loans)*

For borrowers with Navient-owned loans, Defendants would reverse the improper interest capitalization. This would reduce the principal balance to the correct amount and eliminate any interest that accrued on the improperly capitalized sum. ████████████████████████████████████████

### iii. *Monetary relief (ED-owned loans)*

For borrowers with ED-owned loans, damages resulting from improper interest capitalizations would be calculated as follows:

| Interest Capitalization Damages | |
|---|---|
| 1. | Identify the amount capitalized. |
| 2. | Multiply that amount by the borrower's interest rate. |
| 3. | Multiply the resulting figure by the number of post-capitalization years prior to eligibility for IDR loan forgiveness. |

These damages would be separated into two components: 1) Past damages sustained through trial, and 2) future damages sustained throughout the life of the loan. For example, assume the borrower's interest rate is 5%, and he is eligible for loan forgiveness after 20 years of IDR payments. If he incurs an improper interest capitalization of $2,000 after one year of IDR enrollment, and this case proceeds to trial five years after capitalization, damages would be calculated as follows:

| **PAST DAMAGES** | $2,000 (interest capitalized) x<br>0.05 (rate of interest) x<br><u>5 (# of years from capitalization through trial)</u> =<br>**$500 damages through trial** |
|---|---|
| **FUTURE DAMAGES** | $2,000 (interest capitalized) x<br>0.05 (rate of interest) x<br><u>14 (# of years from trial to loan forgiveness)</u> =<br>**$1,400 post-trial damages** |

63

Plaintiffs propose bifurcating damages in this manner to address Defendants' argument that future damages would be speculative. Insofar as this argument prevails, class members would receive past damages only. (Defendants' arguments regarding the calculation of damages are discussed in the following section.)

C. Damages for "Modified Forbearance Class"

Damages for the "Modified Forbearance Class" would be calculated as follows:

### i. *Account corrections (Navient-owned loans)*

Borrowers with Navient-owned loans would receive: 1) reversal of the improper interest capitalization; and 2) credits toward loan forgiveness for each month spent in forbearance prior to IDR enrollment or recertification.

### ii. *Monetary relief (ED-owned loans)*

For borrowers with ED-owned loans, Navient would compensate the borrower for the improper interest capitalization by paying the greater of (a) actual damages (using the computation illustrated on page 63), or (b) statutory damages under the UTPCPL.

### D. Damages for the "Improper Delay Class"

Damages for the "Improper Delay Class" would be calculated as follows:

#### i. *Account corrections (Navient-owned loans)*

Borrowers with Navient-owned loans would receive IDR credits for each month their application was excessively delayed:

| IDR Account Credits | |
|---|---|
| Delay of 45 days or more (minimum under class definition) | 1 IDR credit |
| Delay of two months or more | 2 IDR credits |
| Delay of three months or more | 3 IDR credits |

#### ii. *Monetary relief (ED-owned loans)*

Borrowers with loans owned by ED would receive statutory damages of $100 under the UTPCPL.

### E. Plaintiffs' expert will calculate damages

The damages model set forth above would be implemented by Plaintiffs' expert, Amanda Kurzendoerfer, Ph.D. *See* Exhibit 37, Kurzendoerfer Curriculum Vitae. Kurzendoerfer is a certified fraud examiner, specializing in economic analysis to quantify harm in litigation involving consumer fraud. Ex. 37 at 1. She assisted three attorneys general in *Pennsylvania v. Navient*, calculating damages

caused by improper interest capitalizations. Ex. 37 at 3. She provided similar analysis for the CFPB in its lawsuit against Defendants. Ex. 37 at 3.

Because those lawsuits involved the same damages sought by Plaintiffs, Kurzendoerfer's analysis will render this case manageable. *See In re Checking Account Overdraft Litigation*, 286 F.R.D. 645, 658 (S.D. Fla. 2012) ("Plaintiffs' expert will formulate calculations that can identify members of the class by running queries in [defendant's] computer records. Such calculations will be merely ministerial in nature…damages will be calculated using the same records used to identify the class members. These facts make this case manageable as a class action.").

