# <u>Exhibit 7-A</u>

October 2015 CFPB Report

OCTOBER 2015

# Annual report of the CFPB Student Loan Ombudsman



# Executive summary

- Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, this annual report analyzes complaints submitted by consumers from October 1, 2014, through September 30, 2015. During this period, the Bureau handled approximately 6,400 private student loan complaints, an increase of approximately 23 percent compared to that of the previous year. The Bureau also handled 2,300 debt collection complaints related to private and federal student loans.

- This report observes that outstanding federal student loans made by private lenders may have a higher concentration of borrowers in default or delinquency than the student loan market at-large. Last month, the Bureau estimated that more than 25 percent of student loan borrowers are delinquent or in default market-wide. The Bureau observed that at least 30 percent of borrowers with loans made through the Federal Family Education Loan Program (FFELP)—more than 5 million in total—are behind on their loans or are already in default.

- In addition, this report offers commentary on recent analyses published by government auditors, economists, and federal agencies. These analyses offer further evidence to support the Bureau's observations in this report and suggest that these problems may be experienced by a broad segment of student loan borrowers. Taken together, the following discussion offers additional support for the Bureau's recent recommendation that policymakers pursue industrywide standards for student loan servicers.

- Borrowers with both private and federal student loans continue to submit complaints describing servicing and debt collection practices that create barriers to enroll in alternative repayment plans, including income-driven repayment plans for borrowers with federal loans. As private student lenders expand proprietary modification offerings for borrowers in

distress, private student loan borrowers report that they encounter servicing problems, including lack of access to timely and accurate information on availability or eligibility criteria to enroll in alternative repayment programs.

- Many debt collection complaints from borrowers with federal student loans describe how borrowers attempt to avoid default during a period of financial hardship, but have difficulty finding information about repayment options, including income-driven repayment plans. Despite the right under federal law to enroll in an income-driven repayment plan, some borrowers report that they did not know they were eligible. The Bureau also received complaints that borrowers who apply for an income-driven repayment plan are held up by paperwork processing delays, receive inconsistent instructions from servicers, or experience difficulty enrolling in these programs.

- This report highlights how economic and other incentives for student loan servicers may encourage servicing practices that contribute to borrower distress, particularly for federal student loans originated by private lenders under FFELP. These loans constituted the vast majority of all new federal student loans until Congress eliminated this program in 2010. From 2006 to 2009, these loans made up more than 75 percent of all new federal student loans. As of June 30, 2015, consumers still owe more than $370 billion in student loans made under this program.

- The following report details analysis from a voluntary request sent by the Bureau's Student Loan Ombudsman to certain market participants, asking for data about loans originated under FFELP and held by private investors. The report also describes certain limitations of this data, noting that it may not be representative of all borrowers with FFELP loans and differences in loan maturity, portfolio composition, and availability of certain benefits may contribute to these results. This analysis finds:

  □ The FFELP data we received shows that less than 6 percent of borrowers in our sample are enrolled in income-driven repayment plans. In contrast, borrowers with federal loans made directly by the Department of Education enroll in these plans at nearly three times the rate.

**TABLE 2:** TOP RECIPIENTS OF STUDENT LOAN DEBT COLLECTION COMPLAINTS FROM OCTOBER 1, 2014 THROUGH AUGUST 31, 2015[8]

| Federal Student Loans | Number of Complaints | Private Student Loans | Number of Complaints |
|---|---|---|---|
| Navient | 86 | Navient | 128 |
| Allied Interstate LLC | 40 | Transworld Systems Inc. | 57 |
| ECMC Group, Inc. | 39 | AES/PHEAA | 22 |
| Transworld Systems Inc. | 34 | Allied Interstate LLC | 18 |
| Performant Financial Corporation | 25 | National Enterprise Systems, Inc | 17 |

**FIGURE 5:** DISTRIBUTION OF LOAN TYPE FOR STUDENT LOAN DEBT COLLECTION COMPLAINTS BY COMPANY FROM OCTOBER 1, 2014 THROUGH AUGUST 31, 2015[9]



[8] This table reflects debt collection complaints where: (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table also reflects aggregated complaints of subsidiary debt collection companies under the parent company. This information was not adjusted for market share. Company-level information should be considered in context of market share.

[9] This figure reflects debt collection complaints where: (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This figure reflects the top companies by complaint volume. This figure also reflects aggregated complaints of subsidiary debt collection companies under the parent company. This figure was not adjusted to reflect each company's relative market share. Company-level information should be considered in context of company size.

**Borrowers with federal loans complain that servicers may not consistently communicate information about how to recertify for income-driven repayment plans.** Federal student loan borrowers who enroll in an income-driven repayment plan are also required to provide income documentation and updated household size every year to demonstrate continued partial financial hardship (a process known as recertification). If a borrower fails to recertify, the borrower will receive a bill for a monthly payment equal to the ten-year standard payment amount based on the borrower's loans at the time the loans entered the income-driven plan. Recertification requirements exist for borrowers with Direct Loans[17] and borrowers with FFELP loans.[18] Borrowers complain that they submitted paperwork to recertify; however, their servicer did not process it in time to avoid a large jump in their monthly payment.[19] Borrowers tell us that this forced them to choose between missing a payment, requesting forbearance, or submitting a payment amount far greater than what they knew they were entitled to under federal law.

> My IBR is set to expire on Feb 10, 2014. On Nov 16, 2013, I sent in my re-application for the IBR program. I contacted [my servicer] to ensure they received the application and all the materials were correct. They indicated that the application was complete and it takes "37 business days to process the applications." It has been well over that time, about 75 days and counting, and still no response from [my servicer]. I have called repeatedly and the customer service operators all say the same thing. At this time I have cancelled my automatic withdrawal and have placed the loan in a one month forbearance. If I did not place the loan in "forbearance" the payment due on Feb 10 would have been $815.00, radically higher than the $216.00 I had been paying through the IBR program. I hate having to place anything in forbearance.

---

[17] 34 C.F.R. § 685.221 (Income-Based Repayment); 34 C.F.R. § 685.209 (PAYE and ICR).

[18] 34 C.F.R. § 682.215 (Income-Based Repayment).

[19] *See* Consumer Financial Protection Bureau, *When you make student loan payments on an income-driven plan, you might be in for a payment shock* (Aug. 2015), *available at* http://www.consumerfinance.gov/blog/when-you-make-student-loan-payments-on-an-income-driven-plan-you-might-be-in-for-a-payment-shock.

The current contract incentive structure put in place by the Department of Education for loans it holds employs a fee schedule that declines as borrowers reach increasingly severe stages of delinquency.[40] In effect, this contract structure attempts to incent servicers to direct resources in order to assist borrowers prior to default. In contrast, certain servicing contracts for securitized student loans provide a fixed monthly fee for all borrowers in "repayment" status, which includes current accounts, accounts in repayment but not current, accounts in forbearance, and accounts in IDR plans.[41]

The fixed fee structure may create an economic disincentive to address borrower distress since compensation remains fixed irrespective of the services a borrower needs in a given month and the servicer will likely incur unreimbursed costs when seeking to mitigate default.[42]

Notably, the effects of this compensation structure on servicing practices may also contribute to other problems identified by student loan borrowers experiencing financial distress. Borrowers have stated that servicers may encourage them to enroll in programs designed to provide short-term relief rather than those designed to lower monthly payments over a longer time period. Student loan borrowers, borrower assistance organizations, and other stakeholders have expressed concern that these servicing practices, particularly for federal student loans not held by the Department of Education, are driven by servicers' incentives.[43] In effect, servicers may

---

[40] U.S. Department of Education, *Title IV Redacted Contract Awards 12-13*, *available at* https://www.fbo.gov/spg/ED/FSA/CA/FSA-TitleIV-09/listing.html.

