# Exhibit 9

Congressional Research Service Report



# Federal and State Regulation of Student Loan Servicers: A Legal Overview

September 17, 2019

**Congressional Research Service**

https://crsreports.congress.gov

R45917

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R45917

September 17, 2019

**Kevin M. Lewis**
Legislative Attorney

**Nicole Vanatko**
Legislative Attorney

# Federal and State Regulation of Student Loan Servicers: A Legal Overview

As the federal government's role in the student loan industry has expanded over time, the United States has contracted with student loan servicers to help it administer its growing student loan portfolio. These servicers perform a variety of functions, including (1) communicating with borrowers regarding repayment; (2) disclosing information about student loan terms to borrowers; (3) applying payments to outstanding loan balances; (4) processing applications for enrollment in repayment plans; and (5) processing requests for loan forbearance and deferment. Several federal statutes and regulations—along with an array of contractual provisions—may affect how these servicers conduct these various functions on the government's behalf with respect to federal student loans.

Some allege that the existing scheme of federal regulation has not deterred servicers from engaging in various forms of alleged misconduct. According to critics, servicers of federal student loans have engaged in several undesirable behaviors, such as (1) steering borrowers experiencing financial hardship toward forbearance instead of repayment plans that would be more beneficial; (2) neglecting to inform borrowers of the consequences of failing to promptly submit certain required information; (3) misinforming borrowers on their eligibility for loan forgiveness; and (4) misallocating or misapplying loan payments. The servicers deny these allegations.

Federal laws governing higher education do not authorize borrowers who have allegedly been harmed by servicer misconduct to directly pursue litigation against servicers. Instead, existing law places the primary burden of policing federal student loan servicers upon the federal government. Some commentators disagree, however, over whether the U.S. Department of Education (ED) has exercised sufficient oversight over the servicers with which it contracts. Observers have also disagreed over the extent to which other federal agencies, such as the Consumer Financial Protection Bureau (CFPB), should participate in the regulation of federal student loan servicers.

At the same time, more and more states have enacted legislation specifically targeted at student loan servicers. While the specifics of these laws vary from state to state, many purport to impose legal requirements upon servicers of federal student loans that go beyond those imposed by federal law, such as supervision by a state ombudsperson or mandatory licensing. Furthermore, in addition to new laws specifically aimed at servicers, state attorneys general and borrowers alike have invoked existing state consumer protection statutes and common law causes of action against servicers in civil litigation. These burgeoning disputes between servicers on the one hand and states and borrowers on the other have raised legal questions regarding how existing federal law interacts with the growing body of state servicing regulations. ED has taken the position that federal law "preempts"—that is, displaces—state laws purporting to regulate servicers of federal student loans. While some courts have agreed with ED's conclusions on preemption, the bulk of courts have reached the opposite conclusion that states retain a role in regulating student loan servicing.

This ongoing legal debate has significant legal consequences. On the one hand, if federal law preempts state servicing regulations, servicers will be subject to a single uniform national standard and will not need to expend resources to comply with each jurisdiction's state-specific regulatory regime. On the other hand, allowing states to enact and enforce their own servicing laws could fill regulatory gaps where—at least in the view of some critics—existing federal regulation has not ensured that servicers perform their duties with sufficient regard for borrowers' interests. Preserving a regulatory role for the states could also enable each state to experiment with novel regulatory schemes. Given these legal consequences, several Members and committees of the 116th Congress have expressed interest both in the federal regulation of servicers generally and the preemptive scope of that regulation.

# Contents

Background on the Federal Student Loan Programs ........................................................................ 3

Federal Laws and Contractual Requirements Governing Student Loan Servicers........................ 5
    Statutory Provisions ................................................................................................................. 5
    Regulations................................................................................................................................ 7
        Regulations Specifically Governing Loan Servicing........................................................ 7
        General Regulatory Duties That ED Has Delegated to Servicers..................................... 9
    Servicer Contracts with the Federal Government ..................................................................... 9
    Role of the Consumer Financial Protection Bureau ............................................................... 10

Allegations of Servicer Misconduct ...........................................................................................11
    Forbearance Steering...............................................................................................................11
    Income Recertification ........................................................................................................... 13
    Loan Forgiveness Eligibility ................................................................................................. 13

State Laws Regulating Servicers of Federal Student Loans ........................................................ 14
    State Laws Governing Student Loan Servicers Specifically................................................... 14
    State Laws of General Applicability ....................................................................................... 18
    Preemption and the Interaction of Federal and State Servicing Laws .................................... 19
        Federal Preemption ....................................................................................................... 19
        ED's Interpretation........................................................................................................ 20
        Recent Litigation........................................................................................................... 21

Considerations for Congress........................................................................................................ 27

# Contacts

Author Information...................................................................................................................... 30

The United States has created vast federal loan programs offering to millions of students alternatives to private educational loans.[1] According to the U.S. Department of Education's (ED's) Office of Federal Student Aid (FSA), nearly 43 million borrowers owed money on federal student loans as of the second quarter of 2019, and the total amount of outstanding federal student loan debt currently exceeds $1.4 trillion—a figure that has nearly tripled since 2007.[2] In recent years, a significant number of these borrowers have experienced difficulty repaying their student loans.[3] Moreover, borrowers who lack financial experience may need guidance to navigate the student loan repayment process, which some borrowers find daunting or confusing.[4] Student loan servicers[5]—with whom the United States has contracted to assist with the administration of its sizable student loan portfolio[6]—are a key source of guidance and assistance for borrowers struggling to understand and repay their federal student loans.[7] Under its contract with the federal government, a servicer may be responsible for (among other things)

---

[1] *See, e.g.*, Daniel A. Austin, *The Indentured Generation: Bankruptcy and Student Loan Debt*, 53 SANTA CLARA L. REV. 329, 338-39 (2013) (tracing the development of federal student loan programs from 1958 to the present).

Other CRS products discuss the various federal student loan programs in greater detail. *See* CRS Report R43351, *The Higher Education Act (HEA): A Primer*, by Alexandra Hegji, at 13-14, 15-17 [hereinafter Hegji, *Primer*]; CRS Report RL31618, *Campus-Based Student Financial Aid Programs Under the Higher Education Act*, by Joselynn H. Fountain; at 10-16; CRS Report R40122, *Federal Student Loans Made Under the Federal Family Education Loan Program and the William D. Ford Federal Direct Loan Program: Terms and Conditions for Borrowers*, by David P. Smole, at 1-4.

A different legal framework governs private student loans, so this report does not focus on them. Private loans, as the name implies, are neither issued nor guaranteed by the federal government. *E.g.*, Jonathan D. Glater, *Student Debt and the Siren Song of Systemic Risk*, 53 HARV. J. ON LEGIS. 99, 110 n.54 (2016). Congress has opted to regulate private student loans differently from federal student loans in various respects. *Compare, e.g.*, 15 U.S.C. § 1638(e) (providing that the Truth in Lending Act (TILA) applies to "private education loans" but does not apply to most federal loans), *with, e.g.*, *id*. § 1603(7) (providing that federal "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act of 1965" are not subject to TILA's requirements relating to consumer credit cost disclosure).

[2] Fed. Student Aid, *Federal Student Loan Portfolio*, U.S. DEP'T OF EDUC., https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last visited September 6, 2019).

[3] *See, e.g.*, Nat'l Ctr. for Educ. Statistics, *Stats in Brief: The Debt Burden of Bachelor's Degree Recipients*, U.S. DEP'T OF EDUC. 16 (2017), https://nces.ed.gov/pubs2017/2017436.pdf (reporting that many student loan borrowers face a debt burden that exceeds "a manageable percentage of income that a borrower can be expected to devote to loan repayment").

[4] *See, e.g.*, CONSUMER FINANCIAL PROTECTION BUREAU, STUDENT LOAN SERVICING: ANALYSIS OF PUBLIC INPUT AND RECOMMENDATIONS FOR REFORM 18, 20 (2015), https://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ("[The various federal student loan programs] feature a range of different borrower benefits and protections that can affect borrower performance, payment amount, interest rate, and other key loan terms and features . . . . [B]orrowers experiencing financial hardship may not be able to understand and enroll in appropriate programs without assistance from their student loan servicer."); Amanda Harmon Cooley, *Promissory Education: Reforming the Federal Student Loan Counseling Process to Promote Informed Access and to Reduce Student Debt Burdens*, 46 CONN. L. REV. 119, 143 (2013) (describing "the loan repayment process" as "complex for student borrowers, most of whom have relatively little financial experience or savvy").

[5] This report addresses only federal student *servicers*; it does not discuss *collectors* of student loans. Loan collection implicates slightly different legal issues. *See, e.g.*, Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1261-66 (9th Cir. 1996) (analyzing whether federal law preempted state law claims relating to collection of federal student loan); Linsley v. FMS Inv. Corp., No. 3:11cv961 (VLB), 2012 WL 1309840, at *1-8 (D. Conn. Apr. 17, 2012) (same).

[6] *See, e.g.*, USA Grp. Loan Servs., Inc. v. Riley, 82 F.3d 708, 711 (7th Cir. 1996) ("[T]he student loan program places heavy administrative burdens on the entities involved in it . . . A whole industry of 'servicers' has arisen to relieve these entities of some of the administrative burdens.").

[7] *See, e.g.*, Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 39 (D.D.C. 2018); CRS Report R44845, *Administration of the William D. Ford Federal Direct Loan Program*, by Alexandra Hegji, at 19-22

- communicating with borrowers regarding repayment;
- disclosing information about student loan terms to borrowers;
- applying payments to outstanding loan balances;
- processing applications for enrollment in repayment plans;
- processing applications for loan forgiveness or discharge; and
- processing requests for loan forbearance or deferment.[8]

Some maintain that at least some of these federal student loan servicers have engaged in various forms of undesirable conduct,[9] such as steering borrowers away from beneficial repayment options[10] or providing inaccurate[11] or incomplete[12] information. Representatives from the servicing industry deny these accusations.[13]

These allegations of servicer misconduct have drawn the attention of both federal and state policymakers. At least two congressional subcommittees have conducted hearings on student loan servicing within the past few months,[14] and the House Committee on Financial Services

---

[hereinafter Hegji, *Administration*]; U.S. DEP'T OF EDUC. OFFICE OF INSPECTOR GENERAL, FEDERAL STUDENT AID: ADDITIONAL ACTIONS NEEDED TO MITIGATE THE RISK OF SERVICER NONCOMPLIANCE WITH REQUIREMENTS FOR SERVICING FEDERALLY HELD STUDENT LOANS 5-6 (Feb. 12, 2019) [hereinafter OIG REPORT]. *See generally infra* "Servicer Contracts with the Federal Government."

[8] *See* Hegji, *Administration*, *supra* note 7, at 20. *See also, e.g.*, OIG REPORT, *supra* note 7, at 5-6 (stating that ED has hired servicers to "collect[] payments on federally held student loans that are not in a default status, advis[e] borrowers on available resources to better manage their loan obligations, respond[] to borrowers' inquiries, and perform[] other administrative tasks associated with collecting and servicing federally held student loans on behalf of [ED]"). The government has contracted with slightly over a dozen servicers at various times over the past decade, although several of those entities no longer service federal student loans. *See, e.g.*, OIG REPORT, *supra* note 7, at 5-6 & n.7 (listing and describing the entities with which ED has contracted to service federal student loans). Portions of these contracts are publicly available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.

[9] *See infra* "Allegations of Servicer Misconduct." Notably, allegations of servicer misconduct have captured the attention of the ED Office of Inspector General (OIG), which published an audit report in early 2019 that identified instances of servicer "noncompliance with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection." OIG REPORT, *supra* note 7, at 4. OIG ultimately concluded that ED's Office of Federal Student Aid (FSA)—the primary ED office responsible for administering the loan programs—had "rarely h[eld] servicers accountable for instances of noncompliance with Federal loan servicing requirements." *Id.* at 17. Although FSA disputed the OIG report's factual findings, see *id.* at 42, it agreed with the report's recommendations for improving servicer oversight and claimed it has already implemented (or is in the process of implementing) many of those recommendations. *Id.* at 46-47 (Feb. 12, 2019) (FSA response to OIG report). *See also id.* at 42 (describing "significant ongoing improvements [FSA] has made to [its] oversight and monitoring policies and procedures, some of which directly align with the recommendations included in [OIG's] report").

[10] *See infra* "Forbearance Steering."

[11] *See infra* "Loan Forgiveness Eligibility."

[12] *See infra* "Income Recertification."

[13] *See, e.g.*, *An Examination of State Efforts to Oversee the $1.5 Trillion Student Loan Servicing Market: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs.*, 116th Cong. (2019), https://plus.cq.com/doc/congressionaltranscripts-5565345?8 [hereinafter *6/11/19 Hr'g*] (testimony of Scott Buchanan, Executive Director, Student Loan Servicing Alliance) ("I'm unaware of any servicer who provides compensation to put someone into forbearance.").

[14] As of September 15, 2019, neither of the official transcripts of these hearings are available. The reader may access unofficial transcripts at *Protecting Student Borrowers: Loan Servicing Oversight: Hearing Before the Subcomm. on the Dep'ts of Labor, Health & Human Servs., Educ., and Related Agencies of the H. Comm. on Appropriations*, 116th Cong. (2019), https://plus.cq.com/doc/congressionaltranscripts-5481087?3 [hereinafter *3/6/19 Hr'g*]; *6/11/19 Hr'g*, *supra* note 13. This report cites to these unofficial transcripts herein.

conducted another hearing on the topic on September 10, 2019.[15] Additionally, several state legislatures have enacted new laws to regulate student loan servicers within the past few years.[16] A number of state attorneys general and individual borrowers have also tried to pursue civil litigation against servicers of federal student loans based on alleged violations of state statutory and common law.[17]

The states' involvement has raised questions involving the appropriate interaction between federal and state law, as well as the respective roles of the federal and state governments with respect to regulating student loan servicers. Significantly, ED has taken the position that the existing regime of federal regulation of student loan servicers leaves no room for state regulation on the topic.[18] While some courts have agreed with this position, others have concluded that current federal law permits the state to regulate servicers with whom the federal government contracts.[19]

This report analyzes the regulation of servicers of federal student loans. After providing necessary background information regarding the federal student loan programs,[20] the report describes federal law governing student loan servicers.[21] The report then discusses how some states and borrowers have tried to enact or enforce state laws to regulate servicers of federal student loans.[22] Then, the report analyzes the legal issues implicated by the interaction of federal and state servicing laws, including whether (and, if so, to what extent) federal servicing regulation preempts the states from creating or enforcing servicing laws of their own.[23] The report concludes by identifying relevant legal considerations for Congress.[24]

# Background on the Federal Student Loan Programs

The federal government's roles with respect to the operation, supervision, and administration of federal student loan programs have evolved over time.[25] Around the turn of the millennium, for instance, most (though not all) federal student loans were issued under the now-discontinued

---

[15] This hearing was entitled *A $1.5 Trillion Crisis: Protecting Student Borrowers and Holding Student Loan Servicers Accountable*. The Committee's web page for the hearing is available at https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=404230.

