## APPENDIX OF UNPUBLISHED OPINIONS

1. *Donacy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007 (D.N.J. Mar. 14, 2012)

2. *S.F. by K.F. v. . Dist. of Upper Dublin*, No. 17-4328, 2021 WL 1979501 (E.D. Pa. May 18, 2021)

3. *U.S. ex rel Hlywiak v. Great Lakes Educ. Servs., Inc.,* No. 1:20-cv-13590, 2022 WL 787957 (D.N.J. Mar. 15, 2022)

1

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

KeyCite Yellow Flag

Distinguished by  In re TD Bank, N.A.,  D.S.C.,  December 10, 2015

2012 WL 869007
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Dave DONACHY, et al., Plaintiffs,

v.

INTRAWEST U.S. HOLDINGS,
INC., and Playground Destination
Properties, Inc., Defendants.

Civil Action No. 10–4038 (RMB/KMW).
|
March 14, 2012.

**Attorneys and Law Firms**

Benjamin F. Johns, Esquire, Joseph G. Sauder, Esquire, Chimicles & Tikellis, LLP, Haverford, PA, for Plaintiffs.

Aaron Van Nostrand, Esquire, Cory M. Gray, Esquire, Greenberg Traurig LLP, Florham Park, NJ, for Defendants.

**OPINION**

BUMB, District Judge.

*1 Plaintiffs Dave Donachy, Carol Donachy, Anthony DiMeglio, Susan DiMeglio, Andrew Wingfield, Charlene Wingfield, Richard Kucharski, Suzanne Kucharski, Vincent LaRocca, Donna LaRocca, and Ali Imtiaz ("Plaintiffs") bring this suit in their own names, and on behalf of a class of similarly situated individuals, against Defendants Intrawest U.S. Holdings, Inc. ("Intrawest") and Playground Destination Properties, Inc. ("Playground") (collectively the "Defendants").[1] Defendants have moved for judgment on the pleadings and to strike Plaintiffs' class action allegations. For the reasons that follow, Defendants' motion for judgment on the pleadings is GRANTED. Because this Court dismisses Plaintiffs' individual claims, and

class allegations are not viable unmoored to any viable individually named Plaintiffs, Plaintiffs' class claims are also dismissed.

*I. Background*

Plaintiffs are eleven individuals from New Jersey, New York, and Connecticut, who purchased condominium units in a luxury resort called "Veranda" on the island of Turks and Caicos.[2] *See* FAC ¶¶ 21–25. Defendants marketed and sold the units to individuals and were compensated on a commission basis. (FAC at ¶¶ 23, 33.)

In connection with their purchases, Plaintiffs were required to pay a deposit equal to 20% of the ultimate purchase price. (FAC at ¶ 25.) According to Plaintiffs, prior to making the deposits, Defendants represented that the deposit would be safe from any "unforeseen circumstances." (FAC at ¶ 26.) Specifically, Plaintiffs allege that Defendants utilized a marketing brochure, which represented that: "Veranda will require only a 20% down payment and these funds will be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period." (FAC ¶ 27; *see* Pl.Ex. A to Compl.)[3] Defendants' representatives also are alleged to have repeatedly assured Plaintiffs over the telephone and by e-mail "that their deposits would be safe in all circumstances." *Id.* Plaintiffs' agreements with Cherokee Ltd. ("Cherokee"), the seller of the condominium units, however, contain an acknowledgment that no representations made by Cherokee or its agents influenced or induced Plaintiffs to enter into the purchase agreements and disclaim reliance on "any information or forecasts of any nature whatsoever" including in promotion material provided to Plaintiffs. (Pl.Ex. B to Compl. at 11.3.)[4]

Notwithstanding this disclaimer, Plaintiffs claim that they relied on the representation that their deposits would be safe and made deposits for purchase of the condominiums to Cherokee. (*See, e.g.,* FAC ¶ 41.) Plaintiffs' agreements with Cherokee provided that the deposit could be utilized in funding costs related to the condominium development, but would otherwise be held by Cherokee's attorneys in an interest bearing account. (*See e.g.* FAC Ex. B.) The agreement provides for the deposit to be refunded in the event

2012 WL 869007

Cherokee failed to complete its obligations under the agreement, but does not otherwise provide for a refund of the deposit. (*See e.g.* FAC Ex. B.) Some Plaintiffs paid their deposits in installments. (FAC ¶ 41, 53.) It is unclear from the FAC whether Defendants continued to repeat the alleged misrepresentations to the Plaintiffs who paid in installments, between the installments. However, it is clear that, after making the deposits, all of the Plaintiffs allege that they were again reassured that their deposits would be safe. (*See e.g.* FAC ¶¶ 42, 43, 55.) But, despite the assurances made by Defendants, Cherokee exhausted the deposits and filed for bankruptcy, without completing the condominium project. (FAC ¶ 28, 29.) The named Plaintiffs now seek the recovery of their individual deposits, which range in size from $70,180 to $135,180.

II. *Standard*

*2 To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sheridan v. NGK Metals Corp.,* 609 F.3d 239, 262–63, n. 27 (3d Cir.2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949).

The Court conducts a three-part analysis when reviewing a claim:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Iqbal,* 129 S.Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions are not entitled to the assumption of truth." *Id.* at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*

*Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir.2010); *see also Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir.2009) ("... [A] complaint must do more than allege the plaintiff's entitlement to relief.

A complaint has to 'show' such an entitlement with its facts.").

Claims premised on fraud must, under Federal Rule of Civil Procedure 9(b) ( "Rule 9(b)"), do more. Plaintiffs claiming fraud or mistake must allege, at a minimum, the "who, what, when, where and how" of the events at issue, "or otherwise inject precision or some measure of substantiation into a fraud allegation." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 276, (3d Cir.2006); *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir.2007). Where allegations of fraud are brought against multiple defendants, the complaint must "plead with particularity ... the [specific] allegations of fraud" applicable to each defendant. *MDNet, Inc. v. Pharmacia Corp.,* 147 F. App'x 239, 245 (3d Cir.2005).

III. *Discussion*

Plaintiffs, on behalf of themselves and a purported class of similarly situated individuals, allege five causes of action against Defendants: (1) violation of the New Jersey Consumer Fraud Act ("NJCFA"); (2) violation of Connecticut's Unfair Trade Practices Act ("CUTPA"); (3) violation of Section 349 of the New York General Business Law ("NY Section 349"); (4) negligent misrepresentation; and (5) unjust enrichment. These claims all arise out of Defendants' alleged misrepresentations regarding the safety of Plaintiffs' deposits and Plaintiffs' loss of the deposit moneys. The Court addresses each claim in turn before turning to the viability of Plaintiffs' class allegations.

A. *Plaintiffs' NJCFA Claim*

Plaintiffs claim that Defendants made both material misrepresentations and omissions concerning the safety of Plaintiffs' deposits, causing Plaintiffs to suffer the loss of their deposits. Those allegations can be divided into three categories: (1) allegations based on the brochure's representation that the deposit would be safe from all unforeseen circumstances; (2) allegations of generalized statements by Defendants that that Plaintiffs' deposits would be "safe in all circumstances"; and (3) a generalized allegation that Defendants failed to disclose material information concerning the deposits. Defendants have moved for dismissal of Plaintiffs' NJCFA claim based on Plaintiffs' alleged failure to plead with particularity pursuant to Rule 9(b) and failure to allege causation.

**\*3** Claims under the NJCFA are subject to the heightened pleading requirements of Rule 9(b). *FDIC v. Bathgate,* 27 F.3d 850, 876 (3d Cir.1994) (applying Rule 9(b) to NJCFA claim). More generally, in order to state a claim under the NJCFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss. The first element may be satisfied through either: "an affirmative misrepresentation, even if not made with knowledge of its falsity or with an intent to deceive; the knowing omission or concealment of a material fact, accompanied by an intent that others rely upon the omission or concealment; or a violation of a specific regulation promulgated under the NJCFA." *Billings v. Am. Exp. Co.,* No. 10–3487, 2011 WL 5599648, at \*9 (D.N.J. Nov.16, 2011).

A pervasive defect of the FAC is that Plaintiffs lump the two Defendants together referring to them collectively as "Intrawest." (FAC at ¶ 18.) Under Rule 9(b), however, Plaintiffs are required to detail the allegations of fraud against each defendant individually. *MDNet,* 147 F. App'x at 245. Plaintiffs' failure to do so here is fatal to the FAC. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91 Civ. 2923, 1994 WL 88129, at \*7 (S.D.N.Y. Mar.15, 2004) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)."); *Esposito v. I–Flow Corp.,* No. 10–cv–3883, 2011 WL 5041374, at \*4 (holding that a "complaint that lumps together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations.") (quotations and citation omitted).

Even assuming this defect were corrected, Plaintiffs' Complaint still contains deficiencies that would warrant dismissal of all but Plaintiffs' first NJCFA claim. Only Plaintiffs' allegations based on the brochure would survive 9(b) scrutiny. While Plaintiffs have not provided the exact timing of when the brochure was provided to each plaintiff, they have otherwise injected enough precision into their claims to satisfy Rule 9(b). Plaintiffs have: indicated the specific portion of a specific document they claim constitutes a misrepresentation[5]; alleged that they received the brochure prior to making their deposits; and alleged that the brochure was provided to them by Defendants. However, Plaintiffs second and third claims would fail. Plaintiffs have failed to provide the who[6], what, when, where, and how, or otherwise provide factual detail, regarding Plaintiffs' second claim—the allegedly repeated misrepresentation that the deposits would be "safe in all circumstances." These allegations simply do not provide sufficient notice under Rule 9(b). With respect to the third claim, the alleged omissions, Plaintiffs were required, and failed, to allege what material facts Defendants knew and failed to disclose concerning the risks associated with the deposits. *In re Magnesium Oxide Antitrust Litig.,* No. 10–5943, 2011 WL 5008090, at \*26 (D.N.J. Oct.20, 2011) (holding that a plaintiff, under Rule 9(b), must plead a specific omission of a material fact and the defendant's knowledge of it); *Hughes v. Panasonic Consumer Elecs. Co.,* No. 10–846, 2011 WL 2976839, at \*12–14 (D.N.J. July 21, 2011) (finding that the complaint had failed to allege the defendants' awareness of, and failure to disclose, a material fact where it only conclusorily asserted such). They have instead only offered the conclusory assertion that Defendants knew and failed to disclose material facts concerning the safety of the deposits. (FAC ¶ 127.) Therefore, even assuming Plaintiffs had properly delineated their allegations as against the two defendants, only Plaintiffs' allegations based on the brochure would be sufficient to satisfy Rule 9(b).

**\*4** All three categories of allegations also fail to properly allege causation as required. While claims under the NJCFA do not require a demonstration of reliance by the plaintiff, the causal nexus element still requires that a plaintiff allege that, but for the alleged misrepresentation, it would not have suffered the loss at issue. *Maniscalco v. Brother Int'l Corp.,* 627 F.Supp.2d 494, 503–04 (D.N.J.2009) (holding that, for purposes of satisfying the causal nexus requirement, "it is sufficient if a plaintiff avers that 'had the alleged [d]efect been disclosed, consumers would not have purchased [defendant's product].' ") (citation omitted); *Zebersky v. Bed Bath & Beyond, Inc.,* No. 06–CV–1735, 2006 WL 3454993, at \*3 (D.N.J. Nov. 29, 2006) (holding that misrepresentation must have induced purchase to meet causal nexus requirement); *Acrand v. Brother Int'l Corp.,* 673 F.Supp.2d 282,

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

304 (D.N.J.2009) (finding that an allegation that the plaintiffs would not have made the purchases at issue but for the alleged misrepresentations at issue to be sufficient to satisfy the NJCFA's causation requirement); *In re Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litig.,* 701 F.Supp.2d 356, 380 (E.D.N.Y.2010) ("Courts have found it sufficient where plaintiffs claim that but for defendant's misrepresentations they never would have purchased defendant's products. CFA plaintiffs have fallen short, however, where they alleged a price inflation theory, which New Jersey courts have found insufficient to show the requisite ascertainable loss or causation.") (interpreting NJCFA). Plaintiffs have not alleged that, had the truth regarding these alleged misrepresentations and omissions been disclosed, they would not have agreed to purchase the condominiums, or, in the case of deposits made in installments, continued making deposit payments. Neither have they alleged that, had the truth been disclosed following their deposits, when Plaintiffs claim that these misrepresentations were instead repeated, that they would have sought, and been able to obtain, a refund of their deposits. *See Wiatt v. Wingston & Strawn, LLP,* No. 10–6608, 2011 WL 2559567, at *7–8 (D.N.J. June 27, 2011) (finding that plaintiffs had failed to adequately plead causation in negligent misrepresentation claim where alleged misrepresentations occurred *after* transfers that were basis for loss claim were made and plaintiffs had not sufficiently pled that they would have "demanded" and "recovered" the funds at issue if truth had been disclosed). Therefore, Plaintiffs' NJCFA claim must be dismissed for this additional reason.

### B. *Plaintiffs' CUTPA Claim*

CUTPA claims are similarly subject to heightened pleading under Rule 9(b) when they are based on fraud and similarly require that plaintiffs demonstrate that the alleged unfair practice caused the plaintiffs' injury. *Empower Health LLC v. Providence Health Solutions LLC,* No. 3:10–CV–1163, 2011 WL 2194071, at *5–6 (D.Conn. June 3, 2011) (holding that Rule 9(b) applies to CUTPA claims premised on fraud); *Haesche v. Kissner,* 229 Conn. 213, 640 A.2d 89, 94 (Conn.1994) (holding that a plaintiff in a CUTPA failure to warn case could not demonstrate causation because he could not show that he would not have purchased the product at issue if the defect had been properly disclosed).

**\*5** Plaintiffs' CUTPA claims are based on the same conduct as their NJCFA claims. Defendants argue, and Plaintiffs do not dispute, that Plaintiffs' CUTPA claim, as pled, is subject to Rule 9(b). Therefore, this Court will apply Rule 9(b) to Plaintiffs' CUTPA claim. Defendants contend that Plaintiffs' CUTPA claim has the same Rule 9(b) and causation infirmities as Plaintiffs' NJCFA claim. Because both claims are based on the same allegations and subject to the same Rule 9(b) and causation pleading requirements, this Court agrees. Plaintiffs' CUTPA claims are therefore dismissed.

### C. *Plaintiffs' N.Y. Section 349 Claim*

Plaintiffs' N.Y. Section 349 claim is premised on the same alleged misrepresentations described above. Defendants concede that this claim is not subject to the heightened pleading requirements of Rule 9(b). They are correct. *Pelman ex rel. Pelman v. McDonald's Corp. .,* 396 F.3d 508, 511 (2d Cir.2005). Plaintiffs claiming a violation of N.Y. Section 349 must allege that the "defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Goshen v. Mut. Life Ins. Co. of New York,* 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190, 1195 (N.Y.2002). Applying this rule, courts have required that plaintiffs demonstrate that the allegedly deceptive conduct is the "but for" cause of the alleged injury. *City of New York v. Smokes–Spirits.com, Inc.,* 12 N.Y.3d 616, 883 N.Y.S.2d 772, 911 N.E.2d 834, 839 (N.Y.2009). While affording plaintiffs a broad ability to "address commercial misconduct", the territorial reach of section 349 is limited: "the deception of a consumer must occur in New York." *Goshen,* 746 N.Y.S.2d 858, 774 N.E.2d at 1195. Notably, the statute's reach "does *not* turn on the residency of the parties"—only the locus of the transaction. *Id.* at 1196 (emphasis added).

Defendants argue, and this Court agrees, that Plaintiffs' claim is deficient in two respects. First, for the reasons described above, Plaintiffs were required, but failed, to establish that the alleged misrepresentations were the "but for" cause of their injuries. Second, though Plaintiffs include New York residents, Plaintiffs have not alleged that any of the named Plaintiffs

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

were deceived in New York, as required. Therefore, Plaintiffs' section 349 claim must be dismissed.

#### D. *Plaintiffs' Negligent Misrepresentation Claim*

Plaintiffs' negligent representation claim is based on two allegations. First, Plaintiffs claim that Defendants made misrepresentations regarding the safety of the deposits because they should have known that the deposits at issue would not be safe in the event Cherokee went bankrupt. Second, the FAC also vaguely alludes to representations made by Defendants regarding the financial health of Cherokee. (FAC ¶ 154, "Intrawest's representations regarding the financial health of Cherokee (the construction company) were incorrect statements."). Plaintiffs claim that these statements were incorrect, that Defendants were negligent in making them, and that Plaintiffs justifiably relied on them to their detriment. (FAC ¶ 154–56.) The parties dispute whether a claim of negligent misrepresentation must be pled under Rule 9(b). However, because Plaintiffs' negligent misrepresentation claim is specifically alleged as a separate claim, it is not subject to Rule 9(b)'s heightened pleading requirements, notwithstanding the significant overlap in allegations between the claims. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d at 272–74 (holding that Rule 9(b) does not apply to negligence based misrepresentation claims); *Kirtley v. Wadekar*, No. 05–5383, 2006 WL 2482939, at *2 (D.N.J. Aug.25, 2006) (holding that, where negligent misrepresentation is alleged as its own cause of action, it is not subject to Rule 9(b)). [7]

**\*6** Defendants contend, and Plaintiffs do not dispute that the viability of the negligent misrepresentation claim should be judged based on the laws of New York, Connecticut, and New Jersey, the three states in which the named Plaintiffs reside. Because the parties do not dispute the application of these bodies of law, this Court will apply them in assessing this claim. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir.2001) (applying New Jersey law where there was no dispute as to its application).

In order to state a negligent misrepresentation claim, under all three states' laws, the plaintiff must allege, among other elements, (a) the furnishing of a false statement (*Masone v. Levine*, 382 N.J.Super. 181,

187, 887 A.2d 1191 (N.J.Super.Ct.App.Div.2005); *Mandarin Trading, Ltd. v. Wildenstein*, 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104, 1109 (N.Y.2011); *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 657 A.2d 212, 220 (Conn.1995)), (b) reasonable reliance on that statement (*Id.*), and (c) that the false statement was the proximate cause of the loss at issue. *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 438 (3d Cir.2007) (holding that negligent misrepresentation requires that the misrepresentation be the proximate cause—i.e. a substantial contributing factor to the loss); *Amusement Indus., Inc. v. Stern*, 786 F.Supp.2d 758, 776 (S.D.N.Y.2011) (holding that, under New York law, plaintiffs must allege transaction causation—that, but for the defendant's wrongful acts, the plaintiffs would not have entered into the transaction that resulted in their losses); *Johnson v. Chesebrough–Pond's USA Co.*, 918 F.Supp. 543, 548–49 (D.Conn.1996) (holding that, for a negligent misrepresentation claim under Connecticut law, a plaintiff must show at least "but for" causation).

