## **APPENDIX OF UNPUBLISHED OPINIONS**

1. *Pledger v. Reliance Trust Co.,* Case No. 1:15-cv-4444-MHC, 2019 WL 44396068 (Feb. 25, 2019)

2. *Sugg v. Virtusa*, Case No. 18-08036, 2026 WL 91995 (D.N.J. Jan. 13, 2026)

3. *Watts v. Hollock*, Case No. 3:10-cv-92, 2011 WL 6026998 (M.D. Pa. Dec. 5, 2011)

1

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 3 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

2019 WL 4439606
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

Ronda A. PLEDGER, Sandra Britt, Jennifer L.
Primm, Alex Brooks, Jr., and Edward Comer
Buck, individually and as representatives
of a class of similarly situated persons
of the Insperity 401(k) Plan, Plaintiffs,
v.
RELIANCE TRUST COMPANY, Insperity, Inc.,
Insperity Holdings, Inc., Insperity Retirement
Services, L.P., Insperity Retirement Plan
Committee, and John Does 1-20, Defendants.

CIVIL ACTION FILE NO. 1:15-CV-4444-MHC
|
Signed 02/25/2019

**Attorneys and Law Firms**

Bradley S. Wolff, Swift, Currie, McGhee & Hiers,
LLP, Atlanta, GA, Heather Lea, Jerome J. Schlichter,
Kurt C. Struckhoff, Michael A. Wolff, Scott Andrew
Bumb, Pro Hac Vice, Troy A. Doles, Aaron E.
Schwartz, Ethan D. Hatch, Schlichter Bogard &
Denton, LLP, St. Louis, MO, for Plaintiff Ronda A.
Pledger.

Bradley S. Wolff, Swift, Currie, McGhee & Hiers,
LLP, Atlanta, GA, Heather Lea, Jerome J. Schlichter,
Kurt C. Struckhoff, Michael A. Wolff, Troy A. Doles,
Aaron E. Schwartz, Ethan D. Hatch, Schlichter Bogard
& Denton, LLP, St. Louis, MO, for Plaintiffs Sandra
Britt, Jennifer L. Primm, Alex Brooks, Jr.

Aaron E. Schwartz, Ethan D. Hatch, Troy A. Doles,
Jerome J. Schlichter, Schlichter Bogard & Denton,
LLP, St. Louis, MO, Bradley S. Wolff, Swift, Currie,
McGhee & Hiers, LLP, Atlanta, GA, for Plaintiff
Edward Comer Buck.

Abby Johnston, Stuart Sarnoff, Taylor Simeone,
O'Melveny & Myers, LLP, New York, NY, Benjamin
Bradshaw, Brian D. Boyle, Pro Hac Vice, John
McDermott, Shannon M. Barrett, O'Melveny &
Myers, Washington, DC, William Bard Brockman,

Bryan Cave Leighton Paisner LLP, Atlanta, GA, for
Defendant Reliance Trust Company.

David M. Mohl, Emily Seymour Costin, Pro Hac Vice,
Alston & Bird, LLP, Washington, DC, Emily Catherine
Hootkins, Howard Douglas Hinson, Alston & Bird,
LLP, Atlanta, GA, for Defendant Insperity Holdings,
Inc.

## ORDER

MARK H. COHEN, United States District Judge

**\*1** This case comes before the Court on Defendants
Insperity, Inc., Insperity Holdings, Inc., Insperity
Retirement Services, L.P., and the Insperity Retirement
Plan Committee (the "Insperity Defendants")' Motion
to Exclude Proffered Testimony of Plaintiffs' Expert
[Doc. 170]; the Insperity Defendants' Motion to
Exclude Proffered Testimony of Plaintiffs' Expert
Michael Geist [Doc. 171-2] ("Mot. to Exclude
Geist") [1] ; and the parties' eight motions to seal various
filings [Docs. 136, 142, 155, 162, 165, 172, 182, &
187].

## I. BACKGROUND

Plaintiffs are participants in the Insperity 401(k)
Plan (the "Plan"), a defined contribution, individual
account, employee pension retirement plan under the
Employee Retirement Income Security Act of 1974, 29
U.S.C. §§ 1001-1461 ("ERISA"). Am. Compl. [Doc.
37] ¶¶ 6, 13-17; 29 U.S.C. § 1002(34). The Plan is one
of the largest 401(k) plans in the United States, with
over $2 billion in assets and 50,000 participants. Am.
Compl. [Doc. 37] ¶ 12.

Defendant Insperity, Inc. ("Insperity") is a
"professional employer organization" (PEO) that
offers the Plan to employees of small-and medium-
sized businesses that contract with Insperity to provide
human resources services. Id. ¶¶ 8-9, 19. In marketing
the Plan, Insperity admits that it is the "plan sponsor"
and "assumes all of the responsibilities inherent in plan
sponsorship, including fiduciary obligations." Id. ¶ 33.
In annual reports filed with the Department of Labor
("DOL"), Insperity states that the Plan is a "single-
employer plan." Id. 10, 80. Insperity administers the
Plan through its subsidiaries. Id. ¶ 20.

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 4 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

Defendants Insperity Holdings, Inc. ("Holdings") and Insperity Retirement Services, L.P. ("Retirement Services") are wholly-owned subsidiaries of Insperity. Id. ¶¶ 21, 26. Holdings is named in the Plan as the fiduciary responsible for the Plan's control, management, and administration. Id. ¶ 22. Holdings, pursuant to its authority to delegate any of its responsibilities under the Plan, "delegated its fiduciary responsibility to hold, manage, and control the assets of the Plan" to Reliance Trust Company ("Reliance"), including "the selection, retention, and monitoring of [the] Plan['s] investment options," but retained the responsibility for the selection, retention, and compensation of the Plan's administrative service providers. Id. ¶¶ 23, 57. Retirement Services has served as the Plan's recordkeeper since October 1, 2003. Id. ¶ 26.

Reliance functions as the Plan's discretionary trustee "to hold, manage and control the assets of the Plan" under a Trust Agreement with Holdings, and is responsible for the selection, retention, and monitoring of the Plan's investment options. Id. ¶¶ 18, 23, 57-58. Reliance also is responsible for selecting investments that compensate Retirement Services for providing recordkeeping services for the Plan. Id. ¶¶ 58, 77. [2]

**\*2** Plaintiffs' Amended Complaint brings claims class action claims [3] against Defendants under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), which empowers any "participant, beneficiary, or fiduciary" to bring a civil action under 29 U.S.C. § 1109(a). See id. ¶¶ 3, Section 1109(a) provides in relevant part:

> (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets

> of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

Specifically, Plaintiffs contend that Defendants breached their fiduciary duties and conducted prohibited transactions under ERISA in a number of ways: (1) by selecting untested proprietary funds as investment options for the Plan and retaining those funds despite their poor performance, which benefited Defendants at the expense of participants (Am. Compl. ¶¶ 61-74, 170-74) (Count I); (2) by paying Retirement Services, the Plan's recordkeeper, excessive administrative expenses, and failing to monitor and control the amount of those administrative expenses (id. ¶¶ 75-85, 176-80) (Count II); (3) by providing to the Plan investment options that contained unreasonable management fees when cheaper versions of the same investments were available to the Plan, as were other high-quality, low-cost institutional alternatives (id. ¶¶ 86-127, 182-89) (Count III); (4) by failing to properly monitor the Plan's fiduciaries (id. ¶¶ 137-44, 198-203) (Count V); (5) by engaging in prohibited transactions with a party in interest by putting proprietary investments in the Plan, causing the Plan to pay unreasonable compensation to Retirement Services, and providing the Plan unduly expensive investment options (id. ¶¶ 205-09) (Count VI); and (6) by engaging in prohibited fiduciary self-dealing through the use of proprietary investment options in the Plan and the use of Retirement Services as the Plan's recordkeeper (id. ¶¶ 211-17) (Count VII). [4]

## II. MOTIONS TO EXCLUDE

### A. Legal Standard
Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)**

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

**\*3** (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court has directed that

> [u]nlike an ordinary witness, <u>see</u> Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. <u>See</u> Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

<u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579, 592 (1993). Because Rule 702 permits a broader range of testimony, the Supreme Court has made clear that district courts must perform a critical "gatekeeping" function concerning the admissibility of all expert testimony to ensure that an expert witness's testimony is not only relevant, but reliable. <u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing <u>Kumho Tire Co. v. Carmichael</u> 526 U.S. 137, 147 (1999); <u>Daubert</u>, 509 U.S. at 589 n.7, 597). In particular, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." <u>Corwin v. Walt Disney Co.</u>, 475 F.3d 1239, 1250 (11th Cir. 2007).

In performing this gatekeeping function, Eleventh Circuit has developed "a rigorous three-part inquiry" to determine the admissibility of expert testimony under Rule 702, that considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>Frazier</u>, 387 F.3d at 1260 (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." <u>Id.</u>

"A district court's gatekeeper role under <u>Daubert</u> 'is not intended to supplant the adversary system or the role of the jury.' " <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001) (quoting <u>Allison v. McGhan</u>, 184 F.3d 1300, 1311 (11th Cir. 1999); <u>accord Daubert</u>, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); <u>Adams v. Lab. Corp. of Am.</u>, 760 F.3d 1322, 1332, 1334 (11th Cir. 2014) (citations omitted) ("Bias in an expert witness's testimony is usually a credibility issue for the jury.... The risk of bias would mean, at most, that [the expert's] testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility."). Rather, the Court's role as a gatekeeper under <u>Daubert</u> "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs

in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

**\*4** The proponent of expert testimony "always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address, the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact." Frazier, 387 F.3d at 1260 (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (internal punctuation omitted)); see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1107 (11th Cir. 2005) (explaining that it is the proponent's burden to lay the foundation for admission of expert testimony).

The Eleventh Circuit has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test." Maiz, 253 F.3d at 665 (quoting Daubert, 509 U.S. at 593). While Daubert and its progeny provide flexible guidelines for the admissibility of evidence under Rule 702, "expert testimony that does not meet all or most of the Daubert factors may sometimes be admissible" based on the particular circumstances of a specific case. United States v. Brown, 415 F.3d 1257, 1268 (11th Cir. 2005); see also United States v. Scott, 403 F. App'x 392, 397 (11th Cir. 2010) (quoting Kumho Tire Co., 526 U.S. at 152) (finding that the Daubert factors are only general guidelines and the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); Quiet Tech. D C-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (finding that the court should consider the Daubert factors "to the extent possible" but that "these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis").

"[T]he [court's] gatekeeping function is not a stringent" when, as here, the factfinder is "the court rather than a jury."[5] See In re Suntrust Banks, Inc. ERISA Litigation, No. 1:08-CV-03384-RWS, 2016 WL 4377131, at \*4 (N.D. Ga. Aug. 17, 2016) (citing United States v. Brown, 415 F.3d 1257, 1268 (11th

Cir. 2005)). The barriers to expert testimony "are even more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about dumping a barrage of questionable scientific evidence on a jury." Brown, 415 F.3d at 126859 (citing Allison, 184 F.3d at 1310; Daubert, 509 U.S. at 588) (internal quotation omitted). The same rationale for applying Daubert less stringently in a bench trial applies to considering expert testimony at summary judgment. See Fitzgerald v. Alcorn, No. 5:17-cv-16, 2018 WL 312720, at \*4 n.7 (W.D. Va. Jan. 5, 2018) (citing Humphreys & Partners Architects, L.P. v. Lessard Design. Inc., 790 F.3d 532, 538 (4th Cir. 2015).[6] However, "[t]he district court enjoys 'considerable leeway' in making such evidentiary decisions, and will be reversed only if 'the ruling is manifestly erroneous.' " Winn-Dixie Stores. Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1027 (11th Cir. 2014) (citing Frazier, 387 F.3d at 1258).

### 1. Qualification

**\*5** There are various ways for determining whether an expert is qualified. "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Frazier, 387 F.3d at 1260-61. Federal Rule of Evidence 702 provides that an expert's qualification may be based on "knowledge, skill, experience, training, or education." See also FED. R. EVID. 702 advisory committee's note (2000 amends.) ("Nothing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony."). Thus, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas de P.R. Assocs., 452 F.3d 59, 63 (1st Cir. 2006). Rule 702 requires an expert witness relying solely on experience to "explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citing FED. R. EVID. 702 advisory committee's note (2000 amends.)).

### 2. Reliability

The district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and quotation omitted). "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." Allison, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. Daubert, 509 U.S. at 595. While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. Frazier, 387 F.3d at 1261 (citing Quiet Tech. DC-8, 326 F.3d at 1341-42). Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and Daubert that proposed expert testimony must be based on "good grounds." Id.

Daubert delineates a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the theory in question can be and has been empirically tested; (2) whether the theory in question has been subjected to peer review and publication; (3) the theory's known or potential error rate and whether that rate is acceptable; and (4) whether the theory is generally accepted in the scientific community. Daubert, 509 U.S. at 593-594. The advisory committee notes for Rule 702 identify additional factors that courts consider in assessing the reliability of expert testimony:

(1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.

(3) Whether the expert has adequately accounted for obvious alternative explanations.

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note (2000 amends.) (internal quotation marks and citations omitted).

> If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it.

**\*6** Frazier, 387 F.3d at 1261 (internal quotation omitted) (citing FED. R. EVID. 702 advisory committee's note (2000 amends.) (emphasis added)).

### 3. Helpfulness

Finally, the court must assess whether the expert testimony is helpful to the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63.

### B. Testimony of Plaintiffs' Expert Jania Stout

Defendants[7] ask the Court to exclude the entirety of Jania Stout ("Stout")'s testimony. Insperity Defs.' Mem. of Law in Supp. of Their Mot. to Exclude Proffered Testimony of Pls.' Expert Jania Stout ("Defs.'

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

Mem. in Supp. of Mot. to Exclude Stout") [Doc. 170-1] at 3. Plaintiffs proffer Stout as an expert in a fiduciary's obligations when managing and administering a 401(k) plan, qualified by virtue of her experience. *See* Expert Report of Stout dated March 1, 2018 [Doc. 170-3] ("Stout Report") ¶¶ 2, 24-27. Stout offers expert opinions that: (1) Holdings failed to establish a prudent fiduciary plan governance structure; (2) Holdings failed to conduct appropriate due diligence prior to selecting the Insperity Horizon Risk-Managed Funds; (3) neither Reliance nor Holdings prudently assessed the reasonableness of recordkeeping and administrative fees charged to the Plan; and (4) the Plan's design afforded inherent administrative efficiencies to the recordkeeper that would have allowed a recordkeeper to charge the Plan far lower fees. *See id.* ¶¶ 20-23.

Stout has worked in the retirement plan industry for 22 years. Stout Report ¶ 4. She is currently a consultant, where she serves as an investment advisor under 29 U.S.C. § 1002(21) [ERISA § 3(21)] providing fiduciary advice to assist clients in fulfilling their fiduciary obligations, and as an investment manager under 29 U.S.C. § 1002(38) [ERISA § 3(38)]. *Id.* In May 2009 to August 2014, Stout was Senior Vice President, Practice Leader and was "responsible for the retirement plan practice" at "a large regional, multi-disciplined firm called PSA Financial." *Id.* ¶ 9. When Stout joined PSA Financial, "the firm recently purchased the prior year a third-party administrator" that had "hundreds of clients with a staff of about 13 employees." *Id.* ¶ 10. Stout's division at PSA Financial "provided recordkeeping, administration, and investment advisory services for plan sponsors, which included approximately 140 defined contribution plan clients." *Id.*

In August 2014, Stout founded her own firm, Fiduciary Plan Advisors, which is part of HighTower Fiduciary Plan Advisors. *Id.* ¶ 11. Stout has grown her practice to approximately $3 billion in assets under advisement and approximately 130 clients, "rang[ing] from small business with 5 to 20 employees to larger employers with up to 15,000 employees." *Id.* Stout's firm focuses on "helping ... clients understand fiduciary governance and implement processes to protect them as fiduciaries." *Id.* Stout has also been an Adjunct Lecturer for The Plan Sponsor University (TPSU) for

the past three years. *Id.* ¶ 15. TPSU provides "fiduciary training for plan sponsors at an all-day training...." *Id.* The first part of Stout's training at TPSU "focuses on key areas of fiduciary responsibilities...." *Id.* Stout has also spoken on fiduciary best practices at conferences. *Id.* Stout was also part of the committee that created test questions for the Certified Plan Fiduciary Advisor, "a designation ... for advisors to keep themselves educated about what it means to be a fiduciary advisor who works with plan sponsors." *Id.* ¶ 16.

**\*7** Defendants contend that Stout is not qualified to render her opinions, does not use a reliable methodology to render those opinions, and her opinions would not assist the trier of fact. *See* Defs.' Mem in Supp. of Mot. to Exclude Stout at 1-2. The Court considers these arguments *seriatim*.

### 1. Whether Stout is Qualified to Testify as an Expert

Plaintiffs contend that Stout's experience qualifies her "to testify regarding prudent fiduciary practices, including the duty to monitor, plan governance, investment selection and due diligence, and recordkeeping and administrative fees." Opp'n to Mot. to Exclude Proffered Test. of Pls.' Expert Jania Stout ("Pls.' Opp'n to Mot. to Exclude Stout") [Doc. 180] at 5-9. Defendants contend that Stout "usurp[s] the roles of the Court or the factfinder" by opining on legal issues which "Stout is particularly unqualified to offer ... to the Court because she is not a lawyer and has no legal training, much less training in ERISA law." Defs.' Mem. in Supp. of Mot to Exclude Stout at 1-2.

However, an expert witness does not need to have legal experience to testify in an ERISA breach of fiduciary duty action. *See* Hans v. Tharaldson, No. 3:05-cv-115, 2011 WL 6937598, at \*4-6 (D. N.D. Sept. 23, 2011) (permitting both a trust officer and lawyer, and a certified public accountant, to testify about "the duty to act prudently, the standard of care applicable to a fiduciary in this situation, [and] how [defendant]'s actions deviated from the applicable standard of care...."); In re Iron Workers Local 25 Pension Fund, Nos. 04-cv-40243, 07-cv-12368, 2011 WL 1256657, at \*1-2, \*8 (E.D. Mich. Mar. 31, 2011) (stating that the expert witness's "lack of both a law

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

degree and experience as a trustee do not render him unqualified to offer opinions" in an ERISA breach of fiduciary duty case).

Defendants further contend that Stout "is not qualified to offer opinions on the facts because she has no experience in the fiduciary role or factual circumstances involved here." Defs.' Mem. in Supp. of Mot. to Exclude Stout at 2. Specifically, Defendants assert that Stout is not qualified to testify about ERISA's duty to monitor because she has no applicable experience monitoring fiduciaries. Id. at 7. The Court does not agree. In her consulting practice, Stout serves as an investment advisor under 29 U.S.C. § 1002(21) [ERISA § 3(21)], where she "provid[es] fiduciary advice to assist ... clients in fulfilling their fiduciary obligations...." Stout Report ¶ 4. Stout's investment advisory firm "focus[es] on helping clients understand governance and implement processes to best protect them as fiduciaries." Id. ¶ 12. Although Stout has not personally been appointed an ERISA fiduciary, she has advised clients who have fiduciary duties. Tr. of Video Dep. of Stout dated Apr. 5, 2018 [Doc. 127-1] ("Stout Dep.") at 67-68. Stout has been hired to advise and assist fiduciaries with monitoring and has been appointed to work with and advise fiduciary committees in their monitoring duties. Id. at 64-74. In the last three years, she advised about seventeen plan fiduciaries regarding their duty to monitor an investment manager. Id. at 106-07. Stout's consulting experience qualifies her to testify about ERISA's duty to monitor. See Acosta v. WPN Corp., No. 14-1494, 2018 WL 3707418, at *2, *5 (W.D. Pa. Aug. 3, 2018) (finding that a forensic economist who had never served on a retirement committee but had trained ERISA retirement committees was qualified to testify as an expert on ERISA's duty to monitor).

**\*8** Defendants also assert that Stout is not qualified to testify about the Plan's recordkeeping and administrative fees and expenses because "Stout has no experience with similar PEO plans, or the compensation of an in-house recordkeeper...." Defs.' Mem. in Supp. of Mot. to Exclude Stout at 9. This argument also is unpersuasive. Stout testified that she is familiar with how inhouse recordkeeping fees work from her experience running a third-party administrator. Stout Dep. at 345. As the Senior Vice President and Practice Leader at PSA

Financial, Stout led a staff of thirteen employees that provided recordkeeping, administration, and investment advisory services for plan sponsors. Stout Report ¶¶ 9-10. Over the course of a year, PSA Financial conducted over sixty requests for proposals to identify a suitable recordkeeping provider for each client Id. ¶ 10.

Defendants also contend that Stout is not qualified to testify because her "experience in the investment and fiduciary issues involved here is limited to the last few years and involves only significantly smaller plans." Defs.' Mem. in Supp. of Mot. to Exclude Stout at 8. It is true that the largest plan fiduciary Stout advised had about $75 million in plan assets; the Plan here has over $2.7 billion dollars in assets. Stout Dep. at 106-07. Stout estimates that the assets of her seventeen clients combined were probably over $200 million or $250 million. Id. at 107. Stout advised one plan with over $1 billion in assets. Id. at 309. Even if "a $75 million single-employer plan" is "obviously" less complex than "an almost $3 billion PEO plan record-kept like a multiple-employer plan[,]" Defendants do not explain why Stout's fiduciary experience is inapplicable to their more complex Plan. [8] See Insperity Defs.' Reply in Supp. of their Mot. to Exclude Proffered Test. of Pls.' Expert Stout [Doc. 185] ("Defs.' Reply in Supp. of Mot. to Exclude Stout."). Defendants' arguments about Stout's limited experience go to the weight of her testimony, not its admissibility—particularly since the Court will be the trier of fact. See Wildman v. Am. Century Servs., No. 4:16-CV-00737-DGK, 2018 WL 2326628, at *1-2 (W.D. Mo. May 22, 2018) (finding that witness with experience providing consulting services to investment advisors was qualified to testify as an expert even though he lacked experience consulting with plan committees and "had no experience with the practices of fiduciaries of a retirement plan for a mutual fund company."). The Court finds that Stout is qualified to testify as an expert.

### 2. Whether Stout Uses a Reliable Methodology

Defendants contend that Stout's opinions are unreliable because they are contrary to law. Defs.' Mem. in Supp. of Mot. to Exclude Stout at 10-11. Expert opinions that conflict with controlling law are unreliable. See

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 10 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

Long v. Amada Mfg. Am., Inc., No. 1:02-CV-1235, 2004 WL 5492705, at *13 (N.D. Ga. Mar. 31, 2004) (citations omitted) ("[T]he [c]ourt holds that such opinions would not be reliable inasmuch as they conflict with controlling law."); Bailey v. Allgas, Inc., 148 F. Supp. 2d 1222, 1242-46 (N.D. Ala. 2000) (finding expert testimony unreliable because it was "contrary to well-established law" in the Eleventh Circuit). The Court reviews each of Stout's opinions that Defendants contend are contrary to law.

**\*9** First, when discussing due diligence regarding selection of the Insperity Horizon Funds, Stout states that, "[t]here does not appear to be any documentation that the Board conducted any independent investigation into the qualifications of F-Squared, Reliance Trust's expertise in managing target fund strategies, or available target fund date alternatives that met the stated goals expressed by Reliance Trust in favor of the Insperity Horizon funds." Stout Report at 125. As part of her conclusion that Holdings failed to conduct appropriate due diligence prior to selecting the Insperity Horizon Funds, Stout states:

> The Board of Holdings should have had increased their oversight responsibilities and asked questions, which would be addressed through documentation, to ensure there truly was a rigorous process. A prudent fiduciary would not simply take an investment manager's representations of their purported diligent process to satisfy their oversight responsibilities, particularly when Reliance Trust had a clear conflict of interest in selecting a proprietary investment option.

Stout Report ¶ 142. Defendants claim that this conclusion is contrary to the below DOL regulation:

Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments?

A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

29 C.F.R. § 2509.75-8 at FR 17 (DOL questions and answers) (emphasis added). Stout's opinion that the board should have increased their oversight is not contrary to this regulation.[9]

Second, Stout was asked at her deposition about a board of directors' oversight role in general when investment decisions are made by an internal committee of laypersons and an investment manager. See Stout Dep. at 190-93. Stout explained that with an investment manager, the board's oversight role is to ensure that the investment manager is "actually putting the funds through the due diligence of the investment policy statement and ... acting as an investment manager[,]" but with an internal committee of laypersons, the board "make[s] sure that the charter is actually being executed and that the committee has the governance process." Id. at 192-93. According to Defendants, Stout expressed the opinion that "the duty to monitor is less stringent when lay persons are making these important decisions[,]" and this opinion is contrary to the requirement that whoever appoints the decision-making fiduciary has the duty to monitor that fiduciary. Defs.' Mem. in Supp. of Mot. to Exclude Stout at 14 (citing Howell, 633 F.3d at 562). The Court does not agree with Defendants' characterization of Stout's testimony. Stout did not say that the board has a lesser duty to monitor an internal committee of laypersons; she explained how doing do was different than monitoring an investment manager.[10] Stout did not express an opinion contrary to law.

