## APPENDIX OF UNPUBLISHED OPINIONS

1.  *Breitman v. Xerox Educ. Servs., LLC*, 2014 WL 5364103 (S.D.N.Y. 2014)

2.  *Chery v. Conduent Educ. Servs., LLC*, 2021 WL 1791756 (N.D.N.Y. 2021)

3.  *Cohen v. Chicago Title Ins. Co.*, 2013 WL 842706 (E.D. Pa. 2013)

4.  *Dawson v. Great Lakes Educ. Loan Servs., In*c., 2016 WL 5415096 (W.D. Wis. 2016)

5.  *Fukaya v. Daiso Cal., LLC*, 2025 WL 2644747 (N.D. Cal. 2025)

6.  *Huber v. Simon's Agency, Inc.*, 2025 WL 1710045 (E.D. Pa. 2025)

7.  *In re Fedloan Student Loan Serv. Litig.*, 2025 WL 539681 (E.D. Pa. 2025)

8.  *In re Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 (D.N.J. 2021)

9.  *Innospec Fuel Specialties, LLC v. Isochem N.A., LLC*, 2012 WL 3682988 (D.N.J. 2012)

10. *Johansson v. Nelnet*, 2022 WL 6232089 (D. Neb. 2022)

11. *Kirchner v. Wyndham Vacation Resorts, Inc.*, 2024 WL 4188865 (D. Del. 2024)

12. *Lyons v. Great Lakes Educ. Loan Servs., Inc.*, 2022 WL 602972 (D.N.J. 2022)

13. *Meenan v. Navient Corp.*, 2020 WL 5057654 (D. Ariz.2020)

14. *Polansky v. Vail Homes, LLC*, 2014 WL 6682473 (W.D. Pa. 2014)

15. *Ritti v. U-Haul Int., Inc.*, 2006 WL 1117878 (E.D. Pa. 2006)

16. *Seaman v. Nat'l Coll. Student Loan Tr.*, 2023 WL 6290622 (S.D.N.Y. 2023)

17. *Shelley v. AmSouth Bank*, 2000 WL 1121778 (S.D. Ala. 2000)

18. *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 1105236 (M.D. Pa. 2017)

19. *Walden v. the Bank of New York Mellon Corp.*, 2025 WL 2696463 (W.D. Pa. 2025)

20. *Well Built Realty Corp. v. Leviton Manufacturing Co., Inc.*, 2025 WL 295778 (W.D. Pa. 2025)

**1**

Case 3:18-cv-00121-JFS-PJC     Document 232-13     Filed 02/24/26     Page 3 of 230

Breitman v. Xerox Educ. Services, LLC, Not Reported in F.Supp.3d (2014)

2014 WL 5364103
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cindy L. BREITMAN, on behalf of herself
and all others similarly situated, Plaintiff,
v.
XEROX EDUCATION SERVICES, LLC,
s/h/i as Affiliated Computer Services, Inc.,
Nextstudent, Inc., and U.S. Bank, N.A., Defendants.

No. 12 Civ. 6583(PAC).
|
Signed Oct. 22, 2014.

*OPINION & ORDER*

Honorable PAUL A. CROTTY, District Judge.

**\*1** The facts of this case are fully set forth in *Breitman v. Xerox Education Services, LLC,* 2013 WL 5420532 (S.D.N.Y. Sept. 27, 2013). Lead Plaintiff Cindy Breitman ("Breitman" or "Plaintiff") alleges that Xerox Education Services, LLC, NextStudent, Inc., and U .S. Bank, N.A. (collectively, "Defendants") misapplied payments which Breitman made towards her student loan and failed to apply certain benefits to which Breitman was entitled. Following this Court's Opinion and Order of September 27, 2013, Plaintiff has claims for breach of contract and violations of N.Y. General Business Law section 349.

Breitman now moves to certify the following two classes:

The Checkmate II Class: On behalf of federal student loan borrowers enrolled in defendant Xerox Education Services, LLC's ("Xerox") auto-debit payment program *CheckMate II,* or any similar auto-debit payment program offered by Xerox, and who, since August 28, 2006, made payments in excess of the stated monthly amount due (i.e. payments other than the regular installment) ("Prepayments") to their loans and had those Prepayments applied to satisfy (in whole or in part) subsequent installments or prevent the next month's auto-debit.

The Benefits Class: On behalf of federal student loan borrowers who were, since August 28, 2006, promised and qualified for borrower benefits applicable to their loans

serviced by Xerox, such as the On–Time Payment Benefit (1% rate reduction after "only" 36 consecutive on-time payments) and Grace Period Benefit (.375% rate reduction to the "grace period rate" after 6 months of consecutive on-time payments), but for whom Xerox failed to apply the earned benefit to decrease as promised the borrowers' loans

(Dkt. 57, at 1–2). The Benefits Class is pursuing claims for breach of contract only, while the Checkmate II Class is pursuing both breach of contract claims and violations of N.Y. General Business Law section 349. Breitman seeks to certify these classes for both damages and injunctive relief under Rule 23(b)(3) and Rule 23(b)(2).

Breitman also moves to appoint herself Class Representative for both classes and to appoint Bragar Eagel & Squire, P.C. ("BES") as counsel to the Classes. For the reasons that follow, Breitman's motion for class certification is denied, mooting the motion to appoint a Class Representative and Class Counsel.

*DISCUSSION*

**I. Standards for Class Certification**

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a)," *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 201 (2d Cir.2008), namely that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

**\*2** Fed.R.Civ.P. 23(a). "The requirements of commonality, typicality, and adequacy of representation are closely related." *In re IndyMac Mortgage–Backed Sec. Litig.,* 286 F.R.D. 226, 233 (S.D.N.Y.2012). They "serve as guideposts for determining whether under the particular circumstances

**Breitman v. Xerox Educ. Services, LLC, Not Reported in F.Supp.3d (2014)**

maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 n. 13 (1982).

If the requirements of Rule 23(a) are met, the court "may then consider granting class certification [under Rule 23(b)(3) ] where it 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Teamsters,* 546 F.3d at 202.

A class may be certified under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." A Rule 23(b)(2) class is appropriate only when "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2557 (2011). Individualized monetary claims are inappropriate in a class certified under Rule 23(b)(2). *Id.* at 2558–59; *accord Janes v. Triborough Bridge and Tunnel Auth.,* 2011 WL 10885430, at *5 (S.D.N.Y. Oct. 5, 2011).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir.2010). A district court must conduct a "rigorous analysis" to make that determination. *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 33 & n. 3 (2d Cir, 2006) (quoting *Falcon,* 457 U.S. at 161 (1982)). Nonetheless, it has "broad discretion" in doing so. *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 165 (2d Cir.2012).

## II. Analysis

### A. Standing
Defendants argue that Plaintiff lacks standing to represent both classes. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Def.Mem."), at 9–10, 13. Defendants contend that Plaintiff does not have standing to represent the Benefits Class because she was ineligible for benefits and therefore "does not fit within her own class definition"; and that she lacks standing to represent the Checkmate II class because she withdrew from

Checkmate II for five months and because she did not provide written instructions regarding her extra payments until November 2011.

A plaintiff has standing on behalf of a putative class "if he plausibly alleges (1) that he personally suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA,* 693 F.3d at 162 (internal quotation marks and citation omitted). With respect to both classes, Defendants have failed to show how these factual differences impacts Plaintiff's standing. Plaintiff has plausibly alleged that she and other putative class members suffered an injury arising out of the failure to apply benefits and the failure to apply prepayments, and has alleged a common set of concerns between Plaintiff and the putative class. Defendants' arguments regarding these differences may have bearing on Plaintiff's ability to represent these classes with respect to other Rule 23 requirements, but are insufficient to destroy standing.

### B. Rule 23(a) Requirements

#### 1. Numerosity
**\*3** A class of more than 40 members presumptively satisfies the numerosity requirement of Rule 23(a). *See Torres v. Gristede's Operating Corp.,* 2006 WL 2819730, at *12 (S.D.N.Y. Sept. 29, 2006). Plaintiffs assert that "Xerox is one of the nation's largest (if not the largest) student loan servicers. *CheckMate* II is a repayment program widely offered to borrowers whose loans are serviced by Xerox." Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pl.Mem."), at 11. Indeed there may be over 40,000 borrowers participating in the Checkmate II program, and over 12,000 borrowers who may have been eligible to participate in the On–Time Payment Benefit program. Defendants do not dispute that Plaintiff has met the numerosity requirement.

#### 2. Commonality
"Commonality is satisfied where a single issue of law or fact is common to the class." *In re IndyMac,* 286 F.R.D. at 233 (citing *Wal–Mart,* 131 S.Ct. at 2256 ("[E]ven a single common question will do.")). Nonetheless, class certification requires not only "common questions," but "the capacity of a classwide proceeding to generate common *answers* apt to

**Breitman v. Xerox Educ. Services, LLC, Not Reported in F.Supp.3d (2014)**

drive the resolution of the litigation." *Wal–Mart,* 131 S.Ct. at 2551.

Here, the common thread among putative Benefits Class members is "whether Xerox breached the relevant form contracts by failing to apply earned borrower benefits." Pl. Mem. at 21. A classwide proceeding on this allegation would produce common answers to this question. For these reasons, Plaintiff has adequately shown commonality among Benefits Class members. Similarly, despite Defendants' assertion that Plaintiff's circumstances with respect to her participation in Checkmate II are unique, the Checkmate II Class shares common questions. These questions include whether skipping auto-debits after a prepayment constitutes a breach of contract or a violation of General Business Law section 349. That Plaintiff herself had "unique communications with [Defendants] concerning her individual intentions with respect to the application of her prepayments," Def. Mem. at 14, does not destroy this common thread.

Accordingly, both classes satisfy the commonality requirement.

### 3. Typicality
Typicality "is satisfied where 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.' " *In re IndyMac,* 286 F.R.D. at 233 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009)). Courts have stated that this is "not [a] demanding" requirement. *See, e.g., Tsereteli v. Residential Asset Securitization Trust 2006–A8,* 283 F .R.D. 199, 208 (S.D.N.Y.2012); *In re Prestige Brands Holdings, Inc. Sec. Litig.,* 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007). Thus, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993).

*\*4* With respect to the Benefits Class, Defendants argue that because Plaintiff is subject to unique defenses concerning her eligibility for the relevant benefits, her claims are not typical of the class. Def. Mem. at 11. Defendants' argument fails, however, in light of the evidence put forth by Plaintiff that 92% of the borrowers who did not receive the on-time payment benefit were disqualified for missing one of their first six payments. Plaintiff's Reply Memorandum of Law in Further Support of Motion for Class Certification, at 10; Declaration of Justin Kuehn in Support of Motion for Class Certification, at Ex. O. Defendants have not overcome Plaintiff's showing that these defenses would not be unique to her situation.

The claims of the entire Checkmate II Class arise from the same course of conduct in which Defendants allegedly failed to allow prepayments without advancing monthly payments to slow repayment of loans and increase the amount of interest paid. Here, Plaintiff has shown that her claims and those of the putative classes concern the same conduct and is premised upon the same legal theories. As a result, she has met the typicality requirement.

### 4. Adequate Representation
"Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa,* 222 F.3d at 60. In addition, "[a] class representative must ... possess the same interest and suffer the same injury as the class members." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625–26 (1997).

Defendants assert that Plaintiff is an inadequate class representative because she made "misstatements concerning material facts that go to the core of her class claims, and even her [Amended Complaint] is not free of them." Def. Mem. at 22. Defendants have not shown that the statements at issue, some of which have since been corrected in the Amended Complaint, are the product of lies or subterfuge; instead, they appear to be the result of mere confusion or lack of memory regarding the precise details of a complicated transaction. Breitman appeared honest and competent in her deposition, has displayed a willingness to participate in the litigation, and seeks to protect the interests of the classes. For these reasons, she is an adequate class representative.

Accordingly, Plaintiff has met the requirements of Rule 23(a) for both the Benefits Class and the Checkmate II Class.

### C. Predominance of Common Questions under Rule 23(b)(3)
"The predominance criterion is, in effect, a stricter version of the commonality requirement of Rule 23(a)(2)." *Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 89 (S.D.N.Y.2001). "To satisfy the predominance prong of

**Breitman v. Xerox Educ. Services, LLC, Not Reported in F.Supp.3d (2014)**

Rule 23(b)(3), a plaintiff must show that common proof will predominate at trial with respect to the essential elements of liability of the underlying causes of action." *Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *3 (S.D.N.Y. Mar. 29, 2010). Courts have a "duty to take a close look at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).

**\*5** Defendants do not reach the requirements of Rule 23(b)(3) in their opposition to Plaintiff's certification of the Benefits Class, as they believe Plaintiff fails to satisfy the Rule 23(a) requirements. The Court finds, however, that Defendants' arguments against Rule 23(a) certification for both classes apply with greater force to the Rule 23(b)(3) requirements and, indeed, demonstrate that neither class can be certified.

Plaintiff cannot show that common issues in the Benefits Class predominate over individual questions. The threshold question of eligibility for the relevant benefits requires individualized inquiries regarding putative class members' paying or failing to pay on time and the circumstances surrounding each payment. Besides showing that a large percentage of putative class members missed one of the first six payments, Plaintiff has not demonstrated an ability to prove on a classwide basis that this was due to a common policy, without necessitating individualized inquiries. Defendants would certainly be entitled at trial to prove that each class member was at fault for missing a payment and therefore ineligible for these benefits, through no policy or involvement of the Defendants.

A similar issue burdens the Checkmate II Class in several respects. First, individualized inquiries would be necessary to determine which class members provided instructions regarding prepayments, which class members sought to advance their next due date, and which set of contract terms applied to each class member. With respect to damages, Defendants argue that putative class members differ from Plaintiff because they may not share Plaintiff's intention for additional payments being applied to principal and not advancing a regular monthly payment. Defendants have offered a plausible argument that some borrowers seek to advance their due dates in various circumstances, such as those serving in the military, with seasonal earnings or inconsistent income streams, or on extended travel. Def. Mem. at 7. Such differences implicate class members' entitlement to damages, and would necessitate individualized inquiries into each members' intentions.

Rather than common issues predominating, here individualized inquiries would predominate with regard to both classes. Accordingly, certification under Rule 23(b)(3) is improper.

### D. Rule 23(b)(2) Certification

As discussed above, Plaintiff seeks to certify both classes for injunctive relief under Rule 23(b)(2). Plaintiff asserts that the *"CheckMate II* Class qualifies as a class action[ ] under Rule 23(b)(2) because Xerox's uniform failure to adhere to the form *CheckMate II* terms and conditions and systematic deceptive business practices are actions of general applicability to all members of the *CheckMate II* class 'so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.' " Pl. Mem. at 16. Likewise, Plaintiff states that the "Benefits Class qualifies as a class action[ ] under Rule 23(b)(2) because Xerox's alleged common pattern of wrongdoing to fail to apply borrower benefits to slow repayment of student loans, and thereby increase total interest paid by borrowers, is an action of general applicability to all members of the Benefits Class." *Id.* at 21.

**\*6** Rule 23(b)(2) certification of the Checkmate II Class is improper. As discussed above, not all users of Checkmate II intended for prepayments to be used in the way Plaintiff now seeks. Some putative class members sought to advance their next due date for a multitude of reasons, and injunctive relief, if granted, would hinder those class members' ability to do so. This difference is substantial, and Plaintiff cannot show that injunctive relief would be appropriate respecting the class as a whole.

With respect to both the Benefits Class and the Checkmate II Class, Plaintiff has not shown that the monetary relief sought is incidental to the requested injunctive or declaratory relief. Certification under Rule 23(b)(2) is improper " 'when-despite the suitability of generalized injunctive or declaratory relief-each class member would [also] be entitled to an individualized award of monetary damages.' " *Ackerman v. Coca–Cola Co.*, 2013 WL 7044866, at *16 (E.D.N.Y. July 18, 2013) (quoting *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir.2012)). Here, class members seek monetary damages in addition to the injunctive relief sought. These damages awards, if granted, would involve individual determinations to calculate the amount of damages for each class member.[1] Plaintiff has not shown that these

Breitman v. Xerox Educ. Services, LLC, Not Reported in F.Supp.3d (2014)

monetary damages are merely incidental to the injunctive relief claims, and the crux of the complaint, that prepayments were misapplied in order to slow repayment of the loan and that financial benefits were improperly denied, concerns financial losses which Plaintiff seeks to have repaid.

Plaintiff now argues that "[a]t a minimum, a(b)(2) class should be certified to: (i) enjoin Xerox from altering the October 2013 change,[2] (ii) extend the October 2013 change to all *CheckMate II* borrowers, and (iii) compel Xerox to determine when and what instructions made by borrowers should be (or should have been) followed," Reply Mem. at 9. This suggestion, made for the first time in Plaintiff's Reply Brief, does not provide any information or specificity with respect to the efficacy or necessity of such certification.[3] Nor has Plaintiff shown that such relief would be appropriate respecting the class as a whole, or indeed that any putative class member besides Plaintiff would seek such specific and limited injunctive relief. As a result of this dearth of specificity and information, the Court cannot determine whether certification by means of the Court's authority under Rule 23(c)(4) to certify separate issues would be appropriate. This vague and conclusory suggestion must be rejected.

## CONCLUSION

Accordingly, the Court denies Plaintiff's class certification motion. This ruling moots Plaintiff's motion to appoint Class Counsel and Class Representative. The parties are directed to appear for a status conference on November 18, 2014, at 3:15 p.m. The Clerk of the Court is directed to close out the pending motion in this case (Dkt.57).

**\*7** SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 5364103

---

## Footnotes

1    Plaintiff argues that "damages can be calculated through the repayment histories maintained by Xerox" and that *"CheckMate II* Class members are entitled to the difference between the repayment cost of their loans and what the repayment cost would have been had *CheckMate II* auto-debits not been skipped." Reply Mem. at 8. Determining damages in this way requires "a review of each putative class member's file to assess whether the prepayment was applied to principal or interest, a determination of the new unpaid principal balance, a review of the new payment schedule, and then a quantification of that amount as a lump sum payment to each putative class member," with the added complication that the timing, amounts, and interest rates for payments differ for each putative class member, Def. Mem. at 21. These variations will cause "[q]uestions of individual damages calculations [to] inevitably overwhelm questions common to the class." *Comcast,* 133 S.Ct. at 1433.

2    The "October 2013 change" is a reference to an update regarding the Checkmate II program which provided that for borrowers who enrolled in Checkmate II after April 5, 2012, "if the customer makes an additional payment, regardless of the amount," the monthly auto-debit will continue to be withdrawn. Pl. Mem. at 4–5.

3    The Court notes that the practice of raising an issue for the first time in reply papers is disfavored. *See S.E.C. v. Yorkville Advisors, LLC,* 300 F.R.D. 152, 168 (S.D.N.Y.2014) (citing cases).

---

**End of Document**                                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**2**

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 9 of 230

Chery v. Conduent Education Services, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 1791756

2021 WL 1791756
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeffrey CHERY, on behalf of himself
and all others similarly situated, Plaintiff,
v.

CONDUENT EDUCATION SERVICES, LLC,
formerly known as ACS, Access Group, Inc.,
and Access Funding 2015-1, LLC, Defendants.

1:18-CV-75
|
Signed 05/05/2021

**Attorneys and Law Firms**

OF COUNSEL: JUSTIN A. KUEHN, ESQ., MOORE KUEHN, PLLC, Attorneys for Plaintiff, 30 Wall Street, 8th Floor, New York, NY 10005.

OF COUNSEL: LAWRENCE P. EAGEL, ESQ., BRAGAR EAGEL & SQUIRE, P.C., Attorneys for Plaintiff, 810 Seventh Avenue, Suite 620, New York, NY 10019.

OF COUNSEL: JOHN GRUGAN, ESQ., DANIEL C. FANASELLE, ESQ., ELIZABETH SEIDLIN-BERNSTEIN, ESQ., THOMAS BURKE, ESQ., BALLARD, SPAHR LAW FIRM, Attorneys for Defendants, 1735 Market Street, 51st Floor, Philadelphia, PA 19103.

**MEMORANDUM-DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**
**\*1**  On January 18, 2018, plaintiff Jeffrey Chery ("Chery" or "plaintiff") filed this putative class action against defendants Conduent Education Services, LLC, formerly known as ACS ("ACS"), Access Group, Inc. ("Access Group"), and Access Funding 2015-1, LLC ("Access Funding"), a group of entities that hold or service certain federal student loans.

Chery's amended complaint alleges that ACS, Access Group, and Access Funding (collectively "Conduent" or "defendants") interfered with his right to pre-pay or consolidate his student loans in accordance with certain guarantees set out in federal law. The operative complaint asserts six claims: (1) a violation of New York General Business Law § 349; (2) a breach of contract; (3) a breach of the implied covenant of good faith and fair dealing; (4) a request for a declaratory judgment; (5) negligence; and (6) unjust enrichment. Dkt. No. 19.

On April 24, 2018, Conduent moved to dismiss Chery's complaint. Dkt. No. 20. That motion was denied. *Chery v. Conduent Educ. Servs., LLC*, 2019 WL 1427140 (N.D.N.Y. Mar. 29, 2019). Thereafter, the parties engaged in some contested discovery before the assigned magistrate judge. Dkt. No. 60.

On January 15, 2021, Chery moved under Federal Rule of Civil Procedure ("Rule") 23 seeking to certify a class of student loan borrowers whose right to prepay their Federal Family Education Loan Program ("FFELP") student loans was thwarted because Conduent failed to provide a Loan Verification Certificate ("LVC") within ten days of the borrower's filing of a Federal Direct Consolidation Loan Application (the "Class"). Dkt. No. 79.

The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

**II. BACKGROUND**
Chery is a Virginia resident who took out nine FFELP student loans while he lived in Queens, New York. Am. Compl. ¶ 12. ACS, a Delaware company that maintains an office in Utica, New York, initially serviced plaintiff's loans. *Id.* ¶¶ 12–13. Access Group, a Delaware corporation registered to do business in New York, owned seven of plaintiff's loans, and Access Funding, another Delaware company, owned the other two. *Id.* ¶ 14–15.

Chery's FFELP loans were governed by a Master Promissory Note ("MPN"), which included a form disclosure statement ("Disclosure Statement"). As relevant here, the MPN and Disclosure Statement (collectively the "Contract") together provided that (a) a borrower may prepay all or any part of the unpaid balance on their loans at any time without penalty; (b) the loan is subject to the Higher Education Act of 1965 and applicable U.S. Department of Education regulations; and (c) repayment obligations are interpreted according to applicable federal law and regulations, applicable state law and regulations governing the FFELP program, and the terms of the MPN. *See* Exs. E and F to Kuehn Decl., Dkt. Nos. 79-8, 79-9.

2021 WL 1791756

On February 4, 2016, Chery submitted a Federal Direct Consolidation Loan Application to FedLoan Servicing ("FedLoan"), an entity that services federal student loans for the Public Service Loan Forgiveness Program ("PSLF"). Am. Compl. ¶¶ 16, 28. As part of this application process, FedLoan instructed ACS to certify the balance of each of plaintiff's loans using an LVC. Id. ¶¶ 29, 31. Although applicable federal regulations required ACS to "complete the LVC and return it to FedLoan within ten business days of having received it," it took ACS nearly ten months to certify plaintiff's student loans. Id. ¶¶ 3, 30–31, 34. Plaintiff alleges that he was harmed as a result of this delay. Id. ¶ 35.

*2  The proposed Class members each held one or more FFELP student loans governed by the same material Contract terms. See Am. Compl. ¶ 45; see also Dkt. No. 16 at 16. The class complaint alleges that Class members sought to pay off or consolidate their FFELP student loans in accordance with the terms of the Contract. Am. Compl. ¶ 45. The class complaint further alleges that the Class members were harmed because Conduent failed to return their LVCs within the time period mandated by law. Id.

According to plaintiff, Conduent has admitted that that it failed to return LVCs within the time period mandated by law. See Ex. A to Kuehn Decl., Dkt. No. 79-4. In fact, Conduent entered into consent orders with the federal Consumer Financial Protection Bureau ("CFPB") and the New York State Department of Financial Services ("DFS") in which it conceded that it had failed to do so. Ex. B to Kuehn Decl., Dkt. No. 79-5 ¶¶ 24–26, Ex. C to Kuehn Decl., Dkt. No. 79-6 ¶¶ 22–25.

Discovery has revealed that at least 3,361 putative Class members suffered an average LVC processing delay of 173 days. Ex. D to Kuehn Decl., Dkt. No. 79-7 ¶¶ 21–22. Plaintiff's expert calculates that the Class has suffered damages in the range of $2.5 million to $3.4 million. Id. ¶ 31.

### III. LEGAL STANDARD
Rule 23 requires a party seeking certification to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a).

Rule 23 also requires a party to satisfy at least one of three additional requirements:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b).

### IV. DISCUSSION
Chery contends that class certification is warranted because the relevant Contract terms were materially the same for every member of the proposed Class. Pl.'s Mem., Dkt. No. 79-1 at 7–8.[1] According to plaintiff, readily available data establishes that the Class members suffered delays in processing their LVCs that resulted in quantifiable harm. Id. at 10.

Conduent concedes that it failed to adhere to the ten-day processing rule for LVCs. Defs.' Opp'n, Dkt. No. 80 at 6. Even so, defendants argue that the length of the delay was not uniform for each Class member, and therefore an analysis of whether any individual borrower suffered harm would depend on the particular status of the loan(s) in question. Id. at 6–7. Further, defendants argue that plaintiff's class certification motion should be "summarily denied" as to Access Group and Access Funding because his motion "does not detail *anything* that [these defendants] allegedly did or did not do." Id. at 8 (emphasis in original).

Chery v. Conduent Education Services, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 1791756

**\*3** A district court enjoys broad discretion when it comes to resolving questions of class certification because it is "often in the best position to assess the propriety of the class and has the ability ..., to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig. v. Credit Lyonnaise Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

"However, because the class action device is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only, a party seeking class certification must affirmatively demonstrate its compliance with the Rule." *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 572 (N.D.N.Y. 2017) (cleaned up). Accordingly, "the district court is required to make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, and must resolve material factual disputes relevant to each Rule 23 requirement." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (cleaned up).

In sum, "[c]lass certification is appropriate where the proposed class meets, by a preponderance of the evidence following a court's 'rigorous analysis,' the requirements of Rule 23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b)." *Stinson*, 282 F.R.D. at 367 (citation omitted).

### A. **Rule 23(a)**
Chery seeks to certify the following Class:

> All student loan borrowers who submitted an application to consolidate one or more FFELP Loans into a Direct Consolidated Loan between January 18, 2012, and the date of the Order certifying the Class, for which Defendants failed to provide an LVC within ten days of receiving the request therefor.

### 1. **Numerosity**
The first element of Rule 23(a) requires the plaintiff to demonstrate that "the class is so numerous that joinder of all

members is impracticable." FED. R. CIV. P. 23(a)(1). As the Second Circuit has explained:

> the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members.

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

"[T]he numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Conway*, 236 F. Supp. 3d at 574 (cleaned up). Accordingly, "[n]umerosity is presumed for classes larger than forty members." *Id.*

Upon review, Chery has carried his burden on this element. Plaintiff's submissions identify at least 3,361 putative Class members who sought LVCs for 7,393 loans. Ex. D to Kuehn Decl., Dkt. No. 79-7 ¶¶ 21–22. In addition to the sheer number of Class members, the contextual factors—in particular judicial economy and the reality that individual Class members are unlikely to file separate suits for relatively small recoveries—weigh in favor of finding this requirement satisfied as well. Accordingly, plaintiff has demonstrated by a preponderance of the evidence that the class is sufficiently numerous such that joinder of all members is impracticable.

### 2. **Commonality**
**\*4** The second element of Rule 23(a) requires the plaintiff to demonstrate that there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). Importantly, this "does not require all questions of law or fact to be common," and "even a single common question will suffice." *Sykes*, 285 F.R.D. at 286.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 12 of 230

Chery v. Conduent Education Services, LLC, Not Reported in Fed. Supp. (2021)

2021 WL 1791756

"The common question must lend itself to 'classwide resolution' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' " *Sykes*, 285 F.R.D. at 286 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). In other words, what matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original).

Upon review, Chery has carried his burden on this element. At the very least, plaintiff's submissions establish that the LVCs were delayed because of an issue common to the proposed Class—a remediation process undertaken because of systematic flaws in Conduent's record-keeping system(s). *See* Ex. I to Kuehn Decl., Dkt. No. 79-12 ¶ 7; Ex. J to Kuehn Decl., Dkt. No. 79-13 at 41:14–42:11, 103:18–104:15. As plaintiff explains in his memorandum, a number of related legal issues are derivative of this common delay. *See* Pl.'s Mem. at 17. Accordingly, plaintiff has demonstrated by a preponderance of the evidence that there are questions of law or fact common to the class.

### 3. Typicality

The third element of Rule 23(a) requires the plaintiff to demonstrate that "the claims or defense of the representative parties are typical of the claims or defense of the class." FED. R. CIV. P. 23(a)(3). "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar arguments to prove the defendant's liability." *Stinson*, 282 F.R.D. at 370–71 (citation omitted). "When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality is usually met." *Id.* at 371.

Upon review, Chery has carried his burden on this element for substantially the same reasons as set forth above. *Sykes*, 285 F.R.D. at 287 ("The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites."). As plaintiff explains, Conduent concedes that it failed to provide LVCs in accordance with the applicable time limit for plaintiff and for the proposed Class members. Defendants also concede that the governing language in the Contract is substantially similar as to plaintiff and to each member of the proposed class. Accordingly, plaintiff has demonstrated by a preponderance of the evidence that the claims or defenses of the representative party is typical of the claims or defenses of the class.

### 4. Adequacy of Representation

The fourth element of Rule 23(a) requires the plaintiff to demonstrate that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "[T]he adequacy requirement is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "In addition, class counsel must be qualified, experienced and able to conduct the litigation." *Conway*, 236 F. Supp. 3d at 576.

**\*5** This inquiry "serves to uncover conflicts of interest between the parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Not every conflict, however, precludes a finding of adequacy." *Sykes*, 285 F.R.D. at 287. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *Id.* (citation omitted).

Upon review, Chery has carried his burden on this element. There is no indication at this point that plaintiff's interests have diverged from that of the members of the proposed Class, all of whom have allegedly been harmed in substantially the same manner by the same course of conduct. *See generally* Chery Decl., Dkt. No. 79-2. Further, class counsel have substantial class litigation experience. *See* Ex. K to Kuehn Decl., Dkt. No. 79-14; Ex. L to Kuehn Decl., Dkt. No. 79-15. Accordingly, plaintiff has demonstrated by a preponderance of the evidence that the representative parties will fairly and adequately protect the interests of the class.

### B. Rule 23(b)

Chery relies on Rule 23(b)(3), which requires the plaintiff to show (1) that "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1. Predominance

"As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to

Chery v. Conduent Education Services, LLC, Not Reported in Fed. Supp. (2021)
2021 WL 1791756

warrant adjudication by representation." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (cleaned up). In short, the Rule "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.*

First, Conduent contends that Chery cannot satisfy the predominance requirement of Rule 23(b)(3) because the pleading's claim under New York General Business Law ("GBL") § 349 (Count One) requires individualized proof regarding whether (1) each putative Class member actually read the Contract; (2) the varying lengths of delay amount to a violation; and (3) each Class member's GBL § 349 claim is duplicative of their breach of contract claim. Defs.' Mem., Dkt. No. 80 at 20–22.

Upon review, these arguments will be rejected. First, as Chery points out, the question of whether an act or practice is "materially misleading" under GBL § 349 is an objective inquiry, and "consumers do not have to prove that they actually relied on a misrepresentation." *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *8. Second, at least for now plaintiff has established that any LVC processing delay of longer than ten days amounts to a violation under the governing law, which obviates the need for individualized inquiries into the particular length of additional delay suffered in each instance. Third, the question of whether a GBL § 349 claim is duplicative of a breach of contract claim under the facts alleged is also subject to common proof.

Second, Conduent contends that Chery cannot satisfy the predominance requirement of Rule 23(b)(3) because the pleading's claims for breach of contract (Count Two) and breach of the implied covenant (Count Three) require an individual analysis of whether the varying length of delay in each Class member's case ripened into a breach. Defs.' Mem. at 22–23. In defendants' view, "an LVC delay of two weeks is different from an LVC delay of six months." *Id.* at 23.

**\*6** Upon review, this argument will be rejected for substantially the same reasons set forth above. This is the unusual case in which Chery has identified support for the assertion that the breach of a standard, common form contract is established after ten days of processing delay because of a governing rule of law. And the alleged existence of a common, underlying reason for that delay—a servicing system that was

unable to handle borrower's requests—is also a common issue susceptible to common proof.

Third, Conduent contends that Chery cannot satisfy the predominance requirement of Rule 23(b)(3) because the pleading's claims for negligence (Count Five) and unjust enrichment (Count Six) require individualized proof to determine whether the "economic loss doctrine" applies as a defense to the claim. Defs.' Mem. at 24. Upon review, this argument will also be rejected because "the determination of the existence of a contractual relationship between Class members and Conduent rests on common facts and contains no predominating individual issues." Pl.'s Reply, Dkt. No. 81 at 9.

Fourth, Conduent Contends that Chery has failed to demonstrate that damages can be calculated on a class-wide basis. Defs.' Mem. at 24–28. As defendants explain, it is not always financially beneficial for a student loan borrower to consolidate their FFELP loans into a consolidation loan. *Id.* at 25. Thus, in defendants' view, the calculation of whether any individual borrower suffered damages would require a series of individual assessments as to each member of the proposed Class. *Id.* at 25–26.

This argument will also be rejected. The alleged harm involves injury caused by the LVC processing delay. Plaintiff's expert has offered a facially reasonable approach to calculating this harm on both an individual and a class-wide basis. The alleged harm also involves having payments erroneously applied to FFELP loans instead of direct loans, two different loan products. Notably, courts have recognized that awarding statutory damages under GBL § 349 can be appropriate even in the absence of "pecuniary harm or quantifiable economic loss." *McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 256 (W.D.N.Y. 2019). In short, plaintiff's damages "model survives the minimal scrutiny" required by Rule 23(b)(3); *i.e.*, his "theory of liability matches [his] theory of damages and individualized damages issues will not predominate." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015).

### 2. Superiority
Finally, Conduent contends that Chery cannot satisfy the superiority requirement of Rule 23(b)(3) because "he cannot surmount the overwhelming difficulties that would hinder administration of the putative class." Defs.' Mem. at 29. According to defendants, each claim will require a

2021 WL 1791756

"[c]omplex financial assessment[ ]" that is "better handled through separate actions brought by the individuals who believe they have been affected." *Id.*

In assessing this "superiority" question, Rule 23(b)(3) instructs courts to consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. FED. R. CIV. P. 23(b)(3)(A)–(D).

Upon review, these factors favor certification. As Chery points out, each individual Class member's claim is likely to be relatively small, making individual claims unlikely to be prosecuted. Likewise, this litigation has progressed through partial discovery, and neither party has identified any other active cases pending on these same issues. As the Second Circuit has cautioned, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Secs.*, 862 F.3d 250, 268 (2d Cir. 2017) (cleaned up).

### C. Ascertainability

**\*7** Courts have written a third, "implied requirement" into Rule 23: a party seeking certification must demonstrate that the proposed class is "ascertainable." *Conway*, 236 F. Supp. 3d at 573. Under this additional element, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *Stinson*, 282 F.R.D. at 367 (citation omitted). Upon review, Chery has carried his burden on this element because the data produced in discovery has generated an objectively identifiable set of borrowers who have allegedly been harmed.

### D. Class Counsel

Finally, Chery has moved to appoint Bragar Eagel & Squire, P.C. ("BES") and Moore Kuehn, PLLC ("MKPLLC") as co-counsel for the Class. Pl.'s Mem. at 25. Under Rule 23, "a court that certifies a class must appoint class counsel." FED. R. CIV. P. 23(g)(1). In making this appointment, a court must consider (i) "the work counsel has done in identifying or investigating potential claims in the action"; (ii) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (iii) "counsel's knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A). A court may also consider, *inter alia*, "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).

Upon review, this motion will be granted for the reasons set forth *supra* in section IV.A.4.

## V. CONCLUSION

Chery has demonstrated by a preponderance of the evidence that certification of the Class is appropriate.[2] Plaintiff has also demonstrated that BES and MKPLLC should be appointed as co-counsel to the Class.

Therefore, it is

ORDERED that

    1. Chery's motion for class certification is GRANTED;

    2. Chery is appointed as representative of the Class; and

    3. BES and MKPLLC are appointed as co-counsel to the Class.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1791756

---

**Footnotes**

1      Pagination corresponds to CM/ECF.

---

**Chery v. Conduent Education Services, LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 1791756

2    Conduent's contention that certification should be denied as to Access Group and Access Funding is rejected for the reasons set forth in Chery's brief. Pl.'s Reply at 13–14.

---

**End of Document**                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**3**

KeyCite Yellow Flag

Distinguished by  Walden v. Bank of New York Mellon Corporation, W.D.Pa.,  April 10, 2024

2013 WL 842706
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Pearl E. COHEN, On Behalf of Herself
and All Others Similarly Situated
v.
CHICAGO TITLE INSURANCE COMPANY.

Civil Action No. 06–873.
|
March 7, 2013.

**Attorneys and Law Firms**

Benjamin H. Carney, Richard S. Gordon, Martin E. Wolf, Quinn Gordon & Wolf Chtd, Gordon & Wolf Chtd, Towson, MD, Philip S. Friedman, Friedman Law Offices, PLLC, Washington, DC, Michael D. Donovan, Noah I. Axler, Donavan Axler, LLC, Philadelphia, PA, for Pearl E. Cohen, On Behalf of Herself and All Others Similarly Situated.

Burt M. Rublin, David H. Pittinsky, Geoffrey A. Kahn, Melissa E. Scott, Evan Krick, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Chicago Title Insurance Company.

**MEMORANDUM**

JUAN R. SÁNCHEZ, District Judge.

*1 Plaintiff Pearl E. Cohen brings this suit on behalf of herself and similarly situated class members against Chicago Title Insurance Company (Chicago) alleging Chicago overcharged her and the other class members for title insurance they obtained in refinancing their mortgages. At the parties' request, this case was placed in suspense pending the Pennsylvania Supreme Court's review of *White v. Conestoga Title Insurance Co.,* 982 A.2d 997 (Pa.Super.Ct.2009). Following the issuance of the decision, the case was removed from suspense. Chicago filed a renewed motion to decertify the class. Cohen filed a motion for partial summary judgment. For the following reasons, this Court will grant Chicago's

motion to decertify the class and deny Cohen's motion for partial summary judgment.

**FACTS** [1]

Chicago is a title insurance provider. Title insurance guarantees the purchaser of a parcel of property owns the property free and clear of all liens and encumbrances except as specifically disclosed in the title insurance policy. All title insurers providing such insurance in Pennsylvania, including Chicago, are governed by the Pennsylvania Title Insurance Companies Act, 40 Pa. Stat. Ann. § 910–1 *et seq.,* which regulates title insurers and the rates they may charge for title insurance policies. The statute requires title insurers to either (1) file their own individual proposed rate with the Insurance Commissioner, *id.* § 910–37(a); or (2) elect to become a member of a rating organization that files proposed rates on behalf of all members of the organization, *id.* § 910–37(b).

Chicago issues two kinds of title insurance policies, owner's policies and lender's policies. When a consumer buys real property in Pennsylvania, the consumer typically purchases an owner's title insurance policy. The lender's policy insures the lender/mortgagee and protects the lender's security interest in the property. It usually provides coverage in the amount equal to the secured loan. Chicago is a member of the Title Insurance Rating Bureau of Pennsylvania (TIRBOP). TIRBOP submits its proposed rates to the Insurance Commissioner for approval. The approved rates and regulations governing how the rates are applied are set forth in the Manual of Title Insurance Rating (Rate Manual). The Rate Manual contains the rates that TIRBOP members must be charged, and it is unlawful not to charge customers such rates.

There are three different rate tiers: (1) the basic rate, (2) the reissue rate, which is 90% of the basic rate, and (3) the refinance rate, which is 80% of the reissue rate. [2] The basic rate is the default rate charged to consumers. The reissue and refinance rates are discounted rates given to a purchaser when only a few years have passed since the issuance of a title insurance policy.

In 2002, Cohen and her husband decided to refinance their home. They had previously obtained three loans secured by mortgages on their property located at 130 West Pomona Street, Philadelphia: (1) a loan from the Department of Housing and Urban Development in the amount of $8,900, recorded on September 10, 1969; (2) a loan from Class

Cohen v. Chicago Title Ins. Co., Not Reported in F.Supp.2d (2013)

2013 WL 842706

Exteriors in the amount of $18,868, recorded on November 14, 1997; and (3) a loan from Capstone Mortgage Corporation in the amount of $44,175, recorded on March 19, 1999.

**\*2** As a part of the refinancing, Cohen's lender requested that she purchase a lender's title insurance policy. Cohen sought title insurance from Chicago through its agent, Chelsea Land Transfer, Inc. (Chelsea), which provided the closing and settlement services to Cohen. Maria Rozniakowski, an employee of Chelsea, handled Cohen's transaction. Chelsea issued a lender's title insurer policy on behalf of Chicago to Cohen with a face value of $57,600. At closing, Cohen signed the settlement sheet, known as the HUD–1. Line 1108 of Cohen's HUD–1 stated Chicago charged Cohen $606.75, the basic rate, for the lender's policy. Cohen argues she was overcharged because she had bought title insurance within the previous three years and was thus entitled to the refinance rate.

On January 27, 2006, Cohen filed a suit in the Philadelphia Court of Common Pleas against Chicago asserting the following causes of action: (1) money had and received; (2) "unjust enrichment/account/disgorgement/restitution"; and (3) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL). On February 28, 2006, Chicago removed the case to this Court. On December 4, 2006, Cohen filed a motion for class certification. On April 9, 2007, this Court issued a Memorandum and Order certifying the following class:

> All persons or entities in the Commonwealth of Pennsylvania who within 10 years of having previously purchased title insurance in connection with their mortgages or fee interests, refinanced the identical mortgage or fee interest, were charged a title insurance premium by Chicago Title that did not include the applicable premium discount for title insurance on file with the Pennsylvania Insurance Commissioner.

Order filed April 9, 2007, ECF No. 38. On February 2, 2009, this Court denied Chicago's motion to decertify the class as to the UTPCPL claim without prejudice to its reassertion prior to trial. ECF No. 78.

On July 15, 2010, following an oral argument, this Court granted the parties' joint motion to stay the case pending the Pennsylvania Supreme Court's review of *White v. Conestoga Title Insurance Company,* 982 A.2d 997 (Pa.Super.Ct.2009). The case was thereafter placed in suspense. The Supreme Court issued its decision in *White* in August 2012. After the case was removed from suspense, Chicago filed a renewed motion to decertify the class. Cohen filed a motion for partial summary judgment as to liability. Cohen's only remaining claim is her claim pursuant to the "catch-all" provision of the UTPCPL, 73 Pa. Stat. Ann. §§ 201–9.2, 201–2(4)(xxi). [3]

## DISCUSSION

### A. Chicago's Motion to Decertify the Class

Under Federal Rule of Civil Procedure 23(c)(1)(C), "an order that grants or denies class certification may be altered or amended before final judgment." Fed.R.Civ.P. 23(c)(1)(C). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Chicago moves to decertify the class based on intervening case law clarifying the elements of a UTPCPL catch-all claim, as well as changes in the legal landscape pertaining to class actions.

**\*3** The UTPCPL provides a person who "purchases or leases goods or services primarily for personal, family or household purposes" and suffers an ascertainable loss as a result of the use or employment by any person of a method, act, or practice declared unlawful by the statute may bring a private cause of action to recover damages. 73 Pa. Stat. Ann. § 201–9.2. The statute prohibits a range of unfair and deceptive practices, including a catch-all provision, which prohibits "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." *Id.* § 201–2(4)(xxi). To succeed on a claim under this provision, "a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports., Inc.,* 578 Pa. 479, 854 A.2d 425, 438 (Pa.2004) (citations omitted).

Chicago argues decertification is warranted in light of the Third Circuit's holding in *Hunt v. United States Tobacco Company,* 538 F.3d 217 (3d Cir.2008), a decision issued after this Court certified the class in the instant case. In *Hunt,* the Court held the Pennsylvania Supreme Court has "categorically and repeatedly stated that, due to the causation

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 19 of 230
**Cohen v. Chicago Title Ins. Co., Not Reported in F.Supp.2d (2013)**
2013 WL 842706

requirement in the Consumer Protection Law's standing provision, 73 Pa. Stat. Ann. § 201–9.2(a) (permitting suit by private plaintiffs who suffer loss 'as a result of' the defendant's deception), a private plaintiff pursuing a claim under the statute must prove justifiable reliance." *Hunt,* 538 F.3d at 221. In addition, the Court held reliance generally cannot be presumed. *Id.* at 227.

The Third Circuit noted the Superior Court has recognized a narrow exception to this rule, allowing a presumption of reliance when the parties are in a fiduciary relationship. *See Hunt,* 538 F.3d at 227 n. 17 (citing *Debbs v. Chrysler Corp.,* 810 A.2d 137, 157 (Pa.Super.Ct.2002)). A fiduciary relationship exists where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *In re Johnson,* 292 B.R. 821, 828 (Bankr.E.D.Pa.2003) (citation omitted). Generally, in Pennsylvania, insurers do not owe a fiduciary duty to their insureds. *Allen–Wright v. Allstate Ins. Co.,* No. 07–4087, 2008 WL 5336701, at *6 (quoting *Smith v. Berg.,* No. 99–2133, 2000 WL 365949, at *14–15 (E.D.Pa. Apr.10, 2000)). Pennsylvania law is clear that "the relationship between the insurance agent and the purchaser reflects 'the quintessential arm's-length relationship, that of seller and buyer, ... rather than a confidential relationship." *In re Glauser,* 365 B.R. 531, 537 (Bankr.E.D.Pa.2007) (citation omitted); *see Contawe v. Crescent Heights of Am. Inc.,* No. 04–2304, 2004 WL 2244538, at *5 (E.D.Pa. Oct.1, 2004) ("Plaintiffs' claim fails because Pennsylvania does not, absent special or unusual facts, recognize a fiduciary relationship between a title insurance agent and a purchaser of real estate." (citing *In re Johnson,* 292 B.R. at 828)).

**\*4** The holding in *Hunt* creates a difficult obstacle for a plaintiff pursuing a class action based on the UTPCPL's catch-all provision. One of the prerequisites for class action certification is that there are questions of law or fact common to the class. *See* Fed.R.Civ.P. 23(a)(2). In addition, Rule 23(b)(3) requires common questions of law or fact predominate over any question affecting only individual members. Fed.R.Civ.P. 23(b) (3). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Whether a plaintiff's reliance on a defendant's deceptive conduct was justifiable is " 'typically a question of fact for the fact-finder to decide,

and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction.' " *Johnson v. MetLife Bank, N.A.,* 883 F.Supp.2d 542, 548–49 (E.D.Pa.2012) (citation omitted). Thus, numerous courts have not certified or have decertified classes pursuing UTPCPL claims, finding the justifiable reliance requirement makes individual issues predominate over issues common to the class. [4]

Chicago argues this Court should decertify the class based on the *Hunt* decision and because the class previously certified does not meet all of the requirements of a class action. Chicago argues Cohen must demonstrate she, as well as each of the class members, justifiably relied on a HUD–1 containing a misrepresentation of the title insurance rate. Chicago contends there was no misrepresentation, as line 1108 of Cohen's HUD–1 simply stated what Cohen actually paid for the insurance, not what she should have paid. Chicago claims the Court would need to determine whether each class member read line 1108 of the HUD–1 and relied on it, and asserts these individual inquiries predominate over class issues. Also, Chicago argues Cohen cannot rely on the limited exception to the requirement to prove justifiable reliance because it did not have a fiduciary relationship with Cohen or the class members. Even if the Court were to find such relationships may have existed, the Court would be required to engage in individualized inquiries to determine if such a relationship did in fact exist. Furthermore, Chicago submits the Court would have to determine whether each member was entitled to the reissue or refinance discounted rate on a case-by-case basis. The currently defined class includes individuals who obtained reissue or refinance rates based on different Rate Manuals.

Cohen opposes decertification of the class, arguing individual issues do not predominate over class-wide issues. Cohen argues *Hunt* provides no basis for decertifying the class, because *Hunt* is factually different and does not require justifiable reliance in every case. Cohen further contends the UTPCPL does not require proof of common law fraud, which includes an element of justifiable reliance. However, even if justifiable reliance is required, Cohen argues she and the class members may demonstrate such reliance based on the representations in the HUD–1. Cohen argues Chicago engaged in deceptive conduct when it presented consumers with purportedly correct and lawful rates under the Rate Manual which were in fact overcharges. Cohen argues the HUD–1 was prepared by a Chicago agent and required in every transaction. The common question among the class

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 20 of 230
**Cohen v. Chicago Title Ins. Co., Not Reported in F.Supp.2d (2013)**
2013 WL 842706

members is whether Chicago engaged in "deceptive conduct" by not disclosing the discounted rates.

**\*5** Cohen also argues reliance may be presumed under the circumstances in this case. She maintains her and the class members' reliance on the representations in the HUD–1 can be "easily inferred," and may be presumed because the class members are in a confidential/special relationship with Chicago. With respect to each class member's entitlement to discounted rates, she also argues if the Rate Manual is ambiguous as to who was entitled to a discount, then the rates and regulations should be construed in favor of the insured.

The Court finds Cohen cannot maintain a class action for a violation of the UTPCPL's catch-all provision because the need to show justifiable reliance on Chicago's deceptive conduct renders such claims unsuitable for class treatment. Justifiable reliance requires an individual inquiry into each of the class member's transactions with Chicago. The individual questions of justifiable reliance, misrepresentation, and entitlement of a discount would be questions of both law and fact affecting individual class members, which would predominate over the issues common to the class. Therefore, the Court will decertify the class.

Cohen's argument that *Hunt* does not impose a requirement that a plaintiff prove justifiable reliance to successfully assert a UTPCPL catch-all claim is inaccurate, as the Third Circuit in *Hunt* explicitly stated such a requirement. *Hunt,* 538 F.3d at 227. Cohen relies on two cases, *Slapikas v. First American Title Insurance Co.,* No. 06–84, 2010 WL 3222129 (W.D.Pa. Aug.13, 2010) and *Markocki v. Old Republic National Title Insurance Co.,* 254 F.R.D. 242 (E.D.Pa.2008), in support of her argument that reliance may be presumed or inferred based on the circumstances in this case. In particular, Cohen argues a consumer would reasonably expect to be charged a lawful rate and would not elect to pay a hire charge had they known about the discount. However *Slapikas* and *Markocki* did not discuss justifiable reliance or *Hunt,* thus this Court does not find them persuasive.[5]

Cohen also claims Chicago maintained a fiduciary relationship with her by assuming "overmastering influence" over the title insurance transaction, through use of its standardized HUD–1 and maintains she had no role or input in the process until the closing. This alone does not demonstrate that there was a fiduciary relationship. *See Allen–Wright,* 2008 WL 5336701, at \*7. Further, determining whether the class members had a fiduciary relationship with Chicago

would also involve individual inquiries and demonstrates lack of commonality and predominance.

The Court notes the suitability of giving class treatment to these types of cases. *See Corwin v. Lawyers Title Ins. Co.,* 276 F.R.D. 484, 490 (E.D.Mich.2011) ("Certainly, because of the small amounts of damages involved in each overcharged transaction, class treatment of the claims might otherwise be appropriate. However, 'because the [plaintiff has] defined the class and presented [her] claim in a manner that requires substantial, individual inquiries,' ... class issues cannot predominate when the resolution of those common issues in the plaintiff's favor could not result in a finding of liability against the defendant on a classwide basis."). However, this Court is constrained by the Third Circuit's holding in *Hunt* that a plaintiff pursuing a claim under the UTPCPL catch-all provision must show justifiable reliance. Because this requirement causes individual issues to predominate over issues common to the class, the Court will decertify the class.[6]

### B. Cohen's Motion for Partial Summary Judgment

**\*6** Cohen moves for partial summary judgment as to liability.[7] A court may grant summary judgment where the moving party demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of proving no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 587. "[T]he non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].' " *Burton v. Teleflex Inc.,* No. 11–3752, 2013 WL 616973, at \*4 (3d Cir. Feb.20, 2013) (quoting *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir.2007)).

Cohen argues the HUD–1 contained all the necessary information which entitled her to a discounted refinance rate, yet Chicago charged her the basic rate. She argues she demonstrated justifiable reliance in the purchase of the insurance policy and reliance on the legitimacy of the title

2013 WL 842706

insurance process. Chicago breached the implied contract it had with every consumer to charge the correct rate. She relied on written representations in the HUD–1, which states all of the verifications in the document were "true and accurate." She also argues reliance may be presumed through a fiduciary relationship, as Chicago assumed "overmastering influence" during the entire title insurance transaction. Accordingly, she claims she can satisfy all of the elements of the UTPCPL claim and this Court should grant summary judgment in her favor.

Chicago argues Cohen has not proven justifiable reliance. There is no evidence she read line 1108 of the HUD–1 or that she relied on it. Furthermore, reliance may not be presumed. Alternatively, Chicago contends Cohen was not entitled to a discount rate and properly charged the basic rate. The Rate Manual in effect at the time of the transaction required the borrower to provide evidence of a prior insurance policy in order to receive a discounted rate. Chicago argues, because Cohen did not provide such evidence to the title agent, she was not entitled to the discounted rate.

As stated above, justifiable reliance is a required element of a UTPCPL claim, *Hunt,* 538 F.3d at 221, and it cannot be presumed, *id.* at 227. "To show justifiable reliance a plaintiff must provide evidence demonstrating how his knowledge of a mortgage loan's actual terms would have altered his decision to execute the mortgage." *Laidley v. Johnson,* No. 09–395, 2011 WL 2784807, at *3 (E.D.Pa. July 11, 2011). " '[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction.' " *Levine v. First Am. Title Ins. Co.,* 682 F.Supp.2d 442, 467 (E.D.Pa.2010) (quoting *Toy v. Metro. Life Ins. Co.,* 593 Pa. 20, 928 A.2d 186, 208 (Pa.Super.Ct.2007).

**\*7** Cohen has not presented the Court with any evidence that she relied on the HUD–1 other than asserting general and conclusory arguments that the purchase of the title insurance demonstrates reliance or that a consumer would expect to receive an entitled discounted rate and be charged accordingly. In support of her argument, she cites cases that have addressed these principals in the contexts of motions to dismiss or motions granting class certification. As Cohen's case is at a motion for partial summary judgment stage, she fails to provide the court with sufficient evidence that she justifiably relied on the contents of the HUD–1 such that she would have acted differently had she known of the overcharge. *See Hunt,* 538 F.3d at 227. Furthermore, this factual determination is typically left to the finder of fact, which makes this case inappropriate for summary judgment. [8] Thus, Cohen's motion will be denied.

An appropriate Order follows.

### ORDER

AND NOW, this 7th day of March, 2013, it is ORDERED Defendant Chicago Title Insurance Company's Renewed Motion to Decertify the Class (Document 152) is GRANTED. The class previously certified in this Court's Order docketed April 9, 2007 (Document 38) is DECERTIFIED.

It is further ORDERED Plaintiff Pearl E. Cohen's Motion for Partial Summary Judgment (Document 151) is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 842706

---

## Footnotes

1    The Court recites the parties' undisputed facts from Cohen's and Chicago's statements of facts submitted in support of and in opposition to Cohen's motion for partial summary judgment.

2    The refinance provision in the Rate Manual, which both Cohen and Chicago submitted to the Court, states in relevant part:

When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property

Cohen v. Chicago Title Ins. Co., Not Reported in F.Supp.2d (2013)
2013 WL 842706

    previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate.

    Def.'s Br. in Opp'n. Ex. B, "Rate Manual," Section 5.6.

3    It appears Cohen is no longer pursuing her common law claims of money had and received and unjust enrichment. Cohen does not move for summary judgment as to those common law claims.

4    *See Lewis v. Ford Motor Co.,* 263 F.R.D. 252, 264 (W.D.Pa.2009) (denying class certification in a UTPCPL action because "each class member would have to show not only justifiable reliance but also loss as a result of that reliance, aspects subject to individual, rather than common questions of law or fact," and concluding "that such lack of commonality renders this case unsuitable for class treatment"); *Kondratick v. Beneficial Consumer Disc. Co.,* No. 04–4895, 2006 WL 305399, at *7 (E.D.Pa. Feb.8, 2006) (holding an "unfair trade practices claim under UTPCPL cannot be certified for class treatment because UTPCPL claims require an individualized examination of reliance, causation, and damages"); *Dawson v. Dovenmuehle Mortg., Inc.,* 214 F.R.D. 196, 201 (E.D.Pa.2003) ("Because reliance is an essential element that must be proven in UTPCPL claims and other state consumer fraud claims, the court finds that individual questions of law and fact predominate over any common questions with respect to the pending claim, thereby precluding class certification pursuant to Rule 23(b) (3)."); *Debbs,* 810 A.2d at 158 ("[T]he trial court erred when it concluded that the commonality requirement was met because common law fraud and fraud under UTPCPL require an individualized showing of reliance on a fraudulent statement.").

5    On March 5, 2013, Cohen also submitted a "Notice of Supplemental Authority" citing a United States Supreme Court case *Amgen Incorporated v. Connecticut Retirement Plans and Trust Funds,* —— U.S. –– – –, 133S.Ct. 1184, —— L.Ed.2d – – – – , 2013 WL 691001 (2013). She argues the case is relevant to Chicago's motion to decertify the class. However, *Amgen* involves a securities case where reliance may be presumed. Such securities cases were considered by the Court in *Hunt,* and the Court found the presumption of reliance in such securities cases is inapplicable in UTPCPL cases. *Hunt,* 538 F.3d at 228. Similarly, this Court rejects this supplemental authority and its application to the present class decertification motion.

6    Cohen also requested the Court appoint a special master to determine the actual damages suffered by the class members. In light of the Court's ruling in decertifying the class, this request will be denied as moot.

7    On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *See Hugh v. Butler County Family YMCA,* 418 F.3d 265, 267 (3d Cir.2005) (citing *Marzano v. Computer Sci. Corp.,* 91 F.3d 497, 501 (3d Cir.1996)).

8    The Court will defer its ruling on Chicago's alternative argument based on the interpretation and application of the different Rate Manuals.

---

**End of Document**        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**4**

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 24 of 230

Dawson v. Great Lakes Education Loan Services, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5415096

2016 WL 5415096
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Meredith D. DAWSON, Plaintiff,

v.

GREAT LAKES EDUCATION LOAN SERVICES,
INC., Great Lakes Higher Education Corporation, Jill
Leitl, David Lentz and Michael Walker, Defendants.

15-cv-475-bbc
|
Signed 09/28/2016

**Attorneys and Law Firms**

David J. Harris, Jr., Jeffrey Robert Krinsk, Trenton R.
Kashima, William R. Restis, Finkelstein & Krinsk LLP, San
Diego, CA, for Plaintiff.

Thomas L. Shriner, Jr., Aaron Russell Wegrzyn, Elizabeth A.
N. Haas, Eric G. Pearson, Foley & Lardner LLP, Milwaukee,
WI, Michael D. Leffel, Foley & Lardner, Madison, WI, for
Defendants.


OPINION AND ORDER

BARBARA B. CRABB, District Judge

*1  Plaintiff Meredith D. Dawson has filed this putative
class action lawsuit against defendants Great Lakes
Education Loan Services, Inc., Great Lakes Higher Education
Corporation and certain Great Lakes Education Loan
Services, Inc. executives. She contends that defendants
violated the Racketeer Influenced and Corrupt Organizations
Act (18 U.S.C. §§ 1961-1964) (RICO), were negligent in
capitalizing certain types of interest that had accrued on
plaintiff's loans and made negligent misrepresentations in
connection with their actions.

Presently before the court is plaintiff's motion for class
certification under Fed. R. Civ. P. 23(b)(3), which I am
denying. At this stage of the litigation, plaintiff's claims
remain too vague and her injury too ill-defined to enable
the court to conduct the necessary inquiry into whether Rule
23(a) and Rule 23(b)(3)'s requirements are met. I will give
her an opportunity to submit additional briefing in support of

her motion for class certification and I will deny defendants'
motion to submit supplemental briefing as moot.

From the declarations, depositions and other materials
submitted by the parties, I find the following facts for the
purpose of deciding plaintiff's motion for class certification.


BACKGROUND

Great Lakes Education Loan Service, Inc. and Great Lakes
Higher Education Corporation are student loan servicing
companies that contract with the United States Department of
Education to service borrowers' accounts. (The parties do not
distinguish between these two entities in their briefs, so I will
refer to them collectively as "Great Lakes.") Defendants Jill
Leitl, David Lentz and Michael Walker are officers for Great
Lakes.

The majority of loans made by Great Lakes are held by the
Department of Education under the Federal Family Education
Loan program (FFEL loans) or the William D. Ford Direct
Loan program (Direct loans). Plaintiff took out both FFEL
loans and Direct loans serviced by Great Lakes.

The interest rates borrowers must pay on FFEL loans and
Direct loans are determined by Congress. Generally, interest
that accrues on student loans is subject to capitalization,
which is the process by which unpaid interest is added to
the principal balance. Once added to the principal balance,
additional interest accrues on that capitalized amount. The
Department of Education promulgates rules and provides
guidance for capitalizing accrued interest.

The general rule is that accrued interest is capitalized when the
interest accrues. However, during a B-9 Forbearance period,
the borrower's monthly payment obligations are suspended
for up to 60 days while Great Lakes processes certain
paperwork related to a borrower's request to switch repayment
plans. Government regulations clearly provide that interest
that accrues during a B-9 Forbearance ("intra-forbearance
interest") is not subject to capitalization. However, the
regulations do not make it clear whether the conclusion
of a B-9 Forbearance qualifies as a "triggering event" for
purposes of capitalizing the interest that accrued *prior* to the
forbearance (so-called "pre-forbearance interest"). Between
2009 and September 2014, Great Lakes generally capitalized
accrued pre-forbearance interest at the conclusion of the B-9
Forbearance period. The parties cite conflicting evidence on

Dawson v. Great Lakes Education Loan Services, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5415096

the questions whether this practice was prohibited by the governing regulations, what guidance defendants received from the Department and the nature of the borrowers' master promissory notes.

**\*2** On October 3, 2013, plaintiff's loans were placed into a B-9 Forbearance period while she applied for a switch from a standard repayment plan to an "income driven repayment plan." Her application for an income driven repayment plan was approved. At the conclusion of the B-9 Forbearance on November 28, 2013, Great Lakes capitalized $819.65 worth of accrued interest on her loan, which included interest accrued during the B-9 Forbearance period. Plaintiff filed suit on July 31, 2015, contending that the capitalization of this interest was "illegal" and in violation of the regulations prohibiting the capitalization of intra-forbearance interest. Great Lakes determined that its system was programmed so that generally intra-forbearance interest was not capitalized. However, it discovered two errors that had improperly inflated plaintiff's principal balance. First, Great Lakes had mistakenly programmed its system so that only the interest that accrued up to, rather than through, the sixtieth day of the B-9 Forbearance period was exempt from capitalization. In other words, Great Lakes was improperly capitalizing one day of B-9 Forbearance interest. This single day of B-9 Forbearance interest represented $4.09 of the $819.65 plaintiff contends was illegally capitalized. Second, payments being made during the B-9 Forbearance period were being credited improperly against intra-forbearance interest before being credited against pre-forbearance interest. By applying plaintiff's payment to the intra-forbearance interest first, Great Lakes allowed $125.78 of plaintiff's pre-forbearance interest to be capitalized. Neither error was identified specifically in the complaint and defendants assert that they have corrected these programming errors and rectified plaintiff's and all other borrowers' accounts.

## OPINION

Plaintiff has moved to certify a class under Fed. R. Civ. P. 23(b)(3). Before I can consider whether certification is appropriate under that rule, I must determine whether plaintiff has met the requirements set forth in Fed. R. Civ. P. 23(a), which provides that class certification is appropriate only when "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses

of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If those threshold requirements are met, I must then determine whether plaintiff has met Rule 23(b)(3)'s requirements that "common questions of law and fact predominate over individual questions" and that a class action is "superior" to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). It is plaintiff's burden to establish that each of these elements is met. Retired Chicago Police Association v. City of Chicago, 7 F.3d 584, 596 (7th Cir. 1993).

In deciding a motion for class certification, the court cannot accept the parties' assertions at face value. Instead, the court must "look beyond pleadings in order to properly understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful decision on class certification, as it must consider how a trial on the merits would be conducted." Joseph M. McLaughlin, McLaughlin on Class Actions § 3:12 (11th ed. 2014) (citing Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)). After reviewing plaintiff's complaint and the parties' class certification materials, I conclude that plaintiff's claims and her alleged injuries are too vague to enable the court to conduct the "rigorous analysis" required by Rule 23.

### A. Plaintiff's Class is Overbroad

Plaintiff requests certification of the following class:

> All persons who, between January 1, 2006 and the present: (i) were borrowers of a student loan issued under the Federal Family Education Loan Program ("FFEL" or "FFELP"), or of a student loan issued under the Federal Direct Loan Program ("Direct"); (ii) had their FFELP and/ or Direct student loan(s) serviced by Great Lakes Educational Loan Services, Inc. or Great Lakes Higher Education Corporation (collectively, "Great Lakes"); **and** (iii) had Great Lakes place their FFELP and/or Direct student loan(s) in an administrative forbearance status for a period of up to 60 days, concurrent with the processing of their application for a

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 26 of 230

Dawson v. Great Lakes Education Loan Services, Inc., Not Reported in Fed. Supp. (2016)
2016 WL 5415096

deferment, forbearance, consolidation
loan, or change in repayment plan.

Plt.'s Br., dkt. #55, at 1. The problem with this definition
is that it includes all borrowers that were subject to a B-9
Forbearance, regardless whether any of the interest that
accrued on their accounts was capitalized, either before or
during that forbearance. It is clear there was no injury to the
individuals whose loans were placed in a B-9 Forbearance
status, but were not subject to the capitalization of any of
their intra-forbearance interest, or to the individuals for whom
the conclusion of this forbearance period was not a triggering
event for interest capitalization purposes.

**\*3** A district court cannot certify a class including a large
number of persons that have not suffered a tangible injury.
Kohen v. Pacific Investment Management Co. LLC, 571
F.3d 672, 677-78 (7th Cir. 2009) ("[A] class should not
be certified if it is apparent that it contains a great many
persons who have suffered no injury at the hands of the
defendant[.]"); Oshana v. Coca-Cola Co., 472 F.3d 506, 514
(7th Cir. 2006) (denying class certification where a proposed
class definition included "countless members" who could
not "show any damage"). If plaintiff decides to refile her
motion for class certification, at a minimum, her proposed
class must be limited to individuals who were subject to either
the capitalization of intra-forbearance interest or who had pre-
forbearance interest capitalized at the conclusion of their B-9
Forbearance period.

**B. Plaintiff's Claim are Too Vague for Class Certification**

An additional and equally significant problem with plaintiff's
motion for class certification is that her claims are too vague
and ill-defined to allow the court to conduct the necessary
Rule 23 analysis. Without additional details regarding
plaintiff's claims, her legal theories and the particular issues
that need to be decided, I cannot determine whether there are
a sufficient number of putative class members with identical
claims, whether plaintiff's claims are typical of those she
seeks to represent, which issues are common among the
class and whether those common issues predominate over
issues that will require individualized proof. I will set forth
the concerns I have regarding whether plaintiff's claims are
subject to class-wide adjudication so that plaintiff can attempt
to address them if she files any subsequent motions for class
certification.

**1. Plaintiff's theory as to defendants' wrongful conduct**
Plaintiff's civil RICO, negligent misrepresentation and
negligence claims against defendants all hinge on her
contention that defendants "wrongfully capitalized a total of
$819.65 in B-9 Interest on [her] FFELP and Direct loans."
However, plaintiff is equivocal as to why the capitalization of
this amount was wrongful. Throughout her class certification
materials, she raises at least three disparate theories without
clearly committing to any one of them. Plaintiff's failure to
clarify the basis for her belief that defendants' capitalization
of her interest was improper precludes class certification
because some of her theories may be more amenable to
class certification than others and the scope of the class will
necessarily vary depending upon which theory she intends to
pursue.

The theory that comes across most clearly in her complaint
is her theory that the $819.65 in wrongfully capitalized
interest was interest that accrued during the B-9 Forbearance
period. As I have noted, the capitalization of intra-forbearance
interest is clearly prohibited by the applicable regulations,
see, e.g., 34 C.F.R. §§ 682.11(f), 682.11(f)(11) ("Interest
that accrues during [a B-9 Forbearance] period is not
capitalized."), thereby lending strong legal support for this
theory. However, in her motion for class certification,
plaintiff appears to back away from her "intra-forbearance
capitalization" theory. As defendants point out, their system
was always programmed so that intra-forbearance interest
was not capitalized. (Although defendants identified a
programming error that led to the capitalization of one day of
intra-forbearance interest, I am construing this capitalization
issue as separate and distinct from the willful capitalization
of *all* B-9 Forbearance interest described in the complaint.).
If plaintiff is pursuing a theory that her intra-forbearance
interest was improperly capitalized, she should say so and
the proposed class (or a subclass) should be limited to
those individuals that were subject to the same specific
capitalization error.

**\*4** The theory that plaintiff now appears to be pursuing
at the class certification stage is that defendants' practice
of capitalizing her pre-forbearance interest at the conclusion
of a B-9 Forbearance was improper. I have a number of
reservations about the merits of this claim, including (1) the
basis for plaintiff's belief that this capitalization practice was
improper; (2) whether the ambiguity inherent in the governing
regulations and the department's guidance is fatal to plaintiff's
civil RICO fraud claim; and (3) how plaintiff was injured

2016 WL 5415096

by the capitalization of her pre-forbearance interest at the conclusion of her B-9 Forbearance period if that interest was subject to eventual capitalization anyway. However, these issues are better suited for resolution in a motion for summary judgment. At this stage, all that is necessary for plaintiff to do is decide whether this is the theory she is pursuing, so that the class or a subclass can be defined accordingly.

Finally, plaintiff appears to be relying, at least in part, on the two programming errors defendants identified while investigating plaintiff's claims. However, I will not certify a claims based on these two errors. They are too far removed from the claims plaintiff alleged in her complaint. First, defendants admit that Great Lakes' practice of crediting payments against intra-forbearance interest before pre-forbearance interest was improper, but that practice has nothing to do with plaintiff's claim that defendants wrongfully capitalized $819.65 worth of interest at the conclusion of her B-9 Forbearance. Rather, this issue relates to the rules governing the application of payments to an account, not to how a B-9 Forbearance affects the capitalization of interest. Second, plaintiff did not raise any claim in her complaint about programming errors that caused a single day of intra-forbearance interest to be capitalized in her account. Moreover, with respect to both of these issues, it does not appear that plaintiff disputes defendants' contention that these errors have been corrected and that all affected borrowers' accounts have been rectified. If plaintiff wishes to certify a class based on these alleged errors, she will have to obtain leave to file an amended complaint.

2. Plaintiff's injury

In addition to the ambiguity surrounding plaintiff's contention that the capitalization of her interest was wrongful, class certification is not possible at this stage because plaintiff's alleged injury is too vague. To obtain class certification, plaintiff must identify her alleged injury and show that the class suffered the same type of injury. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law.") (internal citations and quotations omitted). Plaintiff is proceeding against defendants on a civil RICO fraud claim, a negligent misrepresentation claim and a common law negligence claim, all three of which require proof of injury. Plaintiff states that she was injured by being "overcharged," but she does not state whether she ever submitted a payment in excess of the amount she actually owes.

Plaintiff cites Bible v. United Student Aid Funds, Inc., 799 F.3d 633, 651 (7th Cir. 2015), for the proposition that simply receiving an inflated accounted statement is enough to state a claim. However, Bible is inapposite. The issue in that case was whether the plaintiff had pleaded damages in the context of a breach of contract claim. Here plaintiff is asserting tort claims, including a civil RICO fraud claim, which requires tangible and concrete financial losses to business or property. In other words, there must be an "out-of-pocket" loss. See, e.g., Evans v. City of Chicago, 434 F.3d 916, 925-26 (7th Cir. 2006) ("[E]very court that has addressed this issue has held that injuries proferred by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to speculative and amorphous."), overruled on other grounds, Hill v. Tangherlini, 724 F.3d 965 (7th Cir. 2013); In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation, 155 F. Supp. 2d 1069, 1091 (S.D. Ind. 2001) ("Federal courts have consistently and repeatedly held that to satisfy the injury requirements of [a civil RICO claim], a plaintiff must prove an actual, concrete monetary loss (i.e., an 'out-of-pocket' loss).").

*5 Identifying plaintiff's injury is necessary for defining the scope of the class. It is also necessary for confirming that plaintiff has standing to maintain her claims in the first place. At least with respect to plaintiff's civil RICO claim, courts have consistently held that alleging a cognizable injury under RICO is a jurisdictional standing issue. Evans, 434 F.3d at 924 ("The phrase 'injured in business or property' has been interpreted as a standing requirement—rather than an element of the cause of action—which must be satisfied in order to prevail on a RICO claim.... As such, the issue represents a jurisdictional requirement which remains open to review at all stages of the litigation.") (internal quotations and citations omitted); Gagan v. American Cablevision, Inc., 77 F.3d 951, 958-59 (7th Cir. 1996). Although defendants argue that plaintiff lacks standing to sue, this issue cannot be addressed until after plaintiff provides further details regarding the exact nature of her alleged injuries. Therefore, if plaintiff clarifies the scope of her claims and the harm she contends she has suffered, the parties may submit additional briefing on the issue of plaintiff's standing: in particular, whether she has suffered an "injury" for Article III purposes.

ORDER

IT IS ORDERED that

Dawson v. Great Lakes Education Loan Services, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 5415096

1. Plaintiff Meredith D. Dawson's motion to certify a class under Rule 23, dkt. #54, is DENIED. If plaintiff wishes to try again to show that a class would be proper in this case, she may have until October 20, 2016 to file a renewed motion for class certification addressing the issues identified in this order. Defendants Great Lakes Educational Loan Services, Inc., Great Lakes Higher Education Corporation, Jill Leitl, David Lenz and Michael Walker may have 21 days after plaintiff files her renewed motion in which to file a response brief. Plaintiff's reply shall be filed within 10 days of the filing of defendants' response brief.

2. Plaintiff's motion to compel production of defendants' email and instant messages, dkt. #73, is DENIED as moot.

3. Defendants' motion to submit supplemental briefing, dkt. #83, is DENIED as moot.

Entered this 28th day of September, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5415096

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**5**

2025 WL 2644747
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Makiko FUKAYA, Plaintiff,

v.

DAISO CALIFORNIA LLC, Defendant.

Case No. 23-cv-00099-RFL
|
Signed September 15, 2025

**Attorneys and Law Firms**

Ara R. Jabagchourian, Law Offices of Ara Jabagchourian, P.C., San Mateo, CA, for Plaintiff.

Sean P. Flynn, Tomiko Angelina-Cairo Ortiz, Gordon Rees Scully Mansukhani, LLP, Reno, NV, for Defendant.

**ORDER DENYING MOTION TO CERTIFY CLASS**

Re: Dkt. No. 102, 113

RITA F. LIN, United States District Judge

**I. INTRODUCTION**

*1 In this putative class action, Plaintiff Makiko Fukaya alleges that Defendant Daiso California LLC failed to properly label its pre-packaged food products as containing tree nuts on its English-language ingredient lists. Fukaya, individually and on behalf of those similarly situated, alleges that Daiso's improper labeling violates California's Unfair Competition Law ("UCL"), Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and constitutes a breach of express warranty. Fukaya filed a motion for class certification on May 29, 2025. (Dkt. Nos. 102, 113.) For the reasons stated below, Fukaya's motion for class certification is **DENIED**. With respect to the proposed restitutionary relief classes, individualized questions regarding reliance, causation, and damages are likely to predominate because the classes, as defined, are not limited to purchasers who are allergic to tree nuts or buying for others with such allergies. Even if the classes were redefined, Fukaya has not carried her burden with respect to numerosity and damages. The proposed injunctive relief class also fails because Fukaya has not identified a policy or practice that can be enjoined as to the entire class.

**II. BACKGROUND**

According to the evidence submitted in support of this motion, Fukaya, who is allergic to tree nuts, suffered a severe allergic reaction after eating a Tiramisu Twist Cookie ("Tiramisu") that she purchased from a Daiso in Daly City, California on July 15, 2022. (Dkt. No. 106 ¶ 2.) The English translation of the Tiramisu's ingredient list did not list any tree nuts, but the Japanese ingredient list (which was covered by the English translation) listed two tree nuts: almonds and hazelnuts. (Id.) Fukaya's attorney wrote to Daiso, which recalled the Tiramisu product. (Dkt. No. 114-2; Dkt. No. 114-3 at 8.) [1] Fukaya returned to the Daly City Daiso on December 15, 2022 and purchased a Caramel Corn product. (Id. ¶ 3; Dkt. No. 106-2.) The Caramel Corn had an English ingredient list which did not list any tree nuts, covering a Japanese ingredient list that listed almonds. (Dkt. No. 106 ¶ 3.) Daiso has since recalled the product. (Dkt. No. 114-3 at 7.) Fukaya asserts that she "would go back and purchase more pre-packaged food products from Daiso ..., but [is] concerned about the accuracy of the English language sticker labels." (Dkt. No. 106 ¶ 5.) The record indicates that until the products were recalled, Daiso sold 38,265 units of Tiramisu and 35,984 units of Caramel Corn. (Dkt. No. 113 at 9.) Both products were mislabeled in the same way throughout the sales period. (Dkt. No. 114-1 at 32–33, 46.)

Fukaya seeks to certify classes of individuals who purchased the same products with the mislabeled English ingredient labels that she purchased. (Dkt. No. 103 at 15.) As to each one of her claims, Fukaya alleges that she "and the [ ] Class members would not [have] purchase[d] the Products, but for Defendants' misleading omission that the Products are free of tree nuts." (Dkt. No. 47 ¶¶ 56, 71, 85; see also id. ¶ 101.) Fukaya proposes the following classes:

*2 **A. Restitutionary Relief Classes**

All people who purchased "Tiramisu Twist Cookie" product from a Daiso retail store and resided in the State of California, Arizona, Washington, Nevada, Texas, New Jersey, or New York from October 1, 2019 through October 27, 2022 and who were not directly employed by Daiso. Excluded from the proposed class are Defendants, Defendants' employees, and the Court and its staff.

All people who purchased "Caramel Corn" product from a Daiso retail store and resided in the State of California,

Arizona, Washington, Nevada, Texas, New Jersey, or New York from January 1, 2022 through January 10, 2023 and who were not directly employed by Daiso. Excluded from the proposed class are Defendants, Defendants' employees, and the Court and its staff.

(Dkt. No. 102 at 2.)

### B. Injunctive Relief Class

All people who purchased Tiramisu Twist Cookie and/or Caramel Corn product from a Daiso retail store and resided in the State of California, Arizona, Washington, Nevada, Texas, New Jersey, or New York from October 1, 2019 through January 10, 2023 who were not directly employed by Daiso. Excluded from the proposed class are Defendants, Defendants' employees, and the Court and its staff.

(*Id.*)

## III. LEGAL STANDARD

Class certification requires Fukaya to show, by a preponderance of the evidence, that the four requirements of Rule 23(a) and at least one of the bases for certification under Rule 23(b) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). With respect to Rule 23(a), Fukaya must show "numerosity," "commonality," "typicality," and "adequacy." "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). Class certification is proper only if the trial court has concluded, after a "rigorous analysis," that Rule 23(a) has been satisfied. *Dukes*, 564 U.S. at 351.

With respect to Rule 23(b), Fukaya seeks to show that certification is proper under both 23(b)(3) and 23(b)(2). Rule 23(b)(3) requires a plaintiff to prove the elements of predominance and superiority, such that "questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3). Rule 23(b)(2) requires the Court to find that "the party opposing the class has acted or refused to act on grounds

that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

## IV. DISCUSSION

### A. Restitutionary Relief Classes

#### 1. Predominance

**\*3** The restitutionary relief classes cannot be certified because individualized questions of reliance, causation, and damages are likely to predominate. In seeking to certify a monetary relief class under Rule 23(b)(3), a plaintiff must show that common questions "predominate over any questions affecting only individual members." This requirement presupposes satisfaction of the commonality requirement of Rule 23(a)(2), which itself tests "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015) (citation omitted). But the predominance inquiry goes further and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). The predominance analysis requires a court to evaluate "the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove the common question in one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022) (internal quotation marks omitted).

In most circumstances, misrepresentation-based breach of warranty claims and claims under the CLRA, UCL and FAL are governed by an objective, "reasonable consumer" test. *See Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 713 F. Supp. 3d 660, 672, 675–76 (N.D. Cal. 2024). "Plaintiffs [may] establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation." *Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at \*10 (N.D. Cal. Sept. 25, 2018). "Materiality is an objective standard," *Badella v. Deniro Mktg. LLC*, No. 10-cv-03908-CRB, 2011 WL 5358400, at \*9 (N.D. Cal. Nov. 4, 2011), as a misrepresentation is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in

2025 WL 2644747

question[.]" *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009).

As discussed above, Fukaya's proposed restitutionary classes includes every individual who purchased Tiramisu and Caramel Corn during the time that the products were mislabeled. But Fukaya has not submitted any evidence of why the omission of tree nuts from the English language ingredient list would be material to an objective reasonable consumer. To be sure, Fukaya's own declaration is likely sufficient to establish that a reasonable consumer *with a tree nut allergy* would find the omission material, but the proposed classes are not limited to purchasers who have tree nut allergies or are buying for others with those allergies. Fukaya has not proposed a method by which she will be able to show that a reasonable consumer in general, "would attach importance to [the] existence or nonexistence" of tree nuts on an ingredient list "in determining his choice of action in the transaction in question." *Moore*, 713 F. Supp. 3d 660, 672 (explaining that materiality is generally shown through market research) (quotation omitted). And because Fukaya has not established that materiality is susceptible to classwide proof, she has not shown that individualized issues will not predominate with respect to the elements of reliance, causation, and damages for each of her claims.

Fukaya argues that individualized issues do not predominate with regard to her UCL claim because, under the unlawful and unfair prong of the UCL, she need not show reliance to the extent the claim is premised on violations of the Federal Food, Drug, and Cosmetic Act ("FDCA") and its enabling regulations. (Dkt. No. 103 at 13.) However, even under the unlawful and unfair prongs of the UCL, a plaintiff alleging a misrepresentation must prove reliance in order to establish causation and harm. *See Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 888–889 & n. 9 (Cal. 2011); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105 (9th Cir. 2013), ("Applying *Kwikset* in a straightforward manner, we hold that when a consumer purchases merchandise on the basis of false price information, and when the consumer alleges that he would not have made the purchase but for the misrepresentation, he has standing to sue under the UCL [ ] because he has suffered an economic injury."), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013). As discussed above, Fukaya has not shown that there is a classwide method for proving reliance. [2]

*4 Nor does the alleged violation of the FDCA's ingredient list requirements provide a basis for presuming materiality. While *Hinojos* stands for the proposition that, at least at the

motion to dismiss stage, "the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation," the *Hinojos* court still held that the plaintiff was required to allege "that he would not have made the purchase but for the misrepresentation" to establish standing under *Kwikset*. *Id.* at 1105, 1107. And, regardless, Fukaya has not shown that the FDCA's ingredient list requirements at issue in this case were enacted to address a "misleading advertising practice," like the misleading use of "Made in U.S.A." labels in *Kwikset* or the fake "sales" at issue in *Hinojos*. Therefore, materiality in this case cannot be presumed.

Fukaya has also failed to show that individualized questions will not predominate with respect to damages calculations. To satisfy Rule 23(b)(3)'s predominance requirement, plaintiffs must offer a "model purporting to serve as evidence of damages" that "measure[s] only those damages attributable to [their] theory" of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). A plaintiff must present "a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (internal quotation marks omitted). Under California law, the proper measure of restitution is "[t]he difference between what the plaintiff paid and the value of what the plaintiff received." *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 96 (Cal. App. 2009). Here, Fukaya has not presented a damages model or theory of class-wide recovery, stating only that the calculation "will be a simple mathematical task, or one that Daiso itself can and has generated." (Dkt. No. 103 at 20.) Therefore, she has not carried her burden of showing, by a preponderance of the evidence, that individualized questions regarding damages will not predominate.

### 2. Potential Narrowing of the Class Definition

Fukaya's failure to demonstrate predominance across her proposed classes raises the question of whether the classes should be narrowed to include only those purchasers who have tree nut allergies or are buying for others with those allergies, since classwide reliance could potentially be established as to a more limited class. *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 669 n. 14 (explaining that "the court may redefine the overbroad class to include only

2025 WL 2644747

those members who can rely on the same body of common evidence to establish the common issue").

As an initial matter, Fukaya's counsel stated at the hearing that Fukaya does not request the Court to modify the class definition, and opined that the costs of litigating such an action across such a narrowed class would not be worthwhile for the proposed class. Moreover, a narrowed class would still fail the Rule 23 requirements. Individualized issues as to damages would likely still predominate. Also, Fukaya has submitted no evidence showing numerosity for a narrowed class. A class may be certified only if it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is nothing in the record to support the numerosity of a narrowed class of individuals who purchased one of the products for someone with a tree nut allergy. Fukaya has not introduced any evidence regarding the prevalence of tree nut allergies in the general population, and Daiso has introduced unrebutted evidence that it did not receive any other reports of allergic reaction to the products aside from Fukaya's report. (Dkt. No. 108-1 at 28–29.)

Therefore, the Court declines to exercise its discretion to redefine the class. *Victorino v. FCA US LLC*, 326 F.R.D. 282, 301–02 (S.D. Cal. 2018).

### B. Injunctive Relief Class

**\*5**  An injunctive relief class cannot be certified either, because Fukaya has not identified a pattern and practice that is generally applicable to the class as a whole. [3]  Certification under Rule 23(b)(2) is proper where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Unlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class. Rather, " 'it is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members complain of a pattern or practice that is generally applicable to the class as a whole.' " *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (citing *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).

Fukaya seeks an injunction that is not limited to the two products she purchased (which have now been recalled). Instead, she asks that Daiso be ordered to "cease its deceptive and misleading labeling," and be required to have a "Japanese to English translator [ ] audit all packaged food products sold by Daiso with a translated ingredient label sold in the United States." (Dkt. No. 103 at 17.) However, Fukaya has not carried her burden of proof with respect to the existence of a pattern or practice of widespread mislabeling sufficient to satisfy Rule 23(b)(2). Fukaya has identified two products that were incorrectly labeled, and which have since been recalled. The record also shows that Daiso relied on a third-party vendor to prepare translations. (Dkt. No. 114-3 at 7.) But Fukaya does not identify, nor does the record show, the existence of any pattern or practice regarding the mislabeling of products in a way that would affect the entire class.

Fukaya points out that when Daiso's motion to dismiss was denied, the order found that Fukaya's purchase of two similarly mislabeled products "supports an inference that other products are also mislabeled." (Dkt. No. 109 at 9 (citing *Fukaya v. Daiso California LLC*, No. 23-cv-00099-JSC, 2023 WL 3436092, at \*3 (N.D. Cal. May 11, 2023).) However, at class certification, Fukaya may no longer rely only on allegations that could permit plausible inferences in her favor. Instead, she must actually identify evidence of a widespread policy or practice affecting the class. *Dukes*, 564 U.S. at 350 (explain that a party seeking class certification cannot rely on mere allegations, but must affirmatively demonstrate that Rule 23's requirements are in fact met). At this stage, the existence of two mislabeled products is insufficient for the Court to find that Daiso "acted or refused to act on grounds that apply generally to the class." Certification of the injunctive relief class is denied. [4]

## V. CONCLUSION

For the reasons explained above, Fukaya's motion for class certification is **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2025 WL 2644747

Fukaya v. Daiso California LLC, Slip Copy (2025)

2025 WL 2644747

---

# Footnotes

1    All citations to page numbers refer to ECF pagination.

2    Even if reliance were not required, predominance could not be satisfied through a UCL claim for unlawful conduct predicated purely on an FDCA violation, because such a claim would be preempted. Section 337(a) of the FDCA provides that, except as set forth in section 337(b), "all ... proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). Thus, "a private action brought under [other laws] may not be pursued when, as here, the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the [Food and Drug Administration] has not itself concluded that there was such a violation." *See Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1049 (9th Cir. 2022) (quoting *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010)). Here, "[l]itigation of [Fukaya's unlawful UCL] claim[ ] would require litigation of whether [Daiso] violated the FDCA" and thus would be preempted. *Telebrands Corp. v. Luminas Int'l LLC, No.* 22-cv-00891, 2023 WL 6370902, at *4 (S.D. Cal. July 12, 2023); *see also Wilson v. ColourPop Cosms., LLC*, No. 22-cv-05198-TLT, 2023 WL 6787986, at *7–8 (N.D. Cal. Sept. 7, 2023) (dismissing UCL unlawful claim premised on conduct that violated the FDCA as preempted and barred), *appeal dismissed*, No. 23-2627, 2023 WL 9112928 (9th Cir. Dec. 20, 2023).

3    The proposed injunctive relief class definition is also improper because it does not include any requirement that class members intend to purchase translated, pre-packaged Daiso products in the future. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970–71 (9th Cir. 2018). While the Court could modify the class definition to remedy this deficiency, it declines to do so because class certification fails for other reasons described below.

4    The Court does not reach Daiso's other arguments for why class certification should be denied.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

6

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 36 of 230
Huber v. Simon's Agency, Inc., Slip Copy (2025)
2025 WL 1710045

2025 WL 1710045
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Jamie HUBER, on behalf of all
others similarly situated, Plaintiff,
v.
SIMON'S AGENCY, INC., Defendant.

CIVIL ACTION 19-1424
|
Filed June 18, 2025

**Attorneys and Law Firms**

Ari H. Marcus, Yitzchak Zelman, Marcus & Zelman LLC, Asbury Park, NJ, for Plaintiff.

Jessica Reilly, Clark Hill PLC, Philadelphia, PA, David Benjamin Shaver, Surdyk Dowd & Turner Co. LPA, Dayton, OH, for Defendant.

**MEMORANDUM**

Anita B. Brody, District Judge

**\*1** After nearly six years of litigation, Plaintiff Jamie Huber moves for an award of costs and attorneys' fees under the Fair Debt Collection Practices Act. Defendant Simon's Agency, Inc. concedes that Huber is entitled to an award, but objects to the amount of fees requested. For the reasons that follow, the Court will award Huber $3,326.25 in costs and $59,513.90 in fees.

**I. LEGAL STANDARD**

In "any successful action to enforce [ ] liability" under the Fair Debt Collection Practices Act ("FDCPA"), an award of costs and "a reasonable attorney's fee" is mandatory. 15 U.S.C. § 1692k(a)(3); *Graziano v. Harrison*, 950 F.2d 107, 113 (3d Cir. 1991), *overruled on other grounds by Riccio v. Sentry Credit, Inc.*, 954 F.3d 582 (3d Cir. 2020). Three standards govern a court's analysis of a request for attorney's fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 433-35, 433 n.7 (1983) (setting forth standards that are "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party' "); *Graziano*, 950 F.2d at 114 ("[I]n a typical case under the [FDCPA], [a] court should determine what constitutes a reasonable fee in accordance with the substantial Supreme

Court precedent pertaining to the calculation of reasonable attorney's fees.") (citing *Texas State Teachers Assoc. v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989) *and Hensley*, 461 U.S. at 433-37). First, "no fee award is permissible until the plaintiff has crossed the 'statutory threshold' of prevailing party status." *Texas State Teachers Assoc.*, 489 U.S. at 789 (quoting *Hensley*, 461 U.S. at 433). A plaintiff prevails if she succeeds "on any significant issue in litigation which achieves some of the benefit sought in bringing the suit." *Id.* (internal citation omitted). Second, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. The resulting number—the "lodestar"—is presumptively reasonable. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). Third, "other considerations" may warrant an upward or downward adjustment to the lodestar, "including the important factor of the 'results obtained.' " *Hensley*, 461 U.S. at 434.

The moving party bears the burden of proving that its request for attorney's fees is reasonable by "submit[ting] evidence supporting the hours worked and rates claimed." *Rode*, 892 F.2d at 1183. The burden then shifts to the opposing party "to challenge ... the reasonableness of the requested fee." *Id.* A court "cannot decrease a fee award based on factors not raised at all by the [opposing] party"; however, once the opposing party "raises objections to the fee request," a court "has a great deal of discretion to adjust the fee award in light of those objections." *Id.*

**II. DISCUSSION**

As an initial matter, the Court concludes that Huber has "crossed" the requisite "statutory threshold" entitling her to an award of costs and fees. *Texas State Teachers Assoc.*, 489 U.S. at 789 (internal citation omitted). More specifically, Huber's "action" was "successful" because the Court granted —and the Court of Appeals for the Third Circuit affirmed— summary judgment in her favor on her individual § 1692e claim. 15 U.S.C. § 1692k(a)(3); *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 151 (3d Cir. 2023). She is thus entitled to recover the costs of the action and reasonable attorneys' fees.

**\*2** Huber moves for $3,326.25 in costs and $147,219.04 in attorneys' fees. *See* Mem. in Supp. Mot. for Fees and Costs 13, ECF No. 130-1 (hereinafter "Mem."); Reply Br. 20, ECF No. 132.[1] In support of her request for fees, she has submitted (1) records detailing the hours her two attorneys (Yitzchak

Huber v. Simon's Agency, Inc., Slip Copy (2025)

2025 WL 1710045

Zelman and Ari Marcus) spent working on the case; and (2) declarations outlining the reasonableness of their respective hourly rates. *See* Mem. Ex. A, ECF No. 130-4 (hereinafter "timesheet"); Mem. 8-11 (discussing rates); Zelman Decl., ECF No. 130-2 (discussing Zelman's work on the case and rates charged); Marcus Decl., ECF No. 130-3 (discussing same for Marcus); Marcus Reply Decl. ¶¶ 3-4 (discussing Marcus' work on the fee petition), ECF No. 132-1.

Simon's Agency, Inc. ("SAI") agrees that Huber is entitled to all $3,326.25 in costs she seeks. *See* Resp. 16, ECF No. 131.[2] SAI likewise does not dispute the reasonableness of Huber's proposed hourly rates. *Id.* at 15. SAI, does, however, contend that (1) 30.9 hours should be excluded from the lodestar calculation; and (2) the lodestar should be reduced by 75% due to Huber's limited overall success. *Id.* at 10-15.

The Court will start by calculating the lodestar—first by determining the hours Huber's attorneys reasonably expended, then assessing the reasonableness of Huber's requested hourly rates—and then will address whether a downward adjustment is warranted.

## A. The Lodestar

### 1. Hours Reasonably Expended

In determining the number of hours "reasonably expended" on a particular case, a court must "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Pennsylvania Env't Def. Found. v. Canon-McMillan Sch. Dist.*, 152 F.3d 228, 232 (3d Cir. 1998) (internal quotations omitted).

Huber contends that her two attorneys reasonably expended 283.6 hours litigating this case: 63.5 by Zelman, and 220.1 by Marcus. *See* Timesheet. SAI asks the Court to exclude 30.9 of those hours as (1) "unnecessary ... for consumer law experts"; (2) "vague"; (3) "administrative"; (4) "block billing"; (5) "duplicative"; and/or (6) "non-billable interoffice communications." Resp. 10-13. The Court addresses each of SAI's six objections in turn.

### i. "Unnecessary ... for consumer law experts"

SAI argues that the 1.2 hours Marcus spent "review[ing] relevant FDCPA and TCPA laws" at the very outset of the case was "unnecessary" given Marcus' expertise in consumer law. Resp. 10, 10 n.2. Had Marcus "run up an inordinate amount of time researching" these laws, the Court might have agreed. *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). 1.2 hours is hardly inordinate. *See A.B. by & through F.B. v. Pleasant Valley Sch. Dist.*, No. 3:17-CV-02311, 2019 WL 2715681, at *5 (M.D. Pa. June 28, 2019) ("[I]t is not inherently unreasonable for attorneys to bill for limited time spent reviewing and researching matters that fall within their legal specialty."), *aff'd*, 839 F. App'x 665 (3d Cir. 2020). After reviewing the billing records in their entirety, the Court is satisfied that neither Marcus nor Zelman engaged in any "non-stop meter running" and will not exclude time from the lodestar calculation on this ground. *Ursic*, 719 F.2d at 677.

### ii. Vague entries

**\*3** SAI contends that 16 billing entries are too "vague" to be recoverable—for example, "PC with client," "emails with client," and "R court order." *Id.* at 10-12. "[A] fee petition should include 'some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys.' " *Rode*, 892 F.2d at 1190 (internal citation omitted). Even still, a fee petition need not detail "the precise activity to which each hour was devoted nor the specific attainments of each attorney"; rather, it need only provide a court with enough information "to determine if the hours claimed are unreasonable for the work performed." *Id.*

Each of the 16 challenged entries details the general nature of the activity performed, the date the activity took place, and the amount of time spent on the activity in fractional hours—all of which is enough for the Court to assess their reasonableness. *See Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1037-38 (3d Cir. 1996) (itemized and dated time entries regarding "research," "review[ing]" and "prepar[ing]" were sufficiently specific); *Rode*, 892 F.2d at 1189 (rejecting argument that timesheet entries need to set forth "the nature of briefs, pleading, research, and conferences").[3] The Court therefore declines to exclude time on vagueness grounds.

Huber v. Simon's Agency, Inc., Slip Copy (2025)

2025 WL 1710045

### iii. Administrative tasks

Third, SAI asserts that 14 entries are nonrecoverable because they show that Zelman and Marcus spent time on "administrative" rather than legal tasks. *See* Resp. 10-12. As a general rule, hours that would not be billed to a client "are not properly billed to an adversary." *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995) (internal citation omitted). Because administrative tasks— routine or clerical work that could be performed by non-attorneys—are not the type normally billed to a client, a court can exclude them from the lodestar calculation. *See, e.g., Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995) (excluding hours lead counsel spent on tasks that were also performed by a paralegal); *Bilazzo v. Portfolio Recovery Assocs., LLC*, 876 F. Supp. 2d 452, 471 (D.N.J. 2012) (excluding hours billed by paralegal on administrative tasks). Alternatively, when a lawyer spends time on "matters easily delegable to non-professionals or less experienced associates," a court can include those hours in the lodestar calculation but bill them at a lower rate. *Ursic*, 719 F.2d at 677.

**\*4** The Court agrees that all of the 14 entries to which SAI objects include time spent on administrative tasks and are not properly billed to SAI. And, after going "line, by line, by line through the billing records supporting the fee request" as is required by the reasonableness inquiry, the Court finds that additional entries are non-compensable for the same reason. *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 362 (3d Cir. 2001). It is surprising that Zelman and Marcus continue to bill for these tasks, let alone bill for them at their usual rates, despite having been put on notice that such fees are non-recoverable. *See Piccinetti v. Clayton, Myrick, McClanahan & Coulter, PLLC*, No. CV 16-4032 (TJB), 2018 WL 5313919, at \*9 (D.N.J. Oct. 26, 2018) (identifying entries on Zelman and Marcus' timesheets that included time spent on administrative tasks and excluding that time from lodestar calculation).[4] The Court will therefore exclude, rather than bill at a lower rate, the time spent on these tasks as follows:

| Attorney | Date | Description | Time Billed | Time Excluded |
|---|---|---|---|---|
| Ari Marcus | 3/11/2019 | Prepared retainer for client signature | .2 | .2 |
| Ari Marcus | 4/12/2019 | R Affidavit of Service, File Returned Summons | .2 | .1 |
| Ari Marcus | 8/21/2019 | Draft stipulation and proposed order re: time to respond to complaint | .4 | .3 |
| Ari Marcus | 9/9/2019 | Review Notice and calendar settlement conference call | .2 | .2 |
| Ari Marcus | 9/13/2019 | Draft stipulation to extend time to respond | .3 | .2 |
| Ari Marcus | 9/16/2019 | Review and Calendar Order re: settlement | .1 | .1 |
| Ari Marcus | 9/16/2019 | Review and calendar Order re: MTD | .1 | .1 |
| Ari Marcus | 10/3/2019 | Prepare courtesy copies for Judge Brody | .4 | .4 |
| Ari Marcus | 10/15/2019 | Review Order and Calendared new date for Reply | .1 | .1 |
| Ari Marcus | 2/11/2020 | R amended scheduling order and calendared accordingly | .3 | .2 |

Huber v. Simon's Agency, Inc., Slip Copy (2025)

2025 WL 1710045

| Ari Marcus | 6/29/2020 | Review Notice of Appearance | .1 | .1 |
|---|---|---|---|---|
| Ari Marcus | 6/30/2020 | Draft Motion for Extension | .3 | .2 |
| Ari Marcus | 11/17/2020 | Draft Consent Motion to Extend Dispositive Motions | .3 | .2 |
| Ari Marcus | 12/15/2020 | Calendar response deadlines | .2 | .2 |
| Ari Marcus | 2/1/2022 | File revised notice | .4 | .4 |
| Yitzchak Zelman | 7/13/2022 | Review proposed changes and finalized stipulation for filing | .4 | .2 |
| Ari Marcus | 8/12/2022 | File NOA | .2 | .2 |
| Yitzchak Zelman | 8/12/2022 | File NOA | .2 | .2 |
| Yitzchak Zelman | 3/3/2023 | Legal Fee: Reviewed and calendared calendaring notice, filed acknowledgment of arguing counsel | .5 | .4 |
| Yitzchak Zelman | 4/10/2023 | Legal Fee: Filed summary of oral argument. | .2 | .2 |
| Ari Marcus | 10/17/2024 | Reviewed proposed edits, incorporated changes, and filed scheduling order | .3 | .1 |
| Ari Marcus | 10/21/2024 | Calendar Scheduling order re: Fee Petition | .2 | .2 |

### iv. Block-billed entries

SAI objects to three entries because of "block billing." Resp. 11-12. Block billing is a common practice that saves time (and, as a result, money). *U.S. ex rel. John Doe I v. Pennsylvania Blue Shield*, 54 F. Supp. 2d 410, 415 (M.D. Pa. 1999). Rather than exclude a block-billed entry wholesale from the lodestar calculation, a court should "look at the entire block, compar[e] the listed activities and the time spent, and determin[e] whether the hours reasonably correlate to all of the activities performed." *Id.*

The Court disagrees that the three entries SAI finds objectionable[5] should be excluded, but finds that other block-billed entries commingle reasonably billed work with work that is administrative. The Court will exclude the time from those entries spent on administrative work as follows:

| Attorney | Date | Description | Time Billed | Time Excluded |
|---|---|---|---|---|
| Ari Marcus | 8/27/2020 | PC with Court re: Schedule, Calendared amended schedule | .2 | .1 |
| Yitzchak Zelman | 4/6/2023 | Legal Fee: Reviewed notice setting matter down for oral argument. Calendared same. Researched our panel and pulled cases they were involved in. | 3.4 | .1 |

| | | Obtained recordings of oral arguments they presided over. | | |
|---|---|---|---|---|
| Yitzchak Zelman | 4/19/2023 | Legal Fee: Reviewed Third Circuit's new decision on standing in Deutsch, filed a 28j later in our appeal to notify the Court. | .7 | .1 |

### v. Duplicative entries

SAI also objects to six entries as "duplicative." Resp. 11–12. First, SAI contends that Marcus double-billed for reviewing a reply brief: once on January 19, 2021, and again on January 28, 2021. *See* Resp. 11; Timesheet 4–5. SAI appears to have forgotten that it filed two reply briefs—one on January 18, and another on January 28—both of which Marcus had an obligation to review. Second, SAI takes issue with four of Marcus' entries from December 2021 and January 2022 that refer to, inter alia, his review and research regarding the potential consequences for failing to disclose insurance on a Rule 26(f) report. *See* Resp. 11–12; Timesheet 5. The Court, however, finds these 3.6 hours reflect a reasonable time expenditure for the tasks described. Finally, SAI objects to the combined 16 hours Marcus and Zelman spent preparing for oral argument on April 13 and 23, 2023. *See* Resp. 12; Timesheet 7. But as SAI's counsel likely knows, "preparation"—especially for a complex and case-defining appellate argument—"often requires collaboration and rehearsal." *Sheffer v. Experian Info. Sols., Inc.*, 290 F. Supp. 2d 538, 546 (E.D. Pa. 2003) (quoting *Rodriguez-Hernandez v. Miranda–Velez*, 132 F.3d 848, 860 (1st Cir. 1998)); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2016 WL 3522964, at *11 (M.D. Pa. June 28, 2016) ("It is more than reasonable for two attorneys to prepare for oral argument even if only one of them is ultimately making the argument."). The Court will therefore include all of the time recorded in these entries.

### vi. "Non-billable interoffice communications"

**\*5** Finally, SAI claims that 10 entries reflect "non-billable interoffice communications." Resp. 11–12. As a threshold matter, "it is reasonable for lawyers ... to communicate about a case throughout the course of the litigation." *Sch. Dist. of Philadelphia v. Deborah A.*, No. CIV.A. 08-2924, 2011 WL 2681234, at *3 (E.D. Pa. July 8, 2011). That being said, "when several attorneys bill a large number of hours for strategy and conferencing, a reduction in the fee request

may be warranted"—particularly when those attorneys bill for "time spent on both sides of the correspondence and conferencing." *Arlington Indus., Inc.*, 2016 WL 3522964, at *11 (citing *Daggett v. Kimmelman*, 811 F.2d 793, 797 (3d Cir. 1987)). That is not what happened here. The billing records show that when Marcus and Zelman conferred to discuss the case, only one of them billed for it. The Court therefore finds that these hours are recoverable and will include them in the lodestar calculation.

### 2. Reasonable Hourly Rates

### i. Regular Hourly Rates

Huber seeks an hourly rate of $522.50 for Zelman and $577.50 for Marcus. *See* Mem. 10.[6] SAI concedes Huber's proposed rates are reasonable insofar as they "conform" with the fee schedule promulgated by Community Legal Services of Philadelphia ("CLS"). Resp. 15.

Fees are awarded based on the *current* hourly market rate, which is "the rate at the time of the fee petition, not the rate at the time the services were performed." *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001) (citations omitted). "The 'starting point' in determining the appropriate hourly rate is the attorneys' usual billing rate. The Supreme Court has directed that [a] district court should then consider the 'prevailing market rates' in the relevant community," *Pennsylvania Envtl. Def. Found.*, 152 F.3d at 231 (internal quotations and citations omitted), for attorneys of "comparable skill, experience, and reputation," *Rode*, 892 F.2d at 1183. The Court of Appeals for the Third Circuit has "approvingly" cited the fee schedule promulgated by CLS as "well developed" and "a fair reflection of the prevailing market rates in Philadelphia." *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001) (internal citations omitted). The CLS fee schedule was most recently updated with an effective date of January 19, 2023. *See Attorney Fees*, COMMUNITY LEGAL SERVICES, https://clsphila.org/about-community-legal-services/attorney-fees/ (last visited June 18, 2025).

Courts within the Third Circuit have adjusted the CLS fee schedule rates upwards to account for inflation. *See, e.g., Donofrio v. IKEA US Retail, LLC*, No. CV 18-599, 2024 WL 3511614, at *3 (E.D. Pa. July 23, 2024) (adjusting hourly rates by five percent annually); *Ismail v. IHI Power Servs. Corp.*, No. CV 20-4801, 2023 WL 3689608, at *4 (E.D. Pa. May 25, 2023) (same); *Earley v. JMK Associates*, No. 18-CV-760, 2020 1875535, at *2 (E.D. Pa. Apr. 15, 2020) (same). The Court will do the same in fixing appropriate hourly rates for Marcus and Zelman.

**\*6** Huber contends that Zelman's rate should be set at the "midpoint" and Marcus' at the "upper [end]" of the CLS range, and that accounting for inflation, Zelman should be awarded $522.50 an hour and Marcus $577.50. Mem. 10. As of the time the fee petition was filed, Zelman had practiced law for 12 years and Marcus for 14. Per the declarations submitted in support of Huber's request for fees, both attorneys (1) focus their practice on consumer protection law; (2) have significant experience litigating under the FDCPA; and (3) charge anywhere from $550-750 an hour. *See* Zelman Decl.; Marcus Decl. The January 2023 CLS fee schedule sets forth a comparably lower hourly rate for attorneys with 11 to 15 years of experience—$420-525 an hour (or $463.05-$578.81, accounting for two years of inflation).

For Zelman, the Court finds that the January 2023 CLS fee schedule billing rate of $441 per hour reflecting his 12 years of experience is proper. With a five-percent annual increase accounting for two years of inflation, the Court will fix Zelman's regular hourly rate at $486.20. For Marcus, the Court finds that the January 2023 CLS fee schedule billing rate of $504 per hour reflecting his 14 years of experience is proper. Accounting for two years of inflation, the Court will fix Marcus' regular hourly rate at $555.66. [7]

### ii. Hourly Rates for Travel Time

Because neither SAI nor Huber address how Zelman and Marcus should be reimbursed for travel time, the Court exercises its discretion in addressing how travel time should factor into the lodestar.

"In order to determine the rate at which attorneys may be compensated for their travel time, 'a court must look to the practice in the local community.' " *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 711 (3d Cir. 2005), *as amended* (Nov. 10, 2005) (internal citation omitted). Courts in this district have opted to reimburse attorneys for travel time at both their full hourly and reduced rates. *Compare Rush v. Scott Specialty Gases*, 934 F. Supp. 152, 156 (E.D. Pa. 1996) (approving reimbursement of travel time at regular hourly rates) *with Haberern v. Kaupp Vascular Surgeons, Ltd.*, 855 F.Supp. 95, 100 (E.D. Pa. 1994) (awarding reimbursement of attorney travel time at a 50% reduced hourly rate), *vacated in part on other grounds*, 24 F.3d 1491 (3d Cir. 1994).

Huber's attorneys, who billed relatively few hours for travel, opted for both approaches: Zelman charged his regular hourly rate for the 4 hours he spent travelling in connection with the case, while Marcus charged 50% of his regular hourly rate for the 6.5 hours he billed for travel. *Compare* Timesheet 7 (Zelman entry dated April 25, 2023 regarding travel to and from Philadelphia for oral argument) *with id.* at 2-3 (Marcus entries dated August 20, 2019, March 5, 2020, and March 12, 2020 regarding travel to and from Rule 16 conference and depositions). Having received no objections from SAI, and because both full and half-rates have been deemed reasonable, the Court will reimburse Zelman and Marcus for their travel time at the rates they recorded: Zelman at 100% of his regular hourly rate ($486.20), and Marcus at 50% ($277.83).

### 3. Lodestar Calculation

**\*7** Based on the above, the Court calculates the lodestar as follows:

| Attorney | Approved Hours | Approved Hourly Rate | Lodestar Amount |
|----------|----------------|----------------------|-----------------|
| Zelman | 62.3 hours (excluding 1.2 hours as unreasonably billed, including 4 hours of travel time) | $486.20 | $30,290.26 |

Huber v. Simon's Agency, Inc., Slip Copy (2025)

2025 WL 1710045

| Marcus | 210 hours (excluding 3.6 hours unreasonably billed and 6.5 hours of travel time billed at 50%) | $555.66 | $116,688.60 |
| | | $277.83 | $1,805.90 |
| | 6.5 hours (travel time billed at 50%) | | |
| Lodestar Total | $148,784.76 | | |

**B. Downward Adjustment to Lodestar**

SAI argues that the lodestar should be reduced by 75% because Huber—by prevailing only on one of her three FDCPA claims and "voluntarily abandon[ing]" her putative class claims—achieved "only very limited success." Resp. 15. Huber contends that no reduction is warranted because she achieved "complete success." Reply 10.

The lodestar "is presumed to be the reasonable fee." *Blum v. Stenson*, 465 U.S. 886, 897, (1984). Nonetheless, after calculating the lodestar, a court has discretion to adjust it up or down, based on a variety of factors. *Windall*, 51 F.3d at 1185. [8] The Supreme Court has instructed that "the most critical" of these factors "is the degree of success obtained." *Hensley*, 461 U.S. at 436. When a defendant requests a downward adjustment based on plaintiff's limited success, a court must "make clear that it has considered the relationship between the amount of fee awarded and the results obtained." *Id.* at 437. "There is no precise rule or formula for making" such an adjustment. *Id.* at 436. A court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37.

By certain measures, Huber achieved "a high degree of success." *Tolentino v. Friedman*, 46 F.3d 645, 653 (7th Cir. 1995). Even though Huber did not prevail on all three of her individual FDCPA claims and ultimately decided not to pursue her class claims, she still achieved a "desired outcome": she held SAI accountable for its deceptive debt collection letter and is set to recover the maximum amount of statutory damages available under the FDCPA. *Hensley*, 461 U.S. at 435 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of ... certain grounds is not a sufficient reason for reducing a fee. The result is what matters."). Indeed, Huber could not have achieved a higher degree of success even if she had prevailed on all three claims because the FDCPA caps

statutory damages at $1,000 per lawsuit, not per violation. 15 U.S.C. § 1692k(a)(2)(A); *Williams v. Mountain Run Sols.*, No. 2:21-CV-05630-JDW, 2022 WL 2905175, at *2 (E.D. Pa. July 22, 2022). Furthermore, if putative class members later decide to vindicate their individual rights under § 1692e, they may benefit from her victory in this case. *See China Agritech v. Michael H. Resh*, 584 U.S. 732, 736 (2018) (the statute of limitations is tolled "during the pendency of a putative class action, allowing unnamed class members to ... file individual claims if the class fails.").

**\*8** By other measures, Huber's overall success was limited. Although she prevailed on her individual § 1692e claim, she did not—as she claims in her fee petition—obtain relief "for herself *and* hundreds of similarly situated class members." Mem. 13 (emphasis added). It's true that Huber continued pursuing her class claims after the Court of Appeals vacated this Court's order certifying the class and remanded the case "for individualized inquiry to determine the standing of the unnamed class members." *Huber*, 84 F.4th at 154. However, after the parties and the Court spent ten months attempting to heed the Court of Appeals' instructions, Huber "decided not to re-file a class certification motion." Proposed Case Management Plan, ECF No. 128. Huber's case may exemplify how the Court of Appeals' holding—namely, "that the predominance inquiry of the class action certification analysis cannot be conducted unless and until the District Court inquires into whether each class member did or did not detrimentally rely on the defendant's misleading collection letter, and the extent of the harm"—"dooms all class actions under § 1692e" and "undermines the statutory scheme" of the FDCPA. *Huber*, 84 F.4th at 163 (Rendell, J.) (concurring in part and dissenting in part). Even still, the Court cannot conclude that Huber achieved "complete success" for herself and hundreds of others as she claims. Resp. 10.

While the Court agrees with SAI that the lodestar should be reduced to account for Huber's limited success, the Court disagrees that a 75% reduction is appropriate. SAI

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 43 of 230
**Huber v. Simon's Agency, Inc., Slip Copy (2025)**
2025 WL 1710045

appears to have arrived at this figure by comparing the total number of "claims" in the case (four) to those that Huber actually prevailed upon (one). Resp. 14-15 ("Because Plaintiff achieved success on only one (1) of her three (3) FDCPA claims, and she did not achieve any success on her class claims ... it would be reasonable to reduce the potential amount lodestar fees ... by 75%."). [9] Because *Hensley* expressly forbids this "mathematical approach" to lodestar reductions, the Court declines to apply it here. *See Hensley*, 461 U.S. at 435 n.11 ("Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors.").

SAI's proposed 75% reduction also assumes a clear divide exists between Huber's success and lack thereof. But Huber did not bring "distinctly different claims for relief ... based on different facts and legal theories" such that the work her attorneys performed on her unsuccessful claims was wholly unrelated to their work on her successful claim. *Hensley*, 461 U.S. at 434–35. All three of her FDCPA claims stemmed from a "common core of facts" involving SAI's attempt to collect a debt that Huber believed she did not owe. *Id.* at 435. The same can be said of her putative class claims, both of which relied on the same argument that led her to prevail on her individual § 1692e claim: that SAI's debt collection letter violated the FDCPA. *Id.*; *see also Huber v. Simon's Agency, Inc.*, No. CV 2:19-01424, 2021 WL 5356772, at *3 (E.D. Pa. Nov. 17, 2021) (observing that Huber's collection letter claims "rely on a single argument"); *Huber*, 84 F.4th at 151 (affirming that SAI's form letter "is the very definition of a

'deceptive' communication, in violation of § 1692e"). Given the overlap between Huber's successful and unsuccessful claims, a 75% lodestar reduction is unwarranted. *Webb v. Cnty. Bd. of Educ. of Dyer Cnty., Tenn.*, 715 F.2d 254, 259 (6th Cir. 1983) (declining to reduce fee award where plaintiff obtained individual relief via a settlement agreement but abandoned class action claims because "the individual and class allegations [were] sufficiently related such that no reduction in fees [was] merited"), *aff'd sub nom. Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234 (1985).

Even though Huber's "claims were interrelated, nonfrivolous, and raised in good faith," some reduction to the lodestar is still warranted. *Hensley*, 461 U.S. at 436. Rather than "attempt[ing] to identify specific hours that should be eliminated" from the lodestar calculation, the Court will instead reduce the lodestar by 60% to account for Huber's limited success on her putative class claims. *Id.* Applying a 60% reduction to the lodestar set forth above ($148,784.76) results in a final attorneys' fee award of $59,513.90.

### III. CONCLUSION

**\*9** For the reasons outlined above, the Court will award Huber **$3,326.25** in costs and **$59,513.90** in fees.

### All Citations

Slip Copy, 2025 WL 1710045

---

### Footnotes

1    Huber initially moved for $136,006.05 in attorneys' fees. *See* Mem. 13. She later amended the amount to account for the 18.4 hours Marcus spent on the fee petition—an additional $11,219.99 in fees. *See* Reply Br. 20; Marcus Reply Decl. ¶¶ 3–4, ECF No. 132-1.

2    In light of SAI's concession and because the Court finds these costs were documented and reasonably incurred, the Court will award Huber all $3,326.25 in costs. *See* Timesheet 7 (itemized costs); Mem. 13 (explaining each line item).

3    To the extent the entries include abbreviations, the Court has no difficulty interpreting them. *See Rode*, 892 F.2d at 1190–91.

4    These tasks included, but were not limited to, filing an affidavit of service, calendaring deadlines, preparing and filing a notice of appearance, preparing a letter and order requesting leave to file a late response, and preparing a brief for filing. *Compare Piccinetti*, 2018 WL 5313919, at *9 (identifying entries that included

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 44 of 230
Huber v. Simon's Agency, Inc., Slip Copy (2025)
2025 WL 1710045

administrative tasks), *with* Mot. for Attorney Fees Ex. B, ECF No. 47–5 (timesheet submitted by Zelman and Marcus).

5      Though these entries were block-billed, the Court finds they evidenced hours reasonably expended on expert outreach, strategy discussions, drafting a motion for summary judgment, and appellate argument preparation.

6      The Court notes that Huber's proposed lodestar is *not* based on these rates, but rather, a graduated scale that roughly tracks her attorneys' historical hourly rates over the six years of the case. *See* Mem. at 9 (setting forth rates for each attorney from 2019–2025). Huber is correct that applying their historical hourly rates would mean "charging *less* than the [prevailing market] rate for the vast majority of their work." *Id.* at 10. Reading between the lines, it appears as if Huber's attorneys are trying to strike a more reasonable looking bargain. But given that the Court of Appeals squarely rejected a district court's attempt to use historical rates in *Lanni v. New Jersey*, the Court declines to do so here. 259 F.3d 146, 150 (concluding "that the District Court's use of an historical graduated scale ... was a misapplication of the appropriate legal standard."); *see also LeJeune v. Khepera Charter Sch.*, 420 F. Supp. 3d 331, 340–41 (E.D. Pa. 2019) (rejecting argument that hourly rates "should reflect the cost of counsel's time on the date services were rendered" based on *Lanni*).

7      Accounting for two years of inflation, these rates are consistent with those that other courts in this District have recently deemed reasonable for Zelman and Marcus in FDCPA class action settlements. *See Black Grievance Comm. v. Philadelphia Elec. Co.*, 802 F.2d 648, 652 (3d Cir. 1986), *vacated on other grounds*, 483 U.S. 1015 (1987) (a court may consider hourly rates set for a specific attorney in previous court decisions if the rates were for the same attorney and same type of work over a contemporaneous time period); *Barenbaum v. Hayt, Hayt & Landau, LLC*, No. CV 18–4120, 2021 WL 120925, at *6 (E.D. Pa. Jan. 13, 2021) (approving hourly rate of $450 for Zelman and $500 for Marcus in connection with FDCPA class action settlement).

8      These factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Windall*, 51 F.3d at 1185 n. 8.

9      SAI does not mention, and the Court has not considered, Huber's "success" on her Telephone Consumer Protection Act ("TCPA") claim. After the Court denied Huber's motion for summary judgment on her TCPA claim, the parties jointly moved for an order dismissing that claim with prejudice. ECF Nos. 88, 90. In so moving, the parties agreed that "each party [was] to bear their own attorneys' fees and costs" with respect to Huber's TCPA claim. ECF No. 88.

---

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

7

2025 WL 539681
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

IN RE: **FEDLOAN STUDENT
LOAN** SERVICING **LITIGATION**

MDL NO.
**18**
-
**2833**
ALL CASES
|
Signed February 18, 2025

### MEMORANDUM OPINION

NITZA I. QUIÑONES ALEJANDRO, District Judge

### INTRODUCTION

\*1 Plaintiffs, a group of thirty-three federal **student loan** borrowers, filed these putative class actions against the *United States Department of Education and the Secretary of Education* (together, the "Department") and one of the Department's contractual **student loan** servicers, the *Pennsylvania Higher Education Assistance Agency* ("PHEAA") (collectively, "Defendants"), based on alleged administration and servicing errors relating to three federal **student** borrower benefit programs: (1) the *Teacher Education Assistance for College and Higher Education Grant* Program (the "TEACH Program"), (2) the *Public Service Loan Forgiveness* Program (the "PSLF **Loan** Forgiveness Program"), and (3) *the income driven repayment* ("IDR") plans.[1] Plaintiffs bring federal claims against the Department under the Administrative Procedure Act (the "APA") and the Fifth Amendment Due Process Clause and bring common law breach of contract claims premised on various contracts governing the plaintiffs' federal **student loans**. Against PHEAA, Plaintiffs assert various state common law claims and claims for violations of various state consumer protection statutes.

Presently before the Court are Defendants' motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), in which Defendants argue that Plaintiffs' claims must be dismissed because, *inter alia*, Plaintiffs lack standing

and/or the claims are moot. For the reasons set forth herein, Defendants' motions are granted.

### FACTUAL AND PROCEDURAL BACKGROUND

The *Higher Education Act* of 1965 (the "HEA") was enacted to increase educational opportunities and "assist in making available the benefits of postsecondary education to eligible **students** ... in institutions of higher education ...." 20 U.S.C. § 1070(a). To make the cost of higher education more affordable for **students** who otherwise could not afford it, Congress established several federal financial aid programs under Title IV of the HEA, 20 U.S.C. § 1001 *et seq.* Under the HEA, the Department has the authority to issue a variety of federal **loans** and grants to **student** borrowers. *See* 20 U.S.C. §§ 1070–1099c. Initially, the federal government guaranteed privately issued **loans** through the *Federal Family Education Loan* Program (the "FFEL Program"). Beginning in 1994, the federal government began originating **loans** under the *William D. Ford Direct Loan Program* (the "Direct **Loan** Program"). *See* 20 U.S.C. §§ 1087a–1087j. In 2010, Congress discontinued the FFEL Program, meaning that all new federal **student loans** since that time have been Direct **Loans**.

The Department, through its Office of Federal **Student** Aid, is responsible "for managing the administrative and oversight functions" of the Title IV **student** financial aid programs. 20 U.S.C. § 1018(a)(1). Direct **Loans** are governed by standardized *Master Promissory Notes* ("MPNs") constituting contracts between the federal government and the borrower. 20 U.S.C. §§ 1802(m)(1)(D), 1087e(a)(1). Key provisions of the MPNs require the Department to interpret the terms of the MPNs in accordance with applicable federal statutes and regulations. The Direct **Loan** Program is highly regulated by the Department, including the administration of **loan** repayment (34 C.F.R. §§ 682.209 and 685.208), income-based repayment plans (34 C.F.R. §§ 682.215 and 685.209), and deferments and forbearances (34 C.F.R. §§ 682.210–211 and 685.204–205).

\*2 The HEA requires the Department to contractually delegate Direct and FFEL **Loans** servicing functions to third parties. 20 U.S.C. § 1086(a). Since 2009, the Department has contracted with PHEAA as one of several **loan** servicers to service its FFEL and Direct **Loans**. In 2012 and 2013, the Department also awarded PHEAA an exclusive contract to manage the PSLF **Loan** Forgiveness and TEACH Grant Programs, respectively. PHEAA's **loan** servicing contract requires it to "maintain[ ] a full understanding of all federal and state laws and regulations and FSA requirements,"

"ensure[ ] that all aspects of the service continue to remain in compliance as changes occur," and maintain "procedures and systems," including "a system of internal controls that ensures resource use is consistent with laws, regulations and policies."

Given the complexity of the FFEL and the Direct **Loan** Programs, PHEAA (and other servicers) are required to provide borrowers with the necessary information to best manage their **loans**. The Department instructs **loan** servicers to establish a relationship with the borrower, educate and inform borrowers regarding the tools and options available to assist them in the management of their **student loans**, and provide information on repayment options that best meet the borrower's financial situation.

### *The TEACH Grant Program*

In 2007, Congress created the TEACH Grant Program with the goal of attracting and retaining teachers in certain fields at low-income schools. 20 U.S.C. §§ 1070g–1070g-4. Through the TEACH Grant Program, participants may receive up to $4,000 per academic year for undergraduate, post-baccalaureate, and graduate programs. Undergraduate **students** may receive a maximum of $16,000 in grants, while graduate **students** are capped at $8,000 in grants. 20 U.S.C. § 1070g-1(d). In 2013, the Department contracted with PHEAA to be the exclusive servicer of the TEACH Grant Program.

To receive a TEACH grant, a **student** must sign an "Agreement to **Serve**" with the Department, by which the **student** agrees to teach for a total of at least four years in an eligible position at a low-income school within eight years of graduating. Included in the Agreement to **Serve** are a series of notices and rules established by the Department, providing, *inter alia*, that recipients must: (1) certify within 120 days of completing school that they are employed in a qualifying position or intend to satisfy the terms of service; and (2) certify annually that they intend to complete their service and are on track to do so within the permitted time frame.

If a recipient fails to satisfy the teaching service obligation, the Teach Grant will be converted to an interest-bearing Direct **Loan** (a "TEACH **Loan**") that the recipient must pay back. The Department's regulations identify specific situations in which this conversion may occur, including, at the request of the recipient, when a recipient ceases enrollment in an eligible program, when the recipient is not able to meet the teaching requirement within the eight-year timeframe, and when the recipient does not actively confirm his or her intention to satisfy the agreement to **serve** at least annually. According to

the TEACH Plaintiffs, PHEAA routinely converts grants to **loans** for reasons not authorized by statute or regulation or, otherwise, after failing to comply with the Department's rules, including conversions: (1) based on hyper-technical mistakes on the Certification form, such as a missing signature or the inadvertent omission of the start and end dates for the qualifying academic year; (2) after PHEAA failed to provide sufficient notice of the annual deadline for submitting the required paperwork by posting it only to a paperless inbox on PHEAA's website; and (3) after PHEAA failed to provide recipients with sufficient time to submit their annual paperwork.

**\*3** After several public reports of the problems with the TEACH Grant Program, including reports by the U.S. Government Accountability Office ("GAO"), the Treasury Department, and the Department itself, the Department implemented the TEACH Grant Reconsideration Program in February 2019, wherein recipients could apply to have their TEACH **Loans** reconverted to TEACH Grants. According to the TEACH Plaintiffs, under the reconsideration program, some recipients were improperly denied, and others were not fully refunded the amount of principal and interest they paid toward their **loans**.

### *The Public Service Loan Forgiveness Program (the "PSLF Program")*

In 2007, Congress authorized the Department to administer a number of **loan** forgiveness programs, including the Public Service **Loan** Forgiveness Program (the "PSLF Program"). *See* 20 U.S.C. § 1087e(m). The PSLF **Loan** Forgiveness Program provides an opportunity for **student** borrowers with Direct **Loans** to seek forgiveness of their **student loan** balance after satisfaction of several conditions. *See id.*; *see also* 34 C.F.R. § 685.219. Federal law provides that to be eligible for forgiveness, the borrower must (1) make 120 separate, on-time monthly qualifying payments on a Direct **Loan** (2) while enrolled in a qualifying repayment plan (3) while working full-time (4) for a qualifying public-service employer. 20 U.S.C. § 1087e(m); 34 C.F.R. § 685.219(c). Only some repayment plans are PSLF qualifying. 34 C.F.R. § 685.219(c)(1)(iv). These include the Standard Repayment Plan and the IDR Plans. *Id.* Since 2012, the Department has contracted with PHEAA as its sole servicer for borrowers pursuing PSLF relief. Only **loans** made under the Direct **Loan** Program are eligible to be forgiven under PSLF. Borrowers with other types of **loans**, such as FFEL **Loans**, are not eligible for PSLF, but may consolidate these other types of **loans** into a Direct Consolidation **Loan** to become eligible.

Borrowers may, but need not, submit an interim *Employment Certification Form* ("ECF") to receive confirmation that their employer qualifies and to track their progress toward PSLF forgiveness. To track one's progress towards **loan** forgiveness, the Department recommends that borrowers submit an ECF to determine the number of qualifying payments made so far and certify the borrower's employer as a qualifying employer. The Department delegates the ECF determination process to PHEAA, as the exclusive **loan** servicer of the PSLF Program. Accordingly, when a borrower expresses interest in the PSLF Program, his or her **loans** are transferred to PHEAA for servicing.

In 2018, Congress created the *Temporary Expanded Public Service Loan Forgiveness* **Program** (the "TEPSLF Program"), which extended PSLF **loan** forgiveness to Direct **Loan** borrowers who were enrolled in an ineligible repayment plan for some or all of their payments, but otherwise satisfied the requirements of PSLF. *See* Consolidated Appropriations Act, Pub. L. No. 115-141, § 315, 132 Stat. 348, 752–53 (2018).

*Income Driven Repayment Plans*

To address the financial difficulties **students** faced in repaying their **student loans**, Congress required the Department to offer borrowers repayment plans that base the monthly repayment amount on the borrower's income and provide other benefits that traditional repayment plans do not, including **loan** forgiveness after a period of 20 or 25 years. The federal government offers four *income-driven repayment plans* ("IDR Plans") designed to make the repayment of federal **student loans** less onerous and to help borrowers better manage their **student loan** debt: (1) *Income-Contingent Repayment* ("ICR"); (2) *Income-Based Repayment* ("IBR"); (3) *Pay-As - You-Earn* ("PAYE"); and (4) *Revised Pay-As-You-Earn* ("REPAYE") (collectively, the "*IDR Plans*"). Payments on an IDR Plan can result in forgiveness of any remaining **loan** balance after twenty or twenty-five years, depending on the plan. *See* 34 C.F.R. §§ 685.209(a)(6); 685.209(c)(5); 682.15(f); 685.221(f). Periods of forbearance do not count towards the qualifying repayment period. If a borrower chooses to switch repayment plans or is obligated to switch repayment plans due to a change in eligibility, federal regulations require that outstanding interest be capitalized, *i.e.*, added to the principal balance of the **loan**. *See* 34 C.F.R. §§ 682.215(b)(5); 685.221(b)(4); 685.209(a)(2) (iv)(A); 685.209(c)(2)(iv).

*4  Borrowers enroll in an IDR plan by submitting an IDR Request form, which according to Department guidance, should be processed within fifteen days. If additional time is necessary, the Department may place the borrower's **loans** into an "administrative forbearance" for a period up to sixty days. During this forbearance period, interest may not be capitalized.

A borrower's enrollment in an IDR plan is effective for a one-year period. Therefore, borrowers must submit documentation of their income and family size for each year they wish to remain on an IDR Plan. Generally, if a borrower does not submit his or her annual recertification paperwork within ten days of the deadline, the borrower's repayment amount will be recalculated at the Standard Repayment amount and any accrued interest will be capitalized. However, certain regulatory exceptions may apply, including, when the Department is able to determine the borrower's new repayment amount before the end of the borrower's current annual payment period. In these circumstances, a borrower's payment will not be recalculated under the Standard Repayment plan and any accrued interest will not be capitalized. Upon receipt of a recertification request, the Department must process the request "promptly," or within ten days, and maintain a borrower's current payment until their new payment can be determined. If a deficiency is identified in the enrollment or recertification paperwork, PHEAA is required to contact the borrower several times by phone and email to provide "high touch servicing" and "a clear expectation of what is needed to complete their enrollment or **re**-enrollment so they can stay on track." (Compl, ECF 49, at ¶ 440).

The Department is required to provide borrowers with notice of the recertification obligation, the consequence for failing to comply, and the deadline. The MPNs require that the Department send all required notices "by first-class mail," "by electronic means to an email address [the borrower has] provided," or "by any other method of notification that is permitted or required by applicable law and regulations." Notice of the recertification obligation, however, was routinely posted to a "paperless inbox" on PHEAA's website. (*Id.* at ¶¶ 452-43).

Borrowers may change repayment plans, including to an IDR Plan, at any time. Although the Department tells borrowers that they can do so "for free," changing from an IDR plan to another plan has harsh financial consequences, *i.e.*, all outstanding interest is capitalized. (*Id.* at ¶¶ 461-62). Without

regard to a borrower's specific need, and without sufficiently disclosing that interest will capitalize, the Department includes a blanket recommendation on the form used for the annual recertification process to choose the option that allows the Department to change the borrower's repayment plan to the plan with the lowest monthly payment.

### *The Consolidated Class Action Complaint*

As noted, Plaintiffs are thirty-three federal **student loan** borrowers and grant recipients from seventeen jurisdictions, bringing claims on behalf of themselves and three putative classes. Against PHEAA, Plaintiffs assert claims for (1) violations of the consumer protection statutes of fourteen state jurisdictions and (2) state common-law claims for: (a) breach of contract; (b) breach of fiduciary duty; (c) constructive fraud; (d) unjust enrichment; (e) negligence; (f) negligence per se; and (g) negligent misrepresentation. Against the Department, Plaintiffs assert claims under the APA and the Fifth Amendment Due Process clause, and for breach of various contracts governing the Plaintiffs' **student loans**. The factual basis for each named plaintiff's claim(s) varies depending on which **student loan** program applies to their **loans**. Plaintiffs are divided into three (sometimes overlapping) sub-groups, each raising claims pertaining to one of the three **student loan** programs described above.

#### *1. The TEACH Plaintiffs*

**\*5** Eight plaintiffs (the "TEACH Plaintiffs") bring TEACH-related claims on behalf of themselves and a putative class.[2] The TEACH Plaintiffs allege that they were harmed by the inappropriate conversion of their TEACH Grants to TEACH **Loans** after: (1) PHEAA rejected certification paperwork for "hyper-technical" errors; and/or (2) PHEAA failed to give appropriate notice of certification deadlines. All eight TEACH Plaintiffs applied for reconsideration of their conversions through the Department's reconsideration process. At the time the operative complaint was filed: (a) Plaintiff Asby's application for reconsideration had been denied; (b) Plaintiff Meyers' application for reconsideration was pending; and (c) Defendants had approved the applications for reconsideration of the other six TEACH Plaintiffs but had not refunded all of the principal and/or interest that these TEACH Plaintiffs had paid toward their TEACH **Loans**. As of the date of this opinion, all of the TEACH Plaintiffs have received full relief with respect to their TEACH-related claims: all TEACH Grants have been reinstated, all accrued interest has been removed, all payments

on the **loans** have been refunded, and all TEACH Plaintiffs have been advised that they satisfied their service obligations.

#### *2. The PSLF Plaintiffs*

Fifteen Plaintiffs (the "PSLF Plaintiffs") bring PSLF-related claims on behalf of themselves and a putative class.[3] The PSLF Plaintiffs allege that they have been harmed by PHEAA's undercounting their PSLF-qualifying payments and by the Department's improper administration and oversight of the PSLF Programs, such that they claim to be either already eligible for PSLF forgiveness or are closer than Defendants' disclosed figures would indicate. At the time the operative complaint was filed, however, ten of the fifteen PSLF Plaintiffs — even if credited with the PSLF-qualifying payments that they say PHEAA has not counted — were at least a full year away from potentially qualifying for PSLF forgiveness.[4] As of the date of this opinion, all of the PSLF Plaintiffs have received full relief with respect to their PSLF-related claims: the balances of all of the PSLF Plaintiffs' eligible **loans** have either been forgiven under the PSLF **Loan** Forgiveness Program or the PSLF Limited Waiver or have been fully paid by the Plaintiff prior to meeting the 120 payment requirement.

#### *3. The IDR Plan Plaintiffs*

Nineteen plaintiffs (the "IDR Plaintiffs") assert IDR-related claims on behalf of themselves and a putative class.[5] The IDR Plaintiffs' claims arise from allegations that PHEAA failed to: (1) disclose the availability of IDR plans; (2) disclose that accrued interest would capitalize after periods of forbearance or when a borrower switched IDR plans; (3) timely process IDR applications; and (4) give adequate notice of annual IDR recertification deadlines; and by the Department's improper administration and oversight of the IDR Plans. The IDR Plaintiffs allege they were harmed by having to pay higher monthly amounts, losing eligibility for future forbearances, and losing the opportunity to make qualifying payments toward IDR forgiveness. As of the date of this opinion, the balances on all but three of the nineteen IDR Plaintiffs' federal **student loans** have been fully paid and/or forgiven. Only IDR Plaintiffs Anderson, Arany, and Leone have remaining **student loan** balances. Each of these three IDR Plaintiffs has earned additional months of progress toward IDR and/or PSLF forgiveness.

**STANDARD OF REVIEW**

**\*6** As noted, Defendants move to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1) on the basis that this Court lacks subject-matter jurisdiction because some of the Plaintiffs lack Article III standing to assert their claims and some or all of the claims have been mooted by undisputed events that occurred after Plaintiffs filed the operative complaint.

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.' " *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Submitting a signed declaration or otherwise presenting competing jurisdictional facts presents a factual challenge. *Davis*, 824 F.3d at 346. When a party presents a factual challenge to the Court's jurisdiction, a court is not limited to the pleadings in resolving the challenge. *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 251 (3d Cir. 2002) ("When a Rule 12(b)(1) motion is evaluated as a 'factual attack' on the Court's subject matter jurisdiction, the court may consider evidence outside the pleadings in evaluating that attack."). Here, Defendants have made a factual challenge, and all parties have submitted jurisdictional evidence.

**DISCUSSION**

Though federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), Article III of the Constitution limits the federal judiciary's authority to exercise its "judicial Power" to resolving "Cases" and "Controversies." U.S. Const. Art. III, § 2. This case-or-controversy limitation is "essential to our system of separated powers," *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009). It "ensur[es] that the Federal Judiciary respects the proper — and properly limited — role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted). Federal courts enforce this limitation "through the several justiciability doctrines that cluster about Article III," including "standing, ripeness, [and] mootness ...." *Toll Bros.*, 555 F.3d at 137 (internal quotation marks omitted).

**I. *ARTICLE III STANDING***

Defendants argue that many of the Plaintiffs falling into one or more of the three categories described above lack Article III standing because they have not suffered an injury in fact and, therefore, this Court lacks subject-matter jurisdiction over these Plaintiffs' claims. Before addressing any of Plaintiffs' claims, this Court must determine whether Plaintiffs have Article III standing to assert their claims. *Biden v. Nebraska*, 600 U.S. ——, 143 S. Ct. 2355, 2365, 216 L.Ed.2d 1063 (2023). Under Article III, Plaintiffs must have a "personal stake" in the case. *Id.* at 2365. To meet this requirement, a "plaintiff must have suffered an injury in fact — a concrete and imminent harm to a legally protected interest, like property or money — that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Id.*; *see also Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 268 (3d Cir. 2020). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing Article III standing. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020).

**\*7** To satisfy Article III standing, a plaintiff must allege facts sufficient to show: (1) an injury in fact that is concrete and particularized, as well as actual and imminent; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In a class action, named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003).

The first element, injury in fact, "is often determinative." *Toll Bros.*, 555 F.3d at 138. "To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.' " *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)).

"A harm is 'actual or imminent' rather than 'conjectural or hypothetical' where it is presently or actually occurring, or is sufficiently imminent ... [P]laintiffs relying on claims of imminent harm must demonstrate that they face a realistic danger of sustaining a direct injury from the conduct of which they complain." *Sherwin-Williams*, 968 F.3d at 269 (citation omitted). "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Id.* (citation omitted).

"Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components, as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact." *Cottrell*, 874 F.3d at 162 (3d Cir. 2017) (citation omitted). However, "there is a significant difference between ... an actual harm that has occurred" and "a mere risk of future harm." *TransUnion*, 594 U.S. at 437, 141 S.Ct. 2190. The Supreme Court has repeatedly held that a risk of future injury must be "certainly impending" to constitute injury in fact, and that allegations of "*possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (emphasis in original). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2, 112 S.Ct. 2130.

When a plaintiff fails to establish Article III standing, the court lacks subject-matter jurisdiction, *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), and dismissal is required, *Goodmann v. People's Bank*, 209 F. App'x 111, 113 (3d Cir. 2006). Where the named plaintiff fails to establish Article III standing, the putative class action must also be dismissed for lack of subject-matter jurisdiction. *Finkelman*, 810 F.3d at 195.

### A. *The TEACH Plaintiffs*

Defendants argue that five of the eight TEACH Plaintiffs (hereinafter, the "Reconsideration TEACH Plaintiffs")[6] lack standing to bring their TEACH claims because they had not suffered an injury in fact as of the time of the operative complaint. Specifically, Defendants argue that because the Reconsideration TEACH Plaintiffs were provided a full remedy through the TEACH Program's Reconsideration process *prior* to the filing of the operative complaint, the

Reconsideration TEACH Plaintiffs lack standing. This Court agrees with Defendants.

**\*8**    At the core of the TEACH Plaintiffs' claims is their allegation that Defendants wrongfully converted the TEACH Plaintiffs' grants into interest-bearing repayable **loans**, effectively depriving the TEACH Plaintiffs of the benefits of the TEACH Grant Program. As remedy for the Defendants' alleged wrongdoing, the TEACH Plaintiffs seek injunctive relief in the form of "an order requiring the Department to (i) reconvert [their] ... TEACH **Loans** back to TEACH Grants, (ii) provide credit for all accrued but unpaid interest, (iii) provide a credit or refund for payments of principal and interest made towards the TEACH **loans**." (Compl., ECF 49, at ¶ 595). Notably, in the operative complaint, the Reconsideration TEACH Plaintiffs allege that Defendants approved their applications for reconsideration, resulting in the conversion of the repayable **loans** back into grants. (*See* Comp., ECF 55, at ¶¶ 58-59, 106, 165, 222-23, and 230). In addition, according to the unrebutted declaration of Christin Bulman, a **loan** analyst with the U.S. Department of Education, each of the Reconsideration TEACH Plaintiffs' requests for reconsideration was approved and each of the Reconsideration TEACH Plaintiffs was granted complete relief prior to the filing of the operative complaint. (*See* Bulman Decl., ECF 61-1, at ¶ 14(b)-(c), (e), (g)-(h)). Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other **loan** balances, prior to the filing of the complaint. (*Id.*). Each of the Reconsideration TEACH Plaintiffs has also been advised that they have fully satisfied their service obligation. (*Id.*). As such, each of the Reconsideration TEACH Plaintiffs obtained the remedies sought in the operative complaint *prior* to its filing. Because the Reconsideration TEACH Plaintiffs have not asserted an injury in fact, they lack Article III standing, and this Court lacks subject-matter jurisdiction over their claims.

Despite receiving the very remedies they sought in the operative complaint, the Reconsideration TEACH Plaintiffs now argue that they suffered an injury in fact in the form of having their payments credited to other school **loan** balances and the lost time value of their money. Notably, as argued by Defendants, the operative complaint does not contain any allegations to support these alleged injuries. (*See generally* Compl, ECF 49). Indeed, the Reconsideration TEACH Plaintiffs expressly sought as remedy "a credit or refund for payments of principal and interest made towards

TEACH **Loans**." (Compl., ECF 49, at ¶ 595(iii); *see also id.* at ¶¶ 11, 43(a), 60(a), 107(a), 146(a), 167, 212(b)-(c), 224(a), and 231(a)) (alleging injuries from failure to refund and/or credit payments). The Reconsideration TEACH Plaintiffs each received either refunds or credits to their other school **loan** balances, the very remedies requested in the operative complaint. As such, the Reconsideration TEACH Plaintiffs have not alleged an injury in fact, and, thus, lack standing. Accordingly, the TEACH-related claims of Plaintiffs Charles, Jones, Musser, Wardlow, and Webb are dismissed for lack of standing.

### B. *The PSLF Plaintiffs*

Defendants argue that ten of the fifteen PSLF Plaintiffs (hereinafter, the "Pre-Forgiveness PSLF Plaintiffs")[7] lack standing to bring any of their PSLF claims because they have not suffered an injury in fact. Specifically, Defendants argue that because the Pre-Forgiveness PSLF Plaintiffs' alleged injuries are contingent on their successful completion of 120 qualifying **loan** payments and ten years of employment with a qualifying employer, the alleged injuries are not real and immediate but instead speculative. This Court agrees with Defendants.

Notably, this case is not the first in which federal **student loan** borrowers have brought suit against **student loan** servicers claiming they were wrongfully denied access to or the benefits of the PSLF **Loan** Forgiveness Program. When adjudicating those cases, courts have held that the plaintiff borrowers do not have standing to sue until they have suffered the actual injury alleged, *i.e.,* making more than the required 120 payments while working in public service for ten years. *See e.g., Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070 (C.D. Cal. 2019); *Love v. Pa. Higher Educ. Assistance Agency*, 2020 WL 1545798 (N.D. Ga. Mar. 16, 2020). For example, in *Winebarger*, federal **student loan** borrowers alleged that their **student loan** servicers incorrectly calculated the number of qualifying payments they had made towards the 120 required for **loan** forgiveness under the PSLF **Loan** Forgiveness Program. 411 F. Supp. 3d at 1080. As for their alleged injuries, the *Winebarger* plaintiffs asserted that as a result of the servicer's mistakes, the plaintiffs would be required to make more **student loan** payments than necessary to qualify for forgiveness and had been unable to make informed decisions about whether to continue working in the public sector. *Id.* Adopting the standing argument made by Defendants in the case *sub judice*, the *Winebarger* court

concluded that the plaintiffs lacked standing because they had not asserted an injury in fact since they had not yet met the statutory requirements for **loan** forgiveness. *Id.* at 1086-87. As for the alleged inability to make an informed decision between public and private employment, the court found such injury speculative and not "actual and imminent," particularly in the absence of any allegations that the plaintiffs had engaged in any private employment job search. *Id.* at 1087. Similarly, the court found the potential prolongation of payments beyond the necessary 120 payments was "purely hypothetical" because it was unknown whether the plaintiffs would eventually make all of the requisite 120 **loan** payments and/or remain employed by a qualifying employer. *Id.* "Thus, Plaintiffs' unfounded fear that they may need to make more than 120 qualifying payments to obtain PSLF **loan** forgiveness in five to seven years is wholly speculative and far too remote to confer standing." *Id.*

**\*9** Other district courts have held similarly. *See e.g., Love*, 2020 WL 1545798, at \*4–5 (holding plaintiff **student loan** borrowers did not have Article III standing to bring claims against defendant PHEAA premised on the PSLF **Loan** Forgiveness Program because plaintiffs had not yet made the requisite 120 payments and plaintiffs may not remain eligible for the program in the future); *Alexander v. Great Lakes Higher Educ. Corp*, No. 17-00253, slip op. at \*12 (N.D. Fla. June 19, 2021) (holding that while plaintiff **loan** borrowers had alleged sufficient facts to show misconduct on the part of **loan** servicer Great Lakes, those plaintiffs that had not yet made sufficient payments to apply for PSLF **loan** forgiveness had not suffered an Article III injury in fact, and any future injury was too speculative to confer standing); *Meenan v. Navient Corp.*, 2020 WL 5057654, at \*2 (D. Ariz. Aug. 27, 2020) (holding that **student loan** borrower would not have had Article III standing to bring suit for claim premised on PSLF **Loan** Forgiveness Program until the plaintiff had made more than 120 payments towards repaying her **student loans**); *Lyons v. Great Lakes Educ. Loan Serv., Inc.*, 2022 WL 602972, at \*9 (D. N.J. Mar. 1, 2022) (holding that **student loan** borrowers lacked Article III standing where "no injury would materialize until Plaintiffs have to pay a single dollar towards 'wrongfully' accrued **student loan** interest—which could be years in the future.").

Similar to the claims asserted by the plaintiffs in the above-referenced cases, here, the core of the Pre-Forgiveness PSLF Plaintiffs' claims is their anticipation/fear that at some point in the future — *after* they have made 120 qualifying payments and have worked for a qualified employer for 10 years — their

applications for **loan** forgiveness will be wrongfully denied, resulting in a delay in PSLF forgiveness and/or unnecessary payments of principal and interest. Specifically, with respect to their requisite injury, the Pre-Forgiveness PSLF Plaintiffs allege that they have been denied "the opportunity to make qualifying [**loan**] payments, which delays **loan** forgiveness under PSLF....." (Comp., ECF 49, at ¶ 96; *see also* ¶¶ 20, 67, 81, 86, 91, 111, 122, 132, 136, 150, 158). The alleged "delay in **loan** forgiveness," however, is purely hypothetical. The Pre-Forgiveness PSLF Plaintiffs may or may not make all their **loan** payments on time over the next few years; they may or may not continue to work for a qualifying employer for the required time; and Defendants may or may not correct any allegedly incorrect qualifying payment tally. [8] Indeed, the Pre-Forgiveness PSLF Plaintiffs have not applied for **loan** forgiveness nor have they alleged that they are currently eligible to do so.

This speculative chain of possibilities requires both assumptions that these ten PSLF Plaintiffs will fulfill all of the PSLF **Loan** Forgiveness Program requirements and guesswork regarding the Department's future decisions on each of these ten PSLF Plaintiffs' yet-to-be filed applications. This is the precise type of hypothetical injury that courts have found to be insufficient to confer standing. With respect to these ten PSLF Plaintiffs, no injury will materialize unless and until their **loan** forgiveness under the PSLF **Loan** Forgiveness Program has been delayed beyond the point when they have made the requisite 120 payments while working for a qualifying employer. Taking the Pre-Forgiveness PSLF Plaintiffs' allegations in the operative complaint as true, this Court finds that the feared denials of the Pre-Forgiveness PSLF Plaintiffs' future applications for **loan** forgiveness depend on future contingencies that may or may not occur and, therefore, are not "certainly impending." As such, the Pre-Forgiveness PSLF Plaintiffs do not have standing to bring their PSLF **Loan** Forgiveness Program claims. Accordingly, the Pre-Forgiveness PSLF Plaintiffs' claims are dismissed for lack of subject-matter jurisdiction.

## *II. MOOTNESS*

**\*10**  Defendants argue that many of Plaintiffs' claims have been mooted by various programmatic and legislative initiatives that address and remedy many of Plaintiffs' alleged claims with respect to the three **student loan** programs at issue — the TEACH Grant Program, the PSLF **Loan** Forgiveness Program, and the IDR Program. The mootness doctrine "ensures that the **litigant's** interest in the outcome

continues to exist throughout the life of the lawsuit and is concerned with the court's ability to grant effective relief." *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017) (internal quotations and citations omitted). A case is moot if "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief." *Id.* (quoting *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698-99 (3d Cir. 1996)).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' " *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). Plaintiffs must maintain a personal stake in the resolution of the dispute throughout the **litigation**. *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013). "Therefore, 'if developments occurring during the course of adjudication eliminate a plaintiff's personal stake in the outcome of a suit, then a federal court must dismiss the case as moot.' " *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (citation omitted).

The party asserting mootness bears the burden of demonstrating mootness. *Freedom from Religion Found. Inc. v. New Kennsington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016). "The party asserting that a claim is moot must show that it is 'absolutely clear that the allegedly wrongful behavior [is] not reasonably [ ] expected to recur.' " *Id.* (quoting *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693). If a party claims that some development has mooted the case, it bears "[t]he 'heavy burden of persua[ding]' the court" that there is no longer a live controversy. *Friends of the Earth*, 528 U.S. at 189, 120 S.Ct. 693 (citation omitted). A case will be found moot if "(1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *N.J. Tpk. Auth/ v. Jersey Cent. Power and Light*, 772 F.2d 25, 31 (3d Cir. 1985) (internal citations omitted). "When a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct." *Hartnett*, 963 F.3d at 306.

### A. The PSLF Plaintiffs

As set forth above, this Court finds that the Pre-Forgiveness PSLF Plaintiffs (ten of the fifteen PSLF Plaintiffs) lack Article III standing to pursue the PSLF **Loan** Forgiveness Program claims asserted in this action because they failed to assert an injury in fact. Defendants further argue that the PSLF **Loan** Forgiveness Program claims of the five remaining PSLF Plaintiffs (PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff), as well as those of the Pre-Forgiveness PSLF Plaintiffs, are now moot because of the post-complaint programmatic changes to the PSLF **Loan** Forgiveness Program that have effectively cured the alleged failures in the program and have provided the PSLF Plaintiffs the remedies they seek in this action. This Court agrees with Defendants.

As described above, the PSLF Plaintiffs assert claims against Defendants premised on their allegation that, due to various systematic failures, Defendants effectively undercounted these plaintiffs PSLF-qualifying payments, thereby delaying and/or denying **loan** forgiveness under the PSLF **Loan** Forgiveness Program. As remedies, the PSLF Plaintiffs seek damages resulting from the undercounting and various injunctive relief, including "an order requiring the Department to (i) conduct a full accounting review of the qualifying payments made by PSLF Plaintiffs and members of the PSLF Class and provide explanation for any payment that is deemed a non-qualifying payment; (ii) provide additional credit for all payments made after Plaintiffs and members of the PSLF Class submitted PSLF Employment Certification Requests or otherwise expressed a documented interest in the PSLF Program, regardless of repayment plan; (iii) grant **loan** forgiveness for any PSLF Plaintiff or member of the PSLF Class who have made 120 qualifying payments and such additional payments; (iv) provide a credit or refund for any payment of principal and interest made after the date of the last qualifying or additional payment." (Compl., ECF 49, at ¶ 612; *see also* Prayer for Relief, at p. 231).

**\*11** In October 2021, the Department announced (and has since implemented) a series of actions that significantly affect the PSLF **Loan** Forgiveness Program. Acting under authority of the HEROES Act, 20 U.S.C. § 1098bb, the Department implemented a time-limited *waiver of many of the PSLF **Loan** Forgiveness Program's restrictions* (the "PSLF Waiver"). Under the PSLF Waiver, from October 2021 through October 2022, **student loan** borrowers (like

the PSLF Plaintiffs here) were provided opportunity to obtain retroactive credit toward **loan** forgiveness for prior periods of repayment that would not have otherwise qualified under the original PSLF **Loan** Forgiveness Program. So long as applicable employment requirements are met, past periods of repayment are counted toward **loan** forgiveness — even if the borrower was in a nonqualifying **loan** program or repayment plan, and even if past payments were not made in full or on time. *See generally* https://studentaid.gov/announcements-events/pslf-limited-waiver (last visited August 26, 2024).

As set forth in the various declarations attached to Defendants' briefs, and not disputed by Plaintiffs, every PSLF Plaintiff was eligible to request relief under the above-described PSLF Waiver. Further, of the five PSLF Plaintiffs who have standing to assert PSLF-based claims (PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff), all but Plaintiff Bonham have received complete forgiveness/discharge of their federal **student loans** pursuant to the PSLF **Loan** Forgiveness Program. To the extent any of these PSLF Plaintiffs made payments after the effective date of their forgiveness, those payments have been fully refunded. PSLF Plaintiff Bonham received a complete retroactive discharge of one of her federal **student loans** and has received credits toward forgiveness for additional qualifying payments on her remaining federal **student loan** under the PSLF Waiver and will be eligible for additional PSLF forgiveness after making eighteen more qualifying payments.

As a result of the systemic changes to the PSLF **Loan** Forgiveness Program, particularly the PSLF Waiver, all of the PSLF Plaintiffs who have standing have effectively received the remedies sought in this action. Specifically, these PSLF Plaintiffs have received complete forgiveness/discharge of their qualifying federal **student loans**, received refunds for overpayments, and/or have received credits for all qualifying payments made under the PSLF **Loan** Program. As such, these PSLF Plaintiffs' claims are moot. Accordingly, the PSLF-based claims of PSLF Plaintiffs Bonham, Davis, Pruess, Shelley, and Wolff are dismissed for lack of subject-matter jurisdiction.

### B. The TEACH Plaintiffs

As set forth above, this Court finds that the Reconsideration TEACH Plaintiffs (five of the eight TEACH Plaintiffs) lack Article III standing to pursue their TEACH Grant Program claims in this action because they obtained full relief

prior to the filing of the operative complaint. Defendants argue that the TEACH Grant Program claims of the three remaining TEACH Plaintiffs (*Plaintiffs Asby, Meyer, and Stevens*) (hereinafter, the "Remaining TEACH Plaintiffs") are moot because each of these TEACH Plaintiffs has similarly received full relief after the operative complaint was filed. This Court agrees.

As set forth in the unrebutted declaration of Ms. Bulman, each of the requests for reconsideration submitted by the Remaining TEACH Plaintiffs was approved, and each of these TEACH Plaintiffs was granted complete relief after the filing of the operative complaint. (*See* Bulman Decl., ECF 61-1, at ¶ 14(a), (d), and (f)). Specifically, each of the requests for reconsideration was granted and any amounts previously paid were either refunded or applied to the borrower's other **loan** balances, after the filing of the complaint. (*Id.*). In addition, the Remaining TEACH Plaintiffs have all been advised that they have fully satisfied their service obligation. (*Id.* at ¶ 14(a) and (d)) (*see also* Sup. Bulman Decl., ECF 80-1, at ¶ 8(m)). As such, each of the Remaining TEACH Plaintiffs obtained the remedies sought in the operative complaint after its filing. Accordingly, the Remaining TEACH Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### C. The IDR Plaintiffs

**\*12** Defendants argue that the IDR Plaintiffs' claims are now moot because of post-complaint programmatic changes to the IDR Program (in combination with similar changes to the PSLF **Loan** Forgiveness Program) that have effectively cured the alleged failures in the program and provided the IDR Plaintiffs the remedies they seek in this action. This Court agrees with Defendants.

On April 19, 2022, the Department announced changes to the manner in which it counts qualifying payments for purposes of **loan** forgiveness available to borrowers on IDR Plans. To address concerns about servicers "steering" borrowers into forbearance, the Department explained that it would be conducting a review of accounts, and count toward IDR forgiveness certain periods of forbearance deemed to be excessive (12 or more consecutive months or 36 or more cumulative months). Borrowers steered into shorter periods of forbearance may seek account review by filing a complaint with the FSA Ombudsman at StudentAid.gov/feedback. The Department also announced that it was taking other steps to

address complaints that **loan** servicers were inappropriately steering borrowers into forbearance when other options were more in the borrowers' interests. *See id.*

As of the date of this opinion and as a result of these programmatic changes, the entire balances of sixteen of the nineteen IDR Plaintiffs' federal **student loans** have been fully forgiven and/or discharged under either the PSLF **Loan** Forgiveness Program or the IDR Program or other discharge/ repayment options. Indeed, only IDR Plaintiffs Anderson, Arany, and Leone have remaining **student loan** balances. However, each of these three IDR Plaintiffs has received additional credits toward **loan** forgiveness under the IDR Programs and/or PSLF **Loan** Forgiveness Program since revisions have been made to those programs.[9] As such, all of the IDR Plaintiffs have received the remedies sought in the operative complaint for which they are currently eligible. Accordingly, the IDR Plaintiffs' claims are moot, and this Court lacks subject-matter jurisdiction over them.

### D. Exceptions to Mootness

While not disputing Defendants' jurisdictional facts with respect to mootness, Plaintiffs argue that various exceptions to the mootness doctrine apply. When applicable, these exceptions allow a class plaintiff to continue to represent a class in a class action. Contrary to Plaintiffs' arguments, however, none of the mootness exceptions apply here.

When a plaintiff seeks to represent a class of similarly situated individuals, the general rule is that "the mooting of [the] named plaintiff's claim prior to class certification moots the entire case." *Richardson v. Bledsoe*, 829 F.3d 273, 286 (3d Cir. 2016) (citations omitted); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000); *Hering v. Walgreens Boots Alliance, Inc.*, 341 F. Supp. 3d 412, 418 (M.D. Pa. 2018). However, "Article III mootness is more 'flexible' than other justiciability requirements, especially in the context of class action **litigation**." *Richardson*, 829 F.3d at 278 (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 400, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). "A plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class." *Rosetti v. Shalala*, 12 F.3d 1216, 1226 (3d Cir. 1993) (quoting *Geraghty*, 445 U.S. at 404, 100 S.Ct. 1202). Accordingly, the Third Circuit has "recognized that '[i]n the class action context, special mootness rules apply' for determining at what

point in time a named plaintiff must still have a personal stake in the **litigation** to continue seeking to represent a putative class action." *Richardson*, 829 F.3d at 278-79 (quoting *Brown v. Phila. Hous. Auth.*, 350 F.3d 338, 343 (3d Cir. 2003)).

**\*13** Where a class has been certified, "mooting of the class representative's claims does not moot the entire action because the class 'acquire[s] a legal status separate from the interest asserted [by its named plaintiff].' " *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)). The Third Circuit has also held that "so long as a plaintiff files a motion to certify a class when he still has a live claim, the mooting of that claim while the motion is pending precludes the court from reaching the merits but does not preclude it from deciding the certification motion." *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 838 F.3d 297, 305 (3d Cir. 2016) (citing *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000)). In such circumstances, a motion for class certification is said to "relate back" to the complaint, before the plaintiff's individual claims became moot. *Id.* at 306-07.

The Third Circuit has expanded the "relation back doctrine" in limited cases where, like here, the plaintiff's claims were mooted prior to the filing of a motion for class certification. *Richardson*, 829 F.3d 273, 288 (3d Cir. 2016). In *Richardson*, the Third Circuit cited "the general principle that 'the class action process should be able to "play out" according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues." *Id.* at 281 (quoting *Weiss v. Regal Collections*, 385 F.3d 337, 348 (3d Cir. 2004)). The Court further explained that the mere "filing of a certification *motion*, rather than the entry of a certification *order* ... does nothing significant" and simply "indicates that the named plaintiff intends to represent a class if allowed to do so." *Richardson*, 829 F.3d at 285 (quoting *Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 707-08 (11th Cir. 2014)). Because the filing of a class action complaint provides equal notice of the plaintiff's intent to represent a class, the absence of a motion seeking certification is not alone fatal. *Id.* at 288. The *Richardson* Court went on to recognize the so-called "relation back doctrine," which allows a class action lawsuit to proceed even when plaintiffs' claims were mooted prior to filing a motion for class certification when one of three mootness exceptions applies: the inherently transitory, capable of repetition yet evading review, and picking off exceptions. *Id.* at 279.

### 1. The Inherently Transitory Exception

Under the inherently transitory exception to mootness, the relation back doctrine may apply in class actions "where it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct and the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.' " *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013) (citations omitted). This exception was developed "to address circumstances in which the challenged conduct was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for **litigation** to run its course." *Id.* This exception, however, "has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's **litigation** strategy." *Id.* at 76-77, 133 S.Ct. 1523. Plaintiffs carry the burden of showing that their claims fall within this exception. *See Richardson*, 829 F.3d at 283 n.4.

Plaintiffs have not met their burden of showing application of this exception. First, it is far from a certainty that potential class plaintiffs will continue to be subject to the complained of conduct in light of the undisputed changes to the underlying **student loan** programs that have mooted Plaintiffs' claims. Second, the asserted claims are not so inherently transitory as to deprive a court of the time necessary to consider class certification. Indeed, as alleged, Defendants' conduct took place over a period of years. As such, Plaintiffs' claims do not meet this narrow exception to mootness.

### 2. The Capable of Repetition Yet Evading Review Exception

**\*14** The "capable of repetition yet evading review" exception is also "narrow" and "applies only in exceptional situations ...." *Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 231 (3d Cir. 2021) (quoting *Hamilton v. Bromley*, 862 F.3d 329, 335 (3d Cir. 2017)). "A dispute qualifies for that exception only 'if (1) the challenged action is in its duration too short to be fully **litigated** prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.' " *United States v. Sanchez-Gomez*, 584 U.S. 381, 391, 138 S.Ct. 1532, 200 L.Ed.2d 792 (2018) (quoting *Turner v. Rogers*, 564 U.S. 431, 439–440, 131 S.Ct. 2507,

180 L.Ed.2d 452 (2011)). "There must be more than a theoretical possibility of the action occurring against the complaining party again; it must be a reasonable expectation or a demonstrated probability." *Cnty. of Butler*, 8 F.4th 226 at 231 (citing *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). It is the plaintiff's "burden to show that the 'capable of repetition yet evading review' exception applies." *Id.*

Plaintiffs have not met their burden of showing that this exception applies. The complained of actions by Defendants were not too short in duration to allow for full **litigation**, but rather occurred over multiple years. Further, Plaintiffs have all received or are eligible to receive the remedies sought in the operative complaint. Thus, there is not a reasonable expectation that Plaintiffs will be subject to the same conduct again. As such, this exception does not apply.

### 3. The Picking Off Exception

The "picking off" exception to mootness "permits courts to relate a would-be class representative's (now moot) claim for relief back in time to a point at which that plaintiff still had a personal stake in the outcome of the **litigation**." *Duncan v. Governor of Virgin Islands*, 48 F. 4th 195, 204 (3d Cir. 2022) (quoting *Richardson*, 829 F.3d at 279). This mootness exception has been applied where a defendant "picks off" a named plaintiff by mooting the individual plaintiff's claims early in the **litigation** — such as through settlement offers — and thus cuts off the **litigation** before class action procedures progress. The *Richardson* Court limited its holding to permitting relation back in the absence of a certification motion "[w]hen an individual plaintiff's claim for relief is acutely susceptible to mootness and it is clear from the complaint that the plaintiff is seeking to represent a class." *Id.* at 286; *see also Duncan*, 48 F.4th at 204-05. The picking off exception, however, applies "only in situations where the mooting of the individual claim 'occurred at so early a point in **litigation** that the named plaintiff could not have been expected to file a class certification motion.' " *Id.* (quoting *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011)); *see also Smith v. Vision Solar LLC*, 2023 WL 2539017, at *3 (E.D. Pa. Mar. 16, 2023).

Though the operative complaint makes it clear that Plaintiffs intended to seek class certification, for the same reasons set forth above with respect to the other mootness exceptions, Plaintiffs' claims for relief are not acutely susceptible to

mootness. Defendants' alleged conduct occurred over a period of years. Indeed, most of the asserted claims were not mooted until years after Plaintiffs filed the operative complaint. As such, the claims were not mooted "at so early a point in **litigation** that the named plaintiff could not have been expected to file a class certification motion." Accordingly, the picking off exception does not apply.

### 4. The Voluntary Cessation Exception/Doctrine

Plaintiffs also argue that the TEACH Plaintiffs and PSLF Plaintiffs' claims should not be deemed mooted under the voluntary cessation exception. [10] "Voluntary cessation of challenged activity will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007)). The crucial issue is whether the defendant "could reasonably be expected to engage in the challenged behavior again." *Hartnett v. Pennsylvania State Education Assoc.*, 963 F.3d 301, 306 (3d Cir. 2020) (citation omitted). "[T]he focus is on whether the defendant made that change unilaterally and so may 'return to [its] old ways' later on." *Id.* at 307. (citations omitted). The party asserting mootness "bears the 'heavy burden' of showing that it will not 'revert to' its prior policy." *Fields*, 936 F.3d at 161 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1, 137 S.Ct. 2012, 198 L.Ed.2d 551 (2017)). The Third Circuit has opined, however, that "[a]bsent any evidence to the contrary," a court " 'generally presume[s] that government officials act in good faith.' " *Parker v. Governor of Pa.*, 2021 WL 5492803, at *4 (3d Cir. Nov. 23, 2021) (quoting *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 230 (3d Cir. 2022)).

**\*15** This Court finds that Defendants have carried their burden of showing that it is absolutely clear that recurrences are not reasonably likely. The changes to the TEACH Grant Program that have now provided the TEACH Plaintiffs the remedies sought in the operative complaint are the result of President Biden's signing into law the Consider Teachers Act of 2021, Pub. L. 117-49, which amended statutory provisions pertaining to the TEACH Grant Program. These changes, codified into law, occurred in 2021 and remain in effect. Moreover, each TEACH Plaintiff has obtained the relief sought in the operative complaint and has completed his/her service obligation. There is no record evidence to

overcome the presumption of the Government's good faith in implementing these changes. Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the TEACH Plaintiffs' detriment.

Similarly, the changes to the PSLF **Loan** Forgiveness Program that have now provided the PSLF Plaintiffs the remedies sought in the operative complaint are the result of a series of regulatory actions taken by the Department under the authority of the HEROES Act, 20 U.S.C. § 1098bb. These regulatory changes began in 2021 and, though these changes included a Limited PSLF Waiver, that limited waiver was extended through June 30, 2024. Moreover, each PSLF Plaintiff has obtained, or is eligible to obtain, the relief sought in the operative complaint. There is no record evidence to overcome the presumption of the Government's good faith in implementing these changes. Under these undisputed facts, it is absolutely clear that Defendants cannot resort to their alleged previous misconduct to the PSLF Plaintiffs' detriment.

**CONCLUSION**

For the reasons set forth, this Court lacks jurisdiction over Plaintiffs' claims in this action because Plaintiffs either lack Article III standing or the claims have become moot. Accordingly, Defendants' motions to dismiss are granted. An Order consistent with this Opinion shall follow.

**All Citations**

Slip Copy, 2025 WL 539681

---

## Footnotes

1      These and other programs are in bold to facilitate the reading of this memorandum opinion.

2      The TEACH Plaintiffs are Michael Asby, Jacquelynn Charles, Lindsey Jones, Steven Meyer, Megan Musser a/k/a Megan Holland, Chris Stevens, Katherine Wardlow, and Maggie Webb. (*See* Compl., ECF 49, at ¶ 242).

3      The PSLF Plaintiffs are Katie Bonham, Jamie Coleman, Andrea Davis, Arianne Gallagher, Dr. Garima Gupta, Nathan Harig, Brittany King, Yannet Lathrop, Adela Levis, Shon Meckfessel, Amanda Miller, Adam Morris, Heather Pruess, Seth Shelley, and Nicole Wolff. (*See* Compl., ECF 49, at ¶ 244).

4      Specifically, at the time of the operative complaint, these ten PSLF Plaintiffs had the following minimum repayment durations remaining: Coleman - 2 years (*Id.* at ¶ 62); Gallagher - 2 years (*Id.* at ¶ 74); Gupta - 3 years (*Id.* at ¶ 84); Harig - 1 year (*Id.* at ¶ 88); King - 6 years (*Id.* at ¶ 108); Lathrop - 2 years (*Id.* at ¶ 115); Levis - 3 years (*Id.* at ¶ 131); Meckfessel - 7 years (*Id.* at ¶ 134); Miller - 7 years (*Id.* at ¶ 149); Morris - 6 years (*Id.* at ¶¶ 154–55).

5      The IDR Plaintiffs are Arielle M. Anderson, Tanuja Goulet Arany, Laura Brady, Jamie Coleman a/k/a Jamie McFarland, Arianne Gallagher, Mark Hawkins, Seniqua Johnson, Brittany King, Yannet Lathrop, Amanda Leone, Shon Meckfessel, Adam Morris, Heather Pruess, Meagan Pryor, Stacey Puccini, Hannah Rockwell, Seth Shelley, Adele S. Turnage, and Nichole Wolff. (*See* Compl., ECF 49, at ¶ 243).

6      The Reconsideration TEACH Plaintiffs include the following: Plaintiffs Charles, Jones, Musser, Wardlow, and Webb.

7      The Pre-Forgiveness PSLF Plaintiffs are the following: Plaintiffs Coleman, Gallagher, Gupta, Harig, King, Lathrop, Levis, Meckfessel, Miller, and Morris.

8       Indeed, as discussed below with respect to Defendants' mootness arguments, *see infra* at Section II.A, Defendants have implemented changes to the PSLF **Loan** Forgiveness Program that have effectively fixed the alleged problems.

9       Notably, as of April 17, 2024, IDR Plaintiff Anderson needed only fifteen additional qualifying payments for **loan** forgiveness under the PSLF **Loan** Forgiveness Program.

10      This Court is aware that reference to voluntary cessation as an "exception to mootness" is not entirely accurate. *See Hartnett v. Pa. State Educ. Assoc.*, 963 F.3d 301, 307 (3d Cir. 2020). Notwithstanding, its requirements are well-settled. *Id.*

---

**End of Document**                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.

8

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 61 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

2021 WL 2349828
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

IN RE: LAMICTAL DIRECT
PURCHASER ANTITRUST LITIGATION

Civil Action No. 12-995
|
Signed 06/07/2021

## OPINION

John Michael Vazquez, U.S.D.J.

**\*1** This antitrust class action stems from a settlement in a patent lawsuit concerning a brand drug, Lamictal, and its generic competitor, lamotrigine. In the patent case, Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") sued Defendants Teva Pharmaceutical Industries LTD and its subsidiary Teva Pharmaceuticals USA, Inc. (collectively "Teva"). GSK and Teva settled the matter, with GSK promising not to launch an authorized generic version of Lamictal for a specified period.

Plaintiffs in the current matter are purchasers of Lamictal and lamotrigine and claim that the agreement not to launch an authorized generic constituted an improper "reverse payment," causing Plaintiffs to pay more than they would have if GSK had sold the authorized generic. But there is a twist. GSK claims that Plaintiffs were not harmed because GSK lowered the prices of Lamictal through a contracting strategy. And Teva adds that it learned of GSK's contracting strategy and preemptively lowered the price of lamotrigine.

This matter is on remand from the Third Circuit Court of Appeals' decision in *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020), which vacated this Court's previous Opinion, D.E. 428, and Order, D.E. 429, granting Plaintiffs' motion for class certification, D.E. 371.[1] The Third Circuit instructed the Court to perform a rigorous analysis in determining whether to certify the class as to direct purchasers of lamotrigine.[2] The Third Circuit further instructed the Court to address certain predicate questions before assessing Plaintiffs' use of averages to prove antitrust injury as to each class member. Following remand, the parties filed supplemental briefs, D.E. 478 ("Br."), D.E.

479 ("Opp."), D.E. 483 ("Reply"). The Court then held oral argument. D.E. 498. For the reasons that follow, the Court determines that Plaintiffs have not shown by a preponderance of the evidence that they can prove antitrust injury through common evidence as to generic-only purchasers.

## I. BACKGROUND

The underlying patent suit was filed in April 2002 and involved litigation pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, 21 U.S.C. § 355, *et seq.*, which was discussed in detail in the Court's prior Opinions. *See e.g.*, D.E. 105 at 2-4. GSK sued Teva, alleging that Teva's generic drug, lamotrigine, infringed GSK's patent for Lamictal. *See* D.E. 55 ("Class Compl.") ¶ 13. Lamictal is used to treat epilepsy and bipolar disorder. On February 16, 2005, GSK and Teva settled the patent case. D.E. 373-3 at 2.[3] As part of the settlement, GSK agreed that Teva could begin selling lamotrigine on July 22, 2008. D.E. 373-4 at 16. GSK further promised that it would refrain from launching its own competing authorized generic version of Lamictal (the "No-AG Promise") until Lamictal's patent expired on January 22, 2009. *See id.*; *see also* D.E. 406-2 at 10-11, ¶ 17. This No-AG promise is at the heart of the current dispute, with Plaintiffs contending that it constituted an improper reverse payment.

**\*2** Plaintiffs claim that absent the settlement agreement, either (1) Teva would have prevailed in the patent litigation, allowing for an earlier launch of generic lamotrigine tablets as well as triggering Teva's 180-day generic exclusivity, or (2) Teva would have launched its generic version of lamotrigine tablets "at risk" (*i.e.,* before the patent case was decided) following the FDA's final approval and the expiration of the 30-month statutory stay. *Id.* ¶ 26. Thus, Plaintiffs contend that absent the settlement, GSK would have faced price competition for its Lamictal products through Teva's generic launch, and that absent the No-AG Promise, Teva's generic drug would have faced pricing competition from GSK's authorized generic. *Id.* ¶ 28. Plaintiffs continue that the lack of competition that resulted from the No-AG promise forced Plaintiffs to purchase both Lamictal and lamotrigine at artificially inflated prices. *Id.*

On June 28, 2018, Plaintiffs moved to certify the following class:

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 62 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

> All persons or entities in the United States and its territories who purchased Lamictal Tablets directly from GSK, or who purchased a generic version of lamotrigine tablets directly from Teva, at any time during the Class Period from February 17, 2008 until January 22, 2009.

D.E. 372 at 3.

As to the predominance requirement of Fed R. Civ. P. 23(b)(3), Plaintiffs argued that it was met because Plaintiffs could show antitrust impact through common evidence – "empirical economic research," *id*. at 32, "documents, testimony, and forecasting documents regarding the effects of generic competition," *id*. at 33, and data, *id*. at 34. Defendants countered that this case was different from other reverse-payment cases because GSK employed a "contracting strategy" ("Contracting Strategy") for Lamictal. D.E. 406 at 5. GSK asserted that because "[m]any doctors were concerned that switching to a generic could reduce the drug's effectiveness[,]" GSK believed that "the magnitude of [generic] erosion [would] not approach that seen in most other disease areas." *Id*. Thus, GSK offered discounts up to 40% on Lamictal to certain customers to compete with Teva's generic. *Id*. at 6. In exchange for GSK's discount, the customers receiving discounts agreed to dispense "[Lamictal] as a generic." *Id*. Defendants further claimed that Teva learned of GSK's Contracting Strategy, sued GSK for breach of the parties' settlement agreement, and preemptively lowered the price for lamotrigine. *Id*. at 6-7. Therefore, Defendants contended that Plaintiffs could not use evidence about average changes in generic prices when a second generic enters the market to prove antitrust injury because doing so would ignore the reality that Teva faced competition – through the Contracting Strategy – from GSK's discounted brand Lamictal. *Id*. at 20-22. Judge Walls rejected Defendants' arguments and certified the class. D.E. 428 at 13-15.

On appeal, Defendants only challenged "the [d]istrict [c]ourt's predominance finding," *id*. at 190, "as to the members who purchased generic lamotrigine from Teva." *Lamictal*, 957 F.3d at 195. The Third Circuit first reviewed a district judge's duties in assessing a class certification motion, stating that a district court "must conduct a 'rigorous analysis' of the evidence and arguments presented" at class certification. *Id*. at 190-91 (citing *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 309 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ). The Circuit continued that (1) "the court must 'find' that the requirements of Rule 23 are met and any '[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence' "; (2) "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits"; and (3) "the court must consider 'all relevant evidence and arguments,' including 'expert testimony, whether offered by a party seeking class certification or by a party opposing it[.]' " *Id*. (citing *Hydrogen Peroxide*, 552 F.3d at 307). The Circuit concluded that if, after considering the foregoing, the district court "is convinced by a preponderance of the evidence that the plaintiffs' claims are capable of common proof at trial, then the predominance requirement is satisfied." *Id*.

**\*3** The Circuit framed the issue before it in the following terms:

> With that in mind, we turn to the Direct Purchasers'[4] claim. *The injury element is at issue here.* Recall that their theory of liability is that they suffered an antitrust injury because but for the reverse-settlement agreement, each would have paid less for lamotrigine than it actually did. This requires the Direct Purchasers to prove by a preponderance of the evidence that they could establish, through *common* proof at trial, facts supporting an antitrust injury, namely: 1) GSK would have launched an AG but for the reverse-settlement; and 2) as a result, all class members would have paid less for lamotrigine in this but-for world. If each individual class member could rely on this same proof to prove the elements of its claim, then the injury is capable of common proof at trial.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 63 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

*Id.* at 192 (first emphasis added).

The Third Circuit then ruled that "a more rigorous analysis" was needed to determine whether Plaintiffs' expert's reliance on averages was acceptable in light of GSK's Contracting Strategy. The Third Circuit found that the Court erred when it "refused to 'address the multi-leveled microeconomic analysis of what each Defendant would or would not have possibly done in the but-for world." *Id.* at 193. Without that inquiry, the Third Circuit found that "it is impossible to determine whether the Contracting Strategy raised individual issues." *Id.*

Specifically, the Third Circuit found that the Court erred in failing to resolve issues raised in the parties' dueling expert reports. Plaintiffs' expert (Dr. Russell Lamb), the Circuit noted, relied on the following:

> (1) economic literature showing that, on average, prices of generics are lower as more enter the market; (2) Teva's own general pricing forecast tending to discount a generic by 50% without competition, but by 65% when facing an additional competitor; and (3) transaction-level sales data showing that the average actual price paid was consistent with these predictions.

*Id.* Conversely, the Circuit continued, Defendants' expert (Dr. James Hughes) opined that an individualized inquiry was necessary to determine whether any particular member of the class suffered an actual injury. *Id.* The Third Circuit also highlighted that Defendants' expert (1) criticized Lamb's use of averages, (2) opined that Lamb committed meaningful error when he assumed an aggregate actual price because he failed to acknowledge that purchasers paid significantly different prices, and (3) criticized Lamb's use of general forecasting documents rather than lamotrigine-specific prices. *Id.* The Circuit further noted that Hughes developed his own model based on lamotrigine-specific prices from Teva documents which demonstrated that "25 of the 33 generic-only purchasers likely paid the same or lower

prices in the actual world under the Contracting Strategy than they would have paid had GSK launched an AG." *Id.*

**\*4**  The Third Circuit then ruled as follows:

> Here, the District Court abused its discretion when it assumed, absent a rigorous analysis, that averages are acceptable. As is clear from the dueling expert reports, the acceptability of averages depends largely on the answer to several factual predicates, most importantly: 1) whether the market is characterized by individual negotiations; 2) whether Teva preemptively lowered its pricing in response to the Contracting Strategy; and 3) whether and to what extent GSK, absent the settlement agreement, would or could have pursued both the Contracting Strategy and an AG. The Court did not resolve these factual disputes, which would have required it to weigh the competing evidence and make a prediction as to how they would play out at trial. Further, much of each expert's analysis turned on his sources of evidence for pricing and discounting data, many of which were in tension. It was up· to the District Court to scrutinize the evidence to determine what was credible and could be used in the expert analysis.

*Id.* at 194.

The Third Circuit added that if the Court had assumed antitrust injury, the Court had misunderstood Defendants' argument that the "prices were never inflated to begin with because Teva preemptively lowered its prices before launching; thus, some Direct Purchasers never suffered an overcharge." *Id.* The Circuit concluded that the Court also appeared to have conflated damages with antitrust injury. *Id.*

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

## II. ANALYSIS

The Court first reviews antitrust injury, then resolves the three questions posed by the Third Circuit, and concludes with an analysis of related arguments raised in the supplemental briefing.

## A. Antitrust Injury

Because the Third Circuit focused on antitrust injury (or antitrust standing), the Court reviews the applicable legal standards. "[E]ven [if] a plaintiff has established Article III standing, antitrust standing remains as a prerequisite to suit, focus[ing] on the nature of the plaintiff's alleged injury, [and] asking whether it is of the type that the antitrust statute was intended to forestall." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016) (internal quotations omitted). Antitrust standing, unlike Article III standing, is a "prudential limitation" that does not affect the Court's subject-matter jurisdiction, but rather "prevents a plaintiff from recovering under the antitrust laws." *Ethypharm S.A. v. Abott Laby's*, 707 F.3d 223, 232 (3rd Cir. 2013); *see also Sullivan v. DB Invs. Inc.*, 667 F.3d 273, 307 (3d Cir. 2011) ("[L]ack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject-matter jurisdiction of the court.") (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)) ).

Antitrust standing requires a plaintiff to "prove more than injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This inquiry looks to whether the plaintiff suffered an antitrust injury, meaning an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* [5] In class actions, the Third Circuit has observed the following:

> **\*5** In an antitrust class action, "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." [*Hydrogen Peroxide*, 552 F.3d] at 311. A district court must thus undertake a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312. The class should only be certified "if such impact is plausible in theory [and]

it is also susceptible to proof at trial through available evidence common to the class." *Id.* at 325. This inquiry often involves an overlap into the merits. *Id.* at 324.

*In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262-63 (3d Cir. 2016).

To be clear, Plaintiffs are asserting a harm that would qualify as an antitrust injury. Plaintiffs are claiming that due to the No-AG Promise, they (as direct purchasers) paid higher prices because Teva's lamotrigine did not face price competition from GSK's authorized generic. This theory fits squarely within a cognizable antitrust injury.

One example of an insufficient antitrust impact was discussed in *Brunswick Corp.*, 429 US. at 477. In that case, the plaintiffs operated bowling centers and alleged that the defendant violated the Clayton Act. The defendant was a large manufacturer of bowling equipment who had been acquiring bowling centers that were in default. *Id.* at 479-80. The plaintiffs contended that if the defendants had not purchased the defaulting centers, then the plaintiffs would have made more money because they would have faced less competition. *Id.* at 481. The issue before the *Brunswick* Court was "whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares." *Id.* at 484. The Supreme Court determined that the plaintiffs suffered no antitrust injury because the complained of harm – lost profits because of more competition – was the exact opposite of the harm that the antitrust laws were designed to guard against. *Id.* at 488.

Other times, a plaintiff cannot establish antitrust injury because its relationship to the alleged antitrust conduct is too attenuated. For example, in *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 580 (3d Cir. 1979), the plaintiff claimed that it was injured because it purchased bags from a competitor of the defendants and that the competitor was able to charge higher prices because of the defendants' price fixing. The Third Circuit ruled that the plaintiff did not have antitrust standing because it was not a direct customer of the defendants. *Id.* at 583.

**\*6** By comparison, Plaintiffs here are direct purchasers of lamotrigine. Thus, the question before the Court is not whether Plaintiffs' alleged harm falls within the parameters of antitrust injury; it clearly does. Instead, the question is whether Plaintiffs have shown that they can prove such harm to all class members through common evidence.

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

## B. The Third Circuit's Predicate Questions
As noted, The Third Circuit ruled as follows:

> As is clear from the dueling
> expert reports, *the acceptability
> of averages depends largely on
> the answer to several factual
> predicates, most importantly: 1)
> whether the market is characterized
> by individual negotiations; 2)
> whether Teva preemptively lowered
> its pricing in response to the
> Contracting Strategy; and 3)
> whether and to what extent GSK,
> absent the settlement agreement,
> would or could have pursued both
> the Contracting Strategy and an
> AG.* The Court did not resolve
> these factual disputes, which would
> have required it to weigh the
> competing evidence and make a
> prediction as to how they would
> play out at trial. Further, much of
> each expert's analysis turned on his
> sources of evidence for pricing and
> discounting data, many of which
> were in tension. It was up to
> the District Court to scrutinize the
> evidence to determine what was
> credible and could be used in the
> expert analysis.

*Lamictal*, 957 F.3d at 194 (emphasis added). These factual
predicates all concern a common query – the "acceptability
of averages" in evaluating classwide antitrust injury. [6]

### 1. Individualized Negotiations in the Market

The first inquiry from the Third Circuit is "whether the
market is characterized by individual negotiations." *Id.* at
194. Plaintiffs' expert defined the relevant market as that for
"lamotrigine tablets ... [in] the United States." D.E. 373 ¶
47. Accordingly, the question before the Court is whether

the market for lamotrigine tablets in the United States is
characterized by individual negotiations.

For reasons unknown, Plaintiffs do not address this issue
in the supplemental briefing. *See* Br. at 2 (addressing
three questions, none of which discuss whether the
market is characterized by individual negotiations); *see
also* Opp. at 3 n.1 ("Plaintiffs do not even dispute that
Teva individually negotiated prices with each lamotrigine
customer."). Plaintiffs have not put forward argument as
to whether the market for lamotrigine in the United States
was characterized by individual negotiations. Defendants
proofs as to individualized negotiations focus on the
Contracting Strategy. *See* D.E. 406 at 20-22. However, based
on the evidence Defendants submitted, Teva appears to
have contemplated and implemented different lamotrigine
prices for different *groups* of customers. For example,
Defendants' expert divided Teva's customers into categories
when discussing Teva's price reductions in response to the
Contracting Strategy. Dr. Hughes found that 13 customers
received discounts of 20.8%, 2 received discounts of 16.7%,
and 10 received discounts of 9.3%. Opp. at 11. These
categories, or groups, of customers are discussed in more
detail in the next section. As a result, the Court concludes
that Teva's prices for lamotrigine varied by specific groups of
customers rather than each customer individually.

### 2. Teva Preemptively Lowering its Generic Prices
**\*7** The next issue on remand is "whether Teva preemptively
lowered its pricing in response to the Contracting Strategy."
*Lamictal*, 957 F.3d at 194. The Third Circuit commented
that this question "is a factual matter hotly contested by the
parties" and instructed this Court "to resolve that dispute by
a preponderance of the evidence." *Id.* On remand, Plaintiffs
make alternative arguments. First, Plaintiffs assert that Teva
did not preemptively lower its prices in response to the
Contracting Strategy. Br. at 9-14. Second, Plaintiffs indicate
that even if Teva did preemptively lower its prices, Plaintiffs
can show by common evidence that Teva would have lowered
it prices further if it faced competition from an authorized
generic rather than just the contracting strategy. Br. at 15-19.

The Court is somewhat surprised that this issue is hotly
contested as it seems susceptible to a straightforward answer
because either Teva did, or Teva did not, preemptively
lower its lamotrigine prices in response to GSK's Contracting
Strategy. From the best that the Court can discern, it
appears that part of the difficulty may be attributed to
Plaintiffs' not obtaining fact discovery on this issue. It appears

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 66 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

that Plaintiffs were aware of GSK's Contracting Strategy (although Plaintiffs may not have known how GSK referred to the strategy). Plaintiffs also knew that Teva was aware of the Contracting Strategy at the time it launched lamotrigine, July 22, 2008. [7] *See e.g.,* Class Compl. ¶ 80; *see also id.* ¶ 87 (discussing Teva's allegation "in the subsequent litigation" that "GSK implemented a scheme to slow Teva's market penetration for its generic version of Lamictal Tablets.") ). However, while Plaintiffs may have been aware of the Contracting Strategy, it appears that Plaintiffs did not learn during discovery that Teva allegedly lowered its lamotrigine prices as a result of the strategy.

Defendants rely on a declaration by Maureen Cavanaugh; Cavanaugh was deposed but did not answer questions as to Teva's purported preemptive pricing response to the Contracting Strategy. In a declaration dated February 23, 2018, Cavanaugh indicated that Teva learned of the Contracting Strategy and decided to lower its prices for lamotrigine. D.E. 476-2 ("Cavanaugh Declaration" or "Cavanaugh Decl."). In 2008, Cavanaugh was Teva's Director of Sales & Marketing and then Senior Director of Marketing. Cavanaugh Decl. ¶ 2. Cavanaugh was involved, along with "other employees" in preparing for Teva's July 22, 2008 launch of lamotrigine. *Id.* at ¶ 4. Cavanaugh indicated that "[d]uring this time" (while preparing for the launch), "Teva learned that GSK had begun offering discounts to customers purchasing Lamictal tablets." *Id.* at ¶ 5. As a result, Cavanaugh continued, "Teva responded to GSK's discounts by lowering the initial price that Teva would charge purchasers for lamotrigine tablets upon launch." *Id.* at ¶ 6. In connection with the launch, Cavanaugh and another Teva employee, Kevin Galownia, built a spreadsheet with several tabs, including the "Original Pricing" tab and the "Updated Pricing" tab. *Id.* at ¶ 7.

The Original Pricing tab reflected prices that Cavanaugh [8] thought Teva should charge for lamotrigine before learning of the Contracting Strategy. *Id.* at ¶ 8. The Updated Pricing tab indicated prices that Cavanaugh thought Teva should charge after learning of the Contracting Strategy. *Id.* at ¶ 9. The prices in the Updated Pricing tab are "generally lower" when compared to those in the Original Pricing tab. *Id.* To be clear, it does not appear that the prices in either the Original Pricing tab or the Updated Pricing tab, at least according to Cavanaugh, were the prices that Teva had actually decided to charge for lamotrigine.

**\*8** Cavanaugh added that "[w]e revised contract prices again shortly before Teva's July 22, 2008 launch of lamotrigine tablets." *Id.* at ¶ 10. Cavanaugh does not indicate how prices were revised (either higher or lower). Cavanaugh also does not indicate whether some, or all, prices were revised. Cavanaugh then pointed to a "a spreadsheet that compiled the initial orders that Teva's customers placed for lamotrigine and the prices Teva charged those purchasers," which Teva produced under the Bates Number TEVA00022998. *Id.* Cavanaugh stated the "Go Forward Pricing" tab of the spreadsheet summarized her analysis of the initial orders. *Id.* Cavanaugh concluded that "[t]he contract prices listed in the 'Go Forward Pricing' tab ... are lower than those in the 'Original Pricing' tab ... because Teva lowered its contract prices for lamotrigine tablets upon launch in response to GSK's discounts on Lamictal Tablets." *Id.* at ¶ 11.

Plaintiffs are highly critical of Cavanaugh's Declaration. Plaintiffs first indicate that during her deposition, Cavanaugh responded, "I don't recall" when asked if she had found any lamotrigine forecasts after searching all of her files. Br. at 11. Plaintiffs continue that Teva's preemptive pricing argument is "a defense that appeared only after the close of discovery." Br. at 11 n.17. Defendants respond that Cavanaugh did not testify about "Teva's actual pricing in response to the Contracting Strategy at her deposition because Plaintiffs' counsel inexplicably failed to ask her about it." Opp. at 9.

Assuming, without deciding, the accuracy of Plaintiffs' arguments, Plaintiffs do not request any relief from the Court. Plaintiffs do not make a motion to reopen discovery to take another deposition of Cavanaugh. Plaintiffs also do not provide any evidence showing that Defendants' misled Plaintiffs during discovery as to Teva's preemptive pricing strategy. And Plaintiffs do not invoke the "sham affidavit doctrine." *Baer v. Chase*, 392 F.3d 609, 623-24 (3d Cir. 2004) (discussing the doctrine as to a motion for summary judgment). In fact, in the initial briefing before Judge Walls, Defendants similarly relied on Cavanaugh's Declaration and supporting documents. D.E. 406 at 11-12. Plaintiffs did not challenge Cavanaugh's Declaration or the associated pricing tabs, instead asserting in a footnote that information constituted "common evidence[.]" D.E. 419 at 13 n.13. As a result, the Court considers the Cavanaugh Declaration. [9]

Plaintiffs next assert that contemporaneous email evidence shows that Cavanaugh's Declaration is incorrect. Plaintiffs submit that this evidence shows Teva had planned to sell its lamotrigine at 50% discount off the Lamictal

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 67 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

WAC ("wholesale acquisition cost") before learning of the Contracting Strategy. Br. at 9. Plaintiffs assert that a July 9, 2008 email sent to Cavanaugh indicates that Teva's generic price would be the same, 50% of WAC. Br. at 10. The email's subject line is "Re: Latest IMS on Lamotrigine Tabs" and it does indicate "Price 50% of Brand WAC[.]" D.E. 421 at 2. At the same time, Cavanaugh did not respond to the email, so while the communication has some probative value it is not dispositive. Plaintiffs do not provide evidence that Cavanaugh expressly agreed with the contents of the email. Another unanswered question is what 50% of WAC would have amounted to in light of the Contracting Strategy; presumably the WAC would have been lower than it would have been without the strategy because the price of Lamictal was reduced.

**\*9** Defendants also point to Galownia's deposition testimony, Opp. at 17, in which he testified that Teva never intended to price lamotrigine at 50% of brand WAC. Instead, Galownia stated that Teva had the following pricing strategy based on customer categories,[10] stated as a percentage of WAC, [Redacted] D.E. 479-2 at 92-93, Tr. 159:6-162:11. Plaintiffs do not address this evidence in their reply.

Plaintiffs also refer to a Teva earnings conference call on November 6, 2008, several months after the launch of lamotrigine. D.E. 500. During the call, Teva's President and CEO, Shlomo Yanai, was asked whether "there was anything going on with GSK during the launch that maybe clipped the pricing?" D.E. 500-1 at 9. While acknowledging that GSK tried to do something "creative," Yanai responded that GSK's effort "was largely unsuccessful and really didn't impact price all that much. Remember, Lamotrigine is our own API [active pharmaceutical ingredient]. It's a relatively high margin product so I think there was no real issue." *Id.* These comments do appear to undercut Defendants' position, but, again, Plaintiffs do not provide evidence to explain the ambiguous or inexact words/terms such as "largely," "all that much," and "relatively."

Before turning to the remaining arguments as to Teva's preemptive pricing strategy, the Court notes that there are numerous additional pieces of information that would have been helpful to the Court's analysis. For example, evidence as to whether the Contracting Strategy resulted in GSK's Lamictal pricing to be equivalent to that of an authorized generic. According to GSK, due to the uniqueness of Lamictal, it believed that physicians would not be inclined to switch patients, who were stable on Lamictal, from the

brand to the generic. Opp. at 5. Of course, such a notion begs the question – why engage in the Contracting Strategy at all if physicians were not going to switch from Lamictal for such patients? At a minimum, such a belief would seemingly indicate that GSK never believed that its Contracting Strategy prices had to be the same as those for an authorized generic because of GSK's basic premise – physicians were unlikely to switch from Lamictal for patients who were stable.

And, more importantly, once Teva learned[11] of the Contracting Strategy before it launched lamotrigine, did Teva *believe* that the Contracting Strategy would result in GSK offering prices that were commensurate with those of an authorized generic. Because once Teva learned of the Contracting Strategy, it had no financial incentive to lower its prices for lamotrigine to the same level as it would have had it been competing with an authorized generic unless Teva believed that the Contracting Strategy forced it do so.

Turning to the parties' remaining arguments, Plaintiffs contend that Teva's internal documents show that the prices Teva charged for generic lamotrigine were consistent with the prices Teva projected years prior to the launch. Br. at 10. In support, Plaintiffs cite to testimony from Dr. Lamb that in a "June 2006 Teva sales forecast for its lamotrigine tablets, Teva assumed that it would charge a price that was 50 percent of the brand Lamictal price for the first six months when [Teva] was the sole manufacturer." D.E. 373-1 at 36, ¶ 65. Although Dr. Lamb claims this statement is supported by an "Exhibit 1172" to the "Galownia Deposition" the Court is unable to locate this exhibit and it is unclear whether Plaintiffs have provided it to the Court. *Id.* Plaintiffs also rely on testimony from Dr. Lamb as to the July 9, 2008 email to Cavanaugh (discussed above) that forecasted generic Lamotrigine would be priced at 50 percent of brand WAC during Teva's 180-day exclusivity period. *Id.* at 64, ¶ 112. However, even accepting Dr. Lamb's analysis as accurate, it does not answer a fundamental question, that is, what was Lamictal's WAC before and after the Contracting Strategy. It appears unrefuted that due to the Contracting Strategy, GSK lowered the price of Lamictal (up to 40%). Thus, even if Teva still priced lamotrigine at 50% of WAC, if the WAC was lower, then Teva charged less for lamotrigine.

**\*10** A review of the Original Pricing tab and the Updated Pricing tab reveals that those documents corroborate Cavanaugh's Declaration.[12] For example, in the Original Pricing tab, [Redacted][13] D.E. 479-2 at 70. [Redacted] *Id.*

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 68 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

Original pricing for other amounts and doses of generic lamotrigine followed a similar pattern with [Redacted] *Id.*

The Updated Pricing tab reflects updated contract prices for "25mg 100s" of generic lamotrigine as follows: (1) [Redacted] (2) [Redacted] (3) [Redacted] and (4) [Redacted] D.E. 479-2 at 75. Supervalu Inc., was projected to pay pricing similar to [Redacted] *Id.* Updated pricing for other amounts and doses of generic lamotrigine followed a similar pattern with [Redacted] paying the highest contract prices; [Redacted] paying the lowest contract prices; and [Redacted] paying an amount in between. *Id.*

Thus, the projected contract prices on the Updated Pricing tab were lower for a majority of the purchasers than the projected prices in the Original Pricing tab. It appears that Teva was projecting fairly significant discounts to [Redacted] However, [Redacted] were not projected to receive discounts (as both the Original Pricing tab and the Updated Pricing tab reflected a price of $166.38 for "25mg 100s" of lamotrigine). Cavanaugh's declaration along with the Original Pricing tab and the Updated Pricing tab indicate that when Teva learned of GSK's Contracting Strategy, Teva initially projected that it would lower prices for most of its customers. The remaining question is whether and to what extent the updated pricing was actually implemented.

The parties' dispute centers on their disparate interpretations of the Go Forward Pricing tab in the spreadsheet produced under Bates Number TEVA00022998. *See* D.E. 479-2 at 79. [14] As noted, Cavanaugh indicated that TEVA00022998 is "a spreadsheet that compiled the initial orders that Teva's customers placed for lamotrigine and the prices Teva charged those purchasers." Cavanaugh Decl. at ¶ 10. Cavanaugh further explained that the Go Forward Pricing tab in the spreadsheet contained "the summary of [her] analysis." *Id.*

Plaintiffs first argue that some prices on the Go Forward Pricing tab are higher than the prices in the Updated Pricing tab. Br. at 12. Defendants counter that it is not surprising that some prices are higher because the "Updated Pricing tab was Teva's initial internal response" to the Contracting Strategy whereas the Go Forward Pricing tab reflects prices customers actually paid, which "played out differently in some instances." Opp. at 10. The Court agrees with Defendants that just because some purchasers did not ultimately receive a discount of the magnitude projected in the Updated Pricing tab, it does not mean that discounts did

not occur or otherwise impact the accuracy of the Go Forward Pricing tab.

**\*11** Plaintiffs next argue that the " 'Go Forward' *net* 'prices' are flatly inconsistent with the *net* prices Teva actually charges as shown in its own contemporaneous transactional sales data." Br. at 13 (emphasis added). Defendants respond that "[n]either Ms. Cavanaugh's testimony nor the spreadsheet purports to reflect actual net prices[.]" Opp. at 11. Instead, Defendants say the spreadsheets reflect the gross (or "contract") price charged. *Id.* Gross prices (or "contract prices") appear to be the price set to be paid under the relevant contract, whereas the net price reflects the gross price less "all rebates and discounts ultimately provided." *Id.*; *see also* D.E. 421 at 67, n. 3 ("Net prices are gross prices net of returns, credits, chargebacks, and rebates."). Plaintiffs appear to admit that they are attempting to compare gross prices with net prices, *see* Br. at 14, but still argue that "whether Class members would have paid lower *net* prices is what matters." *Id.* The Court agrees with Defendants that the spreadsheet cannot be attacked as inaccurate for failing to reflect prices it does not purport to record. *See* Cavanaugh Decl. ¶ 11 ("The *contract* prices listed in the 'Go Forward Pricing' tab ...." (emphasis added) ).

Plaintiffs next assert, D.E. 476-1 ("Coslett Declaration" or "Coslett Decl."), that the prices reflected in the Go Forward Pricing tab do not reflect the gross prices actually paid by some of Teva's customers. *See id.*; *see also* Br. at 14. Plaintiffs argue that prices attributed to certain categories of customers in the Go Forward Pricing tab do not match the prices actually paid by those customers. *Id.* Plaintiffs contend that these discrepancies "impeach Ms. Cavanaugh's declaration and expose it as inaccurate and unreliable." *Id.* at 3, ¶ 10. Defendants respond that Plaintiffs incorrectly ascribed the prices associated with "other small distributors" and "other small retailers" on the Go Forward Pricing tab to 18 of the 21 customers listed in the Coslett Declaration. *Id.* at 11-12. As to those customers, Defendants contend that "Sheet 1" of the spreadsheet TEVA00022998 reflects the correct prices paid. *Id.* at 13. Defendants also refute these discrepancies through an exhibit they compiled ("Coslett table replication") and through a declaration. D.E. 479-1 at 4 ¶ 19 (arguing the analysis in Exhibit 16 "shows that TEVA00022998 is fully consistent with the Teva transactional data."); *see also* D.E. 479-3 at 2. Specifically, Defendants explain that TEVA0002298 "contains nine tabs, including the Go Forward tab – the only one Plaintiffs address. The Go Forward tab summarizes the date and analysis on the other

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 69 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

eight tabs. Unlike the Go Forward tab, the other tabs expressly list the prices charged to every customer, including those Plaintiffs had pricing discrepancies." Opp. at 13 n. 8. [15]

The Go Forward Pricing tab does not list every purchaser of lamotrigine from Teva. After listing several purchasers, the tab also includes categories of "other small distributors" and "other small retailers." *See* D.E. 479-2 at 79. The prices reflected on the Go Forward Pricing tab for the purchasers who fall into those "other" categories do not match the prices actually paid in the underlying transaction data. Defendants seemingly admit that the Go Forward Pricing tab provides an inaccurate summary as to the "Contract Price" for "other small distributors" and "other small retailers." [16] *See* Opp. at 13. For example, the Go Forward Pricing tab lists [Redacted] as the "Go Forward" price for a 100-count bottle of 100mg tablets of generic lamotrigine for [Redacted] D.E. 479-2 at 79. Through their "Coslett table replication," Defendants admit that some of the customers who arguably fall into those categories paid higher prices when compared to the Go Forward Pricing tab. *See* D.E. 479-3 at 2. Although the Go Forward Pricing tab apparently represented that [Redacted] for a 100-count bottle of 100mg tablets of lamotrigine, Defendants concede that [Redacted] *Id.* Likewise, although the Go Forward Pricing tab apparently represented [Redacted] or the same quantity and dose, Defendants concede that [Redacted] *Id.*

**\*12** However, Defendants are correct that the contract prices reflected in "product price" column of "Sheet 1" — the second tab of TEVA00022998 — match the prices listed in the "Actual Gross Price in Teva's Actual Sales Data." [17] *See* D.E. 479-2 at 79. And a review of the correct pricing data, which Plaintiffs concede is accurate, shows that Teva did preemptively lower its pricing in response to the Contracting Strategy for most of its customers. The Original Pricing tab shows that, prior to learning of GSK's Contracting Strategy, Teva projected that [Redacted] for a 100-count bottle of 100 milligram tablets of generic lamotrigine and that [Redacted] or the same. *See* D.E. 479-2 at 720. As with [Redacted] the Go Forward Pricing tab shows that many of the customers listed received discounts for lamotrigine when compared to the prices they were projected to pay before Teva learned of GSK's Contracting Strategy. *Compare* D.E. 479-2 at 70 (projecting that [Redacted] or a 100-count bottle of 100 milligram generic lamotrigine tablets) *with* D.E. 479-2 at 79 (reflecting that [Redacted] per 100-count bottle of 100 milligram generic lamotrigine tablets). Thus, the pricing data that Plaintiffs' concede is accurate, *see* D.E. 476-1 at 4,

reveals that most potential class members received discounts for their purchases of generic lamotrigine from Teva when compared to the prices that they were projected to pay before Teva learned of GSK's Contracting Strategy. *Compare* D.E. 479-2 at 70 *with* Coslett Decl. at 4.

Plaintiffs also assert that the prices on the Go Forward Pricing tab listed for [Redacted] are inaccurate. Defendants respond that Plaintiffs are incorrectly comparing the "indirect" contract prices attributable to those customers with the transaction data without accounting for amounts those customers were able to "chargeback" to Teva. Opp. at 13-14 ("[B]ecause the price initially paid to Teva is the higher direct contract price, that is the gross price that is directly observable in the transactional data. The indirect contract prices do not match the gross prices in the transactional data (nor should they) unless one takes chargebacks into account."). Defendants explain that Teva entered into two kinds of contracts with wholesale purchasers: direct and indirect. *Id.* at 13. Defendants continue that direct contracts set the upfront price for a wholesaler's purchase and that indirect contracts set "a lower price Teva agreed to honor via chargebacks when the wholesaler resells the product." *Id.* at 14. Defendants further explain that for wholesalers it is the "indirect price that is ... listed on the Go Forward tab as the contract price for such customers ... [but] because the price initially paid to Teva is the higher direct contract price, that is the gross price that is directly observable in the transactional data." *Id.*

[18]  Plaintiffs concede that [Redacted] is one of the small retailers." D.E. 476-1 at 8, n.3.

[19]  "In accordance with Dr. Hughes' methodology .. [Redacted].. [is] assigned to the 'other small distributor' category." D.E. 476-1 at 8, n.3.

Plaintiffs do not take issue with Defendants' explanation of the difference between direct and indirect contracts. *See* Reply at 7-10. Sheet 1 confirms Defendants' explanation. *See* D.E. 479-2 at 79, Sheet 1. For example, Sheet 1 has 8 entries for [Redacted] *Id.* at Rows 21-28. Under the column titled "Dir/Ind Flag" on Sheet 1, there are four entries listed as "direct" contracts and four entries listed as "indirect" contracts. *Id.* at Rows 25-28. As to the indirect contract price for a 100-count bottle of 100 milligram generic lamotrigine tablets, Sheet 1 reflects that [Redacted] *Id.* at Row 21. This matches the price listed on the Go Forward Pricing tab. *See* D.E. 479-2 at 79, Go Forward Pricing tab. Sheet 1 also shows

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 70 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

that [Redacted] as a direct contract price for a 100-count bottle of 100 milligram generic lamotrigine tablets. *See* D.E. 479-2 at 79, Sheet 1 at 25. This matches the amount Plaintiffs claim is reflected in Teva's transactional data. *Compare id. with* Coslett Declaration at 4. Similarly, as to [Redacted] the direct contract prices reflected in Sheet 1 match the amounts Plaintiffs claim in Teva's transactional data, *compare* D.E. 479-2, at 79, Sheet 1 at Rows 111-14 *with* Coslett Declaration at 4, and the indirect contract prices reflected in Sheet 1 also match those listed on the Go Forward Pricing tab. *See* D.E. 479-2 at 79. As to [Redacted] the direct contract prices reflected in Sheet 1 match the amounts Plaintiffs claim are reflected in Teva's transactional data, *see* D.E. 479-2 at 79, Rows 259-262. And four of the eight indirect contract prices reflected in Sheet 1 also match those listed on the Go Forward Pricing tab. *Id.* at Rows 255-58. However, there are four "Multi-Source 661340-1" indirect contracts with prices that do not match those listed on the Go Forward Pricing tab. *Id.* at Rows 251-54; *see also* D.E. 479-3 at 2, n. 2 ([Redacted]. Despite those four inconsistencies, the Court is unaware of any other discrepancy between the prices Teva claims were charged in TEVA00022998 and the prices that Plaintiffs have derived from the transactional data.

**\*13** Although the Court wishes that the proofs would have been more specific, based on the current record, the Court finds by a preponderance of the evidence that Teva did preemptively lower of its prices for lamotrigine for most of its customers in response to the Contracting Strategy.

### 3. GSK's Pursuit of Both the Contracting Strategy and an Authorized Generic Absent the Settlement Agreement

The final issue from the Circuit is "whether and to what extent GSK, absent the settlement agreement, would or could have pursued both the Contracting Strategy and an AG." *Lamictal,* 957 F.3d at 194. Plaintiffs contend that absent the No-AG Promise, GSK would have simultaneously pursued both the Contracting Strategy and distribution of an authorized generic. Br. at 7. Plaintiffs further argue that the Contracting Strategy and launching an authorized generic would have been complementary strategies. *Id.* Plaintiffs state that "[n]o GSK witness even implied that the brand contracting strategy was a reason for GSK not to launch an [authorized generic]." *Id.* at 8-9. Defendants counter that it would have been illogical for GSK to pursue both an authorized generic and the Contracting Strategy concurrently because, under the

Contracting Strategy, pharmacies were required to dispense Lamictal as a generic so GSK would have been illogically competing with itself had it launched an authorized generic. Opp. at 6-7.

Plaintiffs rely on Dr. Lamb's Revised Expert Reply Report. Br. at 7. Dr. Lamb stated that David Ballesteros of GSK "testified that the decision not to launch an authorized generic lamotrigine tablet was because GSK was prevented from doing so under [the No-AG Agreement] not because it had chosen to pursue a brand contracting strategy instead."[20] D.E. 373-1 at 67, ¶ 104. Dr. Lamb also indicated that Rick Proctor of GSK testified to the same effect. *Id.* at 67-68, ¶ 105. Dr. Lamb's report further referenced testimony of Diane Tulp of GSK that GSK was considering discounting brand Lamictal prior to (or just after) the No-AG Agreement. *Id.* at 68, ¶ 106. Based on this testimony, Dr. Lamb opined that "GSK would have launched an authorized generic and engaged in brand contracting, and it would have been economically rational for GSK to have engaged in brand contracting regardless of whether GSK launched an authorized generic. *Id.* ¶ 107, *see also id.* at 69 ¶ 108 ("[I]t is appropriate to assume that in the but-for world, GSK would have launched an authorized generic lamotrigine tablet at the same time Teva launched its generic lamotrigine tablet in the but-for world[.]").

**\*14** Plaintiffs also rely on Luis Molina, an expert with professional experience within the pharmaceutical industry. *See* D.E. 374-4 at 35. Molina indicated that absent the No-AG Promise, "GSK would have been ready, willing, and incentivized to simultaneously launch an authorized generic version of Lamictal tablets, and would have done so." D.E. 374-4 at 6, ¶ 11. Molina continued that "GSK would have been able to launch an AG because there are few regulatory hurdles to doing so, and it had already selected its third-party distributor of the AG." *Id.* at 10, ¶ 23. Molina added that "based on its previous AG launches, GSK had determined that it made financial sense to launch an AG and planned to do so." *Id.* Molina added that he did "not view the Contracting Strategy as an 'alternative' form of competition. Launching an authorized generic and engaging in the Contracting Strategy to try to maximize brand sales are not mutually exclusive." D.E. 375-1 at 19 ¶ 24. Molina explained that the strategies are "complimentary" because "[a]n authorized generic allows the branded company to capture revenues from sales that would otherwise go to the generic company. The Contracting Strategy targets revenues from retained brand sales." *Id.*

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 71 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

Plaintiffs further claim that Defendants' experts admitted that "brand contracting and an AG are complementary, not mutually exclusive, and so would have been deployed simultaneously." Br. at 7-8. Plaintiffs cite the deposition testimony of Dr. Edward A. Snyder in support. However, the testimony cited by Plaintiffs does not indicate what Plaintiffs claim it does. Plaintiffs' counsel asked Dr. Snyder:

> Did you see any evidence that GSK would have preferred to do or sell an authorized generic version of Lamictal tablets once Teva entered the market instead of the contracting strategy and would not have done the contracting strategy if it weren't for the promise it made to Teva not to launch an authorized generic?

D.E. 421 at 6, Tr. 57:23-58:6. Dr. Snyder responded:

> I have not seen evidence that related to all of the comparative preferred, instead of, and would have questions
>
> ...
>
> I've seen things in the record ... as to issues related to whether GSK wanted to or would have or how it evaluated costs and benefits, risks and opportunities, with an authorized generic. I saw a multitude of indications that this was in general something that required analysis ... I saw additional analyses that were more specific to Lamictal ... this was an analysis that was important and complicated and had not been done. I did not see anything that definitively said we are going to do this or we're going to do that.

Id. at 8, Tr. 59: 3-6; 59:9-60:6.

Plaintiffs also cite to the testimony of GSK's employee David Ballesteros. Br. at 8, n.12. In response to being asked whether "the net sales proceeds realized by the authorized generic would be some share of the sales that would otherwise go to the generics who filed ANDAs and entered the market," D.E. 476-8 at 4, Tr. 343:12-15, Ballesteros responded, "Perhaps, yes." Id. at 4, Tr. 343:18. This answer is certainly not definitive. Plaintiffs also rely on the testimony of former

GSK employee Diane Tulp. Tulp testified that the Contracting Strategy was "an opportunity ... to capture some of those patients" who did not want to switch from Lamictal to generic lamotrigine out of fear of breakthrough seizures. D.E. 376-4 at 41, Tr. 157:20-25. Tulp's response does not address the issue before the Court.

Defendants contend that the evidence cited by Plaintiffs only shows that GSK could have launched an authorized generic along with the Contracting Strategy, not that it would have. Opp. at 5. Defendants continue that launching an authorized generic would have undermined the Contracting Strategy. Id. Defendants first point to a GSK document entitled "Global Commercial Plan: Compound/Product: Lamictal™ (IR and XR), Indications: Epilepsy & Neuropathic Pain (Painful Diabetic Neuropathy, Post-Herpetic Neuralgia), dated May 2003 and approved on June 2, 2003." Id. The document provides that "there are nine critical success factors which will be addressed to achieve [GSK's] objectives." D.E. 479-2 at 4. One of the factors is the "Risk/Benefit assessment of any potential third-party agreements to supply Lamotrigine to generic houses to minimize the risk that this could seriously undermine the entire defence [sic] strategy." Id. Later, the document notes that "[p]hysicians are extremely resistant to switching patients considered to be controlled on their current [antiepileptic drug] treatment regimen." Id. at 6. The document continues that "[d]ue to the increased level of generic competition and the lack of a narrow therapeutic classification for the newer AEDs,[21] it is believed that generic erosion of current branded AEDs [including brand Lamictal] will occur more in the future than has been the case with older AEDs." Id. at 6-7. The document adds that "the magnitude of this erosion will not approach that seen in most other diseases areas." Id. at 7.

*15 The document does not necessarily support the conclusion that GSK believed that the launch of an authorized generic would have undermined its Contracting Strategy. Instead, it appears that GSK believed that physicians would be less likely to switch a patient effectively controlled on Lamictal. In fact, GSK believed that generic use would extend "to new patients or those who have yet to achieve adequate seizure control," which reflects a market that GSK would seemingly have wanted to access through an authorized generic. Id. at 7.

Similarly, another exhibit that Defendants cite to only notes that "both patients and Neurologists are extremely resistant to a change of drug therapies – even to generic formulations

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 72 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

of the same drug." D.E. 479-2 at 11. The exhibit does not indicate GSK would not have pursued an authorized generic in addition to the Contracting Strategy. To the contrary, the document appears to indicate that there was an entirely new market to be serviced by the authorized generic, that is, for new patients or existing patients whose seizures were not sufficiently controlled.

Defendants' further contend that because customers participating in GSK's Contracting Strategy "agreed to 'dispense branded Lamictal® as a *generic*' ... a pharmacy could either sell the [authorized generic] or participate in the Contracting Strategy, but not both, GSK would have illogically been competing against itself by launching an [authorized generic]." Opp. at 6 (emphasis in original). To support this proposition, Defendants cite to a GSK document, entitled "Post-generic Strategy for LAMICTAL®" that sets forth the following target: "Establish contract terms and conditions that will enable GSK to retain more of its market share by competing more successfully following entry of generic lamotrigine." D.E. 479-2 at 14. The document further reflects a proposal for "Retail and Mail Order" that provides "[a]llow discounts up to 40% off WAC to PBM [22] mail order facilities and retail pharmacies from time of first generic entry to second generic entry." *Id.* at 15. The document continues that "[m]ail order and retail pharmacies must demonstrate the capability and agree to dispense branded LAMICTAL® as a generic using a DAW-5 code or another similar mechanism for the same generic copay." *Id.*

The Court does not find Defendants' argument convincing. As part of the Contracting Strategy, GSK required Lamictal to be dispensed as a generic. However, GSK was not legally required to do so. Instead, GSK was precluded from initially launching an authorized generic due to the settlement agreement with Teva. Yet, this does not mean that if GSK did not face the same limitation (No-AG promise), it would have nevertheless engaged in the same course of conduct (dispensing Lamictal as a generic). In other words, absent the settlement agreement, GSK was free to launch its authorized generic and, as a result, free to change its Contracting Strategy so that it did not require Lamictal to be dispensed as a generic. In fact, in their initial briefing before Judge Walls, Defendants conceded that "GSK decided on the Contracting Strategy in 2008 – *after* the settlement already had taken an authorized generic off the table." D.E. 406 at 30 (emphasis in original). When the Contracting Strategy required Lamictal to be dispensed as a generic, GSK could not compete with itself

through an authorized generic because it was precluded from doing so under the settlement agreement.

**\*16** Defendants also rely on their expert witnesses' reports. Br. at 6. Defendants' expert Dr. Bruce E. Stangle opined that "it is unlikely GSK would have launched an authorized generic." D.E. 479-2 at 22 ¶ 40. Dr. Stangle based this opinion first on the general proposition that "there is a risk that the brand firm's authorized generic will take sales away from the branded product, a phenomenon referred to as 'cannibalization.' " *Id.* at 23-24 ¶ 41. Dr. Stangle reported that "cannibalization is an important consideration for GSK in evaluating whether to launch an authorized generic" and that the "brand firm is generally not entitled to all of the sales revenue from selling an authorized generic" but must share such revenue "with a marketing partner responsible for selling the product." *Id.* However, Dr. Stangle did not cite any evidence as to Lamictal specifically.

Dr. Stangle also reviewed evidence that GSK expected generic erosion to be lower and slower for Lamictal because of physicians' concerns that users of the drug could suffer "breakthrough seizures as a result of switching to a generic." *Id.* at 23 ¶ 42. Dr. Stangle claimed that "these considerations, in particular expected higher brand retention rates [were] a strong disincentive to launch on authorized generic." *Id.* at 24 ¶ 44. However, Dr. Stangle does not adequately explain his basis for this view. Unless GSK expected no significant generic erosion whatsoever, it appears that, as Plaintiffs' experts explained, *see* D.E. 375-1 at 19 ¶ 24, GSK would still be incentivized to capture sales within the generic market if it had the right to do so. Indeed, as discussed above, GSK's internal documents indicated that the Contracting Strategy was not focused on new patients or patients whose seizures were not well controlled.

Dr. Stangle also pointed to other instances in which GSK did not launch an authorized generic out of concern for cannibalization. D.E. 479-2 at 25-27, ¶¶ 45-49. But as to Lamictal specifically, Dr. Stangle only relied on the testimony of Christopher Viehbacher, [23] the former president of North American pharmaceuticals at GSK. *Id.* at 26 ¶ 48. Viehbacher testified that at the time of the No-AG Agreement, GSK had "no plans one way or the other," that GSK "hadn't made any decision as to an authorized generic," and that "there were a number of good reasons why you wouldn't necessarily do an authorized generic with [Lamictal]." *Id.* This testimony does not establish that GSK had decided not to launch an authorized generic absent the No-AG Agreement; instead, the

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 73 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

testimony reflects that GSK had not made a decision one way or the other.

Last, Dr. Stangle pointed to the declaration of Bill Clark, "a Subject Matter Expert for Planning at GSK and former Supply Manager." *Id.* at 27 ¶ 49. Dr. Stangle indicated that Mr. Clark had stated that "GSK struggled to maintain a supply of branded Lamictal for several reasons, including because GSK did not have, and could not get access to, enough ... lamotrigine." *Id.* Clark opined that because of the reduced quantities of lamotrigine and the fact that GSK would have continued to manufacture brand Lamictal, he was "confident that GSK would have elected to continue manufacturing the branded product rather than making bailment stock of authorized generic." *Id.* at 28 ¶ 51. However, Clark did not indicate when GSK was experiencing "the short supply" of lamotrigine. Moreover, GSK had been the exclusive supplier of the drug before Teva entered the market, and Defendants provide no evidence that GSK ever had difficulty in meeting the supply demands of the entire market. Clark does not adequately explain how GSK would have been unable to supply fewer purchasers after lamotrigine was launched.

**\*17** Defendants also rely on the expert reports of Drs. Snyder and Hughes. Dr. Snyder opined that "the record does not support Professor Elhauge's assumption that GSK was 100 percent certain to launch an AG" for nearly identical reasons as those expressed by Dr. Stangle: (1) generic cannibalization; (2) GSK's failure to launch authorized generics in other circumstances; and, (3) supply and manufacturing constraints. *See* D.E. 479-2 at 37-39 ¶ 33. However, Dr. Snyder also indicated that it would be plausible to estimate the probability of GSK launching an authorized generic at between zero percent to 50 percent. *Id.* at 39 ¶ 34. Dr. Hughes' opinion that "[t]he evidence indicates that GSK would not have launched an authorized generic in the but-for world" is based on the same evidence relied on by Drs. Snyder and Stangle. *See* D.E. 479-2 at 41-45, ¶¶ 43-47.

The Court finds that Plaintiffs have shown by a preponderance of the evidence that they can prove through common evidence that GSK, absent the settlement agreement, would and could have pursued both the Contracting Strategy and an AG. Frankly, the Court does not see any apparent individual proof issues as to this evidence – either GSK would have done so or it would not have. Plaintiffs have expert testimony from a former pharmaceutical industry employee that (1) "GSK would have been ready, willing, and incentivized to simultaneously launch an authorized generic version of

Lamictal tablets, and would have done so," D.E. 374-4 at 6, ¶ 11; (2) "based on its previous AG launches, GSK had determined that it made financial sense to launch an AG and planned to do so," *id.*; and, (3) launching an authorized generic and engaging in the Contracting Strategy are "complimentary" because "[a]n authorized generic allows the branded company to capture revenues from sales that would otherwise go to the generic company [and the] Contracting Strategy targets revenues from retained brand sales." D.E. 375-1 at 19 ¶ 24. And GSK's stated reason for implementing the Contracting Strategy – that physicians would be highly reluctant to switch patients who were stable on Lamictal – does not account for the new patient population to be served by the generic. GSK's evidence makes clear that GSK expected "new patients or those who have yet to achieve adequate seizure control," D.E. 479-2 at 7, to use a generic and it is, at best, unclear why GSK would not have competed for that market through an authorized generic if it had the right to do so. [24]

## C. Common Evidence as to Classwide Antitrust Injury

The Court now addresses whether Plaintiffs have proven by a preponderance of the evidence that they can prove classwide antitrust injury through the use of common evidence. In doing so, the Court considers Plaintiffs use of averages in light of the answers to the three predicate questions set forth by the Circuit. The Court also reviews additional, related arguments raised on remand by the parties.

As to the predicate questions, the Court has determined that neither side has proven by a preponderance of the evidence that the market vis-à-vis lamotrigine was characterized by individual negotiations. Instead, Defendants have demonstrated that Teva set different lamotrigine prices for different *categories* of purchasers. Plaintiffs have shown by a preponderance of evidence that they can prove through common evidence that GSK would have pursued an authorized generic absent the No-AG promise. In addition, Teva has shown that it preemptively lowered the prices of lamotrigine for most customers in response to GSK's Contracting Strategy. While this finding supports Defendants' position, it does not provide a definitive answer to the Court's inquiry. First, those Teva customers whose lamotrigine prices were not reduced in response to the Contracting Strategy could prove through common evidence that they suffered antitrust injury. Second, for those customers whose prices were lowered, the key question becomes whether the prices would have been lowered further if GSK had introduced an

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

authorized generic? Of course, a response to this question depends on how a jury answers the inquiry as to whether GSK would have launched an authorized generic absent the No-AG promise. If a jury finds that GSK would not have launched an authorized generic, then it appears that Defendants prevail without further deliberation. If a jury reaches the opposite conclusion, then whether Teva would have reduced its prices further – across the class – in the face of authorized generic competition becomes the critical issue. For purposes of the Court's current analysis, as mandated by the Circuit, the important question is whether Plaintiffs can demonstrate through common evidence antitrust injury for each class member.

### 1. The Third Circuit's *Suboxone* Decision

**\*18** In their reply, Plaintiffs cite to the Third Circuit's opinion in *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020). Reply at 2-3, 5. In *Suboxone*, the direct purchasers of Suboxone alleged that the manufacturer impeded generic entry in violation of § 2 of the Sherman Act. *Suboxone*, 967 F.3d at 267. Because its market exclusivity period for Suboxone tablets was set to expire, the manufacturer developed an under-the-tongue film of Suboxone. *Id.* at 267-68. The plaintiffs alleged the manufacturer attempted to eliminate the market for generic tablets by engaging in a widespread campaign to disparage the tablets' safety, announcing that it was withdrawing Suboxone tablets from the market for safety reasons, ending its rebate program for Suboxone tablets in favor of one for the film, and manipulating the Food and Drug Administration's review process through a baseless citizen petition. *Id.* at 268. The plaintiffs were all direct purchasers of Suboxone tablets. *Id.* The plaintiffs' expert was also Dr. Lamb. *Id.* The district court certified the class. *Id.* at 269.

On appeal, the manufacturer focused on Rule 23(b)(3)'s predominance requirement, first arguing that the plaintiffs did not suffer an antitrust injury because the manufacturer could lawfully raise the price of Suboxone tablets and also change its rebate program. *Id.* at 270. The Third Circuit rejected this argument, reasoning that the plaintiffs' theory of the case focused on the totality of the manufacturer's conduct, not just the pricing changes and the rebate program. *Id.* The manufacturer next argued that predominance was not met because the plaintiffs' model only calculated aggregate damages such that individual damages' questions defeated predominance. *Id.* at 271. The Circuit again disagreed, stating the following:

> [The manufacturer] is incorrect. Antitrust plaintiffs may satisfy the predominance requirement by using a model that estimates the damages attributable to the antitrust injury, even if more individualized determinations are needed later to allocate damages among class members.

*Id.* (citing *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 262 (3d Cir. 2016), as amended (Sept. 29, 2016) ).

*Suboxone* is inapposite. The relevant issue before the *Suboxone* court was damages, not antitrust injury. If Plaintiffs are successful in showing that they can prove antitrust injury through common evidence, then *Suboxone* would be relevant as to Plaintiffs use of an aggregate damages model.

### 2. Parties Related Arguments on Remand

The parties also raise additional, related arguments. At the outset, the Court addresses several of Plaintiffs' assertions that appear to be made despite the Third Circuit's remand opinion. First, Plaintiffs claim that there is common evidence to rebut Defendants' Contracting Strategy defense. Br. at 4. But that is not the issue before the Court. Instead, the Court must decide whether Plaintiffs' can prove antitrust injury to each class member through common evidence. Among the common evidence, Plaintiffs point to Teva's forecasting documents and economic literature. Br. at 4-5. Yet, the Circuit cited to the same evidence and nevertheless remanded the matter. The Circuit noted that Dr. Lamb relied on economic literature, Teva's own general pricing forecasts, and transaction-level data reflecting the average price Teva's customers paid. *Lamictal*, 957 F.3d at 193.

Plaintiffs also rely on common evidence that prices for lamotrigine generally moved in unison, downward, upon the entrance of additional generics to the market. D.E. 373 at 50-52, ¶¶ 83-85. This is an accurate statement, but its relevance is diminished by the underlying facts. Here, there was no period when two generics competed on the market; instead, the number of generics increased from one to eight once Teva's exclusivity ended. D.E. 406-3 at 10 ¶ 13; D.E. 373 at 22-23, ¶ 30; *see also* Br. at 5, n. 6 ("[T]he number of

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 75 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

generics increased from one (Teva) to eight.") ). Dr. Lamb, Plaintiffs' expert, acknowledged that there is a cost savings increase "as the number of generics in the market increases until there [*sic*] [are] four or five generics in the market" and that "the price [will not go] materially lower with, for example, ten generics on the market as opposed to nine." D.E. 373 at 41-42 ¶ 65(a); *id.* at 42, n. 1. Thus, when Plaintiffs argue that prices moved in unison with additional generics, they omit that the price drop was not gradual; rather, the market was flooded with eight generics at the same time which, as Plaintiffs' expert admitted, caused the generic lamotrigine price to reach its nadir. This evidence does not provide any indication as to the lamotrigine price that would have existed for all class members in the but-for, two-generic world.

*19 Plaintiffs claim that common evidence shows that the price drop attributable to the Contracting Strategy "is much shallower than the generic price drop that would have occurred absent Defendants' unlawful conduct." Br. at 15-16. Plaintiffs rely on the "New Product Share/Pricing Assumptions – TUSA Generics East." Br. at 16; *see also* D.E. 473 at 66. This pricing matrix shows that in year 1, if Teva was the exclusive generic, it planned to price that generic at approximately 50% of the Lamictal's WAC. *Id.* However, if Teva was competing with another generic (including an authorized generic), Teva projected its price at 35% of the brand's WAC. *Id.* at 66 n. 198. The pricing matrix reflects Teva's general forecasts over its entire generic portfolio and is not specific to lamotrigine. Defendants respond that the pricing matrix actually assumed a 44% WAC (because of retroactive discounts Teva would have to provide beginning in the seventh month) and that the matrix reflects a general rule of thumb as to all generic products. Opp. at 15, n.9. Defendants continue that the matrix does not reflect prices that Teva actually charged for lamotrigine. Opp. at 15. Nevertheless, to determine whether Teva followed the pricing matrix for lamotrigine, Dr. Lamb "compared the net price for generic lamotrigine tablets charged by Teva during its six-month period of exclusivity to the brand WAC for Lamictal tablets during this time." D.E. 473 at 67, ¶ 104. Dr. Lamb determined that "the weighted average ratio of ASP[25] to brand WAC was 49.672 percent" which is consistent with the projected 50% discount reflected in Teva's pricing matrix. *Id.*

Plaintiffs therefore claim that, had GSK launched an authorized generic, the price of Teva's generic would have been 30% lower than the price Teva originally projected it would charge – 35%, as opposed to 50%, of brand WAC.

Plaintiffs further contend that, based on the analysis of Dr. Hughes, Defendants' expert, generic prices would have dropped even further "by at least 6.1%" because brand Lamictal's WAC at the but-for generic entry date was 6.1% lower than in June 2008 – the month before Teva launched lamotrigine. Dr. Hughes' report opined as follows:

> The brand WAC was 6.1 percent lower in September 2007 (the month before Teva would have launched its generic product in Dr. Lamb's "No-Payment Settlement" scenario) than it was June 2008 (the month before Teva launched its generic product in the actual world). Following Dr. Lamb's assumption that Teva set generic prices based on the brand WAC at the time of generic entry, generic prices would have been 6.1 percent lower in a but for world in which Teva launched in October 2007 than they actually were at the time of generic entry.

D.E. 478-3 at 5, ¶ 54. Using the common evidence of Teva's forecasting documents – shown to be reliable based on a comparison to prices paid in the real world, *see* D.E. 473 at 67, ¶ 104 – and Dr. Hughes' testimony, Plaintiffs assert that Plaintiffs would have paid, on average, 34.3%[26] less for lamotrigine absent the No-AG Agreement. Br. at 18. Plaintiffs claim this price drop is larger "than the largest alleged preemptive Teva price drop (20.8%) than Defendants attribute to GSK's [Contracting Strategy]." *Id.* at 18.

Defendants respond that "[l]ike the failed sensitivity analysis, this theory compares a dizzying assembly of averages." Opp. at 19. Defendants argue that "some purchasers would receive higher or lower discounts" and that "a given purchaser might have received a 20% discount off the generic price in the but-for world" and would therefore "be uninjured, not withstanding the higher average but-for discount." Opp. at 19-20.

Plaintiffs have a sound theory. Plaintiffs assert that if Teva had faced authorized generic competition when it launched lamotrigine, generic purchasers would have paid less. The economic literature supports this theory. While GSK indicates

Case 3:18-cv-00121-JFS-PJC     Document 232-13     Filed 02/24/26     Page 76 of 230

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

that pursuant to the Contracting Strategy, it lowered the price for Lamictal up to 40% for certain customers, the Court does not know which customers received which discount. In fact, other evidence strongly suggests that GSK did not lower Lamictal's price commensurate to that of an authorized generic. First, GSK believed that the unique nature of Lamictal meant that physicians would not (or would be reluctant) to switch patients to lamotrigine if the patients were stable on Lamictal. This unique feature would weigh against lowering the price of Lamictal to that of an authorized generic. Second, GSK appeared to internally acknowledge that it would lose a portion of the market to generic competition, particularly the market consisting of new patients or patients who were not yet stabilized. If GSK had lowered the price of Lamictal to that of an authorized generic, GSK should have been able to compete in this market. Finally, as noted, in November 2008, Teva's President and CEO stated that the Contracting Strategy "was largely unsuccessful and really didn't impact price all that much." D.E. 500-1 at 9.

**\*20** Plaintiffs' theory, however rational it may be, is missing critical supporting evidence. First, while Plaintiffs rely on the evidence as to 50% of brand WAC without other generic competition compared to the 35% of WAC when facing a generic competitor, the Circuit was well aware of this evidence. *Lamictal*, 957 F.3d at 193 (indicating that Dr. Lamb relied on, among other things, "Teva's own general pricing forecast tending to discount a generic by 50% without competition, but by 65% when facing an additional competitor"). Defendants respond (in accord with the Third Circuit) that its customers received varying discounts on lamotrigine in response to the Contracting Strategy, and that Plaintiffs have not shown that all such customers would have received an additional discount if GSK had launched an authorized generic. According to Defendants (and the Circuit), this is the crucial issue that the Court must confront in determining whether Plaintiffs' can rely on averages in establishing classwide antitrust injury. And Plaintiffs have failed to prove that such evidence exists by a preponderance of the evidence.

Plaintiffs have not provided the critical evidential link. For example, Plaintiffs did not produce evidence showing that if Teva faced an authorized generic and the Contracting Strategy at the same time, it would have further lowered the prices of lamotrigine across the board. Nor did Plaintiffs, for instance, cite to evidence demonstrating that the Teva customers who received discounts in response to the Contracting Strategy, would have received additional, commensurate discounts

in response to authorized generic competition. The Court assumes that Teva provided discounts for rationale business reasons rather than charitable, idiosyncratic, or arbitrary motivations. This assumption would mean that Teva would do the same in response to authorized generic competition. But this is an assumption, not evidence, and Plaintiffs have the burden of producing such evidence and proving the issue by a preponderance of the evidence.

As discussed, a key concern of the Third Circuit was the Court's analysis of the competing experts vis-à-vis the use of averages. The Circuit noted, among other things, that Defendants' expert, Dr. Hughes, criticized Plaintiffs' expert's, Dr. Lamb, use of general forecasting documents rather than lamotrigine-specific prices and indicated that Hughes developed his own model based on lamotrigine-specific prices from Teva documents that demonstrated that "25 of the 33 generic-only purchasers likely paid the same or lower prices in the actual world under the Contracting Strategy than they would have paid had GSK launched an AG." *Lamictal*, 957 F.3d at 194.

Dr. Hughes indicated that an "FTC study, cited by Dr. Lamb, shows that on average, the launch of an authorized generic decreases the generic's product's price by 6.6 to 13.5 percent. The FTC-reported discounts provide a reasonable benchmark for comparison to Teva's price discounting in response to the Contracting Strategy[.]" D.E. 476-6 at 4, ¶ 52 (citing U.S. Federal Trade Commission, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011). Using this benchmark, Dr. Hughes then reached the following conclusions:

> Exhibit 4b demonstrates that the range of Contracting Strategy discounts received by generic-only purchasers in the proposed Class overlaps substantially with the range of authorized generic discounts reported by the FTC. In fact, Exhibit 4b shows that 15 generic-only purchasers actually received discounts larger than 13.5 percent, the higher of the two estimates reported by the FTC. An additional ten purchasers (i.e. 25 in

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

total) received discounts larger than 6.6 percent, the lower FTC estimate.

*Id.* (footnotes omitted). Dr. Stangle, another defense expert, noted that average discount provided to Teva's customers in response to the Contracting Strategy was 11%. D.E. 406-3 at 31 ¶ 54. Dr. Hughes calculated the following as to Teva's customers in response to the Contracting Strategy: at least 4 did not receive a discount, 10 received discounts of 9.3%, 2 received discounts of 16.7%, and 13 received discounts of 20.8%.[27] D.E. 406-2 at 79-80. Dr. Hughes's conclusion – that "25 of the 33 generic-only purchasers likely paid the same or lower prices in the actual world under the Contracting Strategy than they would have paid had GSK launched an AG" – was emphasized by the Circuit. *Lamictal,* 957 F.3d at 194.

*21 On remand, Plaintiffs have not shown by a preponderance of the evidence that that they can prove through common evidence that all of Teva's purchasers would have received additional discounts had GSK also launched an authorized generic. Plaintiffs theory is reasonable, but they are missing the critical evidential link emphasized by the Circuit.

### III. CONCLUSION

Plaintiffs' motion for class certification as to generic-only purchasers is denied. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2021 WL 2349828

---

### Footnotes

1    The matter was transferred to the undersigned following the remand.

2    The proposed class includes direct purchasers of both Lamictal and generic lamotrigine. The Circuit's opinion, however, only addressed the purchasers of the generic.

3    Unless otherwise specified, page numbers for exhibits reflect the Court's electronic filing system's generated page numbers.

4    The Third Circuit defined Plaintiffs as "Direct Purchasers" meaning "companies that directly purchased brand Lamictal from GSK or lamotrigine from Teva." *Id.* at 189. However, for purposes of the appeal, the Circuit continued that "GSK and Teva challenge only certification as to the members who purchased generic lamotrigine from Teva (hence any reference to the Direct Purchasers that follows is limited to those Direct Purchasers)." *Id.* at 190. As a result, the Court does the same on remand and focuses on Plaintiffs who purchased the generic from Teva.

5    The Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* articulated several factors to consider when determining whether a plaintiff has antitrust standing. 459 U.S. 519, 535-38 (1983). Since then, the Third Circuit has "organized those factors ... into the following multifactor test":

     (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 78 of 230
In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)
2021 WL 2349828

speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. France*, 707 F.3d at 232-33 (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)).

6    Of note, Plaintiffs represent that they will no longer rely on Dr. Lamb's sensitivity analysis in support of class certification. Br. at 6. The Third Circuit described Dr. Lamb's sensitivity analysis as follows: "While the parties dispute whether GSK would have used both strategies—launching an AG and engaging in the Contracting Strategy—simultaneously, Lamb conducted a 'sensitivity analysis' as part of his model purporting to show that, either way, the price of lamotrigine would have been lower absent the settlement agreement." *Lamictal*, 957 F.3d at 193 n.4. Accordingly, the Court does not consider the analysis here.

7    The day after the lamotrigine launch, on July 23, 2008, Teva sued GSK for breach of their settlement agreement because of the Contracting Strategy. *Teva Pharm. Indus. Ltd. v. Smithkline Beecham Corp.*, Civ. No. 08-3706, 2009 WL 1687457 (D.N.J. June 16, 2009). Judge Cavanaugh, who was assigned to the case, described the matter as follows: "Just prior to Teva launching its generic, GSK approached various pharmacies, group purchasing organizations, and long-term care facilities and proposed that they purchase and distribute GSK's Lamictal at a generic product price which would be eligible for generic product reimbursement." *Id.* at *2.

8    Cavanaugh stated that the tab "reflects the contract prices that *we* thought Teva should charge[.]" *Id.* at ¶ 7 (emphasis added). However, Cavanaugh did not indicate who the "we" consisted of. It is not clear if she meant Galownia or a broader group of people.

9    Moreover, even if Plaintiffs were not aware that Teva was claiming a preemptive price reduction in response to the Contracting Strategy, the Court would anticipate that Plaintiffs would have sought discovery that would have revealed such information. As noted, due to the 2008 litigation between Teva and GSK, Plaintiffs knew that Teva had been aware of the Contracting Strategy before Teva launched lamotrigine. Plaintiffs could have followed up with basic inquiries: when did Teva learn of the Contracting Strategy? What was Teva's understanding of the Contracting Strategy (particularly as to the pricing of Lamictal)? And what, if any actions, did Teva take once it learned of the Contracting Strategy (particularly as to the pricing of lamotrigine)?

10    As to the first predicate question, this evidence also indicates Teva contemplated different prices based on *categories* of purchasers

11    It is entirely unclear to the Court when or how Teva first learned of the Contracting Strategy. Obviously, Teva learned of the strategy before it sued GSK on July 23, 2008. Other than that, the most specific information is in Cavanaugh's declaration, which indicates that she "and others at Teva" learned of the Contracting Strategy "[d]uring the first half of 2008." Cavanaugh Decl. at ¶¶ 3, 5.

12    Returning to the first predicate question as to individualized negotiations, these tabs also reveal that Teva contemplated different prices based on *categories* of purchasers.

13    The other comparable prices that the Court refers to also apply to the same quantity and dose.

14    Due to the size of TEVA00022998, Defendant provided a copy to the Court via USB flash drive and Defendants' Exhibit 12 was provided as a slip page. For the sake of clarity, the Court will cite to TEVA00022998 using the designation "D.E. 479-2 at 79" and will reference appropriate tab names and row and column numbers and titles where applicable.

In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)

2021 WL 2349828

15    In reply, Plaintiffs claim that this explanation undermines Cavanaugh's Declaration and argue that the Court should therefore exclude it. Reply at 8-9. The Court disagrees. At paragraph 10 of her declaration, Cavanaugh explained that "[w]e revised contract prices again shortly before Teva's July 22, 2008 launch of lamotrigine tablets. Two months after the launch, I prepared a spreadsheet that compiled the initial orders that Teva's customers placed for lamotrigine tablets and the prices Teva charged those purchasers. I understand that Teva has produced that spreadsheet under Bates Number TEVA00022998. That tab labeled 'Go Forward Pricing' contains the *summary* of my analysis." Cavanaugh Decl. ¶ 10 (emphasis added).

16    However, it should be noted that Defendants do not concede that the purchasers for whom Plaintiffs claim the Go Forward Pricing tab is inaccurate fall into the "other" categories. Opp. at 12-13.

17    It appears that in limited instances [Redacted] purchased lamotrigine from Teva at a higher price than reflected on "Sheet 1" of TEVA00022998. *See* D.E. 479-3 at 2. However, Sheet 1 does accurately report the other prices those purchasers paid for lamotrigine.

20    The Court notes that Dr. Lamb's analysis based on the testimony of GSK representatives does not appear to be within the purview of expert testimony. That is not to say the issue – whether GSK would have pursued both the Contracting Strategy and the launch of an authorized generic – does not raise topics that may be appropriate for expert analysis. For example, an expert apparently could opine whether GSK had the capacity to do both or an expert could seemingly provide insight as to whether it was economically rational to pursue both strategies simultaneously. Nevertheless, statements by GSK representatives are evidence, however, and it appears that Plaintiffs' counsel could have argued the import of such evidence. Because such statements are evidence, and because Plaintiffs' counsel would have been free to present such evidence to the Court, the Court considers it at this time.

21    The Court assumes that "AEDs" refers to antiepileptic drugs.

22    The Court assumes that "PBM" refers to a pharmacy benefits manager.

23    As with Dr. Lamb's testimony, it appears that this portion of Dr. Stangle's testimony is not within the purview of proper expert opinion. The same is true of Dr. Stangle's opinion as to Bill Clark's statements. Again, defense counsel is free to point to such evidence – that is, statements or testimony by GSK representatives – and argue their import. Yet, as the Court also did in Dr. Lamb's case, the Court considers the underlying statements because they are part of the record.

24    GSK's anticipated success under the Contracting Strategy did not pan out. As Plaintiffs' expert indicated, Teva's generic lamotrigine had captured nearly 75% of the market share for both the brand and the generic by July 2008. D.E. 373 at 54-55, ¶ 82-83.

25    "ASP" refers to the "average selling price." D.E. 373 at 65, ¶ 102.

26    Plaintiffs actually assert that the discount is 36.1%. They arrive at this number by adding 30% (the discount projected by Teva) and 6.1% (the additional discount projected by Dr. Hughes). Br. at 17-18. But, as Defendants accurately point out, "percentages with different bases cannot be summed" so the appropriate figure is "34.3%." Opp. at 19.

27    Plaintiffs argue that the Court should disregard Drs. Hughes and Stangle's conclusions because their opinion are based on the Go Forward Pricing tab rather than Sheet 1 of TEVA00024341. Reply. at 8-10. Plaintiffs, however, do not provide additional analysis as to which specific conclusions by defense experts are invalid in light of Sheet 1. As a result, the Court declines to adopt Plaintiffs' all-or-nothing approach.

**In re: Lamictal Direct Purchaser Antitrust Litigation, Not Reported in Fed. Supp. (2021)**

2021 WL 2349828

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

9

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 82 of 230

Innospec Fuel Specialties, LLC v. Isochem North America, LLC, Not Reported in...

2012 WL 3682988

2012 WL 3682988
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

INNOSPEC FUEL SPECIALTIES, LLC, Plaintiff,
v.
ISOCHEM NORTH AMERICA, LLC, Defendant.

Civ. No. 10–1642.
|
Aug. 24, 2012.

**Attorneys and Law Firms**

Christopher R. Carton, Newark, NJ, for Plaintiff.

Matthew Sean Ingles, New York, NY, for Defendant.

MEMORANDUM OPINION, ORDER & JUDGMENT

THOMPSON, District Judge.

**\*1** Presently before the Court is Defendant Isochem North America, LLC's ("Isochem") Motion to Dismiss [docket # 51] the First Amended Complaint [49] which has been converted into a Motion for Summary Judgment, *see* (Mem. Op. & Order of Mar. 5, 2012)[56]. Plaintiff Innospec Fuel Specialties, LLC's ("Innospec") opposes the Motion [66]. For the reasons set forth below, the Motion will be granted.

## I. BACKGROUND

This matter arises out of a purported breach of an agreement between Plaintiff Innospec and Defendant Isochem pursuant to which Isochem was to pay Innospec commissions and rebates on certain sales.

Innospec is a distributor of 2–EHN, a chemical fuel additive, in North America. (Am.Compl.¶ 7). Innospec purchases 2–EHN from Defendant Isochem for distribution to, among others, Exxon Mobil. (*Id.* ¶ 10). In or around October 2004, representatives of Isochem (then named SNPE North America, LLC) and Octel Starreon LLC ("OS")[1] began negotiations concerning an arrangement wherein Isochem would pay OS commissions and freight charges on all deliveries made to Exxon Mobil and provide a "volume rebate" to OS for all 2–EHN purchased by OS from Isochem.

(*Id.*¶ 13). Thereafter, on or around August 17, 2005, the parties entered into the Exxon Mobil Commission Agreement (the "Agreement"), retroactive to January 1, 2005. (*Id.* ¶¶ 18–19). Under the terms of the Agreement, Defendant agreed to pay OS a "$0.04/lb commission on all E/M sales up to 3500 metric tons ["M/T"] ( [Exxon Mobil] contract amount)" as well as provide OS a "[r]ebate of $0.017/lb on all volume as long as a minimum of 8000 M/T are purchased per annum." (*Id.* ¶¶ 21–22). Additionally, Isochem agreed to pay for all freight, duty and storage costs from the Isochem facilities in Sarina and/or Lavera on all sales of 2–EHN to Exxon Mobil up to 3500 M/T. (*Id.* ¶ 23). Shortly thereafter, as market conditions began to deteriorate, representatives of Eurenco[2] began claiming that the rebate under the Agreement only applied to 2005 and not 2006 as previously negotiated by the parties. (*Id.* ¶¶ 24–40). Additionally, around this time, the parties began disputing the price that Innospec was required to pay Eurenco for 2–EHN in 2006 and in subsequent years. (*Id.* ¶¶ 41–45). In the course of these exchanges, Plaintiff alleges it was advised that Innospec and Isochem would "sort [the rebate issue] out after we get the pricing issue resolved." (*Id.* ¶ 46).

On December 12, 2005, the relevant parties met to discuss the disputed pricing and rebate issues. (*Id.* ¶ 48). In the course of that meeting, representatives of Eurenco advised Innospec that Isochem allegedly read the Agreement to require Innospec to pay Isochem almost $400,000 in commissions. (*Id.* ¶ 49). Innospec allegedly denied this interpretation of the Agreement and reserved its rights to seek additional payments of amounts owed. (*Id.* ¶ 50).

**\*2** Following that meeting, the parties continued to engage in negotiations concerning the underlying pricing relationship and the scope of the Agreement. Although Innospec alleges that it carried "a belief that Innospec and Isochem/Eurenco might come to some form of resolution or an arrangement that would resolve all outstanding issues between them, which would include the issues related to the Exxon Mobil Commission Agreement," (*id.* ¶ 50), such an agreement never materialized.

Based on these events, on February 23, 2010, Innospec initiated an arbitration proceeding before the International Chamber of Commerce against Eurenco, claiming that it was owed substantial sums under its distribution agreement. Shortly thereafter, on March 31, 2010, Innospec commenced the present action [1]. Isochem moved to stay this action pending the outcome of the European arbitration, and, in

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 83 of 230
**Innospec Fuel Specialties, LLC v. Isochem North America, LLC, Not Reported in...**
2012 WL 3682988

the alternative, moved to dismiss a number of claims in the Complaint [10]. The Court denied the request to stay the action pending arbitration, but dismissed certain disputed counts [20]. On November 11, 2011, Plaintiff filed a Motion to Amend/Correct its Complaint [45]. On November 14, 2011, Magistrate Judge Bongiovonni granted the Motion [48]. Subsequently on November 15, 2011, Plaintiff filed its Amended Complaint. On December 19, 2011, Isochem filed a motion to dismiss. In the Motion and subsequent reply brief [55], Defendant argued: (1) that decision not to pursue relief for many years prevents Innospec from asserting any claim for which relief could be granted; and (2) that Innospec has failed to demonstrate that its claim is plausible or that it has any possibility of success as Innospec's own documents purportedly demonstrate that Isochem paid the full amounts owed in 2005 and that the parties terminated their agreement in 2006. (Def.'s Reply Br., at 1–3). Plaintiff Innospec opposed the Motion, contending: (1) that it had properly and sufficiently stated its claims against Isochem; and (2) that Defendant had ignored the appropriate standard in its Motion by introducing affidavits and documents not relied upon in the Amended Complaint and not tested in discovery. (Pl.'s Opp'n to Mot. to Dismiss, at 1–2)[53]. On March 5, 2012, the Court on its own motion converted the motion to dismiss into a motion for summary judgment, ordered additional discovery for such purpose, and gave both parties the opportunity to submit simultaneous letter briefs addressing the now-converted motion for summary judgment. *See* (Mem. Op. & Order of March 5, 2012). On May 11, 2012, the parties submitted such briefs.

In its May 11, 2012 submission, Defendant maintains that the evidence adduced during discovery establishes that: (1) Innospec recognized, from the outset, that under the Agreement it would share a portion of the profit margin created by the difference between the price at which Exxon Mobil purchased 2–EHN from Isochem and the price at which Isochem sold that product to Innospec; (2) Innospec itself twice calculated the exact amounts that were owed under the Agreement, concluding that $394,242.64 was due to Isochem; (3) Innospec admitted that it "conceded" to excluding Exxon Mobile volume from a rebate it received; and (4) Innospec took a credit that reflected the payment of the amounts that it calculated under the Agreement without protest or any reservation of rights. (Def.'s Letter Br. at 1–2). Moreover, Defendant contends the evidence is equally clear that: (1) Innospec's internal documents show that only one day after the parties met to discuss whether to continue under the Agreement for 2006, Innospec began calculating that it would

make more money without the Agreement and without a rebate; (2) Innospec never calculated any amounts due in 2006 under the Agreement; (3) Innospec never requested payment for 2006 under the Agreement; (4) Innospec never reserved its rights, or otherwise protested, as to any claimed payment; and (5) an executive of Innospec seemed to concede that Innospec had waived its claim to recover under the Agreement stating in a 2007 correspondence to Eurenco "[i]n Q4 2005, Innospec agreed to terminate all rebates for specific accounts [and] conceded on the mis-interpretation of the ExxonMobil commission." *See* (*id.* at 2 (citing Hyon Decl. Ex. V at INNOSPEC 000000067)).

**\*3** Plaintiff by contrast argues that genuine issues of material fact exist that preclude summary judgment, including: (1) Whether Isochem fully paid Innospec pursuant to the Agreement; (2) Whether Innospec was required to transfer profit margins to Isochem pursuant to the Agreement; (3) Whether the rebate provision of the Agreement applied to all 2–EHN volume sold by Innospec in North America in 2005 and 2006; (4) Whether the parties agreed to terminate the Agreement in the last quarter of 2005; and (5) Whether the March 2006 return of profits was calculated under duress. (Pl.'s Letter Br. at 2).

## II. LEGAL STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed.R.Civ.P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir.2002) (internal quotations omitted). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

**Innospec Fuel Specialties, LLC v. Isochem North America, LLC, Not Reported in...**
2012 WL 3682988

party will bear the burden of proof at trial." *Celotex, All* U.S. at 322. Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial. *Id.* at 323–24.

## III. DISCUSSION

Defendant contends that it is entitled to summary judgment because Innospec's conduct suggests it had abandoned the contract or waived its claim. After reviewing the record before it, the Court agrees.

Under New Jersey law, a contract "will be treated as abandoned where one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior." *Dorchester Manor v. Borough of New Milford,* 287 N.J.Super. 163, 670 A.2d 600, 603–04 (N.J.Super.Ct.1994), *aff'd,* 287 N.J.Super. 114, 670 A.2d 576 (N.J.Super.Ct.App.Div.1996) (citations omitted). As described above, under the terms of the Agreement, Innospec was supposed to send freight, duty, and shipping costs to Isochem for reimbursement each quarter. Isochem notes that Innospec never sent the freight and shipping costs to Isochem for any quarter of 2006, as required by the terms of the Agreement. *See* (Slick Aff. ¶ 45). Although the parties appeared to have periodically negotiated pricing for 2–EHN and shared the benefits and costs of the fluctuation of 2–EHN pricing under their previous distribution agreement, reviewing the record the Court does not find any documentation that would suggest that the parties continued to perform under the Agreement or that the parties discussed any amounts due and owing under the Agreement for either 2005 or 2006. *See also* (Patrick McDuff Aff. at 11 ("in light of the December 12, 2005 meeting I believed that any further communications regarding the Agreement would be futile and a wasted effort because Isochem had already announced that it would not pay any rebates for 2006.... I also believed that the continued requests for payment further strain an already hostile relationship") [67]. Such conduct suggests that Innospec had abandoned the contract. *See Anstalt v. F.I.A. Ins. Co.,* 749 F.2d 175, 178 (3d Cir.1984) (when rescission or abandonment of a contract "is to be implied from the conduct of the parties, the actions must be positive and unequivocal.").

**\*4** Moreover, Innospec's failure to timely assert its alleged claims under the Agreement operate as a waiver of its breach of contract claim. It is well settled that waiver may occur when a promisor manifests the intent not to require a promisee to strictly comply with a contractual duty. *See, e.g., Moore's Trucking Co. v. Nat'l Starch & Chem.,* No. 93–750, 1994

WL 741081 (D.N.J. Sept. 27, 1994); *Nat'l Westminster Bank, U.S.A. v. Yaeger,* 130 B.R. 656, 675 (S.D.N.Y.1991), *aff'd,* 962 F.2d 1 (2d Cir.1992) ("It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes waiver of the breach."); *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.,* 710 F.Supp. 305, 311 (D.Utah 1989) ("The applicability of waiver depends on the intent of the non-breaching party. If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." (citing *Saverslak v. Davis—Cleaver Produce Co.,* 606 F.2d 208, 213 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980))). As the United States Court of Appeals for the Third Circuit has noted, New Jersey courts have held that a waiver occurs when a party dispenses with the performance of something which he or she has a right to exact, or does or forbears to do something inconsistently with the right or the intention to rely on it. *Evvco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3d Cir.1987) (citations omitted). Waiver may be inferred from silence or acquiescence as from other conduct or inaction. *See id.* at 196 (citing *Midwest Maint. & Constr. Co. v. Vela,* 621 F.2d 1046, 1048 (10th Cir.1980); *Minnesota Mining & Mfg. Co. v. Kirkevold,* 87 F.R.D. 324, 335 (D.Minn.1980)); *see also N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt.,* 264 F.Supp.2d 165, 177 (D.N.J.2003) (where a party "fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." (citations omitted)).

As noted above, this dispute stems from commissions allegedly due and owing from a period roughly four years before the filing of the first Complaint. Rather than assert its claim to the full amounts at some point reasonably soon after Isochem indicated its unwillingness to continue the Agreement in December 2005, Plaintiff appeared to renegotiate its position and in later documentation appeared to concede to Isochem's interpretation of the Agreement. Plaintiff continued to do business with Isochem, billed and accepted payment under terms it now asserts were made under duress, but has failed to provide any contemporaneous documentation that suggests that such payments were made under protest or that Innospec felt that additional amounts were due and owing. Indeed, the record suggests that to this day Plaintiff has not calculated the amounts allegedly due

2012 WL 3682988

under the Agreement, nor provided such calculations to the Defendant.

**\*5** Applying the law of waiver to these facts, the Court concludes that Plaintiff has waived any claim that it may have had to additional amounts owing under the commission structure underlying the Agreement. Plaintiff manifested its acquiescence to the rescission of the contract because it: (1) continued to serve as Defendant's distributor throughout the next four years without indicating that such participation was without prejudice to its asserting its rights under the Agreement; (2) failed to submit receipts as provided for under the Agreement; and (3) continued to bill and accept the Defendant's payments without protesting the amounts. The Court finds such conduct on Plaintiff's part contradictory to a claim that Defendant breached the parties' Agreement, and it leads this Court to conclude that Plaintiff voluntarily relinquished its claim to any outstanding commissions owed. No reasonable jury could find otherwise.

These facts also warrant the conclusion that Plaintiff is estopped from now seeking to hold Defendant to the Agreement. Estoppel operates to preclude a party from asserting a right to which it otherwise might be entitled when its actions would render its exercise inequitable. *See Moore's Trucking Co.,* 1994 WL 741081, at \*4 (citing *Hosp. Computer Sys. v. Staten Island Hosp.,* 788 F.Supp. 1351, 1358 (D.N.J.1992)). While the same facts may lend themselves to application of waiver and estoppel, the latter doctrine focuses not on the intent of the promisor, but rather on the effect of the promisor's conduct on the promisee. *See id.* Therefore, even if the intent element of waiver is missing, estoppel may arise from apparent waiver if the defendant has reasonably inferred from plaintiff's behavior that there has been a waiver. *Id.* at 1358–59. The party asserting the defense of estoppel bears the burden of proving the following elements: "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *U.S. v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987).

Applying these elements, the Court finds that the doctrine of estoppel bars this action. Although the Court does not believe

that Plaintiff necessarily intended to misrepresent its current position with respect to the Agreement, Plaintiff's silence and acceptance of payment unsurprisingly led Defendant to assume that it was honoring in full its obligations to Plaintiff. The Court finds that Defendant's reliance was reasonable under the circumstances given the parties' extensive contacts during the course of business and Plaintiff's history of documenting its protests in other disputes. *See, e.g.,* (Hyon Decl. Ex. S, at 1 (correspondence noting that the surcharge was included "under protest")). Moreover, arguably, this reliance was to Defendant's detriment as it foreclosed Defendant from seeking out a new distributor rather than to continue its association with Plaintiff. *See Moore's Trucking Co.,* 1994 WL 741081 at \*4. In light of the foregoing, the Court finds that a jury could reach only one conclusion—that Plaintiff's action is barred by the doctrines of abandonment, waiver, and estoppel. The Court therefore will grant Defendant's motion for summary judgment and the above-captioned action will be dismissed in its entirety.

## IV. CONCLUSION

**\*6** For the reasons set forth above,

IT IS on this 21st day of August, 2012,

ORDERED that Defendant Isochem North America, LLC's ("Isochem") Motion to Dismiss [docket # 51] the First Amended Complaint which has been converted into a Motion for Summary Judgment, *see* (Mem. Op. & Order of March 5, 2012) is hereby GRANTED; and it is further

ORDERED that JUDGMENT shall be entered in favor of Defendant Isochem North America, LLC and against Plaintiff Innospec Fuel Specialties, LLC; and it is further

ORDERED that this case is CLOSED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3682988

---

## Footnotes

1    Plaintiff is the successor in interest to OS. (Br. Demonstrating Citizenship, Ex. B[18].)

---

**Innospec Fuel Specialties, LLC v. Isochem North America, LLC, Not Reported in...**

2012 WL 3682988

2       Eurenco, as part of the SNPE Group of Companies, manufactures 2–EHN. (*Id.* ¶ 9).

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**10**

2022 WL 6232089

2022 WL 6232089
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Andrew JOHANSSON, on behalf of themselves and
the Class Members described herein; Jon Pearce, on
behalf of themselves and the Class Members described
herein; and Linda Stanley, on behalf of themselves
and the Class Members described herein, Plaintiffs,
v.
NELNET, INC., a Nebraska Corporation; Nelnet
Servicing, LLC, a Nebraska limited liability
company; and Nelnet Diversified Solutions, LLC,
a Nebraska limited liability company, Defendants.

4:20CV3069
|
Signed July 21, 2022

**Attorneys and Law Firms**

Anthony J. Fiorentino, Pro Hac Vice, Fiorentino Law Firm,
Chicago, IL, Cassandra P. Miller, Pro Hac Vice, Daniel
A. Edelman, Pro Hac Vice, Edelman, Combs Law Firm,
Chicago, IL, David A. Domina, Domina Law Group, Omaha,
NE, for Plaintiffs Andrew Johansson, Jon Pearce, Linda
Stanley.

Charles F. Kaplan, Daniel F. Kaplan, Perry, Guthery Law
Firm, Lincoln, NE, for Defendants.

**FINDINGS, RECOMMENDATION, AND ORDER**

Cheryl R. Zwart, United States Magistrate Judge

**\*1** This matter is before the court on Defendants' Motion
to Strike the class certification allegations of Plaintiffs'
complaint, and Motion to Strike Plaintiffs' Motion for Class
Certification. (Filing No. 150, see Filing No. 138). As to
Defendant's Motion to Strike, the undersigned magistrate
judge recommends that Plaintiffs' allegations seeking class
certification as set forth in their initial complaint be dismissed
as abandoned, and Plaintiffs' current arguments to certify
the "Modified Nationwide Class" referred to in Plaintiffs'
briefing be denied as unsupported by the allegations within
in the operative complaint and raised in contravention of
the court's prior order, (Filing No. 137). The court will
grant Defendants' Motion to Stay Briefing on the Plaintiff's

Motion for Class Certification, (Filing No. 152), pending
Judge Gerrard's review of the Motion to Strike.

**BACKGROUND**

Plaintiffs are borrowers on loans owned by the federal
Department of Education. Nelnet Inc., Nelnet Servicing,
LLC, and Nelnet Diversified Solutions, LLC ("Defendants"
or "Nelnet") collectively administer, service, and collect
on the loans. (Filing No. 1 at CM/ECF p. 2). Plaintiffs
allege Defendants, as federal loan servicers, are responsible
for administering federal income-driven repayment ("IDR")
plans. (Id.). Borrowers who cannot afford to repay their loans
pursuant to the standard repayment plan may enroll in IDR
plans based on their gross income and family size. (Id.). IDR
plans are renewed annually. (Id. at CM/ECF p. 4).

Plaintiffs' initial complaint alleges Defendants improperly
canceled or failed to renew their IDR plans and enrolled
Plaintiffs in unnecessary and costly forbearances. (Id. at CM/
ECF p. 3). Plaintiffs allege that such actions caused borrowers
to incur improper fees and/or caused unpaid accrued interest
to be added to the borrower's principal loan balance; that
is, "capitalized." (Id.). Specifically, the operative complaint
alleges Defendants violated:

- 34 C.F.R. § 685.221(e)(8)(i),[1] which states that a
  loan servicer must "maintain[ ] the borrower's current
  scheduled monthly payment amount" until the request
  has been fully processed if the borrower's recertification
  materials were received prior to the renewal deadline;

- 34 C.F.R. § 685.205(b)(9), by placing Plaintiffs'
  loans in hardship forbearance (during which interest
  is capitalized), (34 C.F.R § 685.205(a)), instead of
  administrative forbearances, during the documentation
  gathering and review of IDR plan renewal
  applications;[2] and

- 34 C.F.R. § 685.221(e)(8)(i), which requires that IDR
  applications be processed "promptly."

(Filing No. 1, at CM/ECF p. 19, ¶¶ 75-77). The initial
complaint does not allege hardship forbearances extended
on Plaintiffs' loans were unlawful because they were not
requested in writing.

**\*2** Plaintiffs filed this case on June 15, 2020. (Filing No.
1). After early motion practice, an initial progression order

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

was entered on August 30, 2021. (Filing No. 55). The order required that all motions to amend pleadings or add parties be filed on or before October 15, 2021. (Id.). The parties then began discovery focused on class certification. (Id.). On February 3, 2022, plaintiffs deposed Viola Pruett ("Pruett"), Program Manager for Defendants' loan servicing operations. (Filing No. 111 at CM/ECF p. 4). Plaintiff filed a motion for leave to file an amended complaint outside of the time period established by the progression order, claiming Pruett's deposition revealed new evidence of Defendants' alleged wrongdoing. (Filing No. 109).

Plaintiffs' proposed amended complaint essentially re-wrote the initial complaint, significantly expanding the theories of recovery and redefining the putative classes. (See Filing No. 109-2). As relevant to the currently pending issues, the proposed amended complaint would have added an "Improper Forbearance Enrollment" claim, alleging Defendants violated 34 C.F.R. § 685.205(a) by granting hardship forbearances despite the lack of a written request and supporting documentation from the borrower. (Filing No. 109-1, at CM/ECF pp. 10-15). Under the proposed amended complaint, Class I (the Improper Hardship Forbearance Class) would have included:

> All individuals who, according to Defendants' records, had a federal direct student loan serviced by Nelnet, and, at any time on or after a date five years (breach of contract) or four years (negligent misrepresentation) or three years (state subclasses) prior to the filing of this action who experienced the following:
>
> a. The borrower was enrolled in an IDR plan, but the income-driven payments were cancelled when the plan was not renewed prior to the annual deadline;
>
> b. Within 60 days of the cancellation of income-driven payments, Nelnet enrolled the borrower in a hardship forbearance, and the interest that accrued during the forbearance was capitalized;
>
> c. The borrower did not submit a written request for the hardship forbearance referenced above; or
>
> d. The borrower's loans were not in default status when the hardship forbearance was approved.

(Filing No. 109-1, at CM/ECF p. 32) (emphasis added).

On May 4, 2022, the undersigned denied Plaintiffs' motion for leave to amend, holding the motion was untimely under the court's progression order and Plaintiffs had failed to show good cause for moving to amend beyond the court-ordered deadline. Specifically, the court held that prior to the deadline for moving to amend, Plaintiffs either knew or should have known the facts underlying the new allegations and theories in the proposed amended complaint. (Filing No. 137, at CM/ECF p. 8). The order denying Plaintiff's motion to amend was not appealed. As such, the initial complaint remains the operative complaint in this case.

Defendants assert Plaintiffs' counsel informed them on May 13, 2022 that Plaintiffs intended to move to certify several of the putative classes as redefined in the proposed amended complaint. Defense counsel objected. Then on May 17, 2022, Plaintiffs' counsel stated that Plaintiffs would be moving to certify only the "Improper Hardship Forbearance" class as defined in the proposed amended complaint. Defendants again objected. (Filing No. 162-1).

Although the court's prior order denied Plaintiffs' motion to amend the complaint to add an "Improper Hardship Forbearance Class," Plaintiffs Motion for Class Certification filed on May 19, 2022, (Filing No. 138), asks the court to certify a proposed putative class that includes "Borrowers who were (1) enrolled in a hardship forbearance (2) without their written consent (3) while their IDR applications were pending." (Filing No. 138). The motion for class certification itself does not contain a precise putative class definition, but the supporting brief defines the "Modified Nationwide Class" as identical to the "Improper Hardship Forbearance Class" within Plaintiffs' proposed amended complaint. (Filing No. 109-1 at CM/ECF p. 32). Both parties apparently accept that the Modified Nationwide Class definition is the definition embraced by Plaintiffs' pending motion for class certification. As such, the court's prior order, (Filing No. 137), foreclosed as untimely the filing a complaint seeking relief on behalf of the "Modified Nationwide Class" now discussed in Plaintiffs' brief in support of class certification.

*3 Defendants have moved to strike both Plaintiffs' motion for class certification and the class allegations in Plaintiffs' initial complaint, arguing Plaintiffs have abandoned the class claims alleged in the operative complaint, and the allegations in the initial complaint do not support the class they now seek to certify. (Filing No. 150). Defendants also request that briefing on the motion for class certification be stayed pending a decision on the motion to strike. (Filing No. 152).

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

ANALYSIS

I. Motion to Strike Class Certification

Defendants have moved to strike Plaintiffs' Motion for Class Certification in its entirety, alleging that Plaintiffs have "abandon[ed] the theories of liability and putative class definitions set forth in the Complaint, and instead introduce a new, unpled theory of class-wide liability under a materially different putative class definition." (Filing No. 150). Defendants allege Plaintiffs are precluded from advancing the theory of liability and putative class definition presented in Filing No. 138, because they were not alleged in the initial complaint, and their new claims and theories are precluded by the Memorandum and Order entered by the undersigned magistrate judge on May 4, 2022. (Filing No. 137). Defendants further allege that had the complaint been amended, they would have filed a motion to dismiss. Because the amendment was not allowed, Defendants argue they were not able to adequately challenge the putative class definition, or conduct discovery based on the modified definition in Plaintiffs' class certification briefing before Plaintiffs' motion for class certification was filed. Thus, Defendants argue, allowing the motion for class certification to proceed would prejudice Defendants.

In opposition, Plaintiffs assert: (1) the modified putative class definition is supported by the allegations in the original complaint; (2) the modified class definition is based on computer search queries that Nelnet performed during discovery at Plaintiff's request, thus Defendants acquiesced or waived any challenge to the modified putative class definition; and (3) Nelnet's argument in support of the instant motions is contrary to prior representations made by counsel, and Plaintiffs would be prejudiced if the class definition is stricken at this stage in the proceedings.

Each of these arguments will be addressed in turn.

A. Previously Unpled Theories:

Defendants assert the Motion for Class Certification should be struck because "Plaintiffs' new theory of class-wide liability and overhauled putative class definition are invalid *ab initio* because they stray from the theories and class definition articulated in the Complaint." (Filing No. 153).

The operative complaint, (Filing No. 1), alleges Plaintiffs timely and successfully recertified their IDR plans, but Defendants' alleged processing mistakes and delays caused costly interest capitalization on Plaintiffs' loans and caused Plaintiffs to lose progress toward loan forgiveness. The complaint alleges Defendants failed to grant a 60-day administrative forbearance as provided for under 34 C.F.R. § 685.205(b)(9), and instead placed the Plaintiffs' loans, and the loans of the putative class members, in hardship forbearances under 34 C.F.R. § 685.205(a)(1). (Filing No. 1 at CM/ECF p. 19).

Plaintiffs assert the proposed class definition is still "based on allegations in the original complaint; that Nelnet 'improperly placed the loans of countless borrowers into hardship forbearance during the IDR recertification process, causing unpaid accrued interest to be capitalized, or added to the borrower's principal loan balance.' " (Filing No. 160 at CM/ECF pp. 7-8, citing Filing No. 1 at CM/ECF p. 3). In support of their argument they assert that "a court is not bound by the class definition proposed in the complaint." Smith v. Brown & Williamson Tobacco Corp., 174 F.R.D. 90, 92 n.2 (W.D. Mo. 1997).

*4 On its face, the initial complaint does not allege any claims premised on the fact that Plaintiffs' forbearance enrollment was requested orally and not in writing. In fact, the complaint contains no allegations regarding how, or if, Plaintiffs communicated their assent to hardship forbearances. (Compare, Filing No. 1 at CM/ECF p. 20 with Filing No. 140 at CM/ECF p. 19.). Based on Plaintiffs' modified class definition, Plaintiffs are now claiming their loans were unlawfully placed in hardship forbearance without Plaintiffs' written request. In contrast, Plaintiffs' initial complaint alleges Defendants unlawfully capitalized interest during the 60-day period for collecting and processing documentation to support the borrower's request for changes to a repayment plan by placing borrowers in hardship forbearances instead of administrative forbearances. (Filing No. 1 at CM/ECF p. 6, ¶19; Filing No. 1 at CM/ECF p. 19, ¶ 76) Contrary to Plaintiffs' argument, these allegations are not the same. The allegations in the initial complaint did not afford Defendants sufficient notice of the allegations now being pursued in the motion to certify the modified and redefined class. See WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co., 897 F.3d 987, 992-93 (8th Cir. 2018) Quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("Although the pleading requirements under Rule 8(a) are relatively permissive, the essential function of notice pleading

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 91 of 230

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 6232089

is to 'give the defendant fair notice of what the ... claim is *and the grounds upon which it rests.*' " (alteration in original) (emphasis supplied). In WireCo the Eighth Circuit found the district court did not abuse its discretion when it determined that only those theories of breach that WireCo pleaded in its complaint were before the court.

Before filing their motion to certify, Plaintiffs were fully aware of the court's position on this issue. The court's May 4, 2022 memorandum and order specifically addressed and denied Plaintiffs motion to amend their claims to assert that Nelnet had a policy of enrolling borrowers in hardship forbearances without written consent. (Filing No. 137 at CM/ ECF pp. 7-8).

Nonetheless, Plaintiffs argue they are entitled to pursue claims arising from lack of written consent, asserting Defendants will not be prejudiced by the new class definition because they knew about in February 2022 and had ample time to respond to the modified proposed class. (Filing No. 160 at CM/ECF p. 17). Defendants assert that, to date, they have spent time and resources conducting legal research and discovery to support their defenses based on the original complaint. Defendants argue that to allow Plaintiffs to advance their modified putative class definition would prejudice them because the allegations contained in the modified definition were not raised in the initial complaint and therefore have not been the subject of Rule 12 motion practice or discovery.

Defendants are correct. The modified putative class definition is not sufficiently based on the claims and theories in the operative pleading, and that pleading defines the scope of the issues to be litigated and the parameters of relevant discovery. Issues that are not raised in the pleadings are not part of this lawsuit. Plaintiff cannot use a motion for class certification or a redefined putative class to introduce an unpled claim and corresponding theories of liability. This is especially true when, as will be discussed in more detail below, this court has previously rejected as untimely Plaintiffs' attempt to amend the complaint and expand their theories of liability.

B. Effect of the May 4, 2022 Memorandum and Order

In Filing No. 137, the undersigned rejected the addition of language in the proposed amended complaint regarding Nelnet's alleged policy of enrolling borrowers in hardship forbearances without the borrower's written request. (Filing No. 137 at CM/ECF pp. 7-8). Specifically, the undersigned

found that since Plaintiffs Johansson and Stanley knew from the outset that they consented to hardship forbearances orally but not in writing, any claim to recover based on a lack of written consent could have been raised in the initial complaint and clearly before the deadline for amended pleadings set in the court's case progression order. Since Plaintiffs neither timely raised the consent allegations as a basis for recovery, nor showed due diligence in moving to add these allegations, the court denied the motion to amend. (Id., see, also Filing No. 121-12 at CM/ECF p. 42).

**\*5** Plaintiffs now seek to represent a modified nationwide class and several subclasses that include: "Borrowers who (1) were enrolled in a hardship forbearance (2) without their written consent (3) while their IDR applications were pending." (Filing No. 138 at CM/ECF pp. 1-2)(emphasis added). Citing my May 4, 2022 order, (Filing No. 137), Defendants argue Plaintiffs are prohibited from redefining the class to include a lack of written consent theory which was not raised in the operative complaint. Although Plaintiffs did not appeal my order denying their motion to add the written consent allegations, they claim they can nonetheless proceed with their new class definition; that Defendants' "law of the case" argument is unavailing because my order is interlocutory and "can always be reconsidered and modified by a district court prior to entry of a final judgment." [3] (Filing No. 160 at CM/ECF p. 21).

While it may be true that the prior order can be subject to reconsideration or modification, Plaintiffs have not requested either reconsideration by me or appellate review by Judge Gerrard. [4] Instead, within 15 days of the undersigned's order denying the motion to amend, Plaintiffs ignored that order and plunged ahead with a motion for class certification, with briefing that redefines the putative class to mirror the written consent allegations foreclosed by court order. Plaintiffs' motion to certify therefore attempts to bypass the deadlines in the case progression order, Rule 16's good cause requirements for modifying those deadlines, the rulings in the order denying the Plaintiffs' motion for leave to amend (Filing No. 137), and Plaintiffs' waiver of any objections to that order by failing to timely appeal. See Fed. R. Civ. P. 72(a) and NECivR 72.2. Plaintiffs' attempt to avoid the court's rules and orders cannot be allowed.

Plaintiffs argue that the undersigned's denial of a motion to add new claims has "no bearing on whether the original class definition may be modified." This is simply untrue. While a Plaintiff is not prevented from redefining a putative class

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

to meet the needs of the case, the putative class definition must nonetheless align with and cannot expand beyond the foreseeable claims arising from the operative complaint itself. See Klein v. TD Ameritrade Holding Corp., No. 8:14CV396, 2018 WL 3997126, at *7 (D. Neb. July 12, 2018), ("[I]t is clear that plaintiffs' class certification motion attempts to broaden the class and add theories of recovery beyond those pled in the complaint, which will not be permitted") report and recommendation adopted in part, rejected in part, (on separate grounds) 327 F.R.D. 283 (D. Neb. 2018), rev'd and remanded sub nom. Ford v. TD Ameritrade Holding Corp., 995 F.3d 616 (8th Cir. 2021). See, also Smith v. Seeco, Inc., No. 4:15CV00147 BSM, 2016 WL 3541412, at *3 (E.D. Ark. Mar. 11, 2016).

Plaintiffs assert that the May 4, 2022 memorandum and order "resolved the narrow procedural issue of whether an amended complaint could supersede the original complaint," but it did not reach the substantive issue of whether Plaintiffs' current class definition is grounded in the original pleadings. (Filing No. 160 at CM/ECF p. 21). This argument lacks merit. The court's order held that Plaintiffs could not amend the complaint to add claims alleging Defendants granted hardship forbearances without written requests. Despite this prior ruling, Plaintiffs now seek to represent a class whose "forbearance was processed over the phone, and the borrower never submitted a written request for the hardship forbearance." (Filing No. 140 at CM/ECF p. 19). The court's May 4, 2022 order found these allegations were not within the initial complaint, were not timely raised, and could not be added to this lawsuit.[5]

**\*6** Under the facts presented, Plaintiffs' attempt to certify the Modified Nationwide Class, also known as the "Improper Hardship Forbearance" class, described in their briefs is an attempt to incorporate unpled theories of recovery where permission to do so has already been denied. If allowed, Defendants would be forced to respond to a motion to certify a class that was not defined nor supported by the allegations in Plaintiffs' complaint.

C. Waiver or Acquiescence to
the Modified Nationwide Class

Plaintiffs argue that notwithstanding the undersigned's order on Plaintiffs' motion for leave to amend, Defendants have acquiesced to the modified nationwide putative class definition or waived the right to object to it. Plaintiffs claim

that "From the time Plaintiffs propounded Search Query 1 on Nelnet in February 2022, to the time Plaintiffs filed their motion for certification on May 19, 2022, Nelnet raised no objections to a class definition based on Search Query 1, either with the Court, or with Plaintiffs." (Filing No. 160 at CM/ECF pp. 14-15). In fact, Plaintiffs argue, "Nelnet gave every indication that the parties were in agreement" that Search Query 1 would form the basis for the motion for class certification. (Id. at CM/ECF p. 15). Plaintiffs assert that Defendants' objection to the modified nationwide class definition "at this late stage would substantially prejudice Plaintiffs' case." (Id. at CM/ECF p. 22). Plaintiffs argue that Defendants' "first objection to the class definition" was four months after it was served, three months after Plaintiffs waived their right to introduce expert testimony regarding the search queries, and two weeks after Plaintiffs moved for class certification. (Filing No. 160 at CM/ECF p. 23). Defendants vehemently disagree with this assertion.

The record shows that on January 25, 2022, the parties had a conference before the undersigned and Plaintiffs represented that they needed Defendants to run a query to determine the number of individuals who completed an application to renew an IDR and whose account was placed in a forbearance other than an administrative forbearance (i.e. a forbearance which would have a negative impact on the loan).[6] (Filing No. 88, audio file, at 12:00). Defendants agreed to provide that information, assuming it was capable of being queried. (Id., at 33:00). Plaintiffs were ordered to "provide Defendants the computer query they are requesting Defendants to run in preparation for filing Plaintiffs' anticipated motion for class certification." (Filing No. 89). The order required Plaintiffs to provide the query by February 10, and stated that Defendants should notify the court and Plaintiffs' counsel by February 17 if a query could not be feasibly run as requested. (Id.)

On February 10, 2022, Plaintiffs' counsel sent a list of four searches, and also notified Defendants that they intended to file an Amended Complaint containing "these revised class definitions as additional fact assertions which relate to these definitions." (Filing No. 141-13 at CM/ECF p. 2). Defense counsel emailed Plaintiffs' counsel on February 17 stating Defendants "fundamentally disagree" with the characterization of the complaint and the scope of the allegations. (Filing No. 141-15). The email stated that the new theories of liability had "zero basis in the complaint" but stated that Search Query 1 was at least feasible, so they were working on a response in compliance with the undersigned's order. (Filing No. 141-15). In a follow-up email on February

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

18, Defense counsel clarified that "defendants do oppose plaintiffs' motion for leave to amend" generally, and they specifically object to devoting resources to running specific queries. (Filing No. 165-8 at CM/ECF p. 2).

**\*7** Upon review, contrary to Plaintiffs' argument, there is no indication that Defense counsel accepted Search Query 1 as the basis for or a draft of a revised class definition. Defendants have repeatedly and consistently argued against amending the complaint, and specifically against the introduction of "new facts, legal theories, and putative class definitions" including an "improper hardship forbearance claim." (See, Filing No. 122 at CM/ECF pp. 6, 24). Defendants timely voiced their objection to Plaintiffs' motion to amend. The fact that Defendants completed the court-ordered electronic search does not mean the information returned by that search is relevant to the claims alleged in the original complaint—relevancy for discovery purposes is far broader than relevancy for admission into evidence. Nor does the performance of the search demonstrate that Defendants acquiesced to re-writing the putative class definition, especially given this court's denial of Plaintiffs' request to amend their complaint on similar grounds. Plaintiffs' assertion that Defendants have acquiesced to the new putative class definition is without merit.

### D. Expansion or Narrowing of the Putative Class

Plaintiffs also assert the proposed class definition does not expand the previously pled class definition. It narrows it by eliminating the "issues of individualized proof" posed by the previous definition. (Filing No. 140 at CM/ECF p. 21, Filing No. 160 at CM/ECF p. 16). Plaintiffs allege the new definition "amounts to a simple restructuring of the [original] definition to better identify the class," and actually "narrows the class" by including only a subset of borrowers within the original complaint's putative class definition. (Filing No. 160 at CM/ECF pp. 12-13).

Defendants assert the proposed class definition has the opposite effect. They argue that Plaintiffs removed several conditions which had been previously defined, thereby expanding the class. For example, where the original complaint was limited to those who submitted a *timely* application, that was *temporarily discontinued*, and *eventually approved*, the proposed class definition under subsection (a) now includes any borrower whose plan was not renewed prior to the annual deadline. Defendants argue

that this amendment relegates the concept of IDR plan recertification into an afterthought when it appeared to be the crux of the original complaint.

Defendants also assert that Plaintiffs have shifted their focus from claiming Defendants are liable because they granted hardship forbearances for an unauthorized reason (i.e. to cover up their internal processing delays) (See Filing No. 1 at CM/ECF p. 28), to claiming Defendants are liable because they permitted hardship forbearances without a written request. Defendants argue that the former would constitute a blatant violation of § 685.205(a)(1) while the latter aligns with Defendants' internal procedures, which would result in a "wildly inflated size of the redefined putative class." (Filing No. 164 at CM/ECF p. 20). Having considered the parties' arguments, the undersigned agrees that the redefined putative class definition as stated in the motion for class certification would expand the size and scope of the putative class and this litigation, not narrow it.

As an afterthought, Plaintiffs assert that, if appropriate, modification of the class definition is preferable to the relief Defendants request. They suggest the court can "alter" the new putative class definition by "synthesizing it with the original class," but they offer no potential solution along those lines. (Filing No. 160 at CM/ECF pp. 18-19). The undersigned cannot envision any synthesis of the original and amended class definitions that would resolve Plaintiffs' shifting basis of Defendants' alleged liability. And the court is not willing to "synthesize" a new class definition that it is favorable to Plaintiffs' case, adverse to Defendants' interests, and resurrects arguments the court rejected in its May 4, 2022 order.

### II. Motion to Strike Portions of the Complaint

Having concluded Plaintiffs' proposed class is not based on facts within the operative pleading, the court will now consider Defendants' motion to strike the class allegations that are within the original complaint. Defendants argue the allegations fall "hopelessly short of meeting the criteria for certification under Fed. R. Civ. P. 23." (Filing No. 151 at CM/ECF p. 24).

**\*8** Rule 23(b)(3), requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "An individual question is one where 'members of a proposed class will need to present

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.' " Ford v. TD Ameritrade Holding Corp., 995 F.3d 616, 620 (8th Cir. 2021) citing Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, (2016) If the plaintiffs' method of proving their claims would "include individualized inquiries that cannot be addressed in a manner consistent with Rule 23, then the class cannot be certified." Harris v. Union Pac. R.R. Co., 953 F.3d 1030, 1035 (8th Cir. 2020) (internal quotation omitted).

In their briefing, Plaintiffs assert the putative class definition was redefined, at least in part, to eliminate the individualization issues raised in Defendants' pleadings. (Filing No. 160 at CM/ECF pp. 9, 11). For example, as originally written, Plaintiffs' claims depend on whether the applications were timely submitted, complete, and accompanied by sufficient income documentation. This would require reviewing each putative class member's annual IDR plan recertification application and any accompanying or supplemental documents. The putative class definition in the original complaint would create the type of fact-intensive and borrower-specific allegations which foreclose class certification under Rule 23.

Plaintiffs argue that their new proposed class definition "eliminates these issues by focusing on the question of improper forbearance enrollment." (Filing No. 140). Plaintiffs further argue that the "existence of an interest-capitalizing forbearance enrollment without written request can be – and has been through the search query – [ ] established from Defendant's records. The legality of that practice is a classwide question." (Filing No. 140 at CM/ECF p. 26).

Even in response to Defendants' motion to strike, Plaintiffs' briefing does not argue that the putative class definition in the original complaint is viable, and the briefing admits that the class definition in the initial complaint necessitates individualized factual inquiries. That briefing, along with Plaintiffs' clear shift in legal theories and modification of the class definition, indicates Plaintiffs have, in fact, abandoned the class action allegations originally asserted. Under Fed. R. Civ. P. 12(f), courts may strike "from any pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Courts enjoy liberal discretion to strike pleadings under this provision. Harris v. Union Pac. R.R. Co., No. 8:16CV381,

2017 WL 11609769, at *3 (D. Neb. Mar. 8, 2017), citing BJC Health System v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007). While striking a party's pleadings is an "extreme and disfavored measure" (Id.), "it is sometimes appropriate to strike pleadings, such as when a portion of a complaint lacks a legal basis." Donelson v. Ameriprise Fin. Servs. Inc., 999 F.3d 1080, 1092 (8th Cir. 2021). Indeed, "[i]t is 'sensible ... to permit class allegations to be stricken at the pleading stage' if it is 'apparent from the pleadings that the class cannot be certified' because 'unsupportable class allegations bring 'impertinent' material into the pleading' and 'permitting such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained.' " Id. (quoting 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1383 (3d ed.)). It is apparent that Paragraphs 75 through 91 of the original complaint are now immaterial to this litigation and under the circumstances, they should be dismissed as abandoned.

\*9  Accordingly,

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to 28 U.S.C. § 636(b),

    A. As to Defendant's Motion to Strike, (Filing No. 150),

        1) Plaintiffs' allegations seeking class certification, (Filing No. 1, ¶¶ 75 through 91)), be dismissed as abandoned; and

        2) Plaintiffs' current motion to certify the "Modified Nationwide Class" referred to in Plaintiffs' briefing be denied as unsupported by the allegations within in the operative complaint and raised in contravention of the court's prior order, (Filing No. 137).

    B. The Motion for Class Certification (Filing No. 138) be denied for the reasons supporting Paragraph A(2) of this recommendation.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED:

    A. Defendants' Motion to Stay Briefing on Plaintiffs' Motion for Class Certification is granted. (Filing No. 152).

Johansson v. Nelnet, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 6232089

B. If Judge Gerrard grants objections to the Findings and Recommendation herein, if any, the parties shall contact my chambers within 10 days following Judge Gerrard's ruling to discuss whether further discovery is needed as to the redefined putative class, the deadlines for completing any such discovery, and any motion and briefing deadlines.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 6232089

---

## Footnotes

1    The complaint references 34 C.F.R. § 685.221(e)(8)(ii). This is a typographical error. The language quoted in the complaint is from 34 C.F.R. § 685.221(e)(8)(i).

2    As used in this case, an "administrative forbearance" is "a 60-day forbearance, with no resulting capitalization of interest, if the purpose of the forbearance is to allow the loan holder to collect and process documentation supporting the borrower's request for any changes to the repayment plan." (Filing No. 1, at CM/ECF p. 6, ¶19).

3    Plaintiffs cite First Union Nat. Bank v. Pictet Overseas Tr. Corp., 477 F.3d 616, 621 (8th Cir. 2007) for the proposition quoted. However, in that case the Eighth Circuit found that even if the district court had intended to resolve an issue, "it failed to do so with sufficient directness and clarity to establish the settled expectations of the parties necessary for the subsequent application of the law of the case doctrine." The same cannot be said for the undersigned's May 4, 2022 order finding there was not good cause to amend the complaint.

4    FRCP 72(a) states "A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."

5    Also, Plaintiffs cannot represent a class when there is no allegation that they fit within the class definition. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982) ("a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.") The operative complaint lacks sufficient allegations indicating the plaintiffs would be members of the modified nationwide class.

6    During the January 25, 2022 conference, Plaintiffs did not state that the method of assent to a specific type of forbearance would be an element of the potential query or queries.

---

**End of Document**                                       © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**11**

Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)

2024 WL 4188865

2024 WL 4188865
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Steven Eric KIRCHNER, Elizabeth Lee Kirchner,
and Robert Grant Weston, individually and on behalf
of all other persons similarly situated, Plaintiffs,
v.
WYNDHAM VACATION RESORTS, INC., Defendant.

Civil Action No. 20-436-RGA
|
Signed September 13, 2024

**Attorneys and Law Firms**

Gina M. Serra, Herbert W. Mondros, Rigrodsky Law, P.A.,
Wilmington, DE, Adam Szulczewski, Pro Hac Vice, Howard
B. Prossnitz, Pro Hac Vice, Steven Eric KirchnerElizabeth
Lee Kirchner, for Plaintiffs.

Nancy Shane Rappaport, DLA Piper LLP, Wilmington, DE,
David S. Sager, Yan Grinblat, Chicago, IL, for Defendant.

MEMORANDUM ORDER

United States District Judge

*1 Before me are Plaintiffs' motion for class certification
(D.I. 112) and motion for an evidentiary hearing and for leave
to file a trial plan (D.I. 134). I have considered the parties'
briefing. (D.I. 113, 120, 122, 134–36). I heard oral argument
on the motion for class certification on July 22, 2024. [1] For
the reasons set forth below, Plaintiffs' motions are DENIED.

**I. BACKGROUND**

This putative class action arises out of alleged omissions
and misrepresentations made in timeshare sales presentations
by Defendant Wyndham. [2] On March 27, 2020, Plaintiffs
Steven Eric Kirchner and Elizabeth Lee Kirchner filed their
first complaint with co-plaintiff Nazret Z. Gebremeskel on
behalf of themselves and all other similarly situated people.
(D.I. 1). The class allegations were limited to people who
signed timeshare agreements in Tennessee and Nevada.
The Kirchners sought to represent the class of people
who had signed timeshare agreements in Tennessee, while

Gebremeskel sought to represent the class of people who had
signed timeshare agreements in Nevada. (*Id.* ¶¶ 60–61).

After a dismissal under Federal Rule of Civil Procedure
9(b), Plaintiffs filed an amended complaint on April
26, 2021, substituting Gebremeskel with a new class
representative, Marcia Richards, because Gebremeskel's
claims were individually settled. (*See* D.I. 21 ¶ 1; *see also*
D.I. 27). In addition to pleading additional facts to cure
the Rule 9(b) defect, the Amended Class Action Complaint
added a count of "fraudulent inducement by omission" and
correspondingly modified the putative class to one without
geographical restrictions, with all three named Plaintiffs
serving as class representatives. (D.I. 27 ¶¶ 65, 92–98).
The Kirchners continued to seek to represent the subclass
of people who had signed agreements in Tennessee, while
Richards sought to represent the subclass of people who had
signed agreements in Nevada. (*Id.* ¶¶ 65–67). I dismissed
Plaintiff Richards's claims as untimely. (D.I. 44 at 6–8).

Plaintiffs then filed a Second Amended Class Action
Complaint, substituting Plaintiff Robert Grant Weston as an
additional class representative for the national class and as the
sole representative for the Nevada subclass. (D.I. 52 ¶¶ 65,
67). The current operative complaint is the Corrected Third
Amended Class Action Complaint (the "Third Amended
Complaint"), which added additional factual pleadings. (D.I.
83). It alleges fraudulent inducement by omission, violation
of Nevada's deceptive trade practices act, and violation of
Tennessee's timeshare act. (*Id.* ¶¶ 92–108).

On March 27, 2023, I granted Defendant's motion to
dismiss Count II of the Third Amended Complaint. I denied
Defendant's motion to dismiss Count I. (D.I. 97 at 9–10).

Plaintiffs seek to certify the following class and subclass
under Rule 23(b)(3):

*2 a. All persons who signed Wyndham timeshare
agreements (without arbitration clauses and without prior
Wyndham timeshare agreements) within three years prior
to the filing of this suit after attending Wyndham sales
presentations who requested cancellation of their contracts,
were unsuccessful in obtaining rescission, and complained
about sales misrepresentations. [3]

b. All persons who signed Wyndham timeshare agreements
(without arbitration clauses and without prior Wyndham
timeshare agreements) in Tennessee within three years
prior to the filing of this suit after attending Wyndham sales

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 98 of 230
Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)
2024 WL 4188865

presentations who requested cancellation of their contracts, were unsuccessful in obtaining rescission, and complained about sales misrepresentations. [4]

(D.I. 112 at 1–2).

Plaintiffs seek to certify the following class under Rule 23(b)(2):

> All persons who signed Wyndham timeshare agreements (without arbitration clauses and without prior Wyndham timeshare agreements) within three years prior to the filing of this suit after attending Wyndham sales presentations. [5]

(*Id.* at 2).

## II. LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To qualify for this exception, a party "must affirmatively demonstrate [its] compliance" with Federal Rule of Civil Procedure 23 by a preponderance of the evidence. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015). Before a proposed class can be certified, plaintiffs must establish that all four prerequisites of Rule 23(a), and at least one part of Rule 23(b), are met. *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir. 2001).

Rule 23(a) sets forth four prerequisites that must be met to obtain certification of a class: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a).

Rule 23(b)(2) authorizes a class action if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." *Sullivan v. DB Investments,*

*Inc.*, 667 F.3d 273, 296 (3d Cir. 2011). Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The district court must conduct a "rigorous analysis" when determining whether Rule 23's requirements have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). The Third Circuit has provided detailed guidance for district courts conducting this "rigorous analysis." *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008). A party's assurances that it plans to meet Rule 23's requirements are insufficient. *Id.* at 318. Rather, the Court is required to make a "definitive determination" that each requirement of Rule 23 has been met. *Id.* at 320. To the extent factual determinations are necessary, they must be made by a preponderance of the evidence. *Id.* Because Rule 23 does not merely establish pleading rules, the Court may make a "preliminary inquiry into the merits," and "may 'consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.' " *Id.* at 316–17 (citation omitted); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001) ("A class certification decision requires a thorough examination of the factual and legal allegations."). If the Court grants class certification, the order must include "a clear and complete summary of those claims, issues, or defenses subject to class treatment." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 184 (3d Cir. 2006).

**\*3** Courts have recognized "that an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013). To satisfy this implicit "ascertainability" requirement, a plaintiff must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (cleaned up).

## III. DISCUSSION

### A. Rule 23(a)

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 99 of 230
Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)
2024 WL 4188865

### 1. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." This means that the "claims must depend upon a common contention" and that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Count I of the Third Amended Complaint pleads a fraudulent inducement by omission claim. (D.I. 83 ¶¶ 92–98). The Third Amended Complaint alleges that Defendant omitted a variety of material facts in conversations with prospective timeshare owners. The Third Amended Complaint alleges owners "are not told that they will rarely be able to use their timeshares to stay at their desired locations," that owners "are not told that they will need to book up to thirteen months in advance," and more. (*Id.* ¶ 7).

Plaintiffs argue that the class members "share the common question of whether Wyndham's omissions are actionable." (D.I. 113 at 14). Defendant contends that Plaintiffs have failed to establish commonality. (D.I. 120 at 19).

Although the Third Amended Complaint lists various purported omissions, Plaintiffs' briefing focuses on availability. Plaintiffs argue that Defendant's sales scripts uniformly state, "You can go anywhere / anytime / and stay in any size accommodation for any number of nights." (D.I. 113 at 2 (quoting D.I. 113-14)). Plaintiffs contend that this statement omits that there is an availability problem. They argue that Defendant "deliberately and intentionally fails to reveal that less than half of Wyndham [o]wners, a mere 38%, are able to use their timeshares within their first year of ownership. Lack of availability of destinations is the number one reason that [o]wners are unable to use their timeshares." (*Id.* at 1 (citing D.I. 113-1 at 24–25 of 49)).

The record does not support Plaintiffs' assertion that an availability problem exists. The evidence on which Plaintiffs rely is a 2019 survey of "new owner barriers to book." (D.I. 113-1 at 23 of 49). The survey, which features a 12% response rate—1,023 out of 8,489 individuals—includes the following statement: "Reservation data shows that only 54% of new CLUB WYNDHAM owners are booking within their first year of ownership and only 38% are going on vacation using

their points during this first year." (*Id.* at 24 of 49). On its own, this statement does not show that owners were unable to book within their first year, nor does it show that an availability problem exists. The survey also states that 35% of survey responders listed "availability" as the reason they had not made a resort reservation. (*Id.* at 27 of 49). These survey responses, which reveal the perspectives of a small sample of owners, are insufficient to establish that Defendant has an availability problem.

**\*4** I am dubious about whether Plaintiffs' proffered common question of an actionable omission is specific enough to establish commonality, at least as far as the common question relates to availability. As I explain below, Plaintiffs have not established the requirements of Rule 23 regardless of commonality.

### 2. Typicality

Under Rule 23(a)(3), class certification is appropriate only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality "does not require that all class members share identical claims," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 530 (3d Cir. 2004), but the proposed representative must be "sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class," *In re Schering Plough Corp. ERISA Litig*, 589 F.3d 585, 597 (3d Cir. 2009).

Plaintiffs argue that their experiences are typical of the class members' experiences. (D.I. 113 at 19). Plaintiffs contend that Defendant "engaged in a common scheme of omissions" in its sales presentations. (*Id.* at 15). Defendant argues there is no evidence of typicality, as Plaintiffs' spreadsheet shows that owners requested cancellation for different reasons. (D.I. 120 at 19–20). Defendant contends that Plaintiffs' claims even vary between the Kirchners and Mr. Weston. (*Id.* at 20). Plaintiffs reply, "It is irrelevant that owners cancel for different expressed reasons because every single one of them was subject to the same omissions." (D.I. 122 at 11).

I do not think that Plaintiffs have established typicality. Contrary to Plaintiffs' assertions, I think the class members' reasons for cancellation are relevant, at least for the Cancellation Class and the Tennessee Subclass. The definitions of the Cancellation Class and Tennessee Subclass

**Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)**

2024 WL 4188865

describe individuals who, after attending Defendant's sales presentations, "requested cancellation of their contracts, were unsuccessful in obtaining rescission, and complained about sales misrepresentations." (D.I. 112 at 1–2). An individual's experience is more likely to be typical of others' experiences when the purported sales misrepresentations are related to the cancellation request. Plaintiffs' main theory about the purported omissions is, "If these facts were disclosed, Plaintiffs and Class [m]embers would not have purchased Wyndham timeshares." (D.I. 122 at 1). Yet in the case of Mr. Weston, the record shows that he attempted to cancel his contract before attempting to book. At his deposition, Mr. Weston testified,

Q. Well, the next day you were concerned enough –

A. Well, I was concerned enough. It's like, wait a minute, this smells like a rat in a barrel because they're not returning our calls, and we're thinking we made a mistake and we have got some serious questions.

Q. So you did think in those terms the next day?

A. Well, yeah. But, again, that's not how my mind works, other than when you call somebody and you have got some questions and you're thinking you made a mistake and they do not respond. Even though I don't think in those terms, you've got to start thinking, wait a minute, the red flag's going up here.

Q. Why did you call these Wyndham folks? What did you want to ask them?

*5 A. Basically, I think at that point, we were thinking we shouldn't do this. We're giving them money we don't have, it's a travel situation we really don't do, may never do. Yeah, so, it was – it was like, we have made a mistake.

...

Q. Now, after you went back and tried to terminate or rescind unsuccessfully, did you ever try to use your Wyndham points?

A. Well, when I – when we couldn't do it, it's like, okay, we have got it, so I will try this, because we were going to go see my mother. So ... as long as we're going to Orlando, let's stay at a nice place .... We couldn't even get a place, let alone with the points we had, that was a joke.

(D.I. 113-4 at 17–18 of 82 (deposition transcript at 64:9–67:19)). Thus, the record does not show that Mr. Weston's decision to cancel relates to omissions about availability.

Plaintiffs have also not shown that the Kirchners' allegations are typical of other class members' experiences. The Kirchners say they were unable to book vacations at their desired locations. (*See, e.g.,* D.I. 113-2 at 31–32 of 116). Plaintiffs cite to various Better Business Bureau complaints, Yelp reviews, consumeraffairs.com posts, and Trip Advisor reviews to argue that many owners complained about Defendant's "failure to disclose the truth in its sales presentations." (D.I. 113 at 15). These reviews, however, reveal a variety of reasons for owners' complaints. (*See, e.g.,* D.I. 113-15 at 3 of 15 ("I am demanding that our contract be cancelled, the unauthorized credit line be voided, my credit be restored, and all monies paid to them be immediately refunded."); *id.* at 4 of 15 ("They exploited our family's aspirations, concealed fees and obligations, and ignored our financial constraints."); *id.* at 12 of 15 ("I tried cancelling my contract the same day I signed. They deny I ever tried and now are systematically ruining my credit.")). Plaintiffs' other evidence, a spreadsheet of more than 2,000 cancellation requests, does not provide enough details about individuals' reasons for cancellation. (*See generally* D.I. 113-17). Plaintiffs' reply brief cites to "specific information" in the spreadsheet about availability. (D.I. 122 at 10–11). These assertions are not supported by the excerpted records. (*See* D.I. 113-17).[6]

Based on the record before me, I conclude that the proposed class members' claims require independent consideration of each plaintiff's experience to determine what kinds of purported misrepresentations were made. Plaintiffs have not established typicality by a preponderance of the evidence.

### 3. Numerosity, Adequacy of Representation, and Ascertainability

Because I conclude that Plaintiffs have failed to show typicality, I do not need to address the parties' arguments about numerosity, adequacy of representation, or ascertainability. Plaintiffs have failed to satisfy the requirements of Rule 23(a).

### B. Rule 23(b)(2)

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 101 of 230
**Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)**
2024 WL 4188865

Plaintiffs argue that the Injunctive Relief Class should be certified because Defendant "acted on grounds generally applicable to the Class by not disclosing material information." (D.I. 113 at 23). Plaintiffs argue that Defendant "should be ordered to make full disclosure to these Class [m]embers concerning [the] availability issue and to give [o]wners the option of not making further payments." (*Id.* at 24).

*6 Defendant argues that Plaintiffs improperly seek to add a new class of all timeshare purchasers since 2017. (D.I. 120 at 9). Defendant argues that Plaintiffs may refine or narrow an existing class but cannot amend the Third Amended Complaint "to assert an entirely new class." (*Id.* at 10). Defendant further contends that Plaintiffs lack standing. (*Id.* at 10–11).

Even if Plaintiffs had properly raised this class, Defendant argues that they cannot establish wrongful conduct common to the class. (*Id.* at 16). Defendant contends that timeshare owners "participated in individualized sales discussions at different times, with different sales agents, and at different locations, and these discussions necessarily varied based on owners' unique interests." (*Id.*). Defendant further argues that the requested relief would not benefit the entire class because some owners were satisfied or already paid off their timeshares. (*Id.* at 17). To argue that cohesion is not present, Defendant cites to Plaintiffs' request that timeshare owners be allowed to stop paying, as "cohesion is less apparent" when "monetary relief is requested." (*Id.* (quoting *Barabin v. Aramark Corp.*, 2003 WL 355417, at *1 (3d Cir. Jan. 24, 2003))).

Plaintiffs contend that "massively increasing class size [is] not a valid objection." (D.I. 122 at 8). Plaintiffs argue that similar objections were rejected in *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2020 WL 5026553, at *2 (D. Del. Aug. 25, 2020). (*Id.* at 7–8). Plaintiffs further argue that they have standing. Plaintiffs contend there is a likelihood of future injury because Defendant "is still billing the Kirchners for maintenance fees." (*Id.* at 8). Plaintiffs contend they do not seek damages, but rather proper disclosure and relief from further payment obligations. (*Id.*).

"Although Rule 23(b)(2) classes need not meet the additional predominance and superiority requirements of Rule 23(b)(3), 'it is well established that the class claims must be cohesive.' " *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263–64 (3d Cir. 2011) (citation omitted). "Rule 23(b)(2) requires that 'the

party opposing the class has acted or refused to act on grounds that apply generally to the class.' " *Id.* at 264 (quoting Fed. R. Civ. P. 23(b)(2)). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' " *Wal-Mart*, 564 U.S. at 360 (citation omitted). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

I agree with Defendant that Plaintiffs have not satisfied the requirements of Rule 23(b)(2) for the Injunctive Relief Class. The record before me does not show that all members of the Injunctive Relief Class would be entitled to the same injunction or declaratory judgment. For the Kirchners, relief from further payment obligations would allow them to stop paying maintenance fees. Plaintiffs have not shown, however, that other members of the class would benefit from the same relief. In other words, Plaintiffs have not shown that all members of the proposed class have paid off their timeshares and are only making maintenance fee payments at this time. Plaintiffs' reply brief merely states that the Kirchners are being billed for maintenance fees. (D.I. 122 at 8). At oral argument, Plaintiffs' attorney explained that owners "usually put a down payment on a credit card that Wyndham gets for them for two or three, $4,000, and then Wyndham finances the balance at like 15.99 percent." (Hearing Tr. at 17:13–16). It is unclear whether the members of the proposed class are all in the Kirchners' position, or whether they seek cancellation of additional types of payments. Based on the record before me, it appears that the Kirchners desire the option of not making additional maintenance fees, whereas other class members could request broader relief to cover other types of payment as well.

*7 The proposed class also lacks cohesion because many of the members have not voiced any complaints about their timeshares. Plaintiffs assert the Injunctive Relief Class has at least 120,000 members (D.I. 113 at 13), but the spreadsheet Plaintiffs submitted has fewer than 2,400 entries (*id.* at 23). [7] There is no evidence that the 117,600 or so other members are part of a cohesive class. The Injunctive Relief Class is broad enough to include individuals who are satisfied with their timeshares and may not want to stop making payments. Plaintiffs have not shown that the requested relief would be

2024 WL 4188865

equally appropriate for individuals such as the Kirchners and those who are satisfied with their timeshares.

I do not need to reach the parties' dispute about whether adding a new, larger class at this stage is proper. Even if it were proper, Plaintiffs have failed to satisfy the requirements of Rule 23(b)(2) for the Injunctive Relief Class.

### C. Rule 23(b)(3)

The predominance requirement of Rule 23(b)(3) is "a standard 'far more demanding' than the commonality requirement of Rule 23(a)." *Hydrogen Peroxide*, 552 F.3d at 310–11. Under the first criterion of Rule 23(b)(3), I consider whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). To determine whether common issues of fact or law predominate over individual issues, I "examine the elements of plaintiffs' claim." *Hydrogen Peroxide*, 552 F.3d at 311. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton*, 259 F.3d at 172.

I do not think that Plaintiffs have shown predominance. Even if Defendant's sales scripts omitted material information regarding availability, the record does not show that all members of the Cancellation Class and Tennessee Subclass are exposed to the same information. During oral argument, Plaintiffs' attorney asserted he is confident that all new owners watch the group presentations. (Hearing Tr. at 30:4–13). Plaintiffs' briefing, however, does not cite to evidence showing that all new owners in fact viewed group presentations that featured the sales scripts. Plaintiffs' opening brief merely states, "All Class [m]embers were subject to the same omissions," without pointing to evidence. (*See* D.I. 113 at 2).

To the extent that Plaintiffs argue owners cannot go "anywhere / anytime / and stay in any size accommodation for any number of nights," Defendant's sales script includes this language under the "Renting Vacations" section. The "Renting Vacations" and "Owning Vacations" sections discuss the positives and negatives of owning and renting in general, not with respect to Defendant specifically. (*See* D.I. 113-12 at 11 of 26; *see also* D.I. 113-14 at 9 of 22). Because the script does not expressly state that timeshare

owners can book any of Defendant's locations at any time, and because the context indicates the discussion is about a different topic, Plaintiffs' reading of the script is not a reasonable interpretation of what the script says.

Additionally, as explained above, the record shows that proposed class members attempted to cancel their contracts for a variety of reasons, including lack of availability, "unauthorized" credit lines, and "concealed fees." Resolution of these concerns requires individual treatment, particularly because Plaintiffs must establish reliance as an element of their fraudulent inducement claim. (*See* D.I. 83 ¶ 96). Plaintiffs' references to *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998), for the proposition that reliance can be presumed are unpersuasive. A presumption of reliance would be in conflict with recent Third Circuit cases directing district courts to conduct a "rigorous analysis" of the evidence and arguments to determine whether the putative class has satisfied the predominance requirement. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190–91 (3d Cir. 2020). I think Plaintiffs have failed to show that the proposed Rule 23(b)(3) classes are sufficiently cohesive to warrant adjudication by representation.

**\*8** Because the record does not support Plaintiffs' assertions, I conclude that Plaintiffs have failed to establish predominance for the Cancellation Class and Tennessee Subclass. I do not need to reach the parties' arguments about superiority, as Plaintiffs cannot satisfy the requirements of Rule 23(b)(3) without showing predominance.

### D. Motion for an Evidentiary Hearing

I will also deny Plaintiffs' motion for an evidentiary hearing and for leave to file a trial plan. First, Plaintiffs had the opportunity to submit a trial plan for about nine months between the filing of the class certification motion and oral argument. Regardless, even if a trial plan had been filed and supported a finding of superiority, Plaintiffs would nevertheless fail to satisfy Rule 23(b)(3) due to the predominance requirement. Second, fact and expert discovery have already been completed. Both sides allowed the expert deadline to expire while the class certification motion was pending. Neither side sought to extend the deadline. (Hearing Tr. at 36:12–18, 37:4–9, 74:7–16). Lastly, I do not think that Plaintiffs' briefing sufficiently addresses what kind of information an evidentiary hearing could reveal in support of the class certification motion.

**Kirchner v. Wyndham Vacation Resorts, Inc., Not Reported in Fed. Supp. (2024)**

2024 WL 4188865

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification (D.I. 112) and motion for an evidentiary hearing and for leave to file a trial plan (D.I. 134) are DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4188865

---

### Footnotes

1    Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. at ___."

2    Plaintiffs seek class certification based on omissions, not misrepresentations. (Hearing Tr. at 9:17–21).

3    I refer to this as the "Cancellation Class."

4    I refer to this as the "Tennessee Subclass."

5    I refer to this as the "Injunctive Relief Class."

6    I note that of the three quoted pieces of "specific information" (D.I. 122 at 10), only the third is aligned with Plaintiffs' fraud theory.

7    Based on what is in the spreadsheet (D.I. 113-17), it is hard to say even the nearly 2400 people on it look like they have cohesion. I reviewed the first four pages, which have a column "ReasonForContactOrig." About half of the entries in that column on those four pages have as a reason, "Question," or "Transaction," or "Cancel—Financial Hardship."

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**12**

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 105 of 230

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 602972

KeyCite Yellow Flag
Distinguished by   Witz v. Great Lakes Educational Loan Services, Inc.,
N.D.Ill.,   June 24, 2025

2022 WL 602972
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Sienna LYONS, et al., Plaintiffs,
v.
GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., et al., Defendants.
Victoria Gallagher, et al., Plaintiffs,
v.
Navient Corporation, et al., Defendants.
Gary Strockbine, et al., Plaintiffs,
v.
Pennsylvania Higher Education Assistance Agency
a/k/a PHEAA d/b/a FedLoan Servicing, Defendant.

No. 1:21-cv-01047, No. 1:21-
cv-01052, No. 1:21-cv-09096
|
Signed 03/01/2022

**Attorneys and Law Firms**

NOAH AXLER, Anderson Kill, P.C., 1760 Market St.,
Suite 600, Philadelphia, PA 19103, DAVID M. CEDAR,
Williams Cedar, LLC, 8 Kings Highway West, Suite B,
Haddonfield, NJ 08033, On behalf of Plaintiffs Sienna Lyons,
Danielle Labella, Saundra O'Donnell, Victoria Gallagher,
Megan O'Donnell, Gary Strockbine, Sean Maher, and Rachel
Ann Philbin.

JONATHAN SPELLS KRAUSE and CORINNE SAMLER
BRENNAN, Klehr Harrison Harvey Branzburg, LLP, 1000
Lincoln Drive East, Suite 201, Marlton, NJ 08053, On behalf
of Defendants Great Lakes Educational Loan Services, Inc.,
Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC,
and Nelnet, Inc.

DAVID G. MURPHY and DIANE A. BETTINO, Reed Smith
LLP, 506 Carnegie Center, Suite 300, Princeton, NJ 08540,
On behalf of Defendants Navient Corporation and Navient
Solutions LLC.

STEPHEN M. ORLOFSKY, Blank Rome LLP, 300 Carnegie
Center, Suite 220, Princeton, NJ 08540, BLAIR A. GEROLD,

Blank Rome LLP, 1 Logan Square, Philadelphia, PA 19103,
On behalf of Defendant Pennsylvania Higher Education
Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.

**OPINION**

O'HEARN, District Judge.

**\*1** Before the Court is the Joint Motion to Dismiss in
three separately filed actions (Case No. 21-01047 (“*Lyons*”),
ECF No. 33; Case No. 21-01052 (“*Gallagher*”), ECF
No. 23; Case No. 21-09096 (“*Strockbine*”), ECF No. 11)
by Defendants Navient Corporation and Navient Solutions
LLC (collectively, “Navient”), Great Lakes Educational
Loan Services, Inc. (“Great Lakes”), Nelnet Diversified
Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc.
(collectively, “Nelnet”), and Pennsylvania Higher Education
Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing
(“PHEAA,” and together with Navient, Great Lakes, and
Nelnet, the “Defendants”) seeking to dismiss the Class Action
Complaints (*Lyons*, ECF No. 1; *Gallagher*, ECF No. 1;
*Strockbine*, ECF No. 1) filed by Sienna Lyons, Danielle
Labella, Saundra O'Donnell (together, the “*Lyons* Plaintiffs”),
Victoria Gallagher and Megan O'Donnell (together, the
“*Gallagher* Plaintiffs”), and Gary Strockbine, Sean Maher,
and Rachel Ann Philbin (the “*Strockbine* Plaintiffs,” and
together with the *Lyons* Plaintiffs and the *Gallagher* Plaintiffs,
the “Plaintiffs”).

The Court did not hear oral argument pursuant to Local
Civil Rule 78.1. For the reasons discussed herein, the Court
**GRANTS** the Joint Motion to Dismiss.

**I. BACKGROUND**
These cases are three separately-filed putative class actions
brought by several federal student loan borrowers against
multiple federal student loan servicers alleging that the loan
servicers wrongfully allocated the Plaintiffs' payments made
on their federal student loans after the Coronavirus Aid,
Relief, and Economic Security Act (“CARES Act”) was
passed in March 2020.

**A. Procedural Background**
On January 22, 2021, the *Lyons* Plaintiffs filed a class action
complaint (*Lyons*, ECF No. 1) (the “*Lyons* Complaint”)
against Defendants Great Lakes and Nelnet asserting claims

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

for breach of contract, tortious interference with a business relationship, negligent misrepresentation, unjust enrichment, negligence, violations of the New Jersey Consumer Fraud Act (the "NJCFA") and seeking declaratory judgment and injunctive relief (herein referred to as the "*Lyons* Case").

On January 22, 2021, the *Gallagher* Plaintiffs filed a class action complaint (*Gallagher*, ECF No. 1) (the "*Gallagher* Complaint") asserting the same claims against the Navient Defendants (the "*Gallagher* Case") as were asserted in the *Lyons* Case.

On April 13, 2021, the *Strockbine* Plaintiffs filed a class action complaint (*Strockbine*, ECF No. 1) (the "*Strockbine* Complaint," and together with the *Lyons* Complaint and the *Gallagher* Complaint, the "Complaints") against PHEAA (the "*Strockbine* Case") asserting the same claims as those in the *Lyons* and *Gallagher* Cases, and also asserting claims for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL").

Given the overlapping allegations and issues presented in all three cases and the Defendants' expressed intention to each file a motion to dismiss in each case, the Court entered a briefing schedule (*Lyons*, ECF No. 28; *Gallagher*, ECF No. 22; *Strockbine*, ECF No. 7) whereby Defendants filed a Joint Motion to Dismiss (*Lyons*, ECF No. 33; *Gallagher*, ECF No. 23; *Strockbine*, ECF No. 11), and Plaintiffs filed a Joint Response in Opposition (*Lyons*, ECF No. 38; *Gallagher*, ECF No. 27; *Strockbine*, ECF No. 15), to which Defendants filed a Joint Reply (*Lyons*, ECF No. 41; *Gallagher*, ECF No. 30; *Strockbine*, ECF No. 16). [1]

**\*2** In their Joint Motion to Dismiss, Defendants argue that the Complaints must be dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(1) because Plaintiffs lack Article III standing as they have not suffered an injury in fact, and therefore, this Court lacks subject matter jurisdiction. (ECF No. 11 at 9–22). Defendants also argue that Plaintiffs have failed to state cognizable claims under Rule 12(b)(6) (*id.* at 22–43) and moved to strike Plaintiffs' class allegations under Rule 12(f) and Rule 23(d)(1)(D) (*id.* at 44–50).

Having considered the parties' arguments, this Court concludes that Plaintiffs lack Article III standing to bring their claims, as they have not suffered an injury in fact, and any alleged future injury is too speculative to satisfy the jurisdictional requirements placed on this Court by Article III of the Constitution. Therefore, the Court dismisses the Complaints without prejudice.

## B. Factual Background

### 1. Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), the U.S. Department of Education (the "DOE") has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, the DOE began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, *see* (ECF No. 1, ¶ 14). The Federal Student Aid ("FSA") office, a part of the DOE, is responsible for managing these and other federal loan programs authorized under the HEA. (*Id.*).

Congress directed the DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, the DOE awarded each Defendant a contract to service federal loans (the "Servicing Contracts") with five-year terms, each of which has been extended numerous times. (ECF No. 1, ¶¶ 15–16, 22). The Servicing Contracts require the Defendants to correctly record the borrowers' interest rates, calculate borrowers' balances, and appropriately apply payments to borrowers' accounts, among other obligations. (*Id.*, ¶ 29). The DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (*See id.*, ¶¶ 24–27, Ex. A, § B.13).

### 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance [2] until September 30, 2020, meaning that all payments due for certain student loans held by the DOE were suspended, interest on these loans

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 602972

would not accrue after March 13, 2020, and the interest rates on these loans were temporarily reduced to 0% (the "CARES Act Forbearance Period"). [3] Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum. [4] Since that first extension, the CARES Act Forbearance Period has been extended several times, most recently until May 1, 2022. [5]

**\*3** Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a student loan borrower has more than one loan.

### 3. The Plaintiffs' Prepayments and Allegations Against Defendants

The Plaintiffs all made prepayments during various months falling within the CARES Act Forbearance Period, with the first prepayment by a Plaintiff being made in March 2020, and the last in February 2021. [6] Without providing much detail about how student loan borrowers make prepayments, Plaintiffs acknowledge in their class allegations and elsewhere in a footnote that each Plaintiff had the option to select a "custom payment allocation," whereby a Plaintiff's prepayment would be applied to the student loan of the Plaintiff's choice. (ECF No. 1, ¶¶ 94 n.9, 110–12). With the exception of *Strockbine* Plaintiff Sean Maher's May 2020 prepayment (*id.*, ¶ 94 n.9), none of the Plaintiffs chose a "custom payment allocation" indicating the loan to which the prepayment should be applied. (*Lyons*, ECF No. 1, ¶¶ 83–124; *Gallagher*, ECF No. 1, ¶¶ 73–92; *Strockbine*, ECF No. 1, ¶¶ 72–108). The Plaintiffs allege that the Defendants wrongfully applied their prepayments proportionally across the various loans held by each Plaintiff, instead of allocating them to the loans with the highest interest rates. (*Id.*). Plaintiffs allege that this proportional payment allocation method violates federal and state law.

An example of Defendants' proportional payment allocation method is instructive. *Strockbine* Plaintiff Rachel Ann Philbin made a $500 prepayment toward her federal student loans on May 28, 2020, during the CARES Act Forbearance Period and did not select how this prepayment should be applied. (ECF No. 1, ¶ 99). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, so her $500 prepayment was allocated proportionally among the principals of her five federal student loans as follows:

| Loan Disbursement Date | Applied to Principal | Applied to Interest | Interest Rate Assigned Prior to CARES Act |
|---|---|---|---|
| 9/27/2012 | $76.02 | $0.00 | 3.150% |
| 8/25/2013 | $92.85 | $0.00 | 3.610% |
| 8/19/2014 | $113.17 | $0.00 | 4.410% |
| 8/16/2015 | $117.82 | $0.00 | 4.040% |
| 1/3/2017 | $100.14 | $0.00 | 3.510% |

(*Id.* at ¶ 100). She asserts that PHEAA violated federal law when it proportionally allocated her prepayment, as PHEAA should have allocated her $500 prepayment entirely to her loan that had been assigned a 4.410% interest rate—the highest rate—prior to the CARES ACT Forbearance Period. (*Id.* at ¶¶ 107–109).

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

*4  In asserting that Defendants violated federal law, Plaintiffs rely on former President Obama's Presidential Memorandum issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "As soon as practicable, the Secretary [of Education] shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate ... unless otherwise instructed by borrowers." [7] The *Strockbine* Plaintiffs also rely on guidance issued by the FSA (the "FSA Guidance") on February 17, 2021 (after the *Lyons* and *Gallagher* Complaints were filed), which "expressly requires" student loan servicers, including Defendants, to "allocate any overpayments [or prepayments] [8] to a borrower's loans with the highest interest rate first" using the interest rate that was assigned prior to the CARES Act Forbearance Period for those prepayments where the borrower does not provide special instructions indicating to which loan the prepayment should be applied. U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] (2021), (ECF No. 1 at 12). [9]

In asserting that Defendants violated New Jersey and Pennsylvania [10] state law, Plaintiffs rely on representations made on Defendants' websites. The *Lyons* Plaintiffs assert that Great Lakes' and Nelnet's websites advised borrowers that making payments during the CARES Act Forbearance Period could help borrowers "save money in the long run," and that Great Lakes e-mailed borrowers advising them that making prepayments when the interest rates on their loans were set to 0% would make "payments go farther toward reducing the principal balance of your loan amount once any outstanding interest has been paid." (*Lyons*, ECF No. 1, ¶¶ 62–65). The *Gallagher* Plaintiffs allege that Navient provided similar advice on their website that making prepayments could reduce the overall cost of a borrower's loan. (*Gallagher*, ECF No. 1, ¶ 59). The *Strockbine* Plaintiffs allege that PHEAA's website which "was updated on April 2, 2021" promised to allocate prepayments to the loan with the highest interest rate. (*Strockbine*, ECF No. 1, ¶¶ 60–61).

Plaintiffs allege that the "false and misleading statements regarding payment allocation" on Defendants' websites induced them to make prepayments, and that Defendants (i) misrepresented how prepayments were applied to loans, (ii) made false and misleading statements about interest capitalization, (iii) misrepresented the benefits gained by making prepayments, (iv) created a likelihood of confusion or misunderstanding, and (v) purposefully failed to disclose critical information to Plaintiffs regarding the repayment terms of their loans. (ECF No. 1, ¶¶ 183–192).

*5  Plaintiffs allege that Defendants' proportional payment allocation method has resulted in "unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same" and "financial harm associated with lost progress towards loan payoff." (*Id.*, ¶ 127). Plaintiffs additionally make class action allegations pursuant to Rule 23 for other individuals who made a prepayment during the CARES Act Forbearance Period without selecting how the payment should be allocated and who have more than one federal student loan with varying interest rates serviced by a Defendant. (*Id.* at 22–26).

## II. LEGAL STANDARD

In their Joint Motion to Dismiss, Defendants argue under Rule 12(b)(1) that Plaintiffs fail to bear their burden of establishing that the Court has subject matter jurisdiction because the Complaints present no justiciable case or controversy. (ECF No. 11 at 1, 9–14). Defendants assert that regardless of how Plaintiffs' prepayments were allocated across their respective loans by the Defendants, Plaintiffs cannot allege a cognizable injury to date as no interest is accruing; and therefore, it would be impossible for Plaintiffs to have paid any additional amount in principal or interest to date. (*Id.* at 10–11). Defendants argue that Plaintiffs' alleged future injury, that they will pay more in interest over the life of their loans, is too speculative and indefinite to confer Article III standing at this moment. (*Id.* at 9–14).

In their Response in Opposition, Plaintiffs do not dispute that they have not yet paid any interest on their loans that accrued during the CARES Act Forbearance Period, but argue that Defendants' "serial misapplication" of prepayments violates federal and state law, which is enough to establish "concrete injuries in fact" sufficient to establish Article III standing. (ECF No. 15 at 17). Plaintiffs additionally assert that the Defendants' conduct "will result in borrowers paying more over the life of their loans," and that this future harm is sufficiently imminent since interest will again begin to accrue on the Plaintiffs' student loans once the CARES Act Forbearance Period ends. (*Id.*). Plaintiffs further argue that they are entitled to attorneys' fees under the catalyst theory because they brought about a change in Defendants' conduct making them "prevailing parties." (*Id.* at 41–52).

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 109 of 230

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

### A. Scope of the Rule 12(b)(1) Analysis

"A challenge to subject matter jurisdiction under Rule 12(b) (1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack "concerns 'an alleged pleading deficiency' whereas a factual attack concerns 'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.' " *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Submitting a signed declaration or otherwise presenting competing jurisdictional facts presents a factual challenge. *Davis*, 824 F.3d at 346. When a party presents a factual challenge to the Court's jurisdiction, a court is not limited to the pleadings in resolving the challenge. *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 281, 251 (3d Cir. 2002) ("When a Rule 12(b)(1) motion is evaluated as a 'factual attack' on the Court's subject matter jurisdiction, the court may consider evidence outside the pleadings in evaluating that attack.").

### B. Legal Standard for Article III Standing

Pursuant to Article III of the Constitution, this Court may only exercise jurisdiction to resolve "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. "Thus, federal courts can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). As the party invoking federal jurisdiction at the start of litigation, the plaintiff bears the burden of establishing Article III standing. *Id.* To establish standing, a plaintiff must show (1) "that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "If 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.' " *TransUnion*, 141 S. Ct. at 2203 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)).

**\*6** "To allege injury in fact sufficiently, a plaintiff must claim 'that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.' " *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162–63 (3d Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components [of injury in fact], as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact." *Cottrell*, 874 F.3d at 162 (3d Cir. 2017) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291, 293 (3d Cir. 2005)).

However, "there is a significant difference between ... an actual harm that has occurred" and "a mere risk of future harm." *TransUnion*, 141 S. Ct. at 2211. The Supreme Court has repeatedly held that a risk of future injury must be "certainly impending" to constitute injury in fact, and that allegations of "*possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2. Of particular importance in this case, imminency "has been stretched beyond the breaking point" where a "plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Id.*

When a plaintiff fails to establish Article III standing, the court lacks subject matter jurisdiction, *Finkelman v. Nat'l Football League*, 810 F.3d 187 (3d Cir. 2016), and dismissal is required, *Goodmann v. People's Bank*, 209 F. App'x 111, 113 (3d Cir. 2006); Fed. R. Civ. P. 12(b)(1). Where the named plaintiff fails to establish Article III standing, the putative class action must be dismissed for lack of subject matter jurisdiction. *Finkelman*, 810 F.3d at 195.

### III. ANALYSIS

In their Complaints, Plaintiffs allege that Defendants' misallocation of their prepayments has resulted in two injuries: (i) "unpaid interest added to the principal balance of loans along with amounts accrued as a result of the capitalization of same" and (ii) "financial harm associated with lost progress towards loan payoff." (ECF No. 1, ¶ 127). Because the Court finds that Plaintiffs have yet to suffer a cognizable injury, and any future harm is too speculative, Plaintiffs lack Article III standing. The Court further concludes that they are not entitled to attorneys' fees.

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

### A. Plaintiffs Have Not Suffered a Cognizable Past or Present Injury

Plaintiffs cannot plausibly allege that they have suffered any economic harm because their loans are now and have been continuously frozen in administrative forbearance during the CARES Act Forbearance Period. Defendants correctly highlight that it would be impossible for any unpaid interest to have been added to the Plaintiffs' loan balances as no interest has been accruing on Plaintiffs' federal student loans while the interest rate has been set to 0% since March 2020. In their Response in Opposition, Plaintiffs do not (and cannot) dispute that they have made no payments on loan interest that accrued due to Defendants' proportional payment allocation method. Instead, Plaintiffs argue that Defendants' alleged violation of federal and state law is sufficient to establish Article III standing in itself. This is incorrect, as the Supreme Court has held that "an injury in law is not an injury in fact" sufficient to confer Article III standing. *TransUnion*, 141 S. Ct. at 2205.

**\*7** In *TransUnion*, the Supreme Court addressed "the Article III requirement that the plaintiff's injury in fact be 'concrete'—that is, 'real, and not abstract.' " *Id.* at 2204 (quoting *Spokeo*, 578 U. S. at 340 (internal quotation marks omitted)). There, a class of consumers brought a class action against the credit reporting agency TransUnion LLC under the Fair Credit Reporting Act ("FCRA") alleging that the agency failed to use reasonable measures to ensure the accuracy of their credit files and instead maintained alerts in those files incorrectly designating the consumers as "terrorists, drug traffickers, or serious criminals." *Id.* at 2009. The class included both members whose erroneously flagged credit reports had been disclosed to third party creditors, and members whose misleading alerts in their credit files had *not* been disclosed to third parties. *Id.* at 2210. After a jury returned a verdict for all class members, the Supreme Court reversed on standing grounds with respect to those plaintiffs whose reports had not been disclosed because, despite the statutory violation, these plaintiffs had not suffered a concrete injury. *Id.* The Court stated: "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205 (emphasis in original).[11] Thus, even assuming Plaintiffs could establish a violation of the law, the Plaintiffs in this case, like those in *TransUnion*, simply have no concrete harm sufficient to confer standing—a statutory violation alone does not cut it.

While *TransUnion* addresses whether Congress may create constitutional standing for a plaintiff to bring a claim in federal court alleging a federal statutory violation absent suffering a concrete injury, it does not address the separate issue of whether a *state legislature* can elevate harms to the status of Article III injuries in the context of diversity jurisdiction. *See generally TransUnion*, 141 S. Ct. at 2204–05. This issue of whether a state legislature may create Article III standing in federal court based on a state statutory violation absent a concrete injury from such alleged violation "raises serious federalism concerns," *Finkelman*, 810 F.3d at 196 n.65, yet Plaintiffs cite no case law nor present any argument of how an alleged statutory violation of the NJCFA or UTPCPL, assuming either even applies, may create constitutional Article III standing absent a concrete injury, *see* (Opp. Brief, ECF No. 15 at 17).

Regardless, however, "[w]hatever the contours of Article III, the New Jersey Consumer Fraud Act only permits a private plaintiff to sue when that plaintiff has suffered an 'ascertainable loss of moneys or property.' " *Finkelman*, 810 F.3d at 196 n.65 (quoting N.J. STAT. ANN. § 56:8–19). Although the Court does not reach the merits of Plaintiffs' claims, the Court nonetheless observes that having failed to demonstrate an injury-in-fact in the *constitutional* standing analysis under Article III, it is at least doubtful that Plaintiffs can establish statutory standing to bring an NJCFA claim absent suffering a "real and measurable loss"—the kind of injury that New Jersey law requires. *See Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 794 (N.J. 2005) ("[A] private [NJ]CFA plaintiff [must] demonstrate a real and measurable loss of property or moneys to have [statutory] standing to pursue a [NJ]CFA action."); N.J. STAT. ANN. § 56:8–19; *see also Finkelman*, 810 F.3d at 196 n.65. Similarly, it is not clear to the Court that Plaintiffs have suffered an "actual loss of money or property" to have statutory standing to bring a claim under Pennsylvania's UTPCPL. *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 360 (E.D. Pa. 2013) ("[T]he plain language of the statute indicate[s] an actual loss of money or property must have occurred to state a cognizable UTPCPL claim."); *see also* 73 PA. STAT. ANN. § 201–9.2 (requiring a person to have suffered an "ascertainable loss of money or property" to bring a private action under the UTPCPL).

**\*8** Therefore, in absence of even any persuasive authority provided by Plaintiffs, the Court declines to break new ground by extending the power to confer constitutional standing to state legislatures when the Supreme Court has denied that

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 111 of 230

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

same power to Congress and where it is not evident to the Court that the Plaintiffs can state a claim under those state statutes. Accordingly, without a concrete injury in fact that gives rise to Article III standing, Plaintiffs' claims must be dismissed for lack of standing.

### B. Plaintiffs' Alleged Future Injuries Are Too Speculative to Confer Article III Standing and Are Not Imminent

Likewise, Plaintiffs' alleged future injury is too speculative to give rise to Article III standing. Plaintiffs' alleged "lost progress towards loan payoff" is an alleged future injury —that Defendants' proportional payment allocation method "will result in borrowers paying more over the life of their loans." (Opp. Brief, ECF No. 15 at 16). Plaintiffs argue this future harm is sufficiently imminent to confer Article III standing because interest will again begin to accrue on the Plaintiffs' student loans once the CARES Act Forbearance Period ends. (Id.). However, this Court is not convinced that the alleged future injury will occur the moment that the CARES Act Forbearance Period expires, and student loan interest again begins to accrue. As an initial matter, given the continuing nature of the pandemic and the number of times the CARES Act has been extended, the date when any interest may begin to accrue is indeterminate. Further, the future injury would not materialize until the Plaintiffs have *actually paid* the interest that would not have accrued but for Defendants' proportional allocation of a Plaintiff's prepayment across that Plaintiff's student loans.

Several cases cited by Defendants support this conclusion, albeit in a slightly different context involving student loan servicers charged with mismanaging federal student loans under the Public Student Loan Forgiveness ("PSLF") program. The PSLF program provides loan forgiveness to student loan borrowers that work in public service and make 120 on-time payments towards repaying their student loans. 34 C.F.R. § 685.219 (2021). Numerous student loan borrowers have brought suit against loan servicers claiming they were wrongfully denied access to the PSLF program. Courts have generally held that the plaintiff borrowers do not have standing to sue until they have suffered the actual injury alleged: making more than 120 payments while working in public service.

In *Meenan v. Navient Corp.*, the U.S. District Court for the District of Arizona held that the plaintiff student loan

borrower would not have had Article III standing to bring suit until the plaintiff's injury arose and became concrete— i.e., once the plaintiff made more than 120 payments towards repaying her student loans. No. 20-08122, 2020 WL 5057654, at *2 (D. Ariz. Aug. 27, 2020). The court denied the defendant loan servicer Navient's motion to dismiss, which argued the plaintiff's claims were barred by the statute of limitations since the borrower became aware years earlier that Navient had erroneously informed the plaintiff that her type of loans were eligible for forgiveness and that she qualified for the PSLF program. Id. at *1. The court held that the statute of limitations did not begin to run until the plaintiff's injury arose and became concrete when the plaintiff made her 121st payment, as an injury asserted years earlier would have been considered too speculative to give rise to Article III standing. Id. at *3.

**\*9** The U.S. District Court for the Central District of California likewise held that student loan borrowers' alleged injuries that they "will be required" to make more than the necessary 120 payments to obtain loan forgiveness under the PSLF program were hypothetical injuries that were insufficient to confer standing. *Winebarger v. Pa. Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1086 (C.D. Cal. 2019). The court noted that the plaintiffs may or may not make all of their loan payments on time over the next five to seven years, they may not continue to work in public service, or the defendant loan servicer PHEAA may correct any alleged wrongdoing. Id. at 1087. Therefore, the alleged future injury of paying more than required when repaying plaintiffs' student loans was "wholly speculative and far too remote to confer standing." Id.

Other district courts have held similarly. *See Love v. Pa. Higher Educ. Assistance Agency*, No. 19-02387, 2020 WL 1545798, at *4–5 (N.D. Ga. Mar. 16, 2020) (holding plaintiff loan borrowers did not have Article III standing to bring claims against defendant PHEAA for negligence and breach of contract where plaintiffs alleged that PHEAA had incorrectly tallied plaintiffs' qualifying payments under the PSLF program because (i) plaintiffs had not yet made 120 payments and (ii) plaintiffs may not remain eligible for the program in the future created a "speculative chain of possibilities"); *Alexander v. Great Lakes Higher Educ. Corp*, No. 17-00253, slip op. at *12 (N.D. Fla. June 19, 2021) (holding that while plaintiff loan borrowers had alleged sufficient facts to show misconduct on the part of loan servicer Great Lakes, those plaintiffs that had not yet made sufficient payments to apply for PSLF loan forgiveness had not suffered

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 112 of 230

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

an Article III injury in fact, and any future injury was too speculative).

Like the plaintiffs in the above-referenced cases, Plaintiffs here allege that they will have to pay more in the future to satisfy their outstanding federal student loans. While the student borrower plaintiffs in the PSLF program alleged they would have to make more than 120 payments to qualify for loan forgiveness due to those defendants' conduct, Plaintiffs allege that they will have to pay more in interest to fully satisfy their student loan debt due to Defendants' proportional payment allocation method. However, none of the Plaintiffs can say with certainty *when* student loan interest may again begin to accrue, as the CARES Act Forbearance Period has been extended numerous times since the original Complaints were filed, most recently until May 1, 2022.[12] Additionally, no injury would materialize until Plaintiffs have to pay a single dollar towards "wrongfully" accrued student loan interest—which could be years in the future. This "speculative chain of possibilities" is the exact type of "hypothetical or abstract disputes" that federal courts are prohibited from adjudicating under Article III of the Constitution. *TransUnion*, 141 S. Ct. at 2203.[13]

**\*10** Further buttressing the conclusion that Plaintiffs' alleged injury lacks immediacy, Defendants submitted signed declarations along with their briefing from Nelnet, PHEAA, and Great Lakes stating that all borrowers may contact their respective loan servicers to have the entire amount of prepayments made during the CARES Act Forbearance Period fully refunded, (ECF No. 11 at Ex. 4 ¶ 14, Ex. 5 ¶ 16, Ex. 6 ¶ 10), and PHEAA provides that borrowers may request to have prepayments reallocated to the borrower's highest interest rate loan, (ECF No. 11 at Ex. 5 ¶ 16). Nelnet asserts that it is has been allocating prepayments to borrowers' highest interest rate loans since before the CARES Act Forbearance Period began, (ECF No. 11 at Ex. 6, ¶8), and Great Lakes has already reallocated all borrowers' prepayments to each borrower's highest interest rate loan since June 2021 (ECF No. 16 at Ex. 9 ¶ 4). The declarations further state that this information has been available to borrowers on PHEAA's website since April 2020, (ECF No. 11 at Ex. 5 ¶ 16), and on Nelnet's website since May 2020, (*id.* at Ex. 6 ¶ 10).[14] Because submitting signed declarations or presenting competing jurisdictional facts presents a factual challenge to the Court's subject matter jurisdiction, *Davis*, 824 F.3d at 346, the Court may consider these affidavits, *United States ex rel. Customs Fraud Investigations*, 839 F.3d at 251.

In Plaintiffs' Response in Opposition, Plaintiffs do not dispute that Plaintiffs may contact their respective Defendant student loan servicer to have their prepayments reallocated to their highest interest rate loan or refunded. Plaintiffs instead cite *Potts v. Johnson & Johnson Consumer Inc.*, No. 20-10406, 2021 WL 2177386 (D.N.J. May 28, 2021), arguing that a refund offer does not defeat Article III standing, (ECF No. 15 at 20), that any refund offer does not moot their claims, (*id.* at 10), and any reallocation or offered reallocation was made in response to Plaintiffs' cases, making Plaintiffs "prevailing parties" entitled to attorneys' fees, (*id.* at 41–51). The Court addresses Plaintiffs' argument for attorneys' fees below, and does not address the parties' mootness arguments because its injury-in-fact analysis is dispositive. The Court does not find *Potts* instructive to its injury-in-fact analysis given the dissimilarity of the injuries alleged. The *Potts* plaintiffs did not allege future injuries as the Plaintiffs do here, but past physical injuries as well as economic injuries, and the refund offer at issue was for the cost of cosmetic products alleged to have caused those injuries. *Potts*, 2021 WL 2177386, at \*5.

Despite Plaintiffs' arguments to the contrary, the Court views the ability of Plaintiffs to control the allocation of their prepayments (via either a refund to allocate per their wishes or via a request to the Defendant to reallocate) to have "stretched beyond the breaking point" Article III's immediacy requirement because "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. The alleged future injury of paying excess interest is certainly more than "partly" within the Plaintiffs' own control, because a Plaintiff may at any time contact their respective Defendant student loan servicer and request that their prepayments be reallocated to their highest interest rate loan, avoiding any injury from ever occurring. "[T]he underlying purpose of the imminence requirement" is to avoid this exact scenario: a court "render[ing] an advisory opinion in 'a case in which no injury would have occurred at all.' " *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2).

Courts have routinely held that a plaintiff has failed to demonstrate imminent harm where a plaintiff has control over an alleged future injury coming to pass. In *Animal Legal Defense Fund*, a psychobiologist was one of several plaintiffs who brought suit against the Department of Agriculture for its failure to include rats, mice, and birds in the definition of "animals" under the Federal Laboratory Animal Welfare Act, which would have required research laboratories registered under the Act to employ humane treatment of the rats and

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 113 of 230

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

mice used in research. 23 F.3d at 498–99. The psychobiologist had left the research field six years prior but intended to return to conduct research in registered laboratories in order to advance her career. *Id.* at 500. She alleged that she would be unable to control whether laboratories humanely treated the rodents used in her planned research studies, and that the inhumane treatment would directly impair her ability to perform her research because she would be required to spend time advocating for the facility to employ humane treatment. *Id.* The D.C. Circuit stated that the plaintiff was not in immediate danger of sustaining this alleged injury because whether she returned to the research field was "wholly within her control," and she could exercise her choice to determine whether "to subject herself" to the future injury. *Id.* at 500–01.

*11 In *Pennsylvania Prison Society v. Cortes*, the Third Circuit held that the future harm that prisoner plaintiffs may experience, being unable to be paroled due to changes to Pennsylvania's Board of Pardons, was not imminent because applying to the Board of Pardons for parole or a commuted sentence was within the plaintiffs' control, and no plaintiff presented evidence of having submitted such an application. 508 F.3d 156, 166 (3d Cir. 2007). In *New Jersey Physicians, Inc. v. Obama*, the plaintiff's potential subjection to the individual mandate under the Affordable Care Act was not an immediate harm to confer Article III standing, because *inter alia* it was possible that he would not be subject to the mandate if he secured health insurance through an employer before the mandate became effective in 2014—a factor that was within the plaintiff's control. 757 F. Supp. 2d 502, 507–08 (D.N.J. 2010), *aff'd sub nom. New Jersey Physicians, Inc. v. President*, 653 F.3d 234 (3d Cir. 2011).

The fact that Plaintiffs may contact their respective student loan servicer to have their prepayments refunded or reallocated per their wishes "stretches" immediacy "beyond the breaking point." *Lujan*, 504 U.S. at 564 n.2. This Court will not conduct mathematical gymnastics to determine when the Plaintiffs may be required to pay "wrongfully accrued" student loan interest, nor will the Court issue an advisory opinion where Plaintiffs maintain the choice over whether "to subject [themselves]" to the future injury, and the future injury may never occur at all. *Animal Legal Def. Fund*, 23 F.3d at 500–01.

### C. Plaintiffs' Request for Attorneys' Fees Based on State Law Claims

Being unable to allege any past or immediate future injury, Plaintiffs next argue that if Defendants changed their conduct to reallocate prepayments either retroactively or prospectively, that the Plaintiffs are "prevailing parties" entitled to attorneys' fees under the catalyst theory, since Defendants changed their default payment allocation method "[a]s a direct result of this litigation." (ECF No. 15 at 41–42). "Under the catalyst theory ... a litigant will qualify as a 'prevailing party' entitled to an award of attorney's fees under a fee-shifting statute if the lawsuit 'achieves the desired result because [it] brought about a voluntary change in the defendant's conduct.' " *D. Russo, Inc. v. Twp. of Union*, 9 A.3d 1089, 1092–93 (N.J. Super. Ct. App. Div. 2010) (quoting *Mason v. City of Hoboken*, 951 A.2d 1017, 1029 (N.J. 2008)); N.J. STAT. ANN. § 56:8-19. "In the absence of a judgment or enforceable consent decree, the catalyst theory entitles a plaintiff to an award of attorney's fees if it 'can demonstrate: (1) a factual causal nexus between plaintiff's litigation and the relief ultimately achieved; and (2) that the relief ultimately secured by plaintiffs had a basis in law.' " *Id.* at 1093 (quoting *Singer v. State*, 472 A.2d 138, 142 (N.J. 1984)).

Both the NJCFA and the UTPCPL are fee-shifting statutes. *See* N.J. STAT. ANN. § 56:8-19; 73 PA. CONS. STAT. § 201-9.2. Under New Jersey law, a party is considered a "prevailing party" when they " 'obtain an enforceable judgment against the defendant ... or comparable relief through a consent decree or settlement.' " *Tarr v. Ciasulli*, 853 A.2d 921, 930 (N.J. 2004) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). In other words, a party must achieve " 'relief on the merits of his [or her] claim.' " *Id.* (quoting *Farrar*, 506 U.S. at 111). A plaintiff cannot be entitled to attorneys' fees under the NJCFA as a "prevailing party" when their claim cannot survive a motion to dismiss. *See Perez v. Prof. Green LLC*, 73 A.3d 452, 463–65 (N.J. 2013); *Weinberg v. Sprint Corp.*, 801 A.2d 281, 293 (N.J. 2002) (holding that "a plaintiff, who pleads but cannot survive a motion for summary judgment" may not assert a claim for attorneys' fees under the NJCFA). As to a claim brought under the UTPCPL, Plaintiffs cite no cases applying the catalyst theory to such a claim, and this Court's "independent research did not locate any such decision." *Gonzalez v. Owens Corning Sales, LLC*, 367 F. Supp. 3d 381, 387 (W.D. Pa. 2019), *aff'd sub nom. Gonzalez v. Owens Corning*, 813 F. App'x 53 (3d Cir. 2020) (similarly noting the dearth of decisions applying the catalyst theory to any UTPCPL claim). The court in *Gonzalez* relied on the Third Circuit's decision in *Templin v. Independence Blue Cross*, 785 F.3d 861 (3d Cir. 2015), to state that, "[e]ven if the court had authority to consider counsel fees under the catalyst

2022 WL 602972

theory, it would decline to award them" because the plaintiffs did not obtain success "on the merits" of their UTPCPL claim, and that "victory on procedural motions will not suffice." *Id.* at 386–87 (citing *Templin*, 785 F.3d at 867 n.3).

**\*12** Defendants argue that neither the NJCFA nor the UTPCPL apply to their conduct as they are federal student loan servicers retained by the DOE to service loans held by the DOE, and therefore, they have not sold or advertised any merchandise or real estate to Plaintiffs for their conduct to be regulated by the NJCFA, nor have they sold any goods or services to Plaintiffs for their conduct to fall under the UTPCPL. (ECF No 11 at 41–43 (citing *Lyons* Compl., ECF No. 1, ¶¶ 15, 28)); *see* N.J. STAT. ANN. § 56:8-2 (describing unlawful practices "in connection with the sale or advertisement of any merchandise or real estate"); 73 PA. CONS. STAT. § 201-9.2 (listing elements of private actions to be brought by "[a]ny person who purchases or leases goods or services").

Defendants cite *Huertas v. Galaxy Asset Management*, arguing that the NJCFA is "intended to encompass only consumer oriented commercial transactions involving the marketing and sale of merchandise or services," 641 F.3d 28, 35 (3d Cir. 2011), and cite cases where courts have dismissed claims when a defendant's alleged practices or statements are not made in connection with the marketing or sale of merchandise or real estate. *See Brancato v. Specialized Loan Servicing, LLC*, 2018 WL 2770137, at \*7 (D.N.J. June 8, 2018) (dismissing NJCFA claim where plaintiff "never bought any merchandise or real estate" from defendant mortgage loan servicer); *Boyko v. Am. Int'l Group, Inc.*, 2009 WL 5194431, at \*4 (D.N.J. Dec. 23, 2009) (dismissing NJCFA claim where defendant debt collector had not "sold merchandise or real estate" to plaintiff and stating "debt collection efforts on behalf of a third party who might have sold merchandise is not itself a sale of merchandise"). Relying on two Third Circuit cases, Defendants argue that a private individual must have purchased or leased goods or services to have statutory standing under the UTPCPL. *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 240 (3d Cir. 2002); *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1994) ("The [UTPCPL] contemplates as the protected class only those who purchase goods or services, not those who may receive a benefit from the purchase.").

In response, Plaintiffs argue that the NJCFA's definition of "merchandise" includes "services," N.J. STAT. ANN. §

56:8-1(c), which clearly includes Defendants as student loan servicers, and that it was the New Jersey Legislature's intent for the NJCFA to be interpreted broadly to combat consumer fraud. (Opp. Br., ECF No. 15 at 38) (citing *Lemelledo v. Beneficial Management Corp. of America*, 696 A.2d 546 (N.J. 1997)). Plaintiffs further rely on *Manetta v. Navient Corp.*, where another court in this district has held that a plaintiff student loan borrower's NJCFA claim survived a motion to dismiss against federal student loan servicer Navient Corporation. No. 20-7712, 2021 WL 2886115, at \*5 (D.N.J. July 8, 2021). Similarly, Plaintiffs argue that the UTPCPL should be interpreted broadly to protect consumers from fraud and unfair or deceptive business practices. *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 881 (Pa. 2007), and cite several cases where the UTPCPL has been applied in the mortgage loan servicing context, *Hollenshead v. New Penn Financial, LLC*, 447 F.Supp.3d 283 (E.D. Pa. 2020); *Trunzo v. Citi Mortg.*, 876 F.Supp.2d 521 (W.D. Pa. 2012).

Having reviewed the case law cited by the parties, the Court is doubtful that the NJCFA applies to federal student loan servicers and does not find *Manetta* instructive because the issue of the statute's applicability was neither argued by the parties or addressed in that court's ruling. 2021 WL 2886115, at \*5. Further, the applicability of the UTPCPL to Defendants' conduct where Plaintiffs transacted with the DOE—not Defendants—to borrow federal student loans is far from clear. *Compare Balderston*, 285 F.3d at 241 ("[T]he [UTPCPL] unambiguously permits only persons who have purchased or leased goods or services to sue.... Had the Pennsylvania legislature wanted to create a cause of action for those not involved in a sale or lease, it would have done so." (internal quotation marks omitted)) *with Nigro v. Pa. Higher Educ. Assistance Agency*, No. 19-02000, 2020 WL 5369980, at \*10 (M.D. Pa. Sept. 8, 2020) (dismissing plaintiff student loan borrower's claim under the UTPCPL's "catchall" provision but granting plaintiff leave to amend complaint against defendant PHEAA).

**\*13** However, for the Court to rule on whether either statute is intended to regulate Defendants' conduct as federal student loan servicers, it would be required to reach the merits of Plaintiffs' claims, which is improper when this Court lacks subject matter jurisdiction. *Finkelman*, 810 F.3d at 193 ("A federal court's obligation to assure itself that it has subject matter jurisdiction over a claim is antecedent to its power to reach the merits of that claim."). Furthermore, the catalyst theory, as interpreted by New Jersey courts, requires a Plaintiff to obtain relief *on the merits* of their claim,

Lyons v. Great Lakes Educational Loan Services, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 602972

*Tarr*, 853 A.2d at 930, which Plaintiffs have not achieved here, and the Court is doubtful that the catalyst theory is even applicable to the UTPCPL, particularly where the Third Circuit has described this doctrine as "moribund," *Cottrell v. Nicholson Props. LLC*, No. 12-02128, 2018 WL 4062723, at *13 (D.N.J. Aug. 24, 2018), *aff'd*, 768 F. App'x 148 (3d Cir. 2019) (quoting *A.P. Boyd, Inc. v. Newark Pub. Schs.*, 44 F. App'x 569, 573 (3d Cir. 2002)). This Court refuses to reach beyond its jurisdiction, and Plaintiffs' request for attorneys' fees is denied as a matter of law. [15] *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 186 (4th Cir. 2013) (affirming district court's denial of party's motion for attorneys' fees because dismissal for lack of Article III standing "does not constitute a decision on the merits").

Having concluded that this Court lacks subject matter jurisdiction over these actions, the Court will not address Defendants' remaining arguments, [16] and Plaintiffs' Complaints are dismissed without prejudice. *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 119 (3d Cir. 2019) (discussing that a case should be dismissed without prejudice where the plaintiff lacks Article III standing and the district court has no subject matter jurisdiction to reach the merits of the claims); *see also Finkelman*, 810 F.3d at 195 ("Absent [Article III] standing on the part of the named plaintiffs, we must dismiss a putative class action for lack of subject matter jurisdiction."). [17]

## IV. CONCLUSION

**\*14** For the reasons stated herein, Defendants' Joint Motion to Dismiss (*Lyons*, ECF No. 33; *Gallagher*, ECF No. 23; *Strockbine*, ECF No. 11) is **GRANTED**, Plaintiffs' Complaints (*Lyons*, ECF No. 1; *Gallagher*, ECF No. 1; *Strockbine*, ECF No. 1) are **DISMISSED WITHOUT PREJUDICE**, and the Clerk of the Court is ordered to close these Cases. An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2022 WL 602972

---

## Footnotes

1    Because the allegations in the Complaints are substantially similar and the parties submitted joint briefings, all citations to the record will refer to the docket in the *Strockbine* Case (Case No. 21-09096), unless otherwise noted, to avoid lengthy citations to the records in all three cases.

2    34 C.F.R. § 685.205(a) (2020) (" 'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower ... due to a ... local or national emergency.").

3    CARES Act, Pub. L. No. 116-136, 134 Stat. 281, §§ 3513(a)–(b) (20 U.S.C. § 1001 *et seq.*).

4    Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

5    Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Complaints being filed and the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 3d 367, 390 n.34 (D.N.J. 2010).

2022 WL 602972

6    The Plaintiffs made prepayments in the following manner: Sienna Lyons made monthly prepayments from July through September 2020 (*Lyons*, ECF No. 1, ¶¶ 84–92); Danielle Labella made monthly prepayments in March 2020 and from May through September 2020 (*id.* at 95–108); Saundra O'Donnell made monthly prepayments from April through September 2020 (*id.* at 110–124); Victoria Gallagher made a prepayment in August 2020 (*Gallagher*, ECF No. 1, ¶¶ 74–78); Megan O'Donnell made monthly prepayments from March through June 2020 and in August 2020 (*id.* at ¶¶ 80–92); Gary Strockbine made prepayments in January and February 2021 (*Strockbine*, ECF No. 1, ¶¶ 74–78); Sean Maher made monthly prepayments from March through July 2020 (*id.* at ¶¶ 82–92); and Rachel Ann Philbin made prepayments in March, May, June, August, and September 2020 (*id.* at ¶¶ 96–106).

7    Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473 (Mar. 13, 2015), https://www.federalregister.gov/documents/2015/03/13/2015-05933/student-aid-bill-of-rights-to-help-ensure-affordable-loan-repayment.

8    The Complaints and the joint briefings refer to "prepayments" synonymously with "overpayments," and the Court finds the definitions of each to be substantially similar and immaterial to its analysis. *Compare* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.") *with* FSA SERVICER GUIDANCE at 1 ("Overpayment: When a borrower makes a payment when none is due, or pays an amount greater than the monthly payment amount.").

9    The Court takes judicial notice of the full text of the guidance document, *In re Synchronoss*, 705 F. Supp. 2d at 390 n.34, and notes that the *Strockbine* Plaintiffs selectively quoted it, omitting the opening portion which states: "There are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." FSA SERVICER GUIDANCE at 1.

10    Only the *Strockbine* Plaintiffs bring claims under Pennsylvania's UTPCPL.

11    The Plaintiffs cite *Freedom from Religion Found. Inc. v. New Kensington Arnold School District*, 832 F.3d 469, 473 (3d Cir. 2016), to support their assertion that a violation of federal and state law in itself creates Article III standing. (Opp. Brief, ECF No. 15 at 17). However, *Freedom from Religion* involves Article III standing in an action under the First Amendment's Establishment Clause, which presents a different factual and legal analysis under Article III than presented in this case and thus is inapposite here.

12    Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022.

13    The parties agree that the issues of standing and ripeness turn on the same question of "whether the threat of future harm ... is sufficiently immediate to constitute a cognizable injury," *Free Speech Coal., Inc. v. Att'y Gen.*, 825 F.3d 149, 167 n. 15 (3d Cir. 2016), and if the Plaintiffs do not have standing, the claims are also not ripe for judicial review. (ECF No. 11-1 at 14 n.5) (ECF No. 15 at 20 n.16). Where the issue of standing and ripeness "boil down to the same question" the Court may address both issues in tandem. *ASAH v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1002 (D.N.J. 2018). Because the Plaintiffs lack Article III standing, their claims are also not ripe for judicial review. *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985))).

14    Navient did not submit a declaration, instead noting in a footnote that it was "planning to implement changes to its allocation methodology." (ECF No. 11 at 17 n.9). The Court's analysis regarding Plaintiffs' control over alleged future harm is therefore narrowed to include only the *Lyons* and *Strockbine* Plaintiffs.

15      The Court further notes that Plaintiffs' request for attorneys' fees being included in its Response in Opposition to the Joint Motion to Dismiss is procedurally improper. *See* Fed. R. Civ. P. 54(d)(2).

16      Because the Court finds the issue of whether the Plaintiffs have met their burden of showing an injury in fact to establish Article III standing to be dispositive of the pending Joint Motion to Dismiss, the Court does not address the parties' arguments regarding traceability under Article III, issues of mootness, any arguments that Plaintiffs' Complaints fail to state a claim under Rule 12(b)(6), or class allegations under Rule 12(f) and Rule 23(d)(1)(D). *See Finkelman*, 810 F.3d at 203 (3d Cir. 2016); *Fensterer v. Cap. One Bank (USA), N.A.*, No. 20-05558, 2021 WL 838333, at *4 (D.N.J. Mar. 5, 2021). The Court also does not reach Nelnet's argument that they did not service the *Lyons*' Plaintiffs' loans, as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion because the Plaintiffs lack Article III standing, and the Complaints are dismissed under Rule 12(b)(1).

17      Plaintiffs have requested leave to amend their Complaints in their Response in Opposition to address the pleading deficiencies outlined in this Opinion, (ECF No. 15 at 54), but have not filed a motion or done so properly. "[F]ailure to submit a draft amended complaint is fatal to a request for leave to amend.... [W]e [have] held that a district court need not worry about amendment when the plaintiff does not properly request it." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007). Plaintiffs have made that fatal error here, and thus the Court denies their request. Further, the Court cannot conceive of any facts that Plaintiffs could plead that would change the analysis as outlined herein.

---

**End of Document** 

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**13**

Meenan v. Navient Corporation, Not Reported in Fed. Supp. (2020)

2020 WL 5057654

2020 WL 5057654
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Denise MEENAN, Plaintiff,
v.
NAVIENT CORPORATION, et al., Defendants.

No. CV-20-08122-PCT-DLR
|
Signed 08/27/2020

**Attorneys and Law Firms**

Denise Meenan, Lake Havasu City, AZ, pro se.

Jordan S. O'Donnell, Pro Hac Vice, Hinshaw & Culbertson LLP, Boston, MA, for Defendants.

**ORDER**

Douglas L. Rayes, United States District Judge

*1  Before the Court is Navient Corporation and Navient Solutions, LLC's ("NSL")[1] motion to dismiss, which is fully briefed. (Docs. 13, 14, 16, 19.) NSL's motion is denied for the following reasons.

Between July 1996 and September 1999, Denise Meenan took out seven William D. Ford Direct Loans, totaling $87,771, to finance her law school education. (Doc. 11 at 5-6.) After graduation, Ms. Meenan began employment as a public service attorney. On July 26, 2002, Ms. Meenan's loan servicer, NSL, recharacterized her direct loans as FFEL Consolidated loans without her knowledge. (Id. at 6.)

In 2007, Congress created the Public Service Loan Forgiveness ("PSLF") program, which provides loan forgiveness to participant borrowers if (1) the borrower's loans are qualifying direct loans, (2) the borrower is employed full-time by a qualifying public service employer, and (3) the borrower has made 120 on-time payments pursuant to a qualifying payment plan. Winebarger v. Pa. Higher Ed. Assistance Agency, 411 F. Supp. 3d 1070, 1079 (C.D. Cal. 2019).

On March 15, 2008, Ms. Meenan contacted NSL to confirm that her loans were eligible under the PSLF program. (Doc.

11 at 6.) An NSL representative assured Ms. Meenan by telephone that her loans and payment plan qualified. (Id.) Again, in July 2009 and August 2010, NSL assured her that her loans and payment plan qualified. (Id. at 7-8.) On June 17, 2011, Ms. Meenan emailed Joe Pinkas, her law school's student loan program director, who informed her that her loans were not direct loans and did not, in fact, qualify for the PSLF program. Instead, she learned she would need to consolidate her loans in order to qualify. (Id. at 8-9.) Ms. Meenan quickly consolidated her loans in July 2011. (Id. at 9.)

On June 10, 2019, Ms. Meenan requested an accounting of her payments from Fed Loan Servicing because she believed she would be making her 120th payment in the fall of 2019. (Id.) On April 3, 2020, Fed Loans Servicing informed her that 33 payments she made prior to loan consolidation in July 2011 did not count for PSLF purposes. (Id.)

On May 26, 2020, Ms. Meenan filed this suit, bringing claims against NSL under the Arizona Consumer Fraud Act ("ACFA") and Arizona common law. (Docs. 1, 11.) On August 3, 2020, NSL filed a motion to dismiss, asserting that each statute of limitations period[2] has run. (Docs. 13, 14.) NSL contends that the statute of limitations clock began to run on Ms. Meenan's claims in 2011 when Mr. Pinkas put her on notice that her loans did not qualify for PSLF in their present form, alerting her that NSL's 2008-2010 representations were untrue.[3] Alaface v. National Inv. Co., 892 P.2d 1375, 1380 (Ariz. Ct. App. 1994) (The statute of limitations begins to run for an ACFA or common law fraud claims when the allegedly "defrauded party discovers or with reasonable diligence could have discovered the fraud."). NSL's argument is misguided.

*2  In order to have standing to bring suit, a plaintiff must have suffered an injury in fact. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). To determine whether Ms. Meenan would have had standing to bring suit on these claims in 2011, the Court must determine what injury Ms. Meenan alleges to have suffered and when that injury arose. The Central District of California's decision in Winebarger provides useful guidance.[4] There, the court found that the plaintiffs, who were several years from making their 120th qualifying loan payment, lacked standing to seek recovery for "be[ing] required to make more than the necessary 120 payments to obtain PSLF Program loan forgiveness" in the future. Winebarger, 411 F. Supp. 3d at 1086. The court explained,

Meenan v. Navient Corporation, Not Reported in Fed. Supp. (2020)

2020 WL 5057654

> [T]hat injury is purely hypothetical. Plaintiffs may or may not make all their loan payments on time over the next five to seven years; they may or may not continue to work for a qualifying employer for the required time; and [Defendant] may [remedy the issue without court intervention]. Thus, Plaintiffs' unfounded fear that they may need to make more than 120 qualifying payments to obtain PSLF loan forgiveness in five to seven years is wholly speculative and far too remote to confer standing.

*Id.* at 1087. Like the plaintiffs in *Winebarger*, Ms. Meenan had not suffered the injury alleged in her complaint in

2011,[5] when, regardless of any misrepresentations, it was unclear whether Ms. Meenan would otherwise qualify for the PSLF program. Any number of factors other than NSL's misrepresentations—such as a decision by Ms. Meenan to enter the private sector to pursue more lucrative employment —could have rendered her ineligible for loan forgiveness. Ms. Meenan's claims were not ripe for judicial resolution in 2011 because the injury she alleges—experiencing a delay to her loan forgiveness—was at that time speculative. Her injury only arose and became concrete, thereby starting the statute of limitations clock, once she made her 120th payment on November 1, 2019. Ms. Meenan brought this action on May 26, 2020, well within each limitations period. Accordingly,

**IT IS ORDERED** that NSL's motion to dismiss (Doc. 13) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5057654

---

## Footnotes

1    For present purposes, the Court jointly refers to Navient Corporation and Navient Solutions, LLC as NSL. Although Defendants maintain that Navient Corporation is merely a parent corporation and is improperly named in this lawsuit, they do not brief the issue, it is not the basis for their motion, and the motion refers to the two entities, jointly, as NSL.

2    ACFA, negligent misrepresentation, and intentional misrepresentation claims are subject to one year, two-year, and three-year limitations periods, respectively. *Murry v. Western Am. Mortgage Co.*, 604 P.2d 651, 654 (Ariz. Ct. App. 1979); A.R.S. § 12-543(3); *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003).

3    NSL also references various documents, including agency complaints, which emphasize that Ms. Meenan knew, years before filing her 2020 complaint, that NSL had made misrepresentations to her. However, as the Court will explain, even though Ms. Meenan knew of NSL's misrepresentations as early as 2011, such misrepresentations did not injure her until 2019.

4    NSL attempts to distinguish *Winebarger* from the instant case. None of the distinctions underscored by NSL are material to the Court's analysis.

5    NSL argues that the statute of limitations clock should nevertheless have begun running in 2011 because the misrepresentations caused Ms. Meenan injuries as early as 2011 by preventing her, inter alia, from accessing a more simplified loan repayment plan. (Doc. 19 at 3.) The injuries listed by NSL in its reply are not those for which Ms. Meenan seeks redress in her complaint and are irrelevant to the statute of limitations analysis here.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**14**

2014 WL 6682473
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Doris POLANSKY, an adult individual; and
Timothy Polansky, her husband, Plaintiffs,
v.
VAIL HOMES, LLC, a Maryland limited liability
Company, and Mountaineer Log and Siding
Company, Inc., a Maryland Corporation; Christopher
Meerschaert; Timothy Meerschaert, Defendants.
Mountaineer Log and Siding Company, Inc. a
Maryland corporation, Cross–Claim Plaintiff,
v.
Vail Homes, LLC, Cross–Claim Defendant.

Civil Action No. 13–296.
|
Filed Nov. 25, 2014.

**Attorneys and Law Firms**

John R. Orie, Jr., Jonathan A. Orie, Matthew E. Orie, Orie, LLC, Pittsburgh, PA, for Plaintiffs.

Seth J. Schwartz, Stuart H. Sostmann, Marshall, Dennehey, Warner, Coleman & Goggin, Adam G. Vahanian, The Chiurazzi Law Group, Wayne M. Chiurazzi, hiurazzi & Mengine, LLC, Pittsburgh, PA, for Defendants.

### ORDER

TERRENCE F. McVERRY, District Judge.

**\*1** AND NOW, this 25th day of November, 2014, after Plaintiffs, Doris Polansky and Timothy Polansky, filed an action in the above-captioned case, and after a Motion for Partial Dismissal of Plaintiffs' Third Amended Complaint or, in the Alternative, Motion for Summary Judgment (ECF No. 79) was submitted by Mountaineer Log and Siding Company, Inc., and after a Report and Recommendation was filed by the United States Magistrate Judge giving the parties until November 13, 2014, to file written objections thereto, and no objections having been filed, and upon independent review of the record, and upon consideration of the Magistrate Judge's Report and Recommendation, which is adopted as the opinion of this Court,

IT IS HEREBY ORDERED that the Motion for Partial Dismissal of Plaintiffs' Third Amended Complaint or, in the Alternative, Motion for Summary Judgment [ECF No. 79] is granted in part and denied in part. The motion is granted as to Plaintiffs' claims under the UTPCPL for statements made by Mountaineer regarding Vail Homes *prior* to the execution of the Purchase Contract. However, the motion is denied as it relates to Plaintiffs' claim under the UTPCPL for statements and representations made by Mountaineer *after* the Purchase Contract was executed.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if any party wishes to appeal from this Order a notice of appeal, as provided in Fed. R.App. P. 3, must be filed with the Clerk of Court, United States District Court, at 700 Grant Street, Room 3110, Pittsburgh, PA 15219, within thirty (30) days.

### *REPORT AND RECOMMENDATION*

MAUREEN P. KELLY, United States Chief Magistrate Judge.

**I. RECOMMENDATION**

Pending before the Court is the "Motion for Partial Dismissal of Plaintiffs' Third Amended Complaint or, in the Alternative, Motion for Summary Judgment," (ECF No. 79) filed on behalf of Defendant Mountaineer Log and Siding Company, Inc. For the following reasons, it is respectfully recommended that the motion be GRANTED IN PART AND DENIED IN PART.

**II. REPORT**

    **A. FACTUAL AND PROCEDURAL BACKGROUND**
Plaintiffs Doris and Timothy Polansky, husband and wife, commenced this action with a Complaint seeking damages arising out of the construction of a home designed by Defendant Mountaineer Log and Siding Company, Inc. ("Mountaineer") and built by Defendant Vail Homes LLC ("Vail Homes"). Plaintiffs allege that as a result of Mountaineer's defective design and Vail Homes' shoddy construction, water was caused to dangerously pool on an improperly sloped rear deck providing ingress and egress to the home. Plaintiffs allege that inevitably, these conditions created a hazard, resulting in Doris Polansky's serious injury in a fall from the deck.

With relevance to the pending Motion to Dismiss, Plaintiffs, in the Third Amended Complaint, allege three causes of action against Mountaineer for Negligence (Count III), Loss of Consortium (Count IV), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count VIII).

**\*2** Plaintiffs' claim under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa.C.S. §§ 201, *et seq.,* is predicated upon Mountaineer's alleged misrepresentations through its agent and/or employee Jack Barnhardt, relating to the competency, experience and/or workmanship of Vail Homes, as well as representations disparaging the competency, experience and workmanship of the builder that Plaintiffs originally intended to use, Robert Metz. (Third Amended Complaint at ¶¶ 75–84).

Plaintiffs allege that these representations and statements were made to induce Plaintiffs to use Vail Homes, as part of a scheme by which Mountaineer's agent, Jack Barnhardt, could collect a "referral fee" from Vail Homes. Plaintiffs allege that in reliance upon the misrepresentations and as a direct result of this "fraudulent and/or deceptive" conduct, they suffered damages by selecting Vail Homes as their builder.

In the Motion to Dismiss, Mountaineer challenges Plaintiffs' reliance upon the alleged representations, pointing to the express language of the Purchase Contract entered into between Mountaineer and Plaintiffs. The General Terms and Conditions of the Purchase Contract specifically provide, in pertinent part:

> 10. This agreement is a "materials only" package. It does not include labor, construction, foundation work and/or finishing work. The Purchaser understands and agrees that the investigation and selection of the builder(s) and/or construction contractor(s) is solely the decision of the Purchaser. Notwithstanding any oral and/or written representation to the contrary, Mountaineer does not recommend any particular builder(s), contractor(s) or sub-contractor(s), nor should any oral or written representation by Mountaineer relating to the competency, experience and/or workmanship of any builder, contractor and/or sub-contractor be relied upon by the Purchaser in the selection of a builder and/or contractor. It is further understood and agreed that any Builders List provided by Mountaineer and/or any other oral or written opinion and/or statement by Mountaineer relating to any builder and/or contractor is provided

by Mountaineer solely as a courtesy to Purchaser and should not be relied upon by Purchaser.

> 11. The Purchase Contract, any attachments and/or riders thereto and these General Terms and Conditions together constitute the entire understanding of the parties hereto and are intended to supersede all prior agreements, understandings and representations, written or oral, with respect thereto. This agreement shall not be amended, altered or changed except by a written agreement signed by the parties thereto.

Mountaineer contends that in light of the express provisions of the Purchase Contract, Plaintiffs cannot prove justifiable reliance upon its alleged wrongful conduct as required for a UTPCPL claim. Accordingly, Mountaineer seeks the dismissal of the UTPCPL claim (Count VIII) of Plaintiffs' Third Amended Complaint.

**B. STANDARD OF REVIEW**

**\*3** In assessing the sufficiency of the complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff. *Odd v. Malone,* 538 F.3d 202, 205 (3d Cir.2008). The Court, however, need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint. *See California Public Employees' Retirement System v. The Chubb Corp.,* 394 F.3d 126, 143 (3d Cir.2004), citing *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). Nor must the Court accept legal conclusions set forth as factual allegations. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.,* citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Fed.R.Civ.P. 12(b)(6) where it does not allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, or where the factual content does not allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 513 U.S. 662, 678 (2009). *See Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (finding that, under *Twombly,* "labels and conclusions, and a formulaic recitation of the elements of a cause of action" do not suffice but, rather, the complaint

"must allege facts suggestive of [the proscribed] conduct" and that are sufficient "to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s] of his claim"). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 677. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

While Mountaineer has framed its motion as one seeking dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, in the alternative, it also moves for summary judgment pursuant to Rule 56. When a party moves to dismiss, and "matters outside the pleadings are presented to and not excluded by the court, the motions shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(d).

In this instance, Mountaineer relies upon the four corners of the contract entered into by the parties. Such reliance does not require the conversion of its Motion to Dismiss into a Motion for Summary Judgment. The law is clear that in considering a Motion to Dismiss, the Court is not limited to evaluating the complaint alone; it can also consider documents attached to the complaint, matters of public record, indisputably authentic documents, *Delaware Nation v. Pennsylvania,* 446 F.3d 410, 413 n. 2 (3d Cir.2006), documents that form the basis of a claim, *Lum v. Bank of America,* 361 F.3d 217, 221 n. 3 (3d Cir.2004) (*abrogation on other grounds recognized by In re Insurance Brokerage Antitrust Litigation,* 618 F.3d 300, 323 n. 22 (3d Cir.2010)), and "documents whose contents are alleged in the complaint and whose authenticity no party questions," even though they "are not physically attached to the pleading...." *Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002).

**\*4** In responding to Mountaineer's Motion to Dismiss, Plaintiffs have submitted affidavits filed on their behalf concerning additional misrepresentations by Mountaineer's agent and/or employee *after* the Purchase Contract was executed. Plaintiffs therefore appear to invite the Court to treat the pending motion as a motion for summary judgment.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Andreoli v. Gates,* 482 F.3d 641, 647 (3d Cir.2007); *UPMC Health System v. Metropolitan Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir.2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex,* 477 U.S. at 322. *See also Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell,* 2010 WL 2089639 *1 (3d Cir.2010) quoting *Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir.2005).

When considering a motion for summary judgment, the Court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**C. DISCUSSION**
The UTPCPL seeks to prevent "[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce...." 73 P.S. § 201–3. The statute prohibits, in a catchall provision, "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce. 73 Pa. Stat. § 201–2(4)(xxi). The UTPCPL applies to residential real estate transactions, and creates a private right of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal," as a result of deceptive representations. *Growall v. Maietta,* 931 A.2d 667, 676 (Pa.Super.2007), *appeal denied,* 597 Pa. 717, 951 A.2d 1164 (Pa.2008), 73

Polansky v. Vail Homes, LLC, Not Reported in F.Supp.3d (2014)

Pa.C.S. §§ 201–2, 201–9.2(a). "[T]he UTPCPL is to be liberally construed to effectuate its objective of protecting the consumers of this Commonwealth from fraud and unfair or deceptive business practices." *Ash v. Cont'l Ins. Co.,* 593 Pa. 523, 932 A.2d 877, 881 (Pa.2007); *Benner v. Bank of Am., N.A.,* 917 F.Supp.2d 338, 359–60 (E.D.Pa.2013).

**\*5** To state a claim under the UTPCPL, Plaintiffs must allege facts that would prove: (1) Mountaineer, through its agent Barnhardt, made a misrepresentation or engaged in deceptive conduct, likely to deceive a consumer acting reasonably under similar circumstances, (2) Plaintiffs justifiably relied on the misrepresentation or deceptive conduct, and (3) Plaintiffs were damaged by their justifiable reliance on the alleged misrepresentation or deceptive conduct. *Ries v. Curtis,* No. 13–1400, 2013 WL 3196429 (E.D.Pa. June 25, 2013) (citing, *Sacks v. DJA Auto,* 2013 WL 210248 (E.D.Pa. Jan.19, 2013), and *Seldon v. Home Loan Servs.,* 647 F.Supp.2d 451, 470 (E.D.Pa.2009)).

Where, as here, Plaintiffs allege deceptive conduct under the UTPCPL's catchall provision, justifiable reliance must be sufficiently alleged to state a claim. *See Hunt v. U.S. Tobacco Co.,* 538 F.3d 217, 224 (3d Cir.2008) (concluding that "plaintiffs alleging deceptive conduct under the ... catchall provision must allege justifiable reliance"). In other words, Plaintiffs must allege that knowledge of the deceptive conduct "would have changed [Plaintiffs'] conduct." *Id.* at 227.

Mountaineer contends as a result of the "integration clause" contained in Paragraph 11 of the Purchase Contract, as well as the explicit disclaimer as to builder recommendations set forth in Paragraph 10 of the agreement's "General Terms and Conditions," Plaintiffs cannot establish justifiable reliance and therefore cannot state a claim under the UTPCPL. The integration clause expressly disclaims any "prior agreements, understandings, representations, written or oral" in connection with Plaintiffs' purchase of a Mountaineer log cabin home. Mountaineer argues that through this clause, Plaintiffs have explicitly disclaimed reliance on any statements made with regard to the qualifications and competency of any builder and, therefore, cannot establish justifiable reliance to support a UTPCPL claim.

Plaintiffs respond, arguing that because the representations at issue were made before *and after* entering into the Purchase Contract, and were intentionally and affirmatively false in furtherance of a scheme to earn an undisclosed referral fee, Mountaineer has waived or is equitably estopped from

asserting either the integration clause or the disclaimer as to builder recommendations as defenses to their UTPCPL claim. (ECF Nos. 82, 83 and 92).

### 1. UTPCPL and the Parol Evidence Rule/Integration Clause

The Pennsylvania Supreme Court has held that to state a cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or misrepresentations, and that he suffered harm as a result of that reliance. *Yocca v. Pittsburgh Steelers Sports, Inc.* 578 Pa. 479, 854 A.2d 425, 438–439 (Pa.y2004). However, the Pennsylvania Supreme Court limited the scope of a plaintiff's alleged justifiable reliance through its acknowledgment that the parol evidence rule remains applicable to consumer contracts.

**\*6** The parol evidence rule provides that " '[w]here the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.' " *Id.,* 854 A.2d at 436 (quoting *Gianni v. Russell & Co.,* 281 Pa. 320, 126 A. 791, 792 (1924) (citations omitted)).

The Pennsylvania Supreme Court then explained, "for the parol evidence rule to apply, there must be a writing that represents the 'entire contract between the parties.' *Gianni,* 126 A. at 792. To determine whether or not a writing is the parties' entire contract, the writing must be looked at and 'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties....' *Id.* An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." *Id.* "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract

Polansky v. Vail Homes, LLC, Not Reported in F.Supp.3d (2014)

is almost always inadmissible to explain or vary the terms of the contract." *Id.*

There are a limited number of exceptions to the parol evidence rule, for fraud and mistake. However, the Pennsylvania Supreme Court has unequivocally stated that fraud in the inducement is not an exception permitting the admissibility of parol evidence.

Parol evidence is inadmissible based on a claim of fraud in the inducement of the contract, i.e., that an opposing party made false representations that induced the complaining party to agree to the contract." *Id.* at 437 n. 26, 126 A. 791. In other words, " 'a party cannot justifiably rely upon prior oral representations, yet sign a contract denying the existence of those representations.' " *Diodato v. Wells Fargo Ins. Servs., USA, Inc.,* No. 12–CV–2454, 2014 WL 4411591 (M.D.Pa. Sept.8, 2014) (quoting *1726 Cherry St. P'ship v. Bell Atl. Props.,* 439 Pa.Super. 141, 653 A.2d 663, 666 (Pa.Super.Ct.1995), and *McGuire v. Schneider, Inc.,* 368 Pa.Super. 344, 534 A.2d 115, 119 (Pa.Super.Ct.1987)). Holding otherwise would allow the "parol evidence rule [to] become a mockery, because all a party to the written contract would have to avoid, modify or nullify it would be to aver (and prove) that the false representations were fraudulently made." *Id.* (quoting *Rahemtulla v. Hassam,* 539 F.Supp.2d 755, 773 (M.D.Pa., 2008)).

**\*7** Parol evidence *is* admissible, however, when a party alleges fraud in the execution, that is, that a previously agreed upon term was omitted from the final contract "because of fraud, accident, or mistake." *Yocca,* 854 A.2d at 437. *See also, Toy v. Metropolitan Life Ins. Co.,* 593 Pa. 20, 928 A.2d 186, 206–207 (Pa.2007) (parol evidence rule does not apply when fraud in the execution alleged; fraud in the execution occurs when a party alleges he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud).

Here, with regard to statements made prior to entering into the Purchase Contract, Plaintiffs do not allege fraud in the execution but, rather, fraud in the inducement. (Third Amended Complaint, ECF No. 76, ¶ 74). Further, the alleged fraud is predicated entirely on a subject addressed by the express terms of the Purchase Contract. Given the presence of an integration clause in the Purchase Contract as well as the explicit disclaimer of recommendations as to the competency of any builder, it is apparent that the Plaintiffs cannot establish that they justifiably relied upon the representations

made prior to entering into the contract by Mountaineer's agent. Accordingly, Plaintiffs cannot state a claim under the UTPCPL for statements made by Mountaineer regarding the quality of Vail Homes *prior* to entering into the Purchase Contract.

**2. Post–Contractual Representations**

In response to Mountaineer's contention that the explicit terms of the Purchase Contract render reliance on statements regarding builder competency unjustified, Plaintiffs allege that additional statements were made *after* the Purchase Contract was entered into and, as such, the parol evidence rule does not apply to preclude a finding of justifiable reliance to support a UTPCPL claim. Alternatively, Plaintiffs argue that post-contract statements constitute an estoppel or waiver of Mountaineer's rights under the integration clause and disclaimer set forth in the Purchase Contract.

Plaintiffs have submitted affidavits in opposition to the pending Motion to Dismiss/Motion for Summary Judgment which indicate that *after* entering into the underlying Purchase Contract, they informed Barnhardt that they selected a builder, Robert Metz, to construct the home. Barnhardt allegedly informed Plaintiffs that "Metz did not have adequate experience, skill, or knowledge to properly construct [the] log cabin home and again recommended [that Plaintiffs] use Vail." (ECF No. 82–1). Later, Barnhardt took Plaintiffs to "various high quality log cabin homes and represented ... that Vail had built these log cabin homes. During this meeting, Barnhardt represented ... that Vail had the skill, experience, and knowledge to build [their] log cabin home, using the log cabin homes Barnhardt was showing to us as examples of Vail's competence and ability." *Id.*[1] Based upon these representations, Plaintiffs chose Vail Homes. Plaintiffs also allege Vail Homes paid Barnhardt a referral fee in the event Vail was selected as a builder.

**\*8** These statements, if believed by a fact-finder, are not limited by the parol evidence rule and render the Purchase Contract disclaimer potentially subject to the defenses of waiver and estoppel. *See, e.g., Leitner v. Allstate Ins. Co.,* No. 11–7377, 2014 WL 3408385 (E.D.Pa. July 11, 2014) (even a valid contractual limitation is subject to the defenses of waiver and estoppel, which must be supported by a sufficient factual basis).

Pennsylvania courts have defined waiver as "a voluntary and intentional abandonment or relinquishment of a known right"

Polansky v. Vail Homes, LLC, Not Reported in F.Supp.3d (2014)

that may be established by "a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary." *Leitner v. Allstate Ins. Co.,* 2014 WL 3408385 * 4 (quoting *Samuel J. Marranca General Contracting Co., Inc. v. Amerimar Cherry Hill Assocs. Ltd. P'ship,* 416 Pa.Super. 45, 610 A.2d 499, 501 (Pa.Super.Ct.1992) (citation omitted); *Prime Medica Assocs. v. Valley Forge Ins. Co.,* 970 A.2d 1149, 1156 (Pa.Super.Ct.2009)). Additionally, equitable estoppel is defined as:

> a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity.

*Prime Medica Assocs.,* 970 A.2d at 1157 (citing *Kreutzer v. Monterey Cnty. Herald Co.,* 560 Pa. 600, 747 A.2d 358, 361 (Pa.2000)). Estoppel requires the presence of two elements: (1) inducement to act; and (2) justifiable reliance on that inducement. *See, e.g., Kreutzer,* 747 A.2d at 362; *Havas v. Temple University of the Commonwealth System of Higher Educ.,* 357 Pa.Super. 353, 516 A.2d 17, 18 (Pa.Super.Ct.1986). "The burden rests upon the party asserting estoppel to establish the elements thereof by evidence which is clear, precise, and unequivocal ... mere silence or inaction is not a ground for estoppel unless there is a duty to speak or act." *Farmers Trust Co. v. Bomberger,* 362 Pa.Super. 92, 523 A.2d 790, 793–94 (Pa.Super.Ct.1987) (citations omitted); *Prime Medica Assocs.,* 970 A.2d at 1157 (citations omitted).

In this case, and at this early juncture, given the issues of fact that appear of record in support and in opposition to Mountaineer's motion, it is premature to determine whether Mountaineer's affirmative representations and conduct, through its agent/employee Barnhardt, constitute a waiver of the disclaimer set forth in the Purchase Contract, such that Plaintiffs could have justifiably relied upon the representations and suffered damages as alleged in the Third Amended Complaint. Accordingly, it is recommended that the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, be denied as it relates to representations made by Mountaineer *after* the Purchase Contract was executed.

**D. CONCLUSION**

**\*9** For the foregoing reasons, it is respectfully recommended that the Motion for Partial Dismissal of Plaintiffs' Third Amended Complaint or, in the Alternative, Motion for Summary Judgment [ECF No. 79] be GRANTED IN PART AND DENIED IN PART. The motion should be granted as to Plaintiffs' claims under the UTPCPL for statements made by Mountaineer regarding Vail Homes *prior* to the execution of the Purchase Contract. However, the motion should be denied as it relates to Plaintiffs' claim under the UTPCPL for statements and representations made by Mountaineer *after* the Purchase Contract was executed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b) (1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. *Brightwell v. Lehman,* 637 F.3d 187, 193 n. 7 (3d Cir.2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Filed Oct. 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6682473

---

**Footnotes**

Polansky v. Vail Homes, LLC, Not Reported in F.Supp.3d (2014)

1    Plaintiffs allege that they later learned that the homes that they were shown by Barnhardt and that he represented to have been built by Vail Homes, were, in fact, not built by Vail Homes.

**End of Document**                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**15**

🚩 KeyCite Yellow Flag

Distinguished by  Agostino v. Quest Diagnostics Inc.,  D.N.J.,  February 11, 2009

2006 WL 1117878
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Edward A. RITTI, Plaintiff

v.

U–HAUL INTERNATIONAL, INC., Defendant.

Civil Action No. 05–4182.
|
April 26, 2006.

**Attorneys and Law Firms**

Sherrie R. Savett, Berger & Montague, PC, Philadelphia, PA, for Plaintiff.

Lance Rogers, Dechert LLP, Philadelphia, PA, for Defendant.

***MEMORANDUM***

DIAMOND, J.

**\*1** Plaintiff Edward Ritti brings this suit against U–Haul pursuant to the Class Action Fairness Act of 2005. *See* Pub.L. No. 109–2, 119 Stat. 4 (2005) (codified as part of 28 U.S.C.). Plaintiff alleges that although U–Haul promised to make a rental truck available to him on a particular day, it did not do so, causing Plaintiff to incur additional cost when he rented a truck from another company. Plaintiff alleges that U–Haul has engaged in a nationwide "pattern and practice" of breaching its rental contracts in this manner, and asks me to certify a Class of

> all persons in the United States who reserved rental trucks or trailers from U–Haul for specific dates, received written confirmations of their agreements with U–Haul, did not receive trucks or trailers from U–Haul

on the specific dates promised, and who were damaged thereby.

*Pl. Mem. for Class Cert. at 1; Mar. 31 Tr. at 4.*

I cannot certify for several reasons. Most significantly, there is no single rental agreement at issue here. Rather, like Ritti himself, each Class member will base his claim on a unique contract comprising terms offered and accepted when the Class member met with, spoke to, or electronically communicated with U–Haul. Moreover, the circumstances relating to each purported breach necessarily differ and so trigger different defenses. In these circumstances, I am compelled to conclude that Plaintiff is not typical of the purported Class and that common issues of law and fact do not predominate.

**BACKGROUND AND PROCEDURAL HISTORY**

In late July, 2005, Plaintiff sought to rent a truck to move furniture from his Pottstown home on July 30, 2005. *Pl. Mem. at 5* . He logged onto the U–Haul web site and learned the rental price and mileage rate for truck rentals. *Def. Br. at Ex. 4 (Ritti Dep.) at 38–41.* Ritti chose not to reserve a truck online. *Id.* Instead, he phoned U–Haul's Reservations number: 1–800–468–4285 (1–800–GO–UHAUL) and reserved a rental truck in Pottstown, Pennsylvania for July 30, 2005. *Ritti Dep. at 41–45; Compl. at ¶ 16.* Plaintiff paid a $5 reservation fee (billed to his credit card), and was told "he would receive a telephone call a couple of days before his move ... informing him of the location where he was to pick up his truck." *Compl. at ¶ 18.* After paying the reservation fee, Ritti— through his wife's e-mail account—received an e-mail from uhaul_ reservations@uhaul.com, stating:

> Your reservation is confirmed, and we thank you for choosing U–Haul.... The rate(s) on the In–Town rental equipment for pickup on 07/30/2005 in the area of Pottstown, PA reserved for you is: 1–14′ Truck [at] $29.95 [☞] $1.69/mile.... Note: 1. Your reservation can be changed or canceled up to the day prior to your pick up date; if you change or cancel on the day of pick up you are subject to a $50.00

cancellation fee. 2. U–Haul reserves the right to substitute equipment of equal or greater size at no additional charge to you. 3. The rate is valid for the date specified in this letter and is subject to change if you change your pick up date. 4. U–Haul rental periods vary based on availability.

**\*2** *Compl. at ¶ 17; Def. Br. at Ex. C.* The e-mail ends with the name of its apparent author: "Clay Breece[,] Marketing Company President[,] Phone: (800) 858–5756." Def. Br. at Ex. C.

When Ritti did not receive a follow-up telephone call from U–Haul on Wednesday, July 27, 2005, he telephoned 800–858–5756, and a customer service representative told him that although "they were running behind with reservations," he would receive a call on Thursday. *Ritti Dep. at 112–16.* Hearing nothing, Plaintiff telephoned twice on Thursday, July 28th and learned he should expect a call on Friday, July 29th. *Id. at 117–21.* Plaintiff phoned approximately five times on the 29th and was told that "because the computers were down, they were having trouble providing [him] with information." *Id. at 124.*

Early on Saturday, July 30th, Ritti phoned again and spoke to a customer service representative for approximately two hours. *Id. at 140–42.* The representative tried to assist Ritti, but could not locate an appropriate truck within a 150–mile radius. *Id. at 143.* Plaintiff then found a truck offered by U–Haul competitor Penske Truck Rental in King of Prussia, cancelled his U–Haul reservation, and rented the Penske truck for $145.66. *Id. at 145–46, 161.* He immediately learned that other customers were dissatisfied with U–Haul, and resolved on Sunday, July 31 st, or Monday, August 1 st, to file this Class Action. *Id. at 163, 169–72.* Ritti also filed a Better Business Bureau complaint in Arizona—where U–Haul International, Inc. is headquartered—and contacted the law firm of Berger & Montague. *Id. at 169.*

In response to the BBB complaint, U–Haul refunded the $5 reservation fee and offered Plaintiff a $170 reimbursement to Plaintiff for his expenses. *Id. at 190–92, 208, 224–26.* Plaintiff rejected the reimbursement and filed this Complaint on August 5, 2005—six days after U–Haul's alleged breach of the rental contract. *Id. at 193.* On November 2, 2005, Plaintiff moved to certify his claim as a Class Action. *Mot. for Class*

*Cert. (Doc. No. 13).* Both sides have extensively briefed and argued the certification issue.

Defendant has separately moved for Summary Judgment, raising significant questions as to whether Plaintiff should have brought this suit against U–Haul Company of Pennsylvania, a wholly-owned subsidiary of Pennsylvania. *See Mot. For Summ. J. (Doc. No. 22).* I have assumed for the purposes of certification that Plaintiff has sued the proper party.

## LEGAL STANDARDS

To certify this matter as a Class Action, I must conclude that Ritti satisfies all the prerequisites of FED.R.CIV.P. 23(a) and fulfills at least one of the requirements of Rule 23(b). *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 624 (3d Cir.1996), *aff'd,* 521 U.S. 591 (1997); *Nelson v. Astra Merck, Inc.,* 1998 U.S. Dist. LEXIS 16599 (E.D.Pa.1998). In addition, "[t]hough not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class." *In re A.H. Robins Co.,* 880 F.2d 709, 728 (4th Cir.1989); 7A C. WRIGHT, A. MILLER & M. KANE, *Federal Practice & Procedure,* § 1760, § 1761 (2005); *see also Commonwealth v. Callahan Land Title Ins. Co.,* 1990 U.S. Dist. LEXIS 14524 (E.D.Pa.1990).

**\*3** The requirements of Rule 23(a) are numerosity, commonality, adequacy of representation, and typicality. FED.R.CIV.P. 23(a). Ritti seeks certification pursuant to Rule 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3). It is Ritti's burden to show that the Class should be certified. *See Karnuth v. Rodale, Inc.,* 2005 U.S. Dist. LEXIS 14426 (E.D.Pa.2005) (*citing Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974)).

Rule 23 affords me considerable discretion in determining whether to certify. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 345 (1979). Although I must accept as true all substantive allegations in the Amended Complaint, I may nonetheless look beyond the four corners of the Complaint to the Motion for Certification and to other documents. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir .1996)

Ritti v. U-Haul Intern., Inc., Not Reported in F.Supp.2d (2006)

("A district court certainly may look past the pleadings to determine whether the requirements of [R]ule 23 have been met."); *Lyon v. Caterpillar Inc.*, 194 F.R.D. 206, 209 (E.D.Pa.2000) (Courts are "not bound by the four corners of the complaint" at certification.); *see also Gen. Tel. Co. of the Southwest*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings ... and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."). I may not, however, decide "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal quotations omitted).

## DISCUSSION

Class actions allow large numbers of individuals who have suffered essentially the same wrong to obtain legal redress in a single proceeding. *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 403 (1980); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1091 (3d Cir.1976). Class actions provide those holding nominal claims with a cost-effective way of seeking redress: proving the claim of the class representative also proves the claim of every class member. *See Panetta v. SAP Am., Inc.*, 2006 U.S. Dist. LEXIS 17556, at *2–*3 (E.D.Pa.2006); *Federal Practice & Procedure, supra*, at § 1762. Thus, the class action works as intended only if the representative's claim is typical of those held by class members. Similarly, unless the factual and legal commonalities of the class predominate, the class action will deteriorate into an unmanageable mass of individual claims and defenses. *See* FED.R.CIV.P. 23(b)(3); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 343–44 (4th Cir.1998).

According to his own testimony, Plaintiff's breach of contract claim is not typical of that of the proposed Class. Indeed, given the manner in which U–Haul's truck rental contracts are formed, it is highly doubtful that any "typical" breach of contract claim exists. Rather, it is apparent that this proposed Class Action is in actuality an agglomeration of individual breach of contract claims whose merits must be litigated individually.

### I. Plaintiff Has Not Satisfied The Rule 23(a) Prerequisites For Class Certification.

### A. Plaintiff Has Met The Numerosity Requirement.

**\*4** Rule 23 requires "that the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir.2001); FED.R.CIV.P. 23(a)(1). Although there is "[n]o magic number ... satisfying the numerosity requirement, the Court of Appeals has generally approved of classes of forty or more." *In re Loewen Group Secs. Litig.*, 233 F.R.D. at 154 (*citing Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001)); *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa.1989). I remain obligated to perform a "rigorous analysis" to ensure that Plaintiff has proven each of the Rule 23 requirements even though U–Haul apparently does not dispute numerosity. *See Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 183–84 (3d Cir.2001); *Schwartz v. Dana Corporation/Parish Div.*, 196 F.R.D. 275, 278 (E.D.Pa.2000) (*citing General Telephone v. Falcon*, 475 U.S. 147, 161 (1982)).

Ritti seems to base his numerosity analysis almost exclusively on U–Haul's size and volume of business. Plaintiff argues that because "U–Haul is the largest truck rental company in the U.S.," and "claims to have moved 47 million families in the last five years," that "common sense dictates a finding of numerosity." *Pl. Mem. at 8*. Plaintiff supports this "common sense" assertion with a Declaration by his Counsel. *See Fantini Decl., filed with Pl. Opp. to Def. Mot. to Dismiss, Oct. 18, 2005 (Doc. No. 8))*. In his Memorandum, however, Plaintiff misstates what is represented in the Declaration.

For instance, Ritti argues that "the internet is filled with *hundreds* of postings by people complaining about U–Haul's failure to provide trucks in accordance with its written confirmations." *Pl. Mem. at 8* (emphasis added). Yet Counsel's Declaration states only that one website (www.dontuseuhaul.com) "contains *many* complaints by persons regarding U–Haul's reservations policies." *Fantini Decl. at ¶ 7* (emphasis added). Similarly, Plaintiff alleges that UHaul's "membership has been cancelled by the Phoenix [BBB] because of the high volume of consumer complaints relating to the unavailability of equipment." *Pl. Mem. at 8*. Yet, the 1998 ABC News report on which this allegation is based does not discuss reservations at all, focusing instead on problems with "the mechanical condition of [U–Haul's] trucks ... including bad brakes, loose steering, and worn tires." *Fantini Decl. at Ex. E, pp. 2–3. Id. at ¶ 8; Ex. E.*

Ritti also offers newspaper descriptions of lawsuits brought in 1997 and 1999 by the Kansas and Massachusetts Attorneys

General, both of whom charged that U–Haul's reservations policies were misleading. *See Fantini Decl. at Ex. D.*

Relying on all the materials summarized in Counsel's Declaration, Plaintiff contends:

> Since the proposed Class encompassed U–Haul customers throughout the United States for the past several years, plaintiff estimates that there are hundreds or thousands of persons in the class.

**\*5** *Pl. Mem. at 8.*

If Ritti's estimate is correct, he satisfies the numerosity requirement. *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001) (numerosity is generally satisfied if the number of plaintiffs exceeds forty). In the absence of data supporting Plaintiff's estimate, however, I am compelled to determine whether the materials that actually relate to U–Haul's reservations policy—the 1997 and 1999 Kansas and Massachusetts lawsuits, combined with Counsel's description of "many" website complaints—satisfy Rule 23. I conclude that they do. *See Maxwell v. Arrow Fin. Servs., LLC,* 2004 U.S. Dist. LEXIS 5462, at *7–*8 (N.D.Ill.2004) (it is "reasonable to assume" that numerosity is satisfied where plaintiff alleges Class membership based on standardized forms.); *In re HealthSouth Corp. Sec. Litig.,* 213 F .R.D. 447, 457 (N.D.Ala.2003) (numerosity is met once it can be found that "many" would be in the Class). *But see In re One Meridian Plaza Fire Litig.,* 1993 U.S. Dist. LEXIS 9841 (E.D.Pa.1993) (defendant had "raised some doubt" about numerosity where the only support for numerosity came from newspaper articles).

**B. Plaintiff Has Met The Commonality Requirement.**
Rule 23(a)(2) requires that plaintiffs identify "questions of law or fact common to the members of the proposed class." *Schwartz,* 196 F.R.D. at 279; FED.R.CIV.P. 23(a)(2). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective Class. Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal for & by Kanter v. Casey,* 43 F.3d 48, 56

(3d Cir.1994). Once again, it appears that U–Haul does not dispute that Ritti has met the commonality requirement.

Ritti contends that all Class members would share the following legal and factual questions:

> [W]hether defendant is liable for breach of contract, and whether plaintiff and Class members have suffered damages as a result thereof.

*Pl. Mem.* at 9. These issues meet the commonality requirement. *See Baby Neal,* 43 F.3d at 56; *Stewart v. Avon Prods., Inc.,* 1999 U.S. Dist. LEXIS 17616 (E.D.Pa.1999) (commonality met by breach of contract); *In re Ravisent Techs., Inc. Sec. Litig.,* 2005 U.S. Dist. LEXIS 6680 (E.D.Pa.2005) (common issue of "whether class members sustained damages"); *Contawe v. Crescent Heights of Am., Inc.,* 2004 U.S. Dist. LEXIS 25746 (E.D.Pa.2004) ("single issue" sufficient to satisfy commonality)

**C. Plaintiff Will Fairly And Adequately Represent The Interests Of The Class.**
A class representative must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "This requirement has two components: 1) adequacy of class counsel, and 2) adequacy of the class representative." *Davis v. Kraft Foods N. Am.,* 2006 U.S. Dist. LEXIS 3512 at * 27 (E.D.Pa.2006). Thus, I must determine whether the putative plaintiff "has the ability and incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes,* 846 F.2d 169, 179 (3d Cir.1988).

**\*6** U–Haul does not dispute that Ritti will be an adequate Class representative. Plaintiff seeks recovery of his reservation fee and the costs he incurred in renting a truck from U–Haul's competitor: "the same remedy that other potential [C]lass members would seek." *Schwartz,* 196 F.R.D. at 281. Plaintiff does not appear to have any interests "antagonistic to the [C]lass." *Baby* Neal, 43 F.3d at 55. Finally, Plaintiff's Counsel, Berger & Montague, P.C., is a well-known firm with a history of successful litigation of class actions. *See, e.g., In re: Rite Aid Corp. Securities Litigation,* 269 F.Supp.2d 603 (E.D.Pa.2003); *In Re Brand*

*Name Prescription Drugs Antitrust Litigation,* 2000 U.S. Dist. LEXIS 1734 (N.D.Ill.2000). In these circumstances, I believe that Plaintiff satisfies the adequacy requirement of Rule 23.

### D. Plaintiff Cannot Meet Rule 23's Typicality Requirement.

The class representative satisfies Rule 23(a)(3) if his claims or defenses "are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). "To determine typicality, I must examine whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' " *Kraft,* 2006 U.S. Dist. LEXIS 3512 at *21 -*22 (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)). Although "Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members," there must be "a strong similarity of legal theories" between the class representative and the class. *Hassine,* 846 F.2d at 177; *Baby Neal,* 43 F.3d at 58. "Where the defendant can raise unique defenses to each plaintiff's claim, typicality may not exist if the defenses could threaten to become the focus of the litigation." *Jones v. GPU, Inc.,* 2005 U.S. Dist. LEXIS 18820 at *51 (E.D.Pa.2005); *see Zenith Laboratories, Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1974) ("defenses which would not be applicable to the Class as a whole" may defeat certification).

#### 1. Plaintiff's Breach Of Contract Claim Is Not Typical Because It Is Based On A Unique Contract.

U-Haul argues that Ritti is not typical because his deposition testimony conflicts with the theory of liability on which he bases his Class claim: that U-Haul has breached "standard written contracts,"—the e-mail "confirmations of the[ ] rental agreements" received by the purported Class members. *See Def. Mem. at 27–29; Pl. Reply Br. at 19.* Because Ritti has testified that his reservation telephone call and the e-mail confirmation *together* constitute his contract with U-Haul, I agree that he cannot satisfy Rule 23's typicality requirements. *Pl. Reply Br. at 19.*

Plaintiff contends that the written confirmations are "standard, boilerplate, computer-generated forms" and that they "contain the essential terms of the parties' agreements." *Id.* Thus, in Ritti's view, there will be no "need to inquire into any oral conversations that customers may have had with U-Haul. *Id. at 20.* In support, he cites class action

decisions involving form-insurance contracts. *See Pl. Br. at 14–15* (citing, e.g., *Steinberg v. Nationwide Mutual Ins. Co.,* 224 F.R.D. 67 (E.D.N.Y.2004); *Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683 (N.D.Ga.1983); *Janicik v. Prudential Insurance Co. of America,* 451 A.2d 451 (Pa.Super.1982)).

**\*7** Ritti's deposition testimony contradicts these contentions and underscores the atypicality of his claim. *See Lyon,* 194 F.R.D. at 209. U-Haul's email confirmation—which Plaintiff contends comprises the entire contract between the parties—explicitly states that "U-Haul reserves the right to substitute equipment of equal or greater size at no additional charge to you." *Def. Br. at Ex. C.* Yet, Plaintiff explained that because his Pottstown home was on "a one-way street with parking on both sides," his rental truck could be no longer than fourteen to sixteen feet. *Ritti Dep. at 48, 64.* It was only in his telephone conversation with U–Haul that Ritti was assured—*contrary* to what is provided in his purportedly complete written contract—that a fourteen to sixteen foot truck would be provided on July 30th. *Id. at 75.* Plaintiff considered this term to be a "deal breaker." *Id.* Accordingly, Plaintiff testified, "I believe that if you put [the written confirmation] together with my [telephone] conversation, it embodies the contract that I had with U–Haul." *Id. at 104.* Plaintiff further stated that "the deal I had with U–Haul [ ] was with the phone conversation and this [e-mail]." *Id. at 107.*

In these circumstances, Ritti himself has confirmed that his claim against U–Haul differs significantly from those of the purported Class. Accordingly, Plaintiff cannot meet Rule 23's typicality requirements. *See Georgine v. Amchem Prods.,* 83 F.3d 610, 631 (3d Cir.1996) (no typicality "where the legal theories of the named plaintiff[ ] potentially conflict[s] with [that] of the absentees"); *Broussard v. Meineke Disc. Muffler Shops,* 155 F.3d 331, 343 (4th Cir.1998) (no typicality where defendant "directed different representations to" named plaintiff and other Class members); *see also Stirman v. Exxon Corp.,* 280 F.3d 554, 562 (5th Cir.2002) (typicality not met where named plaintiff allegedly breached two different types of leases).

#### 2. Plaintiff's Claim Is Subject To A Unique Defense.

U-Haul also argues that any breach by U-Haul is excused by the impracticability of performance in the specific circumstances of Plaintiff's rental. *See In re Loewen Group Secs. Litig.,* 233 F.R.D. 154 (E.D.Pa.2005) ( "If the litigation threatens to be dominated by an arguable defense or defenses of a named plaintiff," the typicality prong may not be met.); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197,

211 (E.D.Pa.2001) (certification inappropriate where "it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff"); *see also Zenith Laboratories, Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1976) (rejecting certification where "unique defenses could conceivably become the focus of the entire litigation").

Once again, Plaintiff's deposition testimony confirms the likelihood that his claim will be subject to a "unique defense." Ritti testified that although he was told by the representative at 1–800–GO–UHAUL that he would "receiv[e] a phone call [to] confirm the pickup ... by Wednesday night," U–Haul never made the call. *Ritti Dep. at 110–12.* Rather, when Ritti phoned U–Haul's regional office to confirm his rental, he was "told over multiple times that the computers were down." *Ritti Dep. at 123.* U–Haul argues that these "computer problems were an unexpected contingency" that made the "alleged contract commercially impracticable." *Def. Mem. at 32; see Gulf Oil Corp. v. Federal Power Com.,* 563 F.2d 588, 599 (3d Cir.1977) (commercial impracticability doctrine applies where "the cost of performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice"); *cf. Zuckerman v. Pacific Savings Bank,* 187 Cal.App.3d 1394 (1986) ("computer error" may be valid contract defense); *Roland Pietropaoli Trucking, Inc. v. Nationwide Mut. Ins. Co.,* 100 A.D.2d 680 (N.Y.App.1984) (same).

**\*8** Plaintiff equates U–Haul's defense of "impracticability" with "impossibility," arguing that impossibility is inapplicable because U–Haul's computer failure is not "a natural disaster, such as a hurricane or tornado...." *Pl. Reply Br. at 25.* I disagree. First, "impossibility" is not limited to acts of God. Rather, courts have traditionally allowed the defense when there is an "implied condition that the parties shall be excused in case, before breach, performance becomes impossible ... without [fault] of the contractor." *Taylor v. Caldwell,* 3 Best & S. 826, 122 Eng. Rep. 309, 324, 6 R.C. 603 (1863). *See generally Opera Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts,* 817 F.2d 1094, 1097 (4th Cir.1987) (outlining how *Taylor v.. Caldwell* became the foundation of the doctrine of impossibility in American law).

Moreover, a party may be excused from non-performance not only because of "impossibility" (where performance is "physically and objectively impossible"), but for "impracticability." *See Albert M. Greenfield & Co. v. Kolea,* 475 Pa. 351 (1977) (impracticability doctrine extends

impossibility defense to situations involving "extreme and unreasonable difficulty, expense, injury, or loss"); *see generally 14–74 Corbin on Contracts § 74.5.* Although I may not assess here the merits of U–Haul's claim of impracticability, I agree with U–Haul that this defense could well become a "focus" of the litigation of Ritti's case. *Eisen,* 417 U.S. at 177 (forbidding inquiry into the merits at the certification stage); *Zenith,* 530 F.2d at 512. Ritti's Complaint and his legal contentions underscore that the claims of most other Class members would not be subject to this defense. *See, e.g., Pl. Reply Br. at 25.* Given that Ritti's claim thus appears to be subject to a unique defense, I do not believe he has met Rule 23's typicality requirement. *See id.; Loewen Group,* 233 F.R.D. at 154.

In other circumstances, Ritti's atypicality could be remedied by substituting a new class representative. *See, e.g., Davis v. Thornburgh,* 903 F.2d 212, 233 (3d Cir.1990) (Becker, J., dissenting) ("afford[ing] an opportunity to provide a substitute ... is the common practice"); In *re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. 61, 80 (D.Mass.2005) (class counsel granted opportunity to replace atypical class representative). Given my decision that class issues do not predominate, however, substitution will not change the result here. *See Jacobs v. Home Depot U.S.A., Inc.,* 219 F.R.D. 549, 551 (S.D .Fla.2003) (amending complaint "would be futile" where "the fundamental nature of the claims here would require individualized inquiries for virtually every potential plaintiff and putative class member").

### III. Plaintiff Has Not Demonstrated That Common Issues Of Law And Fact Will Predominate In This Action.

Rule 23(b)(3) requires that "questions of law or fact common to members of the Class predominate over any questions affecting only individual members." FED.R.CIV.P. 23(b) (3). "The predominance requirement overlaps considerably" with the commonality and typicality inquiries of Rule 23(a). *In re Vicuron Pharms. Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 3861 (E.D.Pa.2006); *see also Sommers v. Abraham Lincoln Federal Sav. & Loan Associates,* 66 F.R.D. 581, 590 (E.D.Pa.1975) (overlap with typicality). Predominance is nevertheless "far more demanding" than the commonality and typicality requirements, so "[s]atisfaction of ... any of the Rule 23(a) requirements [ ] is not an indication that 23(b)(3) is likewise satisfied." *Amchem Prods. v. Windsor,* 521 U.S. 591, 623 (1997); *Schwartz,* 196 F.R .D. at 282. The plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a

whole ... predominate over those issues that are subject only to individualized proof." *Wal–Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.),* 280 F.3d 124, 136 (2d Cir.2001).

**\*9** Although the need for individualized determinations of damages may weigh against a finding of predominance, "the focus of the [predominance] inquiry is directed primarily toward the issue of liability." *Forman v. Data Transfer,* 164 F.R.D. 400, 404 (E.D.Pa.1995); *see In re Microcrystalline Cellulose Antitrust Litig.,* 218 F.R.D. 79 (E.D.Pa.2003).

### A. Determining The Provisions Of Each Class Member's Rental Contract Will Predominate Over Any Common Questions.

Plaintiff repeatedly asserts that this case "invites the parties' straightforward claim for breach of contract based upon the parties' standard written agreements." *Pl. Mem. at 1.* Yet, the written confirmation plainly is not a complete agreement. Accordingly, this case will necessarily involve a multitude of rental contracts. Plaintiff will thus be required to prove the existence and terms of each Class member's contract with U-Haul. *See, e.g., United States v. Clementon Sewerage Authority,* 365 F .2d 609 (3d Cir.1966) (discussing non-integrated "agreement[s] part of whose terms were in writing and part oral"). In these circumstances, because questions "affecting only individual [Class] members" will obviously predominate, Ritti cannot meet the requirements of Rule 23(b) (3). *See also Klay v. Humana, Inc.,* 382 F.3d 1241, 1263 (11th Cir.2004) ("sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate").

In arguing that Class issues predominate, Plaintiff notes that U-Haul does not dispute that the written confirmation is a standard form. *See Pl. Reply Br. at 19.* That concession hardly ends the integration inquiry, however. Unless the confirmation form is an integrated document, it does not reflect the complete agreement between each renter and U-Haul. *Kehr Packages v. Fidelity Bank, N .A.,* 710 A.2d 1169, 1173 (Pa.Super.Ct.1998) (a written contract is "integrated" only "if it represents a final and complete expression of the parties' agreement"). Numerous factors underscore that the written confirmations are not "final and complete" expressions of the rental contracts.

First, Plaintiff admits that there is no integration clause. *See Ex. C. to Def. Br.; Mar. 31, 2006 Tr. at 6.* An integration clause ensures that a writing "express[es] all of the negotiations,

conversations, and agreements made prior to its execution." *Dilworth Paxson v. Asensio,* 2003 U.S. Dist. LEXIS 7719 (E.D.Pa.2003) (*citing 1726 Cherry St. v. Bell Atl. Props., Inc.,* 439 Pa.Super. 141 (1995)). In the absence of an integration clause, I may "examine the text of the agreement to determine its completeness," and consider all evidence that comprises "the entire agreement of the parties." *Kehr Packages,* 710 A.2d at 1173; *Silverstein v. Percudani,* 2005 U.S. Dist. LEXIS 10005 (M.D .Pa.2005).

The loose language and reservations of rights in Ritti's confirmation certainly show that the e-mail is not a "final and complete" agreement. For instance, the confirmation indicates that U-Haul may change the truck size and vary the truck rental period. *Def. Br. at Ex. C.* Even more significantly, the confirmation states that "U-Haul rental periods vary based on availability." *Id.; see also Ritti Dep. at 68* (stating that Ritti "needed the truck for" six hours or "most of the day"). It also provides that the renter may "change [ ] or cancel[ ]" the reservation "up to the day prior" to the pickup date. *Id.* Moreover, as Plaintiff confirms, other material terms are entirely omitted from the confirmation. *See id.; Pl. Reply Br. at 10, 12, 18* ("[T]he rental terms relating to time and location of truck pick up are not contained in the contract and are to be arranged with each customer through a scheduling call...."). These open and ambiguous terms are left to be resolved during the subsequent scheduling telephone conversations between U-Haul and the renter; indeed, the confirmation effectively requires that such a conversation take place. *See Def. Br. at Ex. C., ¶¶ 4–6, 8.*

**\*10** U-Haul's website also requires that customers assent to specific terms that do not appear in the subsequent e-mail confirmation. *See Def. Br. at Ex. D.* Among these terms is an acknowledgment that a renter's preferred truck size and time-of-day may be unavailable if he or she seeks to pick up the vehicle on a Friday or (like Ritti) on a Saturday, and that final details will be arranged through the follow-up scheduling telephone call. *Id.* Not all renters go on the website and read these terms, however, while some—like Ritti—may go on the website and then book their rental by telephone. *Ritti Dep. at 38–45.* Others may simply go to a U-Haul office, meet with a U-Haul representative, conclude a rental agreement with U-Haul, and pick up their trucks at that time. *Def. Br., Ex. 2, at ¶ 14.* Consequently, a rental contract may include terms from the website as well as conversations and meetings with U-Haul.

In these circumstances, in which every renter's contract is created by U–Haul and the renter, I cannot accept Plaintiff's contention that the predominant legal question here is U–Haul's breach of the same rental contract. Plaintiff has not identified any case in which a court certified a class for breach of contract without such a common contract. *Compare Pl. Mem. at 2, n. 2 (citing* breach of written contract cases, *e.g., Durant v. Servicemaster Co.,* 208 F.R.D. 228 (E.D.Mich.2002); *Friedman v. Lansdale Parking Authority,* 1993 U.S. Dist. LEXIS 12019 (E.D.Pa.1993); *Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683 (N.D.Ga.1983)). In contrast, courts have rejected class action treatment where different contracts are at issue. *See, e.g., Klay,* 382 F.3d at 1263; *Broussard,* 155 F.3d at 343; *Avery v. State Farm Mut. Ins. Co.,* 835 N.E.2d 801 (Ill.2005). Courts have likewise rejected certification of a class of persons with oral contracts. As the Third Circuit has observed, contracts "based substantially on oral rather than written communications" are generally "inappropriate for class action treatment." *Johnston v. HBO Film Mgmt.,* 265 F.3d 178. 190 (3d Cir.2001); *see also Szczubelek v. Cendant Mortg. Corp.,* 215 F.R.D. 107 (D.N.J.2002).

Plaintiff also argues that my consideration of anything other than the standard form would violate the parol evidence rule. *See Pl. Reply Br. at 17.* Yet, the law provides just the opposite: "The parol evidence rule only applies to written agreements which are integrated." *FDIC v. Barness,* 484 F.Supp. 1134, 1146 (E.D .Pa.1980) (*citing Friestad v. Travelers Indemnity Co.,* 260 Pa.Super. 178 (1978)). The written "contract" here, however, contemplates and practically requires the providing of additional terms. Moreover, (as discussed below), application of the parole evidence rule in these circumstances will require that I determine which of the fifty states' parole evidence rules to apply.

Finally, Plaintiff contends that even if I consider extrinsic evidence, it would relate only to the "ancillary issue" of "incidental oral terms." *Pl. Reply Br. at 20.* Until I actually consider extrinsic evidence as to each rental contract, however, I cannot determine the "importance" of that evidence, whether it relates to terms "incidental" to the contract, or whether it relates to terms that are "deal-breakers" (as the truck size was for Ritti). *See Ritti Dep. at 75.* Obviously, I cannot, at this early stage, determine the "essential" provisions of each Class member's rental contract. *See Eisen,* 417 U.S. at 178.

**\*11** In sum, it is apparent that if I were to certify the proposed Class, this case would become endlessly mired in disputes over the terms of each Class member's rental contract. In that event, individual legal issues would predominate—the exact opposite of what Rule 23 requires.

### B. Individualized Defenses and Damages Determinations Will Predominate Over Common Issues of Law and Fact.

Although the "mere fact" of affirmative defenses "does not compel a finding that individual issues predominate over common ones," class certification is inappropriate if individual defenses will be widespread through the class and vary significantly among class members. *See In re: LifeUSA Holding,* 242 F.3d 136, 149 (3d Cir.2001) (district courts may decline certification where "individualized claims and individualized defenses" prevent predominance and superiority); *Bratcher v. Nat'l Standard Life Ins. Co.,* 365 F.3d 408, 420 (5th Cir.2004) ("The predominance of individual issues necessary to decide an affirmative defense may preclude class certification."). *But see In re Linerboard Antitrust Litig.,* 305 F.3d 145, 162 (3d Cir.2000) (individual determinations of statute of limitations defense do not preclude certification). U–Haul "ha[s] the right to raise individual defenses against each class member." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 192 (3d Cir.2001).

U–Haul's unique defense to Ritti's claim illustrates the likely predominance of unique defenses in this proposed Class Action. *See supra* pp. 13–15. There can be innumerable explanations for a party's late contract performance: some may be legally significant; others may not. *See, e.g., Le Gare, Inc. v. Brookhaven Residential Sales, Inc.,* 337 Pa.Super. 478 (1985) (affirming and modifying judgment for late performance); *Seaway Painting, Inc. v. D.L. Smith Co.,* 242 B.R. 834 (E.D.Pa.1999) (assessing damages for late performance). *Compare Gimbel Bros., Inc. v. Markette Corp.,* 307 F.2d 91 (3d Cir.1962); with *Gulf Oil Corp. v. Federal Energy Regulatory Com.,* 706 F.2d 444 (3d Cir.1983) (whether *force majeure* is excuse for untimely performance); *Dempsey v. Stauffer,* 312 F.2d 360, 362 (3d Cir.1962) (right to rescind limited in a contract "where time is not of the essence"). *See generally* 15 *Williston on Contracts* § 46:1 (4th ed. 2005) ("When a party to a contract agrees to do a certain act at a certain time, or within a certain period, the promisor's undertaking can conceivably be regarded either as a single, indivisible promise to do the act, with the time frame as merely an aspect of the promise to do it, or instead

as composed of two separate promises—one a promise to do the act, and the second a separate promise that the act shall be done at or within the time specified.").

U–Haul argues that the defense of novation will require an individualized factual determination for each purported Class member. As U–Haul notes, a follow-up conversation (particularly where one party agrees to new, key terms) may be a novation—a new contract substituted for the existing one. *See T & N, PLC v. Pennsylvania Ins. Guar. Ass'n,* 44 F.3d 174, 186 (3d Cir.1994) (citing *Black's Law Dictionary* 1064 (6th ed.1990)). The existence of a novation may be proved by "the facts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties," with the burden of proof on "[t]he party asserting a novation." *Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 148 (3d Cir.1999); *I.W. Berman Properties v. Porter Brothers, Inc.,* 344 A.2d 65, 70 (Md.1975).

*\*12* Here, it is undisputed that both parties expected a follow-up telephone call from U–Haul. As Ritti's experience demonstrates, potential "deal-breaker" elements of the rental could well be agreed to when a customer speaks with U–Haul. *See Def. Mem. at 12–13* (describing follow-up calls); *Pl. Reply Br. at 12–13, 18* ("[U–Haul] told [P]laintiff Ritti that he would be contacted before his move.... [R]ental terms relating to time and location of truck pick up ... are to be arranged with each customer through a scheduling call."). As with the oral terms of contracts between renters and U–Haul, the existence or absence of such a novation will have to be proven for each Class member. *See CC Investors Corp. v. Raytheon Co.,* 2005 U.S. Dist. LEXIS 6893 (D.Del.2005) (novation defense "raises several questions which require a plaintiff-by-plaintiff analysis, [and] is not suited for class certification").

U–Haul identifies other fact-specific potential defenses that it will seek to raise, including severe weather, truck accidents, mechanical breakdowns, and delayed returns. *See Pl. Mem. at 32–33* . Significantly, Plaintiff does not allege a deliberate policy causing U–Haul's purported breaches. Rather, Plaintiff has challenged the "pattern or practice" of occasional non-performance itself. Especially in the absence of any allegation that there is a common cause to UHaul's alleged breaches, U–Haul will necessarily seek to excuse each failure to provide a rental truck. U–Haul will have the absolute right to present each such unique defense. *See Broussard,* 155 F.3d 331, 344–45 (4th Cir.1998) (holding that certification cannot be used to abridge defendant's rights to defend each plaintiff's claim and defendant must be allowed "the benefit of deposing or

cross-examining the disparate individuals"); *see also Arch v. Am. Tobacco Co.,* 175 F.R.D. 469 (E.D.Pa.1997) (defendants have due process rights to challenge causation and injury as to each plaintiff). In these circumstances, "unique defenses" may well be the rule for the entire Class.

Finally, although I have identified some common issues involved in determining the damages of purported Class members, the damages phase of this litigation will also require extensive, individualized determinations. Significantly, Plaintiff seeks the consequential damages incurred when "[C]lass members had to rent trucks from other companies at higher rates than those agreed to with U–Haul." *Compl. at ¶ 36.* As stated in three of the first five cases listed in Plaintiff's Appendix, consequential damages are available only if "contemplated by the parties at the time they entered the contract." *All Am. Supply Co. v. Slavens,* 609 P.2d 46, 48 (Ariz.1980) (*cited in Pl. Mem.* at *Ex. D); see also Marshall Durbin Farms, Inc. v. Landers,* 470 So.2d 1098, 1102 (Ala.1885); *Native American Reclamation and Pest Control Inc. v. United Bank Alaska,* 685 P.2d 1211, 1219–20 (Ak.1984) (same). This requires an inquiry into individual facts. *See id.* In addition, the calculation of these consequential damages will also require individualized proof and calculation. *See, e.g., Parkhill v. Minn. Mut. Life Ins. Co.,* 188 F.R.D. 332, 345 (D.Minn.1999). Although these individual damages issues are not as central to the litigation as the individual liability issues, they underscore the inadvisability of certification here. *Compare Porter v. Nations Credit Consumer Disc. Co.,* 229 F.R.D. 497, 500 (E.D.Pa.2005) (individual damages calculations create a predominance problem) with *Bradburn Parent/Teacher Store v. 3M,* 2004 U.S. Dist. LEXIS 16193 (E.D.Pa.2005) ("[I]ndividualized determinations of the amount of the damages that each individual class member suffered will be needed does not, in itself, preclude class certification."). This is especially true where Plaintiff alleges that "damages" are one of two issues common to the proposed Class, and the other common issue—U–Haul's breach of the same contract—is non-existent.

## C. State Law Variations And The Necessity For Individualized Choice Of Law Determinations Preclude Predominance.

*\*13* The "[e]xistence of state law variations is not alone sufficient to preclude class certification." *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 458 (D.N.J.1998). In cases where "numerous state law variations [are] implicated by certification of a nationwide class," however, the movant

Ritti v. U-Haul Intern., Inc., Not Reported in F.Supp.2d (2006)

"must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.' " *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) (*quoting In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986)). Where the movant's analysis of the state laws is "overly simplistic," or "state laws vary significantly," the court should deny class certification. *See Carpenter v. BMW of N. Am., Inc.,* 1999 U.S. Dist. LEXIS 9272 at *11 (E.D.Pa.1999).

Plaintiff asserts that "the laws of contracts are uniform throughout the United States," noting that: 1) "all 50 states uniformly require ... an offer, acceptance, consideration, and definite terms" to create a contract; 2) "all 50 states essentially define breach of contract as the failure of a party to a contract to perform"; 3) "all 50 states allow the non-breaching party to recover consequential damages"; and 4) "where the contract is complete ... all 50 states disallow the introduction of parol evidence for the purpose of construing the contract." *Pl. Mem. at 16–17.*

Plaintiff has not offered the "extensive analysis" required to show that the law of all 50 states is "identical." Rather, he offers four very general and unremarkable propositions of contract law, and cites to over two hundred cases ostensibly in support—with no descriptions, quotations, or pinpoint cites. *Compare Steinberg v. Nationwide Mut. Ins. Co.,* 224 F.R.D. 67, 77–78 (E.D.N.Y.2004) (*cited* in *Pl. Mot. at 14*) (describing a thorough analysis of the state law variations). Moreover, he has not even addressed the specific contract law issues on which this litigation may well turn, such as integration, impracticability, novation, and the like. This is hardly the "extensive analysis" the law requires. *See Walsh,* 807 F.2d at 1017. *Compare Carpenter,* 1999 U.S. Dist. LEXIS 9272 at *11.

Significantly, U–Haul identifies state law variations that could well require extensive, individualized examinations. For instance, states apply numerous different versions of the parol evidence rule. *See Def. Mem. at 25–26* (describing a number of variations). Thus, Alaska law provides that "extrinsic evidence is always admissible on the question of the meaning of the words of the contract itself," as long as the "parties disagree about the interpretation of a provision." *See id.* at 25 (*citing Casey v. Semco Energy, Inc.,* 92 P.3d 379, 383 (Ak.2004)). Missouri and Texas, in contrast, permit extrinsic evidence only where language has a "plain and ordinary meaning ... reasonably susceptible to more than one

construction." *Rosemann v. Roto Die, Inc.,* 276 F.3d 393, 399 (8th Cir.2002).

**\*14** Plaintiff responds that variations in extrinsic evidence law are "irrelevant to the issues raised in this case." *Pl. Reply Br. at 17.* Yet the Third Circuit plainly requires the admission of extrinsic evidence where "the written contract is not fully integrated." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010 n. 9 (3d Cir.1980). As I concluded earlier, the written confirmation on which Ritti bases the Class breach of contract claim is *not* fully integrated. *See supra* pp. 16–19. There is "a significant variation in the laws of the states with respect to the use of extrinsic evidence (including the types of extrinsic evidence that may be used) to determine whether, as a matter of law, the contract language is ambiguous." *See Bowers v. Jefferson Pilot Fin. Ins. Co.,* 219 F.R.D. 578, 583 (E.D.Pa.2004). Moreover, there is similar variation among state laws governing the admission of extrinsic evidence "even where the court determines that the language is not ambiguous." *Id.* (collecting cases). Thus, I will be required to apply the laws of numerous states to determine the terms of the class members' contracts.

Further, neither party has claimed that the e-mail confirmation or the telephone conversation between Plaintiff and U–Haul contained a choice of law provision. I would therefore be required to conduct a difficult choice of law analysis—involving a consideration of the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation and place of business of the parties—for each Class member. *See Bowers,* 219 F.R.D. at 582 (choice-of-law analysis required for each individual); *Kruzits v. Okuma Mach. Tool,* 40 F.3d 52, 55 (3d Cir.1994) (Pennsylvania applies Second Restatement approach where contract lacks a choice-of-law clause.); Restatement (Second) of Conflict of Laws § 188 (enumerating factors).

Plainly, allowing this Class Action to proceed will require countless choice-of-law determinations and an unmanageable inquiry into the law governing the existence, terms, and breach of each contract, the availability of defenses to any breach, and the resulting damages for a vast number of the purported Class members. Accordingly, I conclude that common issues do not predominate.

**CONCLUSION**

**Ritti v. U-Haul Intern., Inc., Not Reported in F.Supp.2d (2006)**

Plaintiff's claims and defenses are not "typical of the claims or defenses of the class" for which certification is sought, and common questions of law and fact do not "predominate" in this litigation. *See* FED.R.CIV.P. 23(a)(3); 23(b)(3). Accordingly, Plaintiff's Motion for Class Certification is **DENIED** . An appropriate ORDER follows.

*ORDER*

**AND NOW,** this 26th day of April, 2006, upon consideration of Plaintiff's Motion for Class Certification (Doc. No. 13), all related submissions, the Oral Argument held on March 31, 2006, and the reasons set forth in the accompanying Memorandum, the Motion is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1117878

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**16**

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....
2023 WL 6290622

KeyCite Yellow Flag
Distinguished by  Ngambo v. Chase,  S.D.N.Y.,  December 28, 2023

2023 WL 6290622
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Katherine SEAMAN, Individually and on
behalf of all others similarly situated; Mary Re
Seaman, Individually and on behalf of all others
similarly situated; and Sandra Tabar, Plaintiffs,
v.
NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2007-2; National Collegiate Student Loan
Trust 2007-3; Transworld Systems, Inc., In its own right and
as successor to NCO Financial Systems, Inc.; EGS
Financial Care Inc., formerly known as NCO Financial
Systems, Inc.; and Forster & Garbus LLP, Defendants.
Christina Bifulco, Individually and on behalf
of all others similarly situated; Francis Butry,
Individually and on behalf of all others similarly
situated; and Cori Frauenhofer, Individually and
on behalf of all others similarly situated, Plaintiffs,
v.
National Collegiate Student Loan Trust 2004-2;
National Collegiate Student Loan Trust 2006-4;
Transworld Systems, Inc., In its own right and as
successor to NCO Financial Systems, Inc.; EGS
Financial Care Inc., formerly known as NCO Financial
Systems, Inc.; and Forster & Garbus LLP, Defendants.

18 Civ. 1781 (PGG) (BCM), 18 Civ. 7692 (PGG) (BCM)
|
Signed September 27, 2023

**Attorneys and Law Firms**

Asher Hawkins, Marvin Lawrence Frank, Gregory Alan
Frank, Frank LLP, New York, NY, for Plaintiffs Katherine
Seaman, Mary Re Seaman, Sandra Tabar, Cori Frauenhofer
in No. 18 Civ. 1781 (PGG) (BCM).

Asher Hawkins, Marvin Lawrence Frank, Frank LLP, New
York, NY, Gregory Thomas Casamento, Locke Lord LLP,
New York, NY, for Plaintiffs Francis Butry, Christina Bifulco
in No. 18 Civ. 1781 (PGG) (BCM).

Asher Hawkins, Marvin Lawrence Frank, Gregory Alan
Frank, Frank LLP, New York, NY, for Plaintiffs Christina
Bifulco, Francis Butry, Cori Frauenhofer in No. 18 Civ. 7692
(PGG) (BCM).

Andrew Max Braunstein, Gregory Thomas Casamento, Lisa
Ruggiero, R. James Jude De Rose, III, Locke Lord LLP, New
York, NY, James Matthew Goodin, Locke Lord LLP, Chicago,
IL, for Defendants National Collegiate Student Loan Trust
2007-2, National Collegiate Student Loan Trust 2007-3 in No.
18 Civ. 1781 (PGG) (BCM).

Andrew Joshua Blady, Sessions, Israel & Shartle, LLC,
Furlong, PA, Aaron R. Easley, Sessions, Israel & Shartle,
LLC, Flemington, NJ, Bryan C. Shartle, Michael Alltmont,
Sessions, Israel & Shartle, LLC, Metairie, LA, Gregory
Thomas Casamento, Locke Lord LLP, New York, NY, James
Kevin Schultz, Sessions, Israel & Shartle, LLC, San Diego,
CA, for Defendant Transworld Systems, Inc. in No. 18 Civ.
1781 (PGG) (BCM).

Andrew Joshua Blady, Sessions, Israel & Shartle, LLC,
Furlong, PA, Aaron R. Easley, Sessions, Israel & Shartle,
LLC, Flemington, NJ, Bryan C. Shartle, Michael Alltmont,
Sessions, Israel & Shartle, LLC, Metairie, LA, Gregory
Thomas Casamento, Locke Lord LLP, New York, NY, for
Defendant EGS Financial Care Inc. in No. 18 Civ. 1781
(PGG) (BCM).

Carol A. Lastorino, David Stephen Wilck, Kenneth A.
Novikoff, Amanda R. Griner, Rivkin Radler, LLP, Uniondale,
NY, James P. Lagios, Capital District Physicians' Health Plan,
Inc., Albany, NY, Gregory Thomas Casamento, Locke Lord
LLP, New York, NY, for Defendant Forster & Garbus LLP in
No. 18 Civ. 1781 (PGG) (BCM).

Gregory Thomas Casamento, Andrew Max Braunstein, Lisa
Ruggiero, R. James Jude De Rose, III, Locke Lord LLP, New
York, NY, for Defendants National Collegiate Student Loan
Trust 2004-2, National Collegiate Student Loan Trust 2006-4
in No. 18 Civ. 7692 (PGG) (BCM).

Aaron R. Easley, Sessions, Israel & Shartle, LLC,
Flemington, NJ, Gregory Thomas Casamento, Locke Lord
LLP, New York, NY, for Defendants Transworld Systems,
Inc., EGS Financial Care Inc. in No. 18 Civ. 7692 (PGG)
(BCM).

Kenneth A. Novikoff, Rivkin Radler, LLP, Uniondale, NY,
Gregory Thomas Casamento, Locke Lord LLP, New York,

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 143 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

NY, for Defendant Forster & Garbus LLP in No. 18 Civ. 7692 (PGG) (BCM).

**MEMORANDUM OPINION & ORDER**

PAUL G. GARDEPHE, United States District Judge:

*1 In these consolidated putative class actions, Plaintiffs Katherine Seaman, Mary Re Seaman, Sandra Tabar, Christina Bifulco, Francis Butry, and Cori Frauenhofer allege that Defendants National Collegiate Student Loan Trust 2007-2 ("Trust 2007-2"), National Collegiate Student Loan Trust 2007-3 ("Trust 2007-3"), National Collegiate Student Loan Trust 2004-2 ("Trust 2004-2"), and National Collegiate Student Loan Trust 2006-4 ("Trust 2006-4") (collectively, the "Trust Defendants"); Transworld Systems, Inc. ("TSI"), in its own right and as successor to NCO Financial Systems, Inc. ("NCO"), and NCO, now known as EGS Financial Care Inc. ("EGS") (collectively, "TSI-NCO"); and Forster & Garbus LLP have orchestrated a scheme to "fraudulently obtain default judgments ... for unprovable debts" against them in state court, and that Plaintiffs have carried out this scheme by, <u>inter alia</u>, filing documents containing false or deceptive information in those state court proceedings. (Consol. Cmplt. (Dkt. No. 124) ¶¶ 1, 7-13, 15-17)[1] Plaintiffs assert claims for violations of the Fair Debt Collection Practices Act (the "FDCPA"); New York General Business Law ("GBL") Section 349; and New York Judiciary Law Section 487. (<u>Id.</u> ¶¶ 266-85)

On June 3, 2021, Plaintiffs moved for class certification, pursuant to Fed. R. Civ. P. 23. (Pltf. Mot. (Dkt. No. 312)) On April 7, 2022, Defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of standing. (Def. Mot. (Dkt. No. 371))

In a March 13, 2023 report and recommendation ("R&R"), Magistrate Judge Moses recommends granting in part and denying in part Defendants' motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), and granting in part Plaintiffs' motion for class certification. (R&R (Dkt. No. 423) at 67-68)

On April 14, 2023, both Defendants and Plaintiffs filed objections to the R&R (Def. Obj. (Dkt. No. 433); Pltf. Obj. (Dkt. No. 434)), and on April 28, 2023, Defendants and Plaintiffs filed their responses to each other's objections. (Def. Resp. (Dkt. No. 436); Pltf. Resp. (Dkt. No. 437))

As discussed below, Judge Moses' R&R will be adopted in part.

**BACKGROUND**

**I. FACTS**[2]

**A. The Parties**

*2 Plaintiffs Katherine Seaman, Mary Re Seaman, and Sandra Tabar are "current or former New York City residents and holders of student loan debt." Plaintiffs Christina Bifulco, Francis Butry, and Cori Frauenhofer are "residents of Erie County, New York, and likewise hold student loan debt." (R&R (Dkt. No. 423) at 6 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 23-28))

Defendants are the four Trust Defendants that sued the six named plaintiffs in state court, each alleging that it was the "original creditor" of the loan sued upon and/or "authorized to proceed with this action"[;] the Trust Defendants' servicing agent, TSI-NCO, which directed the litigation and furnished evidentiary material, including affidavits, for use in the collection actions[;] and Forster [& Garbus – a Long Island-based debt-collection law firm –] which served as the Trust Defendants' counsel of record in each action.

(<u>Id.</u> (footnotes and citations omitted) (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 29-35, 49-50, 58-59, 89, 92, 95, 101, 104, 120, 123, 126, 132, 162, 166, 171, 174, 194, 198, 203, 206, 223, 227))

**B. The Alleged Fraudulent Debt Collection Scheme**

Plaintiffs allege that TSI-NCO – servicing agent for the Trust Defendants, which have no employees – "causes baseless lawsuits to be filed on behalf of the Trust Defendants in state and local courts against student debt holders like [P]laintiffs." (<u>Id.</u> at 7 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 2, 47)) "TSI-NCO coordinates with various law firms to sue the debt holders on the Trust Defendants' behalf, relying on Forster [& Garbus] to do so in New York State." (<u>Id.</u> (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 2, 35))

Plaintiffs allege that Defendants make several misrepresentations with respect to these lawsuits. First, "[i]n the New York collection actions, [D]efendants' boilerplate complaints falsely state that one of the Trust Defendants is the 'original creditor' of the loan at issue and/or is 'authorized to

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 144 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

proceed' with the action." However, the Trust Defendants did not "originate[ ] any of the loans sued on; rather, the Trust Defendants 'are the ultimate owners of bundles of student loan debt following a byzantine securitization process.' " (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶¶ 8, 10)) "Nor, according to [P]laintiffs, were any of the Trust Defendants 'authorized to proceed' in a New York court, because none of them registered with the New York Department of State and paid the tax required of 'out-of-state entities that regularly file suit in this state's courts.' " (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 11))

With respect to the filings in these lawsuits, "[D]efendants' pleadings and motions 'were not meaningfully reviewed by an attorney prior to filing,' " but were " 'created by automated systems and non-attorney support staff.' " (Id. at 8 (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 17)) Defendant Forster & Garbus "filed 'hundreds, if not thousands,' of lawsuits against New Yorkers allegedly indebted to one of the Trust Defendants." (Id. (citing Consol. Cmplt. (Dkt. No. 124) ¶ 59)) "The pleadings and other papers filed in those lawsuits, which contained 'identical assertions of fact,' were 'mass-produced by non-lawyers at the push of a button, and then signed by attorneys who had done nothing to confirm the validity of the allegations and claims lodged against the consumer-defendants.' " (Id. (citation omitted) (quoting Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 19-20; Consol. Cmplt. (Dkt. No. 124) ¶¶ 60-63)) "Forster [& Garbus] 'did not possess, and did not review, any actual documentary support' for the complaints it filed on behalf of the Trust Defendants." (Id. (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 61; citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 11-12))

*3 Plaintiffs further allege that Defendants "submit[ ] deceptive affidavits in connection with motions for default judgments." In particular, "[t]he TSI-NCO employees who fill out and sign those affidavits falsely attest to 'personal knowledge' of key facts such as the relevant account records, the consumer's debt, and – most significantly – the chain of assignments establishing the relevant Trust Defendant's entitlement to sue." (Id. at 7-8 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 12-13)) These employees "did not possess or review the underlying records upon which those affidavits were supposedly based." (Id. at 8 (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 22-27)) "TSI-NCO had a team of employees (the Affiants) sign those affidavits and aver before the New York State courts that they were 'competent and authorized to testify' as the Trusts' witnesses against debtors in state court if called upon to do so." (Id. (citing Consol. Cmplt. (Dkt.

No. 124) ¶¶ 105, 139, 175, 207, 236)) The team "consist[ed] of roughly half a dozen members at any one time [ ] but churned out a large number of affidavits daily, with each Affiant signing 'upwards of 45 affidavits per day.' " (Id. at 9 (quoting Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 25-26))

"The Affiant team relied on a computerized system that began with a 'pre-created' affidavit template and then 'pull[ed] data in' from another system to 'populate the various fields,' which were 'utilized to create that affidavit.' " (Id. (alteration in original) (quoting Hawkins R. 23 Decl., Ex. B (Dkt. No. 315-2) at 6-10)) "The system populated, among other things, the names of the borrower and any co-borrower, 'the status of the account, balances, last payment date, amount, Trust name, fields such as those.' " (Id. (quoting Hawkins R. 23 Decl., Ex. B (Dkt. No. 315-2) at 9-10)) Although each affidavit stated that the affiant "had 'reviewed the education loan records' regarding the account at issue, and on that basis attested to the amount owed[,] [i]n reality, [P]laintiffs allege, the Affiants lacked the personal knowledge to which they attested." (Id. at 9-10 (citation omitted) (quoting Hawkins R. 23 Decl., Ex. J (Dkt. No. 315-10) at 5; citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 106-09)) Rather, the Affiants were " 'instructed to review data on a computer screen,' but did not know the source of that data, how it was obtained or maintained, or whether it was accurate." (Id. at 10 (quoting Consol. Cmplt. (Dkt. No. 124) ¶ 107)) "TSI-NCO did not require the Affiants to review the actual documents evidencing the chain of title of the loan sued upon, or the terms of that loan. It did not even tell the Affiants where those documents could be found in TSI-NCO's records (if at all)." (Id. (citation omitted) (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 23-24))

TSI-NCO also "reported the underlying debts to the major credit bureaus (Equifax, Experian, and TransUnion) as 'valid and owed.' " (Id. (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 192, 221; Hawkins R. 23 Decl. (Dkt. No. 315) ¶ 30)) "That reporting, in turn, negatively impacted [P]laintiffs' credit scores." (Id. (citing Pltf. R. 23 Br. (Dkt. No. 314) at 30 n.16; Plft. R. 23 Reply Br. (Dkt. 335) at 19 n.18; Hawkins R. 12(b)(1) Decl., Ex. 1-D ("Bifulco Dep.") (Dkt. No. 390-4) at 6-8))

## II. PROCEDURAL HISTORY

The Complaint in Seaman was filed on February 27, 2018 (see Cmplt. (Dkt. No. 8)), and the Complaint in Bifulco et al. v. National Collegiate Student Loan Trust 2004-2 et al., 18 Civ. 7692 (PGG) (BCM) was filed on August 23, 2018. (See Bifulco Cmplt. (Dkt. No. 1)) On August 28, 2018, this Court accepted Bifulco as related to Seaman. On November

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 145 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

29, 2018, this Court ordered that Seaman and Bifulco be consolidated. The Court also extended the briefing schedule for the Seaman Defendants' motion to dismiss, and entered a briefing schedule for the Bifulco Defendants' motion to dismiss. (Order (Dkt. No. 73))

On January 18, 2019, the Seaman Defendants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and on January 25, 2019, the Bifulco Defendants moved to dismiss, on the same grounds. (Def. Br. (Dkt. No. 80); Bifulco Def. Br. (Dkt. No. 37))

On September 30, 2019, this Court granted in part and denied in part Defendants' motions to dismiss. (Sept. 30, 2019 Order (Dkt. No. 107); Oct. 11, 2019 Mem. Op. & Order (Dkt. No. 109)) This Court dismissed Plaintiff Michelo's FDCPA claim as time-barred. The Seaman Plaintiffs' FDCPA claims were dismissed as time-barred to the extent they relied on the misrepresentation that Defendant Trust 2007-3 was the 'original creditor' of the Seamans' loan. Plaintiff Katherine Seaman's and Plaintiff Butry's GBL Section 349 claims were dismissed for failure to plead an actual injury. And Plaintiff Michelo's Judicial Law Section 487 claim was dismissed for failure to plead damages. Defendants' motions to dismiss were otherwise denied. (Id.)

*4 In a December 3, 2019 order, this Court concluded that, "[g]iven that this Court ordered [Seaman and Bifulco] consolidated in November 2018, and that the operative complaints are 'functionally identical,' it is appropriate for this action to proceed on the basis of a Consolidated Complaint." (Dec. 3, 2019 Order (Dkt. No. 122) at 2 (citations omitted))

The Consolidated Class Action Complaint was filed on December 10, 2019. (See Consol. Cmplt. (Dkt. No. 124)) It asserts violations of: (1) the FDCPA (against Defendants TSI, NCO, EGS, and Forster & Garbus); (2) GBL Section 349 (against all Defendants); and (3) Judiciary Law Section 487 (against Forster & Garbus). (Id. ¶¶ 266-85) On December 20, 2019, all Defendants filed Answers to the Consolidated Class Action Complaint. (See Dkt. Nos. 125-28; Bifulco, Dkt. No. 73)

On April 28, 2020, this Court referred these consolidated cases to Judge Moses for general pretrial supervision (Dkt. No. 144), and the cases proceeded to discovery.

On June 3, 2021, Plaintiffs moved for class certification, pursuant to Fed. R. Civ. P. 23 (Pltf. Mot. (Dkt. No. 312)), and on June 8, 2021, this Court referred Plaintiffs' motion to Judge Moses for an R&R. (Dkt. No. 318) On April 7, 2022, Defendants moved to dismiss for lack of standing, pursuant to Fed. R. Civ. P. 12(b)(1) (Def. Mot. (Dkt. No. 371)), and on April 8, 2022, this Court referred Defendants' motion to Judge Moses for an R&R. (Dkt. No. 373)

In a March 13, 2023 report and recommendation, Magistrate Judge Moses recommends that Defendants' motion to dismiss for lack of standing be granted in part and denied in part. She recommends dismissing (1) all claims based on "specific false statements made in state court debt-collection proceedings," whether brought under the FDCPA or GBL § 349; and (2) the claims of Plaintiffs Katherine Seaman, Mary Seaman, Tabar, Butry, and Frauenhofer based on negative credit reports, whether brought under the FDCPA or GBL § 349. She recommends that Defendants' Rule 12(b)(1) motion to dismiss otherwise be denied. (R&R (Dkt. No. 423) at 34, 67)

Judge Moses further recommends that Plaintiffs' class certification motion, pursuant to Fed. R. Civ. P. 23, be granted in part. She recommends certifying one class, pursuant to Rule 23(b)(3),

> comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster [& Garbus] as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

(Id. at 67-68 (emphasis omitted))

Judge Moses also recommends that the Seamans, Tabar, Butry, Bifulco, and Frauenhofer be appointed as class representatives, and that Frank LLP be appointed as class counsel. (Id. at 68)

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....
2023 WL 6290622

On April 14, 2023, both Defendants and Plaintiffs filed objections to the R&R (Def. Obj. (Dkt. No. 433); Pltf. Obj. (Dkt. No. 434)), and on April 28, 2023, Defendants and Plaintiffs filed responses to the other side's objections. (Def. Resp. (Dkt. No. 436); Pltf. Resp. (Dkt. No. 437))

## III. OBJECTIONS

### A. Defendants' Objections

Defendants argue that Judge Moses makes the following errors in her R&R:

*5 1. [f]inding that the mere existence of a collection action and a default judgment against Plaintiffs (when they failed to appear or participate) constitutes an actual injury sufficient to support Article III standing following the Supreme Court's decision in TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021);

2. [f]inding that this Court has subject matter jurisdiction to hear Plaintiffs' claims based on injuries inextricably tied to and arising out of the default judgments against Plaintiffs (such as wage garnishment or attorneys' fees), despite the Supreme Court's admonition in Exxon Mobile Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005), that the Rooker-Feldman doctrine bars federal courts from hearing claims based on alleged injuries caused by state court judgments or seeking review and rejection of state court judgments;

3. [f]inding that Plaintiff Bifulco's self-serving deposition testimony standing alone, without any evidentiary support, is sufficient to establish a concrete injury from alleged negative credit reporting following TransUnion;

4. [f]ailing to address or recommend a ruling on Defendants' Rule 12(b)(1) Motion to Dismiss with respect to Plaintiffs' claims under Judiciary Law § 487;

5. [f]inding that Plaintiffs satisfied their obligation to demonstrate they could be adequate and typical representatives of the putative class, where Plaintiffs each assert a different combination of legal claims and Plaintiffs are subject to unique defenses – including that none of the wrongful conduct they allege actually occurred in their individual collection actions;

6. [f]inding that Plaintiffs satisfied their obligation to show questions of law or fact common to the class that can be answered with common evidence and/or that common questions would predominate over questions requiring individual assessment, where Plaintiffs have not identified any common path or common evidence to evaluate: (i) whether the wrongful conduct alleged actually occurred in the collection actions against each putative class member, (ii) whether or how each putative class member was injured, or (iii) whether and for what period of time each putative class member can take advantage of equitable tolling to resurrect time-barred claims; and

7. [f]inding that a class action is the superior method of adjudicating Plaintiffs' claims and the claims of the putative class, instead of encouraging Plaintiffs and other defendants in collection actions to challenge conduct in the collection actions themselves rather than ignoring the actions and waiting years to raise speculative claims in a separate federal lawsuit.

(Def. Obj. (Dkt. No. 433) at 7-8)

### B. Plaintiffs' Objections

Plaintiffs object to Judge Moses' recommendation to "deny[ ] Rule 23(b)(2) injunctive relief addressing [c]lass members' creditworthiness harms." (Pltf. Obj. (Dkt. No. 434) at 6 (citing R&R (Dkt. No. 423) at 64-67)) According to Plaintiffs, "[t]he R&R incorrectly presumes that older instances of negative reporting cannot entail future risk of harm. But this overlooks the reality that any negative item on a credit report permanently lowers the credit score, which impedes access to credit unless resolved." (Id. (citation omitted) (citing R&R (Dkt. No. 423) at 64-67)) "All Plaintiffs and [c]lass members will, at some point soon, need to pay a utility bill, apply for a car loan, take out a mortgage, and so on. They are entitled to credit-score relief, and the only basis for denying this is a misunderstanding of the role that credit scores play in daily life." (Id.)

*6 Plaintiffs next contend that "the R&R wrongly recommends Rule 12(b)(1) dismissal of Plaintiffs' claims concerning the false statements by Defendants' debt collection attorneys and affiants in the underlying state-court actions." (Id. (citing R&R (Dkt. No. 423) at 34)) Plaintiffs argue that they have standing to bring these claims because "[b]oth the papers and the scheme itself meant negative legal consequences for Plaintiffs, which meet Article III's standing requirement of concrete harm." (Id. at 7)

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 147 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

Plaintiffs also object to Judge Moses' "finding that any Plaintiff lacks standing to assert claims against Defendants' negative credit-reporting where there is no affirmative evidence that credit bureaus transmitted this information to potential lenders." (Id. (citing R&R (Dkt. No. 423) at 34-38)) Plaintiffs contend that "[t]his ignores that everyone's credit score is readily available and affects myriad daily activities like how much a person pays in utility fees, car insurance, credit charges, and the like." (Id.)

Plaintiffs further contend that "the R&R should not have recommended certifying a single Rule 23(b)(3) class, rather than four classes reflecting each of the four Trust Defendants herein," and that "[t]his approach has several flaws, including ignoring the Trusts' chosen corporate form in a manner that is outside this Court's authority." (Id. (citing (R&R (Dkt. No. 423) at 62)))

Finally, Plaintiffs assert that "[t]he R&R did not address Plaintiffs' alternative request for an amended pleading in the event any claim is dismissed for lack of standing," and state that "[i]f this Court dismisses any of Plaintiffs' claims[,] Plaintiffs request leave to amend the complaint, as well as supplementation of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions with the credit bureaus about [c]lass members' tradelines." [3] (Id. at 16)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). " 'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.' " Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been

committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.' " Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS) (JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent ... that the party ... simply reiterates the original arguments, [courts] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343 (WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, ... rehashing ... the same arguments set forth in the original petition." (quotation marks and citations omitted)).

### B. Rule 12(b)(1) Motion to Dismiss

*7 "[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.' " APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)); see also Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 148 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

the evidence." (citing Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002))). "Under Rule 12(b)(1)[,] even 'a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient.' " Castillo v. Rice, 581 F. Supp. 2d 468, 471 (S.D.N.Y. 2008) (quoting Frisone v. Pepsico Inc., 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005)).

In considering a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004). " '[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " APWU, 343 F.3d at 623 (alteration in original) (quoting Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998)). The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but ... may not rely on conclusory or hearsay statements contained in the affidavits." J.S., 386 F.3d at 110; see also Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." (citing Makarova, 201 F.3d at 113)).

"A motion to dismiss a complaint for lack of standing is properly brought pursuant to Rule 12(b)(1) ... because it relates to the court's subject matter jurisdiction." ED Cap., LLC v. Bloomfield Inv. Res. Corp., 155 F. Supp. 3d 434, 446 (S.D.N.Y. 2016), aff'd in rel. part, 660 F. App'x 27 (2d Cir. 2016). " 'The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise.' " United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015) (quoting Kowalski v. Tesmer, 543 U.S. 125, 128 (2004)).

[T]he "irreducible constitutional minimum" of standing consists of three elements. Lujan[ v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)]. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

judicial decision. Id. at 560-[ ]61 ...; Friends of the Earth, Inc.[ v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)]. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 ... (1990).

*8 Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). The "elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court." Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

While courts "do not require that each member of a class submit evidence of personal standing," "no class may be certified that contains members lacking Article III standing." Denney v. Deutsche Bank AG, 443 F.3d 253, 263-64 (2d Cir. 2006). "The class must therefore be defined in such a way that anyone within it would have standing." Id. at 264.

### C. Motion for Class Certification

Fed. R. Civ. P. 23(a) sets forth the requirements for class certification and requires a potential class representative to show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

"If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222 (2d Cir. 2008), partially abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008). A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A class may be certified under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met." In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006). "[S]uch determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement." Id. "A motion for class certification should not, however, become a mini-trial on the merits." Katz v. Image Innovations Holdings, Inc., No. 06 Civ. 3707 (JGK), 2010 WL 2926196, at *2 (S.D.N.Y. July 22, 2010).

"The dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met." Lewis Tree Serv., Inc. v. Lucent Techs., Inc., 211 F.R.D. 228, 231 (S.D.N.Y. 2002). "The Rule 23 requirements must be established by at least a preponderance of the evidence," Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (citing Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)), and "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

## II. MOTION TO DISMISS

### A. The R&R

*9  In her R&R, Judge Moses concludes that

> none of the named [P]laintiffs has standing to pursue the FDCPA and GBL § 349 claims outlined in [the Consolidated Class Action Complaint] – based on specific false statements made in state court debt-collection proceedings – because no plaintiff has testified that he or she ever read and detrimentally relied on any of those statements.

R&R (Dkt. No. 423) at 34 (citing Def. Mot., Ex. A ("K. Seaman Dep.") (Dkt. No. 362-1) at 4-6; Def. Mot., Ex. B ("M. Seaman Dep.") (Dkt. No. 362-2) at 4-5; Def. Mot., Ex. C ("Bifulco Dep.") (Dkt. No. 362-3) at 3-4; Def. Mot., Ex. D ("Frauenhofer Dep.") (Dkt. No. 362-4) at 3-5; Def. Mot., Ex. E ("Tabar Dep.") (Dkt. No. 362-5) at 5-7)) She adds that "no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits." (Id. (citing Bifulco Dep. (Dkt. No. 362-3) at 4; Frauenhofer Dep. (Dkt. No. 362-4) at 5))

According to Judge Moses, "[a]bsent evidence of actual harm directly caused by one of the allegedly false statements that [D]efendants made in state court, [P]laintiffs lack standing to bring their FDCPA claims (or pendent state GBL § 349 claims) on that basis." (Id. (citing Rosenberg v. McCarthy, Burgess & Wolff, Inc., No. 21 Civ. 2199 (MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022); Ergas v. Eastpoint Recovery Grp., Inc., No. 20 Civ. 333S, 2022 WL 1471348, at *9 (W.D.N.Y. May 10, 2022), modified on reconsideration, 2022 WL 2128029 (W.D.N.Y. June 14, 2022)))

As to the FDCPA and GBL § 349 claims based on negative credit reporting, Judge Moses concludes that "[o]nly Bifulco[ ] ... testified that she had a 'low credit score' and paid a higher interest rate on a car loan and credits cards as a result of the National Collegiate Trust tradeline," and that "[t]he remaining [P]laintiffs have made no showing of either reputational or financial harm resulting from [D]efendants' negative credit-reporting, and therefore have no standing to sue [D]efendants for that conduct in this Court." (Id. at 34-35 (citing Bifulco Dep. (Dkt. No. 390-4) at 6-8; Grauman v. Equifax Info. Servs., LLC, 549 F. Supp. 3d 285, 292 (E.D.N.Y. 2021)))

Judge Moses finds that Bifulco has standing to sue for these claims because she "testified that the interest rate on [her car] loan was 16%, and that she was told by the dealership that 'absent the judgment being on [her] credit report,' the rate would have been six to seven percent." (Id. at 34 (second alteration in original) (quoting Bifulco Dep. (Dkt. No. 390-4) at 138)) "Her testimony thus establishes both concrete reputational harm, flowing from the 'dissemination' of the adverse credit report to the car dealership and credit card companies, and concrete financial harm, flowing from the higher interest rates that she actually paid as a direct result of [D]efendants' tradeline." (Id. at 34-35 (emphasis omitted) (citation omitted) (citing Krausz v. Equifax Info. Servs.,

LLC, No. 21 Civ. 7427 (KMK), 2023 WL 1993886, at *10 (S.D.N.Y. Feb. 14, 2023); Grauman, 549 F. Supp. 3d at 292))

**\*10** Judge Moses finds that "[a]lthough [P]laintiffs argue in broad terms that the tradelines resulting from [D]efendants' negative credit-reporting 'were included in credit reports on Plaintiffs that the bureaus disseminated during the [c]lass period,' the record simply does not substantiate that claim for any [P]laintiff other than Bifulco." (Id. at 38 (citations omitted) (citing Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 15 & n.16; Aug. 26, 2022 Pltf. Ltr. (Dkt. 420) at 2))

Since only Bifulco has demonstrated the necessary "concrete harm" to sue [D]efendants in federal court for reputational or financial injuries caused by their negative credit-reporting, only Bifulco has standing to sue for that harm. The remaining [P]laintiffs have demonstrated only "an inaccuracy in an internal credit file," which, "if it is not disclosed to a third party, causes no concrete harm."

(Id. (quoting TransUnion, 141 S. Ct. at 2210))

Judge Moses further concludes that "the named [P]laintiffs and the proposed class members have standing to sue with respect to the sham lawsuit scheme" alleged in the Consolidated Class Action Complaint. (Id. at 48) Judge Moses finds that

[g]iven the broad reach of the [FDCPA], district courts in [this] Circuit have repeatedly recognized that the type of conduct described in [the Consolidated Class Action Complaint] – filing deficient debt-collection lawsuits in bulk, without the intent or ability to prove their claims, in hopes of obtaining default judgments or extracting settlements from borrowers ill-equipped to defend themselves – violates [the] FDCPA as well as GBL § 349.

(Id. at 38-39) " '[T]here can be no doubt that false, deceptive, or misleading representations made by debt collectors to state courts with the power to enter judgments adverse to consumers have the ability to cause consumers severe harm.' " (Id. at 40 (quoting Toohey v. Portfolio Recovery Assocs.,

LLC, No. 15 Civ. 8098 (GBD), 2016 WL 4473016, at *8 (S.D.N.Y. Aug. 22, 2016)))

Those harms include: being subjected to a lawsuit that should never have been brought; suffering the entry of an adverse default judgment in such a lawsuit, followed in many cases by wage garnishment; and, for those consumers who fought back, incurring significant costs, both in time and money, to vacate improperly-obtained judgments.

(Id. (citing Pltf. Supp. Damages Br. (Dkt. No. 410) at 2)) Judge Moses finds that "[t]hese are all 'distinct and palpable' injuries in fact, 'fairly traceable' to the challenged action, and redressable in this forum," and that "these harms bear 'a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.' " (Id. at 41-42 (citation omitted) (quoting Denney, 443 F.3d at 263; TransUnion, 141 S. Ct. at 2204)) These traditionally recognized harms are "common-law 'unjustifiable litigation' torts such as civil malicious prosecution, abuse of process, and wrongful use of civil proceedings." (Id. at 42)

Judge Moses rejects Defendants' argument that "[P]laintiffs cannot bring these claims in federal court because they cannot 'establish a redressable concrete injury as required, especially in light of the Rooker-Feldman doctrine.' " (Id. at 40 (quoting Def. R. 12(b)(1) Supp. Br. (Dkt. No. 408) at 2)) In so concluding, Judge Moses notes that "the question whether Rooker-Feldman bars [P]laintiffs from relying on the garnishments for standing has already been decided by [this Court]." (Id. at 44-45) Judge Moses quotes from this Court's opinion granting in part and denying in part Defendants' earlier motion to dismiss: " 'The Court concludes that the Rooker-Feldman doctrine presents no obstacle to the claims of the Seaman Plaintiffs and the Bifulco Plaintiffs....' 'Wage garnishment is a pecuniary harm that satisfies the actual injury requirement.' " (Id. at 45 (quoting Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2, 419 F. Supp. 3d 668, 686-88, 709 (S.D.N.Y. 2019))) Given that there has been no change in the law regarding this issue, Judge Moses concludes that "there is no reason to reconsider [this Court]'s Rooker-Feldman analysis, which is ... law of the case." (Id. at 45)

*11 In any event, Judge Moses finds that this Court's analysis of the Rooker-Feldman issue "remains sound." (Id.) She notes that Plaintiffs "do not invite this Court to review or reject the state court judgments against them." (Id. (citing Pltf. Supp. Damages Br. (Dkt. No. 410) at 2-3)) Rather, "they bring 'claims sounding under the FDCPA ... and state law [that] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that [D]efendants pursued in obtaining such judgments.' " (Id. (alteration and omission in original) (quoting Michelo, 419 F. Supp. 3d at 687))

Judge Moses also rejects Defendants' argument that Plaintiff Tabar lacks standing because costs incurred in vacating a default judgement do not confer standing or suffice as actual damages. (Id. at 47) She reasons that "[w]here, as here, the [D]efendant[s'] actionable misconduct included bringing an improper lawsuit against the current [P]laintiff, that [P]laintiff's legal fees and related costs incurred in the prior action can constitute both a concrete injury that confers standing and (in most jurisdictions) a measure of the [P]laintiff's compensatory damages." (Id. (citing Restatement (Second) of Torts § 681))

### 1. Defendants' Objections

In their objections, Defendants contend that the R&R's finding that injuries related to the "sham lawsuit scheme" can provide a basis for standing "is inconsistent with the requirements of Article III injury following TransUnion and the boundaries of federal jurisdiction established by the Rooker-Feldman doctrine." (R&R (Dkt. No. 423) at 38; Def. Obj. (Dkt. No. 433) at 20) According to Defendants, (1) "the R&R erred in finding that the mere existence of a collection action against Plaintiffs, without more, could establish Article III standing following TransUnion"; (2) "the Court does not have jurisdiction to hear any claim for which the default judgments themselves are the only alleged injury"; and (3) "this Court lacks subject matter jurisdiction to hear Plaintiffs' claims based on any alleged 'sham lawsuit scheme,' and must dismiss." (Def. Obj. (Dkt. No. 433) at 22, 25)

In support of their lack of subject matter jurisdiction claim, Defendants rehash their argument that the Rooker-Feldman doctrine bars this Court from exercising jurisdiction over Plaintiffs' claims to the extent they are based on default judgments. (Compare Def. Supp. R. 12(b)(1) Br. (Dkt. No. 408) at 9 ("Here, because Plaintiffs' only injuries are based on

garnishments relating to alleged improper default judgments, this Court cannot redress Plaintiffs' injuries because, in order to do so, this Court would have to reverse or modify the state court judgments that authorized the garnishments. Said another way, the Court would need to conclude the default judgments were improper to remedy any alleged improper garnishments, something this Court clearly cannot do under Rooker-Feldman.") with Def. Obj. (Dkt. No. 433) at 24-25 ("The only alleged concrete injuries [P]laintiffs complain of are, or arise from, the default judgments. These alleged injuries are dependent on Plaintiffs' (unproven) contention that the default judgments are invalid or were wrongfully procured. However, Rooker-Feldman prohibits this Court from hearing claims that would require the Court to review, reject, and invalidate the default judgments. Plaintiffs fail to identify any concrete injury sufficient to satisfy Article III that is [redressable] by this Court." (footnote omitted)); and id. at 22 ("It is not difficult to see that a default judgment cannot be an injury unless it is invalid or flawed, and such injury cannot be redressed without review, rejection, and invalidation of the judgment. The Second Circuit has made clear Rooker-Feldman bars any claim where the judgment is the injury.")) Accordingly, the portions of the R&R addressing this argument will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. To the extent that Defendants object to the R&R's finding that the state court lawsuits themselves constitute an injury for standing purposes, the R&R will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

*12 Defendants also object to the R&R's finding that Plaintiff Bifulco has standing based on negative credit reporting. (Def. Obj. (Dkt. No. 433) at 25) Defendants argue that "the negative credit reporting complained of was based on the 'judgment being on [Plaintiff Bifulco's] credit report,' " and "to find harm flowing from the judgment necessitates finding the judgment invalid, which Rooker-Feldman prohibits." (Id. (alteration in original) (quoting Bifulco Dep. (Dkt. No. 390-4) at 8)) Defendants further argue that "there are no documents in the record to support Plaintiff Bifulco's self-serving testimony." (Id.) This objection will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Finally, Defendants complain that "the R&R only proceeded to analyze and recommend a resolution of Defendants' motion to dismiss as to the FDCPA and GBL claims," and that "[t]here is no reason to decline to resolve Defendants' motion to dismiss Plaintiffs' claims under Judiciary Law § 487." (Def. Obj. (Dkt. No. 433) at 26) According to

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 152 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

Defendants, "Plaintiffs lack standing to assert a Judiciary Law § 487 claim based on specific false or misleading statements for the same reasons the R&R recommends dismissal of the FDCPA and GBL claims based on specific false or misleading statements." (Id. (citing R&R (Dkt. No. 423) at 34)) "The Court should also dismiss all Plaintiffs' Judiciary Law § 487 claims for lack of Article III standing to the extent they are based on a 'sham lawsuit scheme.' " (Id.) This objection will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

## 2. Plaintiffs' Objections [4]

Plaintiffs object to Judge Moses' recommendation that "Plaintiffs' claims concerning the false statements by Defendants' debt collection attorneys and affiants in the underlying state-court actions" be dismissed. (Pltf. Obj. (Dkt. No. 434) at 10 (citing R&R (Dkt. No. 423) at 34)) They first argue that Judge Moses errs in analogizing their false statement claims "to those in 'letter cases,' in which FDCPA plaintiffs press claims based on a collection letter." Judge Moses "overlooks the distinguishing fact that courts have dismissed letter cases for lack of standing because the plaintiffs there never suffered legal consequences – such as a state-court collection action, as with Plaintiffs here." (Id. at 11 (emphasis omitted)) In this objection, Plaintiffs merely repeat the argument they made in their opposition papers that "Defendants inaptly rely on post-TransUnion letter cases, in which FDCPA plaintiffs who never got sued were denied standing." (See Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 8 (emphasis omitted))

*13  Plaintiffs next argue that "the R&R focuses solely on the absence of the first type of harm discussed by Rosenberg [v. McCarthy, Burgess & Wolff Inc., No. 21 Civ. 2199 (MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022)] (actual reliance by the plaintiff) but ignores the existence of the second type (legal consequences)." (Pltf. Obj. (Dkt. No. 434) at 11 (citing R&R (Dkt. No. 423) at 34)) They argue that "[b]ecause Defendants' various false statements in state court meant negative legal consequences for Plaintiffs, the R&R should not have recommended dismissing Plaintiffs' claims for lack of meaningful attorney review, false affidavits, or false complaints." (Id.) According to Plaintiffs, "[c]ourts in analogous cases have held that individuals like Plaintiffs suffer Article III injury where the defendant has filed a debt-collection lawsuit in state court, but its attorneys prosecuted the action without taking the time to review the claims and the papers submitted in state court." (Id.) (citing McCrobie

v. Palisades Acquistion XVI, LLC, No. 1:15 Civ. 00018 (LJV) (MJR), 2022 WL 1657226, at *8 n.10, 13 (W.D.N.Y. Mar. 4, 2022), report and recommendation adopted sub nom. McCrobie v. Palisades Acquisition XVI, LLC, 2023 WL 5317844 (W.D.N.Y. Aug. 18, 2023)) "[T]he R&R should have found that Defendants' false default-judgment affidavits are subject to claims for which Plaintiffs have standing," because "these affidavits trigger the negative 'legal' consequence of default judgment for individuals like Plaintiffs." (Id. at 12 (citing Rosenberg, 2022 WL 3030390, at *5; McCrobie, 2022 WL 1657226, at *13)) "The R&R's comparison of the[ ] [three] falsities" that Defendants' state-court complaints relied on – that "(1) [e]ach Trust is an 'original creditor,' when really it was an assignee; (2) [e]ach Trust must be paid the debt alleged, despite not first identifying which lender may have originated the underlying loan; [and] (3) [e]ach Trust is 'authorized to proceed' in state court, when really none is, for failure to register with the state" – "to the falsities in the letter cases, ignores the aggregate impact of Defendants' state-court filings." (Id. at 13 (citing R&R (Dkt. No. 423) at 34))

Because this objection repeats several arguments Plaintiffs made in their motion papers, including that alleged debtors suffer injuries when attorneys prosecuting a case do not review the claims and papers submitted (see Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 9-10 ("[T]he injury is even greater when the claims of indebtedness were pursued in state court without review of proof, as were Defendants' here.")), and that "Defendants' falsities furthered the actions that caused Plaintiffs the various harms clearly demonstrated by the evidence here." [5]  (Id. at 14)

Accordingly, the portions of the R&R addressing these arguments will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. The portions of the R&R addressing Plaintiffs' remaining argument – involving the "negative legal consequences" that Plaintiffs argue provide a basis for standing – will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Plaintiffs next object to the R&R's finding that "TransUnion and subsequent cases foreclose Plaintiffs' asserting credit-related harms, where there is no confirmative evidence that Defendants' negative reporting to credit bureaus was in turn passed to Plaintiffs' potential creditors." (Pltf. Obj. (Dkt. No. 434) at 14) They argue that the R&R "mistakenly relies on cases that did not involve debt collections, FDCPA or GBL claims, or violations connected to state-court actions." According to Plaintiffs, "[e]ach case cited by the R&R

Case 3:18-cv-00121-JFS-PJC     Document 232-13     Filed 02/24/26     Page 153 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

is distinguishable, as each involved claims against credit bureaus and/or original creditors for violations of the FCRA," and that "[t]he R&R's reliance on FCRA cases is inapt because the FDCPA uniquely extends special protections to victims of fraudulent debt collections, which Congress specifically identified as a problem necessitating heightened standards for the collections industry." (Id. (citing R&R (Dkt. No. 432) at 32-38)) Plaintiffs claim that Judge Moses erred in "refusing to credit the leading case on standing for FDCPA claims over negative credit-reporting in the debt-collection context" – Ewing v. MED-1 Solutions, LLC, 24 F.4th 1146 (7th Cir. 2022) – and "in rejecting the significance of the in-Circuit case In re Anderson, 641 B.R. 1 (Bankr. S.D.N.Y. 2022)." (Id. at 15) The portions of the R&R addressing these arguments will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

*14 Finally, Plaintiffs assert that "[t]he R&R did not address Plaintiffs' alternative request for an amended pleading in the event any claim is dismissed for lack of standing." Plaintiffs request leave to amend as to any dismissed claim, "as well as supplementation of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions with the credit bureaus about [c]lass members' tradelines." (Pltf. Obj. (Dkt. No. 434) at 16) Although Plaintiffs' objection repeats this argument in their opposition papers (see Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 18), the R&R did not address this argument. Accordingly, it will be considered de novo. See 28 U.S.C. § 636(b)(1)(C).

* * * *

Those portions of the R&R addressing standing to which Defendants and Plaintiffs have not objected will be reviewed only for clear error. See Gilmore, 2011 WL 611826, at *1.

**B. Analysis**

**1. Defendants' Objections**

According to Defendants, Judge Moses erred in finding that injuries related to the "sham lawsuit scheme" provide a basis for standing. Defendants contend that this finding "is inconsistent with the requirements of Article III injury following TransUnion and the boundaries of federal jurisdiction established by the Rooker-Feldman doctrine." (Def. Obj. (Dkt. No. 433) at 20) Defendants' arguments are not persuasive.

Defendants contend that "the mere existence of a collection action against Plaintiffs, without more, [cannot] establish Article III standing following TransUnion." (Id. at 22) But in making this argument, Defendants misconstrue the R&R's findings.

The R&R finds that the alleged harm suffered by Plaintiffs includes

> being subjected to a lawsuit that should never have been brought; suffering the entry of an adverse default judgment in such a lawsuit, followed in many cases by wage garnishment; and, for those consumers who fought back, incurring significant costs, both in time and money, to vacate improperly-obtained judgments.

(R&R (Dkt. No. 423) at 40) Judge Moses concludes that "[e]ach of the named [P]laintiffs was subjected to a wrongful lawsuit in which an adverse default judgment was entered." (Id.)

In sum, Judge Moses does not find that "the mere existence of a collection action against Plaintiffs, without more," establishes standing. Instead, Judge Moses concludes that because every named Plaintiff "was subjected to a wrongful lawsuit in which an adverse default judgment was entered," each has alleged a harm that gives rise to standing. This finding is consistent with applicable case law. See, e.g., Toohey, 2016 WL 4473016, at *4 n.5 ("[Plaintiff]'s allegation that the default judgment obtained against her was obtained improperly sufficiently alleges an 'injury-in-fact' so as to establish constitutional standing.").

Defendants further contend that, under Rooker-Feldman, "the Court does not have jurisdiction to hear any claim for which the default judgments themselves are the only alleged injury," and that "this Court lacks subject matter jurisdiction to hear Plaintiffs' claims based on any alleged 'sham lawsuit scheme.' " (Def. Obj. (Dkt. No. 433) at 22-25) The R&R correctly concludes, however, that "[w]hile TransUnion required the lower federal courts to rethink the 'concrete-harm requirement' of standing, it did not alter the 'redressability' analysis, and said nothing at all about Rooker-

2023 WL 6290622

Feldman." (R&R (Dkt. No. 423) at 45 (citation omitted) (citing TransUnion, 141 S. Ct. at 2204)) "Consequently, there is no reason [for this Court] to reconsider [its] Rooker-Feldman analysis [as set forth in the October 11, 2019 memorandum opinion and order], which is ... law of the case." (Id.) In the October 11, 2019 memorandum opinion and order, this Court concluded that "the Rooker-Feldman doctrine presents no obstacle to the claims of the Seaman Plaintiffs and the Bifulco Plaintiffs" because – as in analogous cases – " '[P]laintiffs assert claims independent of the state-court judgments and do not seek to overturn them.' " (Oct. 11, 2019 Mem. Op. & Order (Dkt. No. 109) at 17-18 (quoting Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 94 (2d Cir. 2015) ("Sykes III"); citing Toohey, 2016 WL 4473016, at *4))

*15  Judge Moses finds that this Court's "analysis remains sound." (R&R (Dkt, No. 423) at 45) "Plaintiffs here do not invite this Court to review or reject the state court default judgments against them," and "they bring 'claims sounding under the FDCPA ... and state law [that] speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that [D]efendants pursued in obtaining such judgments.' " (Id. at 45 (omission and first alteration in original) (quoting Michelo, 419 F. Supp. 3d at 687)) This Court finds no error in Judge Moses' analysis. Accordingly, Defendants objections are overruled.

As to Judge Moses' finding that Plaintiff Bifulco has standing with respect to negative credit reporting, Defendants argue that "the negative credit reporting complained of was based on 'the judgment being on [Plaintiff Bifulco's] credit report,' " and "to find harm flowing from the judgment necessitates finding the judgment invalid, which Rooker-Feldman prohibits." (Def. Obj. (Dkt. No. 433) at 25 (quoting Bifulco Dep. (Dkt. 390-4) at 8)) For the reasons stated above, however, Defendants' invocation of the Rooker-Feldman doctrine is unavailing.

As to Defendants' complaint that "there are no documents in the record to support Plaintiff Bifulco's self-serving testimony" (id.), the short answer is that Bifulco's testimony is sufficient at this stage to show reputational and financial harm.[6] Bifulco testified that, as a result of Defendants' dissemination of negative credit information concerning her, she suffered a "[l]ow credit score," which resulted in "[h]igher interest rates" on her credit cards and on a car loan. She was charged 16% interest on her car loan; the dealership told her that – but for the judgment on her credit report –

she would have been charged 6-7%. (See Bifulco Dep. (Dkt. 390-4) at 6-8) In sum, Bifulco adequately pleads financial and reputational harm resulting from the negative credit report. Defendants' objection is overruled.

Defendants also complain that Judge Moses did not "resolve [their] motion to dismiss Plaintiffs' claims under Judiciary Law § 487." (Def. Obj. (Dkt. No. 433) at 26) Plaintiffs respond that "[t]he R&R did properly analyze these claims," and assert that "[t]his Court should confirm standing for ... these claims." (Pltf. Resp. (Dkt. No. 437) at 30)

In their moving papers, Defendants do not separately address Plaintiffs' Judiciary Law claims. Instead, in arguing that Plaintiffs lack standing, Defendants group Plaintiffs' Judiciary Law claims with their FDCPA and GBL claims. Having said that, Defendants clearly request that the Court dismiss "Plaintiffs' Section 487 claims in their entirety for failure to adequately establish Article III standing." (Def. R. 12(b)(1) Br. (Dkt. No. 372) at 11; see also id. at 7 (arguing that Plaintiffs lack Article III standing to pursue their claims based on allegedly false information in state court filings, and citing Plaintiffs' Judiciary Law claims))

*16  The R&R states that "[a]ll of [P]laintiffs' claims based [on specific false statements made in state court debt-collection proceedings, under both the FDCPA and GBL § 349], should be dismissed, along with the claims of [P]laintiffs K. Seaman, M. Seaman, Tabar, Butry, and Frauenhofer based on [negative credit reporting, under both the FDCPA and GBL § 349]. The motion to dismiss should otherwise be denied." (R&R (Dkt. No. 423) at 67 (emphasis omitted)) Read in context, it is thus clear that Judge Moses recommends that Defendants' motion to dismiss Plaintiffs' Judiciary Law claims be denied.

As to Judge Moses' reasoning, the R&R states that "this Court has already held that the costs incurred by Tabar in vacating the default judgment against her are compensable as damages for purposes of her [Judiciary Law] § 487 claim against Forster [& Garbus]. It would be an odd result indeed if that same injury failed even to provide her with standing to sue the remaining [D]efendants." (See id. at 48 (citation omitted) (citing Michelo, 419 F. Supp. 3d at 714 n.29))

Section 487 of the Judiciary Law provides that:

An attorney or counselor who:

Case 3:18-cv-00121-JFS-PJC     Document 232-13     Filed 02/24/26     Page 155 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Jud. Law § 487. "Section 487 thus permits a civil action to be maintained by any party who is injured by an attorney's intentional deceit or collusion in New York on a court or on any party to litigation, and it provides for treble damages." Amalfitano v. Rosenberg, 533 F.3d 117, 123 (2d Cir. 2008), certified question accepted, 11 N.Y.3d 728 (2008), certified question answered, 12 N.Y.3d 8 (2009). "The act of deceit need not occur during a physical appearance in court; the statute applies to any oral or written statement related to a proceeding and communicated to a court or party with the intent to deceive." Id.

As Defendants acknowledge, "Plaintiffs' claims under Judiciary Law § 487 are based on nearly identical allegations and the same theories of injury as their FDCPA and GBL claims." (Def. Obj. (Dkt. No. 433) at 26 (citing Consol. Cmplt. (Dkt. No. 124) ¶¶ 274, 280, 284)) Plaintiffs allege that "Forster [& Garbus] violated New York Judiciary Law § 487 by engaging in a chronic, persistent pattern of conduct with the intent to deceive consumer-defendants and multiple New York courts." (Consol. Cmplt. (Dkt. No. 124) ¶ 284) Plaintiffs further allege that Forster & Garbus' violations "include but are not limited to":

a. commencing actions against consumers on behalf of a Trust Defendant without sufficient factual basis, yet backed by an attorney's Rule 130 certifications falsely stating that, to the best of his or her knowledge, and after an inquiry "reasonable under the circumstances," the complaint and the contentions therein were not frivolous;

b. filing complaints against consumers that falsely stated that a Trust Defendant was the "original creditor" with respect to the student loan at issue in the action;

c. filing complaints against consumers that falsely stated that a Trust Defendant was "authorized to proceed with th[e] action";

d. filing default judgment applications on behalf of a Trust Defendant without reasonable inquiry into the validity of the claims made against the consumer-defendant; and,

**\*17** e. submitting default judgment affidavits on behalf of a Trust Defendant where the affiant falsely attested to personal knowledge of proof of indebtedness.

(Id. (alteration in original)) Because Plaintiffs' Judiciary Law claims are premised on the same conduct as Plaintiffs' FDCPA and GBL § 349 claims based on (1) specific false statements made in state court debt-collection proceedings, and (2) the alleged sham lawsuit scheme, this Court finds that the same analysis applies to Plaintiffs' FDCPA, GBL § 349, and Judiciary Law claims. This Court further concludes that (1) Plaintiffs lack standing to assert Judiciary Law claims based on specific false or misleading statements for the same reasons that Plaintiffs lack standing to assert FDCPA and GBL claims based on these statements; and (2) Plaintiffs have standing to assert their Judiciary Law claims based on the alleged sham lawsuit scheme for the same reasons Plaintiffs have standing to assert FDCPA and GBL claims based on this alleged scheme. (See R&R (Dkt. No. 423) at 34, 38-48) Accordingly, Defendants' motion to dismiss Plaintiffs' Judiciary Law claims will be granted in part and denied in part.

## 2. Plaintiffs' Objections

As to Plaintiffs' standing to bring FDCPA and GBL § 349 claims based on Defendants' allegedly false statements made in state court proceedings, Judge Moses finds that "none of the named [P]laintiffs has standing[,] ... because no [P]laintiff has testified that he or she ever read and detrimentally relied on any of those statements," and "no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits." (R&R (Dkt. No. 423) at 34)

Plaintiffs object, arguing that "[b]ecause Defendants' various false statements in state court meant negative legal consequences for Plaintiffs, the R&R should not have recommended dismissing Plaintiffs' claims for lack of meaningful attorney review, false affidavits, or false

complaints." (Pltf. Obj. (Dkt. No. 434) at 11) In objecting, however, Plaintiffs misstate the standard for establishing standing. A plaintiff does not establish standing merely by alleging that he or she has suffered a legal consequence from a defendant's actions. [7] "[U]nder Article III, an injury in law is not an injury in fact," and "[o]nly those plaintiffs who have been <u>concretely</u> <u>harmed</u> by a defendant's statutory violation may sue that private defendant over that violation in federal court." <u>TransUnion</u>, 141 S. Ct. at 2205 (emphasis in original); <u>see also</u> <u>Maddox v. Bank of New York Mellon Tr. Co., N.A.</u>, 19 F.4th 58, 64 ("<u>Maddox II</u>") (2d Cir. 2021) ("<u>TransUnion</u> established that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no standing.' " (quoting <u>TransUnion</u>, 141 S. Ct. at 2214)).

*18  Plaintiffs argue, however, that the legal consequences they have alleged suffice to establish standing. With respect to "[t]he [alleged] Article III injury resulting from no-review collection suits," Plaintiffs contend that "[t]he concreteness of the violations is especially profound in New York, where state law requires that attorneys like Defendant Forster [& Garbus] certify meaningful review in prosecuting suits like those against Plaintiffs." (Pltf. Obj. (Dkt. No. 434) at 12 (citing 22 N.Y. C.R.R. § 130-1.1)) Plaintiffs further contend that "[f]or largely the same reasons, Plaintiffs also have standing to pursue their claims concerning the false default-judgment affidavits signed by TSI-employed affiants." (Id.) "Under state law, such affidavits are a prerequisite for default judgment – and require the affiant to attest to personal knowledge and review of the facts of the debt alleged.... [T]hese affidavits [thus] trigger the negative 'legal' consequence of default judgment for individuals like Plaintiffs." (Id. (citing N.Y. C.P.L.R. § 3215; <u>Rosenberg</u>, 2022 WL 3030390, at *5))

These arguments do not demonstrate that Plaintiffs have suffered the type of concrete injury necessary to establish standing. Plaintiffs describe statutory violations, without alleging concrete harm that occurred as a result of the statutory violation. The R&R correctly concludes that Plaintiffs lack standing to bring claims "based on specific false statements made in state court debt-collection proceedings [ ] because no [P]laintiff has testified that he or she ever read and detrimentally relied on any of those statements," and "no [P]laintiff has testified that he or she took or forbore from any action in reliance on any of the specific statements made in [D]efendants' pleadings or affidavits." (R&R (Dkt. No. 423) at 34)

While Plaintiffs argue that default judgments are the concrete injury they suffered, this Court is now addressing claims premised merely on Forster & Garbus' failure to review collection suits and on TSI's filing of false affidavits. The alleged failure to review and the mere filing of the alleged false affidavits did not cause concrete harm to Plaintiffs. And to the extent that Plaintiffs argue that the default judgments constitute the concrete harm, this Court has accepted Judge Moses' recommendation that those claims should proceed pursuant to Plaintiffs' sham lawsuit theory. (See id. at 48 ("[W]hile none of the [P]laintiffs has standing to sue with respect to the specific false representations ..., and only Bifulco has standing to sue with respect to the negative credit-reporting ..., each named [P]laintiff – and, by definition, each member of the proposed classes – has been subjected to a lawsuit that should never have been brought, in which a default judgment was entered.... [T]he named [P]laintiffs and the proposed class members have standing to sue with respect to the sham lawsuits alleged in [the Consolidated Class Action Complaint].''))

Plaintiffs also contend that "[e]ven if any of the falsities [in the state court complaints] were acceptable on its own – which none is – this wouldn't excuse the illegality of using them in combination." (Pltf. Obj. (Dkt. No. 434) at 13) According to Plaintiffs, "[d]ebt-collection schemes like Defendants' enjoy a kind of positive feedback loop: more falsities about entitlement to judgment, in more suits, mean more judgments, and more money, continuing and growing the cycle. Such schemes can be nearly as harmful to local court systems as to consumers alone." (Id. at 13-14)

Plaintiffs again ignore the applicable legal standard. The Article III standing analysis does not consider harm "to local court systems" or "to consumers" that are not involved in the case. As discussed above, Plaintiffs must show – but have not shown – that they suffered concrete harm merely as a result of false statements they allege were made by Defendants in state court proceedings.

Accordingly, this Court overrules Plaintiffs' objection to the R&R's recommendation that Plaintiffs' claims concerning the false statements in the underlying state court actions be dismissed.

*19  Plaintiffs next object to the R&R's finding that "<u>TransUnion</u> and subsequent cases foreclose Plaintiffs' asserting credit-related harms[ ] where there is no

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 157 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

confirmative evidence that Defendants' negative reporting to credit bureaus was in turn passed to Plaintiffs' potential creditors." (Pltf. Obj. (Dkt. No. 434) at 14 (citing R&R (Dkt. No. 423) at 32-38))

Plaintiffs have not pled facts demonstrating that negative credit information was disseminated to a third party, other than as to Bifulco in connection with her car loan. Although Plaintiffs argue that "Defendants' liability attached the moment Defendants disseminated the [negative credit] information to a third party," and that the "tradelines" resulting from the negative credit reporting "were included in credit reports on Plaintiffs that the bureaus disseminated during the [c]lass period" (Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 15), "the distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor[ ] ... does not constitute or cause concrete injury for standing purposes." Campbell v. Portfolio Recovery Assocs, LLC, 21 Civ. 1322 (PKC) (RML), 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022); see also Grauman, 549 F. Supp. 3d at 292 ("[T]he lack of dissemination of [Plaintiff's] credit report renders him unable to adequately allege a concrete injury."). As in Maddox II, although Plaintiffs other than Bifulco "may have suffered a nebulous risk of future harm" by having negative credit information included in their credit reports, "that risk, which was not alleged to have materialized, cannot not form the basis of Article III standing." 19 F.4th at 65. Accordingly, Plaintiffs' objection is overruled. [8]

*20 Finally, Plaintiffs complain that Judge Moses "did not address Plaintiffs' alternative request for an amended pleading in the event any claim is dismissed for lack of standing." Plaintiffs seek leave to amend as to any dismissed claim, "as well as supplementation of the previously ordered [c]lass-sampling discovery, to incorporate Defendants' interactions with the credit bureaus about [c]lass members' tradelines." (Pltf. Obj. (Dkt. No. 434) at 16)

This objection is overruled, and the request for leave to amend and discovery will be denied. Even if Plaintiffs showed that Defendants disseminated Plaintiffs' tradelines to credit bureaus, "the distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor[ ] ... does not constitute or cause concrete injury for standing purposes." Campbell 2022 WL 657225, at *2. Given that Plaintiffs have not offered evidence that the credit bureaus disseminated the negative credit information to potential creditors, Plaintiffs' requested amendment would be futile. See O'Shea v. P.C. Richard & Son, LLC, No. 15 Civ. 9069

(KPF), 2017 WL 3327602, at *8 (S.D.N.Y. Aug. 3, 2017) ("Because Plaintiff['s] ... proposed amendments would be insufficient to confer Article III standing, they are futile and Plaintiff['s] ... request to amend is denied."). [9]

## III. MOTION FOR CLASS CERTIFICATION

### A. The R&R
In her R&R, Judge Moses recommends that this Court

> certify one class, pursuant to Rule 23(b)(3), comprised of all persons who have been sued in New York State court debt collection lawsuits from November 1, 2012 through February 27, 2018, where the plaintiff was one of the Trust Defendants, with TSI-NCO acting as servicing agent and Forster [& Garbus] as plaintiff's counsel, and where a default judgment was obtained, but excluding any individual who appeared in state court to defend themselves and against whom the Trust Defendant named as plaintiff was awarded a judgment on the merits.

(R&R (Dkt. No. 423) at 67-68 (emphasis omitted)) Judge Moses further recommends that "[P]laintiffs K. Seaman, M. Seaman, Tabar, Butry, Bifulco, and Frauenhofer be appointed [c]lass [r]epresentatives (although [P]laintiffs neglected to ask for this relief), and that Frank LLP be appointed [c]lass [c]ounsel." (Id. at 68)

Judge Moses finds that the requirements of Fed. R. Civ. P. 23(a) are satisfied here. As to numerosity, Judge Moses finds that, when "narrowed (for Rule 23(b)(3) purposes) to those who had default judgments entered against them, the proposed class consists of roughly 3,183 members," and that accordingly "[n]umerosity has been adequately established." (Id. at 50-51)

*21 As to commonality, Judge Moses finds that

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 158 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

in this case, all members of the proposed classes were named in sham lawsuits, which were filed and litigated in accordance with a unified playbook authored (literally) by NCI-TCO and carried out by its Affiants and by Forster [& Garbus]. Additionally, all of the members of the proposed Rule 23(b)(3) class were injured by the resulting, wrongfully-procured default judgments. Although the alleged scheme had several interrelated components – including boilerplate complaints, never meaningfully reviewed by the attorneys who signed them, that falsely alleged that the Trust Defendant named as plaintiff was the "original creditor" on the loan and was "authorized to proceed" in state court, and deceptive affidavits, signed by Affiants who routinely attested to "personal knowledge" of chain-of-title documents they had not actually reviewed – [P]laintiffs have shown that [D]efendants engaged in a "unitary course of conduct" leading to the injuries alleged.

(Id. at 52) Judge Moses further finds that "[P]laintiffs have demonstrated a 'unitary course of conduct,' applicable to all class members, which presents common questions of fact, subject to common proof, which will generate common answers and are thus 'capable of classwide resolution.' " (Id. at 53 (citation omitted) (quoting Sykes III, 780 F.3d at 84; Wal-Mart Stores, Inc., 564 U.S. at 350)) For the same reasons, Judge Moses "conclude[s] that typicality has also adequately been established." (Id. at 57)

As to adequacy, Judge Moses finds that "all of the named [P]laintiffs have standing – and thus have 'live' claims – with respect to the sham lawsuit scheme alleged in [the Consolidated Class Action Complaint]." (Id. at 58) According to Judge Moses, "[t]hese claims are also suitable for litigation on a class basis, as they can be pursued against the Trust Defendants under GBL § 349; against TSI-NCO under [the] FDCPA and GBL § 349; and against Forster [& Garbus]

under [the] FDCPA, GBL § 349, and [Judiciary Law] § 487," and "all putative class members would qualify for statutory damages under [the] FDCPA and GBL § 349." (Id.) Although "only one plaintiff – Bifulco – has a 'live' claim with respect to [D]efendants' negative credit-reporting, as to which she could, in theory, seek damages not available to the other named [P]laintiffs or the class," Judge Moses "do[es] not view that as a disabling conflict, because it does not render Bifulco's interests 'antagonistic' to those of other [P]laintiffs." (Id. at 58 n.33) "Further, it is by now well-settled that liability under [the] FDCPA can be established 'irrespective of whether the presumed debtor owes the debt in question.' " (Id. at 58 (quoting Sykes III, 780 F.3d at 83)) Accordingly, "[D]efendants' contention that some of the named [P]laintiffs 'owed the debts' – and indeed acknowledged them when they filed for personal bankruptcy – does not give rise to a defense, much less a unique defense, to their FDCPA claims." (Id. at 59 (citations omitted) (quoting Def R. 23 Opp. (Dkt. No. 323) at 28, 30-32)) And "Defendants do not raise, and [Judge Moses] has not identified, any basis upon which to question the qualification and experience of [P]laintiffs' counsel." (Id.)

**\*22** Finally, Judge Moses finds that "ascertainability is not a barrier to certification of the proposed classes here," because

Plaintiffs' class discovery, based on a sampling of 5% of the putative class members sued in New York, shows that [P]laintiffs can easily identify which individuals fall within the proposed ... class definitions, i.e., which persons have been sued by [D]efendants in a New York State court and have had default judgments entered against them in those suits.

(Id. (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 38-39))

As to Fed. R. Civ. P. 23(b), Judge Moses finds that "Rule 23(b)(3)'s predominance requirement is met because the key issues – indeed, virtually all of the liability issues – are susceptible of generalized proof applicable to all putative class members, and there is little chance 'that individual issues will overwhelm the common questions.' " (Id. at 60 (quoting In re NASDAQ Market-Makers Antitr. Litig., 169 F.R.D. 493, 517 (S.D.N.Y. 1996))) "Nor are [P]laintiffs

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 159 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

required to propose, prior to certification, 'a common method for determining ... to what degree any individual Plaintiff or putative class member was damaged by the alleged misconduct.' " (Id. (omission in original) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 37)) Judge Moses explains that "[i]n a consumer debt case, where statutory damages are available under both federal and state law, '[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.' " (Id. (second alteration in original) (citations omitted) (citing 15 U.S.C. § 1692k(a)(2)(A)–(B); GBL § 349(h); quoting Sykes III, 780 F.3d at 88))

As to superiority, Judge Moses finds that "a class action 'is, without question, more efficient than requiring thousands of debtors to sue individually,' whether in state or in federal court." (Id. at 62 (quoting Sykes v. Mel Harris & Assocs., LLC, 285 F.R.D. 279, 294 (S.D.N.Y. 2012) ("Sykes II"), aff'd sub nom. Sykes III, 780 F.3d 70 (2d Cir. 2015))) She further finds that "[c]ertifying a class is ... consistent with the remedial purpose of [the] FDCPA, which requires the courts to construe its terms 'in liberal fashion if the underlying Congressional purpose is to be effectuated.' " (Id. at 62 (quoting Hart v. FCI Lender Servs., Inc., 797 F.3d 219, 225 (2d Cir. 2015))) She adds that "[i]f, as [D]efendants contend, they 'can show they unequivocally had the proper documentation in their possession' when they defaulted the class members, they can – and no doubt will – make that showing on a classwide basis in this Court." (Id. (citation omitted) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 43))

Judge Moses finds, however, that "[P]laintiffs' request that the Court certify four Rule 23(b)(3) classes, on a per-Trust basis, appears to be motivated simply by [P]laintiffs' desire to circumvent the $500,000-per-class statutory damages cap under [the] FDCPA." (Id. (emphasis omitted) (citing 15 U.S.C. § 1692k(a)(2)(B))) "As a matter of logic, it cannot be the case that common questions of fact and law predominate here to the degree required to justify class certification – except that 'each Trust is its own legal entity, with its own distinct facts,' necessitating the multiplication of classes," as Plaintiffs contend. (Id. at 63 (citation omitted) (quoting Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 10)) To the contrary, "Plaintiffs have shown (and [D]efendants have largely conceded) that TSI-NCO litigated on behalf of all four Trust Defendants in exactly the same way, using the same Affiants, the same outside counsel, and the same training and instruction materials (the Procedure and the [Standard Operating Procedure manual]) across New York

State," and "[P]laintiffs do not point to any actual variation in the alleged scheme, or the evidence needed to prove it, between one Trust Defendant and another." (Id.) Although "each class member can recover damages against only one Trust Defendant – the one that sued that member, ... it is sufficient, for certification purposes, that 'for every named [d]efendant there ... be at least one named plaintiff who can assert a claim directly against that defendant.' " (Id. (second omission in original) (quoting NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 159 (2d Cir. 2012))) "Beyond that, the necessary computations (to ensure that each [P]laintiff's damage award is assessed against the correct Trust Defendant) can easily be performed within the confines of a single class." Accordingly, Judge Moses finds that Plaintiffs are entitled to certification of one class under Rule 23(b)(3). (Id.)

**\*23** As to certification under Rule 23(b)(2), Judge Moses finds that "[P]laintiffs' efforts to certify a Rule 23(b)(2) class founder on the issue of standing." (Id. at 65) "The proposed class seeks relief only pursuant to GBL § 349, and only with respect to [D]efendants' negative credit-reporting." (Id.)

> It thus appears that [P]laintiffs seek both a prohibitory injunction (preventing [D]efendants from credit-reporting debts "without possession or review of proof thereof") and a mandatory injunction (requiring [D]efendants to "instruct" the credit bureaus and FICO to remove the tradelines relating to the student loan debts they attempted to collect), both targeted narrowly to the harm allegedly caused by [D]efendants' negative credit-reporting.

(Id. at 65-66) "[O]nly one of the named [P]laintiffs – Bifulco – has standing to seek damages related to [D]efendants' negative credit-reporting," however, and "[e]ven Bifulco[ ] ... lacks standing to seek prospective relief on her credit-reporting claim, because the risk of future harm from this species of misconduct is neither imminent nor substantial." (Id. at 66 (emphasis omitted))

Although "Plaintiffs point out that there is no confirmation in the record that [D]efendants have 'requested tradeline removals' for the entire class, ... this does not help them get a Rule 23(b)(2) class certified." (Id. (quoting Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 17)) According to Judge Moses,

> [P]laintiffs have shown – at best – that some members of the proposed class might still have default

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 160 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

judgments or negative tradelines affecting their credit scores as a result of [D]efendants' allegedly unlawful debt collection efforts, which puts them at risk of future harm should that information be disseminated to potential creditors. This is not sufficient.

(Id. at 67 (emphasis omitted)) "Nor may [P]laintiffs rely for standing on the risk that [D]efendants will initiate new debt-collection lawsuits against them, or other members of the putative class, 'without possession or review' of the necessary proof of indebtedness," because "[b]oth TSI-NCO and Forster [& Garbus] are now enjoined from engaging in that conduct." (Id.) For all of these reasons, Judge Moses concludes that "[P]laintiffs cannot show that they face an 'imminent and substantial' risk of harm, either from the lingering effects of [D]efendants' past conduct or from any future repetition of that conduct." (Id. (quoting TransUnion, 141 S. Ct. at 2210))

### 1. Plaintiffs' Objections

According to Plaintiffs, Judge Moses "erred in recommending denying Plaintiffs injunctive relief under Rule 23(b)(2) for the harm caused by Defendants' improper credit-reporting lowering Plaintiffs' credit scores," because "[c]redit scores are used constantly throughout daily life," "Plaintiffs will always need necessities like cars, housing, credit cards, and other goods and services that require a credit score check," and "[l]ower credit scores cause actual or imminent harms that are not hypothetical or conjectural and automatically translate into permanently higher interest rates and other burdens." (Pltf. Obj. (Dkt. No. 434) at 8 (emphasis omitted) (citing R&R (Dkt. No. 423) at 64-67)) "The R&R mistakenly assumes that past negative credit-reporting eventually ceases to cause harm to an individual's reputation for creditworthiness," "fails to address the permanent harm to Plaintiffs' credit scores," and "compounds this mistake by focusing on the now years-old vintage of Plaintiff Bifulco's evidence concerning inability to obtain a loan for an automobile on favorable terms due to Defendants' negative reporting." (Id. at 8-9 (citing R&R (Dkt. No. 423) at 64-67))

**\*24** Plaintiffs contend that

[t]he fact [that Bifulco's loan experience] happened years ago is irrelevant – what [matters] is that every [c]lass member eventually will have their credit score assessed when they purchase a car or home, rent an apartment, sign up for a utility, apply for a credit card, and so on. When that happens, each will be relying on a credit score that would have been higher but for Defendants' violations.

(Id. at 9 (emphasis omitted)) Plaintiffs go on to assert that they "have alleged a continuing harm in the form of forever lowered credit scores that are used extensively, unavoidably, in everyone's daily life." (Id. at 10)

Plaintiffs also complain that Judge Moses erred in rejecting their request for "four Rule 23(b)(3) classes or subclasses, one for each of the four Trust defendants." (Id. at 16) (citing R&R (Dkt. No. 423) at 62-63)) "[T]he R&R overlooks the text of the FDCPA, which, unlike other statutes, does not prohibit multiple classes," and "mistakenly relies on precedent from securities litigation, where there is no basis [for certifying] multiple classes." (Id. (citing R&R (Dkt. No. 423) at 63))

These objections will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

### 2. Defendants' Objections

Defendants contend that Plaintiffs' claims are not susceptible to common proof. (Def. Obj. (Dkt. No. 433) at 27) In this regard, Defendants maintain that "[t]he R&R focused on ... technical disputes" – "such as whether the Trust Defendants were required to register to do business in New York in order to be 'authorized to proceed' on collection of Plaintiffs' unpaid debts and whether certain Pool Supplements and Schedules are legally sufficient to establish chain of title" [10] – "and found that many of them were 'well-suited to classwide resolution.' " (Id. at 27-28 (citing R&R (Dkt. No. 423) at 55)) But "[t]hese types of technical issues ... cannot form the basis for class certification because the R&R dismissed Plaintiffs' claims based on false or misleading statements." (Id. at 28)

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

**\*25** In connection with their common proof arguments, Defendants next contend that, "[t]o succeed on their claims, Plaintiffs and each member of the class must demonstrate that the problems they contend were rampant in collection actions brought by Defendants actually occurred in the specific collection actions brought against Plaintiffs." (Id. (emphasis omitted)) Although "Plaintiffs and the R&R suggest this question can be determined with common evidence, pointing to 'written training and instructional materials,' " Defendants argue that "written training and instructional materials would not establish what an affiant actually looked at before signing an affidavit in each individual Plaintiff's collection proceedings." Rather, "[t]hat would require an individualized, case-specific inquiry." (Id. (quoting R&R (Dkt. No. 423) at 55-56))

Defendants further contend that "the R&R's assumption that it would be possible to determine the necessary chain of title 'for all of the loans ..., not just for one or two' from common evidence in the form of Pool Supplements and Schedules is factually incorrect." (Id. at 29 (omission in original) (citation omitted) (quoting R&R (Dkt. No. 423) at 55)) According to Defendants, "[e]ach Trust Defendant acquired pools of loans from multiple originating lenders through multiple different Pool Supplements and Schedules," which means that "subsets of putative class members will need to rely on different documentation to substantiate claims against the same Trust Defendant." (Id.) "Thus, contrary to the R&R's suggestion, there is no common evidence that could generate common answers to the question of whether the appropriate Trust Defendant had authority to collect on each putative class member's loan." (Id.)[11]

Defendants' objections with respect to common proof will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Defendants further argue that individual issues will predominate: "For the same reasons that Plaintiffs' claims are not susceptible to common proof, the individual issues associated with determining whether the alleged patterns of wrongful conduct were actually at play in any class member's collection proceedings will predominate over any common proof of the alleged patterns of wrongful conduct themselves." (Def. Obj. (Dkt. No. 433) at 32 (citation omitted)) According to Defendants, "individual mini-trials will be necessary to determine whether any allegedly wrongful collection conduct actually occurred in each putative class member's case, as well as whether

and how each putative class member was injured," and "[t]hese individualized inquiries will predominate over any alleged patterns susceptible to common proof." (Id. at 32-33) Defendants also assert that "equitable tolling issues [require] a highly individualized inquiry focused on each Plaintiff's diligence, and what they knew, when," and that "for nearly all class members, the Court will need to conduct individual mini-trials to determine whether and to what extent equitable tolling applies to their claims." (Id. at 33)[12]

**\*26** Defendants' arguments regarding the equitable tolling issues echo their arguments in their opposition papers. (See, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 44 ("Here, Plaintiffs cannot establish entitlement to equitable tolling on a class-wide basis given the individualized inquiry necessary to determine due diligence or whether a class member was aware of his or her potential claims before the limitations. These individualized inquiries will require numerous mini-trials on each putative class members' subjective state of mind and knowledge of their student loan, rendering the case unmanageable as a class action.")) Accordingly, the portions of the R&R addressing Defendants' equitable tolling arguments will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211. The portions of the R&R addressing Defendants' remaining predominance arguments will be reviewed de novo. See 28 U.S.C. § 636(b)(1)(C).

Defendants next argue that Plaintiffs are not adequate class representatives. (Def. Obj. (Dkt. No. 433) at 30) According to Defendants, the surviving claims "have different elements, allow for different types of damages, and are available against different Defendants," rendering the named Plaintiffs inadequate representatives of a class. (Id.) "Plaintiffs are also not adequate class representatives because their claims are subject to unique defenses." In particular, "[t]he evidence shows that the Trust Defendants can establish that Plaintiffs absolutely owed the debts that were the subject of their collection actions and that the debts were in fact owned by the Trust Defendants." And although the R&R "find[s] that ownership of a debt is not a defense to an FDCPA claim," it "does not explain how these facts do not create serious adequacy problems under the other claims brought by Plaintiffs (under GBL § 349 and Judiciary Law § 487)." (Id. at 31) Because in this objection Defendants repeat arguments made in their opposition brief (see, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 27 ("Plaintiffs are not adequate class representatives because each of them has an interest in pursuing different combinations of the three causes of action brought in the Complaint, which creates

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 162 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

insurmountable conflicts of interest."); id. at 28 ("Plaintiffs are also inadequate class representatives because they are subject to unique defenses – namely, that they did indeed owe the amounts claimed in their collection actions.")), the portion of the R&R addressing adequacy will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

Defendants also contend that Plaintiffs' claims are not typical of the claims of the proposed class. (Def. Obj. (Dkt. No. 433) at 31) According to Defendants, "Plaintiffs cannot demonstrate that their claims and defenses are typical of those of the proposed class for the same reasons they cannot establish their adequacy as class representatives." (Id.) "The R&R does not address this question head-on, stating only that 'typicality has ... been adequately established' '[g]iven the discussion of commonality.' " (Id. at 32 (alteration and omission in original) (quoting R&R (Dkt. No. 423) at 57)) "But Plaintiffs are not and cannot be typical representatives of the purported class alleging fraudulent collection actions where the evidence shows that each Plaintiff owed the debt, the correct entity initiated the collection actions, and the affiant(s) adequately reviewed all appropriate documentation." (Id.) In making this objection, Defendants rehash arguments made in their opposition brief. (See, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 33 ("Plaintiffs have not and cannot demonstrate that their claims and defenses are typical of those of the proposed class for the same reasons that they cannot establish their adequacy as class representatives.")) Accordingly, the portion of the R&R addressing typicality will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

*27 Finally, Defendants object on the ground that a class action is not a superior method for adjudicating Plaintiffs' claims. (Def. Obj. (Dkt. No. 433) at 33) According to Defendants, Judge Moses "find[s] that the superiority requirement is met here, based on her conclusion that many issues in this case can be resolved by common proof." (Id. at 33-34 (citing R&R (Dkt. No. 423) at 61)) But "common proof can only go so far in this case; for Plaintiffs and any class members to succeed on their claims, many issues will need to be determined on an individualized basis, via individualized proof. A class action is not the superior method of adjudication for these kinds of claims." (Id. at 34) Defendants add that Judge Moses "misunderstands" the public policy arguments they made in their opposition papers, which they restate as follows:

> if debtors want to challenge the veracity or provenance of information or documents filed in collection actions against them, debtors should appear in those actions and address their concerns before a default judgment is entered instead of ignoring those proceedings and then raising speculative claims years later in a separate federal lawsuit. Resolving disputes about whether an affiant years ago looked at the documents he said he looked at is not an efficient use of the Court's time or resources.

(Id. at 34 (citation omitted) (citing R&R (Dkt. No. 423) at 34))

Because these objections rehash arguments Defendants made in their opposition brief (see, e.g., Def. R. 23 Opp. (Dkt. No. 323) at 42 ("Here, each Plaintiff would need to demonstrate that Defendants did not possess and/or review sufficient documentation of their debt before initiating collection actions against them, and that any misrepresentations regarding possession or review of loan documentation caused Plaintiffs to suffer some injury, and finally the nature and amount of any such injury. The court would have to conduct a mini-trial for each Plaintiff and class member."); id. at 43 ("Where Plaintiffs have technical complaints about whether civil procedures were properly followed in actions against them – such as Plaintiffs' complaints here, which center on whether documents were reviewed by the correct people at the right time – Plaintiffs should be encouraged to raise those issues in their individual collection actions instead of declining to participate in the collection action and allowing default judgment to be entered against them, only to ask the courts to take up the technical procedural complaints years later en masse.")), those portions of the R&R addressing superiority will be reviewed only for clear error. See Phillips, 955 F. Supp. 2d at 211.

\* \* \* \*

Those portions of the R&R addressing class certification to which Defendants and Plaintiffs have not objected will be reviewed only for clear error. See Gilmore, 2011 WL 611826, at *1.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 163 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

## B. Analysis

### 1. Plaintiffs' Objections

Plaintiffs contend that they are entitled to "injunctive relief under Rule 23(b)(2) for the harm caused by Defendants' improper credit-reporting lowering Plaintiffs' credit scores," because "[c]redit scores are used constantly throughout daily life," "Plaintiffs will always need necessities like cars, housing, credit cards, and other goods and services that require a credit score check," and "[l]ower credit scores cause actual or imminent harms that are not hypothetical or conjectural and automatically translate into permanently higher interest rates and other burdens." (Pltf. Obj. (Dkt. No. 434) at 8 (emphasis omitted) (citing R&R (Dkt. No. 423) at 64-67))

Plaintiffs' general assertions that "every [c]lass member eventually will have their credit score assessed when they purchase a car or home, rent an apartment, sign up for a utility, apply for a credit card, and so on," and that "[w]hen that happens, each will be relying on a credit score that would have been higher but for Defendants' violations" (id. at 9 (emphasis omitted)), are entirely speculative. Plaintiffs have not pled facts demonstrating that they face "a 'real or immediate threat' of injury" such that injunctive relief would be appropriate. See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.") (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111-12 (1983)). Plaintiffs' unsupported assertion that they "eventually will have their credit score[s] assessed when they purchase a car or home, rent an apartment, sign up for a utility, apply for a credit card, and so on" (Pltf. Obj. (Dkt. No. 434) at 9 (emphasis omitted)), is insufficient absent a non-conclusory showing that Plaintiffs are at risk of imminent injury. Accordingly, this objection is overruled.

*28 Plaintiffs also object to Judge Moses' finding that one class – rather than four subclasses, one "for each of the four Trust [D]efendants" – is appropriate. Plaintiffs complain that Judge Moses (1) should not have been concerned that certifying four subclasses would "expose[ ] Defendants to potentially hundreds of classes nationally," because the R&R "properly limits the [c]lass to individuals sued in New York"; and (2) "overlooks the text of the FDCPA, which, unlike other statutes, does not prohibit multiple classes," and "mistakenly

relies on precedent from securities litigation, where there is no basis [for certifying] multiple classes." (Pltf. Obj. (Dkt. No. 434) at 16) (citing (R&R (Dkt. No. 423) at 20 n.15, 62 n.35, 62-63))

As to Judge Moses' alleged concern about exposing Defendants to massive litigation nationally, Judge Moses explains the ramifications of subclasses as follows:

> [u]nder [the] FDCPA, a successful plaintiff may elect to recover either the "actual damage[s] sustained" as a result of the violation, 15 U.S.C. § 1692k(a)(1), or statutory damages, which in a class action are capped at $1,000 for each named plaintiff and "such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector." Id. § 1692k(a)(2). The obvious purpose of [P]laintiffs' request for a separate Rule 23(b)(3) class for each Trust and each state was to overcome the $500,000 cap that would otherwise apply to a single nationwide class, and to make it possible for each class (of which there could be as many as 200, if all four Trust Defendants sued consumers in all 50 states) to seek its own $500,000 statutory damages award.

(R&R (Dkt. No. 423) at 20-21 n.15 (third alteration in original); see also id. at 62 ("[P]laintiffs' request that the Court certify four Rule 23(b)(3) classes, on a per-Trust basis, appears to be motivated simply by [P]laintiffs' desire to circumvent the $500,000-per-class statutory damages cap under [the] FDCPA." (emphasis omitted)); id. at 62-63 n.35 ("[S]plitting their Rule 23(b)(3) class into four classes would let [Plaintiffs] seek up to $500,000 per class under [the] FDCPA from the remaining [D]efendants, TSI-NCO and Forster [& Garbus]. Statutory damages under the GBL are limited to $50 per plaintiff, or 'an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section,' plus attorneys' fees. GBL § 349(h). There is no separate class action cap under the GBL."))

In any event, Judge Moses goes on to find that, "[a]s a matter of logic, it cannot be the case that common questions of fact and law predominate here to the degree required to justify class certification," yet also require a separate class for each Trust Defendant. (Id. at 63) Although Plaintiffs are correct that the FDCPA does not prohibit separate classes, see 15 U.S.C. § 1692k(a)(2)(B), separate classes are not appropriate here, where Plaintiffs assert that TSI-NCO, as servicing agent

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 164 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

for all four Trust Defendants, engaged in the same alleged sham lawsuit scheme on behalf of all four Trust Defendants. (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 47-49, 274, 280) Accordingly, this objection is overruled.

## 2. Defendants' Objections

As to commonality, Defendants argue that the "technical disputes" that the R&R "focused on" – "such as whether the Trust Defendants were required to register to do business in New York in order to be 'authorized to proceed' on collection of Plaintiffs' unpaid debts and whether certain Pool Supplements and Schedules are legally sufficient to establish chain of title" – "cannot form the basis for class certification because the R&R dismissed Plaintiffs' claims based on false or misleading statements." (Def. Obj. (Dkt. No. 433) at 27-28 (citing R&R (Dkt. No. 423) at 55))

*29 While the R&R recommends dismissing Plaintiffs' claims based on false and misleading statements under both the FDCPA and the GBL, the R&R does not recommend dismissing Plaintiffs' FDCPA and GBL claims based on the alleged sham lawsuit scheme (see R&R (Dkt. No. 423) at 67), and what Defendants euphemistically refer to as "technical disputes" are part of the alleged sham lawsuit scheme. Whether the Trust Defendants were required to register to do business in New York is relevant to whether they were authorized to file lawsuits against Plaintiffs to collect Plaintiffs' unpaid debts. (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 274(a)-(b), 280(a)-(b)) And whether the Pool Supplements and Schedules establish chain of title with respect to the loans on which Defendants filed lawsuits is relevant to whether Defendants would be able to prove, in those lawsuits, that they owned the loans and thus could prevail on their claims. (See id. ¶¶ 274(a), 280(a))

Defendants argue, however, that "written training and instructional materials would not establish what an affiant actually looked at before signing an affidavit in each individual Plaintiff's collection proceedings," and that this "would require an individualized, case-specific inquiry." (Def. Obj. (Dkt. No. 433) at 28) However, "[a]ll that must be proven, at this stage, is that 'there are in fact sufficiently ... common questions of law or fact,' " Sykes III, 780 F.3d at 86 (emphasis omitted) (omission in original) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350), and "[c]ommonality may be found where the plaintiffs' alleged injuries 'derive from a unitary course of conduct by a single

system,' " Sykes II, 285 F.R.D. at 287 (quoting Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997)), which here is the alleged sham lawsuit scheme.

Plaintiffs contend that "[f]or each of the Trust Defendants, TSI-NCO's uniform written policies prohibited the Trust's Attorneys (including Forster [& Garbus]) and Affiants (employed by TSI-NCO) from requesting and/or reviewing proof of the debt alleged in each suit' " (Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 3 (citing Hawkins R. 23 Decl. (Dkt. No. 315) ¶¶ 11, 23-24; Hawkins R. 23 Reply Decl. (Dkt. No. 336) ¶¶ 35-37)), while Defendants maintain that "each affidavit was independently reviewed, verified and signed consistent with TSI policy." (Def. R. 23 Supp. Opp. (Dkt. No. 414) at 7) Acknowledging the factual dispute, Plaintiffs need not show – at class certification – that they will ultimately prevail on the merits of their claims. See Lewis Tree Serv., Inc., 211 F.R.D. at 231. Instead, "what matters is 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.' " Sykes II, 285 F.R.D. at 286 (emphasis omitted) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350). Where, as here, Plaintiffs' claim is that "TSI-NCO's uniform written policies prohibited" its Affiants from reviewing records, it is possible that this issue could be resolved on the basis of the written policies, rendering unnecessary any individualized inquiry into what each Affiant "actually looked at before signing an affidavit in each individual Plaintiff's collection proceedings," as Defendants contend. (See Def. Obj. (Dkt. No. 433) at 28)

Defendants further argue that "there is no common evidence that could generate common answers to the question of whether the appropriate Trust Defendant had authority to collect on each putative class member's loan," because "[e]ach Trust Defendant acquired pools of loans through multiple originating lenders through multiple different Pool Supplements and Schedules," which means that "subsets of putative class members will need to rely on different documentation to substantiate claims against the same Trust Defendant." (Def. Obj. (Dkt. No. 433) at 29) Again, however, "what matters is 'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.' " Sykes II, 285 F.R.D. at 286 (emphasis omitted) (quoting Wal-Mart Stores, Inc., 564 U.S. at 350). And where, as here, the parties dispute whether the Pool Supplements and Schedules – which allegedly show the named Plaintiffs' alleged loans that the banks assigned to the Trust Defendants (see Luke Decl. (Dkt. No. 330) ¶¶ 5, 14(a); id., Ex. 1-A (Dkt. No. 330-1)) – are sufficient to establish the necessary chain

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....
2023 WL 6290622

of title for the loans (compare Pltf. R. 23 Supp. Br. (Dkt. No. 409) at 3 ("The record shows each Trust lacks chain of title, as well as terms and conditions, for any of the purported loans that Defendants claim the Trusts own.") with Def. R. 23 Supp. Opp. (Dkt. No. 414) at 9 ("The Trusts came to hold those loan documents, which were attached to four of the five Affidavits at issue, as part of the transfer of ownership of the loans to the Trust under the Pool Supplement Agreements and Deposit and Sale Agreements.")), this dispute can be resolved by a review of the Pool Supplements and Schedules. Accordingly, Defendants' objections on the basis of commonality are overruled.

**\*30** As to predominance, Defendants assert, "[f]or the same reasons that Plaintiffs' claims are not susceptible to common proof, [that] the individual issues associated with determining whether the alleged patterns of wrongful conduct were actually at play in any class member's collection proceedings will predominate over any common proof of the alleged patterns of wrongful conduct themselves." (Def. Obj. (Dkt. No. 433) at 32 (citation omitted)) For the same reasons that Plaintiffs' objections as to common proof are overruled, Defendants' objections as to predominance are likewise overruled.

Judge Moses correctly concludes that "Rule 23(b)(3)'s predominance requirement is met because the key issues – indeed, virtually all of the liability issues – are susceptible of generalized proof applicable to all putative class members, and there is little chance 'that individual issues will overwhelm the common questions.' " (R&R (Dkt. No. 423) at 60 (quoting In re NASDAQ Market-Makers Antitr. Litig., 169 F.R.D. at 517)) "Nor are [P]laintiffs required to propose, prior to certification, 'a common method for determining ... to what degree any individual Plaintiff or putative class member was damaged by the alleged misconduct.' " (Id. (omission in original) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 37)) The R&R correctly explains that "[i]n a consumer debt case, where statutory damages are available under both federal and state law, '[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.' " (Id. (second alteration in original) (citations omitted) (citing 15 U.S.C. § 1692k(a)(2)(A)-(B); GBL § 349(h); quoting Sykes III, 780 F.3d at 88))

As to Defendants' argument that "equitable tolling issues [will require] a highly individualized inquiry focused on each Plaintiff's diligence, and what they knew, when," and that

"for nearly all class members, the Court will need to conduct individual mini-trials to determine whether and to what extent equitable tolling applies to their claims" (Def. Obj. (Dkt. No. 433) at 33), the R&R properly concludes that "[t]his is not a nationwide class action, and there is no reason to believe that equitable tolling issues cannot be resolved efficiently in a class format." (R&R (Dkt. No. 423) at 61)

As to adequacy, the R&R correctly concludes that "all of the named [P]laintiffs have standing – and thus have 'live' claims – with respect to the sham lawsuit scheme alleged in [the Consolidated Class Action Complaint]." (Id. at 58) "These claims are also suitable for litigation on a class basis, as they can be pursued against the Trust Defendants under GBL § 349; against TSI-NCO under [the] FDCPA and GBL § 349; and against Forster [& Garbus] under [the] FDCPA, GBL § 349, and [Judiciary Law] § 487." Judge Moses further notes that "all putative class members would qualify for statutory damages under [the] FDCPA and GBL § 349." (Id.)

While Judge Moses acknowledges that Bifulco "has a 'live' claim with respect to [D]efendants' negative credit-reporting, as to which she could, in theory, seek damages not available to the other named [P]laintiffs or the class," she correctly determines that this circumstance does not constitute "a disabling conflict, because it does not render Bifulco's interests 'antagonistic' to those of other [P]laintiffs." (Id. at 58 n.33) "Under Rule 23(a)(4) of the Federal Rules of Civil Procedure, adequacy is satisfied unless a 'plaintiff's interests are antagonistic to the interest of other members of the class.' " Sykes III, 780 F.3d at 90 (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). Moreover, "[t]he fact that some class members may advance ... GBL[ ] and Judiciary Law claims ... does not mean the interests of these class members are antagonistic to those other members of the class that also advance FDCPA claims." Id. Accordingly, Defendants' objection on the basis that the surviving claims "have different elements, allow for different types of damages, and are available against different Defendants" – rendering the named Plaintiffs inadequate representatives of a class (Def. Obj. (Dkt. No. 433) at 30) – is overruled.

**\*31** Defendants object to Judge Moses' finding that – although some of the named Plaintiffs admit that they "owed the debts," and indeed acknowledged the debts when they filed for personal bankruptcy – these circumstances do "not give rise to a defense, much less a unique defense, to their FDCPA claims." (R&R (Dkt. No. 423) at 59) (quoting Def. R.

23 Opp. (Dkt. No. 323) at 28, 30-32; Def. Obj. (Dkt. No. 433) at 31) Judge Moses explains that "it is by now well-settled that liability under [the] FDCPA can be established 'irrespective of whether the presumed debtor owes the debt in question.'" (Id. at 58 (quoting Sykes III, 780 F.3d at 83))

Defendants complain that although the R&R "find[s] that ownership of a debt is not a defense to an FDCPA claim," it "does not explain how these facts do not create serious adequacy problems under the other claims brought by Plaintiffs (under GBL § 349 and Judiciary Law § 487)." (Def. Obj. (Dkt. No. 433) at 31) Even if some class members owed the debts and some did not, however, any conflict on this basis is not "fundamental," because Plaintiffs' remaining claims — under the FDCPA, the GBL, and the Judiciary Law — are based on the alleged sham lawsuit scheme. See Denney, 443 F.3d at 268 ("A conflict or potential conflict alone will not ... necessarily defeat class certification — the conflict must be 'fundamental.' "). The alleged sham lawsuit scheme is, in turn, based on allegations that Defendants filed lawsuits without the intent or ability to prove their claims, and for the sole purpose of procuring default judgments against or extracting settlements from Plaintiffs. (See Consol. Cmplt. (Dkt. No. 124) ¶¶ 274(a)-(b), 280 (a)-(b), 284(a)) Accordingly, Defendants' adequacy objections are overruled.

The R&R also correctly concludes that, "[g]iven the discussion of commonality ... [,] typicality has also adequately been established." (R&R (Dkt. No. 423) at 57) Defendants contend, however, that "Plaintiffs are not and cannot be typical representatives of the purported class alleging fraudulent collection actions where the evidence shows that each Plaintiff owed the debt, the correct entity initiated the collection actions, and the affiant(s) adequately reviewed all appropriate documentation." (Def. Obj. (Dkt. No. 433) at 32) But the R&R notes that Plaintiffs have alleged that

> all members of the proposed classes were named in sham lawsuits, which were filed and litigated in accordance with a unified playbook authored (literally) by NCI-TCO and carried out by its Affiants and by Forster [& Garbus]. Additionally, all of the members of the proposed Rule 23(b)(3) class were injured by the resulting, wrongfully-procured default

judgments. Although the alleged scheme had several interrelated components — including boilerplate complaints, never meaningfully reviewed by the attorneys who signed them, that falsely alleged that the Trust Defendant named as plaintiff was the "original creditor" on the loan and was "authorized to proceed" in state court, and deceptive affidavits, signed by Affiants who routinely attested to "personal knowledge" of chain-of-title documents they had not actually reviewed – [P]laintiffs have shown that [D]efendants engaged in a "unitary course of conduct" leading to the injuries alleged.

(R&R (Dkt. No. 423) at 52) In sum, as discussed above, "[P]laintiffs' alleged injuries 'derive from a unitary course of conduct by a single system,' " Sykes II, 285 F.R.D. at 287 (quoting Marisol A., 126 F.3d at 377), and "Rule 23(a) (2) does not require that the claims of the lead plaintiffs 'be identical to those of all other plaintiffs.' Indeed, 'factual differences in the claims of the class do not preclude a finding of commonality.' " Id. at 286-87 (citations omitted) (quoting Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y. 2008); Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 73 (S.D.N.Y. 2006)). Accordingly, Defendants' typicality objection is overruled.

*32 As to superiority, the R&R correctly concludes that "a class action 'is, without question, more efficient than requiring thousands of debtors to sue individually,' whether in state or in federal court," and that "[c]ertifying a class is also consistent with the remedial purpose of [the] FDCPA, which requires the courts to construe its terms 'in [a] liberal fashion if the underlying Congressional purpose is to be effectuated.' " (R&R (Dkt. No. 423) at 62 (quoting Sykes II, 285 F.R.D. at 294; Hart, 797 F.3d at 225)) In their objections, Defendants contend that "common proof can only go so far in this case." For "Plaintiffs and any class members to succeed on their claims, many issues will need to be determined on an individualized basis, via individualized proof." According to Defendants, "[a] class action is not the superior method of adjudication for these kinds of claims." (Def. Obj. (Dkt. No. 433) at 34) Judge Moses notes, however, that "[i]f, as [D]efendants contend, they 'can show they unequivocally

Case 3:18-cv-00121-JFS-PJC   Document 232-13   Filed 02/24/26   Page 167 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

had the proper documentation in their possession' when they defaulted the class members, they can – and no doubt will – make that showing on a classwide basis in this Court." (R&R (Dkt. No. 423) at 62 (citations omitted) (quoting Def. R. 23 Opp. (Dkt. No. 323) at 43))

Finally, Judge Moses did not "misunderstand" Defendants' policy argument that "debtors should appear in [collection] actions and address their concerns before a default judgment is entered instead of ignoring those proceedings and then raising speculative claims years later in a separate federal lawsuit." (Def. Obj. (Dkt. No. 433) at 34) She rejects Defendants' argument, which the Second Circuit likewise rejected in Sykes III, finding that it "amount[s] to nothing more than a 'preference that their widespread fraudulent

behavior be dealt with in a piecemeal fashion.' " (R&R (Dkt. No. 423) at 61-62 (quoting Sykes III, 780 F.3d at 92)) Accordingly, Defendants' superiority objection is overruled.

## CONCLUSION

Judge Moses' R&R is adopted in part as set forth above. Defendants' motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), is granted in part and denied in part, and Plaintiffs' motion for class certification is granted in part.

### All Citations

Not Reported in Fed. Supp., 2023 WL 6290622

## Footnotes

1    Unless otherwise specified, all docket citations are to the docket of the first-filed action, Seaman et al. v. National Collegiate Student Loan Trust 2007-2, et al., 18 Civ. 1781 (PGG) (BCM). The original lead Plaintiff in this action was Mutinta Michelo, but on May 12, 2021, this Court so-ordered a stipulation to dismiss Michelo's claims (Dkt. No. 298), which left Katherine Seaman as the lead Plaintiff.

2    Because the parties have not objected to Judge Moses' factual account, this Court adopts it in full. See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL 1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's characterization of the background facts ..., the Court adopts the R&R's 'Background' section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16 Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's ... recitation of the facts of this case, and the Court adopts them in full.").

3    The R&R defines "tradeline" as follows:

        "A tradeline is a term used by credit reporting agencies to describe credit accounts listed on your credit report. For each account you have, there is a separate tradeline, which includes information about the creditor and the debt. The information included in your tradelines is primarily used to calculate your credit scores."

     (R&R (Dkt. No. 423) at 19 n.14 (citation omitted) (quoting Experian, What Are Tradelines and How Do They Affect You?, https://www.experian.com/blogs/ask-experian/what-are-tradelines/ (last visited Sept. 25, 2023)))

4    Defendants contend that Plaintiffs' objections are untimely and should not be considered. (Def Resp. (Dkt. No. 436) at 6-7) According to Defendants, the R&R was issued on March 13, 2023, and objections were thus due on March 27, 2023 absent an extension of time. (See id. at 6; R&R (Dkt. No. 423) at 68) On March 20, 2023, Defendants requested an extension until April 14, 2023 "for [D]efendants to file [o]bjections" to

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 168 of 230

Seaman v. National Collegiate Student Loan Trust 2007-2, Not Reported in Fed. Supp....

2023 WL 6290622

the R&R. (Mar. 20, 2023 Def. Ltr. (Dkt. No. 425)) This Court granted that application on March 21, 2023. (Mar. 21, 2023 Order (Dkt. No. 426)) Plaintiffs filed their objections on April 14, 2023, without requesting a similar extension of time. (See Pltf. Obj. (Dkt. No. 434)) Defendants request that this Court "apply a clear error standard to its review of the portions of the R&R challenged in Plaintiffs' untimely [o]bjection[s]." (Def. Resp. (Dkt. No. 436) at 7) This Court has considered Plaintiffs' objections as though they were timely filed. As discussed below, however, even when reviewed de novo, Plaintiffs' objections fail.

5    In connection with several of their objections, Plaintiffs repeat verbatim arguments they made in their opposition brief. (See, e.g., Pltf. Obj. (Dkt. No. 434) at 12 ("The Article III injury resulting from no-review collections suits was actionable before TransUnion and remains so today."); Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 10 (same); Pltf. Obj. (Dkt. No. 434) at 13 ("No court before or after TransUnion has condoned practices like Defendants'."); Pltf. R. 12(b)(1) Opp. (Dkt. No. 389) at 13 (same))

6    In arguing that Bifulco's "self-serving" testimony should be ignored, Defendants rely on Deebs v. Alstom Transportation, Inc., 346 F. App'x 654 (2d Cir. 2009) (summary order) (see Def. Obj. (Dkt. No. 433) at 25), in which the Second Circuit – in affirming summary judgment – notes that defendant "correctly asserts that 'the only "evidence" cited in plaintiffs' brief is their own self-serving testimony' and that the plaintiffs have 'made no attempt ... to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery.' " Deebs, 346 F. App'x at 656 (omission in original). Setting aside the fact that Deebs is a summary order, which has no precedential value, the case is not on point. Unlike in Deebs, Defendants have not set forth "hard evidence adduced during discovery" that rebuts Bifulco's testimony. Accordingly, "this is not an instance in which plaintiff's testimony contradicts uncontroverted documentary evidence, such that it should be deemed 'self-serving' and disregarded." Frost v. Lentex Co., LLC, No. 20 Civ. 5313 (VB), 2022 WL 17968058, at *6 (S.D.N.Y. Dec. 27, 2022), reconsideration denied, 2023 WL 373242 (S.D.N.Y. Jan. 24, 2023).

7    Plaintiffs argue that, "[i]n Rosenberg [v. McCarthy, Burgess & Wolff, Inc., No. 21 Civ. 2199 (MKB), 2022 WL 3030390, at *5 (E.D.N.Y. Aug. 1, 2022)], ... the court emphasized that an FDCPA plaintiff would have standing in either of two instances: (1) the plaintiff saw the false statements and in response took or refrained to take certain actions; or, (2) the plaintiff suffered 'legal[ ] or other harm' following the false statement." (Pltf. Obj. (Dkt. No. 434) at 11 (emphasis omitted) (second alteration in original)) According to Plaintiffs, Judge Moses "focuses solely on the absence of the first type of harm discussed by Rosenberg (actual reliance by the plaintiff) but ignores the existence of the second type (legal consequences)." (Id.) But Rosenberg does not hold that standing in FDCPA cases may be premised on either actual reliance or "legal or other harm," as Plaintiffs contend. The portion of Rosenberg that Plaintiffs quote in their objections is in turn a quotation from an Eleventh Circuit case, in which that court found that a

plaintiff "ha[d] not alleged an injury-in-fact sufficient to confer standing" where she merely alleged that debt collection letters violated the FDCPA and left her confused about her statutory rights[,] [noting] that ... plaintiff did not allege that the letter caused her to take or refrain from taking any action or that she suffered any financial, legal, or other harm beyond the alleged statutory violations.

Rosenberg, 2022 WL 3030390, at *5 (first alteration in original) (quoting Cooper v. Atl. Credit & Fin. Inc, 822 F. App'x 951, 954-55 (11th Cir. 2020)). Rosenberg quotes Cooper in support of its conclusion that "[p]laintiff did not suffer – and has not alleged – an economic harm arising from a possessory interest in seized property. Rather, [p]laintiff's only alleged harm is an informational injury, which courts have found insufficient to confer standing in the FDCPA context." Id. In sum, Rosenberg does not stand for the proposition that "an FDCPA plaintiff would have standing [if] the plaintiff suffered 'legal[ ] or other harm.' " (Pltf. Obj. (Dkt. No. 434) at 11 (emphasis omitted) (second alteration in original))

8    As noted above, in challenging Judge Moses' recommendation concerning Plaintiffs' negative credit reporting claims, Plaintiffs complain that she "mistakenly" relied on FCRA cases. (See Pltf. Obj. (Dkt. No. 434) at 14) The FCRA and the FDCPA are "analogous statute[s]," however. Sputz v. Alltran Fin., LP, No. 21 Civ. 4663 (CS), 2021 WL 5772033, at *6 (S.D.N.Y. Dec. 5, 2021). And "cases in the Second Circuit brought in the context of financial credit – including claims specifically brought pursuant to both the FDCPA and the FCRA ... – have uniformly held that, absent specific evidence of reputational or monetary harm, plaintiffs lack standing under TransUnion." Adler v. Penn Credit Corp., No. 19 Civ. 7084 (KMK), 2022 WL 744031, at *8 (S.D.N.Y. Mar. 11, 2022). Accordingly, Judge Moses did not err in citing FCRA cases.

And to the extent Plaintiffs complain that Judge Moses erred in refusing to rely on Ewing v. MED-1 Solutions, LLC, 24 F.4th 1146 (7th Cir. 2022) and In re Anderson, 641 B.R. 1 (Bankr. S.D.N.Y. 2022) (Pltf. Obj. (Dkt. No. 434) at 15), this Court finds no such error. Neither case is binding on this Court, and the reasoning of these cases is not persuasive here.

Ewing runs contrary to Second Circuit law, which holds that dissemination, without more, does not establish Article III standing. See Maddox II 19 F.4th at 65 (finding that "[t]he public nature of the record is not analogous to the dissemination of the credit reports in TransUnion [where class members' credit reports were disseminated to third-party businesses]," and although plaintiffs "may have suffered a nebulous risk of future harm during the period of delayed recordation [of the satisfaction of mortgage] – i.e., a risk that someone (a creditor, in all likelihood) might access the record and act upon it – but that risk, which was not alleged to have materialized, cannot not form the basis of Article III standing").

In Anderson, "[t]he injury was [defendant]'s violation of the discharge injunction by [defendant]'s systematic policy of refusing to correct its tradelines to pressure [plaintiff] and the putative class members to pay their discharged debts." In re Anderson, 641 B.R. at 55. Here, Plaintiffs do not allege any such practice, or that any Plaintiff requested that her tradeline be corrected. Plaintiffs instead allege that their injury is negative credit reporting alone.

9    Although Plaintiffs cite Faehner v. Webcollex, LLC, No. 21-1734-CV, 2022 WL 500454, at *1 (2d Cir. Feb. 18, 2022) (summary order) in support of their application for leave to amend and for discovery (Pltf. Obj. (Dkt. No. 434) at 16), that case provides no support for Plaintiffs' application. While the Second Circuit remanded in that case "to allow plaintiff an opportunity to replead her claims to comport with the pleading standards set out in TransUnion, and to give the district court an opportunity to address any standing questions in the first instance," in Faehner the Supreme Court's TransUnion decision was issued three days after the district court's order dismissing the amended complaint. Id. Here, Plaintiffs have had ample time to address TransUnion and to construct their arguments as to why leave to amend and discovery should be granted.

10   As to chain of title issues, Judge Moses explains that

[a]ccording to Bradley Luke, TSI's Director of Operations, the loans at issue were all originally assigned, by the banks that made them, to National Collegiate Funding, Inc. (NCF), by means of a series of nearly identical Pool Supplements (one from each originating bank), which NCO received on various dates in 2012 from First Marblehead Corporation (FMC), the company that arranged the securitization. [(Luke Decl. (Dkt. No. 330) ¶¶ 5, 14(a); id., Ex. 1-A (Dkt. No. 330-1))] Each Pool Supplement, in turn, recites that the loans being assigned to NCF (which later assigned them to one of the Trust Defendants) are listed on an attached Schedule, but no such Schedule is attached to any of the Pool Supplements in TSI-NCO's possession. [(See Luke Decl., Ex. 1-A (Dkt. No. 330-1))] Luke attests that the Schedules exist in "digital Excel file format[ ]" [(Luke Decl. (Dkt. No. 330) ¶ 14(c)-(e))], and that these files were received from FMC on November 14, 2012, "separately" from the Pool Supplements. [(Id. ¶ 14(a), (c))] Plaintiffs counter that the Pool Supplements and (unattached) Excel files are not adequate to establish ownership of the loans listed in the Excel files, arguing (among other things) that [D]efendants have lost or misplaced the "loan roster CD"

2023 WL 6290622

containing the Schedules as transmitted by FMC; that the Excel files contain a variety of apparent errors; and that their metadata does not match the dates on which they were supposed to have been created. [(Hawkins R. 23 Reply Decl. (Dkt. No. 336) ¶¶ 6-34; Hawkins R. 23 Supp. Decl. (Dkt. No. 342) ¶¶ 13-28)]

(R&R (Dkt. No. 423) at 54-55 n.32)

11    Defendants further argue that

[a]fter TransUnion and Maddox II, the Court lacks subject matter jurisdiction to consider claims where the alleged injury is a state court judgment itself or an injury allegedly caused by the state court judgment. From this it follows that federal courts should not certify class actions where the only purportedly common issues involve whether a state court judgment was wrongfully procured. Simply put, the type of class blessed in Sykes[ III] is not sustainable post-TransUnion.

(Def. Obj. (Dkt. No. 433) at 30) Given that this Court concluded that it has subject matter jurisdiction over the claims in this case, Defendants' objection on this point is overruled.

12    Defendants add that "all of the common issues identified in the R&R require an assessment of whether the default judgments were wrongfully procured – a topic this Court lacks subject matter jurisdiction to consider under Rooker-Feldman." (Def. Obj. (Dkt. No. 433) at 33) As discussed above, the Rooker-Feldman doctrine does not apply to Plaintiffs' claims.

---

**End of Document**                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**17**

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

2000 WL 1121778
Only the Westlaw citation is currently available.
United States District Court, S.D.
Alabama Southern Division.

Kelli SHELLEY, et al., Plaintiffs,

v.

AMSOUTH BANK, Defendant.

No. CIV.A.97–1170–RV–C.
|
July 24, 2000.

ORDER ON MOTION FOR CLASS CERTIFICATION

VOLLMER, District J.

**\*1** This matter is before the Court on the plaintiffs'
Amended Motion and Brief for Class Certification. (Doc.
46)[1] Magistrate Judge Cassady conducted a hearing on the
plaintiffs' motion and entered a Report and Recommendation
that class certification be denied except with respect to the
plaintiffs' claim for statutory damages under the Truth in
Savings Act ("TISA"), 12 U.S.C. §§ 4301–13. (Doc. 56)

Prior to the hearing, the parties filed a joint stipulation of facts
and law, (Doc. 53), and the defendant filed a memorandum
of law in opposition to class certification. (Doc. 54) On the
day of the hearing, the defendant filed proposed findings
of fact and conclusions of law. (Unnumbered document)
Following the hearing, the plaintiffs filed proposed findings
of fact and conclusions of law (unnumbered document), to
which the defendant filed a reply. (Doc. 55) In response to
Judge Cassady's report and recommendation, the plaintiffs
filed a statement of objection and a brief in support thereof,
(Docs.57, 58), and the defendant filed a brief in opposition to
the plaintiffs' objections and a copy of the hearing transcript.
(Docs.59, 60) The plaintiffs later filed a motion to file
supplemental evidence, (Doc. 65), to which the defendant
filed a response and a notice of filing. (Docs.66, 67)[2] Finally,
the defendant filed a supplemental filing of recent authorities.
(Doc. 68)

After careful consideration of the evidence, the parties'
argument and Judge Cassady's report and recommendation,
the Court concludes that the plaintiff's amended motion for
class certification is due to be denied in its entirety.[3]

Background.
The plaintiffs are current and former account holders at the
defendant bank.[4] The defendant charges its customers a fee
when a check is presented for payment on insufficient funds,
whether the check is paid (creating or increasing an overdraft)
or returned. These charges are described, collectively, as
"OD/NSF" charges. At all times relevant to this lawsuit, the
defendant has maintained a policy of charging customers an
OD/NSF fee for each check that is presented for payment
on insufficient funds (the "per check policy"). At all times
relevant to this lawsuit, the defendant has also maintained a
policy, when multiple checks are presented for payment on
the same business day, of posting the checks in descending
dollar value of the check (the "posting order policy").

The plaintiffs assert three claims arising out of the defendant's
policies. Count One asserts that the defendant failed to
disclose these policies in violation of TISA. Count Two
asserts that the defendant "breach[ed] its agreement for
depository accounts with its customers" by failing to disclose
these policies. Count Three asserts that the defendant
fraudulently suppressed its true policies. (First Amended
Complaint at 10–15) The plaintiffs expressly disavow any
claim that the defendant's policies are improper; instead, "the
substance of the Plaintiffs' complaint is that the [defendant]
illegally fails to disclose the policy." (Plaintiffs' Response in
Opposition to Defendant's Motion for Summary Judgment at
2)

**\*2** The plaintiffs seek to certify a class "composed of all
depositors who, at any time since July 1, 199[3] ... maintained
depository accounts at AmSouth." (Amended Motion for
Class Certification at 1)[5] The plaintiffs further seek to certify
three subclasses, as follows:

(*Id.* at 1–2)

Subclasses One and Two are subsets of Subclass Three; while
Subclass Three includes all class members to whom the
defendant did not disclose the policies at issue, Subclasses
One and Two consist of those class members that were
damaged by the non-disclosure. (Amended Motion for Class
Certification 3)

Class Certification Analysis.

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

"The initial burden of proof to establish the propriety of class certification rests with the advocate of the class." *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000). The Court's function is to perform a "rigorous analysis" of the plaintiffs' asserted satisfaction of the requirements for class certification. *General Telephone Co. v. Falcon,* 457 U.S. 147, 161 (1982). While the Court may look beyond the pleadings to the extent necessary to perform this function, it "may not properly reach the merits of a claim when determining whether class certification is warranted." *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984).

Analysis of class certification requests is governed by Federal Rule of Civil Procedure 23. The plaintiffs seek to certify a class pursuant to Rule 23(b)(3). To obtain certification of such a class, the plaintiffs must establish six elements:

• "the class is so numerous that joinder of all members is impracticable";

• "there are questions of law or fact common to the class";

• "the claims or defenses of the representative parties are typical of the claims or defenses of the class";

• "the representative parties will fairly and adequately protect the interests of the class";

• "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members";

**\*3** • "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Fed.R.Civ.P. 23(a), (b)(3).

As discussed below, the plaintiffs have failed to establish one or more of these elements with respect to each of the claims they assert against the defendant.

I. Fraud.

Count Three alleges that, "pursuant to" TISA, the defendant "was under a legal duty to communicate [to depositors] the manner in which it charges depositors accounts and any changes in such manner" and that the defendant "intentionally withheld" such information from the plaintiffs. (First Amended Complaint at 15)

A. Numerosity.

As of the class certification hearing in January 1999, the defendant had approximately 600,000 demand deposit accounts. (Report and Recommendation at 13–14)[6] This figure includes an unidentified number of business accounts. (*Id.*) Because Count Three alleges that the defendant's duty to disclose derives from TISA, which imposes disclosure requirements only with respect to accounts "intended for use by and generally used by consumers primarily for personal, family or household purposes," 12 U.S.C. § 4313(1), such business accounts fall outside the proposed class. On the other hand, the 600,000 figure includes only consumer demand accounts existing in January 1999 and therefore ignores all such accounts that, while existing within the class period, were closed before, or opened after, January 1999. Plaintiffs Root and Shelley, for example, fall within this category. (Joint Stipulation of Facts and Law at 3–4) Due to the large number of accounts involved, the Court finds the numerosity requirement to be satisfied.

B. Commonality.

The commonality requirement serves as a threshold "guidepost" for gauging the interrelatedness of the named plaintiff's claim with those of the proposed class. *General Telephone v. Falcon,* 457 U.S. at 157 n. 13. A common issue is one that may be proved by generalized proof applicable to the class as a whole; an issue is not "common" simply because it must be decided, on individualized proof, with respect to each class member. *Nichols v. Mobile Board of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir.1982)(a common issue is one "subject to generalized proof").

A single common issue does not necessarily satisfy the commonality requirement. *See, e.g., Moore v. American Federation of Television & Radio Artists,* 2000 WL 865002 at 5 (11th Cir., June 29, 2000)(two common facts deemed insufficient to satisfy the commonality requirement); *In re: Temple,* 851 F.2d 1269, 1273 (11th Cir.1988)(similar). Instead, the Court must evaluate each common issue and "conside[r] what value the resolution of the class-side issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1234 (11th Cir.2000).

The plaintiffs' fraud claim asserts that TISA imposed on the defendant a duty to disclose the policies at issue and that the defendant's written disclosures failed to do so. The defendant does not question that these issues, common to all class members' fraud claims, satisfy the commonality requirement.

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

C. Typicality.

**\*4** The typicality requirement, along with the commonality requirement, "represent the 'nexus' necessary between class representatives and class members." *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 n. 8 (11th Cir.1992). While the requirements of commonality, typicality and adequacy "tend to overlap," *Appleyard v. Wallace,* 754 F.2d 955, 959 (11th Cir.1985), the typicality requirement " 'primarily directs the district court to focus on whether named representatives' claims have the same essential characteristics as the claims of the class at large.' " *Id.* (quoting *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)).

As a threshold matter, the typicality requirement bars a plaintiff from representing a class of which he is not a member. *Machella v. Cardenas,* 653 F.2d 923, 926 (5th Cir.1980). To be part of the class, a plaintiff must "possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216 (1974).

Assuming the named plaintiff is a member of the proposed class, typicality next requires that he assert the same legal theory or claim as the proposed class. "A sufficient nexus is established if the claims or defenses of the class and the class representative ... are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied,* 470 U.S. 1004 (1985); *see also Appleyard v. Wallace,* 754 F.2d at 958 ("[C]ourts have found that a strong similarity of legal theories will satisfy the typicality requirement ...."); *Machella v. Cardenas,* 653 F.2d at 927 (named plaintiff's claims were not typical when "predicated on an entirely different legal theory from that on which potentially successful members of the class ... would rely").

Factually, "a sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice." *Kornberg v. Carnival Cruise Lines,* 741 F.2d at 1332. Identical fact patterns are not required; instead, "[a] factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.; see also Appleyard v. Wallace,* 754 F.2d at 958 ("[C]ourts have found that a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences.").

Finally, "[w]hile it is well settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, ... class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2nd Cir.1990), *cert. denied,* 498 U.S. 1025 (1991). "The existence of even an arguable defense can vitiate the adequacy of representation if it will distract the named plaintiff from the issues common to the class." *Ross v. Bank South, N.A.,* 837 F.2d 980, 990–91 (11th Cir.)(noting that unique defenses can be considered under the typicality, commonality or adequacy requirement), *vacated,* 848 F.2d 1133 (11th Cir.1988), *on rehearing,* 885 F.2d 723 (11th Cir.1989)(en banc), *cert. denied,* 495 U.S. 905 (1990).

**\*5** The only account that plaintiff York maintained with the defendant is his "Papa Doolies" coffee shop business account. Although the proposed class definition literally would encompass business account holders as well as consumer account holders, as related above the first amended complaint limits the source of any duty to disclose to TISA, which requires disclosure only to consumer account holders. Therefore, York is not a member of the proposed class and cannot serve as a class representative. The plaintiffs concede that York is not a proper class representative. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 10)

Additionally, plaintiff Root's complaints are unrelated to the posting order policy and are limited to the per check policy. (Report and Recommendation at 4) [7] Therefore, as he asserts no claim concerning the posting order policy, he cannot serve as a class representative with respect to such a claim.

Finally, there is evidence that each of the named plaintiffs was aware, more than two years prior to filing suit, that the defendant charged OD/NSF fees on a per check basis. The defendant has asserted the statute of limitations as a defense, and the defense is sufficiently arguable with respect to the defendant's "per check" policy to render the plaintiffs' claims atypical.

D. Adequacy.

The requirements of commonality, typicality and adequacy "tend to overlap." *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985). However, adequacy of representation must be measured in at least the following five ways: (1) " 'whether

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation" '; (2) " 'whether plaintiffs have interests antagonistic to those of the rest of the class" '; (3) whether the named plaintiffs "possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative"; (4) whether the named plaintiffs have "demonstrated [s]ufficient participation in and awareness of the litigation"; and (5) whether the named plaintiffs have the ability to fund the litigation. *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726–27 (11th Cir.1987), *cert. denied,* 485 U.S. 959 (1988)(quoting *Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir.1985)); *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559–60 (5th Cir.1981).

The plaintiffs assert that "counsel for the class have extensive class action and consumer fraud experience and will prosecute this case for the class zealously." (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 10) The defendant, which has stipulated to the appropriateness of a class action with respect to the plaintiffs' claim for statutory damages under TISA, implicitly concurs. Nowhere in the record, however, has the Court located a single piece of evidence to support the plaintiffs' assertion. Adequacy of counsel, like every other fact necessary for class certification, must be proved by the plaintiff and proved with facts, not conclusions. *See, e.g., Morrison v. Booth,* 763 F.2d 1366, 1371 (11th Cir.1985)(plaintiffs "must provide more than bare allegations they satisfy the requirements of Rule 23"); *Simon v. World Omni Leasing, Inc.,* 146 F.R.D. 197, 201 (S.D.Ala.1992)(counsel's adequacy established by an affidavit detailing his class action and consumer rights experience and expertise).[8] The parties' agreement to declare counsel adequate does not dispose of the requirement that such adequacy be shown.[9]

**\*6** "The usual rule is that a plaintiff must initially bear the cost of notice to the class." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974). Accordingly, "the cost of notifying class members ... may require a showing that the plaintiffs can secure proper funding of their litigation." *McGowan v. Faulkner Concrete Pipe,* 659 F.2d at 559–60. This financial ability "is not necessarily determinative, but is important." *Merrill v. Southern Methodist University,* 806 F.2d 600, 608 n. 8 (5th Cir.1986); *see also Palmer v. BRG, Inc.,* 874 F.2d 1417, 1421 (11th Cir.1989).

When a class is certified pursuant to Rule 23(b)(3), individual notice to each class member is required if practicable. Fed.R.Civ.P. 23(c)(2). The cost of sending one notice to

approximately half a million class members by first class mail exceeds $150,000, or $50,000 per class representative (excluding York). The plaintiffs have made no showing that they are able or even willing to pay such a sum or that others have properly agreed to pay. *See Roper v. Consurve, Inc.,* 578 F.2d 1106, 1112 (5th Cir.1978). Absent such a showing, the Court cannot consider them adequate class representatives.

### E. Predominance.

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). It is "far more demanding" than the commonality requirement. *Id.* at 624. The Court must examine each alleged cause of action and "conside[r] what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1234 (11th Cir.2000).

The plaintiffs' fraudulent suppression cause of action, under Alabama law, requires proof of; (1) a duty to disclose the facts; (2) concealment or non-disclosure of the facts by the defendant; (3) materiality of the fact not disclosed; (4) the plaintiff's reliance on the non-disclosure; (5) reasonableness of the plaintiff's reliance under the circumstances; (6) proximate cause; and (7) injury to the plaintiff. *See, e.g., General Motors Corp. v. Bell,* 714 So.2d 268, 280 (Ala.1996); *Crowder v. Memory Hill Gardens, Inc.,* 516 So.2d 602, 604– 05 (Ala.1987). The duty to disclose must be based on a confidential relation or the particular circumstances of the case. *General Motors v. Bell,* 714 So.2d at 280.

The plaintiffs argue that the first element is supplied by TISA and that the defendant's written disclosures fail to disclose the policies at issue. These issues are common to all class members' fraudulent suppression claims. At least the following issues, however, must be addressed individually with respect to each class member: (1) whether the defendant disclosed its policies to the depositor other than through its written disclosures, for example, verbally or through individualized written communications;[10] (2) whether the depositor relied on the defendant's failure to disclose its policies;[11] (3) whether any such reliance was reasonable under the circumstances;[12] and (4) the existence and amount of damages suffered by the depositor as a result of the defendant's non-disclosure of its policies.[13] Moreover, to prove damages each depositor would have to show that

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

she acted in reliance on a belief that the defendant utilized some posting order other than descending dollar value. At least the following alternative methods have been identified in this litigation: (1) ascending dollar value; (2) order of presentation; (3) numerical order; and (4) random. The identification of the posting order relied on by each depositor represents an additional individualized issue.

*7 These individualized issues necessary to each class member's fraudulent suppression claim heavily predominate over the common issues identified by the plaintiffs. Indeed, such fraud claims are uniquely unsuited for class treatment. *See, e.g., Andrews v. American Telephone & Telegraph Co.,* 95 F.3d 1014, 1025 (11th Cir.1996)(reliance, proximate cause and damage elements of RICO claim based on mail and wire fraud were individualized issues predominating over alleged common issues of a scheme to defraud and affirmative misrepresentations). As the plaintiffs have stipulated, (Joint Stipulation of Facts and Law at 12–13), "a fraud cause of action cannot be certified when individual reliance will be an issue ." *Castano v. American Tobacco Co.,* 84 F.3d 734, 745 (5th Cir.1996)(citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 487 F.2d 880, 882 (5th Cir.1973)).

More generally, when (as the plaintiffs admit is the case here) "every member of the class will have to prove actual damage in order to receive compensation for their loss," the challenged policy or practice at issue *"cannot possibly* predominate over all the other issues in the case that are necessarily capable of only individualized resolution." *Rutstein v. Avis Rent–A Car–Systems, Inc.,* 211 F.3d 1228, 1241 (11th Cir.2000)(emphasis added)(Section 1981 claim). "The idea that individual injury could be settled on a class-wide basis is preposterous." *Id.* at 1239.

Moreover, the plaintiffs seek to represent a class composed of all depositors since July 1, 1993, over four years prior to the filing of this lawsuit, even though Alabama's statute of limitations for fraud is two years, Ala.Code § 6–2–38(*l* ), commencing "when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care." *Foremost Insurance Co. v. Parham,* 693 So.2d 409, 417 (Ala.1997). Each depositor's susceptibility to the defendant's statute of limitations defense would have to be determined individually, requiring individual assessments of the existence and timing of the depositor's awareness of either the policies themselves or of facts that would lead a reasonable person to discovery of the policies.

Finally, the defendant has counterclaims against some class members due to checks presented against insufficient funds; one such counterclaim has been asserted against plaintiff Heydolph. (Answer to First Amended Complaint at 11) Such counterclaims are compulsory. *See Plant v. Blazer Financial Services, Inc.,* 598 F.2d 1357, 1364 (5th Cir.1979)(debt counterclaim under TILA is compulsory). These counterclaims would require additional individualized determinations of damages accruing to the defendant, and counterclaim defendants would be required to raise individual defenses, such as waiver and estoppel. *See Heaven v. Trust Company Bank,* 118 F.3d 735, 738 (11th Cir.1997)(trial court properly considered the additional individual determinations required by compulsory counterclaims).

F. Superiority.

*8 Rule 23 provides four considerations to guide the superiority inquiry:

- "the interest of members of the class in individually controlling the prosecution or defense of separate actions";

- "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class";

- "the desirability or undesirability of concentrating the litigation of the claims in the particular forum";

- "the difficulties likely to be encountered in the management of a class action."

Fed.R.Civ.P. 23(b)(3)(A)-(D). [14]

With respect to the fourth consideration, "[i]ssues of class manageability encompass the 'whole range of practical problems that may render the class action format inapposite for a particular suit.' " *Andrews v. AT & T,* 95 F.3d at 1023 (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164 (1974)). If serious manageability problems exist, it is no answer to say they will be resolved later in some unexplained or uncertain manner. *Id.* (quoting *Windham v. American Brands, Inc.,* 565 F.2d 59, 70 (4th Cir.1977)(en banc), *cert. denied,* 435 U.S. 968 (1978)). The manageability difficulties inherent in the class treatment of the plaintiffs' fraudulent suppression claim render it unfit for class certification.

First, superiority analysis is "intertwined" with predominance analysis; when there are no predominant common issues of law or fact, "class treatment would be either singularly

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

inefficient ... or unjust." *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1006 n. 12 (11th Cir.1997). As noted, individual issues in this case greatly predominate over common ones.

Second, "[t]he greater the number of individual issues, the less likely superiority can be established." *Castano v. American Tobacco,* 84 F.3d at 745 n. 19. As noted, the plaintiffs' fraudulent suppression claim requires resolution of several individual issues, each of them composed of numerous individualized sub-issues.

Third, the greater the number of individual determinations that must be made, the less manageable a class action becomes. *See Andrews v. AT & T,* 95 F.3d at 1024–25. The enormous size of the proposed class serves as a tremendous multiplier of the individual issues and sub-issues. That 25% of the named plaintiffs are subject to compulsory counterclaims indicates that a large number of counterclaims are likely as well.

Fourth, the need to apply the laws of multiple jurisdictions exacerbates the manageability problem. *Andrews v. AT & T,* 95 F.3d at 1024–25. While the plaintiffs have not addressed the issue, it is clear that multiple states' substantive law will be implicated by class action treatment. The defendant operates in four states, and some of its consumer account holders likely reside in other states as well, especially adjoining ones. Under Alabama conflicts law, "an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Fitts v. Minnesota Mining & Manufacturing Co.,* 581 So.2d 819, 820 (Ala.1991). Thus, the substantive law of at least four states, and likely numerous others, would have to be applied to the plaintiffs' fraudulent suppression claim.

**\*9** Fifth, the complexity of the individual issues weighs further against manageability of the class action. Most if not all of the individual issues identified above would require extensive individualized examination of each class member. Assessment of reasonable reliance, for example, must be "based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Foremost Insurance v. Parham,* 693 So.2d at 421. The statute of limitations inquiry is similarly wide-ranging. Nor need the defendant accept a depositor's testimony at face value. Thus, for example, the defendant may not only cross-examine the depositor concerning her reliance on the

defendant's non-disclosure but may also introduce testimony and exhibits, such as bank statements, to undermine her testimony.

Similarly, the determination of each class member's damages has not been shown to require only a few mouse clicks to calculate. Given daily transactions for 500,000 account holders for over seven years (since July 1, 1993), almost one *billion* (1,000,000,000) daily transaction histories are at issue. Any calculation of damages would first have to identify, for each depositor, those days on which they were charged OD/NSF fees. With respect to the "per check" policy, it would have to be determined how many checks were presented on insufficient funds before the depositor next infused sufficient funds into his account, which could be days, weeks, or months. With respect to the posting order policy, business days on which more than one OD/NSF fee was charged would have to be identified. It would then have to be determined whether the posting order policy affected the number of OD/NSF fees charged on that day. Because each depositor's damages must be measured with reference to the alternate posting order identified by the depositor as the one she believed to be in place, that posting order must be identified separately for each depositor before her damage determination may proceed. [15] It would also have to be determined whether the depositor in fact was charged the fee and, if so, in what amount. In cases in which the depositor was not charged a fee for each check presented on insufficient funds, it would have to be determined which checks were not charged the fee. Similarly, it would have to be determined whether the depositor later received a full or partial refund—an analysis that would require review of additional, later records. After comparing OD/NSF charges under the defendant's posting order policy with those that would have accrued under the depositor's proposed posting order, it would be open to the defendant to show that, had the alternate posting order been utilized, other fees would have been charged (for example, against an account limiting the number of checks that can be paid in a given period) or refunds that were granted, not granted. The defendant states, plausibly albeit without evidentiary support, that "[m]uch of this information cannot be ascertained without painstaking manual review of each account." (Memorandum of Law in Opposition to Class Certification at 33)

**\*10** The plaintiffs offer no solution to these intractable manageability problems, failing even to address any issue but damages. In response to the foregoing daunting array of steps necessary to determine each class member's damages, the

2000 WL 1121778

plaintiffs respond cavalierly that the amount of such damages "is a calculation the Defendant can perform easily by the use of its computers." (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 21) For this proposition, the plaintiffs rely solely on the deposition of the defendant's senior vice-president for deposit operations, Cynthia Rogers. (*Id.*) Ms. Rogers testified only that the defendant's computer system has the capacity to "take today's transaction mix and rerun it in a test environment under the previous [posting order policy] and determine the difference." (Rogers Deposition at 34) However, among other deficiencies, Ms. Rogers did not state the system can perform the specific steps listed above, did not state the system can do so depositor by depositor or day by day, did not state the system can make a comparison run under each of the alternate posting order policies identified in this litigation, and did not state the computer can perform any such functions uniformly throughout the class period. What she did state was that it would be "difficult" to run a computer report on the defendant's increase in fees resulting from its posting order policy and that the computer cannot account for the many discretionary decisions made by bank officers in determining whether to assess fees. (*Id.* at 32) Ms. Rogers' testimony falls woefully short of supporting a reasonable inference that damages calculations would be completely automated and easy to program.

The plaintiffs next argue that the defendant has not proved with record evidence either the identity of the steps that must be undertaken to determine damages or the difficulty of accomplishing them. No evidence is necessary, however, to observe that the steps outlined above must be undertaken.[16] More fundamentally, the plaintiffs have misplaced the burden of proof. The burden is not on the defendant to show the difficulty of proving each class member's damages; the burden is on the plaintiffs to show the ease of doing so.

Finally, the plaintiffs complain that the Court may not consider the difficulty of proving each class member's damages on the remarkable ground that the plaintiffs voluntarily agreed with the defendant not to conduct the discovery necessary to show "how such damages would be calculated for each class member." (Brief in Support of Statement of Objection at 8). While the plaintiffs' agreement may have been a reasonable tactical decision, it does not excuse their failure to shoulder their burden of proof.

G. Conclusion.

The plaintiffs' fraudulent suppression claim fails to satisfy at least the adequacy, predominance and superiority requirements for class certification. With respect to the "per check" aspect of the claim, it also fails to satisfy the typicality requirement.[17]

II. Breach of Contract.
**\*11** The plaintiffs allege that TISA's disclosure requirements are "read into and becom[e] a part of the contract when it is made" and that defendant breached its resulting contractual obligation to disclose its posting order policy and per check policy. (Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment at 11; First Amended Complaint at 14)

A. Numerosity.
As noted, the numerosity requirement is satisfied.

B. Commonality.
The plaintiff argues that the defendant breached its contract with depositors because its written documents do not disclose the defendant's posting order policy and its per check policy. (Plaintiffs' Opposition to Motion for Summary Judgment at 11) Absent argument to the contrary, the Court will assume for purposes of class certification analysis that the content of the alleged contracts constitutes a common issue satisfying the commonality requirement.

C. Typicality.
As noted plaintiff York is not a member of the class and therefore is not a proper class representative. Similarly, plaintiff Root is not a proper class representative with respect to the posting order policy. Because Alabama' statute of limitations for breach of contract is six years, Ala.Code § 6–2–34(4), the named plaintiffs presumably are not subject to the statute of limitations as a unique defense.

D. Adequacy.
As noted, the plaintiffs have failed to prove either their adequacy or that of class counsel.

E. Predominance.
The elements of a breach of contract claim under Alabama law are as follows: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

nonperformance; and (4) resulting damages. *State Farm Fire & Casualty Co. v. Slade,* 747 So.2d 293, 303 (Ala.1999).

This claim raises individual issues that predominate over the common issues identified in Part II.B. Causation, as well as the defense of failure to mitigate, requires individual assessments of what each depositor understood to be the defendant's policies, which in turn requires assessments of such things as what information each depositor was given in addition to the written documents and what each depositor did do or would have done once armed with sufficient awareness of the defendant's actual policies. As with the plaintiffs' fraudulent suppression claim, the element of damages requires a series of individual determinations. Again, the defendant's compulsory counterclaims would raise additional individual issues.

F. Superiority.

The same manageability problems that plague the plaintiffs' fraudulent suppression claim engulf their breach of contract claim as well. In addition, with no possibility of punitive damages, class members' potential individual recovery is restricted to their actual damages. While some class members may have significant actual damages, others have small actual damages.[18] Nevertheless, their inclusion in the class exposes them to the defendant's compulsory counterclaims, which exposure may easily exceed their potential recovery. These class members' consequent interest in prosecuting and defending individual actions reflects that the class action vehicle is not superior. *See Heaven v. Trust Company Bank,* 118 F .3d at 738 (trial court properly considered that the class members' exposure as counterclaim defendants "could well exceed the amount they might recover" on the class claim); *Carter v. Public Finance Corp.,* 73 F.R.D. 488, 490 (N.D.Ala.1977)(it is not in the class members' interest to bring suit for less than the amount of the defendant's compulsory counterclaim).

G. Conclusion.

**\*12** The plaintiffs' breach of contract claim fails to satisfy at least the adequacy, predominance and superiority requirements for class certification.

III. TISA (Actual Damages).

Briefly, TISA requires depository institutions such as the defendant to maintain a schedule of fees, charges, terms and conditions applicable to each class of consumer accounts

it offers. 12 U.S.C. § 4303(a). Required information is described by statute and regulation. *Id.* § 4303(b). The schedule is required to be distributed to existing depositors on request, to potential depositors before an account is opened and, in the case of changes required to be disclosed, to all account holders that may be adversely affected. *Id.* § 4305(a), (c). A successful plaintiff may recover "any actual damage sustained by such person as a result of the failure," as well as statutory damages. *Id.* § 4310(a).

The plaintiffs allege the defendant failed to make the required disclosures concerning its posting order policy and its per check policy. (First Amended Complaint at 10–13)

A. Numerosity.

As noted, the numerosity requirement is satisfied.

B. Commonality.

The content and adequacy under TISA of the defendant's schedule is a common issue satisfying the commonality requirement.

C. Typicality.

As noted, plaintiff York is not a member of the class and therefore not a proper class representative. Similarly, plaintiff Root is not a proper class representative with respect to the posting order policy.

D. Adequacy.

As noted, the plaintiffs have failed to prove either their adequacy or that of class counsel.

E. Predominance.

TISA, enacted in 1991, has received scant attention in the reported case law. However, the elements of a cause of action under TISA for actual damages may be listed as follows: (1) a proper plaintiff, that is, a consumer account holder; (2) a proper defendant, that is, a depository institution subject to TISA; (3) a failure to create, and/or a failure to disclose as required, a schedule containing the required information; (4) proximate cause; and (5) actual damages.

TISA's damages provisions were patterned after those in the Truth in Lending Act ("TILA"). *Compare* 12 U.S.C. § 4310(a) *with* 15 U.S.C. § 1640(a). Like TISA, TILA allows recovery of "any actual damage sustained by [the plaintiff] as a result

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

of the failure." 15 U.S.C. § 1640(a)(1). With rare exception, courts have held that this language requires, not simply that the plaintiff incur damage following an illegal non-disclosure but also that, had the disclosure occurred as required, the plaintiff would have avoided or reduced the damage, as by obtaining financing elsewhere on more favorable terms or by foregoing financing. *See, e.g., Anderson v. Rizzo Chevrolet, Inc.,* 9 F.Supp.2d 908, 913 (N.D.Ill.1998); *Barlow v. Evans,* 992 F.Supp. 1299, 1309–10 (M.D.Ala.1997); *Wiley v. Earl's Pawn & Jewelry, Inc.,* 950 F.Supp. 1108, 1114–17 (S.D.Ala.1997); *Adiel v. Chase Federal Savings & Loan Association,* 630 F.Supp. 131, 133–34 (S.D.Fla.1986), *aff'd,* 810 F.2d 1051 (11th Cir.1987); *see also Brister v. All Star Chevrolet, Inc.,* 986 F.Supp. 1003, 1008 (E.D.La.1997)(court "inclined to follow" the cases imposing a detrimental reliance requirement). *But see Russell v. Fidelity Consumer Discount Bank,* 72 B.R. 855, 863–64 (Bankr.E.D.Pa.1987)(no showing of detrimental reliance required). [19] The Court discerns no reason to construe TISA differently than TILA.

**\*13** Therefore, the plaintiffs' claim for actual damages under TISA encompasses individualized issues of reliance, causation and damages as involved as those encompassed within the plaintiffs' fraudulent suppression and breach of contract claims. Again, the defendant's compulsory counterclaims would inject additional individual issues into the litigation. These individualized issues predominate over the common issues raised by the plaintiffs' claim for actual damages under TISA.

### F. Superiority.

The manageability problems discussed previously are only worse with respect to the plaintiffs' TISA actual damages claim. Each depositor would be required to prove that, had the defendant's policies been disclosed, the depositor would have altered her behavior. That altered behavior could take numerous forms, including at least the following: (1) banking with a depository institution other than the defendant; (2) banking with a depository institution in addition to the defendant; (3) ending all use of depository institutions; (4) remaining with the defendant but switching to an account not susceptible, or less susceptible, to OD/NSF charges; (5) retaining the same account with the defendant but exercising more caution in making deposits and withdrawals. If the depositor would have banked elsewhere or opened a different account with the defendant, the particulars of the account the depositor would have selected would have to be determined, including such things as monthly fees, per-check fees, ATM

fees and OD/NSF fees, as well as the terms and conditions for charging each. Variations in these particulars during the relevant time period would also have to be accounted for. The depositor's entire account history with the defendant within the TISA statute of limitations—not just those days on which OD/NSF fees were charged—would then have to be recreated under the alternative scenario identified by the depositor in order to compare the cumulative fees and charges under both situations. The large number of alternative scenarios class members could identify, the even larger number of combinations of bank charges at other institutions (and with the defendant), and the exacting scrutiny of every transaction in the depositor's account, both as it occurred and as it would have occurred under a different scenario, engender manageability difficulties that beggar description.

As with the plaintiff's breach of contract claim, the danger of compulsory counterclaim awards larger than damage awards enhances the interest of class members in controlling their individual interests and renders the class action not superior. [20]

### G. Conclusion.

The plaintiffs' claim for actual damages under TISA fails to satisfy at lest the adequacy, predominance and superiority requirements for class certification.

### IV. TISA (Statutory Damages).

The parties "stipulated" that class certification is appropriate with respect to that portion of the plaintiffs' claim that seeks to recover statutory, but not actual, damages under TISA. The parties have devoted no argument or analysis to justifying the propriety of class treatment of this portion of the lawsuit and apparently expect the Court to accept their stipulation uncritically. The Court may not do so. *See, e.g., Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997)(a joint motion for certification of a "settlement-only" class action cannot be granted unless all six requirements for certification under Rules 23(a) and 23(b)(3) are satisfied). Instead, the Court must engage in the same careful consideration of the six elements necessary to certify a Rule 23(b)(3) class that the defendant correctly insists is mandatory with respect to the plaintiffs' other claims. [21] Upon such consideration, the Court concludes that the plaintiff's claim for statutory damages under TISA is not appropriate for treatment as a class action.

### A. Numerosity.

**\*14** As noted, the numerosity requirement is satisfied.


B. Commonality.

As with the plaintiffs' TISA claim for actual damages, the commonality requirement is satisfied.


C. Typicality.

As noted, plaintiff York is not a member of the class and therefore is not a proper class representative. Similarly, plaintiff Root is not a proper class representative with respect to the posting order policy.


D. Adequacy.

As noted, the plaintiffs have failed to prove either their adequacy or that of class counsel.


E. Predominance.

Because proximate cause and actual damages are not elements of a TISA claim for statutory damages, the Court assumes for purposes of class certification analysis that common issues predominate over individual issues.


F. Superiority.

To be certified as a class action, the Court must find that "a class action is superior to other available methods for the *fair* and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3)(emphasis added). The Supreme Court has acknowledged that the superiority requirement focuses not simply on the efficiency of trying large numbers of claims together but also on the fairness to the litigants of doing so. Moreover, the fairness of the device must be gauged both by its procedural ability to produce a fair result and by its tendency not to engender other untoward effects. Through the predominance and superiority elements of class certification analysis, the Advisory Committee "sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, *without sacrificing procedural fairness or bringing about other undesirable results.*' " *Amchem Products v. Windsor,* 521 U.S. at 615 (emphasis added)(quoting Fed.R.Civ.P. 23 Advisory Committee Notes).

The range of potential awards of statutory damages under TISA depends on whether the plaintiff proceeds individually or as a class member. A successful individual plaintiff may be awarded no less than $100 and may be awarded as much as

$1,000. 12 U.S.C. § 4310(a)(2)(A). A member of a successful class, in contrast, may be awarded statutory damages as low as zero. *Id.* § 4310(a)(2)(B)(i). Moreover, the most the class member may recover is her pro rata share of the statutory damages awarded the class. The statutory damages awarded the class are subject to an absolute cap of $500,000; the cap is lower if the defendant's net worth is less than $50,000,000. *Id.* § 4310(a)(2)(B)(ii). [22]

Because the parties have not provided evidence of the defendant's net worth, the Court assumes that the maximum cap of $500,000 applies to this case. As noted, the defendant had approximately 600,000 demand deposit accounts in January 1999. Some of these accounts are business accounts, which fall outside the class. On the other hand, the 600,000 figure includes only accounts that existed in January 1999 and therefore fails to incorporate additional class members who had consumer demand accounts within the relevant period that were closed before January 1999 or opened after January 1999. Accordingly, the maximum recovery per class member may safely be estimated as approximately $1.

**\*15** To summarize, an individual plaintiff's statutory damages range from $100 to $1,000; a class member's maximum statutory damages are approximately $1. Proceeding as a class automatically reduces each class member's potential recovery of statutory damages between 99% and 99.9%.

The disparity between the statutory damages available to an individual plaintiff and those available to a class member is likely to be even greater. The Court is required by statute, in determining the appropriate amount of statutory damages in a class action, to consider "the amount of any actual damages awarded." 12 U.S.C. § 4310(b)(1). Because the proposed class would seek only statutory damages, the amount of actual damages that could be awarded the class is zero. A class member proceeding as an individual, in contrast, could enhance her potential recovery of statutory damages by establishing the existence of actual damages.

The inability of the class to pursue actual damages is more problematic still. TISA creates a single cause of action for violation of its disclosure requirements but provides two cumulative elements of damage: actual and statutory. Proceeding as a class action exclusively for recovery of statutory damages effectively eliminates any claim for actual damages by the class members, not merely in this lawsuit but in any individual lawsuit as well. *See, e.g., Kirkpatrick v. J.C.*

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

*Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987)( "[A]ll members of the class are bound by the res judicata effect of the judgment."). Thus, every class member would surrender, not only 99% to 99.9% or more of her statutory damages but 100% of her actual damages as well—all to recover, at most, approximately $1. [23]

The Court recognizes that many, if not most, class actions result in awards or settlements generating a lesser recovery to each class member than the class member might have achieved by proceeding individually. There is a critical difference, however, between certifying a class action while recognizing the possibility that individual class members' recovery may be reduced by an indeterminate percentage and doing so with the absolute certainty that such recovery will be essentially eliminated altogether.

Indeed, the Fifth Circuit has explicitly instructed that district courts consider, in performing their superiority analysis, "the reduction in damages, if any, to the individual members of the class" by comparing their potential recovery as class members to their potential recovery as individual plaintiffs. *Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114, 118–19 (5th Cir.1975). In *Boggs,* a case brought under TILA, the Court performed hypothetical calculations to assess the degree of reduction in the proposed class members' potential recovery given the cap on statutory damages that may be awarded in a class action brought under TILA. *See id.* at 118. The *Boggs* Court suggested that a reduction in maximum statutory damages to $42 would be significant, *see id.;* a reduction to approximately $1 is necessarily much more significant. [24]

*16 Moreover, with maximum recovery in the $1 range, any class member subject to a compulsory counterclaim would almost necessarily face the specter of losing much more than she could possibly hope to gain in class litigation.

To constitute a "superior" method for the fair and efficient adjudication of a controversy, as required by Rule 23(b)(3), the class action cannot simply be a marginally acceptable device or one merely comparable to other methods of conflict resolution; it must affirmatively be preferable in a legally significant sense. A class action that demands each class member to surrender essentially all of her damages cannot easily be characterized as a superior vehicle for the fair adjudication of a controversy. However, "superior" is a comparative term that requires consideration of "other available methods" for resolving the controversy,

Fed.R.Civ.P. 23(b)(3), principally the individual action. Accordingly, the Court engages in such a comparison.

The most common justification for certifying a Rule 23(b)(3) class action is "vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents to court at all." ' *Amchem Products v. Windsor,* 521 U.S. at 617 (quoting Kaplan, *A Prefatory Note,* 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969)). Such a situation is said to exist when the amount of the individual claims is so small, and the costs (including attorney's fees) of individually prosecuting such claims so great, that there is no incentive for individual litigants to proceed. *See, e.g., Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1241 n. 21 (11th Cir.2000)("[T]he most compelling justification for a Rule 23(b)(3) class action [is] the possibility of negative value suits."). In such a situation, a class action may be a superior vehicle for resolving disputes.

This paradigm, however, does not accurately describe an individual suit for statutory damages under TILA. While a plaintiff's potential recovery may appear small, especially in present-day dollars, [25] the costs of—and therefore the barriers to—prosecuting such a claim are correspondingly small. Most importantly, TISA mandates that successful plaintiffs be awarded "the costs of the action, together with a reasonable attorney's fee as determined by the court." 12 U.S.C. § 4310(a)(3). *Cf. Andrews v. American Telephone & Telegraph Co.,* 95 F.3d 1014, 1025 (11th Cir.1996)(in reversing certification of a class action under RICO, noting that "even small individual claims under RICO can be feasible given the possibility of the availability of treble damages and attorneys' fees to successful plaintiffs"); *James v. Home Construction Co.,* 621 F.2d 727, 731 n. 7 (5th Cir.1980)(availability of attorney's fees to individual plaintiffs seeking rescission under TILA " 'undermines the contention that class treatment furthers the class members' interest' ") (quoting *Nelson v. United Credit Plan, Inc.,* 77 F.R.D. 54, 58 (E.D.La.1978)). TISA's civil liability provisions were modeled after those in TILA, and attorney's fee awards under TILA are not necessarily capped by the size of the award. *See Henson v. Columbus Bank & Trust Co.,* 770 F.2d 1566, 1570–71, 1574–75(11th Cir.1985)(plaintiff proceeding under TILA awarded $7,000 in damages and $12,715 in attorney's fees; case remanded for further consideration of attorney's fees, and their potential increase, based on a comparison with the defendant's attorney's fees).

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 183 of 230
Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)
2000 WL 1121778

**\*17** That TISA expressly references class actions does not authorize this Court to engage in a less searching analysis of the appropriateness of class action treatment of a case arising under TISA than is required for other putative class actions. Assuming that Congress may, by statute, provide for the maintenance of class actions on a lesser showing than is required under Rule 23(b)(3), *see Heaven v. Trust Company Bank,* 118 F.3d 735, 739 (11th Cir.1997), it has provided no indication of an intention to do so under TISA. *See Boggs v. Alto Trailer Sales,* 511 F.2d at 117 (following the 1974 amendments to TILA that "expressly contemplated" class actions, "we perceive the rule to be that courts are to apply Rule 23 to Truth in Lending cases *just as it is applied generally* ")(emphasis added). As noted, Congress's response to *Boggs* was not to criticize it or demand a different analysis but to raise the cap on statutory damages in hopes of reducing the barriers to class certification.

Nor does the denial of class certification in this case render class action treatment inappropriate for all TISA cases. It requires little imagination to envision a situation in which the size of the class, compared to the net worth of the defendant, will allow a significant recovery of statutory damages by each class member; it requires little more to envision a violation that, either on its face or as shown by the evidence, could not have resulted in appreciable actual damages. While a class action might be a superior vehicle for resolving controversies in such a case, it is not the case presented here.

As its sole effort to support certification of a class seeking only statutory damages under TISA, the defendant notes in a footnote that a fellow district court has certified such a class in the context of TILA. This Court, however, finds *Perry v. Household Retail Services, Inc.,* 180 F.R.D. 423 (M.D.Ala.1998), to be unpersuasive, because the *Perry* Court's superiority analysis addressed only the efficiency of a class action and not its fairness. More particularly, the *Perry* Court did not compare the potential recovery available to individual plaintiffs with that available to class members, as required by *Boggs,* did not consider the significance of certifying a class that abandons all claim to the vast majority of potential compensation, and did not evaluate the existence or absence of barriers to prosecuting individual claims.

G. Conclusion.

The plaintiffs' claim for statutory damages under TISA fails to satisfy at least the adequacy and superiority requirements for class certification.

CONCLUSION

The plaintiffs' amended motion for class certification is denied.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1121778

---

## Footnotes

1     The plaintiffs' original motion for class certification, (Doc. 8), is superseded by their amended motion and is therefore moot.

2     The plaintiffs' motion to file supplemental evidence is granted.

3     At the conclusion of the hearing, Judge Cassady informed the plaintiffs that the defendant's proposed findings and conclusions would serve as his template in crafting a report and recommendation and that the plaintiffs should file specific objections to any perceived factual or legal misstatements contained therein. (Hearing Transcript at 185, 189–90) The plaintiffs failed to do so but instead filed a lengthy, competing proposed order. The plaintiffs having failed to direct his attention to any specific errors in the defendant's memorandum, Judge Cassady accordingly drew heavily from the defendant's memorandum in preparing his report and recommendation. In light of the plaintiffs' objections to the report and recommendation and the Court's

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

assessment of the propriety of class certification, the Court enters this separate order on class certification, utilizing the report and recommendation as a foundation.

4    The First Amended Complaint names as defendants AmSouth Bank, AmSouth Bank of Alabama and AmSouth Bank of Florida. (Doc. 16 at 2) At the class certification hearing, defense counsel acknowledged that, due to mergers, the latter two entities ceased to exist in approximately 1995 and that the only appropriate defendant is AmSouth Bank. Judge Cassady then announced that "in all future captions ... we will only have one defendant, and that will be the proper description of AmSouth Bank." (Hearing Transcript at 33–34)

5    Counsel informed Judge Cassady at the class certification hearing that the amended motion contains a typographical error and that the correct opening date is July 1, 1993. (Hearing Transcript at 10–11; *see also* Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 8–9; Brief in Support of Statement of Objection at 10)

| | |
|---|---|
| Subclass One: | Those depositors who, at any time since July 1, 199[3], incurred and paid an overdraft or non-sufficient fee(s)("OD/NSF fee(s)") that they would not have otherwise incurred and paid but for AmSouth's undisclosed policy of posting multiple debit transactions in a sequence of highest debit item to lowest debit item within a certain transaction code in a given banking business day. |
| Subclass Two: | Those depositors who, at any time since July 1, 199[3], incurred and paid more than one OD/NSF fee in a given banking business day. |
| Subclass Three: | All depositors to whom AmSouth, since July 1, 199[3], failed to give proper notice under the Truth in Savings Act that (a) AmSouth had a policy of posting multiple debit transactions in a sequence of highest debit item to lowest debit item within a certain transaction code in a given banking business day, and/or (b) the OD/NSF fee would be charged on a per check basis. |

6    The plaintiffs object that there is no evidence to support this figure, but their counsel stipulated that such evidence exists. (Hearing Transcript at 137) Nor have the plaintiffs produced evidence of any different figure.

7    The plaintiffs have not objected to this finding of fact.

8    The plaintiffs have stipulated that they have the "burden of establishing specific facts sufficient to satisfy each of the prerequisites" of Rule 23. (Joint Stipulation of Facts and Law at 8)

9    The defendant's vouching for the adequacy of plaintiffs' counsel is especially suspect given that the defendant desires the Court to certify a restricted subclass and therefore has an interest in conceding counsel's adequacy.

10    For example, it is the defendant's written policy to disclose any requested information concerning its posting order policy to a customer that asks for it. (Report and Recommendation at 16)

11    The plaintiffs concede that each depositor's reliance constitutes an individualized issue. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 21)

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)
2000 WL 1121778

12    For example, several of the named plaintiffs knew, regardless of any disclosure by the defendant, that OD/NSF fees would be charged on a per check basis.

13    The plaintiffs concede that each depositor's damages constitutes an individualized issue. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 21)

14    These considerations are non-exhaustive and apply as well to the predominance requirement. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615 (1997).

15    The first step would be required for each of approximately half a million depositors. The other foregoing steps would have to be performed for every class member that was ever charged an OD/NSF fee. Later steps would be required only for those class members whose OD/NSF charges are shown by the preceding steps to have been affected by the policies at issue (Subclasses One and Two). The plaintiffs have failed to provide the Court any figures as to the membership in Subclasses One and Two, and the Court cannot assume the number is small; if only 20% of the class members fall within Subclasses One and Two, that translates into approximately 100,000 persons for whom the complete damages analysis would be required. At any rate, the Court's analysis and conclusion are not dependent on the membership of Subclasses One and Two.

16    In fact, the plaintiffs have stipulated and/or failed to object, to facts demonstrating the necessity for each of these steps. (Joint Stipulation of Facts and Law at 6–8; Report and Recommendation at 12; Hearing Transcript at 137)

17    The defendant's additional arguments in opposition to class certification, being unnecessary for decision, will not be considered or addressed.

18    Plaintiff Shelley, for example, has identified only $25 in actual damages and plaintiff Heydolph only $50. (First Amended Complaint at 5–6)

19    The bankruptcy court's decision in *Russell* has been thoroughly discredited, *see especially Wiley v. Earl's Pawn & Jewelry,* 950 F.Supp. at 1114–17, a dissection that need not be repeated here.

20    In their motion to file supplemental evidence, the plaintiffs stress that a district court in the Southern District of Illinois has conditionally certified a class action that covers account holders in approximately 16 jurisdictions who incurred additional OD/NSF fees as a result of the defendant banks' policy of posting checks in descending dollar value and that alleges causes of action for violations of TISA, state consumer fraud acts and breach of contract. (Motion to File Supplemental Evidence, Exhibit 1) The plaintiffs have failed to provide a copy of the certification order, a summary of the evidence and argument presented, or any other information that could allow this Court to measure the significance of the certification. On the contrary, the docket sheet reflects that the plaintiffs' motion for conditional class certification was granted the same day it was filed, pursuant to a proposed settlement, (Notice of Filing, Exhibit 1), suggesting that little analysis preceded the conditional certification order. Under these circumstances, this Court cannot afford any weight to the certification.

21    For the same reason, the plaintiffs' suggestion that the parties' stipulation precludes the Court from making any findings inconsistent with the stipulation, as it impacts the plaintiffs' state law causes of action and TISA actual damages claim, is meritless.

22    Total recovery of statutory damages in a single class action or a series of class actions arising out of the same non-compliance with TISA "shall be not more than the lesser of $500,000 or 1 percent of the net worth of the depository institution involved." *Id.*

Shelley v. AmSouth Bank, Not Reported in F.Supp.2d (2000)

2000 WL 1121778

23    While the amount of actual damages for each class member is of course unknown and certainly varies among class members, the plaintiffs allege that the defendant predicted in excess of $2,000,000 in increased annual income from Alabama and Florida operations from the posting order policy alone. (Amended Motion for Class Certification at 13; Plaintiffs' Proposed Statement of Undisputed Facts in Support of Motion for Partial Summary Judgment, Document No. ASO4650) In addition, many class members presumably were charged by their payees on checks returned under the defendant's posting order policy, as occurred in plaintiff Heydolph's case. (*Compare* First Amended Complaint at 4 *with* Heydolph Deposition at 97–98 & Exhibit 35)

24    The Eleventh Circuit in *Shroder v. Suburban Coastal Corp.,* 729 F.2d 1371 (11th Cir.1984), subsequently stated that "[t]he courts have held that denying class certification because class recovery would be minimal is no longer valid" under TILA following the 1974 amendments imposing maximum, and eliminating minimum, recovery in class actions. *Id.* at 1376–77. Despite its sweeping language, *Shroder* does not undo *Boggs* for at least the following reasons. First, *Shroder*'s statement was dictum, as the Court upheld the district court's denial of class certification on other grounds. 729 F.2d at 1376, 1378–79. Second, *Shroder* addressed only the relevance of reductions in recovery to the adequacy element of certification analysis, not the superiority element. *Id.* at 1376–77. Third, the two cases relied on by *Shroder* (district court cases from Rhode Island and Illinois) justified their position by quoting a Senate Report that in fact expressly acknowledged *Boggs* and, rather than disagreeing with either its analysis or its statement that "courts are to apply Rule 23 to Truth in Lending cases just as it is applied generally," 511 F.2d at 117, instead proposed a fivefold increase in the statutory damages cap (to its current $500,000 level) as a response to *Boggs* ' implicit suggestion that the existing cap was too low to allow "effective use" of the class action device. S. Rep. 94–590, *reprinted in* 1976 U.S.C.C.A.N. 431, 438. Fourth, while the net worth of the defendant is not set forth in the *Shroder* opinion, there were only 496 class members, 729 F.2d at 1379, making it unlikely that the proposed class members' statutory damages were reduced as dramatically as would occur in this case. Finally, even if there were conflicting holdings in *Boggs* and *Shroder, Boggs* alone, as the earlier panel decision, would reflect binding precedent. *See, e.g., United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993).

25    The $100 to $1,000 range of statutory damages under TISA was carried over from TILA, which enacted these brackets in 1968.

---

**End of Document**                                             © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**18**

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

KeyCite Yellow Flag

Declined to Follow by Biscardi v. Government Employees Insurance Company, D.Md., January 11, 2023

2017 WL 1105236
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Thomas SLOANE, individually and on behalf
of all persons similarly situated, Plaintiff,

v.

GULF INTERSTATE FIELD
SERVICES, INC., Defendant.

No. 4:16-cv-01571
|
Filed 03/24/2017

**Attorneys and Law Firms**

Alexandra Koropey Piazza, Sarah R. Schalman-Bergen, Shanon J. Carson, Berger & Montague, P.C., Philadelphia, PA, James A. Jones, Richard J. Burch, Bruckner Burch PLLC, Houston, TX, for Plaintiff.

Annette A. Idalski, Peter N. Hall, Fletcher B. Howard, Chamberlain, Hrdlicka, White, Williams & Aughtry, Atlanta, GA, Keith E. Whitson, Schnader, Harrison, Segal & Lewis, Pittsburgh, PA, Veronica Turner Saltz, Chamberlain Hrdlicka White Williams & Aughtry, West Conshohocken, PA, for Defendant.

**MEMORANDUM**

Matthew W. Brann, United States District Judge

**I. INTRODUCTION**

*\*1* "This is the second attempt by the same counsel to seek certification of a collective action wage and hour lawsuit on a nationwide basis against Gulf Interstate Field Services (GIFS). The first attempt failed." [1] As might be expected, this second-chance effort has fared no better than the first. "Put simply, the old adage that 'if at first you don't succeed, try again' does not apply to litigation in federal court." [2]

This Fair Labor Standards Act case was brought on behalf of a putative class comprised of natural gas pipeline inspectors. In essence, the class members allege that they were paid a day rate with no accounting for overtime worked. Numerous features of this litigation are fatal to the class's success: (1) significant disparities exist among the putative class members, their worksites, their responsibilities, and their clients—there is no common thread; (2) individualized inquiries as to the applicability of certain exemptions would overwhelm collective resolution; (3) applicable payroll records reveal that they were likely paid a salary; and (4) the pay letters at issue are at worst ambiguous and at best clarify that the workers actually received a salary guarantee.

Moreover, I observe from the outset that this is not a putative class comprised of minimum wage earners who perform rote tasks in less than ideal conditions. This is a class of professional pipeline inspectors—one of whom took home an annualized salary of $140,500—that nevertheless now seek to utilize the FLSA's overtime provisions to obtain additional pay they claim they are owed.

Counsel for Plaintiff has already failed to obtain nationwide certification in a related matter pending before the United States District Court for the Southern District of Ohio. In fact, not only was certification of a collective action denied in part, but summary judgment was eventually granted in GIFS's favor in that case.

A few months later and following a radio campaign that sought to recruit potential gas workers to serve as class members, that same counsel arrived at this Court's doorsteps, armed with a new class representative but the same old theory. [3] Technically speaking, they first arrived at a neighboring district from which counsel for Plaintiff had recently won a favorable judgment in another case. [4] Regardless, when the court in that district realized in July 2016 that venue was nonexistent, the case was swiftly punted to this Court. Venue, as it turns out, was improper in that district because the lone putative class member from Pennsylvania had never even worked in one of the counties that comprise that forum.

*\*2* This Court held a telephonic status conference on August 29, 2016, at which time a formal briefing and oral argument was scheduled on the pending motions for conditional certification under 29 U.S.C. § 216(b) and class certification under Federal Rule of Civil Procedure 23. That conference followed a letter from Veronica Saltz, Esquire, counsel for Defendant, which both informed the Court of the parallel Ohio action and expressed skepticism that this case could be meaningfully distinguished from that one.

Case 3:18-cv-00121-JFS-PJC     Document 232-13     Filed 02/24/26     Page 189 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

This Court held a day-long oral argument on November 21, 2016. For all of the distance it seems we must have traversed, we have had to endure, we still find ourselves at the same place where we began. For the reasons set forth below, Plaintiffs have fallen well short of satisfying their burdens under the Fair Labor Standards Act as well as Federal Rule of Civil Procedure 23. Accordingly, both certification motions are denied, and the putative opt-in Plaintiffs are dismissed with prejudice.

## II. BACKGROUND

### A. Significant Variance Is Present Among GIFS's Inspectors, Clients, Worksites, Job Responsibilities, Discretion, And Projects.

GIFS staffs its clients' projects with many different types of inspectors, including: Chief Inspectors, Assistant Chief Inspectors, COR Inspectors, Corrosion Inspectors, Electrical and Instrumentation Inspectors, Environmental Inspectors, Safety Inspectors, Utility Inspectors, Welding Inspectors, and Coating Inspectors.[5] Each type of inspector possesses different qualifications and expertise, and performs different job duties.[6] Nevertheless, Plaintiffs seek certification of collective action generically comprising "all current and former employees of [GIFS] who performed work as a pipeline inspector in the United States in any workweek between three years prior to the date of the Court's Order and the present."[7] The proposed class otherwise embraces no limitations based on geography, timeframe, client, position type, or project nature, though it does incorporate a carve-out for three separate projects where employees are believed not to have suffered any unlawful treatment.[8]

Since 2011, GIFS has staffed approximately 2,275 employees with over 40 clients across at least 35 states, both on- and off-shore.[9] As Robert J. Sprick, the company's Senior Vice President, testified, "[t]he number and type of jobs staffed by [GIFS] on any particular project also varies considerably from project to project, client to client, and over time."[10] This means that "similarly titled jobs, like 'pipeline inspector,' often entail different job duties from project to project, as each client sets the job duties for each [GIFS] employee on its projects."[11]

GIFS "generally has no authority to direct the tasks performed by its employees on its clients' respective projects, or control when or how such tasks are performed."[12] Instead, GIFS's clients "generally assign work to [GIFS's] employees, and [GIFS's] employees exercise various levels of discretion and independent judgment in performing their assigned tasks."[13] "Job duties also may vary depending upon the portion of a particular project that an employee is assigned, as conditions can vary at different parts of a worksite."[14]

Because GIFS is a staffing company, its inspectors' relative positions in the organizational structure is client-dependent.[15] As stated, "inspectors are staffed for each particular project according to the needs of GIFS's clients," and "[s]upervision of inspectors may differ on a project-by-project basis depending upon the individual supervisor assigned by the client."[16] Accordingly, GIFS's various clients, not GIFS, "control[ ] each staffed employee's work schedule, whether the job site is open for work on any particular day, and any applicable sick leave and vacation policies."[17]

### B. The Hughes Court Rejects Counsel For Plaintiff's Day Rate Theory In A Nearly Identical Action In The Neighboring State Of Ohio.

*3 In 2014 and before this case's inception, counsel for Plaintiffs filed a strikingly similar complaint in the United States District Court for the Southern District of Ohio. That case was captioned Hughes v. Gulf Interstate Field Servs., Inc., and it involved nearly identical allegations, save for the differences occasioned by the application of Ohio state law to the plaintiffs' pendent claims.[18] In particular, the Ohio lawsuit alleged that GIFS paid its inspectors a day rate.[19]

Counsel for Plaintiffs' geographical blunders (or creativity) have unfortunately been featured as a common theme in their litigation against GIFS. Importantly, though, there is something obviously proper to be said for Plaintiff's counsel having taken their first bite at the apple in the buckeye state —after all, that's where the named and opt-in plaintiffs in Hughes actually worked.

The telling nature of that initial choice of venue will come into play again later in my discussion, but suffice it to say for now that the Ohio action was a failed endeavor. In fact, the Honorable Edmund A. Sargus, Jr., determined that the plaintiffs could not even "make a modest factual showing" that a nationwide collective should be certified.[20] Because

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 190 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

all five of the opt-in plaintiffs were culled from the MarkWest Ohio project, Judge Sargus did conditionally certify a class consisting only of those inspectors who worked at that lone Ohio job site.[21] As to the motion for conditional certification, he concluded that "Plaintiffs submit no sufficient evidence to support a conditional class outside of the Markwest Ohio Project."[22]

At the same time, Judge Sargus also denied Plaintiffs' motion for certification under Rule 23. He reasoned as follows:

> The applicability of each of these exemptions involve fact-specific inquiries regarding an employee's specific job duties —whether management, business-operations, office or nonmanual etc.; the independent judgment exercised in the performance of said duties, the percentage of time devoted to each duty; and the supervisory capacity, if any, of each employee. While Plaintiffs' employee affidavits touch on the answers to some of these questions as they pertain to the individual affiants, Plaintiffs have not satisfied their burden of demonstrating that all individuals in the proposed class would have common answers, such that a determination of whether these exemptions apply is capable of classwide resolution.[23]

Approximately one year later, GIFS moved for summary judgment as to Plaintiffs' FLSA claims, and summary judgment was granted. Like the matter sub judice, summary judgment in Hughes turned on the applicability of a number of the FLSA's regulatory exemptions.[24] Those exemptions depended upon whether GIFS' employees were "paid on a salary basis."[25]

Judge Sargus relied on Sixth Circuit precedent for the proposition that "employment agreements are no longer the relevant starting point for whether an employee is paid on

a salary basis."[26] The motivation behind such a rule is that what controls is not what the employee was owed, but what he actually received.[27] "It is not written descriptors of the payment policies that are relevant to the salary-basis test inquiry, but rather the actual payment practice," Judge Sargus concluded.[28] Thus, because the plaintiffs in Hughes "were actually paid the requisite amount to satisfy the FLSA's salary-basis requirement," the exemptions applied, and summary judgment was appropriate.[29]

### C. This Case Is Transferred To This District, And Oral Argument On Both Certification Motions Is Heard.

**\*4** The present matter was initiated in the Western District of Pennsylvania on September 16, 2015. Plaintiffs filed their motion for conditional certification and to facilitate notice pursuant to 29 U.S.C. § 216(b) on April 8, 2016. The Honorable Nora Barry Fischer, to whom the case was assigned at that time, heard oral argument as to that motion on May 26, 2016. Later, Plaintiffs motion for class certification pursuant to Federal Rule of Civil Procedure 23 was filed on June 27, 2016. The matter was transferred in its entirety to the undersigned on July 29, 2016. This Court conducted a telephonic status conference call on August 29, 2016, at which time it finalized the remaining deadlines for responsive briefing on Plaintiffs' Rule 23 certification motion. Thereafter, oral argument as to both motions was held on November 21, 2016.

### D. The Named Plaintiffs And Opt-in Plaintiffs Exhibit Significant Variance In Terms Of Their Employment.

This section provides a brief factual comparison of several central factors about the named Plaintiff and the five opt-in Plaintiffs on whose behalf verified consent forms have been filed on the ECF docket. I list the opt-in plaintiffs in the order in which each's notice of consent to opt-in was electronically filed by Plaintiff's counsel on the Court's docket.

#### 1. Named Plaintiff: Thomas Sloane

In early 2014, Kinder Morgan hired GIFS to staff inspectors on a compressor station expansion project along a natural gas pipeline in Wyalusing, Bradford County, Pennsylvania.[30] That compressor station is referred to internally as "Station 319."[31] GIFS sent eight inspectors, including Mr. Sloane, to the Station 319 project.[32] That project began in early January

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

2014 (although Mr. Sloane's work there did not begin until April 2014). [33] His work on that project ended in September 2014. [34] Thereafter, Mr. Sloane worked for approximately one month on an unrelated project for the same client in Oklahoma. [35]

### 2. Opt-in Plaintiff #1: Allen Hinkle

Mr. Hinkle worked for GIFS from approximately August 2012 through December 2012 as a Welding Inspector in West Virginia on a project for MarkWest Liberty Midstream & Resources, LLC. [36] He then worked for GIFS from approximately October 2013 through March 2014 as a Welding Inspector in Missouri on a project for Enbridge Energy Partners, L.P. [37]

### 3. Opt-in Plaintiff #2: Justin Bish

Mr. Bish worked for GIFS from approximately June 2011 through October 2013 as a Utility Inspector in West Virginia on a project for MarkWest Liberty Midstream & Resources LLC. [38] From approximately October 2013 through February 2014 he worked for GIFS as an Assistant Chief Inspector in West Virginia on a second project for that same client. [39] Finally, from approximately February 2014 through March 2014, he worked with GIFS as an Assistant Chief Inspector in Ohio on a project for MarkWest Energy Partners, L.P. [40]

### 4. Opt-in Plaintiff #3: Richard Stapleman

 **\*5** Mr. Stapleman first worked for GIFS from approximately October 2013 through December 2013 as a Quality Control Inspector in Arizona on a project for Kinder Morgan. [41] He then worked for GIFS from approximately March 2015 through April 2015 as a Chief Inspector in New Mexico on a project for Kinder Morgan. [42] He next worked for GIFS from approximately April 2015 through May 2015 as a Chief Inspector in Texas on a project for Kinder Morgan. [43] Finally,

he worked for GIFS from approximately May 2015 through June 2015 as a Chief Inspector in Arizona on a project for Kinder Morgan. [44]

### 5. Opt-in Plaintiff #4: Rodney LaLonde

Mr. LaLonde first worked for GIFS from approximately March 2012 through May 2012 as a Field Engineer in West Virginia on a project for MarkWest Energy Partners, LP. [45] He worked on that same project from approximately May 2012 through September 2013 as a Chief Inspector. [46] He then worked for GIFS from approximately September 2013 through September 2014 as a Chief Inspector in Ohio on a project for MarkWest. [47] Shortly thereafter, he worked for GIFS from approximately February 2015 through June 2015 as an Assistant Chief Inspector in New York on a project for the Williams Companies, Inc. [48] Then, he worked for GIFS from approximately June 2015 through July 2015 as an Environmental Inspector in Virginia on a project for Williams Companies, Inc. [49]

### 6. Opt-in Plaintiff #5: Buggs Pollett

Mr. Pollett worked for GIFS from approximately May 2014 through October 2015. [50] During that period, he served as a Utility Inspector for the Gulf South Pipeline Company (Boardwalk). [51] Mr. Pollett was also employed as a Welding Inspector in Mississippi on a Panhandle Energy project for a period of time beginning in or around June 2012. [52]

### 7. Summary

The below table is adapted from a similar one submitted by Plaintiffs' counsel. It summarizes the named and opt-in plaintiffs' job sites, time worked, job titles, and clients:

### Table 1. Comparison of the Named and Opt-in Plaintiffs

| Name | Time Worked | States Worked | Job Title(s) | Client(s) |
|------|-------------|---------------|--------------|-----------|
| Thomas Sloane | April 2014-October 2014 | OK, PA | Welding Inspector | Kinder Morgan |
| Allen Hinkle | August 2012-December 2012; October | MO, WV | Welding Inspector | Enbridge; MarkWest |

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

|  |  |  |  |  |
|---|---|---|---|---|
|  | 2013-March 2014 |  |  |  |
| Justin Bish | June 2011- March 2014 | OH, WV | Assistant Chief Inspector; Utility Inspector | MarkWest |
| Richard Stapleman | October 2013- December 2013; March 2015-June 2015 | AZ, NM, TX | Chief Inspector; Quality Control Inspector | Kinder Morgan |
| Rodney LaLonde | March 2012- September 2014; February 2015-June 2015 | NY, OH, WV | Chief Inspector; Assistant Chief Inspector; Field Inspector | Mark West; Williams |
| Buggs Pollett | June 2012; May 2014- October 2015 | MS | Welding Inspector; Utility Inspector | Panhandle Energy; Gulf South Pipeline |

## III. LAW

In an FLSA case brought on behalf of a putative class, the district court typically evaluates the propriety of certification at two junctures. How closely the court must scrutinize the proposed class each time depends upon whether discovery has yet been made available to the plaintiff. Thus, although district courts apply a less searching standard initially, once discovery is had, any presumption of leniency recedes, and the plaintiff is held to a more demanding burden. In sum, from the plaintiff to whom much discovery is given, much proof is expected in return.

 *6  "Although this two-step approach is nowhere mandated, it appears to have garnered wide acceptance," including by the United States Court of Appeals for the Third Circuit and those lower courts within its purview.[53] In fact, in its leading 2012 decision Zavala v. Wal-Mart Stores, Inc., the Third Circuit retraced the contours of this two-tier process and "affirm[ed] its use" for FLSA collective action cases going forward.[54]

The initial stage typically involves a request for conditional certification. "[B]ecause discovery has not yet occurred, courts do not review the underlying merits of the action

in deciding whether to conditionally certify the class."[55] Instead, the plaintiff need only make a "modest factual showing—something beyond mere speculation" to obtain conditional certification.[56] This framework recognizes that conditional certification "is not a true certification, but rather an exercise of a district court's discretionary authority to oversee and facilitate the notice process."[57] In particular, the "sole consequence" of conditional certification is the issuance court-approved notice to potential class members.[58]

"At the conclusion of discovery ... the court then makes a second determination, utilizing a stricter standard of 'similarly situated.' "[59] This second, more probing stage is where the rubber meets the road for FLSA collective actions. "[P]laintiffs must satisfy their burden at this second stage by a preponderance of the evidence."[60] A showing that opt-ins are similarly situated to the named plaintiff is "impossible unless Plaintiffs can at least get over the line of 'more likely than not.' "[61] "Relevant factors include (but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

and circumstances of employment." [62] "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." [63]

Although a motion to decertify typically attends this stage, what sets the second step apart from the first is the existence of discovery dispositive to the ultimate issues. In fact, the Third Circuit in Zavala referred to the second step as the "post-discovery stage." [64] Accordingly, district courts in this circuit have applied an intermediate standard to the "similarly situated" inquiry if the parties have already engaged in discovery. [65] Courts have held this intermediate standard to require "some factual showing that the similarly-situated requirement is satisfied," "as a result of the discovery as measured against the original allegations and defenses." [66]

*7 As one district court recognized, applying the intermediate approach helps "the Court [to] make an educated decision as to whether certifying this matter as a collective action would survive the decertification process." [67] To proceed otherwise "would be an exercise in futility and wasted resources for all parties involved." [68] "Although the burden for certifying a FLSA lawsuit for collective action notification is light, there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute." [69] "Consistent with this principle, courts have the responsibility to avoid 'stirring up' litigation through unwarranted solicitation." [70]

Whether the named plaintiff and the proposed opt-ins are similarly situated is a factual question. [71] Thus, when a district court adheres to the legal standard annunciated in Zavala, its determinations are reviewed for clear error. [72]

## IV. ANALYSIS

**A. Prevailing Legal And Equitable Principles Demand That This Court Reject Plaintiff's Second-Chance Attempt To Certify A Nationwide Collective Action of Pipeline Inspectors.**

**1. Because Plaintiffs have engaged in significant discovery in the three years since the Hughes case was initiated, they must offer something more than a modest factual showing to obtain certification.**

Application of a more searching standard is nothing new in FLSA cases where discovery has already changed hands. For instance, in Bunyan v. Spectrum Brands, Inc., the United States District Court for the Southern District of Illinois explained that "[i]n cases such as this one, where substantial but not all discovery has taken place, the intermediate two-step approach seems particularly appropriate." [73] The parties in Bunyan had previously undertaken at least ten months of discovery, and a list of other potential opt-ins was made available. [74]

The Bunyan Court further summarized its decision to apply an intermediate level of scrutiny as follows:

> It is clear that the parties have conducted a substantial amount of discovery in this case. They have exchanged interrogatories, conducted depositions, and exchanged a large number of documents. The Court cannot close its eyes to the amount of discovery already performed in this action. At the same time, the Court is cognizant that Plaintiffs only seek conditional certification at this point and that discovery is not complete. Taking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time. Additionally, because discovery is not yet complete, conditional certification, if granted, permits Defendants to make a fully informed challenge to certification once discovery concludes. As such, the Court's analysis proceeds under the intermediate approach. [75]

Interestingly, the decision to permit discovery to influence the substantive standard at certification in Bunyan was derived from a similar approach followed in Bouaphakeo v. Tyson Foods, Inc., a case that would reach the Supreme Court of the

2017 WL 1105236

United States in 2015. [76] As the district court in Bouaphakeo explained, "the more onerous second stage analysis" allows the factfinder "to account for all the important facts learned through discovery that inform what putative plaintiffs, if any, are similarly situated to existing plaintiffs. Many other courts have done likewise." [77]

**\*8**  These sentiments were echoed by the United States District Court for the Middle District of Alabama, when it wrote in Holt v. Rite Aid Corp. that "[once] the parties have conducted extensive discovery, it is appropriate to carefully consider the submissions of the parties with respect to the collective action allegations." [78] Specifically, the court in Holt found it appropriate to consider evidence such as declarations presented by the defendants "[b]ecause the issues in this case revolve around whether the day-to-day tasks of Store Managers and Assistant Managers are consistent with their designation as exempt." [79]

The same was true in Thiessen v. General Electric Capital Corp., where the United States District Court for the District of Kansas applied an intermediate level of scrutiny to the "similarly situated" inquiry after the parties conducted three months of discovery and several individuals had already opted in. [80] The court in Thiessen set out several factors useful for consideration in conditional certification cases where discovery had already changed hands. Those factors included: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." [81]

Several courts within the Third Circuit have recognized the need for an intermediate level of scrutiny in FLSA cases. [82] Moreover, application of a more searching standard in cases where substantial discovery has already changed hands is, in my view, consistent with the Third Circuit's instructions in Zavala. After all, the crux of that decision is that the primary factor responsible for tightening the standard at certification is the existence of meaningful discovery, even if the case's procedural posture has not yet formally advanced to decertification.

That significant precertification discovery can influence the appropriate standard for certification is reasonable and broadly applicable. By extension, a more searching standard is particularly uncontroversial where nearly the same exact counsel and parties have already exchanged discovery in two strikingly similar actions. It will not always be the case that existing discovery from a prior case can influence the appropriate standard on a subsequent certification motion in a distinct matter. Rather, district courts will naturally have to consider the extent to which those actions share common litigants and common claims, common facts and common law.

Further, it would be an entirely inefficient use of resources for this Court to conditionally certify a collective action, only to double-back because the bulk of the discovery it already considered has cast an ominous shadow upon the propriety of the ultimate merits. And in many ways, this case is perhaps an extreme example of that principle. For instance, Plaintiffs have filed their motion for class certification pursuant to Federal Rule of Civil Procedure 23 contemporaneous with their motion for conditional certification under the FLSA. Presumably, then, Plaintiffs acknowledge that they have in fact received discovery sufficient to enable them to move for a final substantive determination on their Rule 23 allegations. A similar posture was observed in a case entitled Gandhi v. Dell Inc. There, the United States District Court for the Western District of Texas recounted as follows:

**\*9**  One of the puzzling aspects of this issue in the present case is that the parties agreed to a scheduling order which explicitly contemplated discovery being conducted before a motion for class certification would be filed. As stated above, parties generally move for conditional certification early on in a case when little to no discovery has been conducted. Given that most cases addressing the standard of review for conditional certification base their decision in large part on the status of discovery, one would have thought that if the parties were agreeing to a discovery schedule, they would also have agreed on the standard to be applied in determining if this case should proceed as a collective action. That is not the case, however. At the hearing, Plaintiffs' counsel stated that it was his understanding that discovery would be very preliminary and limited in scope, and therefore, the Court should review the collective action certification under the more lenient, initial review standard. Defense counsel, on the other hand, argued that because several months were set aside for discovery, because thousands of pages of documents have been exchanged, and because nearly twenty depositions have been taken, using the lenient standard—which is predicated on the assumption that little or no discovery has occurred—would be inappropriate here.

There is merit to both sides' contentions on this issue. Plainly, because of the amount of discovery conducted

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 195 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

to this point, this is not a classic case where the lenient standard is clearly appropriate. The parties contemplated that they would conduct discovery before the certification issue would be decided, and, given this, it does not seem wholly appropriate to use a very lenient standard, particularly when such a standard was adopted for situations when little or no discovery had been conducted. Further, the case has been pending for more than a year, and the parties had six months to conduct what the scheduling order described as the "discovery related to Plaintiff's Anticipated Motion for Certification."[83]

I also sense that for all of the discussion about lenient versus intermediate standards and the various stages of scrutiny, a district court's role in disposing of conditional certification motions has become increasingly entangled in semantics.[84] The end relationship is much more straightforward: the more discovery you have received, the more searching a standard to which your motion to certify will be held. The reasoning is just as compelling: the plaintiff has received the discovery it asked for—now it needs to support its allegations.

This was the tenor of the oral argument offered by Annette A Idalski, Esquire, counsel for the Defendant. She offered the following rebuttal to counsel for Plaintiffs' contention that a bifurcated discovery militated for application of the most lenient standard possible:

> So what level is evidence is required? We're past the modest factual showing. And most courts—we cited to the Creely case, which actually has a good analysis from the court— several different courts as to what should the standard be at this point. If there is extensive discovery conducted, the plaintiff has to make a modest plus factual showing, not just a modest showing. And courts are pretty clear on that. We're not at the preponderance of the evidence standard. The court did bifurcate discovery.
>
> Judge Fischer did bifurcate discovery. But quite frankly, so much discovery was conducted in the last six months I'm not sure if there is any necessary discovery necessary to be done conducted going forward. I think the factual record is complete. It appears to be, for the most part, complete.
>
> ...
>
> I don't know how much more we can prove here. In 20 years I've never had a case with this much evidence at a motion for conditional certification stage. Typically two months after the case gets started, the plaintiff will file

maybe an affidavit and have some evidence or allegation of an inference of a violation, and the Court has no other evidence to look at. So of course, the Court has to grant conditional certification, because there is no evidence to rebut. Here we did six months of discovery. So be careful what you ask for.[85]

**\*10** Accordingly, this Court will follow the lead of so many district courts before it by requiring that Plaintiff make at least an intermediate showing that any opt-ins are "similarly situated" to the named representative. This "intermediate" or "modest plus" standard requires that Plaintiff make "some factual showing that the similarly-situated requirement is satisfied," "as a result of the discovery as measured against the original allegations and defenses."[86]

### 2. The named and opt-in Plaintiffs are not similarly situated, because they held different positions, worked for different clients and different supervisors on different projects in different states, and performed different work, all pursuant to localized policies and individualized salary agreements.

Section 216(b) of the FLSA permits certification of a collective action only if the Court determines that the opt-in plaintiffs are "similarly situated" to the named plaintiffs. Although the term "similarly situated" is not defined by that provision, "[t]he United States Court of Appeals for the Third Circuit has identified relevant factors to consider as part of this analysis: 'whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment.' "[87]

District courts within the Third Circuit's vicinage that have applied this guidance from the appellate court generally have grouped their analysis into three subparts: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant; and (3) fairness and procedural considerations."[88]

"The first factor assesses the opt-in plaintiffs' job duties, geographical location, supervision, and salary."[89] At that stage, "allegations of an overarching policy are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy or plan."[90] "The second factor

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 196 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

concerns whether potential defenses apply to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual opt-in plaintiff." [91]

Importantly, the third and over-arching factor, which centers on fairness, efficiency, and procedural considerations, requires the district court to consider whether the litigation "would require inquiry into the employment situation of each plaintiff rather than on a broad scale approach to the employment situation of the group." [92] Analysis of these factors should be made in light of § 216(b)'s "primary objectives": (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." [93] "The court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." [94]

*11 Turning to the instant matter, I conclude that "Plaintiffs have failed to satisfy the 'similarly situated' standard. The similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many." [95] I begin with the first factor, the disparate factual and employment settings of the individual plaintiffs. "To weigh in favor of collective treatment, similarities must 'extend beyond the 'mere facts of job duties and pay provisions,' 'and be viewed in light of the claims asserted.' " [96] Indeed, "being similarly situated does not mean simply sharing a common status, rather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." [97] "General allegations of an overarching employer policy 'are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy, or plan.' " [98] Thus, "where an employer maintains a formal policy of lawful compensation, plaintiffs must present 'substantial evidence that he employer, in fact, shirked its FLSA responsibilities.' " [99]

GIFS staffs its clients' projects with many different types of inspectors, including: Chief Inspectors, Assistant Chief Inspectors, COR Inspectors, Corrosion Inspectors, Electrical and Instrumentation Inspectors, Environmental Inspectors, Safety Inspectors, Utility Inspectors, Welding Inspectors, and Coating Inspectors. [100] Each type of inspector has different qualifications, expertise, and performs different job duties. [101] Nevertheless Plaintiff seeks certification of collective action generically comprising "all current and

former employees of [GIFS] who performed work as a pipeline inspector in the United States in any workweek between three years prior to the date of the Court's Order and the present." [102] The proposed class otherwise embraces no limitations based on geography, timeframe, client, position type, or project nature, though it does incorporate a carve-out for three separate projects where workers were believed to not have suffered any unlawful treatment. [103]

Since 2011, GIFS has staffed approximately 2,275 employees with over 40 clients across at least 35 states, both on- and off-shore. [104] As Robert J. Sprick, the company's Senior Vice President, testified, "[t]he number and type of jobs staffed by [GIFS] on any particular project also varies considerably from project to project, client to client, and over time." [105] This means that "similarly titled jobs, like 'pipeline inspector,' often entail different job duties from project to project, as each client sets the job duties for each [GIFS] employee on its projects." [106]

As recited more fully above, GIFS "generally has no authority to direct the tasks performed by its employees on its clients' respective projects, or control when or how such tasks are performed." [107] Instead, GIFS's clients "generally assign work to [GIFS's] employees, and [GIFS's] employees exercise various levels of discretion and independent judgment in performing their assigned tasks." [108] "Job duties also may vary depending upon the portion of a particular project that an employee is assigned, as conditions can vary at different parts of a worksite." [109]

Thus, because GIFS is a staffing company, its inspectors' duties depend upon the demands of each particular client. [110] In fact, "inspectors are staffed for each particular project according to the needs of GIFS's clients," and "[s]upervision of inspectors may differ on a project-by-project basis depending upon the individual supervisor assigned by the client." [111] Accordingly, GIFS's various clients, not GIFS, "control[ ] each staffed employee's work schedule, whether the job site is open for work on any particular day, and any applicable sick leave and vacation policies." [112]

*12 Courts disposing of certification motions in natural gas drilling cases must recognize that, by the very nature of the industry, distinctions between job sites and the nature of any two projects introduce a certain variability into the duties of natural gas workers. Such is the nature of a transcontinental

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

energy enterprise: Not only do different types of inspectors perform different tasks, but those tasks also vary depending upon worksite.

For instance, the evidence uncovered in discovery reveals that a utility inspector on a pipeline project might work to ensure that the project is carried out safely, that the ditch is properly excavated, and that the right-of-way is cleared in accordance with specifications. [113] However, utility inspectors working on a project during later stages would be charged with, for example, ensuring that the pipeline is installed in a stress-free condition or ensuring that the appropriate rock shield, padding, and compacting equipment are used during removal. [114] However, the named Plaintiff here, a utility inspector on a compressor station project, would not perform any of those tasks. [115] Rather, he would have an entirely distinct set of job responsibilities specific to the regulated functioning of the compressor station. [116]

Again, a utility inspector on a pipeline construction project might test soil compaction, whereas a utility inspector on a compressor station project is likely to inspect the pouring of concrete and review structural issues involving the erection of a building. [117] A welding inspector on a pipeline construction project primarily reviews one kind of weld made repeatedly as sections are added to the pipeline. [118] However, a welding inspector at a compressor station would inspect multiple kinds of welds made pursuant to multiple weld procedures and which might involve pipeline, tubes, air piping, or structural steel. [119] These processes pose "unique circumstances and challenges that are different from welding in the field on a pipeline project." [120]

Recall Table 1 from above, which lists the pertinent employment characteristics of each of the Plaintiffs:

| Name | Time Worked | States Worked | Job Title(s) | Client(s) |
|---|---|---|---|---|
| Thomas Sloane | April 2014-October 2014 | OK, PA | Welding Inspector | Kinder Morgan |
| Allen Hinkle | August 2012-December 2012; October 2013-March 2014 | MO, WV | Welding Inspector | Enbridge; Mark West |
| Justin Bish | June 2011-March 2014 | OH, WV | Assistant Chief Inspector; Utility Inspector | Mark West |
| Richard Stapleman | October 2013-December 2013; March 2015-June 2015 | AZ, NM, TX | Chief Inspector; Quality Control Inspector | Kinder Morgan |
| Rodney LaLonde | March 2012-September 2014; February 2015-June 2015 | NY, OH, WV | Chief Inspector; Assistant Chief Inspector; Field Inspector | Mark West; Williams |
| Buggs Pollett | June 2012; May 2014-October 2015 | MS | Welding Inspector; | Panhandle Energy; |

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 198 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

| Utility Inspector | Gulf South Pipeline |
|---|---|

From my perspective, this overview reveals that, despite the lengthy time period during which this litigation has been percolating, counsel for Plaintiffs has produced but a smattering of potential cross-country participants. The opt-ins share no common thread, and they offer virtually zero reasons why, for instance, resolution of an FLSA case as to a utility inspector who worked for Panhandle Energy in Mississippi is any way comparable to or in any way would expedite that brought by a Chief Inspector working for MarkWest in New York. To the contrary, the Court is left with a handful of heterogeneous claimants who worked in different locations, in different positions, for different clients and supervisors, under different pay agreements.

**\*13**  Plaintiffs' ultimate fallback position is one of conciliation rather than aggression: if the Court rejects nationwide certification, it should instead certify a class on a statewide basis instead. There are three problems with that argument. First, that a collective action fails certification on a nationwide basis does not automatically mean that the nationwide shoe was too large, so a statewide shoe must fit just right. In fact, as here, it could mean that neither approach is supported by the facts. Taken to the extreme, counsel for Plaintiffs would have this Court certify separate FLSA collective actions for each individual project for each individual client in each individual state—and how, if at all, would such an approach further judicial economy?

Second, it is not the Court's task to draw appropriate subclasses on counsel for Plaintiffs' behalf. If Plaintiffs believe that a more aptly defined subclass is appropriate, then they should present supporting evidence accordingly.

Third, even were the Court to draw a narrower class, such a class would likely be doomed from the outset. This case was brought in federal district court in Pennsylvania, though only one claimant (the named Plaintiff) ever worked at a Pennsylvania job site according to the pertinent declarations. [121] Further, scouring the employment circumstances of the putative class reveals that the only other potentially viable subclass would perhaps be that comprised of individuals who worked at the MarkWest Ohio site. The problem with that subclass is, of course, that it was already expressly rejected in Hughes.

Taking all of these factors into consideration, Plaintiffs have failed to show the requisite similarity in employment circumstances required to obtain certification. Discovery has plainly not furthered their claims. To the contrary, it has largely debunked them. Even though I have applied a more stringent lens than usual, I believe it is also important to note for the record that I have serious reservations about whether the hodge-podge of claimants presented by counsel for Plaintiffs at this late stage would even be sufficient the most lenient of standards.

As the Defendant here aptly notes: Despite the significant variance that attends the inspector position, "Plaintiff's proposed nationwide class includes every kind of inspector on every kind of project for every client in every state." [122] Accordingly, certification and facilitation of notice will be denied for those reasons.

### 3. Because the members of the putative class are so diverse, resolution of Defendant's exemption defenses will require significant individualized factfinding, which Plaintiffs have failed to show would be aided by certification in any way.

The second factor—the defenses available to the Defendant—also weigh against certification. The exemptions that GIFS contends apply to this case (the administrative and highly compensated exemptions) each have two fundamental elements that must be litigated and decided as to each Plaintiff before entitlement to overtime can be shown: a job duties test and a salary basis test. [123] The highly compensated exemption clarifies that workers who earn a salary of $100,000.00 or more, whose primary duty includes performing office or non-manual work, and who customarily and regularly performs any one or more of the exempt duties of an executive, administrative, or professional employee, need not be paid overtime. The administrative exemption excepts from overtime payments such workers whose primary duty is office or non-manual work directly related to management or general business operations of the employer or the employer's customers. [124]

**\*14**  As applied to the administrative exemption, "primary duty" means "the principal, main, major or most important duty that the employee performs. Determination of an

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." [125] Importantly, the primary duty includes exercise of discretion and independent judgment with respect to matters of significance. [126] Thus, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." [127] Factors to consider include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval, and other factors set forth in the regulation. [128]

"The fact that an employee's decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." [129]

### a. The variety in job duties and discretion exercised by the putative class members precludes certification.

"Application of the administrative exemption is fact specific." [130] Thus, although "the need to examine the facts of an employee's work does not categorically preclude collective determination of exemption," certification is rendered less feasible in cases where plaintiffs have failed to produce "evidence indicat[ing] that prospective class members' job duties were substantially similar." [131]

District courts in the Third Circuit have hesitated to grant nationwide certification in exemption cases where plaintiffs have failed to adduce sufficient evidence of similarity. For instance the United States District Court for the District of New Jersey has explained that "[u]nsurprisingly, determining whether an employee is exempt involves a fact intensive inquiry.... Acknowledging that reality, a number of courts have declined to certify proposed classes of financial advisors who claim they were misclassified as exempt." [132] In addition, as the United States District Court for the District of Delaware has explained "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." [133]

Based upon what discovery has revealed here, the level of discretion employed by individual inspectors varies depending upon the particular client and supervisors involved. For instance, when a project is widely dispersed, supervisors cannot always be available to inspectors. [134] Consequently, inspectors often have to observe construction being performed in two or more places at once, requiring them to make significant judgment calls about how to manage the workflow attendant to both locations. [135] Moreover, depending on the worksite and the particular supervisor, some inspectors were empowered to give orders regarding cutting defective welds, while others could not give that order without approval. [136]

**\*15** In fact, as a welding inspector at Station 319, Mr. Sloane testified that his job was critical to the operation of the pipeline "[b]ecause natural gas is flammable and explosive, and you really want to contain it. You want good quality welds; otherwise, there's that possibility of not containing it and having a fire and explosion and environmental damage." [137] Without quality welding, a natural gas compressor station can become "[d]angerous to life, health, and environment." [138]

Mr. Sloane further admitted that, at times, his supervisor would permit him a great deal of autonomy in precisely how, where, and in what manner he could perform his day-to-day job duties. For example, when he was working on the Paden Vapor Loop project, Mr. Sloane spent most of his time unsupervised, sitting in his truck doing paperwork. [139] Yet, on the Station 319 project, Mr. Sloane was required to allocate

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

his resources by walking around looking at welds "all day long." [140]

Mr. Sloane also addressed safety issues that he observed and only periodically assisted with manual work if he got "bored." [141] Stressing the supervisory nature of his position, he explained that "it wasn't part of my job. I was more less just—because I don't—I get bored standing around too long, so I would pick up a wrench and help them bolt something up or something like that, yeah." [142] Further, when a weld failed to pass Mr. Sloane's inspection, the welders "would ask [him his] personal opinion on what [he] would do as a welder to fix that, and [he] might offer my opinion." [143]

The above-referenced exemptions will be relevant to the proper disposition of this case. The Court will have to consider each of the pertinent elements (primary duty, discretion, etc.), as they apply to each potential claimant. However, Plaintiffs leave the Court guessing as to how certification on a nationwide basis would materially advance those determinations.

Just as problematically, no evidence has been put forth to explain why, say, a Chief Inspector at a given site would be subject to the same analysis or outcomes as that of a Utility Inspector with whom he works. Taken to the extreme, "[e]ven employees who hold the same job title do not necessarily perform the same work." [144] That is particularly true where inspectors here were subject to different supervision and expectations depending upon the client and the particular worksite.

The Honorable Donetta W. Ambrose, writing for the United States District Court for the Western District of Pennsylvania in Kuznyetsov v. W. Penn Allegheny Health Sys., Inc., reached a similar conclusion in a case with a similar posture as this one. [145] In that decision, Judge Ambrose found individualized defenses to be "highly relevant" and likely to "overwhelm" a consolidated proceeding. [146] This was true, because, as here, "[t]he defenses to which Defendants point" would likely be "unique to specific Plaintiffs." [147] "Trying this case in a collective forum," Judge Ambrose concluded, would "prevent Defendants from employing these defenses" and "turn the trial into 824 mini trials." [148] In particular, the defendants would "be unable to delve into the specifics of an individual Plaintiff's situation, supervisor's behavior, etc." [149] "This hardly promotes the efficiency

contemplated by collective actions." [150] Judge Ambrose, who also authored the leading decision Andrako v. U.S. Steel Corp., distinguished that prior case, noting that the differences were more problematic in Kuznyetsov "because the defenses [went] primarily to liability" in the instant matter. [151]

**\*16** Further, even relegating the ultimate burden of proof to the Defendant on the issue of exemptions, Plaintiffs have offered few suggestions that nationwide certification would in any way streamline those ultimate determinations. For all the Court knows, two workers might appropriately advance an exemption and four not, or six might be exempt and none entitled to overtime. That is an especially troubling realization in light of the discovery that has already been conducted and the sweeping relief that is presently being requested.

Counsel for Plaintiffs' primary response is that the exemption issue can be overlooked, given certain Department of Labor regulations and guidance, which state that "[o]rdinary inspection work generally does not meet the duties requirements for the administrative exemption." [152] Needless to say, that directive, though well-taken by this Court, does not provide a one-size-fits-all answer. Proper resolution requires a thorough consideration of the relevant facts, not blind adherence to a generalized policy statement.

It goes without saying that the above guidance begs the question as to what types of inspection tasks constitute "ordinary inspection work" and what types do not. In fact, the case law appears to distinguish between "ordinary inspection work," such as "filling out checklists" or "conduct[ing] an audit," and inspection work that more closely resembled implementation and assurance of "quality, safety and health, and compliance policy," where the inspectors "have independence ... to identify the root cause of the problem and determine the best way to fix or correct the problem." [153]

Consequently, federal courts have determined that inspectors may appropriately qualify for an exemption depending upon the type of work they perform. The United States Court of Appeals for the Sixth Circuit, describing circumstances eerily similar to Mr. Sloane's own deposition excerpts, determined that inspectors were exempt in Schaefer v. Indiana Michigan Power Co. The Court reasoned as follows:

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 201 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

The evidence, viewed in the light most favorable to Schaefer, supports his contention that he spends some of his time performing manual tasks outside the office but this amount of time is not so much that he no longer qualifies for the exemption. Schaefer admits that for the past few years he has spent fifty percent of his time at his desk and that he currently spends greater than eighty percent of his time at his desk. Even when he is away from his desk, he does not spend all of his time on manual tasks. Although Schaefer spends some of this time inspecting trucks, examining load bracings, inspecting shipping containers, and examining shipping labels, these "inspection" tasks— even if not performed at his desk —are nonetheless not manual tasks. Schaefer performs manual tasks when he actually picks up a hammer to brace a load or installs or tightens a strap. Accordingly, Schaefer does not spend so much of his time on these manual tasks so as to fall outside exempt status. [154]

Moreover, the set of bare-bones affidavits that Plaintiffs have offered are precisely what the FLSA case law has pejoratively termed "too thin a reed on which to rest a nationwide certification." [155] The affidavits are exceptionally sparse, merely listing each opt-in Plaintiff's job title and work history before reciting a boilerplate conclusion about payment of a day rate and non-payment of overtime. Not even a glimpse of similarity between those affiants can be seen. [156] Judicial focus in cases like this one is properly placed on the economic realities of the employment situation,

not on nominal conclusions. [157] To reason otherwise would disserve Federal Rule of Civil Procedure 1's mandate of a "just, speedy, and inexpensive determination of every action." For these independent reasons, certification will be denied.

### b. Non-uniformity among the putative class members' pay letters and actual compensation received precludes certification.

*17    The parties debate whether this action is more appropriately construed as a "day rate" case or an "exemption" case. The reality is that it draws from both bodies of jurisprudence, and that fact makes the certification burden exceptionally more demanding for Plaintiffs here. Because the applicable exemptions hinge on whether each Plaintiff received a salary, the Court will necessarily need to inquire into the individual employment agreements, pay letters, and economic realities. Unfortunately for the Plaintiffs, that effectively would require this Court to carry out distinct analyses as to each individual claimant, because the respective pay agreements contain materially different language and are unique to each inspector, his experience and discretion, the client, and the particular conditions of employment.

To illustrate, Table 2 below sets forth the actual language from each of the Plaintiffs' pertinent pay agreements. That language is typically distinct and dynamic as between different inspectors and different pay letters. From the outset, I note that counsel for Plaintiffs points to Defendant's issuance of so-called "clarification" letters after a meeting between counsel in 2014 as evidence that Defendant was attempting to cover the tracks of an illicit compensation scheme. The facts do not bear that charge out. Rather, issuance of the clarification letters are equally consistent with the innocuous theory that the Defendant paid its inspectors a guaranteed salary and moved swiftly to clarify that fact when it was confronted by Plaintiffs' counsel. Without more, such an accusation falls flat.

**Table 2. Comparison of Plaintiffs' Pay Letters**

| Name | Letter Dated | Pay Letter Text |
|---|---|---|

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

| | | |
|---|---|---|
| Thomas Sloane | Apr. 11, 2014 | Salary: $386.00/ Calendar Day (as approved by client) |
| Thomas Sloane | Jun. 17, 2014 | Fixed Salary: $386.00/ Day—Guaranteed seven (7) days per week |
| Allen Hinkle | Aug. 13, 2012 | Salary: $267.00/Day Worked |
| Allen Hinkle | Oct. 24, 2013 | Salary: $419.95/Day Worked |
| Allen Hinkle | Mar. 3, 2013 | Salary: $362.00/Day Worked |
| Allen Hinkle | May 15, 2014 | Salary: $355.00/Day— Five (5) days per week |
| Allen Hinkle | Jul. 22, 2014 | Salary: $355.00/Day —Guaranteed five (5) days per week |
| Allen Hinkle | Apr. 2, 2015 | Fixed Salary: $346.00/ Day—Guaranteed six (6) days per week |
| Justin Bish | Jan. 8, 2015 | Fixed Salary: $405.00/ Day—Guaranteed five (5) daysper week |
| Richard Stapleman | Oct. 1, 2013 | Salary: $337.00/Based on 7 day work week |
| Richard Stapleman | Oct. 30, 2013 | Salary: $330.00/Based on 7 day work week |
| Richard Stapleman | Mar. 12, 2015 | Fixed Salary: $446.00/ Day—Guaranteed seven (7) daysper week |
| Buggs Pollett | Jun. 7, 2012 | Salary: $367.00/Day Worked (No Overtime) |
| Buggs Pollett | Jun. 17, 2014 | Fixed Salary: $285.00/ Day—Guaranteed six (6) days per week |

Clearly, the terms recounted above paint a wide-ranging portrait of the types of compensation agreements entered with its inspectors, each of which would require individualized interpretation and analysis. "This case thus is a far cry from those where nationwide conditional certification has been granted based on evidence of a company's 'national policy' that itself gave rise to the alleged FLSA violations."[158] To the contrary, the truth or falsity any FLSA violation here hinges upon particularized inquiries unique to each claimant and his employment setting.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 203 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

Another issue throughout this litigation has been the extent to which salary guarantees must be expressed in writing rather than verbalized. I note, however, that the above overview makes clear that several "guarantees" were memorialized in writing by the Defendant. Thus, somewhat confusingly, for Plaintiffs to prevail, they must contend that a promised amount guaranteed for a set period of days was not a salary.

Just because a salary is expressed as a guaranteed amount per day does not mean that it is no longer a salary—just the same as expressing it in an hourly, bi-weekly, monthly, or quarterly increments does not convert it from a salary to an "hourly rate," "monthly rate," or "quarterly rate." Moreover, Plaintiffs' interpretation would require this Court to assume that, in least one case, GIFS stated in writing that it would pay a "salary" and "no overtime," although in reality it paid a day rate and owed the worker overtime. That GIFS effectively memorialized its own FLSA violation would certainly be an absurd interpretation of that letter.

*18  Likewise, none of the affiants here stated that they did not in fact receive a guarantee each week; none state that they were not paid if they did not work on a given day, and none state that their pay fluctuated in correlation to the number of days they worked each week. Indeed, they were not so deprived, as the below Payroll Records summaries show that Mr. Sloane, Mr. Stapelman, and Mr. LaLonde received a constant, guaranteed salary each week that they were employed by GIFS. [159]

**Figure 1. Sloane Payroll Record**



**Figure 2. Stapleman Payroll Record**



**Figure 3. LaLonde Payroll Record**



"An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." [160] "Whether an employee is paid on a salary basis is determined by the compensation actually received, not what is stated in an employment agreement." [161]

Plaintiffs offer no persuasive justifications to depart from such pragmatic reasoning—and for obvious reasons: reasonable review of the above Payroll Records reveals that many of the claimants received the same amount of pay every week they worked for GIFS, a disbursement known in common parlance as a fixed salary.

Highly problematic for Plaintiffs are the existence of days upon which the claimants were not at work but were nevertheless paid the same fixed salary. For instance, the United States Court of Appeals for the Seventh Circuit in Kennedy v. Commonwealth Edison Co. held that power plant supervisors were paid a salary basis and came within the reach of the administrative exemption where "the record indicate[d] that even if an employee had chosen to take the day off without pay, ComEd would not have reduced her salary." [162]

A day away from work without a reduction in pay is precisely what the lead Plaintiff Mr. Sloane was treated to during the 2014 Fourth of July weekend. Deposition testimony reveals that Mr. Sloane only worked for a half-day on Friday, July 4, 2014, went to New York with his fiancée to watch the fireworks on Saturday, July 5, and then did not return to work

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

until Sunday, July 6. When Mr. Sloane turned in his timesheet, he wrote that he did not work on July 5 while he was in New York. Nevertheless, his supervisor ensured that he was paid his full salary.

Mr. Sloane explained as follow during his June 22, 2016 deposition:

Q. Did you work on July 5, 2014?

A. July 5th, 2014?

Q. Yes.

A. Yes.

...

Q. Where did you work on July 5th?

A. At home.

...

Q. What did you do when you were working at the apartment on July 5th?

A. Reports and stuff, going over drawings. [163]

**\*19** However, three months later, Mr. Sloane's story seemed to have shifted. He revised his prior account as follows:

> So Friday was the 4th. I worked half a day Friday at the job site and went to New York City that evening, because I remember we saw fireworks. And then —or did I—I think I worked—yeah, we saw fireworks in New York City. So I was off Saturday, and then I go back on Sunday to the job site. [164]

During oral argument, counsel for Plaintiffs attempted to neutralize this testimony by arguing that GIFS must have paid its employees their entire day rate, even if they worked for only a few minutes on any particular day. That is a questionable explanation that contradicts common sense:

THE COURT: It seems odd to me, though, that Gulf Interstate would pay its workers the same rate per day even if they were to only work ten minutes in one of those days.

MR. JONES: If they are paying them a day rate, that's not their choice. That is what a day rate is. In other words, if I'm being paid on a day rate, I work one hour, I get paid my entire day rate.

THE COURT: Or it suggests—it might suggest to an observer that he's being paid a salary.

MR. JONES: Again, I do not disagree that it is consistent —that it is consistent with and looks like a salary. My point is that it is just as consistent as being paid on a day rate basis. And that is why when you are paid on a daily basis, there has to be something else. And that something else is the guarantee.

THE COURT: Why would any sophisticated employer —I would assume for the sake of argument that Gulf Interstate is a sophisticated employer—use a day rate then? Why would they do that? What am I missing?

MR. JONES: In the oil and gas industry, 90 percent of people working out in a field—in the field are paid on a day rate. I can tell you after doing, you know, probably not hundreds but at least tens, multiple tens, of cases involving companies out in the oil field, I can tell you that with the exception of one that paid them hourly, everybody else was paid on a day rate.

THE COURT: That seems a curious way to do business. That's not the business I'm in, obviously. But it seems to me that if they are being paid—if Mr. Sloane is being paid $378 a day, it looks like that's about what it is, that they would be better off putting him on salary to do that. I mean, wouldn't they do that, get ten minutes of work for $378 versus ten hours' worth of work the next day for $378. Which is better? I should think it would be ten hours of work for $378.

That GIFS's contested business practices are consistent with a wholly lawful approach (and "consistent" may be an underestimation based on the evidence) is insufficient at this stage. More is required. As Mr. Sprick explained during several of his depositions, GIFS employees were in fact guaranteed a fixed salary and not paid a day rate, and there

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 205 of 230

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

were compelling accounting reasons to express the salary payment in the increments in which the company did:

Q. Okay. Prior to April of 2014, how many days' pay was a pipeline inspector guaranteed regardless of the number of days that they worked?

*20 A. They were guaranteed six days of pay to make up their guarantee.

Q. Whether or not they worked those days?

A. That is correct.

Q. Okay. Could you identify for me, please, sir, each and every document where it is stated that a pipeline inspector on the MarkWest Ohio project is guaranteed six days of pay prior to April of 2014?

A. Again, it was—they were verbally notified of their six-day guarantee. And it's industry practice if you want to get the employee to work for us, we have to make that guarantee. [165]

In a subsequent deposition, Mr. Sprick reiterated:

Q. And nowhere in Exhibit 9 does it say anything about a six-day guarantee, does it?

A. No, because the guarantee was verbally told to the individual. And the reason we state per day worked, it allows us to make permissible deductions at the beginning and end of the project as well as to pay him for the seventh day if worked. That's the reason, you know, that the day worked is part of the way we calculated the guarantee.

Q. It doesn't say anything about a guarantee, does it?

A. No, because it's—it was verbally told to him as well as an industry practice that all inspectors get a guaranteed salary. And let me add that, you know, all of our pay records demonstrate that they got paid a guaranteed salary. [166]

Plaintiff suggests that the decision by the United States District Court for the Southern District of Ohio in Fenley v. Wood Grp. Mustang, Inc. militates for the opposite conclusion. [167] In my view however, the circumstances in Fenley are entirely distinct from those here. First and foremost, Fenley involved a class of plaintiffs who had explicitly been characterized as receiving a day rate. In fact, the defendant classified the plaintiffs as "Non Exempt Day

Rate" employees using the payroll code "DAY." [168] Further, the company's overtime policy in Fenley stated that "Non-Exempt day rate Mustangers (DAY) receive a day rate that is inclusive of all hours worked, including overtime." [169]

No such smoking guns exist here. To the contrary, whereas the presence of a day rate system was effectively a given in Fenley, whether the opt-in and named plaintiffs were actually paid an unlawful day rate here turns on the text of each worker's pay letter and what that worker actually received. With that foundation in place, it is also important to emphasize that the parties in Fenley had conducted only very limited discovery by the time that the initial motion for conditional certification was filed. [170] In essence, Plaintiffs here have conducted significantly more discovery than was conducted in Fenley but have comparatively less to show for it.

Thus, for all of the preceding reasons, the putative class members are not similarly situated, and individual questions regarding the application of certain exemptions would swallow any economies of scale realized by a collective action. Accordingly, the motion to facilitate notice and certify a collective action is denied.

**B. For Parallel Reasons, Plaintiff's Proposed Rule 23 Class Is An Inadequate Vehicle To Adjudicate The Remaining Claims.**

*21 "Rule 23 governs the certification of class actions in federal courts and its requirements are more stringent than those of the FLSA." [171] In particular, because "Rule 23(b) (3)'s predominance requirement is more stringent than the 'similarly situated' requirement under § 216(b)," it would certainly be a rare occurrence for a given putative class to miss the bar for FLSA certification but simultaneously clear Rule 23's correspondingly higher hurdle. [172]

**1. Because determining one's eligibility for class membership would require particularized, factual inquiries into each worker's pay letters, exempt status, and other employment circumstances, answers common to the class do not predominate over individual ones.**

This lawsuit suffers from two procedural flaws, known colloquially in the class action jargon as "commonality" and "predominance." As the late Justice Antonin Scalia described the commonality requirement in Wal-Mart Stores,

2017 WL 1105236

Inc. v. Dukes, "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." [173] Consequently, commonality is not satisfied merely because the plaintiffs "have all suffered a violation of the same provision of law." [174] Instead, the class claims "must depend upon a common contention." [175] "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." [176]

The next hurdle is predominance. A class action may be certified under Federal Rule of Civil Procedure 23(b)(3) only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." That rule enumerates four factors for consideration:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." [177]

The United States District Court for the Eastern District of Pennsylvania has described predominance as the "counterpart" to commonality. [178] Along the same line, the Third Circuit has stated that "[i]t is often appropriate to discuss commonality and predominance together because the commonality inquiry is subsumed into the predominance inquiry." [179] This is because "[p]arallel with Rule 23(a)(2)'s commonality element, which provides that a proposed class must share a common question of law or fact, Rule 23(b)(3)'s predominance requirement imposes a more rigorous

obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." [180] For example, as one federal court has concluded "[i]n short, certification is not warranted" if " individual issues relating to eligibility for the administrative, professional, and highly compensated employee exemptions will predominate over any questions of law or fact that are common to the class members." [181]

**\*22** Plaintiffs request that the Court certify various Pennsylvania classes of general, supervisory, and non-supervisory inspectors to vindicate state law claims under the Pennsylvania Minimum Wage Act and common law unjust enrichment allegations. [182] "The Pennsylvania Minimum Wage Act [PMWA] mirrors the FLSA. Based on the 'identity of purpose' between those two statutes, Pennsylvania courts employ the same tests used by the federal courts and use federal case law to determine the governing standard." [183] Like the FLSA, the PMWA also recognizes an administrative exemption. "Under the PMWA's administrative employee exemption, anyone employed in a 'bona fide ... administrative ... capacity' is exempt from the PMWA's overtime protections." [184]

Similar to my analysis above, Plaintiffs do not offer any evidence or likely sources of evidence that would resolve questions common the class (should such questions even exist) in one stroke. To the contrary, there is a high probability that any such class proceedings would devolve into mini-trials, focused on each individual inspector's particular duties, discretion, pay agreements, etc.

The differences that permeate the putative class when viewed through the FLSA lens are just as pronounced under Rule 23. First, there exist significant discrepancies among different positions at different worksites. Hours worked, tasks delegated, and discretion exercised by, for example, a welding inspector in New Mexico will likely provide very little information as to how those same metrics apply to a distinct client's chief inspector in New York. At the very least, Plaintiffs offer no persuasive justification as to why those answers would be universal to the class.

The same is true as it applies to liability in general. Individualized questions clearly will predominate, as this Court will need to review each worker's pay agreements, hours worked, days off, and payroll records. Moreover, any two employees' circumstances are highly independent. That

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

is to say, whether GIFS violated or did not violate the FLSA as to one worker bears little upon whether treatment of any other GIFS employee was lawful or not. Plaintiffs offer no reasons otherwise, and that heterogeneity is a fatal to class certification.

This line of thinking could be reiterated over and over, just by swapping out the variable: the amount of discretion an employee exercises; whether the employee received the same payment each week; whether the employee primarily worked in a bona fide administrative capacity; whether the employee performed manual work; whether the employee took days off; whether the employee was compensated while away from work; etc. The consequence is the same: individualized questions predominate over questions common to the class.

It is not enough to argue, as Plaintiffs do here, that the common question is simply whether or not the employees were paid a day rate. As just illustrated, the answer to that question depends on a variety of factors and on a number of distinct sub-questions. Moreover, I have no reason to believe that the answer to that question as it pertains to any given claimant would be common to any others—let alone capable of being resolved as to all class members in a single stroke.

To the contrary, Plaintiffs fall well short of offering the kinds of "common proof" necessary to sustain a class action in federal court. As counsel for Defendant cogently summarized:

First, Sloane does not submit or even describe the "testimony" or "representative sample," making it impossible for the Court to evaluate whether the evidence would be uniform across the class. Second, most of this supposedly "common" evidence either does not exist or is not actually common: there is no relevant "employee handbook" or "policy on exemption determinations;" pay letters and rate sheets are irrelevant to the salary basis test, and are not uniform across the class; "compensation records" are individual to each inspector; and "job descriptions" are not uniform and, according to Sloane,

do not accurately reflect job duties anyway. In other words, Sloane's passing reference to "common proof" does not satisfy his burden of showing predominance, and class certification should be denied. [185]

**\*23** That the putative class (or subclasses) both fail the commonality and predominance requirements is not the stopping point. I note for the record an additional argument raised by counsel for Defendant's opposition papers. That argument calls into question Mr. Sloane's "typicality." In particular, Defendant contends that were this Court to determine that Mr. Sloane actually was guaranteed a salary, and certainly the evidence points in that direction, then his interests would be atypical of the interests of any putative class member who actually did receive a day rate. I agree. Not only would Mr. Sloane lack the requisite motivation to pursue the class's overtime claims to fruition in such an instance, but such divergence in interests would also negatively impact the pertinent exemptions determination. For that reason, I do believe that, although uncommon, there is a lurking problem with typicality in this case.

Further, I agree with the Defendant that Plaintiffs' proposed subclasses are ill-defined and premature. Not only does it appear that the proposed supervisory and non-supervisory subclasses may omit certain inspector positions, it also could be the case that one of those subclasses is entirely an empty set —in other words, it could be that no member of the putative class is a "non-supervisory" inspector. That Plaintiffs cannot readily place existing claimants in either bucket is not a good sign, given the amount of discovery that has already been conducted at this stage. In addition, there is a sense that defining subclasses so narrowly eviscerates any hope of preserving judicial economy. If the Court is asked to divvy up supervisors and non-supervisors, perhaps it will be classifying each worker on an individualized basis, and what is the point of a class action, where there exists no common thread, no common stroke among class members?

For the foregoing reasons, class certification under Rule 23 is inappropriate here, and the corresponding motion will be denied.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 208 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

**2. Owing to his prior convictions and a lack of forthrightness with his own counsel, Mr. Sloane is an inadequate representative, whose propensity for untruthfulness would taint the fair and efficient administration of justice for the other putative class members.**

"Courts of appeals have held that unique defenses bear on both the typicality and adequacy of a class representative." [186] In particular, the Third Circuit has explicitly recognized "the challenge presented by a defense unique to a class representative—the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." [187] "A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." [188]

That a class representative's personal characteristics may be scrutinized is nothing new. In fact, one of the earliest and most persuasive statements of this principle was provided by the late Honorable Malcolm Muir of the Williamsport division of this Court in 1974. Judge Muir explained that "facts regarding the personal qualities of the representatives themselves are relevant, indeed necessary, in determining whether the representative parties will fairly and adequately protect the interests of the class." [189] According to Judge Muir, "Because absent members of the class would be conclusively bound by the results obtained by these representatives and their attorneys, due process requires that they be more than pro forma representatives." [190] Judge Muir also cited the following applicable passage from Wright & Miller, before denying certification on the ground of inadequacy:

> Quality of representation embraces both the competence of the legal counsel of the representatives and the stature and interest of the named parties themselves. The general standard appears to be that the representatives must be of such a character as to assure the vigorous prosecution or defense of the action so

that the members' rights are certain to be protected. Thus courts have looked to factors such as the representatives' honesty, conscientiousness, and other affirmative personal qualities. [191]

**\*24** In cases involving much less dishonesty and criminal conduct than Sloane, courts have found plaintiffs to be inadequate class representatives. See Weisman v. Darneille, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) ("Plaintiff's conviction and subsequent conduct here convince us that he lacks the 'honesty, conscientiousness, and other affirmative personal qualities' required of a class representative"); Kirkpatrick v. Ironwood Communications, Inc., No. C05-1428JLR, 2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) ("Mr. Miller will likely be subject to multiple attacks on his credibility based on his past crimes. These attacks will likely severely limit Mr. Miller's ability to vigorously pursue the interests of absent class members. For these reasons, Mr. Miller is not an adequate class representative."). See also Davidson v. Citizens Gas & Coke Utility, 239 F.R.D. 225, 228 (S.D. Ind. 2006) (adequacy not met due to felony convictions, including burglary and theft); Maddox & Starbuck, Ltd. v. British Airways, 97 F.R.D. 395, 396-97 (S.D.N.Y. 1983) (criminal conviction precluded plaintiff from being class representative).

Mr. Sloane has referred to himself as "an alcoholic and addict who made some irresponsible judgments and decisions." [192] Upon recounting each of his criminal history incidents, he notes of a 2010 burglary charge that "Frankly, I do not remember much at all about that night. I was in an alcoholic blackout." [193] These are not defense counsel's characterizations; they are Plaintiff's own words. Three of Mr. Sloane's offenses involved burglary or theft, one charge having followed an attempt by Mr. Sloane to break into a coin laundry machine. [194] In darkly comedic fashion, Mr. Sloane also recounted the facts leading up to a criminal mischief conviction that he sustained while he was incarcerated:

> In 2010, while confined in jail, I was charged and convicted of Criminal Mischief for having damaged the sprinkler head in my cell. Four or five of us were sitting around in my cell and

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 209 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

someone said that the sprinkler head would spray foam if you stuck a pencil in it. I didn't believe him, so I stuck the point of a pencil in the hole in the center of the sprinkler head (and it sprayed foam).[195]

My reasoning holds especially true given that the salary basis issue is a core component to this litigation. In sum, then, the outcome of this case may turn upon whether certain workers were paid even for days on which they did not work. This means that Mr. Sloane's credibility and his shifting testimony as to the July 2014 weekend will be placed front-and-center for the jury's determination, following what I would presume to be a thorough cross-examination by defense counsel. Thus, those facets of Mr. Sloane's personal claim is unique to him and uniquely troubling. The propriety of the other putative class member's claims should not rightfully rise or fall based on personal credibility determinations.

This Court simply cannot in good faith install Mr. Sloane as the chief representative of the remaining class members' interests. This is particularly true, given that a key triable issue would be whether Mr. Sloane was paid on a salary basis. Mr. Sloane's credibility and his shifting story about the July 2014 weekend will both be central to that determination

## V. CONCLUSION

Consistent with foregoing analysis, Plaintiffs' motions for certification pursuant to 29 U.S.C. § 216(b) and Federal Rule of Civil Procedure 23 are denied. The putative opt-in Plaintiffs are dismissed.

An appropriate Order memorializing my findings and resetting the pertinent case management deadlines follows.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1105236

---

## Footnotes

1    Def.'s Br. in Opp. to Pl.'s Mot. for Conditional Certification, ECF No. 156 at 8.

2    Boone v. United States, No. 02-CR-1185 (JMF), 2017 WL 398386, at *2 n.1 (S.D.N.Y. Jan. 30, 2017).

3    See Transfer Memorandum, ECF No. 136 at 8 (Fischer, J.) ("Sloane became involved in this matter after hearing a radio advertisement several times during the period of March through August of 2015 when he was working in the Corpus Christi, Texas area for another employer. He confirmed that the radio advertisement told listeners that they may be entitled to unpaid overtime compensation under the FLSA if they were paid a 'day rate.' The advertisement directed listeners to contact Bruckner Burch PLLC if they desired to pursue a claim.").

4    Hively v. Allis-Chalmers Energy, Inc., No. CIV.A. 13-106, 2013 WL 5936418, at *8 (W.D. Pa. Nov. 5, 2013) (Fischer, J.).

5    ECF No. 156 at 12.

6    Id.

7    ECF No. 141 at 1.

8    See id.

9    Sprick Feb. 20, 2015 Decl., ECF No. 99 Ex. 7 ¶ 6.

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 210 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

10    Id. ¶ 9.

11    Id. ¶ 10.

12    Id. ¶ 11.

13    Id.

14    Id. at 10.

15    ECF No. 156 at 12.

16    Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 8.

17    Sprick 2015 Decl. ¶ 16.

18    S.D. Ohio Docket No. 2:14-cv-00432.

19    Hughes v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-000432, 2015 WL 4112312, at *1 (S.D. Ohio July 7, 2015).

20    Id. at *3.

21    Id. at *3–4.

22    Id. at *3.

23    Id. at *6.

24    Id. at *3.

25    Hughes v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-000432, 2016 WL 4197596, at *4 (S.D. Ohio Aug. 8, 2016).

26    Id. at *4.

27    Id.

28    Id.

29    Id.

30    Robert J. Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 23.

31    Id.

32    Id.

33    Id.

34    Id.

35    Catherine Kramer May 6, 2016 Supp'l Decl., ECF No. 99 Ex. 6 ¶ 4.

36    Hinkle Apr. 4, 2016 Decl., ECF No. 85 Ex. 23 ¶ 4.

2017 WL 1105236

37    Id. ¶ 3.

38    Bish Apr. 4, 2016 Decl., ECF No. 85 Ex. 24 ¶ 4.

39    Id. ¶ 3.

40    Id. ¶ 2.

41    Stapleman Apr. 7, 2016 Decl., ECF No. 85 Ex. 25 ¶ 6.

42    Id. ¶ 5.

43    Id. ¶ 4.

44    Id. ¶ 3.

45    LaLonde Apr. 7, 2016 Decl., ECF No. 85 Ex. 26 ¶ 4.

46    Id. ¶ 3.

47    Id. ¶ 5.

48    Id. ¶ 6.

49    Id. at ¶ 7.

50    Pollett Opt-in Consent Form, ECF No. 75.

51    See Pollett June 7, 2012 & June 17, 2014 Pay Letters.

52    See id. See also Pollett June 7, 2012 & June 17, 2014 Pay Letters.

53    Symczyk v. Genesis HealthCare Corp., 656 F.3d 189, 193 (3d Cir. 2011) (Scirica, J.).

54    Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 536 (3d Cir. 2012).

55    John v. Nesco Serv. Co., No. 4:15-CV-253, 2016 WL 7757388, at *2 (S.D. Tex. June 10, 2016).

56    Halle v. W. Penn Allegheny Health Sys. Inc., 842 F.3d 215, 224 (3d Cir. 2016) (Smith, C.J.).

57    Id. (citing Hoffman–La Roche v. Sperling, 493 U.S. 165 (1989)).

58    See Halle, 842 F.3d at 224.

59    Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1102–03 (10th Cir. 2001).

60    Id. at 537.

61    Id.

62    Id. at 536–37.

63    Id. at 537.

64    Zavala, 691 F.3d at 536.

Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 1105236

65    See, e.g., Villanueva-Bazaldua v. TruGreen Ltd. Partners, 479 F. Supp. 2d 411, 415 (D. Del. 2007).

66    See id. Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 827 (N.D. Ohio 2011).

67    Basco v. Wal-Mart Stores, Inc., No. CIV.A. 00-3184, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).

68    Id.

69    Colson v. Avnet, Inc., 687 F. Supp. 2d 914, 929–30 (D. Ariz. 2010).

70    Burkhart-Deal v. Citifinancial, Inc., No. 07-1747, 2010 WL 457127, at *5 n.14 (W.D. Pa. Feb. 4, 2010) (Ambrose, J.).

71    Id. at 535.

72    Id.

73    No. 07-CV-0089-MJR, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008).

74    Id.

75    Id.

76    564 F. Supp. 2d 870 (N.D. Iowa 2008).

77    Id. at 895.

78    333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004).

79    Id. at 1275.

80    Thiessen v. Gen. Elec. Capital Corp., 996 F. Supp. 1071, 1081 (D. Kan. 1998)

81    Id.

82    See, e.g., In Re: Enterprise Rent-A-Car Wage & Hour Employment Practices Litig., No. 2:07-CV-01687-JFC, 2010 WL 3447783, at *17 (W.D. Pa. Aug. 13, 2010) (Conti, J.); Reinig v. RBS Citizens, N.A., No. 15CV1541, 2016 WL 1746848, at *2 (W.D. Pa. May 3, 2016) (Schwab, J.); Villanueva-Bazaldua v. TruGreen Ltd. Partners, 479 F. Supp. 2d 411, 415 (D. Del. 2007).

83    No. A-08-CA-248 JRN, 2009 WL 1940144, at *5 (W.D. Tex. July 2, 2009).

84    See, e.g., Reinig v. RBS Citizens, N.A., No. 15CV1541, 2016 WL 1746848, at *2 (W.D. Pa. May 3, 2016) (noting that the "intermediate" label was "a distinction without a difference" given the probative evidence that existed in the record).

85    Tr. of Nov. 21, 2016 Oral Argument at 98:16–25; 111:20–112:09.

86    See id. Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 827 (N.D. Ohio 2011).

87    Karlo v. Pittsburgh Glass Works, LLC, No. 2:10-CV-1283, 2014 WL 1317595, at *17 (W.D. Pa. Mar. 31, 2014), aff'd, No. 15-3435, 2017 WL 83385 (3d Cir. Jan. 10, 2017) (Smith J.) (quoting Zavala, 691 F.3d at 536–37).

88    Kuznyetsov v. W. Penn Allegheny Health Sys., Inc., No. CIV.A. 10-948, 2011 WL 6372852, at *3 (W.D. Pa. Dec. 20, 2011) (Ambrose, J.).

Case 3:18-cv-00121-JFS-PJC    Document 232-13    Filed 02/24/26    Page 213 of 230
Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)
2017 WL 1105236

89    Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011) (Ambrose, J.).

90    Moss v. Crawford & Co., 201 F.R.D. 398, 409–10 (W.D. Pa. 2000) (internal quotation marks omitted).

91    Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011).

92    Lusardi v. Xerox Corp., 118 F.R.D. 351, 360 (D.N.J. 1987).

93    Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing Hoffmann–La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989)).

94    Moss, 201 F.R.D. at 410. Accord Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011).

95    Zavala, 691 F.3d at 537–38.

96    Martin v. Citizens Fin. Grp., Inc., No. CIV.A. 10-260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013) (quoting Zavala v. Wal Mart Stores, Inc., 2010 WL 2652510, at *3 (D.N.J. June 25, 2010)).

97    Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 538 (3d Cir. 2012).

98    Martin, 2013 WL 1234081, at *3 (quoting Andrako, 788 F.Supp.2d at 378).

99    Martin, 2013 WL 1234081, at *3 (quoting Camesi v. University of Pittsburgh Med. Cent., 2011 WL 6372873, at *4 (W.D. Pa., Dec. 20, 2011)).

100    ECF No. 156 at 12.

101    Id.

102    ECF No. 141 at 1.

103    See id.

104    Sprick Feb. 20, 2015 Decl., ECF No. 99 Ex. 7 ¶ 6.

105    Id. ¶ 9.

106    Id. ¶ 10.

107    Id. ¶ 11.

108    Id.

109    Id. at 10.

110    ECF No. 156 at 12.

111    Sprick May 6, 2016 Decl., ECF No. 99 Ex. 8 ¶ 8.

112    Sprick 2015 Decl. ¶ 16.

113    Sprick 2016 Decl. ¶ 22.

114    Id.

115    Id.

2017 WL 1105236

116    <u>Id.</u>

117    May 5, 2016 Decl. of Robert Tate, ECF No. 99 Ex. 9 ¶ 12.

118    <u>Id.</u> ¶ 13.

119    <u>Id.</u>

120    <u>Id.</u>

121    <u>See, e.g.,</u> <u>John v. Nesco Serv. Co.</u>, No. 4:15-CV-253, 2016 WL 7757388, at *1 (S.D. Tex. June 10, 2016) ("[T]he Court will deny St. John's motion for class certification because no one else has expressed interest in opting into this lawsuit.").

122    ECF No. 156 at 15.

123    29 C.F.R § 541.200 (administrative); § 541.601 (highly compensated).

124    29 C.F.R § 541.200.

125    Department of Labor, Fact Sheet #17C ("Administrative Exemption"), available at <u>https://www.dol.gov/whd/overtime/fs17c_administrative.pdf</u>.

126    <u>See</u> <u>id.</u>

127    <u>Id.</u>

128    <u>Id.</u>

129    <u>Id.</u>

130    <u>Williams v. U.S. Bank Nat. Ass'n</u>, 290 F.R.D. 600, 606 (E.D. Cal. 2013).

131    <u>Id.</u>

132    <u>Smith Barney LLC Wage & Hour Litig.</u>, No. 11-cv-3121-WJM, 2016 WL 1407743, *5 (D.N.J. Apr. 11, 2016).

133    <u>Villanueva-Bazaldua v. TruGreen Ltd. Partners</u>, 479 F. Supp. 2d 411, 416 (D. Del. 2007).

134    ECF No. 156 at 14.

135    <u>Id.</u>

136    <u>Id.</u>

137    ECF No. 99, Ex. 20, Sloane Dep. 272:03–14.

138    <u>Id.</u>

139    <u>See</u> <u>id.</u> at 285:18–23.

140    <u>See</u> <u>id.</u>

141    <u>Id.</u> 288:4-17.

142    <u>Id.</u>

2017 WL 1105236

143  Id. at 273:21–274:8.

144  Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 498 (D.N.J. 2000).

145  No. CIV.A. 10-948, 2011 WL 6372852, at *7 (W.D. Pa. Dec. 20, 2011) (Ambrose, J.).

146  Id. at *7.

147  Id.

148  Id.

149  Id.

150  Id.

151  Id.

152  See Tr. of Nov. 21, 2016 Oral Arg. at 40–42 (quoting 29 C.F.R. § 541.202(g); Weiss Report; DOL Field
     Operations Report).

153  Zackaria v. Wal-Mart Stores, Inc., No. ED CV 12-1520 FMO, 2015 WL 2412103, at *12 (C.D. Cal. May 18,
     2015).

154  358 F.3d 394, 402 (6th Cir. 2004).

155  Guillen v. Marshalls of MA, Inc., No. 09 CIV. 9575 LAP GWG, 2012 WL 2588771, at *2 (S.D.N.Y. July 2, 2012).

156  Though Plaintiffs suggest that they all belonged to the same general "division" or "department," Defendant
     has explained that "department 39" refers to GIFS itself and Mr. Sprick the Senior Vice President, all GIFS
     employees, inspectors and non-inspectors alike, share those two characteristics. See ECF No. 156 at 5 n.6.

157  Cruz v. Conocophillips, No. 4:15-CV-02573, 2016 WL 7106363, at *3 (S.D. Tex. Sept. 23, 2016).

158  Martin v. Sprint/united Mgmt. Co., No. 15 CIV. 5237 (PAE), 2016 WL 30334, at *7 n.11 (S.D.N.Y. Jan. 4,
     2016).

159  ECF No. 99 Ex. 28.

160  29 C.F.R. § 541.602(a).

161  Desmond McDonald v. Gulf Interstate Field Servs., Inc., No. 2:14-CV-00432, 2017 WL 462249, at *1 (S.D.
     Ohio Jan. 4, 2017) (citing Orton v. Johnny's Lunch Franchise, LLC, 668 F.3d 843, 847-48 (6th Cir. 2012)).

162  410 F.3d 365, 371 (7th Cir. 2005) (Wood, J.).

163  Sloane Jun. 22, 2016 Dep., ECF No. 182 Ex. 19, at 370–72.

164  Sloane Sep. 25, 2016 Dep., ECF No. 182 Ex. 18, at 106:10–16.

165  Sprick Dep. 33:22–34:17.

166  Sprick Dep. 60:7–24.

167  170 F. Supp. 3d 1063 (S.D. Ohio 2016).

2017 WL 1105236

168    Id. at 1068.

169    Id.

170    Id.

171    Espinoza v. 953 Assocs. LLC, 280 F.R.D. 113, 123 (S.D.N.Y. 2011).

172    Camilotes v. Resurrection Health Care Corp., 286 F.R.D. 339, 355 (N.D. Ill. 2012).

173    564 U.S. 338, 350 (2011).

174    Id.

175    Id.

176    Id.

177    Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

178    Coleman v. Commonwealth Land Title Ins. Co. Mitchell, —— F.R.D. ——, No. CV 09-679, 2016 WL 4705454, at *5 (E.D. Pa. Aug. 17, 2016).

179    Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015) (McKee, C.J.).

180    Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011) (Jordan, J.).

181    In re RBC Dain Rauscher Overtime Litig., 703 F. Supp. 2d 910, 968 (D. Minn. 2010).

182    See ECF No. 126.

183    Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc., 98 F. Supp. 3d 750, 756 (E.D. Pa. 2015).

184    Baum v. Astrazeneca LP, 372 Fed.Appx. 246, 248 (3d Cir. 2010) (quoting 43 P.S. § 333.105(a)(5)).

185    ECF No. 182 at 24–25.

186    Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006).

187    Id. at 297.

188    Id.at 301.

189    In re Goldchip Funding Co., 61 F.R.D. 592, 594 (M.D. Pa. 1974) (internal quotation marks omitted).

190    Id.

191    Id. (citing Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, § 1766, pp. 632–634).

192    Decl. of Thomas Sloane, ECF No. 17 Ex.1 ¶ 4.

193    Id. ¶ 5(f).

194    See id. ¶ 5(b), (c), & (f).

195    See id.

**Sloane v. Gulf Interstate Field Services, Inc., Not Reported in Fed. Supp. (2017)**

2017 WL 1105236

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**19**

Walden v. Bank of New York Mellon Corporation, Slip Copy (2025)

2025 WL 2696463

2025 WL 2696463
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania,
Pittsburgh Division.

Stephen WALDEN, Leslie Walden, Plaintiffs,
v.
The BANK OF NEW YORK MELLON
CORPORATION, BNY Mellon, N.A., Defendants.

Civil Action No. 2:20-cv-01972-CBB
|
Signed September 22, 2025

**Attorneys and Law Firms**

Adam J. Levitt, Pro Hac Vice, DiCello Levitt & Casey,
Chicago, IL, Elijah Savage, Pro Hac Vice, Chicago, IL,
Robert F. DiCello, DiCello Levitt Gutzler LLC, Mentor, OH,
Bruce D. Bernstein, Pro Hac Vice, DiCello Levitt Gutzler
LLC, Washington, DC, Charles Dender, Pro Hac Vice,
DiCello Levitt LLP, New York, NY, Li Yu, Pro Hac Vice,
Bernstein Litowitz Berger & Grossmann LLP, New York, NY,
Jonathan Chally, Pro Hac Vice, Joshua P. Gunnemann, Pro
Hac Vice, Katherine L. D'Ambrosio, Pro Hac Vice, Stephen
D. Councill, Pro Hac Vice, Councill, Gunnemann & Chally,
LLC, Atlanta, GA, for Plaintiffs.

Perry A. Napolitano, Alex Mahfood, Brad A. Funari, Justin J.
Kontul, Reed Smith LLP, Pittsburgh, PA, for Defendants.

### MEMORANDUM OPINION [1] ON MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT ECF No. 191

Christopher B. Brown, United States Magistrate Judge.

## I. Introduction

*1 This action was initiated on December 21, 2020 by
Plaintiffs Stephen and Leslie Walden (collectively "the
Waldens"). The Waldens sought to maintain a class action
against Defendants Bank of New York Mellon Corporation
and BNY Mellon, N.A. (collectively "BNY") for breach of
contract and claims under the Pennsylvania Unfair Trade
Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §
201-1 *et seq.* ("UTPCPL"). This matter centers on investment
management services BNY Mellon provided to the Waldens

and the putative class as a fiduciary under investment
management agreements.

In December 2024, the Court granted BNY's motion to
dismiss the Waldens' class claims for lack of subject matter
jurisdiction, finding the treatment of the Waldens' claims as
a class were preempted by the Securities Litigation Uniform
Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA"). ECF No.
189. In that decision, the Court found the Waldens raised a
novel theory of liability and facts in support which they had
not included in their operative pleading. *Id.* at 24-25. The
Court informed the Waldens that should they want to advance
this novel theory, they could file a motion requesting leave to
amend their complaint, or, in the alternative, they could file a
notice that they intended to proceed with their claims against
BNY in their individual capacities. *Id.* at 25; ECF No. 190 at
1-2. The Waldens chose the first option, and timely filed the
present motion for leave to file a second amended complaint.
ECF No. 191. BNY opposes the motion, and it is fully briefed
and ripe for consideration. ECF Nos. 192, 194, 196, 203.

For the reasons that follow, the Waldens' motion for leave to
file a second amended complaint is denied.

## II. Background

Because the Court writes primarily for the parties, only the
factual background necessary to resolve the instant motion is
discussed.

The Waldens contracted with BNY to provide them with
investment management services under a fiduciary standard.
The Waldens' original complaint alleged BNY breached their
contracts, fiduciary duties, and violated several state laws
by investing client assets into BNY-affiliated mutual funds
and sought class treatment of their claims. ECF No. 35
at 2-3. By doing so, the Waldens claimed BNY and its
employees received additional fees and compensation which
was, *inter alia*, a breach of BNY's fiduciary duty because
the affiliated investments created a conflict of interest which
should have been disclosed to the Waldens, but were not. *Id.*
The Court granted in part and denied in part BNY's motion
to dismiss the original complaint, and the Waldens filed the
operative amended complaint on June 28, 2021. ECF No. 40.
The amended complaint again sought to proceed as a class
and again focused on BNY's failure to disclose conflicts of
interest for investing client assets in BNY-affiliated mutual
funds as well as for failure to disclose that BNY used a
predetermined program to make investment decisions that
preferred underperforming affiliated funds instead of making

individualized investment decisions on its clients' behalf. ECF No. 40 at ¶ 50; ECF No. 48 at 2-3.

**\*2** After a second round of motions to dismiss, the Court dismissed some of the Waldens' claims, and the parties began class discovery on the remaining claims for breach of contract and violations of state law consumer protection laws related to BNY's alleged failure to disclose these conflicts of interest. ECF Nos. 48, 57. The Court also imposed a deadline of March 1, 2022 for the parties to amend their pleadings. ECF No. 89. The Waldens never moved to amend their complaint before this deadline.

More than one year later, on July 31, 2023 and following the close of class discovery, BNY filed a pre-class motion for summary judgment and on its heels, the Waldens filed a motion for class certification.[2] ECF Nos. 98, 106. The Waldens' motion for class certification included a class definition that varied from the one set forth in their amended complaint. The Waldens sought to certify, for the first time, a sub-class of individuals who deposited cash into BNY bank accounts and whose assets were placed in cash sweep accounts despite their amended complaint having no facts suggesting they intended to proceed with class claims related to BNY's practices related to cash sweep accounts. *Compare* ECF No. 40 at ¶ 106 *with* ECF No. 106 at ¶ 1.[3] Nevertheless, the Waldens argued in their motion for class certification that along with their original breach of fiduciary legal theories, BNY also breached its fiduciary duties by placing its clients' cash balances into BNY-owned cash sweep accounts which had higher fees and lower interest rates compared with other investment options – like investing in affiliated money market funds where such fees are waived – BNY and its employees financially benefitted from this allocation, and BNY failed to disclose it placed cash balances into the cash sweep accounts to its clients (the "cash sweep account theory."). *See* ECF No. 106-1 at 12-13. This appears to be the first time the Waldens introduced the cash sweep account theory to the Court and their amended complaint does not appear to include facts suggesting they intended to allege any claims related to BNY's use of cash sweep accounts.

BNY filed its motion for summary judgment the same day as the Waldens filed their class certification motion first raising the cash sweep account theory and thus BNY did not address the newly raised cash sweep account theory in its request for summary judgment. ECF No. 100. However, in its response to the Waldens' class certification motion filed in September 2023, BNY argued the Waldens had not

pleaded the cash sweep account theory in their amended complaint and construed this novel claim as inconsistent with the Waldens' original theory of the case that BNY breached duties by investing in affiliate mutual funds. ECF No. 125 at 30 n. 6. The Waldens similarly incorporated its cash sweep account theory into its response to BNY's summary judgment motion. ECF No. 152 at 6; 18-19.

**\*3** While both motions were pending, the Court held oral argument on the class certification motion on March 21, 2024. ECF No. 171. At oral argument, the Waldens confirmed they intended to proceed solely on the grounds that BNY breached its fiduciary duties and violated state law by failing to disclose it was a conflict of interest for it to invest client assets in BNY-affiliated mutual funds.[4] ECF No. 172 at p. 3: 16-22; p.6: 1-7; p. 8: 9-12; 20-24. The Waldens also mentioned the cash sweep account theory at oral argument, characterizing it as an issue "discussed in the papers" but one they had not "spend much time talking with the court about before," or had given the Court "an opportunity to focus on before" and as "not something we have really highlighted in the case before[.]" ECF No. 172 at p. 12:20-25; 13:1-25; 15:9-14. BNY maintained its position at oral argument that the Waldens failed to plead this cash sweep account theory and that the theory was inconsistent with the Waldens' original theory of the case. *Id.* at p. 31:6-25; 32:1-6.

On April 10, 2024, the Court then issued a decision granting in part, deferring in part and denying in part BNY's summary judgment motion. In its decision, the Court denied summary judgment related to, *inter alia*, the cash sweep account theory but did not address whether it had been properly raised. ECF No. 178 at 20, 21, 34.

On April 29, 2024, upon learning at the class certification oral argument that the Waldens abandoned several of its original claims related to BNY's alleged underperformance and imprudent investment decisions and instead narrowed the focus of their claims upon whether BNY failed to disclose conflicts of interest, BNY moved to dismiss the Waldens' class claims on the basis that the Court lacked subject matter jurisdiction to consider those claims under the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA"). ECF Nos. 180; 181 at 2-3. BNY argued these remaining failure-to-disclose claims involved misrepresentations or omissions of material facts made in connection with the purchase or sale of a covered security, fell within SLUSA's preemption and class treatment of these claims was barred. *See* ECF No. 181. During that briefing, the

2025 WL 2696463

Waldens reasserted their cash sweep account theory arguing SLUSA did not preempt those claims from class treatment because placing clients' assets into bank accounts did not involve trading securities. ECF No. 184 at 9. The Court agreed with BNY that the Waldens' class claims related to BNY's failure to disclose conflicts of interest for investing in affiliated mutual funds involved a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security and were preempted by SLUSA. ECF No. 189. The Court did not address the Waldens' argument that their cash sweep account theory was not barred by SLUSA finding they had not pleaded that theory in their amended complaint, and it was not properly before the Court. *Id.* at 23-25. In granting BNY's motion to dismiss the Waldens' class claims for lack of subject matter jurisdiction, the Court denied the Waldens' pending motion for class certification as moot. ECF No. 190. The Court informed the Waldens if they sought "to litigate [the cash sweep account] claims further, they may file the appropriate motion." ECF No. 189 at 23-25. The Waldens took that opportunity and filed the present motion for leave to file a second amended complaint on January 31, 2025. ECF No. 191.

## III. Discussion

### a. Expanding Theories of Liability Through a Modified Class Definition

**\*4** As an initial matter, the Waldens fundamentally expanded their theories of BNY's liability by asserting their cash sweep theory as part of their modified class definition. While the parties did not address the impact of the Waldens proposing a broader class definition in their class certification motion from what was pleaded in their amended complaint, because the Waldens first included this new legal theory in their amended class definition, the Court believes this topic merits discussion.

Courts in this circuit are not bound by the class definition proposed in a complaint and enjoy significant discretion to amend a class definition *sua sponte* to assure proper certification and administration of the class. *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004)(unpublished). Similarly, a plaintiff is not prevented from redefining a putative class from what was originally pleaded to meet the needs of the case. *Deutsch v. My Pillow, Inc.*, No. 20CV00318SRNECW, 2023 WL 3125549, at \*31 (D. Minn. Apr. 27, 2023); *Johansson v. Nelnet, Inc.*, No. 4:20CV3069, 2022 WL 6232089, at \*5 (D. Neb. July 21, 2022), *report and recommendation adopted*, No. 20-

CV-3069, 2022 WL 6149989 (D. Neb. Oct. 7, 2022); *In re Homaidan*, 640 B.R. 810, 867 (Bankr. E.D.N.Y. 2022).

But, when a modified class definition seeks to expand, instead of narrow, the scope of a putative class by adding more putative class members, new causes of action or claims not included in the complaint, courts may limit that practice where expansion would unfairly prejudice a defendant. *Douglas v. EF Inst. for Cultural Exch., Inc.*, No. 20-CV-11740-DJC, 2024 WL 3070251, at \*4 (D. Mass. June 20, 2024) (collecting cases). Courts have found defendants are unfairly prejudiced by an expanded class definition where it would result in a lack of notice to defendants regarding the nature and scope of the claims asserted, and where discovery has already been conducted. *See Douglas*, 2024 WL 3070251, at \*5 (refusing to expand class definition where the expanded definition was "broader with respect to the alleged scope of [d]efendants' liability"); *Rivera v. Invitation Homes, Inc.*, No. 18-CV-03158-JSW, 2022 WL 504161, at \*4 (N.D. Cal. Feb. 18, 2022) (refusing to allow plaintiffs to include a new theory of liability in a class definition because defendant "has not had sufficient notice of this theory of liability" and "the length of time this case has been pending" when the "Plaintiff's allegations and arguments have focused [on a different theory of liability]"); *Smith v. Seeco, Inc.*, No. 4:15CV00147 BSM, 2016 WL 3541412, at \*3 (E.D. Ark. Mar. 11, 2016) (not allowing an expanded class definition where parties conducted months of discovery and submitted expert disclosures); *Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (refusing to consider an expanded class definition "without any motion to amend the [c]omplaint" and even if additional discovery was not necessary, the modified class definition improperly expanded the class to include members whose claims were untimely and prejudiced defendants); *Bouton v. Ocean Props., Ltd*, 322 F.R.D. 683, 693 (S.D. Fla. 2017) (not permitting an expanded class definition noting that "[a]lthough a plaintiff may seek to certify a class definition narrower than the one proposed in the operative pleading without a new claim for relief, the converse is not allowed") (emphasis omitted). Simply stated, "[c]lass certification is not a time for asserting new legal theories that were not pleaded in the complaint." *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011).

**\*5** The Waldens impermissibly expanded their class definition by first presenting their unpleaded cash sweep account theory of liability in their motion for class certification. While BNY may have had notice of the cash sweep account theory because the Waldens mentioned it in

their expert report and BNY deposed the Waldens' expert on this theory, *see infra* n. 8, it remains that this legal theory contradicts the Waldens' theory of the case from its inception – which is that BNY breached its fiduciary duties to its clients when it invested their assets in affiliated mutual funds and is grounded in new unpleaded claims. *See infra* pp. 16-18. Given that discovery is often broader than the claims and defenses actually litigated, Fed. R. Civ. P. 26(b)(1) ("discovery need not be admissible in evidence to be discoverable"), BNY cannot be said to have had fair notice of this theory until the Waldens first unmistakably placed it into litigation through their expanded class definition in their motion for class certification, and likewise cannot be said to have waived any defense by performing a comprehensive deposition on all grounds raised in an expert report. Ultimately, the cash sweep theory of liability was not pleaded in the amended complaint. Even if the Court were to construe the Waldens' cash sweep theory in the context of whether to allow an expanded class definition, because this is a novel legal theory of liability that impermissibly expands the class definition, it is improper to do so by simply redefining the class. Instead, the Waldens must move to amend their complaint to include such a claim and are subject to the standards set forth in Fed. R. Civ. P. 16 and 15 for doing so.

**b. Fed. R. Civ. P. 16**

Fed. R. Civ. P. 16(b)(4) controls the court's authority to enter scheduling orders and provides: "[a] schedule may be modified only for good cause and with the judge's consent." This applies to deadlines set by the court for the parties to amend pleadings and this "good cause" standard insures "that at some point...the pleadings will be fixed[.]" Fed. R. Civ. P. 16, Advisory Committee Note (1983). Similarly, Fed. R. Civ. P. 15(a)(2) controls a party's ability to amend pleadings and provides: "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

The Waldens maintain that "[d]iscovery revealed that one such breach of BNY's fiduciary duties involved BNY placing customers' cash into BNY-owned cash sweep accounts – bank accounts that earned fees for BNY from [the Waldens] and otherwise benefitted [BNY]. BNY placed customer cash into BNY-owned bank accounts creating a financial benefit for [BNY] and their employees. BNY never disclosed this conflict of interest to [the Waldens] and BNY's self-dealing caused [the Waldens] to suffer financial harm." ECF No. 192 at 2 (emphasis omitted). The Waldens maintain these facts involving cash-sweep accounts were disclosed on January

19, 2023 during the deposition of BNY's corporate designee, Patrick Crowe. *Id.* at 5. The Waldens did not, however, move to amend their complaint to add these new facts and theories until January 31, 2025, and instead maintain their expert "cited to and relied heavily on the conflicts arising from BNY's practice of allocating clients' cash to bank accounts at BNY in his report." *Id.*

It is undisputed that the Waldens did not move to amend their complaint to add their novel theory related to cash sweep accounts until three years after the Court imposed deadline for amending pleadings lapsed. When a party moves to amend a pleading after the deadline in the court's scheduling order has passed, the party must first establish "good cause" for doing so under the standard set forth in Fed. R. Civ. P. 16(b)(4) before the court considers whether the party has met the more liberal standard for amendment set forth in Fed. R. Civ. P. 15. *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

Whether "good cause" exists to support a plaintiff's request to amend a pleading outside of a court-imposed deadline "depends in part on a plaintiff's diligence." *Id.* Several courts recognize if a plaintiff "knows or is in possession of the information that forms the basis of the later motion to amend at the outset of the litigation, the party is presumptively not diligent." *Jackson v. Locust Med., LLC*, No. 4:22-CV-00424, 2024 WL 2701695, at *1 (M.D. Pa. May 24, 2024). "This principle, however, may be rebutted by a clear and cognizable explanation why the proposed amendment was not included in the original pleading." *Chan. v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 702 (E.D. Pa. 2007).

**\*6** The Waldens argue they have met both the good cause standard set forth in Fed. R. Civ. P. 16(b) and the more liberal standard in Fed. R. Civ. P. 15. As for "good cause," the Waldens argue "despite their diligence, [the Waldens] could not have reasonably amended before the Court's deadline" because "the operative facts" related to their cash sweep theory "were only confirmed through the depositions" during discovery that occurred on January 19, 2023, ten months after the Court's March 1, 2022 deadline to amend pleadings. ECF No. 192 at 4-5. While newly discovered evidence can support a finding of good cause under Fed. R. Civ. P. 16 to allow amendment, *see Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 119 (W.D. Pa. 2010), good cause is not shown when a plaintiff is not diligent in seeking the discovery that led to their motion to amend or when the evidence is not actually "newly" discovered. *Karlo v. Pittsburgh Glass*

**Walden v. Bank of New York Mellon Corporation, Slip Copy (2025)**

2025 WL 2696463

*Works, LLC*, No. CIV.A. 10-1283, 2011 WL 5170445, at *3 (W.D. Pa. Oct. 31, 2011) (finding no good cause to amend complaint under Fed. R. Civ. P. 16 where plaintiffs did not conduct discovery for six months after initiating the suit, received discovery that they alleged supported amendment and did not seek to amend or extend the deadline to amend for "several weeks"); *Graham*, 271 F.R.D. at 119–20 (no good cause where evidence is not actually newly discovered).

Assuming the Waldens are correct in asserting the first time they could have reasonably discovered their new cash sweep account theory was in January 2023 through BNY's corporate designee's deposition testimony, they do not explain why they waited more than two years to move to amend their complaint after having that information nor do they justify their lack of diligence in doing so. The fact remains that the Waldens moved to amend the complaint on January 31, 2025, only after the Court rejected their attempt to incorporate the cash sweep theory in their brief in opposition to BNY's motion to dismiss for lack of subject matter jurisdiction, and after the Court further prompted that should they seek to litigate such claims they would need to seek leave to do so.[5] ECF No. 189.

The Waldens also argue they reasonably believed the cash sweep account theory was pleaded in the first amended complaint. ECF No. 192 at 5. Despite the fact the Waldens do not cite to any allegations in their amended complaint they believe supports their cash sweep account theory, and this Court independently having found none, this argument contradicts their assertion that they did not know about the cash sweep account theory until discovery revealed it in January 2023. The amended complaint was filed a year and a half earlier in June 2021. ECF No. 40. The Waldens cannot have both adequately pleaded this novel theory of liability in June 2021 and not have known of the facts supporting it (and therefore could not have sought amendment) until January 2023.

Moreover, the Waldens concede that their own expert, Edward D. O'Neal, Ph.D., "cited to and relied heavily on the conflicts arising from BNY's practice of allocating clients' cash to bank accounts at BNY in his report." ECF No. 192 at 5. Dr. O'Neal's report was authored on March 17, 2023. By their own admission, the Waldens possessed the relevant knowledge upon which the cash sweep account theory rested, if not during BNY's corporate designee deposition, by at least March 2023. Their own expert confirmed their theory of liability in his expert report, yet the Waldens did not move to amend their complaint to include it for almost another two

years. Such a lengthy delay does not support a showing that the Waldens acted diligently.

The Waldens also argue they were diligent because the cash sweep account theory was actively litigated at the pre-class certification summary judgment stage and allowing amendment to include this theory now would "not infringe upon the Court's ability to efficiently adjudicate this matter." ECF No. 192 at 6. Whether the cash sweep account theory became part of the litigation by virtue of reference to these claims during a pre-class certification motion for summary judgment and related decision is in essence an argument for implied consent of amendment under Fed. R. Civ. P. 15(b)(2), which the Waldens have again[6] not raised in their briefing, have not otherwise presented any legal authority for, and the Court will not address *sua sponte*.[7] *Mullen v. Ashirward Hosp., LLC*, No. 2:23-CV-01277, 2024 WL 936322, at *6 (W.D. Pa. Mar. 5, 2024) (failure to raise an argument "means that argument is forfeited.") (collecting cases).

*7 The Waldens' arguments that allowing amendment would not impact this Court's ability to efficiently adjudicate this matter and would not meaningfully change the litigation because their new theory is still based on BNY's alleged failure to disclose conflicts to its clients are also without merit. ECF No. 192 at 8. While on the surface, both theories involve conflicts of interest, the Waldens' new cash sweep account theory contradicts claims originally pleaded in their amended complaint. The Waldens' proposed claim that BNY *should have* invested in BNY-affiliated funds instead of placing clients' assets in cash sweep accounts with low interest rates and fees contradicts the Waldens' theory of the case from its inception: BNY *should not have* invested in BNY-affiliated funds due to undisclosed conflicts of interest and the affiliated funds' underperformance.

Even if the facts underlying the cash sweep account theory do not substantively contradict the Waldens' original theory related to investing in affiliated funds, it remains that the cash sweep account theory is grounded on new facts, based on a novel legal theory, not previously pleaded, for which the Waldens had knowledge of years before seeking to amend. Allowing the Waldens to amend to proceed with this claim would start this litigation anew and hamstring this Court's ability to efficiently adjudicate this matter. From the inception of this litigation almost five years ago, the parties focused class and expert discovery based on the Waldens' theories set forth in their amended complaint that BNY breached its fiduciary duties by not disclosing it purchased

underperforming affiliated mutual funds it had a financial interest in and implemented employee compensation policies that rewarded BNY advisors to invest in these affiliate funds. ECF No. 40 at ¶ 6. Whether BNY's placement of clients' cash into bank accounts instead of BNY-affiliated money market funds violated its fiduciary duty has thus far not been – as acknowledged by the Waldens – a focal point of this litigation. *See supra* at p. 6.

Moreover, the Waldens admit that their proposed second amended complaint, which focuses solely on the cash sweep account theory, "removes all allegations related to securities[,]" *i.e.*, it removes the fundamental crux of the case that BNY breached fiduciary duties by not disclosing potential conflicts of interest when it invested in affiliated mutual funds. ECF No. 192 at 3. *See also* ECF No. 192-2 (comparing the Waldens' amended complaint with their proposed second amended complaint). Thus, the Court is not convinced if amendment were permitted, the parties (and the Court) would be able to essentially pick up where they left off in litigation. Despite the class certification and pre-class summary judgment motions referencing the cash sweep account theory, because that was only one of several theories that the Waldens advanced and was not the focus of litigation until that point, the Court finds it more likely that it would be necessary for the parties to conduct a fresh round of class and expert discovery focused on this new theory [8] and undergo another round of dispositive motions practice, including re-briefing the motion for class certification, after almost five years of litigation and two years after the Waldens had notice of these facts. [9]

**\*8** Ultimately, the Waldens were not diligent in seeking to amend their complaint to include their cash sweep account theory after discovery revealed their theory of liability over two years before they sought to amend their complaint and have failed to rebut the presumption by a clear and cognizable explanation of why they did not diligently move to amend their complaint after learning of this new information. They have therefore not shown good cause under Fed. R. Civ. P. 16 and because they failed to meet this threshold showing, the Court need not address the additional arguments made for amendment under the more liberal standard of Fed. R. Civ. P. 15. *Premier Comp Sols., LLC*, 970 F.3d at 319.

**IV. Conclusion**
Based on the foregoing, the Waldens' motion for leave to file a second amended complaint ECF No. 191 is DENIED. An appropriate Order follows.

**All Citations**

Slip Copy, 2025 WL 2696463

**Footnotes**

1   All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq.*

2   The Court held the motion for class certification in abeyance pending the decision on BNY's motion for summary judgment. ECF No. 160; ECF No. 178 at 17.

3   Specifically, the Waldens defined the putative class in their amended complaint filed on June 28, 2021 as follows:

106.   Plaintiffs seek to represent the following class ("the Class"):

All persons or entities, for whom: (a) BNY Mellon had investment discretion over assets that they provided to the Bank, pursuant to an investment advisory agreement or similar agreement; and (b) BNY Mellon used its discretionary authority to invest in investment vehicles that were financially affiliated with BNY Mellon or BNY Corp.

ECF No. 40 at ¶ 106. By comparison, the Waldens defined the putative class in their motion for class certification filed on July 31, 2023 as follows:

**Walden v. Bank of New York Mellon Corporation, Slip Copy (2025)**

2025 WL 2696463

> (1)   Certifying this action as a class action pursuant to Rules 23(a), 23(b)(2), and
>
> 23(b)(3) of the Federal Rules of Civil Procedure, for a class defined as:
>
> > All persons who, or entities that, during the period 2014 to the present (the "Class Period"), contracted with BNY Mellon to receive investment advice for their investment assets and for whom BNY Mellon used its discretionary authority to purchase, or recommended, or otherwise caused, the purchase of, investment fund vehicles that were financially affiliated with BNY Mellon or BNY Corp. or the deposit of cash into bank accounts at BNY Mellon or related banks.

ECF No. 106 at ¶ 1 (adding language to the class definition to include "deposit of cash into bank accounts" at BNY).

4       The Court later found in its decision on BNY's summary judgment motion that the Waldens' abandoned their claims that BNY breached the investment agreements or violated state law by purchasing BNY Securities for their clients, and abandoned their claims that BNY breached the investment agreements by failing to make individualized assessments of the Waldens' financial needs by using a predetermined program to make investment decisions and that program preferred underperforming and conflicted affiliated funds that charged excess fees and underperformed other non-affiliated investment options. ECF No. 178 at 23-25.

5       The Court also notes the Waldens had notice they had not adequately pleaded this claim in September 2023 when BNY challenged whether the cash sweep account theory was pleaded in the amended complaint in its response to the Waldens' motion for class certification, and still did not move to amend the complaint.

6       In its decision granting BNY's motion to dismiss the class claims as preempted by SLUSA, the Court invited the Waldens to file the present motion and specifically noted the Waldens had not made any "argument for constructive amendment or implied consent of such amendment" for their cash sweep account theory claims in response to BNY's motion to dismiss. ECF No. 189 at 25.

7       The Court notes that the Court of Appeals for the Third Circuit has not yet addressed whether implied consent to amend a pleading under Fed. R. Civ. P. 15(b) applies at the summary judgment stage. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326–27 (3d Cir. 2012) (n. 7 noting the circuit split).

8       While it appears at least some discovery was conducted related to the cash sweep account theory, as it was briefly mentioned in Dr. O'Neal's expert report and BNY deposed Dr. O'Neal on this theory, *see* ECF Nos. 121-1 at ¶¶ 47-49; 121-3 at 244:13-270:20 – it does not appear the discovery conducted went any further than that, nor does it appear in the record that the parties fully engaged in discovery on this topic.

9       Whether the reason for the Waldens' delay in seeking amendment is attributable to attorney oversight or, in the alternative, is a litigation tactic after an unfavorable ruling on summary judgment which foreclosed their class claims as pleaded matters not – neither reason justifies "good cause" under Fed. R. Civ. P. 16(b). *Graham*, 271 F.R.D. at 121.

---

**End of Document**                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**20**

2025 WL 295778
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

WELL BUILT REALTY CORPORATION, Plaintiff,

v.

LEVITON MANUFACTURING
CO., INC., et al., Defendants.

Consolidated Civil No. 2:22-cv-573
|
Member Case No. 2:22-cv-1265
|
Signed January 24, 2025

**Attorneys and Law Firms**

Kenneth T. Levine, De Luca Levine LLC, East Norriton, PA, Matthew Connolly, De Luca Levine LLC, Blue Bell, PA, for Plaintiff.

Bradley D. Remick, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, Stuart H. Sostmann, Marshall, Dennehey, Warner, Coleman & Goggin, Pittsburgh, PA, for Defendants.

## MEMORANDUM ORDER

J. Nicholas Ranjan, United States District Judge

**\*1** Well Built owned commercial property, and leased it to Sukup.[1] A fire occurred at the property. Well Built claimed that Sukup caused the fire, so sued it for negligence. In the meantime, Well Built's insurer, Westfield, paid it about $5 million for the property damage. Sukup now moves for summary judgment, mainly arguing that Well Built doesn't have standing to sue; only Westfield does. The Court disagrees. While Westfield may be the real party in interest, Well Built can prosecute the action on Westfield's behalf. This can be accomplished through the filing of a new or amended Rule 17 ratification affidavit, which the Court will order Well Built to file. Sukup also raises a few merits-based arguments on questions of mitigation and duty; but those concern disputes of fact, and therefore cannot be fully resolved at this juncture. For these reasons, the Court denies Sukup's motion.

## BACKGROUND

Well Built owned commercial property at 360 14th Street, Ambridge PA. ECF 63-1, Joint Appendix, ¶ 3. Sukup Steel Structures leased the property from Well Built. *Id.* On July 18, 2020, a fire occurred at the property, causing extensive damage. ECF 63-1, Joint Appendix, ¶ 4. Experts in the case identified an electrical outlet in an office space as the origination point for the fire. *Id.* at ¶ 27. An air conditioning unit was plugged into that electrical outlet at the time of the fire. *Id.* at ¶ 28. Because of the extensive damage from the fire, Well Built submitted a claim to its insurer, Westfield, and received almost $5 million from Westfield for the loss. *Id.* at ¶ 17.

At that point, Well Built had a few options. That is, under Section 10 of the lease between Well Built and Sukup, when Well Built received its insurance proceeds, it had the right to invoke the restoration obligation. That would have required Well Built to make the insurance proceeds available to Sukup, and then obligated Sukup to use those proceeds to repair or restore the property to its previous condition. *Id.* at ¶ 21. Well Built, however, did not invoke this provision. Rather than tendering the insurance proceeds to Sukup and seeking restoration, Well Built kept the insurance proceeds and later sold the property. *Id.* at ¶¶ 18, 22-25.

Based on these events, Well Built filed suit. It began this action by suing Leviton Manufacturing Co., Inc., which manufactured the outlet Well Built alleged contributed to the fire, at case number 22-cv-573. ECF 1. After filing the complaint, Well Built filed a ratification affidavit under Rule 17(a)(3) from Westfield, in which Westfield stated that it was subrogated to the losses asserted in the action, it agreed to be bound by rulings in the action, it waived any other right to pursue subrogation, and it authorized the case to be prosecuted on its behalf in Well Built's name. ECF 63-1, Joint Appendix, ¶ 26.

**\*2** Next, Well Built brought suit against Sukup Manufacturing Company and Sukup Steel Structures in the Beaver County Court of Common Pleas. *Id.* at ¶ 1. Sukup timely removed the Beaver County Court of Common Pleas matter to this Court, and the action (case No. 22-cv-1265) was consolidated with Well Built's case against Leviton. *Id.* at ¶¶ 10, 12.

After fact and expert discovery concluded, Sukup moved for summary judgment. ECF 62. With the benefit of full briefing and oral argument, the motion is ready for disposition. ECF 68; ECF 70; ECF 72.

## DISCUSSION & ANALYSIS

Sukup moves for summary judgment, raising three arguments —which the Court addresses, in turn.

### I. Well Built's standing to sue.

The first argument Sukup raises goes to standing, though Sukup frames it a few different ways. That is, Sukup argues that Well Built cannot bring a claim here because Well Built was made whole by insurance and that this action is really a subrogation claim that could be brought only by Westfield. Relatedly, Sukup says that Well Built has no "damages" since it received full compensation from its insurer. On careful review, the Court disagrees.

Initially, even if Well Built received an insurance payout from Westfield, it can still recover its full amount of damages from Sukup under the collateral source rule. In Pennsylvania, "[t]he collateral source rule provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer." *Johnson v. Beane*, 664 A.2d 96, 100 (Pa. 1995). The collateral source rule allows a plaintiff to collect its full damages from a tortfeasor even if the plaintiff has received money from an insurance settlement. *See Chavers v. 1605 Valley Ctr. Pky, LP*, 294 A.3d 487, 495 (Pa. Super. Ct. 2023) (discussing collateral source rule in worker's compensation context).

What this means in the context of this case is that Well Built can still recover, but that Westfield will lien any recovery against its insurance settlement. To avoid the (unlikely) situation, of Westfield dropping the ball and not liening any recovery, federal law authorizes Westfield to file something that would require it to either join the case, be substituted in, or ratify Well Built's action. *See* Fed. R. Civ. P. 17. Westfield already did so in the No. 22-cv-573 case, and at oral argument, Well Built's counsel indicated that plaintiffs often file ratification affidavits to assuage the concerns of defendants, and appeared open to filing another one. ECF 72, 35:16-36:5. The Court therefore will order Well Built's counsel to file a second Rule 17 ratification by Westfield that

applies specifically to the No. 22-cv-1265 case, which will moot the issue.

Sukup, though, says, "not so fast." It argues that it is too late to file the Rule 17 ratification. But it's not. To begin with, failure to file a timely Rule 17 ratification does not require dismissal. Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."). There is no statute-of-limitations issue with a late Rule 17 ratification, since Rule 17 has a "relation back" provision, which states that after "ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a) (3). "[T]his mandatory relation-back provision protects the real party in interest from an expired statute of limitations as long as the named plaintiff filed within the limitations period." *Green v. Daimler Benz, AG*, 157 F.R.D. 340, 344 (E.D. Pa. 1994). And Sukup can't otherwise credibly claim any prejudice. After all, when the cases were consolidated, Sukup gained access to all the pleadings in the No. 22-cv-573 case and thus knew a ratification affidavit had been filed. Because Sukup knew of Westfield's interest all along, it will not be prejudiced by a second ratification affidavit.[2]

**\*3** In sum, Well Built has standing to sue Sukup. While Westfield may have subrogation rights to the claim or aspects of the claim, a Rule 17 affidavit will ensure that Well Built can be properly considered the real party in interest.[3]

### II. Failure to mitigate.

Sukup next argues that Well Built is precluded from recovery because it failed to mitigate its damages under the lease. ECF 63, p. 10. Sukup argues that the lease required Well Built to tender the insurance proceeds to Sukup, so that Sukup could then repair the building. This argument fails for two reasons.

First, Sukup misreads the lease; the restoration provision is not mandatory under the lease. The lease provides:

> 10. Restoration. If all or any part of the Premises is damaged or destroyed at any time during the Term of this Lease, then Tenant shall not be entitled to surrender possession of the Premises nor shall Tenant's liability to pay

**Well Built Realty Corporation v. Leviton Manufacturing Co., Inc., Slip Copy (2025)**

2025 WL 295778

Rent under this Lease cease. In case of any such damage or destruction, Tenant *shall repair or restore* the Premises to a condition similar to its previous condition with all reasonable speed, *provided that Landlord makes insurance proceeds available for such purpose* to the extent that Landlord is required to carry insurance for such casualty. If all or any part of the Premises is damaged or destroyed, the Tenant shall immediately notify Landlord thereof.

ECF 63-2, p. 74, Lease Section 10 (emphasis added). The italicized language makes clear that Sukup only had a duty to repair the property *if* Well Built provided it with the insurance proceeds. *See id.* Well Built never did so. The consequence of this is that Sukup then had no obligation to restore the property. Importantly, though, nothing in this section of the lease required Well Built to provide the insurance proceeds to Sukup and to exercise what is essentially a restoration option. And if the parties had intended such a requirement, they certainly could have said as much in their agreement.

Second, to the extent that Sukup is making a mitigation argument separate from this lease language, that issue is for trial. Failure to mitigate is an affirmative defense on which the defendant bears the burden of proof at trial. *Michalek v. Nationwide Mut. Fire Ins. Co.*, 597 F. Supp. 3d 822, 829 (W.D. Pa. 2022) (Conti, J.), *reconsideration denied*, No. 19-351, 2022 WL 1782503 (W.D. Pa. June 1, 2022). "[T]o prove a failure to mitigate, a defendant must establish: (1) reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced." *Id.* (cleaned up). At summary judgment, Sukup must "show that based upon the undisputed facts of evidence, a reasonable jury could find only in its favor." *Id.* Failure to mitigate can be a "fact-intensive inquiry" that cannot be resolved at summary judgment. *Id.; see also In re Rowland*, 292 B.R. 815, 820 (Bankr. E.D. Pa. 2003) ("The question of how much, if any, a plaintiff's recovery should be reduced due to a failure to mitigate, like the applicable question of the reasonableness of a plaintiff's behavior in the face of the breach, is one of fact."). Sukup has not presented undisputed facts sufficient to defeat this affirmative defense at summary judgment. [4]

**\*4** Because the lease provision is not mandatory and failure to mitigate is otherwise a question of fact, summary judgment is not appropriate on this issue.

### III. Duty to maintain HVAC system.

Finally, Sukup argues that it is not liable because Well Built had an independent duty to maintain the HVAC system under the lease. ECF 63, p. 12. Sukup states that if Well Built's claim is that the fire was caused by Sukup's failure to properly maintain the air conditioner at the property, then Sukup does not owe a duty of care and did not breach any duty. *Id.*

This is just a factual argument about the cause of the fire. Under the lease, Sukup was required to maintain the electrical systems and Well Built was required to maintain the HVAC system in the office portion of the building. ECF 63-2, pp. 72-73, Lease Section 8. The parties' experts identified an electrical outlet as the origination point for the fire. ECF 63-1, Joint Appendix ¶ 27. An air conditioning unit was plugged into that electrical outlet at the time of the fire. *Id.* at ¶ 28. Well Built points to the outlet as the cause of the fire, while Sukup points to the air conditioner.

Whether the electrical outlet or the air conditioner that was plugged into the outlet were the cause of the fire is a disputed factual issue. Well Built has presented evidence that the cord on the air conditioner was damaged, and when Sukup plugged in the bad cord, the outlet was damaged. ECF 72, 44:20-45:5; ECF 63-1, Joint Appendix, ¶ 28 ("The only connection that such electrical outlet had to any HVAC aspects of the building is that the power cord for an air conditioning unit cooling [an] office was plugged into such outlet at the time of the fire."); ECF 66, p. 15 (Well Built's claim is that the fire was caused by Sukup's "workers' abuse of an electrical outlet"); ECF 67, p. 10 ("Further, it was the condition of that air conditioner, the short cord which allegedly put a strain on the outlet, which their expert says caused the fire."). That is enough to create a genuine dispute of fact about the exact cause of the fire remain, making summary judgment inappropriate.

\* \* \*

Therefore, after careful consideration, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment (ECF 62) is **DENIED**. In accordance with the above, Well Built is **ORDERED** to file a new or amended ratification affidavit from Westfield on or before February 7, 2025.

**Well Built Realty Corporation v. Leviton Manufacturing Co., Inc., Slip Copy (2025)**

2025 WL 295778

**All Citations**

Slip Copy, 2025 WL 295778

---

## Footnotes

1    The Court refers to Defendant Sukup Steel Structures as "Sukup." The parties agree that Defendant Sukup Manufacturing Company should be dismissed from the case, which the Court will do by separate order.

2    Indeed, this issue only likely arose because of Sukup's removal of the No. 22-cv-1265 case to federal court. When an action that involves subrogation is filed in state court and then removed to federal court, a circumstance can arise where the real party at interest, the insurance company, is not properly joined or ratified to the action. *See Green v. Daimler Benz, AG*, 157 F.R.D. 340, 342 (E.D. Pa. 1994). This is because under the Pennsylvania Rules of Civil Procedure, insurance companies may bring subrogation actions "in the name of the insured even if the insured has no interest in the suit." *Id.* But Federal Rule of Civil Procedure 17 requires that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). "It is settled law that an insurer, whether it has paid all of the loss or only part of the loss, is a real party in interest under Rule 17(a)." *Hancotte v. Sears, Roebuck & Co.*, 93 F.R.D. 845, 846 (E.D. Pa. 1982). Based on this principle, Westfield qualifies as a real party in interest. All of this is to say that it is understandable why a Rule 17 affidavit of some sort wasn't filed with the original complaint.

3    To be clear, because Well Built is asserting a negligence claim under Pennsylvania law, it may present evidence of damages under the Pennsylvania standard for such claims—it is not limited to the amount it received in the insurance settlement. *See Vitale v. Electrolux Home Prods., Inc.*, No. 15-1815, 2018 WL 3868671, at *3 (E.D. Pa. Aug. 14, 2018) (holding that evidence of calculation of damages was trial issue). In other words, Well Built can still pursue damages that might exceed what Westfield paid and for which Westfield has subrogation rights.

4    Sukup points to the lease provision requiring it to rebuild the property if Well Built provided the insurance funds for that purpose, but doesn't otherwise cite to facts of record that would be sufficient to indisputably establish this affirmative defense at this stage.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.