## APPENDIX OF UNPUBLISHED OPINIONS

1.  *Am. Nurses Ass'n v. State of Ill.*, 1986 WL 10382 (N.D. Ill. 1986)

2.  *Humphreys v. Budget Rent a Car Sys. Inc.*, 2016 WL 3940807 (E.D. Pa. 2016)

3.  *Missing Link v. eBay*, 2010 WL 94268 (N.D. Cal. 2010)

4.  *Sloane v. Gulf Interstate Field Servs., Inc.*, 2017 WL 11318794 (M.D. Pa. 2017)

5.  *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2022 WL 17177267 (E.D. Pa. 2022)

1

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 3 of 45

American Nurses' Assoc. v. State of Illinois, Not Reported in F.Supp. (1986)

1986 WL 10382

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

AMERICAN NURSES'
ASSOCIATION, et al., Plaintiffs,
v.
STATE OF ILLINOIS, et al., Defendants.

No. 84 C 4451.
|
Sept. 12, 1986.

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

**\*1** This matter is before the court on the motion of American Federation of State, County and Municipal Employees, AFL–CIO ("AFSCME") to intervene as a party plaintiff and on three closely related motions concerning the scope of discovery. The court will address these motions separately.

*MOTION TO INTERVENE*

AFSCME is the exclusive bargaining representative of numerous state employees, including several of the named plaintiffs, on such issue as wages, hours, and working conditions, and is presently a party to a collective bargaining agreement with the State of Illinois. AFSCME maintains that its role as the exclusive bargaining representative confers upon it the right to intervene as a party plaintiff under Federal Rule of Civil Procedure 24(a)(2). In the alternative, AFSCME seeks permissive intervention under Federal Rule 24(b)(2).

To intervene as of right of Federal Rule 24(a)(2) an applicant must (1) timely apply; (2) claim an interest relating to the property or transaction which is the subject of the action; (3) be so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest; and (4) not be adequately represented by existing parties. *United States v. City of Chicago,* 796 F.2d 205, 208–09 (7th Cir.1986). Failure to satisfy even one of these requirements warrants denial of the motion to intervene as of right. *Id.* at 209.

AFSCME filed its petition to intervene in January 1985, before this case had progressed significantly. The defendants

concede that AFSCME's petition is timely. Therefore, AFSCME has met the first requirement for intervention.

AFSCME asserts that its collective bargaining agreement with the State of Illinois gives it an interest which relates to the subject of this action. In *Vulcan Society v. Fire Department,* 79 F.R.D. 437 (S.D.N.Y.), the court found that unions which represented plaintiff firefighters in collective bargaining had in the collective bargaining agreement an interest related to the race discrimination suit filed by black firefighters against the municipalities which employed them. The court stated:

The collective bargaining agreements between the unions seeking to intervene and the defendants set forth the results of their negotiation and include provisions relating to salaries, assignments and benefits. Should plaintiffs' allegations [of race discrimination] be established, modification of these terms would be within the scope of possible relief sought by plaintiff[s].

*Id.* at 439. Although the court in *Vulcan Society* permitted the unions to intervene before liability had been established, the court's language suggested that the union's interest, the collective bargaining agreement, actually related only to the remedial stage of the proceedings.

Other courts have found that labor unions and collective bargaining agents have a sufficient interest to support intervention only at the remedial stage of an employment discrimination case. In *Little Rock School District v. Pulaski County Special School District No. 1,* 738 F.2d 82 (8th Cir.1984), the Eighth Circuit held that teachers organizations which represented teachers employed by the defendant school districts in collective bargaining had a right to intervene in the remedy phase of a school desegregation case. The court stated that "[a]s representatives of the classroom teachers in the three districts, [the teachers organizations] have an interest in the existing agreements, which they themselves have negotiated with the districts involved, and in the continued viability of these agreements." The Eighth Circuit had previously affirmed the district court's refusal to permit the teachers organizations to intervene at the liability stage, stating that the interest that the organizations sought to protect related to the remedy. *Little Rock School District v. Pulaski County Special School District No. 1,* 725 F.2d 690 (8th Cir.1983) *quoted in* 738 F.2d at 83.

**\*2** In *EEOC v. American Telephone v. Telegraph Co.,* 506 F.2d 735 (3d Cir.1974), the Third Circuit concluded that the recognized bargaining agent for AT & T had no right to intervene generally as a party plaintiff in a civil

rights suit. The court found, however, that the EEOC was entitled to intervene as a matter of right to challenge the terms of a consent decree entered by EEOC and AT & T as the terms of the consent decree required modifications in collective bargaining agreements. Significantly, the court held that although the union sought to intervene as a party plaintiff, it could intervene only as a party defendant as it opposed modifications in existing collective bargaining agreements. [1] *See also Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977) (white employees could intervene pursuant to Rule 24(a)(2) at remedial stage of race discrimination case to object to consent decree which could adversely affect their seniority rights).

Neither AFSCME's existing collective bargaining agreements nor its role as exclusive bargaining representative for state employees give it an interest which would support intervention as of right at this stage of the proceedings. AFSCME's petition to intervene as of right is presently denied, without prejudice to the right to seek intervention at the remedy stage if and when the court determines that the defendants are liable.

AFSCME also seeks permissive intervention under Federal Rule 24(b)(2). Under Rule 24(b)(2), a court may permit intervention when the applicant's claim or defense and the main action have a common question of law or fact. Fed.R.Civ.P. 24(b)(2). Permissive intervention is within the discretion of the district court. *United States v. City of Chicago,* 796 F.2d 205, 211 (7th Cir.1986).

AFSCME contends that because its complaint in intervention closely tracks the complaint in the main action, numerous common questions of law and fact exist. [2] Nevertheless, permitting AFSCME to intervene now will only add to the number of attorneys attending court calls, engaging in discovery, filing motions, submitting briefs, and participating at trial, without adding a unique perspective that would make its participation valuable during the liability phase of this case. Therefore, AFSCME's motion for leave to intervene under Rule 24(b)(2) is denied.

### DISCOVERY MOTIONS

The plaintiffs have moved for an order compelling answers to their first set of interrogatories and their first request for production of documents. The defendants have moved to compel the depositions of the named plaintiffs on the issue of class certification and for a protective order staying general discovery pending resolution of the class certification issue. All three motions relate to the same question: whether classwide discovery on the merits should be stayed and discovery conducted only on the class certification question until that issue is resolved. The plaintiffs seek to commence general discovery on the merits now; the defendants prefer to bifurcate the discovery and proceed only with discovery related to the question of class certification at this time. Although both parties have cited numerous cases and other authorities in support of their respective positions, both parties recognize that the decision to bifurcate discovery is within the discretion of the district court and depends on the circumstances of the individual case.

**\*3** The court is persuaded that bifurcation of discovery would be prudent under the circumstances of this case. This approach will expedite the decision on class certification in accord with Federal Rule 23 which requires that class determination be made "as soon as practicable." Fed.R.Civ.P. 23(c)(1). The Manual for Complex Litigation also prefers bifurcated discovery:

It is recommended that no discovery on the merits be permitted during the discovery of the class action issue, except as is relevant to the class determination. Only in exceptional circumstances, such as obvious lack of merit in the claim for relief, should a decision on the merits be made before scheduling discovery on the class action issue.

The Manual for Complex Litigation § 1.40 (1977).

Plaintiffs' argument that much of the discovery on the merits will be necessary whether or not a class is certified obviously has some merit. Yet, as Judge Robson recognized in *Plummer v. Chicago Journeyman Plumbers' Local Union,* 77 F.R.D. 399, 402 (N.D.Ill.1977), many lawsuits will proceed to the merits regardless of whether a class is certified. "To hold that discovery can proceed on the merits irrespective or whether a class is certified would swallow-up the well-established and sound recommendations of the Manual for Complex Litigation." *Id.*

The plaintiffs also object to bifurcated discovery because it enables the defendants to depose the named plaintiffs twice, once on the issue of class certification and once on the merits of their claim. While the bifurcation of discovery will inconvenience the named plaintiffs in this way, it may result in substantial savings of time and energy later. If class certification is denied, the scope of permissible discovery may be significantly narrowed; if a class is certified, defining that

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 5 of 45

**American Nurses' Assoc. v. State of Illinois, Not Reported in F.Supp. (1986)**

class should help determine the limits of discovery on the merits.

Therefore, discovery on the merits is stayed pending resolution of the class certification issue. The plaintiffs'

motion to compel is denied, and the defendants' motions to compel and for a protective order are granted.

**All Citations**

Not Reported in F.Supp., 1986 WL 10382

## Footnotes

1   The *AT & T* case is noteworthy because it highlights a problem which might arise if AFSCME intervened at this juncture. If the plaintiffs succeed on the merits of their employment discrimination claim, the plaintiffs may seek relief which would require changes in the existing collective bargaining agreement and would adversely affect members of AFSCME who were not victims of, and indeed may have benefited from, the alleged discriminatory practices. AFSCME might then choose to oppose the plaintiffs' request for relief, and it would be clear that AFSCME is not properly aligned as a party plaintiff.

2   The court notes, however, that the applicants have not amended their complaint since the Seventh Circuit issued its opinion upholding the dismissal of the plaintiff's claims to the extent they rest on a theory of "comparable worth."

**End of Document**                                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

2016 WL 3940807
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anne HUMPHREYS, Plaintiff,
v.
BUDGET RENT A CAR
SYSTEM INC., et al., Defendants.

CIVIL ACTION No. 10-cv-1302
|
Signed 07/21/2016

### Attorneys and Law Firms

Ann Miller, Law Office of Ann Miller, Jenkintown, PA, Anthony P. Valach, Phoenixville, PA, Arthur Stock, Shoshana Michelle Savett, Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Daniel M. Harris, The Law Offices of Daniel Harris, Chicago, IL, for Plaintiff.

Bridget E. Montgomery, Adam M. Shienvold, David J. Schertz, Ryan Lee Stauffer, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA, Carol L. Press, Keith E. Smith, Eckert, Seamans, Cherin & Mellott, LLC, Philadelphia, PA, for Defendants.

### MEMORANDUM

Stengel, District Judge

*1 Anne Humphreys initiated this suit after a dispute arose over damage to a car that she rented from defendant Budget Rent A Car System, Inc. ("Budget"). After the plaintiff refused to pay the alleged debt, defendant Viking Collection Service, Inc. ("Viking") attempted to collect the debt. The plaintiff has filed this action against both Budget and Viking and challenges the way in which Budget charges its customers for damage to its rental vehicles. Specifically, the plaintiff contends that two formulas Budget uses to calculate the damages owed are impermissible liquidated damages clauses. She also challenges Budget and Viking's collection practices with regards to these debts, arguing that these practices violate both the Fair Debt Collection Practices Act ("FDCPA") and Pennsylvania's Fair Credit Extension Uniformity Act ("PFCEUA").

The plaintiff now moves to certify four classes and six subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure. Because I find that the plaintiff has not met her burden of demonstrating that the commonality requirement of Rule 23 is satisfied and because I am concerned that the plaintiff's proposed nationwide classes would not be manageable, I will deny the plaintiff's motion.

## I. BACKGROUND

### a. Budget's Rental Fleet

Budget purchases two types of vehicles—risk vehicles and program vehicles. Hr'g Tr., 119:24-25, Mar. 30, 2016. A risk vehicle is one that is purchased directly from the manufacturer and that Budget later sells into the open market. Id. at 120:1-4. Program vehicles also are purchased from the manufacturer but pursuant to a program that has a "guaranteed value or a guaranteed depreciation that [Budget] turn[s] back to the manufacturers." Id. at 120:14-17.

Because of Budget's size, on any given day, it is "most likely taking a delivery of a car" at one of its locations within the United States. Id. at 134:3-7. An individual location, however, may go 30 to 60 days without taking delivery of a new car. Id. at 134:5-7. Further, Budget does not purchase replacement vehicles for specific damaged cars. Id. at 134:15-16. Rather, the company buys in bulk based upon its rental demand. Id. at 134:15-18. Because Budget buys its vehicles in bulk, it normally pays less than retail customers pay per car.[1] Id. at 136:4-6.

### b. Budget's Formulas for Calculating Damages

Budget uses standardized rental agreements. These agreements contain certain clauses which govern damages incurred to a rental car. The sections of the rental agreement pertinent to the plaintiff's claims state:

*2 7. **Loss Damage Waiver.** Loss Damage Waiver (LDW) is not insurance and not mandatory. If you accept LDW by your initials on the rental agreement at the daily rate, for each full or partial day that the car is rented to you, and the car is used and operated in accordance with this agreement, we assume responsibility for the loss of or damage to the car except for your amount of "responsibility", if any, specified on the rental document.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 8 of 45

Humphreys v. Budget Rent a Car System Inc., Not Reported in Fed. Supp. (2016)

You acknowledge that you have been advised that your insurance may cover loss or damage to the car. You also acknowledge reading the notice on loss damage shown on the rental document, or at the end of these terms, or in separate notice form.

**8. Damage/Loss to the Car.** If you do not accept LDW, or if the car is lost or damaged as a direct or indirect result of a violation of paragraph 14 ["Prohibited Use of the Car"], you are responsible; and you will pay us for all loss of or damage to the car regardless of cause, or who, or what caused it. If the car is damaged, you will pay our estimated repair cost, or if, in our sole discretion, we determine to sell the car in its damaged condition, you will pay the difference between the car's retail fair market value before it was damaged and the sale proceeds. If the car is stolen and not recovered you will pay us for the car's fair market value before it was stolen. As part of our loss, you'll also pay for loss of use of the car, without regard to fleet utilization, plus an administrative fee, plus towing and storage charges, if any ("Incidental Loss"). If your responsibility is covered by any insurance, you will provide us with the name of the insurer and policy number, or if the insurance is provided by your card insurer, its insurer. You authorize us to process any or all of our Incidental Loss to your card at or after the completion of your rental. You also authorize us to collect any or all loss from a third party after we have collected our loss from you, we will refund the difference, if any, between what you paid and what we collected from the third party. If the law of a jurisdiction covering this rental requires conditions on LDW that are different than the terms of this agreement, such as if your liability for ordinary negligence is limited by such law, that law prevails. You understand that you are not authorized to repair or have the car repaired without our express prior written consent. If you repair or have the car repaired without our consent, you will pay the estimated cost to restore the car to the condition it was in prior to your rental. If we authorize to have the car repaired, we will reimburse you for those repairs only if you give us the repair receipt.

Second Am. Compl., Ex. 1 at 2. These provisions contain two types of damages – salvage damages and loss of use damages – both of which are assessed using standard formulas. Hr'g Tr. 69:4-7, Mar. 30, 2016.

The salvage formula is disclosed in the rental agreement, which states that the customer "will pay the difference between the car's retail fair market value before it was damaged and the [salvage] sale proceeds." Second Am. Compl., Ex. 1 at 2. Pursuant to Budget's loss of use formula, customers are charged the rental rate for the number of days before the damaged car is sold (not to exceed thirty days) [2] multiplied by 70%. [3] Hr'g Tr. 69: 17-20, Mar. 30, 2016. This formula, however, is not enumerated in the rental agreement. Id. at 70:8-15.

