## APPENDIX OF UNPUBLISHED OPINIONS

1. *Jackson v. Demaske*, No. 2:20-cv-1226, 2022 WL 22680202 (W.D. Pa. March 15, 2022)

2. *Litwak v. Tomko*, CIVIL ACTION NO. 3:16-CV-00446, 2018 WL 1378633 (M.D. Pa. March 19, 2018)

3. *Meyers v. Protective Ins. Co.*, NO. 3:16-CV-01821, 2018 WL 1899285 (M.D. Pa. April 20, 2018)

4. *U.S. ex rel. Hlywiak v. Great Lakes Educ. Loan Servs., Inc.,* No. 1:20-cv-13590, 2022 WL 787957 (D. N.J. Mar. 15, 2022)

1

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 3 of 31

Jackson v. Demaske, Not Reported in Fed. Supp. (2022)

2022 WL 22680202

2022 WL 22680202
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

William JACKSON, Plaintiff,
v.
Sergeant DEMASKE, et al., Defendants.

2:20-cv-1226
|
Signed March 15, 2022

### Attorneys and Law Firms

Andrew James Urko, Elijah Lain Coryell, Jones Day, Pittsburgh, PA, for Plaintiff.

Scott A. Bradley, Office of the Attorney General Litigation Section, Pittsburgh, PA, Dalia Aboraya, Pittsburgh, PA, for Defendants Sergeant Demaske, Corrections Officer Gasdick, Captain Crumb, Lieutenant Gribble, Corrections Officer Grim, Brittany Chiovitti, Shanda Weedon, Lieutenant Ramirez, Corrections Officer Onderko, Sergeant Dilonick, Lieutenant Trout, Brawdy, Richards.

Dalia Aboraya, Pittsburgh, PA, for Defendants Co. Stephens, Co. Johnson, Co. Kirgan, Lieutenant Schamp.

### ORDER OF COURT

Robert J. Colville, United States District Judge

**\*1** Before the Court is the Honorable Patricia L. Dodge's February 7, 2022 Report and Recommendation (ECF No. 32), which recommends that the Motion to Dismiss (ECF No. 22) filed by the Corrections Defendants, who seek dismissal of the claims set forth against them in the Complaint (ECF No. 4) filed by Plaintiff, be granted in part and denied in part. Specifically, the Report and Recommendation recommends that: (1) the Motion to Dismiss should be granted as to Plaintiff's claims against Defendants Caro, Fiscus, and Gilmore, and that such claims should be dismissed with prejudice because amendment would be futile; (2) the Motion to Dismiss should be granted with respect to Counts 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 14, 15, 20, 34, 35, and 38, and that these claims should be dismissed with prejudice because amendment would be futile; (3) the Motion to Dismiss should be granted as to Count 1 only with respect to that portion of Count 1 that attempts to assert a claim based upon allegations relating to a racial slur, and that this specific claim in Count 1 should be dismissed with prejudice, as amendment would be futile, and otherwise denied as to Count 1; (4) the Motion to Dismiss should be granted as to Counts 13, 23, 27, 30, 32, 33, 36, and 37, and that such claims should be dismissed without prejudice and with leave to amend; and (5) the Motion to Dismiss should be denied as to Counts 6, 16, 17, 18, 19, 21, 22, 24, 25, 26, 28, 29, and 31. Objections to Judge Dodge's Report and Recommendation were due by February 25, 2022. No objections were filed, and the matter is now ripe for disposition.

With respect to dispositive matters, the reviewing district court must make a de novo determination of those portions of the magistrate judge's report and recommendation to which objections are made. 28 U.S.C. § 636(b)(1)(B)-(C); Fed. R. Civ. P. 72(b)(3). "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). The United States Court of Appeals for the Third Circuit has explained that, "even absent objections to the report and recommendation, a district court should 'afford some level of review to dispositive legal issues raised by the report,' " and has "described this level of review as 'reasoned consideration.' " *Equal Employment Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 100 (3d Cir. 2017) (quoting *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987)).

Upon reasoned consideration of Judge Dodge's February 7, 2022 Report and Recommendation and upon review of the record in this matter, it is hereby ORDERED as follows:

The Court accepts and adopts Judge Dodge's Report and Recommendation in its entirety as the opinion of the Court. It is further ORDERED that:

1) The Motion to Dismiss is granted as to Plaintiff's claims against Defendants Caro, Fiscus, and Gilmore. Plaintiff's claims against Defendants Caro, Fiscus, and Gilmore are dismissed with

prejudice, and Defendants Caro, Fiscus, and Gilmore are dismissed as party defendants.

**\*2** 2) The Motion to Dismiss is granted with respect to Counts 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 14, 15, 20, 34, 35, and 38. Counts 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 14, 15, 20, 34, 35, and 38 are hereby dismissed with prejudice.

3) The Motion to Dismiss is granted as to Count 1 only with respect to that portion of Count 1 that attempts to assert a claim based upon allegations relating to a racial slur, and this specific claim in Count 1 is hereby dismissed with prejudice. The Motion to Dismiss is otherwise denied as to Count 1.

4) The Motion to Dismiss is granted as to Counts 13, 23, 27, 30, 32, 33, 36, and 37. Counts 13, 23, 27, 30, 32, 33, 36, and 37 are hereby dismissed without prejudice and with leave to amend.

5) The Motion to Dismiss is denied as to Counts 6, 16, 17, 18, 19, 21, 22, 24, 25, 26, 28, 29, and 31.

6) Plaintiff is hereby granted leave, consistent with this Order of Court and the Report and Recommendation, to file an amended complaint to address the pleading deficiencies identified in the Report and Recommendation with respect to those claims that have been dismissed without prejudice. Any amended complaint shall be filed by **April 5, 2022**.

7) To the extent that Plaintiff files an amended complaint, Defendants shall file a response to that amended complaint by **April 19, 2022**. To the extent that Plaintiff does not file an amended complaint, Defendants shall file an answer to the remaining claims set forth in the Complaint by **April 19, 2022**.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 22680202

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 6 of 31

Litwak v. Tomko, Not Reported in Fed. Supp. (2018)

2018 WL 1378633

2018 WL 1378633
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

John R. LITWAK, Jr., d/b/a JRL
Emergency Services, Plaintiff,
v.
Richard E. TOMKO, Mayor of the
Borough of St. Clair et al., Defendants.

CIVIL ACTION NO. 3:16-CV-00446
|
Signed 03/19/2018

**Attorneys and Law Firms**

Lloyd R. Hampton, Hampton and Hampton, Ashland, PA, for Plaintiff.

Paul Gregory Lees, Marshall, Dennehey, Warner, Coleman & Goggin, Allentown, PA, for Defendants.

**MEMORANDUM**

A. Richard Caputo, United States District Judge

**\*1** Presently before this Court is Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint for failing to state a claim upon which relief can be granted and for failing to comply with the Federal Rules of Civil Procedure. This Motion will be granted because Plaintiff has refused to amend his Complaint in accord with my earlier Orders and the Federal Rules of Civil Procedure.

**I. Background**

**A. Factual History**
Plaintiff John R. Litwak, Jr. is a Pennsylvania resident who operates a towing, storage, and repair station called JRL Emergency Services ("JRL") in St. Clair, Shenandoah, and Pottsville, Schuykill County, Pennsylvania. (Third Amended Complaint ("TAC"), at ¶¶ 1-2.) The Third Amended Complaint names as Defendants: The Borough of St. Clair (the "Borough"); Richard Tomko, as the Mayor of the Borough of St. Clair during all relevant times; James Larish, Michael

Petrozino, Joann Brennan, John Burke, Valeria Davis, and John Houseknecht as members of the Borough Council during all relevant times (Larish as Council President and Petrozino as Council Vice President); and William Dempsey, Frank DeMarco, and Joseph Leskin as Borough Police Officers at all relevant times. (TAC, at ¶¶ 3-13.) Defendants are "all named in both their official and personal capacities." (TAC, at ¶ 17.)

(1) Seizure of Three Vehicles:
Litwak first claims that the Defendants unlawfully seized his personal property on three separate occasions. First, around February 18, 2016, Litwak's 1999 Volkswagen Jetta was towed from Litwak's private property located in St. Clair by Trial Towing Company. (TAC, at ¶¶ 20, 23.) Allegedly, this car was seized by all three named police officers at the request of the Mayor. [1] (TAC, at ¶¶ 22-23.) The Jetta is titled in the name of Litwak's business, JRL. (TAC, at ¶ 23.) Second, on a prior unknown date, the St. Clair police–specifically Officer Demarco–seized a 1994 Chevrolet pickup truck titled under one of Litwak's businesses while it was parked on Litwak's private property. (TAC, at ¶ 25.) Litwak claims this truck is being held at B's Garage in Pottsville, Pennsylvania, with towing and storage bills amounting to roughly $90,000.00. (TAC, at ¶ 27.) Third, on another unknown date, the St. Clair police instructed the Pennsylvania State Police to seize another 1994 Chevrolet pickup owned by Litwak while it was parked on property leased by Litwak in Gilberton, Pennsylvania. [2] (TAC, at ¶¶ 29-30.) Notably, the Pennsylvania State Police is not named in this action. The current location of this vehicle is unknown. (TAC, at ¶ 30.) Litwak claims that the Borough, Mayor Tomko, and Officers Dempsey, Leskin, and Demarco "presently retain custody and control over" both Chevrolet pickups and refuse to return either car. (TAC, at ¶ 32.)

**\*2** Plaintiff also suggests that these seizures resulted from a "long-standing ... Borough policy and custom specifically designed to harass, intimidate and harm Plaintiff." (TAC, at ¶ 34.) However, Plaintiff has not offered any detail related to the alleged policy.

