## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JILL BALLARD, REBECCA VARNO, and MARK POKORNI, on behalf of themselves and the class members described herein, | : : : : : | No. 3:18-CV-121<br><br>(Saporito, J.)<br><br>(Caraballo, M.J.) |
| Plaintiffs | : : | |
| v. | : : | |
| NAVIENT CORPORATION; NAVIENT SOLUTIONS, INC.; and NAVIENT SOLUTIONS, LLC, | : : : : | |
| Defendants | : : | |

## <u>MEMORANDUM</u>

Pending before the Court is a motion to exclude Dr. Xiaoling Lim Ang's expert report ("the Motion," Doc. 197) filed by Plaintiffs Jill Ballard, Rebecca Varno, and Mark Pokorni (collectively "the Plaintiffs"). The Court has jurisdiction pursuant to Title 28, United States Code, Section 636(b)(1)(A).[1]  For the reasons set below, the Motion will be denied.

---

[1] A *Daubert* challenge is a non-dispositive matter, and thus properly addressed by a magistrate judge without issuance of a report and recommendation. *See Lithuanian Com. Corp., Ltd. v. Hosiery*, 179 F.R.D. 450, 456 (D.N.J. 1998) (collecting cases holding that "magistrate judge's evidentiary determinations regarding expert

## I.  Background

In this putative class action, the Plaintiffs are student loan borrowers who partook in income-driven repayment ("IDR") programs, and seek recovery for the allegedly wrongful business practices maintained by Defendants Navient Corporation; Navient Solutions, Inc.; and Navient Solutions, LLC (collectively "Navient") in servicing their federal student loans. *See generally* Doc. 118-3.  The basic chord of the operative third amended complaint ("TAC") is that the Navient entities have been "keeping [federal student] loans active for as long as possible to continue collecting" "monthly servicing fees for the federal loans that they administer." *Id.* at 4.

As alleged in the TAC, the default payment plan for federal student loans is the standard repayment plan, which calculates monthly payments "such that the . . . balance is fully paid within 10–30 years." *Id.* at 19.  "Many borrowers who cannot afford payments under the standard plan enroll in various IDR plans that offer significantly lower monthly payments." *Id.*  "When borrowers enroll in an IDR plan,

---

testimony[] . . . a[re] non-dispositive orders[.]"); *see also Kriley v. XTO Energy Inc.*, 2025 WL 1548687, at *1 n.1 (W.D. Pa. 2025) (same); *Withrow v. Spears*, 967 F. Supp. 2d 982, 987 n.1 (D. Del. 2013) (same); *Reedy v. CSX Transp., Inc.*, 2007 WL 1469047, at *1 n.1 (W.D. Pa. 2007) (same).

the plan is effective for a one-year period. To renew the plan for each subsequent year, borrowers must annually recertify their income by submitting a new IDR request form with proof of income to their loan servicer." *Id.* at 20. A failure to renew the IDR plan by the stated deadline results in, among other things, "an increase in monthly payments . . . to the amount dictated by the standard ten-year repayment plan," and an interest capitalization, whereby the accrued interest is added to the principal balance of the loan. *Id.* (citations omitted).

An alternative to IDR plans is discretionary forbearance, which "allows borrowers to temporarily cease making payments during periods of hardship." *Id.* at 21–22 (citation and footnote omitted). "The only time a discretionary forbearance may be applied without the borrower's written consent is after the borrower's loans have gone into default status, but before the loans [are] transferred to collections." *Id.* at 22 (citation and emphasis omitted). "Discretionary forbearances[] . . . delay progress toward loan forgiveness and can be very costly for [a] borrower," as "any unpaid interest that accrues during the forbearance

3

gets capitalized." *Id.* (citation and quotation omitted).  Conversely, this option is "highly lucrative for [a] loan servicer[.]" *Id.* at 23.

