# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JILL BALLARD, REBECCA VARNO, and MARK POKORNI, on behalf of themselves and the class members described herein,** | : : : : : | **No. 3:18-CV-121** |
| | : | **(Saporito, J.)** |
| | : : | **(Caraballo, M.J.)** |
| **Plaintiffs** | : : | |
| **v.** | : : | |
| **NAVIENT CORPORATION; NAVIENT SOLUTIONS, INC.; and NAVIENT SOLUTIONS, LLC,** | : : : : : | |
| **Defendants** | : : | |

## REPORT AND RECOMMENDATION

## I.   Introduction

Plaintiffs Jill Ballard, Rebecca Varno, and Mark Pokorni (collectively "the Plaintiffs") commenced this putative class action against several federal student loan servicing entities on January 16, 2018.  Doc. 1.  After amending their complaint three times, on November 24, 2025, the Plaintiffs filed the pending motion for class certification ("the Motion," Doc. 196).  The Motion, invoking Federal Rule of Civil Procedure 23(b)(3), seeks to certify the following three

classes: (1) the Improper IDR Cancellation Class, to be represented by Ballard; (2) the Modified Forbearance Class, to be represented by Varno; and (3) the Improper Delay Class, to be represented by Pokorni. *Id.* at 2—4. The Motion is fully briefed, and this case was referred to the undersigned to issue this Report and Recommendation ("R&R") pursuant to Title 28, United States Code, Section 636(b)(1)(B).

As discussed below, the Plaintiffs fail to carry their burden of persuasion under Rule 23 for all of the proposed classes. Accordingly, the undersigned recommends that the Court deny the Motion.

## II.    Background

### A.    Factual History[1]

In this putative class action, the Plaintiffs are student loan borrowers who partook in income-driven repayment ("IDR") programs, and seek recovery for the allegedly wrongful business practices maintained by Defendants Navient Corporation; Navient Solutions, Inc.; and Navient Solutions, LLC (collectively "Navient") in servicing their federal student loans. *See generally* Doc. 118-3. The basic chord of

---

[1] The facts referenced herein are drawn from the Plaintiffs' allegations and pleadings; many of which remain contested, as noted.

the operative third amended complaint ("TAC") is that Navient has been "keeping [federal student] loans active for as long as possible to continue collecting" "monthly servicing fees for the federal loans that they administer." *Id.* at 4.[2]

### 1.    *The Navient Entities*

The Navient entities' origins trace back to 1972, when Congress created the Student Loan Marketing Association, colloquially known as "Sallie Mae," "to support the . . . student loan program created by the Higher Education Act of 1965[.]" *Id.* at 10–11.  Over time, Sallie Mae transformed into a private company known as SLM Corporation.  *Id.* at 11.  SLM Corporation became a parent company of Sallie Mae Inc., which was "responsible for most of [SLM Corporation]'s federal loan servicing and collections businesses."  *Id.*  Then, in April 2014, both Sallie Mae Inc. and SLM Corporation underwent a series of reorganizations.  More expansively, SLM Corporation split into two companies: a new SLM Corporation, and Navient Corporation.  *Id.*  The old SLM Corporation merged into Navient Corporation.  *Id.* at 12.  As

---

[2] All citations to the record adhere to the headers created by the Case Management / Electronic Case Files system, not the document page number in footers, as designated by the parties.

for Sallie Mae Inc., the company changed its name to Navient Solutions, Inc., *id.*, which subsequently became Navient Solutions, LLC.  *Id.* at 13.

According to the TAC, Navient Corporation is primarily comprised of "a portfolio of education loans that were previously held by SLM Corporation," the "servic[e] and asset recovery activities related to those loans," and "liabilities resulting from the pre-reorganization conduct of SLM Corp[oration] and its subsidiaries[.]"  *Id.* at 12.  Among the federal student loan programs serviced by Navient are the Federal Family Education Loan Program ("FFELP") and the Direct Student Loan Program ("DSLP").  *Id.* at 11, 13.  Navient allegedly reported in 2018 that it is "the largest servicers and collector" of FFELP loans and "one of four large servicers" of DSLP loans.  Doc. 118-3 at 13–14.  The Navient entities "maintain[] regular, continuous, and systematic" activities in the Middle District of Pennsylvania by "operating a major national call center," "maintaining [regional] offices," and "receiving processing mail" in Wilkes-Barre, Pennsylvania.  *Id.* at 18.

### 2.    *Federal Educational Loan Industry*

The default payment plan for federal student loans is the standard repayment plan, which calculates monthly payments "such

4

that the . . . balance is fully paid within 10–30 years." *Id.* at 19. A borrower "who cannot afford payments under the standard plan enroll in" an IDR plan, which "offer[s] significantly lower monthly payments." *Id.* "When borrowers enroll in an IDR plan, the plan is effective for a one-year period. To renew the plan for each subsequent year, borrowers must annually recertify their income by submitting a new IDR request form with proof of income to their loan servicer." *Id.* at 20. A failure to renew the IDR plan by the deadline results in, among other things, "an increase in monthly payments . . . to the amount dictated by the standard ten-year repayment plan," and an interest capitalization, whereby the accrued interest is added to the principal balance of the loan. *Id.* (citations omitted).

A loan may be placed in discretionary forbearance, which "allows borrowers to temporarily cease making payments during periods of hardship." *Id.* at 21–22 (citation and footnote omitted). According to the Plaintiffs, "[t]he only time a discretionary forbearance may be applied without the borrower's written consent is after the borrower's loans have gone into default status, but before the loans [are] transferred to collections." *Id.* at 22 (citation and emphasis omitted).

In such a situation, a "120-day forbearance may be based on the borrower's oral affirmation." *Id.* (citation and quotation omitted). "Discretionary forbearances[] . . . delay progress toward loan forgiveness and can be very costly for [a] borrower," as "any unpaid interest that accrues during the forbearance gets capitalized." *Id.* (citation and quotation omitted). Conversely, this option is "highly lucrative for [a] loan servicer[.]" *Id.* at 23.

A loan also may be placed in a 60-day administrative forbearance, which is permitted only if a "loan servicer is processing paperwork in connection with a borrower's request to make a change in repayment plan." Doc. 118-3 at 22–23 (citation and quotations omitted). Unlike discretionary forbearance, under an administrative forbearance, any accrued interest is not capitalized on the principal. *Id.*

The Plaintiffs allege that Navient's "practices caused borrowers to suffer measurable financial harm[.]" *Id.* at 9. The Plaintiffs surmise that such financial harms could be grouped into four categories: (1) damages that accrued when "the duration of their loans was extended"; (2) injuries that occurred when the "interest accrued on the principal balance . . . during unnecessary . . . deferment or forbearance"; (3)

6

harms that materialized when "monthly payments under IDR programs were billed at inaccurate levels"; and (4) damages that occurred when "borrowers were charged additional fees due to the delay in processing their [IDR] applications[.]" *Id.*

Against this backdrop, the Plaintiffs aver that Navient developed and maintained several untoward practices in response to a federal student loan borrower's IDR application. For example, Navient allegedly "delayed or failed to process IDR plan applications[,]" and thus "injured borrowers who were required to make additional payments on loans that otherwise would have been forgiven . . . earlier[.]" *Id.* Further, the Plaintiffs accuse Navient of "improperly plac[ing] borrowers making timely loan payments into deferment or forbearance status," which prevents a borrower from "mak[ing] qualifying payments that count towards loan forgiveness under . . . IDR plans, even though Navient . . . continues to collect fees for servicing their loans." *Id.* at 4–5. Also, "at the conclusion of each forbearance, any accrued interest is capitalized." *Id.* at 5 (quotation omitted).

The Plaintiffs also contend that Navient breached its Servicing Contract with the United States Department of Education ("DOE"). As

alleged in the TAC, the Servicing Contract requires Navient to "maintain a full understanding of all applicable federal regulations, meet all statutory and legislative requirements, and ensure that all aspects of the service continue to remain in compliance as changes occur." *Id.* at 23. In return, the DOE pays Navient "an average monthly fee for each . . . borrower[] that Navient . . . services," *id.* at 24, whose amount is determined by "revenue and number of borrowers that maintain an active loan balance." *Id.* at 25.

"This fee structure gives Navient . . . financial incentive[s] to maintain or increase the number of borrowers in its portfolio, while minimizing the number of borrowers who successfully earn loan forgiveness or otherwise discharge their loans," *id.*, and "to place borrowers into deferment or forbearance status to further increase servicing fees." *Id.* at 26. The Plaintiffs also claim that Navient has another reason to increase its borrowers' balances—the company has two subsidiaries that provide collection and rehabilitation services on defaulted federal student loans. *Id.* at 5. "Under the current compensation structure for . . . such rehabilitation services, collectors earn nearly $40 in compensation for every $1 in cash recovered through

certain rehabilitations," as well as "reasonable collection costs from a borrower by assessing a fee of up to 16 percent of the unpaid principal and accrued interest." *Id.* at 5–6 (citation and quotation omitted).

### 3.    *The Named Plaintiffs*

The Plaintiffs are three individuals who seek to represent three classes based on their grievances related to the FFELP and DSLP loans.  The FFELP loans are serviced by Navient.  *See* Doc. 204 at 46. The DSLP loans are serviced by Maximus Loan Servicing, LLC ("Maximus"), which administers student loan servicing for the DOE, *see id.* at 46–47; Docs. 159; 211 at 2 n.1, and "became responsible for servicing the portfolio of federal loans . . . previously serviced by Navient" in October 2021.  Doc. 231-9 at 1—2.

Ballard, a California resident, took out several federal loans, each "governed by a federal promissory note."  Doc. 118-3 at 9–10.  She alleges that she completed her undergraduate education in 2008, and was in deferment status until 2012, "at which time she entered into repayment."  *Id.* at 27.  In 2012, Ballard also reportedly applied for an IDR plan with Sallie Mae, which allegedly processed and approved the request, enrolling Ballard into an IDR plan until January 22, 2014.  *Id.*

at 27–28.  Ballard avers that she submitted a timely renewal request several weeks before the deadline of December 18, 2013, but had her income-based payments canceled in February 2014.  *Id.* at 28.  Ballard also allegedly submitted her first payment under the standard ten-year repayment plan for that month, and followed up with an additional IDR request on February 11, 2014.  *Id.*

In November 2017, Navient reportedly sent Ballard an account summary.  *Id.* at 29.  The document allegedly indicated that she had $14,295.10 in capitalized interest, $4,686.57 of which was added "as a result of [the company's] processing delay in 2014."  *Id.*  Ballard called Navient's customer service, and was told that interest capitalization occurred "because her IDR plan was not renewed [before] the annual deadline" in 2014, although the company timely received Ballard's first request "well before the renewal deadline."  *Id.*

Thus, in December 2017, Ballard sent a written complaint to Navient, which in turn acknowledged that "the interest capitalization . . . was . . . improper, and that th[e] amount would be deducted from her principal loan balance."  *Id.* at 29–30.  Later that month, Navient sent her "a billing statement showing . . . a reduction of $4,276.70" (as

opposed to $4,686.57), and ultimately "failed to refund [the] one-time payment of $902.55." *Id.* at 30. Ballard contends that the transactions violate Title 34, Code of Federal Regulations, Sections 682.215(3)(8)(i) and (ii), which prohibit a loan servicer from enrolling a borrower who submitted a timely IDR renewal request into the standard ten-year plan. *Id.* at 30–31.

As for Varno, who lives in New York, she "combined her multiple federal student loans into a federal consolidation loan" in 2006. Doc. 118-3 at 10. In 2016, she applied for an IDR plan, and was subsequently enrolled in a plan "with monthly payments of [about] $710 per month." *Id.* at 32. Then, in April 2017, Varno submitted her reportedly timely IDR renewal application. *Id.* About a month later, Varno called Navient's customer service line, and was told that her application was approved but "would not be applied . . . for several more months." *Id.* at 33 (quotation omitted). Until then, her "monthly payment . . . would be increased to approximately $1,800 under the standard repayment plan." *Id.*

Since Varno "could not afford payments in that amount," Navient "placed [her] loans into forbearance status until her . . . plan was

11

renewed, even though she never submitted a written request for the forbearance." *Id.* Varno claims that there were other instances of discretionary forbearance in 2015 and 2016 as well. *Id.* at 35. The proposed class representative, concluding that the discretionary forbearance violates Title 34, Code of Federal Regulations, Sections 682.211(a) and 682.215(e)(8)(ii), which allegedly require a loan servicer to maintain an IDR plan applicant's scheduled monthly payment amount, and to apply a discretionary forbearance only if the borrower is unable to make scheduled payments due to an "acceptable reason[]," respectively. *Id.* at 34–35 (quotation omitted).