### 8. Defendants' Expert is not Persuasive



















### 9. Plaintiffs' Counsel will Provide Adequate Representation

Rule 23 requires that class counsel "be qualified, experienced, and generally able to conduct the proposed litigation." *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 312 (3d Cir. 2007). Although adequacy of class counsel was "traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4)," those questions are now "governed by Rule 23(g)." *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010). Under the rule, courts must consider:

- The work counsel has done in identifying or investigating potential claims;

- Counsel's experience in handling class actions, complex litigation, and the types of claims asserted in the action;

- Counsel's knowledge of the applicable law; and

- The resources that counsel will commit to representing the class.

Rule 23(g)(1)(A). Additionally, courts may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id*. at (g)(1)(B).

Daniel Edelman and Carlo Sabatini are seasoned class action attorneys. They have litigated numerous class actions involving consumer law and debt collection, and they have published many articles on consumer protection issues. *See* Exhibit 38, Edelman Affidavit, and Exhibit 39, Sabatini Affidavit. Their extensive experience and knowledge supports a finding of adequacy. *See Chakejian*, 256 F.R.D. at 498 ("The attorneys who represent plaintiffs are experienced in class action litigation, including class actions under consumer protection laws and are well-qualified to conduct the proposed litigation.").

Anthony Fiorentino has established his competency through the quality of his representation in this case. He drafted the pleadings, reviewed Plaintiffs' account records, took the depositions of Stine and Theurer, and wrote Plaintiffs' briefs (including the instant brief). *See* Exhibit 40, Fiorentino Affidavit, at ¶ 6. The quality of his briefing and arguments supports a finding of adequacy. *See Lewis v. Ford Motor Co.*, 263 F.R.D. 252, 266 (W.D. Pa. 2009) ("One of the ways in which counsel with limited experience in the discipline pertinent to the claims brought in the suit may prove his competence is the quality of the briefs or the arguments

presented during the early stages of litigation") (citing 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1769.1 (1986)).

Additionally, for over ten years, Fiorentino has been advocating for legislative reforms to strengthen protections for student loan debtors, as summarized in his affidavit. *See* Ex. 40 at ¶ 7. His dedication to this issue demonstrates that he will zealously represent the interests of class members.

Edelman, Sabatini, and Fiorentino have been committed to this litigation for seven years. They have devoted substantial resources to the case and obtained significant proof of Plaintiffs' claims. These facts support their appointment as class counsel. *See New York City Dep't of Educ.*, 255 F.R.D. at 74 (finding that the plaintiffs' attorneys were adequate because they "invested extensive time, money, and effort in identifying and investigating potential claims" and committed "significant resources" into "achieving a practical remedy for class and subclass members.").

*See also Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 80 (M.D. Tenn. 2004) ("Counsel have aptly demonstrated adequacy throughout the long history of this litigation. The plaintiffs and their counsel have conducted substantial discovery and produced significant proof of the claim, including acquiring and analyzing electronic deal file information, and have hired respected

and experienced statistical experts to rebut [the defendant's] affirmative

defenses.").

## XI.    CONCLUSION

Based on the foregoing, Plaintiffs seek their appointment as class

representatives, appointment of their attorneys as class counsel, and certification of

the classes and issues stated in the proposed order.

Respectfully submitted,

*/s/ Anthony Fiorentino*
Anthony Fiorentino

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Anthony Fiorentino
**FIORENTINO LAW OFFICE**
6119 North Kenmore Ave., Ste. 410
Chicago, IL 60660
(312) 305-2850
anthony@fiorentinolaw.com

Carlo Sabatini, PA 838311
**SABATINI LAW FIRM, LLC**
216 N. Blakely St.
Dunmore, PA 18512
(570) 341-9000
ecf@bankruptcypa.com

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS,
LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
Phone (312) 739-4200
dedelman@edcombs.com
tgoodwin@edcombs.com

77

## <u>CERTIFICATE OF WORD COUNT</u>

In accordance with Local Rule 7.8, the undersigned hereby certifies that the substantive portion of the Plaintiffs' Memorandum In Support of Class Certification on the Pleadings contains 14,996 words.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

DATED:  December 2, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel A. Edelman, hereby certify that on Tuesday, December 2, 2025, I caused a true and accurate copy of the foregoing document to be filed via the court's CM/ECF online system, which sent notice via email to all counsel of record.

<u>*s/ Daniel A. Edelman*</u>
Daniel A. Edelman