[41] *See, e.g.*, Nelnet Student Loan Funding, LLC, *Nelnet Student Loan Trust 2011-1 Offering Memorandum* (Feb. 2011), *available at* http://www.nelnetinvestors.com/dsdownloads.cfm?CategoryID=5164&Year=2011; Navient Corporation, *Prospectus Supplement to Base Prospectus dated May 14, 2014*, *available at* https://www.navient.com/assets/2014-1.pdf.

[42] Companies servicing securitized loans made under the FFEL program may have an additional disincentive to facilitate enrollment in income-driven repayment plans—bonds backed by these student loans may default if loans are not paid on schedule. As a number of credit rating agencies have noted, increased utilization of various borrower protections has increased the risk of default for these securities.

[43] *See, e.g.*, Consumer Financial Protection Bureau, *Request for Information Regarding Student Loan Servicing*, 80 Fed. Reg. 29302, Docket ID CFPB-2015-0021, CFPB-2015-0021-0364 ("In the context of FFEL servicing, it is also possible that servicers have an additional financial disincentive to enroll borrowers in IBR. FFEL loans can be securitized, unlike Direct Loans. Recently, rating agencies have downgraded FFEL-backed securities in part because of increased enrollment in IDR plans.").

prefer to facilitate enrollment in short-term programs as a way to limit the length and volume of customer contacts and manage costs—enrollment in short-term programs can generally be completed verbally during a single phone call, while longer-term arrangements require processing of paperwork and additional customer contacts.

In August 2015, an interagency task force, consisting of the Department of the Treasury, Department of Education, Office of Management and Budget, and White House Domestic Policy Council, released recommendations "to ensure that contractors providing student loan servicing help borrowers responsibly make monthly payments on their student loans," developed in consultation with the Bureau and other stakeholders.[44] These recommendations suggest specific changes to the compensation structure and performance measurements included in federal Direct Loan servicing contracts.[45] Although these recommendations focus on opportunities to improve contract incentives for borrowers with loans held by the Department of Education, investors, trustees, and companies structuring new securitizations may wish to consider adjusting servicers' compensation to encourage specific outcomes.[46]

## VAST MAJORITY OF BORROWERS WITH PRIVATELY-HELD, FEDERALLY-GUARANTEED STUDENT LOANS MADE BY PRIVATE LENDERS (COMMERCIAL FFELP) DO NOT UTILIZE INCOME-DRIVEN REPAYMENT PLANS

Data on utilization and performance of borrowers enrolled in income-driven repayment plans is not widely available to the public. The Department of Education does publish summary information related to utilization of these programs by Direct Loan borrowers,[47] but this

---

[44] *See* Dept. of Education, *Best Practices*, *supra* note 37.

[45] *See* U.S. Department of Education, *Another Step Forward Under the Student Aid Bill of Rights* (Aug. 28, 2015), *available at* http://www.ed.gov/blog/2015/08/another-step-forward-under-the-student-aid-bill-of-rights/.

[46] Readers should also note that, even as the Department of Education attempts to improve incentives for its contractors, student loan market participants structuring new securitizations of FFELP loans continue to rely on servicing compensation models that may offer disincentives to assist borrowers in distress, even when the issuer is the same corporate entity as the student loan servicer and retains residual interest in the trust.

[47] *See* U.S. Department of Education, *Federal Student Aid Data Center*, *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

information lacks key indicators, including servicer-level information about the share of borrowers making payments that reflect their income (PFH payments) and information about the performance of borrowers enrolled in these programs. In contrast to the information published about federal loans held by the Department of Education, very little information is available about income-driven repayment plan utilization for borrowers with FFELP loans.[48]

In recent months, national credit rating agencies have expressed concerns over the performance of certain securitizations of FFELP loans, in part based on increased utilization of income-driven repayment plans by FFELP borrowers and by the reliance on forbearance, and to a lesser extent deferment, by borrowers with these loans.[49] These analyses suggest   a potential tension between borrowers' legal right to access alternative repayment plans and student loan trust issuers' economic incentive to ensure that bonds backed by these loans perform on schedule. In order to address the lack of public information about the utilization of these programs by borrowers with commercial FFELP loans, the Bureau sought to obtain additional information about the performance of these loans, as discussed below.

In February 2015, the Bureau asked a number of companies with portfolios of privately-held FFELP loans (commercial FFELP) to provide portfolio-level information about income-driven payment plan utilization.[50] Using information provided in response to this request, the Bureau

---

[48] A substantial share of outstanding FFELP loans is securitized. Limited information about the utilization of these IDR plans is made public in investor disclosures and analyses performed by credit rating agencies. In recent months, two credit rating agencies have downgraded a number of bonds backed by FFELP loans, citing increased utilization of income-driven options. *See, e.g.*, Moody's Investors Service, *Moody's reviews for downgrade 106 tranches from 57 FFELP student loan securitizations as a result of the risk of default at maturity*, (Jun. 22, 2015), *available at* https://www.moodys.com/research/Moodys-reviews-for-downgrade-106-tranches-from-57-FFELP-student--PR_328361.

[49] Readers should note that pressure on trusts backed by commercial FFELP loans should not impact access to credit for future borrowers. Since Congress enacted the SAFRA Act in 2010, private capital is no longer used to fund new originations of federal student loans. For further discussion, *see* Susan Dynarski, *No, Student Borrowers Don't Need to Worry About Loan Market Turmoil*, N.Y. Times (Sept. 29, 2015), *available at* http://www.nytimes.com/2015/09/30/upshot/no-student-borrowers-dont-need-to-worry-about-loan-market-turmoil.html?_r=0.

[50] Consumer Financial Protection Bureau, *Letter from Rohit Chopra to Market Participants on Student Loan Modifications* (Jan. 2015), *available at* http://files.consumerfinance.gov/f/201501_cfpb_request_ffiec-interagency-guidance-student-loan-information.pdf.

26

distress than the Direct Loan program (12.2 percent v. 15.1 percent). In addition, portfolio data published by the Department of Education shows that the share of FFELP borrowers in default (including both commercial FFELP and FFELP held by the Department of Education) is substantially higher than the share of borrowers in default on Direct Loans, both on a borrower basis (23 percent v. 14 percent) and on a dollar basis (8 percent v. 17 percent).[60]

**More than 10 percent of borrowers were enrolled in forbearance in both our commercial FFELP sample and in the Direct Loan program.** Many borrowers, with both FFELP and Direct Loans, may utilize forbearance for a myriad of different reasons, including short-term periods of unemployment and financial hardship. However, forbearance is not the best option for many borrowers experiencing long-term financial hardship.[61]

Borrowers in the commercial FFELP sample and in the Direct Loan portfolio rely on forbearance at comparable levels. Nearly 15 percent of outstanding principal in the commercial FFELP sample is in forbearance, compared to just over 16 percent of outstanding principal in the Direct Loan program. Approximately 10 percent of borrowers in the commercial FFELP sample are enrolled in forbearance, compared to approximately 13 percent of Direct Loan borrowers.[62]

Taken together, this snapshot of commercial FFELP performance raises additional questions about the adequacy of current servicing practices for borrowers with these loans. As the following section discusses in greater detail, the public would also benefit from increased transparency around performance of these loans.

---

[60] In order to control for some of the differences between the Direct Loan portfolio and the FFELP portfolio, the Bureau compared FFELP loans to Direct Loans in repayment statuses and default status (excluding loans in "in school" and "in grace" status from the denominator in this data point). *See* U.S. Department of Education, *Federal Student Aid Portfolio Summary* (accessed on Oct. 7, 2015), *available at* https://studentaid.ed.gov/about/data-center/student/portfolio.