[16] *See infra* "State Laws Governing Student Loan Servicers Specifically." Connecticut enacted one of the first such statutes in 2015. *See* An Act Concerning a Student Loan Bill of Rights, 2015 Conn. Legis. Serv. P.A. 15-162 (H.B. 6915) (2015).

[17] *See infra* "State Laws of General Applicability."

[18] *See* Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10,619, 10,619 (Mar. 12, 2018) [hereinafter ED Interpretation] (asserting that "the servicing of Direct Loans is an area 'involving uniquely Federal interests' that must be 'governed exclusively by Federal law'") (quoting Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988)).

[19] *See infra* "Preemption and the Interaction of Federal and State Servicing Laws."

[20] *See infra* "Background on the Federal Student Loan Programs."

[21] *See infra* "Federal Laws and Contractual Requirements Governing Student Loan Servicers."

[22] *See infra* "State Laws Regulating Servicers of Federal Student Loans."

[23] *See infra* "Preemption and the Interaction of Federal and State Servicing Laws."

[24] *See infra* "Considerations for Congress."

[25] *See, e.g.*, Wenhua Di & Kelly D. Edmiston, *State Variation of Student Loan Debt and Performance*, 48 SUFFOLK U. L. REV. 661, 664 (2015) ("The student loan market has undergone substantial reform since the last recession, such that the federal government's role and programs have changed. For instance, the [FFELP], which provided guarantees (insurance) and, in many cases, borrower subsidies, for qualified privately-issued student loans, was replaced by the [FDLP], under which the federal government provides student loans directly to borrowers.").

Federal Family Education Loan Program (FFELP),[26] under which private lenders extended loans to borrowers that the federal government guaranteed against the risk of loss.[27] Although the federal government set the terms and conditions of FFELP loans[28] and subsidized the FFELP program,[29] various entities other than the federal government also helped operate the FFELP.[30] For example, private lenders (or third parties with which those lenders contracted) bore the responsibility of servicing FFELP loans.[31]

Several recent developments, however, have shifted the federal government's role in the student loan system.[32] In 2008, for instance, Congress enacted the Ensuring Continued Access to Student Loans Act (ECASLA), which authorized ED to purchase outstanding FFELP loans from private lenders.[33] Thus, for the nearly 4 million loans that ED purchased from private lenders under ECASLA, "the federal government is now the 'lender.'"[34] Then, in 2010, Congress enacted the Student Aid and Fiscal Responsibility Act (SAFRA), which, among other things, terminated the authority to make new FFELP loans.[35] As a result of SAFRA, the United States now issues most

---

[26] *See* Hegji, *Primer*, *supra* note 1, at 13 ("For many years the [FFELP] was the primary source of federal student loans . . . ."); Note, *Ending Student Loan Exceptionalism: The Case for Risk-Based Pricing and Dischargeability*, 126 HARV. L. REV. 587, 591 (2012) ("[FFELP] loans accounted for the majority of federally supported loans each year from 2000 to 2010.").

[27] *E.g.*, Salazar v. King, 822 F.3d 61, 65 (2d Cir. 2016) ("Under the [FFELP], private lenders issue subsidized student loans, which are then insured by guaranty agencies (a state or private non-profit organization), which, in turn, are insured by [ED].") (citing 20 U.S.C. § 1078(b)-(c); 34 C.F.R. § 682.200); Jamie P. Hopkins & Katherine A. Pustizzi, *A Blast from the Past: Are the Robo-Signing Issues that Plagued the Mortgage Crisis Set to Engulf the Student Loan Industry?*, 45 U. TOL. L. REV. 239, 254 (2014) ("Under the [FFELP], private lenders such as Sallie Mae, working under contract with the federal government, provided 'loan capital' directly to the borrower, which the federal government guaranteed against loss in the event the borrower defaulted. The loan itself originated with the private lender . . . .").

[28] *See, e.g.*, Chae v. SLM Corp., 593 F.3d 936, 944 (9th Cir. 2010) ("The statutes [governing the FFELP] defin[e] the required terms of each type of loan. The statutes go so far as to mandate specified repayment terms and specified insurance and guaranty requirements. As one example, the FFELP sets the maximum interest rate that a lender may charge . . . .") (citing 20 U.S.C. §§ 1074, 1077a, 1078, 1078-2, 1078-3).

[29] *E.g.*, Michael C. Macchiarola & Arun Abraham, *Options for Student Borrowers: A Derivatives-Based Proposal to Protect Students and Control Debt-Fueled Inflation in the Higher Education Market*, 20 CORNELL J.L. & PUB. POL'Y 67, 98 (2010).

[30] *See, e.g.*, Bradley J.B. Toben & Carolyn P. Osolinik, *Nonprofit Student Lenders and Risk Retention: How the Dodd-Frank Act Threatens Students' Access to Higher Education and the Viability of Nonprofit Student Lenders*, 64 BAYLOR L. REV. 158, 179 (2012) (describing the FFELP as "a public-private partnership"); *id.* (explaining that along with insuring private lenders, the federal government also "delegated to 'state and nonprofit guaranty agencies' the task of administering that insurance").

[31] *See, e.g.*, *Chae*, 593 F.3d 936, 939 (9th Cir. 2010) ("The lenders must abide by the terms of the FFELP, and [ED] may terminate the participation of any lender who does not follow the rules. Lenders may assign their loans to third-party loan servicers, in which case the loan servicer must also abide by the FFELP regulations.") (internal citations omitted).

[32] *See, e.g.*, John R. Brooks, *The Case for More Debt: Expanding College Affordability by Expanding Income-Driven Repayment*, 2018 UTAH L. REV. 847, 851 (stating that "[a]s a result" of repealing "the federal subsidy for and guarantee of student loans from private lenders under the" FFELP, "the federal government's share of all student lending went from 75 percent in 2007-2008 to 93 percent in 2009-2010"); Michael Simkovic, *Risk-Based Student Loans*, 70 WASH. & LEE L. REV. 527, 588 (2013) ("[T]he U.S. government's role in the higher education market is primarily as a lender . . . .").

[33] Pub. L. No. 110-227, 122 Stat. 740 (2008) (codified at 20 U.S.C. §§ 1070a-1, 1071, 1078, 1078-2, 1078-8, 1087a, 1087f, 1087i-1). *See also* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 38 (D.D.C. 2018).

[34] *Student Loan Servicing All.*, 351 F. Supp. 3d at 38.

[35] Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, §§ 2001-2303, 124 Stat. 1029 (codified in relevant part at 20 U.S.C. § 1071(d)). However, some older loans issued under the FFELP remain outstanding. *See* Hegji, *Primer*, *supra* note 1, at 14 ("Although the authority to make new [FFELP] loans was terminated, borrowers of [FFELP] loans remain responsible for making payments on their loans, loan holders continue to be responsible for

new federal student loans through the Federal Direct Loan Program (FDLP),[36] under which the government itself—rather than a private lender—extends loans directly to students.[37] These developments have thereby expanded the federal government's direct involvement in the student loan industry,[38] which in turn has prompted the United States to rely increasingly on servicers to administer aspects of the federal student loan programs.[39]

# Federal Laws and Contractual Requirements Governing Student Loan Servicers

A variety of federal statutes and regulations—as well as contractual provisions—bear on the servicing of federal student loans.

## Statutory Provisions

One such statute is Title IV of the Higher Education Act of 1965 (HEA),[40] which (among other things) establishes programs to provide financial assistance to postsecondary students,[41] including the FDLP.[42] Title IV also governs loans issued under the now-discontinued FFELP that remain outstanding.[43]

Title IV contains several provisions that pertain to student loan servicing. The first such provision is 20 U.S.C. § 1082, which applies to FFELP loans.[44] 20 U.S.C. § 1082(a)(1), for instance, empowers the Secretary of Education (Secretary) to "prescribe . . . regulations applicable to third party servicers," "including regulations concerning financial responsibility standards for, and the assessment of liabilities for program violations against, such servicers."[45] Section 1082(a)(1)

---

servicing the loans, and guaranty agencies continue to administer the federal loan insurance program. Approximately $305.8 billion in outstanding [FFELP] loans are due to be repaid in the coming years.").

[36] *See, e.g.*, Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp., 951 F. Supp. 2d 479, 484 (S.D.N.Y. 2013) (noting that SAFRA "eliminated the [FFELP] and brought all federal student lending under the [FDLP]").

[37] *E.g.*, Corletta v. Tex. Higher Educ. Coordinating Bd., 531 B.R. 647, 652 n.1 (W.D. Tex. 2015) (explaining that under the FDLP "loans themselves are issued by the federal government"); Toben & Osolinik, *supra* note 30, at 181 (stating that under the FDLP, "funding for all new loans comes directly from the U.S. Treasury").

[38] *See, e.g.*, John R. Brooks, *Income-Driven Repayment and the Public Financing of Higher Education*, 104 GEO. L.J. 229, 230 (2016) ("In 2010, the federal government essentially took over the student loan industry . . . .").

[39] *See* OIG REPORT, *supra* note 7, at 5. (describing FSA's efforts to contract with student loan servicers in 2009 and between 2011 and 2013). *See also* USA Grp. Loan Servs., Inc. v. Riley, 82 F.3d 708, 711 (7th Cir. 1996) ("[T]he student loan program places heavy administrative burdens on the entities involved in it . . . A whole industry of 'servicers' has arisen to relieve these entities of some of the administrative burdens.").

[40] This report uses the acronym "HEA" generically to refer to the provisions currently codified at Title 20, Chapter 28 of the U.S. Code, 20 U.S.C. §§ 1001-1161aa-1, even though some of those provisions were technically added by bills other than the Higher Education Act of 1965.

[41] *See id*. §§ 1070-1099d (Title IV of the HEA). *See also* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 37 (D.D.C. 2018) ("Congress passed the [HEA] 'to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education.'") (quoting Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965)); Am. Ass'n of Cosmetology Sch. v. DeVos, 258 F. Supp. 3d 50, 56 (D.D.C. 2017) ("Congress passed Title IV of the [HEA] to make postsecondary education more widely available to the general public.") (citing 20 U.S.C. § 1070(a)).

[42] *See* 20 U.S.C. §§ 1087a—1087j (Part D of Title IV of the HEA, which governs the FDLP).

[43] *See id*. §§ 1071—1087-4 (Part B of Title IV of the HEA, which governs the FFELP).

[44] Section 1082 is codified in Title IV, Part B of the HEA, which governs the FFELP. *See id*. §§ 1071—1087-4.

[45] *Id*. § 1082(a)(1). This report discusses pertinent regulations that the Secretary has promulgated under that statutory

explicitly specifies, however, that "in no case shall damages be assessed against the United States for the actions or inactions of such servicers."[46] Section 1082(*l*)(1) in turn requires the Secretary to promulgate regulations "prescrib[ing] standardized forms and procedures regarding . . . [student loan] servicing."[47] In addition, Section 1082(p) requires certain officers, directors, employees, and consultants of student loan servicing agencies to submit reports to the Secretary disclosing potential financial conflicts of interest.[48]

Another provision, 20 U.S.C. § 1087f, applies to FDLP loans.[49] Section 1087f(a)(1) directs the Secretary to award federal loan servicing contracts to eligible servicers "to the extent practicable."[50] The Secretary may enter into servicing contracts only with "entities which the Secretary determines are qualified to provide such services" that possess "extensive and relevant experience and demonstrated effectiveness."[51] Additionally, "[i]n awarding such contracts, the Secretary" must "ensure that such services . . . are provided at competitive prices."[52]

Yet another provision that has been particularly critical to the current legal debate over student loan servicing regulations is 20 U.S.C. § 1098g's express preemption[53] provision, which states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] shall not be subject to any disclosure requirements of any State law."[54] As explained below, courts have reached divergent conclusions regarding the significance of this statutory provision.[55]

---

rulemaking authority below. *See infra* "Regulations."

[46] 20 U.S.C. § 1082(a)(1).

[47] *Id.* § 1082(*l*)(1).

[48] *See id.* § 1082(p) ("All officers and directors, and those employees and paid consultants of . . . loan servicing agencies . . . who are engaged in making decisions as to the administration of any program or funds under this subchapter or as to the eligibility of any entity or individual to participate under this subchapter, shall report to the Secretary, in such manner and at such time as the Secretary shall require, on any financial interest which such individual may hold in any other entity participating in any program assisted under this subchapter.").

[49] Section 1087f is codified in Title IV, Part D of the HEA, which governs the FDLP. *See id.* §§ 1087a-1087j.

[50] *Id.* § 1087f(a)(1) ("The Secretary shall, to the extent practicable, award contracts for . . . servicing . . . described in subsection (b)."); *id.* § 1087f(b) ("The Secretary may enter into contracts for . . . the servicing . . . of loans made or purchased under this part . . . .").

[51] *Id.* § 1087f(a)(2).

[52] *Id.* § 1087f(a)(1).

[53] *See infra* "Express Preemption."

[54] 20 U.S.C. § 1098g.

[55] *See infra* "Preemption and the Interaction of Federal and State Servicing Laws."

In addition to the provisions codified in Title 20 of the U.S. Code, appropriations bills may also regulate ED's contracts and interactions with student loan servicers. For example, a recent appropriations act contained provisions regulating the Secretary's allocation of accounts between servicers and allowing borrowers who consolidate their student loans to choose which entity will service the consolidated loan. *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) (providing, among other things, "[t]hat the Secretary shall allocate new student loan borrower accounts to eligible student loan servicers on the basis of their performance compared to all loan servicers utilizing established common metrics, and on the basis of the capacity of each servicer to process new and existing accounts," and "[t]hat for student loan contracts awarded prior to October 1, 2017, the Secretary shall allow student loan borrowers who are consolidating Federal student loans to select from any student loan servicer to service their new consolidated student loan . . . .").

# Regulations

## Regulations Specifically Governing Loan Servicing

ED has promulgated several servicing-related regulations under its rulemaking authority under Title IV of the HEA.[56] Nearly all of these regulations are codified in Part 682 of Title 34 of the Code of Federal Regulations, which governs FFELP loans rather than FDLP loans.[57] 34 C.F.R. § 682.203(a), for instance, contemplates that an FFELP lender "may contract or otherwise delegate the performance of its functions under" governing federal law "to a servicing agency," but emphasizes that doing so "does not relieve the . . . lender . . . of its duty to comply with" all applicable statutes and regulations.[58] 34 C.F.R. § 682.208 in turn prescribes actions that a servicer must take when servicing an FFELP loan, including "responding to borrower inquiries, establishing the terms of repayment, and reporting a borrower's enrollment and loan status information."[59] Similarly, 34 C.F.R. § 682.416 establishes administrative responsibility[60] and financial responsibility[61] standards that third-party servicers of FFELP loans must satisfy.[62] In addition, 34 C.F.R. § 682.416(e) imposes auditing requirements on servicers of FFELP loans.[63] Should a servicer violate any of the federal requirements that apply to it, Subpart G of Part 682 establishes a variety of procedures for addressing those violations, including administrative

---

[56] In addition to the regulations discussed in this section, ED also periodically issues guidelines for servicers outside the administrative rulemaking process. For instance, in 2016, ED issued a memorandum entitled "Policy Direction on Federal Student Loan Servicing" that, among other things, articulated standards that ED expected servicers of federal student loans to follow. *See* Memorandum from Ted Mitchell to James Runcie re: Policy Direction on Federal Student Loan Servicing 2 (July 20, 2016) (outlining "a list of directives federal student loan borrowers can expect their servicer to follow, including specific baseline standards when providing customer service to 'at-risk' borrowers"). *See also* Addendum to July 20, 2016 Memorandum on Policy Direction on Federal Student Loan Servicing (Oct. 17, 2016). ED later withdrew this memorandum in 2017, however. *See* Memorandum from Betsy DeVos to James W. Runcie re: Student Loan Servicer Recompete (April 11, 2017) (withdrawing the July 20, 2016 memorandum "to negate any impediment, ambiguity or inconsistency in the approach needed to accomplish th[e] critical mission" of "acquiring new federal student loan servicing capabilities" and "provid[ing] high quality customer service to federal loan borrowers in a cost-efficient and effective manner").