Defendants argue, among other things, that Plaintiffs' negligent misrepresentation claim fails to meet *Twombly/Iqbal* 's test for plausibility and fails to properly allege causation. First, with respect to Plaintiffs' claim of alleged misrepresentations concerning Cherokee's financial health, Plaintiffs have failed to point to any statements by Defendants concerning Cherokee's financial health that were false. This deficiency is fatal to this claim of negligent misrepresentation. Second, both that claim, and Plaintiffs' claim based on the alleged assurances of safety by Defendants, fail to adequately plead proximate causation. As discussed above, Plaintiffs have failed to plead that the alleged misrepresentations were the "but for" cause of the alleged injuries. Therefore, Plaintiffs' negligent misrepresentation claim must be dismissed in its entirety on this basis. [8]

#### E. *Plaintiffs' Unjust Enrichment Claim*

Plaintiffs' unjust enrichment claim is premised on the same conduct as their other claims. Defendants argue that this claim must be dismissed for three reasons: (1) failure to satisfy Rule 9(b); (2) failure to establish, for the New Jersey Plaintiffs, that those Plaintiffs expected remuneration from Defendants at the time the deposits were made, and for the remaining Plaintiffs, failure to

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

establish that the benefits conferred upon Defendants, the commissions paid to them by Cherokee, were direct; and (3) failure to meet *Twombly/Iqbal.*

### 1. Defendants' Rule 9(b) Argument

**\*7** This Court agrees with Defendants' first argument, in part. To the extent Plaintiffs' claim is premised on allegations sounding in fraud, it must be dismissed for failure to satisfy the requirements of Rule 9(b) for the reasons discussed above. Similarly, however, as discussed above, to the extent it is premised on allegations of negligence, it need not satisfy Rule 9(b).

### 2. Defendants' Directness of Benefit / Expectation of Remuneration Argument

With respect to Defendants' second argument, this Court agrees, in part. Defendants again argue that Plaintiffs' unjust enrichment claim's viability depends upon the law of the three states in which the named Plaintiffs reside, with the named Plaintiffs subject to the law of the state of their residency. Again, because Plaintiffs do not dispute the application of these laws to the named Plaintiffs, this Court will apply those laws in considering the viability of Plaintiffs' claim in the manner proposed by Defendants. *See Transportes Ferreos,* 239 F.3d at 560.

### a. New Jersey Law

Under New Jersey law, the New Jersey Plaintiffs were required, and failed, to allege that they expected remuneration from Defendants when they made the purchases at issue. *Amgro, Inc. v. Lincoln Gen'l Ins. Co.,* 361 F. App'x 338, 346 n. 10 (3d Cir.2010) (stating the general rule that, under New Jersey law, an unjust enrichment claim requires that the plaintiff show that it expected remuneration from the defendant at the time it conferred a benefit); *In re Philips/Magnavox Television Litig.,* No. 09–3072, 2010 WL 3522787, at \*10 (D.N.J. Sept.1, 2010) (holding that a plaintiff must show that it expected remuneration at the time it conferred a benefit upon the defendant) (applying New Jersey law). Therefore, dismissal of the New Jersey Plaintiffs' unjust enrichment claim is warranted.

### b. New York Law

New York law, in contrast, allows for looser claims of unjust enrichment, allowing claims to proceed without privity, or "direct dealing". *Waldman v. New Chapter, Inc.,* 714 F.Supp.2d 398, 403 (E.D.N.Y.2010) [9] . What New York law does require is subject to some dispute. While the New York Court of Appeals has made clear that the relationship between the parties cannot be "too attenuated" (*Id.* at 403–04 (citing to the New York Court of Appeals)), there is debate about the closeness of this relationship necessary to establish a claim. *See Georgia Malone & Co., Inc. v. Ralph Rieder,* 86 A.D.3d 406, 926 N.Y.S.2d 494 (N.Y.App.Div.2011).

That debate centers on the decision of the New York Court of Appeals in *Mandarin Trading Ltd. v. Wildenstein. Id.* There, the New York Court of Appeals held that, although privity was not required to sustain an unjust enrichment claim, a claim would not be supported where "the connection between the parties is too attenuated." 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (N.Y.2011). The Court held that the unjust enrichment claim failed this requirement because it lacked "allegations that would indicate a relationship between the parties, or at least an awareness" by the defendant of the plaintiff's existence. *Id.* It further held that "there are no indicia of an enrichment that was unjust where the pleadings failed to indicate a relationship between the parties that could have caused reliance or inducement." *Id.* at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104. Several courts have interpreted the decision as requiring that, to satisfy the relationship element, the plaintiff must allege more than mere awareness of the plaintiff by the defendant, but that the relationship could have caused reliance or inducement on the plaintiff's part. *Barbagallo v. Marcum LLP,* No. 11–CV–1358, 2011 WL 5068086, at \*13 (E.D.N.Y. Oct.25, 2011); *Georgia Malone,* 86 A.D.3d at 409, 926 N.Y.S.2d 494. That notion was hotly disputed in dissent in *Georgia Malone & Co., Inc. v. Ralph Rieder,* with the dissent arguing that only knowledge or awareness of the plaintiff by the defendant was required. *Id.* at 500 (in dissent).

**\*8** This Court interprets *Mandarin* to require a plaintiff to allege a relationship that is not overly attenuated and no more or less. [10] While *Mandarin* made clear that a lack of awareness by the defendant of the plaintiff would doom the claim, it did not hold that the minimal showing of mere awareness

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 869007

would necessarily satisfy the relationship requirement. *Mandarin,* 16 N.Y.23d at 182. Neither did it hold that the far more substantial showing of "a relationship between the parties that could have caused reliance or inducement" was necessary to satisfy the relationship requirement. *Id.* The lack of a relationship capable of causing reliance or inducement was addressed in the context of assessing whether plaintiffs had alleged an enrichment that was *unjust. Id.* at 182–83. In that case, and on those facts, the lack of such a relationship was fatal to the plaintiff's claim that the enrichment would cause an injustice. *Id.* ("Moreover, under the facts alleged, there are no indicia of an enrichment that was unjust where the pleadings failed to indicate a relationship ...").

Therefore, whether a plaintiff has alleged a sufficient closeness of relationship must be determined on the facts alleged. Here, Defendants are alleged to have directly solicited Plaintiffs to make investments, Plaintiffs made the investments, and Defendants were compensated based on those investments with commissions. On those facts, the relationship between the New York Plaintiffs and Defendants is not so attenuated as to require dismissal on this basis. Even under the more exacting standard of a relationship capable of causing reliance or inducement, required by other courts but not this Court, Plaintiffs have alleged sufficient facts for the New York Plaintiffs to survive a motion to dismiss on this basis under New York law.

c. Connecticut Law

Similarly, Connecticut law does not require that the benefit be conferred directly by the plaintiff on the defendant. *Town of New Hartford v. Connecticut Resources Recovery Auth.,* 291 Conn. 433, 970 A.2d 592, 618 (Ct.2009) ("Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit."). Accordingly, the Court will not dismiss the Connecticut Plaintiffs' unjust enrichment claim on this basis.

3. Defendants' *Twombly/Iqbal* Argument

Despite this Court's findings above, the unjust enrichment claims must be dismissed on *Twombly/Iqbal* grounds. Under all three states' laws, a finding of unjust enrichment requires that there be some injustice. *Banco Espirito Santo De Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537, 2003 WL 23018888, at *17 (S.D.N.Y. Dec. 22, 2003) (holding that, under New York law, if there are no facts supporting a finding of an injustice, then there can be no claim of unjust enrichment); *Cent. Reg'l Employees Benefit Fund v. Cephalon, Inc.,* No. 09–3418, 2010 WL 1257790, at *5 (D.N.J. Mar.29, 2010) (requiring an injustice under New Jersey law); *Town of New Hartford,* 970 A.2d at 609 (requiring that retention of the benefit be unjust under Connecticut law).

**\*9** Where, as here, Plaintiffs have failed to aver allegations sufficient to support the underlying conduct on which the unjust enrichment claim is based, there is no injustice and Plaintiffs' unjust enrichment claim must be dismissed. *See Steamfitters Local Union 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 937 (3d Cir.1999) (dismissing unjust enrichment claim where court had dismissed underlying tort claims upon which it was based due to lack of causation); *Noble Sys. Corp. v. Alorica Cent., L.L.C.,* 543 F.3d 978, 987 (8th Cir.2008) (dismissing unjust enrichment claim where underlying claims had been dismissed); *Cleary v. Philip Morris Int'l,* 656 F.3d 511, 517 (7th Cir.2011) ("What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute. So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim."); *Central Regional,* 2010 WL 1257790, at *5 (dismissing unjust enrichment claim where there was no showing of causation in underlying torts); *Allianz Risk Transfer v. Paramount Pictures Corp.,* No. 08 Civ. 10420, 2010 WL 1253957, at *10 (S.D.N.Y. March 31, 2010) ("Here, because all underlying fraud claims are to be dismissed, the claim for unjust enrichment must also be dismissed.") (applying New York law); *Delino v. Platinum Cmty. Bank,* No. 09–CV–00288, 2009 WL 2366513, at *8 (S.D.Cal. July 30, 2009) (dismissing unjust enrichment claim for lack of a showing of unjustness, where the

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

court had dismissed plaintiffs' claim upon which the unjust enrichment claim was predicated).

*F. Plaintiffs' Class Allegations*

Defendants have also moved for dismissal of Plaintiffs' class allegations. Defendants argue that class treatment was inappropriate for two reasons: (1) that the class action was not superior to individual litigation because Plaintiffs' non-statutory state law claims would require complex choice of law issues; and (2) that common issues did not predominate because the alleged misrepresentations were non-uniform and because there were individualized issues of causation.

The Court need not resolve these issues at this time. Because this Court dismisses all of Plaintiffs' individual claims, and Plaintiffs' purported class has not yet been certified, Plaintiffs' class allegations must also be dismissed. *Bass v. Butler,* 116 F. App'x 376, 385 (3d Cir.2004) (dismissing class claim where individual claims had been dismissed pre-certification); *In re Aspartame Antitrust Litig.,* No. 2:06–CV–1732, 2008 WL 4724094, at *8 (E.D.Pa. Aug. 11, 2008) (dismissing entire action where no class had been certified and all the claims of the class representatives had been dismissed); *Kruse v. Wells Fargo Home Mortgage, Inc.,* No. 02–CV–3089, 2006 WL 1212512, at *9 (E.D.N.Y. May 3, 2006) (holding that, where the named plaintiffs are dismissed prior to class certification, the case must be dismissed as moot).

*10 However, in the interests of judicial economy, the Court notes that it is highly skeptical of the suitability of Plaintiffs' claims for class treatment for two reasons. First, Plaintiffs are unlikely to be able to satisfy the class action predominance requirement, which requires that common questions of law or fact predominate over individualized inquiries. *In re LifeUSA Holding Inc.,* 242 F.3d 136, 144 (3d Cir.2001) (citing to Rule 23). To the extent Plaintiff relies on claims of misrepresentation by Defendants in non-standardized communications, the alleged misrepresentations will require individualized proof. *Id.* at 146–47 (3d Cir.2001) (finding common issues did not predominate where alleged misrepresentations were non-uniform). And all of Plaintiffs' claims of misrepresentation will require individualized causation inquiries. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.,* 192

N.J. 372, 929 A.2d 1076, 1087 (N.J.2007) (recognizing that proof of an NJCFA claim, like the one here, requires inquiry into the individualized decision-making of each purchaser); *Nafar v. Hollywood Tanning Sys., Inc.,* 339 F. App'x 216, 222–23 (3d Cir.2009) (same); *Demmick v. Cellco P'ship,* No. 06–2163, 2010 WL 3636216, at *17 (D.N.J. Sept.8, 2010) (recognizing that the NJCFA causation element generally depends upon proof of the individual motivations of the plaintiffs).

Second, it is questionable whether Plaintiffs could meet Rule 23's requirement that the class action device be superior to individual litigation. *In re LifeUSA Holding Inc.,* 242 F.3d at 143–44. The superiority of the class action here is undercut by the potential need to apply 50 different state laws to Plaintiffs' non-statutory state law claims. Plaintiffs argue in a letter submission that the recently decided case of *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 301–03 (3d Cir. Dec.20, 2011) supports the notion that variations in state law do not defeat the commonality and predominance necessary to sustain a Rule 23(b)(3) class action. But that case stands for two more limited propositions: (1) that those requirements are not defeated where the varying state laws can be grouped into common manageable patterns; and (2) those concerns, because they largely relate to manageability, are further diminished in the settlement class context, where there are no manageability issues. *Id.* Here, litigation of the Plaintiffs' non-statutory state law claims would likely require the application of many different states' laws with varying elements and it is unclear that these states could be successfully broken into subgroups with common elements. Briefing the unjust enrichment and negligent misrepresentation claims of the three states at issue on the motion to dismiss has already exposed the difficulty in finding common ground between various states' common law claims, given the oftentimes subtle differences between the states. It is questionable, under these circumstances, in a non-settlement class, that the class action is a superior mechanism to litigate these claims, particularly given the fact that Plaintiffs' claims appear to be significant enough to support individual litigation. *In re Community Bank of N. Va.,* 418 F.3d 277, 309 (3d Cir.2005) ("The presence of certain class members with significant ... claims may counsel against a finding of superiority, but these individuals

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

can opt-out and pursue their claims individually."); *Gray v. Bayer Corp.,* No. 08–4716, 2011 WL 2975768, at *11 (D.N.J. July 21, 2011) (raising the same concern in rejecting class certification).

### IV. Conclusion

  **\*11** For all these reasons, Plaintiffs' First Amended Complaint is DISMISSED without prejudice. Because this Court cannot say that leave to amend would be futile, and given the liberal standard of amendment, Plaintiffs are granted thirty days to amend their complaint. *Prof'l Benefit Consultants, Inc. v. Claims and Benefits Mgmt., Inc.,* No. 4962, 2011 WL 6012932, at *4 (D.N.J. Dec.1, 2011). An appropriate order will follow the issuance of this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 869007

---

### Footnotes

1    Plaintiffs' First Amended Complaint ("FAC") refers to Intrawest and Playground collectively as "Intrawest." (FAC ¶ 18 .) The Court refers to these parties collectively as "Defendants."

2    The allegations contained in the Amended Complaint are accepted as true for purposes of the motion for judgment on the pleadings.

3    The brochure was attached as an exhibit to Plaintiffs' First Amended Complaint. This Court may consider materials attached to a complaint, like the brochure, on a motion to dismiss. *See ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994) ("When reviewing a complaint, a court should consider not only the allegations contained in the complaint itself but also the exhibits attached to it which the complaint incorporates pursuant to *Fed.R.Civ.P. 10(c)."* ).

4    The Plaintiffs attached a copy of the named Plaintiffs' agreements with Cherokee. Because the agreements between Plaintiffs and Cherokee were attached to the First Amended Complaint, this Court may consider them on a motion to dismiss. *See ALA, Inc.,* 29 F.3d at 859.

5    Defendants did not present argument on, and, therefore, this Opinion does not resolve, the question of whether the brochure's representation regarding the deposit was, in fact, a misrepresentation. The brochure represented that "Veranda will require only a 20% down payment and these funds will be held in an interest bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period." According to the Plaintiffs' purchase agreements, the deposits were to be held in a trust account by Cherokee's attorneys, but could be utilized to meet expenses related to the construction of the condominiums. Plaintiffs have not alleged that the deposits were not held in the manner promised or utilized for any improper purpose, only that the deposits were not as safe as allegedly represented. The nature of that representation is key. Defendants only represented in the brochure that the deposits would be safe from unforeseen circumstances, not all circumstances. Based on the sales agreements, and the risk inherent in any construction project, the possibility that the deposits could be exhausted but the project uncompleted appears to be a foreseeable and known risk.

6    In contrast to the brochure, which, for notice purposes, it is sufficient that Plaintiffs allege that it was distributed by a specific Defendant, for this claim, Plaintiffs must offer some identifying detail as to what specific individuals made these misrepresentations. This is because, while Rule 9(b) generally requires that the plaintiff identify the specific individual who made the misrepresentation at issue, claims of misrepresentation based on a standardized document, like the one alleged

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)

2012 WL 869007

here, do not require the same level of precision to put the defendant on sufficient notice under Rule 9(b). *See Gilmore v. Southwestern Bell Mobile Sys., L.L.C.,* 210 F.R.D. 212, 224 (N.D.Ill.2001) (holding that, while generally "the identity of the person who made the misrepresentation" must be alleged, that Plaintiff need not do so in the context of a "mass mailing"); *3525 N. Reta, Inc. v. FDIC,* No. 10 C 3087, 2011 WL 62128, at *3 (N.D.Ill. Jan.6, 2011) ("When the alleged misrepresentations are contained in standardized documents of a single corporate defendant, Rule 9(b) does not require that the actual author of the documents be specifically identified.").

7    In *In re Suprema Specialties, Inc. Sec. Litig.,* the Third Circuit found that Rule 9(b) did not apply to claims predicated on negligent misrepresentations. That decision was premised on the Circuit's finding that such claims did not "sound in fraud" because "the reputational concerns that animate" the Rule "are not implicated when a defendant stands accused of nothing more than negligence." 438 F.2d at 274.

This Court observes that the decision did not examine the reputational consequences of allegations of higher degrees of negligence, or whether, as a general matter, allegations of negligence, in the business context, may have similar reputational consequences as allegations of intentional fraud. *See Baltimore County v. Cigna Healthcare,* 238 F. App'x 914, 925 (4th Cir.2007) (finding that the same reputational concerns were present in negligent misrepresentation as in intentional fraud) (in dissent).

Neither did the decision address whether negligent misrepresentation claims might qualify for heightened pleading under Rule 9(b)'s heightened pleading requirement for allegations of mistake. *Breeden v. Richmond Community College,* 171 F.R.D. 189, 199 (M.D.N.C.1997) (noting that rule 9(b) applies to allegations fraud and mistake and should therefore apply to negligent misrepresentation claims, which arise out of a party's misunderstanding of a pertinent fact) (abrogated by *Baltimore County v. Cigna Healthcare,* 238 F. App'x 914 (4th Cir.2007) (finding that negligent misrepresentation claim did not require pleading with particularity but with dissent citing positively to *Breeden* ); *Baltimore,* 238 F. App'x at 925 (noting that Rule 9(b) is not limited to intentional fraud because it covers "fraud and mistake") (in dissent).

Finally, the decision did not address the notice concerns that also motivate the Rule. Generally, the only elemental difference between a negligent misrepresentation and a fraud claim is that the latter requires a specific fraudulent intent. *In re Student Finance Corp.,* 02–11620, 2004 WL 609329, at *3 (D.Del. Mar.23, 2004) ("The only difference between an action for fraud and negligent misrepresentation is that, with a claim of negligent misrepresentation, the plaintiff need not plead that the defendant knew or believed this his or her statement was false or that she proceeded in a reckless disregard for the truth."). Intent, unlike the other elements of a fraud claim, may be plead generally. Rule 9(b) ( "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

8    Defendants made two additional arguments in passing with respect to Plaintiffs' negligent misrepresentation claim: (1) that Plaintiffs failed to allege reasonable reliance in light of the disclaimer of reliance contained in the agreement with Cherokee; and (2) that Plaintiffs' negligent misrepresentation claim fails under New York law because New York law requires, and Defendants lacked, a special relationship of confidence and trust with Plaintiffs. Because this Court dismisses this claim on other bases, it need not address these arguments. The Court notes, however, that, Defendants cited no authority for the former argument and little else beyond a bare citation for the latter.

Donachy v. Intrawest U.S. Holdings, Inc., Not Reported in F.Supp.2d (2012)
2012 WL 869007

     If Defendants wish the Court to consider these arguments in the future, they should furnish the Court with appropriate authority and more detailed legal argument.