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 11 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

**\*10** Third, Stout testified at her deposition that Mr. Stanton's, Mr. Pollina's, and Mr. Sivila's actions did not count as monitoring the Plan fiduciaries. See Stout Dep. at 218-19. She further testified that "the three individuals of Holdings should have been involved in the oversight and should not have been relying on ... people throughout the organization." Stout Dep. at 221. She acknowledged that it was acceptable for fiduciary committees of laypersons to get help from lawyers and professionals. See id. Stout went on to explain that

> [i]n this case it appeared that the three [fiduciaries] at Holdings didn't do anything other than potentially talk to some random people.... there was very little governance going on from the three individuals.... [C]ommittee members may rely —get advice from an attorney, but they're also meeting at quarterly committee meetings themselves. They're not just relying on other people, third parties to give them information. They're doing it themselves, they're involved, they're monitoring, and they may get additional information.

Stout Dep. at 222 (emphasis added). Defendants contend that this testimony is contrary to DOL's requirement that "[u]nless they possess the necessary expertise to evaluate [factors to consider when selecting an annuity provider], fiduciaries would need to obtain the advice of a qualified, independent expert." 29 C.F.R. § 2509.95-1(c)(6). Defendants misread Stout's deposition testimony. Stout did not testify that "a corporate entity cannot rely on its individual board members, legal counsel, and staff" to comply with its fiduciary monitoring duty [11]; rather, she testified that fiduciaries can rely on experts, but must also be personally involved in monitoring. See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 15; Stout Dep. at 218-22. Again, Stout did not offer an opinion contrary to law.

Fourth, Stout states in her report that Holdings "never negotiated a fixed amount that Retirement Services would receive for services provided on behalf of the Plan." Stout Report ¶ 146. Stout opines that "a prudent fiduciary ... would enter into a written agreement ... [and] would also negotiate the amount of compensation the provider would receive for services provided to a plan." Id. Defendants claim that negotiating Retirement Services' compensation would be illegal under ERISA's prohibited transaction rules because fiduciaries can only be reimbursed for direct expenses, with no profit or overhead included. See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 19 (citing 29 U.S.C. § 1108(b)(2) and (c)(2)). ERISA's prohibited transaction rules state:

> The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:
>
> ....
>
> (2) Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

29 U.S.C. § 1108(b)(2).

> Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—
>
> ....
>
> (2) receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred....

**\*11** 29 U.S.C. § 1108(c)(2) (emphasis added). While Section 1108(c)(2) limits the compensation a fiduciary

who already receives full time pay to "reimbursement of expenses properly and actually incurred," this language does not prohibit negotiating which expenses will be reimbursed or negotiating a lower-than-cost reimbursement rate for those expenses. At this juncture, the Court does not find that Stout's opinion is contrary to law. [12]

Defendants next contend that Stout's opinions are unreliable "because such opinions are based on her own self-proclaimed, superlative notion of 'best practices' for a monitoring fiduciary." See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 16. Defendants criticize several of Stout's best practices as "flawed, illogical, and unsupported." Id. at 16-17. They point out that Stout does not cite authority for some of her best practices. Id. at 16-17 (citing Stout Report ¶¶ 28-29, 39). They contend that Stout's best practices exceed what the law requires. See id. at 16-19 (citing Stout Report ¶¶ 29, 43, 53, 146-47). Defendants contend that "Stout's opinion highlights her lack of knowledge and experience with in-house recordkeepers, ERISA's prohibited transaction rules, and the undisputed facts." Id. at 18.

These critiques go to the weight the factfinder should give to Stout's testimony, not whether the Court should permit Stout to testify. [13] Defendants will have ample opportunity to demonstrate on cross-examination, as they did during Stout's deposition, the alleged flaws in Stout's conclusions. No doubt Defendants will illustrate to the Court the lack of cited sources for Stout's best practices and how her best practices differ from alleged industry practice. These purported flaws, however, do not make Stout's expert opinion inadmissible. See Acosta, 2018 WL 3707418, at *6 (finding that methodology of expert who "describe[d] what she believes to be the prevailing fiduciary standard" and "use[d] her experience to apply that standard to the facts of this case" was reliable despite defendant's contention that her standards "are a creation of her own subjective standards, common sense, and mere implication, rather than ERISA, DOL's regulations, or any relevant experience or reliable sources regarding the prevailing industry standard."); see also Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 3. Whether Stout's Testimony is Helpful

**\*12** Finally, Defendants contend that Stout's opinions are not helpful because her factual narratives are improper, and she offers impermissible legal opinions on ultimate issues. See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 2-3, 20-24.

#### a. Whether Stout's Factual Narratives are Improper

Defendants contend that Stout's factual narratives are improper because: (1) Stout's report impermissibly constructs a factual narrative from evidence in the record; (2) Stout's narrative presents only facts that support her opinion, and misstates and ignores contrary facts in evidence; and (3) Stout's narrative offers opinions on Defendants' state of mind, intent, and motives. See id. at 20-22.

"As a general matter, it is inappropriate for experts to become a vehicle for factual narrative." Duling v. Domino's Pizza, LLC, No. 1:13-CV-01570-LMM, 2015 WL 3407602, at *12 (N.D. Ga. Jan. 14, 2015) (quotations omitted) (quoting Secs. and Exch. Comm'n v. Tourre, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013)); see also Tillman v. C.R. Bard Inc., 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015) (quoting In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.")). "However, as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the 'factual underpinning' upon which [s]he bases h[er] opinion." Duling, 2015 WL 3407602, at *12 (citing FNB Bank v. Park Nat'l Corp., 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014)).

The Court has reviewed Stout's Report and does not find that it is offered "solely for the purpose of constructing a factual narrative." Rather, Stout explains the facts upon which she bases her opinion. See, e.g., Stout Report ¶¶ 74 ("I have seen no evidence that any fiduciary acting on behalf of

the Plan negotiated the amount of compensation that Retirement Services would receive for services provided on behalf of the Plan."), 84 ("The Board of Holdings also did not prepare meeting minutes to reflect the discussion that occurred during the annual Trustee meeting."), 92 ("[Reliance] also conducted no investigation of the salaries charged by Retirement Services' employees, or compared those salaries to published surveys."). Stout's Report "provide[s] more than simple narratives of Plaintiffs' version of the factual events at issue in this case. Instead, [her] expert report[ ] provide[s] *opinions* based upon facts that *could* be accepted by the [factfinder]." See Duling, 2015 WL 3407602, at *12 (internal citations omitted).

Defendants contend that Stout omits or misstates facts that do not support her opinion. See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 21. Defendants provide three examples [14] where Stout "ignores the evidence on this issue that confirms the opposite" of her conclusion, "ignores key testimony," and "direct testimony directly refutes Stout's argument." See id. at 21-22. But "the fact that [the expert] base[s] [her] opinions on a version of disputed rather than established facts can be properly brought to the [factfinder]'s attention by Defendants through cross-examination." Duling, 2015 WL 3407602, at *13 (quotations omitted) (citing Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.")). Like their concerns with the reliability of Stout's methods, Defendants can bring these disputed facts that allegedly undermine Stout's opinion to the Court's attention during Stout's cross-examination, through the testimony of their Defendants' witnesses, and in their closing argument.

**\*13** Defendants contend that Stout offers opinions regarding Defendants' state of mind, intent, and motives. Defs.' Mem. in Supp. of Mot. to Exclude Stout at 22 & n.15 (citing Stout Report ¶¶ 110, 113, 115, 120, 129-33). "Expert testimony on 'the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise.' " Cason v. C.R. Bard, Inc., No. 1:12-CV-1288-MHS, 2015 WL 9913809, at *13 (N.D. Ga. Feb. 9, 2015) (citation omitted). Most of the

paragraphs Defendants claim contain Stout's opinions about Defendants' state of mind, intent, and motives include no reference to any intent, motive, of state of mind. See Stout Report ¶¶ 113, 120, 129-33. The two that arguably do directly quote from discovery materials in the record, and are not Stout's opinions. See id. ¶¶ 110 (citations omitted) (stating Reliance's " 'primary' business objective" and "third priority"), 115 (citations omitted) (stating Reliance's and Retirement Services's " 'willingness and desire to fund a Reliance and potentially, Insperity branded' target date fund series"). [15] Accordingly, the factual narrative in Stout's Report is not improper.

### b. Whether Stout Offers Improper Legal Opinions

Defendants further contend that Stout offers "improper opinions on the ultimate legal issues of whether Defendants breached any fiduciary duties under ERISA" because "Stout repeatedly opines on whether Holdings' conduct in monitoring RTC was 'prudent.' " Defs.' Mem. in Supp. of Mot. to Exclude Stout at 24.

Section 1104 states:

### (a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

...

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(B). Plaintiffs alleges that Defendants breached this duty of care. See Am. Compl. ¶¶ 175-196. Accordingly, Defendants contend that because Stout "testifies regarding the *prudence* of defendants' actions[,]" Stout "provides improper legal conclusions." Defs.' Reply in Supp. of Mot. to Exclude Stout at 15.

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

"A qualified expert in a civil case may offer [her] opinion on an 'ultimate issue' in a case." Commodores Entm't Corp. v. McClary, 879 F.3d 1114, 1128 (11th Cir. 2018) (citing FED. R. EVID. 704). However, "experts may not testify to the legal implications of conduct or tell the jury what result to reach. Rather, the court must be the jury's only source of law, and questions of law are not subject to expert testimony." Id. at 1128-29 (citing Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (finding that expert testimony that insurer had a duty to hire tax counsel was a legal conclusion and should not have been admitted). "Courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." Id. at 1129 (alterations accepted) (quoting United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977)). "Thus, the district court must take 'adequate steps to protect against the danger that an expert's opinion would be accepted as a legal conclusion.' " Id. (alterations accepted) (quoting United States v. Herring, 955 F.2d 703, 709 (11th Cir. 1992)).

**\*14** "[E]xperts are routinely allowed to testify as to what the applicable standard of care is and whether it has been complied with in a particular case." Hans, 2011 WL 6937598, at \*6; see also Greenbrier Hotel Corp. v. Unite Here Health, No. 5:13-CV-11644, 2016 WL 9781805, at \*1-2 (S.D. W. Va. Mar. 14, 2016) (denying motion in limine to exclude expert witness whose report discussed "fiduciary duties with respect to multi-employer plans" because his report indicated that the "contested expert *may* offer admissible testimony" at the bench trial). Although Stout

> may not opine as to the ultimate legal issue of whether [defendants] violated ERISA, [s]he may testify about a variety of fiduciary and economic issues, including the duty to act prudently, the standard of care applicable to a fiduciary in this situation, how or why [defendant]'s actions deviated

from the applicable standard of care....

Hans, 2011 WL 6937598, at \*6; see also In re Iron Workers Local 25 Pension Fund, 2011 WL 1256657, at \*5 (stating that expert testimony on "subsidiary issues such as ... whether Trustees met the standard of care ... will assist the trier of fact in reaching ultimate conclusions in this case."); In re Reliant Energy Litig., No. H-02-2051, 2005 WL 5989791, at \*2 (S.D. Tex. Aug. 19, 2005) (citing Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 101 (1st Cir. 1997)) ("[A] Court sitting as the trier of fact may find expert testimony on complex legal issues such as the ERISA issues in this case very helpful and, therefore, may consider those opinions.").

Stout's testimony regarding the prudence of Defendants' actions is not an improper legal conclusion. Stout does not invade the province of the factfinder: She does not testify that Defendants violated ERISA. [16] The Court finds that Stout's assessment regarding whether Defendants met the standard of care will be helpful. See Chellis v. Fleet Capital Corp., No. 1:04-CV-1072-CAP, 2006 WL 8431643, at \*1 (N.D. Ga. July 17, 2006) (permitting expert testimony in ERISA case over the defendant's objection that the testimony "consists mainly of legal conclusions" because even though "the experts do make certain legal assumptions ... the expert opinions offered by the plaintiff do not merely tell the court, as factfinder, what result to reach" and "the court, in deciding the ultimate issues of fact, is capable of giving proper weight to legal conclusions offered by the experts...."); see also United States v. Barnette, 800 F.2d 1558, 1568 (11th Cir. 1986) (holding that trial court did not err in admitting testimony of IRS agent as to the income-tax-law implications of defendant's activities); United States v. Gold, 743 F.2d 800, 817 (11th Cir. 1984) (holding that trial court did not err in admitting expert testimony concerning whether claims were eligible for Medicaid reimbursement).

As explained above, the Court finds that Stout is qualified as an expert based on her experience. Defendants have not shown that her testimony is unreliable or that her opinions will not be helpful,

particularly in the context of a bench trial. Accordingly, Defendants' Motion to Exclude Stout is **DENIED**.

### C. Testimony of Plaintiffs' Expert Michael Geist

Defendants also ask the Court to exclude "any proffered testimony or opinions" from Plaintiffs' expert Michael Geist ("Geist"). Insperity Defs.' Mem. of Law in Supp. of their Mot. to Exclude Proffered Test. of Pls.' Expert Geist [Doc. 171-3] ("Defs.' Mem. in Supp. of Mot. to Exclude Geist"). Plaintiffs proffer Geist as an expert in the reasonableness of "recordkeeping and administrative fees charged to the Plan" qualified based on his "experience in [the] recordkeeping industry for defined contribution plans." See Corrected Expert Report of Geist [Doc. 171-5] ("Corrected Geist Report") ¶¶ 1-2.

**\*15** Geist currently is consulting in the retirement plan, recordkeeping, and asset management industries. Id. ¶ 4. His expert opinion is based on his experience at T. Rowe Price. Video Dep. of Geist dated April 11, 2018 [Doc. 126-1] ("Geist Dep.") at 45. From 2005 to 2016, held a variety of senior-level roles in the Retirement Plan Services (RPS) division of T. Rowe Price, where he was "responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans." Id. ¶ 5. Geist was "directly involved with pricing proposals for recordkeeping and administrative services" and had "direct experience" with "large defined retirement contribution plan clients and prospective clients, including those ranging from $500 million to well over $1 billion in total assets." Id. From January 2005 to December 2008, Geist was a "sales producer responsible for winning new recordkeeping and asset management business." Id. ¶ 10. From January 2008 to February 2011, he was a Vice-President of RPS serving as the National Sales Operations Manager. Id. ¶ 9. In this role, Geist was responsible for "all aspects of the sales process for RPS" and "the financial evaluation and governance of all new business retirement plan pricing for RPS...." Id. From around September 2009 to February 2011, Geist also served as National Small Market Sales Manager, where he managed a team of sales producers to "win new business for recordkeeping and administrative services provided by RPS." Id.

From February 2011 to August 2012, Geist was Vice President, Sales Support and Business Development. Id. ¶ 8. In this role, he "managed and oversaw multiple departments supporting sales producers" and was responsible for "developing, leading, and governing the bidding and pricing process" for new business. Id. From August 2012 to February 2015, Geist was National Pricing Governance and Data Strategy Manager for RPS. Id. ¶ 7. In this role, he was responsible for "developing and governing pricing proposals" and "developing a pricing model and pricing strategy for non-qualified plan administration and overseeing the implementation of that pricing model...." Id. Geist's most recent role, from February 2015 to August 2016, was a Senior Vice President in the Product Development and Management department of RPS. Id. ¶ 6. In this role, he was "responsible for the development and management of Recordkeeping Fee services and solutions for RPS." Id. He "developed and launched" a service that assists plan sponsors in monitoring recordkeeping fees and making decisions about allocating plan expenses among plan participants and partnered with the Pricing Governance department to "develop enhanced recordkeeping fee pricing solutions for plan sponsors." Id.

Geist previously testified by deposition as an expert witness at a bench trial in Sacerdote v. N.Y. Univ., 328 F. Supp. 3d 273 (S.D.N.Y. 2018), appeal filed, No. 18-2707 (2d Cir. Sept. 12, 2018). The court declined to exclude Geist before the trial, but ultimately found he lacked the expertise to provide reliable opinions and did not rely on his testimony.

> Plaintiffs retained Geist to provide analysis and opinions related to the Committee's actions/ inactions regarding recordkeeping fees. Geist spent over ten years in the Retirement Plan Services ("RPS") division of T. Rowe Price, during which time he "was responsible for delivering, creating, and/or governing over 20,000 pricing proposals for over 10,000 retirement plans."

> As discussed below, Geist lacked the particular expertise necessary to provide useful opinions to the Court. He has virtually no experience with: (1) the type of plans at issue here (403(b) plans); (2) participants heavily invested in TIAA annuities; or (3) transitioning large plans from multiple to single

recordkeepers. T. Rowe Price did not recordkeep annuities while Geist worked there, and Geist has no specific knowledge of "what it costs to record-keep a fixed annuity." The Court does not believe that he is a true "expert" on the pricing of the specific products at issue here and he did not demonstrate to the Court that he possesses the requisite qualifications to present reliable opinions on whether NYU's participants paid reasonable recordkeeping fees.

Sacerdote, 328 F. Supp. 3d at 282 n.19 (internal citations omitted).

### 1. Whether Geist is Qualified as an Expert

Defendants first contend that Geist is not qualified to offer his damages calculations because: (1) his experience was primarily in sales and marketing but not underwriting analysis; (2) he has never developed a pricing proposal without T. Rowe Price's data and pricing model; (3) he has never developed a pricing proposal where the adjustments to the baseline price exceed the starting point. See Defs.' Mem. in Supp. of Mot. to Exclude Geist at 7-8. Further, Defendants content that Geist is not qualified to testify about the Plan because: (1) he has no experience pricing recordkeeping services for a plan sponsored by a PEO; (2) he has never priced a similarly-sized plan; and (3) he has never priced a plan for a sponsor with in-house recordkeeping operations like those provided by Retirement Services.[17] Id. at 8-9. Plaintiffs respond that Geist has "unparalleled experience" pricing recordkeeping services, responding to request for proposals for recordkeeping fees, and monitoring and evaluating the market for recordkeeping fees. Opp'n to Mot. to Exclude Proffered Test. of Pls.' Expert Geist [Doc. 181] ("Pls.' Opp'n to Mot. to Exclude Geist") at 5.

**\*16** As Geist's job titles indicate, he has significant experience selling T. Rowe Price's products and services to retirement plans and leading and managing teams of others to do the same. Nevertheless, this Court shares the Sacerdote court's concern that Geist lacks the specific experience needed to offer an expert opinion on the reasonableness of the recordkeeping and administrative fees charged to the Plan. Geist managed the underwriting team at T. Rowe Price. Geist

Dep. at 55. He developed pricing proposals with the help of underwriters. See id. at 55-56. But he never acted as an underwriter. Id. at 54-55. As he explained at his deposition, "[t]hat data would come to me, we'd have discussions with the underwriting team, and the operations team. And then yes, I would be the one that would sit in my office and do exactly what I did in this case in many cases." Id. at 59. What Geist did was use T. Rowe Price's data and pricing model to develop pricing proposals. Id. at 57, 59-60. As he explained, "[t]he pricing model would provide ranges for bids and that would assume standard offerings.... there's an art and a science to all of this.... you evaluate those numbers and then you make adjustments." Id. at 60.

Geist has experience with the art of determining a reasonable recordkeeping fee given a price range provided by a model, but he lacks experience with the science behind the model. Notably, Geist has never developed a pricing proposal without T. Rowe Price's data and pricing model. Id. at 61. But he did not use T. Rowe Price's data, its pricing model, an underwriter from T. Rowe Price or elsewhere, or any pricing models from any other recordkeeper when performing his analysis in this case.[18] Id. at 57-58, 60, 94-96. Nor does he base his opinions on any plan that he priced while at T. Rowe Price. Id. at 65. Even if Geist did have experience with the science behind the models, and the Court is not persuaded that he does, Geist testified that he did not use those models—or any model from any other recordkeeper—in forming his opinions. See id. at 65, 94-96.

Accordingly, the Court finds that Geist is not qualified by his experience to testify as an expert on the reasonableness of administrative and recordkeeping fees charged to the Plan. See Winn-Dixie, 746 F.3d 1015, 1018 (11th Cir. 2014) (affirming district court's decision "act[ing] well within its considerable discretion" to exclude expert testimony prior to a bench trial).

### 2. Whether Geist Uses a Reliable Methodology

Furthermore, Geist's methodology is not reliable. Geist's expert opinion is that "Plan participants lost $23,323,383[.00] through unreasonable recordkeeping and administrative fees." Corrected Geist Report

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 17 of 65

**Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)**

¶ 99. Geist calculates the average per-participant unreasonable excess recordkeeping fee paid by Plan participants each year from 2010 to 2016. See id. ¶ 98. He computes this figure by subtracting the average recordkeeping and administrative fees paid by Plan participants each year from a reasonable fee for a typical single plan with $1 billion or more in assets and 30,000 or more participants, and then adjusting this typical fee up or down based upon Insperity-specific and market factors. See id.

Geist explains that "[w]hen developing a pricing proposal for a 401(k) client prospect [at T. Rowe Price], I would first begin with a baseline fee for a standard product offering for a 401(k) plan with similar participants with account balances, cash flows and average account balance." Id. ¶ 80. He further explains:

> *17    When determining the reasonable fee for the specified recordkeeping and administrative services provided to the Insperity Plan, I applied the same pricing methodology. When recordkeepers provide a proposed price for a particular plan, they generally go through the following process. The demographics of the plan are captured and would typically be entered into a pricing intake or model. The primary drivers of the initial fee would be the number of participants with a balance greater than $0 and value of the plan assets.

Id. ¶ 82 (emphasis added). But Geist does not explain what "pricing intake or model" he used to determine the "baseline fee" in this case. See id. Plaintiffs admit that "Geist did not have access to the physical database ... [from] T. Rowe Price...." Pls.' Opp'n to Mot. to Exclude Geist at 13-14. Furthermore, as noted above, Geist did not use any pricing models from any recordkeeper when performing his analysis. Geist Dep. at 94-96. He failed to use the very methodology

that Defendants contend is reliable and that Geist had experience with at T. Rowe Price.

Geist also failed to use "any objective source of pricing information from a third party to form [his] opinions in this case...." Geist Dep. at 239. His deposition transcript demonstrates a lack of data informing his calculated baseline fee:

Q. [I]s there any data that you offer to support [the per-participant reasonable recordkeeping fee for a typical $1 billion plus plan with 30,000 or more participants]?

A. Well, there's data that we provided in the rebuttal report.

Q. Other than the data in the rebuttal report, is there any data that you've offered to support these numbers?

A. No.

Q. And is it true, sir, that you did not look at the data that you've referred to in the rebuttal report to form your opinions about these numbers?

A. That is true.

Q. You formed your opinions about these numbers based solely on your personal experience at T. Rowe; isn't that correct?

A. My extensive experience in providing bids in the market and understanding the fees that could be obtained.

Q. And there's no data that you offer to support them, correct?

[Counsel objects]

THE WITNESS: That is correct.

Q. And there's no benchmarking studies that you point to, to support them?

A. No.

See Geist Dep. at 249-51. Although Geist claims to rely on his experience at T. Rowe Price, he admitted that "T. Rowe Price doesn't have a baseline price." Geist Dep. at 84. Instead, "T. Rowe has a price that you

propose ... [a]nd then you negotiate down to something smaller....” Id. The implication from Geist's testimony is that he recalled from memory the proposed price that T. Rowe Price's model would have generated for standard product offering for a 401(k) plan with similar participants with account balances, cash flows and average account balance to the Plan—and then somehow reduced that proposed price to a baseline price using his knowledge of the marketplace. This is borderline speculation and not reliable.

Plaintiffs nevertheless contend that Geist's findings are supported by hard data. Pls.' Opp'n to Mot. to Exclude Geist at 14. They cite: (1) a table in one paragraph of Geist's Report citing average 401(k) recordkeeping fees from 1995; and (2) several Form 5500s [19] included as attachments to Geist's Rebuttal Report. Id. at 14 (citing Corrected Geist Report ¶ 33; Corrected Rebuttal Expert Report of Geist dated April 10, 2018 [Doc. 171-8] (“Corrected Geist Rebuttal Report”), Exs. 3, 4). The table in Geist's Report provides the average 401(k) cost per participant in 1995 for plans with 200, 500, and 1,000 participants. See Corrected Geist Report ¶ 33. This data is irrelevant: It is fifteen years old [20] and for plans a fraction of the size of the Plan in this case. See id. ¶¶ 33, 98. Geist even admitted during his deposition that these numbers have no relevance to the reasonable fees charged by Insperity. See Geist Dep. at 238. Also, Geist did not consider the data in the Form 5500s when forming his initial opinions. Geist Dep. at 107-08. Even if this data supports Geist's calculated baseline prices, and a cursory review suggests that it may not, this data also is irrelevant because Geist did not rely on it when calculating his baseline prices.

**\*18**  Furthermore, Geist did not perform a “competitive [request for proposal] bidding process” which, according to him, is the “only reliable way” to determine a reasonable fee. See Corrected Geist Report ¶ 42; Geist Dep. at 122. Instead, Geist purports to calculate a precise reasonable fee using his “knowledge of the marketplace.” Geist Dep. at 239, 250. The Court agrees with Defendants that “[i]n short, Geist contends that he is a walking benchmark and is able to conjure the *exact dollar figures* the Plan allegedly should have paid....” [21] See Defs.' Mem. in Supp. of Mot. to Exclude Geist at 13. This evidence is inadmissible. See Winn-Dixie, 746 F.3d at 1028; see also FED. R. EVID. 702.