### c. Budget's Collection Practices

**\*3** When a renter who declined LDW coverage returns a damaged vehicle, Budget's standard practice is to send out a demand package that includes "a repair estimate, the fair market value photos, accident report and rental agreement." Hr'g Tr. 72:12-19, Mar. 30, 2016. Budget also includes a written estimate of the damages and the vehicle loss disclosure form in the packet. Id. at 73:1-9. This vehicle loss disclosure form lists the "actual cash value" of the car. Id at 74:2-5. Although not disclosed on the form, this is the car's retail fair market value. Id. at 74:2-5. Also not disclosed is the fact that the actual cash value may be higher than the net book value of the car, [4] as recorded on Budget's financial books. [5] Id. at 74:9-12.

### d. The Plaintiff's Claim

In July 2008, the plaintiff – then a Pennsylvania resident [6] – rented a car from Budget in Florida. Second Am. Compl. at ¶ 44. When renting the car, the plaintiff signed Budget's standard form rental agreement, which included the standard provisions that governed damage to a rental vehicle. [7] The plaintiff chose to decline loss damage waiver ("LDW") coverage [8] because she believed that "both [her] insurance company, but specifically [her] credit card company" covered damage to rental cars. [9] Hr'g Tr. 41:16-24, Mar. 30, 2016.

The plaintiff's rental car sustained damage when it stalled after she drove through sitting water. [10] See id. at 44:7-45:5. The car would not restart and ultimately, the plaintiff had it towed back to where she was staying. Id. at 45:1-46:25. Later that day, Budget delivered a replacement car to the plaintiff. Id. at 47: 6-7. Budget neither notified the plaintiff at the time it delivered the rental car nor when she returned the car at the end of the trip that she would be responsible for the car's damage. Id. at 47:8-18.

**\*4** On August 6, 2008, Budget sent the plaintiff a letter. See Second Am. Compl., Ex. 5 at 12. That letter stated that "[t]he investigation process of the damages incurred during your rental period indicates that we did not receive sufficient information upon your return." Id. Therefore, Budget asked the plaintiff to provide further information regarding the incident. Id. The plaintiff, however, neither notified her credit card company nor her insurer that she had received this letter or that there was a potential claim for damages as a result of the July 2008 incident. See Hr'g Tr. 60:-24-61:4, Mar. 30, 2016.

Five months later, in January 2009, Budget sent the plaintiff a letter stating that she owed Budget $11,225.55 for damage to the rental car. Second Am. Compl. at ¶ 47. Budget calculated the fee as follows:

$17,434.12 (retail fair market value of the car prior to damage)

-$6,775 (salvage proceeds minus administrative sale fee)

$10,659.12 (salvage fee)

+ $416.43 (thirty days Loss of Use fee at 70% utilization)

+150 (appraisal/evaluation/administrative fees)

$11,225.55

Id. at ¶¶ 53–57; see also id., Ex. 2 at 9. Attached to the letter were numerous documents that summarized and detailed the extent of the damages sustained to the plaintiff's rental car. See generally id at Ex. 2.

The plaintiff contends that this was the first time that Budget provided any notice of a definite claim for damages. Id. Because the plaintiff had declined LDW coverage, Budget claimed that she was responsible for any damage to the car while it was in her possession, regardless of fault. Id. The plaintiff, however, argues that because Budget first notified her of its claim for damages more than six months after the incident, her credit card and auto insurance companies declined to cover the claim because the claim was untimely submitted. [11] Id. at ¶ 49.

On March 2, 2009, the plaintiff sent a letter to Budget stating that her insurer and her credit card company were not willing to pay for the damages. Id. She refused to pay the alleged debt "[s]ince the delay of notification by Budget is what precluded

timely submission of the claim, it would seem that the fault lies with Budget." Id. On April 10, 2009, defendant Viking sent the plaintiff a letter that demanded full payment of the $11,255.55 she allegedly owed to Budget. Id. at ¶ 52; see also Doc. No. 62 at 40. The letter, however, did not disclose how Budget calculated the fee. Id. at ¶ 52. Rather, it simply listed the total amount of the debt.

### e. The Plaintiff's Proposed Classes

The plaintiff now seeks to serve as a class representative for others who similarly declined LDW coverage and who Budget charged for damage to a rental car. Ambitiously, she moves to certify four classes and six subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure. She proposes that the following classes, which I will refer to as the "injunctive classes," be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure:

**\*5** **The Rule 23(b)(2) Class.** All persons who rented a car from Budget; declined Loss Damage Waiver; returned damaged cars, which Budget sold for salvage; and who have been or will be billed by Budget:

(a) based on the "Loss of Use Formula." The "Loss of Use Formula" is defined as the number of days before the damaged car is sold, not to exceed thirty days, multiplied by 70% of the daily rental rate. (***the "Loss of Use (b)(2) Subclass"***); [12]

or

(b) based on the "Salvage Formula," where the retail fair market value of the car before such car was damaged exceeded the book value of the car. The "Salvage Formula" is defined as the difference between the car's retail fair market value before it was damaged and the sales proceeds (***the "Salvage (b)(2) Subclass"***); [13]

or

   (c) were sent or will be sent an initial bill from Budget more than 60 days after the alleged incident causing damage (*the "Late Notice (b)(2) Subclass."*).

The plaintiff also proposes that the Court certify the following classes, which I will refer to as the "damages classes," pursuant to Federal Rule 23(b)(3) :

**The Viking FDCPA Class**. All persons who rented a car from Budget; declined Loss Damage Waiver; returned damaged cars, which Budget sold for salvage; were billed by Budget based on the Loss of Use Formula and/or the Salvage Formula; had addresses in the United States; were sent one or more collection letters from Viking, in an attempt to collect such debt on behalf of Budget; and rented the cars primarily for personal, family or household use after March 26, 2009. [14]

**The Viking and Budget PFCEUA Class** – All persons who rented a car from Budget, declined Loss Damage Waiver, returned damaged cars, which Budget sold for salvage, who was billed by Budget based on the "Loss of Use Formula" and/or the "Salvage Formula", with addresses in Pennsylvania who were sent one or more collection letters from Viking, in an attempt to collect such debt from Budget, that arose primarily for personal, family or household use after March 26, 2008. [15]

**The Budget Breach of Contract/Breach of Good Faith and Fair Dealing Penalty Provision Class** – All persons who rented a car from Budget; declined Loss Damage Waiver; returned damaged cars, which Budget sold for salvage, and:

a) have been billed by Budget based on the Loss of Use Formula (*the "Loss of Use (b)(3) Subclass"*); [16]

or

**\*6**   b) have been billed by Budget based on the Salvage Formula where the retail fair market value of the car before such car was damaged exceeded the book value of the car (*the "Salvage (b)(3) Subclass"*); [17]

or

c) received their initial bill from Budget more than 60 days after the alleged incident causing damage (*the "Late Notice (b)(3) Subclass."*)

Doc. No. 95. [18]

### f. Class Discovery

Class discovery closed on July 10, 2015. See Doc. No. 87. During that period, a group of Budget's managers worked to identify salvage vehicles from the rental fleet for the time period relevant to the proposed class claims. Hr'g Tr. 81:2-7, Mar. 30, 2016. Ultimately, Budget exported this data into a spreadsheet. Id. at 81:6-15. The original spreadsheet – provided in class discovery – contained information from over 18,000 claim files. Id. at 81:20-22. For purposes of class discovery, the parties agreed that the defendants would produce the entire claims file for a sample set of 500 files. Id. at 81:20-82:3. After the parties agreed on a methodology for identifying this subset, 481 claims files were produced. Id. at 82:12-7.

The defendants contend that identifying this sample subset was an arduous task, as they were "required to manually review each and every file to determine in the first instance whether it was, in fact, a salvage formula file or not." Id. at 82:11-24. According to the defendants, this manual review conducted by a team of three lawyers and eight paralegals, took approximately 865 hours over a period of roughly six months. [19] Id. at 82:18-23. Budget contends that there is no automated way to identify which customers were actually

charged the salvage formula. Id. at 84:9-17. Further, because book value is not maintained in Budget's claims management system and not a value that is considered as part of the salvage process, it was not necessarily readily available for each of the claim files. [20] Id. at 85:2-4. Defense counsel speculates that it could take almost 36,000 hours to complete the review necessary to properly identify all members of the proposed classes and subclasses.

**\*7** Furthermore, the defendants had to engage in a manual review to determine who actually paid the claim, as Budget's system only records whether a recovery was made. Id. at 101:23-25;102:1-3. Neither Budget's systems nor the spreadsheets indicate whether payment was made by the renter, an insurer, a third party, or a credit card company. Id. at 102:1-2. Thus, a manual review of each file was necessary to look for correspondence and other documentation that would indicate who made the payment. [21] Id. at 102:3-73. Further, the defendants' review of the sample files revealed that there was no "record in any file of an insurance company or credit card company denying a claim to Budget on the basis of the timeliness of the notice." Id. at 104:2-5. Rather, the only file that contained such information was the plaintiff's, in which they found the letter that she sent to Budget indicating that because the claim was submitted to her in an untimely matter her credit card company was declining coverage. Id. at 104:5-10. The reviewed claims files also did not contain the renters' credit card or insurance agreements that governed the renters' ability to submit such claims. Id. at 104:16-24.

The plaintiff filed her Motion to Certify on August 7, 2015. The matter was fully briefed by November 2015. After resolving the parties' various disputes regarding the scope and timing of an evidentiary hearing on the motion, I held an evidentiary hearing on March 30, 2016. On May 12, 2016, the parties presented argument to the Court on the motion. The matter is now ripe for adjudication.

## II. STANDARD OF REVIEW
"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." In re: Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008) (footnote and quotation marks omitted); see also Reyes v. Netdeposit, LLC, 802 F.3d 469, 484 (3d Cir. 2015). "[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015).

The United States Court of Appeals for the Third Circuit recently clarified the legal standards applicable for class certification and explained the meaning of the "rigorous analysis" called for by Rule 23. See Reyes, 802 F.3d at 483; see also In re: Hydrogen Peroxide, 552 F.3d at 316; Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982) (holding class certification is proper only if the district court concludes, after a rigorous analysis, that the prerequisites of Rule 23 are met). In Reyes, the court noted that when evaluating a motion for class certification, a district court must:

> (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits) in order to (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements.

Id. at 485. Furthermore, the trial court's proper task "in deciding whether to certify a class [is to] resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all the relevant evidence and arguments presented by the parties." In re: Hydrogen Peroxide, 552 F.3d at 320. Therefore, at the certification stage, a district court must resolve such factual or legal disputes that are " 'relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action.' " Reyes, 802 F.3d at 484 (quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 591 (3d Cir. 2012)); see also Powers v. Lycoming Engines, 328 Fed.Appx. 121, 123 (3d. Cir. 2009) ("The mandates set out in Rule 23 are not mere pleading rules....Unless each requirement is actually met, a class cannot be certified.")(internal citation and quotation marks omitted).

## III. DISCUSSION
**\*8** This Court may certify a class action only if the plaintiff satisfies all four provisions of Rule 23(a) and at least one provision of Rule 23(b). See, e.g., Amchem Prods. v. Windsor, 521 U.S. 591, 613–14 (1997).

### a. Rule 23(a)'s Requirements

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). The Rule 23(a) requirements have been termed: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.

### i. Numerosity

A plaintiff must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40" the numerosity requirement has been satisfied. Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). While, there is no minimum number of plaintiffs required to maintain a suit as a class action, id. at 226, "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." Brown v. Phila. Hous. Auth., No. 06-CV-1495, 2006 WL 1737212, at *2 (E.D. Pa. June 22, 2006)(internal quotation marks and citation omitted).

The plaintiff contends that the Rule 23(b)(2) class contains at least 400 members, and that each of the injunctive subclasses contains at least forty members. Pl.'s Mot. to Certify at 16. She also contends that the damages class contains over 440 members. Id. The smallest subclass she proposes is the PFCEUA class, which she argues has ninety-three members. [22] Hr'g Tr. 20:21-21:7, May 12, 2016.

In their papers, the defendants do not provide argument as to why the plaintiff has failed to meet Rule 23(a)'s numerosity requirement. Instead, in a mere footnote, they argue that they "do not agree with plaintiff's calculation of the number of putative class members in her various proposed classes and subclasses." See Defs.' Br. in Opp. at 23 n.9. Because they contend that the plaintiff cannot meet the other requirements of Rule 23(a), the defendants declined to provide alternative calculations for the number of putative class members. At oral argument, however, the defendants argued that the plaintiff failed to meet her burden of demonstrating numerosity because it would require the court to speculate about what happened to other prospective class members. Hr'g Tr. 51:19-24, May 12, 2016.

I am satisfied that despite the defendants' arguments, the plaintiff has met her burden of establishing that the proposed nation-wide classes and subclasses [23] are sufficiently numerous. Her contentions regarding class size are more than speculative. Rather, at the hearing, by manipulating a spreadsheet that contained information from 481 sample salvage files, she demonstrated that each class and subclass contains enough members that joinder would be impracticable. Therefore, the plaintiff has established numerosity.

### ii. Commonality

**\*9** Commonality is a consideration of whether there are "questions of law or fact common to the class[.]" FED. R. CIV. P. 23(a)(2). As the Supreme Court has noted, the commonality language of Rule 23 is "easy to misread, since [a]ny competently crafted class complaint literally raises common 'questions.' " Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 (2011) (internal quotation marks omitted) (alteration in original). Rather, the commonality requirement is satisfied "when there are classwide answers." Reyes, 802 F.3d at 482 (citing Dukes, 564 U.S. at 350).

Thus, the class claims must depend upon a common contention that "must be of such a nature that it is capable of classwide resolution." Dukes, 564 U.S. at 350. Commonality, however, "does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.' " Reyes, 802 F.3d at 482 (quoting Dukes, 564 U.S. at 359); see also id. (noting that the inquiry must focus on "whether the defendant's conduct is common to all of the class members...the bar is not a high one.")(internal

quotation marks and citations omitted); In re: Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 397 (3d Cir. 2015) cert. denied sub nom. PNC Bank v. Brian W., No. 15-CV-693, 2016 WL 763688 (U.S. Feb. 29, 2016) ("The bar is not high; we have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury,...when class members did not have identical claims,...and, most dramatically, when some members' claims were arguably not even viable,...."). Therefore, the focus "is not on the strength of each class member's claims but instead 'on whether the defendant's conduct was common as to all of the class members.' " In re Cmty Bank, 795 F.3d at 397 (quoting Sullivan v. DB Investments, Inc., 667 F.3d 273, 298 (3d Cir. 2011)).

Here, the plaintiff contends that:

> [t]he legitimacy and legality of this contract and these formulas and the legitimacy and the legality of the standardized collection letters and demand packages that Budget and its agent, Viking, sent to these customers present common and predominant issues that can be resolved for all class members following a single, manageable trial.