(2) St. Clair Borough Zoning Appeal Dispute:

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 7 of 31

Litwak v. Tomko, Not Reported in Fed. Supp. (2018)
2018 WL 1378633

Litwak owns parcels of land located in the Borough that are zoned in a C-2 General Commercial District under St. Clair Zoning Ordinance 326 (the "Ordinance"). (TAC, at ¶ 40.) On June 20, 1996, a Borough zoning officer issued Litwak a zoning permit which certified the repair garage Litwak sought to open was a use in compliance with the Ordinance. (TAC, at ¶ 42.) Days later, the Borough revoked the June 20, 1996 permit. (TAC, at ¶ 43.) On April 29, 1997, Litwak and his wife, Frances Litwak, filed an Application with the Borough Zoning Hearing Board ("Zoning Board") seeking a determination that the sale, service, and repair of used automobiles on his parcels of land in a C-2 zoning district was a permitted use as of right under Section 5.202. (TAC, at ¶ 45.) Under the Pennsylvania Municipalities Planning Code, 53 P.S. § 10908(1.2), "[t]he first hearing before the [zoning] board or hearing officer shall be commenced within 60 days from the date of receipt of the applicant's application, unless the applicant has agreed in writing to an extension of time." (TAC, at ¶¶ 46.) The Zoning Board did not hold a hearing on the Application within sixty (60) days of its filing. (TAC, at ¶¶ 46-47.) Furthermore, § 10908(9) states:

> Where the board fails to ... commence, conduct or complete the required hearing as provided in subsection (1.2), the decision shall be deemed to have been rendered in favor of the applicant unless the applicant has agreed in writing or on the record to an extension of time. When a decision has been rendered in favor of the applicant because of the failure of the board to meet or render a decision as hereinabove provided, the board shall give public notice of said decision within ten days from the last day it could have met to render a decision in the same manner as provided in subsection (1) of this section. If the board shall fail to provide such notice, the

> applicant may do so. Nothing in this subsection shall prejudice the right of any party opposing the application to appeal the decision to a court of competent jurisdiction.

On September 2, 1997, Litwak published a Notice in the Pottsville Republican Herald Newspaper that stated because "[t]he Board did not hold a hearing on the Variance Application within sixty (60) days of the Filing Date ... a decision granting the Relief is thus deemed to have been rendered in favor of the Applicants." (TAC, at ¶ 49.) The Borough subsequently filed an appeal of the decision on September 22, 1997. (TAC, at ¶ 50.) On April 21, 1998, the entire record from the Zoning Board regarding this matter was filed with the Schuylkill County Prothonotary. (TAC, at ¶ 52.) In August of 2000, the Prothonotary sought to have the case purged for lack of docket activity. (TAC, at Ex. 9.) In response, the Borough filed a motion to remove the zoning case from the purge list together with a certificate of service. (*Id.*) The only other docket entries from April 21, 1998 to October 28, 2015 were made on September 5, 2003, August 8, 2006, September 11, 2012, and September 28, 2015. These entries were all Statements of Intention to Proceed with the appeal and a concurrent certificate of service filed by the Borough. (*Id.*)

**\*3** Around October 28, 2015, Litwak filed a motion to dismiss with prejudice the Borough's eighteen-year-old zoning appeal. (TAC, at ¶ 56.) The Schuylkill County Court of Common Pleas scheduled a hearing on Litwak's motion for December 16, 2015. (TAC, at ¶ 57.) On December 3, 2015, the Borough withdrew its appeal. (TAC, at ¶¶ 58.) To date, Plaintiff alleges that the Borough has not issued the zoning permit at issue.

Other individuals located within the C-2 zoning district were granted zoning permits by the Borough during this time. Specifically, Tom's Auto Sales was granted a zoning permit for a used car lot in 1999 for property in a C-2 zoning district that is less than one-quarter mile from Litwak's location. (TAC, at ¶ 63.) 21 st Street Motors was also granted a zoning permit for a used car lot in 1979 for a location in a C-2 zoning district

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 8 of 31

Litwak v. Tomko, Not Reported in Fed. Supp. (2018)

2018 WL 1378633

that is three blocks from Litwak's location. (TAC, at ¶ 64.) Additionally, Kenneth Diehl was granted a zoning permit to "conduct auto sales [on] property he purchased from Defendant Joanne Brennan...." (TAC, at ¶ 65.)

### (3) Litwak's Towing Business:

In 1989, Litwak began operating JRL, a towing service and related business, along Route 61 with a principal place of business at 148 North 3rd Street, St. Clair, Pennsylvania. (TAC, at ¶ 73.) From 1989 to the present, Litwak regularly received requests to tow vehicles from private motorists, members of the Pennsylvania State Police, and members of the police from surrounding communities. (TAC, at ¶ 74.) Since opening JRL, Litwak has made requests to the Borough Council, as well as to federal and state government officials, asking the Borough "to be advised to utilize his towing services, to no avail." (TAC, at ¶ 75.) From 1994 to the present, Litwak claims his towing business possessed the capabilities necessary to conduct vehicle towing operations within the Borough. (TAC, at ¶ 77.) Beginning in 1997, Litwak would attend the Borough Council meetings and attempt to discuss the problems he was having regarding his towing operations. (TAC, at ¶ 79.)

Litwak claims the Borough blacklisted him from towing jobs. (TAC, at ¶ 80.) Litwak petitioned the Borough at least forty (40) times regarding the blacklisting of JRL and his zoning dispute. (TAC, at ¶ 81.) Despite JRL's location right next to Route 61 in the Borough of St. Clair, Litwak claims Defendants Officers Dempsey, DeMarco, and Leskin refused to call his towing service when an accident occurred within the Borough along Route 61. (TAC, at ¶ 82.) Litwak specifically claims the Defendant Police Officers would exclusively call Trail Towing instead of JRL. (TAC, at ¶¶ 83-84.)

Despite this alleged Borough policy or custom to exclusively use Trail Towing, Litwak notes that the Borough Police used JRL for towing services at least twice. In the Summer of 2013, Litwak complained to then-Mayor Robert Maley that the Borough Police would not use his towing services. (TAC, at ¶ 87.) Maley wrote a letter to Defendant Officer Dempsey, the Acting Chief of Police, dated September 20, 2013,

which states in relevant part: "Effective September 20, 2013, JRL ... will be utilized as the towing service for the St. Clair police department. JRL will provide services for towing, abandoned vehicles, accidents, etc." (TAC, at Ex. 12.) During the two towing jobs Litwak performed for the Borough Police, Litwak arrived to the scene within fifteen minutes of being called, whereas it would take Trail Towing approximately forty-five minutes to respond to any accident that occurred in near proximity to the Borough. (TAC, at ¶¶ 89, 91.) Despite this response time, Defendant Police Chief Dempsey told Litwak he had a poor response time, was incompetent, and distracted motorists by leaving his emergency lights activated while at the scene of the accident. (TAC, at ¶¶ 90, 92.)

### B. Procedural History

 *4  On March 11, 2016, Plaintiff filed a complaint in the United States District Court for the Middle District of Pennsylvania against the twelve Defendants described above. (Doc. 1). Following Defendants' first Motion to Dismiss on June 7, 2016 (Doc. 7), Plaintiff amended his original Complaint. (Doc. 9).

Defendants moved to dismiss Plaintiff's First Amended Complaint on July 6, 2016 claiming that the infirmities in the original Complaint had not been cured. (Doc. 11). On January 17, 2017, I denied Defendants' Motion to Dismiss as moot and ordered Plaintiff to replead his First Amended Complaint due to its failure to comply with the requirements of Federal Rules of Civil Procedure 8. (Doc. 17). Plaintiff timely filed his Second Amended Complaint on January 30, 2017. (Doc. 18).

Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint on February 13, 2017. (Doc. 19). Again, Defendants took the position that Plaintiff's newly filed Complaint failed to comply with the mandates of Rule 8. I agreed and ordered Plaintiff to file a Third Amended Complaint. (Doc. 26.) Plaintiff timely filed his Third Amended Complaint.

Defendants have filed a fourth Motion to Dismiss. (Doc. 28.) Again, Defendants argue that Plaintiff's Third Amendment Complaint fails to comply with Rule 8 and fails to state a claim upon which relief may

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 9 of 31

Litwak v. Tomko, Not Reported in Fed. Supp. (2018)

2018 WL 1378633

be granted. Defendants' Motion has been fully briefed and is ripe for review.

## II. Discussion

### A. Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint:

Defendants argue that Plaintiff's Third Amended Complaint should be dismissed because it intermingles separate causes of action within each count[3] in contravention of the Federal Rules of Civil Procedure and my January 17, 2017 and September 19, 2017 Orders. Plaintiff disagrees and explains that he has separated his action into "three separate components." (*Doc.* 34-1, at 3.) I agree with the Defendants and will dismiss Plaintiff's Complaint with prejudice.

Federal Rule of Civil Procedure 8 provides "that any pleading that includes a claim for relief shall contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *In re Westinghouse Securities Litigation*, 90 F.3d 696, 702 (3d Cir. 1998) (Alito, J) (citing FED.R.CIV.P. 8(a)(2)). Rule 8 further provides that "each averment of a pleading shall be simple, concise, and direct." Fed.R.Civ.P. 8(e)(1). "Taken together, Rules 8(a) and 8(e)(1) underscore the emphasis placed on clarity and brevity by the federal pleading rules." *In re Westinghouse Securities Litigation*, 90 F.3d at 702 (citing Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1217 at 169 (2d ed. 1990)). At bottom, to comply with Rule 8 a complaint "must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Frazier v. Southeastern Pa. Transp. Auth.*, 785 F.2d 65, 66 (3d Cir. 1986) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Failure to comply with the mandates of Rule 8 may result in dismissal. *Washington v. Warden SCI-Greene*, 608 Fed.Appx. 49, 51 (3d Cir. 2015) (allowing for the dismissal of a *pro se* complaint in violation of FED.R.CIV.P. 8).

**\*5** In two earlier Memoranda, I explained that prior iterations of Plaintiff's Complaint qualified as "shotgun pleadings.[4]" Such pleadings have been regularly criticized by the Third Circuit and fail to meet the pleading requirements of Rule 8. *See Hynson*

*v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988) (criticizing the "all too common shotgun pleading approach" to complaints; *see also Bartol*, 2017 WL 1709814, \*3-4 ("The unifying characteristic of ... shotgun pleadings is that they fail to ... give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." (quoting *Weiland*, 792 F.3d 1313)); *Wright v. City of Phila.*, No. 01-6160, 2005 WL 3091883, at \*11 (E.D. Pa. Nov. 17, 2005) (citing *Hynson* for the proposition that "[t]he Third Circuit ... has a policy against Plaintiffs using a 'shotgun pleading approach' ... and requires civil rights cases [to] be plead[ed] with considerable specificity."). Put simply, a shotgun pleading does not give defendants adequate notice of the claims brought against them and the grounds upon which each claim rests. *See Weiland*, 792 F.3d at 1313. For that reason, a shotgun pleading does not comply with the mandates of Rule 8. *See Conley*, 355 U.S. at 47 (Rule 8 requires a complaint provide a defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests.").