Still another alternative to an IDR track is the 60-day administrative forbearance, which is permitted only if a "loan servicer is processing paperwork in connection with a borrower's request to make a change in repayment plan." *Id.* at 22–23 (citation and quotations omitted).  Unlike a discretionary forbearance, under an administrative forbearance, any accrued interest is not capitalized on the principal.  *Id.*

The Plaintiffs also contend that Navient breached its Servicing Contract with the Department of Education ("DOE").  As alleged in the TAC, the Servicing Contract requires Navient to "maintain a full understanding of all applicable federal regulations, meet all statutory and legislative requirements, and ensure that all aspects of the service continue to remain in compliance as changes occur." *Id.* at 23.  In return, the DOE pays Navient "an average monthly fee for each . . . borrower[] that Navient . . . services," *id.* at 24, whose amount is determined by "revenue and number of borrowers that maintain an active loan balance." *Id.* at 25.

4

"This fee structure gives Navient . . . financial incentive[s] to maintain or increase the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans," *id.*, and "to place borrowers into deferment or forbearance status to further increase servicing fees." *Id.* at 26. The Plaintiffs also claim that Navient has another reason to increase its borrowers' balances—the company has two subsidiaries that provide collection and rehabilitation services on defaulted federal student loans. *Id.* at 5. "Under the current compensation structure for . . . such rehabilitation services, collectors earn nearly $40 in compensation for every $1 in cash recovered through certain rehabilitations," as well as "reasonable collection costs from a borrower by assessing a fee of up to 16 percent of the unpaid principal and accrued interest." *Id.* at 5–6 (citation and quotation omitted).

Noting that Navient "generated the highest number of written complaints" out of "approximately 12,900 federal student loan complaints," *id.* at 8, the Plaintiffs complain that the company's "practices caused borrowers to suffer measurable financial harm[.]" *Id.* at 9. The Plaintiffs surmise that such financial harms could be grouped

into four categories: (1) damages that accrued when "the duration of their loans was extended"; (2) injuries that occurred when the "interest accrued on the principal balance . . . during unnecessary . . . deferment or forbearance"; (3) harms that materialized when "monthly payments under IDR programs were billed at inaccurate levels"; and (4) damages that occurred when "borrowers were charged additional fees due to the delay in processing their [IDR] applications[.]" *Id.*

Against this backdrop, the Plaintiffs aver that Navient developed and maintained several untoward practices in response to a federal student loan borrower's IDR application. For example, Navient allegedly "delayed or failed to process IDR plan applications[,]" and thus "injured borrowers who were required to make additional payments on loans that otherwise would have been forgiven . . . earlier[.]" *Id.* Further, the Plaintiffs accuse Navient of "improperly plac[ing] borrowers making timely loan payments into deferment or forbearance status," which prevents a borrower from "mak[ing] qualifying payments that count towards loan forgiveness under . . . IDR plans, even though Navient . . . continues to collect fees for servicing their loans." *Id.* at 4–

6

5. Also, "at the conclusion of each forbearance, any accrued interest is capitalized." *Id.* at 5 (quotation omitted).

Based on these premises, the Plaintiffs commenced this action on January 16, 2018. Doc. 1. After several years of litigation and amended pleadings, the operative TAC presents seven causes of action:

- Count I: Breach of the Servicing Contract;
- Count II: Breach of or Interference with Promissory Notes;
- Count III: Violation of the California Consumer Legal Remedies Act;
- Count IV: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;
- Count V: Violation of the New York General Business Law;
- Count VI: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and
- Count VII: Violation of the Rosenthal Act.

Doc. 118-3 at 44–61.

On November 24, 2025, the Plaintiffs moved for class certification. Doc. 196. The motion seeks to certify three nationwide classes, each of which purports to present its respective state law claims, as well as claims for breach of the Servicing Contract, breach of or interference with the MPN, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law. Docs. 196 at 4–5; 118-3 at 44–49, 52–54. The first class (the "Improper IDR Cancellation" Class) includes a California subclass, and would present Counts III and VII of

7

the TAC, and be represented by Ballard. Doc. 196 at 2. The second class ("the Modified Forbearance" Class), which seeks to combine two classes outlined in the TAC ("the Forbearance Without Written Consent" and "No Administrative Forbearance" Classes), contains a New York subclass, would present Count V of the TAC, and be represented by Varno. *Id.* at 2–4. Finally, the third class ("the "Improper Delay" Class) contains an Illinois subclass, would present Count VI of the TAC, and be represented by Pokorni. *Id.* at 3–4. Navient filed its brief opposing class certification on February 24, 2026. Doc. 231.