Finally, Pokorni, a resident of Illinois, *id.* at 10, applied for an IDR plan on February 20, 2016. *Id.* at 36. Two days later, Navient stated that "it could take 22 and 25 days to process his IDR application." *Id.* Then, on March 11, 2016, the company sent another email stating that "an unexpected increase in volume" forced the company to "fall behind on [its] completion date." *Id.* On April 5, 2016, 45 days after Pokorni submitted his application, Navient processed the document. *Id.* Pokorni avers that the 45-day delay not only ran afoul of the DOE guideline to process IDR requests within ten to fifteen days, but also

12

"prevented him from making a qualifying payment toward loan forgiveness in . . . March . . . 2016." *Id.* at 37–38.  Thus, he reasons, "the date on which [he] will become eligible for loan forgiveness has been delayed by a month," and "generated an additional monthly servicing fee for Navient[.]"  *Id.* at 38.

## B.    Procedural History

On January 16, 2018, the Plaintiffs commenced this action.  Since then, the Plaintiffs amended their complaint three times.  Docs. 29; 80-1; 118-3.  On July 12, 2018, Navient moved to dismiss the first amended complaint and to strike class allegations.  Doc. 39.  On March 31, 2021, the Honorable Martin C. Carlson issued an R&R, subsequently adopted by the Court in its entirety.  Docs. 56–57.  The R&R concluded that: (1) Navient's motion to strike class allegations, prior to conducting class discovery, was premature, as "[t]he very nature of th[e] fact-bound inquiry" for class certification under Rule 23(a) did not warrant resolution of the class allegations on the pleadings alone; and (2) Navient's dismissal motion be granted for the tortious interference with contract alternative cause of action, but be denied for the claims based

13

on breach of contract and violations of state consumer protection statutes.  Doc. 56 at 9–14, 19—25, 30—31.

The operative TAC, deemed filed by the Order of December 19, 2024, Doc. 136, presents seven causes of action:

- Count I: Breach of the Servicing Contract;
- Count II: Breach of or Interference with Promissory Notes;
- Count III: Violation of the California Consumer Legal Remedies Act;
- Count IV: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;
- Count V: Violation of the New York General Business Law;
- Count VI: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and
- Count VII: Violation of the California Rosenthal Act.

Doc. 118-3 at 44–61.  The TAC also describes four putative classes: (1) Improper IDR Cancellation; (2) Forbearance without Written Consent; (3) No Administrative Forbearance; and (4) Improper Delay.  *Id.* at 39—40.

On June 20, 2025, Navient filed a motion for partial judgment on the pleadings.  Doc. 158.  The undersigned issued an R&R on January 23, 2026, recommending that Navient's standing challenge against the Improper Delay class be denied, as the Plaintiffs' allegations present a cognizable financial injury for Article III purposes.  Doc. 218 at 12—24. The undersigned also recommended that Navient's challenges against

14

Counts I, II, IV, and V be denied, and that the Court decline to strike class allegations. *Id.* at 25—39. On March 30, 2026, the Court rejected Navient's objections and adopted the R&R in its entirety. Doc. 256.

Following an extensive period of class discovery, on November 24, 2025, the Plaintiffs filed a motion to exclude the expert report of Dr. Xiaoling Lim Ang, offered in support of Navient's opposition to class certification. Doc. 195. Dr. Ang opined on whether the economic evidence and analysis offered by the Plaintiffs are "common to members of each of the Putative Classes and whether . . . any questions in relation to that evidence and analysis affect only individual members[.]" Doc. 203-1 at 7. The crux of Dr. Ang's report was her opinion that the applicability of the Plaintiffs' claims to the putative class members heavily relies on borrower-specific inquiries. *Id.* at 15–46. On June 2, 2026, following briefing and oral argument on the motion, the undersigned found that Dr. Ang meets all three *Daubert* prongs and denied the motion to exclude her report. Docs. 272; 273.

On November 24, 2025, the Plaintiffs also filed the Motion. Doc. 196. Unlike the TAC, the Motion seeks certification of three

15

classes, presumably for litigation and trial:[3] (1) the Improper IDR

Cancellation Class; (2) the Modified Forbearance Class; and (3) the

Improper Delay Class. *Id.* at 2–3. Navient filed an opposition on

February 24, 2026, and the Plaintiffs' reply was lodged on April 24,

2026. Docs. 231; 262. On May 20, 2026, the undersigned held oral

argument, Doc. 269, rendering the Motion fully briefed and ripe for

decision.

## III.   <u>Legal Standard</u>

"Class certification is proper only if the trial court is satisfied,

after a rigorous analysis, that the prerequisites of Rule 23 are met." *In*

*re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008)

(citations omitted). "A class certification decision requires a thorough

examination of the factual and legal allegations," *id.* (footnote omitted)

---

[3] Both parties appear to presume that the Motion seeks certification for litigation and trial. Navient repeatedly cites theoretical and evidentiary problems that, in the company's view, would impose insurmountable problems at trial. *See, e.g.*, Doc. 231 at 36–37 ("capable of proof at trial through evidence that is common to the class" (citation and quotation omitted)), 56–58 (discussing expert to be presented at trial), 72–73 (discussing trial plan). Likewise, the Plaintiffs discuss points that are relevant for trial purposes. *See, e.g.*, Doc. 262 at 60 ("expert testimony at trial"), 72 ("separate trials for each state-wide class, or perhaps a combined trial for few statewide subclasses[]" (citation and quotation omitted)), 80 ("Plaintiffs' trial plan is essentially summarized"). Therefore, for purposes of this R&R, the undersigned proceeds under the assumption that the Plaintiffs seek certification for litigation and trial. *See Hydrogen*, 552 F.3d at 310; Fed. R. Civ. P. 8(e).

16

(citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001)), that are "presented by the parties." *Id.* at 320; *see also* Fed. R. Civ. P. 23(c)(1)(C) advisory committee's note to 2003 amendment ("A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." (quoted in *Hydrogen*, 552 F.3d at 319)).

Such a rigorous analysis "[f]requently . . . entail[s] some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). The Court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (footnote and quotation omitted) (quoting *Hydrogen*, 552 F.3d at 307). As for undisputed issues, the Court must ensure that the unchallenged requirements are met. *See, e.g.*, *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *20 (W.D. Pa. 2022) (briefly analyzing uncontested Rule 23(a) factors); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *8–9 (D.N.J. 2015) (same).

In doing so, the Court notes that "the requirements set out in Rule 23 are not mere pleading rules"—that is, the Court may "delve beyond the pleadings to determine whether the requirements for class certification are satisfied." *Marcus*, 687 F.3d at 591 (citations omitted). A corollary is that the Court, "well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23." *Hydrogen*, 552 F.3d at 310 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997)); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). This discretion, however, "does not soften the rule [that] a class may not be certified without a finding that each Rule 23 requirement is met." *Id.*

"To obtain class certification, plaintiffs must satisfy all of the requirements of Rule 23(a) and come within one provision of Rule 23(b)." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 624 (3d Cir. 1996) (citing *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 248 (3d Cir. 1975)). "Rule 23(a) mandates a showing of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Id.* As for Rule 23(b)(3), the basis for certification here, Doc. 196 at 1–2, the rule "requires that

18

(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Marcus*, 687 F.3d at 591 (quotation omitted) (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) ("*Bank II*")).

For each Rule 23 consideration, the plaintiff "must show, by a preponderance of the evidence, that [each] class is currently and readily ascertainable based on objective criteria." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) (quotation omitted) (quoting *Marcus*, 687 F.3d at 593); *see also Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with" Rule 23). Neither an "intention," "a threshold showing," "some showing," nor "some evidence" meet this criterion. *Hydrogen*, 552 F.3d at 321. "In other words, to certify a class[,] the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *Id.* at 320 (citation omitted).

"If a class is certified, the text of the order or the opinion must include: (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified; and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to

be treated on a class basis." *Id.* at 320–21 (cleaned up). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

## IV.   <u>Discussion</u>

### A.   **The Proposed Classes**

The Motion seeks to certify three nationwide classes, each of which is paired with a subclass. All three proposed classes, in addition to their respective state law claims referenced below, advance Counts I (breach of the servicing contract, Doc. 118-3 at 44–47), II (breach of or interference with the MPN, *id.* at 47–49), and IV (violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, *id.* at 52–54) of the TAC. Doc. 196 at 4–5.

#### 1.   **The Improper IDR Cancellation Class**

The first proposed class, represented by Ballard, would consist of federal student loan borrowers who are defined as follows:

> a. On or after January 16, 2012, the borrower was enrolled in an IDR plan.
> b. The borrower submitted an IDR renewal application, which was received by NSL within 90 days or less prior to the renewal deadline.

20

    c. The borrower's partial financial hardship status expired, at which time the borrower's payments were recalculated under the standard repayment plan.

    d. At the time the application received its first review, it was deemed complete.

<u>California Sub-class</u>: Members of the Class who were living in California when the events stated in subpart c. occurred.

Doc. 196 at 2. The California Subclass advances Count VII under the Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code § 1788, "the Rosenthal Act").[4]  Doc. 118-3 at 59–61.

### 2.     The Modified Forbearance Class

The second proposed class, represented by Varno is an amalgamation of two classes outlined in the TAC—the Forbearance Without Written Consent and No Administrative Forbearance Classes. *See* Docs. 118-3 at 39–40; 196 at 2–3.  The putative class would contain members who meet the following criteria:

    a. On or after January 16, 2012, the borrower submitted an application to enroll in, or renew, an IDR plan.

    b. Within 60 days of Navient receiving the application, the borrower was enrolled in a discretionary forbearance, which was based on oral affirmation.

    c. At the time of enrollment in the discretionary forbearance, the borrower was not in default.

<u>New York Sub-class</u>: Members of the Class who were living in New York when the events stated in subpart b. occurred.

---

[4] The Motion does not present the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, "CLRA") as a basis for class certification.  Doc. 204 at 52.

Doc. 196 at 3.  The New York Subclass advances Count V under New

York General Business Law Section 349 (N.Y. Gen. Bus. Law § 349).

Doc. 118-3 at 54–56.

### 3.   The Improper Delay Class

Finally, the third proposed class, represented by Pokorni, contains

federal student loan borrowers who meet the following qualifications:

a. On or after January 16, 2012, the borrower applied to enroll in, or to renew, an IDR plan.
b. The borrower submitted a completed IDR application, accompanied by proof of income, which was subsequently approved by Navient.
c. Navient did not fully process the application until 45 days or more after it was received.

Illinois Sub-class: Members of the Class who were living in Illinois when the events stated in subpart c. occurred.

Doc. 196 at 3.  The Illinois Subclass advances Count VI under the

Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill.

Comp. Stat. 505/2).  Doc. 118-3 at 56–58.

### B.   Varno's No Administrative Forbearance and Forbearance Without Consent Classes

The undersigned recommends that the Court deny, without

prejudice, certification of the No Administrative Forbearance and

Forbearance Without Consent Classes that Varno purports to

represent, as the Plaintiffs moved to certify those classes for the first time in their reply brief, without any supporting argument.  That tact falls short of meeting their burden to show the existence of the Rule 23 factors by a preponderance of the evidence.  *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350.

Although the TAC outlines two No Administrative Forbearance and Forbearance Without Consent Classes, Doc. 118-3 at 39–40, the Motion seeks to certify a single Modified Forbearance Class in their stead.  Doc. 196 at 3–4.  The Plaintiffs surmise that combining the No Administrative Forbearance and Forbearance Without Consent Classes into one would "streamline the litigation," is "consistent with class action jurisprudence in the Third Circuit," and thus "is a sensible approach[.]"  Doc. 204 at 59–60.

In response, Navient protests that the new "Modified Forbearance" class was "neither included in Plaintiffs' TAC nor disclosed during discovery."  Doc. 231 at 31.  Navient also claims that the class "significantly and impermissibly broadens the scope of the proposed classes," as the new class adds "over 100,000 class members for a class not identified until after the close of discovery and months

after the deadline for expert reports." *Id.*  Relying on *Walden v. Bank of N.Y. Mellon Corp.*, 2025 WL 2696463 (W.D. Pa. 2025), and other authorities, Navient surmises that expanding the class definition and size without due notice and corresponding discovery is prejudicial, and thus should be denied.  Doc. 231 at 31–33.

In reply, the Plaintiffs acknowledge that the proposed modification to their class definitions "expanded class membership," and explain that the new class constituted their attempt to resolve inherent tensions in their terminology.  Doc. 262 at 36–37.  The Plaintiffs then abandoned their motion to certify the Modified Forbearance Class, proposing that, "[t]o resolve Navient's objection, [they] agree to proceed with the definitions in the TAC."  *Id.* at 37.

Against this backdrop, the undersigned concludes that certification of the No Administrative Forbearance and Forbearance Without Consent Classes should be denied, as the Plaintiffs' attempt to certify those classes via their reply brief runs afoul of a federal procedural axiom.  Namely, a reply brief may not present a new issue. *See, e.g.*, *Servis One Inc. v. OKS Grp. LLC*, 2025 WL 733670, at *3 n.7 (3d Cir. 2025) (deeming issue forfeited "because it was raised for . . .