[61] For further discussion, *see* Consumer Financial Protection Bureau, *Student Loan Servicing* (Sept. 2015), *available at* http://www.consumerfinance.gov/reports/student-loan-servicing/.

[62] The Bureau's sample also revealed variation between servicers' use of forbearance. At one servicer, more than 12 percent of borrowers used forbearance, compared to an average of 10 percent across our sample.

# Exhibit 7-B

August 2016 CFPB Report

August 2016

# Midyear update on student loan complaints

Income-driven repayment plan application issues



Consumer Financial
Protection Bureau

# Executive summary

- This midyear report analyzes complaints submitted by consumers from October 1, 2015 through May 31, 2016. During this period, the Bureau handled approximately 3,500 private student loan complaints, and also handled 1,500 debt collection complaints related to private and federal student loans. The Bureau also began handling complaints about problems managing or repaying federal student loans, and handled 2,400 federal student loan servicing complaints during the final three months of this reporting period.

- Since 2009, the vast majority of borrowers with federal student loans have a right under federal law to set their monthly student loan payments based on their income. For borrowers who are unemployed or earn low wages, these income-driven repayment (IDR) plans provide for a "payment" as low as $0 per month.

- Many borrowers depend on student loan servicers to inform them about the availability of IDR options and for processing borrowers' enrollment in these plans. This report observes that borrowers encounter obstacles when submitting applications for IDR plans, including poor customer service, unexpected delays, lost paperwork, and inconsistent or inaccurate application processing. Consumer complaints describe how these obstacles can increase costs, reduce benefits, and extend repayment terms for consumers.

- This report focuses on problems for borrowers who submit an application to enroll in or recertify income and family size under an IDR plan. These observations build on previous reports by the Bureau that noted consumers encountered problems with two other key segments of the IDR enrollment process. First, we described problems identified by consumers related to the information provided by student loan servicers regarding available repayment options. These include concerns raised by borrowers about practices by some servicing personnel that drive borrowers into short-term alternatives such as forbearance, over longer-term options that may be better suited to meet many borrowers' needs. Second, we noted that borrowers described problems related to communications and processes for recertifying income and family size for

borrowers who do successfully enroll—the process through which borrowers maintain an income-driven payment over the long-term.

▪ With this report, the Bureau has now reported on servicing problems at every step of the IDR lifecycle, as identified by consumers with federal student loans.

▪ The Bureau handled complaints from borrowers describing IDR application processing delays that last weeks or months, during which these borrowers lose out on protections that can lower their monthly payment, save them money on interest charges, and start them on the path to loan forgiveness. Many student loan borrowers are able to complete the application process for an IDR plan online at www.studentloans.gov, supplemented by tax information provided electronically by the Internal Revenue Service. For these borrowers, a student loan servicer need only validate the information provided, and approve or deny the application. However, consumers seeking to apply online in this manner report encountering costly and cumbersome delays.

▪ The Bureau has also handled complaints from otherwise eligible borrowers describing differing approaches to addressing incomplete applications, depending on the identity of their servicer. Borrowers report that servicers reject borrowers' applications without providing borrowers the opportunity to fix mistakes or update documentation. Instead of facilitating these borrowers' enrollment in their requested IDR plan, clumsy or flawed IDR enrollment practices mean borrowers are unlikely to obtain an affordable repayment option. Many borrowers are required to provide supplemental information directly to their student loan servicer outside of the electronic enrollment process, either to attest that they are unemployed or have no income, or to provide documentation indicating that their income has changed substantially since their prior year's tax returns. These borrowers rely on their student loan servicer to evaluate whether borrowers' supporting documentation is sufficient to approve or deny an enrollment application, and to work with them to address any deficiencies in their application. However, consumers report surprise rejections that can lead to payment shocks, delayed benefits, and increased interest charges.

▪ This report offers recommendations to address the challenges identified in consumer complaints. This report recommends immediate action from student loan servicers, highlighting recent policy guidance issued by the Department of Education as a roadmap to strengthen practices related to the handling of IDR applications. This report also

From October 1, 2015 through May 31, 2016, the CFPB handled approximately 1,500 debt collection complaints related to private and federal student loans.

**TABLE 2:** TOP RECIPIENTS OF DEBT COLLECTION COMPLAINTS ABOUT STUDENT LOANS FROM OCTOBER 1, 2015 THROUGH MAY 31, 2016

| Federal Student Loans | Number of Complaints | Private Student Loans | Number of Complaints |
|---|---|---|---|
| Navient | 102 | Navient | 115 |
| Transworld Systems Inc. | 25 | AES/PHEAA | 50 |
| ECMC Group, Inc. | 21 | Transworld Systems Inc. | 26 |
| Allied Interstate LLC | 18 | URS Holding, LLC | 19 |
| AES/PHEAA | 17 | Financial Asset Management Systems Inc. | 15 |
| Performant Financial Corporation | 17 | Allied Interstate LLC | 13 |

Note: This table reflects debt collection complaints where (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table also reflects aggregated complaints of subsidiary debt collection companies that operate under their respective parent companies.

protections intended to facilitate successful repayment. Under an IDR plan, borrowers can make payments based on their income and family size, rather than based on their loan balance.[10] For borrowers who are unemployed or have very low wages, "payments" under these plans may be as low as $0 per month.[11] In addition to obtaining immediate payment relief, borrowers enrolled in these plans can take advantage of other immediate and long-term benefits, including interest subsidies, special treatment of unpaid interest, and potentially loan forgiveness.

Borrowers depend on student loan servicers to manage and process enrollment in IDR plans, including making determinations about eligibility, evaluating documentation, and communicating with borrowers about the enrollment process.

However, since the Bureau began accepting federal student loan servicing complaints, issues related to enrollment in IDR plans have emerged. In particular, consumer complaints continue to cite IDR enrollment issues that result in lost interest subsidy benefits, potentially delay eligibility for loan forgiveness benefits, and trigger unnecessary capitalization of interest.

## Application processing delays drive up borrower costs

To enroll in an IDR plan, borrowers are required to submit an application, along with proof of income and family size, to their servicer for review and processing. This application may be submitted online through www.studentloans.gov—an information system managed by the

---

[10] *See* U.S. Department of Education, *Income-Driven Repayment Plans for Federal Students Loans* (Feb. 2016), *available at* https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment.pdf.

[11] In April 2016, the Department of Education published a framework outlining its expectations for how student loan information should appear on borrowers' credit reports. *See* U.S. Department of Education, *Fact Sheet: Modernizing Credit Reporting for Student Loans* (Apr. 2016), *available at* http://www2.ed.gov/documents/press-releases/04282016-credit-reporting.doc.

Department of Education—or via paper application, submitted directly to a student loan servicer. In both cases, servicers target processing IDR applications within 15 days.[12]

---

[12] *See* U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on *Policy Direction on Federal Student Loan Servicing* (July 20, 2016), *available at* http://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

**FIGURE 7:**   IDR ENROLLMENT AND RECERTIFICATION PROCESS



Servicers' failure to timely process these applications can be detrimental to borrowers. Borrower complaints note that IDR applications may take weeks or months to process, delaying borrowers' access to the consumer protections described above. Furthermore, when borrowers' enrollment in IDR is delayed, they may be subject to otherwise avoidable harms, such as increased loan balances and loss of benefits.

report that when servicers process applications over an extended period of time, these delays can result in extra interest charges that would have otherwise been waived.