[57] *See* 34 C.F.R. §§ 682.100-682.712. *See also Comments of Bankruptcy Scholars on Evaluating Hardship Claims in Bankruptcy*, 21 J. CONSUMER & COM. L. 114, 120 (2018) (observing that FFELP regulations "do not explicitly apply to" servicers of FDLP loans and that "no other regulation is directed specifically at [FDLP] servicers").

[58] 34 C.F.R. § 682.203(a).

[59] *See generally id*. § 682.208(a)-(j).

[60] *See id*. § 682.416(a) ("A third-party servicer is considered administratively responsible if it—(1) Provides the services and administrative resources necessary to fulfill its contract with a lender or guaranty agency, and conducts all of its contractual obligations that apply to the [FFELP] in accordance with [FFELP] regulations; (2) Has business systems including combined automated and manual systems, that are capable of meeting the requirements of [the portion of Title IV of the HEA that governs the FFELP] and with the [FFELP] regulations; and (3) Has adequate personnel who are knowledgeable about the [FFELP].").

[61] *See id*. § 682.416(b) ("The Secretary applies the provisions of 34 CFR 668.15(b)(1)-(4) and (6)-(9) to determine that a third-party servicer is financially responsible under this part."); *id*. § 668.15(b)(1)-(4), (6)-(9) (imposing various requirements, including that the servicer be "current in its debt payments" and "meeting all of its financial obligations"); *id*. § 682.416(d) (specifying additional circumstances in which a third-party servicer will not be deemed financially responsible).

[62] *See id*. § 682.416(c)(1) (authorizing the Secretary to "review a third-party servicer to determine that it meets the administrative capability and financial responsibility standards"); *id*. § 682.416(c)(4) (empowering the Secretary to "initiate an administrative proceeding" against a servicer that does not meet those standards).

[63] *See id*. § 682.416(e)(1) (providing, subject to specified exceptions, that "[a] third-party servicer shall arrange for an independent audit of its administration of the FFELP loan portfolio"); *id*. § 682.416(e)(2) (specifying when and how to conduct the audit).

proceedings to limit, suspend, or terminate the servicer's eligibility to enter into servicing contracts.[64]

It is unclear whether—and, if so, to what extent—these FFELP loan servicing regulations apply to servicers of FDLP loans.[65] Section 1087e(a)(1) of the HEA provides that, with certain exceptions, FDLP loans "shall have the same terms, conditions, and benefits" as FFELP loans.[66] At least one court has therefore concluded that Section 1087e(a)(1) embodies a general congressional preference that FDLP and FFELP loans be governed by the same legal standards.[67] The few judicial opinions interpreting Section 1087e(a)(1) do not conclusively resolve, however, whether FFELP regulations governing third-party servicers qualify as "terms, conditions, and benefits" of FFELP loans that would apply equally to FDLP servicers.[68] Furthermore, courts considering whether FFELP regulations apply to FDLP loans outside the loan-servicing context have reached divergent conclusions.[69] Nor do the portions of the servicing contracts that FSA has

---

[64] *See id*. § 682.700(a) ("This subpart governs the limitation, suspension, or termination by the Secretary of the eligibility . . . of a third-party servicer to enter into a contract with an eligible lender to administer any aspect of the lender's FFEL programs. The regulations in this subpart apply to a . . . third-party servicer that violates any statutory provision governing the [FFELP] or any regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA prescribed under the [FFELP].").

For instance, Section 682.703 establishes an informal compliance procedure that the Secretary may use when she obtains information that a servicer may be violating federal requirements. *See id*. § 682.703(a) ("The Secretary may use the informal compliance procedure in paragraph (b) of this section if the Secretary receives a complaint or other reliable information indicating that a . . . third-party servicer may be in violation of applicable laws, regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA."); *id*. § 682.703(b) ("Under the informal compliance procedure, the Secretary gives the . . . servicer a reasonable opportunity to—(1) Respond to the complaint or information; and (2) Show that the violation has been corrected or submit an acceptable plan for correcting the violation and preventing its recurrence.").

Additionally, Section 682.705 and Section 682.706 empower the Secretary to suspend, limit, or terminate a servicer's eligibility to enter into servicing contracts with eligible lenders. *See id*. §§ 682.705(a), 682.706. *See also id*. § 682.701 (defining "Termination" as "[t]he removal of a third-party servicer's eligibility to contract with a lender . . . for an indefinite period of time"; "Suspension" as "[t]he removal of a . . . third-party servicer's eligibility to contract with a lender . . . for a specific period of time or until the . . . servicer fulfills certain requirements"; and "Limitation" as "[t]he continuation of a . . . third-party servicer's eligibility subject to compliance with special conditions established by agreement with the Secretary . . . or imposed as a result of a limitation or termination proceeding").

In addition, Section 682.709 authorizes "the Secretary, or a designated [ED] official," to "require a . . . third-party servicer to take reasonable corrective action to remedy a violation of applicable laws, regulations, special arrangements, agreements, or limitations entered into under the authority of statutes applicable to Title IV of the HEA." *Id*. § 682.709(a).

[65] ED has made certain non-FFELP regulations applicable to federal student loan servicers, however. *See, e.g.*, Contract Between ED and Great Lakes Educational Loan Services, Attachment A-3, at 4 (2009), https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing ("The Servicer shall comply with . . . the following standard items related to records management: . . . 36 CFR Part 1222 and Part 1228.").

[66] *See* 20 U.S.C. § 1087e(a)(1).

[67] *See* Chae v. SLM Corp., 593 F.3d 936, 945 (9th Cir. 2010) ("Congress's direction to [ED] shows that aimed for uniformity of FFELP regulations . . . In the rules governing the [FDLP], Congress created a policy of inter-program uniformity by requiring that 'loans made to borrowers [under the [FDLP]] shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFELP].' [20 U.S.C.] § 1087e(a)(1). Congress's instructions to [ED] on how to implement the student-loan statutes carry this unmistakable command: Establish a set of rules that will apply across the board.").

[68] *See* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 39 & n.6 (D.D.C. 2018) (implying in a footnote that the FFELP regulations qualify as "terms, conditions, and benefits" of FDLP loans, yet simultaneously appearing to adopt the opposite position that the FFELP "regulations do not define the terms of [ED]'s contracts with FDLP servicers").

[69] *Compare* Won v. Nelnet Servicing, LLC, No. 18-00381 ACK-RLP, 2019 WL 1548572, at *3 n.7 (D. Hawai'i Apr. 9, 2019) (concluding that FFELP regulation pertaining to loan rehabilitation agreements did not apply to FDLP loan),

posted on its website specify whether servicers of FDLP loans must follow the FFELP servicing regulations.[70] It is possible, however, that ED may nonetheless demand or expect its FDLP servicers to comply with some or all of the FFELP servicing standards.[71] Moreover, some servicers have implicitly suggested in litigation briefs that at least some of the FFELP servicing regulations apply to FDLP servicers.[72]

### General Regulatory Duties That ED Has Delegated to Servicers

In addition to regulations that directly concern loan servicing, ED has also promulgated regulations establishing various responsibilities that the Secretary must fulfill, which the Secretary has in turn delegated to servicers.[73] 34 C.F.R. § 685.221(e)(3), for instance, requires the Secretary to "notif[y] the borrower in writing of" the requirement to regularly submit income recertification information to remain eligible to participate in an income-driven repayment (IDR) plan,[74] which this report details below.[75] ED has delegated that notification responsibility to servicers with which it contracts.[76]

## Servicer Contracts with the Federal Government

Pursuant its authority to enter into servicing contracts,[77] ED has contracted with multiple entities to service federal student loans.[78] These contracts govern many details of those servicers' operations, including financial reporting, transaction management, internal controls, accounting, and security.[79] The servicing contracts also contain several mechanisms that ED may invoke

---

*with* Weber v. Great Lakes Educ. Loan Servs., Inc., No. 13-cv-00291-wmc, 2013 WL 3943507, at *2 n.2, *3 (W.D. Wis. July 30, 2013) (crediting defendant's position that FFELP loan collection regulation applied equally to FDLP loans).

[70] *See, e.g.*, Contract Between ED and Great Lakes Educational Loan Services (2009); Contract Between ED and Nelnet Servicing (2009); Contract Between ED and Pennsylvania Higher Education Assistance Agency (2009); and Contract Between ED and SLM Corp. (2009), https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing. *See generally infra* "Servicer Contracts with the Federal Government."

[71] *See Comments*, *supra* note 57, at 120 (stating that FDLP servicers have "traditionally . . . mirrored their practices after those required in the C.F.R. regulations governing" FFELP loans).

[72] *See* Memorandum of Points of Authorities in Support of Plaintiff's Response to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment at 36, Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26 (D.D.C. 2018) (No. 1:18-cv-0640 (PLF)), ECF No. 27-1 (listing certain FFELP regulations among "the laws and regulations governing FDLP"). *Cf. Weber*, 2013 WL 3943507, at *2 n.2, *3 (crediting loan servicer's argument—albeit in a case involving loan collection rather than loan servicing—that a particular FFELP regulation applied equally to FDLP loans).

[73] *See, e.g.*, Contract Between ED and Great Lakes Educational Loan Services, Attachment A-3, at 4 (2009) https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing ("The servicer shall meet all legislative and regulatory requirements . . . .").

[74] 34 C.F.R. § 685.221(e)(3). *See also id.* § 685.221(e)(1) (establishing the income recertification requirements).

[75] *See infra* "Forbearance Steering"; "Income Recertification."

[76] *See, e.g.*, Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 538 (M.D. Pa. 2018) (describing servicer's "notices to borrowers regarding the IDR plans").

[77] *See supra* "Statutory Provisions."

[78] *See, e.g.*, OIG Report, *supra* note 7, at 5-6 & n.7 (listing and describing the entities with which ED has contracted to service federal student loans). Portions of these contracts are publicly available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.

[79] *See generally, e.g.*, Contract Between ED and Great Lakes Educational Loan Services (2009); Contract Between ED and Nelnet Servicing (2009); Contract Between ED and Pennsylvania Higher Education Assistance Agency (2009); and Contract Between ED and SLM Corp. (2009), https://studentaid.ed.gov/sa/about/data-center/business-

against servicers that violate applicable federal requirements, including (1) ordering the noncompliant servicer "to return any fees that [it] billed to [ED] from the time of noncompliance" or (2) "reallocating new loan volume to other servicers or transferring all or part of the noncompliant servicer's current loan volume to another servicer until the noncompliant servicer comes back into compliance."[80] Interested parties disagree, however, whether ED uses these contractual provisions with sufficient frequency and diligence to effectively punish and deter servicer misconduct.[81]

## Role of the Consumer Financial Protection Bureau

In addition to ED's own oversight of its servicing relationships, the Consumer Financial Protection Bureau (CFPB) is another federal agency that possesses certain authorities as to federal student loan servicers. Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act,[82] the CFPB may exercise supervisory authority over certain nonbank "larger participants" in consumer financial product or service markets that it chooses to define by rule.[83] In 2013, the CFPB exercised this authority to define larger participants in the student loan servicing market.[84] Pursuant to the rule, the CFPB has supervisory authority over student loan servicers servicing more than 1 million accounts.[85] The purposes of CFPB supervision include assessing compliance with consumer financial protection laws and detecting risks to consumers and consumer financial markets.[86] By statute, the CFPB may conduct examinations as well as request information from supervised entities.[87] In addition to its supervisory authority, the CFPB may bring enforcement actions against student loan servicers.[88] In January 2017, for instance, the CFPB sued one of the largest federal student loan servicers, Navient Corporation.[89] As of the date of this report, the case currently remains pending.[90]

Notably, questions have arisen regarding the relationship between the CFPB and ED. In the early 2010s, the two agencies entered into Memoranda of Understanding (MOUs) (1) providing for interagency sharing of information pertaining to, among other things, complaints about student

---

info/contracts/loan-servicing.

[80] OIG REPORT, *supra* note 7, at 15. *See also, e.g.*, Contract Between ED and Great Lakes Educational Loan Services, Addendum 2, at 12 (2009), https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing ("Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (i.e., correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.").

[81] *Compare* OIG REPORT, *supra* note 7, at 2 (claiming that "FSA management rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance"), *with id*. at 46-47 (FSA's response that it is actively using these contractual provisions "to ensure accountability of the servicers").

[82] Pub. L. No. 111-203, 124 Stat. 1376 (2010).

[83] 12 U.S.C. §§ 5514(a)(1)(B), (a)(2).

[84] 12 C.F.R. § 1090.106.

[85] *Id.*

[86] 12 U.S.C. § 5514(b)(1).

[87] *Id.* § 5514(b).

[88] *See, e.g.*, *id.* § 5564.

[89] *See* CFPB v. Navient Corp., 3:17-CV-101, 2017 WL 3380530, at *1 (M.D. Pa. Aug. 4, 2017).

[90] *See* Docket, CFPB v. Navient Corp., No. 3:17-CV-101 (M.D. Pa.).

loan servicers[91] and (2) coordinating supervisory and oversight activities pertaining to student loans.[92] However, ED terminated these MOUs in 2017.[93] Among its reasons for terminating the MOUs, ED asserted that the CFPB had "unilaterally expand[ed] its oversight role to include the Department's contracted federal loan servicers" in derogation of ED's claimed "full oversight responsibility for federal student loans."[94] The CFPB further represented to Congress in April 2019 that "student loan servicers have declined to produce information requested by the [CFPB] for supervisory examinations related to" FDLP and FFELP loans since 2017.[95]

# Allegations of Servicer Misconduct

As described below, some claim that the aforementioned federal requirements and oversight mechanisms have not deterred federal student loan servicers from engaging in misconduct.[96]

## Forbearance Steering

Some, for instance, have accused federal student loan servicers of steering borrowers toward forbearance when participating in an IDR plan would be more beneficial for the borrower.[97] Forbearance is a way for a borrower who encounters short-term financial hardship to obtain temporary relief from his obligation to repay a federal student loan.[98] Forbearance allows the borrower to either

- temporarily cease making student loan payments;
- temporarily make smaller student loan payments; or

---

[91] *See* Memorandum of Understanding Between the Bureau of Consumer Financial Protection and the U.S. Department of Education Concerning the Sharing of Information (Oct. 19, 2011), https://www.governmentattic.org/18docs/CFPB-MOUsMOAsCorres_2013.pdf ("Both the [CFPB] and ED may receive comments, inquiries, and requests for assistance (complaints) from student loan borrowers. The items below describe how the [CFPB] and ED will cooperate to help borrowers resolve their requests for assistance . . . . For all complaints received by the [CFPB] related to the . . . servicing of [Title IV loans], the [CFPB] shall direct the complaint to ED within 10 days of contact by the consumer.").