9     Defendants cite several cases that appear to require a more direct relationship between the parties to state a claim for unjust enrichment under New York law. *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano,* 331 F.Supp.2d 247, 256 (S.D.N.Y.2004); *Sperry v. Crompton Corp.,* 26 A.D.3d 488, 810 N.Y.S.2d 498, 500 (N.Y.App.Div.2006); *Sybelle Carpet & Linoleum of Southampton, Inc. v. East End collaborative, Inc.,* 167 A.D.2d 535, 562 N.Y.S.2d 205, 206–07 (N.Y.App.Div.1990). These cases all pre-date the decisions of the New York Court of Appeals in *Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (N.Y.2007) and *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (N.Y.2011), in which the Court of Appeals made clear that such a direct relationship was not required. *Sperry,* 8 N.Y.3d at 215, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (rejecting a privity requirement); *Mandarin,* 16 N.Y.3d at 182–83, 919 N.Y.S.2d 465, 944 N.E.2d 1104.

10     A same or similar approach appears to have been taken in *Vertex Const. Corp. v. T.F.J. Fitness, L.L.C.* No. 10–CV–683, 2011 WL 5884209, at *5 (E.D.N.Y. Nov. 23, 2011).

---

**End of Document**        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

2021 WL 1979501
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

S.F., BY his Parents, K.F. and E.I., Plaintiff,
v.
SCHOOL DISTRICT OF
UPPER DUBLIN, Defendant.

No. 17-4328
|
Filed 05/18/2021

**Attorneys and Law Firms**

Shanon S. Levin, Disability Rights Pennsylvania, Philadelphia, PA, Laura E. Caravello, Disability Rights Pennsylvania, Pittsburgh, PA, for Plaintiff.

Michael D. Kristofco, Benjamin A. Andersen, Brian Richard Elias, Wisler Pearlstine, LLP, Blue Bell, PA, for Defendant.

**MEMORANDUM**

ELIZABETH T. HEY, U.S.M.J.

**\*1** Plaintiff, S.F., through his parents K.F. and E.I. ("Plaintiff" or "S.F."), brought suit in 2017 against the School District of Upper Dublin ("Defendant" or the "District"), for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, concerning architectural barriers to S.F.'s motorized wheelchair at Sandy Run Middle School. Doc. 1 ("Comp."). The litigation resulted in a negotiated consent decree approved by the court on September 20, 2018. See Docs. 55 & 63-2 at 1 ("Order"); Consent Decree, Doc. 63-2 at 2-33 ("Consent Decree"). [1] Presently before the court is Plaintiff's motion to enforce the Consent Decree (Doc. 62), and Defendant's response and cross-motion to modify the Consent Decree (Doc. 65). For the following reasons, Plaintiff's motion will be granted and Defendant's cross-motion will be denied. [2]

**I. BACKGROUND**

**A. The Consent Decree**

When the Complaint was filed, S.F. was in the fourth grade, and would begin attending middle school in the sixth grade. Comp. ¶¶ 4, 8. The 29-page Consent Decree mostly pertains to modifications to the existing middle school building to make it accessible to S.F. Consent Decree ¶¶ 4-26. In addition, at the time of the Consent Decree, the District was planning to build a new middle school, which the parties also addressed in the Consent Decree. That building is now under construction, and Plaintiff's motion seeks to compel modifications to the District's plans for the auditorium in the new building. Plaintiff moves pursuant to the Consent Decree's third paragraph, entitled "New middle school facility," which states in full:

a. It is the District's plan to construct a new middle school and associated grounds ("New Middle School"), which is scheduled to be completed for the 2022-23 school year. The District will construct the New Middle School so that it is accessible to and usable by S.F. The District will ensure that the New Middle School fully complies with the 2010 [ADA] Standards for Accessible Design codified at 28 C.F.R. § 36 Appx. A ("2010 ADA Standards"). [3]

b. The District will provide construction plans for the New Middle School sufficient for Plaintiff to determine whether the New Middle School meets the terms of this Consent Decree to Plaintiff by August 9, 2019. Within 30 days of receiving the plans, Plaintiff will submit to Defendant any concern regarding compliance with the 2010 ADA Standards to Defendant. Any agreement regarding modifications to the construction plans will be reduced to writing as an Addendum to this consent decree. If Defendant does not provide corrected plans fully addressing an issue raised by Plaintiff within 30 days of being notified of the issue by Plaintiff, Plaintiff shall have the right to seek enforcement of this Consent Decree or modification of the plans from the Court to reflect the obligations of the District as required by the Consent Decree. Defendant shall not be entitled to claim that a modification cannot be made because making the modification will interfere with or delay the construction schedule. The District will provide a copy of any revised plans to Plaintiff. The agreed-upon plans will be identified in a separate

writing and incorporated into this Consent Decree by reference.

  **\*2**  Id. ¶ 3.

Middle school in the District runs from sixth grade through eighth grade. See Declaration of Steven Yanni, Ed.D. (District Superintendent), Doc. 65-3 ("Yanni Dec."), ¶ 6. S.F. is currently in seventh grade and is scheduled to finish seventh grade at the end of this school year. Id. ¶ 4. As a result, S.F.'s last year in middle school is expected to be the 2021-22 school year. Id. ¶ 5. According to the District, at the time the Consent Decree was executed, it believed that the New Middle School would not be completed until the start of the 2022-23 school year, but it was possible that the New Middle School would be ready in time for some portion of the 2021-22 school year, when S.F. would still be a middle school student. Doc. 65-1 at 2 n.2, 3-4; Declaration of M. Arif Fazil, P.E. (Defendant's engineer), Doc. 65-4 ("Fazil Dec."), ¶ 14. It is now certain that the New Middle School will not be completed for student occupancy until the 2022-23 school year, by which time S.F. will be in ninth grade and no longer attending middle school. Yanni Dec. ¶ 8; Fazil Dec. ¶ 14. Plaintiff does not dispute that S.F. will not be a middle school student in the New Middle School. Declaration of K.F. and E.I., Doc. 68-6, ¶ 6. By its terms, the Consent Decree terminates once S.F. completes middle school, Consent Decree ¶ 47, which as noted is not expected to be until the spring of 2022.

## B. The New Middle School Auditorium

The plans for the New Middle School include a 468-seat[4] auditorium, illustrated by a notated design drawing appended to this Memorandum.[5] The diagram is oriented with the front, or stage end, toward the top of the drawing and the rear, or main entry end, toward the bottom of the drawing. In order from the top of the diagram to the bottom are a corridor with entrance/exit doors to the stage end of the auditorium, the stage with a corridor on either side of the stage, the well or pit area ("well") between the stage and the front row of seats, the seating area, the main entrance/exit doors after the rear row of seats, and a vestibule with entrance/exit doors leading to the outer corridor. In the seating area are fifteen rows of seats divided into three sections (left, center, and right) with four aisles that run

from the well to the rear of the auditorium. All of the entrance/exit doors are accessible.[6] The auditorium includes eight wheelchair accessible seats, marked on the diagram with wheelchair icons. Four are in the first row -- one in the front left, two in the front center, and one in the front right. Four are in the last row -- one in the rear left, two in the rear center, one in the rear right.

  **\*3**  As in a typical auditorium, the level of the floor slopes from the rear toward the front of the stage. Specifically, the floor begins to slope downward after the rear row of seats, and the slope continues evenly ending just before front row of seats. In the well are two sets of steps leading from the well to the stage, one on the left side of the stage and one on the right. At the far right of the well is a platform lift leading between the well level and the stage level.[7]

There is no dispute that the four aisles are the primary paths for non-disabled people using the auditorium seating. There is also no dispute that the aisles are not "accessible routes" for people with mobility disabilities, primarily because the aisles exceed the slope limitations for accessible ramps. LaBrake Dec. ¶ 42; Marinelli Dec. ¶¶ 35-39.[8] The design of not using the aisles as accessible routes is intentional, and the District contends that it is permissible to maintain the necessary line of sight for all viewers from the seats to the stage. LaBrake Dec. ¶ 42.

According to the District, the accessible path for a student using a wheelchair to reach the rear seats is through the rear entrance doors, and the accessible path for a student using a wheelchair to reach the front seats is to enter through the right stage entrance door, follow the corridor along the stage, and then use the lift to descend to the well level. LaBrake Dec. ¶¶ 53-54; Hersh Dec. ¶¶ 46-47. While Defendant's witness declarations are silent on an accessible path to get from the rear of the auditorium to the front or stage area, the diagram explicitly illustrates that the proposed accessible path uses the hallways outside the auditorium. That is, to gain access to the stage from the rear seats, a student using a wheelchair must exit the rear of the auditorium, turn right, turn left at the next hallway, turn left at the end of the long hallway, turn left to enter the right stage entrance door, and then proceed to the stage.[9] If that same student wanted

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

to reach the front row or well, the student would use the lift to descend. Plaintiff's expert estimated from the diagram that a non-disabled student seated at the rear of the auditorium would travel approximately 85 feet to reach the stage, whereas a student using a wheelchair would travel approximately 200 feet to travel the described path. Marinelli Dec. ¶ 45. [10]

### C. Communications Regarding the New Middle School

**\*4** The parties dispute whether Plaintiff raised a timely objection to the District's plans for the auditorium, and therefore I will review the parties' post-Consent Decree communications in some detail. The communications described below were all through the parties' attorneys, and illustrate that the District's planned accessible paths were not immediately apparent to Plaintiff.

Consistent with the Consent Decree, on August 9, 2019, the District sent S.F. an email that contained an internet link to thirteen files containing its plans for the New Middle School. Doc. 65-5; N.T. 04/08/21 at 6. The linked files have not been provided to the court, but it is not disputed that the drawings accompanying the August 9th materials did not mark the proposed accessible routes in the auditorium. [11]

On October 29, 2019, [12] Plaintiff sent Defendant an email attaching a spreadsheet from his accessibility expert, Dominic Marinelli, identifying 117 aspects of the drawings (not just the auditorium) that required clarification to ensure accessibility and compliance with the 2010 ADA Standards. See Doc. 65-6 ("Marinelli Report"); Marinelli Dec. ¶¶ 24-25. [13] On January 19, 2020, the District responded to the Marinelli Report, attaching a memorandum by Ms. LaBrake that reprinted Mr. Marinelli's itemized spreadsheet and set forth itemized responses to each of the 117 contested aspects of the design in a table format. Docs. 63-7 & 65-9 ("LaBrake Response"). Ms. LaBrake as well as the District's other architectural and engineering experts who had participated in planning the New Middle School, Mr. Hersh and Mr. Fazil, also participated in preparing the response. See LaBrake Dec. ¶¶ 32-35; Hersh Dec. ¶27; Fazil Dec. ¶ 32. [14]

**\*5** The relevant entries in the Marinelli Report concerning the auditorium are identified as Issues 40 and Issue 88. As to the accessible route issue identified in Issue 40, Mr. Marinelli noted:

> Depict intended slope at aisles between seating. Assumes 5% maximum.

Doc. 65-6 at 6. In Response T to Issue 40, the LaBrake Response indicated:

> The aisles between the seating ... are not an accessible route. The slope is approximately 10%. A wheelchair lift has been provided to provide access [to] the low end of the auditorium.

Doc. 65-9 at 13.

As to the stage lift identified in Issue 88, Mr. Marinelli noted:

> Confirm platform lift is not intended along the accessible route and only used a limited and specific locations.

Doc. 65-6 at 9. In Response OO to Issue 88, the LaBrake Response stated:

> The platform lift is part of an accessible route allowing a person in a wheelchair to access the pit area of the auditorium from the stage. The lift is in the same area as the general circulation path and is in the same area as the steps leading

from the stage to the lower
auditorium area (pit).

Doc. 65-9 at 14-15; see also N.T. 04/08/21 at 9.

The parties then engaged in lengthy back and forth, ultimately reaching agreement on most aspects of the design, but not the auditorium wheelchair accessibility issues that give rise to the present motion, debate over which lasted the remainder of 2020.[15] For example, in an email on February 10, 2020, Plaintiff stated, "[i]t appears that, in large part, we are in agreement on the substance and it is just a matter of documentation. In some cases, additional information needs to be provided." Doc. 65-10. The attachment noted that Issue 40 remained open and that "we need an accessible route. Id. at 8. As to Issue 88, Plaintiff noted "Since used in limited application, will comply," and marked this issue "Closed." Id. at 12.[16]

In its response emailed on February 29, 2020, the District updated its Response T addressing Issue 40, stating:

> This response assumes that
> the review comment is
> with regards to ADA
> Standard 221.2.3.2 Vertical
> Dispersion.[17] This standard
> requires that wheelchair spaces
> be located at varying distances
> from the performing area. The
> accessible seating locations in
> this Auditorium are located
> along an accessible route at
> the front and rear of the
> Auditorium, and therefore, are
> at varying distances from the
> stage.... By having accessible
> seating at the front and rear of
> the Auditorium the locations are
> vertically dispersed and comply
> with the ADA Standard.

*6 Doc. 65-11 at 16-17. This response did not make specific reference to the accessible route from the rear seating area to the stage.

On April 9, 2020, Plaintiff emailed an updated report from Mr. Marinelli indicating as follows regarding Issue 40:

> No direct route from grade
> has been provided to lower
> level seating. Accessible route
> as designed relies on a lift.
> Lift cannot be part of an
> accessible route. Exception at
> stage areas is intended to get
> from the seating to the stage,
> not the other way around. With
> 467 seats, accessible seating
> needs to be dispersed in new
> construction at top middle
> and bottom at a minimum.
> Accessible route needs to be
> provided to all three locations.

Doc. 65-12 at 11.[18] Plaintiff emphasized that Mr. Marinelli needed the full set of drawings and related specifications and addenda that would be provided to the contractor for construction. Id. at 2.

Following several exchanges evidencing optimism that remaining issues could be resolved, the District emailed Plaintiff on May 19, 2020, stating in part:

> It looks like there are two areas
> on which genuine disagreement
> remains regarding what the
> ADA Standards require, as
> reflected by Comments T and
> QQ. I do not think these
> disagreements are intractable;
> rather, there needs to be further
> discussion of what the ADA

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)
2021 WL 1979501

Standards actually provide on those specific topics.

Doc. 65-13 at 2. [19]

On May 29, 2020, Plaintiff's attorney sent an email again expressing "that there do not appear to be many areas of genuine disagreement," and stating that "we are having trouble getting the required notes included in the construction documents." Doc. 68-12 at 2. As to Comment T, Plaintiff needed

to get from the architect some additional details that explain why the architect thinks it complies. The lift does not provide an accessible route into the auditorium.

Id. at 3.

The District replied by email on June 15, 2020, with another link, and stating in part:

As concerns the accessible path, there is no need to use a wheelchair lift to access the rear seats. The accessible path to the front seats does require the use of a wheelchair lift; however, that is permitted by Section 206.7.2 of the Standards....

Doc. 65-15 at 6.

Plaintiff emailed in response on July 1, 2020, and as to item T, stated:

I think there is some confusion. The issue is that there is no accessible route to the accessible seats in the

front row. The slope exceeds the maximum allowable slope of 8.33%. Therefore, the auditorium will need to be designed to correct the excess slope so that a person in a wheelchair can access the front row of accessible seats. Please provide drawings that reflect compliance.

*7 Doc. 68-13 at 4. [20] In the attached issue list, Plaintiff's expert noted as to item 40:

[A]ccessible route has not been provided coinciding with or in the [same] general area as the general circulation path.

Approximate slope is depicted at 10% along the 4 ramps.... These paths do not comply.

Id. at 15. [21]

In its email on August 2, 2020, the District responded:

The accessible path for the front-row wheelchair-accessible seats in the auditorium is through the side entrance onto the stage.[22] Anyone who wishes to use the front row-wheelchair-accessible seats who does not want to enter through the back of the auditorium and use the center aisle due to its slope may enter through the side entrance at stage level and then use the wheelchair lift at the front of the stage to get down to the level of the first row.

The most recent response from Plaintiff's consultants contends that there is not a route "coinciding with or in the [same] general area as the general circulation path." Although the author of this comment does not cite a particular ADA Standards section to which this relates, we believe it is intended to refer to 206.3. Assuming this is correct, we disagree with any opinion that the existing design fails to comply with Section 206.3. The accessible path for the wheelchair-accessible seats at the front of the auditorium is in the general area of the general circulation path for the auditorium. The fact that it uses a different entrance to the same room does not place it outside of the

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

general area of the general circulation path, as it does not require anyone to go outside the building, does not require passing through multiple other doors that may be locked, etc. The District's architects would be comfortable testifying to this opinion as being a prevailing interpretation of these requirements within the professional design industry.

Doc. 65-17 at 2. The District did not explicitly mark the location of the accessible route, id.; N.T. 04/08/21 at 12-13, although it contends that the location of the accessible route was "pretty obvious." N.T. 04/18/21 at 15-16.

*8 On August 6, 2020, Plaintiff reiterated his position that

> the route to access the
> accessible seats in the front row
> and the route to access the
> stage from the accessible seats
> in the back do not comply with
> Section 206.3 because the slope
> of the aisle(s) in the general path
> of circulation, meaning the path
> used by non-disabled people, is
> too steep.

Doc. 65-18 at 2. Counsel for the District did not respond until November 5, 2020, suggesting a time frame for counsel to confer. See Doc. 68-14 at 3-5.

Counsel conferred on the auditorium issues on November 13, 2020, see Doc. 68-15, and on November 30, 2020, following additional e-mail exchanges, the District's counsel informed Plaintiff's counsel that he did not "think either side is going to convince the other" and advised that if Plaintiff wants "a definitive resolution of this issue, I think you will have to go to the Court." Doc. 68-16 at 3. On December 1, 2020, Plaintiff's counsel agreed that the parties "simply disagree on this one and that court intervention is necessary to resolve the issue." Id. at 2. [23]

On December 21, 2020, Plaintiff filed the present motion to enforce the Consent Decree, Doc. 62, arguing that that Defendant's proposed design for

the auditorium violates federal law by denying "full and equal access for students, teachers, parents and community members with mobility disabilities to events like plats, concerts, assemblies and awards ceremonies." Doc. 63 at 1-2. Defendant filed a brief in opposition, arguing in the alternative that Plaintiff's motion should be dismissed as moot, barred by the doctrine of laches, and denied on the merits, and asserting a counter-motion to modify the Consent Decree by striking paragraph three in its entirety. Doc. 65-1. Plaintiff then filed a reply brief in support of its motion and in opposition to Defendant's cross-motion. Doc. 68. On April 8, 2021, I held remote oral argument on Plaintiff's motion and Defendant's cross-motion. N.T. 04/08/21 (Doc. 73). The matter is ripe for disposition.

## II. LEGAL STANDARDS

### A. Consent Decrees

In order to discern the scope of a consent decree, courts examine "the language within its four corners," and "as consent decrees have many of the attributes of contracts, we interpret them with reference to traditional principles of contract interpretation." United States v. New Jersey, 194 F.3d 426, 430 (3d Cir. 1999); see also McDowell v. Phila. Housing Auth., 423 F.3d 233, 238 (3d Cir. 2005) (contract principles generally govern construction of a consent decree issued upon agreement of the parties, and courts should enforce unambiguous agreements according to their plain terms). In doing so, an interpretation that "gives reasonable meaning to all of the contract's provisions is preferred to one which leaves a portion of the writing useless or inexplicable." Pennbarr Corp. v. Ins. Co. of N. Am., 976 F.2d 145, 141 (3d Cir. 1992) (internal quotations omitted). A court "may not make a different or better contract than the parties themselves saw fit to enter into." Id.