Geist failed to perform the very analysis he contends is the only reliable way to determine a reasonable fee. He failed to use any objective source of pricing information to determine the baseline prices, say nothing about a pricing model like he used while at T. Rowe Price. He relied on no identifiable data to calculate his baseline prices. Even if Geist were qualified as an expert because of his experience, Geist's methodology is not reliable. [22] See Butler v. First Acceptance Ins. Co., 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)) (“An expert's opinion testimony becomes inadmissible, however, where it is connected to existing data only by the ipse dixit of the expert.”); see also Fed. Trade Comm'n v. Nat'l Urological Grp., No. 1:04-CV-3294-CAP, 2017 WL 6759868, at *41 (N.D. Ga. Oct. 10, 2017) (granting motion to exclude expert because “he failed to apply any reliable methodology in forming his opinions, instead relying on his own *ipse dixit*.”); Seawell v. Brown, 2010 WL 11561287, at *9 (S.D. Ohio Sept. 9, 2010) (excluding expert's opinion as unreliable where “finding that the Plan suffered $11 million in losses is based on pure speculation.... [the expert] testified that he performed no statistical analysis.... it appears that [the expert] simply created his own method of calculating damages for the purposes of this litigation. He has pointed to nothing in the literature or elsewhere to show that his method is an accepted method.”). Geisf's testimony does not “rest[ ] upon good grounds” so it need not “be tested by the adversary process....” See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345-46 (11th Cir. 2003) (quoting In re TMI Litig., 193 F.3d 613, 692 (3d Cir. 1999)) (affirming district court's denial of motion to exclude because the alleged flaws in analysis of expert who “misused a method that, in the abstract, is reliable” were “of a character that impugn the accuracy of his results, not the general scientific validity of his methods”); see also Ass Armor, LLC v. Under Armour, Inc., No. 15-cv-20853-COOKE/TORRES, 2016 WL 7156092, at *3 (S.D. Fla. Dec. 8, 2016) (citation omitted) (“Flaws in methodology must be ‘serious and pervasive’ to justify exclusion under Rule 702.”); Sacerdote, 328 F. Supp. 3d at 306 (“[P]laintiff's expert

on [reasonable recordkeeping fees], Geist, failed to provide adequate data to back his numbers up.").

**\*19** Because the Court finds that Geist is not qualified as an expert based on his experience and his methodology is not reliable, it need not consider if Geist's testimony would assist the trier of fact in understanding the evidence. Accordingly, Defendants' Motion to Exclude Geist is **GRANTED**.

## III. MOTIONS TO SEAL

### A. Legal Standard

Although this Court permits "the sealing of documents that contain information protected from disclosure by statute, personal information (such as Social Security numbers), trade secrets, or sensitive security data," the filing of documents under seal is generally disfavored as all documents filed with the Court are presumptively public. Standing Order Regarding Civil Litigation entered December 28, 2015 [Doc. 3] ("Standing Order") § II.E. This is consistent with the Eleventh Circuit's position that court records are presumptively public: "Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case." Brown v. Advantage Eng'g, Inc., 960 F.2d 1013, 1016 (11th Cir. 1992).

The Eleventh Circuit has explained that "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th Cir. 2007) (quoting Chi. Tribune Co. v. Bridgestone/ Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2001) (internal punctuation omitted)). "The common-law right of access includes the right to inspect and copy public records and documents." Chi. Tribune Co., 263 F.3d at 1311 (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978) (referencing specifically the right to inspect and copy "judicial records and documents.")). "Material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." Romero, 480 F.3d at 1245. A substantive pretrial motion is "[a] motion that is presented to the court to invoke its powers or affect its decisions, whether or not

characterized as dispositive, [and it] is subject to the public right of access." Id. at 1246 (quotation marks and citation omitted). The common-law right of access, however, is not absolute as it does not apply to all discovery materials. Id. at 1245; see also Chi. Tribune Co., 263 F.3d at 1311.

A party seeking to have material sealed can overcome the common-law right of access by a showing of good cause where there exists "a sound basis or legitimate need to take judicial action." In re Alexander Grant & Co. Litig., 820 F.2d 352, 356 (11th Cir. 1987). Such good cause "is established by the moving party when disclosure will cause the party to suffer a clearly defined and serious injury." NXP B.V. v. Research In Motion, Ltd., No. 6:12-CV-498-ORL-22TBS, 2013 WL 4402833, at \*2 (M.D. Fla. Aug. 15, 2013). A good cause determination "requires balancing the asserted right of access against the other party's interest in keeping the information confidential." Romero, 480 F.3d at 1246 (internal punctuation omitted) (quoting Chi. Tribune Co., 263 F.3d at 1309); see also FED. R. CIV. P. 26(c) (authorizing the trial court to issue a protective order upon a showing of good cause "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."). Essentially, good cause exists where "[a] party's privacy or proprietary interest in information ... overcomes the interest of the public in accessing the information." Romero, 480 F.3d at 1246.

**\*20** The decision of whether good cause exists rests with the sound discretion of the district court judge, is based on the "nature and character of the information in question," and "should be informed by a sensitive appreciation of the circumstances that led to the production of the particular document in question." Chi. Tribune Co., 263 F.3d at 1311, 1315 (quoting Nixon, 435 U.S. at 603) (internal punctuation omitted). Factors for the Court's consideration in making such a determination include

> whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 20 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

Romero, 480 F.3d at 1246 (citation omitted).

## B. Analysis

Collectively, the parties have filed eight motions to seal [Docs. 136, 142, 155, 162, 165, 172, 182, & 187]. The Court will address them *seriatim* and reference them by the number they have been assigned on the docket.

### 1. Insperity Defendants' Motion for Leave to File Under Seal [Doc. 136]

The Insperity Defendants move to seal the following documents and information:

(1) Footnote 22 in the Memorandum of Law in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-1];

(2) Paragraph 68 of the Statement of Undisputed Material Facts in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-2];

(3) Portions of Attachment A to John Stanton ("Stanton")'s Affidavit [Docs. 135-3 & 135-4];

(4) The entirety of Sean Duffy ("Duffy")'s deposition transcript [Doc. 130-1] ("Duffy Dep.") and excerpts therefrom [Doc. 135-5];

(5) The entirety of Retirement Services Summary by Year [Doc. 135-6];

(6) The entirety of Ian Ratner's Declaration [Doc. 132-1] and expert report [Docs. 132-2 & 135-7]; and

(7) One line of Stanton's deposition transcript [Doc. 128-1].

Mem. of Law in Supp. of the Insperity Defendants' Mot. for Leave to File Docs. Under Seal [Doc. 136] ("Insperity Defs.' 136 Br.").

The Insperity Defendants seek to seal Stanton's salary information in his deposition transcript. Id. at 3. They filed a public version of his deposition transcript [Doc. 129-1] redacting only his salary. The Insperity Defendants also seek to seal employee names, identification numbers, financial information,[23] client names, and plan names in Attachment A to Stanton's Affidavit. Id. at 4. They also filed a public version of Attachment A [Doc. 134-18] redacting only this confidential information. The Insperity Defendants next ask to seal one piece of commercially-sensitive financial information in both their Statement of Undisputed Material Facts (paragraph 68) and Memorandum of Law in support of their motion for summary judgment (footnote 22). Once again, they filed public versions of these documents [Docs. 133-1 & 134] redacting only this information. The Court finds that good cause exists to seal this information and that the Insperity Defendants properly used the least onerous method to protect the information.[24]

**\*21** Next, the Insperity Defendants seek to seal the entirety of Duffy's deposition transcript and excerpts therefrom, Ian Ratner's Declaration and expert report, and Retirement Services Summary by Year. Their only argument for sealing the entirety of these documents is that "public disclosure of the commercially-sensitive financial and/or business information in these documents could cause competitive harm to the Insperity Defendants." See Insperity Defs.' 136 Br. at 5. The Insperity Defendants contend that redactions "would not achieve the appropriate balance between public disclosure and the protection of legitimate sensitive financial and/or business information." Id. at 5-6.

With respect to Retirement Services Summary by Year, the Court agrees that good cause exists to seal the entire document. It contains detailed information on Retirement Services's income, expenses, headcount,

Case 3:18-cv-00121-JFS-PJC    Document 224-2    Filed 02/17/26    Page 21 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

and employee salaries from fiscal years 2009 to 2016, and redaction would not be appropriate.

However, limited redactions would achieve the appropriate balance with respect to the other documents. Large portions of Duffy's deposition transcript do not appear to contain any commercially-sensitive financial or business information. The Insperity Defendants can protect the sensitive information contained in this transcript by redacting only the sensitive information. Ian Ratner's Declaration contains no information that justifies sealing it as he merely explains who he is and attests to the accuracy of his expert report. Large portions of his report, like Duffy's deposition transcript, do not appear to contain any commercially-sensitive financial or business information. For example, the first eight pages do not discuss Insperity, Inc. or Retirement Services's financials at all, and Appendix 1 contains only Ratner's resume and details about his qualifications. Moreover, Ratner's methodology explained in the Report is not confidential—only the actual financial information is, and it can be redacted. The entirety of the schedules within his report can also be redacted to protect the financial information they contain.

Accordingly, Insperity Defendants' Motion for Leave to File Under Seal [Doc. 136] is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** with respect to salary information contained in the Transcript of John Stanton's deposition [Doc. 128-1], footnote 22 in the Memorandum of Law in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-1], paragraph 68 in the Statement of Undisputed Material Facts in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-2], portions of Attachment A to John Stanton's Affidavit [Docs. 135-3 & 135-4], and the entirety of Retirement Services Summary by Year [Doc. 135-6]. In all other respects the motion is **DENIED**.

### 2. Reliance's Motion for Leave to File Under Seal [Doc. 142]

Reliance moves to seal the following portions of documents:

(1) Paragraphs 57, 59-60, 65, 77 (in part), 80 (in part), and 109-10 of the Expert Report of Gerald Buetow ("Buetow") [Doc. 141-1] ("Buetow Report");

(2) Slides 9-10, 12, 25, 28-29, and 35-37 of Exhibit 50 to Reliance's Statement of Facts [Doc. 141-2]; and

(3) Paragraphs 23 and 36 (in part) of the Rebuttal Expert Report of Buetow [Doc. 141-3] ("Buetow Rebuttal Report").

Am. Mem. in Supp. of Def. Reliance's Mot. for Leave to File Under Seal [Doc. 143-1] ("Reliance's 142 Br.").

Reliance contends that the paragraphs in Buetow's reports that it seeks to seal "describe [Reliance]'s purported business strategies and objectives—the public disclosure of which could cause [Reliance] competitive harm" and "are not of public concern" Id. at 4. Reliance filed public versions of Buetow's reports [Docs. 137-3 & 137-12] redacting only these paragraphs. The redacted paragraphs contain factual background for Buetow's expert conclusions, all supported by citations to evidence produced in discovery. At least some of that evidence is in the record. See, e.g., Videotaped Dep. of William Harlow dated Jan. 19, 2018 [Doc. 149-1] at 25-26. Notably, Reliance does not ask to seal this underlying evidence. Moreover, Reliance does not explain how the information it seeks to seal would cause it competitive harm. See Reliance's 142 Br. Reliance has not shown good cause to seal the redacted paragraphs in Buetow's reports.

**\*22** Exhibit 50 is "an internal presentation prepared by [Reliance] that contains confidential information" about its "finances, sales, transaction volumes, and operating income and expenses" on the slides it seeks to seal. Reliance's 142 Br. at 2. Reliance contends that this information should be sealed because (1) Reliance designated it confidential pursuant to the Stipulated Protective Order [Doc. 84], (2) "confidential and sensitive information" of this type is "typically protected" within this district, (3) if the information was disclosed to competitors, Reliance would suffer harm, and (4) the public interest in accessing the information is very low because "the information at

issue is not a public concern." Id. at 3. Reliance filed a public version of this presentation [Doc. 137-51] redacting only the slides it seeks to seal.

As an initial matter, the parties' designation of a document as confidential pursuant to Stipulated Protective Order is not sufficient grounds for sealing. See Stipulated Protective Order ¶ 13 ("Any documents ... designated as Confidential Information or Highly Confidential—Outside Counsel Only Information that are submitted to the Court in support of or in opposition to a motion ... may retain their protected confidential status only by order of the Court in accordance with the procedures outlines [sic] in Appendix H of the Local Rules of the Northern District of Georgia."); Standing Order § II.E (same); see also LR App. H § II(J)(1), NDGa ("Agreements between or among the parties to protect documents from public disclosure, whether through designation under a confidentiality agreement or protective order or otherwise, will not prevent their disclosure in the event the Court denies sealed filing for the documents."); Wilson v. Am. Motors Corp., 759 F.2d 1568, 1571 (11th Cir. 1985) (finding that parties "do not have the right to agree to seal what were public records.").

However, the slides that Reliance seeks to seal identify its cumulative sales, financial overview, total assets under management, transaction volumes, and detailed balance sheets. Good cause exists to seal this detailed, internal financial information.

Accordingly, Reliance's Motion for Leave to File Under Seal [Doc. 142] is **GRANTED IN PART and DENIED IN PART**. The motion is **GRANTED** with respect to Slides 9-10, 12, 25, 28-29, and 35-37 of Exhibit 50 to Reliance's Statement of Facts [Doc. 141-2]. In all other respects the motion is **DENIED**.

### 3. The Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. 155]

The Insperity Defendants also move to seal Geist's corrected damages analysis [Doc. 134-89]. Mem. of Law in Supp. of the Insperity Defs' Mot. for Leave to File Docs. Under Seal [Doc. 155-1] ("Insperity Defs.' 155 Br."). They contend that Geist's

analysis "contains commercially-sensitive financial and business information that is Confidential under this Court's Protective Order." Id. at 3. As explained above, this alone does not justify sealing. See supra part III.B.2. The Insperity Defendants also contend that public access to Geist's corrected damages analysis would "harm legitimate privacy interest and injure the Insperity Defendants" because it would cause them competitive harm. Insperity Defs.' 155 Br. at 4. Furthermore, they contend that more redactions would not sufficiently protect them from harm. Id.

Geist's corrected damages analysis does contain some of Defendants' commercially-sensitive financial information that justifies sealing. See Chemence Med. Prods., Inc. v. Medline Indus., Inc., No. 1:13-CV-500-TWT, 2015 WL 149984, at *2 (N.D. Ga. Jan. 12, 2015) (granting motion to seal portions of documents that contain confidential business information or product specifications). But other information in Geist's analysis—including his executive summary, footnotes, "average" and "typical" numbers of certain activities for plans with assets comparable to Reliance, and descriptions of Geist's assumptions—does not appear to be sensitive in nature. "Counsel generally should not request sealing of an entire filing but only those portions of the filing for which there is legal authority to seal...." LR App. H § II(J)(1), NDGa. The Court's Standing Order states that the Court will entertain only the least restrictive measure of sealing documents: "It should be noted that even these exceptions to public filing usually do not require that entire documents or pleadings be filed under seal, but only those portions of a pleading or document for which protection is authorized." Standing Order § II.E.

**\*23** The Court finds that the Insperity Defendants could sufficiently protect Defendants' financial information with limited redactions. Accordingly, the Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. 155] is **DENIED**.

### 4. Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 162]

Plaintiffs move to seal paragraph 68 of their Response to Statement of Undisputed Material Facts in Support of the Insperity Defendants' Motion for Summary

Judgment and Plaintiffs' Statement of Additional Facts [Doc. 161-1]. Pl.'s Mem. in Supp. of Mot. for Leave to File Docs. Under Seal [Doc. 162-1]. Plaintiffs filed a public version of the response [Doc. 160-1] redacting only paragraph 68 of the Insperity Defendants' statement and Plaintiffs' response to it. Plaintiffs' sole reason for sealing is that paragraph 68 "contain[s] information that Defendants designated as Confidential Information pursuant to the Stipulated Protective Order." Id. at 1. As explained above, this alone does not justify sealing. See supra part III.B.2. However, the Court found (for other reasons) that good cause existed to seal paragraph 68 of the Insperity Defendants' statement of undisputed facts. See supra part III.B.1. Good cause also exists to seal Plaintiffs' response to paragraph 68. Accordingly, Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 162] is **GRANTED**.

### 5. Plaintiffs' Motion for Leave to File Exhibits Under Seal [Doc. 165]

Plaintiffs also move to seal the following exhibits to their responses in opposition to Defendants' motions for summary judgment:

(a) The entirety of Expense Submission for 4th Quarter 2011 [Docs. 164-1 & 164-2];

(b) The entirety of excerpts from Duffy's deposition transcript [Doc. 164-3]; [25]

(c) The entirety of the Insperity Frustration e-mail [Doc. 164-4];

(d) The entirety of the Testing (2007-15) Spreadsheet tabs [Doc. 164-5];

(e) The entirety of the Administaff Retirement Services Expense Submission to Reliance [Doc. 164-6];

(f) The entirety of Alex Brooks's Account Statement [Doc. 164-7]; [26]

(g) The entirety of the Account Statement for Reliance for the Insperity 401(k) Plan [Doc. 164-8];

(h) The entirety of the Reliance Investment Fund Services, Business & Product Overview [Doc. 164-9];

(i) The entirety of the Collective Investment Trust Business Plan [Doc. 164-10];

(j) The entirety of the Reliance Asset Management Budget Kickoff Meeting Presentation [Doc. 164-11];

(k) Portions of Buetow's Expert Report [Doc. 164-12] and Rebuttal Report [Doc. 164-13]; [27] and

(l) The entirety of Geist's Corrected Expert Report [Doc. 164-14], Corrected Rebuttal Report [Doc. 164-15], and Exhibits 2-4 to his Corrected Rebuttal Report [Docs. 164-16, 164-17, & 164-18].

Pls.' Mem. in Supp. of Mot. for Leave to File Exs. Under Seal [Doc. 165-1] ("Pls.' 165 Br."). Once again, Plaintiffs sole reason for sealing is that "Defendants designated as Confidential Information pursuant to the Stipulated Protective Order." [28] Id. at 1. As explained above, this alone does not justify sealing. See supra part III.B.2.

**\*24** Moreover, it is the burden of the party that marked the document confidential (here, allegedly Defendants) to establish good cause before the Court to seal the document. See LR App. H § J(2)(e), NDGa. Thus, it is not sufficient for the non-movant to consent to the motion to seal. Rather, the non-movant must respond to the motion for leave to file under seal explaining the reasons sealing is necessary, explaining why less drastic alternatives than sealing will not provide adequate protection, and addressing the factors governing sealing of documents reflected in controlling case law. Id. §§ J(2)(d)-(e). If the non-movant who marked the information confidential fails to file such a brief, they have not established good cause for sealing, and the motion to seal will be denied. Here, Defendants have not filed a brief supporting Plaintiffs' motion to seal, and Plaintiffs' have not shown good cause to seal the documents. Accordingly, Plaintiffs' Motion for Leave to File Exhibits Under Seal [Doc. 165] is **DENIED**.

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

**6. The Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. 172]**

The Insperity Defendants next move to seal the following documents:

(a) Paragraph 68 and part of paragraph 246 of the Insperity Defendants' Reply in Further Support of Their Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Additional Material Facts [Doc. 171-1];

(b) The entirety of the Motion to Exclude Geist, Memorandum in Support of Motion to Exclude Geist, its supporting exhibits [Docs. 171-5 through 171-9][29], and the proposed order [Doc. 171-4]; and

(c) The entirety of excerpts from Duffy's deposition transcript [Doc. 171-10].

Mem. of Law in Supp. of the Insperity Defs.' Mot. for Leave to File Docs. Under Seal [Doc. 172-1] ("Insperity Defs.' 172 Br.").

The Insperity Defendants contend that their reply contains "confidential and completely sensitive financial information regarding one of Insperity Inc.'s subsidiaries that is not made public in Insperity, Inc.'s public filings or otherwise." Id. at 3. The Insperity Defendants filed a public version of their reply [Doc. 169] redacting all of paragraph 68 and part of their response in paragraph 246. As described earlier, good cause exists to seal paragraph 68 of the statement and of Plaintiff's response, see supra parts III.B.1. & III.B.4; accordingly, good cause exists to seal paragraph 68 of the Insperity Defendants' reply. However, paragraph 246 merely quotes from and explains two documents in the public record. See generally Lance Studdard et al., Trustee's Report, Insperity 401(k) Plan and Insperity Corporate 401(k) Plan (Mar. 14, 2012) [Doc. 134-6]; Duffy Dep. Good cause does not exist to seal that portion of paragraph 246.

The Insperity Defendants contend that their Motion to Exclude Geist, Memorandum in Support of Motion to Exclude Geist, and supporting exhibits "contain confidential and completely sensitive

financial information regarding one of Insperity Inc.'s subsidiaries that is not made public in Insperity, Inc.'s public filings or otherwise." Insperity Defs.' 172 Br. at 3. They also state that Geist's reports "have been designated confidential under the protective order and Plaintiffs filed [them] under provisional seal." Id. at 4.

First, "[e]xcept in rare circumstances, motions and settlement agreements may not be filed under seal." LR App. H § II(J)(1). The parties have not identified anything in the Motion to Exclude Geist which is confidential, see Mot. to Exclude Geist; therefore, it will not be sealed. Nor will the proposed order granting the motion. Second, large portions of the Memorandum in Support of Motion to Exclude Geist are obviously not confidential. The Insperity Defendants make no attempt to explain what specific information contained within it is confidential or to redact that information. See Insperity Defs.' 172 Br. Third, designating Geist's report confidential pursuant to a protective order is, again, not sufficient to justify sealing. See supra part III.B.2. Fourth, as explained above, whichever party[30] designated Geist's report confidential has the burden to show good cause exists to seal that report. See supra part III.B.5. But neither party explains what information in Geist's report and its exhibits is confidential or sensitive, or why redactions would not protect that information. Clearly, Geist's entire report is not confidential. Geist discusses, among other non-confidential, non-sensitive topics, the terms of his engagement, his qualifications and experience, the contribution plan recordkeeping industry generally, and the factual background of this case. The Insperity Defendants have not shown good cause to seal Geist's report, its exhibits, or their Memorandum in Support of Motion to Exclude Geist.

**\*25** The Insperity Defendants also contend, without explanation, that Duffy's deposition transcript excerpts "contain[ ] extensive commercially-sensitive information." See Insperity Defs.' 172 Br. at 4. But significant portions of these excerpts appear to be devoid of sensitive information. The Court finds that the Insperity Defendants could sufficiently protect any commercially-sensitive information with limited redactions. For this same reason, the Court denied without prejudice the Insperity Defendant's motion to seal other excerpts from Duffy's deposition transcript. See supra part III.B.1.

Accordingly, the Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. **172**] is **GRANTED IN PART and DENIED IN PART.** The motion is **GRANTED** with respect to paragraph 68 of the Insperity Defendants' Reply in Further Support of Their Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Additional Material Facts [Doc. **171-1**]. In all other respects the motion is **DENIED.** [31]

### 7. Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 182]

Plaintiffs move to seal the entirety of their Opposition to Motion to Exclude Geist, excerpts from Geist's deposition transcript [Doc. 181-1], and excerpts from James Scheinberg's deposition transcript [Doc. 181-2]. See Pls.' Mem. in Supp. of Mot. for Leave to File Docs. Under Seal [Doc. 182-1]. Once again, Plaintiffs' sole reason for sealing the entirety of these documents is that they "contain information that Defendants designated as Confidential Information pursuant to the Stipulated Protective Order." See id. This is not sufficient to justify sealing. See supra part III.B.2. Large portions of Plaintiffs' Opposition to Motion to Exclude Geist obviously are not confidential. See Pls.' Opp'n to Mot. to Exclude Geist. Plaintiffs make no attempt to explain what specific information in their opposition or in the deposition transcript excerpts is confidential or why redactions will not protect that information. They have not shown good cause exists to seal these documents. Accordingly, Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 182] is **DENIED.**

### 8. The Insperity Defendants' Motion for Leave to File Document Under Seal [Doc. 187]

Finally, the Insperity Defendants' move to seal the entirety of their Reply in Support of Motion to Exclude Geist [Doc. 186-1]. Mem. of Law in Supp. of the Insperity Defs.' Mot. for Leave to File Doc. Under Seal [187-1]. The Insperity Defendants again contend that their reply "contains confidential and competitively sensitive financial information regarding one of Insperity, Inc.'s subsidiaries that is not made public in Insperity, Inc.'s public filings or otherwise." Id. at 3. They also again state that Geist's reports have been designated confidential under the protective order and that Plaintiffs moved to seal these reports. See id. The Insperity Defendants again contend that redactions would not protect the sensitive information. See id.

As explained above, designating a document confidential pursuant to a protective order is not sufficient to justify sealing the document. See supra part III.B.2. The party designating the document confidential has the burden to show good cause exists to seal the document. See supra part III.B.5. It is unclear which party designated Geist's report confidential, and neither party explains what specific information contained therein is confidential. See supra parts III.B.5-7. Furthermore, large portions of the Insperity Defendants' Reply in Support of Motion to Exclude Geist are obviously not confidential. The Insperity Defendants fail to explain what specific information confidential or why redactions will not protect that information. They have not shown good cause to seal this document. Accordingly, the Insperity Defendants' Motion for Leave to File Document Under Seal [Doc. **187**] is **DENIED.**

### IV. CONCLUSION

**\*26** For the foregoing reasons, it is hereby **ORDERED** that the Insperity Defendants' Motion to Exclude Proffered Testimony of Plaintiffs' Expert [Doc. 170] is **DENIED** and the Insperity Defendants' Motion to Exclude Proffered Testimony of Plaintiffs' Expert Michael Geist [Doc. 171-2] is **GRANTED.**

It is further **ORDERED** that the Insperity Defendants' Motion for Leave to File Under Seal [Doc. 136] is **GRANTED IN PART and DENIED IN PART.** The motion is **GRANTED** with respect to salary information contained in the Transcript of John Stanton's deposition [Doc. 128-1], footnote 22 in the Memorandum of Law in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-1], paragraph 68 in the Statement of Undisputed Material Facts in Support of the Insperity Defendants' Motion for Summary Judgment [Doc. 135-2], portions of Attachment A to John Stanton's Affidavit [Docs. 135-3 & 135-4], and the entirety of Retirement Services Summary by Year [Doc. 135-6]. In all other respects the motion is **DENIED.**

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

The Clerk is **DIRECTED** to maintain the duplicate Transcript of John Stanton's deposition [Doc. 145-1] under seal.