Hr'g Tr. 3:7-12, May 12, 2016. Further, the plaintiff argues that because a standardized contract was used by all members of the proposed class and because standardized dunning letters were sent in an attempt to collect payments Budget claims were owed, she has met her burden of establishing that common questions exist.

Contrary to the plaintiff's arguments, however, this is not a run-of-the-mill contract dispute. The central question here is not whether the defendants' use of the retail fair market value in lieu of the car's book value violates the contract itself. Nor is the issue whether the defendants' alleged practice of billing customers over 60 days after the alleged incident that caused damages violates the contract's terms. In fact, to the contrary, the parties agree that Budget has applied the salvage formula to members of the proposed class in exactly the way in which the contract allows.[24] Additionally, the contract is silent regarding when a claim for damages must be submitted to a customer. Therefore, the central question in

this suit is not whether or not Budget breached the contract. Rather, the question is whether or not these formulas are invalid liquidated damages clauses and whether Budget's billing practices violates the covenant of good faith and fair dealing. The answers to these questions will not be found by looking at the contract's language and comparing it to the defendants' actions (or inactions). Rather, the answers will only be found through an analysis of whether or not these formulas and the defendants' billing practices violate state laws governing liquidated damages provisions and pertaining to the covenant of good faith and fair dealing.

### 1. Choice of law issues

**\*10** Because the plaintiff seeks to represent nationwide classes and subclasses to advance claims that raise state law issues, I must, as a threshold matter, determine whether the variations in state law will "swamp any common issues."[25] See Grandalski v. Quest Diagnostics, Inc., 767 F.3d 175, 180 (3d Cir. 2014) (quoting Sullivan v. DB Invs., Inc., 667 F.3d 273, 304 n.28 (3d Cir. 2011))(internal quotation mark omitted); see also Powers, 328 Fed.Appx. at 124 ("A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply."). The burden is on the plaintiff to "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.' " Powers, 328 Fed.Appx. at 124. "This comprehensive analysis is necessary because aggregate class action should not alter the applicable substantive legal rights of the plaintiffs." Id. (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821 (1985)). Moreover, this inquiry is key when determining whether there are classwide answers to the common questions the plaintiff argues that she has posed in her class complaint.

The Third Circuit has noted that variations in state law may preclude class certification. Sullivan, 667 F.3d at 304 n.28; see also Grandalski. 767 F.3d at 184 (affirming the district court's decision that variations in state law precluded certification). For purposes of certifying a litigation class, the court noted that "if more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law." Id. (citing Klay v. Humana, Inc., 382 F.3d 1241, 1261(11th Cir. 2004))(internal quotation marks omitted). The court also acknowledged the inherent difficulties a district court would face when trying such a claim on a class basis. Id.

Pennsylvania's choice-of-law principles apply to this case, as a federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits to determine the applicable state law. Chin v. Chrysler, LLC, 538 F.3d 272, 278 (3d Cir. 2008) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)); see also In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig., No. 12-CV-07263, 2015 WL 2417411, at *2 (E.D. Pa. May 20, 2015). Pennsylvania employs a "flexible rule" which combines the "significant contacts" analysis of Restatement (Second) of Conflict of Laws § 145 and a "governmental interest analysis." See Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964) ("[W]e are of the opinion that the strict lex loci delicti rule should be abandoned in Pennsylvania in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court."). "The merit of such a rule is that 'it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction most intimately concerned with the outcome of [the] particular litigation.' " Id. at 806 (citation and quotation marks omitted).

*11 Thus, Pennsylvania's choice-of-law analysis asks three questions: (1) is there an actual conflict or a false conflict between potentially applicable states' laws, (2) if there is an actual conflict, is there a "true conflict" based on the governmental interests underlying each law, and (3) if there is a "true conflict," which state has more significant contacts and a greater interest in its law being applied. See Specialty Surfaces Intern., Inc. v. Cont'l Cas. Co., 609 F.3d 223, 229–36 (3d Cir. 2010); Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229–36 (3d Cir. 2007). While the plaintiff argues that the "defendants unduly complicate the choice of law analysis," I disagree. See Pl.'s Rep. Br. at 17. Rather, it is clear to me that the choice-of-law analysis – a crucial inquiry – prevents the proposed classes and subclasses from being certified.

To determine which state's law will govern the plaintiff's claims, I will have to engage in Pennsylvania's choice-of-law analysis not once but numerous times. The first step of the inquiry – determining whether an actual conflict exists – will require me to engage in an individualized inquiry for each class member, as I will need to analyze the laws of both the rental state and the individual class members' home state, to determine if "there are relevant differences between the laws." Hammersmith, 480 F.3d at 23. If an actual conflict exists, then I will need to classify the conflict as

"true," "false," or "unprovided-for." McDonald v. Whitewater Challengers, Inc., 116 A.3d 99, 107 (Pa. Super. Ct. 2015), appeal denied, 130 A.3d 1291 (Pa. 2015). A "true conflict" exists if "the governmental interests of both jurisdictions would be impaired if their law were not applied," Garcia v. Plaza Oldsmobile, Ltd., 421 F.3d 216, 220 (3d Cir. 2005), while a "false conflict" exists when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991). When a false conflict exists, "the court must apply the law of the state whose interest would be harmed if its law were not applied." Id. If a true conflict exists, then I must proceed to the second step of the choice-of-law analysis. Cipolla v. Shaposka, 267 A.2d 854, 586 (Pa. 1970); see also McDonald, 116 A.3d at 107.

In an attempt to meet her burden of demonstrating that this analysis should not bar class certification, the plaintiff offers three spreadsheets that summarize the elements of her state law claims under each state's laws. See Savett Decl., Exs. 19-21. She then argues that the choice-of-law analysis is "simple" because "either the laws are uniform and Pennsylvania law can apply to everyone, or the law of the Class member's rental state will apply." Pl.'s Mot. for Class Cert. at 17–18.

The plaintiff has overly simplified the burden that she faces. Instead of engaging in an extensive analysis of the state laws invoked by her class complaint, she has placed before the court charts that attempt to lay out the state law "standards" for determining whether liquidated damages clauses are permissible and whether a party has breached the covenant of good faith and fair dealing. These charts alone are not sufficient to end the inquiry that I would have to engage in prior to certifying the class. Rather, I would have to look at each of these "standards" in the context of the individual state's case law to determine how they have been applied to decide whether or not a conflict even exists.

Thus, the plaintiff has merely shifted the burden to the Court to determine whether state law prevents class certification and decline the plaintiff's invitation to engage in this analysis. Therefore, because the plaintiff has not met her burden of credibly demonstrating, through an extensive analysis, that the variations in state laws do not present "insuperable obstacle[s]" to finding common answers to the questions posed, I will deny her motion to certify. [26] Powers, 328 Fed.Appx. at 124.

### i. Adequacy

**\*12** Even if the plaintiff could establish that choice-of-law issues do not preclude certification, I still could not certify her late notice subclasses, because she is not a member of those subclasses. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "This inquiry concerns both (1) the experience and performance of class counsel; and (2) the interests and incentives of the representative plaintiffs." In re: Processed Egg Products Antitrust Litig., No. 08-MD-2002, 2015 WL 7067790, at \*4 (E.D. Pa. Nov. 12, 2015) (quoting Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012)) (internal quotation marks omitted); see also Martin v. Ford Motor Co., 292 F.R.D. 252, 269 (E.D. Pa. 2013) ("The adequacy inquiry under Rule 23(a) (4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). Furthermore, the Supreme Court has been clear: "a class representative must be part of the class and possess the same interests and suffer the same injury as the class members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 –26 (1997)(citing East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted).

Here, the plaintiff has not provided this court with any competent evidence that she is in fact a member of the late notice subclasses. Rather, the only evidence that her credit card company denied her claim is her testimony that she called the company twice and was told that the claim was untimely. See Hr'g Tr. 54:6-20, Mar. 30, 2016. There is no evidence on the record, other than this hearsay testimony, that the claim was denied because of when it was filed. Further, the plaintiff has neither provided the defendants nor the Court with a copy of her credit card agreement. See id. at 61:10-16. Without this evidence the plaintiff cannot demonstrate that she is a member of the late notice subclasses. Therefore, even if she could prove that the choice of law issues did not preclude certification, I would deny her motion with regards to the late notice subclasses.

## IV. CONCLUSION

For the foregoing reasons, I will deny the plaintiff's motion for class certification, as it is clear to me that she has not met her burden of demonstrating that common answers exist to the questions she poses. Further, even if she could demonstrate through an extensive analysis that the choice-of-law issues do not preclude class certification, I would deny the plaintiff's motion with regards to the late-notice subclasses, because she has not demonstrated that she is in fact a member of those two subclasses. The plaintiff has had years to meet her burden – this case was filed in 2010, and the motion for class certification was filed in August of 2015. Despite having years to craft her arguments and to demonstrate to the Court that certification is appropriate, she has been unable to do so. Therefore, I will deny her motion with prejudice.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3940807

## Footnotes

1    Robert Adams, Vice President of Fleet Planning and Analysis for Avis Budget Group, later clarified that while Budget would normally acquire its risk vehicles at a lower price than that typically paid by retail customers, the price paid for program vehicles "would depend on what retail incentives the manufacturers have out in the marketplace." Hr'g Tr. 136:9-11, Mar. 30, 2016. Therefore, it is not clear that Budget always purchases its program vehicles at a lower cost than retail customers.

2    The time it takes to sell a car for salvage can vary greatly. For example, a car that was damaged in an accident in which serious injuries occurred may not be sold right away, as Budget may have a legal obligation not to do so. Hr'g Tr. 153:9-13, Mar. 30, 2016. Location and seasonality also play a role in how quickly cars are able to be sold for salvage. Id. at 153:21-154:2. On a fleet-wide basis, however, it takes on an average of 30.7

days to sell a car for salvage. Id. at 154:6-11. Regardless of how long it takes, a customer is not charged loss of use damages for a period greater than thirty days.

3    Budget does not utilize this formula in states where state law prohibits or limits damages that may be charged for the loss of use. States that prohibit the use of such a formula are California, Illinois, New York, and Wisconsin. Id. at 69:25-70:4. The number of days for which an individual can be charged is limited by law in Texas and Minnesota. Id.

4    As I noted in my earlier decision:

when valuing its cars for its corporate records, Budget records the original cost of the car minus depreciation to arrive at an amount known as "book value." If a car is damaged, Budget will calculate its anticipated "loss" by subtracting the anticipated salvage net proceeds from the sale of the damaged vehicle from the book value of the car prior to the accident.

Humphreys v. Budget Rent A Car Sys. Inc., No. 10-CV-1302, 2014 WL 1608391, at *3 (E.D. Pa. Apr. 22, 2014)

5    According to Budget's review of its own records, there are also times – approximately 22% in the sample taken from all of the files – where the net book value is higher than the retail fair market value. Defs.' Mot. in Opp. at 21.

6    The plaintiff currently resides in Florida. Hr'g Tr. 39:18-19, Mar. 30, 2016.

7    These sections are provided verbatim above. See supra Section I.b.

8    According to the International Risk Management Institute ("IRMI"), an LDW is "[a]n agreement with an auto rental company in which the renter is released from liability for physical damage to the vehicle in exchange for a fee, subject to the terms of the rental agreement or a state statute if one exists." See Loss Damage Waiver (LDW), IRMI available at https://www.irmi.com/online/insurance-glossary/terms/l/loss-damage-waiver-ldw.aspx (last accessed Feb. 23, 2016).

9    Although some credit card companies provide coverage for damage to rental vehicles, because such coverage is not an insurance policy, Budget is not allowed to report a claim directly to a credit card company. Hr'g Tr. 149:11-153, Mar. 30, 2016. Therefore, Budget depends upon the renter to make contact with his or her credit card company if seeking coverage for the claim. Id. at 149:11-19.

10   The plaintiff disputes that she damaged the car, as she claims that the amount of water that she drove through was minimal. See Hr'g Tr. 46:7-10, Mar. 30, 2016. While I acknowledge this dispute over the actual cause of the damage to the plaintiff's rental car, this dispute and its resolution are not relevant to the plaintiff's Motion to Certify.

11   The only evidence that the plaintiff has provided that her credit card company denied her claim is her testimony that she called the company twice and was told that the claim was untimely. See Hr'g Tr. 54:6-20, Mar. 30, 2016. There is no evidence on the record, other than this hearsay testimony, that the claim was denied because of when it was filed. The plaintiff also has failed to provide the defendants or the Court with a copy of her credit card agreement. See id. at 61:10-16.

Further, GEICO, the plaintiff's automobile insurance carrier, denied the claim on February 10, 2009 because there was "no applicable coverages" on the plaintiff's policy. See Defs.' Mot. in Opp. at Ex. 7. In other words, GEICO denied the claim because the plaintiff's policy did not cover damage to her rental car. There is no evidence on the record that GEICO denied the claim because of the time in which it was filed.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 17 of 45

Humphreys v. Budget Rent a Car System Inc., Not Reported in Fed. Supp. (2016)

12    Because the Loss of Use Formula is not charged in California, Illinois, New York, and Wisconsin, the class would exclude individuals who rented in those states.

13    Because the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

14    Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

15    Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from this class.

16    Because the Loss of Use formula is not used in California, Illinois, New York, and Wisconsin and the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from this class.

17    Because the Salvage Formula is not charged in Illinois and New York, individuals who rented in those states would be excluded from the class.

18    The plaintiff has modified these definitions since filing her Second Amended Complaint. Namely, the plaintiff has changed the definition for the salvage b(2) and b(3) subclasses to include only customers who were charged the retail fair market value of the car before it was damaged when that value exceeded the car's book value. While the defendants do not challenge the plaintiff's ability to do so under the law, they argue that these changes have been made in an attempt "to disguise the fatal defects in her proposed classes by removing any putative class members whose presence reveals the fatal defects in her theories of liability." See Defs.' Br. in Opp. at 17–20. They further contend that after class discovery, it is now evident that for a significant number of the putative class members, almost a quarter, the book value was actually greater than the retail fair market value. Id. at 20. Therefore, these changes are "completely at odds with [the plaintiff's] theory of the case...that she will prove, on a class wide basis, that the use of retail fair market value is a violation of the covenant of good faith and fair dealing and/or an unenforceable penalty because book value is 'the proper measure of damages under the law.' " Id. at 20– 21. Furthermore, the defendants argue that allowing the plaintiff to exclude those customers who were benefitted by the use of the retail fair market value would only serve to harm members of the class as well as customers who would have benefited from the current formula in the future. Id. at 21.

19    This calculation does not include the time spent by Budget's own employees. Hr'g Tr. 83:23-84:2, Mar. 30, 2016. The plaintiff, however, argues that this manual review is unnecessary. Instead, she argues that only two to three documents had to be reviewed from each file. Hr'g Tr. at 16:11-16, May 12, 2016. Defense counsel concedes that if he only had to review two pages from each file, this review would have taken less time. Hr'g Tr. 111:11-112:1, Mar. 30, 2016.