Plaintiff's Third Amended Complaint remains a shotgun pleading. First, the Third Amended Complaint contains multiple counts where each count adopts the allegations of all preceding counts. *See Magluta*, 256 F.3d at 1284 (explaining that incorporating all preceding allegations results in the inclusion of "factual allegations that could not possibly be material to that specific count."). For example, Count Three contains, by reference, all averments previously alleged. (TAC, at ¶ 72.) Stated differently, this means that Plaintiff's tortious interference claim includes a number of unrelated allegations such as the existence of a zoning dispute and the taking of private property. This confusing pleading practice was identified in both the January 17, 2017 and September 19, 2017 Memoranda. Yet, Plaintiff has not altered his Complaint after two amendments to remedy this confusion. Second, the Third Amended Complaint is riddled with vague and conclusory statements. *See Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 164 (11th Cir. 1997) (explaining that a complaint that "offered vague and conclusory factual allegations in an effort to support a multiplicity of discrimination claims leveled against 15 defendants" was a "prototypical shotgun complaint."); *Bartol*, 2017 WL 1709814, \*3-4 (finding a complaint "replete" with

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 10 of 31

Litwak v. Tomko, Not Reported in Fed. Supp. (2018)

2018 WL 1378633

vague and conclusory allegations to be a shotgun pleading). For example, Count Two relies heavily on a "sham" appeal allegedly maintained by Defendant Council Members. (*See* TAC, at ¶ 50.) But, Plaintiff avers no statement of fact related to the appeal. Instead, Plaintiff relies on repetition–stating that the appeal was a "sham" or "unlawful" at least ten times–in an attempt to allege a cognizable claim. (*See, e.g.*, TAC, at ¶¶ 50-52; 55.) Third, the most recent Complaint does not separate claims into distinct counts. Remember, I explicitly noted in the September 19th Memorandum that Count Three contained a variety of claims, which were wholly unrelated to the titled count. I stated:

> *6 Count Three, titled "Tortious Interference with Prospective and Actual Contractual Relationships," claims that the actions pled resulted in a "deprivation of equal protection, denial of due process, and selective treatment motivated by an intention by the Defendants to willfully discriminate on the basis of desire to punish ... Plaintiff...." Such a statement is not only conclusory, but confusing because the deprivation described is wholly unrelated to a state contract claim of tortious interference. Such a pleading–one that intermingles a wide number of claims based on a variety of legal theories–runs afoul of the Federal Rules and this Court's January 17, 2017 order.

*Litwak v. Tomko*, No. 16-446, 2017 WL 4151178, at *5 (M.D. Pa. Sept. 19, 2019). In Count Three of the Third Amended Complaint, Plaintiff remains steadfast in his belief that there is some logical connection between a contract claim of Tortious Interference and constitutional claims premised on the Fourteenth Amendment's Equal Protection and Due Process Clauses. (TAC, at ¶ 99 ("[Defendant's action] results in deprivation of equal protection, denial of due process, and selective treatment motivated by an intention by the Defendants to willfully discriminate on the basis of desire to punish and maliciously, with

bad faith, economically injure Plaintiff....).) I continue to disagree.[5]

For these reasons, I will not diverge from my earlier finding: Plaintiff's pleading, which intermingles seemingly unrelated fact and conclusory statements with claims based on a variety of legal theories, is a shotgun pleading. Because the Third Amended Complaint is a shotgun pleading, it is yet again in violation of the pleading requirements set forth by the Federal Rules of Civil Procedure.

It is within my discretion to dismiss Plaintiff's Third Amended Complaint. *See Washington*, 608 Fed.Appx. at 51. I will dismiss Plaintiff's Third Amended Complaint with prejudice because I find that amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (explaining that Plaintiff is not entitled to an inequitable or futile amendment). I have provided Plaintiff ample opportunity to amend his Complaint, and I recognize that there is no evidence to suggest that offering Plaintiff a third opportunity to amend would result in the production of a compliant complaint.[6]

Therefore, Plaintiff's Third Amended Complaint will be dismissed with prejudice because a shotgun pleading does not comply with the mandates of Rule 8.

### III. Conclusion

For the above stated reasons, Plaintiff's Third Amended Complaint will be dismissed with prejudice.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1378633

---

**Footnotes**

1    While not immediately clear, it appears that Plaintiff claims that the Mayor directed the Police to conduct the seizure. (TAC, ¶ 22-23.)

2018 WL 1378633

2    It is not clear who actually seized the vehicle in question. First, Plaintiff pleads that the Pennsylvania State Police were instructed to seize the car. (TAC, at ¶ 29.) Then, Plaintiff implies that Officers Dempsey and Demarco seized the car while it was outside of their jurisdiction. (TAC, at ¶ 31.)

3    "This type of pleading completely disregards Rule 10(b)'s requirement that discrete claims should be plead in separate counts." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

4    "The United States Court of Appeals for the Eleventh Circuit has articulated the bulk of existing law in this area. The Eleventh Circuit recently categorized shotgun pleadings into four different types: (1) 'a complaint containing multiple counts where each count adopts the allegations of all preceding counts'; (2) a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action'; (3) a complaint that does 'not separat[e] into a different count each cause of action or claim for relief'; and (4) a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.' The 'unifying characteristic of these four types of shotgun pleadings 'is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.' " *Bartol v. Barrowclough*, No. 17-0614, 2017 WL 1709814, *3-4 (E.D. Pa. May 3, 2017) (quoting *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015)).

5    Notably, Counts One and Two suffer equally from this pleading flaw. For example, Count Two, when construed liberally, appears to allege: (1) a violation of a local zoning ordinance; (2) a violation of a state statute, 42 Pa. C.S.A. § 8351, for the wrongful use of civil proceedings; (3) a violation of the Fourteenth Amendment's Due Process Clause; and (4) a violation of the Fourteenth Amendment's Equal Protection Clause.

6    It is important to remember that Plaintiff is represented by counsel; he is not a pro se plaintiff. As such, I am under no obligation to liberally construe the instant Complaint to make out potential claims. *See Ostrowski v. D'Andrea*, No. 3:14-cv-00429, 2015 WL 10434888, at *3 (M.D. Pa. Aug. 11, 2015). It is the job of Plaintiff's counsel to clearly articulate a federal claim in the Complaint.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

Meyers v. Protective Insurance Company, Not Reported in Fed. Supp. (2018)

2018 WL 1899285

2018 WL 1899285
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Thomas and Colleen MEYERS, Plaintiffs,

v.

PROTECTIVE INSURANCE
COMPANY, Defendant.

NO. 3:16-CV-01821
|
Signed April 20, 2018

**Attorneys and Law Firms**

Adam G. Kornblau, Kornblau & Associates, P.C.,
Lynn S. Kornblau, Kornblau, Kornblau & Solomon,
Jenkintown, PA, for Plaintiffs.

Nigel A. Greene, Sonia DiValerio, Rawle & Henderson
LLP, Philadelphia, PA, for Defendant.

**MEMORANDUM**

A. Richard Caputo, United States District Judge

*1 Presently before me is the Motion for Judgment
on the Pleadings on all Claims of Bad Faith (Doc.
35) filed by Defendant Protective Insurance Company
("Defendant"). For the reasons that follow, the motion
for judgment on the pleadings will be denied.

**I. Background**

The facts as alleged in the Amended Complaint are
outlined in detail in my October 10, 2017 Opinion
denying Defendant's Rule 12(b)(6) motion to dismiss
the claims of bad faith in the Amended Complaint.
(See Doc. 30, generally ). Briefly, Plaintiff Thomas
Meyers ("Plaintiff") [1] alleges that he sustained serious
injuries after he was struck by a hit-and-run vehicle
while delivering boxes for his employer which had an
automobile insurance policy issued by Defendant. (See
id. at 1). Plaintiff provided Defendant with notice of
his uninsured motorist claim in April 2014. (See id. at
1-2).

Over the next fourteen (14) months, Defendant
sent correspondence to Plaintiff's counsel on several
occasions requesting updates on the status of his
injury. (See Doc. 34, ¶ 28 and Ex. "A"). Defendant
also requested authorization to obtain Plaintiff's
workers' compensation file in these correspondence,
but Plaintiff never provided such authorization. (See
id.).

On or about February 1, 2016, Plaintiff provided
Defendant with a damages package. (See Doc. 30,
2). Thereafter, on March 9, 2016, Plaintiff asked
Defendant to advise him of the status of the review
of his claim, but Defendant failed to do so. (See id.).
Rather, Defendant's adjuster responded to Plaintiff that
her final report would be submitted to management
over the weekend and she would advise Plaintiff of
Defendant's position as soon as possible. (See id.).
Defendant's adjuster did not advise Plaintiff of the
status of the review as promised. (See id.). Plaintiff
again requested Defendant provide him a report on
the status of his claim evaluation on March 31, 2016,
but that request was ignored. (See id.). On April 18,
2016, Plaintiff provided Defendant with a blanket
authorization to obtain certain investigative records.
(See id.).

Plaintiff wrote to Defendant on April 20, 2016 as
follow up to an earlier email and multiple voice
messages regarding the status of his claim. (See
id.). Defendant's adjuster responded that the review
meeting was not yet on her calendar. (See id.). Despite
subsequently informing Plaintiff that she would find
out when the claim would be reviewed, the adjuster
failed to provide this information to Defendant. (See
id.).

Plaintiff left several voice messages for Defendant's
adjuster during the week of May 8, 2016 requesting
an update on the status of Defendant's investigation,
to which Defendant's adjuster responded on May 18,
2016 that she still did not have a calendar date for
review of Plaintiff's claim. (See id. at 2-3). After
multiple requests, Defendant finally provided Plaintiff
with a copy of its investigative file on May 24,
2016. (See id. at 3). Plaintiff contacted the adjuster's
supervisor the following day regarding Defendant's
failure to provide a settlement offer or otherwise

Meyers v. Protective Insurance Company, Not Reported in Fed. Supp. (2018)

2018 WL 1899285

communicate regarding the status of its investigation. (*See id.* at 3).