Among the materials offered in support of Navient's opposition, and relevant to this Memorandum, is the expert report and testimony of Dr. Ang, an economist who opines on whether the economic evidence and analysis offered by the Plaintiffs are "common to members of each of the Putative Classes and whether . . . any questions in relation to that evidence and analysis affect only individual members[.]" Doc. 203-1 at 7. The parties express disagreement over the reliability and fit of her testimony. *See* Docs. 203 at 7–13; 226 at 5–12; 252 at 5–11.

The crux of Dr. Ang's report is her opinion that the applicability of the Plaintiffs' claims to the putative class members heavily relies on borrower-specific inquiries, and that the Plaintiffs' theories of damages are speculative. Doc. 203-1 at 15–46. To that end, the economist researched the federal student loan program's basic structure, the relevant publications and regulation, and the filings and discovery materials stemming from this action. *Id.* at 59–85. Dr. Ang's report also states that she may supplement her opinion based on "the receipt of additional relevant information or data." *Id.* at 9.

In conjunction with their class certification motion, the Plaintiffs filed the motion to exclude Dr. Ang's report, asserting that it contains improper materials and thus should be inadmissible. Doc. 197. The Motion's basic premise is that Dr. Ang provides opinions on matters that are beyond her qualifications. Docs. 203 at 7–13; 252 at 5–11. And, as highlighted by the Plaintiffs, her report, dated October 22, 2025, Doc. 203-1 at 2, allegedly neglects to mention the "verified statement, dated September 19, 2025," provided by Patrick Theuer, Navient's Vice President and Chief Information Officer. Docs. 252 at 9;

204-35 at 10.[2] Navient, in turn, responds that: (1) Dr. Ang's opinions are well within her purview as an expert or under the relevant class certification standards; and (2) even if some parts of her opinion were overbroad, such issues are related to her report's weight, not its admissibility. Doc. 226 at 5–12. The Plaintiffs filed a reply on April 24, 2026, and the Court held oral argument on May 20, 2026, rendering the Motion ripe for decision. Docs. 262; 269.

## II.    Discussion

Federal Rule of Evidence 702, which governs admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[2] While the Plaintiffs generally cite Document 208-28 as "Theuer's verified statement, dated September 19, 2025, stating that 5,548 borrowers experienced Ballard's servicing error," Doc. 252 at 9, the filing in question appears to be Navient's second amended supplemental responses to the Plaintiffs' search requests (Doc. 204-35), verified by Theuer on September 19, 2025.

Fed. R. Evid. 702.

This means that, when "[f]aced with a proffer of expert scientific testimony, . . . the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (footnotes omitted). This gatekeeping duty applies to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quotation omitted) (citing Fed. R. Evid. 702); *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025).

To that end, the Court must consider "three . . . restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741–43 (3d Cir. 1994)); Fed. R. Evid. 702. More expansively, the analysis weighs "(1) whether the proposed witness is a qualified expert in the area in which he or she is being offered as an expert; (2) whether the proposed expert's testimony is reliable; and (3) whether the expert's testimony will assist the trier of fact." *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d

11

510, 512 (E.D. Pa. 2001) (footnote omitted) (first citing *Paoli*, 35 F.3d at 741–43; and then citing *Daubert*, 509 U.S. at 595).

The first prong (qualification) requires that "the witness possess[es] specialized expertise," *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quotation omitted), including "a broad range of knowledge, skills, and training." *Paoli*, 35 F.3d at 741 (citation omitted). Second, reliability means that the testimony is "based on the methods and procedures of science," not "subjective belief or unsupported speculation." *Calhoun*, 350 F.3d at 321 (citations and quotations omitted). Finally, the third factor (fit) "requires a valid scientific connection to the pertinent inquiry[.]" *Daubert*, 509 U.S. at 592. This standard, though "not that high," is still "higher than bare relevance." *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quoting *Paoli*, 35 F.3d at 745).