24

first time in . . . reply brief" (citations omitted)).  This proposition applies in this district court as well.  *See, e.g.*, *Webb v. Discovery Prop. & Cas. Ins. Co.*, 2014 WL 105608, at *3 n.3 (M.D. Pa. 2014) (declining to consider Rule 23(b)(2) as grounds for class certification for presentation of that issue in reply brief).

The Plaintiffs' reliance on the premise that "a court is not bound by the class definition proposed in the complaint," *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004) (citation and quotation omitted) (cited in Doc. 204 at 60), is misplaced.  In *Weisfeld*, the movant changed the class definition "in his brief in support of class certification," not in a reply brief, as here.  *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 138 (D.N.J. 2002).  In other words, the *Weisfeld* nonmovant received fair notice of the proposed class through the opening brief.  *See id.*

Here, the Plaintiffs propose reverting to their original class definitions in the TAC, but fail to offer any supporting analysis for those new classes.  Doc. 262 at 36–37.  Judge Carlson warned the Plaintiffs during the pleading stage, before the second amended complaint was docketed, that they cannot "modify the class definitions without the

[C]ourt's prior approval." Doc. 88 at 14. They nonetheless contend that the change here is merely definitional. Doc. 262 at 37. To be sure, the Court may modify a class definition during certification litigation. *Gwiazdowski v. Cnty. of Chester*, 263 F.R.D. 178, 184 (E.D. Pa. 2009). But the proposed change here is far more substantial—the Plaintiffs now seek to certify two classes in the place of one, neither of which were addressed in their opening brief.

Critically, the Plaintiffs do not offer any analysis of the relevant Rule 23 factors that correspond to those two classes. Doc. 262 at 37. Indeed, when questioned, during oral argument, how the two classes could be certified absent briefing, the Plaintiffs simply responded that, because Jeffrey Stine, a Navient employee, "admit[ted] liability," about Ballard's class and "class definition[s are] common," the Court would "see that the Rule 23 factors are met." Doc. 276 at 111–12. Not only does this tactic deprive Navient of the opportunity to present a proper response to the Plaintiffs' arguments, but it falls short of the Plaintiffs' burden as the movants. *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350. Although the Court could potentially surmise and assume the various grounds on which the Plaintiffs seek certification for their

26

newly proposed classes, that approach would impermissibly lift their burden and require the Court to scour the record for the information supporting their positions.

As the Plaintiffs' summary concession and argument in their reply contravene the premise that a reply brief may not raise a new issue, and fall short of their burden of persuasion under Rule 23, the undersigned recommends that the Court deny certification for the No Administrative Forbearance and Forbearance Without Consent Classes. The denial would be without prejudice to the Plaintiffs' ability to move for certification of those classes at a later juncture, as the undersigned cannot discern whether viable classes exist absent briefing. *See Luxama v. Ironbound Express, Inc.*, 2018 WL 6819341, at \*17 (D.N.J. 2018) (denying Rule 23(b)(3) motion for class certification without prejudice); *see also Conley v. DiStefano*, 2017 WL 2345605, at \*2 (D.N.J. 2017) (dismissing without prejudice arguments that were raised for first time in reply brief).

## C.    Pokorni's Improper Delay Class

Though the parties discuss standing issues associated with Pokorni and his associated Improper Delay Class in the context of

predominance under Rule 23(b)(3), the undersigned addresses it in accordance with the Court's "obligation to satisfy [itself] of jurisdiction if it is in doubt." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–77 (3d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977)); *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361 (3d Cir. 2015) ("[i]f certification issues were genuinely in doubt[,] . . . the jurisdictional issues would loom larger." (first alteration in original) (quotation omitted) (quoting *Windsor*, 521 U.S. at 613 n.15)).

Article III of the Constitution of the United States confines federal jurisdiction to certain "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Therefore, "[f]ederal courts are courts of limited jurisdiction," wielding "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). In other words, "subject matter jurisdiction is non-waivable." *Nesbit*, 347 F.3d at 77 (citing *Healthy*, 429 U.S. at 278).

Article III's "case-or controversy requirement is satisfied only where a plaintiff has standing." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 258 (3d Cir. 2009) (quotation omitted) (first quoting

28

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008); and then citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). "In this manner does Art[icle] III limit the federal judicial power to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Id.* (quotations omitted) (first quoting *Valley*, 454 U.S. at 472; and then citing *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).

Standing is founded on two sets of requirements. *Id.* at 257–59. The first set is constitutional, and has the following three elements:

> (1) an injury in fact (*i.e.*, a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.*, a "fairly traceable" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

*Id.* at 258 (first quoting *Sprint*, 554 U.S. at 273–74; then citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); and then citing *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 161 (3d Cir. 2007)).

Here, the parties dispute the injury-in-fact requirement only. First, Navient, acknowledging that standing is present "if a named plaintiff has standing for each claim brought on behalf of the putative class," Doc. 231 at 34 (citation omitted), still asserts that "it cannot be known who has . . . standing without hundreds of thousands of individualized determinations that would not be remotely manageable or feasible." *Id.* at 35. This is so because, according to Navient, "[w]hether each putative class member suffered an alleged injury depends on variables unique to each borrower's account." *Id.* That is, "[t]here are legitimate reasons why borrowers would fall into . . . the proposed class definition[]," which may mean that many of the putative Improper Delay Class members may not have suffered the alleged injury, thus warranting their exclusion under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Doc. 231 at 34. In *TransUnion*, the Supreme Court held that "[e]very class member must have Article III standing in order to recover individual damages." 594 U.S. at 431.

The Plaintiffs respond that "class definitions need not exclude uninjured persons," at least for certification purposes. Doc. 262 at 48 (citation omitted); *see Neale*, 794 F.3d at 362 ("squarely hold[ing] that

unnamed, putative class members need not establish Article III standing."); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 275 (3d Cir. 2009) ("critical question is whether . . . named plaintiffs . . . ha[ve] standing[,] irrespective of whether each absent class member c[an] establish standing."). Rather, the Plaintiffs' aver that Navient's reliance on *TransUnion* is mistaken, as that precedent involved a class action tried by the jury. Doc. 262 at 48–49. Thus, the Plaintiffs contend, this action is more akin to *Huber v. Simon's Agency, Inc.*, 84 F.4th 132 (3d Cir. 2023), which held that class certification need not involve a finding of injury for all class members. Doc. 262 at 48–49. Moreover, the Plaintiffs offer a means to exclude uninjured individuals from the class. *Id.* at 37–48, 51.

The undersigned agrees with the Plaintiffs on this first standing dispute. In its summary reliance on *TransUnion*, Navient overlooks that the Supreme Court specifically refrained from deciding "whether every class member must demonstrate standing *before* a court certifies a class." 594 U.S. at 431 n.4 (citation omitted). "At the remedial phase, each class member must establish standing to recover individual damages." *Huber*, 84 F.4th at 155 (citing *TransUnion*, 594 U.S. at 431).

"[I]t is not necessary for each member to prove his or her standing for the class action to be justiciable." *Id.* (citing *TransUnion*, 594 U.S. at 431 n.4).  Third Circuit courts remain bound by the "precept that[,] so long as a named class representative has standing, a class action presents a valid case or controversy under Article III." *Id.* (quotations omitted) (citing *Neale*, 794 F.3d at 369).

However, Navient's second standing challenge against Pokorni specifically warrants a closer look.  Navient contends that Pokorni, who was placed in a non-capping administrative forbearance, was not subjected to any interest capitalization.  Navient also avers that Pokorni cannot claim damages resulting from allegedly losing a month toward loan forgiveness, because it will remain unknown whether he will, in fact, lose a month, until he reaches the forgiveness period. Thus, Navient reasons, he lacks standing to represent the Improper Delay Class, which premises that its members' IDR applications were not processed within 45 days, even though their applications were accompanied by proofs of income and eventually approved.  Docs. 231 at 24; 204 at 65–66.  This incongruity, Navient reasons, is only magnified by the individualized review of accounts and transactions that would be

32

required to resolve the underlying common law and statutory claims for the broader class. Doc. 231 at 66. Relying on *In re Fedloan Student Loan Serv. Litig.*, 2025 WL 539681 (E.D. Pa. 2025), and *Lyons v. Great Lakes Educ. Loan Servs., Inc.*, 2022 WL 602972 (D.N.J. 2022), Navient concludes that a delay in loan forgiveness is insufficient to establish an injury in fact for standing purposes. Doc. 204 at 65–66.

The Plaintiffs present a two-part response to this second challenge. They first claim that the attack on Pokorni's claimed injuries from delayed loan forgiveness is largely meritless due to *Nigro v. Pa. Higher Educ. Assistance Agency*, 2020 WL 5369980 (M.D. Pa. 2020), which rejected a standing challenge and held that a borrower possibly "could have been eligible for loan forgiveness as early as 2017 if the loan had been serviced properly." Doc. 262 at 34 (citation and quotation omitted). But that reliance on *Nigro* to circumvent the concrete injury requirement is unavailing. *Nigro* concerned a motion to dismiss, which required the court to accept the operative complaint's allegations about potential earlier loan forgiveness as true. 2022 WL 5369980, at *1, 7; *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (establishing that, at pleading stage, "a complaint must contain

sufficient factual matter, accepted as true," and that "[the] court should assume [its] veracity") (citation and quotation omitted).

By contrast, this action is at the class certification stage, which does not afford such deference to the movant's averments. *See Hydrogen*, 552 F.3d at 309. That is, the Plaintiffs' reliance on their allegations is insufficient for approval of a class under Rule 23(b)(3). *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350. And, here, the Plaintiffs fail to offer any evidence that Pokorni has, at least thus far, suffered a concrete financial injury from the possibility that his loan forgiveness could be delayed for a month.

As Navient observes, Doc. 231 at 65–66, standing requires that the plaintiff allege concrete injury. *Common Cause*, 558 F.3d at 258. In other words, hypothetical injuries premising that putative class members who have yet to actually complete paying off their loans suffered delayed loan forgiveness are insufficient for Article III's purposes. The undersigned is persuaded by the reasoning set forth in *Fedloan* and *Lyons* (and, by extension, other federal courts in the nation)—that a federal loan borrower does not suffer an injury sufficient for Article III standing from future potential delays in loan

34

forgiveness, until the borrower makes more than the required 120 payments while working in public service. *Fedloan*, 2025 WL 539681, at *8–9 (collecting cases); *Lyons*, 2022 WL 602972, at *8–11.

In *Fedloan*, fifteen of the proposed class representatives were student loan borrowers who claimed that they were "either already eligible for [public service loan] forgiveness or are closer than Defendants' disclosed figures would indicate." 2025 WL 539681, at *5. "At the time the operative complaint was filed, however, ten of the fifteen . . . Plaintiffs . . . were at least a full year away from potentially qualifying for PSLF forgiveness." *Id.* (footnote omitted). The defense argued that ten of the movants should be dismissed, as "the alleged injuries [we]re not real and immediate but instead speculative," partly because the "alleged injuries [we]re contingent on their successful completion of 120 qualifying loan payments and ten years of employment with a qualifying employer." *Id.* at *8. The Court agreed with the defendants, and concluded that "the feared denials of the . . . Plaintiffs' future applications for loan forgiveness depend on future contingencies that may or may not occur and, therefore, are not certainly impending." *Id.* at *9 (quotation omitted). Likewise, the

35

*Lyons* court held that standing was absent for the movants who based their putative class action on "lost progress toward[] loan payoff." 2022 WL 602972, at *8–11.

Here, Pokorni's allegations rest on a similar defect.  He alleges that, "because Navient delayed the processing of [his] IDR plan application, the date on which [he] will become eligible for loan forgiveness has been delayed by a month."  Doc. 118-3 at 38.  That averment necessarily assumes that a series of speculative scenarios will happen, including that Pokorni will make all of the qualifying payments while working for a qualifying employer until he is eligible for loan forgiveness.  Those are the same type of allegations that other Third Circuit courts have found to be too speculative to confer standing.  *See, e.g.*, *Fedloan*, 2025 WL 539681, at *8–9 (collecting cases); *Lyons*, 2022 WL 602972, at *8–11.  Indeed, the Plaintiffs acknowledged at oral argument that Pokorni would not suffer the alleged injury if he were to pay off his loan before reaching the forgiveness period.  Doc. 276 at 50–54.  Pokorni's claimed lost month towards forgiveness thus falls short of establishing the concrete and particularized injury necessary to confer standing.