**Delayed IDR enrollment also delays and decreases borrowers' potential loan forgiveness.** Borrowers enrolled in an IDR plan are entitled to forgiveness of any remaining loan balance after 20 or 25 years of qualified payments.[17] If these borrowers are employed in public service, they can receive loan forgiveness after 10 years of qualified payments.[18] Borrowers complain that their servicer's delayed processing of their IDR applications is obstructing their road to repayment, and effectively reducing any loan forgiveness benefit they may ultimately receive.[19] One borrower notes:

> *[My servicer] still [has] not completed the processing of my application. . . . This delay . . . is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public Service Loan Forgiveness program, so the "clock" on my maximum 10-year repayment time span has essentially stopped. . .*

**Borrowers complain that processing delays drive them to draw down on a limited allotment of forbearance.** Federal student loan borrowers are entitled to 36 months of financial hardship forbearance over the life of their loan—an important protection against very

---

[17] *See* 34 C.F.R. § 682.215(f); 34 C.F.R. §§ 685.209(a)(6), (c)(5).

[18] *See* 34 C.F.R. § 685.219.

[19] In effect, borrowers using forbearance forgo qualifying months at their present income and family size and assume an obligation to make future monthly payments—in some circumstances, borrowers may experience future wage growth that makes these monthly payments substantially higher than payments based on their current income and family size. For these borrowers, processing delays can result in higher future payments that may further increase the total lifetime cost of their loan.

process their enrollment.[25] Deficiencies may include lack of income documentation, signatures on required forms, or other personal or demographic information. Borrowers with incomplete applications report that servicers reject their applications, despite borrowers' offering to remedy the application. Borrowers note that rejections may result from missing information or lost paperwork, and that in both circumstances borrowers are not asked to address these issues prior to the denial of their application. Other borrowers complain that their application is rejected simply for checking the "wrong box," and that they are not given the opportunity to submit a corrected application prior to rejection. These borrowers complain that they must then submit a new application, potentially encountering the same processing delays and lost benefits described above.

**Borrowers who enter forbearance due to application processing delays may find their applications rejected due to their use of forbearance.** When borrowers submit IDR applications, they must provide the current status of their income and their loans, including whether the loan is in forbearance.[26] As previously discussed, borrowers complain that when application processing exceeds their allotted 60 days of administrative forbearance, borrowers with loans that were in active repayment may need to use an additional "voluntary" forbearance, in some cases at the express direction of servicing personnel. As a result, by the time these borrowers' applications are finally reviewed, their loan status will have changed from repayment to voluntary forbearance. Borrowers complain that servicers subsequently reject their applications because of inaccurate information regarding loan status, yet the loan status only

---

[25] As noted above, the distinction between an "incomplete" application and an "ineligible" loan or borrower is critical. Potentially eligible consumers report that their enrollment in IDR is rejected by their servicer despite the fact that they have both (1) an "eligible loan," and (2) are able to demonstrate partial financial hardship. These rejections occur because an application is "incomplete"—once a servicer has identified deficiencies in a borrower's application that may be easily remedied (*e.g.*, missing information, incorrect documentation), borrowers report that their servicer may opt not to take proactive steps to work with them to address these deficiencies and, in some cases, may summarily reject the application.

[26] *See* U.S. Department of Education, *Income-Driven Repayment Request Application*, *available at* http://www.ifap.ed.gov/dpcletters/attachments/18450102IDRFINALExtended.pdf.

# 4. Ombudsman's discussion

Based on the analysis of complaints and other market trends, additional discussion is offered below. The discussion represents the Ombudsman's independent judgment and does not necessarily represent the view of the Consumer Financial Protection Bureau.

## 4.1    Securing and keeping an income-driven student loan payment

The preceding section of this report focuses on application processing problems that can increase costs and cause delays for borrowers seeking to enroll in an IDR plan. Similarly, these challenges can cause problems for borrowers seeking to recertify income and family size—a requirement for borrowers seeking to maintain an income-driven monthly payment under any IDR plan.

The recertification process essentially functions as re-enrollment; borrowers must submit the same application and proof of income as they did when initially enrolling in the IDR plan, using the same process described above. The Bureau handled substantively similar complaints describing comparable obstacles for borrowers seeking to recertify. As the following discussion highlights, servicing practices related to enrollment or recertification, particularly processing delays, can create substantial, unnecessary costs for borrowers.

**When borrowers apply to enroll in IDR, processing delays can increase the short-term and long-term cost of repayment.** Consider a borrower with $23,000 in Direct Subsidized Loans (the loan limit for dependent undergraduate students) with a weighted

average interest rate of 3.76 percent interest who is not currently enrolled in an IDR plan but who would qualify for a $0 monthly payment upon enrollment.[27] She completes an IDR enrollment application online at www.studentloans.gov and her servicer offers to suspend her prior monthly payment as her application is processed, using an administrative forbearance. Because this borrower is not enrolled in an IDR plan while waiting for her application to be processed, she is responsible for paying any interest charges on her loan that accrue during this period.[28]

Due to the daily accrual of interest on student loans, this borrower will have to pay $2.37 in extra interest charges for each day that it takes her servicer to process her application.[29] Because she has Direct Subsidized Loans, any interest charges that accrued while enrolled in an IDR plan would be waived for up to 36 consecutive months. This protection does not apply to periods of

---

[27] $23,000 is the maximum aggregate subsidized loan amount available to undergraduate Direct Loan borrowers. *See* https://studentaid.ed.gov/sa/types/loans/subsidized-unsubsidized. Direct Subsidized Loans for undergraduates disbursed between July 1, 2016 and July 1, 2017 carry an interest rate of 3.76 percent. *See* https://studentaid.ed.gov/sa/about/announcements/interest-rate. Some observers also suggest that IDR borrowers outperform borrowers in other repayment plans because these plans are largely utilized by higher-income borrowers with graduate degrees and above-average levels of student debt. Although public data on wages of borrowers in IDR plan is limited, one large student loan servicer provided data to the Bureau related to IDR utilization by its customers with Direct Loans. This data shows that, of the greater than 1 million Direct Loan borrowers on its platform enrolled in IBR or PAYE, 50 percent reported adjusted gross income between $0 and $20,000 and 84 percent reported AGI less than $50,000. 95 percent of these borrowers reported AGI less than $75,000. *See also* Government Accountability Office, *Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options* (Aug. 25, 2015), *available at* http://www.gao.gov/products/GAO-15-663.

[28] Readers should note that when servicers apply a specific type of administrative forbearance to a borrower's account and complete an IDR application within 60 days, unpaid interest charges may not capitalize and will be treated similarly to any unpaid interest charges accrued while making IDR payments.

[29] For higher-balance borrowers or borrowers with higher-rate debt, the cost associated with processing delays increases. This is particularly true for higher-balance borrowers enrolled in Revised Pay As You Earn (REPAYE) who are entitled to a 50 percent subsidy of unpaid interest on all federal student loans. A graduate student who borrows up to the loan limit of $138,500 in Direct Unsubsidized Loans and enrolls in REPAYE with a $0 payment can expect a monthly interest subsidy of $302.23. Processing delays will cost this borrower more than $10 per day in unnecessary interest charges.

forbearance. In effect, for every month this borrower must wait for her enrollment to be approved, she is charged more than $70 in interest.[30]

In addition, if her servicer takes more than 60 days to process her application, all outstanding, unpaid interest charges may be capitalized, resulting in greater interest charges over the life of her loan. If, for example, it takes four months for her servicer to complete her enrollment, she will have missed out on nearly $300 interest subsidies, as noted above. She will also pay an additional $10 a year in extra interest because the interest charges incurred during this period are added to the outstanding balance of her student loan.[31]

**When borrowers who enroll in IDR seek to retain a payment based on their income, processing delays can also increase the short-term and long-term cost of repayment.** Now consider a similar borrower with the same starting balance at the same interest rate, but with Direct Unsubsidized Loans, as he approaches the expiration of his initial income and family size certification. He has been making $0 IDR payments under Pay As You Earn and each month, unpaid interest has remained outstanding, but has not been added to his principal balance.[32] Over the first 12 months of his enrollment in IDR, he has accrued more than $865 in unpaid interest. If this borrower submits his application 45 days before his current certification expires, but experiences the same four month servicer processing delay, he would find that his loan balance increased by more than $1,000, and as a result, he will also pay more than $30 in unnecessary interest charges every year for the lifetime of his loan. In effect,

---

[30] Student loans are simple daily interest loans. In this illustration, we calculated the monthly interest costs as 1/12th of the total annual interest charges on this loan. Borrowers' actual daily interest charges are equivalent to 1/365th of the annual interest that would accrue based on the outstanding daily principal balance. In this illustration, the daily interest charged on a $23,000 balance is $2.37.