[92] *See* Memorandum of Understanding Concerning Supervisory and Oversight Cooperation and Related Information Sharing Between the U.S. Department of Education and the Consumer Financial Protection Bureau (Jan. 9, 2014).

[93] *See* Letter from Acting Assistant Secretary Kathleen Smith and Chief Operating Officer Dr. A. Wayne Johnson to Director Richard Cordray (Aug. 31, 2017), https://buckleyfirm.com/sites/default/files/Buckley%20Sandler%20InfoBytes%20-%20Department%20of%20Education%20Letter%20to%20CFPB%20Terminating%20MOUs%202017.08.31.pdf.

[94] *See id.*

[95] *See* Letter from Director Kathleen L. Kraninger to Sen. Elizabeth Warren (Apr. 23, 2019), http://www.warren.senate.gov/imo/media/doc/2019.04.23%20KK%20to%20Warren_student%20loan%20industry.pdf.

[96] *See, e.g.,* OIG REPORT, *supra* note 7, at 4 (alleging instances of servicer "noncompliance with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection").

[97] *See, e.g.,* Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 642 (7th Cir. 2019); Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 536-37 (M.D. Pa. 2018).

[98] *See* 34 C.F.R. § 685.205 (governing the forbearance of FDLP loans); *id.* § 682.211 (governing the forbearance of FFELP loans). *See also* OIG REPORT, *supra* note 7, at 44 ("[F]orbearance originally was developed and appropriately is used as a tool to help borrowers cover temporary periods of financial hardship during which they are unable to make timely payments. For example, if borrowers are laid off from work, suffer an injury, or have their life disrupted by a natural disaster or family crisis, they may fail to make payments for a number of months without needing to permanently change their repayment plan. Forbearance can be used as a tool to bring these borrowers current without the need for a lump-sum payment to cover the months of delinquency."). *See generally* Smole, *supra* note 1, at 29-30 (discussing student loan forbearance in detail).

- extend the deadline by which the borrower must make payments.[99]

Interest, however, typically continues to accrue on the loan during the forbearance period, which is then capitalized—that is, added to the loan principal[100]—when the forbearance period concludes.[101] Thus, for borrowers experiencing *long*-term financial hardship, this interest accrual and capitalization may render forbearance less advantageous than participation in an IDR plan,[102] the latter of which allows borrowers to make reduced monthly payments based on their income and offers them the prospect of obtaining loan forgiveness after making such payments over a specified period of years.[103]

Some allege that certain servicers have systematically encouraged borrowers to enter into forbearance rather than participate in IDR plans that would be more advantageous for the borrower.[104] According to critics, servicers have a financial incentive to steer borrowers into forbearance because enrolling a borrower in an IDR plan requires the servicer to expend more resources than steering the borrower toward forbearance.[105] Representatives from the servicing industry, however, deny that servicers engage in forbearance steering[106] and assert that servicers in fact earn less money when borrowers enter forbearance.[107]

---

[99] 34 C.F.R. §§ 682.211, 685.205.

[100] *E.g.*, *Nelson*, 928 F.3d at 644.

[101] 34 C.F.R. § 685.205(a) ("Except as provided in paragraph (b)(9) of this section, if payments of interest are forborne, they are capitalized."); Smole, *supra* note 1, at 29 ("[D]uring periods of forbearance borrowers are liable for all the interest that accrues on their loans. Any interest that accrues during forbearance is capitalized at the end of the forbearance period."); *3/6/19 Hr'g*, *supra* note 14 (testimony of Byron Gordon, Assistant Inspector General for Audit, ED OIG) (stating that if borrowers "are improperly moved into a forbearance," they may "ultimately end up with a larger loan debt"). *But see* 34 C.F.R. § 685.205(a), (b)(9) (carving out a limited circumstance in which interest that accrues during a forbearance period is not capitalized).

[102] *See, e.g.*, *6/11/19 Hr'g*, *supra* note 13 (testimony of Nicholas Smyth, Senior Deputy Attorney General, Pennsylvania Office of Attorney General) ("[IDR] plans are generally a much better option than forbearance. Borrowers who enroll in forbearance face significant cost including accumulation of unpaid interest which is added to the loan's principal balance at the end of the forbearance, missing out on low or zero dollar payments that could count towards loan forgiveness and the borrower's monthly payment can dramatically increase after the forbearance period ends."); Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 537 (M.D. Pa. 2018) ("Forbearance is generally only appropriate for borrowers facing temporary financial hardship, due to the 'accumulation of unpaid interest and the addition of that unpaid interest to the principal balance' . . . IDR plans are usually a better option for borrowers.").

[103] *See* 20 U.S.C. § 1098e(b); 34 C.F.R. §§ 682.208(k), (m), 682.215, 685.209, 685.221. *See generally* CRS Report R43571, *Federal Student Loan Forgiveness and Loan Repayment Programs*, coordinated by Alexandra Hegji, at 43-50 (describing the various IDR options offered by the federal government).

[104] *See, e.g.*, *Pennsylvania*, 354 F. Supp. 3d at 537 (describing allegations that servicer "affirmatively steered borrowers facing long-term financial hardship into forbearance rather than exploring more appropriate IDR options"); *6/11/19 Hr'g*, *supra* note 13 (testimony of Joanna Darcus, Racial Justice Fellow, National Consumer Law Center, Massachusetts Legal Assistance Corporation) (testifying that "[i]nstead of IDR," "servicers steer many borrowers into forbearances and deferments" that "are profitable for servicers and costly for borrowers").

[105] *See Nelson*, 928 F.3d at 644 ("Nelson asserts that enrolling borrowers in [IDR] plans is 'time-consuming' and requires 'lengthy and detailed conversations' with the borrowers about their financial situations."); *Pennsylvania*, 354 F. Supp. 3d at 537 (alleging that servicer's "motivation in steering borrowers to forbearance rather than evaluating IDR options is rooted in a desire to cut down on lengthy customer-service interactions and processing of forms, which are more likely when enrolling a borrower in an IDR plan versus a forbearance"); *6/11/19 Hr'g*, *supra* note 13 (testimony of Joe Sanders, Student Loan Ombudsman and Supervising Attorney, Consumer Fraud Bureau, Illinois Attorney General's Office) (alleging that at least one servicer "used an incentive compensation plan to pay employees more for shorter call times" and thereby encouraged its employees to steer borrowers into forbearance).

[106] *See 6/11/19 Hr'g*, *supra* note 13 (testimony of Scott Buchanan, Executive Director, Student Loan Servicing Alliance) ("I'm unaware of any servicer who provides compensation to put someone into forbearance.").

[107] *See id*. (testimony of Scott Buchanan, Executive Director, Student Loan Servicing Alliance) ("[W]e are paid far less

## Income Recertification

Some have also accused servicers of failing to provide critical information to student loan borrowers regarding the income recertification process a borrower must complete to remain in an IDR plan. Because, as noted above, a borrower's monthly payments under an IDR plan depend on the borrower's income, borrowers enrolled in IDR plans must recertify their income and family size each year.[108] A borrower who does not comply with this annual recertification requirement may experience an increase in both his monthly loan payments and his total loan balance.[109] Critics have accused some servicers of failing to "advise borrowers of the negative consequences of failing to submit timely, complete, and correct recertifications to renew borrowers' IDR plans."[110]

## Loan Forgiveness Eligibility

Some borrowers also allege that federal student loan servicers misinformed them about their eligibility for loan forgiveness under federal law.[111] Subject to various conditions, the Public Service Loan Forgiveness (PSLF) program affords loan forgiveness to borrowers who make 10 years of monthly loan payments while employed in a public service job.[112] Critically, however, only loans issued under the FDLP qualify for the PSLF program.[113] Some borrowers claim that they relied to their detriment on their servicers' representations that they qualified for forgiveness under the PSLF program, only to later learn that they were in fact ineligible because their student loans were non-FDLP loans, such as FFELP loans.[114]

---

for any borrower that is in a forbearance status . . . [W]e are paid on a monthly basis $1.05 to service a borrower who is in . . . forbearance. We are paid $2.85 for a borrower who is in a repayment plan.").

[108] *See, e.g.*, *Pennsylvania*, 354 F. Supp. 3d at 537.

[109] *See, e.g.*, Olsen v. Nelnet, Inc., No. 4:18-CV-3081, 2019 WL 2189486, at *2 (D. Neb. May 21, 2019) (listing as "consequences of failing to timely renew" the borrower's IDR plan by recertifying his income (1) "an increase in the borrower's monthly payment to the amount that would be due pursuant to a standard repayment plan" and (2) "capitalization of the unpaid interest, which involves adding the current interest due and owing to the unpaid loan balance").

[110] *See, e.g.*, *Pennsylvania*, 354 F. Supp. 3d at 538.

[111] *See* Daniel v. Navient Solutions, LLC, 328 F. Supp. 3d 1319, 1321-22 (M.D. Fla. 2018) ("Plaintiffs allege that they relied on incorrect information and recommendations given to them by Defendant regarding their eligibility for student loan forgiveness under the PSLF, resulting in their mistaken belief that they were eligible for the PSLF program."). *See also* CRS Report R45389, *The Public Service Loan Forgiveness Program: Selected Issues*, by Alexandra Hegji, at 22-24, 27-28 [hereinafter Hegji, *PSLF*] (describing "communication issues" and other "administrative complexities and challenges" facing servicers of federal student loans in connection with the PSLF). *But see* Daniel v. Navient Solutions, LLC, No. 8:17-cv-2503-T-24JSS, slip op. at 19-20 (M.D. Fla. Aug. 28, 2019) (concluding that evidence in record revealed that student loan servicer "acted properly with respect to servicing the . . . Plaintiffs' loans" and "provided accurate information to the . . . Plaintiffs about the PSLF program and their respective eligibility for it").

[112] 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219. *See also* Am. Bar Ass'n v. U.S. Dep't of Educ., 370 F. Supp. 3d 1, 10-12 (D.D.C. 2019) (describing the statutory and regulatory framework governing the PSLF). *See generally* Hegji, *PSLF*, *supra* note 111.

[113] *See* 20 U.S.C. § 1087e(m)(1) ("The Secretary shall cancel the balance of interest and principal due . . . on any eligible *Federal Direct Loan* . . . .") (emphasis added); Hyland v. Navient Corp., No. 18cv9031(DLC), 2019 WL 2918238, at *1 (S.D.N.Y. July 8, 2019) ("Only Direct Loans qualify for PSLF . . . A borrower who has Guaranteed Loans [under the FFELP] must consolidate them into Direct Loans [under the FDLP] in order to qualify for PSLF. If a borrower consolidates Guaranteed Loans into Direct Loans, payments previously made on the Guaranteed Loans will not count toward the required 120 qualifying payments.").

[114] *See Hyland*, 2019 WL 2918238, at *3 (allegation that servicer informed plaintiff "that she was 'on track' for PSLF even though she was making payments on [FFELP] loans rather than [FDLP loans]," with the result that "[t]he

# State Laws Regulating Servicers of Federal Student Loans

Significantly, the HEA does not provide litigants with a private right of action—that is, the HEA does not authorize borrowers to directly pursue civil litigation against servicers of federal student loans.[115] Instead, only the Secretary may enforce the HEA.[116] States, however, have developed their own laws empowering entities other than the federal government—such as state officials or individual borrowers—to pursue legal action against servicers. These state laws fall into two broad categories: (1) statutes that specifically target servicers for regulation and (2) statutes and common law causes of action that apply more generally to a broad range of entities, including servicers of federal student loans.

## State Laws Governing Student Loan Servicers Specifically

First, several states have recently enacted legislation that specifically imposes legal requirements on federal student loan servicers[117] beyond what federal law requires.[118] Because the specifics of each statute vary from state to state, the following subsections of this report survey the most significant similarities and differences between the various state servicing laws.[119]

Some state servicing statutes, for instance, prohibit student loan servicers from operating within the state's boundaries unless they maintain an active servicing license issued by the state.[120] A

---

payments she made on these loans did not count toward her 120 qualifying payments for loan forgiveness"); Lawson-Ross v. Great Lakes Higher Educ. Corp., No. 1:17-CV-253-MW/GRJ, 2018 WL 5621872, at *1 (N.D. Fla. 2018) (allegation that after servicer "repeatedly and explicitly told" the plaintiff "'that she was on track to benefit under' PSLF," the servicer then informed her that she was in fact "not eligible for PSLF loan forgiveness because the majority of her loans were not Direct Loans") (internal citations omitted).

[115] *See, e.g.*, Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 40 (D.D.C. 2018) ("[T]he HEA does not provide a private right of action for borrowers . . . .").

[116] *See, e.g.*, L'ggrke v. Benkula, 966 F.2d 1346, 1348 (10th Cir. 1992) ("The express language of the [HEA], and the regulations promulgated thereunder, does not create a private cause of action, and there is nothing in the Act's language, structure or legislative history from which a congressional intent to provide such a remedy can be implied . . . Title IV's provisions demonstrate that Congress vested exclusive enforcement authority in the Secretary . . . .").

[117] Some state servicing statutes explicitly apply to servicers of federal student loans. *See* COLO. REV. STAT. § 5-20-103(6) (defining "student education loan" to include, among other things, certain loans "made, insured, or guaranteed under Title IV of the [HEA]"); 110 ILL. COMP. STAT. 992/1-5 (defining "student loan" to include, *inter alia*, "any federal education loan"); MD. CODE ANN., EDUC. § 26-601(e)(1) (effective October 1, 2019) (similarly defining relevant statutory terms to include federal student loans). Other state statutes apply to student loan servicers generally, without expressly differentiating between servicers of federal loans and servicers of private loans. *See, e.g.*, CONN. GEN. STAT. § 36a-846 (defining "student loan servicer" as "any person . . . responsible for the servicing of any student education loan," which the statute in turn defines as "any loan primarily for personal use to finance education or other school-related expenses," without differentiating between federal and private loans); D.C. CODE § 31-101 (defining "student loan servicer" and "student education loan" in a similarly broad fashion); R.I. GEN. LAWS § 19-33-2(5), (7) (similar).

[118] *See, e.g.*, WASH. REV. CODE § 31.04.415 (purporting to list requirements with which "a student education loan servicer must comply" "[i]n addition to complying with any applicable federal program requirements").

[119] For a fifty state survey of student loan servicing regulations, see HINSHAW & CULBERTSON LLP, STUDENT LOAN SERVICING REGULATIONS: 50 STATE GUIDE ON LAWS AND REGULATIONS (3d ed. 2019), https://www.hinshawlaw.com/newsroom-news-third-edition-50-state-guide-student-loan-regulations.html.