*9 It is well settled that a court has the inherent power to enforce a consent decree in response to a party's non-compliance, and to modify a decree in response to changed conditions. See Holland v. N.J. Dep't of Corr., 246 F.3d 267, 270 (3d Cir. 2001) (citing Spallone v. United States, 493 U.S. 265, 267, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (courts have inherent power to enforce compliance with their consent decrees); United States v. United Shoe Mach. Corp., 391 U.S. 244,

2021 WL 1979501

248, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (courts have inherent power to modify a consent decree upon an appropriate showing)). Modifications of consent decrees are permitted when "a significant change in facts or law warrants their amendment." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004) (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 393, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)). When the defendant seeks to modify a consent decree, it must show " 'a significant change either in factual conditions or in law.' " Holland, 246 F.3d at 284 n.16 (quoting Rufo, 502 U.S. at 384-85, 112 S.Ct. 748).

### B. Regulatory Interpretation

Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals. PGA Tour, Inc. v. Martin, 532 U.S. 661, 674–75, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). Pursuant to this purpose, the ADA is defined by its broad character. Id. at 675, 121 S.Ct. 1879; see also Disabled in Action of PA v. Transp. Auth., 539 F.3d 199, 208-09 (3d Cir. 2008) ("[The ADA] as a remedial statute, designed to eliminate discrimination against the disabled in all facets of society, ... must be broadly construed to effectuate its purpose."). Thus, ambiguities in the ADA are resolved by granting deference to the party alleging discrimination to keep with the ADA's rationale to provide clear "enforceable standards" addressing such discrimination. See Ford v. Schering-Plough Corp., 145 F.3d 601, 608 (3d. Cir. 1998).

The present motion involves interpretation of the 2010 ADS Standards, issued by the Department of Justice ("DOJ"). In interpreting these regulations, principles of statutory interpretation apply. See Kisor v. Wilkie, —— U.S.——, 139 S. Ct. 2400, 2415, 204 L.Ed.2d 841 (2019). If the Court can determine an unambiguous meaning of a regulation by reviewing its text, structure, history, and purpose, then the Court must apply the regulation without further resort to other means of construction. As the Supreme Court has emphasized, if a regulation is not ambiguous, then it "just means what it means – and the court must give it effect, as the court would any law." Id. at 2416-17.[24] Moreover, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."

Id. at 2415 (citing Chevron U.S.A. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (adopting same approach for agency interpretation of ambiguous statutes)).

Neither the DOJ nor any other federal agency polices compliance with the 2010 ADA Standards, leaving that role to the courts. The parties' consultants have expressed opinions as to whether the District's design complies with the 2010 ADA Standards. However, the court cannot defer to such opinions, nor can it rely on the approval of local or state code officials who are not empowered to interpret the 2010 ADA Standards. Although case law offers little guidance in interpreting the specific regulations at issue here, several courts have held that interpretation of the ADA's accessibility standards are legal questions for the court to decide. See, e.g., Steelman v. City of Salem, 2013 WL 1363792, at *6 n.4 (E.D. Mo. Apr. 4, 2013) (interpretation of 1991 ADA Accessibility Guidelines ("ADAAG"), the predecessor of the 2010 ADA Standards, is a matter of law); Small v. Dellis, 1997 WL 853515, at *4 n.5 (D. Md. Dec. 18, 1997) (expert could opine on factual matters related to ADAAG, but "the question of interpretation posed by [ADAAG] are legal questions within the competence of the court to resolve...."). This proposition is consistent with the broader principle that experts may testify as to facts, but not as to law. See, e.g., United States v. Leo, 941 F.2d 181, 195-96 (3d Cir. 1991) ("An expert witness is prohibited from rendering a legal opinion."); In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig., No. 13-02436, 2016 WL 4039324, at *3 (E.D. Pa. July 27, 2016) (court "'must ensure that an expert does not testify as to the governing law' ") (quoting Berckeley Inv. Grp. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006)); Orner v. Nat'l Beef Packaging Co., LLC, No. 4:13-CV-0837, 2015 WL 8334544, at *9 (M.D. Pa. Dec. 9, 2015) (experts may testify as to facts, but cannot testify regarding a duty the ADA imposes upon employers or owners of places of public accommodation subject to the ADA).

### III. DISCUSSION

### A. The Motion to Enforce the Consent Decree is Proper

**\*10** Defendant asserts three barriers to the court's consideration of the Plaintiff's motion; mootness, laches, and modification of the Consent Decree to eliminate paragraph three.

### 1. Mootness

Defendant argues that Plaintiff's motion to enforce the consent decree is moot because the school will not be completed until Plaintiff is in ninth grade and he will therefore never be a student at the New Middle School. Doc. 65-1 at 3-4; N.T. 04/08/21 at 29-30. Plaintiff disputes that the motion is moot. Doc. 68 at 30-35.

"A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 216 (3d Cir. 2003) (internal brackets omitted) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). "If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." Id. (internal brackets omitted) (quoting Blanciak v. Allegheny Ludlum Corp. 77 F.3d 690, 698–699 (3d Cir. 1996)). The burden of establishing mootness is "heavy," "even 'formidable.' " DeJohn v. Temple Univ., 537 F.3d 301, 309 (3d Cir. 2008) (quoting Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); United States v. Virgin Islands, 363 F.3d 276, 285 (3d Cir. 2004)). A request to compel enforcement of a consent decree, like other claims, can become moot if " '(1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.' " Del. Dep't of Nat. Res. & Env. Control v. U.S. Envtl Prot'n Agency, 746 F. App'x at 131, 133 (3d Cir. 2018) (not precedential) (quoting Finberg v. Sullivan, 658 F.2d 93, 97-98 (3d Cir. 1980) (en banc)).

Defendant relies primarily on Donovan. Doc. 65-1 at 20-22. In Donovan the plaintiff alleged that the school district interfered with her First Amendment religious rights by refusing to allow her to hold a Bible club meeting during the school's morning activity period,

and the Third Circuit held that the student's graduation from high school during the pendency of the litigation mooted her claim for injunctive relief. 336 F.3d at 213. The court explained that plaintiff's graduation meant that the alleged harm of which she complained bore no possibility of repetition, and therefore her requests for injunctive and declaratory relief no longer presented a live controversy. Id. at 216. In doing so the court listed several cases similarly concluding that a student's challenge to a school's conduct or policy moots a claim for injunctive or declaratory relief upon graduation. Id. (citing, inter alia, Bd. of Sch. Comm'rs v. Jacobs, 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam) (in suit by six plaintiffs to declare certain school regulations unconstitutional, once "all of the named plaintiffs in the action had graduated ... a case or controversy no longer exists")). Because S.F. will have graduated from middle school by the time the New Middle School is completed, Defendant argues that Plaintiff's request for injunctive relief is not a live controversy and must by dismissed as moot.

**\*11** However, Donovan and the cases it relied on all involved claims of constitutional violations and not, as here, a claim of a violation of a consent decree reached upon the agreement of the parties and entered by the court. The question here is not whether Plaintiff's underlying suit regarding accessibility is moot, but whether Plaintiff's motion to enforce his rights under the mutually negotiated Consent Decree is moot. Such a matter only becomes moot if it is beyond dispute that defendant fully complied with its contractual obligations. See, e.g., Davis, 440 U.S. at 633-34, 99 S.Ct. 1379 (defendants' compliance with the terms of a consent decree was sufficient to moot its enforcement); cf. Ketzner v. John Hancock Mut. Life Ins. Co., 118 F. App'x 594, 601-02 (3d Cir. 2004) (payment of benefits on disability claim was sufficient to moot breach of contract claims). That cannot be said here where Plaintiff's rights are not contingent on his attendance of the middle school. The Consent Decree by its terms remains in effect because Plaintiff has not yet completed middle school. Consent Decree ¶ 47. As a result, this action is not moot.

Defendant's argument that the matter is moot is belied by other express language of the Consent Decree. As quoted above, the parties stated in the Consent Decree that the New Middle School "is scheduled to

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

be completed for the 2022-23 school year," Consent Decree ¶ 3(a), meaning that at the time the parties entered into the Consent Decree, it was already known that S.F. would most likely be in ninth grade by the time the New Middle School would be ready for occupancy. Nevertheless, the District agreed that it would "construct the New Middle School so that it is accessible to and usable by S.F. [and] ensure that the New Middle School fully complies with the [2010 ADA Standards]." Id. In other words, the fact that the District is now certain that the New Middle School cannot be completed until the 2022-23 school year does not affect the express terms of the Consent Decree.

For these reasons, I find that the motion to enforce the consent decree is not moot.

## 2. Laches

Defendant also argues that Plaintiff's motion is improper by operation of the doctrine of laches because Plaintiff had Defendant's architectural plans for over a year before filing the present motion, see Doc. 65-1 at 2, 4-11, and because Plaintiff did not assert its objections to the District's plans within thirty days as required by the Consent Decree. N.T. 04/08/231 at 28-29. Plaintiff argues in response that the doctrine of laches is not applicable because he filed his motion within the statute of limitations and because Defendant did not come to the court with clean hands and has not shown that any delay was inexcusable and resulted in prejudice. Doc. 68 at 36-51.

A consent decree is, essentially, "a settlement that contains an injunction." In re Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1025 (2d Cir. 1992). "[E]nforcement of a consent decree ... is subject to the Court's inherent power under principles of equity ... [and is] 'therefore subject to the usual equitable defenses.' " Montalvan v. Neville's Mobile Home Court, LLC, No. 3:11-CV-850, 2020 WL 3172758, at *12 (M.D. Pa. June 15, 2020) (citing Virgin Islands, 363 F.3d at 290, and quoting Cook v. City of Chicago, 192 F.3d 693, 695 (7th Cir. 1999)). Laches is one such equitable defense.

"Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." Lontex Corp. v. Nike, Inc., No. 18-5623, 2021 WL 724971, at *4 (E.D. Pa. Feb. 24, 2021) (quoting Santana Prods. v. Bobrick Washroom Equip., Inc. 401 F.3d 123, 138 (3d Cir. 2005)). "To establish an inexcusable delay, the defendant must show that the plaintiff sat on his rights." Beattie v. Line Mountain Sch. Distr., 992 F. Supp.2d 384, 396 (M.D. Pa. 2014) (citing In re Mushroom Transp. Co., 382 F.3d 325, 343-43 (3d Cir. 2004)). As for the prejudice prong, Judge Baylson of this court recently stated:

> **\*12** There are two types of prejudice a defendant might suffer. "Evidentiary prejudice occurs when, by reason of the delay, a defendant is unable to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories." Heraeus Electro-Nite Co. v. Midwest Instrument Co., No. 06-355, 2007 WL 2071905, at *4 (E.D. Pa. July 17, 2007) (Padova, J.). "Economic prejudice occurs when a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the [plaintiff] brought suit earlier." Id. In finding economic prejudice, the court does "not merely consider those losses attributable to a finding of liability ..., but must look for a change in the defendant's economic position during the period of delay." Id.

Lontex Corp., 2021 WL 724971, at *5.

The Consent Decree does not contain a time limitation on when Plaintiff can seek enforcement with respect to the New Middle School. As Plaintiff points out, see Doc. 68 at 36, the doctrine of laches is presumptively inapplicable if an action is commenced within the statute of limitations. Degussa Constr. Chem. Oper., Inc. v. Berwind Corp., 280 F.Supp.2d 393, 411 (E.D. Pa. 2003) (citing Mantilla v. United States, 302 F.3d 182, 186 (3d Cir. 2002)); see also Santana Prods., 401 F.3d at 138 ("Once the statute of limitations has expired, the defendant enjoys the benefit of a presumption of inexcusable delay and prejudice."). Here, the most analogous limitations period for a legal action is Pennsylvania's four-year statute of limitations for contract actions, 42 Pa. C.S.A. § 5525(a)(1), which also applies to "[a]n action upon a judgment or decree

**S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)**

2021 WL 1979501

of any court of the United States or of any state." Id. § 5525(a)(5). Because Plaintiff clearly filed this motion within the four-year statute of limitations, laches is presumptively inapplicable, and the presumption can be overcome by a showing that Plaintiff's delay in commencing this action was inexcusable and resulted in prejudice.

To decide if Plaintiff improperly delayed bringing the present action, I look to whether the parties' communications between August 2019 and November 2020 evidence intentional delay or misrepresentations on Plaintiff's part. These communications were summarized previously. Supra at 7-14. Initially I observe that the District provided plans to Plaintiff on August 19, 2019, as called for by the Consent Decree, but that Plaintiff did not respond with any objections to the plans until October 29, outside 30 days as contemplated. Consent Decree ¶ 3(b). [25] However, I conclude that Plaintiff's failure to respond in time is not a barrier to Plaintiff's motion. Apart from issues Plaintiff raises with difficulty in accessing the link containing the plans, the District was required to provide plans "sufficient for Plaintiff to determine whether the New Middle School meets the terms of this Consent Decree," id., and it is clear from the parties' communications that the proposed accessible paths in the auditorium were not clear from the initial plans.

The plans for the new building were complex, and although Plaintiff's current objection was not fully clarified for some time, Plaintiff did identify auditorium access issues from the outset. In its October 2019 response, Plaintiff inquired about an accessible route both as to the slope in the aisles and the purpose of the wheelchair lift. In its January 2020 response, the District indicated that the "aisles are not on an accessible route" because the slope was approximately 10%, and that the "wheelchair lift has been provided to provide access [to] the low end of the auditorium." Plaintiff's response in February as to the seating area was that "we need an accessible route," indicating that Plaintiff either did not understand where the District intended to place the accessible route to reach the front wheelchair seats, or believed the intended route did not comply.

*13 The parties' communications throughout the following months make clear that they were attempting to reach mutual understanding and agreement on this (as well as other) issues. To some degree, it appears that the parties were talking past each other, as they each made the same point on several occasions, and it was not until about August that their differences began to crystalize. What is clear is that Plaintiff never acquiesced in the District's plans to use the lift as an accessible route to reach the lower seating area or to use the corridors as the accessible route to reach the front row seats or stage, and that the issues did not ripen into an intractable dispute until November 30, 2020, when the District advised Plaintiff to "go to the court" for a "definitive resolution." Plaintiff filed the motion on December 21.

On this record I do not find that Plaintiff exhibited inexcusable delay. Had the District illustrated the intended paths more clearly perhaps the parties would have identified their stalemate earlier. The intended paths were easily illustrated for the court by the simple solution of notating them on the appended diagram, something the District did not do at any prior point. N.T. 04/08/21 at 12. In any event, the parties worked in good faith to come to a mutual understanding and did so with respect to the vast majority of their differences, and Plaintiff did not unreasonably delay his objection.

As for prejudice, Defendant is in an even weaker position. The District does not assert any evidentiary prejudice, and in any event the determination of the Auditorium's compliance with the 2010 ADA Standards is a legal one, informed by materials which remain available. As to economic prejudice, the District's invocation of laches also fails. The Consent Decree specifically anticipated that negotiations concerning accessibility of the New Middle School might be ongoing after construction began and that it could impact construction, as the Consent Decree expressly provides that "Defendant shall not be entitled to claim that a modification cannot be made because the modification will interfere with or delay the construction schedule." Consent Decree ¶ 3(b). It is also worth noting that the District did not raise any concern during the parties' lengthy communications that the delay would impact the ongoing construction.

Additionally, Plaintiff argues that Defendant is not entitled to the benefit of the doctrine of laches because it makes its arguments with "unclean hands."

As with undue delay, a determination of "unclean hands" turns on the extent of the delays and intentional misrepresentations made by the District in the parties' lengthy communications. The parties actively communicated regarding progress on the plans for the New Middle School, but simply could not overcome their differences regarding auditorium accessibility issues. Under the circumstances, a finding of "unclean hands" is not warranted, and I do not rely on wrongdoing by the District in finding that laches does not bar Plaintiff's motion.

### 3. Modification of Consent Decree

In its brief opposing Plaintiff's motion, the District presents a cross-motion asking the court to modify the Consent Degree by deleting paragraph three relating to the New Middle School, which would eliminate the basis for Plaintiff's motion. Doc. 65-1 at 34-36. Plaintiff maintains that the District has offered no valid justification for modification. Doc. 68 at 51-54.

As previously noted, the court has the inherent power to modify a consent decree in response to "a significant change either in factual conditions or in law." Holland, 246 F.3d at 284 n.16. Defendant argues that there is a changed condition here that warrants modification of the Consent Decree -- namely, that it is now certain that the New Middle School will not be completed until after S.F. is no longer a middle school student.

**\*14** As discussed above in the context of mootness, Defendant's reliance on this alleged "new" fact is misplaced because the Consent Decree expressly provides that the New Middle School "is scheduled to be completed for the 2022-23 school year," and therefore the District already knew that S.F. would likely no longer be attending middle school when the new building was completed. Consent Decree ¶ 3(a); N.T. 04/08/21 at 95-96. Nevertheless, the District agreed to "construct the New Middle School so that it is accessible to and usable by S.F." Id. Given the express language of the Consent Decree, confirmation that S.F. will not be a middle school student in the New Middle School does not constitute a "changed condition." As such, Defendant is not entitled to have paragraph three stricken from the Consent Decree.

### B. Merits of the Motion

Having found the motion to enforce to be procedurally proper, I will now address the merits. As previously noted, the Consent Decree requires the District to comply with the 2010 ADA Standards (hereinafter "Standards") in constructing the New Middle School. Consent Decree ¶ 3(a). This is consistent with applicable regulations, which provide that new construction of local government facilities commenced on or after March 15, 2012, must comply with the Standards to meet the accessibility requirements of Title II of the ADA. See 28 C.F.R. § 35.151(c)(3). [26] The Standards require state and local governments to comply with both 28 C.F.R. § 35.151 and the 2004 ADA Accessibility Guidelines ("ADAAG") promulgated by the United States Access Board ("Access Board"). See Standards Introduction.

Pursuant to the Standards, "[a]ccessible routes shall be provided in accordance with [section] 206 and shall comply with Chapter 4." Standards § 206.1. Both section 206 and Chapter 4 are entitled "Accessible Routes." Section 206 identifies where accessible routes are required to be placed as well as when platform lifts can be used as part of an accessible route. Id. §§ 206.2, 206.3, 206.7. Chapter 4 details the technical standards for accessible routes, including the maximum running slope for ramps and walkways, when landings for ramps must be installed and how they must be designed, and how platform lifts are to installed. E.g., id. §§ 401.1 ("[t]he provisions of Chapter 4 shall apply where required by Chapter 2"), 405 (ramps), 410 (platform lifts).

As described above and illustrated in the appended diagram, according to the District's design plans, the only way for wheelchair users to reach the front row of accessible seats is to enter through the right stage door and travel along the corridor adjacent to the stage and use the platform lift to descend to the accessible seating area. A wheelchair user seated in the rear accessible seats who wishes to access the stage must exit by the rear doors, travel along the corridors to the right stage entrance door and then to the stage. Plaintiff argues that these plans violate three sections of the Standards; (1) section 206.2.6 relating to accessible routes between accessible seating and performance areas, (2) section 206.3 relating to location of accessible routes, and

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)
2021 WL 1979501

(3) section 206.7 relating to platform lifts. Defendant counters that the auditorium plans comport with the Standards and that in any event the modifications sought by Plaintiff would be "impossible."