It is further **ORDERED** that Reliance's Motion for Leave to File Under Seal [Doc. 142] is **GRANTED IN PART and DENIED IN PART.** The motion is **GRANTED** with respect to Slides 9-10, 12, 25, 28-29, and 35-37 of Exhibit 50 to Reliance's Statement of Facts [Doc. 141-2]. In all other respects the motion is **DENIED.**

It is farther **ORDERED** that the Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. 155] is **DENIED.**

It is further **ORDERED** that Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 162] is **GRANTED.**

It is further **ORDERED** that Plaintiffs' Motion for Leave to File Exhibits Under Seal [Doc. 165] is **DENIED.**

It is further **ORDERED** that the Insperity Defendants' Motion for Leave to File Documents Under Seal [Doc. 172] is **GRANTED IN PART and DENIED IN PART.** The motion is **GRANTED** with respect to paragraph 68 of the Insperity Defendants' Reply in Further Support of Their Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Additional Material Facts [Doc. 171-1]. In all other respects the motion is **DENIED.** The Insperity Defendants are **ORDERED** to submit within fourteen

(14) days of the date of this Order a public version of their Reply redacting only paragraph 68.[32]

It is further **ORDERED** that Plaintiffs' Motion for Leave to File Documents Under Seal [Doc. 182] is **DENIED.**

It is further **ORDERED** the Insperity Defendants' Motion for Leave to File Document Under Seal [Doc. 187] is **DENIED.**

It is further **ORDERED** that each party shall have fourteen **(14)** days from the date of this Order to re-file one consolidated motion for leave to file under seal any document(s) or portion(s) thereof that the Court declined to seal,[33] except Ian Rather's Declaration [Doc. 132-1], the Motion to Exclude Geist [Doc. 171-2], and the Proposed Order to Exclude Geist [Doc. 171-4]. The Court will not seal these three documents.

***27** The Clerk is **DIRECTED** to keep the documents that are the subject of any motion addressed herein that has been denied, except for Docs. 132-1, 171-2, and 171-4, provisionally sealed until further Order of this Court. If the parties do not re-file as instructed above within fourteen (14) days from the date of this Order, the Court will direct the Clerk to unseal those documents that remain provisionally sealed.

**IT IS SO ORDERED** this 25 <u>th</u> day of February, 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4439606

---

## Footnotes

1    Insperity filed this motion under seal. "Except in rare circumstances, <u>motions</u> and settlement agreements may not be filed under seal. A party may request that a <u>brief or other document in support of a motion</u> be filed under seal consistent with this policy." LR App. H § J(1), NDGa (emphasis added). In the interests of resolving the pending motions efficiently, the Court will consider this motion without requiring Insperity to re-file it properly.

2    The remaining Defendant, classified by Plaintiff as "the Insperity Retirement Plan Committee," consists of "certain officers and members of management" of Holdings whose identities are

unknown to Plaintiffs. Id. ¶ 24. The Insperity Defendants contend that this committee does not exist. See, e.g., Mot. to Exclude Geist at 1 n.1.

3    The Court previously approved the parties' stipulation regarding class certification. See Nov. 7, 2017, Order [Doc. 101].

4    The Court previously dismissed Counts IV and VIII of the Amended Complaint, as well as those claims in Count II related to the initial selection of Retirement Services as the Plan's recordkeeper. See March 7, 2017, Order [Doc. 65] at 44-45.

5    The Court previously determined that Plaintiffs are not entitled to a jury trial. See Order dated Nov. 7, 2017 [Doc. 100].

6    Some courts have even denied Daubert motions outright at or before summary judgment, reserving a decision on the admissibility of the expert's testimony until the bench trial. See, e.g., Bishop of Charleston v. Century Indem. Co., 225 F. Supp. 3d 554, 567 (D. S.C. 2016); Rader v. Bruister, No. 4:10cv95-DPJ-FKB, 2013 WL 6805403, at *16 (S.D. Miss. Dec. 20, 2013) Traxys N. Am., LLC v. Concept Mining, Inc., 808 F. Supp. 2d 851, 853 (W.D. Va. 2011). In this case, "in an abundance of caution, the Court will evaluate the proffered expert testimony against the touchstones of Daubert and Rule 702." See Evanston Ins. Co. v. Premium Assignment Corp., No. 8:11-cv-2630-T-33TGW, 2013 WL 81997, at *5 (M.D. Fla. Jan. 7, 2013).

7    Reliance joined the Insperity Defendants' motions to exclude Jania Stout and Michael Geist. See Notice of Reliance's Joinder in the Insperity Defendants' Mots. to Exclude the Proffered Test. of Pls.' Experts Jania Stout and Michael Geist [Doc. 176].

8    Defendants' reliance on In re M/V MSC FLAMINIA, No. 12-cv-8892, 2017 WL 3208598 (S.D.N.Y. July 28, 2017) is unpersuasive. In that case, the court found that a marine engineer, surveyor, and consultant with "[n]o special expertise in firefighting or fire-safety systems" who "investigated numerous fires over the course of his career, including several fires and explosions on ships" and "inspected vessels on a regular basis" lacked "sufficient demonstrated experience in the areas of crew training and drilling to provide opinions on those matters." In re M/V MSC FLAMINIA, 2017 WL 3208598, at *26-28. The court stressed that the proffered expert was not a trained drill instructor, nor did he "have the requisite expertise based upon a combination of experiences such as having fought fires as well as participated in drills." Id. at *28. Here, Stout has experience advising plan fiduciaries. Although she was never personally appointed a fiduciary, she has direct experience in the areas where she offers opinions.

9    Defendants are correct that this duty to monitor does not "require every appointing Board member to review all business decisions of Plan administrators." See Howell v. Motorola, 633 F.3d 552, 573 (7th Cir. 2011) (emphasis added). But unlike the plaintiffs in Howell, Stout does not contend that "appointing fiduciaries must continually monitor their appointees." See id.; Stout Report ¶ 142. Instead, Stout contends that Holdings' Board should have increased their oversight of Reliance before it selected Insperity Horizon Funds. See Stout Report ¶ 142. This conclusion is not contrary to law: "There is no doubt that those who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of those appointees." See Howell, 633 F.3d at 573 (citing Leigh v. Engle, 727 F.2d 113, 134-35 (7th Cir. 1984)).

10    Stout describes the board's oversight of an investment manager as "a much more complicated event." See Stout Dep. at 193. She stated that the duty to monitor an investment manager "needs to take place more frequently." See id. at 199. When asked, "why is the duty to monitor greater

Case 3:18-cv-00121-JFS-PJC     Document 224-2     Filed 02/17/26     Page 28 of 65

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

when you're monitoring an expert than if you're monitoring a bunch of laypeople?", Stout replied that "it's more complicated" than "monitoring five people meeting as a committee...." See id. at 201. Defendants make much of these statements, but Stout's characterization of the relative difficulty and complexity of overseeing an investment manager instead of a committee of laypeople does not make her expert opinion contrary to law.

11   If Stout offers opinions at trial that are contrary to law, Defendants can make an appropriate objection.

12   Neither party cites any authority addressing this precise issue. See generally Ronald J. Cooke, 2 ERISA PRACTICE AND PROCEDURE § 6.75 (Oct. 2018). Defendants cite two cases stating that revenue sharing arrangements are common and acceptable practices, but neither case states that negotiating what expenses would be reimbursed and at what rate violates the statute. See Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014) (stating that revenue sharing is a common and acceptable investment industry practice that frequently benefits ERISA plans); Hecker v. Deere & Co., 556 F.3d 575, 585 (7th Cir. 2009) (agreeing with district court that a revenue-sharing arrangement violates no statute or regulation). In their reply, Defendants puzzlingly say that Tussey is inapplicable because it is a third-party bookkeeper case. See Defs.' Reply in Supp. of Mot. to Exclude Stout at 12.

13   Furthermore, to the extent Defendants challenge Stout's conclusions, this is inappropriate in a Daubert motion. See, e.g., Architects Collective v. Pucciano & English, Inc., 247 F. Supp. 3d 1322, 1332 (N.D. Ga. 2017) (citing Daubert, 509 U.S. at 595) ("The inquiry into reliability must focus on 'principles and methodology' and not the expert witness's conclusions.").

14   The parties vigorously dispute, with citations to evidence in the record, which version of each of these events is correct. See Defs.' Mem. in Supp. of Mot. to Exclude Stout at 21-22; Pls.' Opp'n to Mot. to Exclude Stout at 22 n.11; Defs.' Reply in Supp. of Mot. to Exclude Stout at 14.

15   Defendants insist that Stout "concludes that [Reliance] increasing expense reimbursements to Retirement Services as a 'quid pro quo' for Holdings's eventual decision to add the Horizon Funds." See Defs.' Mem. in Supp. of Mot to Exclude Stout at 22 (citing Stout Report ¶¶ 113, 133); Defs.' Reply in Supp. of Mot. to Exclude Stout at 14. Stout does not use the term "quid pro quo." See Stout Report ¶¶ 113, 133. Nor does she "opine[ ] that [Retirement Services] increased expense reimbursements in exchange for Holdings approval...." See Stout Report ¶¶ 113, 133. Rather, Stout testifies that the two events "occurred at or around" the same time, id. ¶ 113, and that Reliance "had a conflict of interest" and "abused its position of trust" and Holdings "would have an interest in permitting this action to preserve the compensation by Retirement Services." Id. ¶ 133. Identifying Defendants' interests and conflicts of interest at the time of a transaction is not the same as offering an opinion on their state of mind, motives, or intent.

16   If Stout so testifies at trial, Defendants can object and the Court will not consider testimony that invades the province of the factfinder.

17   Defendants also contend that Geist "is not qualified to opine on ERISA's fiduciary duties" because he has never been a fiduciary, plan sponsor or advisor, or advised a plan sponsor or fiduciary. See Defs.' Mem. in Supp. of Mot. to Exclude Geist at 10. However, unlike Stout, Geist does not offer an opinion about specific actions or "best practices" a prudent fiduciary would or would not take. See Stout Report; Corrected Geist Report. Instead, he testifies that the recordkeeping and

administrative fees paid to Retirement Services were unreasonable. Corrected Geist Report ¶¶ 68-102.

18    Plaintiffs' contend that Geist "personally developed the same type of pricing models the Insperity Defendants claim he cannot work without." Pls.' Opp'n to Mot. to Exclude Geist at 10. Geist states in his report that he was "responsible for developing a pricing model and pricing strategy...." Corrected Geist Report ¶ 7. Managerial responsibility for developing a model is different from personally developing the model. Moreover, Geist did not take any pricing models from T. Rowe Price when he left, and "did not rely on any T. Rowe Price pricing model or any other information from T. Rowe [Price] in coming to my opinions in this case." Geist Dep. at 60.

19    Employee benefit plans must file Form 5500, Annual Return/Report of Employee Benefit Plan, annually with DOL to satisfy ERISA's and the Internal Revenue Code's annual reporting requirements. Form 5500s are publicly available on DOL's website.

20    Geist calculates the average per-participant unreasonable excess recordkeeping fee paid by Plan participants each year from 2010 to 2016. Corrected Geist Report ¶ 98.

21    Geist could not identify any plan that paid his calculated reasonable recordkeeping fees. See Geist Dep. at 397-98.

22    Defendants contend that Geist's methodology is flawed in a host of other ways. See Defs.' Mem. in Supp. of Mot. to Exclude Geist at 17-24. Having determined that Geist's methodology for calculating a baseline price is unreliable, the Court need not consider whether his methodology for calculating adjustments to that baseline price is reliable or whether his opinions contains many mathematical and other admitted calculation errors.

23    Although the Insperity Defendants do not specify which financial information they redacted, it appears to the Court that they redacted payment information, including account and routing numbers and credit card numbers.

24    Reliance also filed the complete transcript of Stanton's deposition [Doc. 145-1] provisionally under seal. In their notice of filing, Reliance observes that the Insperity Defendants moved to file this deposition under seal. As explained herein, the Court finds good cause to redact Stanton's salary information in this transcript. Accordingly, the Clerk is **DIRECTED** to maintain Doc. 145-1 under seal.

25    Plaintiffs note that Defendants also moved to seal the entirety of Duffy's deposition transcript. See Pls.' 162 Br. at 1. The Court denied the Insperity Defendants' motion to seal this excerpt from Duffy's deposition transcript. See supra part III.B.1. As explained below, the party that designated this excerpt confidential has the burden to show good cause exists to seal it.

26    Alex Brooks's mailing address and account number are already redacted in the provisionally-sealed version of his account statement.

27    Plaintiffs move to seal the same portions of these reports as does Reliance. See Reliance's 142 Br.; Buetow Report (redacted) [Doc. 163-160]; Buetow Rebuttal Report (redacted) [Doc. 163-161]. The Court denied Reliance's motion to seal these excerpts from Buetow's reports. See supra part III.B.2.

28    Geist is the Plaintiffs' expert. It is unclear from the various motions to seal who designated his report confidential.

Pledger v. Reliance Trust Company, Not Reported in Fed. Supp. (2019)

29    The Court denied Plaintiffs' motion to seal these exhibits (Geist's Corrected Expert Report, Corrected Rebuttal Report, and Exhibits 2-4 to his Corrected Rebuttal Report). See supra part III.B.5.

30    See supra note 28.

31    Because good cause exists to seal paragraph 68 of, the Insperity Defendants are **ORDERED** to submit within fourteen (14) days of the date of this Order a public version of their reply redacting only paragraph 68.

32    If the Insperity Defendants fail to do so, the Court will direct the Clerk to unseal their provisionally-sealed reply [Doc. 171-1].

33    Each party's consolidated motion must be accompanied by: (1) a brief complying with Local Rules Appendix H § J(2)(d), and (2) public versions of each document the party seeks to seal redacting only that information for which good cause exists to seal. As explained in part III.B.5 of this Order, the party that designated a document confidential has the burden to show good cause to seal. Because it appears that no party opposed any of the motions to seal, the parties may choose to jointly, rather than individually, submit one consolidated consent motion and brief.

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

2026 WL 91995
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Gwynne SUGG, individually and on behalf
of all those similarly situated, Plaintiff,

v.

VIRTUSA, Defendant.

Civil Action No. 18-08036 (GC) (JTQ)
|
Signed January 13, 2026

**Attorneys and Law Firms**

Jonathan Rudnick, The Law Offices of Jonathan
Rudnick LLC, Tinton Falls, NJ, for Plaintiff.

Peter Owen Hughes, Robert M. Pettigrew, Jason W.
Isom, Ogletree, Deakins, Nash, Smoak & Stewart,
P.C., Morristown, NJ, Ryan Todd Warden, Warden
Law LLC, Cherry Hill, NJ, for Defendant.

**OPINION**

CASTNER, District Judge

**\*1 THIS MATTER** comes before the Court upon
three motions: Plaintiff Gwynne Sugg's Motion for
Class Certification pursuant to Federal Rule of Civil
Procedure (Rule) 23 (ECF Nos. 141, 142); Defendant
Virtusa's Motion to Exclude the Expert Reports of
David Lang, Ph.D. (ECF No. 144); and Defendant's
Motion to Exclude the Expert Report of Ronil Hira,
Ph.D. (ECF No. 145). The parties briefed each of the
Motions. (*See* ECF Nos. 142, 144-145, 150-151, 153,
157-158, 160.) The Court has carefully considered the
parties' submissions and decides the matter without
oral argument pursuant to Rule 78(b) and Local
Civil Rule 78.1(b). For the reasons set forth below,
and other good cause shown, Defendant's Motion to
Exclude the Expert Reports of David Lang, Ph.D.
is **GRANTED in part** and **DENIED in part**;
Defendant's Motion to Exclude the Expert Report of
Ronil Hira, Ph.D. is **DENIED**; and Plaintiff's Motion
for Class Certification is **DENIED**.

## I. BACKGROUND

### A. Procedural Background

On February 28, 2018, Plaintiff filed a putative class
action in the Superior Court of New Jersey, Law
Division, Monmouth County. (ECF No. 1-1.) On
April 19, 2018, Defendant removed the case to this
Court. (ECF No. 1.) After retaining new counsel,
Plaintiff filed a First Amended Complaint (FAC) on
July 11, 2018. (ECF No. 7.) Plaintiff's FAC contains
three counts: disparate treatment on the basis of
race in violation of 42 U.S.C. § 1981 (Count I);
an unenforceable and unconscionable non-competition
agreement in violation of New Jersey state law (Count
II); and breach of contract and unjust enrichment in
violation of New Jersey state law (Count III). (*Id.*) [1]
The first two Counts are brought by Plaintiff and the
putative class, and the third Count is brought only
on behalf of Plaintiff. (*Id.*) On September 7, 2018,
Defendant moved to dismiss the FAC. (ECF No. 11.)
The Court denied the Motion to Dismiss with respect
to Counts I and III. (ECF No. 24.) Plaintiff voluntarily
withdrew Count II. (*Id.* at 2 n.2.) [2]

The parties then moved into discovery. As is relevant
here, Plaintiff served its Expert Reports—authored by
David Lang, Ph.D. and Ronil Hira, Ph.D., respectively
—on July 29, 2024. (ECF No. 135-1 at 6; ECF No. 139
at 6.) [3] Virtusa served a rebuttal to Dr. Lang's Report—
authored by Paul White, Ph.D.—on March 10, 2025.
(ECF No. 135-1 at 6; ECF No. 139 at 10.) On May 5,
2025, Dr. Lang filed an Expert Reply Report. (ECF No.
135-1 at 6; ECF No. 139 at 11.) The parties completed
fact and expert discovery on May 23, 2025. (*See* ECF
No. 126.)

**\*2** After the completion of discovery, the parties filed
the instant Motions. On May 28, 2025, Defendant filed
a motion to strike Dr. Lang's Expert Reply Report.
(ECF No. 135.) On June 25, 2025, Plaintiff filed a
class certification motion. (ECF No. 141.) On that
same date, Defendant filed motions to exclude the
expert reports of Drs. Lang and Hira. (ECF Nos. 144,
145.) On December 23, 2025, the Honorable Justin T.
Quinn, U.S.M.J., granted Defendant's motion to strike
Dr. Lang's Expert Reply Report, and Plaintiff did not
appeal that decision. (ECF No. 166.)

## B. Factual Background

### 1. Facts Relevant to the
### Motion for Class Certification

#### a. Virtusa's Business Model

Virtusa provides information technology (IT) and consulting services to customers across the globe. (ECF No. 146 at 3; ECF No. 153-3 at 1.)[4] The company was founded in Sri Lanka but maintains its corporate headquarters in Massachusetts. (ECF No. 142 at 7; ECF No. 146 at 3.) As of 2024, Virtusa employs over 27,000 individuals, (ECF No. 142-5), and nearly 70% of those individuals live in India. (ECF 142-4 at 27; 142-5 at 3.) Approximately 2,700 employees live in the United States. (ECF No. 142-6 at 7.) Virtusa employs an "offshore-onsite" business model to serve its United States clients. Under this model, most of the work performed for these clients is done "offshore" in India or Sri Lanka. (ECF No. 153-2 at 1.) Some of the work is done "on-site" at customer facilities in the United States. (*Id.*) Regardless, employees who work on these client projects—as opposed to "selling, general, and administrative" employees who work on internal Virtusa matters— are referred to as "billable employees." (ECF No. 153-3 at 1-2.) These billable employees make up 90% of Virtusa's workforce. (*Id.* at 2.) For all employees, Virtusa has a six-Tier job hierarchy based on employee roles and years of experience. Tier 4 (campus hires) is the lowest, followed by Tier 3 (two to five years' experience), Tier 2 (five to eight years), Tier 1 (seven to twelve years), Tier 0 (ten to sixteen years), and Global Tier 0 (the highest Tier, comprised of Senior Directors and Vice Presidents, ranging in experience from fifteen to thirty years). (ECF No. 142-4 at 34-35.) Within this hierarchy, there are technology, delivery, and consulting tracks for billable employees, and sales and administration tracks for non-billable employees. (*Id.* at 31-32, 34.)

#### b. Virtusa's Hiring Practices

When a billable role becomes available,[5] the company will either staff the role with a current employee or an external candidate. (*Id.* at 16, 22-23.) Virtusa generally first looks to availability among internal employees before hiring externally. (*See, e.g.,* ECF No. 142-10 at 6-8, 12.) When hiring externally, Virtusa's Talent Acquisition Group employs various "modes of hiring" to attract candidates. (ECF No. 153-4 at 23-24.) It finds candidates through its own job portal postings; LinkedIn and other electronic job boards; external recruiters; external vendors who provide personnel; and internal recruiters. (*Id.* at 24-25.) Once candidates are sourced, they go through three rounds of interviews. First, technical recruiters conduct screening interviews to ensure applicants "will fit the profile." (*Id.* at 25.) Second, "strategic business unit[ ] representatives"—similar to hiring managers —conduct interviews. (*Id.* at 26.) Third, practice managers—"high-end technology experts"—conduct interviews. (*Id.*) During the course of these interviews, applicants are asked whether they would be open to relocation and open to travel "to be sure" the applicant is aligned with the needs of the client. (*Id.* at 28.) If the applicant makes it through these three rounds, Virtusa presents the applicant to the client. (*Id.* at 28.) Between 80% and 90% of the time, the client then interviews the applicant. (*Id.* at 29.) The client and practice manager both play a "critical role" in deciding whether to extend an offer to an external applicant. (*Id.* at 32.) Virtusa also considers affordability when making its external hiring decisions. (*Id.*) During the application process, Virtusa does not collect documents from candidates other than their resumes, though it does inform candidates that they must have work authorization, and it does not ask candidates to self-identify their race. (*Id.* at 27-30; ECF No. 142-4 at 9-10.)

#### c. Virtusa's Promotion Practices

**\*3** Multiple players are involved in Virtusa's promotion process. (ECF No. 153-3 at 3-4; ECF No. 153-4 at 53; *see also* ECF No. 142-16; ECF No. 142-18.) The process begins when an individual manager makes a promotion recommendation, and that recommendation is forwarded to the next level of management or to Human Resources personnel who make the ultimate decision. (ECF No. 153-3 at 3.) The promotion recommendation is based on a number of considerations:

(1) employees may not be promoted if they lack required technical certifications, (2) an employee must have completed a required number of months of service in their current role, which varies depending on the tier an employee is in; (3) an employee must meet performance rating requirements; (4) an employee's utilization levels and contribution to projects are considered; (5) an employee's initiative, learning ability, and general growth potential are considered; (6) supervisor and client feedback; and (7) performance against expected goals[.]

(*Id.* at 3-4.) But these factors change depending on the Tier in which the employee is seeking the promotion. (*Id.* at 4.) For junior level positions, promotions are based on tenure and performance ratings, which turn on the employee's potential. (ECF No. 153-4 at 53-54.) These employees—ones moving from Tier 4 to Tier 3—can be considered for promotion generally within 12 to 18 months. (*Id.* at 54; ECF No. 142-18 at 4.) As the employee moves up, the focus becomes less on potential and more on whether the individual is in fact contributing to the practice, and the employee can be considered for promotion generally after 24 to 36 months. (ECF No. 153-4 at 54; ECF No. 142-18 at 4.) To be promoted to the top positions —*i.e.*, into Tiers 1 and 0—tenure and performance are key parameters, but as Virtusa's Chief People Officer testified, affordability and a business need for the role are also "super" important. (ECF No. 153-4 at 54; ECF No. 142-18 at 3.)

Performance rating is a key factor throughout, but it applies differently depending on the type of job sought and the corresponding Tier. Billable employees are reviewed, at least in part, based on a qualitative scale. (ECF No. 142-18 at 3-4.) Employees who receive the top two scores on this scale—"Outstanding" and "Exceeds Expectation Consistently"—are eligible to be promoted at an expedited pace. (*Id.*) But billable employees seeking to be promoted within Tier 0 cannot do so unless they receive either of these two ratings. (*Id.* at 4.) By contrast, non-billable roles —like sales—do not employ the qualitative scale. (ECF No. 153-3 at 6.) Instead, these employees are primarily evaluated based on their "revenue impact" and "margin." (*Id.*) Regardless of the type of role, "360-degree feedback"—that is feedback by not just managers but also peers and subordinates— is implemented when evaluating promotions into and within Tier 0, but not at more junior Tiers. (ECF No. 153-3 at 4; ECF No. 153-4 at 55-56.) Promotion into or within Tier 0 may also be accompanied by an interview with an internal or external review panel. (ECF No. 142-18 at 3; ECF No. 153-3 at 4.)