20    After its review of 481 files, Budget contends that the book value was only available in 384 files. Hr'g Tr. 85:8-11, Mar. 30, 2016. Conversely, the retail fair market value was contained in all but three of the 481 claim files that were part of the sample set, as Budget lists a car's retail fair market value on the Vehicle Loss Disclosure form, a form that also lists the dollar amount that was charged to the renter. Id. at 94:3-5; 94:14-21.

21    The defendants argue that should no such evidence be available in the file, they would have to engage in "some investigation beyond the claim files in order to determine whether there was a payment made by an insurance company on behalf of that renter." Hr'g Tr. 103:19-22, Mar. 30, 2016.

22    In her Motion to Certify, the plaintiff stated that there were "at least 15 members" in the Viking and Budget PFCEUA class. Pl's Mot. to Certify at 16. Because I believe that the plaintiff has sufficiently met her burden of demonstrating that numerosity has been satisfied, I need not determine which assertion is correct.

23    The fact that customers from certain states are excluded from the loss of use and salvage formula subclasses, as discussed above, does not alter my decision that the classes and subclasses as proposed satisfy the numerosity requirement.

24    The plaintiff does note, however, that the loss of use formula is not disclosed within the contract. Rather, the contract states that the renter will "also pay for loss of use of the car, <u>without regard to fleet utilization</u>, plus an administrative fee, plus towing and storage charges, if any." Second Am. Compl., Ex. 1 at 2. Nonetheless, the plaintiff argues that Budget's formula is an impermissible liquidated damages clause, which, as I discuss above, is inherently not a breach of contract claim.

25    This inquiry, however, is not solely applicable to whether or not commonality has been met. Rather, determining which law or laws govern the action also plays a role analyzing the "typicality, and adequacy requirements of Rule 23(a), and the superiority and predominance factors of Rule 23(b)(3)." <u>Powers v. Lycoming Engines</u>, 328 Fed.Appx. 121, 124 (3d Cir. 2009). Further, it is clear that I must engage in this inquiry at this stage of the litigation. See <u>Grandalski v. Quest Diagnostics, Inc.</u>, 767 F.3d 175, 180 (3d Cir. 2014) (noting that the Third Circuit has found error when a district court failed to engage in a choice– of–law analysis at the certification stage).

26    I also must deny the plaintiff's motion with regards to her proposed FDCPA and PFCEUA classes. Even though these claims are based upon the plaintiff's contention that the defendants' actions violated a specific and common statute, they still raise state law issues. The plaintiff argues that the letters sent to the class members were "uniformly misleading and confusing" because they did not disclose that the damages were calculated using the retail fair market value for the car in lieu of the car's book value. Pl.'s Mot. to Certify at 10. Thus, her FDCPA and PFCEUA claims are based upon the contention that the salvage and loss of use formulas were impermissible liquidated damages clauses. For the same reasons noted above that prevent me from certifying these subclasses, I also must deny the plaintiff's request to certify the FDCPA and PFCEUA classes, as the choice-of-law issues are also present with regards to these claims and prevent common answers, as required by Rule 23(a).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**3**

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 20 of 45
Missing Link, Inc. v. eBay, Inc., Not Reported in F.Supp.2d (2010)
75 Fed.R.Serv.3d 969

2010 WL 94268

United States District Court, N.D. California,
San Jose Division.

The MISSING LINK, INC., d/b/a Bath
Plus Inc., individually and on behalf of
all others similarly situated, Plaintiffs,

v.

eBAY, INC., Defendant.

No. C–07–04487 RMW.
|
Jan. 6, 2010.

**Attorneys and Law Firms**

Kevin K. Eng, Noah Shube, Edward Scott Zusman, Frank
Jablonski, Ilan Joel Chorowsky, for Plaintiffs.

Joseph Samuel Leventhal, Heather Coe Meservy, Michael
Graham Rhodes, Whitty Somvichian, for Defendant.

ORDER DENYING MOTION TO EXTEND
CLASS CERTIFICATION DISCOVERY

RONALD M. WHYTE, District Judge.

**\*1** On November 20, 2009, the court heard plaintiffs'
motion to extend class certification discovery pursuant to
Federal Rule of Civil Procedure 16(b)(4). Defendant opposed
the motion. Having considered the papers submitted by the
parties and the arguments of counsel, and for the reasons set
forth below, the court denies plaintiffs' motion.

On August 29, 2007, The Missing Link, Inc., d/b/a Bath Plus,
Inc. ("The Missing Link") filed a putative class action against
defendant eBay, Inc. ("eBay"). eBay moved to dismiss. On
May 5, 2008, the court denied in part and granted in part
eBay's motion to dismiss with leave to amend. Plaintiffs
filed an amended complaint on May 27, 2008, and a second
amended complaint ("SAC") on April 17, 2009. Plaintiffs'
SAC asserts the following claims on behalf of two classes
of plaintiffs: breach of contract; violation of Cal. Bus. &
Prof.Code § 17200; unjust enrichment; and breach of the
covenant of good faith and fair dealing.

## I. BACKGROUND

Defendant eBay is "the largest virtual retail store and auction
site on the internet. SAC ¶ 17. To post items for sale on
eBay.com, a seller must register with eBay and complete an
online form for a listing on eBay's site, which includes a
description of the item and quantity for sale as well as the
duration for which the listing is to be available. *Id.* ¶ 19.
Plaintiff The Missing Link is an Illinois corporation that sells
bathroom fixtures online. *Id.* ¶ 6. The Missing Link has a
seller's account with eBay, and has purchased listings using
eBay's website. *Id.*

The Missing Link seeks to bring suit against eBay on behalf
of two different classes of plaintiffs. The first class consists
of all persons and entities who, before July 19, 2006 paid for
listings on eBay.com and used eBay's "Good 'Til Cancelled"
format. *Id.* ¶ 44. The second class consists of all persons who
paid to list one or more items for sale in any format but whose
listing was not advertised for sale on eBay.com for the entire
duration purchased. *Id.* ¶ 55.

The parties stipulated to a discovery schedule on June 19,
2009, pursuant to which the period for class certification
discovery closed on September 30, 2009. Doc. No. 65. The
day after discovery closed, on October 1, 2009, plaintiffs
filed the present motion seeking to extend the time for
class discovery to November 30, 2009. Plaintiffs have not,
however, identified what discovery they seek to conduct during
they were unable to conduct during the agreed upon time
period.

## II. ANALYSIS

Federal Rule of Civil Procedure 16(b) states that "schedul[ing
orders] shall not be modified except on a showing of good
cause." When analyzing a request for a change in the schedule
the court primarily considers whether the party seeking the
modification has been diligent:

> Rule 16(b)'s good cause standard
> primarily considers the diligence of
> the party seeking the amendment....
> Carelessness is not compatible with
> a finding of diligence and offers no
> reason for a grant of relief. Although

**Missing Link, Inc. v. eBay, Inc., Not Reported in F.Supp.2d (2010)**

75 Fed.R.Serv.3d 969

the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

**\*2** *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) (internal quotations and citations omitted). The parties in their joint case management statement stipulated to September 30, 2009 as the close of class certification discovery. Doc. No. 65. In order to modify or extend this date plaintiffs must show good cause. *Zivkovic v. Southern California Edison Co.,* 302 F.3d 1080, 1087 (9th Cir.2002) (denying motion to extend discovery where plaintiff's "counsel did not seek to modify [scheduling] order until four months after the court issued the order"). Generally, in determining whether there is good cause to permit an extension the court will primarily look to the (1) diligence of the party seeking the extension, but may also consider (2) the explanation for the failure to complete discovery in a timely fashion; and (3) potential prejudice in allowing the extension. Fed.R.Civ.P. 16, advisory committee note of 1983; *Johnson,* 975 F.2d at 604.

### A. Diligence of Requesting Party

Plaintiffs claim that "[d]espite their best efforts" they were "unable to complete discovery for the purposes of class certification in the time period allotted." Mot.¶ 6. Plaintiffs characterize their efforts as "diligent" and claim that their analysis of the documents produced by eBay was ongoing and continued into September 2009. *Id.* However in the final hour plaintiff served additional discovery requests, then filed a motion to extend the agreed schedule. Defendant opposes any extension. Opp. at 1:2–5.

Defendant argues plaintiffs' actions demonstrate a lack of diligence and moreover, that plaintiffs' lack of good cause precludes the court from granting an extension. *Id.* Defendant asserts that during preliminary depositions, plaintiffs did not ask any questions of the 30(b)(6) witness, suggesting plaintiffs proceeded with a lack of preparation and further that this lack of diligence caused the need for an extension. *Id.* at 1:20–23. Defendant asserts that plaintiffs' additional discovery requests served on the last day of the discovery period also demonstrate a lack of diligence. Defendant further

argues that they completed the majority of their document production in June and July giving plaintiff ample time to analyze the documents and prepare for deposition. Opp. at 1:11–12. According to defendant, no effort was made by plaintiffs until literally the last day of certification discovery. *Id.* at 2:19–20.

In short, plaintiffs' failure to show diligence in either its actions or its inquiries leads the court to determine that modification of the discovery deadline is inappropriate. Although generally a lack of diligence on the part of the requesting party ends the inquiry, the court will still address the other factors below. *See Gestetner Corp. v. Case Equip. Co.,* 108 F.R.D. 138, 141 (D.Me.1985).

### B. Explanation for Incomplete Discovery

To show good cause and to explain their delayed request for further time for discovery, plaintiffs assert that defendant did not provide all discovery by July, but rather episodically served its responses to plaintiffs' written discovery requests including producing documents as late as August and September 2009. Mot.¶ 2. Plaintiffs further argue that defendant's Rule 30(b)(6) deposition testimony in August 2009 bore out new revelations with respect to potential material for discovery thus giving rise to the need for an extension. *Id.* ¶ 4. In addition, plaintiffs assert they did not anticipate that defendant's document production would be drawn out and that despite their best efforts this resulted in a failure to make further timely follow-up requests which concern material critical to the issue of class certification. *Id.* ¶ 6. Finally, plaintiffs' counsel claims to have been attending to family emergency issues in September 2009. Mot. at 2 n. 1.

**\*3** In response to plaintiffs' explanation for the need for further time for discovery, defendant argues that only eleven additional documents were produced in August and September constituting only 1% of eBay's total production. According to defendant, plaintiffs have no right to extend investigation regarding the depositions when they failed to pose even one question to the witness. Opp. at 4:5–6, 10–12.

In sum, plaintiffs' cite defendant's late production of documents as their good cause for an extension. However, the allegations of delayed production stand naked without specifics as to what still needs to be discovered, and from whom. Without specifics to show good cause as to how a two month extension would provide the needed discovery, plaintiffs' motion to extend the discovery deadline fails.

Missing Link, Inc. v. eBay, Inc., Not Reported in F.Supp.2d (2010)

75 Fed.R.Serv.3d 969

**C. Prejudice Against Opposing Party**

Finally, defendant argues that additional and belated discovery will burden eBay's witnesses and internal personnel and that this prejudice is grounds to deny plaintiffs' motion. *Id.* at 7:12–16 (citing *Kaplan v. Rose,* 49 F.3d 1363, 1370 (9th Cir.1994)). The court is not persuaded that the potential prejudice to defendant is significant under the present circumstances. Even if an extension will not cause undue prejudice, however, in this case plaintiffs' lack of diligence and failure to show good cause weigh against granting an extension.

## III. CONCLUSION

Class certification or its denial will have a substantial impact on further proceedings, including the scope of future discovery, the definition of issues, the length and complexity of trial, and the opportunities for settlement. According to plaintiffs they "do not wish to 're-depose' eBay's witness, nor do they wish to duplicate discovery or testimony." Reply at 3–4. Given that statement, it appears that plaintiffs have some plan for discovery. However plaintiffs' failure to provide the court with any level of specificity regarding the discovery material makes it difficult for the court to determine the merits of plaintiff's request. Without any sense of the parameters of the extended discovery the court is unwilling to grant the motion.

Upon examining the chronology of events offered by both parties, it appears plaintiffs should have been aware of the potential need for an extension much earlier than October 1, 2009, and despite this, waited until the day after the close of discovery to inform the court and defendants of the need for an extension. *See Acri v. International Ass'n of Machinists and Aerospace Workers,* 781 F.2d 1393, 1398 (9th Cir.1986) (stating that "late amendments are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action."). In considering amending the deadline, the court has taken into consideration the parties' arguments. Ultimately, plaintiff's lack of diligence and failure to address specifically what discovery is sought and needed prevents the court from granting the motion.

## IV. ORDER

**\*4** The court hereby denies plaintiffs' motion to extend class certification discovery.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 94268, 75 Fed.R.Serv.3d 969

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**4**

2017 WL 11318794
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Thomas SLOANE, individually and on behalf
of all persons similarly situated, Plaintiff,
v.
GULF INTERSTATE FIELD
SERVICES, INC., Defendant.

No. 4:16-cv-01571
|
Filed 05/12/2017

### Attorneys and Law Firms

Alexandra Koropey Piazza, Sarah R. Schalman-Bergen, Shanon J. Carson, Berger & Montague, P.C., Philadelphia, PA, Clifford A. Rieders, Rieders Travis Humphrey Waters & Dohrmann, Williamsport, PA, James A. Jones, Pro Hac Vice, Richard J. Burch, Pro Hac Vice, Bruckner Burch PLLC, Houston, TX, for Plaintiff.

Annette A. Idalski, Peter N. Hall, Pro Hac Vice, Chamberlain, Hrdlicka, White, Williams & Aughtry, Atlanta, GA, Veronica Saltz Turner, Clark Hill PLC, Philadelphia, PA, for Defendant.

### ORDER

Matthew W. Brann, United States District Judge

### FINDINGS

**\*1**  1. The Court entered its Memorandum and Order denying class and collective certification on March 24, 2017.

2. Since that time, this action has proceeded on an individualized basis.

3. On April 13, 2017, the Court denied a motion for reconsideration of its certification decision filed by Plaintiff.

4. On April 26, 2017, Defendant filed the instant motion for a protective order against non-party subpoenas.

5. The contested subpoenas, which were served subsequent to my denial of class certification, seek documentary and testimonial information regarding a number of contracts between the Defendant and Kinder Morgan, as well as compensation processes pertinent to every one of Defendant's employees who worked at Kinder Morgan sites.

6. In addition to receiving written submissions from the parties, the Court held a telephonic conference on the motion on May 1, 2017, at which time it heard oral argument from counsel.

7. "It is well established that the scope and conduct of discovery are within the sound discretion of the trial court ... and that after final judgment of the district court ... our review is confined to determining if that discretion has been abused." *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983) (Aldisert, J.). "To find such abuse it is usually necessary to conclude that there has been an interference with a substantial right ... or that the discovery ruling is seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." *Id.* Thus, the United States Court of Appeals for the Third Circuit has forewarned litigants that it "will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817–18 (3d Cir. 1982) (Aldisert, J.).