**\*2** On May 26, 2016, Defendant made its first settlement offer in the amount of $225,000.00. (*See id.* at 3). At the time the offer was made, Defendant possessed medical lien and wage loss documentation in an amount in excess of $122,000.00. (*See id.*). Defendant was also aware at that time that Plaintiff's medical and wage loss liens were rapidly increasing as Plaintiff was still unable to work and was undergoing medical treatment. (*See id.*). The following week, Defendant increased its settlement offer and retained counsel to represent its interests in this matter. (*See id.*). After counsel was retained, Defendant over the next month requested three (3) medical evaluations of Plaintiff, including two with orthopedic physicians. (*See id.*).

On June 9, 2016, Plaintiff advised Defendant that he would be willing to settle his claim within the policy limits. (*See id.*). A week later, Defendant wrote to Plaintiff stating that he delayed in reporting the accident, that Plaintiff had a "significant medical history", that there was only "minor property damage", and that there were "other relevant factors" that Defendant failed to identify. (*See id.*).

Based on the foregoing, Plaintiffs filed this action against Defendant in the Court of Common Pleas of Lackawanna County, Pennsylvania on July 25, 2016. (*See* Doc. 1, Ex. "A"). Defendant removed the action and moved to dismiss the Complaint, (*see* Doc. 3, *generally* ), and that motion was granted in part and denied in part, but Plaintiff was given leave to amend his bad faith claim. (*See* Docs. 16-17, *generally* ). The Amended Complaint was filed on February 17, 2017. (*See* Doc. 18, *generally* ).

Defendant again moved to dismiss Plaintiff's bad faith claims. (*See* Doc. 19, *generally* ). The motion was denied and Plaintiff was permitted to proceed with his bad faith claims in the Amended Complaint. (*See* Docs. 30-31, *generally* ).

On November 7, 2017, Defendant filed its Answer with Separate Defenses to the Amended Complaint. (*See* Doc. 34, *generally* ). Attached as an exhibit to Defendant's Answer are a series of emails between

claims adjusters employed by Defendant and Plaintiff's counsel. (*See id.* at Ex. "A").

Defendant filed the instant motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on February 14, 2018. (*See* Doc. 35, *generally* ). Although Defendant's previous motion to dismiss the bad faith claims in the Amended Complaint was denied, Defendant now contends that judgment on the pleadings is warranted based on the contents of the Amended Complaint, the Answer, and the exhibits attached to those pleadings. (*See* Doc. 36, 9-19). More particularly, Defendant argues that correspondence between Plaintiff's counsel and Defendant's claim representatives prior to the commencement of this action that are attached as an exhibit to its Answer conclusively establish that it did not engage in any bad faith conduct. (*See id.*).

Plaintiff raises a number of arguments in opposition to Defendant's motion. (*See* Doc. 38, *generally* ). Citing the law of the case doctrine, Plaintiff first asserts that the motion should be denied because the issue raised therein has already been ruled upon and decided when Defendant's motion to dismiss the bad faith claims was denied. (*See id.* at 8-11). Second, Plaintiff argues that even if the sufficiency of the bad faith claims is revisited, the pleadings still establish plausible bad faith claims under the applicable standard of review. (*See id.* at 11-13). This is the case, says Plaintiff, even with consideration of the Answer and correspondence attached thereto because the content of the correspondence are consistent with the allegations in the Amended Complaint which have already been found sufficient to allege plausible bad faith conduct. (*See id.* at 13-19). Plaintiff also maintains that the pleadings establish viable bad faith claims based on Defendant's misrepresentations and settlement conduct. (*See id.* at 19-23).

**\*3** In reply, Defendant contends that courts routinely entertain motions for judgment on the pleadings even after denying previous motions to dismiss. (*See* Doc. 40, 3-4). As a result, Defendant insists that Plaintiff is wrong in relying on the law of the case doctrine as a basis to deny its motion (*See id.* at 4-7). Defendant also reiterates in its reply that the pleadings fail to establish plausible bad faith claims. (*See id.* at 7-15).

Oral argument was held on the motion for judgment on the pleadings on April 12, 2018. Defendant's motion is now ripe for disposition.

## II. Legal Standard

Federal Rule of Civil Procedure 12(c) provides: "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate "if the movant clearly establishes that there are no material issues of fact, and he is entitled to judgment as a matter of law." *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005). " 'A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion.' " *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017) (quoting *Revel v. Port Auth. of NY, NJ*, 598 F.3d 128, 134 (3d Cir. 2010) ). "In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Id.* at 417-18 (citing *Allah v. Al–Hafeez*, 226 F.3d 247, 249 (3d Cir. 2000) ). "In ruling on a motion for judgment on the pleadings, 'the court reviews not only the complaint but also the answer and written instruments attached to the pleadings.' " *Barnard v. Lackawanna Cnty.*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016) (quoting *Brautigam v. Fraley*, 684 F. Supp. 2d 589, 591 (M.D. Pa. 2010) ); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("On a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.").

## III. Discussion

Defendant's motion for judgment on the pleadings will be denied.[2] Defendant's contention that its Answer and the exhibit attached thereto compel a finding that Plaintiff does not present viable bad faith claims is unconvincing. The correspondence between Plaintiff's counsel and Defendant's claims representatives were not attached to the Amended Complaint. (*See* Doc. 18, *generally* ). Nevertheless, the substance of much of the parties' communications was set forth in detail in Plaintiff's pleading. (*See id.* at ¶¶ 24-58). Thus, for all practical purposes, the operative facts here are no different than they were when the sufficiency of the bad faith claims was determined on Defendant's motion to dismiss the Amended Complaint. And, although Defendant's Answer provides additional information pertaining to communications between the parties during 2014 and 2015, (*see* Doc. 34, ¶ 28 and Ex. "A"), that by itself does not establish that the bad faith claims in the Amended Complaint are not facially plausible. Defendant is not entitled to judgment on the pleadings.[3]

## IV. Conclusion

**\*4** For the above stated reasons, Defendant's motion for judgment on the pleadings will be denied.

An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2018 WL 1899285

---

## Footnotes

1    Plaintiff's wife Colleen Meyers is also a party to this litigation asserting a derivative claim for loss of consortium.

---

2018 WL 1899285

2    The parties dispute whether the decision denying Defendant's motion to dismiss the bad faith claims in the Amended Complaint on a 12(b)(6) motion precludes the instant Rule 12(c) motion. While "a motion for judgment on the pleadings is not an opportunity to re-litigate issues raised and decided in a motion to dismiss, the Federal Rules do not flatly bar a defendant from asserting a Rule 12(c) motion for judgment on the pleadings simply because he or she previously asserted a Rule 12(b)(6) motion to dismiss." *Burke v. Nationstar Mortg. LLC*, No. 14-837, 2016 WL 4231705, at *5 (E.D. Va. Aug. 9, 2016) (quotation, citation, and alteration omitted). A Rule 12(c) motion following the denial of a Rule 12(b)(6) motion is proper, among other instances, where the defendant "produces legal authority and/or evidence in response to the court's decision." *Id.*

3    Of course, "[a] ruling on a motion brought pursuant to Federal Rule of Civil Procedure 12(c) does not preclude a later summary judgment motion brought pursuant to Rule 56(a)." *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 872 (N.D. Ohio 2014); *accord Hazen v. Modern Food Servs., Inc.*, 113 Fed.Appx. 442, 444 (3d Cir. 2004).

---

**End of Document**        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

4

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 18 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

 KeyCite Yellow Flag

Distinguished by JILL BALLARD, REBECCA VARNO, and MARK POKORNI, on behalf of themselves and the class members described herein, Plaintiffs v. NAVIENT CORPORATION; NAVIENT SOLUTIONS, INC.; and NAVIENT SOLUTIONS, LLC, Defendants. M.D.Pa., January 23, 2026

2022 WL 787957
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

UNITED STATES of America EX
REL. Shauna HLYWIAK, Plaintiff,
v.
GREAT LAKES EDUCATIONAL LOAN
SERVICES, INC., et al., Defendants.

No. 1:20-cv-13590
|
Filed 03/15/2022

**Attorneys and Law Firms**

Noah Axler, Anderson Kill, P.C., 1760 Market St., Suite 600, Philadelphia, PA 19103, David M. Cedar, Williams Cedar, LLC, 8 Kings Highway West, Suite B, Haddonfield, NJ 08033, Gerald J. Williams, Williams Cedar, LLC, One South Broad St., Suite 1510, Philadelphia, PA 19107, On behalf of Plaintiff/Relator Shauna Hlywiak.

Jonathan Spells Krause, Corinne Samler Brennan, Klehr Harrison Harvey Branzburg, LLP, 1000 Lincoln Drive East, Suite 201, Marlton, NJ 08053, On behalf of Defendants Great Lakes Educational Loan Services, Inc., Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC; and Nelnet, Inc.

David G. Murphy, Diane A. Bettino, Reed Smith LLP, 506 Carnegie Center, Suite 300, Princeton, NJ 08540, On behalf of Defendants Navient Corporation and Navient Solutions LLC.

Stephen M. Orlofsky, Nicholas C. Harbist, Blank Rome LLP, 300 Carnegie Center, Suite 220, Princeton, NJ 08540, Blair A. Gerold, Blank Rome LLP, 1 Logan Square, Philadelphia, PA 19103, On behalf of Defendant Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing.

David Edward Dauenheimer, U.S. Department of Justice Office of the U.S. Attorney, 970 Broad St., Newark, NJ 07102, On behalf of Interested Party United States.

**OPINION**

O'HEARN, District Judge.

**INTRODUCTION**

**\*1** Plaintiff/Relator Shauna Hlywiak ("Relator") brings this *qui tam* action against Defendants Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Nelnet Diversified Solutions, LLC, Nelnet Servicing, LLC, and Nelnet, Inc. (collectively, "Nelnet"), Navient Corporation and Navient Solutions LLC (collectively, "Navient"), and Pennsylvania Higher Education Assistance Agency a/k/a PHEAA d/b/a FedLoan Servicing ("PHEAA," and together with Great Lakes, Nelnet, and Navient, the "Defendants"),[1] alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). (Am. Compl., ECF No. 5, ¶ 1). In her Amended Complaint (ECF No. 5), Relator alleges that Defendants, which service federal student loans, are liable under the FCA for violating federal and state laws in breach of their servicing contracts ("Servicing Contracts") with the U.S. Department of Education ("DOE") by failing to apply student loan borrowers' payments to those borrowers' loans with the highest interest rate since the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")[2] was passed in March 2020. (Am. Compl., ECF No. 5, ¶¶ 5–9). Now, this matter comes before the Court upon PHEAA's Motion to Dismiss the Amended Complaint, (ECF No. 71), which Navient, Great Lakes, and Nelnet join (ECF No. 72; ECF No. 73). For the reasons that follow, the Court **GRANTS** Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72; ECF No. 73) and **DISMISSES** the Amended Complaint (ECF No. 5).