The party proffering expert testimony must show admissibility on all three factors by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). In deciding whether each factor is satisfied, the Court wields "discretionary authority" that grants "latitude in deciding how these

12

requirements are met." *Cohen*, 125 F.4th at 460 (cleaned up). This judicial discretion premises that Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (footnote and quotation omitted) (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).

As a threshold matter, the Court notes that a *Daubert* challenge to an expert report applies at the class certification stage. "Although there is no definitive Third Circuit precedent on point, the general consensus [is] that the Court should subject expert witnesses to *Daubert* scrutiny at the class certification stage of the litigation." *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 415 (E.D. Pa. 2015) (collecting cases); *see also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 207–08 (M.D. Pa. 2012) (same); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 235 (E.D. Pa. 2012) (same). Thus, absent contrary guidance from the Court of Appeals, the Court follows the reasoning articulated by several other courts, and holds that the judicial duty to scrutinize the record in the context of class certification extends to *Daubert* inquiries. *See Egg*, 81 F. Supp. 3d at 415; *Chocolate*, 289 F.R.D. at 207–08; *Flonase*, 284 F.R.D. at 235.

Applying that analysis, the Court finds that all three *Daubert* inquiries are met here. Regarding qualification, Dr. Ang's curriculum vitae shows that she meets this first inquiry. She is an economist who serves as the Managing Director at National Economic Research Associates, Inc. Doc. 203-1 at 48. She received her B.S. and M.S. degrees (both 2005) in mathematics from Loyola University Chicago, and M.A. (2007) and Ph.D. (2011) in economics from Princeton University. *Id.* at 47.

Dr. Ang worked as a financial economist at the Federal Deposit Insurance Corporation, and as an economist at the Consumer Financial Protection Bureau. *Id.* at 48. Several of her publications—such as "Choice Architecture vs. Price: Comparing the Effects of Changes in the U.S. Student Loan Market," "Student Loan Repayment Options In Light of CFPB v. Navient," and "Private Student Loans and BAPCPA: Did Consumers Benefit from the Increased Collectability of Student Loans?"—are relevant to her report. *See id.* at 51–52. Further, Dr. Ang is no stranger to the Third Circuit, as she provided testimony or expert opinions on at least ten separate occasions in cases filed in this circuit. *Id.* at 49–50.

14

Further, neither side challenges her expertise as an economist. Indeed, during oral argument, Navient clarified that the company offers Dr. Ang as an economic expert on interpreting the underlying loan servicing data, not as an expert on the student loan industry. Therefore, the Court finds that Navient has demonstrated by a preponderance of evidence that Dr. Ang, based on her educational background and experience, qualifies for her proffered expertise.

Having determined that the qualification inquiry is satisfied, the Court turns to the reliability question. The parties primarily disagree over whether Dr. Ang's submission opines on matters beyond the scope of her qualification. Docs. 203 at 7–13; 226 at 5–12; 252 at 5–11. More expansively, the Plaintiffs accuse the expert report of improperly opining on matters not within Dr. Ang's expertise, including: (1) liability; (2) predominance and manageability under Federal Rule of Civil Procedure 23(b)(3); (3) a computer system's search capabilities; (4) credibility; (5) mootness of certain damages; and (6) burden of proof. Doc. 203 at 7–13.

In response to the first three challenges, Navient relies on the proposition that an expert may provide factual conclusions, and her

opinions may overlap with the underlying case's merits.  Doc. 226 at 5–8.  As for credibility, the company asserts that "identifying facts that conflict with Plaintiffs' claims or theories to support her expert opinion is firmly within Dr. Ang's purview." *Id.* at 8–9.  Further, Navient claims that the last two challenges are misguided, as the mootness language merely referred to "a scenario where no economic harm occurs," and the assessment on the Plaintiffs' methodology was "a direct and permissible critique of their economic case for certification." *Id.* at 9–10.  Navient concludes by stating that, even if the Court were to find that certain parts of Dr. Ang's report are objectionable, "a wholesale exclusion" would be a drastic remedy. *Id.* at 11–12.  Rather, Navient posits, the Court remains free to consider the non-objectionable portions, and strike or weigh any objectionable portions accordingly. *Id.*