36

Second, the Plaintiffs contend that, regardless of whether Pokorni was subject to interest capitalization when he was placed in a non-capping administrative forbearance, he nonetheless suffered injury from the "loss of an interest subsidy," which is different from "interest capitalization." Doc. 262 at 33. Interest capitalization means that "any unpaid interest that accrues during [a discretionary forbearance] gets capitalized, or added to the borrower's loan balance." Doc. 118-3 at 22 (quotation omitted) (citing 34 C.F.R. § 682.211(a)(4)). By contrast, losing an interest subsidy, according to the Plaintiffs, means that, "as a result of Navient's processing delay, and the daily accrual of interest, [Pokorni] was partially deprived of the interest subsidy provided under 34 C.F.R. § 682.215(b)(4)."[5] Doc. 204 at 27. This distinction was presented in the Motion. *Id.* at 25–27. During oral argument, Navient clarified that "[i]t was difficult for [the company] to comprehend what [the Plaintiffs] . . . meant by interest subsidy in their reply," but still

---

[5] An interest subsidy under Title 34, Code of Federal Regulations, Section 682.215(b)(4) means that, "[i]f the borrower's monthly payment amount is not sufficient to pay the accrued interest on the borrower's subsidized Stafford Loans or the subsidized portion of the borrower's Federal Consolidation loan, the Secretary pays to the holder the remaining accrued interest for a period not to exceed three consecutive years from the established repayment period start date on each loan repaid under the income-based repayment plan." 34 C.F.R. § 682.215(b)(4).

opined that the loss of interest subsidy is "speculative," as it "may or may not occur."  Doc. 276 at 94—95.

Pokorni does present an actual injury via the issue of the loss of his interest subsidy, which is reportedly accrued "as a result of Navient's processing delay," Doc. 204 at 27, and thus does not force the Court to "conduct mathematical gymnastics to determine when the Plaintiffs may be required to pay wrongfully accrued student loan interest" because of the alleged delayed loan forgiveness.  *See Lyons*, 2022 WL 602972, at *11 (citation and quotation omitted); *see also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) (rejecting defendant's standing argument in putative class action as "[p]laintiffs s[ought] recovery for their actual economic harm[.]").

Therefore, the undersigned recommends that the Court find Navient's standing challenge valid only as to Pokorni's allegations concerning damages premised on delayed loan forgiveness.  This results, however, in an absence of sufficient briefing and record citations to gauge whether an Improper Delay Class limited to putative class members who lost interest subsidies passes muster under a Rule 23 analysis.  Namely, the Motion seeks certification of Pokorni's class

based on the allegations concerning interest capitalizations *and* loss of interest subsidy, but fails to discuss how a class limited to interest subsidy losses meets the Rule 23 standards. *See* Doc. 204 at 60–68, 73–74. Indeed, the Plaintiffs' reply brief confines the discussion on subsidies to the differences between the two alleged injuries. Doc. 262 at 33–35.

As the Plaintiffs neglect to carry their burden of answering the factual and legal questions about whether the narrower class satisfies Rule 23—including how many putative class members lost their interest subsidies for even a preliminary numerosity inquiry, or whether those members are ascertainable through database searches— the Court cannot determine whether Pokorni's class should be certified, much less whether common questions of law or fact predominate in that narrowed class. Therefore, the undersigned recommends that the Motion be denied for Pokorni and his narrowed Improper Delay Class.

## D.    Ballard's Improper IDR Cancellation Class

The Ballard class remains the only one subject to full briefing, and thus is ripe for a Rule 23 analysis. The parties do not appear to dispute two of the Rule 23(a) factors; namely, numerosity and typicality. They

disagree, however, over whether the other two Rule 23(a) prongs (commonality and adequacy) and the two Rule 23(b) factors (predominance and superiority) are satisfied here.  The undersigned concludes that the Plaintiffs have established the Rule 23(a) factors by a preponderance of the evidence, but fail to carry their burden on the Rule 23(b)(3) analyses.

### 1.  *Rule 23(a)(1): Numerosity*

Numerosity means that a proposed class "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While the rule is "devoid of any numerical minimum required for class certification," "[i]mpracticable does not mean impossible."  *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (citation and quotation omitted).  Instead, the Court of Appeals has established that, while there is no floor, a class of 41 or more satisfies this first inquiry.  *Id.* at 249–50 (citations and quotations omitted).  In conducting a numerosity analysis, the Court has "considerable discretion[.]"  *Id.* at 249 (citation omitted).  As with other Rule 23 requirements, numerosity "must be proven by a preponderance of the evidence."  *Marcus*, 687 F.3d at 595 (citing *Hydrogen*, 552 F.3d at 307).

Ballard and her Improper IDR Cancellation Class fulfill the Rule 23(a)(1) requirement. The Plaintiffs' brief states that "Navient identified 5,548 class members, including 569 California residents," and that the DOE "identified 107,175 class members, including 9,493 California residents." Doc. 204 at 57. Absent any specific challenge from Navient, Ballard's class and subclass are therefore sufficiently numerous.

### 2.    *Rule 23(a)(2): Commonality*

Commonality asks whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This inquiry's heart lies in whether the plaintiff "demonstrate[s] that the class members have suffered the same injury." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 487 (3d Cir. 2018) (quotation omitted) (first quoting *Dukes*, 564 U.S. at 349; and then citing *Falcon*, 457 U.S. at 157); *see also Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382–83 (3d Cir. 2013) ("the focus . . . is . . . on whether the defendant's conduct was common as to all of the class members." (citations and quotation omitted)).

To be sure, "th[e] bar is not a high one." *Rodriguez*, 726 F.3d at 382; *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir.

41

2013) (commenting that commonality under Rule 23(a)(2) is less rigorous than predominance under Rule 23(b)(3)).  Indeed, "only one question of law or fact in common is necessary to satisfy the commonality requirement[.]"  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 n.10 (3d Cir. 2009) (citations omitted).  This means that commonality is present "even when not all plaintiffs suffered an actual injury[;] when plaintiffs did not bring identical claims[;] and, most dramatically, when some plaintiffs' claims may not have been legally viable."  *Rodriguez*, 726 F.3d at 382 (internal citations omitted).

At the same time, "[a] complaint's mere recital of questions that happen to be shared by class members is not sufficient to obtain class certification."  *Mielo*, 897 F.3d at 487 (quotation omitted) (quoting *Dukes*, 564 U.S. at 349).  This is so because "[a]ny competently crafted class complaint literally raises common questions."  *Id.* (alteration in original) (citations and quotations omitted).  "What matters to class certification" is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (citation omitted).

42

Therefore, commonality is nonexistent if, for example, the "putative class members merely allege to have all suffered a violation of the same provision of" a federal statute, which "can be violated in many different ways." *Mielo*, 897 F.3d at 489 (citation and quotations omitted). Neither does a claim of a common practice that rests on "an untold number of unique [local] decision[]makers in the making of thousands upon thousands of individual decisions[.]" *Rodriguez*, 726 F.3d at 386 (footnote omitted); *see also Reyes v. Netdeposit, LLC*, 802 F.3d 469, 488 (3d Cir. 2015).

Here, Ballard claims that commonality is present, as her class and subclass present common questions.[6] Doc. 204 at 63–64. More specifically, she avers that the following common issues govern: (1) "[w]hether Navient breached the MPN and Servicing Contract;" (2) "[w]hether [the company] violated federal regulations and FSA requirements"; and (3) "[w]hether [the company] violated applicable state consumer laws." *Id.* at 64. During oral argument, the movants

---

[6] The Plaintiffs' argument on commonality consists of a 1.5-page section that combines discussions on commonality and predominance, and seemingly confines the discussion on Rule 23(a)(2) to a single sentence. Doc. 204 at 63–64. For this R&R's purpose, the undersigned construes the accompanying list of questions as the Plaintiffs' argument for a finding of commonality. *See Hydrogen*, 552 F.3d at 310; Fed. R. Civ. P. 8(e).

reiterated that "[e]very class member is walking into court with the same contractual rights; namely, to have their loans serviced in accordance with federal law, [and] in accordance with [DOE]'s regulations." Doc. 276 at 33—34.

In response, Navient broadly contends that commonality is absent, as the Plaintiffs lack "evidence that the essential elements of their causes of action are capable of proof at trial through evidence that is common to the class." Doc. 231 at 35—37. During oral argument, Navient acknowledged that there are common questions, but also argued that commonality is absent for lack of common answers to those inquiries. Doc. 276 at 73.

The undersigned agrees with the Plaintiffs, as commonality asks only whether "there are *questions* of law or fact common to the class." *See* Fed. R. Civ. P. 23(a)(2) (emphasis added). To the extent that common proof and answers are relevant to this action, that issue is more properly addressed during the predominance inquiry below.

Ballard and her Improper IDR Cancellation Class present several common factual or legal questions, including: (1) whether "Navient breach[ed] the servicing contract[]" and the MPN, Doc. 276 at 73; (2)

44

whether their "income-driven payment amounts were nonetheless cancel[]ed due to . . . processing delays that were [Navient's] fault," Doc. 118-3 at 45; (3) whether Navient made the relevant communications pertaining to their UTPCPL theory "from [its] offices in Pennsylvania," *id.* at 53; and (4) whether the company "knowingly and willfully violated the Rosenthal Act." *Id.* at 61. These inquiries suffice for Rule 23(a)(2) purposes.

### 3. *Rule 23(a)(3): Typicality*

Typicality means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). More specifically, "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established[.]" *Newton*, 259 F.3d at 183–84 (citations and footnote omitted). This third guidepost premises that "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quotations omitted) (first

45

quoting *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998); and then citing *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).  Likewise, "[t]he mere fact that some members of the class may have additional state or federal law claims, not asserted by the named plaintiffs, does not preclude . . . typicality." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005) ("*Bank I*").

As the discussion above indicates, "[t]he concepts of commonality and typicality are broadly defined and tend to merge." *Newton*, 259 F.3d at 182 (quotations omitted) (first quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998); and then citing *Baby*, 43 F.3d at 56).  This is partly so because "Rule 23(a) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards." *Id.* (quotation omitted) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 817 (3d Cir. 1995)).  The Court of Appeals therefore "set a low threshold for satisfying both requirements." *Id.* (citations omitted).

Ballard "share[s] at least one question of fact *or* law with the grievances of the prospective" Improper IDR Cancellation Class and

46

California Subclass, *see Baby*, 43 F.3d at 56 (emphasis added) (citations omitted)—namely, that Navient violated their servicing contracts and MPNs.  *See* Docs. 196 at 4–5; 204 at 48–52, 56–57.  Navient does not offer any opposition.  The undersigned therefore concludes that the typicality requirement is satisfied for the Improper IDR Cancellation Class and the California Subclass.

### 4.    *Rule 23(a)(4): Adequacy of Representation*

Adequacy of representation means that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This last inquiry entails two considerations: "the experience and performance of class counsel," and "the interests and incentives of the class representatives."  *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 392 (3d Cir. 2015) ("*Bank III*") (citing *Bank I*, 418 F.3d at 303).

### a.    *Adequacy of Counsel*

The first adequacy inquiry, seemingly unchallenged by Navient, is satisfied.  Adequacy of class counsel essentially "tests the qualifications of the counsel to represent the class."  *Bank I*, 418 F.3d at 303 (quotation omitted) (quoting *Pick-Up Truck*, 55 F.3d at 800).  The

analysis involves assessment of the four considerations specified by Rule 23: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Further, the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* R. 23(g)(1)(B).

Here, the proposed class counsel is adequate. The Plaintiffs assert that their attorneys: (1) have been committed to this action for over seven years (as of the Motion's filing date); (2) have respectable experience in class actions and consumer protection law; (3) possess considerable expertise in the relevant areas of law; and (4) have and will commit substantial resources to representing the proposed classes and subclasses. Doc. 204 at 82–85. The undersigned sees no reason to doubt these assertions.

### b. *Adequacy of Class Representatives*

The second prong of the adequacy analysis is fulfilled as well. An individual or an entity seeking to represent a class must "represent [the] class capably and diligently." *Football*, 821 F.3d at 430. This usually entails "[a] minimal degree of knowledge," along with able execution of relevant duties "by closely following the litigation, authorizing the filing of the Class Action Complaint, and approving the final settlement." *Id.* (citations omitted). The conditions for being a class representative are relatively light since, "[r]ealistically," "the performance of class counsel is intertwined with . . . the class representative['s]." *Bank II*, 622 F.3d at 292 (citation and quotation omitted); *see also Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 n.9 (3d Cir. 1973) ("it is counsel for the class representative and not the named parties[] who direct and manage these actions. . . . [A]ny statements to the contrary is sheer sophistry.").