[31] $280 at 3.76 percent interest results in $10 in accrued interest per year.

[32] Interest accrued during period of IDR repayment is not capitalized as long as the borrower timely recertifies at the end of the current repayment period, and the recertification application is timely processed.

processing delays by his student loan servicer cause him to forfeit the long-term protection against compounding unpaid interest, a key feature of IDR plans.

It is also important to note that in both cases described above, the borrowers would miss out on progress toward loan forgiveness during any month in which the borrowers needed to use forbearance to postpone an unaffordable monthly payment. In effect, because each borrower must still make 240 months of qualifying payments in total, not including any months spent in forbearance, each borrower forgoes qualifying months toward loan forgiveness in the near term, but remains obligated to make additional monthly payments in the future.[33] This may prove particularly costly if either borrower experiences wage growth, causing future qualifying payments to be calculated based on a higher income. As these examples demonstrate, there are multiple touchpoints during the IDR application process where processing delays can lead to substantial increases in costs for consumers.[34]

Borrowers on an IDR plan can expect to recertify income and family size as many as 24 times during the life of their loan.[35] If a single application processing delay can increase a borrower's loan balance by over $1000, delays during each annual recertification process could cause a borrower's loan balance to increase by tens of thousands of dollars.[36]

---

[33] Borrowers enrolled in PAYE are entitled to loan forgiveness after making 240, or 20 years, of qualified payments. *See* 34 C.F.R. § 685.209(a)(6).

[34] *See also* Education Secretary John King, Remarks on Student Loan Servicing (July 20, 2016) (stating, "When loan servicers make mistakes or don't provide the right information at the right time, borrowers pay the price. And I'm concerned that less-than-stellar student loan servicing is tripping up borrowers as they seek to climb the economic ladder.").

[35] *See* 34 C.F.R. § 682.215(f); 34 C.F.R. §§ 685.209(a)(6), (c)(5).

[36] The Department of Education has proposed multiyear recertification as a potential option to mitigate the harm caused by processing delays. Under this process, borrowers would be able to recertify eligibility for an IDR plan over multiple years in order "to simplify the repayment process for many borrowers in these plans." U.S. Department of Education, *U.S. Department of Education Releases Report on Strengthening the Student Loan System to Better*

# Exhibit 7-C

October 2016 CFPB Report

October 2016

# Annual report of the CFPB Student Loan Ombudsman

Transitioning from default to an income-driven repayment plan

# Executive summary

- Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, this annual report analyzes complaints submitted by consumers between September 1, 2015 and August 31, 2016. During this period, the Bureau handled approximately 5,500 private student loan complaints and 2,300 debt collection complaints related to private and federal student loans. The Bureau also began handling complaints about problems managing or repaying federal student loans and handled 3,900 federal student loan servicing complaints during the final six months of this reporting period.

- Over the past 12 months, consumers with student loans identified a range of payment processing, billing, customer service, borrower communications, and income-driven repayment (IDR) plan enrollment problems. These consumers submitted complaints about nearly 300 companies, including student loan servicers, debt collectors, private student lenders, and companies marketing student loan "debt relief." For five of the largest student loan servicers, borrowers reported a broad range of servicing problems across each company's operations. The Bureau's analysis of these complaints suggests that borrowers assigned to the largest student loan servicers may encounter widespread problems, whether these borrowers are trying to get ahead or struggling to keep up with their student debt.

- This report highlights complaints about the transition from default into an IDR plan, as reported by the most economically distressed consumers. Earlier this year, the Department of Education reported that more than 8 million federal student loan borrowers are in default and that 1.2 million borrowers with Direct Loans defaulted in the past 12 months. The Bureau estimates that more than 1-in-4 student loan borrowers are past-due or in default on a student loan.

- The Bureau estimates that in the last year, more than 650,000 student loan borrowers "rehabilitated" a defaulted federal student loan by making $5 monthly payments for nine months. Over the next 24 months, the Bureau projects that more than 220,000 of these

- This report offers recommendations to policymakers and market participants, calling for immediate action to improve and strengthen the transition from default to IDR. As Congress seeks to reauthorize the Higher Education Act, lawmakers may wish to consider ways to improve repayment success for previously defaulted borrowers that include immediate access to a stable and long-term IDR plan.

- Policymakers and market participants can take the steps outlined in this report in the near-term to address the challenges identified in consumer complaints by improving borrower communication throughout the default to IDR transition and by streamlining IDR application and enrollment.

- Borrowers and taxpayers both benefit when borrowers successfully complete the default to IDR transition and succeed over the long-term. The current compensation structure for debt collectors reflects this benefit by incentivizing collectors to rehabilitate loans - in some cases, collectors earn nearly $40 in compensation for every $1 in cash recovered through certain rehabilitations. Collectors earn this compensation irrespective of borrower performance over the months or years following a completed rehabilitation, ensuring that collectors have no "skin in the game" when a borrower defaults again. Policymakers may wish to reevaluate the economic incentives in place for debt collectors and student loan servicers to encourage long-term borrower success.

- This report also recommends immediate action to implement the Department of Education's July 2016 recommendation to monitor the repayment behavior of high-risk borrowers through the compilation of public performance metrics on student loan servicing, including data on delinquencies and defaults, as well as data on borrower performance in IDR plans.

5

**FIGURE 4:**    ISSUE TAGS IDENTIFIED IN COMPLAINTS SUBMITTED AGAINST GREAT LAKES BETWEEN MARCH 1, 2016 AND AUGUST 31, 2016



**FIGURE 5:**    ISSUE TAGS IDENTIFIED IN COMPLAINTS SUBMITTED AGAINST NAVIENT BETWEEN MARCH 1, 2016 AND AUGUST 31, 2016



find it difficult and confusing to transition their income-driven payments in rehabilitation to full enrollment in an IDR plan.[40]

**When seeking to make post-default payments, borrowers report servicing problems that can contribute to default.** As noted above, available data suggest that the vast majority of borrowers curing default through an income-driven rehabilitation make $5 payments, and, consequently, should have a right to make $0 payments under an IDR plan.[41] However, borrowers report that servicers do not proactively take the steps necessary to help them understand how to access IDR and quickly enroll. Borrowers report that these communication and processing problems may lead to subsequent delinquency and re-default.

One borrower who rehabilitated his loan complains that he was facing immediate delinquency when he could not afford to make payments under his standard payment plan after rehabilitation. The borrower complains that after curing his default, his loan was transferred to a servicer where his payment jumped to $1000, which was more than he could afford to pay. He expressed frustration that he was placed in this position because the debt collector was aware of his financial circumstances, but failed to provide this information to his new servicer.

**Borrowers complain that poor customer service creates barriers to enrollment in IDR plans, even when they proactively request payment relief.** Borrowers report that servicers direct them to temporary forbearance and deferment options, instead of providing information on and facilitating enrollment in an IDR plan. Borrowers who are experiencing continuing financial distress describe how they can quickly fall behind when a short-term cessation of payment expires.