[120] *See, e.g.*, CAL. FIN. CODE § 28102(a) (stating that, with certain exceptions, "[n]o person shall engage in the business of servicing a student loan in this state without first obtaining a license . . . ."); CONN. GEN. STAT. § 36a-847(a)(1) (similar); D.C. CODE § 31-106.02(a) (similar); 110 ILL. COMP. STAT. 992/15-5(a) (similar); N.Y. BANKING LAW § 711

servicer that operates in one of these states without a license is subject to monetary penalties.[121] These statutes also typically provide that the state may revoke a servicer's license—and thereby preclude the servicer from servicing loans within the state—if the servicer engages in specified acts of misconduct.[122] For example, the District of Columbia's servicer licensing statute states that the Commissioner of the District of Columbia Department of Insurance, Securities, and Banking "may revoke" a student loan servicing license "if, after notice and a hearing, the Commissioner finds that the licensee has" "[d]emonstrated incompetency or untrustworthiness to act as a licensee" or "[c]ommitted any fraudulent acts, engaged in any dishonest activities, or made any misrepresentation in any business transaction."[123] Notably, some of these state licensing statutes contain provisions that appear intended to mitigate potential interference with the federal government and the servicers with which it contracts. For example, New York's servicing statute, which becomes effective on October 9, 2019, will provide that entities hired by ED to service federal student loans will automatically be deemed licensed to service those loans, without the need to submit a license application and otherwise meet the prerequisites for licensure.[124] However, the New York statute will still require federal student loan servicers to comply with many of the statute's other requirements.[125] Several other states, including Colorado[126] and Maine,[127] have likewise enacted similar laws allowing for automatic licensure for federal student loan servicers.[128]

---

(effective October 9, 2019) (similar). At least one state servicing statute does not impose *licensing* requirements on student loan servicers *per se*, but requires servicers to *register* with the state. *See* R.I. GEN. LAWS § 19-33-4.

[121] *See, e.g.*, CAL. FIN. CODE § 28170(a) (empowering the California Department of Business Oversight to assess an administrative penalty not to exceed $2,500 against any person "engaged in the business of servicing student loans without a license").

[122] *See, e.g.*, *id.* § 28166 (specifying various circumstances in which the California Commissioner of Business Oversight "may issue an order suspending or revoking a license" to service student loans); CONN. GEN. STAT. §§ 36a-850, 36a-852 (providing that the Connecticut Banking Commissioner "may suspend, revoke or refuse to renew any license issued under" Connecticut's student loan servicing statute "if the commissioner finds that" the servicer has committed specified unlawful acts, such as "omit[ting] any material information in connection with the servicing of a student education loan" or "[k]nowingly misapply[ing] or recklessly apply[ing] student education loan payments to the outstanding balance of a student education loan"); 110 ILL. COMP. STAT. 992/20-30 (specifying conduct for which the Illinois Secretary of Financial and Professional Regulation "may suspend or revoke any license issued pursuant to" Illinois's student loan servicing statute).

[123] D.C. CODE § 31-106.02(h)(1).

[124] *See* N.Y. BANKING LAW § 711(3) (effective October 9, 2019) ("Any person that services federal student loans owed by one or more borrowers residing in this state shall be automatically deemed by operation of law to have been issued a license to service federal student loans . . . ."). *See also id.* § 710(9) (effective October 9, 2019) (defining "federal student loan" to include, *inter alia*, loans issued pursuant to the FDLP as well as FFELP loans "presently owned by the government of the United States"). *But see id.* § 711(3) ("The license automatically issued pursuant to this section shall only authorize the servicing of federal student loans. A person that services both federal student loans and non-federal student loans shall be required to be licensed . . . .").

[125] *Id.* § 711(4) (effective October 9, 2019) (providing that "[a] person . . . that services federal student loans" must still comply with specified provisions of the statute "and any regulations applicable to student loan servicers").

[126] *See* COLO. REV. STAT. § 5-20-106(1).

[127] *See* ME. STAT. tit. 14, §§ 107(9), 108(2) (effective January 1, 2020).

[128] *Cf.* WASH. REV. CODE § 31.04.420 (exempting "[t]he United States or any department or agency thereof" from the State of Washington's servicer licensing requirement "to the extent [the federal entity in question] is servicing student education loans that it originated").

Some state statutes designate a student loan ombudsperson[129] to conduct oversight of servicers' operations,[130] review and attempt to resolve borrowers' complaints about student loan servicers,[131] and otherwise assist and educate borrowers with the loan servicing process.[132] Some of these statutes contemplate that if the ombudsperson discovers that a servicer is engaging in unlawful conduct, he may refer that servicer to the responsible state agency for civil enforcement proceedings or even criminal prosecution.[133]

In response to allegations that some federal student loan servicers have steered borrowers toward forbearance instead of an IDR program,[134] some states have also enacted laws requiring servicers to evaluate the borrower's eligibility for IDR plans before placing the borrower in forbearance.[135] Relatedly, at least one state prohibits servicers "from implementing any compensation plan that

---

[129] *See, e.g.*, CONN. GEN. STAT. § 36a-25(a) ("The Banking Commissioner shall . . . designate a Student Loan Ombudsman within the Department of Banking to provide timely assistance to any student loan borrower . . . ."); 110 ILL. COMP. STAT. 992/10-5(a) ("The position of Student Loan Ombudsman is created within the Office of the Attorney General to provide timely assistance to student loan borrowers."); ME. STAT. tit. 14, § 104 (effective January 1, 2020) (requiring the Maine Superintendent of Consumer Credit Protection to "support, maintain, and designate a student loan ombudsman . . . to provide timely assistance to student loan borrowers"); MD. CODE ANN., FIN. INST. § 2-104.1(b)(1) ("The [Maryland Commissioner of Financial Regulation] shall designate an individual to serve as the Student Loan Ombudsman.").

Washington law creates a similar office with similar responsibilities, but labels the designated official as a "student loan advocate" rather than a "student loan ombudsman." *See* WASH. REV. CODE § 28B.77.007.

[130] *See, e.g.*, D.C. CODE § 31-106.01(c) (stating that the Student Loan Ombudsman shall, among other things, (1) "[m]onitor the actions that student loan servicers take to ensure that student loan borrowers are informed of their rights and responsibilities under the terms of the student loan borrower's student education loan in a transparent, accessible, and timely manner"; and (2) "[c]onduct an examination of the activities of each student loan servicer at least once every 3 years").

[131] *See, e.g.*, CONN. GEN. STAT. § 36a-25(b) ("The Student Loan Ombudsman . . . shall . . . [r]eceive, review and attempt to resolve any complaints from student loan borrowers . . . ."); D.C. CODE § 31-106.01(c) (similar); ME. STAT. tit. 14, § 104 (effective January 1, 2020) (similar); MD. CODE ANN., FIN. INST. § 2-104.1(c) (similar).

Some states confer these responsibilities on state officials other than an ombudsperson. *See* R.I. GEN. LAWS § 19-33-3(a) (stating that the Rhode Island Office of the Attorney General, "in collaboration with the" Director of the Rhode Island Department of Business Regulation, the General Treasurer of Rhode Island, and the Rhode Island Commissioner of Postsecondary Education, must (among other things) "[r]eceive, review, and attempt to resolve complaints from student loan borrowers").

[132] *See, e.g.*, COLO. REV. STAT. § 5-20-104(1)(h) (providing that the Student Loan Ombudsman must "[e]stablish and maintain a student loan borrower education course"); D.C. CODE § 31-106.01(c) (similar); MD. CODE ANN., FIN. INST. § 2-104.1(e) (requiring that the Student Loan Ombudsman "disseminate information about student loans and servicing by," among other things, "[h]elping student loan borrowers understand their rights and responsibilities under the terms of student education loans"); ME. STAT. tit. 14, § 104 (effective January 1, 2020) ("The student loan ombudsman . . . shall . . . [a]ssist student loan borrowers to understand their rights and responsibilities under the terms of student education loans . . . .").

[133] *See, e.g.*, MD. CODE ANN., FIN. INST. § 2-104.1(d) ("The Student Loan Ombudsman may refer any matter that is abusive, unfair, deceptive, or fraudulent to the Office of the Attorney General for civil enforcement or criminal prosecution.").

[134] *See supra* "Forbearance Steering."

[135] *See, e.g.*, COLO. REV. STAT. § 5-20-109(1)(i) (providing that, "[e]xcept as otherwise provided in federal law, federal student loan agreements, or a contract between the federal government and a student loan servicer," "[a] student loan servicer shall not . . . fail to properly evaluate a student loan borrower for an income-based or other student loan repayment program or for eligibility for a public service loan forgiveness program before placing the student loan borrower in forbearance or default, if an income-based repayment or other program is available to the student loan borrower."); ME. STAT. tit. 14, § 108(2)(F) (effective January 1, 2020) (similar); R.I. GEN. LAWS § 19-33-12(9) (similar). *See also* 110 ILL. COMP. STAT. 992/5-30(b) ("A servicer shall refrain from presenting forbearance as the sole or first repayment option to a student loan borrower struggling with repayment unless the servicer has determined that, based on the borrower's financial status, a short term forbearance is appropriate.").

has the intended or actual effect of incentivizing a repayment specialist to violate" applicable servicing regulations "or any other measure that encourages undue haste or lack of quality."[136]

Similarly, in response to allegations that servicers have failed to provide borrowers with key information about income recertification,[137] at least one state requires servicers to "disclose the date that a borrower's [IDR] plan certification will expire and the consequences to the borrower for failing to recertify by the date, including the new repayment amount."[138]

A few state statutes also attempt to address concerns that some servicers have misinformed borrowers regarding their eligibility for loan forgiveness programs, such as the PSLF.[139] The State of Washington, for instance, makes it unlawful to "[m]isrepresent or omit any material information" about "the availability of loan discharge or forgiveness options."[140]

A number of states have also enacted statutory provisions to regulate various other aspects of servicers' operations.[141] For instance, some state statutes purport to require servicers to acknowledge and respond to borrower complaints and requests within a specified time frame.[142] Several statutes also impose recordkeeping[143] or annual reporting requirements[144] upon servicers. Additionally, some laws require servicers to inform the borrower if the identity or address of the party to whom the borrower must send payments or communications changes.[145]

There are a host of different remedies for violating state servicing laws. Some states, for instance, have authorized borrowers to pursue a private cause of action against a servicer who violates the state's servicing laws.[146] A Maine statute that becomes effective January 1, 2020, for example, will authorize borrowers to recover compensatory, treble, and punitive damages—as well as costs

---

[136] 110 ILL. COMP. STAT. 992/5-30(i).

[137] *See supra* "Income Recertification."

[138] 110 ILL. COMP. STAT. 992/5-40.

[139] *See supra* "Loan Forgiveness Eligibility."

[140] WASH. REV. CODE § 31.04.027(2)(b).

[141] *See, e.g.*, 110 ILL. COMP. STAT. 992/5-5—992/5-65 (statutory provisions regulating payment processing, the imposition of fees, billing statements, mandatory disclosures, and other matters).

[142] *See* ME. STAT. tit. 14, § 108(2)(A) (effective January 1, 2020) ("Upon receipt of a written inquiry from a student loan borrower . . . a student loan servicer shall respond by: (1) Acknowledging receipt of the written inquiry within 10 days; and (2) Providing, within 30 days after receiving the inquiry, information relating to the inquiry and, if applicable, the action the student loan servicer will take to correct the student loan borrower's account or an explanation of the student loan servicer's position that the borrower's account is correct."). *See also, e.g.*, CAL. FIN. CODE §§ 28130(g)(1)-(2), 28132; N.Y. BANKING LAW §§ 719(8), 721(6) (effective October 9, 2019); R.I. GEN. LAWS § 19-33-8(f).

[143] *See* N.Y. BANKING LAW §§ 717(1), 721(7) (effective October 9, 2019) ("Each student loan servicer shall keep and use in its business such books, accounts and records as will enable the superintendent to determine whether such servicer . . . is complying with the provisions of [New York's servicing laws]. Every servicer shall preserve such books, accounts, and records, for at least three years."). *See also, e.g.*, CAL. FIN. CODE § 28138 (similar); CONN. GEN. STAT. § 36a-849(a) (similar); ME. STAT. tit. 14, § 107(11) (effective January 1, 2020) (similar).

[144] *See* N.Y. BANKING LAW § 717(2)(a) (effective October 9, 2019) ("Each student loan servicer . . . shall annually . . . file a report with the superintendent giving such information as the superintendent may require concerning the business and operations during the preceding calendar year of such servicer . . . ."). *See also* R.I. GEN. LAWS § 19-33-7(a) (similar).

[145] *See* 110 ILL. COMP. STAT. 992/5-10(b) ("A servicer shall provide borrowers and cosigners with prompt notice if the servicer changes the address to which the borrower or cosigner needs to send payments."); *Id.* § 992/5-60 (notice requirements governing the transfer of servicing). *See also, e.g.*, CAL. FIN. CODE § 28134; ME. STAT. tit. 14, § 108(2)(D) (effective January 1, 2020); R.I. GEN. LAWS § 19-33-8(i), (k)-(*l*).

[146] *See, e.g.*, R.I. GEN. LAWS § 19-33-14 ("Any student loan borrower may bring an action . . . for a violation of [certain provisions of Rhode Island's student loan servicing statute] as an unlawful act or practice . . . .").

and attorney's fees—from servicers who violate the statute's prohibitions.[147] As an alternative to enforcement by private litigants, some state statutes authorize the government to (1) levy fines or penalties against servicers who commit specified acts or omissions[148] or (2) sue servicers who violate the state's servicing laws.[149] Some state servicing statutes explicitly contemplate enforcement by both individual borrowers and the state government alike.[150]

Whereas the aforementioned provisions impose servicing requirements that go beyond federal law, some state statutes also incorporate existing federal servicing standards by reference and thereby provide state law remedies for alleged violations of federal requirements.[151] A Connecticut statute, for instance, provides that in addition to complying with all requirements imposed by Connecticut law, a student loan servicer must also "comply with all applicable federal laws and regulations relating to student loan servicing."[152] "[A] violation of any such federal law or regulation shall be deemed a violation of" Connecticut law "and a basis upon which the [Connecticut Banking Commissioner] may take enforcement action" against a noncompliant servicer.[153]

## State Laws of General Applicability

In addition to these statutes that specifically purport to regulate student loan servicers, servicers may also be bound by a state's laws of general applicability. For example, many states have enacted consumer protection statutes that purport to apply to various entities and prohibit an array of activities that state legislatures have deemed deceptive or unfair to consumers.[154] As explained below,[155] some borrowers and states have invoked these consumer protection statutes in civil lawsuits against servicers challenging various forms of alleged misconduct.[156] Additionally, state

---

[147] *See* ME. STAT. tit. 14, § 108(4) (effective January 1, 2020).

[148] *See, e.g.*, COLO. REV. STAT. § 5-20-114(1); 110 ILL. COMP. STAT. 992/20-30(h)(5), (i)(1)-(13); N.Y. BANKING LAW § 723(1) (effective October 9, 2019); R.I. GEN. LAWS § 19-33-10(b).