Initially, I note that there is almost no caselaw to guide interpretation of the Standards at issue. "Most ADA access cases settle. For that reason, the case law in this area is relatively underdeveloped given the breadth of the statutory scheme and number of suits filed." Feltenstein v. Wykagyl Ass. HJ, 184 F.Supp.3d 76 (S.D.N.Y. 2016).

### 1. Section 206.2.6 - accessible routes between accessible seating and performance areas

**\*15** Plaintiff first argues that the New Middle School auditorium fails to comply with section 206.2.6 because it does not directly connect the seating areas with the performance areas. Doc. 63 at 17-20; Doc. 68 at 15-21. Defendant counters that the planned accessible routes between accessible seating and performance areas complies with section 206.2.6. Doc. 65-1 at 16-18, 28-30. [27]

Section 206.2.6, entitled "Performance Areas," provides in relevant part:

> Where a circulation path directly connects a performance area to an assembly seating area, an accessible route shall directly connect the assembly seating area with the performance area.

Standards § 206.2.6. [28] Although it is not a defined term, the term "performance area" in the context of the planned auditorium unambiguously refers to the stage. As previously noted, a circulation path is a "way of passage provided for pedestrian travel." Id. § 106.5. [29] There is no dispute that each of the four aisles is a circulation path connecting the seating area to the stage for those capable of walking. Therefore, the question in applying section 206.2.6 is whether the

aisles "directly connect" the stage to the seating area, and if so, whether the District's intended accessible routes for wheelchair users also "directly connect" the stage to the seating area.

The Standards do not define the terms "directly" or "directly connects." However, it is beyond dispute that the auditorium seating area is directly connected to the stage via the circulation path of the aisles and steps. A student who is able to walk and who is seated anywhere in the auditorium can use one of the aisles to walk to the well and then use the steps on the right or left of the stage to ascend to the stage, and reverse that path to retake his or her seat.

Plaintiff does not dispute that wheelchair users sitting in the front row accessible seats have an accessible route that directly connects to the stage. These students can travel from their seats to the stage using the platform lift, and the Standards allow use of a platform lift to reach a performance area/stage from the front accessible seating area. Standards § 206.7.1; N.T. 04/08/21 at 22, 24-25 (no dispute that platform lift is a permissible use for this purpose).

The parties' dispute concerns students seated in the rear row wheelchair seats. As noted, the only route for wheelchair users seated in the rear row to reach the stage requires them to exit through the rear doors, make two left turns, travel down a hallway roughly parallel to the aisles inside the auditorium, and make two more left turns to reenter the auditorium through the right stage door, and proceed to the stage. Therefore, the issue for decision as to section 206.2.6 is whether this route is "direct."

**\*16** I first dispose of one of the District's arguments. Seizing upon the language "an accessible route shall directly connect," the District maintains that there only needs to be one accessible route directly connecting accessible seating to the stage, and that because the front row seating satisfies section 206.2.6, it is not necessary for the rear row seating to do so. Doc. 65-1 at 28; LaBrake Dec. ¶¶ 78-79. This reading twists the regulatory language. The section states that "[w]here a circulation path directly connects" the stage to the seating area, "an accessible route" shall also directly connect the stage to the seating area. Standards § 206.2.6 (emphasis added). This language

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 27 of 52

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

unmistakably calls for an accessible path connecting a stage and seating area that corresponds to a circulation path connecting that same stage and seating area. Because the rear seats have a circulation path directly connecting them to the stage, so too the rear wheelchair seats must have an accessible path directly connecting to the stage.

Is the District's proposed accessible path from the rear seats to the stage "direct?" Not surprisingly, the parties answer the question differently. From Plaintiff's perspective, the route is not "direct" because it takes a student using a wheelchair outside the auditorium and along a series of hallways to reach the stage; whereas from the District's perspective the adjacent hallways lead directly from the rear seating to the stage. Doc. 63 at 18; Doc. 65-1 at 17, 29. Neither party defines the term. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "not crooked, oblique, reflected, refracted, or circuitous," or "proceeding by the shortest way." Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/direct (last accessed 5/4/21). Under any of these definitions, the term not accurately describe the District's proposed route. The District's position seems to suggest that because the path is continuous it is direct, but those terms do not have the same meaning.

The parties also consult different sources to assist in interpreting the term "direct" in section 202.2.6. According to the District, the "prevailing industry interpretation" of section 202.2.6 is that a route is "direct" so long as it does not exit the building, does not go to a different side/section of the building, and does not require a wheelchair user to pass through other rooms (like closets or kitchens) or potentially locked doors. LaBrake Dec. ¶ 75; see also Doc. 65-1 at 17, 29; N.T. 04/08/21 at 55 (defense counsel defining "direct" as "[s]taying inside the building and following normal circulation paths within the building"). Plaintiff argues that the District's unspecified "industry" standards are not relevant to the court's interpretation of regulatory language, and also are self-serving declarations made by the very architects who designed the auditorium. See Doc. 68 at 17.

Plaintiff instead looks to the history of the regulatory language. Doc. 63 at 19-20. In drafting ADAAG

in 2004, the provisions of which were incorporated in the Standards, the Access Board noted that the requirement that the accessible route "directly connect" the seating and performance areas was intended to "ensure that the accessible route to a performance area is comparable to the general circulation route," "otherwise, it may be possible to provide access to performance areas through a more circuitous route and still be in compliance." 69 Fed. Reg. 44,084, 44,093 (Jul. 23, 2004). The DOJ explained that Section 206.2.6 was intended to change the prior provision, which could be read to allow routes between accessible seats and performance areas to "go outside the assembly area and use an indirect interior route." DOJ, Final Regulatory Impact Analysis at 175, 395, 417 (July 23, 2010) (Doc. 63-10). Similarly, in adopting ADAAG as part of the Standards, the DOJ indicated that Section 202.2.6 was intended to expand the accessibility required in assembly areas with performance stages from the previous ADA accessibility standards, which required an accessible route connecting accessible seating and the stage. See 75 Fed. Reg. 56,236, 56,313-14 (Sep. 15, 2010). In doing so, DOJ weighed the burdens and benefits of the enhanced requirement, and noted the importance of ensuring that people who use wheelchairs can fully and equally participate in events in such facilities:

*17  Many advocacy groups and individual commenters strongly supported the revised requirement, discussing the acute need for direct access to stages, as such access has an impact on a great number of people at important life events, such as graduations and awards ceremonies, at collegiate and competitive performances and other school events, and at entertainment events that include audience participation. Many commenters expressed the belief that direct access is essential for integration mandates to be satisfied, and that separate routes are stigmatizing and unequal. The

2021 WL 1979501

Department agrees with those concerns.

Id. at 56,313. Defendant asserts that the court cannot rely on the DOJ-commissioned Regulatory Impact Analysis for guidance because it was issued after the regulations were adopted, and because it was prepared by an entity with a private economic interest. N.T. 04/08/21 at 53-55.

Taking into account the text, structure, history, and intent of the regulatory standards, I conclude that the District's reading is untenable. As noted, the term "direct," while perhaps not unambiguous as applied to all potential scenarios, is not ambiguous as applied to the current scenario and cannot fairly be used to describe the District's proposed accessible route. I also find it inappropriate to rely on "industry standards" to understand the regulation's meaning. I find much more relevant the regulatory history reflecting that section 206.2.6 represented a change to add the requirement of a direct connection between accessible seating areas and the stage, with the goal of making the stage more accessible to audience members who use wheelchairs, comparable to the access of their able-bodied peers.

As Plaintiff pointed out at oral argument, N.T. 04/08/21 at 43-37, it is noteworthy that although section 206.2.6 contains the word "directly" twice, the District's interpretation of the section would result in the word having two different meanings. First, for non-disabled individuals, "directly" would mean a route entirely inside the auditorium by way of the aisles, and second, for people with disabilities, "directly" would mean a circuitous route involving exiting the auditorium, taking several turns and hallways, and reentering the auditorium. An interpretation adopting two meanings as disparate as these for the same term is not consistent with the mandates of the ADA, the language of section 206.2.6, or the history and intent of the regulations. For example, the District's interpretation has no outer limit, meaning that a wheelchair accessible route could be much longer than the one at issue here and still comply with the section, so long as it did not exit the building or go through other rooms. Such an unlimited reading cannot be what the Standards envisioned.

Defendant noted at oral argument that the term "space" is a defined term, whereas the term "area" is not. N.T. 04/08/21 at 51, 64; see Standards § 106.5 ("Space" defined as "A definable area, such as a room, toilet room, hall, assembly area, entrance, storage room, alcove, courtyard, or lobby."). Defendant argues from this that by referring to a "performance area" and "seating area" rather than performance or seating "space," section 206.2.6 is not intended to be restrictive and "is not written to say that the direct connection has to be within the same space." N.T. 04/08/21 at 51, 64. This argument stretches the term "area" beyond it's normal and ordinary meaning to encompass the meaning of the term "directly connect." Whether the "performance area" or "seating area" is confined or expansive in nature, the requirement of a route directly connecting them remains.

**\*18**  The District makes an additional argument that bears mentioning. It asserts that "[m]ost people attending events in the auditorium remain in their seats for the duration of the proceedings," and that "most persons receiving awards know about it in advance, and generally, they sit near the stage so as to prevent having to traverse the length of the room." LaBrake Dec. ¶ 60; see also Doc. 65-1 at 14-15 & 29 n.18.[30] The District provides no legal authority for what would amount to an unwritten exception to the regulation's requirements. Nothing in the regulations supports an interpretation that would make accessibility contingent on the frequency with which an accessible route is used. To allow the District to provide a direct route between the stage and the accessible seats in only one part of the auditorium for persons with disabilities, while providing a direct route between the stage and the entire auditorium for people without disabilities, undermines the ADA's requirement for dispersion of accessible seats intended to allow wheelchair users choices comparable to non-disabled persons.[31]

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.2.6.

### 2. Section 206.3 - the accessible path to the front of the auditorium

Plaintiff next argues that the auditorium fails to comply with Section 206.3 because the proposed accessible path to the front of the auditorium is separate from and longer than the general circulation paths used by able-bodied persons. Doc. 63 at 21-23; Doc. 68 at 21-26. Defendant counters that the plans for wheelchair accessibility to the front of the auditorium complies with Section 206.3. Doc. 65-1 at 11-16, 25-28.

Whereas the issue as to section 206.2.6 dealt with access between the seating and the stage, the issue here is access from outside the auditorium to the accessible seats. Section 206.3 addresses the location of accessible paths, and is not specific to an assembly area. It states in relevant part: "Accessible routes shall coincide with or be located in the same area as general circulation paths." Standards § 206.3. The Advisory to this section explains in relevant part:

> The accessible route must be in the same area as the general circulation path. This means that circulation paths, such as vehicular ways designed for pedestrian traffic, walks, and unpaved paths that are designed to be routinely used by pedestrians must be accessible or have an accessible route nearby.

Id. Advisory.

There is no dispute that the auditorium design provides an accessible route to the rear accessible seats that coincides with the circulation path used by non-disabled persons, because both walking and wheelchair students enter through the rear doors to reach the rear row. There is also no dispute that the general circulation paths for walking students to reach the seats at the front of the auditorium (the aisles) are not accessible paths due to the steep slope of the aisles and the absence of landings. As previously described, the District's proposed path is that wheelchair students enter through the right stage door, proceed along the corridor adjacent to the stage to reach the platform lift, and then descend to the front seating area. Clearly,

this path does not coincide with the general circulation paths (aisles). Thus, the question is whether the proposed accessible path is in the "same area" as or "nearby" the general circulation paths.

**\*19** As with the previous section, this determination comes down to terms that are familiar but undefined -- in this case "same" and "nearby" -- and again the parties disagree as to their meaning. From Plaintiff's perspective, the path to an entrance that is distant from the main entrance and that uses the platform lift to reach the front seating area is neither "in the same area" nor "nearby" the aisles which are the general circulation path. See, e.g., N.T. 04/08/21 at 72-73 (arguing that the routes do not have to entirely overlap, but they can diverge "only as much as necessary"). Plaintiff also argues that the District's accessible route is inconsistent with the Advisory Board's statement in its Technical Guide in reference to this provision that "[i]t promotes equivalency and precludes accessible routs that are obscure, hard to find, or that diverge from circulation paths more than necessary." Doc. 63 at 21; Doc. 63-5 at 3; N.T. 04/08/21 at 78. Defendant argues that the proposed accessible route for wheelchairs satisfies section 206.3 because it is roughly parallel to the auditorium's aisles and is "simply on the other side of an interior wall." Doc. 65-1 at 15 (quoting LaBrake Dec. ¶ 65);[32] N.T. 04/08/21 at 76 ("[T]he accessible route has to be nearby. Not in the same room, not in the exact same space, not identical, not equivalent, but nearby.").

Plaintiff again has the better argument. The term "same" is defined as "resembling in every way," "conforming in every respect," and "corresponding so closely as to be indistinguishable." Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/same (last visited 5/4/21). "Nearby" is defined as "near at hand" and "close by." Id., https://unabridged.merriam-webster.com/unabridged/nearby (last visited 5/4/21). While the circulation path and the proposed accessible path reach the same place, it cannot fairly be said that they reach that place through paths that are either in the same area or nearby each other, using the plain and commonly recognized meaning of those terms. One takes students from the rear entrance down the aisles, and the other takes students from the right stage entrance to the platform lift. These entrances are at a significant

distance from each other, and thus require non-disabled and wheelchair students to take different paths to the auditorium from their classroom or other starting point. The proposed accessible route is clearly not equivalent, nor can it be fairly said to promote equivalency.

Defendant makes a number of additional arguments in supports of its position. Defendant cites Oberloh v. Eclips Hair Design, 2015 WL 1064609 (N.D. Ind. 2015), which arose in the context of a motion for contempt for the defendant's alleged violation of a consent decree. Oberloh is one of few cases interpreting the Standards, but it does not support the District's position. The dispute involved an accessible path from a van-accessible parking space to defendant's hair salon, and the plaintiff contended that the accessible route was not in the same area as the general circulation path in violation of section 206.3. The court denied the plaintiff's motion. "Defendant's business has only one entrance ..., everyone must use the same general paths and walkways to get to the entrance form the parking lot[, and] [t]he access route exactly parallels and in some areas overlaps with that path." Id. at *4. Thus, the facts in Oberloh are easily distinguished, because here the proposed accessible path does not parallel or overlap the circulation path.

Defendant also cites the 2018 International Building Code ('IBC'), which Ms. LaBrake states are "routine[ly] relied upon by architects and engineers. LaBrake Dec. ¶¶ 66-67. IBC section 1104.5 contains language identical to section 206.3, adding that "[w]here only one accessible route is provided, the accessible route shall not pass through kitchens, storage rooms, restrooms, closets, or similar spaces." LaBrake Dec. Exh. 3 (Doc. 65-7 at 22). The commentary states that "the intent of this section is to avoid the circumstance where an interior path between facilities is provided but the only accessible route between those facilities is an exterior path." Id. Therefore, according to the District, an accessible path is permitted to pass through a different hallway, but cannot pass through other rooms which may be locked or otherwise have restricted access, which its proposed accessible path does not do. Id. ¶ 68.

**\*20** The IBC building code is of limited value to interpreting section 206.3. First, although one of Plaintiff's accessibility consultants states that the IBC has been adopted in some jurisdictions, Declaration of Marsha K. Mazz, Doc. 68-3, ¶ 17, neither side contends that IBC binds this court's interpretation of the Standards. Second, while the first two sentences of section 206.3 and IBC § 1104.5 are virtually identical, the specific language of IBC § 1104.5 that the District relies on -- "[w]here only one accessible route is provided, the accessible route shall not pass through kitchens, storage rooms, restrooms, closets or similar spaces" – is notably absent from section 206.3. Therefore, it cannot be inferred that the DOJ or the Access Board concurs with the suggested interpretation, and in fact the opposite inference is more likely correct. In any event, the fact that the IBC provides that an accessible route should not pass through other rooms does not compel the corollary conclusion that an accessible route complies so long as it does not pass through other rooms.

Defendant also relies on section 405 of the Standards to support its position that the auditorium complies with section 206.3. As referenced in the fact summary, supra at 5 n.8, that section sets the maximum slope for ramps (1:12 or 8.33%) and requires landings every thirty feet, specifications that the aisles do not meet. However, section 405 contains an exception: "In assembly areas, aisle ramps adjacent to seating and not serving elements required to be on an accessible route shall not be required to comply with 405." Id. § 405.1. The District argues that, reading the Standards as a whole, this exception informs the acceptable location of accessible routes. Doc. 65-1 at 26. The District argues that aisles adjacent to seating are permitted to exceed slopes for accessible routes and are not required to have landings that would otherwise be required for accessible routes, in order to maintain adequate line-of-sight as required by other provisions of the Standards. Id. at 12 (citing LaBrake Dec. ¶¶ 42-43; Standards § 802.2).[33] According to the District, "[i]n many buildings, it would be impossible to maintain adequate line-of-sight if the main floor of an auditorium seating area had to be structured the same as an ADA-compliant accessible path.... For these reasons, *most* modern auditoriums have accessible paths for wheelchair users that are somewhere *other than* the slope of the main floor." Id. at 12-13 (citing LaBrake Dec. ¶¶ 44-45, 48 (emphasis in original)).

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

Defendant reads too much into the exception provided in section 405.1. The plain language of the exception is that aisle ramps are not required to be part of an accessible path to the seating areas. This does not mean that aisle ramps can never be part of an accessible path, or that aisle ramps are exempted from being part of an accessible path if the planned design contains no alternative accessible path. [34] Defendant seems to suggest that Plaintiff's position would compel it to use the aisles as the accessible path, but that if it did so it would fail to comply with the line of sight requirements, forcing it to choose which provision to violate. However, the District does not seriously argue that it is impossible to design the auditorium to be in compliance with the Standards, and indeed Ms. Labrake states only that "most" modern buildings do not use auditorium aisles as accessible paths. Rather, it seems that the District has chosen to design the auditorium in such a way that makes it difficult to do so.

*21 Policy considerations also favor Plaintiff's interpretation of section 206.3. In addition to imposing distinct routes on wheelchair users to access the front accessible seats before and after an auditorium event, the District's proposed accessible route would require them to use a different path if they needed to leave their seats during the event, which is likely to lead to embarrassment or stigma. For example, once seated in the wheelchair accessible seats in the front row, if a student needed to use the bathroom during an event, the student would have to use the platform lift to ascend to the stage level, and then exit the right stage door to access one of the lavatories. All other students can use the aisles to exit toward the rear, in a direction away from the stage where the audience's eyes are generally directed. Only the wheelchair students would have to leave the seating area by passing in front of the stage on the way to the platform lift, which is inconsistent with the goals of the 2010 ADA Standards, which are explicitly to "promote inclusion, reduce stigma and potential embarrassment, and combat isolation, segregation, and second-class citizenship of individuals with disabilities." 75 Fed. Reg. at 56,241.

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.3.