### d. Virtusa's Termination Practices

Virtusa's termination procedures are related to its "benching" practices. Being "on the bench" refers to a billable employee's status when he or she is not currently staffed on a billable project. (ECF No. 153-4 at 35.) Non-billable employees cannot be on the bench because they are not staffed on client projects. (*Id.* at 49.) A billable employee may end up on the bench for three reasons. First, and most commonly, their previous project has come to an end. (*Id.* at 48.) Second, the client cancels a new project that the employee was already staffed on. (*Id.*) Third, the client requests the employee be removed from the project because of dissatisfaction with the employee's performance. (*Id.*) If an employee is on the bench for too long, they run the risk of termination. (*See, e.g.*, ECF No. 142-29 at 8-9.)

### e. Virtusa's Visa Policies

**\*4** As of 2020, more than half of Virtusa's United States-based employees are H-1B or L-1 visa holders. (ECF No. 146 at 5.) H-1B visas allow companies to sponsor employees in specialty occupations requiring application of highly specialized knowledge and attainment of at least a bachelor's degree or equivalent. (*Id.* at 6-7.) *See also* 8 C.F.R. § 214.2(h)(1)(ii)

(B). L-1 visas allow multinational corporations to transfer a worker from a foreign office to a United States office. (ECF No. 146 at 10.) *See also* 8 C.F.R. § 214.2(l). L-1B visas apply to transferees with "specialized knowledge" and L-1A apply to transferees who are executives or managers. (ECF No. 146 at 10.) It is Virtusa's alleged practices pertaining to visa-holding employees, and the possibility of discriminatory treatment in implementation of those policies on the basis of race, that are primarily at issue here. Virtusa's alleged practices largely fall within two buckets: visa preparation and visa utilization.

The clearest example of Virtusa's visa preparation policy is its alleged implementation of "Project Catalyst." Under this program, introduced in 2013, Virtusa sought to increase the percentage of employees in the United States that were H1-B or L-1 visa holders to decrease costs. (*See generally* ECF No. 142-21 (Virtusa presentation outlining Project Catalyst).) Accordingly, and following the lead of its competitors, Virtusa considerably increased its number of visa applications. (*See* ECF No. 142-25 at 3; ECF No. 146 at 21.) And it took a proactive approach—submitting more applications than it could use and filing them before specific positions opened up. (*See* ECF No. 146 at 19; ECF No. 142-50 at 6, ECF 142-52 at 2.) By 2014, more than 15% of Virtusa's United States employees were H1-B or L-1 visa holders, by 2016, more than 50%, and by 2018 it reached 65%. (ECF No. 146 at 21.)

Having secured a large number of visa-holding employees, Virtusa ensured its employees used those visas. Under the "Cost Per Consultant" initiative, Virtusa sought to bring visa-ready employees to the United States. (*See* ECF No. 142-31 (Virtusa presentation on Cost Per Consultant initiative).) Accordingly, it "[p]roactively train[ed] visa ready [offshore employees] for onsite roles." (ECF No. 142-32 at 2.) [6] And pursuant to Virtusa's rotation policy, implemented in 2014, if an employee was staffed on a project for more than 18 months and operated at a margin of under 30%, then Virtusa would implement a plan to increase that margin or replace the employee with a "lower cost onsite hiring" or a "visa ready" offshore employee. (ECF No. 142-40 at 2.) This rotation policy appeared to apply to both visa-holding and non-visa-holding United States-based employees. (ECF No. 153-4 at 45.) Finally, Virtusa implemented a new bench policy following the influx of visa-holding employees. Under this policy, Virtusa helped visa-holding employees identify new opportunities after only one day on the bench but waited seven days to assist non-visa employees. (*See* ECF No. 142-29 at 8-9 (Virtusa presentation on bench policy).) If a visa-holding employee was still on the bench after 60 days, the employee would be "immediately sen[t] ... back offshore." (*Id.* at 9.) The implication being that a visa-holder is still valuable to Virtusa because Virtusa could pay that employee significantly less in Sri Lanka or India. (ECF No. 146 at 23-24.) By contrast, a non-visa holder that remained on the bench for 90 days would be subject to a discussion on "alternatives and options"— suggesting the possibility of termination. (ECF No. 142-29 at 8.)

### f. Mr. Sugg's Experience

**\*5** Leo Sugg, a white male from the United States, worked for Virtusa from 2014 to 2017 as Vice President and the Global Account Executive for one of Virtusa's clients, American International Group, Inc. (AIG). (ECF No. 142-11 at 6, 22; ECF No. 143-4 at 4, 7-8.) Virtusa labels employees like Mr. Sugg "Client Partners" because they are responsible for managing the relationship with one client. (*See* ECF No. 153-3 at 2.) Client Partners are not hired through the usual three-round interview process. (*Id.* at 3.) Instead, the process "proceeds on an as needed basis and involves the discretion of individual executives and personnel at Virtusa." (*Id.*) Accordingly, Mr. Sugg was hired by Executive Vice President James Francis because of Sugg's prior experience working with AIG. (ECF No. 143-4 at 1, 3.) Mr. Sugg's role was "principally relationship driven, business development driven, making sure [AIG] was happy." (ECF No. 142-11 at 7.) He was not a billable employee. (*See* ECF No. 153-3 at 2.) During his tenure, Mr. Sugg was not promoted, nor did he seek a promotion. (ECF No. 142-11 at 25; ECF No. 153 at 42; ECF No. 157 at 18.) Mr. Sugg could not name a position that existed at Virtusa to which he could have been promoted, though he testified that Virtusa "could have gotten creative" and "given [him] more responsibility." (ECF No. 142-11 at 27.) Mr. Sugg also testified that during his tenure, he was told by Virtusa's President, Raj Rajogpal, that Mr. Sugg did not "look like someone

2026 WL 91995

who sells technology" and should "find someone from India to work with [him]." (*Id.* at 22-23.)

Francis terminated Sugg in 2017 because "Virtusa's business with AIG dramatically." (ECF No. 143-4 at 6.) Plaintiff contends that during this period Mr. Sugg "still performed well." (ECF No. 142 at 19.) Mr. Sugg was replaced by Sameer Menon, but when Menon similarly failed to grow the AIG business, he was transitioned to a new role in banking rather than terminated. (ECF No. 142-11 at 26-27.) Mr. Sugg stated that he suffered "stress" and "anxiety associated with switching employers" and sought help from two mental health professionals. (*Id.* at 3-5.)

### *2. Facts Relevant to the Motions to Exclude Expert Reports*

Defendant challenges the admissibility of two of Plaintiff's experts: (1) Dr. Lang (labor economics) and (2) Dr. Hira (business models of information technology services companies). (*See* ECF Nos. 144, 145.) Plaintiff relies on Dr. Lang's Reports for statistical evidence of the disparate treatment non-South Asians faced as a result of Virtusa's policies, and he relies on Dr. Hira's Report to contextualize Virtusa's actions.

#### a. *Dr. David Lang*

Plaintiff retained Dr. Lang [7] to analyze employment data provided by Virtusa and opine on whether racial disparities existed in Virtusa's workforce with respect to hiring, promotion, and termination, and if so, whether those disparities were statistically significant. (ECF No. 144-4 at 3.) Dr. Lang concluded that there was a "significant hiring disparity between White and Asian hiring rates." (*Id.* at 15.) [8] Specifically, Dr. Lang found that "[r]egardless of the number of applicants for a position, the probability that the hired applicant is Asian is very high (84.6% to 93.2%)" and that "[w]hen the number of applicants for a position is relatively high (11 or more applicants), the likelihood of the hired employee being Asian increases significantly" to 93.2%. (*Id.*) This disparity also existed within Virtusa's job Tiers: "Regardless of job [T]ier, the probability that

the hired applicant is Asian is very high (59.6% to 93.8%)." (*Id.*) Dr. Lang provided no data on or analysis of the applicant pool. (*See generally id.* at 5-6.)

As for promotions, Dr. Lang found that "White employees are significantly less likely to receive employee ratings of 'Exceeds Expectations' (the second highest rating) compared to Asian employees." (*Id.* at 15.) White employees were more likely to receive the highest rating, but the difference was not statistically significant. (*Id.* at 7.) Based on an analysis of less than 20 white employees, Dr. Lang also found that white employees who started at Tier 4 were significantly less likely to be promoted to Tiers 3, 2, and 1 than were Asian employees. (*Id.* at 9, 15.) However, there was no overall significant difference in the percentage of white versus Asian employees who were never promoted. (*Id.* at 8.) Dr. Lang attributed non-significance to a small sample size: there were only approximately 17 white individuals not promoted. (*See id.*)

**\*6** Finally, with respect to terminations, Dr. Lang found that "White employees at Virtusa were 2.19 times more likely to be involuntarily terminated than Asian employees," employees with visas were 1.68 times less likely to be involuntarily terminated than employees without a visa, and that "[a]fter accounting for gender, job [T]ier and age, being Asian (as opposed to being White) leads to an 8.2 percentage point reduction in the probability of being terminated involuntarily." (*Id.* at 12-13, 15.) Dr. Lang drew from a sample of approximately 18 white individuals, and 101 non-visa holding individuals, who were involuntarily terminated. (*See id.* at 12.)

Dr. Lang conducted his analyses based off of data provided by Virtusa. Sometimes the data included the Virtusa employee's race and nationality, sometimes it included just race, sometimes just nationality, and sometimes neither, which is why sample sizes for different types of analyses varied. (*Id.* at 4.) Because the study—and the underlying 42 U.S.C. § 1981 claim —are based on race rather than nationality, Dr. Lang used nationality as a proxy for race in all of his analyses when data about race was unavailable but nationality was available. (*Id.*) Dr. Lang only implemented this proxy system for employees from India or Sri Lanka because Dr. Lang found that—where race

and nationality data was available—99.6% of Indian and 100% Sri Lankan individuals also identified as Asian, whereas American employees were too racially diverse to implement the proxy. (*Id.*) Beyond this common thread, Dr. Lang employed slightly a different methodology for his hiring, promotion, and termination analyses.

To opine on Virtusa's hiring practices, Dr. Lang employed a "name-matching" method. (ECF No. 144-3 at 10-11.) Based on the data provided to him, 4,420 employees were hired by Virtusa between October 31, 2018 and March 12, 2024. (ECF No. 144-4 at 5.) Dr. Lang wrote that for this dataset, "race and nationality [were] seldom reported," so he employed name matching. (*Id.*) Under this method, Dr. Lang compared the first and last names of applicants with the names of employees—whose race was known to Virtusa—that were coded as non-Asian or Asian. (*Id.*) For example, Dr. Lang testified in his deposition that if an applicant were named "Rajesh Koothrappali," and there were Asian employees with the first name "Rajesh" and the last name "Koothrappali," then that applicant would be coded as Asian so long as there was not a non-Asian employee with the first name "Rajesh" or the last name "Koothrappali." (ECF No. 144-3 at 12-13.) For the applicant to be coded as Asian, there would not need to be an employee named "Rajesh Koothrappali"—there would just need to be at least one employee with the first name "Rajesh" and another with the surname "Koothrappali." (*Id.* at 13.) Conversely, Dr. Lang testified that if an applicant were named "Rajesh Smith" but there were non-Asian employees named "David Smith" or "Mary Smith," then "Rajesh Smith" would not be coded as Asian. (*Id.*)

Defendants raised significant concerns with Dr. Lang's Report and deposition testimony. First, Dr. Lang testified that because of the incomplete race and nationality data related to hiring, he "was unable to perform" an "error analysis." (ECF No. 150-3 at 6.) [9] Second, Dr. Lang did not "distinguish between South Asian and other forms of Asian ethnicity," but Dr. Lang stated that this concern was "theoretical[ ]" because "the vast majority of the data ... happened to be of two particular [countries: India and Sri Lanka]." (ECF No. 144-3 at 13-14.) Third, Dr. Lang stated that the specific method he employed "does not exist out in the world" but noted that "[o]ther individuals have used name

matching techniques." (*Id.* at 15.) While Dr. Lang could not point to an authoritative treatise on name matching or specific peer-reviewed studies that have employed name matching, he stated that it was "almost certain" that he had come across peer-reviewed studies that employed name matching given that the articles he reads are almost always peer reviewed. (ECF No. 150 at 7-8.) [10] Finally, Dr. Lang did not control for certain variables. (*See* ECF No. 144-3 at 17, 33.) For example, he did not consider the racial composition of the applicant pools or the racial composition of the job market in his Report. (*See* ECF No. 144-1 at 14; ECF No. 144-4 at 5-6; ECF No. 150-2 at 12.)

**\*7** As for promotions, employee ratings, and job flow, Dr. Lang drew on data for full-time employees where race information was available or ascertainable based on the proxy system. (ECF No. 144-4 at 7.) For each of these analyses, Dr. Lang used t-tests, "inferential statistic[s] used to determine if there is a statistically significant difference between the means of two variables," to arrive at conclusions. (*Id.* at 5.) However, neither in his Report nor in his deposition does Dr. Lang mention controlling for any potentially relevant factors beyond race in conducting his analyses. (*See* ECF No. 144-3 at 34-36.)

Finally, as for termination, Dr. Lang similarly used t-tests to find several statistically significant differences involving employees terminated after July 11, 2014. (ECF No. 144-4 at 11-13.) Dr. Lang does not appear to control for any other factors in making most of these assessments, though he did conduct one logistic regression that controlled for gender, job Tier, and age in evaluating race-based discrimination. (*Id.* at 14.)

### b. Dr. Ronil Hira

Plaintiff retained Dr. Hira [11] to analyze Virtusa's business model and discuss how that model impacts Virtusa's employment practices. (ECF No. 146 at 3.) In preparation for his Report, Dr. Hira reviewed 60 documents produced by Virtusa, deposition transcripts, and publicly available data, including government visa data and Virtusa's Securities and Exchange Commission (SEC) filings. (ECF No. 146 at 2, 26-28.)

Dr. Hira began his Report by providing an overview of Virtusa. Among other things, he noted "[f]or its onsite workforce, Virtusa relies heavily on importing foreign employees from India and Sri Lanka who require a visa." (*Id.* at 5.) Dr. Hira recounted that employers are required to pay those employees with H-1B visas as much as they pay similarly experienced non-visa workers in the United States. (*Id.* at 5-6.) Only 85,000 new H-1B visas may be issued each year, and demand has far exceeded that cap. (*Id.* at 6.) Thus, the United States has implemented a lottery system for those spots. (*Id.*) Dr. Hira opined, based on publicly available data and documents obtained during discovery, that Virtusa submits more visa applications than it needs, with the knowledge that only a portion of them will be successful. (*Id.*) Dr. Hira reported that Virtusa is one of a series of employers that "improperly attest[ ] on the H-1B visa petition that there is an actual open position in the U.S. for the sponsored employee to fill when, in reality, no such position exists." (*Id.* at 9.)

Dr. Hira then explained why companies like Virtusa employ these visa policies. Dr. Hira concluded that "from [his] experience, IT outsourcing firms like Virtusa have adopted workforce strategies designed to predominantly fill U.S. positions with visa workers from countries in South Asia, rather than hiring Americans locally, because of deep-seated racial and ethnic preferences, rather than any business necessity." (*Id.* at 11.) Dr. Hira drew this conclusion based on several facts. First, he opined that management and senior members of IT outsourcing firms are generally comprised of South Asians, like Virtusa, and they prefer to hire employees who are racially and ethnically similar to them. (*Id.* at 12.) Second, Dr. Hira stated that management prefers to hire visa workers because of the bargaining power: H1-B employees will likely not leave Virtusa because the employees would have to return to 10% wages in India and Sri Lanka, as compared to United States wages, so management can exert control over their working condition in an "indenturing"-like manner. (*Id.* at 12-13.) Indeed, as Dr. Hira opined, Virtusa requires visa employees to sign an "HR bond" before processing their visas, and if the employee leaves the company within less than two years, the employee is required to re-pay the bond amount. (*Id.* at 13.) Thus, Dr. Hira opined that even though Virtusa is required to pay H1-B visa employees at equal rates to U.S.

employees, Virtusa pays them less. (*Id.* at 14.) Dr. Hira noted that these cost-saving measures came from McKinsey & Company recommendations. (*Id.*)

## II. LEGAL STANDARD

### A. Expert Testimony

**\*8** Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule reads as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, "[d]istrict courts are tasked with a 'rigorous gatekeeping function,' " to ensure that expert testimony is both relevant and reliable. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)). Notwithstanding, "Rule 702 ... has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). Expert testimony will be admissible if: (1) "the expert is qualified"; (2) "the proposed testimony is reliable and concerns matters requiring scientific, technical, or specialized knowledge"; and (3) "the expert's testimony is 'sufficiently tied to the facts of the case,' ... so that it 'fit[s]' the dispute and 'will assist the trier of fact[.]' " *Cohen*, 125 F.4th at 460

**Sugg v. Virtusa, Slip Copy (2026)**

2026 WL 91995

(quoting *Daubert, v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)). The party proposing the expert testimony must show that each prong is satisfied by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

Importantly, the "gatekeeping function is necessarily 'flexible,' ... granting district courts 'latitude in deciding how' these requirements are met." *Cohen*, 125 F.4th at 460 (first quoting *Daubert*, 509 U.S. at 594, and then quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Such 'discretionary authority' permits a district court to 'decide whether or when special briefing or other proceedings are needed to investigate reliability.' " *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 152).

### 1. Prong One – Qualification

"Qualification refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The basis for this specialized expertise "can be practical experience as well as academic training and credentials." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 628 (3d Cir. 1998)). While courts have interpreted the special expertise requirement "liberally," "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741 (quoting *Waldorf*, 142 F.3d at 625). Importantly, however, an expert does not have to "be the best qualified" or "have the specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244.

### 2. Prong Two – Reliability

**\*9** The "reliability requirement ensures that an expert's testimony is 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.' " *Cohen*, 125 F.4th at 461-62 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80-81 (3d Cir. 2017)). "[A]dmissibility does not hinge on 'whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable

research.' " *Id.* at 462 (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)). Rather, courts look to whether the expert's testimony is supported by "good grounds." *Id.* (quoting *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020)). In conducting this analysis, courts are to consider "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "The court's focus must be on the principles and methods, rather than on the ultimate conclusions reached." *Milltown-Ford Ave. Redevelopment Agency v. SB Bldg. Assocs., L.P.*, Civ. No. 19-21494, 2024 WL 3690776, at \*16 (D.N.J. Aug. 7, 2024) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)). Because, however, " 'conclusions and methodology are not entirely distinct from one another,' ... the court may conduct 'at least a limited review of the expert's conclusions "in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.' " *Id.* (first quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and then quoting *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 656 (D.N.J. 2008)).

As the Third Circuit recently reiterated, "there is no 'definitive checklist or test,' " for courts to employ when analyzing what constitutes "good grounds." *Cohen*, 125 F.4th at 462 (quoting *Daubert*, 509 U.S. at 593). Nevertheless, along with "any other [factors] that are relevant," courts consistently consider the following factors in determining the reliability of a proposed expert:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the

technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli*, 35 F.3d at 742 & n.8 (citing *Daubert*, 509 U.S. at 591-94; *United States v. Downing*, 753 F.2d 1224, 1238-39 (3d Cir. 1985); *see also Cohen*, 125 F.4th at 462 (noting that "some analysis of these factors is necessary" (quoting *UGI Sunbury*, 949 F.3d at 834)).

"Although these factors are neither exhaustive nor applicable in every case, they provide a convenient starting point for analyzing" reliability. *Kannankeril*, 128 F.3d at 806-07. But in non-scientific cases, the relevant reliability concerns "may focus upon personal knowledge or experience," rather than "scientific foundations." *Kumho Tire Co.*, 526 U.S. at 150; *see also United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006) ("It is settled law that an expert may testify about common behavior patterns in a profession or subculture."); *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, Civ. No. 10-800, 2012 WL 12929813, at *5 (M.D. Pa. July 23, 2012) ("While rate of error, publication,[ ] peer review[,] and testing are imperative in ascertaining the reliability of a new scientific methodology ... their application to testimony regarding customs and practices in [a business] industry" may be "both illogical and irrelevant."); *S.Y. v. Roman Cath. Diocese of Paterson*, Civ. No. 20-2605, 2024 WL 1231333, at *6 (D.N.J. Mar. 21, 2024) ("[I]n nonscientific cases, the relevant reliability concerns will focus upon personal knowledge and experience of the witness and the methodology used will be applying that experience to the facts of the case.") (internal quotation marks and citation omitted).

**\*10** Importantly, "good grounds" do not require that an expert's opinion be perfect. *Matter of Soued*, 689 F. Supp. 3d 1, 11 (D.N.J. 2023). "Indeed, 'an expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not

its admissibility.' " *Id.* (quoting *N.J. Dep't of Env't Prot. v. Amerada Hess Corp.*, Civ. No. 15-6468, 2019 WL 4052431, at *6 (D.N.J. Aug. 28, 2019)). If good grounds are shown, an expert's testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

### 3. Prong 3 – Fit

"The third prong of admissibility, fit, concerns whether the expert's testimony will be helpful to the trier of fact." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 132 (D.N.J. 2020) (citing Fed. R. Evid. 702(a)). The Third Circuit has explained that "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.' " *In re Paoli*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237). "Fit is an issue of relevance and simply means that scientific validity of the method or principles applies to the issues at hand." *Geiss v. Target Corp.*, Civ. No. 09-2208, 2013 WL 4675377, at *5 (D.N.J. Aug. 30, 2013) (citing *United States v. Ford*, 481 F.3d 215, 220 n.6 (3d Cir. 2007)). "Whether an expert's testimony meets the fit requirement 'is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.' " *In re Johnson & Johnson Talcum Powder Prods. Mktg.*, 509 F. Supp. 3d at 132 (quoting *In re Paoli*, 35 F.3d at 743).

### B. Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks and citation omitted). The "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163

(3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp v. Behrend*, 569 U.S. 27, 33 (2013)).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. A court must engage in a "rigorous analysis" to determine whether all of Rule 23's prerequisites have been satisfied. *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). This rigorous analysis has "three key aspects":

> First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence. Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it.

**\*11** *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (internal citations and quotations omitted) (cleaned up). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 322 (3d Cir. 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

### III. DISCUSSION

### A. Motions to Exclude Plaintiff's Experts

#### 1. *Dr. Lang*

Defendant raises two arguments in support of excluding Dr. Lang's Expert Report and corresponding testimony. [12] First, Defendant contends Dr. Lang's methodology was unreliable. (ECF No. 144-1 at 7-20.) Second, Defendant argues Dr. Lang improperly offered a legal conclusion. (*Id.* at 20-22.) Plaintiff disagrees on both counts. (*See* ECF No. 150.) There is no dispute over whether Dr. Lang is qualified to opine or whether his opinions are relevant. (*See generally* ECF No. 144-1.)

#### a. Reliability

Defendant argues Dr. Lang's methodologies are unreliable for two reasons. First, Defendant challenges Dr. Lang's use of the "name-matching" method in support of hiring statistics. (ECF No. 144-1 at 7-11.) Second, Defendant argues that Dr. Lang failed to control for relevant factors in his hiring, promotion, and termination analyses. (*Id.* at 11-20.) The Court is unpersuaded that Dr. Lang's Report should be excluded on these grounds. [13]

#### i Name Matching

First, Defendant argues the name-matching method is unreliable because "[i]t has not been subjected to peer review, publication, or scrutiny by Dr. Lang's peers.... Nor did Dr. Lang perform an analysis of this methodology to determine its error rate." (*Id.* at 7.) Plaintiff argues "name-matching is a well-established methodology that has been subject to peer review, publication, and scientific scrutiny." (ECF No. 150 at 12.) As for peer review, it appears that the specific type of name-matching Dr. Lang employed is not peer-reviewed, but that name-matching as a broader methodology is peer-reviewed. (*See* ECF No. 144-3 at 15.) While Dr. Lang could not point to specific peer-reviewed, name-matching articles in his deposition or a treatise in support of name matching, he testified that he was "almost certain" articles existed, (ECF No.

150-3 at 7-8), and Plaintiff's brief highlights several instances, (ECF No. 150 at 12-13.)

**\*12** For example, Plaintiff cites a peer-reviewed article that itself reviews 13 articles that have employed name matching. (*Id.* at 12 (citing Pablo Mateos, *A Review of Name-based Ethnicity Classification Methods and their Potential in Population Studies*, 13 Population, Space and Place 243 (2007)). In that article, Dr. Mateos sought to "extract[ ] methodological commonalities" in name-matching studies. Mateos at 243. First, the 13 studies all included "a name *reference list* [that was] independently built ...." *Id.* at 249 (emphasis in original). "Generally, [the studies] all used some type of 'ethnic origin information' in the reference population, such as self-reported ethnicity, [or] country of birth or nationality, to classify individuals into ethnic groups" in the reference list. *Id.* at 250. Second, the studies included "a separate *target population*" and individuals from that target population were "classified into ethnic groups." *Id.* at 249 (emphasis in original.) There were two common approaches for classifying such individuals: manually creating a "rich number of 'fuzzy rules' " that the classifier applies "in order to decide the group into which an individual should be assigned"; or "apply[ing] an automated algorithm to search for the name of each individual in the target population against the reference list, and then assign ... [an] ethnic group for that name to the individual." *Id.* at 252. Third, "all of the studies measure the accuracy of the name-based classification by comparing it to a 'gold standard' for the ethnicity of the individuals in the target population, which had to be previously known through an independent source." *Id.* In other words, the authors had access to information confirming the ethnicities of the individuals in the target populations, so they could compare their results to that information and assess their approach's accuracy. The study found that the 13 articles' approaches had a positive predictive value—"the proportion of persons classified" into an ethnic group that "were correctly classified as such"— of between 70% and 96%. *Id.* at 254. There were "no substantial differences between the accuracy of the manual [versus] automatic classification methods." *Id.* Dr. Mateos notes that one limitation of the studies was that "[n]ames usually only reflect patrilineal heritage" and thus name matching is "incapable

of identifying mixed ethnicity or women's ethnicity in mixed marriages." *Id.* at 255. Nonetheless, the study concluded that while "this methodology cannot entirely replace self assigned ethnicity information, it provides a sufficient level of classification confidence to be used in the measurement of inequalities ...." *Id.* at 256.