8. "Discovery need not be perfect, but discovery must be fair." *Boeynaems v. LA Fitness Int'l, LLC*, 285 F.R.D. 331, 333 (E.D. Pa. 2012) (Baylson, J.). "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party." *Hicks v. Arthur*, 159 F.R.D. 468, 470 (E.D. Pa. 1995). "[T]he scope of [ ] discovery is not without limits." *Kresefky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996). As such, "[d]iscovery should be tailored to the issues involved in the particular case." *Id.*

9. Federal Rule of Civil Procedure 26(c)(1) states that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending —or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken." It further provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.*

10. Moreover, it is axiomatic that "the party seeking discovery must first demonstrate the relevance before the party seeking

a protective order must demonstrate good cause." *Bell v. Lockheed Martin Corp.*, 270 F.R.D. 186, 195 (D.N.J. 2010).

**\*2** 11. Chief Judge D. Brooks Smith, writing for the United States Court of Appeals for the Third Circuit in *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 226 (3d Cir. 2016), stated that "[i]f a collective action is decertified at the final stage ... the court will decertify the class, dismiss the opt-in plaintiffs without prejudice, and permit the named plaintiffs to proceed to trial." Judge Smith further clarified that "[w]hile a dismissed opt-in plaintiff retains the ability to pursue *individual* claims after a district court decertifies a collective action, we have located no authority (nor have the parties cited any) discussing the approach taken by Steven Halle in the underlying case here—namely, his decision ... to try to resurrect substantially similar collective action allegations." *Id.* at n.11.

12. I have reviewed the contested discovery requests and believe that they are overbroad, unduly burdensome, and most importantly, irrelevant in light of the individualized posture of this action following my denial of certification. In other words, the requests are not sufficiently tailored so as to obtain relevant information about the only remaining Plaintiff, Mr. Sloane. *See Flomo v. Bridgestone Americas Holding, Inc.*, 2009 WL 1456736, at \*3 (S.D. Ind. May 20, 2009) ("Plaintiffs drafted their discovery requests while this case was still a putative class action, to be litigated on behalf of all minors who allegedly work on the Plantation. Because *Roe II* denied class certification, many of the discovery requests must be narrowed to encompass documents and information relating only to Plaintiffs' claims, not to claims of other minors on the Plantation."); *Am. Nurses' Assoc. v. State of Illinois*, No. 84 C 4451, 1986 WL 10382, at \*3 (N.D. Ill. Sept. 12, 1986) ("If class certification is denied, the scope of permissible discovery may be significantly narrowed."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 176 (D.D.C. 2009) ("Plaintiffs will have to concede that what may be a king's ransom will have been spent on discovery that may never be used if [a district court] denies class certification or narrows the nature of the class.").

13. Moreover, I believe that production of the requested documents would be duplicative, as the Defendant warrants that it "has already produced all relevant documents including Plaintiff's pay letters, payroll records, and timesheets, and has been deposed repeatedly on its pay practices over the last 16 months in two separate lawsuits." ECF No. 198 at 2.

14. Finally, I agree, as adroitly conceptualized by counsel for Defendant, that the terms of the agreements between Defendant and its clients do not bear the requisite attributes of *legally* relevant evidence, although in some tangential fashion, they may *economically* serve as considerations that factor into Defendant's wage-setting determinations. Counsel for Plaintiff has failed to put forth any evidence that alters my opinion on that dynamic, as the relationship between economically relevant and legally relevant concepts is an attenuated one, even in an industry that utilizes mark-up pricing. To be precise, the former category is undoubtedly a much larger one in cases such as these.

**AND NOW, THEREFORE, IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Protective Order against Non-Party Subpoenas, ECF No. 198, is **GRANTED**.

2. The contested subpoenas are deemed **WITHDRAWN**.

3. **No later than May 15, 2017**, counsel for Plaintiff shall formally notify each subpoena recipient of this Order and of the subpoenas' withdrawal.

4. The case management deadlines set forth by this Court's March 24, 2017 Order, ECF No. 193, remain in **FULL FORCE AND EFFECT**.

**\*3** 5. The Clerk of Court is directed to docket this Order as a "written opinion," pursuant to the E-Government Act of 2002.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 11318794

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**5**

Case 3:18-cv-00121-JFS-PJC     Document 238-1     Filed 02/26/26     Page 27 of 45
Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....
2022 WL 17177267

2022 WL 17177267
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

VALUE DRUG COMPANY
v.

TAKEDA PHARMACEUTICALS, U.S.A., INC., Par
Pharmaceutical, Inc., Watson Laboratories, Inc., Teva
Pharmaceutical Industries, Ltd., Teva Pharmaceuticals
USA, Inc., Amneal Pharmaceuticals, LLC

CIVIL ACTION NO. 21-3500
|
Filed November 23, 2022

**MEMORANDUM**

KEARNEY, District Judge

**\*1** A colchicine purchaser claims the brand name
manufacturer and three generic colchicine manufacturers
violated antitrust law by conspiring to maintain higher prices
for brand name and generic colchicine through three separate
agreements signed within a few months of each other to settle
pending patent litigations shortly before trials. We earlier
found the purchaser stated a claim for a single conspiracy
among the four manufacturers subject to discovery closing
in a month. The parties engaged in vigorous discovery. The
purchaser now moves to represent all colchicine purchasers of
the brand name and generic colchicine through a class action.
The purchaser relies on an expert opinion from a qualified
economist to show antitrust impact across all similarly
situated colchicine purchasers. The economist assumes facts
based on the purchaser's counsel's proffered assumptions
in two but-for scenarios which centrally ask us to assume
a theory the brand manufacturer would lose the patent
litigations and the generics would have earlier moved to
market notwithstanding regulatory review. We cannot simply
assume facts like an economist to support a theory. We
based our decisions on facts in evidence. Our obligation
is to rigorously analyze whether the theory offered by the
lead plaintiff seeking class certification is plausible today
and at trial based on evidence adduced at and before our
evidentiary hearing. The colchicine purchaser before us
today did not adduce the evidence allowing us to find
its theory of antitrust impact is plausible. We need not
address the manufacturers' arguments challenging the alleged

number of similarly situated purchasers given this lack of
plausibility before us. We deny the purchaser's motion for
class certification without prejudice.

**I. Background**
Physicians prescribe colchicine to treat gout and Familial
Mediterranean Fever. [1] Colchicine is sold in both tablet and
capsule form and has been used to treat gout since the Sixth
Century. [2] Unapproved and unbranded colchicine products
have long been on the market. [3]

The United States did not approve or regulate a patented
branded colchicine until the last thirteen years. The Food
and Drug Administration announced the Unapproved Drugs
Initiative in 2006 to bring previously marketed non-Food and
Drug Administration approved drugs like colchicine into the
approval process to encourage clinical trials of medicines
predating federal regulation for safety and effectiveness. [4]
Mutual Pharmaceutical Company, a subsidiary of United
Research Laboratories, Inc., sought approval of its 0.6mg
colchicine tablet in response to the Unapproved Drugs
Initiative. [5] The Food and Drug Administration approved
its brand name Colcrys as "the first pharmaceutical product
contain[ing] colchicine as the sole active ingredient" on July
29, 2009. [6] The Food and Drug Administration granted a
seven-year period of marketing exclusivity for colchicine
to United Research. [7] United Research launched its brand
Colcrys in late 2009. [8]

**\*2** Takeda Pharmaceuticals U.S.A., Inc. became the first
company able to obtain marketing exclusivity for brand
Colcrys when it bought United Research in 2012. It holds
seventeen patents for Colcrys which allegedly only covered
methods of administering colchicine and not the colchicine
itself. [9] Takeda charged 5,733.33% over the 2006 price of
colchicine and controlled nearly 100% of sales of single-
ingredient colchicine tablets by May 2014. [10] Takeda's seven-
year marketing exclusivity ended July 29, 2016 after which
competitors could manufacture and market AB-rated generic
colchicine. [11]

*Par, Hikma, Amneal, Watson, and Mylan
file Abbreviated New Drug Applications.*

Generic drug companies attempt to bring an AB-rated generic form of a drug once a brand drug comes to market by filing an Abbreviated New Drug Application with the Food and Drug Administration.[12] A brand company like Takeda can lose profits because AB-rated generic versions are usually less expensive and can take significant sales from brand-name counterparts.[13]

Par Pharmaceutical Inc. filed an Abbreviated New Drug Application to market AB-rated generic colchicine in December 2011 and certified Takeda's patents were invalid or not infringed by its AB-rated generic colchicine.[14] The Food and Drug Administration approved Par's filing and granted Par 180 days of statutory exclusivity upon entry of the generic colchicine market because they first filed an Abbreviated New Drug Application.[15] Par obtained tentative Food and Drug Administration approval for its Abbreviated New Drug Application in February 2015.[16]

Hikma International Pharmaceuticals LLC filed a New Drug Application to market colchicine in 0.6-mg capsules for the prophylaxis of gout on October 5, 2012.[17] Hikma received Food and Drug Administration approval and launched colchicine capsules under the brand name Mitigare on October 1, 2014, making it the first entrant of a branded colchicine product since the Food and Drug Administration approval of Colcrys for United Research/Takeda in July 2009.[18]

Amneal Pharmaceuticals LLC filed an Abbreviated New Drug Application in September 2012. Watson Laboratories, Inc., then filed an Abbreviated New Drug Application in February 2013. Both Amneal and Watson certified Takeda's colchicine patents were invalid or not infringed by their AB-rated generic colchicine.[19] Watson and Amneal obtained tentative Food and Drug Administration approval in October 2015 and September 2016 respectively.[20]

Non-party Mylan Pharmaceuticals, Inc filed an Abbreviated New Drug Application for generic colchicine approval in September 2016.[21]

*Takeda sues the generic manufacturers*
*for patent infringement.*

Takeda sued the generic company filers for patent infringement in the District of Delaware.[22] Takeda first sued Par in August 2013 before suing Amneal and Watson.[23] These suits triggered a thirty-month stay on Food and Drug Administration approval for Par, Amneal, and Watson.[24] Par, Amneal, and Watson could not immediately market their generic colchicine product because of the stay imposed by the patent suits.

**\*3** Takeda sued Hikma for patent infringement on October 3, 2014 alleging the brand name colchicine capsules Mitigare infringed on five of its Colcrys patents.[25] Hikma launched an approved generic version of Mitigare in January 2015 prompting Takeda to file an amended complaint in its existing patent suit.[26] Judge Andrews granted Hikma's Motion to dismiss the amended complaint in May 2016 and found Hikma's generic colchicine did not infringe on Takeda's patents.[27]

Takeda sued Alkem, Zydus, Dr. Reddy, Mylan, Granules, Hetero, Aurobindo, and Strides for patent infringement after each generic received Food and Drug Administration final approval of their Abbreviated New Drug Application between 2016 and 2018.[28]

Takeda agreed non-party Prasco could market, distribute, and sell authorized generic colchicine during the pendency of the patent suits in January 2015.[29] Takeda received substantial royalties from Prasco's sales.[30] Takeda lost profitability on its brand Colcrys with the addition of a generic colchicine on the market.[31]

*Takeda settles with Par, Watson, and Amneal.*

Takeda entered into a settlement agreement with Par on November 24, 2015 before their scheduled trial.[32] Takeda and Par agreed Par would have the right to market a generic colchicine subject to a royalty payment to Takeda beginning on July 1, 2018 and Takeda granted Par a license to market its own generic colchicine.[33] Par would step into Prasco's shoes and delay selling its generic colchicine for several years.[34]

Par and Takeda agreed to show their settlement agreement to the other generic litigants Watson and Amneal.[35] Takeda and Watson then settled Takeda's claim for patent infringement

against Watson two months (in early 2016) after Takeda settled with Par. [36] Watson obtained the right to launch its generic colchicine no later than October 15, 2020, with an option to enter the market earlier if another generic entered. [37] Takeda then settled with Amneal. [38] Amneal obtained the right to launch its generic colchicine no later than October 15, 2020, unless Takeda licensed another entrant or if another entrant entered the market. [39]

### Takeda settles and later again unsuccessfully sues Mylan.

Takeda settled its patent infringement claims against Mylan in November 2017, approximately eighteen months after Judge Andrews granted Hikma's motion to dismiss Takeda's patent infringement counterclaim. [40] Takeda agreed Mylan could enter the Colcrys market "upon a court decision invalidating the patents covering Colcrys." [41] Hikma ultimately prevailed on summary judgment in December 2018. [42] Judge Andrews's decision on Hikma's generic colchicine involved the same patents challenged in the Par, Amneal, and Watson suits. [43] Takeda did not appeal. [44]

Takeda again sued Mylan for patent infringement in the District of Delaware in December 2019 when it entered the generic colchicine market. [45] Takeda sought a preliminary injunction alleging Mylan breached a contract and infringed its patent. [46] Mylan agreed to stop selling and distributing its generic colchicine while waiting for the Judge Andrews's decision on a preliminary injunction to avoid an emergency motion for temporary restraining order. [47] Judge Andrews denied Takeda's request for a preliminary injunction in January 2020. Mylan reentered the market on March 25, 2020 and the United States Court of Appeals for the Federal Circuit affirmed Judge Andrews' denial of the preliminary injunction on July 31, 2020. [48]

### Mylan's market entry allows Par, Amneal, and Watson to enter market.

**\*4** Mylan's November 2019 entry and 2020 re-entry triggered the "escape clause" in Par, Amneal, and Watson's settlement agreements allowing them to immediately enter the Colcrys market. [49]

### Value Drug alleges a single antitrust conspiracy.

Value Drug Company directly purchased Colcrys brand colchicine tablets and AB-rated generic versions of colchicine from Prasco and Par between July 29, 2016 and December 1, 2020. [50] Value Drug, for itself and similarly situated colchicine purchasers, sued Takeda, Watson/Teva, Amneal, and Par on August 5, 2021 for entering a conspiracy "to restrict output and restrain competition" by preventing AB-rated generics of colchicine tablets from coming to market. [51] Value Drug alleges this conspiracy restrained generic competition, caused inflated prices, and allowed Takeda and Par to earn larger profits until other generic competitors launched in 2020. [52] Value Drug alleges the conspiracy compelled it and the other proposed Class members to pay "artificially inflated prices for their requirements for Colcrys tablets." [53]

Value Drug focuses on a single conspiracy under which Takeda, Par, Amneal, and Watson agreed: Par would not bring its own generic colchicine to market but would instead agree to market Takeda's "authorized generic" previously distributed by Prasco, but Par would not do so until two-and-a-half years after the agreement to lengthen the time Takeda enjoyed the colchicine market competition-free; Par would pay Takeda a "large royalty"; Watson and Amneal would refrain from selling their generic colchicine for several years in exchange for a defined period of time to sell their respective generic colchicine free from all other generic competition; and, Takeda would enter license agreements with other non-conspiring generic companies to delay their entry beyond Watson and Amneal's agreed periods of competition-free sales "thereby giving the co-conspirators long periods of supracompetitive Colcrys profits." [54]

Value Drug initially alleged two claims against Takeda and the three generics—conspiracy to restrain trade in violation of 15 U.S.C. § 1 and conspiracy to monopolize in violation of 15 U.S.C. § 2—and one claim for monopolization against Takeda only in violation of 15 U.S.C. § 2. [55] The brand and generics moved to dismiss for failure to plead antitrust injury. We dismissed Value Drug's claims alleging Takeda, Par, Watson, and Amneal conspired to restrain trade and monopolize the market on the eve of Par's trial with Takeda in November 2015. [56] We found Value Drug did not plead direct or circumstantial evidence supporting the alleged single,

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 30 of 45
**Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....**

2022 WL 17177267

horizontal conspiracy but granted leave to amend. [57] Value Drug amended. [58] The brand and generics again moved to dismiss for failure to plead antitrust injury. We denied their Motion to dismiss finding Value Drug cured its evidentiary defects to plead a single horizontal conspiracy but granted the Motion to dismiss as to Value Drug's claim Takeda separately conspired with each Par, Watson, and Amneal individually to order the market and restrict output (three separate bilateral conspiracies). [59] The single horizontal conspiracy claim among Takeda, Par, Watson, and Amneal is pending before us with a discovery close in a month and trial set for March 2023.