**I. BACKGROUND**

**A. Procedural History**

Relator instituted this *qui tam* action on September 30, 2020. (ECF No. 1). After an investigation into Relator's claims, the United States filed a Notice of Election to Decline Intervention on January 5, 2021. (ECF No. 3). Relator filed an Amended Complaint against the Defendants on January 7, 2021. (ECF No. 5). [3]

In their Joint Motion to Dismiss, Defendants argue that the Amended Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) because Relator fails to state a claim under the FCA as she fails to plausibly allege (i) that Defendants submitted false claims; (ii) that any alleged misrepresentations —which there were none—were material to DOE's decision to pay Defendants; (iii) that Defendants acted with the requisite scienter under the FCA; and (iv) that Defendants acted with the requisite particularity required by Rule 9(b). (ECF No. 71 at 1–4).

**\*2** Having considered the parties' arguments, the Court agrees with Defendants that Relator fails to state a claim and concludes that the Amended Complaint must be dismissed.

### B. Factual Background [4]

#### 1. Administration of the Federal Student Loan Program

Under the Higher Education Act ("HEA"), DOE has the authority to issue a variety of federal loans and grants to student borrowers. *See* 20 U.S.C. §§ 1071–1099c. In the 1990s, the federal government began originating loans under the William D. Ford Direct Loan Program, *see* 20 U.S.C. §§ 1087a–1087j, and in 2008, began purchasing student loans from non-federal entities through the Federal Family Education Loan Program, (ECF No. 5, ¶ 29). The Federal Student Aid ("FSA") office, a part of DOE, is responsible for managing these federal loan programs authorized under the HEA. (ECF No. 5, ¶ 29).

Congress directed DOE to enter into contracts for the "servicing" of these federal loans and "such other aspects of the direct student loan program as the Secretary determines are necessary." 20 U.S.C. § 1087f. In 2009, DOE awarded each Defendant a

Servicing Contract with a five-year term, each of which has been extended numerous times. (ECF No. 5, ¶¶ 30, 32, 36). The Servicing Contracts require each Defendant to " 'be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.' " (ECF No. 5, ¶¶ 33, 44, 56). [5] DOE pays each Defendant a dynamic monthly servicing fee calculated based on a number of factors including the number of borrower accounts serviced by each Defendant and the repayment status of each borrower account. (ECF No. 5, ¶¶ 48–51; Ex. A, § B.13). The Servicing Contracts guarantee a minimum annual revenue for each Defendant "provided that [they are] in compliance with the requirements for servicing federally held debt." (ECF No. 5, ¶ 31; Ex. A, § B.13). The Servicing Contracts also state:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer[s] (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

**\*3** (ECF No. 5, ¶ 46; Ex. A, § B.13).

Relator alleges that Defendants were not servicing loans in compliance with the Servicing Contracts because they violated federal and state law after the CARES Act was passed in March 2020.

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 20 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

## 2. The CARES Act Places Federal Student Loans in Administrative Forbearance

In March 2020, in response to the COVID-19 pandemic, Congress passed the CARES Act, which granted temporary relief to federal student loan borrowers by placing their loans in administrative forbearance[6] until September 30, 2020, meaning that all payments due for certain student loans held by DOE were suspended, interest on these loans would not accrue after March 13, 2020, and the interest rates on the loans were temporarily reduced to 0% (the "CARES Act Forbearance Period"). Before the CARES Act Forbearance Period expired on September 30, 2020, former President Trump directed the Secretary of Education ("Secretary") to extend the administrative forbearance until December 31, 2020, by Presidential Memorandum.[7] Since that first extension, the CARES Act Forbearance Period has been extended several times—most recently until May 1, 2022.[8]

Because federal student loan borrowers are not required to make loan payments during the CARES Act Forbearance Period, these payments are considered "prepayments" under federal regulation, and are to be applied to repay a borrowers' federal student loans in the following manner: "first to any accrued charges and collection costs, then to any outstanding interest, and then to outstanding principal." 34 C.F.R. §§ 685.211(a)(1)–(2) (2014). Although this provision is clear about how a prepayment should be allocated on amounts due under a single federal loan, the regulation does not specify how a single prepayment should be allocated across student loans when a borrower has more than one loan.

## 3. Relator's Prepayments and Allegations against Defendants

**\*4** Relator Shauna Hlywiak, whose federal student loans are serviced by Great Lakes, made prepayments between March and August 2020 during the CARES Act Forbearance Period, (ECF No. 5, ¶¶ 112–22). Relator alleges that Great Lakes wrongfully applied her prepayments proportionally across her various loans, instead of allocating her prepayments to the loans with the highest interest rate. (ECF No. 5, ¶¶ 123–26). Relator argues that this proportional allocation method violates federal and state law because Great Lakes was required to allocate each prepayment to her loans with the highest interest rate, and that Great Lakes' website stated that it would apply prepayments to a borrower's highest interest rate loans. (ECF No. 5, ¶¶ 123–26).

An example of Defendants' proportional allocation method is instructive. Relator made a $1,300 prepayment toward her federal student loans during the CARES Act Forbearance Period on May 15, 2020. (ECF No. 5, ¶ 115). At the time of her prepayment, she had no outstanding interest that had accrued prior to March 13, 2020, and her $1,300 prepayment was allocated proportionally among the principals of her federal student loans as follows:

| Loan Number | Applied to Principal | Applied to Interest | Unpaid Principal | Interest Rate Prior to the COVID Forbearance Period |
| --- | --- | --- | --- | --- |
| 519 | $0.00 | $0.00 | $3,247.42 | 5.600% |
| 520 | $36.40 | $0.00 | $2,406.49 | 6.800% |
| 521 | $0.00 | $0.00 | $4,175.21 | 4.500% |
| 522 | $69.94 | $0.00 | $4,601.54 | 6.800% |
| 523 | $34.97 | $0.00 | $2,300.72 | 6.800% |
| 524 | $0.00 | $0.00 | $5,103.01 | 3.400% |

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 21 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

| 525 | $32.37 | $0.00 | $2,135.00 | 6.800% |
| 526 | $0.00 | $0.00 | $5,190.38 | 3.400% |
| 527 | $5.33 | $0.00 | $348.33 | 6.800% |
| 528 | $172.64 | $0.00 | $11,369.12 | 5.410% |
| 529 | $233.60 | $0.00 | $14,723.05 | 6.210% |
| 530 | $111.41 | $0.00 | $7,332.11 | 5.410% |
| 531 | $315.90 | $0.00 | $20,796.26 | 5.840% |
| 533 | $297.44 | $0.00 | $19,548.79 | 5.310% |

(ECF No. 5, ¶ 116). She asserts that Great Lakes violated federal and state law when it proportionally allocated her prepayment, as Great Lakes should have allocated her $1,300 prepayment only to her loans that had been assigned a 6.800% interest rate—the highest interest rate—prior to the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 123–125). Relator alleges that she "brought the misallocation to the attention of Great Lakes" via e-mail, and Great Lakes responded explaining that the interest rates for Relator's loans are not "taken into consideration" because all the interest rates of her loans had been lowered to 0% during the CARES Act Forbearance Period. (ECF No. 5, ¶¶ 126–27). Therefore, the prepayments were prorated across her loans "based on the outstanding principal balance only." [9] (ECF No. 5, ¶ 127).

Relator alleges that after this "exchange" with Great Lakes, she contacted other individuals whom Relator knew were also continuing to pay their federal student loans during the CARES Act Forbearance Period, and that these individuals, whose loans were serviced by Great Lakes, Nelnet, Navient, and PHEAA, sent her "screenshots" showing that these Defendants were proportionally allocating these individuals' prepayments as well. (ECF No. 5, ¶ 128).

### 4. Defendants' Website Representations

Relator alleges that Great Lakes' website indicates that Great Lakes' default payment allocation method for prepayments is that the portion of the prepayment that is applied to principal will be applied to the principal of a borrower's highest-interest-rate loan, including those that are in forbearance. (ECF No. 5, ¶¶ 94–95). Nelnet's website allegedly makes a similar representation that any prepayment will be allocated across a borrower's loans "starting with the highest interest rate," including those loans that are "not in repayment status," which Relator interprets to mean those loans in forbearance. (ECF No. 5, ¶¶ 96–97). Relator further alleges that Navient's website indicates the same default allocation method: where a borrower does not "provide special payment instructions," a prepayment will be allocated to a borrower's loan with the highest interest rate. (ECF No. 5, ¶ 98). Relator's allegations regarding PHEAA's website do not discuss PHEAA's payment allocation method, and instead allege that its website states that a prepayment could assist a borrower to "pay less interest over the life" of the borrower's loan by making prepayments. (ECF No. 5, ¶ 101). [10]

### 5. Alleged Violations of Federal and State Law

**\*5** In asserting that Defendants violated federal law, Relator relies on former President Obama's Presidential Memorandum ("Presidential Memorandum") issued in March 2015, which stated its intent to create a "Student Aid Bill of Rights," and directed that "[a]s soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate ... unless otherwise instructed by borrowers." [11] Relator further asserts that Defendants violated the Consumer Financial Protection Act

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 22 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

("CFPA"), "which prohibits 'unfair, deceptive, or abusive acts or practices' in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," (ECF No. 5, ¶ 110 (citing 12 U.S.C. § 5531)), and briefly refers to a case where the Consumer Financial Protection Bureau ("CFPB") sued Navient under the CFPA "for making misrepresentations to borrowers and misallocating payments, in context other than those set forth in this Amended Complaint," (ECF No. 5, ¶ 110).

Relator alleges that Defendants also violated the following state laws: (1) New Jersey's Student Borrower Bill of Rights (N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*); (2) California's Student Borrower Bill of Rights (CAL. CIV. CODE § 1788.100 *et seq.*); (3) Colorado's Student Loan Servicers Act (COL. REV. STAT. ANN. § 5-20-101 *et seq.*); (4) North Carolina's Student Borrowers' Bill of Rights (H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019)); (5) Rhode Island's Student Loan Bill of Rights (19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.*); and (6) Virginia's law regulating education loan servicers, (2020 Va. Legis. Serv. ch. 1198 (West) (codified at VA. CODE ANN. § 6.2-2611(4))). (ECF No. 5, ¶¶ 58–63).