After considering the opposing positions, the record, and the relevant law, the Court determines that Dr. Ang's report also meets the reliability criterion.  Her testimony is largely founded on discussions of economics, statistical analysis, and the federal student loan industry, and thus is adequately supported by the record.  More expansively, Dr. Ang researched the basic structure of the federal student loan

16

programs, Doc. 203-1 at 69–85, publications and regulation on federal student loans and interests, *id.* at 61–68, and the relevant court filings and discovery materials. *Id.* at 59–61. In light of her expertise and research, the Court sees no reason to conclude that Dr. Ang's report warrants total exclusion. To the extent that Dr. Ang transgresses her qualifications, the Court may discount those portions of her report. Critically, the material will be used at this juncture only for the Court's assessment of class certification issues; not, say, a factfinder's determination of the merits of the Plaintiffs' claims.

Two other challenges mounted by the Plaintiffs warrant a brief discussion. First, they assert that the expert report is unreliable because it fails to address Theuer's statement. Doc. 252 at 9. The Plaintiffs reason that, even though Dr. Ang stated that she may "supplement [her] opinions[] . . . based on[] . . . the receipt of additional relevant information or data," Doc. 203-1 at 9, she failed to consider the information provided by Theuer, and thus produced unreliable conclusions. Doc. 252 at 9–10. This alleged omission, though nonnegligible, goes to the weight, not admissibility, of Dr. Ang's report.

Second, the Plaintiffs cite *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183 (3d Cir. 2015),[3] to argue that "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot prove that the Rule 23(a) prerequisites have been met in fact, nor can it establish through evidentiary proof that Rule 23(b) is satisfied." *Id.* at 187 (citations and quotations omitted) (quoted in Doc. 252 at 9–10). The Plaintiffs' reliance on *Blood* is misguided, as the holding pertained to the class *plaintiff*'s burden, and thus is inapposite to this dispute, which concerns a defense expert report. *See* 783 F.3d at 187 ("We . . . hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to [prove] conformity with Rule 23[.]"). Even if *Blood* had persuasive weight, the decision held that expert testimony may be used so long as the movant "demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert.*" *Id.* Those conditions are met here, as detailed in this Memorandum.

---

[3] The Plaintiffs also cite *Perez v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 3116355 (N.D. Cal. 2012), for the proposition that "the lack of an articulated methodology for choosing which sources to rely upon is particularly troubling." Doc. 252 at 10 (quotation omitted). However, *Perez*, a Ninth Circuit district court opinion, is not binding on this Court. *See, e.g., Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Finally, the third *Daubert* analysis is also satisfied because Dr. Ang's expert report, which discusses "whether the economic evidence and analysis that would be used to assess impact and damages resulting from allegations in the Complaint are common to members of each of the Putative Classes[,] and whether . . . any questions in relation to that evidence and analysis affect only individual members based on varying circumstances," Doc. 203-1 at 7, fits this case's issues. A review of her report determines that her statements may help the Court understand the relevant issues and evidence in ruling on the pending class certification motion. *See generally* Fed. R. Evid. 702.

For example, Dr. Ang stated that an examination of Varno's IDR application "involved a manual review of supporting documentation," which required a "review of materials beyond Navient's structured data," as opposed to the "live review of a scanned document" that was provided to Stine during his deposition. Doc. 203-1 at 26 (cleaned up). This evaluation may provide useful guidance in resolving predominance issues under Rule 23(b)(3). Further, Dr. Ang states that the Plaintiffs' assumption that putative class members would make qualifying IDR payments is speculative. *Id.* at 38–40. Such statements, based on

19

Dr. Ang's economic expertise, could assist the Court in fulfilling its duty to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied." *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (citations omitted). Moreover, Dr. Ang's opinions directly address many of the class allegations advanced in the TAC, as summarized above.

## III.  Conclusion

Accordingly, the Court will deny the Plaintiffs' motion to exclude Dr. Ang's report, without prejudice to their ability to reassert the motion at future stages of this litigation. A separate order shall be issued.

Date:  June 2, 2026

*s/ Phillip J. Caraballo*
Phillip J. Caraballo
United States Magistrate Judge