Examination of a class representative's interests and incentives "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Windsor*, 521 U.S. at 625 (citing *Falcon*, 457 U.S. at 157–58, n.13). The "linchpin of the adequacy requirement is

49

the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Football*, 821 F.3d at 431 (quotation omitted) (quoting *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012)).  Thus, the inquiry here is whether a named representative and his or her class members "share[] the same goal of establishing the [defendant's] liability . . . , suffered the same injury resulting from the [defendant's alleged wrongdoing], and s[eek] essentially the same damages[.]"  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

Relatedly, a fundamental intra-class conflict concerning a "specific issue[] in controversy" "defeat[s] a finding of adequacy."  *Football*, 821 F.3d at 431 (citations and quotation omitted).  This means that the Court "must thus address two questions: (1) whether an intra-class conflict exists; and[,] if so, (2) whether that conflict is fundamental." *Dewey*, 681 F.3d at 184 (quotation omitted).  A classic example of a fundamental conflict of interest is "the divide between present and future injury plaintiffs[,]" who would be interested in quicker and measured resolutions, respectively.  *Football*, 821 F.3d at 431–32. Other examples include allocations of damages, *Dewey*, 681 F.3d at 182

(citation omitted), and materiality of the alleged conflicts. *Id.* at 184 (citations omitted). By contrast, a mere claim of an inherent conflict is insufficient to defeat a finding of adequacy. *See Warfarin*, 391 F.3d at 533.

Here, the undersigned determines that Ballard carries her burden on this analysis. There is no indication on the record that her interests diverge from those of her class and subclass, members of which were allegedly harmed by the same acts or omissions in substantially similar manners. *See* Doc. 118-3 at 3–9, 18–61.

Navient asserts that a fundamental conflict of interest exists, as the Plaintiffs may confine the class members to settlement awards that are far below what they might recover through independent lawsuits. Doc. 231 at 59–60. The company, noting that "the UTPCPL provides for statutory damages of $100 when actual damages are less than that," and that the "Plaintiffs are seeking thousands of dollars in alleged damages for themselves," summarily concludes that the Plaintiffs would "readily consign putative class members to $100 recoveries[.]" Doc. 231 at 58–59 (citations omitted).

51

This argument is unavailing for several reasons.  First, as the Plaintiffs correctly observe, Doc. 262 at 59, the UTPCPL provides that a civil plaintiff "may bring a private action to recover actual damages or one hundred dollars . . . , whichever is *greater*."  73 Pa. Const. Stat. § 201-9.2 (emphasis added).  Thus, Navient's reliance on *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 594 (2013), for the proposition that a class representative who seeks to impose an "artificial cap . . . on the class'[s] recovery" is inadequate, Doc. 231 at 59, is inapposite.  Second, Navient "only assert[s], rather than establish[es], an inherent conflict" between the class representative and her class and subclass, and thus falls short of its burden as the nonmovant.  *See Warfarin*, 391 F.3d at 533.  Third, the defense view "is not focused on the alignment of the[] interests, but rather on their magnitude."  *See Dewey*, 681 F.3d at 186.  As the Court of Appeals noted, "a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes.  . . . [T]he [class members would] ha[ve] the option to opt-out of th[is action] if it was in their interest to bring their claims separately."  *See Warfarin*, 391 F.3d at 534 (internal citation omitted).  Thus, provided that the Plaintiffs offer an

opportunity for any putative class members wishing to opt out of this litigation to do so at a later point, the alleged differences in recovery amounts alone are insufficient to defeat adequacy at this stage. *See In re Nat'l Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 376 (E.D. Pa. 2015) ("Not every distinction between a class member and a class representative renders the representative inadequate.") (cited in Doc. 231 at 59–60).

### 5.    *Rule 23(b)(3): Predominance and Ascertainability*

Predominance means that "the questions of law or fact common to class members predominate over [ones] affecting only individual members." Fed. R. Civ. P. 23(b)(3). That is, the rule "tests whether proposed classes are sufficiently cohesive to warrant" class certification. *Hydrogen*, 552 F.3d at 310–11 (quotation omitted) (quoting *Windsor*, 521 U.S. at 623). To that end, Rule 23(b)(3) names four considerations: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely

difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)–(D);

*Hydrogen*, 552 F.3d at 310 n.7.

These four considerations "ask[] the court to balance, in terms of

fairness and efficiency, the merits of a class action against those of

alternative available methods of adjudication."  *Warfarin*, 391 F.3d at

533–34 (quotation omitted) (quoting *Prudential*, 148 F.3d at 316).  A

corollary is that the Court has "a wide range of discretion[]" to handle

this "practical problem."  *Newton*, 259 F.3d at 191 (quotations omitted)

(first quoting *Link v. Mercedes-Benz of N. Am., Inc.*, 550 F.2d 860, 864

(3d Cir. 1977); and then quoting *In re Sch. Asbestos Litig.*, 789 F.2d 996,

1010 (3d Cir. 1986)); *see also, e.g.*, *Bank III*, 795 F.3d at 410 (declaring

that district court may "decid[e] that it [may] address [manageability]

more fully at a later date.").

Though the analyses for commonality and predominance sound

similar, *Hayes*, 725 F.3d at 359, Rule 23(b)(3) is "far more demanding"

and "requir[es] more than a common claim."  *Hydrogen*, 552 F.3d at 311

(citations and quotations omitted).  Thus, in a putative Rule 23(b)(3)

class action, commonality is "subsumed by . . . predominance[.]"

*Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019)

54

(quotation omitted) (citing *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008)).

"Predominance begins[] . . . with the elements of the underlying c[laim]." *Neale*, 794 F.3d at 370 (citations omitted). This is so because "the nature of the evidence . . . suffic[ient] to resolve a question determines whether the question is common or individual," and the Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen*, 552 F.3d at 311 (citations and quotations omitted); *see also Hayes*, 725 F.3d at 359 (stating that predominance asks, "whether essential elements . . . can be proven at trial with common, as opposed to individualized, evidence." (citation omitted)). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (alteration in original) (citation and quotation omitted).

55

"[T]he presence of individual questions does not *per se* rule out a finding of predominance." *Prudential*, 148 F.3d at 315.  Indeed, "Rule 23(b)(3) requires . . . that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).  Ultimately, if "one or more of the central issues . . . are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some . . . members." *Tyson*, 577 U.S. at 453–54 (citation and quotation omitted).

Related to the predominance inquiry is consideration of whether a class proposed under Rule 23(b)(3) is ascertainable.  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (footnote omitted) (citing *Hayes*, 725 F.3d at 354).  This essential (albeit implicit, *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 132–33 (3d Cir. 2023) ("*Niaspan II*")) analysis means that a class treatment is inappropriate "if class members cannot be identified without extensive, individualized factfinding or mini-trials." *Marcus*, 687 F.3d at 592–93 (cleaned up).  To that end, the

analysis "consists of nothing more than . . . two inquiries": (1) whether "the class is defined with reference to objective criteria"; and (2) whether "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (quotations omitted) (first quoting *Hayes*, 725 F.3d at 355; and then citing *Marcus*, 687 F.3d at 593–94). These two prongs, though not "relevant in every case[,]" are "independent from the other requirements of Rule 23." *Id.* at 165.

To be sure, ascertainability "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that class members *can* be identified." *Id.* at 163 (quotation omitted) (emphasis in original) (quoting *Carrera*, 727 F.3d at 308 n.2). That is, "the size of a potential class and the need to review individual files to identify its members are not[, by themselves,] reasons to deny class certification." *Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) (quotation omitted) (citations omitted). Instead, ascertainability seeks to "save[] the resources of both the courts and the parties" by requiring a process that could be completed "in an economical and administratively feasible manner." *Niaspan II*,

67 F.4th at 132 (quotation omitted) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)).

For example, a defending entity's "review of individual records with cross-referencing of voluminous data from multiple sources" may suffice. *Kelly*, 47 F.4th at 224, 223 (collecting cases). Such a review may be based on "[a]ffidavits, in combination with records or other reliable and administratively feasible means." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017) (citing *Byrd*, 784 F.3d at 171). By contrast, transactions that require review of individual transactions may bar certification. *See Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 185 (3d Cir. 2014) ("individual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member."). Nor may a movant obtain certification if it has neither a method to discern "whether individuals should be included in the proposed class," nor a "method for determining" how many of the relevant transactions involved the alleged wrongdoings. *Hayes*, 725 F.3d at 355–56.

Here, the Plaintiffs fall short of their burden on predominance for the Improper IDR Cancellation Class on at least three grounds: (1)

manageability and ascertainability for all claims for breach of contract and state consumer protection statutes; (2) manageability and ascertainability for the UTPCPL causes of action; and (3) manageability of the application of state laws.

### a. *Manageability and Ascertainability*

The undersigned concludes that the Plaintiffs fail to carry their burden on Ballard's proposed class, because their method for identifying members and proving their breach of contract and consumer fraud claims through common evidence raises a barrage of concerns about individualized review of the implicated accounts and transactions. Navient reasons that "individualized issues predominate" the Plaintiffs' claims, because evaluating causation elements necessitates an individualized review of loan borrowers' accounts. Doc. 231 at 37. As such, Navient broadly reasons, the movants, even if they could offer proof that is common to each class, lack "a reliable method" of ascertaining class members and "damages on a classwide basis," *id.* at 39—42, 47, 56 (cleaned up), given that "the damages they seek must be determined at the individual transaction level." *Id.* at 58 (cleaned up).

59

During oral argument, Navient further clarified that its contention rests primarily on the Plaintiffs' method of identifying class members through database search criteria that failed to explain "when each IDR plan applicant applied, was reenrolled, submitted his or her IDR application; and whether he or she was eligible for renewal in the IDR plan." Doc. 276 at 18 (cleaned up). Further, Navient contends, "[c]apitalized interest may be imposed for many different reasons," which are unaccounted for by the Plaintiffs. *Id.* at 70. In other words, neither the parties nor the Court would know, based on that common proof alone, "whether [an] interest capitalization accrued because of the triggering event that [the Plaintiffs] have included in their search criteria[,]" as opposed to "some other event that has nothing to do with this case." *Id.* at 84. Further compounding those factual gaps is that, "[d]uring the relevant period, Navient employed thousands of customer service representatives who regularly engaged with individual borrowers, provided points of contact for [them], addressed [their] questions, and took other steps to . . . facilitate . . . repayment of their student loans. The facts and circumstances relating to one borrower's

student loan servicing thus vary dramatically from [those] of other borrowers."  Doc. 231 at 13.

In support of its position, Navient rely partly on discovery responses provided by Patrick Theurer, a Navient employee.  *Id.* at 70. There, Navient responded to the Plaintiffs' search query for Ballard's Improper IDR Cancellation Class by stating that "the search is not feasible" because, among other things:

(i)  Subsection b:  Plaintiffs appear to assume that NSL received a complete application, and with sufficient time to allow for processing (e.g., an application received one day before the annual renewal deadline might not be processed before expiration of that deadline).  . . . The system would reflect that the document was an IDR application, but *without an assessment of the completeness or correctness of the application.*

(ii)  Subsection c:  . . . in NSL's system, the *reason for the addition of capitalized interest on an account in a particular instance is not reflected in a manner that allows for systematic identification.  Capitalized interest may be imposed for many different reasons*, including, but not limited to, requirements that pertain to IDR plans.

(iii)  Subsection d:  . . . Plaintiffs seemingly assume that NSL did not timely process an application, but then did, and recertified the borrower into partial financial hardship.

Doc. 204-34 at 6—7 (emphases added and omitted).

The Plaintiffs attempt to address those concerns by detailing their method of identification of injured class members.  That method involved running search criteria through a database maintained by Maximus, which services DOE student loans.  Doc. 262 at 37–40, 46–47.  For those DSLP loans, the Plaintiffs state that Lisa Aton, a Maximus employee, discussed during her deposition the Excel spreadsheet resulting from those searches that "itemizes the amount of interest capitalized when each relevant transaction occurred."  *Id.* at 38.  The movants aver that the spreadsheet shows "triggering events," each of which allegedly leads to an interest capitalization, including an IDR plan's expiration.  *Id.* at 39.  Also, the spreadsheet can purportedly be modified to omit any transaction where a triggering event did not result in an interest capitalization, or where an interest capitalization was later reversed, with such instances being identified by a hyphen in the spreadsheet.  *Id.* (citations omitted).  While there was no manual review of those interest capitalizations, Aton confirmed the results by "pulling" several dozens of sample accounts and "crosschecking" them "against information in [each] borrower's file to ensure that the dates and amounts matched."  *Id.* at 39–40 (citation and quotation omitted).

As for the FFELP loans, the Plaintiffs posit that they can use a similar method for the Navient-owned loans. *Id.* at 46–47. The basis for that contention is Theurer's testimony that "Navient's servicing system and ED's servicing system are based on the same loan servicing platform," and that "the basic data structures between the two systems are very, very similar." *Id.* (citations and quotations omitted).