---

[40] Borrowers with Parent PLUS loans who complete rehabilitation are not eligible for a repayment plan based on their income. However, borrowers who first consolidate their Parent PLUS loans can enroll in the Income-Contingent Repayment plan. *See* U.S. Department of Education, *Loan Servicing and Collection – Frequently Asked Questions*, LR-Q4 (accessed Sept. 28, 2016), *available at* https://ifap.ed.gov/LoanServicingandCollectionInfo/LSCFAQ.html.

[41] *See* NCHER, s*upra* note 23; GAO, *supra* note 15.

29

whether the economic incentives that drive collector and servicer practices throughout the default-to-IDR transition are properly aligned and, as discussed below, whether rehabilitation delivers the intended benefits to consumers, industry, and taxpayers when the program was created more than two decades ago.

## 4.2   Rehabilitation was designed as a feature of the legacy bank-based guaranteed loan program

The basic structure of the rehabilitation program — including the requirement that borrowers make a series of payments to a debt collector prior to exiting default — has not been revised in more than two decades. This process does not reflect two major changes to the federal student loan program in the intervening years — the termination of bank-based guaranteed lending and the establishment of a near-universal right for borrowers to make income-driven student loan payments. As the preceding section of this report indicates, today, consumers encounter significant problems with the debt collection and servicing practices put in place to execute certain required program functions, forcing vulnerable borrowers to work with multiple private companies to complete seemingly duplicative processes to set affordable student loan payments.

---

troubling statistics raise concerns that millions of borrowers may not be getting information about repayment options or may encounter breakdowns when attempting to enroll in these plans. For borrowers of color, who are more likely to attend for-profit colleges and face unique obstacles while completing a degree, these breakdowns may be even more troubling. Some research suggests higher rates of student loan defaults and delinquencies in ZIP codes populated primarily by minorities with higher income levels," *citing* Washington Center for Equitable Growth, *Geography of Student Debt* (2016), *available* at http://equitablegrowth.org/research-analysis/an-introduction-to-the-geography-of-student-debt/).

When a borrower with a FFELP loan defaults on his or her obligation, the guarantor repays the private investor that owns the loan and assumes ownership of the loan.[63] However, the guarantor must still attempt to recover the defaulted amount from the borrower, either by serving as a first-party debt collector or by contracting with a third-party debt collector. Federal law also permits collectors to recover "reasonable collection costs" from a borrower by assessing a fee of up to 16 percent of the unpaid principal and accrued interest.[64] Guaranty Agencies turn over recovered funds and the net of collection costs to the federal government.

Guarantors are not permitted to sell defaulted federal student loan debt to private debt buyers — under most circumstances, they must continue to pursue collection of all defaulted debt on their balance sheet until a borrower cures their default or satisfies his or her obligation.[65]

Federal law provides for a series of extraordinary tools to collect on this type of defaulted federal student loan debt (*e.g.* administrative wage garnishment, the offset of tax refunds and other

---

[63] Under certain circumstances, the federal government then reimburses the guarantor.

[64] 20 U.S.C. § 1078–6(a)(1). Prior to July 1, 2014, federal law permitted collection costs up to a maximum of 18.5 percent. The Department of Education has ceased imposing collection costs for borrowers with loans on its balance sheet who cure default through rehabilitation; however, this practice continues for borrowers who cure default on a privately held FFELP loan. The U.S. Department of Education has attempted to halt the imposition of collections costs by Guaranty Agencies when a borrower has initiated rehabilitation within 60 days of default. For further discussion, *see* U.S. Department of Education, *Dear Colleague Letter GEN-14-15* (July 10, 2015), *available at* https://www.ifap.ed.gov/dpcletters/attachments/GEN1514.pdf; and *see Bible v. USA Funds Inc.*, 799 F.3d 633 (7th Cir. 2015).

[65] *See* 34 C.F.R. § 682.405. Readers should note that under certain circumstances Guaranty Agencies are also permitted to assign defaulted student loans to the Department of Education after performing "due diligence" to collect on the defaulted debt.

# APPENDIX A: FEDERAL STUDENT LOAN COMPLAINT SAMPLE

| Company | Total complaints handled March 1, 2016 – August 31, 2016 | Total complaints reviewed in sample set |
|---|---|---|
| Navient Solutions, Inc.* | 812 | 200 |
| AES/PHEAA* | 580 | 200 |
| Nelnet* | 259 | 200 |
| Great Lakes | 152 | 152 |
| ACS Education Services | 117 | 117 |
| ECMC Group, Inc. | 48 | 48 |
| MOHELA | 47 | 47 |
| Utah System of Higher Education | 39 | 39 |
| Heartland Payment Systems | 37 | 37 |
| EdFinancial Services | 21 | 21 |

*For companies with over 200 complaints handled during the reporting period, a random sample of 200 complaints was reviewed.

# Exhibit 7-D

October 2017 CFPB Report

October 2017

# Annual report of the CFPB Student Loan Ombudsman

Strategies for consumer-driven reform



# Executive summary

- Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, this annual report analyzes complaints submitted by consumers between September 1, 2016 and August 31, 2017. During this period, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") handled approximately 12,900 federal student loan servicing complaints, 7,700 private student loan complaints, and approximately 2,300 debt collection complaints related to private or federal student loan debt.

- During the reporting period, consumers with student loans submitted complaints about more than 250 companies, including student loan servicers, debt collectors, private student lenders, and companies marketing student loan "debt relief." These consumers identified a range of payment processing, billing, customer service, borrower communications, and income-driven repayment (IDR) plan enrollment problems. The Bureau's analysis of these complaints suggests that borrowers assigned to the largest student loan servicers may encounter widespread problems, whether these borrowers are trying to get ahead or struggling to keep up with their student debt.

- Since 2012, the Bureau has handled complaints from individual student loan borrowers, and the CFPB Student Loan Ombudsman has monitored these complaints. Each year, reports by the Student Loan Ombudsman emphasize the individual challenges borrowers identify in their complaints. These reports also highlight where challenges may be systemic in nature and illustrate where law enforcement, regulatory action, or market-driven reform may be necessary to better protect similarly situated student loan borrowers.

- From July 21, 2o11 through August 31, 2017, CFPB handled over 50,700 private and federal student loan complaints, and about 9,800 debt collection complaints related to private or federal student loan debt. These complaints have served as the critical link in a process through which government agencies and market participants have repeatedly taken action to

**FIGURE 2:**    COMPANIES WITH THE MOST FEDERAL STUDENT LOAN COMPLAINTS SENT TO COMPANIES RANKED BY VOLUME FROM SEPTEMBER 1, 2016 THROUGH AUGUST 31, 2017



Note: This table reflects complaints where (1) the consumer identified the sub-product as a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table reflects the top companies by complaint volume for the period of September 1, 2016 through August 31, 2017.

**FIGURE 3:**    ISSUES IDENTIFIED IN FEDERAL STUDENT LOAN COMPLAINTS BY COMPANY FROM SEPTEMBER 1, 2016 THROUGH AUGUST 31, 2017



Note: This table reflects complaints where (1) the consumer identified the sub-product as a federal student loan, (2) the consumer identified the issue and (3) the identified company responded to the complaint, confirming a relationship with the consumer. This table reflects the top companies by complaint volume. When preparing the images for this report, a graphical error was made in Figure 3 and reflected in the version published on October 16, 2017. Figure 3 has since been updated.

example, nearly all federal student loan borrowers have the right to make payments based on their income through an IDR plan.[6] The Bureau has also repeatedly documented how the ability to enroll in and maintain an IDR plan is crucial for struggling borrowers hoping to avoid default.[7] However, borrowers continue to complain to the Bureau that servicing roadblocks may delay or block their ability to make income-driven payments.