[149] *See, e.g.*, CAL. FIN. CODE § 28172(a) (authorizing the California Commissioner of Business Oversight to bring "a civil action . . . in the name of the people of the State of California" against "[a]ny person who violates" California's student loan servicing laws "for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation"); COLO. REV. STAT. § 5-20-117 (similar); R.I. GEN. LAWS § 19-33-13 (similar).

[150] *See, e.g.*, R.I. GEN. LAWS §§ 19-33-13, 19-33-14 (allowing both "[t]he attorney general" and "[a]ny student loan borrower" to bring an action for violating specified provisions of Rhode Island's student loan servicing statute).

[151] *See, e.g.*, COLO. REV. STAT. § 5-20-111 ("A student loan servicer shall comply with all applicable federal laws and regulations relating to servicing . . . ."). The Supreme Court has ruled that federal law ordinarily does not preempt state law requirements that are "equivalent to, and fully consistent with," federal legal standards even if the state provides a different remedy to enforce substantive federal standards. *See* Bates v. Dow Agrosciences LLC, 544 U.S. 431, 447 (2005). *See generally* CRS Report R45825, *Federal Preemption: A Legal Primer*, by Jay B. Sykes and Nicole Vanatko, at 12.

[152] CONN. GEN. STAT. § 36a-853.

[153] *Id.*

[154] *See, e.g.*, Gen. Motors Corp. v. Abrams, 897 F.2d 34, 41 (2d Cir. 1990) (describing "consumer protection law" as "a field traditionally regulated by the states").

[155] *See infra* "Recent Litigation."

[156] *See, e.g.*, Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 642 (7th Cir. 2019) (alleging that servicer "violated the Illinois Consumer Fraud and Deceptive Business Practices Act" by "steer[ing] borrowers into repayment plans that were to [the servicer's] advantage and to borrowers' detriment"); Hyland v. Navient Corp., No. 18cv9031(DLC), 2019 WL 2918238, at *3-4, *11-13 (S.D.N.Y. July 8, 2019) (alleging violations of the Maryland, Florida, New York, and California consumer protection statutes based on servicer's alleged misrepresentations regarding borrowers' eligibility for PSLF); Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 533 (M.D. Pa. 2018) (alleging that servicer "committed a variety of unfair, deceptive and abusive practices in connection with the . . .

courts typically recognize common law causes of action for acts like fraud, negligent or fraudulent misrepresentation, breach of fiduciary duty, negligence, unjust enrichment, tortious interference, and breach of contract.[157] Some borrowers have likewise invoked (or tried to invoke) these common law doctrines against servicers allegedly engaged in misconduct.[158]

# Preemption and the Interaction of Federal and State Servicing Laws

With both federal and state laws coexisting in the realm of federal student loan servicing regulations, questions of federal preemption—that is, questions regarding whether federal law in a given area displaces or overrides state laws in that area—have arisen.

## Federal Preemption

Under case law interpreting the Constitution's Supremacy Clause,[159] federal law can preempt conflicting state law in two central ways.[160] First, statutory language that expressly addresses the scope of a law's preemptive effect, such as the express preemption clause in 20 U.S.C. § 1098g,[161] may be the basis to conclude that Congress intended federal law to supersede certain state laws.[162] Second, even if a statute is silent as to Congress's preemptive intent, implied preemption principles can also displace state law.[163] A statute can implicitly preempt state law where (1) the scheme of federal regulation is so pervasive, or the federal interest is so dominant, that it can be presumed that Congress intended to supplant all state laws in a particular area (also known as "field preemption");[164] or (2) the state law conflicts with federal law by either making it

---

[157] "Common law" causes of action are "derived from judicial decisions, rather than from statutes or constitutions." *Common law*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[158] *See, e.g.*, *Nelson*, 928 F.3d at 642 (describing a lawsuit asserting "constructive fraud and negligent misrepresentation [claims] under Illinois common law" based on servicer's alleged practice of "steer[ing] borrowers into repayment plans that were to [the servicer's] advantage and to borrowers' detriment); *Hyland*, 2019 WL 2918238, at *4 (discussing a lawsuit pursuing "breach of contract, breach of implied warranty of authority, tortious interference with contract, tortious interference with expectancy, unjust enrichment, breach of fiduciary duty, negligence, [and] negligent misrepresentation" claims against servicer); *Daniel*, 328 F. Supp. 3d at 1321-22 (describing a lawsuit asserting breach of fiduciary duty, negligence, unjust enrichment, and breach of implied-in-law contract claims predicated upon allegations that servicer gave borrowers "incorrect information . . . regarding their eligibility for student loan forgiveness under the PSLF"); Genna v. Sallie Mae, Inc., No. 11 Civ. 7371 (LBS), 2012 WL 1339482, at *2-7 (S.D.N.Y. Apr. 17, 2012) (discussing a lawsuit asserting fraudulent misrepresentation, negligent misrepresentation, breach of contract, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and promissory estoppel claims against servicer).

[159] U.S. CONST. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

[160] *See* Sykes & Vanatko, *supra* note 151, at 6-29.

[161] *See supra* "Federal Laws and Contractual Requirements Governing Student Loan Servicers." 20 U.S.C. § 1098g states that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] shall not be subject to any disclosure requirements of any State law."

[162] *See, e.g.*, Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996).

[163] *See, e.g.*, Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992).

[164] Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

impossible to simultaneously comply with both laws[165] or by frustrating the purposes and objectives of the federal law (also known as "conflict preemption").[166] For each type of preemption, congressional intent is the touchstone of courts' analyses.[167] Influencing the preemption analysis, courts have, at times, employed a "presumption against preemption," meaning that they begin with an assumption that Congress did not intend to displace state law, particularly in areas falling within the traditional police powers of the states.[168]

## ED's Interpretation

Invoking several of these principles of federal preemption, in March 2018 ED announced its own position on the issue—that is, that federal law preempts a wide range of state laws that regulate federal student loan servicers.[169] Significantly, ED did not promulgate this interpretation through notice-and-comment rulemaking;[170] it instead published its interpretation in the Federal Register as an informal guidance document.[171] Among other things, the ED interpretation claims that federal law displaces

- state laws that "impose regulatory requirements on servicing," such as laws that "impose deadlines on servicers for responding to borrower inquiries" or "require specific procedures to resolve borrower disputes";[172]

- state regulations "requiring licensure of servicers" of certain federal student loans;[173] and

- state requirements concerning what servicers must disclose to borrowers.[174]

ED appears to ground its interpretation in several preemption theories, including conflict preemption (i.e., that state servicing laws allegedly impede Congress's objective of establishing uniform federal loan servicing standards) and field preemption (i.e., that existing federal regulation is comprehensive and adequate, leaving no role for additional state regulation).[175] ED

---

[165] Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963).

[166] *See, e.g.*, Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000).

[167] *See, e.g.*, Wyeth v. Levine, 555 U.S. 555, 565 (2009) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.") (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103 (1963)).

[168] *See* Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 548 (M.D. Pa. 2018); Daniel v. Navient Solutions, LLC, 328 F. Supp. 3d 1319, 1323-24 (M.D. Fla. 2018). *See also* Sykes & Vanatko, *supra* note 151, at 3.

[169] ED Interpretation, 83 Fed. Reg. 10,619.

[170] The Administrative Procedure Act sets forth the requirements governing agencies' process for informal rulemaking, also known as "notice and comment" rulemaking. *See* 5 U.S.C. § 553(b). Such rulemaking requires the agency to publish a notice of the proposed rule and allow the public an opportunity to submit written comments. *Id.* The agency, after consideration of the comments, then publishes its final rule along with a concise statement of its basis and purpose. *Id.* § 553(c)-(d). Agency rules promulgated under this procedure have the force and effect of law, while other agency statements, such as interpretive rules and policy statements, do not. *See* CRS Report R41546, *A Brief Overview of Rulemaking and Judicial Review*, by Todd Garvey, at 1-3 & n.5 (citing Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 250 (D.C. Cir. 2014) ("Legislative rules have the 'force and effect of law' and may be promulgated only after public notice and comment.")).

[171] *See* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 48 (D.D.C. 2018); *see also* CRS In Focus IF10003, *An Overview of Federal Regulations and the Rulemaking Process*, by Maeve P. Carey (describing notice and comment rulemaking, including in contrast to less formal agency statements).

[172] ED Interpretation, 83 Fed. Reg. at 10,620.

[173] *Id.*

[174] *Id.* at 10,621.

[175] *See supra* "Federal Preemption."

also relies on express preemption principles, arguing that 20 U.S.C. § 1098g's preemption provision—stating that "[l]oans made, insured, or guaranteed pursuant to a program authorized by Title IV of the [HEA] shall not be subject to any disclosure requirements of any State law"— broadly bars states from imposing disclosure requirements.[176] ED "interprets the term 'disclosure requirements' under section 1098g . . . to encompass" not only written disclosures, but also "informal or non-written communications to borrowers."[177] In addition to issuing this interpretation, ED has also submitted filings in several cases, asking courts to dismiss lawsuits against student loan servicers on preemption grounds or otherwise narrow or invalidate state regulations.[178]

## Recent Litigation

ED's interpretation and its litigation position have fueled the debate between states and plaintiff borrowers on one side—who claim that state servicing statutes may harmoniously exist alongside federal laws and policies—and ED and federal student loan servicers on the other, who claim that those state regulations irreconcilably conflict with supreme federal law.[179] Federal courts addressing these disputes, as discussed below, have analyzed the applicability of field preemption, conflict preemption, and express preemption to state student loan servicing laws and state law claims against federal student loan servicers.[180] In doing so, the courts have afforded varying levels of weight to ED's interpretation in conducting their preemption analyses.[181]

### *Field Preemption*

Courts have somewhat readily concluded that the HEA does not occupy the field of federal student loan servicing regulation.[182] As an initial matter, several federal appellate courts over the past 25 years—in analyzing different legal contexts in the realm of higher education—have held that the HEA does not have field preemptive effect more generally.[183] For example, in one such case involving state law negligence claims against national school accrediting agencies (which

---

[176] *See* ED Interpretation, 83 Fed. Reg. at 10,621.

[177] *Id.*

[178] *See, e.g.,* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 37 n.1 (D.D.C. 2018).

[179] *See, e.g.,* Jillian Berman, *Clash Between Student-Loan Companies and States Could Wind Up in the Supreme Court*, MarketWatch (Jan. 28, 2019), https://www.marketwatch.com/story/we-may-soon-find-out-whether-student-loan-companies-have-to-follow-state-law-2019-01-28; David M. Gettings, Stephen C. Piepgrass, Timothy St. George, & Amir Shachmurove, *Tussling Over Preemption: Emerging Battleground Between State Authorities and Student Loan Servicers*, 2018 A.B.A. BUSINESS L. TODAY (May 16, 2018).

[180] *See infra* "Field Preemption"; "Conflict Preemption"; "Express Preemption."

[181] *Compare, e.g.*, *Student Loan Servicing All.*, 351 F. Supp. 3d at 51 ("[T]he Court gives no deference to the DOED Preemption Notice and turns now to its own independent preemption analysis"), *with, e.g.*, Lawson-Ross v. Great Lakes Higher Educ. Corp., No. 1:17-CV-253-MW/GRJ, 2018 WL 5621872, at *3 (N.D. Fla. Sept. 20, 2018) ("The Interpretation is persuasive and due deference under *Skidmore*.").

[182] *See* Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 651-52 (7th Cir. 2019); Chae v. SLM Corp., 593 F.3d 936, 941-42 (9th Cir. 2010); Hyland v. Navient Corp., No. 18cv9031(DLC), 2019 WL 2918238, at *8 (S.D.N.Y. July 8, 2019); *Student Loan Servicing All.*, 351 F. Supp. 3d at 55-59; Genna v. Sallie Mae, Inc., No. 11 Civ. 7371, 2012 WL 1339482, at *7 (S.D.N.Y. Apr. 17, 2012).

[183] *See Chae*, 593 F.3d at 941-42; Coll. Loan Corp. v. SLM Corp., 396 F.3d 588, 596 n.5 (4th Cir. 2005); Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1126 (11th Cir. 2004); Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc., 168 F.3d 1362, 1369 (D.C. Cir. 1999); Keams v. Tempe Tech. Inst., Inc., 39 F.3d 222, 225-26 (9th Cir. 1994); *see also* Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1263 (9th Cir. 1996) ("[T]he HEA does not preempt all state law governing lenders and guarantors of student loans . . . .").

ED approves pursuant to the HEA), the Ninth Circuit[184] concluded that Congress, in enacting the HEA, "expected state law to operate in much of the field in which it was legislating."[185] Although courts have recognized that the HEA is comprehensive, they have also noted that a regulatory regime's comprehensiveness on its own does not necessarily result in field preemption.[186] Moreover, courts have observed that scattered throughout the HEA are several express preemption provisions, which explicitly foreclose certain state laws—such as state usury, garnishment, and, with respect to Section 1098g, disclosure laws.[187] Such explicit preemption provisions, courts have reasoned, would not be necessary if Congress had intended to simply supplant *all* state laws.[188]

When it comes to student loan servicing specifically, courts have uniformly rejected the argument that in the HEA Congress intended for federal regulation of federal student loan servicers to be an exclusive field.[189] The HEA provides ED with the authority to contract with student loan servicers and to "establish *minimum* standards" governing those servicers' management and accountability.[190] The district court in *Student Loan Servicing Alliance v. District of Columbia*, for example, concluded that this language merely sets a federal regulatory "floor," without foreclosing supplemental regulation from the states.[191] The servicers in *Student Loan Servicing Alliance* further raised the argument that the federal government has a *dominant* interest in regulating federal student loan servicing that would merit field preemption—particularly because, with the discontinuation of the FFELP, the federal government now makes over 90% of new student loans through the FDLP.[192] The servicers argued, accordingly, that the federal government has a unique interest in protecting its rights under its servicing contracts for these loans.[193] However, in weighing the federal interests against the "compelling" interest of states in protecting their consumers, the *Student Loan Servicing Alliance* court concluded that the federal interest was not dominant enough to preclude state regulation.[194]

## Conflict Preemption

Although field preemption arguments have not thus far posed a hurdle to state student loan servicing regulation, the federal district court in *Student Loan Servicing Alliance* recently invalidated significant portions of the District of Columbia's student loan servicing law under *conflict* preemption principles.[195] In its student loan servicing law passed in 2016, the District of Columbia (DC) required student loan servicers to obtain a license from DC and adhere to other

---

[184] This report references several decisions by federal appellate courts of various regional circuits. For purposes of brevity, references to a particular circuit in the body of this report (*e.g.*, the Ninth Circuit) refer to the U.S. Court of Appeals for that particular circuit.

[185] *Keams*, 39 F.3d at 225-27.

[186] *Student Loan Servicing All.*, 351 F. Supp. 3d at 56-57 ("The Supreme Court has explained . . . that the promulgation of comprehensive regulations in a field is not sufficient to find full occupation of that field.") (citing Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. at 717).

[187] *See Nelson*, 928 F.3d at 647-48; *Keams*, 39 F.3d at 225.

[188] *See Nelson*, 928 F.3d at 648, 652; *Cliff*, 363 F.3d at 1126; *Keams*, 39 F.3d at 225-26.

[189] *See, e.g.*, *Student Loan Servicing All.*, 351 F. Supp. 3d at 57.