### 3. Section 206.7 – the platform lift

Plaintiff next argues that the auditorium fails to comply with Section 206.7 of the Standards related to platform lifts. Doc. 63 at 23-25; Doc. 68 at 27. Defendant counters that the auditorium complies with section 206.7. Doc. 65-1 at 18-19, 30-32. As noted, Plaintiff concedes that the proposed platform lift is permitted to provide an accessible route to the stage from the front row seats. Doc. 63 at 25 n.9 (citing Standards § 206.7.1); N.T. 04/08/21 at 83-84. At issue is the District's plan to use the lift as part of the accessible route to reach the front seats. [35]

Section 206.7, entitled "Platform Lifts," provides in relevant part that "[p]latform lifts shall be permitted as a component of an accessible route in new construction." Standards § 206.7. It further provides that "[p]latform lifts shall be permitted to provide an accessible route to comply with the wheelchair space dispersion and line-of-sight requirements of 221 and 802." Id. § 206.7.2.

According to Plaintiff, platform lifts may only be part of an accessible route to reach wheelchair seating if necessary to achieve dispersion of wheelchair seating and/or to comply with line-of-sight requirements. Standards § 206.7.2. [36] Plaintiff believes that the lift is not necessary to comply with those requirements. Doc. 63 at 24-25 (citing Marinelli Dec. ¶¶ 49-53). Plaintiff also relies on the justifications for restricting the use of platform lifts to reach seating areas, including (1) platform lifts can only be used by one person at a time and so they impede people using wheelchairs from entering and leaving the space, (2) they require routine maintenance which can be overlooked and result in no access when the lift is inoperable, (3) they draw attention to the user, and (4) they require parents or other caregivers to separate from those who must use the lift because platform lifts cannot be used by non-disabled people. Marinelli Dec. ¶ 52; N.T. 04/08/21 at 87.

*22 The District takes the contrary position, asserting that the wheelchair lift is necessary to meet dispersion and line-of-sight requirements. Doc. 65-1 at 30-31. Section 221.2.3 requires, among

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 32 of 52

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)
2021 WL 1979501

other things, horizontal and vertical dispersion of wheelchair-accessible seating. 2010 ADA Standards § 221.2.3. [37] The District's experts opine that providing an accessible route between the stage and front seating area would be extremely difficult without the use of a lift because the stage is four feet and two inches higher than the floor of the front of the seating area -- a difference in elevation that is necessary to ensure that all audience members have adequate line-of-sight. Thus, the lift is necessary to comply with the dispersion requirements of section 221 and the line-of-sight requirements of section 802, and therefore complies with section 206.7. LaBrake Dec. at ¶ 85.

Interpretation of section 206.7 also seems to come down to familiar but undefined terms. A platform lift is "permitted to provide an accessible route to comply with" dispersion and line-of-sight requirements. The parties seem to agree that the underlined language means "necessary to comply" with such requirements. Although this construction adds a term to the regulatory language, I accept the parties' construction. Without inserting the term "necessary," the provision could be read to allow an entity extremely wide latitude in relying on dispersion or sight factors to be accommodated by lifts, which is clearly not the intention of the language.

But having agreed that the term "necessary" is the linchpin of this provision, the parties' arguments ascribe different meanings to the term. The term is defined as "that cannot be done without," or "absolutely required." Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/necessary (last visited 5/4/21). This language suggests, when read in context with the other language in section 206.7, that a platform lift can be part of an accessible path to wheelchair seating only when there is no other way to maintain dispersion and line of sight requirements.

Defendant has explained the dispersion and line of sight requirements, but does not establish that it could not design around those requirements by a method other than the lift. Plaintiff argues that use of the lift is necessitated not by dispersion and line of sight requirements but by the District's own design choices, and that those choices were not the only ones available when designing an auditorium in a newly constructed building. Second Declaration of Dominic Marinelli Dec. ¶ 22 (Doc. 68-4); N.T. 04/08/21 at 58-60 (introducing diagram with an alternative route, filed at Doc. 72-1), 91-92; see also Doc. 63-3 at 14 (Plaintiff-provided design concept that would be compliant); Doc. 68-4 at 5-10 (District's recently-built high school auditorium is compliant).

I am aware that the District faced many challenges in designing a building to meet a myriad of ADA and other requirements. Nevertheless, I am not persuaded that the District had no other design options than the lift it proposes. As noted, the District does not argue that a compliant auditorium would be impossible, only that it would be difficult. I decline to authorize the District to use the platform lift as part of an accessible path to the front seating area without a true showing of necessity.

For the aforementioned reasons, I conclude that the District's design for the auditorium does not comply with section 206.7 of the 2010 ADA Standards.

## IV. RELIEF

**\*23**  There remains the issue of the appropriate relief. Plaintiff's proposed order would require the District to cease construction and then sets forth a procedure for the District to submit revised plans and for Plaintiff to object. Doc. 62-2. I will not require the District to cease construction, but will leave it to the District to best determine how to manage its resources in light of this ruling and the Consent Decree, which otherwise remains in effect. I will adopt a procedure similar to that contained in the Consent Decree for revisions attributable to this ruling, with the adjustment that Plaintiff will have a defined time limit for any future motion to enforce the Consent Decree. That schedule will control, rather than the schedule in paragraph 3(b) of the Consent Decree.

## V. CONCLUSION

Plaintiff's motion to enforce the Consent Decree is proper, as it is neither moot nor precluded by the doctrine of laches. Moreover, Defendant is not entitled to a modification of the Consent Decree to eliminate the paragraph upon which Plaintiff's motion is based. Defendant's cross-motion for modification of the Consent Decree will therefore be denied.

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

On the merits, Defendant's plan for the New Middle School's auditorium does not comply with Sections 206.2.6, 206.3, and 206.7 of the 2010 ADA Standards. Accordingly, Plaintiff's motion will be granted.

An appropriate Order follows.



**ORDER**

AND NOW, this 18th day of May 2021, upon consideration of Plaintiff's motion to enforce consent decree and brief in support thereof (Docs. 62 & 63), Defendant's response in opposition thereto, which includes a cross-motion to modify the consent decree (Doc. 65), and Plaintiff's response thereto (Doc. 68), IT IS HEREBY ORDERED that the motion to enforce is GRANTED and the cross-motion is DENIED.

IT IS FURTHER ORDERED that, with regard to revisions attributable to this Order, the parties shall abide by the following schedule:

1. Defendant shall submit to Plaintiff revised construction drawings for the New Middle School auditorium, with accompanying explanations that specifically identify all proposed accessible paths and seating, within 30 days of the date of the Order;

2. Plaintiff shall have 14 days from receipt of Defendant's revised construction plans and accompanying explanations in which to seek any clarifications from Defendant, and Defendant shall have 14 days thereafter in which to respond; and

3. Any unresolved dispute(s) must be the brought to the court's attention on or before August 31, 2021.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1979501

---

**Footnotes**

1    The Order was entered by the Honorable Gerald J. Pappert, to whom this matter was formerly assigned. The parties thereafter consented to magistrate judge jurisdiction, and Judge Pappert transferred the case to the undersigned. Docs. 56 & 57.

2    The court retains jurisdiction to interpret and enforce the Consent Decree. Order ¶ 3; Consent Decree ¶ 46.

3    The relevant 2010 ADA Standards are attached to Plaintiff's motion. Doc. 63-5.

4    There is a slight discrepancy in the experts' seat count. See Declaration of Kimberly LaBrake, AIA, NCARB (Defendant's architect), Doc. 65-7 ("LaBrake Dec."), ¶ 41 (468 seats); Declaration of Daniel Hersh, Jr., A.I.A., LEED AP BD+C (Defendant's architect), Doc. 65-8 ("Hersh Dec."), ¶ 34 (468 seats); Declaration of Dominic Marinelli (Plaintiff's accessibility expert), Doc. 63-3 ("Marinelli Dec."), ¶ 28 (467 seats).

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

5    Both parties have provided renderings of the auditorium, which are all based on the drawings prepared by the District's architects. See Marinelli Dec. at Exhs. A & B (Doc. 63-3 at 18 & 20); LaBrake Dec. at Exh. 2 (Doc. 65-7 at 20). The last of these is the version appended to this Memorandum. It provides an overhead view depicting the auditorium layout, with handwritten notations added by the architects "to provide data that is otherwise only apparent from other sheets of the design." LaBrake Dec. ¶ 39.

6    The term "accessible" is defined as compliant with the 2010 ADA Standards. 2010 ADA Standards § 106.5. The accessibility of restrooms is not at issue. The drawing depicts a ramp inside each stage entrance door leading along either side of the stage. These ramps are not discussed in the briefs, and Plaintiff has raised no objection to their accessibility. I will refer to these areas as corridors along either side of the stage.

7    The District maintains that both the lift and the steps leading from the well to the stage are behind floor-to-ceiling walls, and are therefore not visible to persons seated in the auditorium. LaBrake Dec. ¶ 55.

8    "As shown in the notations, the floor slopes a total of 4'2" over the course of 39 feet from back to front. Accomplishing such a drop requires 1:9 slope ration (or 11.1% grade); this exceeds the maximum slope of an ADA-accessible route of 1:12 (or 8.33% grade) ...." LaBrake Dec. ¶ 42 (citing 2010 ADA Standards § 405). Neither party disputed this measurement at oral argument. N.T. 04/08/21 at 4-5. The aisles also do not have landings, which must be used with ramps exceeding a rise in elevation of 30 inches. Marinelli Dec. ¶ 36 (citing 2010 ADA Standards §§ 405.6, 405.7).

9    The appended diagram marks out this route with arrowed lines and the notations "accessible route from back of auditorium to stage" and "accessible route from front of auditorium to stage," which were added in red to the exhibit attached to Ms. LeBrake's declaration. LeBrake Dec. ¶ 39 & at Exh. 2.

10    The District did not "double check those measurements," N.T. 04/08/21 at 5, but did not dispute that they are roughly accurate. The diagram does not contain sufficient details to calculate specific distances, but does make clear that the distance is more than two times greater and involves leaving the auditorium and traversing portions of three hallways.

11    The District contends that the Consent Decree did not require it to identify the accessible route. See N.T. 04/08/21 at 7. The Consent Decree required the District to provide construction plans "sufficient for Plaintiff to determine whether the New Middle School meets the terms of the Consent Decree," Consent Decree ¶ 3(b), and the parties dispute whether it could be determined from the drawings that the slope of the aisles exceeded that permissible for them to be accessible. N.T. 04/08/21 at 7, 8-9.

12    Plaintiff concedes that his submission was outside the thirty-day period set forth in the Consent Decree, see Consent Decree ¶ 3(b), but contends that there were technical difficulties in accessing the online materials linked to the District's August 9, 2019 email. See Doc. 68 at 46-47 (with exhibit citations). The District concedes that it also took longer than the thirty days specified in the same subparagraph of the Consent Decree in which to respond to Plaintiff's submission. Doc. 65-1 at 6 n.5.

13    Mr. Marinelli has been "providing consulting services devoted to making our built environment accessible to people with disabilities" for more than 30 years, assisting "property owners and

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

designers navigate the accessibility requirements in design and construction that apply to any given building, both at the state and federal level." Marinelli Dec. ¶ 1.

14    Kimberly LaBrake has "been a registered, licensed architect since 2005, with a focus primarily in designing public schools, municipal buildings ..., and healthcare renovation projects...." LaBrake Dec. ¶ 2. Ms. LaBrake works for D'Huy Engineering, the firm engaged by the District to manage the planning, approvals, design, and construction of the New Middle School, and was assigned to assess it accessibility. Id. ¶¶ 21-22. Daniel Hersh is also a licensed architect of longstanding who works for Breslin Ridyard Fadero Architects, the firm retained by the District to prepare the construction documents for the New Middle School, and is the project architect. Hersh Dec. ¶¶ 1, 5, 22-23. M. Arif Fazil is a licensed Professional Engineer and President of D'Huy Engineering, with 33 years of experience in planning, design, and implementation of public school facilities. Fazil Dec. ¶¶ 1-4, 16.

15    In his reply, Plaintiff includes what appears to be a complete chronological summary of each correspondence between the parties between August 9, 2019, and December 1, 2020, with exhibit citations. See Doc. 68 at 38-54. The court will not include each correspondence in its summary.

16    Plaintiff explained at oral argument that the District's stated purpose of the lift in the LaBrake Response was permissible because it was limited to a student in a wheelchair reaching the stage once seated in the front row, see N.T. 04/08/21 at 22, 24-25, but that the District's broader purpose to use the lift as the accessible route by which people in wheelchairs would access the seating at the front of the auditorium was not made clear and is not permissible. Id. at 22-23, 25.

17    The 2010 ADA Standards impose line of sight and dispersion requirements for wheelchair accessible seating in assembly areas. 2010 ADA Standards § 221.2.3.

18    The District responded that the ADA Standards do not require seating in the middle section of the auditorium, Doc. 65-15 at 5, and Plaintiff no longer asserts any objection based on dispersion of the accessible seats.

19    Item QQ related to the guidance services counter, which is not at issue. The District's email did not highlight item OO, which the District believed to be closed. Doc. 65-13 at 10.

20    The District's position is that during the course of this correspondence, it had clearly stated that the auditorium's accessible routes were to the front and to the back of the wheelchair seating areas, and not through the middle of the room, and that since its first response in January 2020, it was clear that the center aisles of the Auditorium were not intended to be accessible routes, and that those routes would be located elsewhere. However, as Plaintiff points out, see Doc. 68 at 51 n.29, although the District said where the accessible routes would not be located, it did not explain where the accessible route would be located.

21    "Circulation Path" is defined as a "way of passage provided for pedestrian travel." 2010 ADA Standards § 106.5. "Accessible routes shall coincide with or be located in the same area as general circulation paths." Id. § 206.3.

22    I interpret the "side entrance" referenced by the District to be what I have called the right stage entrance on the appended drawing. Such an interpretation is consistent with the referenced entrance being "at stage level," as stated in the same August 2, 2020 email.

23    The above communications did not reference the ongoing construction of the New Middle School. According to the District, construction began in September 2019 as scheduled, and continued

S.F. by K.F. v. School District of Upper Dublin, Not Reported in Fed. Supp. (2021)

2021 WL 1979501

through 2020 except for a six-week period from late March through April 2020 when most activities were halted due to the Covid-19 coronavirus pandemic. See Fazil Dec. ¶¶ 28, 37. The construction of the new building portion of the New Middle School has a budget of approximately $60 million. Id. ¶ 40. The parties dispute whether S.F.'s parents were on notice of the ongoing construction.

24    Although Kisor involved an agency that interpreted and applied its own regulations, to which a deferential standard applies, the Supreme Court made clear that these principles of statutory interpretation apply where, as here, the court is not confronted with an agency's interpretation of its own regulations. See 139 S. Ct. at 2415 ("To make that effort [of determining whether a regulation is ambiguous], a court must 'carefully consider[ ]' the text, structure, history, and purpose of a regulation, *in all the ways it would if it had no agency to fall back on.*") (citation omitted) (emphasis added).

25    The District similarly waited more than 30 days to respond to Plaintiff's initial list of comments, also outside the time contemplated. Consent Decree ¶ 3(b).

26    Congress directed the Attorney General to issue regulations to carry out the accessibility provisions of the ADA, 42 U.S.C. § 12186(b), pursuant to which the DOJ adopted the Standards. As noted, the relevant Standards are attached to Plaintiff's motion. Doc. 63-5. The complete document can be found at https://www.ada.gov/ regs2010/2010ADAStandards/2010ADAstandards.htm.

27    Defendant notes that Mr. Marinelli never raised an objection pursuant to section 206.2.6, and that Plaintiff's counsel raised it for the first time in a November 2020 telephone call, approximately one month before the present motion was filed. Doc. 65-1 at 16-17, 28. Based on my previous discussion, I conclude that Plaintiff sufficiently identified the issue by insisting that the lift could not be part of the accessible route to the seating area.

28    The Standards denote defined terms by italicizing them throughout, however I will quote the Standards using standard font.

29    The definition "include[es] but [is] not limited to, walks, hallways, courtyards, elevators, platform lifts, ramps, stairways, and landings." Standards § 106.5.

30    Defendant assumes that for purposes of assemblies, middle school students are told where to go and which entrance to use, and that they are therefore not given a choice as to which entrance or seats to use. N.T. 04/08/21 at 75 ("Students go down to the auditorium by class and they enter the auditorium by class and they sit where they are told to sit."). Even were this to be accepted as true for school assemblies, the same assumption would not necessarily apply for events such as plays or concerts attended by students, their families, and members of the community outside of school hours.

31    The District also expresses concern that this interpretation would make it "impossible in many buildings" to maintain proper line-of-sight because the entire floor would have to meet the Standard's slope and area of respite requirements. LaBrake Decl. ¶ 80. The District's impossibility argument will be addressed more fully later in this opinion, see infra at 42-43. Suffice it to say that the District's concern in this regard does not override the plain language of the regulation.

32    The District and Ms. LaBrake err in stating that the hallway is on the other side of the auditorium wall. As depicted in the appended diagram, there are rooms between the auditorium and the long corridor to the right, including lavatories and storage rooms.

33    Section 802 of the Standards pertains to "Wheelchair Spaces, Companion Seats, and Designated Aisle Seats." Section 802.2 requires that spectators seated in wheelchair spaces be afforded lines of sight over heads and between heads comparable to the lines of sight of other spectators. Standards § 802.2.1.

34    Plaintiff points out that in its Technical Guide, the Access Board addressed section 405's requirement for handrails on accessible routes in assembly areas, noting that "[a]isle ramps that are part of an accessible route can have handrails on at least one side." Doc. 68 at 25 (citing U.S. Access Board, Technical Guide – Ramps and Curb Ramps (Doc. 63-6), at 7). This supports the notion that aisles can be part of an accessible route.

35    I have already held that the District's proposed accessible path to the front row seats violates section 206.3, but will also address whether section 206.7 provides an independent basis for finding fault with the District's plan. Defendant maintains that Plaintiff abandoned this challenge by stating that the issue of the platform lift was "closed." Doc. 65-1 at 11 n.7; see supra at 10; Doc. 65-10 at 12 (Issue 88). However, as previously noted, the District had identified the lift as the means by which wheelchair users would travel between the front row seating and the stage, which Plaintiff concedes is a permissible use, and it was unclear that the District also intended the lift to be part of the accessible route for wheelchairs to access the front row seat. N.T. 04/08/21 at 22-25.

36    The DOJ explained the line-of-sight and dispersion requirements as follows: "Consistent with the overall intent of the ADA, individuals who use wheelchairs must be provided with equal access so that their experience is substantially equivalent to that of other members of the audience." Standards § 221.2.3 Advisory. Line-of-sight requirements ensure that people seated in wheelchair accessible spaces will be able to see the event or performance. Id. § 802.2. Dispersion requirements provide that assembly areas with more than 300 seats disperse the accessible seating vertically and horizontally. Id. §§ 221.2.3.1, 221.2.3.2.

37    "Horizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side." Standards § 221.2.3.1 Advisory. "When wheelchair spaces are dispersed vertically ... they are placed at different locations within the seating area from front-to-back so that the distance from the ... stage ... is varied among wheelchair spaces." Id. § 221.2.3.2 Advisory.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

2022 WL 787957
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

UNITED STATES of America EX
REL. Shauna HLYWIAK, Plaintiff,

v.

GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., et al., Defendants.

No. 1:20-cv-13590
|
Filed 03/15/2022

**Attorneys and Law Firms**

Noah Axler, Anderson Kill, P.C., 1760 Market St., Suite 600, Philadelphia, PA 19103, David M. Cedar, Williams Cedar, LLC, 8 Kings Highway West, Suite B, Haddonfield, NJ 08033, Gerald J. Williams, Williams Cedar, LLC, One South Broad St., Suite 1510, Philadelphia, PA 19107, On behalf of Plaintiff/Relator Shauna Hlywiak.