On the whole, Dr. Lang's Expert Report survives Rule 702's "liberal policy of admissibility." *Pineda*, 520 F.3d at 243 (citation omitted). Many of the *Paoli* factors are sufficiently present. *See* 35 F.3d at 742 n.8. For example, Dr. Lang is qualified as an expert and employed hypothesis testing to arrive at his conclusions. Further, the method of name-matching has been subject to peer review, and Dr. Lang's approach is substantially similar to those in Dr. Mateos's article. Dr. Lang created a reference list based on the known ethnicities of employees and classified applicants, based on a "rich number" of rules, in reference to that list. (ECF No. 144-3 at 12-13; ECF No. 144-4 at 5.) Dr. Lang could not perform an error analysis for this particular study, (ECF No. 150-3 at 6), but Dr. Mateos identified an error rate between 4% and 30% in 13 name-matching articles, Mateos at 254.

Cases in which courts have considered name matching in the context of *Daubert* motions are also instructive. In *Palmer v. Cognizant Technology Solutions Corporation*, the court considered an expert's analysis that employed name-matching to categorize employees as South Asian. *See* Civ. No. 17-6848, 2022 WL 18214014, at \*11 (C.D. Cal. Oct. 27, 2022). Where available, the expert used birth country and passport information to code employees as South Asian. *Id.* To determine if other employees were South Asian, the expert analyzed their last names—*i.e.*, employed name matching. *Id.* The court found the methodology permissible even if "somewhat imprecise." *Id.* at \*12 n.17. By contrast, the court deemed name-matching inadmissible in *Koehler v. Infosys Ltd. Inc.*, 628 F. Supp. 3d 835, 862-63, 891 (E.D. Wis. 2022). There, the plaintiff's expert employed name-matching as follows:

> [The expert] considered an Infosys *employee* to be Indian or South Asian if (a) the employee was born in India

**Sugg v. Virtusa, Slip Copy (2026)**

2026 WL 91995

or South Asia, or (b) the employee's last name matched the last name of another Infosys employee born in India or South Asia and was not one of the sixty-three "Western" names removed from [a list created by the expert]. [The expert] considered an *applicant* to be Indian or South Asian if the applicant's last name matched the last name of an Infosys *employee* born in India or South Asia and was not one of the sixty-three "Western-sounding" names removed from the list. If an employee or applicant did not meet one of the preceding criteria, that employee or applicant was considered non-Indian or non-South Asian.

*Id.* at 856–57 (emphases in original). The court concluded the methodology was not reliable because the record reflected that it was "created for this litigation, not tested, not peer-reviewed, [and had] no known history of error rates." *Id.* at 891. But many of those potential issues are not apparent here. Dr. Lang testified that he employed a "conservative approach ... to mitigate potential errors." (ECF No. 150-3 at 6.) And unlike in *Infosys*, this Court has been presented with evidence that name matching is a peer-reviewed method with known error rates. While it is true that Dr. Lang created his specific name-matching method for purposes of this litigation, the method was designed in response to the unique data with which he was presented.

ii Controlling for Other Variables

**\*13** Defendant's argument that Dr. Lang's Report is unreliable because it does not control for other variables is similarly unpersuasive. With respect to hiring, Defendant argues that Dr. Lang "simply counted the number of allegedly 'Asian' and allegedly 'Non-Asian' employees ... hired and found the gap between the two significant." (ECF No. 144-1 at

13–14.) But Dr. Lang did not account for, among other things, "the relative demographic proportions of qualified, interested, and available candidates who presented themselves for hiring consideration" nor "did he consider the factors that were considered by Virtusa's hiring managers" such as skills the customer required in Virtusa employees or whether the applicant was open to travel or relocating. (*Id.* at 14.) As for performance and promotions, Defendant argues that Dr. Lang again employed a binary analysis—he tested "whether an individual was 'Asian' or 'Non-Asian' ... and whether they were promoted." (*Id.* at 17.) But, Defendant argues, Dr. Lang "made no effort to determine what factors were considered by Virtusa's supervisors in performance reviews or promotions," or "which employees were interested in or sought a promotion." (*Id.* at 18.) Finally, Defendant contends Dr. Lang's termination analyses failed to account for factors such as Virtusa supervisors' considerations in making termination decisions, changes in the job market, and tenure and disciplinary records of terminated employees. (*Id.* at 19–20.) Plaintiff argues Dr. Lang was not required to control for other explanatory factors in his hiring, promotion, or termination analyses. (ECF No. 150 at 16–30.)

The Court agrees that Dr. Lang's methods are sufficiently reliable under *Daubert*. As the Supreme Court stated, "[w]hile the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence of discrimination .... Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (internal citation omitted). Following *Bazemore*, courts in and out of this Circuit have continued to admit simple statistical analyses under *Daubert* that failed to control for other variables. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425, 428 (7th Cir. 2000) (finding report that examined "correlations that existed between the ages of employees and the companies' decisions to terminate" admissible even when expert did not "run a multiple-regression analysis" because disputes over inclusion of variables "went to the weight of the evidence ... not to its admissibility"); *Obrey v. Johnson*, 400 F.3d 691, 695-97 (9th Cir. 2005)

(finding study "based entirely on statistical disparities" between "the race of managers selected... compared to the race of those who applied for managerial positions" admissible because "objections to a study's completeness generally go to the weight, not the admissibility of the statistical evidence ... and should be addressed by rebuttal, not exclusion.") (internal quotation marks and citation omitted); *Gutierrez v. Johnson & Johnson*, Civ. No. 01-5302, 2006 WL 3246605, \*5 (D.N.J. Nov. 6, 2006) ("Generally, decisions regarding what control variables to include in an expert report go to weight, not admissibility.")[14]

While Defendant may have raised serious concerns with Dr. Lang's statistical analyses of hiring, promotion, and termination data, those potential weaknesses go to the weight of Dr. Lang's opinions rather than admissibility.[15] Dr. Lang's report and corresponding testimony "should be tested by the adversary process ... rather than [be] excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (citation omitted.)

### b. Opinion on the Ultimate Question

**\*14** Defendant argues that Dr. Lang's conclusion should be excluded because it "invad[es] the exclusive province [of] the jury in applying the law to the facts" and "is an improper legal conclusion" that Dr. Lang is unqualified to make. (ECF No. 144-1 at 20.) Dr. Lang's challenged conclusion is as follows:

> Based on these findings, it is my expert opinion that there is significant evidence that non-Asians employees are being discriminated against at Virtusa in terms of hiring, employee ratings and promotions, and through terminations. Further, there is significant evidence that visa employees are being favored at Virtusa with lower involuntary termination rates.

(*Id.* (quoting ECF No. 144-4 at 16.) Plaintiff argues that this conclusion is permissible because Dr. Lang "does not offer the opinion that Virtusa engaged in a pattern or practice of race discrimination, only that his statistical analyses offer *evidence* of discrimination." (ECF No. 150 at 31 (emphasis in original) (citing ECF No. 144-4 at 16).) And in any event, Plaintiff submits, Dr. Lang, "will not offer the legal conclusion that Virtusa engaged in intentional race discrimination" but instead will testify that "his statistical analyses show disparities that are not explained by chance and not explained by factors other than race and are therefore suggestive of discrimination." (*Id.* at 32.)

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But the "use of legal terms of art or legal conclusions by an expert" are inadmissible because they "could lead the jury to be prejudicial against the opposing party." *O'Bryant v. Johnson & Johnson*, Civ. No. 20-2361, 2022 WL 7670296, at \*6 (D.N.J. Oct. 13, 2022) (internal quotation marks and citation omitted). The "term 'discrimination' has a specialized legal meaning that is more precise than the lay understanding of the term." *United States v. Xue*, 597 F. Supp. 3d 759, 774 (E.D. Pa. 2022) (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)). Accordingly, courts have held that statistical experts may not draw conclusions about whether a party acted in a discriminatory manner. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, Civ. No. 10-6950, 2022 WL 814074, at \*10 (S.D.N.Y. Mar. 17, 2022) ("[T]o the extent that [the expert] uses the term 'sex discrimination,' which is a legal term of art, he is making a legal conclusion that is improper as it usurps the role of the jury.... [T]he expert may opine ... so long as he does not use the term 'sex discrimination.' ") (citation omitted); *Simpson v. Dart*, Civ. No. 18-0553, 2021 WL 1906469, at \*2 (N.D. Ill. May 12, 2021) (finding expert could not opine on "any ... legal conclusion about 'discrimination' as understood as a legal term of art"); *Chicago Tchrs. Union, Loc. v. Bd. of Ed. of City of Chicago*, Civ. No. 12-10311, 2020 WL 914881, at \*13 (N.D. Ill. Feb. 25, 2020) ("[Expert] cannot opine on whether the Board discriminated against employees nor whether there is statistically significant evidence of racial discrimination.").

Dr. Lang's conclusion must be excluded. Dr. Lang's Report opines on the legal term of art —"discrimination." It is no matter that Dr. Lang caveats his written conclusion by noting there is "evidence" of discrimination rather than that there plainly is discrimination. *See Chicago Tchrs. Union*, at *13. The same goes for his anticipated testimony that his analyses "are suggestive of discrimination." Therefore, Dr. Lang's conclusion must be excluded to the extent it uses the word "discrimination," and should Dr. Lang testify, he may not testify that his findings are "suggestive of discrimination." Rather, Dr. Lang's conclusions must be limited to his statistical findings. Defendant's Motion is therefore granted in part and denied in part.

### 2. Dr. Hira

**\*15** Defendant argues Dr. Hira's Expert Report and corresponding testimony should be excluded on three Rule 702 grounds. First, Defendant argues Dr. Hira is not qualified to opine on the topics in his Report. (ECF No. 145-1 at 10–11; ECF No. 160 at 9–12.) Second, Defendant contends Dr. Hira's report is not reliable because Dr. Hira did not employ a proper methodology and of the 36,000 documents produced in discovery, Dr. Hira only reviewed 60 that were picked by Plaintiff. (ECF No. 145-1 at 11; ECF No. 160 at 5–9.) Third, Defendant argues Dr. Hira's report is irrelevant because it would not assist the Court in deciding whether to certify a class. (ECF No. 145-1 at 8–9.) In addition to these Rule 702 considerations, Defendant argues Dr. Hira made improper legal conclusions that should be excluded. (ECF No. 145-1 at 9; ECF No. 160 at 12–18.) The Court finds these arguments unpersuasive. In making this determination, the Court finds particularly instructive the decision in *Cognizant*, 2022 WL 18214014, at *15–17 (denying motion to exclude Dr. Hira's testimony concerning business model of Virtusa's competitor).

### a. Qualification

Defendant's initial argument goes to the first prong of the 702 inquiry—qualification. To be sufficiently qualified, the individual must have "specialized expertise" on the topic of their testimony, and the basis for this expertise can be "academic training and credentials." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (internal quotation marks and citation omitted). This is a "liberal" standard. *Id.* ("[A]t a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman.") (internal quotation marks and citation omitted). Here, Dr. Hira's report states that he is opining on "business models of information technology services companies." (ECF No. 146 at 3.) With a Ph.D. in political science, Dr. Hira has "published two books, three peer reviewed articles, six book chapters, and testified seven times before the U.S. Congress and twice before the Maryland State House of Delegates on" the topic of business models and employment practices of information technology services companies. (ECF No. 146 at 2; *see also id.* at 32–47.) This topic is therefore "well within his area of expertise" and "he is qualified to opine." *Cognizant*, 2022 WL 18214014, at *17.

### b. Reliability

Defendant's next argument goes to the second prong of the 702 inquiry—reliability. Defendant raises two concerns. First, Defendant contends Dr. Hira did not employ a "legitimate, structured analytical method" and instead relayed a factual narrative as opposed to a legitimate expert opinion. (ECF No. 145-1 at 5, 9–11, 14.) Second, Defendant argues that Dr. Hira's opinions are not reliable because he only reviewed a small portion of allegedly cherry-picked documents. (*Id.* at 11; ECF No. 160 at 6.) As to the first point, Defendant's argument is unpersuasive because in cases involving "specialized," rather than scientific knowledge, the relevant reliability concerns "may focus upon personal knowledge or experience," rather than "scientific foundations." *Kumho Tire Co.*, 526 U.S. at 150. Indeed, standard reliability considerations such as rate of error, publication, and peer review are "illogical and irrelevant" when it comes to opinions "regarding customs and practices" in a particular business industry. *Wolfe*, 2012 WL 12929813, at *5. So long as Dr. Hira applied his "experience to the facts of the case," then his conclusions are sufficiently reliable to be admissible. *S.Y.*, 2024 WL 1231333, at *6 (internal quotation marks and citation omitted).

Here, Dr. Hira drew on his experience studying offshore business models in providing his analysis. This was sufficient. *See Cognizant*, 2022 WL 18214014, at \*16 (stating that Dr. Hira "appears to rely primarily on his own expertise and understanding in opining on the industry generally"). And while courts have held that "[a]cting simply as a narrator of the facts" does not pass muster under *Daubert, see SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013), Dr. Hira does more than that. In paragraphs 16 to 20 of his Report—the section challenged by Defendant (ECF No. 145-1 at 14)—Dr. Hira draws on his experience studying offshore business models to explain why, in his opinion, other companies predominately fill their positions with South Asian visa workers and the ways in which those companies are similar to Virtusa. (ECF No. 146 at 11-14.) [16]

**\*16** As to the second point, while it is true that Dr. Hira reviewed a hand-picked, small portion of the documents received during discovery, his Report "is based on decades of research about the industry and the visa regime under which [Virtusa] operates, in addition to the non-public, [Virtusa]-specific documents produced in this action. Dr. Hira also relied on public information about [Virtusa], including [Virtusa]'s own 10-K and USCIS data about H-1B visa approvals." *Cognizant*, 2022 WL 18214014, at \*16. (*See also* ECF No. 146 at 27-28.) To the extent it is noteworthy that Dr. Hira has not reviewed the vast majority of the documents produced in discovery such that it is possible that those documents therefore contradict his findings, this fact goes to the weight of Dr. Hira's testimony rather than its admissibility. *See S.Y.*, 2024 WL 1231333, at \*7; *Cognizant*, 2022 WL 18214014, at \*16.

### c. Fit

Defendant's subsequent argument goes to the third prong of the 702 inquiry—fit or relevance. "The third prong of admissibility, fit, concerns whether the expert's testimony will be helpful to the trier of fact." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 132 (D.N.J. 2020) (citing Fed. R. Evid. 702(a)). Defendant argues that Dr. Hira's Report will not be helpful for class certification because it does "nothing to answer any common question concerning hiring, termination, or promotions; do[es] not establish any policy or practice; and do[es] not help Plaintiff avoid the obvious fact that hiring, termination, and promotion decisions at Virtusa are *highly* individualized and predicated upon the discretion of hundreds or thousands of Virtusa employees and *clients*." (ECF No. 145-1 at 9 (emphasis in original).) But the question on a *Daubert* motion is not whether the expert will make or break a subsequent decision but rather whether it will be "helpful" in making those decisions. *In re Johnson & Johnson*, 509 F. Supp. 3d at 132.

Here, "Dr. Hira's conclusions about how a business model reliant on H-1B visa holders would help maximize profits lend support to [Plaintiff's] case for commonality because they help to explain why a company might pursue" certain visa policies and "thus substantiate [Plaintiff's] contention that [Virtusa] had such a policy." *Cognizant*, 2022 WL 18214014, at \*15. Additionally, "Dr. Hira's opinion that cultural preferences—not only unconscious bias, but also supervisors' preferences relating to the relationship between supervisors and supervisees—might lead managers to develop a preference for [South Asian] workers even in local hiring is obviously relevant to [Plaintiff's] claims." *Id.* at \*16. And while Dr. Hira's conclusions about Virtusa are more limited than his opinions about the industry as a whole given the dataset Dr. Hira reviewed, the Court will not exclude his opinions on that ground but acknowledges that "these limitations may limit their weight." *Id.*

### d. Opinions on the Ultimate Question

Finally, Defendant challenges certain statements on the grounds that they are legal conclusions. (ECF No. 145-1 at 9 (quoting ECF No. 146 at 9, 12-14, 24).) [17] These statements are: (1) "some IT outsourcing firms have wrongfully used the H-1B visa program to secure visas for future or fictitious work, improperly attesting on the H-1B visa petition that there is an actual open position in the U.S. for the sponsored employee to fill when, in reality, no such position exists," (ECF 146 at 9); (2) the "indenturing nature" of the H-1B visa program, (*id.* at 12-13); and (3) that underpayment "constitutes wage theft." (*Id.* at 14.) [18]

**Sugg v. Virtusa, Slip Copy (2026)**

2026 WL 91995

**\*17** The first statement is proper. Courts have upheld similar statements concerning compliance with laws or regulations when the statements concerned business customs. *See, e.g., United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991); *Bartoli v. Novartis Pharms. Corp.*, Civ. No. 13-0724, 2014 WL 1515870, at \*7 (M.D. Pa. Apr. 17, 2014). And the use of the word "wrongfully" does not make the statement excludable. *Cf. Gov't Emps. Ins. Co. v. Adams Chiropractic Ctr.*, Civ. No. 19-20633, 2023 WL 4248817, at \*7 (D.N.J. June 29, 2023) (finding expert "report d[id] not improperly instruct the jury on what result to reach simply by employing the word 'legitimate.' ") The second statement is proper because it concerns industry customs rather than legal conclusions. *See Price*, 458 F.3d at 212 (3d Cir. 2006) ("It is settled law that an expert may testify about common behavior patterns in a profession or subculture."). The third statement is arguably improper. *See Cognizant*, 2022 WL 18214014, at \*16 n. 25 ("Dr. Hira's specific conclusion that Cognizant engages in 'wage theft' does appear to be beyond the scope of his expertise."). However, Dr. Hira has agreed to withdraw the phrase, so the point is moot. (*See* ECF No. 151 at 14 n.3)

Therefore, Defendant's motion to exclude Dr. Hira's Expert Report is denied.

## B. Motion for Class Certification

Under Rule 23(a)(1)-(4), a class may be certified only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

These requirements are respectively referred to as the numerosity, commonality, typicality, and adequacy requirements. *See id.*

"[E]very putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). Here, Plaintiff seeks certification under Rule 23(b)(3). (ECF No. 142 at 37.) Where a party seeks to certify a class under Rule 23(b)(3), the moving party must satisfy three additional requirements. *See Byrd*, 784 F.3d at 163. First, the party "must prove by a preponderance of the evidence that the class is ascertainable." *Id.* Second, the party seeking certification must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Third, the party must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* These additional requirements are, respectively, referred to as the ascertainability, predominance, and superiority requirements. *See, e.g., Byrd*, 784 F.3d at 161 n.4, 162-64; *Johnson v. Comodo Grp., Inc.*, Civ. No. 16-04469, 2024 WL 2933195, at \*3 (D.N.J. Jun. 10, 2024). A district court "must first determine whether the putative class satisfies the ... provisions of Rule 23(a), and then proceed[ ] to analyze the ... provisions of Rule 23(b)(3)." *In re Citizens Bank, N.A.*, 15 F.4th 607, 612 (3d Cir. 2021).

Plaintiff argues that pursuant to Rule 23(b)(3), common questions of law and fact predominate over individualized questions in this matter, and that a class action is superior to other available methods of adjudicating the claims. (ECF No. 142 at 37-46.) Plaintiff proposes the following three classes:

**Hiring Class:** All non-South Asian applicants who applied for a position with Virtusa in the United States between February 28, 2014 and the date of class certification and who were not hired.

**Promotion Class:** All non-South Asian employees who worked for Virtusa in the United States between February 28, 2014 and the date of class certification and who were not promoted.

**\*18 Terminations Class:** All non-South Asian employees who worked for Virtusa in the United States between February 28, 2014 and the date of class certification and who were involuntarily terminated.

(ECF No. 141 at 3.)

The Court addresses whether class certification is appropriate for each of the three classes. *Citizens Bank*, 15 F.4th at 612.

### 1. Rule 23(a)

#### a. Numerosity

The numerosity requirement is disputed by the parties. (ECF No. 142 at 23-24; ECF No. 153 at 22-27; ECF No. 157 at 5-8.) Numerosity is met where "the class is so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). Although there is no minimum number of members needed to satisfy numerosity, courts hold as a general rule that if the proposed members exceed forty people, the first prong of Rule 23(a) has been met. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

#### i Hiring Class

Plaintiff estimates—based on Dr. Lang's declaration—that the Hiring Class is in the tens of thousands with a cap of 23,589. (ECF No. 142 at 24 (citing ECF No. 142-1 ¶¶ 2-4).) Dr. Lang reviewed data provided by Virtusa which revealed 34,806 individuals who applied to and were rejected from Virtusa during the class period. (ECF No. 142-1 ¶ 2.) Dr. Lang subtracted instances in which individuals applied multiple times and were rejected multiple times and arrived at 23,589. (*Id.* ¶ 3.) Dr. Lang stated that race and national origin data were seldom available for application data but would be able to "ascertain the race of Virtusa's applicants by utilizing a names-based analysis similar to what" he employed in his Expert Report. (*Id.* ¶ 4-5.) Defendant argues that Dr. Lang, on whom Plaintiff solely relies, "presents no *actual* evidence of [the class size number]. Rather, he simply

*counts* the total number of applicants, *regardless* of race." (ECF No. 153 at 25 (emphasis in original).) In other words, the only information Dr. Lang provided is that 23,589 individuals were rejected and an allusion to future name matching is insufficient. Plaintiff replies that "common sense" dictates that the numerosity requirement is met. (ECF No. 157 at 7 (citing *Marcus*, 687 F.3d at 596-97).)

The question therefore boils down to whether the fact that 23,589 individuals were rejected by Virtusa is enough to establish, by a preponderance of the evidence, that at least 40 non-South Asian individuals were rejected. The Court finds that this is not enough. The Third Circuit has given the numerosity requirement "real teeth" in recent years. *Mielo* v. *Steak'n Shake Operations, Inc.*, 897 F.3d 467, 484 (3d Cir. 2018) (citation omitted). "[W]here a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2018.) It is true that when a plaintiff "show[s] sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition .... the court [may] rely on 'common sense' to forgo precise calculations and exact numbers." *Marcus*, 687 F.3d at 596-97. But the Third Circuit has repeatedly found plaintiffs have not satisfied numerosity when applying this principle. *See Marcus*, 687 F.3d at 595-97 (numerosity unsatisfied when 740,102 vehicles leased nationwide but no evidence in the record about vehicles leased in New Jersey—the geographic limitation of the class); *Hayes*, 725 F.3d at 357-58 (numerosity unsatisfied when "the only conclusion that can be drawn from the evidence presented to the trial court is that the number of class members would be equal-to-or-less-than 3,500 and equal-to-or-greater-than zero"); *Mielo*, 897 F.3d at 486 (numerosity unsatisfied when evidence of "between 14.9 million to 20.9 million persons with mobility disabilities who live in the United States" but "no evidence that would permit [the Third Circuit] to use 'common sense' to determine—rather than speculate about—the portion of those disabled individuals who have actually patronized a relevant Steak 'n Shake restaurant, let alone the portion who have experienced or will experience an ADA violation at one of those restaurants."). In these type of cases, the "high[ ]

likel[ihood] that at least 40 individuals" from the larger pool would be in the sub-class is insufficient. *Mielo*, 897 F.3d at 486. And even though it may be "tempting to assume [that the] class meets" the numerosity requirement based on the larger pool, the Court must not "giv[e] in to such temptation" and "excuse speculation." *Id.* at 485 (internal quotation marks and citation omitted). Ultimately, it is a "plaintiff's burden to demonstrate numerosity by a preponderance of the evidence." *Hayes*, 725 F. 3d at 358. And future calculations are of no import because courts "cannot take a wait-and-see approach to numerosity or any other requirement of Rule 23." *Id.*

**\*19** Here, Plaintiff has not established numerosity. The only evidence Plaintiff cites is the size of the larger pool of rejected applicants. Even though it is likely at least 40 members of this pool are not South Asian, Plaintiff provides no evidence for the Court to make this inference. Indeed, Dr. Lang's Expert Report —while admissible under *Daubert* and not cited by Plaintiff in support of numerosity—only provides race estimates for the applicants who were hired, (ECF No. 144-4 at 5), so the Court has no way of determining, beyond speculation, the number of non-South Asian individuals who were not hired. And even if the numerosity issue could be resolved if Dr. Lang applied name matching to the applicant data, the Court cannot accept a "wait-and-see approach." *Hayes*, 725 F.3d at 358. "[T]he only conclusion that can be drawn from the evidence presented to the trial court is that the number of class members would be equal-to-or-less-than [23,589] and equal-to-or-greater-than zero." *Id.* at 357-58. The Court must therefore deny certification with respect to the Hiring Class. *See Fuentes v. Super Bread II Corp.*, Civ. No. 18-6736, 2020 WL 7237942, at \*6 (D.N.J. Dec. 9, 2020) ("Because a failure to meet the numerosity requirement is dispositive of [plaintiff']s motion to certify a class, the [c]ourt will not address the other three requirements under Rule 23(a)—namely, commonality, typicality, and adequacy of representation—or the requirement[s] under Rule 23(b)." [19]

### ii Promotion Class

Plaintiff estimates that the Promotion Class is approximately 269 members. (ECF No. 142 at 24

(citing ECF No. 142-19 at 16).) Defendant argues that this number was derived from a faulty analysis in Dr. Lang's Expert Reply Report—an analysis which resulted in dozens of individuals allegedly in the class who appeared to be South Asian and several individuals who were promoted or held a position from which they could not be promoted. (ECF No. 153 at 26-27.) Plaintiff responds that Dr. White's opinion—a declaration filed with Defendant's opposition brief— cannot be used because it was not disclosed as part of his expert report and is untimely. (ECF No. 157 at 6-7 (citing Fed. R. Civ. P. 37(c)(1)).) In any event, Plaintiff argues other evidence in the record allegedly identifies the requisite number of class members. (*Id.* (citing ECF No. 153-3 ¶ 22; ECF No. 157-1 ¶ 12).)