**\*5** The parties engaged in substantial discovery often leading to discovery disputes. We focused and encouraged discovery based on two phases: (1) fact and expert discovery consistent with the limits set by the Federal Rules of Civil Procedure including merits as warranted necessary to move for class certification and response completed by August 19, 2022 with the parties agreeing to produce all or most of the requested discovery no later than March 3, 2022; and then (2) remaining merits and expert discovery to prepare for summary judgment and trial of either Value Drug's claim or the claims of the defined Class completed by December 22, 2022. [60] We appointed the Honorable Thomas I. Vanaskie (Ret.) as Special Discovery Master on March 15, 2022 with the parties' consent. The parties have had ample opportunity for discovery and filed numerous discovery Motions referred to Judge Vanaskie. [61] We approved and adopted twenty-nine Special Master Recommended Orders from Judge Vanaskie to date. The parties' discovery deadline is December 22, 2022. [62]

## II. Analysis

Value Drug now asks to add the other Colcrys purchasers to the case as absent class members. Value Drug moved to certify a class before the close of discovery and before adducing expert testimony on the likelihood of Takeda losing the patent infringement suit. It moves under Federal Rule of Civil Procedure 23(a) and 23(b)(3) seeking to certify a class of approximately fifty purchasers of brand and generic colchicine tablets seeking to recover overcharges for inflated prices for Colcrys tablets because of an antitrust conspiracy "to stave off a 'third wave' of [Abbreviated New Drug Application] filers for as long as possible to prevent incremental price decrease ... thereby reducing each sellers' market share and profits" in the Colcrys market. [63] Value

Drug claim co-conspirators include Takeda and generic-brands competitors Par, Amneal, and Watson. [64]

Value Drug must satisfy the requirements under Rule 23(a) and either Rule 23(b)(1), (b)(2), or (b)(3). [65] Value Drug seeks class certification under Rule 23(b)(3) requiring common questions of law or fact "predominate" over questions affecting only individual class members, and our finding a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." [66] We must employ a "rigorous analysis" of the evidence and arguments to determine whether there is actual conformance with Rule 23. [67] We "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." [68]

**\*6** We reviewed the parties' thoughtful briefing. Value Drug admittedly bases its arguments almost entirely on the expert opinions of economist Russell L. Lamb, PhD to show the alleged conspiracy resulted in overcharges for brand and generic colchicine for purchasers across the country. [69]

Value Drug attempts to use Dr. Lamb's two "but-for" scenarios to establish antitrust impact and damages for certification. [70] Dr. Lamb claims these two "but-for" scenarios show "what would have occurred in a world free of Defendants' allegedly anticompetitive conduct." [71] Scenario 1 assumes (a) Par launches on July 29, 2016 after winning its patent cases against Takeda; and (b) Amneal and Watson launch 180 days later on January 25, 2017. [72] Value Drug's counsel instructed Dr. Lamb to assume in the first "but-for" scenario:

> Prasco would have launched an authorized generic ("AG") version of Takeda's branded Colcrys on the same date as it did in the actual world (January 12, 2015), and that Par would have prevailed in the patent litigation brought against it by Takeda and would have launched an AB-rated generic version of Colcrys on July 29, 2016 (instead of on July 2, 2018, when it launched in the actual world).

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 31 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

I was also instructed to assume under Scenario 1 that Amneal and Teva would have launched their generic Colcrys products on January 25, 2017 (rather than on the dates they launched in the actual world - May 18, 2020 and December 2, 2020, respectively), and that Mylan, Ascend, Zydus, Granules, Dr. Reddy's, and NorthStar would have launched on the same dates they did in the actual world. Thus, under Scenario 1, I assume that there would have been two generics competing in the market from July 29, 2016 through January 24, 2017 (instead of just one, i.e., the AG), four generics competing in the market from January 25, 2017 through November 24, 2019 (instead of just one, the AG), and five or more generics competing in the market thereafter (instead of Mylan launching on November 25, 2019 in competition with the AG and then exiting the market before reentering in March 2020). [73]

Scenario 2 assumes (a) Par forfeits its 180-day regulatory exclusivity; and (b) Amneal and Watson launch May 1, 2017. [74] Value Drug's counsel instructed Dr. Lamb to assume in the second "but-for" scenario:

Prasco would have launched an AG on the same date as it did in the actual world (January 12, 2015) and that Amneal and Teva would have launched an AB-rated generic version of Colcrys on May 1, 2017 (rather than on May 18, 2020 and December 2, 2020, respectively). I was also instructed to assume under Scenario 2 that Par would have launched generic Colcrys on November 1, 2021, and that Mylan, Ascend, Zydus, Granules, Dr. Reddy's, and NorthStar would have launched on the same dates they did in

the actual world. Thus, under Scenario 2, I assume that there would have been a single generic in the market from January 12, 2015 through April 30, 2017 (as there was in the actual world), three generics competing in the market from May 1, 2017 through November 24, 2019 (instead of just the AG), and four or more generics competing in the market thereafter (instead of Mylan launching on November 25, 2019 in competition with the AG and then exiting the market before reentering in March 2020). [75]

**\*7** Dr. Lamb concludes the conspiracy injured all or nearly all proposed Class members because they paid higher prices than they otherwise would have because of the delayed and ordered entry of multi-source competition for generic colchicine. [76] Dr. Lamb calculated $1.2 billion in aggregate damage under "but-for" Scenario 1 and $772.3 million in aggregate damages under "but-for" Scenario 2. [77] Value Drug's theory of antitrust impact and damages relies on Dr. Lamb's conclusions. [78]

Dr. Lamb conceded he did not analyze "the plausibility of Scenario 1 or Scenario 2 as part of [his] assignment." [79] Dr. Lamb testified his assignment did not include "evaluat[ing] the plausibility of assumptions" or "considering anything about how the assumptions were determined or the parameters that each of Scenario 1 and Scenario 2 contain." [80] Dr. Lamb did not "evaluate the plausibility of those set of facts happening" or "analyze the assumptions with respect to determining whether the pattern assumed with respect to entry by certain generic competitors was ... plausible." [81] Dr. Lamb testified, specifically for Scenario 2, his assignment did not include "whether there were any facts to support" the assumption Par would have forfeited its 180-day regulatory exclusivity. [82] Dr. Lamb also testified his conclusions could "very well change" if Value Drug's counsel instructed him to make different assumptions for the "but-for" scenarios. [83] Dr. Lamb's "opinions ... offered in [his] report with respect to impact and aggregate damages are predicated on these two but-for scenarios." [84]

Case 3:18-cv-00121-JFS-PJC   Document 238-1   Filed 02/26/26   Page 32 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

Takeda, Amneal, and Watson counter with expert opinions from Dr. Bruce Strombom.[85] He primarily opines Dr. Lamb premised his analysis on assumed but-for scenarios lacking economic and factual support, Dr. Lamb's reliance on academic literature, forecasts, and averages fails to establish antitrust injury, and Dr. Lamb's methodology for determining class wide overcharges is unreliable.[86]

Counsel asked for oral argument and a hearing. We asked counsel to clarify under Rule 23(b)(3)'s predominance requirement: 1) Dr. Lamb's evidence supporting his assumptions counsel instructed him to make when analyzing his two "but-for" scenarios; 2) whether the individual inquiries, such as market negotiations and customer-driven purchasing decisions, for each proposed Class member needed to establish antitrust impact and injury predominate questions of law and fact common to the proposed Class; and, 3) how Dr. Lamb's model measures damages consistent with Value Drug's theory of liability and whether those damages are susceptible of measurement across the entire Class.[87]

Dr. Lamb testified during our hearing, offering to explain his assessment of the counsel-supplied assumptions underlying his Scenario 1 and Scenario 2. We asked Dr. Lamb if he "assumed what Counsel told [him] was true."[88] Dr. Lamb stated he assumed the truth of the assumptions but had to make sure they were reasonable to apply them to his methodology.[89] Dr. Lamb testified "[i]f they had suggested crazy, unrealistic scenarios, that would have been clear in the record when I went to find the documents that support the damages analysis. And of course, it would have been clear in the other parts of the record. But what I did, as part of the analysis in looking at whether the scenarios could even be thought about, is to look at the facts of the product in question -- of the colchicine product in question."[90] He claims he "wouldn't have taken the assignment, frankly, if they were stupid assumptions."[91] Dr. Lamb also testified before us he analyzed the plausibility of the assumptions even though his assignment did not include the task and he could not have done the assignment without assessing the reasonableness of the "but-for" scenarios.[92] He claims he listed the complete list of reviewed documents in Appendix B of his expert report.[93] Dr. Lamb testified he does not "see how [he] could give an opinion" on how his models would change if Takeda had been successful in its patent suits instead.[94] Dr. Lamb testified he is not an expert in patent law, patent litigation, or

Food and Drug Administration regulations or the regulatory process.[95]

**\*8** We rigorously analyze Value Drug's theory of antitrust impact for both plausibility and evidentiary support. We find Value Drug has not shown a plausible basis convincing us common issues predominate over individual issues and Value Drug has not produced evidence supporting its theory of antitrust impact.

### A. Value Drug has not shown a plausible basis to find common issues predominate over the individual issues.

Value Drug must show "(1) a violation of the antitrust laws ..., (2) individual injury [or impact] resulting from that violation, and (3) measurable damages" and, to certify a class, must show these issues predominate over individual issues by a preponderance of the evidence.[96]

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[97] The Supreme Court in Rule 23(b) (3) requires common questions predominate over questions affecting only individual Class members.[98] When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."[99] But there are instances when "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."[100] "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."[101]

Takeda, Amneal, and Watson argue Value Drug's theory of antitrust liability and impact is not plausible.[102] They contend Value Drug has not met its burden of producing evidence through Dr. Lamb showing the plausibility of its theory.[103] Value Drug counters it is "commonplace for class certification and damages experts like Dr. Lamb to rely on plausible factual assumptions."[104] Takeda, Amneal, and Watson challenge Dr. Lamb's first assumption Par would have won its patent infringement lawsuit against Takeda.[105] They argue Dr. Lamb did not analyze the plausibility or offer facts supporting this assumption.[106] Dr. Lamb later testified

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 33 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

before us he analyzed the plausibility of the assumptions even though his assignment did not include the task and he could not have done the assignment without assessing the reasonableness of the "but-for" scenarios. [107] Dr. Lamb relies on the outcome of the "Mitigare Litigation" for his support Par would have won its litigation against Takeda. [108] Takeda, Amneal, and Watson contend economist Dr. Lamb is not an expert who can opine on the plausibility of patent suit outcomes and a patent expert would be necessary to assess the plausibility of the facts underlying the assumption Par would have been successful in its lawsuit against Takeda. [109] Dr. Lamb testified he does not "see how [he] could give an opinion" on how his models would change if Takeda had been successful in its patent suits. [110] We agree with Takeda, Amneal, and Watson.

**\*9** The predominance requirement of Rule 23(b)(3) requires evidentiary proof. [111] The theory of antitrust impact or injury must be plausible and be "susceptible to proof at trial through available evidence common to the class" at the class certification stage. [112] Plausibility of the theory of antitrust impact is a threshold question for Rule 23(b)(3) predominance purposes. [113] Our Court of Appeals instructed in *In re Hydrogen Peroxide Antitrust Litigation*, "the question at class certification stage is whether, *if such impact is plausible in theory*, it is also susceptible to proof at trial through available evidence common to the class." [114] We must be "satisfied ... [Value Drug] ha[s] presented a plausible theory for proving a class-wide injury." [115] The law is clear "a class-wide method of proof must be more than 'plausible in theory' and that a district court is to consider 'all relevant evidence and arguments' in predicting whether the class-wide proof will suffice." [116]

Our Court of Appeals first defined what "rigorous analysis" for class certification requires in *In re Hydrogen Peroxide Antitrust Litigation*. [117] We should evaluate the admissibility of expert testimony when determining class certification requirements even if it leads to threshold determinations about the credibility of competing expert opinions. [118] Deciding class certification calls for our "rigorous assessment of the available evidence and the method or methods by which [Value Drug] propose[s] to use the evidence to prove impact at trial." [119] Our "rigorous analysis" focuses on the evidence underlying Dr. Lamb's models showing Value Drug's theory or antitrust impact and damages.

Our Court of Appeals two years ago clarified "rigorous analysis" mandates the requirements of Rule 23 are met by a preponderance of the evidence, we must resolve all factual or legal disputes relevant to class certification even if they overlap with the merits, and we must consider all relevant evidence and arguments including expert testimony. [120] Our Court of Appeals in *In re Lamictal Direct Purchaser Antitrust Litigation* held it could not determine whether the direct purchaser class satisfied Rule 23's predominance requirement by a preponderance of the evidence without rigorous analysis of the expert reports relying on factual assumptions, and reversed and remanded class certification to the district court for a more fulsome evidentiary analysis. [121] On remand, Judge Vasquez denied class certification, concluding "[p]laintiffs have not shown by a preponderance of the evidence that that they can prove through common evidence that all of Teva's purchasers would have received additional discounts had GSK also launched an authorized generic." [122] The mandates in *In re Lamictal Direct Purchaser Antitrust Litigation* confirm our Court of Appeals requires us conduct a rigorous analysis of fact and expert evidence to determine whether a proposed class satisfied the requirements for class certification.