### 6. Violation of the False Claims Act (Count I)

In a single Count in the Amended Complaint, Relator alleges that Defendants knowingly violated the Presidential Memorandum, the CFPA, and numerous state laws, and therefore, when Defendants knowingly failed to disclose to the Government that they had committed these violations when seeking to be paid for their services under the Servicing Contracts, Defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval" and "knowingly made, used, or caused to be made or used a false record or statements material to false or fraudulent claims." (ECF No. 5, ¶ 131–32).

Relator alleges that the Government paid for these claims which would not otherwise have been allowed to be paid under the Servicing Contracts, and that the Government relied on the accuracy of Defendants' "claims, statements, and records," unaware of their false and fraudulent nature. (ECF No. 5, ¶ 133).

Relator asserts that "Defendants acted with the requisite scienter" and that compliance with these laws and contractual provisions were a "precondition of payment by the United States Government." (ECF No. 5, ¶ 134). Relator alleges that due to Defendants' proportional payment allocation method, borrowers' student loans will remain in repayment longer with Defendants receiving additional fees for an extended period of time, resulting in the Government paying more in servicing fees over the life of the loans. (ECF No. 5, ¶ 136).

**\*6** According to Relator, the Servicing Contracts permit the Government to order the return of all the servicing fees that were billed and paid "from the time of noncompliance with any applicable federal requirement." (ECF No. 5, ¶ 135). Consequently, every billing made to the Government for servicing the accounts of borrowers that made prepayments during the CARES Act Forbearance Period is an independent false claim under the FCA. (ECF No. 5, ¶ 135).

## II. LEGAL STANDARD

### A. Motion to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. *Id.* at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When reviewing a plaintiff's complaint on a motion to dismiss under Rule 12(b)(6), the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 23 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

them, and construe those allegations in the light most favorable to the plaintiff." *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that form the basis of the claim. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### B. The False Claims Act

Under the FCA, it is unlawful to knowingly submit a fraudulent claim to the federal government. *In re Plavix Mktg., Sales Prac. & Prod. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 938 (D.N.J. 2017) (citing *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014)). The FCA includes a *qui tam* provision permitting private parties, known as relators, to bring suit on behalf of the United States against anyone who has submitted a false claim to the government. *Id.* at 938–39 (citing *Schumann*, 769 F.3d at 840). A violation of the FCA has four elements: (1) falsity, (2) causation, (3) knowledge, and (4) materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

There are two primary categories of false claims that can satisfy the falsity requirement: (1) factually false claims and (2) legally false claims. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Wilkins v. United Health Grp. Inc.*, 659 F.3d 295, 305 (3d Cir. 2011).

**\*7** Legally false claims are subcategorized into two theories of liability: (1) express false certification and (2) implied false certification. *United States v. Kindred Healthcare Inc.*, 469 F. Supp. 3d 431, 444–45 (E.D. Pa. 2020). A defendant is liable under the express false certification theory when they falsely certify that they have complied with a material statute, regulation, or contractual provision. *In re Plavix Mktg.*, 332 F. Supp. 3d at 939. "By contrast, implied false certification liability attaches when a claimant 'makes specific representations about the goods or services provided' and the claimant's 'failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.' " *United States v. Eastwick Coll.*, 657 F. App'x 89, 93–94 (3d Cir. 2016) (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016)).

Because FCA claims allege fraud, they are subject to the heightened pleading standards of Rule 9(b). *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d Cir. 2014). For a relator to satisfy the standards of Rule 9(b) for purposes of FCA claims, the relator "must provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' Describing a mere opportunity for fraud will not suffice. Sufficient facts to establish 'a plausible ground for relief' must be alleged." *Id.* at 157–58 (citing *Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) and *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)).

### III. DISCUSSION

Because Relator asserts that the Defendants violated the FCA by failing to disclose noncompliance with "material statutory, regulatory, or contractual requirements" when making "specific representations about the goods or services provided," Relator's claims are based on an implied false certification liability theory. *Eastwick Coll.*, 657 F. App'x at 93–94. Among Defendants' arguments for dismissal are that Relator fails to allege (a) that Defendants submitted false claims, (b) that such alleged misrepresentations were material to the Government's payment decisions, and (c) that the Defendants acted with the requisite scienter. The Court agrees and therefore grants their Joint Motion to Dismiss.

### A. Falsity

Relator bases her FCA claim on her allegation that Defendants failed to disclose that they violated the

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 24 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

Presidential Memorandum, the CFPA, New Jersey's Student Borrower Bill of Rights, California's Student Borrower Bill of Rights, Colorado's Student Loan Servicers Act, North Carolina's Student Borrowers' Bill of Rights, Rhode Island's Student Loan Bill of Rights, and Virginia's law regulating education loan servicers.[12] "The falsity element 'asks whether [a] claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government.' " *United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, No. 19-18753, 2021 WL 1904735, at *5 (D.N.J. May 12, 2021) (quoting *United States ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020)). The Court will address each of these alleged violations.

### 1. Alleged Violation of the Presidential Memorandum

**\*8** Defendants argue that the Presidential Memorandum places no direct obligation on servicers and was not law. Rather, the memorandum expressed the President's "policy preferences" and directed the Secretary to take further action; however, the Secretary never implemented the Presidential Memorandum's directive. (ECF No. 71 at 6–7, 16–18). Defendants are correct. The relevant portion of the Presidential Memorandum reads, "As soon as practicable, the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." The Secretary, who has the authority to implement this change by promulgating regulations under 20 U.S.C. § 1082 (a)(1) of the HEA did not do so.

In Relator's Response in Opposition, Relator repeatedly refers to the Presidential Memorandum as "federal law," (ECF No. 80 at 5), citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to argue that the President was acting through an "express or implied authorization of Congress" when issuing the Memorandum. (Case No. 21-09096, ECF No. 15 at 13–16).[13] However, Relator misses the mark. The Court need not determine whether former President Obama could issue the Presidential Memorandum—a fact no one disputes. Nor must the Court dive into the constitutional separation of powers because

the HEA and the Presidential Memorandum do not conflict. Congress empowered the Secretary through the HEA to "prescribe such regulations as may be necessary ... including regulations applicable to third party servicers." 20 U.S.C. § 1082(a)(1). The Presidential Memorandum instructed the Secretary to direct student loan servicers to allocate prepayments to a borrower's highest interest rate loan, through the Secretary's authority under the HEA, "[a]s soon as practicable." STUDENT AID BILL OF RIGHTS at 13476. The Secretary did not take the necessary action to transfer the President's policy objectives into law. This is unequivocally shown by two DOE publications, unenacted Congressional bills, and guidance issued by the FSA.

In July 2016, former Under Secretary of Education Ted Mitchell issued a memorandum ("Mitchell Memorandum") entitled "Policy Direction on Federal Student Loan Servicing" which "provide[d] policy direction for servicing of all federal student loans." U.S. DEP'T OF EDUC., POLICY DIRECTION ON FEDERAL STUDENT LOAN SERVICING [hereinafter MITCHELL MEMORANDUM] (2016) at 1. One of DOE's "policy directions" was to instruct servicers to apply prepayments to "the [borrower's] loan bearing the highest interest rate." *Id.* at 25. The Mitchell Memorandum intended the "policy choices" to be applied "to the ... extent feasible," and noted that some "aspects of this policy guidance" would need to be implemented through "future rulemakings," if "not currently allowable under [DOE's] regulations." *Id.* at 1 n.2. However, this "policy direction" was never implemented, and in April 2017, former Secretary Betsy DeVos formally withdrew the Mitchell Memorandum in a letter ("DeVos Letter") addressed to FSA. U.S. DEP'T OF EDUC., STUDENT LOAN SERVICER RECOMPETE [hereinafter DEVOS LETTER] (2017) ("As we move forward ... I am withdrawing ... the July 20, 2016 memorandum to you from former Under Secretary Ted Mitchell."). Congress also recognized that servicers were not required to allocate prepayments to a borrower's highest interest rate loan by introducing two bills in 2019 that would have amended the HEA to require servicers to do so; however, neither was passed. H.R. 5294, 116th Cong. § 2(g)(2) (2019); S. 1354, 116th Cong. § 3(a)(16)(G) (ii) (2019).

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 25 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

**\*9** Then, in February 2021, the FSA issued guidance ("FSA Guidance") confirming that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan. Federal regulations instruct only that payments must first be allocated to outstanding interest and fees, and then to principal." U.S. DEP'T OF EDUC., G3.21.01, FSA SERVICER GUIDANCE, OVERPAYMENT PROCESS – CARES ACT [hereinafter FSA SERVICER GUIDANCE] at 1 (2021). Relator attempts to argue that the Court should ignore the FSA's "interpretation" of federal law (Case No. 21-09096, ECF No. 15 at 13), yet there are no regulations or statutes that cause the Court to question the statements in the FSA Guidance, nor have Plaintiffs identified any such regulations or laws.[14] The FSA Guidance simply confirms that, at the time it was issued, the HEA and DOE's regulations did not require loan servicers to allocate borrowers' prepayments to their highest-interest-rate loans. Therefore, the Amended Complaint fails to allege any violation of the HEA or DOE regulations, as the Presidential Memorandum was never implemented into law by the Secretary.

**2. Alleged Violation of the CFPA**

Relator next tries to ground Defendants' liability under the FCA in their alleged failure to disclose a supposed violation of the CFPA. Defendants argue that none of their website statements cited in the Amended Complaint reflects an "unfair, deceptive or abusive" act or practice as prohibited by the CFPA. (ECF No. 71 at 24–32). Defendants further note that they "are unaware of any court that has found a violation of the FCA based on a false certification of compliance with the CFPA." (ECF No. 71 at 25). The Court similarly has been unable to locate any case where a court has found a violation of the FCA based on non-compliance with the CFPA. Yet Relator's Response in Opposition wholly ignores each of Defendants' arguments regarding the CFPA and fails to mention the statute at all. Relator would have the Court find in her favor without providing a single case or argument while asking the Court to rule on a matter of first impression. Given Relator's apparent concession that

the Amended Complaint fails to plausibly allege a violation of the CFPA, the Court declines to do so.

**3. Alleged Violations of State Law**

Relator next alleges that Defendants submitted false claims by failing to disclose supposed violations of six state laws. However, upon cursory review, Relator's allegations quickly and easily fail.