Despite that offer of record evidence, the undersigned concludes that the Plaintiffs' method necessarily calls for an extensive review of individual accounts and transactions, which in turn raises acute predominance concerns. In the first instance, "[t]o the extent that a proposed class contains uninjured class members, plaintiffs must provide a reasonable and workable method for differentiating between uninjured class members and injured class members[.]" *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020) ("*Niaspan I*") (citation omitted).

Here, although the Plaintiffs describe their ability to remove class members designated with a hyphen, they do not offer any evidence showing how many of Ballard's putative class members would remain after that exclusion process. "[A] class should not be certified if it is

63

apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552, at *26–28 (E.D. Pa. 2010) (citation and quotation omitted). This is so because, if "there are a great number of uninjured class members, th[en] it would . . . take many mini-trials to determine which of the class members are uninjured." *Id.* For example, "[w]hile it is perfectly reasonable for the Court to address challenges to a small number of uninjured class members, it would be far more difficult . . . to weed out over 2,000 uninjured class members—or some subset of that number— from a class of over 16,000." *Niaspan I*, 464 F. Supp. 3d at 715 (citations omitted). The Court has no basis in the record to discern how many uninjured members are included in the proposed classes for its predominance (and even numerosity) inquiries.

Critically, while the Plaintiffs repeatedly highlight that Aton's spreadsheet can be used to identify the injured class members and calculate the damages they sustained, that data does not specify the triggering events that cause each interest capitalization. In other words, although the Plaintiffs may well be able to establish the interest

capitalization injuries on a classwide basis through use of data searches and the spreadsheet, they have not provided convincing record evidence showing that they can establish, through common proof, that the underlying reasons for those interest capitalizations are the alleged Navient servicing errors in processing the renewal applications of Ballard's class members.

During oral argument, the Plaintiffs contended that Navient employee Stine "testified that accrued interest is capitalized if an IDR plan is not timely renewed." Doc. 276 at 98. Therefore, "if you do not get an IDR plan recertified by the deadline, you do incur a capitalization of interest." *Id.* at 98—99. The movants also cited a portion of the Aton deposition to aver that "every borrower on [Aton's] spreadsheet has an interest capitalization that was directly caused by Navient's servicing errors." *Id.* at 99–102. To that end, the movants quote Aton's testimony that a "triggering event" "could be from . . . the expiration of the repayment plan," and conclude that there are no other causes. *Id.* at 101. Further, the Plaintiffs aver that since "the way [they] devised [their] searches excludes any" other "reasons that the . . .

65

repayment plan could expire[,]" the spreadsheet decidedly shows all qualifying transactions. *Id.* at 100–02.

But just because an IDR plan expiration will result in an interest capitalization, does not mean that every interest capitalization on the Maximus spreadsheet is attributable to a Navient servicing error. Indeed, the search queries only describe a class member who was "enrolled in an IDR plan" "[o]n or after January 16, 2012"; "submitted an IDR renewal application, which was received by [Navient] within 90 days . . . prior to the deadline"; whose "financial hardship status expired, at which time [his or her] payments were recalculated under the standard repayment plan"; and whose renewal application "was deemed complete[]" "[a]t the time the application received its first review." Docs. 204 at 56; 204-42 at 2. That is, the criteria describe *what* happened to each member, but fail to account for *why* those transactions occurred; particularly, the reason why the borrower's payment was calculated under the standard payment plan—the core basis of the Ballard class's claimed financial injury. Nor does a plain reading of the Aton deposition justify the Plaintiffs' position. Although

66

an interest capitalization *could* be attributable to an operative triggering event, the possibility does not compel that conclusion.

Indeed, a review of the record shows otherwise. Aton herself testified that individual review of an account would be necessary to determine what triggering event resulted in an interest capitalization. Doc. 231-9 at 46–47. When asked by the Plaintiffs' counsel whether an "interest capitalization[] would not have occurred" "[h]ad the triggering event not occurred," Aton did not know. Doc. 231-9 at 38—39. Likewise, Aton could not answer whether the absence of a triggering event would result in the absence of an interest capitalization. *Id.* at 40–41. That testimony corroborates Navient's position that there are multiple circumstances that could lead to an interest capitalization, beyond the alleged servicing errors that form the premise of Ballard's class. Moreover, Navient responded to the Plaintiffs' search query for the Improper IDR Cancellation Class by stating that "the search is not feasible," partly because the database fails to note whether an IDR application was correct and complete, and lacks the capacity to identify the reason an interest capitalization was assessed. Doc. 204-34 at 6—7.

Corroborating that testimony, Dr. Ang opined that "the[] documents [provided by Ballard are] insufficient to . . . connect capitalization events to [Navient's] alleged conduct." Doc. 204-44 at 23–24. Critically, this gap in the Plaintiffs' position is anchored in tangible concerns, not mere hypothetical scenarios. Dr. Ang described two proposed members of Ballard's Improper IDR Cancellation Class who submitted renewal applications but were moved into standard repayment terms because they did not qualify for IDR due to income illegibility, *id.* at 44; *see also* Doc. 276 at 18–20, and so would have been improperly included in the class. Although the Plaintiffs attack those two cases as de minimis examples, it is their burden to establish predominance and ascertainability, not Navient's burden to decisively refute it. And, based on the record before the Court, the Plaintiffs have not met that burden.

As the Plaintiffs put it: "The only question is, 'Why did it capitalize?'" Doc. 262 at 41 (citation omitted). And they fail to explain how that the answer to that question can be proven on a classwide basis through common proof, without the individualized account review that necessarily obviates a finding of predominance. Seemingly anticipating

68

such concerns, the Plaintiffs propose that Ballard's class "can be limited to borrowers whose applications were deemed complete *and approved*," Doc. 262 at 54–55 (cleaned up), and present a proposed redlined edit as an exhibit to their reply brief. Doc. 262-22 at 2. That is, the movants again seek a new, conditional amendment to their approach in their reply brief—a maneuver that suffers from the same plague as the proposed Modified Forbearance Class, and thus warrants denial. And even when considering that proposition, the Plaintiffs fail to offer the remaining number of proposed class members after applying this limitation, thus giving rise to uncertainty over basic numerosity.

The movants cite *Finberg v. Sullivan*, 634 F.2d 50 (3d Cir. 1980), to argue that the Court of Appeals declared that it is "preferable for the Court to narrow the class definitions rather than denying" the Motion. Doc. 276 at 27. However, as their reply brief acknowledges, Doc. 262 at 51, that case merely held that doubts about *commonality* "*might* well be remedied by requiring a more specific or a narrower definition of classes." *Finberg*, 634 F.2d at 64 n.9 (emphasis added). Nowhere in the precedent did the Court of Appeals encourage Third Circuit courts to ignore predominance and ascertainability concerns by adhering to a

69

belated suggestion raised in a reply brief, and redefining a class in a fashion to which the nonmovant did not have an opportunity to respond.

The Maximus database fails to clarify why an interest capitalization occurred in the first place.  As such, the litigants and the Court would need to examine each account and its transactions to confirm whether an interest capitalization could indeed be linked to conduct alleged in the TAC.  Compounding those questions would be a myriad of other inquiries raised by Navient, such as the relevant defenses and damages.  Thus, the numerous inquiries that are inherent to the Plaintiffs' method of ascertaining the Ballard class and establishing predominance overwhelm the common questions and proof presented by Ballard's assertions of breach of contract and violations of the consumer fraud statutes.

This deficiency is particularly pronounced when examining the parties' dispute over proving causation elements for the various claims. As a general matter, a breach of contract claim requires causation analysis.  *See, e.g.*, *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (Pennsylvania requires, among other things, "resultant damages" (citation and quotation omitted)); *Bodenburg v. Apple Inc.*, 146 F.4th

761, 767 (9th Cir. 2025) (California mandates "resulting damages to the plaintiff"). The same applies to the UTPCPL. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d Cir. 2008) (stating that UTPCPL requires "causal connection between the misrepresentation and the harm." (footnote omitted)).[7]

Navient observed as much during oral argument, and noted that the parties are still unsure "whether [an] interest capitalization accrued because of the triggering event" described by "their search criteria or some other event that has nothing to do with this case," even though the Third Circuit "require[s] causation on a common proof of evidence." Doc. 276 at 84—86. The undersigned agrees with Navient; offering form contracts and regulatory provisions as common proof at trial does not remedy the necessity here to establish causation on an individualized basis.

During oral argument, the Plaintiffs contended that they need not "prov[e] causation of injury" since "that[ i]s a question that goes to the

---

[7] The parties' extensive arguments on causation and reliance neglect to discuss the Rosenthal Act, even though the manageability and ascertainability issues apply regardless of the underlying statute. Ballard's class allegations (Doc. 118-3 at 39) and definitions (Docs. 196 at 2; 204 at 56) fail to explain how Navient's communications meet the requirements under the California statute.

merits of the case"; and that, even if they had to establish their action's merits, they can prove causation based on testimony provided by Stine and Aton. Doc. 276 at 97—102. Their basis for the latter argument is Stine's response to questions unrelated to Ballard's class allegations. Doc. 204-21 at 12, 15. Aton's testimony was part of a broader conversation about the triggering event leading to an interest capitalization, albeit without establishing that the event is the only cause that triggers capitalization. *See* Docs. 262-9 at 14—17; 231-9 at 38—40.

In any event, this position is unavailing because, regardless of whether the Plaintiffs must prove causation on the merits, they still must show causation for individual members via common evidence, *see Ware*, 322 F.3d at 225; *Bodenburg*, 146 F.4th at 767; *Hunt*, 538 F.3d at 222, which, even if it existed, would be overwhelmed by the requisite individual inquiries. *See e.g.*, *Georgine*, 83 F.3d at 630; *Marcus*, 687 F.3d at 604; *Barnes*, 161 F.3d at 149. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen*, 652 F.3d at 311 (quotation omitted) (quoting *Newton*, 259 F.3d at 172); *see also Georgine*, 83 F.3d

at 630 (remanding for "important individualized issues [that] overwhelm[ed] any common questions.").

In sum, the Plaintiffs fail to establish that their common questions predominate over inquiries about individual class members. At this stage, the Court is left with far too many unanswered questions about the manageability and ascertainability of Ballard class members in applying the requisite Rule 23 analyses. Therefore, class treatment is inappropriate.[8]

### b.    *UTPCPL Claim Requires Reliance*

In addition to the parties' dispute concerning the specific causation element of the breach of contract claims, they disagree over whether the UTPCPL requires individual borrower reliance on an operative representation. The TAC presents a claim under the UTPCPL based on Navient's allegedly deceptive business practices. Doc. 118-3 at 52–54. The statute prohibits "'[u]nfair methods of competition' and 'unfair or deceptive acts or practices[.]'" 73 Pa. Const.

---

[8] Though it is true that "variations in the rights and remedies available to injured class members under the various laws of the fifty states [do] not defeat . . . predominance," *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011) (en banc) (citations and quotation omitted) (first alteration in original), since the Plaintiffs' spreadsheet methodology is plagued by predominance concerns, the Court need not address amortization and other damages concerns that are raised by the litigants.

73

Stat. § 201–2(4).  Such conduct includes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits[,] or quantities that they do not have[,] or that a person has a sponsorship, approval, status, affiliation or connection that he does not have."  *Id.* § 201–2(4)(v).  A plaintiff who seeks recovery for an applicable presentation "must allege that they relied on the defendant's deceptive conduct."  *Hunt*, 538 F.3d at 222 (footnote omitted) (citing *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001)).

The Motion, premising that the UTPCPL "applies to all class members," and "authorizes payment of actual damages[] or one hundred dollars, whichever is greater," moves for class certification for litigation, trial, and damages purposes.  *See* Doc. 204 at 68–69 (citations and quotations omitted).  Because the statute applies to all of their classes, the movants repeatedly suggest (in their reply brief and at oral argument) that, should the Court find various hurdles in their attempts to seek certification, it "could allow [them] to proceed under . . . the UTPCPL, and abandon the other state law claims."  Doc. 262 at 72–73 (citation and quotation omitted).  Further, the Plaintiffs suggest that, if "difficulties arise in proving actual damages, the[ir] classes can fall back

74

on statutory damages[]" under the statute, thus "eliminat[ing] any possibility of individual damages overwhelming the litigation." *Id.* at 65; *see also* Doc. 276 at 55 ("if any difficulties should arise in performing [damages] calculations, statutory damages can be awarded under the UTPCPL."). In other words, the UTPCPL is offered as an alternative avenue to certification, if other claims fail.

But, as Navient observes, Docs. 231 at 43–44; 276 at 75—76, the Court of Appeals clarified that the requisite individual treatment for finding the element of reliance under the UTPCPL serves as a barrier to class certification. *See Hunt*, 538 F.3d at 222; *see also, e.g.*, *Dukich v. IKEA US Retail LLC*, 343 F.R.D. 296, 308 (E.D. Pa. 2022) (stating that UTPCPL requires that each member "prove justifiable reliance on the defendant's conduct." (citations omitted)); *Coleman v. Commonwealth Land Title Ins. Co.*, 318 F.R.D. 275, 284 (E.D. Pa. 2016) ("The justifiable reliance element of a UTPCPL claim makes . . . a claim inappropriate for class treatment because a plaintiff pursuing such a claim generally will fail to meet the . . . predominance requirement[] of Rule 23.").