**Borrowers complain about encountering obstacles when seeking to enroll in IDR plans.** Borrowers report experiencing servicing obstacles when trying to enroll in an IDR plan, such as unexpected delays, lost paperwork, poor customer service, and inconsistent application processing. Borrowers describe how these obstacles can increase loan costs, reduce benefits, and

---

essential to preventing previously defaulted federal student loan borrowers from re-defaulting on their loans); CFPB, *Staying on track while giving back: The cost of student loan servicing breakdowns for people serving their communities* (Jun. 22, 2017), https://www.consumerfinance.gov/data-research/research-reports/staying-track-while-giving-back-cost-student-loan-servicing-breakdowns-people-serving-their-communities; *see also* CFPB, *Update from the CFPB Student Loan Ombudsman* (May 16, 2017), http://files.consumerfinance.gov/f/documents/201705_cfpb_Update-from-Student-Loan-Ombudsman-on-Redefaults.pdf (presenting data from servicers that show "the vast majority (greater than 90 percent) of borrowers who rehabilitated one or more defaulted loans were not enrolled and making IDR payments within the first nine months after 'curing' a default").

[6]  *See* 20 U.S.C. § 1098e(b). Income-Based Repayment (IBR) is one of several types of IDR plans. While all IDR plans peg a borrower's payment amount to the borrower's discretionary income and family size, the individual plans each have slightly different terms, the most prominent of which is the percentage of discretionary income used to determine the payment (*e.g.*, IBR payments are set at 15 percent of a borrower's discretionary income, while payment under Pay As You Earn (PAYE), another IDR plan, are set at 10 percent of a borrower's discretionary income). *See, e.g.*, 34 C.F.R. §§ 682.215 (defining IBR for FFELP borrowers); 685.209 (defining PAYE, Income-Contingent Repayment (ICR), and Revised Pay As You Earn (REPAYE) for Direct Loan borrowers), 685.221 (defining IBR for Direct Loan borrowers); *see also* CFPB, *Student Loan Servicing* (Sept. 2015), http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf (discussing the different IDR options available to federal student loan borrowers).

[7]  *See, e.g.*, CFPB, *Student Loan Servicing* (Sept. 2015), http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf (highlighting how the ability to access IDR plans is critical to repayment success); CFPB, *Annual Report of the CFPB Student Loan Ombudsman* (Oct. 17, 2016), https://www.consumerfinance.gov/data-research/research-reports/2016-annual-report-cfpb-student-loan-ombudsman (explaining how IDR enrollment is essential to preventing previously defaulted federal student loan borrowers from re-defaulting on their loans); *see also* CFPB, *Update from the CFPB Student Loan Ombudsman*, *supra* note 5.

extend repayment terms for consumers.[8] For example, borrowers complain that when seeking to use a pay stub instead of their tax return to prove their income, their application may sit under review for months at a time, inhibiting them from making progress repaying their loan.[9]

Borrowers also complain that when providing their servicer with income documentation other than a tax return, their servicer may incorrectly calculate their income-driven payment amount, resulting in payments that are higher than expected. Other borrowers complain that when they reach out to their servicer because their standard monthly payment is unaffordable, they are directed to options like forbearance or extended repayment, which may be costlier over the long-term. Borrowers with loans in forbearance complain that while it may provide short-term relief, had they known about and enrolled in IDR options, they could have continued to make progress repaying their loans at an affordable amount.[10]

**Borrowers report that when they attempt to recertify their IDR plan, their loans are placed into forbearance, despite their right to continue making IDR payments while their new payment amount is determined.** Borrowers are required to annually recertify their income and family size in order to continue to qualify for an affordable monthly

---

[8] *See also* CFPB, *CFPB Data Point: Student Loan Repayment* (Aug. 16, 2017), https://www.consumerfinance.gov/data-research/research-reports/cfpb-data-point-student-loan-repayment (finding that 23 percent of small-loan borrowers (less than $20,000) are not making payments large enough to reduce their balances. Over half of this group is made up of borrowers who are delinquent or in default on their student loans.).

[9] Borrowers may use alternative documentation such as pay stubs to certify their income if their tax returns are not representative of their current income. *See, e.g.*, 34 C.F.R. §§ 682.215(e)(1)(ii), 685.209(a)(5)(B), (b)(3)(i), (c)(4)(B). As the Bureau previously reported, half of all borrowers enrolled in IDR plans used alternative documentation to certify their income. *See* CFPB, *Midyear update on student loan complaints* (Aug. 2016), files.consumerfinance.gov/f/documents/201608_cfpb_StudentLoanOmbudsmanMidYearReport.pdf (reporting on complaints describing how student loan servicers may delay processing IDR applications and wrongfully reject borrowers seeking to enroll in IDR, resulting in increased interest charges and lost eligibility for certain federal benefits and protections).

[10] IDR options provide for loan forgiveness after 240 or 300 payments (20 or 25 years). *See* 34 C.F.R. §§ 682.215(f), 685.209(a)(6), (b)(3)(D), (c)(5)(iii)(A).

payment under an IDR plan. [11] Generally, servicers are expected to process borrowers'
recertification applications in a few weeks. [12] However, when this process takes longer,
borrowers are entitled under federal law to continue making income-driven payments at the
same amount until their new payment is calculated. [13] Borrowers complain that when their
recertification application is not timely processed by their servicers, rather than extending their
current income-driven payments, servicers require that borrowers make their full, standard
monthly payment amount, or direct them to enter forbearance. Borrowers complain that when
their standard monthly payment is unaffordable, forbearance is their only realistic option.
Borrowers further complain that their loans may spend months in forbearance while their
recertification application is under review, preventing them from progressing towards loan
forgiveness available through IDR forgiveness options or Public Service Loan Forgiveness
(PSLF). [14]

---

[11] *See* 34 C.F.R. §§ 682.215(e), 685.209(a)(5), (b)(1)(v), (c)(4); *see also* CFPB, *When you make student loan payments on an income-driven plan, you might be in for a payment shock* (Aug. 17, 2015), https://www.consumerfinance.gov/about-us/blog/when-you-make-student-loan-payments-on-an-income-drivenplan-you-might-be-in-for-a-payment-shock.

[12] In order to recertify an IDR plan, borrowers should submit recertification paperwork no later than 25 days before the end of each annual period. Servicers are then expected to process the paperwork and determine the borrower's payment amount for the next year before the next annual period begins. *See* 34 C.F.R. §§ 682.215(e)(3)(i), 685.209(a)(5)(iii)(A), (b)(3)(vi)(B)(1), (c)(4)(iii)(A); *see also* CFPB, *Education loan examination procedures* (June 22, 2017), http://content.consumerfinance.gov/policycompliance/guidance/supervision-examinations/education-loan-examination-procedures; CFPB, *Response Letter from Student Loan Ombudsman Seth Frotman to NCLC Director Persis Yu* (May 2, 2017), http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/cfpb-idf-drt-response-letter.pdf.

[13] See 34 C.F.R. §§ 685.209(a)(5)(viii)(A), (b)(3)(vi)(E), (c)(4)(viii)(A), 685.221(e)(8)(i), (ii); see also CFPB, *Staying on track while giving back: The cost of student loan servicing breakdowns for people serving their communities* (Jun. 22, 2017), https://www.consumerfinance.gov/data-research/research-reports/staying-track-while-giving-back-cost-student-loan-servicing-breakdowns-people-serving-their-communities.