[190] *Id.* (citing 20 U.S.C. 1082(a)(1)) (emphasis added).

[191] *Id.*

[192] *Id.* at 58.

[193] *Id.*

[194] *Id.* at 59.

[195] *Id.* at 66.

substantive regulations and standards of conduct.[196] While one of the primary points raised in ED's Interpretation, as discussed above, was that this type of state licensing scheme conflicted with federal law, the court determined that it did not have to give ED's Interpretation any deference.[197] Rather, the court concluded that the ED Interpretation consisted of informal agency guidance that was insufficiently "thorough, consistent, and persuasive."[198]

Yet, in performing its own independent analysis, the district court still held that DC's licensing scheme posed an obstacle to the federal law's underlying purpose by undermining ED's authority—provided for in the HEA—to select servicers for federal student loans.[199] The court relied on a line of prior federal cases arising in different legal contexts that preempted state laws' impeding the federal government's ability to contract.[200] The court reasoned that the DC law did so by effectively "second-guessing" the federal government's decisions to contract with a given loan servicer.[201] The court's reasoning applied to FDLP loans and government-owned FFELP loans (e.g., those that ED purchased under ECASLA), for which ED makes servicer contracting decisions under the HEA.[202] The court held, however, that federal law did not preempt state regulations of servicers of outstanding commercial FFELP loans, where private lenders own and decide whether to contract with student loan servicers and the federal government acts merely as a reinsurer or a guarantor.[203]

Beyond the *Student Loan Servicing Alliance* case and its preemption of DC's licensing requirement for federal student loan servicers, however, courts have generally declined to find conflict preemption in suits brought against servicers for misrepresentations under state laws of general applicability.[204] The main argument that federal student loan servicers have raised in this context is that plaintiffs' ability to sue under state law poses an obstacle to the HEA's objective of providing uniformity in federal student loan servicing regulation, subjecting servicers instead to actions under the laws of 50 different states and DC.[205] However, uniformity is not a stated goal of the HEA.[206] While certain cases have concluded that uniformity is one of the statute's purposes

---

[196] *Id.* at 41; *see supra* "State Laws Governing Student Loan Servicers Specifically."

[197] *Student Loan Servicing All.*, 351 F. Supp. 3d at 51.

[198] *Id.* at 50-51. For more on deference to agency legal interpretations, see CRS Report R44954, *Chevron Deference: A Primer*, by Valerie C. Brannon and Jared P. Cole.

[199] *Student Loan Servicing All.*, 351 F. Supp. 3d at 66.

[200] *Id.* at 62.

[201] *Id.* at 65-66.

[202] *Id.* at 66.

[203] *Id.*

[204] Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 650-51 (7th Cir. 2019); Hyland v. Navient Corp., No. 18cv9031(DLC), 2019 WL 2918238, at *8 (S.D.N.Y. July 8, 2019); Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 552 (M.D. Pa. 2018); Daniel v. Navient Solutions, LLC, 328 F. Supp. 3d 1319, 1324 (M.D. Fla. 2018); Genna v. Sallie Mae, Inc., No. 11 Civ. 7371, 2012 WL 1339482, at *8-9 (S.D.N.Y. Apr. 17, 2012); *but see* Chae v. SLM Corp., 593 F.3d 936, 943-50 (9th Cir. 2010) (holding that plaintiff's state law claims against federal student loan servicer were preempted because they stood as an obstacle to FFELP's uniform operation).

[205] *Nelson*, 928 F.3d at 650-51; *Hyland*, 2019 WL 2918238, at *8; *Pennsylvania*, 354 F. Supp. 3d at 552; *Daniel*, 328 F. Supp. 3d at 1324; *Genna*, 2012 WL 1339482, at *9.

[206] *Pennsylvania*, 354 F. Supp. 3d at 552; *Daniel*, 328 F. Supp. 3d at 1324.

(albeit in arguably distinguishable contexts),[207] other courts have declined to reach that result.[208] Courts have also reasoned that even if uniformity were an objective of the HEA, it does not follow that enforcing state laws prohibiting deceptive conduct would serve as an obstacle to uniformity in the HEA's standards because "uniformity in setting . . . standard parameters for the federal student loan programs is not harmed by prohibiting unfair or deceptive conduct in operating those programs."[209] Moreover, as several courts have noted, a broad reading of servicers' uniformity argument would in effect be akin to a finding of HEA field preemption, which courts have consistently declined to recognize.[210]

Courts have also considered whether the Supreme Court's holding in *Boyle v. United Technologies Corp.*[211] prevents the states from regulating activities that servicers perform under contracts with the federal government.[212] *Boyle* held that plaintiffs could not pursue state law claims against federal contractors when allowing such claims to proceed would either create "a 'significant conflict'" with "an identifiable 'federal policy or interest'" or "'frustrate specific objectives' of federal legislation."[213] In the 2019 case of *Nelson v. Great Lakes Educational Loan Services, Inc.*, for example, the Seventh Circuit determined—albeit with little elaboration—that allowing a borrower to pursue state law misrepresentation claims against a servicer would not impermissibly conflict with federal interests or objectives.[214]

### Express Preemption

Express preemption arguments in recent federal student loan servicing cases have centered on the preemption clause in Section 1098g of the HEA. Specifically, courts have grappled with whether the preemptive language in Section 1098g—which prohibits states from imposing "disclosure requirements" regarding federal student loans—precludes suits against servicers brought under state law for misrepresentations or misleading communications made to federal student loan borrowers.[215]

---

[207] *Chae*, 593 F.3d at 950 (concluding that uniformity is a goal of the HEA in a case concerning servicer's method of calculating interest, assessing late fees, and setting repayment start dates); Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260 (9th Cir. 1996) (concluding that a purpose of the HEA regulatory regime is to establish a uniform national standard for federal student debt collection activity).

[208] *See, e.g.*, College Loan Corp. v. SLM Corp., 396 F.3d 588, 597 (4th Cir. 1998) ("We are unable to confirm that 'uniformity' . . . was actually an important goal of the HEA.").

[209] *Hyland*, 2019 WL 2918238, at *8; *Pennsylvania*, 354 F. Supp. 3d at 553.

[210] *Hyland*, 2019 WL 2918238, at *9 (citing *Genna*, 2012 WL 1339482, at *9); *Pennsylvania*, 354 F. Supp. 3d at 553; *see also* LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 486 (2d ed. 1988) (noting that when state law "undermin[es] a congressional decision in favor of national uniformity of standards," it "presents a situation similar in practical effect to that of federal occupation of a field").

[211] 487 U.S. 500, 507 (1988) (quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979); Wallis v. Pan Am. Petroleum Corp., 384 U.S. 63, 68 (1966)).

[212] *See* Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 651 n.3 (7th Cir. 2019). *See also* Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 56, 58-59 (D.D.C. 2018) (considering *Boyle*'s relevance to the field preemption inquiry).

[213] *Boyle*, 487 U.S. at 507.

[214] *See Nelson*, 928 F.3d at 651 n.3 ("We see no such conflict posed by Nelson's claims here, at least to the extent those claims are confined to affirmative misrepresentations.").

[215] *See Nelson*, 928 F.3d at 649; *Hyland*, 2019 WL 2918238, at *6-7; Olsen v. Nelnet, Inc., 4:18-CV-3081, 2019 WL 2189486, at *8-9 (D. Neb. May 21, 2019); *Pennsylvania*, 354 F. Supp. 3d at 551; Lawson-Ross v. Great Lakes Higher Educ. Corp., No. 1:17-CV-253-MW/GRJ, 2018 WL 5621872, at *1 (N.D. Fla. 2018); Daniel v. Navient Solutions, LLC, 328 F. Supp. 3d 1319, 1324 (M.D. Fla. 2018); *Genna*, 2012 WL 1339482, at *8; *see also* Chery v. Conduent

Allegations in this category of lawsuits primarily include forbearance steering and misstatements regarding loan forgiveness eligibility,[216] with the allegedly false or misleading statements in many cases being made over the telephone by the servicers' call center representatives.[217] Specifically, some plaintiffs claim that they were "steered" toward placing their loans into forbearance rather than being informed of other options or enrolled in an IDR plan that may have been more beneficial in the long term—alleging that forbearance was simply a faster and less burdensome process for the servicer.[218] Other plaintiffs recount, for example, being assured that they were on track to benefit from the PSLF program when that was not the case, thereby preventing them from taking remedial measures.[219] Plaintiffs in these lawsuits—which have included both federal student loan borrowers and state attorneys general—have brought state law tort claims or claims under state consumer protection statutes of general applicability.[220] The main question at issue has been whether enforcing the state's law would require the servicers in these cases to make additional or different "disclosures" under Section 1098g.[221]

Most federal courts considering this question in cases based on these types of allegations have held that Section 1098g does *not* preempt state law.[222] These courts have allowed the students' lawsuits to proceed, viewing their claims as involving affirmative *misrepresentations* or otherwise *deceptive* conduct, which the courts distinguished from the mere failure to provide "disclosures" under Section 1098g. For example, in *Pennsylvania v. Navient Corp.*, a federal district court in Pennsylvania ruled that the HEA did not preempt the plaintiff's state law claims regarding forbearance steering.[223] The court reasoned that the defendant's argument went "too far" by framing the plaintiff's claim as one for lack of disclosure, rather than a claim concerning unfair and deceptive conduct subject to the state consumer protection statute.[224]

A federal district court in Florida in *Lawson-Ross v. Great Lakes Higher Education Corp.*, however, reached a different conclusion as to express preemption in 2018.[225] The *Lawson-Ross* plaintiffs alleged that the defendant servicer falsely assured them that they were on track to benefit from PSLF (when they were not in fact eligible for the program), in violation of a Florida consumer protection statute and several state common law duties.[226] The court concluded, however, that federal regulations already prescribe the information that must be provided to

---

Educ. Servs., No. 1:18-CV-75, 2019 WL 1427140, at *6 (N.D.N.Y. Mar. 29, 2019).

[216] *See supra* "Allegations of Servicer Misconduct."

[217] *See, e.g., Hyland*, 2019 WL 2918238, at *3; *Lawson-Ross*, 2018 WL 5621872, at *1; *Daniel*, 328 F. Supp. 3d at 1324.

[218] *See Nelson*, 928 F.3d at 642; *Pennsylvania*, 354 F. Supp. 3d at 536-37.

[219] *See Hyland*, 2019 WL 2918238, at *3; *Lawson-Ross*, 2018 WL 5621872, at *1; *Daniel*, 328 F. Supp. 3d at 1321. *But see* Daniel v. Navient Solutions, LLC, No. 8:17-cv-2503-T-24JSS, slip op. at 19-20 (M.D. Fla. Aug. 28, 2019) (concluding that borrowers "fail[ed] to provide competent, record evidence that support[ed] their allegations of affirmative misrepresentations made by" their student loan servicer regarding their eligibility for the PSLF program).

[220] *See supra* "State Laws Regulating Servicers of Federal Student Loans."

[221] *See, e.g., Pennsylvania*, 354 F. Supp. 3d at 549.

[222] *Nelson*, 928 F.3d at 649; *Hyland*, 2019 WL 2918238, at *6-7; Olsen v. Nelnet, Inc., 4:18-CV-3081, 2019 WL 2189486, at *8-9 (D. Neb. May 21, 2019); *Pennsylvania*, 354 F. Supp. 3d at 551; *Daniel*, 328 F. Supp. 3d at 1324; Genna v. Sallie Mae, Inc., No. 11 Civ. 7371, 2012 WL 1339482, at *8 (S.D.N.Y. Apr. 17, 2012); *see also* Chery v. Conduent Educ. Servs., No. 1:18-CV-75, 2019 WL 1427140, at *6 (N.D.N.Y. Mar. 29, 2019); *but see Lawson-Ross*, 2018 WL 5621872, at *1.

[223] *Pennsylvania*, 354 F. Supp. 3d at 550-51.

[224] *Id.*

[225] *Lawson-Ross*, 2018 WL 5621872, at *4.

[226] *Id.* at *1.

federal student loan borrowers, so that the plaintiffs' state law claims would essentially impose additional disclosure requirements on the servicer.[227] Even though the plaintiffs argued that they alleged that the servicer had made an affirmative *misrepresentation*, the court construed the plaintiffs' claim as one for the servicer's failure to disclose *accurate* information regarding plaintiffs' eligibility, which it held to be impermissible under Section 1098g.[228] In reaching its conclusion, the *Lawson-Ross* court afforded *Skidmore* deference to ED's interpretation after concluding that ED's views on the preemptive effect of federal law were "well-reasoned and sensible."[229]

The *Lawson-Ross* court, and servicers arguing for preemption in similar cases,[230] also relied for support on a 2010 case from the Ninth Circuit called *Chae v. SLM Corporation*.[231] In *Chae*, students sued a federal student loan servicer challenging certain methods it used to calculate interest, late fees, and repayment dates, claiming that these servicing practices rendered their billing statements, coupon books, and loan applications misleading in violation of a state consumer protection law.[232] The court reasoned that Section 1098g preempted the action, stating that "[a]t bottom, the plaintiffs' misrepresentation claims are improper-disclosure claims" and that "[i]n this context, the state-law prohibition on misrepresenting a business practice 'is merely the converse' of a state-law requirement that alternative disclosures be made."[233] While the *Lawson-Ross* court extended *Chae*'s logic to servicers' oral misrepresentations about PSLF eligibility, other courts have distinguished *Chae*, noting, for example, that *Chae* involved allegations concerning the misleading nature of *written* account statements and coupon books (i.e., "highly prescribed standardized forms"), rather than the "affirmative misconduct" and types of misleading communications involved in forbearance steering or PSLF allegations.[234]

The landscape of decisions concerning Section 1098g's preemptive scope is subject to change as further appellate courts begin to address the issue. Notably, appeals in the *Pennsylvania* and *Lawson-Ross* cases are pending.[235] Moreover, the *Nelson* case, decided by the Seventh Circuit, may be appealed to the U.S. Supreme Court.[236]

---

[227] *Id.* at *3-4.

[228] *Id.* at *4.

[229] *Id.* at *3. Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), a court may accord an agency's interpretation a weight proportional to its "power to persuade," but is not required to defer to the agency's view. By contrast, for example, the courts in the *Nelson* and *Hyland* cases, which held that federal law did not displace state law, concluded that the ED Interpretation deserved no deference. Nelson v. Great Lakes Educ. Loan Servs., Inc., 928 F.3d 639, 651 n.2 (7th Cir. 2019); Hyland v. Navient Corp., No. 18-CV-9031(DLC), 2019 WL 2918238, at *7 (S.D.N.Y. July 8, 2019).

[230] *See, e.g.*, Pennsylvania v. Navient Corp., 354 F. Supp. 3d 529, 551 (M.D. Pa. 2018).

[231] *Lawson-Ross*, 2018 WL 5621872, at *2-3 (citing Chae v. SLM Corp., 593 F.3d 936 (9th Cir. 2010)).

[232] *Chae*, 593 F.3d at 942-43.

[233] *Id.* (citing Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 527 (1992)).

[234] *See, e.g.*, *Pennsylvania*, 354 F. Supp. 3d at 551.