Jonathan Spells Krause, Corinne Samler Brennan, Klehr Harrison Harvey Branzburg, LLP, 1000 Lincoln Drive East, Suite 201, Marlton, NJ 08053, On behalf of Defendants Great Lakes Educational Loan Services, Inc., Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC; and Nelnet, Inc.

David G. Murphy, Diane A. Bettino, Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, NJ 08540, On behalf of Defendants Navient Corporation and Navient Solutions LLC.

Stephen M. Orlofsky, Nicholas C. Harbist, Blank Rome LLP, 300 Carnegie Center, Suite 220, Princeton, NJ 08540, Blair A. Gerold, Blank Rome LLP, 1 Logan Square, Philadelphia, PA 19103, On behalf of Defendant Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.

David Edward Dauenheimer, U.S. Department of Justice Office of the U.S. Attorney, 970 Broad St., Newark, NJ 07102, On behalf of Interested Party United States.

**OPINION**

O'HEARN, District Judge.

**INTRODUCTION**

**\*1** Plaintiff/Relator Shauna Hlywiak ("Relator") brings this *qui tam* action against Defendants Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc. (collectively, "Nelnet"), Navient Corporation and Navient Solutions LLC (collectively, "Navient"), and Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing ("PHEAA," and together with Great Lakes, Nelnet, and Navient, the "Defendants"), [1] alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). (Am. Compl., ECF No. 5, ¶ 1). In her Amended Complaint (ECF No. 5), Relator alleges that Defendants, which service federal student loans, are liable under the FCA for violating federal and state laws in breach of their servicing contracts ("Servicing Contracts") with the U.S. Department of Education ("DOE") by failing to apply student loan borrowers' payments to those borrowers' loans with the highest interest rate since the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") [2] was passed in March 2020. (Am. Compl., ECF No. 5, ¶¶ 5–9). Now, this matter comes before the Court upon PHEAA's Motion to Dismiss the Amended Complaint, (ECF No. 71), which Navient, Great Lakes, and Nelnet join (ECF No. 72; ECF No. 73). For the reasons that follow, the Court **GRANTS** Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72; ECF No. 73) and **DISMISSES** the Amended Complaint (ECF No. 5).

**I. BACKGROUND**

**A. Procedural History**

Relator instituted this *qui tam* action on September 30, 2020. (ECF No. 1). After an investigation into Relator's claims, the United States filed a Notice of Election to Decline Intervention on January 5, 2021. (ECF No.

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 40 of 52

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

3). Relator filed an Amended Complaint against the Defendants on January 7, 2021. (ECF No. 5). [3]

In their Joint Motion to Dismiss, Defendants argue that the Amended Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) because Relator fails to state a claim under the FCA as she fails to plausibly allege (i) that Defendants submitted false claims; (ii) that any alleged misrepresentations —which there were none—were material to DOE's decision to pay Defendants; (iii) that Defendants acted with the requisite scienter under the FCA; and (iv) that Defendants acted with the requisite particularity required by Rule 9(b). (ECF No. 71 at 1–4).

**\*2** Having considered the parties' arguments, the Court agrees with Defendants that Relator fails to state a claim and concludes that the Amended Complaint must be dismissed.

### B. Factual Background [4]

#### 1. Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), DOE has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, (ECF No. 5, ¶ 29). The Federal Student Aid ("FSA") office, a part of DOE, is responsible for managing these federal loan programs authorized under the HEA. (ECF No. 5, ¶ 29).

Congress directed DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, DOE awarded each Defendant a Servicing Contract with a five-year term, each of which has been extended numerous times. (ECF No. 5, ¶¶ 30, 32, 36). The Servicing Contracts require each Defendant to " 'be responsible for maintaining

a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.' " (ECF No. 5, ¶¶ 33, 44, 56). [5] DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (ECF No. 5, ¶¶ 48–51; Ex. A, § B.13). The Servicing Contracts guarantee a minimum annual revenue for each Defendant "provided that [they are] in compliance with the requirements for servicing federally held debt." (ECF No. 5, ¶ 31; Ex. A, § B.13). The Servicing Contracts also state:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer[s] (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

**\*3** (ECF No. 5, ¶ 46; Ex. A, § B.13).

Relator alleges that Defendants were not servicing loans in compliance with the Servicing Contracts because they violated federal and state law after the CARES Act was passed in March 2020.

#### 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance[6] until September 30, 2020, meaning that all payments due for certain student loans held by DOE were suspended, interest on these loans would not accrue after March 13, 2020, and the interest rates on the loans were temporarily reduced to 0% (the "CARES Act Forbearance Period"). Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education ("Secretary") to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum.[7] Since that first extension, the CARES Act Forbearance Period has been extended several times—most recently until May 1, 2022.[8]

Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a borrower has more than one loan.

### 3. Relator's Prepayments and Allegations against Defendants

**\*4** Relator Shauna Hlywiak, whose federal student loans are serviced by Great Lakes, made prepayments between March and August 2020 during the CARES Act Forbearance Period, (ECF No. 5, ¶¶ 112–22). Relator alleges that Great Lakes wrongfully applied her prepayments proportionally across her various loans, instead of allocating her prepayments to the loans with the highest interest rate. (ECF No. 5, ¶¶ 123–26). Relator argues that this proportional allocation method violates federal and state law because Great Lakes was required to allocate each prepayment to her loans with the highest interest rate, and that Great Lakes' website stated that it would apply prepayments to a borrower's highest interest rate loans. (ECF No. 5, ¶¶ 123–26).

An example of Defendants' proportional allocation method is instructive. Relator made a $1,300 prepayment toward her federal student loans during the CARES Act Forbearance Period on May 15, 2020. (ECF No. 5, ¶ 115). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, and her $1,300 prepayment was allocated proportionally among the principals of her federal student loans as follows:

| Loan Number | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Prior to the COVID Forbearance Period |
|---|---|---|---|---|
| 519 | $0.00 | $0.00 | $3,247.42 | 5.600% |
| 520 | $36.40 | $0.00 | $2,406.49 | 6.800% |
| 521 | $0.00 | $0.00 | $4,175.21 | 4.500% |
| 522 | $69.94 | $0.00 | $4,601.54 | 6.800% |
| 523 | $34.97 | $0.00 | $2,300.72 | 6.800% |
| 524 | $0.00 | $0.00 | $5,103.01 | 3.400% |

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

| 525 | $32.37 | $0.00 | $2,135.00 | 6.800% |
| 526 | $0.00 | $0.00 | $5,190.38 | 3.400% |
| 527 | $5.33 | $0.00 | $348.33 | 6.800% |
| 528 | $172.64 | $0.00 | $11,369.12 | 5.410% |
| 529 | $233.60 | $0.00 | $14,723.05 | 6.210% |
| 530 | $111.41 | $0.00 | $7,332.11 | 5.410% |
| 531 | $315.90 | $0.00 | $20,796.26 | 5.840% |
| 533 | $297.44 | $0.00 | $19,548.79 | 5.310% |

(ECF No. 5, ¶ 116). She asserts that Great Lakes violated federal and state law when it proportionally allocated her prepayment, as Great Lakes should have allocated her $1,300 prepayment only to her loans that had been assigned a 6.800% interest rate—the highest interest rate—prior to the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 123–125). Relator alleges that she "brought the misallocation to the attention of Great Lakes" via e-mail, and Great Lakes responded explaining that the interest rates for Relator's loans are not "taken into consideration" because all the interest rates of her loans had been lowered to 0% during the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 126–27). Therefore, the prepayments were prorated across her loans "based on the outstanding principal balance only." [9] (ECF No. 5, ¶ 127).

Relator alleges that after this "exchange" with Great Lakes, she contacted other individuals whom Relator knew were also continuing to pay their federal student loans during the CARES Act Forbearance Period, and that these individuals, whose loans were serviced by Great Lakes, Nelnet, Navient, and PHEAA, sent her "screenshots" showing that these Defendants were proportionally allocating these individuals' prepayments as well. (ECF No. 5, ¶ 128).

### 4. Defendants' Website Representations

Relator alleges that Great Lakes' website indicates that Great Lakes' default payment allocation method for prepayments is that the portion of the prepayment that is applied to principal will be applied to the principal of a borrower's highest-interest-rate loan, including those

that are in forbearance. (ECF No. 5, ¶¶ 94–95). Nelnet's website allegedly makes a similar representation that any prepayment will be allocated across a borrower's loans "starting with the highest interest rate," including those loans that are "not in repayment status," which Relator interprets to mean those loans in forbearance. (ECF No. 5, ¶¶ 96–97). Relator further alleges that Navient's website indicates the same default allocation method: where a borrower does not "provide special payment instructions," a prepayment will be allocated to a borrower's loan with the highest interest rate. (ECF No. 5, ¶ 98). Relator's allegations regarding PHEAA's website do not discuss PHEAA's payment allocation method, and instead allege that its website states that a prepayment could assist a borrower to "pay less interest over the life" of the borrower's loan by making prepayments. (ECF No. 5, ¶ 101). [10]

### 5. Alleged Violations of Federal and State Law

**\*5** In asserting that Defendants violated federal law, Relator relies on former President Obama's Presidential Memorandum ("Presidential Memorandum") issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "[a]s soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate ... unless otherwise instructed by borrowers." [11] Relator further asserts that Defendants violated the Consumer Financial Protection Act ("CFPA"), "which prohibits 'unfair, deceptive, or abusive acts or practices' in connection with any

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," (ECF No. 5, ¶ 110 (citing 12 U.S.C. § 5531)), and briefly refers to a case where the Consumer Financial Protection Bureau ("CFPB") sued Navient under the CFPA "for making misrepresentations to borrowers and misallocating payments, in context other than those set forth in this Amended Complaint," (ECF No. 5, ¶ 110).

Relator alleges that Defendants also violated the following state laws: (1) New Jersey's Student Borrower Bill of Rights (N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*); (2) California's Student Borrower Bill of Rights (CAL. CIV. CODE § 1788.100 *et seq.*); (3) Colorado's Student Loan Servicers Act (COL. REV. STAT. ANN. § 5-20-101 *et seq.*); (4) North Carolina's Student Borrowers' Bill of Rights (H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019)); (5) Rhode Island's Student Loan Bill of Rights (19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.*); and (6) Virginia's law regulating education loan servicers, (2020 Va. Legis. Serv. ch. 1198 (West) (codified at VA. CODE ANN. § 6.2-2611(4))). (ECF No. 5, ¶¶ 58–63).

### 6. Violation of the False Claims Act (Count I)

In a single Count in the Amended Complaint, Relator alleges that Defendants knowingly violated the Presidential Memorandum, the CFPA, and numerous state laws, and therefore, when Defendants knowingly failed to disclose to the Government that they had committed these violations when seeking to be paid for their services under the Servicing Contracts, Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval" and "knowingly made, used, or caused to be made or used a false record or statements material to false or fraudulent claims." (ECF No. 5, ¶ 131–32).

Relator alleges that the Government paid for these claims which would not otherwise have been allowed to be paid under the Servicing Contracts, and that the Government relied on the accuracy of Defendants' "claims, statements, and records," unaware of their false and fraudulent nature. (ECF No. 5, ¶ 133). Relator asserts that "Defendants acted with the requisite scienter" and that compliance with these laws

and contractual provisions were a "precondition of payment by the United States Government." (ECF No. 5, ¶ 134). Relator alleges that due to Defendants' proportional payment allocation method, borrowers' student loans will remain in repayment longer with Defendants receiving additional fees for an extended period of time, resulting in the Government paying more in servicing fees over the life of the loans. (ECF No. 5, ¶ 136).

**\*6** According to Relator, the Servicing Contracts permit the Government to order the return of all the servicing fees that were billed and paid "from the time of noncompliance with any applicable federal requirement." (ECF No. 5, ¶ 135). Consequently, every billing made to the Government for servicing the accounts of borrowers that made prepayments during the CARES Act Forbearance Period is an independent false claim under the FCA. (ECF No. 5, ¶ 135).

## II. LEGAL STANDARD

### A. Motion to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. *Id.* at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When reviewing a plaintiff's complaint on a motion to dismiss under Rule 12(b)(6), the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi*, 696 F.3d

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 44 of 52

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

352, 358 n.1 (3d Cir. 2012). When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that form the basis of the claim. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## B. The False Claims Act

Under the FCA, it is unlawful to knowingly submit a fraudulent claim to the federal government. *In re Plavix Mktg., Sales Prac. & Prod. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 938 (D.N.J. 2017) (citing *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d. Cir. 2014)). The FCA includes a *qui tam* provision permitting private parties, known as relators, to bring suit on behalf of the United States against anyone who has submitted a false claim to the government. *Id.* at 938–39 (citing *Schumann*, 769 F.3d at 840). A violation of the FCA has four elements: (1) falsity, (2) causation, (3) knowledge, and (4) materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d. Cir. 2017).

There are two primary categories of false claims that can satisfy the falsity requirement: (1) factually false claims and (2) legally false claims. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Wilkins v. United Health Grp. Inc.*, 659 F.3d 295, 305 (3d. Cir. 2011).

**\*7** Legally false claims are subcategorized into two theories of liability: (1) express false certification and (2) implied false certification. *United States v. Kindred Healthcare Inc.*, 469 F. Supp. 3d 431, 444–45 (E.D. Pa. 2020). A defendant is liable under the express false certification theory when they falsely certify that they have complied with a material statute, regulation, or contractual provision. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "By contrast, implied false certification

liability attaches when a claimant 'makes specific representations about the goods or services provided' and the claimant's 'failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.' " *United States v. Eastwick Coll.*, 657 F. App'x 89, 93–94 (3d Cir. 2016) (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016)).

Because FCA claims allege fraud, they are subject to the heightened pleading standards of Rule 9(b). *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d. Cir. 2014). For a relator to satisfy the standards of Rule 9(b) for purposes of FCA claims, the relator "must provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' Describing a mere opportunity for fraud will not suffice. Sufficient facts to establish 'a plausible ground for relief' must be alleged." *Id.* at 157–58 (citing *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) and *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)).

## III. DISCUSSION

Because Relator asserts that the Defendants violated the FCA by failing to disclose noncompliance with "material statutory, regulatory, or contractual requirements" when making "specific representations about the goods or services provided," Relator's claims are based on an implied false certification liability theory. *Eastwick Coll.*, 657 F. App'x at 93–94. Among Defendants' arguments for dismissal are that Relator fails to allege (a) that Defendants submitted false claims, (b) that such alleged misrepresentations were material to the Government's payment decisions, and (c) that the Defendants acted with the requisite scienter. The Court agrees and therefore grants their Joint Motion to Dismiss.

## A. Falsity

Relator bases her FCA claim on her allegation that Defendants failed to disclose that they violated the Presidential Memorandum, the CFPA, New Jersey's Student Borrower Bill of Rights, California's Student

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 45 of 52

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

Borrower Bill of Rights, Colorado's Student Loan Servicers Act, North Carolina's Student Borrowers' Bill of Rights, Rhode Island's Student Loan Bill of Rights, and Virginia's law regulating education loan servicers. [12] "The falsity element 'asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government.' " *United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, No. 19-18753, 2021 WL 1904735, at *5 (D.N.J. May 12, 2021) (quoting *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020)). The Court will address each of these alleged violations.

### 1. Alleged Violation of the Presidential Memorandum

**\*8** Defendants argue that the Presidential Memorandum places no direct obligation on servicers and was not law. Rather, the memorandum expressed the President's "policy preferences" and directed the Secretary to take further action; however, the Secretary never implemented the Presidential Memorandum's directive. (ECF No. 71 at 6–7, 16–18). Defendants are correct. The relevant portion of the Presidential Memorandum reads, "As soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." The Secretary, who has the authority to implement this change by promulgating regulations under 20 U.S.C. § 1082 (a)(1) of the HEA did not do so.

In Relator's Response in Opposition, Relator repeatedly refers to the Presidential Memorandum as "federal law," (ECF No. 80 at 5), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to argue that the President was acting through an "express or implied authorization of Congress" when issuing the Memorandum. (Case No. 21-09096, ECF No. 15 at 13–16). [13] However, Relator misses the mark. The Court need not determine whether former President Obama could issue the Presidential Memorandum—a fact no one disputes. Nor must the Court dive into the constitutional separation of powers because the HEA and the Presidential Memorandum do not conflict. Congress empowered the Secretary through

the HEA to "prescribe such regulations as may be necessary ... including regulations applicable to third party servicers." 20 U.S.C. § 1082(a)(1). The Presidential Memorandum instructed the Secretary to direct student loan servicers to allocate prepayments to a borrower's highest interest rate loan, through the Secretary's authority under the HEA, "[a]s soon as practicable." STUDENT AID BILL OF RIGHTS at 13476. The Secretary did not take the necessary action to transfer the President's policy objectives into law. This is unequivocally shown by two DOE publications, unenacted Congressional bills, and guidance issued by the FSA.

In July 2016, former Under Secretary of Education Ted Mitchell issued a memorandum ("Mitchell Memorandum") entitled "Policy Direction on Federal Student Loan Servicing" which "provide[d] policy direction for servicing of all federal student loans." U.S. DEPT OF EDUC., POLICY DIRECTION ON FEDERAL STUDENT LOAN SERVICING [hereinafter MITCHELL MEMORANDUM] (2016) at 1. One of DOE's "policy directions" was to instruct servicers to apply prepayments to "the [borrower's] loan bearing the highest interest rate." *Id.* at 25. The Mitchell Memorandum intended the "policy choices" to be applied "to the ... extent feasible," and noted that some "aspects of this policy guidance" would need to be implemented through "future rulemakings," if "not currently allowable under [DOE's] regulations." *Id.* at 1 n.2. However, this "policy direction" was never implemented, and in April 2017, former Secretary Betsy DeVos formally withdrew the Mitchell Memorandum in a letter ("DeVos Letter") addressed to FSA. U.S. DEP'T OF EDUC., STUDENT LOAN SERVICER RECOMPETE [hereinafter DEVOS LETTER] (2017) ("As we move forward ... I am withdrawing ... the July 20, 2016 memorandum to you from former Under Secretary Ted Mitchell."). Congress also recognized that servicers were not required to allocate prepayments to a borrower's highest interest rate loan by introducing two bills in 2019 that would have amended the HEA to require servicers to do so; however, neither was passed. H.R. 5294, 116th Cong. § 2(g)(2) (2019); S. 1354, 116th Cong. § 3(a)(16)(G)(ii) (2019).

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 46 of 52

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

*9 Then, in February 2021, the FSA issued guidance ("FSA Guidance") confirming that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] at 1 (2021). Relator attempts to argue that the Court should ignore the FSA's "interpretation" of federal law (Case No. 21-09096, ECF No. 15 at 13), yet there are no regulations or statutes that cause the Court to question the statements in the FSA Guidance, nor have Plaintiffs identified any such regulations or laws.[14] The FSA Guidance simply confirms that, at the time it was issued, the HEA and DOE's regulations did not require loan servicers to allocate borrowers' prepayments to their highest-interest-rate loans. Therefore, the Amended Complaint fails to allege any violation of the HEA or DOE regulations, as the Presidential Memorandum was never implemented into law by the Secretary.