Plaintiff has failed to demonstrate numerosity by a preponderance of evidence. Plaintiff's chief hurdle is that Dr. Lang's Expert Reply Report has been stricken by the Court. (*See* ECF No. 166.) And the only source Plaintiff relies on in his brief is that Report. (ECF No. 142 at 24 (citing ECF No. 142-19 at 16).) On reply, Plaintiff cites a declaration by the Vice President of Human Resources for Virtusa, (ECF No. 153-3 ¶ 22), along with Dr. Lang's declaration filed with the reply brief, (ECF No. 157-1 ¶ 12.) But the employee's declaration is an analysis of the Expert Reply Report and Dr. Lang's declaration is a response to that analysis. An analysis of evidence struck from the record cannot sustain Plaintiff's burden. Plaintiff is left with Dr. Lang's original Expert Report, which reveals approximately 17 non-South Asian individuals who were not promoted. (*See* ECF No. 144-4 at 8 (Table 6 depicting that 23.3% of 73 white employees not promoted).) The Court has not been presented with any reason why joinder of these individuals would be impracticable, so the Court finds numerosity is unsatisfied. *See Zangara v. Zager Fuchs, P.C.*, Civ. No. 17-6755, 2019 WL 6310056, \*2-3 (D.N.J. Nov. 25, 2019) (stating that as a "general rule[ ] ... a class of twenty or fewer members is usually insufficiently numerous," but "a class of twenty-one to forty members may or 'may not meet the numerosity requirement depending on the circumstances,' " and finding class of 26 insufficient) (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016). The Court must therefore deny certification with respect to the Promotion Class. *See Fuentes*, 2020 WL 7237942, at \*6.

Sugg v. Virtusa, Slip Copy (2026)

2026 WL 91995

### iii Termination Class

**\*20** Plaintiff estimates that the Termination Class is approximately 249 members based on Dr. Lang's Expert Reply Report. (ECF No. 142 at 24 (citing ECF No. 142-19 at 19).) Defendant argues Plaintiff cannot rely on the Reply Report, and the original Report only records significantly less than 40 individuals in the Class. (ECF No. 153 at 23-24.)

Plaintiff fails to establish numerosity of the Termination Class for the same reason they fail in the Promotion context. Without the Reply Report, which the Court has stricken, the only evidence is Dr. Lang's original Expert Report which puts the number of potential class members at approximately 18. (*See* ECF No. 144-4 at 12 (Table 9 depicting that of 103 white employees terminated, 17.7% were terminated involuntarily).) The Court has been provided with no explanation for why joinder of these individuals would be impracticable, and the Court therefore finds this

number insufficient. *See Zangara*, 2019 WL 6310056, at \*2-3. The Court accordingly denies certification with respect to the Termination Class. *See Fuentes*, 2020 WL 7237942, at \*6.

Therefore, class certification must be denied for each of the three proposed classes. [20]

### IV. CONCLUSION

For the foregoing reasons, and other good cause shown, Defendant's Motion to Exclude the Expert Reports of David Lang, Ph.D. (ECF No. 144) is **GRANTED in part** and **DENIED in part**; Defendant's Motion to Exclude the Expert Report of Ronil Hira, Ph.D. (ECF No. 145) is **DENIED**; and Plaintiff's Motion for Class Certification (ECF No 141) is **DENIED**. An appropriate Order follows.

### All Citations

Slip Copy, 2026 WL 91995

---

### Footnotes

1    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

3    On September 18, 2024, Leo Sugg passed away. (ECF No. 121.) Following a consent motion, this Court substituted Gwynne Sugg for her deceased husband. (ECF No. 129.) Accordingly, the parties jointly proposed an Amended Scheduling Order on February 14, 2025 (ECF No. 125), which the Court entered on March 5, 2025, (ECF No. 126.)

4    Because the Court finds that Dr. Hira's Expert Report (ECF No. 146) is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *see supra* Section III.A.2., the Court may rely on it for determining the facts for the purposes of class certification. *See In re Blood Reagents Antitrust Lit.*, 783 F.3d 183, 187 (3d Cir. 2015) ("[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*.").

5    The hiring process for non-billable employees proceeds differently. *See supra* Section I.B.1.f (citing ECF No. 153-3 at 3-4).

6    Defendant argues that Virtusa never implemented the Cost Per Consultant initiative, and that it was only *recommended* by consulting firm McKinsey & Company, which was hired to identify "market strategy" and "profitable growth" opportunities. (ECF No. 153 at 20; ECF No. 153-4 at 46.) In support, Defendant cites to the deposition transcript of Virtusa's former Global Head of Human Resources. (ECF No. 153 at 20.) In that deposition, when asked whether Virtusa implemented the program, the employee responded: "not really to the depth and the number" that McKinsey recommended, and to the extent Virtusa "might have implemented" the program, that implementation was "very thin." (ECF No. 153-4 at 62-63.) "[T]he Court need not determine at [the class certification] stage whether [Virtusa] actually ha[d]" the Cost Per Consultant initiative. *Palmer v. Cognizant Tech. Sols. Corp.,* No. 17-6848, 2022 WL 18214014, at *27 (C.D. Cal. Oct. 27, 2022). Instead, "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 307 (3d Cir. 2008). Plaintiff has satisfied that burden with respect to the notion that Virtusa implemented some version of the initiative.

7    Dr. Lang holds a Master of Arts degree and Doctorate in economics from Washington University in St. Louis. (ECF No. 144-4 at 3.) Dr. Lang also holds a Bachelor of Arts degree in economics from Stanford University. (*Id.*) Dr. Lang is a Full Professor and Chair of the Economics Department at California State University, Sacramento. (*Id.*)

8    Dr. Lang excluded other races from his analyses because "the number of observations was too small." (ECF No. 144-4 at 3.) As discussed *supra,* Dr. Lang focused on Asian employees rather than South-Asian employees—the reference group identified in the FAC, (ECF No. 7), and the proposed classes, (ECF No. 141 at 3.)

9    In Plaintiff's briefing, Plaintiff cites one study for the proposition that name-matching studies have an error rate of between 4% and 30%. (*See* ECF No. 150 at 13.)

10    In Plaintiff's briefing, Plaintiff cites several peer reviewed name-matching studies. (*See* ECF No. 150 at 12-13.)

11    Dr. Hira holds a doctorate in Public Policy from George Mason University. (ECF No. 146 at 30.) He also holds a Master of Science from George Mason and a Bachelor of Science from Carnegie-Mellon University, both in Electrical Engineering. (*Id.*) Dr. Hira is a professor of political science at Howard University and a research associate at the Economic Policy Institute. (*Id.* at 2.) Dr. Hira has published two books, three peer reviewed articles, six book chapters, and testified seven times before the United States Congress and twice before the Maryland State House of Delegates on the topics of business models and employment practices of information technology service companies. (*Id.*) Dr. Hira has also published dozens of policy briefs on these topics. (*Id.*) Dr. Hira served as an expert in *Palmer v. Cognizant Technology Solutions Corp.*, Civ. No. 17-06848 (C.D. Cal.). (*Id.* at 2-3.)

12    Defendant also seeks to exclude Dr. Lang's Expert Reply Report, but the Magistrate Judge has already granted Defendant's motion to strike that Report on other grounds. (*See* ECF No. 166). Therefore, the *Daubert* motion is moot with respect to this Report.

13    Defendant appears to raise a third argument: Dr. Lang's proxy coding mechanism for race of Virtusa employees—separate from the name-matching method used for the hiring analysis —inflated the number of persons deemed to be "Non-Asians suffering from the employment practices complained of by Plaintiff, that is, non-South Asians not being hired, receiving poor review ratings, not receiving promotions, and being involuntarily terminated." (ECF No. 144-1

at 9 (citing ECF No. 140-1).) The document Defendant cites to in support of this argument is a declaration from Defendant's rebuttal expert, Dr. Paul White. In that declaration, Dr. White raises the inflation concern. (*See* ECF No. 140-1 at 3.) However, the concern only arises in response to Dr. Lang's stricken Expert Reply Report, (*id.* at 2.), so the Court need not address this third argument. To the extent there are issues in the original Report that remain unaddressed because the Expert Reply Report is stricken, the "identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination" and should not serve as grounds for inadmissibility. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (collecting cases, including *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999)).

14    The cases cited by Defendant are inapposite because they concern the type of statistical evidence needed to prove causation rather than the variables needed to be admissible under *Daubert*. *See Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 767 (3d Cir. 1989); *Bell v. Lockheed Martin Corp.*, Civ. No. 08-6292, 2010 WL 3724271, at *7 (D.N.J. Sept. 15, 2010). The question here is "not whether the report[ ] proffered by the plaintiff[ ] prove[s] the entire case; it is whether [it was] prepared in a reliable and statistically sound way." *Adams*, 231 F.3d at 425 (7th Cir. 2000); *see also Obrey*, 400 F.3d at 694.

15    It is true that "[t]here may ... be some regressions so incomplete as to be inadmissible as irrelevant." *Bazemore*, 478 U.S. at 400 n.10. These analyses would face challenges under *Daubert*'s "fit" rather than "reliability" prong. Indeed, Defendant appears to make such an argument with respect to the hiring analysis. Defendant argues it is "egregious" that Dr. Lang failed to control for "the racial composition of the applicant pools." (*See* ECF No. 144-1 at 14.) If Dr. Lang found the applicant pool was predominately Asian, Defendant argues, then it would not be surprising that the hires were predominately Asian, so any analysis that does not factor in this information would be irrelevant for finding disparate treatment. *Id.* But a statistical showing of discrimination need not be "based on [an] analysis of the characteristics of actual applicants" because the "application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977) (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-367 (1977); *see also Buchanan v. Tata Consultancy Servs., Ltd.*, Civ. No. 15-01696, 2017 WL 6611653, at *11 (N.D. Cal. Dec. 27, 2017) (finding expert's failure to consider applicant pool was 40% South Asian went to weight, not admissibility). Therefore, this is an issue more appropriately directed to the weight of Dr. Lang's opinions as opposed to admissibility.

16    Defendant argues this same section of Dr. Hira's Report is also improper because it "focuses singularly on the question of Virtusa's motivation." (ECF No. 145-1 at 16.) It is true that "experts may not provide testimony concerning .... the intent, motives or states of mind of [defendant] corporations ...." *Krys v. Aaron*, 112 F. Supp. 3d 181, 203 (D.N.J. 2015) (internal quotation marks and citation omitted). This is because such testimony "offers inappropriate legal conclusions and invades the province of the jury." *TAKTL, LLC v. IWR, N. Am., LLC*, Civ. No. 18-1546, 2024 WL 4343141, at *11 (W.D. Pa. Sept. 30, 2024). But an "expert may testify about common behavior patterns in a profession or subculture." *United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006). And "it is permissible to testify that facts and circumstances surrounding that behavior may be 'indicative' of a certain intent." *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, Civ. No. 17-00495, 2022 WL 22885376, at *2 (citing *United States v. Farrish*, 297 F. App'x 162, 166 (3d Cir. 2008). Nowhere in the challenged section of Dr. Hira's Report does Dr. Hira usurp the role of the factfinder by opining on Defendant's intent. Instead, Dr. Hira opines that other companies with similar practices to Defendant have engaged in outsourcing "because of deep-

2026 WL 91995

seated racial and ethnic preferences, rather than any business necessity." (ECF No. 146 at 11.) Because the fact finder is left with the ultimate task of deciding whether *Virtusa*'s intent was discriminatory, the section of the Report is proper. *Cf. Palmer v. Cognizant Tech. Sols. Corp.*, Civ. No. 17-6848, 2023 WL 4155403, at *12 (C.D. Cal. June 1, 2023) (declining to exclude analysis when "Dr. Hira provide[d] context from which the jury could properly make informed inferences about [defendant]'s intent or motive.")

17    Defendant introduces additional statements in its reply brief, (*see* ECF No. 160 at 12-13), but it "is axiomatic in federal practice that arguments raised for the first time in a reply brief should be disregarded." *Wilson v. Parker*, Civ. No. 18-2954, 2018 WL 6696783, at *5 (D.N.J. Dec. 20, 2018) (internal quotation marks and citation omitted).

18    Defendant also challenges Dr. Hira's assertion that Virtusa's visa policies are not the result of "business necessity." (ECF No. 145-1 at 9 (citing ECF No. 146 at 24).) This statement is admissible for the same reason Dr. Hira's similar statement was proper. *See supra* n.16 (citing ECF No. 146 at 11.)

19    Even if Plaintiff provided enough information such that the Court could apply "common sense" and find numerosity satisfied, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596-97 (3d Cir. 2012), class certification would still be denied with respect to the Hiring Class because Mr. Sugg was in fact hired by Virtusa, (*see* ECF No. 143-4 at 4). It is axiomatic that a class representative must be a member of the proposed class. *See Amchem Prods., v. Windsor*, 521 U.S. 591, 594-95 (1997) ("Representatives must be part of the class ...."); *In re Pett Food Prods. Liab. Lit.*, 629 F.3d 333, 343 (3d Cir. 2010) ("Class representatives must be part of the class ....") (internal quotation marks and citation omitted). Courts have discussed this principle in relation to both the typicality and adequacy prongs. *See E. Tex. Motor Freight Sys., Inc. v. Rodriquez*, 431 U.S. 395, 403-04 (1977) (adequacy and typicality); *Amchem Prods., v. Windsor*, 521 U.S. at 594-95 (adequacy); *In re Pet Food Prods. Liab. Litig.*, 629 F.3d at 343 (adequacy); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 269-70 (E.D. Pa. 2013) (adequacy and typicality). Here, it is uncontested that Mr. Sugg was hired, (*see* ECF No. 143-4 at 4; ECF No. 157 at 18), so Plaintiff fails the adequacy and typicality requirements.

20    Plaintiff requests that Plaintiff's counsel, Kotchen & Low LLP and Jonathan Rudnick, be appointed class counsel. (ECF No. 141 at 4.) Plaintiff's request is moot because the Court denies Plaintiff's Motion for Class Certification.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

2011 WL 6026998

2011 WL 6026998
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Charles WATTS, and Sharon Watts, Plaintiffs

v.

Eric HOLLOCK, and Ayers
Towing Service, Inc., Defendants.

No. 3:10cv92.
|
Dec. 5, 2011.

**Attorneys and Law Firms**

Joseph P. Lenahan, Lenahan & Dempsey, P.C., Scranton, PA, for Plaintiffs.

William E. Schaefer, Hendrzak & Lloyd, Center Valley, PA, for Defendants.

*MEMORANDUM*

JAMES M. MUNLEY, District Judge.

**\*1** Before the court are motions in limine filed by Plaintiffs Charles and Sharon Watts and Defendants Eric Hollock and Ayers Towing Service, Inc. in advance of the trial scheduled for February 28, 2012. The court has already issued an order disposing of the motions. (*See* Doc. 84). This memorandum explains the court's reasoning.

**Background**

This case arises out of an accident that occurred on October 1, 2008. (Doc. 1, Compl.¶ 5). On that day, Defendant Eric Hollock (hereinafter "Hollock") drove a flatbed trailer up a winding access road along Penobscot Mountain. (*Id.* ¶¶ 9–13). Hollock was hauling a 40,000–pound hoist to the top of the mountain. (*Id.*) The truck skid and became ensnared in the mud on the access road. (*Id.* ¶¶ 18–19). Plaintiff Charles Watts (hereinafter "Watts") was part of a crew of men sent to assist Hollock in freeing the stranded truck. (*Id.* ¶ 20).

As part of their plan to free the truck, the crew decided to attach a bulldozer to the front of the tractor-trailer and drag it from a jackknifed position to safety. (*Id.* ¶ 25). They also attached a forklift to the trailer to pull it away from the cliff as the bulldozer pulled the tractor forward. (*Id.*) Hollock was to sit in the truck's driver's seat to steer as the bulldozer and forklift pulled the trailer around. (*Id.* ¶ 28). He was not to place the truck in gear or attempt to accelerate the truck until the forklift and bulldozer had been detached. (*Id.* ¶ 27). Watts's job during this operation was to stand near the forklift as a spotter. (*Id.* ¶ 29). This operation put the truck in motion, but Hollock allegedly did not follow his assigned role. (*Id.* ¶ 30). Instead of waiting for the bulldozer and forklift to be detached from his truck, plaintiffs claim Hollock engaged the transmission and started to drive the truck forward. (*Id.*) When the truck gained traction the line attached to the bulldozer became slack, which caused the forklift to tip over and fall on top of Watts, causing "severe, permanent and catastrophic injuries." (*Id.* ¶ 31).

After plaintiffs filed a lawsuit against Hollock and Ayers Towing Service, Hollock's employer, and served the complaint, the parties engaged in discovery. At the close of discovery, and in anticipation of a trial, both parties filed motions in limine and defendants filed a motion to bifurcate the trial. The court issued an order disposing of these motions. (Doc. 84). This memorandum explains the courts reasoning with respect to this order.

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332. Plaintiffs are residents of Texas. (Doc 1, Compl. ¶ 1). Defendant Eric Hollock is a citizen of Pennsylvania. (*Id.* ¶ 2). Defendant Ayers Towing Services is a Pennsylvania corporation with a principal place of business in Mountaintop, Pennsylvania. (*Id.* ¶ 3). Because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, the court has jurisdiction over the case. *See* 28 U.S.C. § 1332. Because we are sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d Cir.2000) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

Watts v. Hollock, Not Reported in F.Supp.2d (2011)

2011 WL 6026998

## Discussion

**\*2** Plaintiffs filed four motions in limine. Defendants filed three motions in limine and a motion to bifurcate the trial. We will discuss all of the motions in turn beginning with plaintiffs' motions.

### 1. Plaintiffs' motion to preclude all reference to or evidence regarding use of marijuana/opiates before October 1, 2008 and the exclusion of all drug screen testing (Doc. 34)

Discovery revealed that Watts smoked marijuana on the night before the accident. When Watts arrived in the hospital after the accident, doctors ordered diagnostic studies, and those studies revealed the presence of opiates—specifically morphine—and THC, the chemical found in marijuana. At his deposition, Watts admitted he smoked marijuana the night before the incident, shortly before falling asleep sometime before midnight. No evidence indicates that Watts had behaved in an incoherent or disoriented manner before the accident on October 1, 2008. No eyewitnesses indicate that Watts appeared impaired by marijuana.[1]

Plaintiffs argue that any reference to Watts's marijuana use on the night before the accident and any test results that show the presence of marijuana or opiates in his bloodstream should be precluded. They contend that evidence of prior drug use is irrelevant under Federal Rules of Evidence 401 and 402 because neither evidence that Watts smoked marijuana on the day of the accident nor evidence of impairment exists. Plaintiffs further contend that, even if such evidence is relevant, its probative value is substantially outweighed by its prejudicial effect and should be precluded by Federal Rule of Evidence 403.

Defendants argue that the issues of Watts's perception of the accident and his reaction time—which could have been impaired as a result of drug use—are relevant to the facts at issue in this case. Defendants do not offer any evidence to indicate, however, that Watts displayed evidence of intoxication. Although evidence of prior drug use is somewhat relevant, the court agrees with plaintiffs that the probative value of the evidence is outweighed by its substantial prejudicial effect; as such the court granted this motion in limine.

The Federal Rules of Evidence deem evidence relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. Unless it is otherwise excluded by a rule of evidence, relevant evidence is admissible. FED.R.EVID. 402. However, relevant evidence may be excluded by a district court "if its probative value is substantially outweighed by the danger of unfair prejudice ...." FED.R.EVID. 403.

With respect to the admissibility of test results that demonstrate the use of intoxicants in cases involving accidents, Pennsylvania courts have held that " '[t]he well-settled law of this Commonwealth is that where recklessness or carelessness is at issue, proof of intoxication is relevant, but the mere fact of consuming alcohol is inadmissable as unfairly prejudicial, unless it reasonably establishes intoxication.' " *Locke v. Claypool,* 426 Pa.Super. 528, 627 A.2d 801, 803 (Pa.Super.Ct.1993) (quoting *Whyte v. Robinson,* 421 Pa.Super. 33, 617 A.2d 380, 383 (Pa.Super.Ct.1992)); *see also Critzer v. Donovan,* 289 Pa. 381, 137 A. 665, 666 (Pa.1927) (precluding testimony that a driver's breath smelled of alcohol after an accident because "[t]here was no allegation or proof of intoxication, nor was there any evidence of conduct or appearance from which a reasonable inference could be drawn that the man was intoxicated"). Courts have come to this conclusion because "while proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." *Fisher v. Dye,* 386 Pa. 141, 125 A.2d 472, 476 (Pa.1956) (citing *Balla v. Sladek,* 381 Pa. 85, 112 A.2d 156, 160 (Pa.1955); *Landy v. Rosenstein,* 325 Pa. 209, 188 A. 855, 858–59 (Pa.1937); *Critzer,* 137 A. at 666).

**\*3** Pennsylvania courts have applied the same rule discussed above to the consumption of marijuana: "where it cannot be established that the use of marijuana rendered a driver unfit to drive or impaired his or her ability to drive safely, the use of marijuana is inadmissible to prove recklessness or carelessness." *Hawthorne v. Dravo Corp. Keystone Div.,* 352 Pa.Super. 359, 508 A.2d 298, 303 (Pa.Super.Ct.1986). The standards articulated in these Pennsylvania cases,

based as they are on weighing the balance between relevance and prejudice, apply in federal court and enlighten our Rule 403 analysis. *Rovegno v. Geppert Bros., Inc.,* 677 F.2d 327, 329 (3d Cir.1982).

The court granted plaintiffs' motion as the unfair prejudice of the drug test results substantially outweigh any probative value in the absence of some corroborative evidence. While Watts admitted that he smoked marijuana on the night before the accident, discovery unearthed no evidence that he smoked marijuana on that day. More importantly, defendants offer no testimony or other evidence that indicates Watts's prior drug consumption impaired him. Thus defendants present no supporting evidence that would permit admission of the evidence of marijuana consumption, either in the form of testimony or test results. *See Locke,* 627 A.2d at 803–4.

This case is similar to *Pennington v. King,* No. 07–4016, 2009 WL 415718 (E.D.Pa. Feb.19, 2009). In *King,* the plaintiffs sued the operator of a tractor trailer whose vehicle collided with the decedent's SUV. *Id.* at *1. They alleged that the defendant operated his vehicle while under the influence of marijuana, and was thus liable for negligence, recklessness and punitive damages. *Id.* The defendant spoke with law enforcement officials and an eyewitness after the accident, and no witnesses reported that the defendant exhibited any signs of intoxication or impairment. *Id.* at *3. Plaintiffs, however, produced the report of a toxicology expert who concluded that if the defendant showed signs of impairment while driving, his smoking of marijuana could be blamed for that impairment. *Id.* at *2. The court found plaintiffs had not produced sufficient evidence of intoxication because, in Pennsylvania, "for evidence of elevated blood alcohol to be admissible, it must be supplemented by other evidence of intoxicated behavior." *Id.* at *4 (citing *Rovegno,* 677 F.2d at 330). The only evidence of intoxication were "the results of the toxicology screen and [defendant's] admission that he smoked marijuana on the Saturday evening prior to this Monday morning accident." *Id.* at *6. While the defendant had been speeding and drove in an otherwise "erratic" fashion, that evidence was not sufficient "to introduce evidence of Mr. King's marijuana use at trial." *Id.* The court also rejected the expert report provided by plaintiffs, finding it "weak,

speculative, and replete with qualifiers." *Id.* The report did "not assist Plaintiffs in their attempt to offer 'other evidence' of impairment." *Id.* The court therefore refused to consider defendant's prior marijuana use "and his alleged resulting impairment." *Id.*

**\*4**  Similarly, in the instant case, the probative value of Watts's drug screens is substantially outweighed by the prejudicial effect of admitting such evidence without any other evidence of intoxicated behavior. Therefore, Federal Rule of Evidence 403 requires the exclusion of drug use prior to October 1, 2008.