Value Drug asks us to grant class certification when Dr. Lamb's model showing antitrust impact and damages centrally (and almost entirely) relies on counsel-supplied assumptions. Value Drug cites numerous cases, mostly outside our Circuit or before *In re Lamictal Direct Purchaser Antitrust Litigation*, where judges upheld economist expert's models relying on counsel-supplied assumptions. For example, in *In re Glumetza Antitrust Litigation.*, Judge Aslup rejected the argument the direct purchasers' expert erred by relying on assumptions about when generic entry would have occurred and certified the class. [123] In *In re Loestrin 24 Fe Antitrust Litigation*, Judge Smith found at class certification the expert's assumptions assuming generic entry date were not sufficiently problematic to render his opinions and testimony unreliable. [124] In *In re Lidoderm Antitrust Litigation*, Judge Orrick granted class certification when the direct purchasers' expert relied on assumptions regarding generic entry dates. [125] Fourteen years ago in *Teva Pharmaceuticals USA, Inc. v. Abbott Laboratories*, Judge Robinson declined to resolve arguments regarding assumptions because the court would need to engage in a merits determination. [126]

**\*10** We recognize these cases may support Value Drug's position. But these authorities do not govern our analysis. These cases are all outside our Circuit or before the mandates in *In re Lamictal Direct Purchaser Antitrust Litigation.*[127] Our Court of Appeals requires we conduct a rigorous analysis of expert evidence and allows for merit analysis at the class certification stage. "As a review of *Comcast [v. Behrend]* and its progeny reflect, where an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage. A court may certify a class under these circumstances only where the Court finds the model methodologically sound."[128]

We are guided by the sound judicial reasoning after *In re Lamictal Direct Purchaser Antitrust Litigation.* Judge Engelmayer rejected an argument a flaw in the expert models would be common to the entire Class and these flaws therefore cannot bear on Rule 23(b)(3) predominance inquiry.[129] Judge Engelmayer further emphasized "circuit courts in antitrust cases have consistently, and correctly, read [the Supreme Court's *Comcast*] decision to require that district courts carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact" and "[d]ecisions from the District of Columbia and Third Circuits usefully illustrate this approach."[130] Judge Engelmayer specifically cited *In Re Lamictal Direct Purchaser Antitrust Litigation* in denying class certification and supporting the assertion "challenges to an expert's antitrust injury model are properly considered as part of a court's consideration of predominance at the class certification stage."[131] The Court of Appeals for the District of Columbia Circuit similarly affirmed Judge Friedman's denial of class certification when rigorous analysis of the expert's model showed it could not be used as reliable proof of classwide impact.[132] The expert's model before Judge Friedman showed about 12.7% of the proposed class uninjured.[133] We decline to follow Value Drug's reliance on older inapposite authority; we follow our Court of Appeals's approach and rigorously analyze Dr. Lamb's models of antitrust liability and impact today on this fulsome class certification record.[134]

Value Drug centrally (if not entirely) relies on Dr. Lamb to prove their antitrust impact theory.[135] Value Drug's antitrust impact theory alleges generic and brand Colcrys prices would have been lower for all or nearly all proposed Class members

but-for the alleged conspiracy.[136] But Dr. Lamb does not cite facts or data supporting this theory of impact or testing its plausibility.[137] Dr. Lamb testifies he did not evaluate "the plausibility of the assumptions," "the plausibility of ... [the assumptions] happening," or "consider anything about how the assumptions were determined or the parameters that each of Scenario 1 and Scenario 2 contain."[138] Dr. Lamb testified his conclusions about antitrust impact could "very well change" if the underlying assumptions for the "but-for" scenarios change or are disproved.[139] Dr. Lamb argues he analyzed the plausibility of the assumptions even though his assignment did not include the task and he could not have done the assignment without assessing the reasonableness of the scenarios.[140] Takeda, Amneal, and Watson argue Dr. Lamb is not an expert in patent litigation and cannot opine on the plausibility of Par's likelihood of success in its patent suit against Takeda.[141]

**\*11** We are not satisfied with a qualified economist with no patent experience assessing the plausibility of a patent suit outcome and we are not satisfied with the plausibility of the other assumptions Dr. Lamb relies upon when he testified multiple times he did not assess their plausibility. Dr. Lamb confirmed he could not provide an opinion on patent suit outcomes on which his models and Value Drug's theory of antitrust impact rely.[142] Value Drug's theory of impact and conspiracy cannot occur as alleged if Takeda won the suit against Par. Evidence providing plausibility of this assumption is critical. We are also not experts in the subjects of these assumptions and cannot assess plausibility without expert testimony. So Value Drug's proof of antitrust impact and calculation of damages relies on assumptions we cannot confirm are plausible. We cannot find Rule 23(b)(3)'s predominance requirement satisfied on this record when Value Drug's class-wide proof of its antitrust impact theory admittedly may not be plausible.

### B. Dr. Lamb does not rely on evidence to support Value Drug's theory of antitrust impact.

We must also review the evidence offered to support Value Drug's theory of antitrust impact. Takeda, Amneal, and Watson argue Value Drug's theory of antitrust liability and impact is not supported by evidence.[143] They contend Dr. Lamb's opinions showing class-wide injury is insufficient to satisfy Value Drug's burden because it is predicated only on Counsel's unsupported assumptions.[144] Value Drug's

theory of antitrust impact relies on Dr. Lamb. [145] Value Drug counters the Supreme Court's ruling in *Amgen Inc. v. Connecticut Retirement. Plans & Trust Funds* allows its class certification expert Dr. Lamb to rely on assumptions about when generic entry would have occurred absent the alleged conspiracy. [146] They argue the reasoning in *Amgen* and its progeny require "analysis of the merits ... to the extent that those merits questions implicate whether certain Class Members are injured." [147]

We face evidence adduced by an expert based on assumptions provided to him by counsel with little or no outside verification other than whether the assumption could not possibly be true. Value Drug's counsel instructed Dr. Lamb to assume: 1) Par would have won its patent litigation against Takeda; 2) Par had the capability of launching on July 29, 2016 instead of July 2, 2018 (actual-world launch); 3) Amneal and Watson/Teva would have launched on the same day in the but-for world; and 4) Watson/Teva would have launched years before their Abbreviated New Drug Application was approved. [148] Value Drug argues "it is commonplace for class certification and damages experts like Dr. Lamb to rely on plausible factual assumptions such as these." [149] We held oral argument to determine what evidence supports these counsel-instructed assumptions which Dr. Lamb relies upon to prove antitrust impact. [150]

Dr. Lamb testified he relied on the outcome of *Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical. Corporation* as evidence of the assumption Par would have been successful in its patent suit against Takeda. [151] Value Drug argued evidence supports the other counsel-instructed assumptions relied upon by Dr. Lamb. [152] Dr. Lamb directed us to Appendix B of his report which identifies the documents he reviewed for his expert report. [153] Only one document Value Drug argued supports the assumption "Amneal and Watson would launch 180 days after Par or upon forfeiture" appeared in Dr. Lamb's Appendix B. [154] We cannot confirm whether Dr. Lamb reviewed the rest of the evidence Value Drug argues supports the assumptions. [155] Dr. Lamb also admitted he is not an expert in Food and Drug Administration regulatory processes. [156] Value Drug's theory of antitrust impact relies only on Dr. Lamb's models which is not supported by evidence reviewed by Dr. Lamb. We must deny class certification.

**\*12** Value Drug primarily relies on the Supreme Court's analysis nine years ago in *Amgen* to assert "a class-wide merits defense does not bar certification." [157] In *Amgen*, the Supreme Court held "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the Class." [158] The Supreme Court held "proof of materiality of alleged misrepresentations is not a prerequisite to class certification in a securities fraud action based on a fraud on the market theory." [159] Value Drug also relies on *In re K-Dur Antitrust Litigation* to argue its "burden at the class certification stage is not to establish the element of antitrust ... [but] to demonstrate the element of antitrust impact is capable of proof at trial through evidence that is common to the class." [160] Value Drug cites multiple cases from outside our Circuit where judges rejected the argument class certification should be denied because the expert relied on assumptions about when generic entry would have occurred. [161] They also argue *In re Lamictal Direct Purchasers Antitrust Litigation* is distinguishable because "whether there was a real defense with—Defendants argued was supported by evidence that actually implicated whether some, but not all, of the Class Members were injured." [162] In *In re Lamictal Direct Purchasers Antitrust Litigation*, the pharmaceutical companies "came forward with evidence that they say showed that 25 out of 33 Class Members who only bought the generic were uninjured." [163] Value Drug also contends Dr. Strombom did not opine as to the inaccuracy of Dr. Lamb's assumptions. [164]

Takeda, Amneal, and Watson counter "in this Circuit ... Class certification decisions need to be made on evidence, not assumption, not on attorney argument, but actual evidence." [165] They argue "[t]he law in this Third Circuit is clear ... and the standards its announced when District Courts are deciding whether to certify a class...." [166] They argue under *In re Lamictal Direct Purchaser Antitrust Litigation*. and *In re Hydrogen Peroxide Antitrust Litigation*, the question at Class certification is "whether Plaintiffs can demonstrate through common evidence antitrust injury for each class member." [167] Takeda, Amneal, and Watson argue Dr. Lamb's opinion on antitrust impact is predicated on counsel-supplied assumptions and not evidence as required by our Court of Appeals.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 36 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

The predominance requirement of Rule 23(b)(3) requires evidentiary proof. [168] The theory of antitrust impact or injury must be "susceptible to proof at trial through available evidence common to the class" at the class certification stage. [169] Judge Vasquez when applying our Court of Appeals' mandates on remand in *In re: Lamictal Direct Purchaser Antitrust Litigation* denied class certification when "[p]laintiff's theory is reasonable, but they are missing the critical evidential link emphasized by the Circuit." [170] Judge Vasquez held "[p]laintiffs' theory [of antitrust impact], however rational it may be, is missing critical supporting evidence." [171] We are persuaded our Court of Appeals requires the theory of antitrust impact to be supported by evidence.

Value Drug's reliance on *In re K-Dur Antitrust Litigation* and *Amgen* misses the heart of the issue. [172] Takeda, Amneal, and Watson are not arguing Value Drug needs to establish the element of antitrust impact at the class certification stage like in *In re K-Dur Antitrust Litigation.* [173] They are not arguing those questions common to the class need to be answered on the merits in favor of the class to proceed beyond class certification like *Amgen.* [174] Takeda, Amneal, and Watson are not arguing Value Drug "must first establish it can win" at trial to certify a class today under Rule 23(b)(3). [175] Takeda, Amneal, and Watson are arguing Value Drug's theory of antitrust impact is supported only by counsel-supplied assumptions and not evidence. [176] We engage in an analysis of the evidence underlying the assumptions because those merits questions "implicate whether certain Class Members are injured" under Value Drug's view of *Amgen.* [177] Value Drug's theory of antitrust impact must be supported by evidence at the class certification stage. [178] We find it is not.

**\*13** Dr. Lamb admitted he did "not ... analyze the plausibility of any possible facts that are assumed under Scenario 1 or Scenario 2." [179] Value Drug's theory, "however rational it may be, is missing critical supporting evidence." [180] Dr. Lamb did not cite evidence, facts, or data to support the counsel-instructed assumptions. [181] Dr. Lamb's opinions outlining Value Drug's theory of antitrust impact and injury are supported only by counsel-instructed assumptions and not evidence. [182] We cannot rely on an economic expert's evaluation of how the outcome of one patent case would affect another pending patent case. [183] The evidence Dr.

Lamb claims he relies on for this assumption is well beyond his expertise and requires a patent expert. Dr. Lamb acknowledges in his report Value Drug will offer expert testimony in support of the generic entry dates after discovery. [184] Dr. Lamb himself cannot support the generic entry dates on which Value Drug's theory of impact relies. Value Drug argued other evidence supported the counsel-supplied instruction but based on Dr. Lamb's Appendix B we do not conclude he relied on such evidence. The other assumptions also relate to the Food and Drug Administration's regulatory process and pharmaceuticals companies' capabilities which are also beyond the scope of Dr. Lamb's economics expertise. [185] Value Drug's argument Dr. Strombom did not offer an "opinion ... the assumptions Dr. Lamb utilized were incorrect" is irrelevant because the burden of producing evidence is Value Drug's alone. [186]

Value Drug does not meaningfully distinguish our Court of Appeals' mandates in *In Re Lamictal Direct Purchaser Antitrust Litigation.* Dr. Lamb specifically testified if his unsupported assumptions for the "but-for" models were to change, his conclusions regarding antitrust impact might be different. [187] Dr. Strombom's example of changing the generic entry date for Amneal and Watson in Scenario 2 results in twenty-five percent of the proposed Class being uninjured. [188] Takeda, Amneal, and Watson produced evidence there could be many uninjured Class member through Dr. Strombom if Dr. Lamb changed his unsupported assumptions. [189] This evidence "implicates whether some, but not all, of the Class Members were injured." [190] Judge Vasquez denied class certification on remand in *In re Lamictal Direct Purchaser Antitrust Litigation* for generic-purchasers when the theory of antitrust impact relied on "an assumption, not evidence, and Plaintiffs have the burden of producing such evidence and proving the issue by a preponderance of the evidence." [191] We must do the same.

This sizable portion of the Class possibly being uninjured depending on the reliability and accuracy of Dr. Lamb's model is similar to the unreliable model dismissed in *In re Rail Freight Fuel Surcharge Antitrust Litigation.* [192] An unreliable model showing uninjured class members cannot be used as the basis for predominance. [193] Value Drug has not demonstrated they can prove antitrust impact through common evidence when their model illustrating the theory of antitrust impact is not based on evidence. [194] Value Drug failed to meet their burden of coming forward with evidence

to support the assumptions on which Dr. Lamb's opinions are based.

**C. We do not opine on the Rule 23(a) requirements or other aspects of Rule 23(b)(3).**

Our decision to deny class certification without prejudice does not consider the four requirements of numerosity, commonality, typicality, and adequacy of representation under Rule 23(a), the superiority prong of Rule 23(b)(3), or other arguments relating to predominance under Rule 23(b)(3). Today's denial of the pending Motion for class certification focuses solely on the plausibility of Value Drug's theory of antitrust impact and the missing evidential link

required by our Court of Appeals. We leave those issues for another day should Value Drug returns with evidence allowing us to find it meets the rigorous analysis of its theories before certifying the class.

**III. Conclusion**

**\*14** We agree with Takeda, Amneal, and Watson a threshold showing of plausibility has not been met. We deny Value Drug's Motion for class certification without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 17177267

---

## Footnotes

1    Gout is a type of severe arthritis occurring from high levels of uric acid in the blood. Familial Mediterranean Fever is an auto-inflammatory disease resulting in fever, pain, and swelling of the joints. App. 0016a ¶¶ 26–27. We require the parties submit an Appendix supporting a motion for class certification under our governing Policies. Value Drug submitted an Appendix at ECF Doc. No. 483-2, Bates stamped 0001a–1107a, Takeda, Amneal, and Watson submitted a Response Appendix at ECF Doc. No. 527-1, Bates stamped 1108a–1273a, and Value Drug submitted a Reply Appendix at ECF Doc. No. 543-1, Bates stamped 1274a–1481a.