First, the California and Virginia state laws on which Relator relies were not even in effect in 2020 when the alleged misconduct in the Amended Complaint occurred. *See* CAL. CIV. CODE § 1788.100 *et seq.* (effective Jan. 1, 2021); VA. CODE ANN. § 6.2-2600 *et seq.* (effective July 1, 2021). And North Carolina's "law" is not a law at all, but a bill that was introduced in North Carolina's legislature in April 2019, yet never enacted. *See* H.R. 875, 2019-2020 Legis. Sess. (N.C. 2019).

Next, the remaining three laws that Defendants allegedly violated—Colorado's Student Loan Servicers Act, New Jersey's Student Borrower Bill of Rights, and Rhode Island's Student Loan Bill of Rights—do not require that student loan servicers apply prepayments to a borrower's highest-interest-rate loan. *See* COL. REV. STAT. ANN. § 5-20-101 *et seq.*; N.J. STAT. ANN. § 17:16ZZ-1 *et seq.*; 19 R.I. GEN. LAWS ANN. § 19-33-1 *et seq.* Instead, each contains a provision requiring that servicers "inquire of a student loan borrower" how to apply a prepayment to the borrower's student loans and to continue to implement the borrower's instructions on a go-forward basis. *See* COLO. REV. STAT. § 5-20-108(3)(a) (2019) ("[A] student loan servicer shall inquire of a borrower how to apply a[ ] [prepayment] to a student education loan.... A borrower's direction on how to apply a[ ] [prepayment] to a student education loan shall stay in effect for any future [prepayments]."); N.J. STAT. ANN. § 17:16ZZ-8(b) (2019) (similar); 19 R.I. GEN. LAWS § 19-33-8(g) (similar). The Amended Complaint includes no allegations that Defendants failed to request borrowers provide instructions on how to apply their prepayments, or that Defendants failed to follow their instructions.

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....
2022 WL 787957

*10 In her Response in Opposition, Relator attempts to assert new facts that Defendants failed to follow the borrower's explicit instructions which directed the Defendants to allocate prepayments to their highest-interest-rate loans, (ECF No. 80 at 5), but the Amended Complaint is devoid of these allegations. Relator also attempts to incorporate new allegations that Defendants violated the New Jersey Consumer Fraud Act as a basis for her FCA claim (ECF No. 80 at 5), but these allegations are also not included in the Amended Complaint and will not be considered by the Court. *W. Penn Power Co.*, 147 F.3d at 259; *see Nguyen v. Ridgewood Sav. Bank*, 66 F. Supp. 3d 299, 301 n.1 (E.D.N.Y. 2014) ("To the extent Plaintiff has any factual allegations sufficient to state a claim ... Plaintiff should include all of the necessary allegations in an amended complaint.").

The Amended Complaint fails to plausibly allege that Defendants violated any federal or state law or regulation to support the allegations that Defendants failed to disclose such supposed violations when submitting claims for payment. Accordingly, it must be dismissed.

### B. Materiality

Even if Relator did plausibly allege that Defendants violated a federal or state statute or regulation and submitted false claims by failing to disclose the supposed violation, Relator fails to allege sufficient facts to show that any supposed violations were material to the Government's payment decision.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Escobar*, 579 U.S. at 192. As set forth in *Escobar*, a misrepresentation is not material solely because compliance has been deemed a condition of payment, "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 194.

The FCA's materiality standard is "rigorous" and "demanding[,]" and the statute is not meant to be an "all-purpose antifraud statute ... or a vehicle

for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 193–94. "[A] material misrepresentation is one that goes 'to the very essence of the bargain.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar*, 579 U.S. at 193 n.5). Under the FCA, a misrepresentation is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citing 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12 (4th ed. 2003)).

"[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 194. Proof of materiality could include "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id.* at 194–95. On the other hand, it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.* "[M]ateriality 'cannot be found where noncompliance is minor or insubstantial.' " *Petratos*, 855 F.3d at 489 (quoting *Escobar* 579 U.S. at 178). Moreover, a plaintiff must plead claims of materiality with "plausibility and particularity" under Rule 9(b). *Id.* at 195 n.6.

Relator's claims fail under the *Escobar* standard because they contain no substantive allegations to support a finding of materiality. The Amended Complaint does not allege that DOE would have ceased payment to Defendants under the Servicing Contracts if it learned about the Defendants' proportional allocation method during the CARES Act Forbearance Period. It vaguely discusses a suit brought by the CFPB against Navient "for making misrepresentations to borrowers and misallocating payments," (ECF No. 5, ¶ 110) but offers no additional facts or analysis as to Relator's claims in this case, and instead only links the complaint from that suit in a footnote. (ECF No. 5, ¶ 110 n.10). These vague assertions fall far short of the requirement that materiality be pled with particularity. *Escobar*, 579 U.S. at 195 n.6. Further, Relator alleging that

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 27 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

compliance with the Presidential Memorandum, the CFPA, or various state statutes was a condition of payment under the Servicing Contracts is insufficient to demonstrate materiality. *Id.* at 194. While Relator alleges that the Servicing Contracts give DOE the option to decline to pay Defendants if it knew of Defendants' alleged wrongdoings, (ECF No. 5, ¶ 135), this is still insufficient for a finding of materiality. *Id.*

**\*11** In her Response in Opposition, Relator also relies on the FSA Guidance to argue that the Government did not have knowledge of Defendants' proportional allocation method until her FCA suit was filed, and that the Government having gained knowledge of Defendants' alleged misconduct is evidence of materiality. (ECF No. 80 at 7). However, Relator confuses what the Government *knew* with what is *material* to the Government's decision to pay Defendants under the Servicing Contracts. "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," and "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

Defendants highlight Relator's failure to plead facts showing that DOE halted payments to loan servicers based on any servicer's proportional allocation method (ECF No. 71 at 37), which Relator does not dispute, (ECF No. 80 at 6–8). Such failure "dooms [her] case." *Petratos*, 855 F.3d at 490. The Government is clearly aware of the Defendants' proportional allocation method by its issuance of the FSA Guidance, yet Relator fails to point to a single instance where the Government has refused to pay a federal student loan servicer for implementing a proportional payment allocation method. "Simply put, a misrepresentation is not material to the *Government's payment decision*," when the relator alleges the Government had knowledge yet provides no evidence that the Government stopped making payments or refused to make payments after gaining such knowledge. *Petratos*, 855 F.3d at 490 (emphasis in original; internal quotations omitted). Rather, this fact seems to establish conclusively the *lack* of materiality.

Relator next argues that the Government's having not moved to dismiss her Amended Complaint is evidence of materiality. (ECF No. 80 at 7–8). However, considering that the Government would have to intervene in the case to file a motion to dismiss, as the Third Circuit recently held in *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 385 (3d Cir. 2021), Relator's assertion fails. Courts have often found where the Government declines to intervene in a *qui tam* FCA suit or take any action against a defendant after having notice of alleged misconduct to be evidence that the Government *does not* consider the alleged statutory, regulatory, or contractual violation to be "material" to the services that a defendant performs for the Government. *See Petratos*, 855 F.3d at 490; *United States ex rel. Cressman v. Solid Waste Servs., Inc.*, No. 13-05693, 2018 WL 1693349, at \*6 (E.D. Pa. Apr. 6, 2018). Additionally, as Defendants highlight in their Reply (ECF No. 83 at 13), courts often dismiss *qui tam* complaints for lack of materiality, despite the Government *not* having moved to dismiss the relator's complaint. *See Petratos*, 855 F.3d at 490–92; *Pioneer Educ.*, 2020 WL 4382275, at \*4–5; *In re Plavix*, 332 F. Supp. 3d at 949.

In sum, Relator fails to plead materiality to the heightened standard as set forth in *Escobar*, and therefore, her FCA claim must be dismissed. *Pioneer Educ.*, 2020 WL 4382275, at \*5 ("[F]ailure to plead materiality [is] a proper basis for a motion to dismiss." (internal quotations omitted)).

### C. Scienter

Even if Relator did plausibly allege that Defendants presented false claims to the Government and that those misrepresentations were material to the Government's payment decisions, the Amended Complaint fails to allege sufficient facts to allow the Court to "draw the reasonable inference" that Defendants knew that their claims were false or fraudulent. *Iqbal*, 556 U.S. at 678. The FCA imposes liability on a person who "knowingly" makes a false or fraudulent claim to the Government. 31 U.S.C. § 3729(a)(1)(A). The FCA defines "knowing" and "knowingly" to mean acting with actual knowledge, deliberate ignorance, or reckless disregard of information's truth or falsity. 31 U.S.C. § 3729(b)

(1)(A). Specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B). *Escobar* emphasizes that, like the FCA's materiality requirement, the scienter requirement is "rigorous." 579 U.S. at 182. " 'Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations.' " *United States v. Allergan, Inc.*, 746 F. App'x 101, 105–06 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (recognizing defense of reasonable, but erroneous interpretation of ambiguous statute)).

**\*12** The Amended Complaint states that the Defendants "knowingly violated the Presidential Memorandum, the CFPA ... [and] state laws" and then "knowingly failed to disclose these violations" to the Government when servicing student loans. (ECF No. 5, ¶ 131). These are the only allegations to support Relator's legal conclusion that "Defendants therefore knowingly presented, or caused to be presented, false or fraudulent claims," (ECF No. 5 ¶ 132), and "acted with the requisite scienter" (ECF No. 5, ¶ 133). However, conclusory allegations are insufficient to plead knowledge under the FCA. *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760–61 (3d Cir. 2011). The Amended Complaint is otherwise devoid of facts supporting an inference that Defendants "knew, acted in reckless disregard, or deliberately ignored that [their] submissions were false." *Id.*

In Relator's Response in Opposition, she cites several CFPB reports, which Defendants rely on in their Joint Motion to Dismiss, to argue that because the CFPB has cited some student loan servicers in the past for misconduct and that servicers may have "mismatched incentives" when allocating prepayments, that these reports "surely support[ ] the allegation of the requisite scienter." (ECF No. 80 at 10–12). These arguments are unavailing. Even if Relator plausibly alleges that Defendants submitted false claims to the Government —which she does not—no information from the CFPB reports was alleged in the Amended Complaint to cure Relator's pleading deficiencies to lead to the "reasonable inference" that Defendants knowingly submitted false or fraudulent claims.[15] *Iqbal*, 556

U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " (quoting *Twombly*, 550 U.S. at 545–46)).