Here, reliance precludes class treatment of the Plaintiffs' UTPCPL theory, as their members each must show individual reliance on

75

Navient's representations.  The movants claim that "fraudulent communications" by Navient serve as common proof for their case. Doc. 276 at 38.  More expansively, based on a letter that Navient sent to Ballard (Doc. 204-27), and a deposition statement from Stine that such a letter "was sent to all borrowers after their partial financial hardship status expired"[9] (Doc. 276 at 39, 107), the Plaintiffs contend that they can establish reliance because each proposed member would have acted in reliance on those communications.  *See id.* at 38—39, 107.  "[T]his case is . . . about what Navient did," the movants claim, "not about what [the] borrowers did."  *Id.*

Notwithstanding the uniformity of Navient's communications, the UTPCPL mandates that each member must prove justifiable reliance. *See Hunt*, 538 F.3d at 222 n.4 ("The Supreme Court of Pennsylvania has consistently interpreted the Consumer Protection Law's private-plaintiff standing provision's causation requirement to demand a

---

[9]  The movants state that this statement could be found from Line 19 of Page 58 to Line 6 of Page 59 (Doc. 204-21 at 16) in the Stine deposition.  Doc. 276 at 39.  But the cited part only confirms that the letter is "the notice that [Ballard] is paying under that standard plan," meaning that "she was told . . . that she's going to be switched to the standard repayment plan schedule."  Doc. 204-21 at 16.  A plain reading of the exchange does not clarify whether the same notice was issued to all proposed members of Ballard's class.

showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm." (citing *Weinberg*, 777 A.2d at 446)); *see also, e.g.*, *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) (stating that each UTPCPL plaintiff must prove "deceptive act that is likely to deceive . . . consumer acting reasonably under similar circumstances" (first citing *Seldon v. Home Loan Servs.*, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009); and then citing *Hunt*, 538 F.3d at 223)).

The Plaintiffs do not offer any means of common proof showing that Ballard and her class members relied on Navient's communications. Indeed, Navient produces record evidence stating that "Ballard's experience resulted from a servicing error during processing of her IDR renewal application," Doc. 231 at 20 (citing Doc. 204-21 at 16), not from any act of reliance on the company's statements. Doc. 204-21 at 17. As such, determining whether each member of the Improper IDR Cancellation relied on Navient's communications and acted accordingly requires individual inquiries, which thus would predominate the common questions proposed by the class. The Plaintiffs seem to acknowledge that a reliance element serves as an

insurmountable barrier to class certification, as they "strategically

omitted [their CLRA claim] from [their] certification motion[,] so that

[they] could limit this case to only state laws that do not require a

showing of individual reliance."  Doc. 276 at 39.

The Plaintiffs nonetheless attempt to resuscitate their UTPCPL

theory via two additional arguments.  First, they contend that the

statute "does not require proof of reliance when the defendant took

unilateral action that caused ascertainable losses."  Doc. 262 at 30.

Relying on two opinions issued by a Pennsylvania trial court (*Toth v.*

*Nw. Sav. Bank*, 2013 WL 8538695 (Pa. Ct. Comm. Pleas 2013);

*Patterson v. Fid. Nat'l Title Ins. Co.*, 2015 Pa. Dist. & Cnty. Dec. LEXIS

479 (Pa. Ct. Comm. Pleas 2015)), the movants plead that the UTPCPL

does not require reliance in fraud cases, as "a plaintiff must prove

reliance only when a finding of reliance is needed to establish that

plaintiffs actually suffered an ascertainable loss as a result of

defendants' use or employment of fraudulent or deceptive conduct."

Doc. 262 at 29–31 (quotation omitted).  They also rely on *In re*

*Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), to claim that

"[r]eliance issues do not defeat a finding of predominance," as they "go

right to the right of a class member to recover in contrast to underlying common issues of the defendant's liability." Doc. 276 at 106—07 (citations and quotations omitted).

This first position is unavailing, as a federal court's reasoning is not dictated by state trial courts. *See, e.g., Gov't Emp. Ins. Co. v. Mt. Prospect Chiropractic Ctr., P.A.*, 98 F.4th 463, 467 (3d Cir. 2024) ("When federal courts answer questions of state law, they rule as they predict the state supreme court would." "If that court has not issued a determinative decision, we may consider decisions from state appellate courts, though we are not bound by them[.]" (citations omitted)). As for *Linerboard*, that decision concerned an antitrust suit, whose reliance element, as Navient noted during oral argument, "is much different [from] what [the Court is] dealing with here." Doc. 276 at 114. Namely, "the effect of cartel pricing on consumers is universal," while "student loan servicing is a highly individualized process." Doc. 231 at 12 (citations omitted).

Indeed, the Court of Appeals ruled that UTPCPL plaintiffs "must allege that they relied on the defendant's deceptive conduct." *Hunt*, 538 F.3d at 222 (citation and footnote omitted). "Nothing in the

79

statute's legislative history suggests that the legislature ever intended . . . to do away with the traditional common law elements of reliance and causation." *Id.* at 222—23 (cleaned up).  And, because "proof of [an] essential element[] of the [UTPCPL] cause of action requires individual treatment, . . . class certification is unsuitable." *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190 (3d Cir. 2020) (citation omitted).

Second, the Plaintiffs rely on *Prudential* to suggest that, if "a deceptive practice involves an omission" "reliance can be presumed." Doc. 262 at 29 (citing 148 F.3d at 314).  But, as Navient noted during oral argument, Doc. 276 at 76—78, neither the TAC (which is solely based on Navient's alleged deceptive practices, Doc. 118-3 at 52—54) nor the Motion identified omission as part of Navient's misrepresentations. Nor did the movants counter Navient's observation by proffering any record evidence supporting this new omission theory.  "Class certification is not a time for asserting new legal theories that were not pleaded in the complaint." *Walden*, 2025 WL 2696463, at *4 (cleaned up); *see also Velazquez v. State Farm Fire & Cas. Co.*, 2026 WL 837103, at *6 (E.D. Pa. 2026) ("If a claim has not been alleged in a complaint, a

district court cannot certify a class to litigate those claims." (citations omitted)).

Even if the belated omission theory could be considered, the reply brief fails to discuss how those alleged omissions satisfy the Rule 23(a) and Rule 23(b)(3) factors. "[A]rguments raised in passing . . . , but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. SIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (citing *Commonwealth of Pa. Dep't of Pub. Welfare v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996)); *see also In re Revstone Indus. LLC*, 690 F. App'x 88, 90–91 (3d Cir. 2017). Thus, the undersigned cannot assess whether the omission theory applies to this action, as the Plaintiffs do not meet their burden of providing a corresponding analysis. *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350. Therefore, the UTPCPL cannot serve as a backup remedy for the various impediments to class certification addressed in this R&R.

### c. *Manageability of Application of State Laws*

Navient opines that the proposed classes are unmanageable, as a jury trial on their breach of contract claims, as well as the relevant defenses and choice of law issues, could require individual inquiries and

applications of the law of all 50 states.  Doc. 231 at 14–15, 47–49.  The Plaintiffs respond by invoking the principle that variations between state laws per se do not defeat a finding of predominance.  Doc. 262 at 70–72.  They further suggest that, "if variations in state law are deemed so substantial as to preclude certification, the Court could allow [them] to proceed under Pennsylvania contract law and the UTPCPL, and abandon the other state law claims."  *Id.* at 72–73 (citation omitted).  Neither positions, which focus on certification for trial, illuminate the ongoing issues at the current litigation stage.  *See Prudential*, 148 F.3d at 321 (establishing that certification may be granted or stripped "at any time during the litigation[.]" (citing *Asbestos*, 789 F.2d at 1011)).

Manageability addresses "the whole range of practical problems that may render the class action format inappropriate for a particular suit," and thus is an issue "with which a district court generally has a greater degree of expertise and familiarity[.]"  *Newton*, 259 F.3d at 191 (quotations omitted) (first quoting *Asbestos*, 789 F.2d at 1011; and then quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)).  "[P]redominance is not defeated merely because different states' laws apply to different class members' claims."  *Marcus*, 687 F.3d at 594 n.3

(citing *DB*, 667 F.3d at 301–02); *see also Warfarin*, 391 F.3d at 529–30 (holding that mere implication of "laws of . . . fifty states in [certification of litigation classes] does not defeat commonality and predominance."). But, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen*, 552 F.3d at 311 (quotation omitted) (quoting *Newton*, 259 F.3d at 172).

Consequently, a class plaintiff averring a breach of contract must "*explain*[] how breach could be shown in a manner common to the class." *Hayes*, 725 F.3d at 359 n.7 (emphasis added); *see also Newton*, 259 F.3d at 191. Such an explanation comes in the form of, for example, "a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims." *Prudential*, 148 F.3d at 315 (citation and quotation omitted).

Put differently, a mere assertion, as offered by the Plaintiffs here, that "the differences between the state laws within each group are insignificant or non-existent[]" is insufficient. *Grandalski*, 767 F.3d at 184–85. This is so because "the district court must determine whether variations in state laws present the types of insuperable obstacles which render class action litigation unmanageable." *Warfarin*, 391 F.3d

83

at 529 (first citing *Prudential*, 148 F.3d at 315; and then citing *Asbestos*, 789 F.2d at 1010).  This concern becomes especially acute if the movant seeks to certify a class for litigation or trial (as opposed to settlement or an injunctive relief) purposes.  *See id.* (quoting *Windsor*, 521 U.S. at 620); *DB*, 667 F.3d at 301–04 (stating that litigation classes may present "insuperable obstacles" or "intractable management problems" (footnote and quotations omitted) (first citing *Bank I*, 418 F.3d at 299; and then citing *Warfarin*, 391 F.3d at 529)).

The undersigned concludes that the Plaintiffs fail to meet their burden on manageability issues for two reasons.  First, the movants only rely on the alleged similarities between state breach of contract laws.  They repeatedly contend that the applicable laws are "substantively similar," Doc. 262 at 71–72, and postulate that "it is [thus] unlikely that jury instructions will pose any difficulties because the contested issues are legal in nature."  *Id.* at 71 (citation omitted).  In doing so, the Plaintiffs assert that the relevant statutes of California, Illinois, New York, and Pennsylvania are similar since they contain causal languages.  *Id.* (citing *id.* at 29–31).  Such bare assertions cannot

84

serve as a substitute for the requisite grounds for class certification. *See Grandalski*, 767 F.3d at 184–85; *DB*, 667 F.3d at 301–04.

While the Plaintiffs rely on several decisions released by the Court of Appeals, a review of those cases reveals that the movants overlook certain key aspects. For example, the Plaintiffs cite *DB*, in which the Court of Appeals held "that variations in the rights and remedies available to injured class members under the various laws of the fifty states do not defeat . . . predominance[,] because . . . there would simply be no class that could meet the predominance test[]" otherwise. Doc. 262 at 70 (quotations omitted) (quoting 667 F.3d at 301, 310). But that decision also stressed that, "if the applicable state laws can be *sorted into a small number of groups*," "then certification of subgroups embracing each of the dominant legal standards can be appropriate." *DB*, 667 F.3d at 302 (emphasis added) (citations and quotations omitted). Also, the decision reviewed a settlement class certification, with which a Third Circuit court may not be "as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial." *Id.* at 303

(quotation omitted) (alteration in original) (quoting *Brokerage,* 579 F.3d at 269).

*Marcus*, cited for a similar position, Doc. 262 at 70–71, did not opine on the burden of proof for applicability of state laws, and instead stated in a footnote that "predominance is not defeated *merely* because different states' laws apply to different class members' claims." 687 F.3d at 594 n.3 (emphasis added).  That is, the decision neither discussed nor reduced the burden for a movant seeking to leverage alleged similarities between potentially applicable state laws.

Further, the Plaintiffs quote *Prudential's* observation that "[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit."  Doc. 262 at 72 (quotation omitted) (quoting 148 F.3d at 315).  But the movants' argument neglects the explanation that immediately follows the quoted language: that a valid class certification should be "based on a *creditable showing* that class certification did not present insuperable obstacles relating to variances in state law." *Prudential*, 148 F.3d at 315 (cleaned up).  Indeed, the *Prudential*

86

respondents, who moved for settlement class certification, *id.* at 289, still "compiled a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims[]" to establish that class certification was warranted. *Id.* at 315 (citation and quotation omitted).