[14] Federal student loan borrowers can have their loans forgiven after 20 or 25 years of making payments under an IDR plan, or after 10 years of making qualifying payments while working in public service. *See* 34 C.F.R. §§ 682.215(f), 685.209(a)(6), (b)(3)(D), (c)(5)(iii)(A) (defining loan forgiveness requirements under IDR plans); 34

receiving help to enroll in an IDR plan. These borrowers complain that a single servicing error that prevents timely approval of their IDR recertification application may result in interest capitalization that significantly increases their principal loan balance. [25]

Despite having a low balance, these borrowers complain that servicing breakdowns cause them to struggle to repay their debt, resulting in delinquency or default. For example, one borrower complained that after explaining her financial hardship to her servicer, the servicer never discussed any available repayment options, and only steered her into forbearance. Another low balance borrower claimed that after her servicer advised her to spend years in forbearance, her loans became delinquent because she had exhausted her allotted forbearance and was not advised of affordable repayment options.

## 2.2    Private student loan complaints

From September 1, 2016 through August 31, 2017, the Bureau handled approximately 7,700 private student loan complaints.

### 2.2.1    Private student loan complaint data

The following tables are based on complaints sent to companies from September 1, 2016, through August 31, 2017, as exported from the public Consumer Complaint Database as of October 1, 2017. [26]

---

[25] *See also* CFPB, *CFPB Data Point: Student Loan Repayment* (Aug. 2017), https://www.consumerfinance.gov/data-research/research-reports/cfpb-data-point-student-loan-repayment ("[F]ive years after starting repayment over 23% of these small-loan borrowers in recent cohorts are not making payments large enough to reduce their balances.").

[26] *See supra* note 2.

**Bureau examiners cite illegal application processing practices by student loan servicers related to those practices identified in consumer complaints.** In 2016, building on the issues identified in individual consumer complaints, CFPB examiners determined that one or more servicers were engaging in the unfair practice of denying, or failing to approve, IDR applications that should have been approved on a regular basis.[99]

Bureau Supervision periodically publishes "Supervisory Highlights" reports to share key examination findings in order to help industry limit risks to consumers and comply with federal consumer financial law.[100] In the Fall 2016 edition of Supervisory Highlights, the Bureau's Office of Supervision noted that "when servicers fail to approve valid IDR applications, borrowers can be injured by having to make higher payments, losing months that would count towards loan forgiveness, or being subjected to unnecessary interest capitalization."[101] This report indicated that examiners directed one or more servicers to "remedy borrowers who were improperly denied, and significantly enhance policies and procedures to promptly follow up with consumers who submit applications that are incomplete, prioritize applications that are approaching recertification deadlines, and implement a monitoring program to rigorously verify the accuracy of IDR application decisions."[102]

**Policymakers take action to strengthen contracts with servicers and improve borrower access to critical protections.** In 2016, the Department of Education's Office of Federal Student Aid (FSA) responded to concerns related to IDR application processing by

---

[99] *See* CFPB, *Supervisory Highlights Issue 13: Fall 2016* (Oct. 2016), http://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[100] *See generally* CFPB, *Supervisory Highlights* (accessed Oct. 6, 2017), https://www.consumerfinance.gov/policy-compliance/guidance/supervisory-highlights.

[101] CFPB, *Supervisory Highlights Issue 13: Fall 2016* (Oct. 2016), http://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[102] *Id.*

# Exhibit 7-E

Fall 2022 CFPB Report

CONSUMER FINANCIAL PROTECTION BUREAU  |  SEPTEMBER 2022

# Supervisory Highlights Student Loan Servicing Special Edition

Issue 27, Fall 2022



Consumer Financial Protection Bureau

servicers calculate catch-up payment amounts that get added to consumers' monthly income-derived payments.

During the COVID-19 payment suspension, ED did not require consumers to recertify their incomes. Consumers' payment amounts and duration of IDR enrollments were essentially paused in March of 2020. Recently, ED authorized servicers to accept consumers' oral representation of their incomes over the phone for the purposes of calculating an IDR payment amount. ED will not require consumers that provide their incomes this way to provide any further documentation demonstrating the accuracy of that amount.

In April 2022, ED announced it was taking steps to bring more borrowers closer to IDR forgiveness.[28] ED is conducting a one-time payment count adjustment to count certain periods in non-IDR repayment plans and long-term forbearance.[29] This waiver can help address past calculation inaccuracies, forbearance steering, and misrepresentations about the program terms. While the revision will be applied automatically for all Direct Loans and ED-held FFELP loans, Commercial FFELP loan borrowers can only become eligible if they apply to consolidate their Commercial FFELP loans into a Direct Consolidation Loan within the waiver timeframe. FSA estimates the changes will result in immediate debt cancellation for more than 40,000 borrowers, and more than 3.6 million borrowers will receive at least three years of credit toward IDR forgiveness.[30] The pool of borrowers who may potentially benefit from IDR forgiveness is large. As of March 2022, one third of Direct Loan borrowers in repayment were enrolled in an IDR plan.[31]

### 4.3.1 Unfair act or practice of improper processing of income-driven repayment requests

Examiners found that servicers engaged in unfair acts or practices when they improperly processed consumers' IDR requests resulting in erroneous denials or inflated IDR payment amounts. Servicers made a variety of errors in the processing of applications: (1) erroneously

---

[28] https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs.

[29] ED also announced that it was issuing new guidance to student loan servicers to ensure accurate and uniform payment counting, that it would track payments on a modernized data system, and that it would seek to display IDR payment counts on StudentAid.gov that borrowers could access on their own. *See* https://studentaid.gov/announcements-events/idr-account-adjustment.

[30] https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs.

[31] https://studentaid.gov/sites/default/files/fsawg/datacenter/library/DL.PortfoliobyRepaymentPlan.xls

concluding that the ADOI documentation was not sufficient,[32] resulting in denials; (2) improperly considering spousal income that should have been excluded, resulting in denials; (3) improperly calculating AGI by including bonuses as part of consumers' biweekly income, resulting in higher IDR payments; (4) failing to consider consumers' spouses' student loan debt, resulting in higher IDR payments; and (5) failing to process an application because it would not result in a reduction in IDR payments, when in fact it would. These practices caused or likely caused substantial injury in the form of financial loss through higher student loan payments and the time and resources consumers spent addressing servicer errors. Consumers could not reasonably avoid the injury because they cannot ensure that their servicers are properly administering the IDR program and would reasonably expect the servicer to properly handle routine IDR recertification requests. The injury was not outweighed by countervailing benefits to consumers or competition resulting from the practice, as servicers should be able to process IDR requests in accordance with ED guidelines.

## 4.3.2 Unfair practice of failing to sufficiently inform consumers about the need to provide certain income documentation when reentering the REPAYE payment plan

Consumers enroll in REPAYE by submitting a form with income documentation; they must recertify annually. Consumers who fail to recertify on time are removed from REPAYE and placed into the "Alternative repayment plan" which has monthly payments that are generally significantly higher than those under the REPAYE plan.[33] Many consumers attempt to reenroll in REPAYE creating a gap period that can range from one month to multiple years. Consumers who apply to reenroll in REPAYE must provide income documentation for the gap period. At one servicer, during a two-year period only 12 percent of applicants attempting to reenter REPAYE for the first time provided the required gap period income documentation. Among the 88 percent that were initially denied for this reason, 74 percent were delinquent six months later compared to only 23 percent of consumers who had been successfully reenrolled in REPAYE.

---

[32] For example, denying an IDR application because there is no pay frequency listed on a paystub when in fact the paystub showed the frequency, or the borrower wrote the frequency on the paystub.

[33] Specifically, the monthly payment under this plan is the fixed amount necessary to repay the loan in the lesser of 10 years or whatever is left on the consumer's 20- or 25-year REPAYE repayment period.