[235] *See* Defendants-Appellants' Opening Brief, Pennsylvania v. Navient Corp., No. 19-2116 (3d Cir. July 23, 2019); Reply Brief of Appellants, Lawson-Ross v. Great Lakes Higher Educ. Corp., No. 18-14490 (11th Cir. Feb. 20, 2019). The United States Court of Appeals for the Eleventh Circuit held oral argument in *Lawson-Ross* on September 10, 2019.

[236] *See* Sup. Ct. R. 13.

# Considerations for Congress

Legal debates over the preemptive effect of federal law—both within the student loan servicing context and without—implicate a variety of considerations. On the one hand, replacing state law with a single uniform national standard can sometimes be advantageous. When each state remains free to enact its own laws on a given topic, the requirements of those laws may differ—perhaps irreconcilably—from jurisdiction to jurisdiction.[237] Preempting those state laws can thereby release regulated parties from the "administrative and financial burden[s]" of learning and complying with the "laws of 50 States."[238] Moreover, freeing federal contractors from the burden of complying with state laws could mitigate the risk of state intrusions upon federal prerogatives.[239] On the other hand, however, when federal law does not go far enough in policing a particular industry, preemption can prevent the states from filling those regulatory gaps with their own laws.[240] Preempting state law may also deprive the states of opportunities to experiment with novel methods of regulating particular industries and behaviors, which might ultimately prove more effective than methods devised by the federal government.[241]

Depending on how Congress weighs these competing considerations, it may enact legislation clarifying or modifying the preemptive effect of federal law in the student loan servicing context.[242] For example, a section of the PROSPER Act introduced in the 115th Congress, if enacted, would have provided that the servicing of student loans under Title IV of the HEA would "not be subject to any law or other requirement of any State or political subdivision of a State with respect to"

- "disclosure requirements";
- "requirements or restrictions on the content, time, quantity, or frequency of communications with borrowers, endorsers, or references with respect to such loans"; or
- "any other requirement relating to the servicing . . . of a loan made" under Title IV of the HEA.[243]

---

[237] *Cf.* Gracia v. Volvo Europa Truck, N.V., 112 F.3d 291, 298 (7th Cir. 1997) (stating that when state law claims are "not preempted," regulated parties may "be placed in a position where they could be subject to varying standards from state to state, which could not all be complied with simultaneously").

[238] *Cf.* Egelhoff v. Egelhoff *ex rel.* Breiner, 532 U.S. 141, 149-50 (2001) (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142 (1990)). *See also* ED Interpretation, 83 Fed. Reg. at 10,621 (contending that a "requirement that Federal student loan servicers comply with 50 different State-level regulatory regimes would significantly undermine the purpose of the [FDLP] to establish a uniform, streamlined, and simplified lending program managed at the Federal level").

[239] *See* ED Interpretation, 83 Fed. Reg. at 10,620 (arguing that "State regulation of the servicing of [FDLP] Loans impedes uniquely Federal interests, and that State regulation of the servicing of the" FFELP "undermines uniform administration of the program").

[240] *See* Franita Tolson, *The Union as a Safeguard Against Faction: Congressional Gridlock as State Empowerment*, 88 NOTRE DAME L. REV. 2267, 2282-83 (2013) (describing potential "federalism benefits" of "state legislation to fill the gaps in federal lawmaking").

[241] *Cf.* New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("To stay experimentation in things social and economic is a grave responsibility . . . It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

[242] *See, e.g.*, Hughes v. Talen Energy Mktg., LLC, 136 S. Ct. 1288, 1297 (2016) (quoting Altria Grp., Inc. v. Good, 555 U.S. 70, 76 (2008)) (describing "the purpose of Congress" as "the ultimate touchstone" in any preemption analysis).

[243] H.R. 4508, 115th Cong. § 494E(a) (2d Sess. 2018).

Alternatively, if Congress instead intends to *limit* the preemptive scope of federal law, it could enact a savings clause specifying that federal law does *not* preempt any state law that imposes more restrictive requirements on federal student loan servicers than federal statutes and regulations.[244] For instance, one section of the Student Loan Borrower Bill of Rights (S. 1354, 116th Cong.)—which, among other things, proposes to subject servicers to more expansive federal regulation—explicitly would not "preempt any provision of State law regarding postsecondary education loans where the State law provides stronger consumer protections."[245]

If Congress ultimately decides to displace state servicing laws, it may consider preempting state law either narrowly or broadly. For instance, a federal statute that displaces state servicing regulations could expressly preempt all state laws that implicate the servicing of federal student loans in any fashion,[246] or it could preempt only specified categories of state statutes (such as servicer licensing requirements) and thereby preserve some regulatory role for the states.[247]

Instead of expressly specifying the preemptive effect and scope of federal laws pertaining to federal student loan servicing, Congress could implicitly preempt state laws by changing the substantive standards governing servicers. Several Members of the 116th Congress have introduced legislation that, if enacted, would clarify or broaden servicers' duties and responsibilities under federal law or subject servicers to increased levels of federal oversight.[248]

---

[244] *Cf.* 42 U.S.C. § 227(f)(1) (example of statute from a different regulatory context that provides: "[N]othing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive . . . requirements or regulations . . . .").

[245] *See* S. 1354, 116th Cong. § 3(a) (1st Sess. 2019).

[246] *Cf.* Sherfel v. Newson, 768 F.3d 561, 564 (6th Cir. 2014) (stating that the Employee Retirement Income Security Act "includes an express preemption clause . . . which is so broadly worded that the Supreme Court has struggled to draw boundaries around its scope").

[247] *Cf.* Herrera v. Metro. Life Ins. Co., No. 11 Civ.1901(LAK), 2011 WL 6415058, at *4 (S.D.N.Y. Dec. 19, 2011) (concluding that because "the explicit preemption clause in [the Federal Employees Group Life Insurance Act] is quite narrow," the "extremely limited scope" of that clause's language "reveals Congress' intent not to preempt the role of the states in supplementing federal regulation, but rather an intent to preserve it") (quoting Med. Soc'y of State of N.Y. v. Cuomo, 976 F.2d 812, 818 (2d Cir. 1992)).

[248] *See, e.g.*, Better Service to Borrowers Act of 2019, H.R. 3519, 116th Cong. § 2 (1st Sess. 2019) (proposing to command the Secretary to "develop a manual of common procedures and policies" to govern federal student loan servicers that "ensure[s] consistency of quality and practice across loan servicers, and a minimum standard of quality and practice to ensure that borrowers are well-served").

*See also* Consumers First Act, H.R. 1500, 116th Cong. § 6(b) (1st Sess. 2019) (proposing to subject student loan servicers to increased reporting requirements). As of the date of this report, the Consumers First Act has passed the House of Representatives.

*See also* CFPB Student Loan Integrity and Transparency Act of 2019, S. 720, 116th Cong. § 4 (1st Sess. 2019) (proposing to amend Title IV of the HEA to provide that the "Secretary shall not enter into an agreement with a contractor or vendor that services loans under this title unless, as part of that agreement, such contractor or vendor asserts that the contractor or vendor will provide information to [the federal government] as requested . . . ."); CFPB Student Loan Integrity and Transparency Act of 2019, H.R. 2833, 116th Cong. § 4 (1st Sess. 2019) (same).

*See also* PROTECT Students Act of 2019, S. 867, 116th Cong. § 204 (1st Sess. 2019) (proposing to establish "a complaint tracking system . . . to facilitate the centralized collection of, monitoring of, and response to complaints and reports . . . of suspicious activity (such as unfair, deceptive, or abusive acts or practices) regarding . . . the servicing of postsecondary education loans by loan servicers"); H.R. 3512, 116th Cong. § 204 (1st Sess. 2019) (same).

*See also* Students and Young Consumers Empowerment Act, H.R. 3547, 116th Cong. § 2(a) (1st Sess. 2019) (proposing to establish the office of the Assistant Director and Student Loan Borrower Advocate within the CFPB, who would be tasked with, *inter alia*, "accept[ing] and attempt[ing] to resolve complaints from borrowers with . . . Federal student loans, including complaints against . . . servicers").

*See also* Student Loan Borrower Bill of Rights, S. 1354, 116th Cong. § 2(c)(2) (1st Sess. 2019) (proposing to make certain aspects of the Consumer Financial Protection Act of 2010 and the Truth in Lending Act applicable to servicers

Depending on their content and scope, new federal laws governing the conduct, obligations, and oversight of federal loan servicers could raise legal questions regarding (1) how those federal standards interact with state servicing laws and (2) the respective roles of federal and state law in regulating federal student loan servicers.[249] The preemptive effect that courts will provide to a given federal law largely depends on the specific statutory text that Congress enacts.[250]

One other substantive change that could affect the preemptive scope of federal law is altering how the HEA is enforced. As discussed,[251] the HEA does not presently create a private right of action;[252] instead, the HEA contemplates that ED alone will enforce the statute's mandates.[253] As noted above, however, some observers claim that ED has not diligently policed the servicers with whom it contracts.[254] If Congress agrees with that assessment, it could expressly empower other entities—such as states, individual borrowers, or other federal agencies like the CFPB—to wield a greater level of enforcement authority over federal student loan servicers. For instance, granting borrowers or states a private right of action under federal law against contractors that violate federal servicing standards could provide an additional means to deter, correct, and punish alleged servicer misconduct.[255] That said, subjecting servicers to litigation and regulation by multiple entities could increase federal contractors' costs.[256] Rendering servicers answerable to multiple stakeholders—be they federal agencies, states, or individual borrowers—might also undermine the uniformity that some have argued is a central goal of federal student loan servicer regulation,

---

of FDLP loans); *id.* (proposing to impose requirements upon servicers pertaining to consumer complaints); *id.* (proposing to create a student loan servicing interagency working group); *id.* § 3 (proposing numerous amendments to the Truth in Lending Act pertaining to student loans).

*See also* Discussion Draft, Student Loan Servicing Reform and Consumer Protection Act, https://financialservices.house.gov/uploadedfiles/bills-116pih-slsrcpa.pdf (proposing to impose a variety of obligations upon servicers of Title IV loans, including requirements relating to the application and allocation of payments, duties to promptly respond to borrower inquiries, etc.).

[249] For instance, as discussed above, the Student Loan Borrower Bill of Rights, S. 1354, 116th Cong. § 3(a) (1st Sess. 2019), contains an anti-preemption provision.

[250] *See, e.g.*, Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) ("[O]ur analysis of the scope of [a] statute's preemption is guided by our oft-repeated comment . . . that '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case.") (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103 (1963)).

[251] *See* "State Laws Regulating Servicers of Federal Student Loans."

[252] *See, e.g.*, *Student Loan Servicing All.*, 351 F. Supp. 3d at 40 ("[T]he HEA does not provide a private right of action for borrowers . . . .").

[253] *See, e.g.*, L'ggrke v. Benkula, 966 F.2d 1346, 1348 (10th Cir. 1992) ("The express language of the [HEA], and the regulations promulgated thereunder, does not create a private cause of action, and there is nothing in the Act's language, structure or legislative history from which a congressional intent to provide such a remedy can be implied . . . Title IV's provisions demonstrate that Congress vested exclusive enforcement authority in the Secretary of Education.").

[254] *Compare* OIG Report, *supra* note 7, at 17 (asserting that FSA had "rarely h[eld] servicers accountable for instances of noncompliance with Federal loan servicing requirements"), *with id.* at 42 (FSA's response disputing OIG's factual findings).

[255] *Cf.* Alexander v. Gardner-Denver Co., 415 U.S. 36, 45 (1974) (describing "the private right of action" granted by Title VII of the Civil Rights Act—which empowers a private litigant to "not only redress[] his own injury but also vindicate[] the important congressional policy against discriminatory employment practices"—as "an essential means of obtaining judicial enforcement of Title VII").

[256] *Cf.* Bowers v. Penn. Higher Educ. Assistance Agency, No. 10 Civ. 8675(PKC), 2011 WL 3585986, at *3 (S.D.N.Y. July 29, 2011) (predicting that recognizing "a private right of action under the HEA" against guaranty agencies who "enter into contracts with the Secretary" in connection with FFELP loans "would expose agencies to a multitude of private suits by students," which could in turn "discourage guaranty agencies' participation in the federal program, thus reducing guarantees for lenders and in turn making lenders less willing to offer loans to students").

which could in turn undercut arguments that preemption is necessary to preserve the federal government's predominant role in regulating its contractors.[257]

Several bills pending in the 116th Congress propose to subject servicers to increased litigation or regulation by entities other than ED. Section 3 of the Student Loan Borrower Bill of Rights, for example, would allow individuals to sue federal student loan servicers under the Truth in Lending Act's private right of action provision.[258] By contrast, the CFPB Student Loan Integrity and Transparency Act of 2019 (H.R. 2833, 116th Cong.) would (among other things) (1) require federal student loan servicers to provide the CFPB with any information requested by specified CFPB officials[259] and (2) reinstate the aforementioned MOUs between ED and the CFPB that ED terminated in 2017.[260]

Unless and until Congress specifies the intended preemptive effect of federal servicing laws, however, legal questions regarding preemption in the loan servicing context will be left to the courts to resolve. Depending on their content, the courts' rulings may affect the uniformity of servicing regulations across jurisdictions and the degree and type of oversight to which federal student loan servicers are subject.[261]

## Author Information

Kevin M. Lewis
Legislative Attorney

Nicole Vanatko
Legislative Attorney

---

[257] *See* ED Interpretation, 83 Fed. Reg. at 10,620 (ED's argument that federal student loan servicing involves "uniquely Federal interests" and therefore "must be 'governed exclusively by Federal law'") (quoting Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988)).

[258] S. 1354, 116th Cong. § 3(a) (1st Sess. 2019) ("A postsecondary educational lender or servicer that fails to comply with any requirement imposed under this paragraph shall be deemed a creditor that has failed to comply with a requirement under this chapter for purposes of liability under section 130 [of the Truth in Lending Act, codified at 15 U.S.C. § 1640] and such postsecondary educational lender or servicer shall be subject to the liability provisions under such section . . . ."). *See also, e.g.*, Villasenor v. Am. Signature, Inc., No. 06 C 5493, 2007 WL 2025739, at *3 (N.D. Ill. July 9, 2007) (explaining that "Section 1640(a) of TILA . . . authorizes private rights of action").

[259] *See* H.R. 2833, 116th Cong. § 4 (proposing to amend the HEA to provide that "[t]he Secretary shall not enter into an agreement with a contractor or vendor that services loans . . . unless, as part of that agreement, such contractor or vendor asserts that the contractor or vendor will provide information to the Director of the [CFPB] or the ombudsman of the [CFPB] . . . as requested by the Director of the [CFPB] or that ombudsman.").

[260] *See id.* § 5(b)(1). *See generally* "Role of the Consumer Financial Protection Bureau."

[261] *See, e.g.*, Student Loan Servicing All. v. Dist. of Columbia, 351 F. Supp. 3d 26, 75 (D.D.C. 2018) ("[T]he D.C. Law and Final Rules are preempted under principles of conflict preemption as they relate to the servicing of FDLP and Government-Owned FFELP loans, but not with respect to Commercial FFELP loans.").

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.