## 2. Alleged Violation of the CFPA

Relator next tries to ground Defendants' liability under the FCA in their alleged failure to disclose a supposed violation of the CFPA. Defendants argue that none of their website statements cited in the Amended Complaint reflects an "unfair, deceptive or abusive" act or practice as prohibited by the CFPA. (ECF No. 71 at 24–32). Defendants further note that they "are unaware of any court that has found a violation of the FCA based on a false certification of compliance with the CFPA." (ECF No. 71 at 25). The Court similarly has been unable to locate any case where a court has found a violation of the FCA based on non-compliance with the CFPA. Yet Relator's Response in Opposition wholly ignores each of Defendants' arguments regarding the CFPA and fails to mention the statute at all. Relator would have the Court find in her favor without providing a single case or argument while asking the Court to rule on a matter of first impression. Given Relator's apparent concession that the Amended Complaint fails to plausibly allege a violation of the CFPA, the Court declines to do so.

## 3. Alleged Violations of State Law

Relator next alleges that Defendants submitted false claims by failing to disclose supposed violations of six state laws. However, upon cursory review, Relator's allegations quickly and easily fail.

First, the California and Virginia state laws on which Relator relies were not even in effect in 2020 when the alleged misconduct in the Amended Complaint occurred. See CAL. CIV. CODE § 1788.100 et seq. (effective Jan. 1, 2021); VA. CODE ANN. § 6.2-2600 et seq. (effective July 1, 2021). And North Carolina's "law" is not a law at all, but a bill that was introduced in North Carolina's legislature in April 2019, yet never enacted. See H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019).

Next, the remaining three laws that Defendants allegedly violated—Colorado's Student Loan Servicers Act, New Jersey's Student Borrower Bill of Rights, and Rhode Island's Student Loan Bill of Rights—do not require that student loan servicers apply prepayments to a borrower's highest-interest-rate loan. See COL. REV. STAT. ANN. § 5-20-101 et seq.; N.J. STAT. ANN. § 17:16ZZ-1 et seq.; 19 R.I. GEN. LAWS ANN. § 19-33-1 et seq. Instead, each contains a provision requiring that servicers "inquire of a student loan borrower" how to apply a prepayment to the borrower's student loans and to continue to implement the borrower's instructions on a go-forward basis. See COLO. REV. STAT. § 5-20-108(3)(a) (2019) ("[A] student loan servicer shall inquire of a borrower how to apply a[ ] [prepayment] to a student education loan.... A borrower's direction on how to apply a[ ] [prepayment] to a student education loan shall stay in effect for any future [prepayments]."); N.J. STAT. ANN. § 17:16ZZ-8(b) (2019) (similar); 19 R.I. GEN. LAWS § 19-33-8(g) (similar). The Amended Complaint includes no allegations that Defendants failed to request borrowers provide instructions on how to apply their prepayments, or that Defendants failed to follow their instructions.

*10 In her Response in Opposition, Relator attempts to assert new facts that Defendants failed to follow the borrower's explicit instructions which directed the

Case 3:18-cv-00121-JFS-PJC    Document 220-1    Filed 02/06/26    Page 47 of 52

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

Defendants to allocate prepayments to their highest-interest-rate loans, (ECF No. 80 at 5), but the Amended Complaint is devoid of these allegations. Relator also attempts to incorporate new allegations that Defendants violated the New Jersey Consumer Fraud Act as a basis for her FCA claim (ECF No. 80 at 5), but these allegations are also not included in the Amended Complaint and will not be considered by the Court. *W. Penn Power Co.*, 147 F.3d at 259; *see Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 301 n.1 (E.D.N.Y. 2014) ("To the extent Plaintiff has any factual allegations sufficient to state a claim ... Plaintiff should include all of the necessary allegations in an amended complaint.").

The Amended Complaint fails to plausibly allege that Defendants violated any federal or state law or regulation to support the allegations that Defendants failed to disclose such supposed violations when submitting claims for payment. Accordingly, it must be dismissed.

**B. Materiality**

Even if Relator did plausibly allege that Defendants violated a federal or state statute or regulation and submitted false claims by failing to disclose the supposed violation, Relator fails to allege sufficient facts to show that any supposed violations were material to the Government's payment decision.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 579 U.S. at 192. As set forth in *Escobar*, a misrepresentation is not material solely because compliance has been deemed a condition of payment, "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.

The FCA's materiality standard is "rigorous" and "demanding[,]" and the statute is not meant to be an "all-purpose antifraud statute ... or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 193–94. "[A] material misrepresentation is one that goes 'to the very essence

of the bargain.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5). Under the FCA, a misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citing 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)).

"[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194. Proof of materiality could include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 194–95. On the other hand, it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.* "[M]ateriality 'cannot be found where noncompliance is minor or insubstantial.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar* 579 U.S. at 178). Moreover, a plaintiff must plead claims of materiality with "plausibility and particularity" under Rule 9(b). *Id.* at 195 n.6.

Relator's claims fail under the *Escobar* standard because they contain no substantive allegations to support a finding of materiality. The Amended Complaint does not allege that DOE would have ceased payment to Defendants under the Servicing Contracts if it learned about the Defendants' proportional allocation method during the CARES Act Forbearance Period. It vaguely discusses a suit brought by the CFPB against Navient "for making misrepresentations to borrowers and misallocating payments," (ECF No. 5, ¶ 110) but offers no additional facts or analysis as to Relator's claims in this case, and instead only links the complaint from that suit in a footnote. (ECF No. 5, ¶ 110 n.10). These vague assertions fall far short of the requirement that materiality be pled with particularity. *Escobar*, 579 U.S. at 195 n.6. Further, Relator alleging that compliance with the Presidential Memorandum, the CFPA, or various state statutes was a condition of payment under the Servicing Contracts is insufficient

to demonstrate materiality. *Id.* at 194. While Relator alleges that the Servicing Contracts give DOE the option to decline to pay Defendants if it knew of Defendants' alleged wrongdoings, (ECF No. 5, ¶ 135), this is still insufficient for a finding of materiality. *Id.*

**\*11** In her Response in Opposition, Relator also relies on the FSA Guidance to argue that the Government did not have knowledge of Defendants' proportional allocation method until her FCA suit was filed, and that the Government having gained knowledge of Defendants' alleged misconduct is evidence of materiality. (ECF No. 80 at 7). However, Relator confuses what the Government *knew* with what is *material* to the Government's decision to pay Defendants under the Servicing Contracts. "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," and "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

Defendants highlight Relator's failure to plead facts showing that DOE halted payments to loan servicers based on any servicer's proportional allocation method (ECF No. 71 at 37), which Relator does not dispute, (ECF No. 80 at 6–8). Such failure "dooms [her] case." *Petratos*, 855 F.3d at 490. The Government is clearly aware of the Defendants' proportional allocation method by its issuance of the FSA Guidance, yet Relator fails to point to a single instance where the Government has refused to pay a federal student loan servicer for implementing a proportional payment allocation method. "Simply put, a misrepresentation is not material to the *Government's payment decision*," when the relator alleges the Government had knowledge yet provides no evidence that the Government stopped making payments or refused to make payments after gaining such knowledge. *Petratos*, 855 F.3d at 490 (emphasis in original; internal quotations omitted). Rather, this fact seems to establish conclusively the *lack* of materiality.

Relator next argues that the Government's having not moved to dismiss her Amended Complaint is evidence of materiality. (ECF No. 80 at 7–8). However,

considering that the Government would have to intervene in the case to file a motion to dismiss, as the Third Circuit recently held in *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 385 (3d Cir. 2021), Relator's assertion fails. Courts have often found where the Government declines to intervene in a *qui tam* FCA suit or take any action against a defendant after having notice of alleged misconduct to be evidence that the Government *does not* consider the alleged statutory, regulatory, or contractual violation to be "material" to the services that a defendant performs for the Government. *See Petratos*, 855 F.3d at 490; *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No. 13-05693, 2018 WL 1693349, at *6 (E.D. Pa. Apr. 6, 2018). Additionally, as Defendants highlight in their Reply (ECF No. 83 at 13), courts often dismiss *qui tam* complaints for lack of materiality, despite the Government *not* having moved to dismiss the relator's complaint. *See Petratos*, 855 F.3d at 490–92; *Pioneer Educ.*, 2020 WL 4382275, at *4–5; *In re Plavix*, 332 F. Supp. 3d at 949.

In sum, Relator fails to plead materiality to the heightened standard as set forth in *Escobar*, and therefore, her FCA claim must be dismissed. *Pioneer Educ.*, 2020 WL 4382275, at *5 ("[F]ailure to plead materiality [is] a proper basis for a motion to dismiss." (internal quotations omitted)).

### C. Scienter

Even if Relator did plausibly allege that Defendants presented false claims to the Government and that those misrepresentations were material to the Government's payment decisions, the Amended Complaint fails to allege sufficient facts to allow the Court to "draw the reasonable inference" that Defendants knew that their claims were false or fraudulent. *Iqbal*, 556 U.S. at 678. The FCA imposes liability on a person who "knowingly" makes a false or fraudulent claim to the Government. 31 U.S.C. § 3729(a)(1)(A). The FCA defines "knowing" and "knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless disregard of information's truth or falsity. 31 U.S.C. § 3729(b) (1)(A). Specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B). *Escobar* emphasizes that, like the FCA's materiality requirement, the

scienter requirement is "rigorous." 579 U.S. at 182. " 'Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations.' " *United States v. Allergan, Inc.*, 746 F. App'x 101, 105–06 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (recognizing defense of reasonable, but erroneous interpretation of ambiguous statute)).

*12 The Amended Complaint states that the Defendants "knowingly violated the Presidential Memorandum, the CFPA ... [and] state laws" and then "knowingly failed to disclose these violations" to the Government when servicing student loans. (ECF No. 5, ¶ 131). These are the only allegations to support Relator's legal conclusion that "Defendants therefore knowingly presented, or caused to be presented, false or fraudulent claims," (ECF No. 5 ¶ 132), and "acted with the requisite scienter" (ECF No. 5, ¶ 133). However, conclusory allegations are insufficient to plead knowledge under the FCA. *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760–61 (3d Cir. 2011). The Amended Complaint is otherwise devoid of facts supporting an inference that Defendants "knew, acted in reckless disregard, or deliberately ignored that [their] submissions were false." *Id.*

In Relator's Response in Opposition, she cites several CFPB reports, which Defendants rely on in their Joint Motion to Dismiss, to argue that because the CFPB has cited some student loan servicers in the past for misconduct and that servicers may have "mismatched incentives" when allocating prepayments, that these reports "surely support[ ] the allegation of the requisite scienter." (ECF No. 80 at 10–12). These arguments are unavailing. Even if Relator plausibly alleges that Defendants submitted false claims to the Government —which she does not—no information from the CFPB reports was alleged in the Amended Complaint to cure Relator's pleading deficiencies to lead to the "reasonable inference" that Defendants knowingly submitted false or fraudulent claims.[15] *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.' " (quoting *Twombly*, 550 U.S. at 545–46)).

Even if Relator plausibly alleged that Defendants knowingly submitted false or fraudulent claims, she must further plausibly allege that the Defendants *knew* compliance was material to the Government's payment decision, which the Amended Complaint again fails to do. *Escobar*, 570 U.S. at 181. Relator's conclusory allegation that "Defendants acted with the requisite scienter and [sic] compliance ... was a precondition of payment," (ECF No. 5, ¶ 134), is insufficient. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Further, "even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability." "What matters is not the label the Government attaches to a requirement, but whether the defendant *knowingly* violated a requirement that the defendant *knows is material* to the Government's payment decision." *Escobar*, 579 U.S. at 181 (emphasis added).

Relator fails to plausibly allege that Defendants knew they were submitting false claims to the Government, or that Defendants knew compliance was material to the Government's payment decisions. The Amended Complaint thus must be dismissed.

\*\*\*\*\*

Relator has failed to plausibly allege that Defendants (a) were noncompliant with any federal or state statute or regulation violation rendering any claims submitted as false, (b) that Defendants submitted false claims that were material to the Government's payment decisions, or (c) that Defendants knowingly submitted false claims or knew noncompliance was material to the Government's payment decisions.[16] Because the Court finds that Relator has failed to state an FCA claim on each of these grounds, it need not address Defendants' remaining arguments regarding the applicability of the public disclosure bar or whether the HEA preempts any state laws.[17]

## IV. CONCLUSION

2022 WL 787957

**\*13** For the foregoing reasons, Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72, ECF No. 73) is **GRANTED** and Relator's Amended Complaint (ECF No. 5) is **DISMISSED**. The Court will permit Hlywiak an opportunity to file a Motion for Leave to Amend within thirty (30) days, in which she explains how the deficiencies outlined herein may be cured through amendment. [18] An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 787957

## Footnotes

1    "FedLoan Servicing" was originally named as a Defendant in the Amended Complaint (ECF No. 5), but per Relator and PHEAA's Stipulation of Dismissal (ECF No. 35), Relator withdrew all claims against "FedLoan Servicing" which was added as a "d/b/a" name of PHEAA, and the case caption was revised accordingly.

2    CARES Act, Pub. L. No. 116-136, §§ 3513(a)–(b), 134 Stat. 281, 404.

3    Shortly after Relator filed her Amended Complaint, several other federal student loan borrowers represented by the same counsel as Relator filed three putative class action complaints against the same Defendants, (Case No. 21-01047; Case No. 21-01052; Case No. 21-09096), asserting common law and state law claims based on substantially the same facts. This Opinion contains similar background as its recent Opinion in the putative class action cases, given the overlapping allegations across the four cases.

4    Because the Joint Motion to Dismiss before the Court is under Rule 12(b)(6), the Court accepts the factual allegations in the Amended Complaint (ECF No. 5) as true and will view all facts in the light most favorable to Plaintiffs as the non-moving parties. *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Relator attaches a "disclosure statement" to her Amended Complaint (ECF No. 5-1 at 80–83); however, the Court does not find that this is a "written instrument" to be considered part of the pleading under Rule 10(c), as "affidavits are not considered a 'written instrument' " and instead are considered "outside the pleading." *Barnard v. Lackawanna County*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016), *aff'd*, 696 F. App'x 59 (3d Cir. 2017); Fed. R. Civ. P. 10(c).

5    Relator alleges that the Servicing Contracts with all Defendants are "replicas" and attaches only the Servicing Contract with Great Lakes (ECF No. 5, ¶ 30 n.2), which Defendants do not contest.

6    34 C.F.R. § 685.205(a) (2020) (" 'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In Certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower ... due to a ... local or national emergency.").

7    Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

8    Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Amended Complaint being filed or the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 390 n.34 (D.N.J. 2010).

9    The Amended Complaint alleges that Great Lakes prorated Relator's prepayments across her unsubsidized loans only, and not her subsidized loans (Loan Nos. 519, 521, 524, and 526) (ECF No. 5, ¶ 127), but any material distinction between subsidized and unsubsidized loans is not explained in the Amended Complaint or raised by the parties in their Briefs related to this Motion. Therefore, the Court does not view any such distinction as material to its analysis of the Motion.

10   The Amended Complaint alleges that Defendants' websites defined other terms such as "excess payment" and "overpayment" to mean the portion of a payment received above the amount that was currently due. (ECF No. 5, ¶¶ 93, 99). For clarity's sake, the Court uses the codified term "prepayment," in this Opinion, as it finds all these terms to be substantially similar when referring to the amounts that Relator paid during the CARES Act Forbearance Period. *See* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.").

11   Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473, 13476 [hereinafter STUDENT AID BILL OF RIGHTS] (Mar. 13, 2015). Relator further asserts that although the Presidential Memorandum directed the Secretary to implement this change "as soon as practicable," the Secretary was to take action "no later than January 1, 2016." (ECF No. 5, ¶¶ 54–55). However, the Court takes judicial notice of the full text of the Memorandum, *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d at 390 n.34, and does not accept this statement as true because the Memorandum clearly instructed the Secretary to implement the change "[a]s soon as practicable," not by January 1, 2016. *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) ("[T]he Court need not accept Plaintiffs' allegations as true to the extent that they directly contradict the unambiguous text of [authentic documents or matters of public record]."). Rather, separate directives to the Secretary were to be completed "[b]y January 1, 2016." *Compare* STUDENT AID BILL OF RIGHTS at 13476 ("*By January 1, 2016*, the Secretary of Education shall require all Federal Direct student loan servicers to provide enhanced disclosures to borrowers and strengthened consumer protections." (emphasis added)) *with id.* ("*As soon as practicable*, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." (emphasis added)).

12   Relator also alleges that Defendants violated the "Master Promissory Notes" (ECF No. 5, ¶¶ 131–32), but the Amended Complaint contains no information on what part or provision of the Master Promissory Notes that Defendants may have violated, nor does Relator's Response in Opposition mention the Master Promissory Notes. Therefore, the Court will not accept these conclusory allegations as true. *Iqbal*, 556 U.S. at 679 ("[P]leadings that ... are no more than conclusions, are not entitled to the assumption of truth.").

13   Relator's legal analysis regarding the Presidential Memorandum was included in the Response in Opposition filed by the plaintiffs in the factually-related putative class actions discussed above, *see supra* note 3, and is only incorporated by reference in Relator's Brief in this case. (ECF No. 80 at 5). However, the Court's Scheduling Order clearly separated the briefing in the present

2022 WL 787957

case from the putative class actions, and Relator was to "file a single brief in opposition to all arguments raised" in Defendants' Joint Motion to Dismiss. (ECF No. 67 at 5). The Court nevertheless addresses the issue.

14    Even if the HEA or 34 C.F.R. § 685.211 were ambiguous as to Defendants' obligations regarding applying prepayments—which they are not—the Court must give "substantial deference" to the DOE's reasonable interpretation of the HEA, and the DOE's interpretation of its own regulations is "controlling." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015) (stating that "[t]he Secretary's reasonable interpretation of the [HEA] is entitled to substantial deference" and the DOE's interpretation of its own regulations is "controlling" unless it is "(1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency's fair and considered judgment on the matter in question, or (3) represents a post hoc rationalization advanced by the agency seeking to defend past agency action against attack.").

15    Defendants further argue that their interpretation of legal requirements were objectively reasonable since it was DOE's own understanding of the law that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan." (ECF No. 71 at 40–42 (quoting FSA GUIDANCE at 1)). However, the Court does not reach this argument where it does not find Defendants' interpretation of federal law or DOE's regulations erroneous.

16    Defendants separately argue that Relator's allegations are not sufficiently particularized under the heightened pleading standard imposed on fraud claims by Federal Rule of Civil Procedure 9(b). *See Foglia*, 754 F.3d at 155–56 (acknowledging that the Rule 9(b) standard applies to FCA claims). The Court declines to address this argument because regardless of their relative *particularity*, the *plausibility* of Plaintiff's allegations regarding falsity, materiality, and scienter—or rather, the lack thereof—dooms her claim under Rule 12(b)(6).

17    The Court also does not reach Nelnet's argument that Nelnet, Inc. and Nelnet Diversified Solutions, LLC do not service any federal student loans at issue or present claims for payment to the Government (ECF No. 71-1 at 49 n.17), as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion where Relator's Amended Complaint fails to state an FCA violation under Rule 12(b)(6).

18    Any motion by Relator for leave to file a second amended complaint must attach a copy of the proposed amendment as well as a redline reflecting proposed changes. L. Civ. R. 15.1(a).

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.