### 2. Plaintiffs' motion to exclude opinion testimony of defense expert Thomas Cocchiola (Doc. 51)

The court denied plaintiffs' motion in limine to preclude Thomas Cocchiola, one of defendants' experts. Thomas Cocchiola is a professional engineer with twenty-four years of engineering consulting experience. (Doc. 38–1, Ex. A, Cocchiola Report at 13–14). In his report dated April 15, 2011, Cocchiola opines that Tower King II, Watts's employer, was the cause of the accident. (*Id.* at 11–12). Cocchiola supports this opinion by citing Tower King II's violations of safety codes and industry standards, the failure of its employees to establish proper radio communication and the misuse of the forklift by a Tower King II employee. (*Id.*)

Plaintiffs argue that Tower King II cannot be the superceding cause of the accident, as such, evidence of Tower King II's negligence will be confusing to the jury and unduly prejudicial. In support of their position that Tower King II cannot be the superseding cause, plaintiffs cite Restatement (Second) of Torts Section 447,[2] and assert that Tower King II reacted naturally to Hollock's negligence. As it is plaintiffs' position that Tower King II's conduct was not "highly extraordinary" and was a foreseeable consequence of Hollock's acts, plaintiffs contend that the opinion testimony offered by Thomas Cocchiola on Tower King II's negligence should be excluded under Federal Rule of Evidence 403. Plaintiffs assert that Cocchiola "ignored" the facts of the case upon which plaintiffs rely, and plaintiffs argue that the OSHA and ANSI regulations relied upon by Cocchiola are irrelevant and inapplicable.

Watts v. Hollock, Not Reported in F.Supp.2d (2011)

2011 WL 6026998

Defendants counter that Cocchiola developed his opinion after reviewing the facts of the case, and as a result, developed a different theory of causation than plaintiffs. Defendants contend that developing a different theory when reviewing the same facts does not automatically translate into "ignoring" facts. Furthermore, defendants proffer alleged violations of OSHA and ANSI regulations as evidence of the industry standard and that Tower King II deviated from this standard—creating a hazardous work environment.

The court agreed with defendants and denied plaintiffs' motion to preclude Thomas Cocchiola's testimony. Cocchiola evaluated the facts unearthed in discovery and reached a different conclusion on causation than plaintiffs. The court will not preclude this testimony because these differences are damaging to plaintiffs' case. The law requires that relevant evidence only be excluded from going to the jury when the prejudice and confusion caused by that evidence **substantially** outweighs its probative value. *See* FED.R.EVID. 403. Whether Tower King II created a dangerous working environment, whether failures in communication contributed to the accident and whether employee misuse of the forklift caused the accident are highly relevant.[3]

**\*5** To accept plaintiffs' argument that such evidence is not relevant because Tower King II cannot be the superseding cause of the accident, the court would be making a judgment on the merits with respect to causation. Such a determination is delegated to the finder of fact and is not the proper subject of motions in limine. *See Bouriez v. Carnegie Mellon Univ.,* 585 F.3d 765, 773 n. 4 (3d Cir.2009) (" '[i]t is for a jury to determine whether an act is so extraordinary as to constitute a superseding cause.' " (quoting *Feeney v. Disston Manor Pers. Care Home, Inc.,* 849 A.2d 590, 595 (Pa.Super.Ct.2004))). Therefore the court denied plaintiffs' motion in limine to preclude Thomas Cocchiola's testimony.

**3. Plaintiffs' motion to exclude opinion testimony of defense expert Steven M. Schorr (Doc. 52)**

The court denied plaintiffs' motion in limine to preclude Steven M. Schorr, one of defendants' experts, from stating certain opinions. In his report, Schorr stated eight opinions. (Doc. 38–3, Ex. C, Schorr Report at 5–6). Schorr reached these opinions after conducting an accident reconstruction analysis, which included examining accident photographs, site inspections, review of eyewitness testimony and a simulation. (*Id.* at 2–4). Some of Schorr's opinions are in the form of comparisons between eyewitness testimony in the record and the results of his accident reconstruction.[4]

Plaintiffs argue in their motion in limine that Schorr's first, fourth, fifth, sixth and seventh opinions are not admissible under Federal Rule of Evidence 702. Plaintiffs specifically contend that these opinions "are a transparent attempt to have Mr. Schorr provide an expert opinion on the credibility of the Plaintiff and other eyewitnesses ...." (Doc. 52, Pls.' Second Mot. in Limine ¶ 5).

Defendants respond that Schorr's opinions "are not mere statements challenging the credibility of the accounts of eyewitnesses, but are the opinions of a professional engineer applying his investigation and analysis to the facts of record in this case." (Doc. 77, Mem. of Law in Supp. of Defs.' Response in Opp'n to Pls.' Mot. in Limine at 4). Furthermore, defendants argue that the liberal standards of Rule 702 allow for the admission of Schorr's opinions, and defendants exclaim that Rule 704 allows for expert opinions on the ultimate issue. The court agreed with defendants and denied plaintiffs' motion in limine.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*6** FED.R.EVID. 702. When it comes to whether expert testimony should be admitted under Rule 702, the Third Circuit Court of Appeals has held that " '[h]elpfulness is the touchstone of Rule 702.' " *Linkstrom v. Golden T. Farms,* 883 F.2d 269, 270 (3d Cir.1989) (quoting *Breidor v. Sears, Roebuck & Co.,* 772 F.2d 1134, 1139 (3d Cir.1983)). " '[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions. The jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations.' " *Id.* (quoting *In re Japanese Elec. Prods.,* 723 F.2d 238, 279 (3d Cir.1983)).

In this case, plaintiffs do not attack Schorr's qualifications or scientific process, rather plaintiffs attack the conclusions he draws. Schorr's opinions are not mere comments on the credibility of eyewitness testimony, but the result of accident reconstruction analysis. This analysis produced results contrary to the eyewitness accounts of plaintiffs' witnesses. Schorr's opinions are not unhelpful to the jury simply because they highlight the contradictions between his accident reconstruction analysis and eyewitness testimony. Any weaknesses plaintiffs claim are present with Schorr's opinion are more appropriately the basis of cross-examination than grounds for exclusion.

The court does not agree with plaintiffs' assertion that Schorr's opinion somehow usurps the role of the jury. Federal Rule of Evidence 704 provides that expert testimony is "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED.R.EVID. 704. *See also Forrest v. Beloit Corp.,* 424 F.3d 344, 353 (3d Cir.2005) ("under FRE 704 an expert witness may offer testimony concerning the ultimate issue in the case"). Schorr's opinions are derivative of the methodology he employed in conducting his accident reconstruction analysis, as such, these opinions are admissible under

the rules of evidence. They are admissible even if Schorr's opinions call into question the accounts of eyewitnesses, whose ultimate credibility is to be determined by the jury. For the reasons stated above, the court denied plaintiffs' motion in limine to exclude certain opinions of Steven M. Schorr.

### 4. Plaintiffs' motion to exclude opinion testimony in the supplemental expert report of Thomas Cocchiola (Doc. 53)

Plaintiffs, in a separate motion from their motion in limine to exclude Thomas Cocchiola's testimony in its entirety (Doc. 51), filed a motion in limine to exclude the opinions Cocchiola expressed in his supplemental report. Cocchiola submitted his supplemental report in response to the 6/13/11 report submitted by plaintiffs' expert Michael Pepe. (Doc. 53–1, Cocchiola Supplemental Report at 1). Pepe's 6/13/11 report concluded that Hollock, in driving the tractor trailer up the muddy access road, caused of the accident. (Doc. 48–1, Pepe Supplemental Report at 1–3). Cocchiola issued a supplemental report on causation that rebutted this position. Specifically, Cocchiola opined that OSHA regulations placed a duty in Tower King II to maintain a safe access road, that Tower King II should have conducted a Job Hazard Analysis, that Pepe's opinion of Hollock's driving ability was not sound and that the Tower King II forklift operator caused the accident. (Doc. 53–1, Cocchiola Supplemental Report at 1–4).

**\*7** Plaintiffs contend that Cocchiola is precluded by Federal Rule of Evidence 403 from expressing the opinions contained in his supplemental report. Plaintiffs appear to base their Rule 403 preclusion argument on their belief that Cocchiola's opinions are somehow incorrect. Plaintiffs challenge Cocchiola's application of OSHA regulations and charge Cocchiola with confusing the duty Tower King II owed to independent contractors as opposed to its employees. Plaintiffs argue that Cocchiola's testimony will be confusing to the jury and prejudicial because plaintiffs view Cocchiola's opinion to be incorrect.

Defendants counter that, under Pennsylvania law, employers are imposed with the duty to exercise reasonable care with respect to independent contractors when the employer controls those contractors. RESTATEMENT (SECOND) OF TORTS

§ 414; *Farabaugh v. Pa. Tpk. Comm'n,* 590 Pa. 46, 911 A.2d 1264, 1273–74 (Pa.2006). Additionally, defendants clarified that the alleged OSHA violations are offered as evidence of the industry standard and therefore relevant in this case.

The court agreed with defendants. It is far from clear whether Cocchiola's conclusions are incorrect, and, as such, the court cannot declare his opinion to be incorrectly premised, overly prejudicial and confusing to the jury. Even if Cocchiola's opinions are flawed, such flaws are best vetted during cross-examination rather than as a means to exclude expert opinion in its entirety. Furthermore, as the court stated above, OSHA regulations can be admitted as evidence of the applicable standard of care. *See* RESTATEMENT (SECOND) OF TORTS § 286; *Birt,* 891 A.2d at 1290. For the reasons stated above, the court denied plaintiffs' motion in limine to preclude Cocchiola's opinions as violative of Federal Rule of Evidence 403.

**5. Defendants' motion to preclude plaintiffs' expert Michael Pepe (Doc. 54)**

In their first motion in limine, defendants sought to preclude Michael Pepe, plaintiffs' liability expert, from testifying. Pepe submitted two expert reports. In the first report, dated 12/21/10, Pepe, an accident reconstruction ist, reviewed eyewitness depositions, accident reports and accident photographs. (Doc. 73–1, Ex. 1, Pepe Report at 2). Pepe opined, based upon his analysis of this evidence, that a number of factors caused the forklift to turn over. (*Id.* at 1–2). This conclusion includes the following hypothetical possibility:

> If Mr. Hollock engaged his transmission and began to drive forward once he believed he had gained sufficient traction, the unexpected motion of the semi even over the distance of a few feet would be sufficient to cause the Gehl forklift to slide forward and tip, thereby causing the injury to Mr. Watts. The forward motion of the semi

> was a causative factor in the tipping over of the forklift.

(*Id.* at 2). Pepe's Supplemental Expert Report concluded that Hollock's decision to proceed up the mountain on the access road caused the accident. (*See* Doc. 73–1, Ex. 2, Pepe Supplemental Report at 1–3).

**\*8** Defendants contend that "Mr. Pepe's opinions are generalized observations at best and, as such, does (sic) not rise to the level of expert opinion solely because it was offered by someone with an academic pedigree." (Doc. 54, Defs.' Mot. in Limine Seeking to Preclude Pepe ¶ 72). Defendants argue that Pepe's methodology, or lack thereof, results in an opinion that is not reliable under the standard established in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs counter that Pepe is a qualified expert with an advanced engineering degree and over thirty years of experience in dynamics and stress analysis. Plaintiffs contend that Pepe's opinions are reliable because his investigation and experience-based analysis of the evidence provides a sufficient basis for his opinion. *See Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 406 (3d Cir.2003) (noting that expert theories are not required to gain general acceptance or be subject to peer review to be admissible under Rule 702). Plaintiffs argue that "[t]here are no studies, literature or specific scientific tests that can be employed for the specific facts in the instant case." (Doc. 73, Pls.' Mem. in Opp'n to Defs.' Mot. to Exclude Pepe at 5).

The court denied defendants motion to exclude Michael Pepe. By failing to comply with the court's standing order, the record regarding the methodology Pepe employed is insufficiently developed. [5] Defendants attack on Pepe is based on his methodology as gleaned from his two expert reports and the conclusions contained therein. Similarly, plaintiffs' defense of Pepe's methodology is based solely in his reports. As the defendants failed to comply with this courts order regarding *Daubert* challenges, the record contains nothing more than both parties' competing arguments on how Pepe developed his

opinion, and this record is not sufficient to exclude expert testimony based on methodology.

Even if the court were to confine its review to the expert report, the court does not find Pepe's conditional opinion—if the tractor trailer moved forward, then that motion was sufficient to tip the forklift—objectionable. Pepe has decades of experience, education and training and has conducted a review of the evidence. Pepe's background qualifies him to respond to a hypothetical that is based on Watts's eyewitness testimony—that the tractor moved forward. Furthermore, given the undeveloped record, the court finds that defendants contention that Pepe's opinions are incorrect and not based in the facts are better suited for cross-examination and argument. As the Third Circuit Court of Appeals explained, it is not the province of the district courts to ensure that expert methodology is perfect, only that it is good. *See In re Paoli R.R. Yard Litig.,* 35 F.3d 717, 744 (3d Cir.1994). Thus, the court denied defendants motion to exclude Pepe.

### 6. Defendants' motion to preclude certain references by plaintiffs' expert Beth Cohen, M.D. (Doc. 55)

**\*9** In their second motion in limine, defendants seek to preclude plaintiffs' expert witness Dr. Beth Cohen, M.D. from testifying about certain items discussed in her pre-trial report. Specifically, defendants contend that the "Medical History" section of the report contains impermissible testimony. This section provides a description of the accident and its impact on the patient's life, as described by the patient. (*See* Doc. 55–2, Ex. A, Cohen Report at 2–3).

Defendants contend that Dr. Cohen should be prevented under *Daubert* and Rule 702 from testifying about Watts's statements regarding the accident. Defendants argue that Dr. Cohen should be precluded from mentioning the accident's cause as she is not an engineer. Defendants also contend that such testimony would amount to unfair prejudice under Federal Rule of Evidence 403.

Plaintiffs counter that the "Medical History" section of the report does not contain an opinion by Dr. Cohen, but merely records what Watts related to her during the examination. Plaintiffs argue that Dr. Cohen does

not assert an opinion regarding the testimony, but only records the circumstances surrounding the accident. Plaintiffs point out that the statements fall under the Federal Rule of Evidence 803(4) hearsay exception for statements made for the purpose of medical diagnosis and treatment.[6]

The court denied defendants' motion. Defendants, in violation of our July 25, 2011 Order, attempted to advance a *Daubert* motion without first deposing the challenged expert. Without a proper record, the court cannot determine whether the challenged portions of the "Medical History" of the report are opinions held by Dr. Cohen or background information intended to demonstrate an understanding of the underlying facts of the case. From an examination of the report itself, it appears that the challenged section is intended to be background information that Dr. Cohen obtained from an interview with her patient and other sources.[7] The court is confident that the jury will be able to understand that such background information is not a part of Dr. Cohen's medical opinion. Furthermore, the court did not agree that Rule 403 required the exclusion of this evidence or that it merely represents an attempt to bolster plaintiffs' witnesses. The probative value of the challenged testimony is high as it relates to Dr. Cohen's understanding of the underlying facts upon which her opinion is based. Thus, for the above-stated reasons, the court denied defendants' motion to preclude certain opinions of Dr. Beth Cohen.

### 7. Defendants' motion to exclude plaintiffs' medical bills (Doc. 56)

In their third motion in limine, defendants sought to preclude the admission of Watts's medical bills into evidence. Defendants contend that Watts's medical bills should be precluded because "Plaintiffs' recovery, if any, must be limited to the amount actually paid or owing and ... Plaintiffs' medical expenses must be reduced to reflect the actual amount paid by insurance and accepted by the medical providers and/or the amount of future medical expenses permitted under the [Pennsylvania Workers' Compensation] Act." (Doc. 56, Mot. in Limine to Preclude Medical Bills at ¶ 15).

**\*10** Plaintiffs respond that they only seek to recover the amount of past medical damages that were actually paid by the workers' compensation carrier and by

plaintiffs in their personal capacity.[8] Thus, plaintiffs contend defendants' argument has no basis as plaintiffs only seek to admit those bills that were actually paid. With regard to reducing future medical costs, plaintiffs assert that the law and equitable principles require that future damages not be reduced.

The court agreed with plaintiffs and denied defendants motion in limine. It is well settled under Pennsylvania law that " 'damages are to be compensatory to the full extent of the injury sustained,' and that actual compensation is given 'by graduating the amount of damages exactly to the extent of the loss.' " *Sonlin ex rel. Sonlin v. Abington Mem'l Hosp.,* 748 A.2d 213, 219 (Pa.Super.Ct.2000) (quoting *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1029 (Pa.1980)). The Pennsylvania Supreme Court has clarified that damages for past medical expenses, although recoverable to the fullest extent of the injury sustained, are nonetheless limited to those expenses that " 'have been actually paid, or such as, in the judgment of the jury, are reasonably necessary to be incurred.' " *Moorhead v. Crozer Chester Med.* Ctr., 765 A.2d 786, 789 (Pa.2001) (quoting *Goodhart v. Pa. R.R. Co.,* 177 Pa. 1, 35 A. 191, 192 (Pa.1896)).

In *Moorhead,* the plaintiff claimed $108,668.31 in past healthcare expenses, but the healthcare provider accepted only $12,160.40 from Medicare and Blue Cross as full payment for the plaintiff's bill. *Id.* at 788. The Pennsylvania Supreme Court held that the plaintiff could not recover "illusory" ($108,668.31) past medical expenses, as the amount paid by the plaintiff and the collateral sources ($12,160.40) was far less. *Id.* at 791. In the instant case, with respect to the past medical expenses, the court ruled that Watts's medical bills are admissible as plaintiffs assert claims for only those medical expenses that have been actually paid.

With respect to future medical expense damages, the court disagreed with defendants' assertion that *Moorhead* and the Pennsylvania Workers' Compensation Act require the exclusion of plaintiffs' medical bills or that plaintiffs' future medical expenses be reduced.[9] Other district courts have similarly rejected attempts to limit future medical expenses based on current insurance contribution rates. *See e.g., Pa. Trust Co. v. Dorel Juvenile Grp., Inc.,* No. 07–

4029, 2011 WL 3740472, at *12 (E.D.Pa. Aug.25, 2011) (holding "that *Moorhead* does not automatically preclude parties from offering evidence of future damages beyond Medicaid reimbursement rates").

Furthermore, the precise amount of future medical expenses are inherently speculative. *See Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 697 (Pa.Super.Ct.1982) (citing *Rogers v. Phila. & Reading Ry. Co.,* 263 Pa. 429, 106 A. 734, 736 (Pa.1919)). Defendants can guarantee neither the exact cost of Watts's future medical treatments nor the amount of any potential offsets. Fairness and public policy dictate that the burden of any risk regarding future medical costs or changes in insurance contribution rates should fall on the defendants not the plaintiffs. For the above-stated reasons, the court denied defendants' motion in limine to preclude Watts's medical bills or to limit the amount of future medical expense damages.

### 8. Defendants' motion to bifurcate the trial (Doc. 57)

**\*11** Defendants also filed a motion to bifurcate the trial into liability and damages portions. Defendants argue that their ability to receive a fair and unbiased verdict on liability will be unduly and unfairly prejudiced if plaintiffs are permitted to present their evidence on Watts's significant injuries at the same time as they present evidence of liability.

Rule 42 of the Federal Rules of Civil Procedure provides for bifurcated trials as follows:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.

FED. R. CIV. P. 42(b). Every civil trial contains questions of liability and damages, and the decision whether to bifurcate the trial must be based on the particular facts of the case. *See Lis v. Robert Packer Hosp.,* 579 F.2d 819, 824 (3d Cir.1978). The decision

Watts v. Hollock, Not Reported in F.Supp.2d (2011)

2011 WL 6026998

to bifurcate is left in the trial court's discretion and must be decided on a case-by-case basis. *Idzojtic v. Pa. R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972). In exercising such discretion, the court "must weigh the various considerations of convenience, prejudice to the parties, expedition and economy of resources." *Emerick v. U.S. Suzuku Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). The moving party bears the burden of establishing that bifurcation is appropriate. *Innovative Office Prods., Inc. v. Spaceco, Inc.,* No. 50–04037, 2006 WL 1340865 at *1 (E.D.Pa. May 15, 2006) (citing *Spectra– Physics Lasers, Inc. v. Uniphase Corp.,* 144 F.R.D. 99, 101 (N.D.Cal.1992).

We denied defendants' request to bifurcate the trial. Defendants' argument rests largely on their contention that plaintiffs can only prevail if they establish that defendants behaved recklessly; thus, introducing evidence of damages would confuse the jury when they reach their liability determination on the heightened standard of recklessness. Defendants also argue that plaintiffs' damages experts would be prejudicial to defendants theories regarding liability. Despite these arguments, we find that the benefits derived from bifurcating the trial would be vastly outweighed by the waste of time and resources inherent in holding two trials.

At issue in this case is whether the jury will be able to differentiate between damages and liability issues and the expert witnesses that will testify on these issues. This case is not hopelessly complex. As such, the jury will be able to fairly perform its role in determining liability and damages. Additionally, the court is not convinced that the serious nature of the damages will cause defendants prejudice. To accept such a position would require every seriously injured plaintiff to prosecute his claim in two trials. The court does not accept the position that every plaintiff with evidence of a severe injury creates unfair prejudice and prohibits fair trials. Furthermore, bifurcating the trial will place an additional burden on plaintiffs, who reside in Texas.

**\*12** The court is confident that it can construct a jury charge and a verdict slip that will prevent prejudice to defendants. The court presumes that a jury follows instructions, even in difficult cases, and finds that proper instructions will prevent any prejudicial confusion. *See, e.g., Thaubalt v. Chait,* 541 F.3d 512, 530–31 (3d Cir.2008) (upholding the decision not to bifurcate the trial in part because the court's jury instructions prevented prejudice against the defendant). For the above-stated reasons, the court denied defendants' motion to bifurcate the trial.

**Conclusion**

For the reasons stated above, we granted plaintiffs' motion in limine to exclude evidence of prior drug use (Doc. 34) and denied all of the other pre-trial motions (Docs.51, 52, 53, 54, 55, 56, 57) in our Order dated August 30, 2011 (Doc. 84).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6026998

---

**Footnotes**

1    The parties do not appear to dispute that the opiates found in Watts's body by the drug screen were supplied to him after the accident.

2    Restatement (Second) of Torts Section 447 provides:

     The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

---

**Watts v. Hollock, Not Reported in F.Supp.2d (2011)**

2011 WL 6026998

(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

RESTATEMENT (SECOND) OF TORTS § 447. *See also Klein v. Raysinger,* 504 Pa. 141, 470 A.2d 507, 512 (Pa.1983) (noting that a second negligent actor is not a superseding cause if the second actor's conduct was not highly extraordinary).

3    The standards established in workplace regulations are proper evidence of the standard of conduct that is deemed to be reasonable for that particular workplace. *See* RESTATEMENT (SECOND) OF TORTS § 286; *Birt v. Firstenergy Corp.,* 891 A.2d 1281, 1290–91 (Pa.Super.Ct.2006) (holding that evidence of OSHA violations and industry standards is relevant and admissible on the issue of negligence). Therefore, whether Tower King II complied with OSHA and ANSI regulations is evidence of due care, and whether it deviated from these standards is evidence of negligence.

4    Schorr's fourth and fifth opinions are examples of opinions in which Schorr compares the results of his reconstruction analysis and eyewitness testimony. These opinions are as follows: "4. There is no physical evidence to establish that the tractor-trailer was in gear at the time it was being pulled forward by the bulldozer. 5. Mr. Watt's (sic) testimony that the tractor wheels were spinning and throwing mud is not consistent with the photographs taken at the scene." (Doc. 38–3, Ex. C, Schorr Report at 6). Both of these related conclusions were reached after Schorr's analysis of the materials and simulations referenced in his report.

5    We stated in a July 25, 2011 Order that "[i]f a *Daubert* expert witness issue arises, the party challenging the evidence is required to address the issue at time of deposing the witness. If no deposition is provided, the complaining party must depose the witness so that a record will be made ...." (Doc. 49, Order at 2).

6    Although plaintiffs address hearsay, defendants do not appear to raise hearsay as an issue; therefore, the court limits its analysis to the issue of whether the "Medical History" portion of the report is impermissible opinion testimony.

7    Dr. Cohen states at the beginning of the "Medical History" section that "[t]he history is taken from the patient and chart notes that were kindly provided." (Doc. 55–2, Ex. A, Cohen Report at 2).

8    Plaintiffs contend that, at the time the opposition brief was filed, that the workers' compensation carrier paid $181,790.71 in medical bills and that plaintiffs paid a total of $4,007.58, for a total amount of $185,798.29.

9    The *Moorhead* decision does not preclude parties from introducing evidence of future medical expenses beyond those amounts presently paid by insurance carriers as that decision dealt with past medical damages that the plaintiff would never incur. *Moorhead,* 765 A.2d at 790. The Workers' Compensation provisions cited by defendant are not on point when it comes to reducing awards in tort for future medical expenses. *See* 77 PA. STAT. ANN.. § 71 (governing offsets the

**Watts v. Hollock, Not Reported in F.Supp.2d (2011)**

2011 WL 6026998

Workers' Compensation carrier is entitled); 77 PA. STAT. ANN.. § 531(3) (i-iv) (governing the fee caps and fee schedule for the workers' compensation medical expenses).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.