2    App. 0016a ¶ 27.

3    App. 0364a ¶ 61.

4    App. 0017a ¶ 28.

5    App. 0016a–0017a ¶¶ 26–29.

6    ECF Doc. No. 1 ¶ 29, 32.

7    App. 0402a.

8    App. 0017a ¶ 29. The Food and Drug Administration granted a three-year exclusivity period for treatment of acute gout flares and a seven-year exclusivity period for treatment of Familial Mediterranean Fever. App. 0018a ¶ 30.

9    App. 0018a ¶ 30.

10    App. 0018a ¶ 30–31.

11    App. 0402a. "An AB rating means that the generic drug is pharmaceutically equivalent and bioequivalent to the corresponding reference-listed brand drug." ECF Doc. No. 1 ¶ 37. "An AB-rating is particularly significant because ... pharmacists may (an in many states, must) substitute an AB-rated generic version of a drug for the brand-name drug automatically at the pharmacy counter, without seeking or obtaining permission from the prescribing physician." *Id.*

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 38 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

12    ECF Doc. No. 1 ¶ 33–36. *See also* App. 0591a–0592a.

13    App. 0032a–0038a; 0596a–0598a.

14    App. 0119a. ¶ 29.

15    App. 0199a ¶24.

16    App. 0200a ¶ 25.

17    App. 202a ¶ 28.

18    *Id.*

19    App. 0201a–0202a.

20    App. 0201a–0202a ¶ 27.

21    App. 0202a–0203a.

22    App. 0199a–0203a ¶ 24–28.

23    *Id. See also Takeda Pharm. U.S.A., Inc. v. Par Pharm., Inc.*, No. 13-1524 (D. Del. Aug. 30, 2013); *AR Holding Co., Inc. v. Par Pharm., Inc.*, No. 12-419 (D. Del. Apr. 4, 2012); *Takeda Pharm. U.S.A., Inc. v. Amneal Pharm.*, LLC, No. 13-1729 (D. Del. Oct. 21, 2013); *Takeda Pharm. U.S.A., Inc. v. Watson Lab'ys, Inc.*, LLC, No. 14-268 (D. Del. Feb. 27, 2014).

24    App. 0201a ¶ 26.

25    App. 0202a ¶ 28.

26    App 0203a. ¶ 29.

27    *Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*, 72 F. Supp. 3d 539 (D. Del. 2014), *aff'd* (Fed. Cir. 15-1139, 15-1142 Jan. 9, 2015), *aff'd in part, appeal dismissed in part sub nom. Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625 (Fed. Cir. 2015); App. 0203a ¶ 29.

28    App. 0023a ¶ 39.

29    *See* App. 0645a, 1064a.

30    *Id.*

31    *See* App. 0641–0643a.

32    App. 0200a ¶ 25.

33    *Id.*

34    ECF Doc. No 483-1 at 3. *See* App. 0649a–0660a.

35    App. 665a–667a.

36    App. 0201a ¶ 26.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 39 of 45
**Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....**
2022 WL 17177267

37    App. 0726a–0736a.

38    App. 0696a-0707a.

39    *Id.*

40    App. 0204a. ¶ 30.

41    ECF Doc. No. 1 ¶ 64.

42    App. 0021a ¶ 35.

43    *Id.*

44    ECF Doc. No. 1 ¶ 65.

45    App. 0024 ¶ 41.

46    *Id.*

47    *Id.*

48    *Id.*

49    ECF Doc. No. 1 ¶ 57. ("Par, Watson, and Amneal would refrain from launching their own generic versions of Colcrys for so long as non-conspirators did so. That is, the co-conspirators agreed that if a non-conspiring seller of generic Colcrys entered the market, Par, Watson, and Amneal could do so.").

50    App. 0114a.

51    ECF Doc. No 1 ¶¶ 3, 60.

52    ECF Doc. No. 483-1 at 5.

53    ECF Doc. No. 1 at ¶ 72.

54    *Id.* at ¶ 3(a)–(e). The alleged conspiracy is somewhat generally similar to the conspiracy studied by the courts in *FTC v. Avtavis*, 570 U.S. 136 (2013) ("pay-for-delay" patent litigation settlement agreements where brand drug companies pay generic-drug companies in return for a delay in marketing the generic product).

55    ECF Doc. No. 1.

56    *Id.* ¶ 54; ECF Doc. No. 153.

57    ECF Doc. No. 157.

58    ECF Doc. No 163.

59    ECF Doc. No. 207.

60    ECF Doc. No 94 at 1–2.

61    There have been over 450 docket entries since the appointment of Judge Vanaskie, many of which are discovery disputes. Judge Vanaskie currently has a Rule 45(d)(1) Motion for sanctions and a Rule 37(c)(1)

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 40 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

(C) Motion for sanctions for abusing the discovery process pending before him. ECF Doc. No. 514; ECF Doc. No. 585. Judge Vanaskie also has Motion to compel pending before him. ECF Doc. No. 634.

62      ECF Doc. No. 94. At oral argument, Value Drug's counsel stated fact discovery is still ongoing. ECF Doc. No. 620 at 8:7–11. We asked counsel whether it makes sense to defer this Motion for certification until the close of discovery because there could be some evidence to back the assumptions which are not included in the expert reports. ECF Doc. No. 620 at 152:5–25. Takeda stated additional discovery is not needed because Value Drug has "sophisticated Counsel. They've been on notice. They knew what they needed to do [for class certification]. They chose not to do it. Giving them a do-over and having us incur the time and expense to relitigate this issue again." *Id.* at 180:22–181:7. Value Drug's counsel also stated "we think the record is more than sufficient" for class certification purposes. *Id.* at 221:9–222:4.

63      ECF Doc. No. 207 at 8 n.25. Value Drug moves we define its proposed class as: "All persons or entities in the United States and its territories and possessions, including the Commonwealth of Puerto Rico, who directly purchased branded or generic Colcrys tablets from Takeda, Prasco, or Par at any time from July 29, 2016 until December 1, 2020 (the "Class"). Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities." ECF Doc. No. 483 at 2.

64      We approved Value Drug and Par Pharmaceuticals, Inc. joint stipulation and dismissed Par Pharmaceuticals, Inc. with prejudice following its bankruptcy filing. ECF Doc. Nos. 518, 521.

65      *Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

66      Fed. R. Civ. P. 23(b)(3).

67      *Marcus v. BMW of N. Am.,* LLC, 687 F.3d 583, 591 (3d Cir. 2012) (citing *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 322 (3d Cir. 2008)).

68      *Marcus,* 687 F.3d at 591.

69      App. 0010a ¶ 14.

70      App. 0010a ¶ 14. *See also* ECF Doc. No 483-1 at 14–15.

71      App. 0006a ¶ 7; ECF Doc. No. 483-1 at 14.

72      App. 0006a ¶ 8.

73      App. 0007a ¶ 8.

74      App. 0007a ¶ 9.

75      App. 0007a ¶ 9. A summary table of generic Colcrys entry dates in the two but-for scenarios and the actual world is found at App. 0008a, Tbl. 1.

76      App. 0010a ¶ 14.

77      *Id.*

78      ECF Doc. No. 483-1 at 14–15; App. 0010a ¶ 14.

79      App. 0145a.

2022 WL 17177267

80    App. 0144a.

81    App. 0145a.

82    App 1112a.

83    App. 0147a. *See also* App. 1113a ("If you ask me to make different assumptions, I could do the analysis, and the analysis might be different, as it was for these two class members under scenario 2 compared to scenario 1."). For example, Takeda's expert Dr. Bruce Strombom explained moving generic entry to February 17, 2019 instead of May 1, 2017 would result in 25% of the Class being uninjured. App. 0217a ¶ 50.

84    App. 0141a.

85    App. 0185a.

86    App. 0211a, 0218a, 0222a, 0266a.

87    ECF Doc. No. 545 at 1–2 n. 1.

88    ECF Doc. No. 620 at 37:20–25.

89    *Id.* at 38:1–3.

90    *Id.* at 38:12–20.

91    *Id.* at 49:5–8.

92    *Id.* at 91:21–92:24.

93    App. 0098a–0101a; ECF Doc. No. 620 at 91:4–10.

94    ECF Doc. No. 620 94:19–95:6.

95    *Id.* at 90:19–91:3.

96    *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 311, 321.

97    *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997).

98    *In re Niaspan Antitrust Litigation,* 397 F.Supp.3d 668, 682 (E.D. Pa Aug. 14, 2019) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 469 (2013)).

99    *Tyson Foods, Inc.,* 577 U.S. at 453 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).

100    *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013).

101    *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d at 311 (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir. 2001)).

102    ECF Doc. No. 527 at 19.

103    *Id.* at 20.

104    ECF Doc. No. 543 at 9.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 42 of 45
**Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....**
2022 WL 17177267

105    ECF Doc. No. 620 at 40:1.

106    *Id.* at 40:1-3.

107    *Id.* at 91:21–92:24.

108    App. 0021 ¶ 35.

109    ECF Doc. No. 620 at 40:4–18.

110    *Id.* at 94:19–95:6.

111    *Comcast*, 569 U.S. 33.

112    *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325.

113    *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 304 (3d Cir. 2016) ("The court cannot rely on a mere "threshold showing" that a proposed class-wide method of proof is "plausible in theory.").

114    *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325 (emphasis added).

115    *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015).

116    *Harnish*, 833 F.3d at 306 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325).

117    *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 at 307.

118    *Id.*

119    *Id.*

120    *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).

121    *Id.*

122    *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 12-995, 2021 WL 2349828, at *21 (D.N.J. June 7, 2021).

123    *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468 (N.D. Cal. 2020).

124    *In re Loestrin 24 Fe Antitrust Litig.*, No. 13--2472, 2019 WL 3214257, at *4 (D.R.I. July 2, 2019).

125    *In re Lidoderm Antitrust Litig.*, No. 14-02521, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017).

126    *Teva Pharms. USA, Inc. v. Abbott Lab'ys*, 252 F.R.D. 213, 228 (D. Del. 2008).

127    *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 at 195.

128    *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46 (S.D.N.Y. 2020).

129    *Id.*

130    *Id.* at 47.

131    *Id.*

132    *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1869, 934 F.3d 619, 623 (D.C. Cir. 2019).

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 43 of 45
**Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....**

2022 WL 17177267

133    *Id.*

134    Value Drug moved two days ago to add evidence adduced in the last week and amend its class definition with the new evidence. ECF Doc. No. 647. We today deny this attempt to re-open the record closed earlier this month after lengthy study. The request is curious because we offered Value Drug's counsel the opportunity to withdraw the pending motion for certification and seek relief after adducing more evidence. Value Drug's counsel declined our offer a little over three weeks ago during our oral argument and evidentiary hearing and asked to move forward on the voluminous record then before us. We accepted Value Drug's decision and will not allow do-overs of a pending motion given the parties' and our efforts in reliance on Value Drug's decision.

135    ECF Doc. No. 483-1 at 14–15.

136    *Id.* at 7.

137    ECF Doc. No. 527 at 16.

138    App. 1044a–45a.

139    App. 0147a, 1113a.

140    ECF Doc. No. 620 at 91:21–92:24.

141    *Id.* at 39–40.

142    *Id.* at 94:19–95:11.

143    ECF Doc. No. 527 at 19.

144    *Id.*

145    ECF Doc. No. 483-1 at 14–15.

146    ECF Doc. No. 543 at 9–10.

147    ECF Doc. No. 620 at 14:14–23.

148    App. 0006a ¶ 8.

149    ECF Doc. No. 5.

150    ECF Doc. No. 545 at n.1.

151    *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharmaceutical. Corp.*, 785 F.3d 625 (Fed. Cir. 2015). *See* ECF Doc. No. 620 at 33:17–36:7. *See also* App. 0021a ¶35.

152    ECF Doc. No. 620 at 33:17–59:18.

153    App. 0098a–0100a. *See also* ECF Doc. No. 620 at 56:17–57:7.

154    AMNL_COL_00014697. *See* App. 0098a-0100a.

155    PAR-COL_000289363, PAR-COL_000000032, PAR-COL-000210677, TAK-COLCRYS-01704162, TEVA_COL_00164515, TEVA_COL_00021668, and TAK-COLCRYS-01704162. *Compare* 0098a–0100a.

156    ECF Doc. No. 620 at 90:24–91:3.

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 44 of 45

Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....

2022 WL 17177267

157   ECF Doc. No. 543 at 9.

158   *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

159   *Id.* at 459–60.

160   *In Re K-Dur*, 686 F.3d 197, 222 (3d Cir. 2012). *See* ECF Doc. No. 543 9–10.

161   ECF Doc. No. 9–11; *see In re Glumetza Antitrust Litig.*, 336 F.R.D. at 477; *In re Loestrin 24 Fe Antitrust Litig.*, 2019 WL 3214257 at 13; *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at 12–13.

162   ECF Doc. No. 620 at 16:1–8.

163   *Id.*

164   ECF Doc. No. 543 at 9.

165   ECF Doc. No. 620 at 155.

166   *Id.*

167   *In re: Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 at 17; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325.

168   *Comcast*, 569 U.S. 33.

169   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325.

170   *In re Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 at 21 (denying Class certification when Dr. Lamb did not show evidence all purchasers would have received a discount and holding class wide antitrust injury did not exist).

171   *Id.*

172   We distinguish Value Drug's reliance on cases outside this Circuit because of the emphasis on evidentiary support at the class certification stage required by our Court of Appeals. *In re Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 at 21 ("Plaintiffs theory is reasonable, but they are missing the critical evidential link emphasized by the Circuit.").

173   *In Re K-Dur*, 686 F.3d at 222. *See* ECF Doc. No. 543 9–10.

174   *Amgen*, 568 U.S. at 459–60.

175   *Id.* at 460.

176   ECF Doc. No. 527 at 15–16.

177   Amgen, 568 U.S. at 460; ECF Doc. No. 620 at 14:14–23.

178   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325.

179   App. 0145a.

180   *Id.*

Case 3:18-cv-00121-JFS-PJC    Document 238-1    Filed 02/26/26    Page 45 of 45
**Value Drug Company v. Takeda Pharmaceuticals, U.S.A., Inc., Not Reported in Fed....**
2022 WL 17177267

181    App. 0006a–0007a ¶¶ 7–9. *See also* ECF Doc. No. 527 at 16.

182    *See* App. 0145. ("I'm not analyzing the plausibility of Scenario 1 or Scenario 2 as part of my assignment. That's beyond the scope of my assignment.").

183    ECF Doc. No. 620 at 25:19–4.

184    App. 0008a at n.15. *See also* ECF Doc. No. 620 at 42:5–25. (Value Drug arguing they will have patent expert evidence supporting generic entry date after close of discovery in January 2023).

185    ECF Doc. No. 620 at 90:24–91:3.

186    ECF Doc. No. 543 at 9. *See also In re Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 at 20.

187    App. 0147, 1113a.

188    App. 0217a ¶ 50.

189    *Id.*

190    ECF Doc. No. 16:1–5.

191    *In re Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828 at 20.

192    *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d at 623.

193    *Id.*

194    *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    19