Even if Relator plausibly alleged that Defendants knowingly submitted false or fraudulent claims, she must further plausibly allege that the Defendants *knew* compliance was material to the Government's payment decision, which the Amended Complaint again fails to do. *Escobar*, 570 U.S. at 181. Relator's conclusory allegation that "Defendants acted with the requisite scienter and [sic] compliance ... was a precondition of payment," (ECF No. 5, ¶ 134), is insufficient. *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Further, "even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability." "What matters is not the label the Government attaches to a requirement, but whether the defendant *knowingly* violated a requirement that the defendant *knows is material* to the Government's payment decision." *Escobar*, 579 U.S. at 181 (emphasis added).

Relator fails to plausibly allege that Defendants knew they were submitting false claims to the Government, or that Defendants knew compliance was material to the Government's payment decisions. The Amended Complaint thus must be dismissed.

*****

Relator has failed to plausibly allege that Defendants (a) were noncompliant with any federal or state statute or regulation violation rendering any claims submitted as false, (b) that Defendants submitted false claims that were material to the Government's payment decisions, or (c) that Defendants knowingly submitted false claims or knew noncompliance was material to the Government's payment decisions.[16] Because the Court finds that Relator has failed to state an FCA claim on each of these grounds, it need not address Defendants' remaining arguments regarding the applicability of the public disclosure bar or whether the HEA preempts any state laws.[17]

Case 3:18-cv-00121-JFS-PJC    Document 243-1    Filed 03/04/26    Page 29 of 31

United States ex rel. Hlywiak v. Great Lakes Educational..., Not Reported in Fed....

2022 WL 787957

### IV. CONCLUSION

**\*13** For the foregoing reasons, Defendants' Joint Motion to Dismiss (ECF No. 71; ECF No. 72, ECF No. 73) is **GRANTED** and Relator's Amended Complaint (ECF No. 5) is **DISMISSED**. The Court will permit Hlywiak an opportunity to file a Motion for Leave to Amend within thirty (30) days, in which she explains how the deficiencies outlined herein may be cured through amendment.[18] An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 787957

---

### Footnotes

1    "FedLoan Servicing" was originally named as a Defendant in the Amended Complaint (ECF No. 5), but per Relator and PHEAA's Stipulation of Dismissal (ECF No. 35), Relator withdrew all claims against "FedLoan Servicing" which was added as a "d/b/a" name of PHEAA, and the case caption was revised accordingly.

2    CARES Act, Pub. L. No. 116-136, §§ 3513(a)–(b), 134 Stat. 281, 404.

3    Shortly after Relator filed her Amended Complaint, several other federal student loan borrowers represented by the same counsel as Relator filed three putative class action complaints against the same Defendants, (Case No. 21-01047; Case No. 21-01052; Case No. 21-09096), asserting common law and state law claims based on substantially the same facts. This Opinion contains similar background as its recent Opinion in the putative class action cases, given the overlapping allegations across the four cases.

4    Because the Joint Motion to Dismiss before the Court is under Rule 12(b)(6), the Court accepts the factual allegations in the Amended Complaint (ECF No. 5) as true and will view all facts in the light most favorable to Plaintiffs as the non-moving parties. *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012). The Court may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). Relator attaches a "disclosure statement" to her Amended Complaint (ECF No. 5-1 at 80–83); however, the Court does not find that this is a "written instrument" to be considered part of the pleading under Rule 10(c), as "affidavits are not considered a 'written instrument' " and instead are considered "outside the pleading." *Barnard v. Lackawanna County*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016), *aff'd*, 696 F. App'x 59 (3d Cir. 2017); Fed. R. Civ. P. 10(c).

5    Relator alleges that the Servicing Contracts with all Defendants are "replicas" and attaches only the Servicing Contract with Great Lakes (ECF No. 5, ¶ 30 n.2), which Defendants do not contest.

6    34 C.F.R. § 685.205(a) (2020) (" 'Forbearance' means permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled."); 34 C.F.R. § 685.205(b) (2020) ("Administrative forbearance. In Certain circumstances, the Secretary grants forbearance without requiring documentation from the borrower ... due to a ... local or national emergency.").

7    Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic, 85 Fed. Reg. 49585 (Aug. 8, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000590/pdf/DCPD-202000590.pdf.

8    Press Release, U.S. Dep't of Educ., Biden-Harris Administration Extends Student Loan Pause through May 1, 2022 (Dec. 22, 2021), https://www.ed.gov/news/press-releases/biden-harris-administration-extends-student-loan-pause-through-may-1-2022. Although the newest extension of the CARES Act Forbearance Period had not been issued prior to the Amended Complaint being filed or the Joint Motion to Dismiss being fully briefed, the Court may take judicial notice of such fact. Fed. R. Evid. 201(b); *see also In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d 367, 390 n.34 (D.N.J. 2010).

9    The Amended Complaint alleges that Great Lakes prorated Relator's prepayments across her unsubsidized loans only, and not her subsidized loans (Loan Nos. 519, 521, 524, and 526) (ECF No. 5, ¶ 127), but any material distinction between subsidized and unsubsidized loans is not explained in the Amended Complaint or raised by the parties in their Briefs related to this Motion. Therefore, the Court does not view any such distinction as material to its analysis of the Motion.

10   The Amended Complaint alleges that Defendants' websites defined other terms such as "excess payment" and "overpayment" to mean the portion of a payment received above the amount that was currently due. (ECF No. 5, ¶¶ 93, 99). For clarity's sake, the Court uses the codified term "prepayment," in this Opinion, as it finds all these terms to be substantially similar when referring to the amounts that Relator paid during the CARES Act Forbearance Period. *See* 34 C.F.R. § 685.211(a)(2) (2014) ("If a borrower pays any amount in excess of the amount due, the excess amount is a prepayment.").

11   Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment, 80 Fed Reg. 13473, 13476 [hereinafter STUDENT AID BILL OF RIGHTS] (Mar. 13, 2015). Relator further asserts that although the Presidential Memorandum directed the Secretary to implement this change "as soon as practicable," the Secretary was to take action "no later than January 1, 2016." (ECF No. 5, ¶¶ 54–55). However, the Court takes judicial notice of the full text of the Memorandum, *In re Synchronoss Secs. Litig.*, 705 F. Supp. 2d at 390 n.34, and does not accept this statement as true because the Memorandum clearly instructed the Secretary to implement the change "[a]s soon as practicable," not by January 1, 2016. *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017) ("[T]he Court need not accept Plaintiffs' allegations as true to the extent that they directly contradict the unambiguous text of [authentic documents or matters of public record]."). Rather, separate directives to the Secretary were to be completed "[b]y January 1, 2016." *Compare* STUDENT AID BILL OF RIGHTS at 13476 ("*By January 1, 2016,* the Secretary of Education shall require all Federal Direct student loan servicers to provide enhanced disclosures to borrowers and strengthened consumer protections." (emphasis added)) *with id.* ("*As soon as practicable,* the Secretary shall direct all Federal Direct student loan servicers to apply prepayments to loans with the highest interest rate to ensure consistency across servicers, unless otherwise instructed by borrowers." (emphasis added)).

12   Relator also alleges that Defendants violated the "Master Promissory Notes" (ECF No. 5, ¶¶ 131–32), but the Amended Complaint contains no information on what part or provision of the Master Promissory Notes that Defendants may have violated, nor does Relator's Response in Opposition mention the Master Promissory Notes. Therefore, the Court will not accept these conclusory allegations as true. *Iqbal*, 556 U.S. at 679 ("[P]leadings that ... are no more than conclusions, are not entitled to the assumption of truth.").

13    Relator's legal analysis regarding the Presidential Memorandum was included in the Response in Opposition filed by the plaintiffs in the factually-related putative class actions discussed above, *see supra* note 3, and is only incorporated by reference in Relator's Brief in this case. (ECF No. 80 at 5). However, the Court's Scheduling Order clearly separated the briefing in the present case from the putative class actions, and Relator was to "file a single brief in opposition to all arguments raised" in Defendants' Joint Motion to Dismiss. (ECF No. 67 at 5). The Court nevertheless addresses the issue.

14    Even if the HEA or 34 C.F.R. § 685.211 were ambiguous as to Defendants' obligations regarding applying prepayments—which they are not—the Court must give "substantial deference" to the DOE's reasonable interpretation of the HEA, and the DOE's interpretation of its own regulations is "controlling." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 650 (7th Cir. 2015) (stating that "[t]he Secretary's reasonable interpretation of the [HEA] is entitled to substantial deference" and the DOE's interpretation of its own regulations is "controlling" unless it is "(1) plainly erroneous or inconsistent with the regulation, (2) does not reflect the agency's fair and considered judgment on the matter in question, or (3) represents a post hoc rationalization advanced by the agency seeking to defend past agency action against attack.").

15    Defendants further argue that their interpretation of legal requirements were objectively reasonable since it was DOE's own understanding of the law that "[t]here are no federal laws or regulations explicitly requiring the allocation of borrower payments to the highest interest rate loan." (ECF No. 71 at 40–42 (quoting FSA GUIDANCE at 1)). However, the Court does not reach this argument where it does not find Defendants' interpretation of federal law or DOE's regulations erroneous.

16    Defendants separately argue that Relator's allegations are not sufficiently particularized under the heightened pleading standard imposed on fraud claims by Federal Rule of Civil Procedure 9(b). *See Foglia*, 754 F.3d at 155–56 (acknowledging that the Rule 9(b) standard applies to FCA claims). The Court declines to address this argument because regardless of their relative *particularity*, the *plausibility* of Plaintiff's allegations regarding falsity, materiality, and scienter—or rather, the lack thereof—dooms her claim under Rule 12(b)(6).

17    The Court also does not reach Nelnet's argument that Nelnet, Inc. and Nelnet Diversified Solutions, LLC do not service any federal student loans at issue or present claims for payment to the Government (ECF No. 71-1 at 49 n.17), as this presents a fact issue that cannot be resolved on a motion to dismiss under Rule 12(b)(6). However, the Court does not find this issue of disputed fact relevant to the outcome of this Motion where Relator's Amended Complaint fails to state an FCA violation under Rule 12(b)(6).

18    Any motion by Relator for leave to file a second amended complaint must attach a copy of the proposed amendment as well as a redline reflecting proposed changes. L. Civ. R. 15.1(a).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.