The Plaintiffs quote *Pick-Up Truck* to aver that a "subclass could be tried separately," so long as "[t]he laws of the 50 states could be reduced to four general patterns, providing the framework for sub-classes if the nationwide action had proven unmanageable." Doc. 262 at 72 (quotation omitted) (quoting 55 F.3d at 817–18). However, in doing so, the movants omit that the *Pick-Up Truck* "counsel demonstrated to the court how the laws of the 50 states could be reduced to four general patterns, providing the framework for sub-classes if the nationwide action had proven unmanageable." 55 F.3d at 817–18 (emphasis added) (footnote omitted) (citing *Asbestos*, 789 F.2d at 1011). The pattern analysis accompanied the class certification motion, which, again, was meant for settlement purposes only. *Id.* at 777.

A theme permeating three of the four decisions cited by the Plaintiffs (*DB*, *Prudential*, and *Pick-Up Truck*) is the movant's burden

87

to prove, through a meticulous analysis of the potentially relevant state laws, that application of those authorities would be feasible on a class or subclass basis. *DB*, 667 F.3d at 302; *Prudential*, 148 F.3d at 315; *Pick-Up Truck*, 55 F.3d at 817–18. The Plaintiffs are correct that variances in the laws of the 50 states do not, by themselves, prohibit class certification. But their burden to prove how those variances are not prohibitive to certification, or how they can be addressed by grouping putative class members into sub-classes, remains undiminished—especially given that they appear to be moving for litigation and trial class certification. That is, their perfunctory reliance on the purported similarities among the four state statutes' causal phrases cited in the TAC—as opposed to analyses of the laws of all 50 states, including their elements; the relevant rules, materiality and evidence standards, remedies, and defenses, as noted by Navient, Docs. 231 at 48–49 (citing *Ritti v. U-Haul Int'l, Inc.*, 2006 WL 1117878, at \*12–14 (E.D. Pa. 2006)); and choice of law issues—falls short of meeting their burden under Rule 23(b)(3).

Second, and similar to the issue with the Modified Forbearance Class addressed above, the Plaintiffs' reply brief presents many issues

that should have been addressed in the opening brief.  The Plaintiffs claim that: (1) *if* "the case is tried on liability, jury instructions would be easy to draft because the applicable statutes are substantively similar"; (2) "*if* the Court determines that proof of reliance is required under any statute, the corresponding subclass could be tried separately"; and (3) "*if* variations in state law are deemed so substantial as to preclude certification, the Court could allow Plaintiffs to proceed under Pennsylvania contract law and the UTPCPL, and abandon the other state law claims."[10]  *Id.* at 71–73 (emphasis added) (citations omitted). But class counsels' assurances that they can devise a solution in the future to remediate this hurdle does not overcome judicial concerns about manageability.  *Newton*, 259 F.3d at 191 (quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (3d Cir. 1977)); *Hydrogen*, 552 F.3d at 321.

---

[10] On this third point, the Plaintiffs cite to *Chin* for its holding that "plaintiffs have several options for creation of a more manageable class action, which includes dropping those causes of action deemed less important by Plaintiffs."  Doc. 262 at 72–73 (quoting *Chin*, 182 F.R.D. at 458–59).  As noted above, this proposition cannot substitute the movant's burden under Rule 23.  *See Chin*, 182 F.R.D. at 458–59.

Moreover, those issues, which are raised in the reply brief in one or two sentences, run afoul of another procedural maxim—that "arguments raised in passing . . . , but not squarely argued, are considered waived." *Wyeth*, 119 F.3d at 1076 n.6 (citation omitted); *see also Revstone*, 690 F. App'x at 90–91. Notwithstanding the validity of the Plaintiffs' conditional arguments, the undersigned cannot determine whether they are applicable to the instant suit. Indeed, even the prospect of proceeding under only Pennsylvania contract law and the UTPCPL is bereft of any corresponding analysis of the resulting class's Rule 23 factors, including whether that truncated class is sufficiently numerous in the first instance, or how Ballard (a California resident), Pokorni (an Illinois resident), or Varno (a New York resident) are adequate representatives for classes premised on Pennsylvania law. That burden rests with the movant, not the Court. *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350.

### 6.    *Superiority*

Though the conclusion on predominance and ascertainability obviates discussion of superiority, the undersigned nonetheless includes the following analysis on this last Rule 23(b)(3) factor in the interests of

completeness.  Superiority asks whether "a class action is superior to other . . . methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In answering this question, the Court must consider the following four factors: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  *Id*. R. 23(b)(3)(A)–(D).

Navient mounts a three-front attack on this factor.  First, it argues that "the need for individual inquiries relating to each borrower's claims and defenses" requires "hundreds of thousand[s] of mini-trials" and thus "undermines any benefit class treatment could provide."  Doc. 231 at 72 (cleaned up).  Second, Navient asserts that the Plaintiffs should have submitted a trial plan to facilitate the Court's administration of the proposed classes and subclasses.  *Id*. at 72–73.  Third, the company states that "[b]orrowers can . . . pursue claims relating to the servicing of their loans in individual suits."  *Id*. at 73–74.

91

The Plaintiffs respond by first proposing that individual inquiries are offset by "computer search results, spreadsheet, and availability of statutory damages" "both on liability and damages." Doc. 262 at 79. As for Navient's second point, the Plaintiffs correctly observe that trial plans are not required for a sustainable class action. *Id.* at 79–80. Finally, the Plaintiffs assert that an individual plaintiff may lack an incentive to pursue his or her own litigation, thus rendering the class action a superior vehicle for litigation. *Id.* at 80.

Upon review of the record and the parties' briefs, the undersigned concludes that Ballard fails to carry her burden on this issue. The first Rule 23(b)(3) factor (interest in separate actions) is met because, as both parties note, Docs. 231 at 73–74; 262 at 80, an individual federal loan borrower's claim is relatively small, and thus unlikely to be prosecuted on an individual basis. *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 513 (2017) ("The very premise of class actions is that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (quotations omitted) (quoting *Windsor*, 521 U.S. at 617)). The second consideration (existence of preexisting litigation on same controversies)

is also satisfied—after eight years, this action has progressed through partial discovery, and neither side identifies any other active cases pending on the issues raised by this lawsuit.

However, the remaining two factors strongly advise against a finding of superiority. As set forth above, since the individual inquiries concerning causation, damages, and proof predominate over the common questions, the third factor (wisdom of concentrating the relevant issues into one forum) indicates that the Plaintiffs and their proposed class members would be better served by pursuing recovery on an individual basis. A corollary is that, due to the barrage of individual inquiries and the resultant manageability deficiencies, the fourth consideration (manageability) opposes certification. *See In re LifeUSA Holding Inc.*, 242 F.3d 136, 144 (3d Cir. 2001); *Newton*, 259 F.3d at 190–193. Accordingly, the undersigned concludes that the Plaintiffs fail to satisfy the superiority analysis.

### E. The Improper IDR Cancellation Class and the Improper Delay Class Premised on Loss of Interest Subsidies Should Be Denied With Prejudice

The undersigned recommends that the Motion be denied with prejudice for Ballard's Improper IDR Cancellation Class and Pokorni's

Improper Delay Class, to the extent the latter alleges a loss of interest subsidies. The Court has the discretion to deny class treatment without prejudice, if further litigation might lead to viable class treatment. *See, e.g., Gray v. Bayer Corp.*, 2011 WL 2975768, at *7–8 (D.N.J. 2011) (permitting leave to renew motion for class certification since movant "devoted no more than two short footnotes to argu[e] . . . that certification of his proposed [alternative] class is permissible under Rule 23," and "parties have provided no guidance" on futility of that proposed class); *Bamgbose v. Delta-T Grp., Inc.*, 724 F. Supp. 2d 510, 518–19 (E.D. Pa. 2010) (granting opportunity to present discovery plan and proposed deadline for renewed class certification motion, partly due to viable motion to amend complaint).

In contrast, existing precedents show at least four scenarios in which a class certification motion was denied with prejudice: (1) failure to establish that amending the complaint may lead to viable a class certification motion, *see Bamgbose*, 724 F. Supp. 2d at 518–19; (2) failure to move for class treatment by the court-imposed deadline, *Wilson v. Seven Seventeen HB Phila. Corp. No. 2*, 2001 WL 484193, at *3–5 (E.D. Pa. 2001); (3) failure to meet Rule 23(a) factors, *see, e.g.,*

*Karnuth v. Rodale, Inc.*, 2005 WL 747251, at *2–4 (E.D. Pa. 2005);

*Vinson v. Seven Seventeen HB Phila. Corp.*, 2001 WL 1774073, at *27,

*32 (E.D. Pa. 2001); and (4) failure to demonstrate Rule 23(b)(3) factors,

*see, e.g.*, *Matjastic v. Quantum Pharmics, Ltd.*, 1991 WL 238304, at *6–

7 (E.D. Pa. 1991).

Here, the undersigned, having considered the parties' briefs and

the record, recommends that class certification of Ballard's Improper

IDR Cancellation Class, and Pokorni's Improper Delay Class based on

interest subsidy losses, be denied with prejudice.[11]  The parties do not

discuss whether a potential denial of class certification for a class

should be with or without prejudice, though Navient hints that any

denial should be with prejudice.  *See* Doc. 231 at 37 ("their final attempt

here fails.").

However, the undersigned concludes that this action's procedural

posture warrants denial with prejudice since the Plaintiffs failed to

indicate whether they might be able to overcome the Rule 23(b)(3)

concerns after either additional opportunity to offer evidence of record,

---

[11]  As the portion of Pokorni's class premised on delayed loan forgiveness should be dismissed for lack of standing, it "reflects a lack of jurisdiction, so . . . should [be] without prejudice." *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 896 (3d Cir. 2020).

or further discovery to obtain that evidence, despite having already conducted a lengthy class discovery period in a years-long litigation. The Plaintiffs, for all of their conditional, noncommittal proposals, *see, e.g.*, Doc. 262 at 51 (suggesting that the Court could "narrow the classes"), 54 (suggesting that the Court could "narrow" Ballard's class), 67 (suggesting that the Court could "exclude actual damages"), 70 (suggesting that the Court could "create subclasses"), 72–73 (suggesting that the Court could try each subclass separately, and "allow Plaintiffs to . . . abandon the other state law claims"), fail to state whether additional briefing or discovery might warrant another opportunity at class certification. This despite having ample opportunity to fully present their analyses of the Rule 23 factors in their briefing and oral argument for Ballard's class (including when limited to approved applications), and Pokorni's class (including when limited to those who lost interest subsidies). Navient's position is clear: "We[ are] eight years into litigation. They're still changing class definitions at the last minute." Doc. 276 at 89.

The undersigned agrees that raising the possibility of potentially curable discovery or amended pleadings would impose an undue burden

96

on all of the parties and the Court.  *See Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350; *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("undue delay," "repeated failure to cure deficiencies by amendments previously allowed," "undue prejudice to the [nonmovant] by virtue of allowance of the amendment," "futility of [the] amendment").  As the Plaintiffs have failed to carry their burden to discuss those issues or establish the Rule 23 factors, despite being afforded three amended pleadings, extensive class discovery, and extensive class certification briefing, denial with prejudice for Ballard's class and the remaining Pokorni class is warranted.  *See Bamgbose*, 724 F. Supp. 2d at 518–19; *Matjastic*, 1991 WL 238304, at \*6–7; *see also Carrera*, 727 F.3d at 306; *Dukes*, 564 U.S. at 350.  Further litigation would not "secure the just, speedy, and inexpensive determination of" this action.  Fed. R. Civ. P. 1.

The undersigned acknowledges that many of the issues addressed herein may well prove to be insurmountable hurdles in any further attempt to seek certification of Varno's classes, and that repeated litigation poses a measure of potential prejudice to Navient.  However, in consideration of the complexity of this action, and that evaluation of those two classes was not conducted through full briefing and citation to

the existing record, dismissal without prejudice of the Varno classes is warranted.

## V.   <u>Recommendation and Notice</u>

For the reasons set forth above, it is **RECOMMENDED** that:

1.   The pending motion for class certification (Doc. 196) be:

    a.   **DENIED WITH PREJUDICE** for the Improper IDR Cancellation Class and the portion of the Improper Delay Class that alleges a loss of interest subsidies; and

    b.   **DENIED WITHOUT PREJUDICE** for the No Administrative Forbearance Class, the Forbearance Without Consent Class, and the portion of the Improper Delay Class that alleges delayed loan forgiveness.

2.   This matter be **REFERRED** back to the undersigned for further pretrial management.

All parties are placed on notice that, under Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a

habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

M.D. Pa. L. R. 72.3. The failure to file timely objections to the foregoing

R&R may constitute a waiver of any appellate rights. *See Nara v. Frank*,

488 F.3d 187, 194 (3d Cir. 2007).


Date:  August 10, 2026            *s/ Phillip J. Caraballo*
                                  Phillip J. Caraballo
                                  United States Magistrate Judge