# APPENDIX OF UNPUBLISHED OPINIONS

1. *Campbell v. County of Mercer*, No. 2:23-cv-00099-CB-KT, 2025 WL 965181 (W.D. Pa. Mar. 31, 2025)
2. *Caporale v. EIDP, Inc.,* Civil Action No. 19-1672-JLH-SRF, 2026 WL 967253 (D. Del. Feb. 10, 2026)
3. *Chedwick v. UPMC*, Civil Action No. 07-806, 2011 WL 1559792 (W.D. Pa. Apr. 21, 2011)
4. *Matjastic v. Quantum Pharmics, Ltd.*, Civ. A. No. 90-0647, 1991 WL 238304 (E.D. Pa. July 22, 1991)
5. *McNeil v. Global Tel-Link*, CIVIL ACTION NO. 3:15-cv-01243, 2018 WL 6332847 (M.D. Pa. Nov. 9, 2018)
6. *Morris v. Computer Credit, Inc.*, No. 3:09cv1885, 2010 WL 3620188 (M.D. Pa. Sept. 10, 2010)
7. *Philbin v. Brett Dinovi & Assocs., LLC*, No. 21-cv-20402, 2024 WL 1907192 (D.N.J. Jan. 10, 2024)
8. *Servis One, Inc. v. OKS Grp. LLC*, No. 24-1301, 2025 WL 733670 (3d Cir. Mar. 7, 2025)
9. *Siino v. Foresters Life Ins. & Annuity Co.*, Case No. 20-cv-02904-JST, 2022 WL 20184654 (N.D. Cal. July 26, 2022)
10. *Smith v. Allegheny Technologies, Inc.*, 2:19-cv-147, 2022 WL 10755425 (W.D. Pa. Aug. 1, 2022)
11. *Webb v. Discovery Prop. & Cas. Ins. Co.*, No. 3:08 CV 01607, 2014 WL 105608 (M.D. Pa. Jan. 9, 2014)
12. *Wilson v. Seven Seventeen HB Phila. Corp. No. 2*, No. Civ.A. 99-1729, 2001 WL 484193 (E.D. Pa. Mar. 7, 2001)

1

2025 WL 965181
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Joyelle CAMPBELL, et al., Plaintiffs,
v.
The COUNTY OF MERCER, Defendant.

2:23-cv-00099-CB-KT
|
Signed March 31, 2025

**Attorneys and Law Firms**

D. Aaron Rihn, Sara J. Watkins, Robert Peirce & Associates, P.C., Pittsburgh, PA, for Plaintiffs.

Erika Vasques, Paul D. Krepps, Marshall, Dennehey, Warner, Coleman & Goggin, Pittsburgh, PA, Nathan Marinkovich, Cohen Seglias Pallas Greenhall & Furman, Pittsburgh, PA, G. Michael Garcia II, MacDonald, Illig, Jones & Britton LLP, Erie, PA, for Defendant.

## MEMORANDUM ORDER

Cathy Bissoon, United States District Judge

***1** This case has been referred to United States Magistrate Judge Magistrate Kezia O. L. Taylor for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. §§ 636(b)(1)(A) and (B), and Local Rule of Civil Procedure 72.

On March 3, 2025, the Magistrate Judge issued a Report (Doc. 51) recommending that Plaintiffs' Motion for class certification (Doc. 36) be denied. Service of the Report and Recommendation ("R&R") was made on the parties, and Plaintiffs have filed Objections. *See* Doc. 52. Defendant timely has submitted a Response, filed at Doc. 54.

Having conducted a de novo review, the Court will adopt the R&R and deny Plaintiffs' Motion. The Magistrate Judge's reasoning is thorough and sound, and it compels a denial of class certification. For the sake of clarity moving forward, the Court adds the following.

Footnote 1 of the Report highlights the oddity of Defendant's assertion of merits arguments, typically made under Rule 12 or Rule 56, in opposing class certification. The Court agrees with the sentiment, and - during case management discussions - Defendant might have urged that a dispositive motion be considered at the fore. This may have been proposed, but Judge Taylor and undersigned are not privy to the case management discussions. Those were had by Magistrate Judge Lisa Pupo Lenihan, before she left the bench. To her credit, Judge Lenihan's Minutes note that she raised *Florence*[1] at the Initial Conference; and the case management plan was agreed on by the parties. *See* Doc. 22. In any event, Judge Taylor was correct to adjudicate only the Motion presented.

The analyses in *Florence* and its progeny significantly bolster her rejection of the class vehicle. Plaintiffs' central premise is fatally inconsistent with binding legal authority. The first paragraph of the operative Complaint reads:

> This is a class action brought to redress the [allegedly unconstitutional] uniform practice and procedure of strip searching all individuals who enter the [Jail] ... *regardless of the crime upon which they are charged* and whether or not the detainees are pre-arraignment.

Am. Compl. (Doc. 15) at ¶ 1 (cleaned up, emphasis added). Although not addressed in the class definition, counsel also note that the policy applies regardless of whether there is "suspicion that [a detainee] might be carrying contraband," or whether a detainee's characteristics affect risk-level. *Id.* at ¶ 2. Counsel also claim, on information and belief, that a strip search is conducted "even if [a detainee is] to be held alone without any contact with other detainees." *Id.* But the putative class definition excludes reference to anything but the seriousness of the criminal charges:

> [The proposed class consists of all] persons who have been or will be placed into the custody of the Mercer County Jail after being charged with misdemeanors, summary offenses, violations of probation or parole, traffic infractions, civil commitments, or other minor crimes and were or will be subjected to strip searches prior to being arraigned and/or provided with a reasonable opportunity to post bail ....

***2** *Id.* at ¶ 11.[2]

Plaintiffs' class definition targets an aspect expressly prohibited from consideration. This is most evident from the decision in J.B. ex rel. Benjamin v. Fassnacht, 801 F.3d 336 (3d Cir. 2015). There, the plaintiff challenged a policy materially similar to the one here, in all but one respect. Detainees were strip-searched, prior to a judicial hearing, regardless of the seriousness of their charges or their threat-level. The lone distinction: the policy in *Benjamin applied to juvenile detainees.*

If ever there was reason to deviate from *Florence*, an application involving minors would seem a compelling case. Yet the *Benjamin* Court found the policy constitutional, and it expressly rejected Plaintiffs' central premise here:

> Because officers in any detention facility have an essential interest in readily administrable rules, blanket strip search policies upon admission to the general population of a jail, regardless of whether the detainee is a juvenile or adult, make good sense. Any other policy would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility.... [T]he Supreme Court addressed this type of inquiry in rejecting the ... argument for an exclusion for non-serious offenders, [and] we similarly reject [the] argument that juveniles are to be excluded, or ... that non-serious juvenile offenders be excluded.

*Id.* at 345-46 (emphasis added, internal quotations and citations to quoted and other sources omitted).

The only avenues available to Plaintiffs, *individually*, are the hypothetical exceptions contemplated in *Florence. Benjamin* at 341. They might apply when a detainee will have no "substantial contact with other detainees"; or when he or she "could be held in available facilities apart from the general population." *Id.*

Plaintiffs' class definition does not include aspects supporting a *Florence* exception, and this does not seem accidental. It is fairly obvious that potential exceptions require individualized inquiries, threatening a degeneration into mini-trials. Accounting for *Florence* and *Benjamin*, the impropriety of class treatment is all the more apparent.[3]

***3** These things being said, the individual Plaintiffs have included enough allegations to pursue *Florence* exception(s). *See* Doc. 15 at ¶ 51 (Ms. Campbell never was assigned to the Jail's general population) *and id.* at ¶¶ 65-67 (the same for Mr. Boyd, and there are additional allegations regarding his time in a "classification block"). The denial of class certification is without prejudice to the named Plaintiffs' pursuit of individual claims.

Finally, the Court makes clear one point, and one expectation. The point: Plaintiffs will not be granted leave to amend their class allegations. This case was filed over two years ago, and Plaintiffs already once

have amended their pleadings. They clearly articulated their theory for class treatment, and it is precluded under binding legal authority. Litigation, generally, and the class vehicle, specifically, do not invite games of “hunt the peanut.” Counsel were aware of the *Florence* exceptions, or they would not have included such allegations on behalf of the individual Plaintiffs. Allowing additional amendment also would result in unfair prejudice to Defendant, and the delay is unexcused. The case may proceed only with individual claims. The class aspects are over.

The Court's expectation is that this case will proceed expeditiously on Plaintiffs’ individual claims. The parties already have enjoyed an extended period for class discovery, which required investigation into the individual Plaintiffs’ circumstances, for the purposes of adequacy and typicality. Although the Court doubts that additional discovery is - or should be - necessary, any additional period must be brief, and counsel's efforts, expedited.

Consistent with the above, Plaintiffs’ Motion for class certification (**Doc. 36**) is **DENIED**, and the R&R (**Doc. 51**) is adopted as the Opinion of the District Court as supplemented above.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 965181

## Footnotes

1 Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318 (2012).

2 The class definition's references to putative members’ pre-arraignment status and inability to post bail are subsumed in the relevant *Florence* analyses, below, and thus are inapposite.

3 The fact-intensive, individualized inquiries required by the putative *Florence* exceptions likely informed Defendant's decision not to file a motion under Rule 12. A way around this might be to seek conversion to summary judgment, and urge that it be resolved ahead of the class aspects. To be sure, these are not casual “asks.” *Cf.* Fed. R. Civ. P. 23(c)(1)(A) (class issues must be determined as “early [as] practicable”). To be convincing, counsel would have to account for the time-sensitivity (e.g., limited, expedited discovery) and demonstrate the superiority of their plan (e.g., discovery on the named plaintiffs would shed light on their adequacy and typicality as putative class representatives).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

2026 WL 967253
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Candy CAPORALE, Bruce Davis, Gene Sullenberger, and Christine Wootten, for themselves and on behalf of all others similarly situated, Plaintiffs,
v.
EIDP, INC., the 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), Atotech USA, LLC, MacDermid, Inc., Procino Plating, Inc., a/k/a Procino Enterprises, a/k/a Procino, and Blades Development LLC, Defendants.

Civil Action No. 19-1672-JLH-SRF
|
Signed 02/10/2026

**Attorneys and Law Firms**

Thomas C. Crumplar, Jacobs & Crumplar, P.A., Wilmington, DE, Andrew W. Croner, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, David Thomas Crumplar, Patrick Christopher Gallagher, Jacobs & Crumplar, New Castle, DE, Andrew W. Croner, Pro Hac Vice, Eric F. Citron, Pro Hac Vice, Gabriel M. Vazquez, Pro Hac Vice, Kathleen Foley, Pro Hac Vice, Patrick Haines, Pro Hac Vice, Patrick J. Lanciotti, Pro Hac Vice, Veronica Vazquez Santiago, Pro Hac Vice, for Plaintiffs Candy Caporale, Bruce Davis.

Thomas C. Crumplar, Jacobs & Crumplar, P.A., Wilmington, DE, Andrew W. Croner, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, David Thomas Crumplar, Patrick Christopher Gallagher, Jacobs & Crumplar, New Castle, DE, Andrew W. Croner, Pro Hac Vice, Eric F. Citron, Pro Hac Vice, Gabriel M. Vazquez, Pro Hac Vice, Kathleen Foley, Pro Hac Vice, Patrick Haines, Pro Hac Vice, Patrick J. Lanciotti, Pro Hac Vice, Veronica Vazquez Santiago, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, for Plaintiffs Gene Sullenberger, Christine Wootten.

Gerard F. Gray, Doroshow, Pasquale, Krawitz, & Bhaya, Wilmington, DE, William Joseph Kassab, Parkowski, Guerke & Swayze, Wilmington, DE, for Defendant Procino Plating, Inc.

Brian Tome, Fisher Broyles, LLP, Wilmington, DE, Victoria Ashley Partington, Reilly, McDevitt & Henrich, P.C., Center Valley, PA, for Defendant Blades Development LLC.

Andrew Colin Mayo, Catherine A. Gaul, Ashby & Geddes, Wilmington, DE, Brian A. Biggs, Biggs Law Firm, LLC, Wilmington, DE, Alexandra B. Cunningham, Pro Hac Vice, Madison W. Sherrill, Pro Hac Vice, Michael J. Bisceglia, Pro Hac Vice, Neil K. Gilman, Pro Hac Vice, Thomas R. Waskom, Pro Hac Vice, for Defendant Atotech USA, LLC.

**REPORT AND RECOMMENDATION**

Sherry R. Fallon, UNITED STATES MAGISTRATE JUDGE

***1** Presently before the court in this putative class action are the following motions: (1) the motion to exclude the testimony of Dr. Richard Laton, filed by defendants 3M Company ("3M"); EIDP, Inc. ("EIDP"); Atotech USA, LLC ("Atotech"); MacDermid, Inc. ("MacDermid"); Procino Plating, Inc. ("Procino"); and Blades Development LLC ("Blades Development"),[1] (D.I. 437);[2] (2) the motion for class certification under Federal Rule of Civil Procedure 23, filed by plaintiffs Candy Caporale, Bruce Davis, Gene Sullenberger, Christine Wootten, and all others similarly situated (collectively, "Plaintiffs"), (D.I. 464);[3] and (3) Blades Development's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (D.I. 459).[4] For the following reasons, I recommend that the court DENY Defendants' motion to exclude Dr. Laton's testimony, DENY Plaintiffs' motion for certification of an issue class, and DENY Blades Development's motion for summary judgment.

## I. BACKGROUND

As described in more detail at Sections I.B and II.B.1, *infra*, this is an unusual case beset by numerous delays before, during, and after the briefing on Plaintiffs' motion for class certification. Both sides expended significant time and resources briefing Plaintiffs' motion to certify proposed personal injury and property damage classes under Rule 23(b)(3). (D.I.

356; D.I. 431; D.I. 463) Nearly a year later, Plaintiffs abandoned the proposed Rule 23(b)(3) classes and replaced them with a proposed issue class under Rule 23(c)(4).[5] (D.I. 481) Plaintiffs couched this shift as "an effort to simplify the matters that are currently pending" and did not initially request supplemental briefing on the proposed issue class. (*Id.*) Only after further court-initiated inquiries did Plaintiffs offer a revised class definition and state their position in support of certification under Rule 23(c)(4).[6] (D.I. 487; D.I. 492) Rather than simplifying the issues, these filings suggest Plaintiffs belatedly appreciated the weaknesses in their proposed Rule 23(b)(3) classes and expert testimony and shifted strategies at the eleventh hour without a fully developed certification theory under Rule 23(c)(4).

***2** Due to the unique procedural history of this case, the court's recommendations are largely driven by developments postdating the completion of the original briefing on the pending motions. Consequently, the recommendations herein are limited to the unique factual circumstances of this case.

### A. Facts

This case arises from activities at the sites of two manufacturing facilities located in Blades, Delaware that specialized in chrome plating. Procino was established in 1983 and continues operating today. (D.I. 160 at ¶ 155) Peninsula Plating ("Peninsula") operated an electroplating facility from 1993 to 1995, when it was forced to cease operations due to a history of noncompliance with industrial waste discharge permits and regulations. (D.I. 462, Ex. A at 4) The operative pleading alleges that the operators of both facilities used and stored products containing perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonate ("PFOS;" together with PFOA, "PFAS"), which are used in hard chrome plating processes and the manufacture of nonstick cookware. (D.I. 160 at ¶¶ 1-2, 5, 18-19, 33) The Procino and Peninsula facilities are close to the Nanticoke River and municipal and private water supply wells in Blades, Delaware. (*Id.* at ¶ 70)

Blades Development acquired the former Peninsula site for development after entering into a Brownfields Development Agreement ("BDA")[7] with the Delaware Department of Natural Resources and Environmental Control ("DNREC") in December of 2006.[8] (D.I. 460, Ex. B) The purpose of the BDA was "to assess and respond to the actual, threatened, or perceived release of hazardous substances at the Site and settle and resolve" Blades Development's "potential liability ... for the Existing Environmental Condition at the Site which might otherwise result" under the Hazardous Substance Cleanup Act ("DHSCA"). (*Id.*, Ex. B at 1) A Phase II Site Investigation Report was published in February of 2007. (D.I. 462, Ex. C) Blades Development formally acquired the Peninsula property in April of 2007. (D.I. 160 at ¶ 166) The following month. DNREC adopted a final remediation plan for the former Peninsula site which stated that no further remedial action was required. (D.I. 460, Ex. C) In December of 2007, DNREC issued a Certification of Completion of Remedy ("COCR") confirming that remediation of the former Peninsula site was complete. (*Id.*, Ex. D)

The Procino site also has a history of environmental contamination. In 2013, Procino's owner pleaded guilty to violations of the Clean Water Act and illegal storage of hazardous waste without a permit stemming from the storage of a tank containing liquid hazardous waste, processing of stored chemicals through Procino's wastewater treatment plant, and discharge of the resulting wastewater. (D.I. 160 at ¶ 162) DNREC issued a Final Plan of Remedial Action to address environmental contamination at the Procino site in 2016. (*Id.* at ¶ 163)

***3** In February of 2018, sample testing by DNREC and the Environmental Protection Agency ("EPA") revealed that the public supply wells in Blades, Delaware were contaminated with PFOA and PFOS at levels exceeding the combined EPA health advisory level ("HAL"). (D.I. 356, Ex. 1 at § 2.3.3) Approximately 1,600 Blades residents began receiving alternative water, and a carbon filtration system was installed on the Blades municipal water supply system. (*Id.*, Ex. 1 at §§ 2.3.3, 4.6) By February 28, 2018, follow-up sampling of the treated municipal water supply "showed non-detect levels for PFAS[.]" (*Id.*, Ex. 1 at § 2.3.3)

Sampling of private domestic well water outside of Blades was performed in February, March, and April of

2018. (*Id.*, Ex. 1 at § 2.3.4) Of the fifty-four domestic wells that were tested for PFAS contamination, seven exceeded the combined HAL. DNREC provided and installed carbon filter units to all residents with private wells impacted by PFAS above 75% of the HAL, and filters were provided to a total of eight residences. (*Id.*) Samples collected after the filter installation had no detected levels of PFAS. (*Id.*, Ex. 12)

On September 1, 2020, the EPA added the Blades Groundwater Site to the Superfund National Priorities List, rendering Blades eligible for federal funds to facilitate remedial action.[9] Between 2021 and 2023, testing of unfiltered groundwater samples from wells in and around Blades continued to show elevated levels of PFAS, particularly in shallow wells. (D.I. 356, Exs. 9, 13)

**B. Procedural History**

Plaintiffs initially brought this putative class action complaint in Delaware Superior Court on May 17, 2019, asserting causes of action relating to the contamination of public and private water supplies in Blades, Delaware. (D.I. 1, Ex. A) On September 6, 2019, 3M removed the action to this court under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). (D.I. 1) Plaintiffs responded with a motion for remand challenging the court's subject matter jurisdiction under 28 U.S.C. § 1332(d)(3) and (4), but they subsequently withdrew the motion pursuant to an agreement reached among the parties. (D.I. 8) The court initiated its own inquiry into the basis for the court's subject matter jurisdiction under CAFA and issued a Memorandum Opinion on December 2, 2021 holding that jurisdiction was proper. (D.I. 86; D.I. 104)

Following several rounds of briefing on motions to dismiss, Plaintiffs filed the third amended complaint ("TAC") on November 21, 2022. (D.I. 160) The TAC sets forth seven causes of action: (1) negligence as to defendant Procino (Count I); (2) negligence as to defendants 3M, EIDP, Atotech, and MacDermid (Count II); (3) breach of implied warranty as to defendants 3M, EIDP, Atotech, and MacDermid (Count III); (4) trespass as to all Defendants (Count IV); (5) private nuisance as to all Defendants (Count V); (6) fraudulent concealment as to defendants 3M, EIDP, Atotech, and MacDermid (Count VI); and (7) conspiracy as to defendants 3M, EIDP, Atotech, and MacDermid (Count VII). (*Id.*) Defendants Atotech, 3M, EIDP, and MacDermid moved to dismiss the TAC, and the court issued a Report and Recommendation from the bench recommending dismissal of all causes of action against the movants except for the negligence claim at Count II of the TAC. (D.I. 200) On August 15, 2023, the Report and Recommendation was adopted. (D.I. 202) After the resolution of the motion to dismiss the TAC, the following causes of action remained:

| CAUSE OF ACTION | DEFENDANT(S) |
|---|---|
| Count I: Negligence | Procino |
| Count II: Negligence | Atotech, 3M, EIDP, MacDermid |
| Count IV: Trespass | Procino, Blades Development |
| Count V: Private Nuisance | Procino, Blades Development |

***4** During the successive challenges to the pleadings, the parties requested multiple extensions to delay the issuance of a scheduling order. (D.I. 99; D.I. 149; D.I. 152; D.I. 153; D.I. 155; D.I. 158; D.I. 161; D.I. 165; D.I. 182; D.I. 203) As a result, a scheduling order was not entered until October 11, 2023, more than four years after the case was filed. (D.I. 218) Under the original scheduling order, the deadline for the completion of class certification discovery was April 26, 2024 and Plaintiffs' motion for class certification was due by June 21, 2024. (*Id.* at ¶¶ 7, 9) The scheduling order provided that the remaining deadlines in the case schedule would be set after the motion for class certification was decided. (*Id.* at ¶ 12)

On May 3, 2024, the parties filed a joint motion to amend the scheduling order because they needed additional time to complete class certification discovery. (D.I. 285) The court granted the motion, extending the class certification discovery deadline to June 25, 2024 and setting a deadline of July 19, 2024 for filing a motion for class certification. (D.I. 286) This extension proved to be insufficient, and Plaintiffs moved for an additional extension of 90 days to complete class certification discovery. (D.I. 298) The court denied the motion for an extension of the June 25, 2024 class certification discovery deadline, but it granted a 30-day extension for all briefing on the motion for class certification. (D.I. 327) With this modification, briefing on the motion for class certification was scheduled to begin on August 19, 2024. (*Id.* at ¶ 5; D.I. 333) On that date, however, the parties stipulated to another extension of the briefing deadlines. (D.I. 350) The court granted the requested extension, setting a deadline of August 26, 2024 for Plaintiffs' motion for class certification and setting a deadline of February 4, 2025 for the completion of briefing. (D.I. 352)

In accordance with the extended briefing schedule, Plaintiffs filed their motion for class certification on August 26, 2024, seeking to certify two classes: (1) a personal injury, liability issues only class, and (2) a property damage class. (D.I. 355; D.I. 356 at 7) Plaintiffs' proposed class definitions were as follows:

> **Personal Injury, Liability Issues Only Class** (Class 1), for both persons who resided in the Town of Blades, Delaware, from 1985 to present, and consumed water from the Town's public water system and as a result were exposed to hazardous chemicals due to Defendants actions; and for persons who resided in or near the Town (Exhibit 1 shows the proposed class boundary), from 1985 to present, and consumed water from private wells and as a result were exposed to hazardous chemicals due to Defendants' actions.
>
> **Property Damage Class** (Class 2), for persons who currently own properties in or near the Town of Blades, Delaware, whose water is supplied by the Town's public water system, or who own properties with private drinking water wells in or near the town (Exhibit 1 shows the proposed class boundary), whose property values have been diminished due to Defendants' actions.

***5** (D.I. 356 at 7) Plaintiffs' motion for class certification was supported by the reports of three expert witnesses (Dr. Alan Ducatman, Dr. Richard Laton, and Dr. Kevin J. Boyle) and the report of a fourth witness not designated as an expert (Dr. Stephen King). (*Id.*, Exs. 7-8, 11, 14)

After Plaintiffs filed their motion for class certification, progress in this action stalled again due to delays in Plaintiffs' production of materials pertaining to their class experts' reports. (D.I. 375) Pursuant to the parties' stipulation to extend the class certification deadlines, the court entered an amended scheduling order on November 20, 2024 extending the deadline for completion of briefing to May 2, 2025. (*Id.*; D.I. 377) Briefing was completed in accordance with the extended schedule when Plaintiffs filed their reply brief on May 2, 2025. (D.I. 463)

In the meantime, defendants EIDP, MacDermid, and 3M filed motions for summary judgment. (D.I. 346; D.I. 384; D.I. 393) In a Report and Recommendation issued on January 29, 2025, the court recommended granting the motions for summary judgment because Plaintiffs offered no evidence to establish a nexus between EIDP, MacDermid, and 3M's products and the PFAS-containing chemicals used at Procino and Peninsula. (D.I. 412) On March 19, 2025, the court adopted the Report and Recommendation and terminated EIDP, MacDermid, and 3M from the case. (D.I. 451) Following the resolution of the motions for summary judgment, the remaining causes of action in this case are as follows:

| CAUSE OF ACTION | DEFENDANT(S) |
|---|---|
| Count I: Negligence | Procino |
| Count II: Negligence | Atotech |

| | |
|---|---|
| Count IV: Trespass | Procino, Blades Development |
| Count V: Private Nuisance | Procino, Blades Development |

On August 21, 2025, nearly a year after filing their motion for class certification and more than three months after the completion of briefing, Plaintiffs filed a letter voluntarily withdrawing their proposed personal injury and property damage classes and stating their intention to "proceed solely with their request for certification of an issues class under Fed. R. Civ. P. 23(c)(4)." (D.I. 481) In lieu of requesting additional briefing on a proposed issue class, Plaintiffs referred to their alternative argument for certification of a Rule 23(c)(4) issue class in their opening and reply briefs. (*Id.*) (citing D.I. 356 at 23-25; D.I. 463 at 13-15). Plaintiffs did not propose a new class definition, but they identified the common issues as: (1) whether Defendants discharged PFAS into the environment, (2) whether those discharges contaminated municipal and private water systems, and (3) whether Defendants' conduct breached applicable duties of care. (*Id.*) Plaintiffs also withdrew three of the four declarations submitted in support of the class certification motion which were the subject of pending *Daubert* motions and a motion to strike. (*Id.*)

The court ordered the parties to submit a joint status letter on September 3, 2025 addressing the impact of Plaintiffs' voluntary withdrawals on the status of the pending motions. (8/25/2025 Oral Order) Plaintiffs offered the following definition of their proposed issue class for the first time in the joint status letter: "Persons who currently own property within the proposed class area and persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure." (D.I. 487 at 1) Plaintiffs acknowledged that the existing class certification briefing "was focused almost entirely on the non-issues classes" and requested leave to re-brief the class certification motion to address the merits of the proposed issue class. (*Id.* at 1 n.1) Defendants opposed Plaintiffs' request to re-brief the motion, emphasizing the delays that have already beset this litigation and the lack of good cause to restart class certification briefing beyond the deadlines in the scheduling order. (*Id.* at 2) Defendants also offered substantive arguments in opposition to the proposed issue class. (*Id.* at 3-4)

***6** The court gave Plaintiffs an opportunity to respond to Defendants' substantive arguments in a letter brief of equivalent length, which was due on October 8, 2025. (D.I. 491) Plaintiffs' responsive letter confirms a distinction within the proposed issue class between personal injury plaintiffs "who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure," and property damage plaintiffs "who currently own property within the proposed class area." (D.I. 492 at 2) The responsive letter also represents for the first time that the proposed class area "is described in the affidavit of Dr. Laton." (D.I. 492 at 2; D.I. 356, Ex. 11)

## II. DISCUSSION

### A. Motion to Exclude the Testimony of Dr. Laton

As explained at § I.B, *supra*, Plaintiffs have voluntarily withdrawn the testimony of Dr. Ducatman, Dr. Boyle, and Dr. King for purposes of class certification. (D.I. 487 at 1) Plaintiffs continue to rely on Dr. Laton's expert testimony in support of their motion for class certification, and Defendants' motion to exclude Dr. Laton's testimony remains pending. (*Id.*; D.I. 437) The Third Circuit has held that a plaintiff cannot use challenged expert testimony to satisfy the requirements of class certification unless the plaintiff first shows that the expert testimony satisfies the *Daubert* standard. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). Consequently, the court addresses Defendants' motion to exclude Dr. Laton's testimony before considering Plaintiffs' class certification motion.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" to "ensur[e] that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Rule 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In this regard, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003). Here, Defendants challenge the reliability of Dr. Laton's testimony. (D.I. 438 at 10-15)

The court considers "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion" in evaluating whether each step of an expert's analysis is reliable. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (internal citations and quotation marks omitted). "The standard for reliability is not that high. It is lower than the merits standard of correctness." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (internal citations and quotation marks omitted). Expert testimony is considered reliable if it is supported by "good grounds," even if it is not necessarily supported by "the best methodology or unassailable research."[10] *Id.* In keeping with these tenets, Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal citations and quotation marks omitted).

***7** Plaintiffs emphasize the narrow purpose for which Dr. Laton's testimony is offered: "to define an outer class boundary" in support of Plaintiffs' proposed issue class under Rule 23(c)(4). (D.I. 467 at 5; D.I. 492) Plaintiffs expressly concede that "Dr. Laton's testimony was not presented for the purpose of proving the *source* the PFAS contamination" or "the cause of the plume." (D.I. 467 at 1) (emphasis in original). These representations correctly confirm that Dr. Laton's testimony is insufficient to sustain Plaintiff's ultimate burden on causation or the merits of the case. Plaintiffs posit that allowing Dr. Laton's testimony at the class certification stage "in no way commits one to view that use of such a methodology would be appropriate at the liability stage." (*Id.* at 5) Even considering the limited purpose for which Dr. Laton's testimony is offered and the liberal policy of admissibility under Rule 702 and Third Circuit precedent, Defendants' motion to exclude Dr. Laton's testimony presents a close question.

As it pertains to Plaintiffs' proposed issue class, Dr. Laton's testimony is relevant to establishing the proposed "class area" based on the scope of the contamination plume. (D.I. 492 at 2; D.I. 356, Ex. 11 at ¶ 10) To determine the class area, Dr. Laton reviewed DNREC's sampling data from public supply wells in Blades in January of 2018, EPA testing data from 54 domestic water wells in February of 2018, the results of testing from monitoring wells installed by the EPA in October of 2018, and the results of PFAS analyses on treated drinking water samples from Blades in June and October of 2022. (D.I. 356, Ex. 11 at ¶¶ 13-18) Using this data, Dr. Laton prepared maps[11] showing the maximum recorded levels of PFOA and PFOS concentrations in and around Blades, Delaware:






(D.I. 356, Ex. 11 at ¶¶ 9-22 & Exs. H-1) Dr. Laton then prepared another map delineating the boundaries of the contaminated area based on the locations where concentrations of PFOA and PFOS were found in the groundwater:




(*Id.*, Ex. 11 at Ex. J)

Defendants contend that Dr. Laton's map of the "Impacted Area" is unreliable for three reasons: (1) Dr. Laton cherry-picked data reflecting the highest PFAS concentration from a larger pool of data, (2) Dr. Laton did not account for the effectiveness of filtration in removing PFAS from the Blades drinking water supply, and (3) Dr. Laton docs not explain how the "Impacted Area" boundary line was drawn, (D.I. 438 at 10-15) The first and second issues raised by Defendants have no clear application to Plaintiffs' proposed issue class definition.[12] Both arguments are based on the premise that Dr. Laton's analysis is unreliable because it fails to account for varying levels of PFAS exposure experienced by Plaintiffs across a period of time. As Plaintiffs explain, however, Dr. Laton's analysis does not touch on the ultimate liability issue of exposure levels in residents. (D.I. 467 at 5)

Defendants' third argument presents a closer question. Dr. Laton explains that he relied on objective testing data by DNREC and the EPA to define the "Impacted Area." (D.I. 356, Ex. 11 at ¶¶ 11-19) The "Methodology" portion of Dr. Laton's expert report indicates that he mapped the DNREC and EPA testing data and drew a perimeter around it. (*Id.*, Ex. 11 at ¶¶ 20-25) He acknowledges that certain well samples within the boundary reported non-detect levels of PFAS, but he infers that PFAS contamination nonetheless reached those wells due to their proximity to a well with detected PFAS levels. (*Id.*, Ex. 11 at ¶ 21) Dr. Laton does not name a specific scientific methodology or existing standard governing his analysis. In this regard, his assessment approaches the realm of "unsupported speculation" and "haphazard, intuitive inquiry." *Karlo*, 849 F.3d at 80-81; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

***8** Nonetheless, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." (internal citations and quotation marks omitted)). The boundary drawn by Dr. Laton in Exhibit J is based on objective data corresponding to the Blades town limits and the area outside of Blades where private wells tested positive for PFAS contamination in Exhibits H and I. (D.I. 356, Ex. 11 at Ex. J) Defendants challenge Dr. Laton's inclusion of an area containing wells with non-detectable or minimal levels of PFAS contamination interspersed with others containing meaningful levels of PFAS contamination. (D.I. 438 at 14; D.I. 476 at 10; D.I. 356, Ex. 11 at Exs. H-I) But this argument describes potential methodological flaws that go to the weight of the evidence, not its admissibility. *See Karlo*, 849 F.3d at 83.

The non-binding case authority Defendants cite in their reply brief weighs against their argument to exclude Dr. Laton's report. (D.I. 476 at 10) Both environmental contamination cases arose in the context of a motion for class certification, as opposed to a motion to exclude expert testimony. *See Cox v. American Synthetic Rubber Co.*, 2008 WL 5381909, at *2 (W.D. Ky. Dec. 18, 2008); *Cotromano v. United Techs. Corp.*, 2018 WL 2047468, at *11 (S.D. Fla. May 2, 2018). In both cases, the court accepted expert testimony supporting the proposed class area and proceeded to

rule on the sufficiency of that evidence to satisfy the class certification requirements under Rule 23. *Id.* For example, in *Cotromano*, the court assumed without deciding that the testimony of plaintiffs' groundwater and real estate appraisal experts was admissible before concluding that the expert evidence did not support the ascertainability of the proposed class area. 2018 WL 2047468, at *10-11 (finding both class boundary definitions "to be over-inclusive ... even assuming the admissibility of expert liability evidence on groundwater and soil migration[.]").

In *Cox v. American Synthetic Rubber Co.*, the district court explained that that the plaintiffs must produce "scientific or objective" evidence linking the proposed boundary to the environmental hazard to prevail on class certification. 2008 WL 5381909, at *2 (W.D. Ky. Dec. 18, 2008). To meet this standard, the plaintiffs produced evidence from their expert, who took samples at seventeen sites within a limited geographic area that did not extend to the proposed class boundary. *Id.* The court determined that the expert's testing was insufficient to define the class area because the sampling "fail[ed] completely to cover the breadth of the proposed class. Without testing the boundaries, there is no basis for linking the boundaries to Defendant's actions at all." *Id.* The court rejected the class boundary not because the expert used sampling data to locate contamination, but rather because the contaminated locations bore little relation to the proposed class boundary. Here, Defendants do not suggest that the testing data used by Dr. Laton fails to encompass "large swaths" of the proposed class area. (D.I. 438 at 14-15; D.I. 476 at 10)

Defendants cite another case where Dr. Laton's expert testimony was partially excluded. (D.I. 438 at 6) In *Goldstein v. Exxon Mobil Corp.*, Dr. Laton evaluated air samples to assess the concentrations of certain contaminants, and he suggested that the contamination emanated from a particular source despite acknowledging the need for further testing to verify the source. 2019 WL 4575569, at *3 (C.D. Cal. Mar. 19, 2019). The court sustained a narrow objection to Dr. Laton's statement on a potential source of the contamination, while also observing that "this is not the kind of evidence that would have a meaningful impact on the outcome of Plaintiff's motion for class certification." *Id.* at *3 n.2. The same is true here. For purposes of Plaintiffs' class certification motion, the relevance of Dr. Laton's testimony is limited to the boundary of the class area. The weight assigned to that opinion is a separate matter addressed in the court's class certification analysis under Rule 23:

> ***9** [O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason.... Like any evidence, admissible expert opinion may persuade its audience, or it may not.

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) (citations and footnote omitted). Accordingly, I recommend that the court DENY the motion to exclude Dr. Laton's testimony to the extent the opinion is offered for the sole purpose of establishing the boundary of the impacted area with respect to the proposed issue class.

**B. Motion for Class Certification** [13]

As described at § I.B, *supra*, Plaintiffs no longer seek certification of the personal injury and property damage classes under Rule 23(b)(3) and instead request certification of their proposed issue class under Rule 23(c)(4). Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). A party seeking to certify "particular issues" for class treatment under Rule 23(c)(4) must show that the prerequisites of Rule 23(a) and (b) are satisfied. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 266-67 (3d Cir. 2021). First, the movant bears the burden of showing by a preponderance of the evidence that the four threshold requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 391 (3d Cir. 2015). Next, the movant must

show that the issues (as opposed to the cause of action as a whole) are maintainable under the predominance and superiority requirements of Rule 23(b)(3).[14] *Russell*, 15 F.4th at 267, 273-74 (internal citations omitted). In the Third Circuit, putative class members must also be "currently and readily ascertainable based on objective criteria." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129, 138 (3d Cir. 2023) (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020)).

If the proposed issue class satisfies the ascertainability requirement and the requirements of Rule 23(a) and (b), the court must next determine whether it is "appropriate" to certify the issues as a class. *See Russell*, 15 F.4th at 270. An issue class should only be certified if class resolution of the issues "will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272–73 (3d Cir. 2011). In reaching this determination, the trial court may consider the following non-exclusive *Gates* factors: (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification; (4) the substantive law underlying the claim(s); (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). *See Russell*, 15 F.4th at 268.

### 1. Status of Briefing on Rule 23(c)(4) Issue Class

***10** Before turning to the merits of Plaintiffs' motion for class certification, the court addresses the status of the briefing on the pending class certification motion. As set forth at Section I.B, *supra*, Plaintiffs briefed their motion for class certification over the course of nearly a year, focusing on a proposed personal injury class and a proposed property damage class under Rule 23(b)(3). (D.I. 356 at 7; D.I. 463) Although Plaintiffs' original class certification briefing raised the potential for certifying an issue class under Rule 23(c)(4) as an alternative remedy, the matter "ha[d] not been fulsomely briefed." (D.I. 356 at 23-25; D.I. 463 at 13-15; D.I. 487 at 1) Nonetheless, Plaintiffs did not request additional briefing or propose an issue class definition when they withdrew their personal injury and property damage classes and decided to proceed only on the Rule 23(c)(4) issue class. (D.I. 481); *see* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class *and* the class claims, issues, or defenses[.]" (emphasis added)). Instead, Plaintiffs referred to the Rule 23(c)(4) arguments raised in their original briefing. (D.I. 481)

Plaintiffs' position on the status of class certification briefing began to shift only after the court inquired about the definition of the proposed issue class and the applicability of the existing briefing. (8/25/2025 Oral Order) In response to the court's order, Plaintiffs provided an issue class definition and proposed the submission of "new, tailored class-certification briefing .... focused on what is most relevant to the Court for the class currently proposed[.]" (D.I. 487 at 1) Plaintiffs represented that any additional briefing "could be substantially shorter," suggesting page limits "of half the length contemplated by Local Rule 7.1.3(4) [,]" which equates to ten double-spaced pages or five single-spaced pages. (*Id.*); *see* D. Del. LR 7.1.3(2), (4). Defendants opposed Plaintiffs' request to re-brief the class certification motion, characterizing it as a motion to amend the class certification schedule without a showing of good cause under Rule 16(b)(4). (D.I. 487 at 2) Defendants also raised substantive challenges to Plaintiffs' proposed issue class. (*Id.* at 3-4)

Following a review of the parties' joint status letter, the court partially granted Plaintiffs' request for further briefing on the proposed issue class. Specifically, the court permitted Plaintiffs to file a single-spaced, three-page letter in response to the substantive arguments raised by Defendants in the parties' joint status letter. (D.I. 491) The court declined to grant Plaintiffs the requested equivalent of five single-spaced pages and/or a new, expedited briefing schedule because: (1) Plaintiffs' Rule 23(c)(4) argument was available to them at the time the class certification motion was

originally filed, (D.I. 356 at 23-25); (2) Plaintiffs previously represented that certification of the Rule 23(c)(4) issue class could be resolved on the papers submitted, (D.I. 481); (3) Plaintiffs did not support their request for further briefing with citations to changes in the record or the discovery of new evidence, (D.I. 487 at 1); and (4) the scope of briefing requested by Plaintiffs posed an untenable risk of further delays in this aging case.

A review of Plaintiffs' supplemental letter confirms that the full scope of briefing requested by Plaintiffs would not advance the court's resolution of the class certification motion. (D.I. 492) Instead of maximizing their use of the allotted pages, Plaintiffs began their substantive response to Defendants' arguments on the second page of the three-page letter. (*Id.*) Plaintiffs' own conduct demonstrates that they had an adequate opportunity to raise their arguments in support of the proposed issue class under Rule 23(c)(4), and further briefing is not warranted. *See Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 138 (3d Cir. 2007) (finding that the district court did not abuse its discretion by denying the plaintiff's request to file an overlength brief because the plaintiff had an adequate opportunity to raise his arguments in the standard briefing).

**2. Ascertainability**

***11** In the Third Circuit, an "essential prerequisite of a class action ... is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012). To establish ascertainability, the movant must show that "there [is] a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition," and the class can be defined "with reference to objective criteria." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013). The purpose of the ascertainability requirement is to "assure[ ] that a court will not need to engage in extensive fact-finding to identify the members of the class." *In re Intel Corp. Microprocessor Antitrust Litig.*, 05-1717-LPS, 2014 WL 6601941, at *12 (D. Del. Aug. 6, 2014) (citing *Marcus*, 687 F.3d at 592-93). The movant bears the burden of showing ascertainability by a preponderance of the evidence. *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020).

Plaintiffs have not met their burden to show the ascertainability of the personal injury portion of their issue class definition, which includes "persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure." (D.I. 487 at 1) Plaintiffs argue that this definition resolves Defendants' concerns about the ascertainability of the personal injury class because it is no longer premised on water consumption and attendant exposure, and it is now limited only to those whose exposure "objectively resulted in injury." (D.I. 492 at 2) According to Plaintiffs, members of the issue class can be identified through objective criteria such as water billing records, water sampling reports, property ownership databases, census data and other unspecified records. (D.I. 356 at 11; D.I. 463 at 2; D.I. 492 at 2)

The objective criteria identified by Plaintiffs are not sufficient to ascertain members of the proposed personal injury issue class. Property ownership databases and municipal water billing records may identify owners of the impacted properties, but Plaintiffs have not shown how these records will identify non-owners who resided within the proposed class area. Moreover, Plaintiffs do not identify a form of census data collected with sufficient frequency to accurately identify all individuals who resided in the proposed class area "for six months or more." It is also not clear from Plaintiffs' briefing that water sampling reports will capture all residences with private wells in the proposed class area. Plaintiffs do not identify any method for ascertaining which residents "have been diagnosed with an ailment associated with PFAS exposure." [15] (D.I. 487 at 1)

On this record, Plaintiffs have not met their burden to "propose a classification method with evidentiary support to meet the ascertainability requirement[.]" *In re Niaspan*, 67 F.4th 129-30; *see also Campbell v. County of Mercer*, 2025 WL 1358529, at *3 (W.D. Pa. Mar. 3, 2025) ("The class must be ascertainable in the here and now, the method must be spelled out, and if there is any doubt, class certification is

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

denied[.]”). Consequently, I recommend that the court DENY Plaintiffs’ motion to certify an issue class of “persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure.” (D.I. 487 at 1)

***12** Plaintiffs have also failed to show by a preponderance of the evidence that the proposed issue class of “[p]ersons who currently own property within the proposed class area” is ascertainable. The proposed “class area” is not clearly defined in Plaintiffs’ issue class definition. Initially, Plaintiffs implied that the proposed “class area” of the issue class was consistent with the class boundary associated with the original personal injury and property damage class definitions.[16] (D.I. 481; *see* D.I. 356 at 7, 23-25) Those definitions stated that “Exhibit 1 shows the proposed class boundary[.]” (D.I. 356 at 7) Exhibit 1 to Plaintiffs’ opening brief is more than 2,000 pages in length. (*Id.*; D.I. 356-1) Plaintiffs’ reply brief clarifies that “[t]he geographic boundaries are defined by documented EPA plume maps’ ” in Exhibit 1. (D.I. 463 at 2) These maps identify the boundaries of the Procino and Peninsula sites and the Blades perimeter, but they do not establish a perimeter around private wells located outside the town limits of Blades:



(D.I. 356-1 at 50) Current property owners “within the proposed class area” are not objectively ascertainable based on this evidence.

For the first time in their three-page letter brief filed on October 8, 2025, Plaintiffs allege that “[t]he class area is described in the affidavit of Dr. Laton. D.I. 356-19. which Plaintiffs have not withdrawn.” (D.I. 492 at 2) Plaintiffs do not provide a more specific citation to this 55-page exhibit, which was filed on August 26, 2024 as an attachment to Plaintiffs’ opening brief on class certification but was not cited in the accompanying brief to establish the proposed class boundary. (D.I. 356, Ex. 11) Even assuming Plaintiffs’ new argument regarding the definition of the “class area” is not forfeited,[17] *see In re Niaspan*, 67 F.4th at 135, Plaintiffs’ citation to Dr. Laton's affidavit in its entirety requires the court to draw inferences about which portions of the affidavit define Plaintiffs’ proposed class area. Plaintiffs’ passing reference to Dr. Laton's affidavit does not satisfy their burden to show by a preponderance of the evidence that the “class area” is ascertainable.

In the interest of resolving Plaintiffs’ class certification motion on the merits, the court considers paragraph 22 of Dr. Laton's affidavit, which indicates that “Exhibit ‘J’ shows the area of groundwater impacted by PFOS and PFOA which was prepared by combining the regions that encompass the ‘*Blades Water Service Area*’ and ‘*Private Well Area*.’ ” (D.I. 356, Ex. 11 at ¶ 22) Exhibit J to Dr. Laton's affidavit sets forth a perimeter for the “Impacted Area” in and around Blades, Delaware:




(*Id.*, Ex. 11 at Ex. J) Public property records may objectively establish the current owners of residences falling within this boundary. *See Brown v. Saint-Gobain Performance Plastics*, 2023 WL 9023158, at *10 (D.N.H. Dec. 29, 2023) (explaining that current property owners could be ascertained using state property records and tax bills). Operating under this definition of the proposed “class area,” the court proceeds to assess Plaintiffs’ proposed issue class of “[p]ersons who currently own property within the proposed class area” under the requirements of Rule 23(a) and (b) and the *Gales* factors applied to the Rule 23(c)(4) analysis.

### 3. Requirements Under Rule 23(a) and (b)

***13** A party seeking certification of an issue class under Rule 23(c)(4) must demonstrate that the requirements of Rule 23(a) and (b) are satisfied. *Russell*, 15 F.4th at 266-67. The Third Circuit has recognized the challenges inherent in this inquiry, acknowledging that "[t]he interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issue classes under Rule 23(c)(4) is a difficult matter that has generated divergent interpretations among the courts." *Gates*, 655 F.3d at 272 (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200 n.25 (3d Cir. 2009)). The parties' briefing on these issues following Plaintiffs' assertion of the proposed issue class does little to address those difficulties. (D.I. 487; D.I. 492) For purposes of proceeding to the next step in this analysis, the court assumes without deciding that Plaintiffs' proposed issue class of "[p]ersons who currently own property within the proposed class area" satisfies the requirements of Rule 23(a) and (b).

#### 4. Rule 23(c)(4) *Gates* Factors: Appropriateness

As previously discussed, courts assessing a motion to certify an issue class under Rule 23(c)(4) consider the following *Gates* factors: (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification; (4) the substantive law underlying the claim(s); (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). *See Russell*, 15 F.4th at 268.

Plaintiffs have not shown that certification of the proposed issue class would materially advance the resolution of the class members' claims under the *Gates* factors. The common issues identified by Plaintiffs are: (1) "whether Defendants discharged PFAS into the environment," (2) "whether those discharges contaminated municipal and private water systems," and (3) "whether Defendants' conduct breached applicable duties of care." (D.I. 481) Plaintiffs concede that both the fact and amount of damages will require resolution on an individualized basis after a class-wide determination of these common issues. (D.I. 492 at 3) Plaintiffs also acknowledge that individualized questions of causation will remain after the resolution of common issues. (*Id.* at 2; D.I. 463 at 15) Under similar circumstances, the Third Circuit declined to certify a Rule 23(c)(4) issue class in a groundwater contamination case because "resolution of [common] questions leaves significant and complex questions unanswered." *Gates*, 655 F.3d at 273.

In *Gates*, the residents of a village sought certification of a medical monitoring class and a property damage class for injuries sustained after the defendant allegedly released contaminants into a lagoon that seeped into an underground aquifer, where those contaminants degraded into vinyl chloride. *Id.* at 258. After denying certification of the medical monitoring and property damage classes, the district court alternatively considered certification of an "issue only" class on liability to address common issues, such as whether vinyl chloride was released from the defendant's facility or whether exposure to vinyl chloride can increase the risk of developing brain cancer. *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208, 234 (E.D. Pa. 2010). Ultimately, the district court declined to certify a liability-only issue class because the common evidence would not establish the fact or amount of damages, causation, and the extent of contamination. *Gates*, 655 F.3d at 262, 272. The Third Circuit affirmed. *Id.* at 274.

***14** Here, as in *Gates*, the certification of a liability-only issue class is not warranted due to the complexity of the case and the limited efficiencies to be gained by granting partial certification. Answering the questions of "whether Defendants discharged PFAS into the environment" and "whether those discharges contaminated municipal and private water systems" will not fully establish causation where, as here, there are multiple Defendants, multiple contaminants, and likely alternative sources of

contamination. Recognizing the complexities involved in environmental contamination cases, the Third Circuit has explained that "[s]ingle instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways." *Gates*, 655 F.3d at 271; *see also Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F. Supp. 3d 646, 657 (E.D. Pa. 2022) (denying issue class certification where the case "involve[d] multiple instances of exposure and injuries that will vary significantly from property to property" and the "theories of causation and extent of injury also turn[ed] on several complex factors" that could not be established on a class-wide basis).

Similarly, determining "whether Defendants' conduct breached applicable duties of care" will require separate analyses for each Defendant to account for Defendants' disparate geographic locations and roles in the alleged contamination. [18] Defendants' alleged breach "does not easily separate from the individual issues of injury, causation, and damages." *See Derrick v. Glen Mills Schs.*, 2024 WL 2134340, at *15 (E.D. Pa. May 13, 2024) (citing *Gates*, 655 F.3d at 273). To the extent that Plaintiffs establish a common legal duty applicable to all Defendants, Plaintiffs have not shown that resolution of the issue would result in significant efficiency gains. And certification of an issue class on matters of duty and breach is also likely to adversely impact the effectiveness and fairness of resolving the remaining issues. For example, if it is determined that a particular Defendant breached a duty, that Defendant may be pressured to settle even if the breach did not ultimately cause the alleged harm. *See Russell*, 15 F.4th at 272.

On balance, the *Gates* factors weigh against certification of the proposed issue class. Plaintiffs have not shown that certification of the issue class would meaningfully advance the litigation. Moreover, Plaintiffs' eleventh hour pivot to seek certification of the proposed issue class suggests Rule 23(c)(4) is being invoked "merely to postpone confronting difficult certification questions." 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1790 (3d ed. 2025). "Unlike a situation in which a Rule 23(c)(4) class might be appropriate because liability is capable of classwide treatment but damages are not, Plaintiffs offer no theories of liability for which classwide treatment is apt." *Gonzalez v. Corning*, 885 F.3d 186, 202-03 (3d Cir. 2018). Consequently, I recommend that the court DENY Plaintiffs' motion for certification of an issue class under Rule 23(c)(4).

### C. Blades Development's Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

***15** The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322–23. The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989). The court must draw all reasonable inferences in favor of the nonmoving party without weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

Before filing the pending motion for summary judgment, Blades Development moved to dismiss for failure to state a claim on December 23, 2021. (D.I. 115) In pertinent part, Blades Development argued that its entry into the BDA with DNREC immunized it from liability for trespass and nuisance arising from the site under 7 *Del. C.* § 9125 of the Delaware Hazardous Substances Cleanup Act ("DHSCA"). (D.I. 116 at 4-6) On August 4, 2022, the court issued a Report and Recommendation rejecting Blades Development's immunity argument. (D.I. 135) Specifically, the court questioned whether 7 *Del. C.* § 9125 could immunize a Brownfields Developer

from tort liability to private parties resulting from the developer's ownership and use of its land. (*Id.* at 23) The court indicated that the immunity provided by Section 9125 appeared to be limited to immunity from liability for claims arising under the DHSCA, and Blades Development cited no authority to suggest that the DHSCA preempts common law actions for trespass or nuisance. (*Id.*) Nonetheless, the court confirmed that Blades Development could challenge liability for trespass and nuisance in case dispositive motions at the appropriate time, so long as it supported those arguments with evidence:

> One might question whether Plaintiffs are likely to prevail against Blades Development given that DNREC apparently thought in 2007 that the Peninsula site required no further cleanup action. But it is not the role of the Court to assess likelihood of success at the motion to dismiss stage. All I can say now is that Blades Development has not persuaded me that it is immune from liability to Plaintiffs under 7 *Del. C.* § 9125. Blades Development is free to reraise its arguments against liability —and to cite evidence in support of its arguments—at the appropriate time in a later stage of the case.

(*Id.*) On August 19, 2022, the Report and Recommendation was adopted. (D.I. 137)

Instead of overcoming the deficiencies previously identified by the court at the pleading stage, Blades Development raises the same immunity argument in its motion for summary judgment. (D.I. 460 at 4-7) The argument is largely copy/pasted from Blades Development's brief in support of its motion to dismiss, and it references the same exhibits cited in support of the motion to dismiss. (*Compare* D.I. 460 at 4-7 *with* D.I. 116 at 4-6) [19] Blades Development does nothing to address or resolve the court's concern that "[t]he texts of §§ 9105 and 9125, and their placement in the DHSCA, suggest that the immunity provided by § 9125 might be limited to immunity from liability for claims arising under the DHSCA." [20] (D.I. 135 at 23)

***16** Blades Development contends that the court invited it to revisit this argument at a later stage in the litigation. (D.I. 460 at 2-3) Nothing in the prior Report and Recommendation suggests that Blades Development was free to recycle the same immunity argument on summary judgment without further development of the factual record or citation to supporting legal authority. In fact, the court expressly instructed Blades Development "to cite evidence in support of its arguments" if it chose to "reraise its arguments against liability[.]" (D.I. 135 at 23) Denial of Blades Development's motion for summary judgment is warranted on this basis alone. *See Price v. Kozak*, 569 F. Supp. 2d 398, 407 (D. Del. 2008) (denying motion for summary judgment that raised same exhaustion argument previously raised in support of a motion to dismiss, without the presentation of additional evidence).

Consideration of the immunity argument on the merits does not alter the court's recommendation. Case authority cited by Plaintiffs supports the court's prior assessment of Blades Development's immunity argument. In *Garvin v. Booth*, the Delaware Superior Court explained that the intent of the DHSCA is to "requir[e] the prompt cleanup of hazardous substances to protect Delaware's citizens' welfare and environment." 2022 WL 247696, at *9 (Del. Super. Ct. Jan. 27, 2022). [21] To achieve this goal, the DHSCA "permits DNREC to identify a site, create a plan for cleanup, and then contract with private parties to remediate the site so ... those parties can develop them." *Id.* at *10. The purpose of the DHSCA, as articulated by *Garvin*, is to govern the remediation of contaminated sites and the recovery of remedial costs incurred in the restoration process. *Id.*; *see also Clark v. Teveen Holding Co., Inc.*, 625 A.2d 869, 879 (Del. Ch. 1992) ("7 *Del. C.* § 9105(d) provides an express private right to contribution or reimbursement against other responsible parties on behalf of a claimant who expended money performing a remedial action in satisfaction of the substantive requirements of the statute."). Blades Development has

still cited no authority supporting an expansion of the DHSCA's immunity provision to govern liability for common law tort claims.

Even if the DHSCA could be read to immunize a property owner from common law claims for trespass and nuisance, Blades Development cites no evidence that the BDA or the COCR covers liability for the alleged PFAS contamination at issue here. Plaintiffs' statement of facts states that "[t]he remedial action carried out by DNREC at the site did not test for or address PFAS contamination" and, consequently, neither the COCR nor the BDA addressed PFAS contamination discovered after the COCR was issued. (D.I. 462-16 at ¶¶ 5-7) The accompanying evidence shows that the alleged PFAS contamination was not among the "existing environmental conditions" addressed by the BDA. (D.I. 462 at 8-11; *see* D.I. 460, Ex. at ¶ 6) Specifically, the Phase II Site Investigation Report issued in February of 2007 shows sampling results tested for various metals, cyanide, certain specified volatile and semi-volatile compounds, pesticides, poly chlorinated biphenyls, and poly cyclic aromatic hydrocarbons, but not for PFAS. (D.I. 462, Ex. C at 7-10, 18) The EPA Superfund Program proposed plan from June of 2023 further confirmed that "[i]nvestigations prior to 2018 did not include the collection or analysis of PFAS." (*Id.*, Ex. F at 4) Blades Development cites no evidence contradicting Plaintiffs' representation that the BDA did not contemplate PFAS contamination. (D.I. 460)

***17** Blades Development appears to abandon the argument that the BDA and/or the COCR immunize it from liability in its reply brief (D.I. 469) Instead, Blades Development raises new arguments in reply. Specifically, Blades Development contends that it is not responsible for contamination that occurred before it assumed ownership of the site and faults Plaintiffs for failing to provide evidence that the PFAS contamination originated from the property owned by Blades Development. (*Id.* at 1-5) Blades Development is not permitted to reserve material for a reply brief that could and should have been included in the opening brief. *Fed. Election Comm'n v. O'Donnell*, 209 F. Supp. 3d 727, 737 (D. Del. 2016) (citing D. Del. LR 7.1.3(c)(2)); *see also In re Niaspan*, 67 F.4th at 135 ("Arguments raised for the first time before a district court in a reply brief are deemed forfeited.").

Even if the court were to consider the new arguments raised in Blades's reply brief, the recommended outcome would remain the same. In their concise statement of facts, Plaintiffs cite evidence supporting their assertions that: (i) the EPA identified the presence of PFAS at the Peninsula site and designated the site as a likely source of groundwater contamination in Blades; (ii) the remedial action carried out by DNREC at the Peninsula site did not test for or address PFAS contamination; and (iii) Blades Development has not undertaken any action to remediate the PFAS contamination on the Peninsula site despite knowledge of PFAS migration from its site into the groundwater in Blades. (D.I. 462-16) Blades Development does not provide a counterstatement of facts and cites no evidence in support of the new arguments in its reply brief. Instead, Blades Development alleges that "Plaintiffs provide no evidence that PFAS originated from Blades Development's site and infiltrated the groundwater of the Town of Blades—let alone that such contamination occurred after Blades Development owned the property at issue." (D.I. 469 at 1) These allegations confirm the existence of genuine issues of material fact, including whether the PFAS groundwater contamination can be attributed to the Peninsula site, whether the PFAS contamination continued to migrate from the Peninsula site after Blades Development acquired the property, and/or whether any such migration or continued contamination is attributable to Blades Development's failure to remediate known PFAS contamination at the site. The existence of disputed issues of fact precludes the entry of summary judgment.

## III. CONCLUSION

For the foregoing reasons, I recommend that the court: (1) DENY Defendants' motion to exclude Dr. Laton's testimony, (D.I. 437); (2) DENY Plaintiffs' motion for class certification, (D.I. 464); and (3) DENY Blades Development's motion for summary judgment, (D.I. 459).

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties

shall jointly submit a proposed redacted version by no later than **February 17, 2026**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549. 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Report and Recommendation issued.

***18** This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

**All Citations**

Slip Copy, 2026 WL 967253

## Footnotes

1 Since the pending motion to exclude was filed, defendants 3M, EIDP, and MacDermid have been terminated from this action. (D.I. 412; D.I. 451) As used herein, the term "Defendants" refers to remaining defendants Atotech, Procino, and Blades Development.

2 The briefing and filings associated with Defendants' motion to exclude the testimony of Dr. Laton are found at D.I. 438, D.I. 467, D.I. 476, and D.I. 477.

3 The briefing and filings associated with the pending motion for class certification are found at D.I. 356, D.I. 431, D.I. 432, D.I. 463, D.I. 481, D.I. 482, D.I. 487, and D.I. 492.

4 The briefing and filings associated with Blades Development's motion for summary judgment are found at D.I. 460, D.I. 462, and D.I. 469.

5 Plaintiffs did not include certification of the issue class among the requested relief in their motion for class certification. (D.I. 355; D.I. 464) However, they discussed a Rule 23(c)(4) issue class in their original briefing on class certification as an alternative argument. (D.I. 356 at 23-25; D.I. 463 at 13-15) On this record, the court declines to find that Plaintiffs waived or forfeited their argument under Rule 23(c)(4) in this case.

6 Plaintiffs distinguish two precedential Third Circuit cases on their facts without discussing how any of the factors applicable to a Rule 23(c)(4) issue class are satisfied in this case. (D.I. 492 at 3) (distinguishing *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259 (3d Cir. 2021)). Plaintiffs highlight the Third Circuit's critique of the district court's failure to analyze the issue class factors in *Russell*

without offering any meaningful discussion of whether and how the court should consider those factors in the instant case. (*Id.*)

7 According to the Environmental Protection Agency's website, "[a] brownfield is a property where expansion, redevelopment or reuse may be complicated by the presence or potential presence of a hazardous substance, pollutant or contaminant." *Overview of EPA's Brownfields Program*, EPA, https://www.epa.gov/brownfields/about (last visited February 9, 2026).

8 Although the BDA was executed by DNREC and "The Putnam Group and/or its assigns," the parties do not appear to dispute that Blades Development is subject to the terms of the BDA. (D.I. 460 at 2, 4, Ex. B at 1; D.I. 462 at 2)

9 *See* DNREC, "Blades Groundwater Site" (https://dnrec.delaware.gov/waste-hazardous/remediation/bladesgroundwater-site) (https://archive.is/shQHY) (last visited February 9, 2026).

10 The Third Circuit has articulated numerous non-dispositive factors to assist in determining whether "good grounds" support an expert's potential testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 520 F.3d at 247-48.

11 The maps included in this Report and Recommendation are included to show the colored dots indicating the location of alleged PFOA and PFOS contamination in relation to the class boundary proposed by Dr. Laton, indicated in pink in the third map. Although the text in the maps and corresponding legends is not legible due to the scaling of the images, that text does not reflect the primary purpose for which the maps are included.

12 In response to the court's inquiry after Plaintiffs introduced their proposed Rule 23(c)(4) issue class, Defendants represented that they were "not withdrawing any parts of their briefing on the ... motion to exclude the testimony of Dr. Laton." (D.I. 487 at 4)

13 Although Plaintiffs' proposed issue classes were not raised in the original complaint or the notice of removal, jurisdiction under 28 U.S.C. § 1332(d) is determined at the time a claim is filed or removed. *Coba v. Ford Motor Co.*, 932 F.3d 114, 119 (3d Cir. 2019). Thus, Plaintiffs' modification of the class definition and/or the recommendation to deny Plaintiffs' motion for class and/or issue certification do not divest the court of subject matter jurisdiction under CAFA, which was previously established by the court in this matter. *Id.*; (D.I. 200; D.I. 202).

14 In the briefing on their motion for class certification, Plaintiffs did not present any argument under Rule 23(b)(1) or (2) and instead limited their argument to the application of Rule 23(b)(3). (D.I. 356 at 19-23; D.I. 463 at 8-13) Plaintiffs did not separately address any of the requirements under Rule 23(a) or (b) in their submissions made in support of the proposed issue class under Rule 23(c)(4). (D.I. 487 at 1; D.I. 492)

15 Plaintiffs withdrew the testimony of their toxicology expert, Dr. Ducatman, who identified a list of ailments allegedly associated with PFAS exposure. (D.I. 356, Ex. 8 at 2; D.I. 487 at 1) Plaintiffs

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

also fail to identify any evidence of record associating Caporale's ailments with PFAS exposure. (*Cf.* D.I. 432, Ex. G at 12)

16 Plaintiffs did not redefine the class area when they withdrew their proposed personal injury and property classes, nor did they include a new definition of the class boundary when they first articulated their proposed issue class definition pursuant to the court's August 25, 2025 Oral Order. (D.I. 481; D.I. 487 at 1; 8/25/2025 Oral Order)

17 Plaintiffs had the opportunity to support their proposed “class area” by referring to Dr. Laton's affidavit in their definition of the “proposed class boundary” in the original proposed class definitions, in their initial letter asserting the proposed issue class, and/or in the joint letter setting forth their proposed issue class definition. (D.I. 356 at 7; D.I. 481; D.I. 487) They did not do so. Plaintiffs cite to Dr. Laton's affidavit twice in their opening brief on class certification. Neither citation refers to the map at Exhibit J purportedly identifying the “Impacted Area.” (D.I. 356 at 8 & n.26, 19 & n.42)

18 The briefing on Blades Development's motion for summary judgment, discussed at Section II.C, *infra*, illustrates some of these distinctions. (D.I. 460; D.I. 462; D.I. 469) Unlike Procino, Blades Development allegedly acquired the Peninsula site as a Brownfields Developer after the PFAS contamination occurred. (D.I. 462-16 at ¶¶ 4, 7-10)

19 The only new portion of Blades Development's argument on summary judgment is its citation to 7 *Del. C.* § 9105(c)(2), which provides that the operator of a facility is immune from liability when it “had no knowledge or reason to know of any release or imminent threat of release” at the time it acquired the facility. (D.I. 460 at 6) For the reasons described herein, Blades Development has not established that Section 9105(c)(2), or any other provision of the DHSCA, governs liability for any claim beyond the costs of remediation of a contaminated site.

20 Blades Development asserts that “the BDA agreement ... immunizes Blades Development from claims arising under [the DHSCA],” but Plaintiffs have not brought a cause of action against Blades Development for violations of the DHSCA. (D.I. 460 at 4)

21 Although Plaintiffs cited *Garvin* in their answering briefs to both the motion to dismiss and the pending motion for summary judgment, Blades Development did not address *Garvin* in any of its briefing on those two motions. (D.I. 121 at 14; D.I. 129; D.I. 460; D.I. 462 at 6-7; D.I. 469)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

KeyCite Yellow Flag
Distinguished by Monaco v. City of Jacksonville, M.D.Fla., September 30, 2014

2011 WL 1559792
United States District Court,
W.D. Pennsylvania.

Gary CHEDWICK, Individually, and on behalf of a group of similarly situated individuals, Plaintiff,
v.
UPMC d/b/a University of Pittsburgh Medical Center, Defendant.

Civil Action No. 07–806.
|
April 21, 2011.

**Attorneys and Law Firms**

Gregory G. Paul, Morgan & Paul, PLLC, R. Bruce Carlson, Stephanie K. Goldin, Carlson Lynch, Sewickley, PA, Gary F. Lynch, Carlson Lynch Ltd, New Castle, PA, for Plaintiff.

Pamela G. Cochenour, Eric P. Reif, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Defendant.

***MEMORANDUM OPINION AND ORDER OF COURT***

McVERRY, District Judge.

***1** Before the Court for disposition are the PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (*Document No. 57* ), the Plaintiff's brief and exhibits in support of class certification (*Document No. 58* ), and the Defendant's brief and appendix in opposition to class certification (*Document No. 62* ). For the reasons that follow, the Plaintiff's Motion for Class Certification will be denied.

***Procedural History***

The procedural background to this controversy dates back to August 1, 2005, when Carole C. Bolden ("Bolden"), a former employee of Magee–Women's Hospital of the University of Pittsburgh Medical Center ("Magee"), commenced an action ("Bolden Action") against Magee under the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*]. Civil Action No. 05–1063, ECF No. 1. Bolden alleged that Magee had unlawfully terminated her employment pursuant to a policy providing that an employee could not remain on medical leave for more than six months. *Id.* at ¶ 36. On May 30, 2006, Bolden sought leave to file an amended complaint in class action based on Magee's alleged violations of both the ADA and the Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*]. Civil Action No. 05–1063, ECF No. 15. The amended complaint proposed by Bolden would have added Valentina Tish ("Tish"), another former employee of Magee, as a plaintiff. Civil Action No. 05–1063, ECF No. 15–2. The Court denied Bolden's request for leave to amend on June 13, 2006. Civil Action No. 05–1063, ECF No. 17. In denying the request, the Court explained that the "proposed transformation" of the case into a class action would "unduly delay" its resolution, and that disability-based discrimination claims of the kind asserted by Bolden were not typically amenable to adjudication within the context of a class action. *Id.* at 1.

Tish responded on June 21, 2006, by filing a separate action ("Tish Action") against Magee, alleging that she had been discharged in violation of the Rehabilitation Act. Civil Action No. 06–820, ECF No. 1. Her complaint included class allegations under both the ADA and the Rehabilitation Act. *Id.* at ¶¶ 20–29. Magee filed a motion to dismiss on July 26, 2006, seeking the dismissal of Tish's ADA claims on the ground that she had not exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Civil Action No. 06–820, ECF No. 3.

During the course of a status conference conducted on August 11, 2006, the Court permitted Bolden to renew her request for leave to file an amended complaint. Four days later, Tish responded to Magee's motion to dismiss by filing a motion for joinder pursuant to Federal Rule of Civil Procedure 20. Civil Action No. 06–820, ECF No. 8. She sought to join her action with the Bolden Action. *Id.* Bolden's renewed motion

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

for leave to amend was filed on August 25, 2006. Civil Action No. 05–1063, ECF No. 23. The Court denied Bolden's motion on October 5, 2006, repeating its earlier admonition that the allegations contained in the proposed amended complaint were "not the sort of claims that would ordinarily be appropriate for resolution in a class action." Civil Action No. 05–1063, ECF No. 27 at 5. In a memorandum order dated October 17, 2006, the Court granted Magee's motion to dismiss Tish's ADA claims and denied Tish's motion for joinder. Civil Action No. 06–820, ECF No. 8.

***2** On October 25, 2006, Tish filed an amended complaint purporting to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett"), and Terri Walsh ("Walsh") as plaintiffs and the University of Pittsburgh Medical Center ("UPMC"), UPMC Shadyside, UPMC St. Margaret and UPMC Montefiore as defendants. Civil Action No. 06–820, ECF No. 11. The UPMC entities filed a motion to strike the amended complaint on November 8, 2006. Civil Action No. 06–820, ECF No. 13. The motion to strike was accompanied by an alternative motion to sever filed pursuant to Federal Rule of Civil Procedure 21. *Id.* Five days later, Magee moved for summary judgment in the Bolden Action. Civil Action No. 05–1063, ECF No. 28.

In a memorandum opinion and order dated April 24, 2007, the Court granted Magee's motion for summary judgment in the Bolden Action. *Bolden v. Magee Women's Hospital,* Civil Action No. 05–1063, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. Apr. 24, 2007). In a separate memorandum opinion and order issued that same day, the Court treated Tish's filing of an amended complaint in the Tish Action as an implied request for leave to amend, granted that request, and denied the motion to strike that had been filed by the UPMC entities. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2007 WL 1221137, at *6–8, 2007 U.S. Dist. LEXIS 30130, at *15–22 (W.D.Pa. Apr. 24, 2007). In order to alleviate any prejudice to the UPMC entities, the Court granted their alternative motion to sever and directed Chedwick, Fowler, Hamlett and Walsh to refile their actions as separate cases. *Id.*

Pursuant to the severance order, Chedwick commenced this action against UPMC on June 15, 2007, alleging violations of the ADA and the Rehabilitation Act. ECF No. 1. His complaint included class allegations. *Id.* at ¶¶ 29–39. On August 28, 2007, UPMC moved to dismiss Chedwick's class allegations, arguing that they were violative of the severance order. ECF No. 3 at ¶¶ 35–41. The Court rejected UPMC's argument on December 12, 2007, holding that the severance order entered in the Tish Action did not preclude Chedwick from seeking class certification in this case. *Chedwick v. UPMC,* 619 F.Supp.2d 172, 187–190 (W.D.Pa.2007).

On June 8, 2008, the United States Court of Appeals for the Third Circuit affirmed this Court's decision which granted summary judgment in favor of Magee in the Bolden Action. *Bolden v. Magee Women's Hospital,* 281 Fed. Appx. 88 (3d Cir.2008). Eight days later, Magee filed a motion for summary judgment in the Tish Action. Civil Action No. 06–820, ECF No. 29. The motion was denied on October 27, 2008. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2008 WL 4790733, 2008 U.S. Dist. LEXIS 87010 (W.D.Pa. Oct. 27, 2008). The parties later stipulated to the dismissal of the Tish Action after advising the Court that they had decided to resolve their dispute through settlement. Civil Action No. 06–820, ECF Nos. 47–49.

***3** *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169 (3d Cir.2009), was decided by the Third Circuit Court of Appeals on July 23, 2009. In *Hohider,* the Court of Appeals reversed a class-certification order which had been entered in a case involving alleged violations of the ADA. *Hohider,* 574 F.3d at 171. Speaking through Chief Judge Scirica, the Court of Appeals explained that a determination as to whether the defendant had engaged in the pattern of unlawful discrimination alleged by the plaintiffs would "encompass inquiries" that were "too individualized and divergent" with respect to the defined class to warrant certification under Federal Rule of Civil Procedure 23. *Id.* at 186.

UPMC filed a motion for partial summary judgment on September 30, 2009, contending that *Hohider* precluded the Court from certifying a class in this case. ECF Nos. 32 & 33. The motion was not accompanied by evidentiary submissions. ECF No. 33 at 1, n. 1. In essence, UPMC argued that cases

involving alleged violations of the ADA and the Rehabilitation Act were *categorically* outside of the certification criteria contained in Rule 23, and that *Hohider* had foreclosed any possibility that a class could be certified in this case. *Id.* at 4–6. The Court denied the motion on November 9, 2009, holding that "cases brought under the ADA and the Rehabilitation Act [were] not *categorically* beyond the purview of Rule 23." *Chedwick v. UPMC,* 263 F.R.D. 269, 276 (W.D.Pa.2009) (emphasis in original).

Chedwick filed a motion for class certification on November 30, 2010, seeking to certify a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. That motion is the subject of this memorandum opinion.

### *Standard of Review*

The standards for determining whether a class should be certified are governed by Federal Rule of Civil Procedure 23. Subsections (a) and (b) of Rule 23 provide:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> ***4** (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(a)-(b). In order to establish entitlement to class certification, a party must satisfy all four of the prerequisites found in Rule 23(a) and at least one of the criteria found in Rule 23(b). *Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 147 (3d Cir.2008). A motion for class certification does not justify "a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action ." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732

(1974). Nevertheless, there are circumstances in which the issues relevant to class certification are entangled with the merits of a claim. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). A court presented with a motion for class certification may not decline to resolve factual disputes relevant to the applicable class-certification requirements merely because they overlap with the factual issues surrounding an underlying cause of action. *In re: Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 316 (3d Cir.2008). Although the factual findings made by a court in this context are conclusive for the purpose of class certification, they do not bind the trier of fact when the merits of the underlying claims are considered. *Id.* at 318. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

### *Factual Background*

Chedwick allegedly suffers from post-traumatic stress disorder ("PTSD") as a result of his military service during the conflict in Vietnam. ECF No. 1 at ¶ 11. He was employed by UPMC as an Interface Analyst III prior to the events at issue in this case. ECF No. 1 at ¶ 10. On November 19, 2003, Chedwick left his work station without authorization. ECF No. 62–5 at 2. UPMC responded by requiring Chedwick to serve an uncompensated suspension from November 24, 2003, through November 28, 2003. ECF No. 62–5 at 3. John Truxal ("Truxal"), Chedwick's supervisor, and Rhonda Larimore ("Larimore"), UPMC's Human Resources Manager, met with Chedwick on December 8, 2003, to discuss his past conduct and their expectations concerning his future performance. ECF No. 62–19 at 2–4. During the course of a deposition conducted on September 23, 2010, Chedwick acknowledged that he had left his work station without the permission of his superiors, and that UPMC had been justified in suspending him without pay for five days. ECF No. 62–4 at 11–12; Chedwick Dep. at 32, 35.

***5** Chedwick never returned to work after the meeting of December 8, 2003. ECF No. 62–4 at 12; Chedwick Dep. at 35. During the meeting, he attributed his conduct to his PTSD. ECF No. 62–19 at 2. The Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*] provides that an eligible employee is "entitled to a total of 12 workweeks of leave during any 12–month period for ... a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Chedwick formally requested a leave of absence on January 16, 2004, claiming that he was being treated for "severe depression" and PTSD. ECF No. 62–6 at 2. His request was approved, and he started to receive disability benefits pursuant to UPMC's policy with UNUM Provident. ECF No. 1 at ¶ 16.

In a letter dated March 24, 2004, Matthew Rimer ("Rimer"), a UPMC Human Resources Generalist, informed Chedwick that his FMLA leave was about to expire on March 30, 2004, and that he was expected to return to work on that date. ECF No. 62–7 at 2. Rimer's letter also stated that UPMC's corporate policy provided Chedwick with the option to apply for a personal leave of absence lasting up to fourteen weeks if he was not ready to resume his duties following the expiration of his FMLA leave. *Id.* Chedwick exercised this option and remained on leave for an additional fourteen weeks.

On July 2, 2004, Larimore sent Chedwick a letter which stated the following:

> Your 26–week leave of absence (combination of FMLA and personal leave) expires on July 6, 2004. The University of Pittsburgh Medical Center policy states that the total amount of leave may not exceed 26 weeks in any rolling 12–month period. As such, you will be removed from the University of Pittsburgh Medical Center's payroll and your employment terminated effective July 6, 2004. You will continue to receive Short Term Disability or Long Term Disability benefits as approved through UNUM Provident. Information regarding options for post-employment continuation of your health insurance benefits (COBRA) will be forwarded to you as well.
>
> Should you wish to reapply for employment with the University of Pittsburgh Medical Center after you are fully released by your physician, please visit upmc.com to apply online. Please contact me at (412) 647–1955 if you have any questions regarding this matter.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Chedwick v. UPMC, Not Reported in F.Supp.2d (2011)


> Thank you for your contributions to the University of Pittsburgh Medical Center. I wish you a quick recovery, and the best of luck in the future.

ECF No. 62–9 at 2. UNUM Provident proposed a "return-to-work plan" permitting Chedwick to perform some of his duties at home and some of his duties at UPMC's facility, but UPMC rejected that idea. ECF No. 62–4 at 21; Chedwick Dep. at 49. Chedwick's employment relationship with UPMC was terminated on July 6, 2004.

During the fall of 2005, UNUM Provident determined that Chedwick's medical condition had improved enough to facilitate his return to work. This determination was communicated to UPMC on October 7, 2005, by means of a letter from Stephanie Perry ("Perry"), a Lead Disability Benefits Specialist for UNUM Provident, to Jodi Clark ("Clark"), a UPMC employee. ECF No. 62–12 at 2. UNUM Provident provided Chedwick with three months of advanced benefits and closed his disability claim as of January 1, 2006. *Id.* The advanced benefits were provided in order to give Chedwick sufficient time to secure gainful employment. *Id.* Chedwick was also afforded the benefit of vocational counseling. *Id.*

***6** In October 2005, Chedwick started to submit applications for vacant positions advertised by UPMC. ECF No. 62–4 at 9; Chedwick Dep. at 23. He avers that he applied for at least twenty-eight different positions, including the position that he had previously held. ECF No. 1 at ¶ 20. Chedwick further alleges that UPMC never considered him for these positions because he was suffering from PTSD. *Id.* at ¶ 21.

Chedwick filed a charge of discrimination with the EEOC on August 14, 2006, alleging that UPMC had discharged him, and refused to rehire him, because of his "disability."[1] ECF No. 62–3 at 3–4. After exhausting his administrative remedies with the EEOC, Chedwick sought to become a plaintiff in the Tish Action by means of the amended complaint filed on October 25, 2006. Civil Action No. 06–820, ECF No. 11. He commenced this action against UPMC on June 15, 2007, in accordance with the severance order of April 24, 2007. ECF No. 1 at ¶ 4.

### *Discussion*

#### A. Overview

Title I of the ADA contains provisions which govern the conduct of covered employers in relation to their current and prospective employees. 42 U.S.C. §§ 12101–12117. Title I's anti-discrimination provision, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[2] 42 U.S.C. § 12112(a). The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "discrimination" prohibited by § 12112(a) is defined broadly enough to include a covered entity's failure or refusal to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," or its "den[ial of] employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation[s] to the physical or mental impairments of the employee or applicant ....“ 42 U.S .C. § 12112(b)(5)(A)-(B). In this context, "reasonable accommodations" may include "job restructuring," a "part-time or modified" work schedule, or a "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....“ 29 U.S.C. § 794(a). The standards used for determining whether a recipient

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of federal funding has violated this statutory provision in the employment setting are identical to those used for determining whether a covered entity has violated Title I of the ADA. 29 U.S.C. § 794(d). Chedwick avers that UPMC is both a "covered entity" within the meaning of the ADA and a recipient of federal financial assistance under the Rehabilitation Act. ECF No. 1 at ¶¶ 7–9; 29 U.S.C. § 794(b); 42 U.S.C. § 12111(2), (5)(A).

***7** The complaint alleges violations of both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 10–28. When he filed his EEOC charge, Chedwick listed October 20, 2005, as the *earliest* date on which he had been subjected to discrimination prohibited under the ADA. ECF No. 62–3 at 3. As the Court has already explained, Chedwick's ADA claims concern only UPMC's conduct relating to the job applications submitted on or after October 20, 2005. *Chedwick,* 619 F.Supp.2d at 178–181. On August 28, 2007, UPMC moved for the dismissal of Chedwick's ADA claims to the extent that they were based on the termination decision of July 6, 2004, contending that they had not been exhausted before the EEOC within the applicable 300–day charging period. ECF No. 3 at ¶¶ 29–34. The Court granted that portion of UPMC's motion "for the sake of clarity," since the language of the complaint was "somewhat confusing" as to whether Chedwick was relying on the ADA to challenge his discharge. *Chedwick,* 619 F.Supp.2d at 180. It was noted that Chedwick's "failure-to-hire" claims had been properly exhausted, since they were based on "separate and distinct" violations of the ADA. *Id.*

In support of its motion to dismiss, UPMC also argued that Chedwick could not challenge his discharge under the Rehabilitation Act, since his complaint had been filed more than two years after the termination decision. ECF No. 4 at 5–7. This argument was squarely rejected. Relying on the decision of the United States Supreme Court in *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Court held that the Rehabilitation Act claims concerning Chedwick's discharge, to the extent that they were based on a "failure-to-transfer" theory that would not have been viable under the pre–1992 version of the Rehabilitation Act, had been properly asserted within the four-year limitations period applicable under 28 U.S.C. § 1658(a). *Chedwick,* 619 F.Supp.2d at 181–187. This Court's reasoning as to that issue was subsequently adopted by the United States Court of Appeals for the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206–209 (3d Cir.2009).[3] Therefore, Chedwick clearly has a claim before the Court relating to UPMC's discharge decision of July 6, 2004.[4]

Throughout the course of this litigation, Chedwick has consistently maintained that UPMC discharged him, and refused to rehire him, because of an actual or perceived disability. ECF No. 1 at ¶¶ 23–24. A plaintiff seeking to establish a *prima facie* case of discrimination under the ADA or the Rehabilitation Act must ordinarily show both that he or she suffers from an actual or perceived "disability" (*i.e.,* "a physical or mental impairment that substantially limits one or more [of his or her] major life activities") and that he or she is "qualified" for the position held or desired (*i.e.,* capable of performing the "essential functions" of the position "with or without reasonable accommodation"). 42 U.S.C. §§ 12102(1)(A), 12111(8); *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998). In *Hohider,* the Court of Appeals concluded that the inquiry as to whether the proposed class members were "qualified" for their respective positions would require too many "individualized and divergent" determinations to facilitate the adjudication of their claims on a classwide basis. *Hohider,* 574 F.3d at 185–186. Nonetheless, the Court of Appeals suggested that a case involving alleged violations of the ADA or the Rehabilitation Act could be maintained as a class action if the class definition contained sufficient "unifying or limiting criteria" to make individualized inquiries unnecessary. *Id.* at 189 ("The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation."). When UPMC moved for partial summary judgment on the ground that *Hohider* had rendered Chedwick incapable of pursuing class certification in this case, the Court determined that Chedwick should be afforded the opportunity to pursue class certification within the parameters outlined in that decision. *Chedwick,* 263 F.R.D. at 276.

**B. The Improper "Use" Theory**

***8** Chedwick now appears to concede that he cannot identify the "unifying or limiting criteria" necessary to obtain class certification under *Hohider.* Expressing an intent to pursue his "discrimination" claims "on an individual basis," he seeks to certify a class "for the sole purpose" of proceeding under 42 U.S.C. § 12112(d), which governs the permissible scope and use of medical examinations and inquiries under the ADA. ECF No. 58 at 2. Chedwick contends that UPMC's policies result in the "improper use of medical examinations and inquiries," and that this "improper use" caused him and other potential class members to lose their jobs. ECF No. 58 at 2.

Before considering whether class certification is appropriate, the Court must briefly review the UPMC policies at issue. UPMC maintains a policy providing for the automatic termination of any employee who remains on leave for more than twenty-six weeks during the course of a given twelve-month period. ECF No. 58–1 at 1, 15, 27, 37, 49, 59, 71. An employee who is unable to return to his or her previous position but nevertheless wishes to remain employed by UPMC can obtain an alternative position only by submitting a formal application. ECF No. 58–2 at 22–23; Croushore Dep. at 122–123. Larimore's letter of July 2, 2004, constitutes direct evidence that Chedwick was discharged pursuant to this policy. ECF No. 62–9 at 2.

UPMC also has a Return to Work ("RTW") Assistance Program designed to assist an employee who is able to return to work in some capacity but temporarily unable to perform all of his or her previous duties. ECF No. 58–1 at 10, 23, 33, 45, 55, 67, 77. An employee who wishes to participate in the RTW program must provide medical documentation from a treating physician detailing his or her functional limitations. ECF No. 58–1 at 10, 23, 34, 45, 56, 67, 77. A returning employee who is able to perform the "essential functions" of his or her previous position "with appropriate modifications" is eligible to participate in the program. *Id.* If an employee cannot immediately return to his or her previous position, he or she may participate in the program by accepting a temporary assignment that is consistent with his or her abilities and limitations. *Id.* In either case, a participating employee must be able to work at least 50% of his or her previously-scheduled hours. *Id.* Participation in the RTW program is limited to twenty-six weeks, at which point an employee who "has not found a regular position at UPMC" will be terminated. ECF No. 58–1 at 11, 24, 34, 46, 56, 68. Linda Croushore ("Croushore"), UPMC's Supervisor of Disability Services, testified on August 11, 2010, that the twenty-six week limitations period applicable to an employee's participation in the RTW program begins on the date that he or she returns to work. ECF No. 58–2 at 15; Croushore Dep. at 66. In other words, an employee who has already been on leave for a full twenty-six weeks may participate in the RTW program for an additional twenty-six weeks. *Id.*

***9** An employee seeking a new position at UPMC must submit a formal application regardless of whether he or she is participating in the RTW program. Croushore testified that a returning employee who was performing the duties of a temporary assignment in connection with the RTW program would need to apply for the position if he or she wanted to retain it for more than twenty-six weeks. ECF No. 58–2 at 17; Croushore Dep. at 107. Croushore further explained that such an employee would be in competition with other applicants in his or her attempt to secure the position. ECF No. 58–2 at 18; Croushore Dep. at 108. Since UPMC's policy provides for the termination of any RTW program participant who fails to attain a "regular position" after the expiration of the twenty-six week period, an unsuccessful applicant performing the duties of a temporary assignment would ordinarily be terminated after twenty-six weeks.[5] ECF No. 58–1 at 11, 24, 34, 46, 56, 68, 78.

Chedwick argues that UPMC's policy providing for the automatic termination of any employee who has been on leave for more than twenty-six weeks, or who has participated in the RTW program for twenty-six weeks without securing a permanent position, is violative of the ADA pursuant to the decision of the United States Court of Appeals for the Third Circuit in *Shapiro v. Township of Lakewood,* 292 F.3d 356 (3d Cir.2002). ECF No. 58 at 3–7. UPMC disputes Chedwick's argument and contends that its policy conforms to the ADA and the holding in *Shapiro.* ECF No. 62 at 36–42. That issue need not be resolved at this time, since the only question presently before the Court is whether the matter should be adjudicated within

the context of a class action. *Eisen,* 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."). The inquiry as to whether class certification is appropriate in this case centers on the extent to which UPMC's policies result in the improper use of medical examinations and inquiries. ECF No. 58 at 2.

Croushore testified that her "Work Partners" office typically assists RTW program participants in their efforts to obtain permanent positions by discussing their abilities and limitations with managers who are seeking to fill vacancies throughout UPMC's various business units. ECF No. 58–2 at 10–11; Croushore Dep. at 57–58. She stated that Work Partners personnel would sometimes try to assure a manager that a returning employee's limitations would not preclude the performance of tasks required under a particular job description. *Id.* Chedwick contends that this form of "assistance" results in the impermissible use of medical information to deny employment opportunities to disabled applicants. ECF No. 58 at 3.

The provisions of the ADA governing medical examinations and inquiries are set forth in § 12112(d), which provides:

***10 (d) Medical examinations and inquiries.**

(1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2) Preemployment.

(A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this Act shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement. Information obtained under subparagraph (B) regarding the medical condition

or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d). The ADA's requirements concerning medical examinations and inquiries are incorporated within the Rehabilitation Act by reference. 29 U.S.C. § 794(d); *Lee v. City of Columbus,* ––– F.3d ––––, ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16 (6th Cir.2011); *Doe v. United States Postal Service,* 317 F.3d 339, 340 (D.C.Cir.2003); *Scott v. Napolitano,* 717 F.Supp.2d 1071, 1082, n. 4 (S.D.Cal.2010). Chedwick intimates that UPMC's refusal to rehire him on or after October 20, 2005, was somehow attributable to the improper use of information pertaining to his medical condition. ECF No. 58 at 3–5.

***11** The plain language of the ADA proscribes the discriminatory use of medical examinations and inquires. 42 U.S.C. § 12112(d)(1), (3)(A). A policy requiring only disabled individuals to undergo medical examinations or respond to medical inquiries would clearly violate this statutory proscription. *Harrison v. Benchmark Electronics Huntsville, Inc.,* 593 F.3d 1206, 1213 (11th Cir.2010) (explaining that § 12112(d)(1) incorporates § 12112(a)'s general ban on disability-based discrimination). The remaining provisions of the ADA concerning medical examinations and inquiries relate to three different stages of an employer's relationship with an applicant or employee. Before an offer of employment is made, an employer may not ask a job applicant to undergo a medical examination or inquire as to whether he or she is disabled. 42 U.S.C. § 12112(d)(2)(A). This prohibition is designed "to curtail all questioning" that would identify individuals with disabilities and exclude them from further consideration for employment. *Griffin v. Steeltek, Inc.,* 160 F.3d 591, 594 (10th Cir.1998). Once an offer of employment has been made, a prospective employee may be asked to undergo a medical examination, provided that "all entering employees are subjected to such an examination regardless of disability," the confidentiality requirements of § 12112(d)(3)(B) are adhered to, and the results of the examination are "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3). An "[e]mployment entrance examination" of this kind does not have to be "job-related" or "consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). After an employee's duties have commenced, an employer may not ask him or her to undergo a medical examination or inquire as to whether he or she is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The primary purpose of this restriction is to prevent covered employers from using unjustified medical examinations and inquiries to discover or expose medical information that could stigmatize disabled employees. *Brownfield v. City of Yakima,* 612 F.3d 1140, 1146 (9th Cir.2010). The propriety of a medical examination or inquiry under § 12112(d)(4)(A) is determined pursuant to an objective standard rather than by reference to an employer's subjective point of view. *Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 518 (3d Cir.2001). An employee may be subjected to a medical examination or inquiry when a physical or mental impairment adversely affects his or her job performance. *Yin v. California,* 95 F.3d 864, 686 (9th Cir.1996). An employer remains free to inquire as to the ability of an applicant or employee "to perform job-related functions" at all times. 42 U .S.C. § 12112(d)(2)(B), (4)(B).

Chedwick argues that class certification in this case is not impeded by *Hohider* because a plaintiff asserting a claim under § 12112(d) is not required to show that he or she is "qualified" or "disabled" within the meaning of the ADA. ECF No. 58 at 2. This contention "simply paints with too broad of a brush." *Chedwick,* 263 F.R.D. at 276. The question of whether a plaintiff seeking to proceed under § 12112(d) must demonstrate that he or she is "qualified" or "disabled" depends on the precise nature of the claim being asserted.

***12** Unlike § 12112(a), which prohibits only discrimination "against a qualified individual on the basis of disability," § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection. 42 U.S.C. § 12112(a), (d); *Fredenburg v. Contra Costa County Dept. of Health Services,* 172 F.3d 1176, 1182 (9th Cir.1999). An applicant or employee who is subjected to an unlawful medical examination or inquiry need not show that he or she is "disabled" in order to maintain an action under § 12112(d). *Fredenburg,* 172 F.3d at 1182. Instead, such an employee can prevail by demonstrating that he or she suffered harm as a result of the examination or inquiry. For instance,

a job applicant who is rejected by an employer on the basis of an illegal pre-offer examination or inquiry may proceed with a claim under § 12112(d)(2)(A) regardless of whether he or she is "disabled." *Griffin,* 160 F.3d at 592–595. In the same vein, an employee need not be "disabled" in order to challenge the propriety or scope of a medical examination or inquiry under § 12112(d)(4)(4). *Conroy v. New York State Dept. of Correctional Services,* 333 F.3d 88, 94–95 (2d Cir.2003); *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1229 (10th Cir.1997). Similarly, harm to an employee resulting from an employer's wrongful disclosure of confidential medical information is actionable under § 12112(d)(3)(B) or (4)(C) irrespective of whether the employee suffers from a "disability." *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 969 (8th Cir.1999); *EEOC v. Ford Motor Credit Co.,* 531 F.Supp.2d 930, 936–943 (M.D.Tenn.2008).

In contrast to claims involving improper medical examinations, unjustified medical inquiries or unauthorized disclosures of confidential medical information, there are claims under § 12112(d) which depend on whether applicants or employees are "qualified" or "disabled" within the meaning of the ADA. For example, § 12112(d) (3)(C) provides that the results of an "[e]mployment entrance examination" may only be used "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C). A covered entity engages in prohibited "discrimination" when it rejects a prospective employee on the basis of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Consequently, an employer may not rely on the results of a lawful medical examination to deny employment to an individual unless the examination reveals that a physical or mental impairment suffered by the individual precludes him or her from performing the "essential functions" of the desired position. *Holiday v. City of Chattanooga,* 206 F.3d 637, 640–648 (6th Cir.2000). If a physical or mental examination reveals that a prospective employee suffers from an impairment that could *potentially* preclude the performance of "essential" work-related tasks, an employer may reject that prospective employee only on the basis of an "individualized determination" that the impairment will *actually* preclude the performance of those tasks. *Id.* at 644, citing *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 193 (3d Cir.1999). An employer which rejects a disabled applicant pursuant to a belief that his or her impairment will render him or her incapable of performing "essential" job duties runs the risk of being wrong and incurring liability. *Taylor,* 177 F.3d at 193 ("If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake."). In this situation, an individual must show that he or she is "qualified" for the relevant position in order to establish that the results of a medical examination were improperly "used" to facilitate discrimination.[6] *Holiday,* 206 F.3d at 645.

***13** Like medical information obtained during the course of an "[e]mployment entrance examination," information "regarding the medical condition or history of any employee" obtained by means of a "voluntary medical examination" or an inquiry as to his or her "ability to perform job-related functions" may be "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). A careful reading of Chedwick's brief reveals that he is basing his motion for class certification on an allegation that UPMC improperly "uses" medical information obtained from disabled employees to deprive them of alternative employment opportunities. ECF No. 58 at 5–10. He attempts to rely on § 12112(d) in order to circumvent the holding in *Hohider.* In support of his position, Chedwick calls the Court's attention to *Garrison v. Baker Hughes Oilfield Operations, Inc.,* 287 F.3d 955 (10th Cir.2002), and *O'Neal v. City of New Albany,* 293 F.3d 998 (7th Cir.2002). ECF No. 58 at 8–9. Those decisions, however, do not support Chedwick's argument.

In *Garrison,* the United States Court of Appeals for the Tenth Circuit recognized that § 12112(d)(3)(C) restricts the ways in which an employer may "use" the results of a permissible medical examination or inquiry to withdraw an offer of employment. *Garrison,*

287 F.3d at 963, n. 7 (citing § 12112(d)(3)(C) for the proposition that "[e]mployers may only withdraw job offers for reasons 'in accordance' with subchapter I of the Americans with Disabilities Act"). Nonetheless, the Court of Appeals also explained that while a plaintiff is *generally* not required to show that he or she is "disabled" in order to challenge improper medical examinations and inquiries under the ADA, he or she cannot prevail in an improper "use" claim brought pursuant to § 12112(d) (3)(C) without establishing than an employer "used collected medical information to discriminate on the basis of a disability." *Id.* at 960, n. 4. The United States Court of Appeals for the Seventh Circuit followed this line of reasoning in *O'Neal,* holding that an individual cannot recover under § 12112(d)(3)(C) without establishing that he or she is "disabled" within the meaning of the ADA. *O'Neal,* 293 F.3d at 1009–1010. These decisions are consistent with the plain language of the ADA, which provides that a covered employer "may condition an offer of employment on the results of [a medical] examination" if "the results of such examination are used only in accordance with [Title I]." 42 U.S.C. § 12112(d)(3)(C). In order to show that the results of a lawful medical examination were improperly "used" by an employer to withdraw an offer of employment, a plaintiff must demonstrate both the existence of a statutory "disability" and his or her ability to perform the "essential functions" of the position in question, with or without reasonable accommodations. 29 C.F.R. § 1630.14(b)(3).[7]

The "use" restriction applicable to the results of an "[e]mployment entrance examination" applies with equal force to certain forms of medical information obtained by means of "voluntary medical examinations" and "job-related" medical inquiries involving a covered entity's current employees. 42 U.S.C. § 12112(d)(4)(B)-(C). Chedwick contends that UPMC used medical information related to his disability to deny him alternative employment opportunities. ECF No. 58 at 3. He apparently sought assistance from UNUM Provident personnel when he was trying to get a new job with UPMC. In an email message sent to Croushore on November 1, 2005, Perry asked whether UPMC had a "contact person" who could speak with UNUM Provident's vocational specialist about Chedwick's employment prospects. ECF No. 58–3 at 2. Perry's message indicated that Chedwick was receiving long-term disability benefits. *Id.* The next day, Croushore forwarded the message to Larimore and stated that there was "no set recruiter" for the vocational specialist to contact, and that she could not provide assistance to Chedwick. *Id* . at 1–2. Larimore forwarded the message chain to Rimer, who responded by identifying an Interface Analyst position that was consistent with Chedwick's qualifications. *Id.* at 1. Although Chedwick applied for the position, he never received an interview. ECF No. 62–8 at 8; Croushore Aff. at ¶¶ 35–36. The crux of Chedwick's argument is that UPMC declined to interview him for the position because Croushore had forwarded information to Rimer referencing his receipt of long-term disability benefits. ECF No. 58 at 3–7.

***14** In order to establish a violation of § 12112(d)(4)(C), Chedwick would need to show that UPMC "used" information pertaining to his medical condition in a manner that was not "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(C). He could do so only by demonstrating that he was both "disabled" within the meaning of the ADA and "qualified" for the Interface Analyst position. *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3d Cir.1999). Chedwick does not allege that he was subjected to an improper medical examination or inquiry that could be actionable under the ADA without regard to his individual status. A freestanding "examination" or "inquiry" claim under § 12112(d) accrues as soon as a covered employer "conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." *Green v. Joy Cone Co.,* 107 Fed. Appx. 278, 280 (3d Cir.2004). In contrast, an improper "use" claim does not accrue until an employer *uses* lawfully-obtained medical information to discriminate in a manner that violates § 12112(a). *Garrison,* 287 F.3d at 960, n. 4. The viability of Chedwick's improper "use" claim would depend on questions such as whether he was "disabled" within the meaning of the ADA, whether he was "qualified" for the position in question, and whether there was a causal connection between his status as a "disabled" individual and UPMC's refusal to rehire him. *O'Neal,* 293 F.3d at 1009–1010; *Holiday,* 206 F.3d at 645.

### C. The Application of Rule 23

Chedwick maintains that he can satisfy the requirements of subsections (a), (b)(2) and (b)(3) of Rule 23. ECF No. 58 at 10–19. UPMC attacks Chedwick's motion for class certification from several different angles. UPMC's first argument is that Chedwick cannot pursue a claim under § 12112(d) because he failed to exhaust it before the EEOC and never included it in his complaint. ECF No. 62 at 24–26. With respect to the issue of exhaustion, the Court notes that Chedwick's claims are based on both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 1–2. The Rehabilitation Act incorporates the provisions of the ADA governing medical examinations and inquiries. 29 U. S.C. § 794(d); *Lee,* ––– F.3d at ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16; *Doe,* 317 F.3d at 340; *Scott,* 717 F.Supp.2d at 1082, n. 4. Chedwick was not required to exhaust his Rehabilitation Act claims before commencing this action. *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 192–194 (3d Cir.2000). Thus, UPMC's argument concerning exhaustion, if meritorious, would defeat only Chedwick's claim arising directly under § 12112(d)(4)(C), and would not impact his parallel claim under the Rehabilitation Act. *Hopkins v. City of Wilmington,* 629 F.Supp.2d 392, 396 (D.Del.2009) (explaining that a plaintiff need not exhaust a claim under the Rehabilitation Act even if he or she "also has a viable claim under the ADA, a statute that does require exhaustion of administrative remedies"). In addition, Chedwick's improper "use" claims are wholly dependent on underlying violations of § 12112(a) and, therefore, arguably the *same* claims asserted in his complaint. *Holiday,* 206 F.3d at 640–648 (analyzing a claim involving the alleged misuse of medical information to withdraw a job offer as a typical "failure-to-hire" claim, even though the medical information had been obtained during the course of a medical examination). In any event, there is no need for the Court to consider these issues, since Chedwick cannot satisfy the requirements of Rule 23 even if it is assumed that he can pursue individual claims stemming from UPMC's alleged misuse of his medical information.

***15** Chedwick did not participate in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. UPMC contends that Chedwick's status as a nonparticipant deprives him of standing to pursue a claim under § 12112(d). ECF No. 62 at 27–28. This argument fails to account for Chedwick's assertion that *his* medical information was improperly used to deny him the Interface Analyst position. ECF No. 58 at 3–7. There is no need for the Court to determine whether UPMC actually violated the ADA or the Rehabilitation Act with respect to Chedwick, since the inquiry concerning standing does not depend on whether UPMC's conduct was legal. [8] *Tandy v. City of Wichita,* 380 F.3d 1277, 1283, n. 10 (10th Cir.2004). While the factors distinguishing Chedwick's situation from the factual scenarios involving other potential class members are certainly relevant to the Court's analysis under Rule 23, they do not defeat Chedwick's standing to vindicate his own rights in this case.

UPMC argues that Chedwick cannot meet the requirements of Rule 23. ECF No. 62 at 30–53. Chedwick implicitly concedes that his evidentiary submissions are not sufficient to warrant class certification by suggesting that further discovery is necessary to facilitate the adjudication of his motion. ECF No. 58 at 1. The Court notes that a class cannot be certified unless each relevant component of Rule 23 is satisfied. *In re: Constar International, Inc., Securities Litigation,* 585 F.3d 774, 780 (3d Cir.2009). Chedwick bears the burden of *proving* each factual prerequisite to class certification by a preponderance of the evidence. *Hydrogen Peroxide,* 552 F.3d at 307. Some degree of discovery is obviously necessary to enable a plaintiff seeking class certification to meet his or her evidentiary burden. Nevertheless, the evidence presently before the Court indicates that this case cannot be maintained as a class action, and that additional discovery concerning the issue of class certification would be futile.

The record contains a list of forty-seven former employees of UMPC's corporate unit who were terminated after having been on leave for more than twenty-six weeks. ECF No. 58–4. Chedwick contends that discovery involving UPMC's other business units would identify hundreds or thousands of other potential class members. ECF No. 58 at 12–13. Accordingly, the Court assumes *arguendo* that Chedwick can satisfy Rule 23(a)(1)'s numerosity requirement. *Stewart v. Abraham,* 275 F.3d 220, 226–227 (3d Cir.2001) (observing that "the first prong of Rule 23(a)" is generally met when the proposed class representative demonstrates that the number of

class members exceeds forty). Chedwick need only share "one question of fact or law with the grievances of the prospective class" to surmount Rule 23(a)(2)'s commonality prerequisite.[9] *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Since the claims asserted by all potential class members would relate to whether UPMC's automatic-termination policy violates the ADA and the Rehabilitation Act, Chedwick can presumably satisfy the commonality requirement. ECF No. 57 at ¶ 3.

***16** In order to satisfy Rule 23(a)(3)'s typicality requirement, Chedwick must show that his claims are "typical" of the claims asserted by the other potential class members. FED. R. CIV. P. 23(a)(3). The United States Court of Appeals for the Third Circuit recently articulated the elements of a proper "typicality" analysis by stating as follows:

> [W]e glean the proper consideration in assessing typicality to include three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 599 (3d Cir.2009). A careful review of the parties' filings reveals that Chedwick cannot satisfy this standard.

While Chedwick's improper "use" claims under § 12112(d)(4)(C) would most likely proceed pursuant to the same "legal theory" as the claims asserted by other class members, the "factual circumstances underlying" Chedwick's claims would be materially different from those underlying the claims of the RTW program participants. Chedwick never participated in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. The primary basis for his motion for class certification is the alleged misuse of returning employees' medical information by Work Partners personnel in connection with that program. ECF No. 58 at 3. In an affidavit dated December 28, 2010, Croushore stated that she had not been involved with Chedwick's attempt to secure alternative employment during the fall of 2005 because he had never participated in the RTW program and had already been terminated by UPMC. ECF No. 62–8 at 8; Croushore Aff. at ¶ 34. Croushore's declaration is consistent with her November 2, 2005, email message to Larimore, in which she stated that she could not provide assistance to Chedwick. ECF No. 58–3.

Chedwick moves for the certification of a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. The proposed class definition would identify class members by reference to the manner in which they were *terminated.* Chedwick apparently wants to prove that UPMC misuses information relating to the medical conditions of returning employees that is provided to recruiters by Work Partners personnel charged with implementing the RTW program. ECF No. 58 at 3–7. Chedwick's individual "use" claim, however, concerns the manner in which medical information was used to reject his applications for employment on or after October 20, 2005. ECF No. 58 at 3. The Court has already pointed out that Chedwick's "failure-to-hire" claims are separate and distinct from his wrongful discharge claims. *Chedwick,* 619 F.Supp.2d at 178–181. Chedwick's status as a *former* (and *prospective* ) UPMC employee in October 2005 was materially different from the status of individuals who were trying to *remain* UPMC employees by utilizing the RTW program. A disabled employee attempting to return from leave must find a "transitional" work assignment in order to avoid termination after the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

passage of twenty-six weeks, whereas an applicant for future employment is not directly affected by the automatic-termination policy. ECF No. 58–1 at 11, 23, 34, 45, 56, 67, 77. It is difficult to understand how Chedwick believes that he can represent a class of persons whose medical information was improperly "used" to effectuate their termination based on the improper "use" of his medical information *subsequent* to his own termination. [10]

***17** There is another factor which weighs against a "typicality" finding in this case. Chedwick objects to the fact that he was identified as a former employee receiving long-term disability benefits when Perry's message to Croushore was forwarded to Larimore and Rimer. ECF No. 58 at 3–7; ECF No. 58–3. The provisions of the ADA governing the use of employees' medical information pertain only to information received as a result of specified "medical examinations" and "inquiries." 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). They generally do not apply to information that is voluntarily disclosed by an employee. *Cash v. Smith,* 231 F.3d 1301, 1307–1308 (11th Cir.2000). While the Court expresses no opinion concerning the viability of Chedwick's improper "use" theory, UPMC may argue that the information supplied by Perry (who apparently acted at Chedwick's behest) was beyond the purview of § 12112(d)(4)(C) because it was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345. Although such an argument would not be sufficient to derail Chedwick's more generalized "failure-to-hire" claims under § 12112(a), it could potentially destroy the premise for his argument that UPMC violated his rights under § 12112(d). Given that Chedwick never participated in the RTW program, Croushore's testimony concerning the usual communications between Work Partners personnel and recruiters seeking to fill vacancies throughout UPMC's various business units cannot give rise to an inference that *his* medical information was received and misused by a recruiter. ECF No. 58–2 at 10–15; Croushore Dep. at 57–62. Since the information forwarded to Rimer was arguably *not* subject to the requirements of § 12112(d), Chedwick's individual claim may "be subject to a defense that is both inapplicable to many members of the [proposed] class and likely to become a major focus of [this] litigation." *Schering Plough,* 589 F.3d at 599. For these reasons, Chedwick cannot satisfy Rule 23(a)(3)'s "typicality" prerequisite to class certification.

The "adequacy" inquiry required under Rule 23(a)(4) accounts for both the ability of the class representative's counsel to "fairly and adequately protect the interests of the [proposed] class" and any potential "conflicts of interest" between the named party and the class that he or she seeks to represent. *In re: Warfarin Sodium Antitrust Litigation,* 391 F.3d 516, 532 (3d Cir.2004). The Court has no doubt that the attorneys retained by Chedwick are competent to handle a class action. FED. R. CIV. P. 23(g). The unique nature of Chedwick's claim, however, renders him an inadequate class representative under these circumstances. Vulnerabilities in the individual claims asserted by a proposed class representative are relevant to the "adequacy" inquiry as well as the "typicality" inquiry. *Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir.2006). Since UPMC may be able to attack Chedwick's improper "use" claim on the ground that his medical information was not provided in response to an "inquiry," there is a danger that Chedwick "will become distracted by the presence of a possible defense applicable only to him," and that the interests of the other class members will suffer. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir.1980). Because Chedwick cannot fulfill the applicable "typicality" and "adequacy" prerequisites, his motion for class certification must be denied regardless of whether he could otherwise satisfy the requirements of either subsection (b)(2) or subsection (b) (3). [11]

***18** Even if Chedwick could surmount the "typicality" and "adequacy" hurdles under Rule 23(a), he would not be able to establish his entitlement to certification under Rule 23(b)(2). As noted earlier, an individual's ability to succeed in an improper "use" claim under § 12112(d)(3)(C) or (4)(C) generally depends on whether he or she can succeed on an underlying "discrimination" claim under § 12112(a). *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. A plaintiff pursuing this type of claim must ordinarily show that lawfully-obtained medical information (*i.e.,* evidence of a medical condition obtained as a result of a lawful medical examination or a permissible medical inquiry) was unlawfully used by an employer to deny him or her a position

for which he or she was nevertheless "qualified." *Holiday,* 206 F.3d at 640–648. In this respect, an inquiry into whether the individual plaintiff was "qualified" for the desired position would be necessary to facilitate a determination as to whether disability-based "discrimination against that individual, once proven to have occurred, [was] unlawful" under the ADA and the Rehabilitation Act. *Hohider,* 574 F.3d at 191. A returning employee participating in the RTW program would need to establish both the *existence* of a vacant position and his or her own *qualifications* for the position in order to show that UPMC improperly "used" medical information to reject his or her application for that position. *Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 230 (3d Cir.2000). Only a "qualified" applicant or employee would be able to establish an actionable violation of the ADA or the Rehabilitation Act. *Hohider,* 574 F.3d at 192 (explaining that the ADA "generally requires evaluation of whether a disabled individual is 'qualified' as defined under the statute to determine not only whether discrimination on the basis of disability has occurred, but more fundamentally, whether such discrimination against that individual is unlawful"). An applicant or employee whose disability could not have been accommodated in any event would not be able to succeed in an improper "use" claim, whereas a "qualified" applicant or employee could prevail by demonstrating that UPMC wrongfully relied on medical information to deny him or her a position that was consistent with his or her abilities and limitations. *Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997) (remarking that "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required"); *Willis v. Conopco,* 108 F.3d 282, 285 (11th Cir.1997) (observing that the ADA "is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made"). Since the lawfulness (or unlawfulness) of UPMC's actions with respect to each potential class member would turn on factual characteristics and circumstances unique to each individual, Chedwick cannot show that UPMC "has acted or refused to act on grounds that apply generally to the class," or that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." [12] FED. R. CIV. P. 23(b)(2).

***19** In order to demonstrate that class certification is proper under Rule 23(b)(3), Chedwick would need to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Certification under Rule 23(b)(3) is improper whenever the "essential elements" of the plaintiffs' claims require individualized treatment. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001). Therefore, the propriety of class certification in this case can only be determined by reference to what the individual class members would have to prove in order to hold UPMC liable under the ADA or the Rehabilitation Act. *Hydrogen Peroxide,* 552 F.3d at 311. The decision in *Hohider* was premised on the fact that individualized assessments would be required to determine whether each member of the class was "qualified" for his or her position. *Hohider,* 574 F.3d at 185–186. As the Court has already explained, the reasoning employed in *Hohider* would apply with equal force to improper "use" claims of the kind discussed in Chedwick's brief. ECF No. 58 at 3–10; *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. Consequently, Chedwick cannot satisfy the requirements of Rule 23(b)(3).

Class certification would be improper in this case for the additional reason that Chedwick cannot show that each member of the proposed class was "disabled" within the meaning of the ADA and the Rehabilitation Act at the time of his or her discharge. *O'Neal,* 293 F.3d at 1010 (affirming a grant of summary judgment in favor of an employer defending a claim under § 12112(d)(3)(C) because the plaintiff was concededly not "disabled"). The determination as to whether a person is statutorily "disabled" requires a highly individualized analysis. "[E]ven if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways." *Emory v. AstraZeneca Pharmaceuticals, LP,* 401 F.3d 174, 182 (3d Cir.2005). Moreover, the ADA Amendments Act of 2008, which became effective on January 1, 2009, broadened the category of individuals entitled to statutory protection from discrimination under the ADA and the

Rehabilitation Act by altering the definition of the term "disability." Pub.L. No. 110–325, §§ 4–8, 122 Stat. 3553, 3555–3559 (2008). Several federal courts have determined that the ADA Amendments Act does not apply retroactively. *Becerril v. Pima County Assessor's Office,* 587 F.3d 1162, 1164 (9th Cir.2009); *Thornton v. United Parcel Service, Inc.,* 587 F.3d 27, 35, n. 3 (1st Cir.2009); *Frederickson v. United Parcel Service Co.,* 581 F.3d 516, 521, n. 1 (7th Cir.2009); *Lytes v. DC Water & Sewer Authority,* 572 F.3d 936, 942 (D.C.Cir.2009); *Millholland v. Sumner County Board of Education,* 569 F.3d 562, 565 (6th Cir.2009); *EEOC v. Agro Distribution LLC,* 555 F.3d 462, 469, n. 8 (5th Cir.2009). Chedwick's proposed class would include individuals who were terminated both before and after January 1, 2009. ECF No. 57 at ¶ 3. Thus, the inquiries into whether particular class members were entitled to statutory protection in the first place would have to be conducted under two different legal standards. This reality further illustrates why a class cannot be certified under these circumstances.

### *Conclusion*

***20** The Court acknowledges that a plaintiff can sometimes assert claims under § 12112(d) without establishing his or her "qualifications" for a particular position or the existence of a statutory "disability." For instance, an individual whose injuries are attributable to an *unlawful* medical examination or inquiry can recover under § 12112(d) without showing that his or her employer engaged in a form of "discrimination" proscribed by § 12112(a). *Harrison,* 593 F.3d at 1215–1216; *Griffin,* 160 F.3d at 592–595. Likewise, an employee who is harmed by a covered entity's failure to comply with the ADA's confidentiality requirements can recover for damages resulting from an unauthorized disclosure regardless of whether he or she is "disabled." *Doe,* 317 F.3d at 343–345. These types of violations, however, bear no meaningful relationship to the forms of "discrimination" alleged in Chedwick's complaint or the improper "use" theory advanced in his brief. ECF No. 1 at ¶¶ 10–38; ECF No. 58 at 3–10. Chedwick does not allege that he was subjected to illegal medical examinations or inquiries, or that confidential information pertaining to his "medical condition or history" was wrongfully disclosed. 42 U.S.C. § 12112(d)(2)(A), (3)(B), (4)(A), (C). Instead, he claims that UPMC wrongfully "used" information to perpetrate a form of "discrimination" prohibited by § 12112(a). ECF No. 58 at 3–10. The theory relied upon by Chedwick is subject to the rule established in *Hohider.* Since Chedwick implicitly concedes that he can pursue his underlying "discrimination" claims only "on an individual basis," it is apparent that further discovery involving the issue of class certification would be futile. ECF No. 58 at 2.

Even if the Court were to liberally construe Chedwick's argument to mean that Croushore and Larimore improperly disclosed his receipt of long-term disability benefits to Rimer, thereby obviating the need for him to prove that he was "disabled" within the meaning of the applicable statutory provisions and "qualified" for the Interface Analyst position, Chedwick would nevertheless be an improper representative for the proposed class. UPMC's conduct in relation to Chedwick during the fall of 2005 would still bear no relationship to the automatic-termination policy referenced in the proposed class definition, since Chedwick had already been discharged by that time. ECF No. 57 at ¶ 3. Furthermore, UPMC could persuasively argue that the information contained in Perry's message was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345; *Cash,* 231 F.3d 1307–1308. After all, it was Perry (a UNUM Provident employee acting on behalf of Chedwick) who disclosed the fact that Chedwick was a former employee receiving long-term disability benefits. ECF No. 58–3. After receiving Perry's email message, Croushore merely *forwarded* the message to Larimore, who proceeded to *forward* the same message to Rimer. *Id.* No employee of UPMC supplied Rimer with *medical information* that had not been voluntarily disclosed by Perry. This fact distinguishes Chedwick from those potential class members whose medical information was allegedly passed on to recruiters by Work Partners personnel. *Schering Plough,* 589 F.3d at 599 (stating that a proposed class representative "must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation"). Moreover, a breach-of-confidentiality theory of this kind would in no way resemble the theories of "discrimination" articulated in Chedwick's complaint. [13] ECF No. 1 at ¶¶ 10–38.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***21** For the foregoing reasons, this case cannot be maintained as a class action. The time has come for the parties to concentrate their efforts on the merits of Chedwick's individual claims. The Court expresses no opinion as to whether Chedwick can establish actionable violations of the ADA and the Rehabilitation Act, or as to whether UPMC's policies are in conformity with federal law.

Chedwick cannot establish his entitlement to class certification under subsections (a)(3), (a)(4), (b)(2) and (b)(3) of Fed.R.Civ .P. 23. Accordingly, the motion for class certification (*Document No. 57* ) will be denied. An appropriate order follows.

***ORDER OF COURT***

AND NOW, this 21st day of April, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the Plaintiffs Motion for Class Certification (*Document No. 57* ) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1559792, 24 A.D. Cases 1222

## Footnotes

1 In his EEOC charge, Chedwick also alleged that UPMC had discriminated against him because of his age. ECF No. 62–3 at 2–4. His complaint in this Court, however, does not allege that UPMC violated his rights under the Age Discrimination in Employment Act of 1967 (“ADEA”) [29 U.S.C. § 621 *et seq.*]. ECF No. 1.

2 At the time of Chedwick's termination, § 12112(a) provided that “[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.” Pub.L. No. 101–336, § 102; 104 Stat. 327, 331–332 (1990), (previously codified at 42 U.S.C. § 12112(a)). The language of this anti-discrimination provision was changed by the ADA Amendments Act of 2008, which took effect on January 1, 2009. Pub.L. No. 110–325, § 5; 122 Stat. 3553, 3557 (2008); 42 U.S.C. § 12112(a). Chedwick seeks to certify a class consisting of persons who were terminated by UPMC both before and after January 1, 2009. ECF No. 57 at ¶ 3. The Court quotes the current version of the statute in order to speak in the present tense. The linguistic change to § 12112(a) made by the statutory amendment is not germane to the class-certification inquiry. *Chedwick v. UPMC,* 263 F.R.D. 269, 275, n. 8 (W.D.Pa.2009).

3 *Fowler v. UPMC Shadyside,* Civil Action No. 07–807, like the instant case, resulted from this Court's severance order of April 24, 2007. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206 (3d Cir.2009).

4 The Court points this out because Chedwick's ability (or inability) to act as a class representative in this action largely depends on the extent to which his claims are similar to those of the other potential class members. Nevertheless, it has not gone unnoticed that UPMC wrongfully claimed, during the course of an earlier discovery dispute, that Chedwick's claims concern only matters relating to events occurring on or after October 20, 2005. ECF No. 62–11 at 3–31. It is difficult to fathom how UPMC could have misconstrued this Court's unambiguous pronouncement of December 12, 2007, that Chedwick could challenge his discharge under the Rehabilitation Act, provided that he was proceeding on a “failure-to-transfer” theory. *Chedwick v. UPMC,*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

619 F.Supp.2d 172, 181–187 (W.D.Pa.2007). The Court's opinion clearly contemplated that discovery concerning the circumstances of Chedwick's discharge would take place. *Chedwick,* 619 F.Supp.2d at 187, n. 9. Although the Court's order purported to *deny* UPMC's motion to dismiss only with respect to Chedwick's "failure-to-hire" claims, it *granted* the motion only with respect to the *ADA claims* stemming from Chedwick's discharge. *Id.* at 190. The order dismissed *none* of Chedwick's Rehabilitation Act claims, and the opinion clearly explained that Chedwick could challenge his discharge under the Rehabilitation Act. *Id.* at 181–187, 190. UPMC had no legitimate basis for resisting Chedwick's efforts to obtain information about the manner in which his employment was terminated. ECF No. 19 at 2–3; ECF No. 62–11 at 3–31. While the Court left the door open for UPMC to reassert its statute-of-limitations defense if *discovery revealed* that Chedwick's discharge would have been actionable under the pre–1992 version of the Rehabilitation Act, it did not provide UPMC with a license to obstruct the discovery process itself. *Chedwick,* 619 F.Supp.2d at 187, n. 9.

5 The most recent "UPMC Policy and Procedure Manual" contained in the record, which became effective on October 19, 2009, provides that a participating employee who fails to secure a "regular position" after the expiration of the twenty-six week period will be terminated "absent exceptional circumstances and consistent with applicable state and federal regulations." ECF No. 58–1 at 11. This qualifying language did not appear in the earlier versions of the "UPMC Policy and Procedure Manual." ECF No. 58–1 at 24, 34, 46, 56, 68, 78.

6 It is not clear whether UPMC requires some or all of its incoming employees to undergo medical examinations prior to the commencement of their duties. Although Chedwick refers only to medical "inquiries" to support his argument, his proposed class would presumably include employees who have been discharged because of UPMC's alleged misuse of medical information obtained during the course of post-offer medical examinations (if such examinations are required under UPMC's internal policies). ECF No. 58 at 2 (stating that "UPMC's policy results in an improper use of medical examinations and inquiries").

7 The applicable regulation provides:

> Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity. However, if certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part.

29 C.F.R. § 1630.14(b)(3).

8 UPMC argues that there is no "factual basis" for Chedwick's allegation that the results of medical inquiries are used to discriminate against disabled employees who participate in the RTW program. ECF No. 62 at 29–30. In an affidavit dated December 28, 2010, Croushore declared that her Work Partners office does not reveal confidential medical information about returning employees to recruiters working throughout UPMC's business units. ECF No. 62–8 at 5; Croushore Aff. at ¶¶ 19–21. The Court has no occasion to consider the legality of UPMC's policies and practices relating to the RTW program. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action .").

Chedwick v. UPMC, Not Reported in F.Supp.2d (2011)


9 Although Rule 23(a)(2) refers to *"questions* of law or fact common to the class," the plural form of the word "question" has not been construed to require more than one common question in order for a finding of commonality to be sustained. FED. R. CIV. P. 23(a)(2) (emphasis added); *In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 597, n. 10 (3d Cir.2009).

10 Some decisions applying the ADA and the Rehabilitation Act have recognized similarities between a current employee trying to return from a medical leave and a former employee seeking to be rehired. *Harris v. Harris & Hart,* 206 F.3d 838, 839–845 (9th Cir.2000); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 668–678 (1st Cir.1995). The merits of Chedwick's claims, however, are not presently at issue. The only motion before the Court is Chedwick's motion for class certification. Although Chedwick's proposed class definition would identify class members by reference to the circumstances surrounding their *termination,* his own improper "use" claims relate to UPMC's refusal to rehire him rather than to the reasons for his discharge. ECF No. 57 at ¶ 3; ECF No. 58 at 3. There is simply no logical relationship between UPMC's alleged misuse of Chedwick's medical information and the automatic-termination policy referenced in the proposed class definition.

11 Chedwick does not rely on subsection (b)(1) as a basis for seeking class certification. ECF No. 58 at 19.

12 Chedwick cannot satisfy the requirements of Rule 23(b)(2) simply by demonstrating that all members of the proposed class were discharged pursuant to UPMC's automatic-termination policy. *Purdue v. Murphy,* 915 N.E.2d 498, 507 (Ind.Ct.App.2009) (stating that Rule 23(b)(2) is not "relaxed enough to permit class actions when the only unifying criteria for the members of the class are that they are somehow disabled, in need of accommodation, and mutually affected by the policy sought to be enjoined").

13 As noted earlier, Chedwick's claim that UPMC unlawfully "used" his medical information to engage in disability-based discrimination is inextricably intertwined with his original claim that UPMC refused to rehire him because of his "disability." *Holiday v. City of Chattanooga,* 206 F.3d 637, 645 (6th Cir.2000) (applying the anti-discrimination standards applicable under § 12112(a) to an employer's alleged misuse of information obtained during the course of a post-offer medical examination). The same could not be said of a claim involving the improper disclosure of medical information, which cannot be gleaned from a fair reading of Chedwick's complaint. ECF No. 1 at ¶¶ 10–38.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

4

1991 WL 238304
United States District Court, E.D. Pennsylvania.

Steven MATJASTIC, individually and
on behalf of all others similarly situated,
v.
QUANTUM PHARMICS, LTD.

Civ. A. No. 90–0647.
|
July 22, 1991.

Memorandum

LOWELL A. REED, Jr., District Judge:

***1** Plaintiff Steven Matjastic brought this action against defendant Quantum Pharmics, LTD (“Quantum”) alleging that defendant fraudulently obtained approval to market certain generic drugs and placed them into the stream of commerce in violation of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. §§ 1961 *et seq.* (1988), in addition to common law fraud, negligent misrepresentation, negligence, breach of implied and express warranties under the Uniform Commercial Code (“UCC”) §§ 2–313–15, and various consumer protection statutes.

Before me is plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3). For the reasons set forth below plaintiff's motion will be denied with prejudice.

I. *Factual Background*

The facts of this case as articulated in plaintiff's memorandum are as follows. Quantum was the generic drug subsidiary of American Home Products (“AHP”), one of the largest drug manufacturers in the country. Quantum manufactured and marketed generic drugs. Although the ingredients in generic drugs are slightly different than name brand drugs, they are reviewed by the Food & Drug Administration (“FDA”) to determine if they are the bioequivalent of the brand name drug. In order to market a new drug, a New Drug Application must be submitted to and approved by the FDA. If a manufacturer can demonstrate that the generic drug is the bioequivalent of the brand name drug, that manufacturer may submit an Abbreviated New Drug Application. Quantum submitted the abbreviated form to the FDA for approval to market Lorazapam, minoxidil tablets, chlorazepate dipotassium tablets, meclofenamate sodium capsules, trazadone, doxepin, and diazepam (“generic drugs”). Between 1985 and 1988 the FDA approved all of Quantum's generic drugs based on the information provided by Quantum in its applications. Plaintiff alleges that in its applications Quantum misrepresented the size of its production runs for certain generic drugs and that the actual formulation of other generic drugs may not have been the bioequivalent of the brand name drugs.

In September, 1989 AHP temporarily suspended Quantum's operations and in the following month Quantum began to recall its generic drugs. By January 1990 AHP removed Quantum's generic drugs from the market and halted its production and shipping. Quantum had given up marketing approval for 25 generic drugs.

Plaintiff filed an action under RICO and made several state law claims seeking damages resulting from defendant's misrepresentations. Plaintiff now moves for class certification of all the following class:

All persons in the United States who, between August 9, 1985 and October 20, 1989, purchased Lorazapam, minoxidil tablets, meclofenamate sodium capsules, trazadone, doxepin, and diazepam manufactured by Quantum Pharmics, Ltd. Excluded from the class is defendant, its parent, subsidiaries, affiliates, directors, and officers, and all persons and entities who purchased the drugs for resale.

II. *Discussion*

A. *Standing*

***2** A plaintiff must be a member of the class he seeks to represent. In order to have standing as a class representative it is not enough to assert the claims of others, a plaintiff must allege that he has personally suffered damages. See *Warth v. Seldin,* 422 U.S. 490, 502 (1975). Defendant's sole argument that plaintiff lacks standing as a class representative is that, according to defendant, plaintiff has not suffered

the financial damages he would seek to prove on behalf of the class. Plaintiff, however, did in fact use defendant's products and alleged that he suffered economic injury through his payment plan. I find that plaintiff's allegations as to his economic injury are sufficient to confer standing as a class representative.[1]

B. *Class Certification (Rule 23(a))*

In order to maintain a class action the plaintiff must establish, to the court's satisfaction, that the elements of Fed.R.Civ.P. 23(a) and Fed.R.Civ.P. 23(b)(3)[2] have been satisfied. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). In analyzing whether the plaintiff has met this threshold burden the court does not consider the merits of the case. *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 163 (1974); *Strain v. Nutri/System,* No. 90–2772, slip op. (E.D.Pa. December 12, 1990).

Plaintiff has satisfied all of the following four elements of Rule 23(a):

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Each prerequisite will be discussed in turn.

1. *Numerosity (23(a)(1))*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). This does not require the party to provide the identity or exact number of plaintiffs. Plaintiff has alleged that the amount of possible plaintiffs is "thousands". This [is] sufficient to satisfy the numerosity requirement. See e.g., *Strain supra.*

2. *Common Questions (23(a)(2))*

Rule 23(a)(2) requires that there be questions of law and fact common to the class. This does not require that all questions of law or fact that are raised be common to the entire class. *Weis v. York,* 745 F.2d 786, 808–09 (3d Cir.1984), cert. denied, 470 F.2d U.S. 1060 (1985). Rule 23(a)(2) is substantially less rigorous than Rule 23(b)(3) which requires the common issues to predominate the individual issues. *Strain,* slip op. at 7. It has been suggested that the only requirement that may be gleaned from the actual language of the rule is that there simply be at least more than one question of law or fact. *Stewart v. Winter,* 669 F.2d 328, 335 n. 16 (5th Cir.1982) (quoting 7A Write & A. Miller, *Federal Practice and Procedure* § 1763, at 604 (2d ed. 1988)). Indeed, in the instant case defendant has made no argument that plaintiff has not met this prerequisite. Because there are several factual and legal issues common to the proposed plaintiff class regarding whether Quantum acted in violation [of] RICO §§ 1962(a)–(d), perpetrated a fraud upon the plaintiff class and whether Quantum is liable to the plaintiff, this element has been satisfied.

3. *Typicality (23(a)(3))*

***3** Rule 23(a)(3) requires that the claims or defenses of the class representative be typical of the entire class. Fed.R.Civ.P. 23(a)(3). It is not difficult for a plaintiff to establish typicality. It is well established that factual differences in the claims of the plaintiff and other members of the class will not defeat the typicality requirement "if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith,* 122 F.R.D. 177, 181 (E.D.Pa.1988); See also *Strain,* slip op. at 9 (and cases cited therein). The Court of Appeals for the Third Circuit has reaffirmed the notion that the plaintiff's circumstances do not have to be identical to the other members of the class. *Green v. USX Corp.,* 843 F.2d 1511, 1533 (3d Cir.1988), vacated on other grounds *sub nom., USX Corp v. Green,* 490 U.S. 1103 (1989). Rather "typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' " *Id.* (quoting *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.), cert. denied *sub nom., Weinstein v. Eisenberg,* 474 U.S. 946 (1985) (quoting *Weiss v. York Hospital,* 745 F.2d at 809 n. 36).

The central issue put forth by the plaintiff in this case is, *inter alia,* whether Quantum provided false information in its application as part of a fraudulent scheme to place generic drugs into the stream of commerce and induced plaintiff to purchase generic drugs that he believed to have been properly approved. I am satisfied that this claim of the plaintiff/representative is in adequate accord with the claims of the proposed plaintiff class.

Defendant argues that plaintiff is not typical of the proposed class because (1) although plaintiff has alleged economic injury, his damages in fact were solely physical; and (2) plaintiff cannot establish that he relied on the alleged misrepresentations. Neither argument will render this plaintiff atypical of the class. Both issues raised by defendant Quantum go to the merits of plaintiff's claim and, as indicated earlier, it is not appropriate to consider the merits of plaintiff's complaint at this time. Because I have already determined that plaintiff has made sufficient allegations in his amended complaint, he has satisfied the element of typicality. See Order dated October 11, 1990 (Document No. 29).

4. *Adequacy of Representation (23(a)(4))*

Rule 23(a)(4) requires that the representative party "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Pursuant to this requirement the court must consider whether the class representative's counsel can assure vigorous prosecution, and whether there is a conflict of interest among the claims of the class representative and other members of the class. Satisfaction of the typicality requirement overlaps with the requirement of adequacy of representation. See *General Telephone Co. v. Falcon,* 457 U.S. 147 (1982); *Strain,* slip op. at 10. Defendant does not challenge the professional ability of plaintiff's counsel to litigate a class action. Defendant argues, however, that plaintiff could not fairly and adequately protect the interests of the class because he lacks personal knowledge regarding the litigation, that he is unaware of the substance of the complaint and, once again, that plaintiff's claim is really for personal injury even though plaintiff only alleged an economic injury. This argument is without merit. Plaintiff may not be knowledgeable of the legal principals of this case or which facts will support the legal theory put forth by his counsel, however it is not unusual for a litigant to rely principally upon his or her attorney to fill in those gaps. RICO can be a complicated body of law, especially to a lay person unfamiliar with all the legal jargon and nuances of applicable facts. As such, I find that plaintiff is sufficiently familiar with the facts of this case, and as I have already found in the previous section discussing typicality, his claims are primarily consistent with, and not adverse to the claims of proposed class, and whether he relied in fact upon the misrepresentations is a factual issue not appropriate to consider on the merits at this time.

B. *Predominance of Common Questions (Rule 23(b)(3)).*

***4** Plaintiff seeks class certification under Fed.R.Civ.P. 23(b)(3). In addition to satisfying the elements of 23(a) he must also satisfy 23(b)(3). Rule 23(b)(3) provides for class certification if,

the court finds that the questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the finding include: (A) the interest of prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating other litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Plaintiff has not demonstrated that common issues of law and fact predominate over individual issues. In count one of the complaint plaintiff alleges that defendant acted in violation of RICO, 18 U.S.C. §§ 1961, *et seq.* Plaintiff alleges that defendant engaged in a fraudulent scheme to misrepresent the nature of the generic drugs, more than once within the past ten years, by use of the mails and interstate wires, in order to defraud plaintiff and members of the proposed class and obtain money. Plaintiff also alleges that he and members of the proposed plaintiff class suffered financial injury in their business or property

by defendant's use or investment of income derived from the pattern of racketeering activity in the AHP and Quantum enterprises. Complaint ¶¶ 15–25.

A private action may be brought under RICO by "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).[3] This requires that the plaintiff show his injury was actually caused by the violation of § 1962. *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496–97 (1985); *Shearin v. E.F. Hutton Group., Inc.,* 885 F.2d 1162, 1167 (3d Cir.1989); *Rosenstein v. CPC International, Inc.,* No. 90–4970, slip op. at 5 (E.D.Pa. January 8, 1991) (citing *Haroco Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606 (1985). The Court of Appeals for the Third Circuit reaffirmed this notion and its purposes in *Shearin* quoting the Supreme Court which stated,

[A] plaintiff only has standing if, and can recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation ... A person who violates section 1962 is not liable for treble damages to everyone he might [have] injured by other conduct, nor is the defendant liable to those who have not been injured.

*Shearin,* 885 F.2d at 1167 (quoting *Sedima,* 473 U.S. at 496–97); see *Rosenstein,* slip op. at 6 (quoting *Strain,* No. 90–2272, slip op. at 11).

***5** The district court in *Rosenstein* faced a similar legal issue involving class certification of a RICO action. In that case the plaintiffs brought a RICO action, in addition to several state law claims, against CPC International, Inc., the manufacturer of Mazola corn oil and margarine, alleging that it marketed the products fraudulently advertising that a person's serum cholesterol level would be lowered by using those products. The action was based on the predicate acts of mail and wire fraud. The plaintiffs sought class certification for all persons who purchased the products between February 1, 1990 and the date of class certification. The court stated that because § 1964(c) requires a showing of actual injury, plaintiffs would have to show that each member of the class reasonably relied on the fraudulent acts. The court then found that such reliance would have to be shown on an individual basis because not all members of the class relied on the particular advertisements when purchasing Mazola corn oil and margarine. In denying the motion for class certification the court held that the individualized determination of reliance would have proven too complex and individual issues of reliance would then predominate over common issues. *Rosenstein* slip op. at 6–7 (see cases cited therein in which class certification was denied because individual issues of reliance predominated over common issues).

Although the particular factual situation in *Rosenstein* is somewhat distinguishable from the case at bar, its general factual and legal similarities nevertheless provide a useful analogy. In the case at bar, plaintiff seeks class certification on a RICO action based on the predicate acts of mail and wire fraud. Here too, because not all members of the class would have relied on the alleged fraudulent misrepresentation in purchasing the product, each class member would be required to prove the issue of reliance on an individualized basis. Indeed the plaintiffs in the instant case would have an even more difficult task than the plaintiffs in *Rosenstein.* In *Rosenstein* there was a direct link between the purchaser and the product. Here, there are several circumstances in which the purchase and use of the product was not a result of the proposed class member's decision making, but rather could have been the result of a second tier of decision making through a doctor or pharmacists. Some possible scenarios, as defendant has pointed out, include:

(1) a physician prescribed the branded proprietary product but permitted substitution of a generic product (at the option of either the patient or the dispensing agent), as was the case here; (2) the class member's physician specified a generic drug, and the pharmacist made the decision to sell Quantum's product; (3) the class member's physician prescribed Quantum's product; or (5) the class member specifically requested Quantum's product from his physician or pharmacist.

Defendant's Motion in Opposition to Class Certification at 22. Thus, the individualized issues of reliance would predominate over common issues and Fed.R.Civ.P. 23(b)(3) has not been satisfied.

***6** Plaintiff argues that Rule 23(b)(3) is satisfied because of the following issues which are common

to the class: (1) the issue of defendant's liability is a common link among the class members; (2) the elements of RICO focusing on the conduct of defendant is common to the class; (3) defendant defrauded plaintiff by knowingly placing unapproved generic drugs into the stream of commerce and therefore there are no individual questions with regarding the fraud or misrepresentation. [4]

None of these arguments can satisfy Rule 23(b)(3). As I have already discussed above, the complexity in determining individual reliance of each class member, which plaintiff alleges is in the thousands, on the actual fraudulent application renders the individual issues predominant over common issues. In order to determine if each class member actually relied on the fraudulent acts it would be necessary to determine if they knew of the acts, how they became aware of such acts, whether it affected their determination to purchase, as well as other factual determinations. Defendant, as already intimated in its brief, would presumably contest most of, if not all of, each plaintiff's testimony.

The amount of time spent litigating these individual detailed issues would swallow the common issues of liability and legal elements of RICO. Although plaintiff cites several cases in which class settlement has been granted, most of them involve securities issues and distinguishable factual situations. In as much as *Strain* and *Rosenstein* are the most recent pronouncements on the subject in the Eastern District of Pennsylvania and the most factually similar with respect to the complexities involved in determining individual reliance, I find them most instructive [and] persuasive and conclude that individual issues of reliance overwhelmingly predominate over common issues and plaintiff has not met the requirements of 23(b)(3). [5]

B. *State Law Claims*

The remaining claims allege consumer law fraud, negligent misrepresentation, negligence, breach of express and implied warranties, and violation of various state consumer protection laws. Similar to plaintiff's RICO claim, the claims under common law fraud, negligent misrepresentation, negligence, and breach of warranty based on fraud and misrepresentation, also raise substantial individual questions of reliance and causation. These individual questions therefore predominate over common questions and class certification will be denied for failure to satisfy Rule 23(b)(3).

Additionally, plaintiff alleges that defendant violated various state consumer fraud laws. The resolution of the state law issues in this count would involve the application of the laws of several states. I agree with the court in *Rosenstein* that "Faced with the prospect of having to apply different laws to different plaintiffs, and based on the parties present submissions, the court is not satisfied that common issues of state law will predominate over individual issues of state law." *Id.* at 14. However, in as much as plaintiff's claim for consumer fraud requires proof of fraud or misrepresentation, plaintiff faces the same dispositive difficulty in satisfying Rule 23(b)(3) and that class certification will also be denied as that count.

III. *Conclusion*

***7** For the foregoing reasons plaintiff's motion for class certification shall be denied with prejudice on all counts for failure to meet the requirements set forth in Fed.R.Civ.P. 23(b)(3).

**All Citations**

Not Reported in F.Supp., 1991 WL 238304, RICO Bus.Disp.Guide 7831

## Footnotes

1 Defendant raised this lack of damages issue in its motion to dismiss. After a hearing on that issue I issued an Order denying defendant's motion (Document No. 29). In that Order I expressed some reservation about plaintiff's damage theory and available supporting proof. I continue to have

these reservations but do not consider the merits of plaintiff's claim on a motion for certification. See *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 163 (1974).

2 The plaintiff must show that the action fits within one of the three possible class actions in 23(b). In this case the parties do not dispute that the claim fits within 23(b)(3).

3 Section 1962(c) provides that,

> "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

18 U.S.C. § 1962(c).

4 Although plaintiff made this argument regarding the state law claims of fraud and misrepresentation I find that because such claims involve individual questions of reliance it applies to plaintiff's RICO claim as well.

5 Although not explicit in plaintiff's brief, it may be gleaned from plaintiffs argument that the fact that the generic drugs were placed in the stream of commerce and marketed, members of the plaintiff class could be presumed to have relied on the fact that FDA approval was properly obtained. However, this case is not appropriate for such a presumption. Because the class includes everyone who purchased the generic drugs for use, plaintiff necessarily includes people who did not rely on the fraudulent representation and therefore, reliance cannot he presumed. See *Rosenstein,* slip op. at 12 ("by not limiting the class to consumers who purchased Mazola in reliance of the ... scheme, plaintiffs necessarily include ... consumers who purchased Mazola without any knowledge of [the advertisements].").

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

5

2018 WL 6332847
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Terry MCNEIL, Plaintiff,
v.
GLOBAL TEL-LINK, et al., Defendants.

CIVIL ACTION NO. 3:15-cv-01243
|
Signed 11/09/2018

**Attorneys and Law Firms**

Terry McNeil, Bellefonte, PA, pro se.

Brian T. Feeney, Greenberg Traurig LLP, Philadelphia, PA, for Defendants.

**REPORT AND RECOMMENDATION**

JOSEPH F. SAPORITO, JR., United States Magistrate Judge

***1** The plaintiff, Terry McNeil, commenced this action by filing his original *pro se* complaint on June 25, 2015. At the time, McNeil was incarcerated at SCI Benner Township, in Centre County, Pennsylvania.

## I. BACKGROUND

McNeil's original complaint alleged that defendant Global Tel-Link ("GTL"), a private-sector telecommunications company that provides inmate calling services ("ICS"), charged excessive long-distance telephone service rates to him and other inmates at SCI Benner Township between 2012 and 2015, and that this conduct violated his federal civil rights, made actionable under 42 U.S.C. § 1983. (Doc. 1). On November 7, 2016, we recommended that the original complaint be dismissed as frivolous because GTL is not a state actor for § 1983 purposes, and for failure to state a claim because McNeil's dissatisfaction with the long-distance rates charged by GTL did not rise to the level of a constitutional violation. (Doc. 37). On November 13, 2017, the Court adopted our recommendations over the plaintiff's objections and dismissed the original complaint as frivolous and for failure to state a claim, granting the plaintiff leave to file an amended complaint within twenty-one days. (Doc. 51).

Within that twenty-one day period, the plaintiff submitted two separate documents styled as amended complaints, which we liberally construed *together* as McNeil's operative amended complaint. (Doc. 54; Doc. 55). *See generally* *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions, particularly when dealing with imprisoned *pro se* litigants). This amended complaint, mostly comprised of photocopied pages from a class action complaint previously filed in another federal district court,[1] asserted two claims against GTL: a statutory claim under Section 207 of the Federal Communications Act ("FCA"), 47 U.S.C. § 207, and an unjust enrichment claim under Pennsylvania state common law. These claims are based on allegations that GTL charged "exorbitant rates and fees" for telephone calls to and from inmates under exclusive contracts with correctional facilities around the United States, which the Federal Communications Commission had found to be "unreasonably high, unfair, and far in excess of the cost of providing service." The non-photocopied pages of the amended complaint added allegations of fact specific to McNeil and his own personal use of GTL telephone services on and after June 18, 2001.

## II. LEGAL STANDARD

A plaintiff proceeding *in forma pauperis* is subject to 28 U.S.C. § 1915(e)(2), which provides that a court "shall dismiss the case at any time if the court determines that ... the action ... fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). The Court has a similar obligation with respect to actions concerning prison conditions. *See* 42 U.S.C. § 1997e(c)(1). *See generally* *Banks v. County of Allegheny*, 568 F. Supp. 2d 579, 587–89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and standards). The legal standard for dismissing a complaint for failure to state a claim under § 1915(e)(2)(B)(ii) or § 1997e(c)(1) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp.

2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) ). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) ). Nor is it required to credit factual allegations contradicted by indisputably authentic documents on which the complaint relies or matters of public record of which we may take judicial notice. *In re Washington Mut. Inc.*, ––– Fed. App'x ––––, No. 17-2360, 2018 WL 4600668, at *2 n.3 (3d Cir. Sept. 25, 2018); *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017); *Banks*, 568 F. Supp. 2d at 588–89.

## III. DISCUSSION

***2** McNeil alleges that the defendant, GTL, charged "exorbitant rates and fees" for telephone calls to and from inmates under exclusive contracts with correctional facilities around the United States, which the Federal Communications Commission ("F.C.C.") found in 2013 to be "unreasonably high, unfair, and far in excess of the cost of providing service[,] ... driven largely by substantial commission payments ICS providers have agreed to make to prison authorities," and thus in violation of Sections 201 and 276 of the FCA. *In re Rates for Interstate Inmate Calling Servs.*, 28 FCC Rcd. 15927, 15929 (F.C.C. Nov. 21, 2013) [hereinafter, *ICS Rates II*]. In the alternative, he alleges that imposition of these "exorbitant rates and fees" on inmates and their families constitutes unjust enrichment under the common law of Pennsylvania. He further appears to seek certification of a class action, with himself as a class representative.

### A. Class Certification

Although he has not filed a separate motion for certification of a class action pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, McNeil's amended complaint expressly states that he is seeking certification of a class action.

McNeil has failed to meet the minimum requirements for certification of a class action.

> Four prerequisites must be met to obtain certification of a class action:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

A class can only be certified if all four requirements of Rule 23(a) are met. *Fotta v. Trustees of United Mine Workers of Am.*, 319 F.3d 612, 618–19 (3d Cir. 2003). McNeil, who is proceeding *pro se*, cannot satisfy the fourth requirement, adequacy of representation. *Reid v. Ebbert*, Civil Action No. 1:16-cv-01403, at *1 (M.D. Pa. June 19, 2017), *report and recommendation adopted by* 2017 WL 4408539 (M.D. Pa. Oct. 4, 2017); *Nunez v. Lindsay*, No. 3:CV-05-1763, 2006 WL 3242111, at *1 (M.D. Pa. Nov. 7, 2006) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) ); *see also Alexander v. N.J. State Parole Bd.*, 160 Fed. App'x 249, 250 n.1 (3d Cir. 2005) (per curiam) ("[A] prisoner proceeding pro se may not seek relief on behalf of his fellow inmates.") (citing *Oxendine* ); *Oxendine*, 509 F.2d at 1407 ("[I]t is plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action."). This is so because the "[a]bility to protect the interests of the class depends in part on the quality of counsel, and ... the competence of a layman


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

representing himself [is] clearly too limited to allow him to risk the rights of others." *Oxendine*, 509 F.2d at 1407.

Because McNeil cannot satisfy all four of the prerequisites to class certification under Rule 23(a), his request for the certification of a class action should be denied.

Accordingly, it is recommended that the request for class certification implicit in McNeil's amended complaint be denied.

**B. Federal Communications Act Claim**

Section 201 of the FCA requires that all carriers' interstate rates be "just and reasonable." 47 U.S.C. § 201(b). Section 276 of the FCA additionally requires that payphone rates be "fair." *Id.* § 276(b). Section 207 of the FCA permits a plaintiff to bring suit for the recovery of damages for violations of the FCA. *Id.* § 207.

In 2013, the F.C.C. found that rates charged by various ICS providers were "unreasonably high, unfair, and far in excess of the cost of providing service." *ICS Rates II*, 28 FCC Rcd. at 15929. In doing so, the F.C.C. expressly rejected an argument by the ICS providers that the substantial site commissions they paid to prison authorities should be considered as part of the cost of providing service. *Id.* at 15940–41; *see also id.* at 15946 (ruling that "site commission payments are not part of the cost of providing ICS and therefore not compensable in interstate ICS rates"); *In re Rates for Interstate Inmate Calling Servs.*, 28 FCC Rcd. 14107, 14135–39 (F.C.C. Sept. 26, 2013) [hereinafter, *ICS Rates I*] (ruling that "site commission payments are not part of the cost of providing ICS and therefore not compensable in interstate ICS rates") (footnote omitted). Subsequently, in 2015, the F.C.C. set rate caps and ancillary fee caps for interstate ICS calls. *In re Rates for Interstate Inmate Calling Servs.*, 30 FCC Rcd. 12763, 12775–76, 12838–62 (F.C.C. Nov. 5, 2015) [hereinafter, *ICS Rates III], reprinted in* 80 Fed. Reg. 79136, 79139–40, 79156–62 (Dec. 18, 2015).

***3** Based exclusively on these administrative rulings by the F.C.C., McNeil claims that the ICS rates he was charged by GTL over a period of more than a decade were unjust and unreasonable, in violation of Section 201 of the FCA, and unfair, in violation of Section 276 of the FCA.

But in August 2017, these rulings by the F.C.C. were overturned and abrogated on review by the United States Court of Appeals for the D.C. Circuit. In *Global Tel*Link v. Federal Communications Commission*, 866 F.3d 397 (D.C. Cir. 2017), the D.C. Circuit rejected the F.C.C.'s categorical exclusion of site commission payments as a legitimate cost of providing ICS, reversing the F.C.C.'s ruling in *ICS Rates III* and remanding it for further proceedings. *Id.* at 402 ("We find that [*ICS Rates III*]'s proposed wholesale exclusion of site commission payments from the FCC's cost calculus is devoid of reasoned decisionmaking and thus arbitrary and capricious."); *id.* at 413 ("If agreeing to pay site commissions is a condition precedent to ICS providers offering their services, those commissions are 'related to the provision of ICS.' "); *see also Mojica v. Securus Techs., Inc.*, Case No. 5:14-CV-5258, 2018 WL 3212037, at *2 (W.D. Ark. June 29, 2018) (noting the D.C. Circuit's holding that "site commissions *are* legitimate costs of business when they are a condition precedent to obtaining ICS contracts") (emphasis in original), *appeal filed*, No. 18-2763 (8th Cir. Aug. 10, 2018); *id.* at *5 (quoting *Global Tel*Link*, 866 F.3d at 413).

The only theory of liability pleaded in McNeil's amended complaint is one based on GTL's alleged practice of recouping site commissions it had paid to prison authorities through excessive surcharges and per-minute interstate calling rates charged to inmates and their families. Such a theory of liability under the FCA is foreclosed by the D.C. Circuit's decision in *Global Tel*Link.* As our sister court has observed under substantially identical circumstances,[2] "a lawsuit in federal district court may be brought under 47 U.S.C. § 207 only if 'the FCC could properly hold that a carrier's [practice] is an 'unreasonable practice' deemed 'unlawful' under § 201(b).' " *Mojica*, 2018 WL 3212037, at *8 (quoting *Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 52–53 (2007) ) (alteration in original). Thus, "the D.C. Circuit opinion precludes the FCC from holding that the practice of passing on to ICS users the cost of site commissions that are a condition precedent of doing business." *Id.* at *8. In the absence of any other theory of liability to support McNeil's claims

under the FCA for unjust, unreasonable, and unfair ICS rates, he has failed to plausibly state a claim upon with relief can be granted.

Accordingly, we recommend that the plaintiff's statutory claim under Section 207 of the FCA, 47 U.S.C. § 207, be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 42 U.S.C. § 1997e(c)(1).

**C. Unjust Enrichment Claim**

***4** Based on the very same billing practices underlying the F.C.C. rulings—indeed, based on the F.C.C. rulings themselves—McNeil claims that the ICS rates he was charged over a period of more than a decade constitute unjust enrichment under state common law because GTL "charg[ed] rates and fees that are unjust, unreasonable, and greatly exceed market rates and costs of providing services," and was not entitled to this enrichment because it "was prohibited from engaging in the acts and practices that generated this enrichment by § 201(b) of the FCA." (Doc. 54 ¶¶ 63, 65).

> Unjust enrichment is an equitable doctrine. Pennsylvania courts have defined the elements of unjust enrichment as " 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.' "

*In re Comcast Cellular Telecomm. Litig.*, 949 F. Supp. 1193, 1200 (E.D. Pa. 1996) (quoting *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993) ). "Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust.*" *Styer*, 619 A.2d at 350 (emphasis in original).

Here, the plaintiff has alleged unjust enrichment based solely upon a purported violation of § 201(b) of the FCA, which prohibits unjust or unreasonable ICS rates. He alleges a violation of the FCA based solely on GTL's alleged inclusion of site commissions in its cost calculations in formulating ICS rates. He has alleged no other facts to support his contention that the rates charged by GTL were *unjust.* Based on the D.C. Circuit's ruling in *Global Tel*Link*, which found the practice at issue—passing on to ICS users the cost of site commissions that are a condition precedent to doing business—to be just and reasonable under § 201 of the FCA, and in the absence any other factual allegations to support a finding that GTL was *unjustly* enriched, we are forced to conclude that McNeil has failed to failed to plausibly state an unjust enrichment claim upon with relief can be granted.

Moreover, we note that McNeil's unjust enrichment claim is a clear attempt to use state law to challenge the reasonableness of the rates charged by GTL for inmate calling services that are directly regulated by the federal government under the FCA. "Since 'state law is naturally preempted to the extent of any conflict with a federal statute,' this gives rise to the related question of whether the common-law of unjust enrichment 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of' the FCA.' " *Mojica*, 2018 WL 3212037, at *9 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) ). As in *Mojica*—where our sister court considered virtually identical claims to those raised here—McNeil "wish[es] to pursue the very theory of liability under state law that this Court has concluded [he] cannot under the FCA: that the defendant[ ] 'unjustly enriched [itself] by using [its] monopoly power *to pass on the costs of site commissions*' to consumers of ICS." *Id.* (emphasis in original). Under these circumstances, the FCA necessarily preempts McNeil's state law challenge to the reasonableness of the rates charged by GTL.[3] *See id.; see also In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196–97 (10th Cir. 2010) (holding that the FCA preempts state law challenges to the reasonableness of rates charged by telecommunications carriers for interstate calls); *Boomer v. AT&T Corp.*, 309 F.3d 404, 418 (7th Cir. 2002) (same); *Comcast*, 949 F. Supp. at 1200–01 (finding unjust enrichment claims challenging the reasonableness of rates charged by a cellular telephone company were preempted by the FCA).

***5** Accordingly, we recommend that the plaintiff's state common-law claim for unjust enrichment be dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 42 U.S.C. § 1997e(c)(1).

**D. Leave to Amend**

The Third Circuit has instructed that if a *pro se* complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Based on the record before the Court, it is clear that amendment in this case would be futile. It is therefore recommended that the complaint be dismissed *without* leave to amend.

**IV. PLRA "THREE STRIKES" WARNING**

The plaintiff is hereby notified that a prisoner may not bring a civil action or appeal a civil judgment under 28 U.S.C. § 1915,

> if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If this recommended disposition is adopted by the presiding United States District Judge, the dismissal of this action for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) will constitute a "strike" under 28 U.S.C. § 1915(g), and the accumulation of additional strikes may bar the plaintiff from proceeding *in forma pauperis* in later cases absent a showing of imminent danger. *See generally* *Byrd v. Shannon*,715 F.3d 117, 126 (3d Cir. 2013) (articulating Third Circuit standard for application of § 1915(g) "three strikes" rule).

**V. RECOMMENDATION**

Based on the foregoing, it is recommended that:

1. The plaintiff's request for certification of a class action under Rule 23(c) of the Federal Rules of Civil Procedure be **DENIED**;

2. The plaintiff's amended complaint (Doc. 54; Doc. 55) be **DISMISSED** for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 42 U.S.C. § 1997e(c)(1); and

3. The Clerk be directed to **CLOSE** this case.

Attachment

**NOTICE**

NOTICE IS HEREBY GIVEN that the undersigned has entered the foregoing Report and Recommendation dated November 9, 2018. Any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de

novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

***6** Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Dated: November 9, 2018

______________________

JOSEPH F. SAPORITO, JR.

United States Magistrate Judge

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6332847

## Footnotes

1 *In re Global Tel*Link Corp. ICS Litig.*, Civil Action No. 5:14-cv-5275-TLB (W.D. Ark. filed Apr. 23, 2015).

2 The *Mojica* opinion addressed two separate class action lawsuits, *Mojica v. Securus Technologies, Inc.*, Case No. 5:14-CV-5258 (W.D. Ark. filed Aug. 14, 2014), and *In re Global Tel*Link Corp. ICS Litigation*, Case No. 5:14-cv-05275 (W.D. Ark. filed Sept. 4, 2014). McNeil's amended complaint here consists primarily of a photocopy of an amended complaint filed in the latter case, with a few minor, insubstantial alterations.

3 Although preemption is an affirmative defense, which generally must be raised by way of an answer to the complaint, *see* Fed. R. Civ. P. 8(c), where that defense is obvious from the face of the complaint and no development of the record is necessary, a court may *sua sponte* dismiss preempted claims in an *in forma pauperis* action for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii). *See* *Myrieckes v. Woods*, No. 08 CV 4297(GBD)(THK), 2009 WL 884561, at *7 (S.D.N.Y. Mar. 31, 2009).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

6

2010 WL 3620188
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
M.D. Pennsylvania.

Andrew MORRIS, individually and on behalf of all others similarly situated, Plaintiff
v.
COMPUTER CREDIT, INC., Defendant.

No. 3:09cv1885.
|
Sept. 10, 2010.

**Attorneys and Law Firms**

Brent F. Vullings, Warren & Vullings, LLP, Philadelphia , PA, for Plaintiff.

Mark D. Bradshaw, Stevens & Lee, P.C., Harrisburg, PA, for Defendant.

***MEMORANDUM***

JAMES M. MUNLEY, District Judge.

***1** Before the court for disposition is Plaintiff Andrew Morris's motion for class certification. The motion has been fully briefed, and argument has been held. The matter is thus ripe for disposition.

**Background**

Plaintiff instituted the instant action against the Defendant for a violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). Defendant is in the business of debt collecting, specializing in healthcare collections. Plaintiff seeks to bring the action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. (*See generally* Doc. 1, Complaint).

The FDCPA provides that within five (5) days of an initial communication with a debtor, a debt collector has to provide certain "validation of debts" information including such information as the amount of the debt and the identity of the original creditor. 15 U.S.C. § 1692(g). The law also prohibits false or misleading representations. 15 U.S.C. § 1692(e).

Plaintiff asserts that defendant's communications violated these sections of the FDCPA in that a "final" letter was sent before a "validation" letter.

Plaintiff seeks to proceed with a class action, with himself as the class representative. The class he seeks to represent is as follows: persons in the United States to whom one or more collection letters were sent by defendant which state that the correspondence would serve as the final and last attempt, without sending a required validation notice in an attempt to collect a debt incurred primarily for personal, family, or household purposes sent on or after one year prior to the filing of plaintiff's complaint.

Before proceeding as a class action, the plaintiff must move the court to determine if the case can be maintained, or "certified" as a class action. L.R. 23.3, FED. R. CIV. PRO. 23(c)(1)(A)

**Discussion**

Class actions are covered by Rule 23 of the Federal Rules of Civil Procedure, which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if
>
> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

The plaintiff must establish these four prerequisites. *Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 183 (3d Cir.2001). A class may be certified only if the

court is " 'satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir.2006) (quoting *Gen. Tel. Co. Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). In addition to establishing the prerequisites under Rule 23(a), a plaintiff who seeks to proceed as a class representative must also establish that the case is maintainable as a class action under one of the three subsections to Rule 23(b).

***2** In the instant case, we need not address the substance of whether plaintiff has met these requirements because the plaintiff's motion will be denied as untimely. Under Local Rule 23.3, a plaintiff seeking to proceed with a class action must file a motion to certify the class within ninety (90) days of filing the complaint. L.R. 23.3. The deadline for filing a motion to certify a class may only be extended upon motion and for good cause shown. *Id.*

Plaintiff filed the instant case on September 30, 2009. The motion for class certification was due ninety (90) days later, or December 30, 2009. The plaintiff did not file the motion for class certification until February 9, 2010. (Doc. 11). Plaintiff's brief in support of the motion provides no good cause reason for allowing the late motion. Plaintiff also failed to identify good cause for an extension during the argument on the motion. The motion will thus be denied as untimely. An appropriate order follows.

***ORDER***

**AND NOW,** to wit, this 10th day of September 2010, the plaintiff's motion for class certification (Doc. 11) is hereby **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3620188

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

7

2024 WL 1907192
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Rachel Ann PHILBIN., Plaintiff,
v.
BRETT DINOVI & ASSOCIATES, LLC, Defendant.

No. 21-cv-20402
|
Filed January 10, 2024

**Attorneys and Law Firms**

Christopher Markos, Gerald J. Williams, Williams Cedar, LLC, Philadelphia, PA, David M. Cedar, Williams Cedar, LLC, Haddonfield, NJ, for Plaintiff.

Paul S. Grossman, Christopher John Seelinger, Weiner Law Group LLP, Parsippany, NJ, for Defendant.

**ORDER**

O'HEARN, District Judge.

***1 THIS MATTER** comes before the Court upon Plaintiff Rachel Ann Philbin's Motion for Conditional Certification of F.L.S.A. Claims Pursuant to 29 U.S.C. § 216(b) and for Class Certification of State Law Claims Pursuant to Fed. R. Civ. P. 23 (the "Motion to Certify Class"), (ECF No. 40); and

**WHEREAS**, on May 5th, 2023, the Honorable Ann M. Donio issued an Amended Scheduling Order requiring that "any motion for class certification or to certify a collective action shall be filed by no later than June 30, 2023," (ECF No. 39); and

**WHEREAS**, Plaintiff filed the Motion to Certify Class now before the Court, (ECF No. 40), on August 17, 2023—forty-eight days after the expiration of the filing deadline for such motions established in the Amended Scheduling Order, (ECF No. 39); and

**WHEREAS**, Plaintiff asserts in her Reply Brief (ECF No. 46) that "the complete set of necessary deposition testimony was not available to accompany her motion until August 1, and of course once available it had to be reviewed ..." and that there is for that reason no prejudice to Defendant, (ECF No. 46 at 1); but

**WHEREAS**, Rule 16(b) of the Federal Rules of Civil Procedure provides that a scheduling order "may be modified only for good cause and with the judge's consent," Fed. R. Civ. P. 16(b); and

**WHEREAS**, Rule 6(b) of the Federal Rules of Civil Procedure provides that when a filing "may or must be [submitted] within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect," Fed. R. Civ. P. 6(b); and

**WHEREAS**, after a deadline established by a scheduling order has expired, the higher 'excusable neglect' standard of Rule 6(b) applies, and not the lower 'good cause' standard of Rule 16(b), *see Bradley v. Harrah's Atl. City Operating Co., LLC*, No. 21-10485, 2023 WL 5530495, at *2 (D.N.J. Feb. 27, 2023) ("[W]here the motion for an extension of time is made after the deadline has expired, the moving party must show excusable neglect, which is a more difficult and particular showing than the good cause standard under Rule 16) (internal citations and quotation marks omitted); and

**WHEREAS**, in order to seek an extension of time after a deadline has expired, "a party must make a formal motion for extension of time and the district court must make a finding of 'excusable neglect' under the *Pioneer* factors, before permitting an untimely motion," *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010) (referencing factors to evaluate 'excusable neglect' set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)); *see also Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 896 (1990) ("[A]ny post deadline extension must be upon motion made, and is permissible only where the failure to meet the deadline was the result of excusable neglect.") (internal quotation marks and citations omitted); and

**WHEREAS**, Plaintiff did not file a motion to amend the scheduling order before the expiration of the deadline to file a Motion to Certify Class, and did not


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

file a formal motion for extension of time thereafter; and

*2 **WHEREAS**, Plaintiff therefore failed to comply with Rule 6(b), and Plaintiff's Motion to Certify Class is untimely, *Drippe*, 604 F.3d at 785; now therefore, for the reasons substantially stated herein,

**IT IS HEREBY** on this 9th day of January, 2024,

**ORDERED** that Plaintiff's Motion to Certify Class, (ECF No. 40), is **DENIED WITHOUT PREJUDICE** as untimely; and it is further

**ORDERED** that this matter is referred to the Magistrate Judge to address issues with respect to the previously issued Scheduling Order.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1907192

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

8

2025 WL 733670
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

SERVIS ONE INC., d/b/a BSI Financial Services, Inc.; BSI Financial Holdings, Inc.; Entra Solutions PVT Ltd.; Gagan Sharma, Appellants
v.
OKS GROUP LLC; OKS Group International PVT Ltd.; Vinit Khanna

No. 24-1301
|
Submitted Pursuant to Third Circuit L.A.R. 34.1(a) December 10, 2024
|
(Filed March 7, 2025)

On Appeal from the United States District Court for the Eastern District of Pennsylvania (District Court No. 2:20-cv-04661), District Judge: Honorable Mark A. Kearney

**Attorneys and Law Firms**

Franco A. Corrado, Esq., Elisa P. McEnroe, Esq., Morgan Lewis & Bockius, Philadelphia, PA, William R. Peterson, Esq., Morgan Lewis & Bockius, Houston, TX, Karl A. Schweitzer, Esq., Morgan Lewis & Bockius, Chicago, IL, for Appellants.

E. Kelly Conway, Esq., Michael E. Gehring, Esq., Stephen G. Harvey, Esq., Steve Harvey Law, Philadelphia, PA, for OKS Group LLC, OKS Group International PVT Ltd., Vinit Khanna.

Before: BIBAS, CHUNG, and ROTH, Circuit Judges

OPINION [1]

CHUNG, Circuit Judge.

***1** This case turns on whether lawyers had their client's express authorization to enter into a settlement agreement. The District Court found that they did not, and because this finding is not clearly erroneous, we will affirm.

I. BACKGROUND [2]

Servis One, Inc., d/b/a BSI Financial Services, Inc. ("BSI") hired OKS Group, LLC ("OKS") to provide data entry support in India. When BSI ended the relationship, OKS responded by accusing BSI of misappropriating trade secrets and breaching their contract. OKS brought its claims against BSI via three actions: (1) an arbitration proceeding in Philadelphia, (2) a civil action in India, and (3) a criminal complaint in India. In connection with these actions, OKS hired U.S. attorneys from Duane Morris LLP. OKS also hired Indian attorney Aditya Wadhwa to assist in the criminal action.

In July 2018, the night before arbitration was to begin, the parties seemingly agreed to a settlement in principle. The settlement would have resolved all three actions. However, Wadhwa advised OKS's CEO and lawyers from Duane Morris that OKS could not withdraw or settle the Indian criminal action without running afoul of Indian law and suggested that OKS "handle the Indian disputes independently." JA1341. Accordingly, the parties never signed the agreement.

Attempting to enforce the July 2018 settlement in principle, BSI sued OKS in the United States District Court for the Eastern District of Pennsylvania in August 2019. In response to that action, OKS argued that though the parties had reached a settlement in principle, they had both operated under a mutual mistake of law concerning OKS's ability to withdraw the Indian criminal action.

Meanwhile, the parties continued to try to reach a settlement. Attempts at settlement intensified beginning in December 2019 and continuing through March 10, 2020. During that time, the attorneys for the parties negotiated through a series of emails and phone calls. The negotiations primarily focused on how the settlement agreement would address the Indian criminal proceeding. Throughout this period, the Duane Morris attorneys continued to communicate with OKS through its CEO and their discussions likewise focused on addressing the Indian criminal action, as well as other OKS demands.

The Duane Morris attorneys and OKS's CEO scheduled a call for March 10, 2020, to discuss the

settlement agreement and the CEO's concerns relating to the Indian criminal proceedings. Despite concerns about potentially "jump[ing] the gun," less than two hours before the call with their client, a Duane Morris attorney authorized BSI's attorney to sign and file a letter notifying the Court that the parties had agreed to a settlement. JA642–43. Believing the case was settled, the Court dismissed the case with prejudice.

***2** OKS's CEO continued to communicate with the Duane Morris attorneys, expressing concerns with the settlement, particularly with respect to the Indian criminal action, and requesting changes to it. Unbeknownst to OKS, these requests were futile because the case had already been dismissed. OKS's CEO was not made aware of the dismissal until months later.

BSI filed this action in the Eastern District of Pennsylvania to enforce the alleged new 2020 settlement agreement. The Court held a bench trial and heard testimony from BSI's attorney, OKS's CEO, and two Duane Morris attorneys. The Court found that "OKS had not authorized a settlement as of Friday, March 6, 2020," JA13 (FOF 56), nor did OKS authorize the Duane Morris attorneys to agree to the March 10 settlement.

BSI timely appealed. BSI argues that a settlement agreement was formed between BSI and OKS on either February 20 or March 4 of 2020. Thus, BSI challenges the District Court's finding that "OKS had not authorized a settlement as of Friday, March 6, 2020." JA13 (FOF 56).

## II. DISCUSSION [3]

This background belies a relatively simple factual issue: did the Duane Morris attorneys have express authorization from OKS to enter into the purported settlement agreement? The District Court concluded that the answer was "no," and because this was not clear error, we will affirm.

Under Pennsylvania law, [4] a lawyer can bind a client to a settlement agreement only if the client has expressly authorized the lawyer to do so. Reutzel v. Douglas, 870 A.2d 787, 789–90 (Pa. 2005). The scope of an agency relationship, including the presence of express authority, is a question of fact. Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1351–52 (Pa. Super. Ct. 1992); see Gillian v. Consol. Foods Corp., 227 A.2d 858, 861 (Pa. 1967); King v. Driscoll, 296 A.3d 1178, 1185 (Pa. Super. Ct. 2023). Therefore, we review the District Court's finding that the Duane Morris attorneys lacked express authority for clear error. United States v. U.S. Sugar Corp., 73 F.4th 197, 203 (3d Cir. 2023). A finding is clearly erroneous when we are "left with the definite and firm conviction that a mistake has been committed." United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc) (internal quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001) (internal quotation marks omitted).

First, BSI argues that on February 20, 2020, the parties entered into an oral settlement agreement with express authority from OKS. The Duane Morris attorneys do not dispute that they called attorneys for BSI and orally agreed to terms offered by BSI. [5] These attorneys did so after they explained newly proposed terms of the settlement to the CEO of OKS and he "responded by saying something like 'that's fine.' " JA8 (FOF 35.b). Wadhwa was not on the call. According to BSI, this utterance was a grant of express authority to settle.

***3** In Pennsylvania, express authority "must be the result of explicit instructions regarding settlement." Tiernan, 923 F.2d at 1033 (citing Senyshyn v. Karlak, 299 A.2d 294, 297 (Pa. 1973)). We cannot conclude that the District Court clearly erred in finding that "something like 'that's fine' " fell short of this standard. JA8 (FOF 35.b). In the context of the record of prolonged negotiations, "that's fine" may have signaled approval of one or more specific proposed changes [6] discussed on the call, yet fallen short of providing "explicit instructions regarding settlement," especially when considering the consistent concerns voiced by OKS and Wadha that the Indian criminal matter be kept separate from the settlement. While the District Court could have found that "that's fine" was express approval, it did not and its finding is a permissible view of the evidence that is, therefore, not clearly erroneous. See Scully, 238 F.3d at 506. [7]

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Turning to March 4, 2020, the analysis is much the same. BSI claims that the Duane Morris attorneys entered into a written settlement agreement via a series of emails on March 3 and 4 of 2024. BSI argues that this agreement was expressly authorized because, on March 2, 2020, the Duane Morris attorneys told the CEO of OKS that they would "respond to BSI's counsel, advising that we are amenable to the settlement agreement as drafted, with the exception of a request for clarification." BSI Op. Br. 33 (quoting JA12 (FOF 48)). The CEO responded by stating "Keep it simple," cutting and pasting the Duane Morris attorneys' language explaining their proposed course of action, and then writing "OK." Id. (quoting JA12 (FOF 49)).

Again, we perceive no clear error in the District Court's choice between two permissible views of the CEO's email; namely that it fell short of the required "explicit instructions regarding settlement." Tiernan, 923 F.2d at 1033 (citing Senyshyn, 299 A.2d at 297). Like the statement on February 20, this language could be read to signal approval of a specific proposed change, rather than explicitly approving a final settlement. This is especially apparent when examining the immediately preceding emails between OKS's CEO and the Duane Morris lawyers, which reveal persistent disagreement and concerns by OKS regarding the impact of the settlement on the Indian criminal action.

The same can be said regarding BSI's argument that OKS ratified the agreement when OKS's CEO responded to a Duane Morris email containing the Duane Morris attorneys' counteroffer to BSI with the words "Understood" and "Works." BSI Op. Br. 34 (quoting JA1614). Again, "Understood" and "Works" do not render the District Court's choice between two permissible findings clearly erroneous. [8]

III. CONCLUSION

***4** For the foregoing reasons, we will affirm the judgment of the District Court.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 733670

## Footnotes

1 This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2 Because we write for the parties, we recite only facts pertinent to our decision. While BSI challenges several of the District Court's findings of fact, we rely here only upon uncontested factual findings or facts drawn directly from the record.

3 The District Court had jurisdiction under 28 U.S.C. § 1332(a)(3). We have jurisdiction under 28 U.S.C. § 1291.

4 We apply state law to determine the scope of an attorney's authority to enter into a settlement agreement. Tiernan v. Devoe, 923 F.2d 1024, 1032–33 (3d Cir. 1991). Both parties assume that Pennsylvania law applies, and we agree.

5 Apart from any issue of express authority, the parties dispute whether the February 20 oral agreement was an enforceable final settlement. OKS also contends that BSI cannot raise its argument that an enforceable agreement was reached on February 20 because it failed to make that argument in the District Court. Because we hold that the District Court did not clearly err in finding that the Duane Morris attorneys were not authorized to enter into a final settlement


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

agreement on February 20, we need not determine whether the February 20 phone call would have constituted a final settlement agreement or if BSI can even raise this argument.

6 These proposed changes included deleting a clause regarding the criminal case and adding a clause permitting BSI to terminate the settlement if police in India prosecuted BSI.

7 We do not consider two arguments forfeited by BSI. One argument is forfeited because BSI did not raise it below (arguing that Duane Morris attorneys' reasonable belief they received express authorization to settle itself established express authority) and the other is forfeited because it was raised for the first time in BSI's reply brief (arguing that OKS ratified settlement by not repudiating emails from the Duane Morris attorneys stating that the parties were "in conceptual agreement" and had "verbally acceded in principle," BSI Reply Br. 9 n.6 (internal quotation marks omitted)). Doe v. Mercy Cath. Med. Ctr., 850 F.3d 545, 558 (3d Cir. 2017) (arguments not raised in the District Court); Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 204 n.29 (3d Cir. 1990) (arguments raised for the first time in a reply brief).

8 BSI also argues that the District Court clearly erred in describing the terms of the settlement agreement proposed at various times. BSI Op. Br. 42–47. Even assuming such errors were made, they do not affect our conclusion that the District Court did not clearly err in determining that OKS did not expressly authorize the Duane Morris attorneys to settle the case. In other words, any error was harmless because "it is highly probable that the error did not affect the outcome of the case." Brennan v. Norton, 350 F.3d 399, 416 (3d Cir. 2003) (internal quotation marks omitted).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

9

KeyCite Yellow Flag
Distinguished by LeGrand v. Abbott Laboratories, N.D.Cal., October 10, 2025

2022 WL 20184654
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Pamela SIINO, Plaintiff,
v.
FORESTERS LIFE INSURANCE AND ANNUITY COMPANY, Defendant.

Case No. 20-cv-02904-JST
|
Signed July 26, 2022

**Attorneys and Law Firms**

Alex Michael Tomasevic, Craig McKenzie Nicholas, Nicholas & Tomasevic, LLP, San Diego, CA, Georg Michael Capielo, The Frost Firm, Encinitas, CA, Jack Bruce Winters, Jr., Sarah D. Ball, Winters & Associates, La Mesa, CA, for Plaintiff.

Allison Jean Fernandez, Ogletree Deakins, San Francisco, CA, Elizabeth Wroblewski, Pro Hac Vice, Jarrett E. Ganer, Pro Hac Vice, Thomas F.A. Hetherington, Pro Hac Vice, McDowell Hetherington LLP, Houston, TX, Jodi Krystyn Swick, McDowell Hetherington LLP, Oakland, CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO MODIFY THE SCHEDULING ORDER**

Re: ECF No. 114

JON S. TIGAR, United States District Judge

***1** Before the Court is Plaintiff Pamela Siino's motion to modify the scheduling order to allow for a new motion for class certification. ECF No. 114. The Court will deny the motion.

In January 2022, this Court denied Siino's motion seeking class certification under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. The Court denied Siino's motion for class certification under Rule 23(b)(2) because Siino primarily sought money damages and "[c]lass certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." ECF No. 110 at 4 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (citation omitted)). The Court also denied Siino's motion for class certification under Rule 23(b)(3), because Siino offered no cognizable damages model that would enable damages to be calculated on a class-wide basis as required to demonstrate predominance under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). ECF No. 110 at 9 (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014)).

Siino now moves to modify the Court's scheduling order, which set April 30, 2021 as the deadline for Siino to file a class-certification motion, so that she can file a second motion. In contrast to her prior motion, this one would seek "declaratory or injunctive relief ... that says that the terminations of her and her fellow class members' policies were and are void." ECF No. 114-1 at 8.

Siino makes two arguments in support of her request to modify the scheduling order. First, she contends that although "the Ninth Circuit has not ... issued any express guidance dictating when or under what circumstances to allow renewed motions for class certification under Rule 23," ECF No. 114-1 at 5, this Court should follow the Third Circuit, which Siino says allows second motions for certification under these circumstances. Second, Siino argues that she satisfies Rule 16's good-cause standard for modifying scheduling orders.

The Court is not persuaded. To begin with, Siino misstates the law in the Third Circuit. Citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476 (3d Cir. 2020), Siino contends that "[t]he Third Circuit ... expressed a standard" about "when or under what circumstances to allow renewed motions for class certification under Rule 23." ECF No. 114-1 at 5. But *Hargrove* concerned the standard district courts must apply when considering the *merits* of a new motion for class certification. It did not address the issue present here: what circumstances warrant modifying a case scheduling order to permit a plaintiff a second chance at class certification after a first motion has been denied and the deadline for filing such a motion has passed.

That question is governed by Rule 16. Rule 16 requires "good cause" and the consent of the Court to amend a scheduling order. Fed. R. Civ. P. 16(b)(4). The good cause standard "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). But the Ninth Circuit has explained that "[t]he good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013). Courts within the Ninth Circuit have thus rejected efforts by plaintiffs to modify case scheduling orders to allow for second motions for class certification simply because the Court denied a first motion and the time for filing class-certification motions had passed. *See, e.g.*, *Stockinger v. Toyota Motor Sales, U.S.A.*, Inc., No. 2:17-CV-00035-VAP(KSX), 2020 WL 7314794, at *3 (C.D. Cal. Nov. 30, 2020) ("Plaintiffs do not identify any new evidence or legal theories of which they were not previously aware at no fault of their own. Instead, the only reason for the requested modification is because the Court denied Plaintiffs' motion for class certification. This is insufficient."); *Gustafson v. BAC Home Loans Servicing, LP*, No. 8:11-cv-00915-JLS-AN, 2014 WL 10988335, at *2 (C.D. Cal. Feb. 5, 2014) (same).

***2** Bearing these principles in mind, the Court finds that Siino has not shown good cause to modify the case scheduling order. Siino seeks to modify the scheduling order to correct the legal errors that led the Court to deny her original motion for class certification. But "carelessness is not compatible with a finding of diligence [under Rule 16] and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609. And while Rule 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment," Siino "cite[s] no authority supporting the theory that Rule 23(c)(1)(C) allows [her] to file a second class-certification motion just because [she] received an unfavorable ruling on [her] first one." *Hayes v. Magnachip Semiconductor Corp.*, No. 14-CV-01160-JST, 2017 WL 512777, at *1 (N.D. Cal. Feb. 8, 2017). The Court set April 30, 2021 as the deadline for Siino to file her motion for class certification and Siino could have filed then the motion she seeks to file now. The Court's rejection of her earlier motion does not justify modifying the case schedule to allow her to file a second motion.

Siino's motion to modify the case scheduling order is denied.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 20184654

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

10

2022 WL 10755425
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Ralph SMITH, Plaintiff,
v.
ALLEGHENY TECHNOLOGIES, INC. et al., Defendants.

2:19-cv-147
|
Signed August 1, 2022

**Attorneys and Law Firms**

Joseph H. Chivers, Pittsburgh, PA, Sarah R. Schalman-Bergen, Lichten & Liss-Riordan, P.C., Boston, MA, Alexandra Koropey Piazza, Michaela Wallin, Pro Hac Vice, Shanon J. Carson, Berger Montague PC, Philadelphia, PA, for Plaintiff.

Theodore A. Schroeder, Joshua Vaughn, Katelyn W. McCombs, Taylor N. Brailey, Littler Mendelson, P.C., Pittsburgh, PA, for Defendant Strom Engineering Corporation.

**MEMORANDUM ORDER**

Mark R. Hornak, Chief United States District Judge

***1** This civil action was referred to United States Magistrate Judge Patricia L. Dodge for the conduct of pretrial proceedings, and to make certain reports and recommendations.

Judge Dodge has issued Reports and Recommendations ("R&R") as follows: the R&R [91] as to the Defendant's Motion to Strike the Expert Report and Testimony of Dr. Erin Hatton [74], and the R&R [94] as to the Plaintiff's Motion for Class Certification [67]. Objections to both R&R's, [92, 98] have been filed, along with responses to such Objections. These matters are ripe for disposition by this Court.

For the reasons set out below, the Court OVERRULES the Objections at [92], DENIES the Motion to Strike at [74] and ADOPTS the R&R at [91] as the Opinion of the Court. The Court REMANDS the R&R at [94] as to the Plaintiff's Motion for Class Certification [67] back to Judge Dodge and DISMISSES the Objections at [98] without prejudice.

As to the R&R related to the expert report, opinions and testimony of Dr. Hatton, Judge Dodge recommended that the Motion to Strike be denied. The Objections to that R&R are considered under the "clearly erroneous" standard of review by this Court, as it is considered a non-dispositive pretrial motion under Fed. R. Civ. P. 72. That means that this Court will adopt that R&R so long as there is no error of law, and so long as this Court is not left with the definite and firm conviction that a mistake has been made, *Green v. Fornario*, 486 F. 3d 100, 104 (3d Cir. 2007), or the belief that Judge Dodge had fundamentally misinterpreted or misapplied the applicable law. None of that is the case here, and this Court concludes that Judge Dodge's conclusion that Dr. Hatton would be permitted to testify in the form of an opinion and within her expertise pursuant to Fed. R. Evid. 702 is sound. [1] Thus, the Objections to that R&R are overruled for the reasons stated below.

This Court agrees with Judge Dodge that there is no genuine issue that by virtue of Dr. Hatton's specialized knowledge, study, research and learning, she is a witness falling within the ambit of Rule 702, and that the subject matters of her testimony are outside of the ordinary experience of the trier of fact. She plainly has a record of accomplishment, learning, and study in the field of labor relations and history, particularly as such relates to strikes, lockouts and other labor disputes, the use of replacement workers, and the involvement of staffing organizations in labor disputes. Her testimony will help the trier of fact understand the evidence. The Defendant's contention that Dr. Hatton does not meet the standards for Rule 702 testimony because she had not previously testified as an expert witness in a federal court is unavailing, and as Judge Dodge noted, the Defendant's objections as to Dr. Hatton's Rule 702 qualifications are "singularly lacking in merit." (ECF No. 91 at 6.) Judge Dodge was correct on this point.

***2** Second, for the same reasons as did Judge Dodge, this Court concludes that Dr. Hatton's testimony as set out in her expert report and deposition testimony will likely be of material assistance to the trier of

fact in this case. For the reasons the Defendant has moved to strike her testimony, she may be subject to cross-examination about her knowledge and opinions (and she was during the oral deposition taken at the behest of the Defendant), but importantly, Dr. Hatton has demonstrated specialized knowledge that is of value to assisting in understanding the context of labor disputes, the use of replacement workers in them, the means by which such workers are engaged and used, and how that larger context is considered in conjunction with the factual record developed here. And such matters are germane to the core issues here, namely whether, when, why and how time spent by replacement workers going to and from the worksite where a labor dispute is on-going should or should not be considered for the definition of working hours/compensable time. Contrary to the assertions of the Defendant, Dr. Hatton did not simply opine or testify about ultimate conclusions, but instead has provided testimony in a specialized area in which she possesses special knowledge, and her testimony pursuant to Rule 702 is proper. Once again, Judge Dodge got this issue right.

Third, contrary to the Objections, Dr. Hatton's opinions and testimony "fit" this case. Her report outlines in detail the depth of the factual record generated by the parties about this very case and the underlying labor disputes/use of replacement workers that Dr. Hatton considered. Her report and testimony set out her consideration of the professional research she relied upon. And of course, personal knowledge is not required to support opinion testimony pursuant to Rule 702, and the materials Dr. Hatton considered are of the type that expert witnesses properly consider in federal courtrooms. Both her specialized knowledge and the bases for her opinions and testimony are sufficiently tied to the events in this case, and the evidence of record. Once again, Judge Dodge was correct as to this issue when she concluded both that Dr. Hatton's testimony "fit" this case, and was reliable when considered for these purposes, including as to class certification issues. (ECF No. 91, 10–12.)

Fourth, the Defendant appears to argue that Dr. Hatton's testifying pursuant to Rule 702 should be prohibited because her research did not rely on replicable, mathematical or scientific formulae, or the like. But the application of the *Daubert* "gatekeeping" rules also has to "fit" the case and the proposed testimony. Not all expert testimony is scientific in nature, nor the result of calculations or formulae. Here, the context of relevant research, history and industry practices generate the background for Dr. Hatton's opinion testimony, and more than facially demonstrate a sound and proper basis for the processes she used to present her opinions and testimony. Of course, the Defendant can challenge her opinions and the bases for them on cross-examination, which they have already done in an extensive oral deposition. (ECF No. 93-2 (demonstrating that the deposition of Dr. Hatton convened at 11:31 a.m. and concluded at 4:17 p.m., with breaks).) That argument goes to the weight, not admissibility, of Dr. Hatton's testimony. Judge Dodge was again correct that Dr. Hatton's opinion testimony is not rendered inadmissible on these grounds, and Dr. Hatton's opinions and testimony are properly considered in this case.

Fifth, the Defendant appears to make a passing objection on the basis that Dr. Hatton's disclosed expert report did not sufficiently reveal how she considered certain specific research methodologies. (ECF No. 93 at 4.) Judge Dodge was correct once again on that issue, especially since the oral deposition of Dr. Hatton that the Defendant convened would have caused any potential prejudice from an allegedly overly-modest expert disclosure to evaporate.

Not only is Judge Dodge's R&R as to the Motion to Strike not contrary to law, nor clearly erroneous, but her conclusion that there are good grounds for the admissibility of Dr. Hatton's expert report and testimony (based on the consideration of Rule 702 matters) was and is in this Court's judgment correct, and that R&R will be adopted as the Opinion of the Court as to the Motion at [74], and the Objections to that R&R, [92], are overruled.

***3** As to the R&R [94] addressing the Plaintiffs' Motion for Class Certification [67], the Court has carefully reviewed it, along with the Objections to it and the papers of the parties. The Objections to that R&R, as the Plaintiffs note, trigger *de novo* review by this Court under applicable law. And this Court's initial assessment of that R&R reveals no obvious error. But since that R&R was issued, and since the Objections and the papers relative to them were filed,

there have been important decisional developments at our Court of Appeals. On June 24, 2022, that Court issued its precedential Opinion in *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890 (3d Cir. 2022). One of the central issues in that case was the methodology for assessing whether the "commonality" prong of the Rule 23 analysis has been fulfilled when class certification has been sought. Since the case did not yet exist, the analysis of *Ollie's Bargain Outlet* was not considered by the parties or Judge Dodge when the class certification issue was being litigated before her.

Given Judge Dodge's thorough and extensive administration of this action to date, and her in-depth consideration of the arguments and positions of the parties on all relevant issues in the context of prevailing law, this Court concludes that the sound administration of justice will be furthered by returning the R&R on class certification [94] to Judge Dodge via remand for such further proceedings as she deems appropriate to permit the parties to litigate the impact (if any) of the decision in *Ollie's Bargain Outlet* on the class certification issues here, and for Judge Dodge to consider their positions and to issue an updated R&R as to the class certification motion. This is not a disposition on the merits of that Motion, and this remand is without prejudice to the positions of all parties. The Objections to that R&R, [98], are therefore dismissed without prejudice, and the R&R at [94] is remanded to Judge Dodge for further proceedings in light of the decision in *Ollie's Bargain Outlet*.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 10755425

## Footnotes

1 As part of the Objections, the Defendant appears to at least implicitly raise certain relevance issues unrelated to Dr. Hatton's Rule 702 status. The Court does not address those here, to the extent that they would be raised in the context of an actual relevance objection to the substantive content of any testimony of Dr. Hatton. Because the Court does not conclude that the opinions of Dr. Hatton advanced at this juncture by the Defendant are not relevant in a general sense (instead, for the reasons noted, the Court agrees with Judge Dodge that they are germane to this action), any specific relevance objection to some specific part of her testimony would need to be raised contemporaneously with her testimony.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

11

2014 WL 105608
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Leroy WEBB, et al., Individually and on Behalf of all Others Similarly Situated, Plaintiffs,
v.
DISCOVERY PROPERTY & CASUALTY INSURANCE CO., et al., Defendants.

No. 3:08 CV 01607.
|
Jan. 9, 2014.

**Attorneys and Law Firms**

Eric L. Keepers, Howard G. Silverman, Kane & Silverman, P.C., Philadelphia, PA, Girard J. Mecadon, Pittston, PA, for Plaintiffs.

Bradley J. Vance, Robert J. Foster, Thomas J. Wehner, Reger & Rizzo & Darnall, Matthew A. Goldberg, Nathan P. Heller, DLA Piper, US LLP, Philadelphia, PA, Brett Ingerman, DLA Piper LLP, Baltimore, MD, for Defendants.

***MEMORANDUM OPINION***

ROBERT D. MARIANI, District Judge.

**I. *Procedural History***

***1** Presently before the Court is Plaintiff's Motion for Class Certification and for Appointment of Class Counsel by which they aspire to class action status. (*See* Pls.' Mot for Class Certification and Appointment of Howard G. Silverman, Esq. and Kane & Silverman, P.C. as Class Counsel, Doc. 95.) The gravamen of the underlying action concerns the adequacy of certain waiver forms that the Defendant insurance company supplied to policyholders when those policyholders had the option to accept or reject underinsured motorist protection ("UIM"). (*See* Pls.' Mem. in Supp. of Mot. for Class Certification, Doc. 95–1, at 2–3.)

Pennsylvania law requires that, to be valid, a UIM waiver must read as follows:

> **REJECTION OF UNDERINSURED MOTORIST PROTECTION**
>
> By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

75 Pa. Cons.Stat. Ann. § 1731(c).

By contrast, Defendant's UIM waiver form reads as follows:

> *I reject Underinsured Motorists Coverage under this policy.* By signing this waiver I am rejecting Underinsured *Motorists* Coverage under this policy, for myself and all relatives residing in my household. Underinsured *Motorists* protects me and all relatives *residing* in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for ["all" omitted] losses and damages. I knowingly and voluntarily reject this coverage.

(Doc. 95–2 at 1 (Form No. UA 237 ED 0100); Doc. 95–7 at 2 (Form UA 137 ED 1104).) [1]

Though these changes may appear minor, the Pennsylvania Superior Court ruled in the case of *American International Life Insurance Co. v. Vaxmonsky,* 916 A.2d 1106 (Pa.Super.Ct.2006) that any departure from the statutory form—even the most minor—will render the waiver void. *See id.* at 1109–1111; *see also Jones v. Unitrin Auto and Home Ins. Co.,* 40 A.3d 125, 131 (Pa.Super.Ct.2012) (holding that additions to the statutory language, and not just deletions from it, "fail to specifically comply with the statute" and render the form "completely void"). In a prior decision in the instant case, then-presiding Judge Munley ruled that *Vaxmonsky* applied to void Defendant's waivers. (*See* Opinion of Aug. 12, 2011, Doc. 67, at 13.) Accordingly, for purposes of the law of this case, the invalidity of Defendant's waivers is no

longer in question. Rather, the only question to resolve at this stage is whether the Plaintiffs may seek redress for their injuries through a class action, or whether they must do so through individual claims.

In this regard, Plaintiffs' most recent [2] proposed class definition reads as follows:

> ***2** All those persons injured in motor vehicle accidents as the result of the negligence of an underinsured driver as defined at 75 Pa.C.S.A. 1701 et seq. from May 8, 2000 to the present while occupants of motor vehicles registered in Pennsylvania and insured under a motor vehicle policy of insurance issued by Discover Property and Casualty Insurance Company providing coverage under, inter alia, Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.A. 1701 et seq. where Rejection of Underinsured Motorist Protection form No. UA 237 ED 0100 or No. UA 137 Ed 0104 was executed before an accident with an underinsured motorist.
>
> The class shall be limited to those individuals whose UIM claims accrued on or after August 5, 2004, provided that this limitation shall not apply to a minor or incompetent whose claim for UIM coverage would not be otherwise barred by the Pennsylvania statute of limitations
>
> The Class does not include any insured under a policy for which the named insured signed a subsequent rejection form that is compliant with 75 Pa.C.S.A. § 1731(c) prior to the insured's motor vehicle accident, or whose UIM claim has already been adjusted up to the bodily injury limits in the applicable policy.
>
> (Doc. 110 at 4–5.)

**II.** ***Class Action Certification***

**a. In General**

The Federal Rules of Civil Procedure require Plaintiffs to establish two sets of facts before proceeding with a class action. First, Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if;
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). If these requirements are satisfied, then the Court moves to Rule 23(b), which provides, in relevant part, that;

A class action may be maintained if Rule 23(a) is satisfied and if:

> (1) prosecuting separate actions by or against individual class members would create a risk of;
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> ***3** (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action,

*Id.* at 23(b).

Defendants contest the applicability of Rule 23(a)(1) ("numerosity"), (a)(2) ("commonality"), and (a)(3) ("typicality"), as well as the requirements set forth in Rule 23(b)(1), and (b)(3), to the facts of this case.[3] (*See* Def.'s Mem. of Law in Opp. to Mot. for Class Certification, Doc. 109, at 6–19.)[4]

As the Supreme Court stated, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule-that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The *Dukes* Court also noted both that " 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Id.* (quoting *Gen Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 160–161, 102 S.Ct. 2364, 2372, 72 L.Ed. 740 (1982)). With these directives in mind, the Court will now turn to the Rule 23(a) factors.

**b. Numerosity**

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1).

> While the law is well-established that a plaintiff "need not show the exact number of potential [members] in order to satisfy the [numerosity] requirement," it is equally well-established that "the plaintiffs do have the burden of showing that the size is such that the joinder of all members is impracticable. Mere speculation as to the number of members who may be involved is not sufficient to satisfy Rule 23(a)(1)."

*Jackson v. Se. Pa. Transp. Auth.,* 260 F.R.D. 168, 187 (E.D.Pa.2009) (quoting *Delgado v. McTighe,* 91 F.R.D. 76, 78 (E.D.Pa.1981)).

In the present case, Plaintiffs argue that the numerosity requirement is satisfied because Defendant issued policies with invalid waivers "to a total of approximately 235 separate named individuals Further, since these are *all* commercial policies, there are *multiple* insured persons under *each* of the 235 named insureds' policies. Thus, the number of potential class members may be in the thousands." (Doc. 95–1 at 7.)

However, even if the Court were to assume that thousands of people drove vehicles subject to invalid waiver forms, this would not be sufficient to establish numerosity. Under Plaintiffs' own proposed class definition, class members must also be "persons injured in motor vehicle accidents as the result of the negligence of an underinsured driver as defined at 75 Pa.C.S.A. 1701 et seq." Defendant avers—and Plaintiffs do not deny—that

> ***4** [d]iscovery so far has revealed only four prospective class members [as well as a "fifth possible claim" that does not appear to have "developed into an underinsured motorist claim"], one of which was a former Plaintiff in this action who withdrew his claim with prejudice when he was forced to concede he was not entitled to coverage. The other two claimants are separately represented by counsel.

(Doc. 109 at 7.)

Plaintiffs respond by arguing that "[t] he class cannot be limited, as Defendants contends [*sic* ], to those persons who have already made UIM claims and have already sought reformation of the policy." (Doc. 110 at 5.) That is because a "UIM claim may arise years after an insured has been injured in an accident and made a claim against the tortfeasor." (*Id.*) Essentially, t hen, Plaintiffs ask this Court to use the total number of insurance policies containing invalid waiver forms as the proper reference for numerosity, simply because

some of these insureds might later bring claims for UIM coverage.

But whether new class members might materialize in the future is irrelevant to a finding of numerosity. While Plaintiffs are not required to prove the exact number of class members, they "must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding ." *Marcus v. BMW of N. Am.,* 687 F.3d 583, 596 (3d Cir.2012). Commonsense, guesswork, or even reliance on what the Third Circuit called "a bet worth making" cannot circumvent Plaintiffs' burden to show sufficient evidence of numerosity under Rule 23(a)(1). *See id.* at 596–97. As the Supreme Court emphasized in *Dukes,* it is the Plaintiffs' burden to "affirmatively demonstrate" compliance with Rule 23. *Dukes,* 131 S.Ct. at 2551. The mere possibility that more people might later satisfy the conditions necessary to become class members obviously falls far short of this affirmative demonstration.

Therefore, putting aside Plaintiffs' speculative conclusions, the Court only has evidence of at most five class members, some of whom may actually be barred from bringing claims. Joinder of such a small number would not be impracticable; rather, it would be an efficient means of resolving these issues. Accordingly, the Court finds that the numerosity requirement is not satisfied.

**c. Commonality and Predominance**

The requirements in Rule 23(a) are inclusive, meaning that, if one requirement is not satisfied certification, must be denied. Nonetheless, as an independent basis of its decision, the Court finds that the commonality and predominance analysis would bar class certification even if numerosity did not.

Under what is called the "commonality" requirement of Rule 23, the Plaintiffs must show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Ordinarily, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994), However, as the Supreme Court recently held, the commonality requirement is not met even if the Plaintiffs raise "droves" of common questions, if these common questions are not the kind that would be of such a nature as to lead to *classwide resolution* of the claims at issue. *See Dukes,* 131 S.Ct. at 2551 ("[The Plaintiffs'] claims must depend on a common contention.... That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

***5** Here, the only common question concerns the validity of the waiver forms that all class members signed. This is arguably a relevant issue of common contention under *Dukes* because the invalidity of the waiver forms is central to all of the class members' claims—in other words, none of the class members could proceed at all if the waivers were valid.

However, the Court need not dwell on the commonality requirement because it finds that the proposed class clearly fails Rule 23's "predominance" requirement. Because the predominance requirement covers the same subject matter as commonality, but does so in a more broadly-defined manner, it is often found to "subsume" commonality. *See, e.g., Georgine v. Amc hen Products, Inc.,* 83 F.3d 610, 627 (3d Cir.1996) ("[W]e do not hold that this class fails the commonality requirement because the test of commonality is subsumed by the predominance requirement, which this class cannot conceivably meet.").[5] The predominance requirement, found in Rule 23(b) (3), states that, for a class action to go forward, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

The Advisory Commit tee Notes to Rule 23 provide guidance as to what kinds of cases may be found to satisfy the predominance requirement. For instance, "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

determination of the damages suffered by individuals within the class." Fed R. Civ. P. 23(b)(3) advisory committee's notes. Despite superficial similarities to such cases of misrepresentation, the Court finds that the present case is much more similar to the Advisory Committee's guidance on mass tort cases. The Committee stated that a " 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." *Id.* In other words, "[t]he Committee's warning ... continues to call for caution when individual stakes are high and disparities among class members great." *Amchem Products v. Windsor,* 521 U.S. 591, 625,117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997).

Here, as Defendant correctly notes, disparities among class members may very well be great, making this case analogous to a mass tort inappropriate for classwide resolution:

> The question of the existence of coverage is only one issue in a UIM proceeding. Each UIM claim would require an investigation into the circumstances of the accident. Conflicting witness statements would have to be resolved. Liability experts may be necessary to determine if the class member is even eligible to recover benefits. The nature and extent of the injuries would then have to be evaluated. Medical records would need to be reviewed and analyzed, and a medical examination of the insured would likely be required. A statement under oath to determine the subjective impact of the injuries on the claimant would need to be obtained.

***6** (Doc. 109 at 10.)

Thus, even though the insurance waivers may be "standardized," this Court cannot agree in this case with the reasoning in *Briggs v. Hartford Fin. Services Group, Inc.,* 2009 WL 2370061 (E.D.Pa.2009), that the mere existence of "standardized insurance waiver forms that are contractual in nature" is sufficient to satisfy the predominance requirement. *See id.* at *6. While the invalidity of the waiver forms may well be one of several necessary conditions to recovering UIM coverage, it is certainly not sufficient by itself. Indeed, even though UIM coverage was not validly waived, each individual class member's entitlement to actually receive benefits will depend on a host of individualized considerations pertaining to the facts of each policyholder's accident, and injuries, as noted above. These issues do not solely concern the calculation of individual damages, as Plaintiffs assert. (*See* Doc. 110 at 11.) Instead, they concern the very existence of Defendant's *liability* to pay any coverage to individual policyholders, which the Advisory Committee Notes caution against resolving through the class action mechanism.

Moreover, the stakes for each individual class member are indeed high. By definition, the class members are policyholders whose damages were large enough that the other party's insurance coverage was not enough to make them whole. As such, they are people who have a strong incentive to bring their own claims directly, outside of the class action mechanism. In the absence of any evidence that these claims would not be litigated individually, the Court finds no need to bind these policyholders to the determination of an action that they have not manifested any desire to join. Nor can the Court find any reason to accept the Plaintiffs' conclusory statement that "in the absence of a class action on this issue, many class members, especially those not represented by counsel, would likely rely on the invalid waiver forms and/or the denial of their claims by the Defendants, and simply give up without ever learning that the waiver forms are invalid." (Doc. 95–1 at 14.) Given the likely extent of any potential plaintiff's injuries, the Court cannot simply assume that they will blithely forego their own means of redress or proceed in any manner different from the Webb and Douglas Plaintiffs, who have apparently retained counsel to defend their interests before this Court.

**d. Remaining Considerations**

Based on the foregoing, the Court need not address Rule 23's "typicality" requirement. *See generally* Fed.R.Civ.P. 23(a) (3). The typicality requirement is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57. It "entails an inquiry whether the named plaintiff's individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Id.* at 57–58 (internal quotations and alterations omitted). Moreover, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id.* at 58 (internal quotations and alterations omitted). The Court finds no reason to believe that these concerns apply to the present case: the legal theories that the named Plaintiffs and any other purported class members might rely on are sufficiently similar to support a finding of typicality. However, the defects in the other Rule 23 requirements, discussed at length above, are sufficient to make compliance with the typicality requirement a moot point.

***7** Likewise, Plaintiffs' request to appoint class counsel, (*see* Doc. 95–1 at 15–17), has been rendered moot by the disposition of this case, because there shall be no class action.

**III. *Conclusion***

Based on the foregoing considerations, Plaintiffs' Motion for Class Certification (Doc. 95) is **DENIED.** A separate Order follows.

***ORDER***

**AND NOW, THIS 9TH DAY OF JANUARY, 2014,** in accordance with the Court's Memorandum Opinion, **IT IS HEREBY ORDERED THAT** Plaintiffs Motion for Class Certification and for Appointment of Counsel (Doc. 95) is **DENIED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 105608

## Footnotes

1 Both of the forms at issue use identical language. The differences between Defendants' waiver form and the text laid out in 75 Pa. Cons.Stat. Ann. § 1731(c) are italicized or noted parenthetically as appropriate.

2 Plaintiffs' Motion for Class Certification states a slightly different class definition, Plaintiffs proposed the following definition in their Reply Brief in order to answer some of the issues raised in Defendants' Brief in Opposition to class certification. (*See* Pls." Reply Mem. in Supp. of Mot. for Class Certification and Appointment, Doc. 110, at 1, 4.)

3 Plaintiffs do not raise Rule 23(b)(2) as a grounds for certification in their Motion, but only do so later in their Reply Brief. (*See* Doc. 110 at 9–10.) Therefore, the Court will not rule on the applicability of Rule 23(b)(2), as not being properly before the Court. As this Court stated in a recent case, it is improper to rule on issues raised for the first time in a Reply Brief:

> In ruling on a motion, "a district court need not address issues raised for the first time in a reply brief." *Dreyer v. Sheaffer,* 2009 WL 917829, at *3 (M.D.Pa.2009). That is because "[a]

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin,* 454 F.Supp.2d 278, 281 n. 3 (E.D.Pa.2006) (collecting cases).

*Matthews v. Runco's Tavern & Grill, Inc.,* 2013 WL 6055219, at *2 (M.D.Pa.2013).

4 Though Defendant refers to Rule "23(b)(2)" and "23(b)(3)" in its Brief in Opposition when it discusses the commonality and typicality requirements, it is clear from the nature of Defendant's legal analysis that it actually means to refer to Rule 23(a)(2) and 23(a)(3). (*See* Doc. 109 at 8–13.) These latter subsections are the only ones where the commonality and typicality rules are found.

5 Theoretically, even if predominance subsumed commonality and then failed, the test laid out in Rule 23(b)(1) could still allow a class action to go forward if all the prerequisites in Rule 23(a) were met. However, even if all of the prerequisites were met, the requirements of Rule 23(b)(1) have not been met.

First, this case presents no risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." *See* Fed.R.Civ.P. 23(b)(1)(A). Just because a Defendant who is sued by several different but similarly-situated Plaintiffs may be found liable to some and not liable to others does not mean that "incompatible standards of conduct" are being demanded; it only means that the Defendant would have to pay some claims and not others under state law tort and damage assessment principles of general application. Litigation will always be uncertain and capable of generating varying conclusions. This does not justify pulling all potential Plaintiffs together into one binding class.

Second, there is no risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." *See id.* at 23(b) (1)(B). Indeed, Plaintiffs' only argument to this effect is that any individual action "would create precedent that would presumably be followed by other courts and would direct Defendant's future claims handling." (Doc. 95–1 at 12.) But any adjudication can create precedent; this does not mean that any judicial decision that might be precedential to third parties creates the need for a class action.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

12

2001 WL 484193
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Geary L. WILSON, et al., Plaintiffs
v.
SEVEN SEVENTEEN HB PHILADELPHIA CORP. NO. 2 t/a Adam's Mark Hotel, et al., Defendants

No. Civ.A. 99-1729.
|
March 7, 2001.

*MEMORANDUM AND ORDER*

SMITH, Magistrate J.

***1** Currently before the Court in the above-referenced matter is a request by Defendants HBE Corporation and Seven Seventeen HB Philadelphia Corp. No. 2 for Reconsideration of the Order Dismissing defendants' Cross-Motion to Deny Class Certification with Prejudice. Because the Court finds a manifest error of law in our prior order, we shall vacate it and find that the Motion to Deny Class Certification with Prejudice should be granted.

I. PROCEDURAL HISTORY

In April of 1999, plaintiffs Geary L. Wilson, et al. brought this class action suit against defendants alleging racially discriminatory employment practices at the Adam's Mark Hotels. Following extensive motion practice and amendment of the complaint, defendants moved, on October 25, 1999, to strike plaintiffs' class allegations for failure to comply with Local Rule of Civil Procedure 23.1(c)'s ninety-day time limit for seeking class certification. Four days later, plaintiffs sought their first extension of time for filing their class certification motion. Notwithstanding its untimeliness, the Honorable Jay C. Waldman granted the motion and extended the deadline to January 31, 2000.

On January 31, 2000, plaintiffs submitted their motion for class certification, to which defendants responded on March 7, 2000. Prior to filing the certification motion, however, plaintiffs had filed a motion to compel substantial amounts of discovery. Judge Waldman considered the two motions together and found that some of the information sought by plaintiffs in the contested discovery requests appeared “to be relevant to certification issues and the claims of the named plaintiffs.” *See* Order of Honorable Jay C. Waldman, dated June 8, 2000. To that end, the Court ordered that defendants provide certain specified discovery to plaintiffs by June 30, 2000. In conjunction with that Order, the Court also ruled that plaintiffs' Motion for Class Certification was “DENIED without prejudice to renew with any appropriate additional supporting submissions within twenty days of the completion of court ordered class certification discovery.” *Id.* By June 30, 2000, defendants had supplied plaintiffs with the information and documents specified in the June 8, 2000 order.

On July 21, 2000, plaintiffs, unsatisfied with the discovery received, again moved to compel defendants to disclose the information allegedly ordered by the Court. During the briefing of this matter, the case was reassigned from Judge Waldman to the Honorable Barclay Surrick, who then referred discovery motions to the Honorable Arnold Rapoport. On December 11, 2000, Judge Rapoport entered an order denying the motion to compel. Plaintiffs promptly moved for a Rule 16 Conference, and Defendants responded by way of a Cross-Motion to Deny Class Certification with Prejudice for failure to comply with the Court-ordered deadline for seeking class certification, as well as a motion to compel.

On February 1, 2001, the management of the file having been transferred to the undersigned, the Court held a Rule 16 Conference with the parties, at which time we entertained some argument on the pending motions. The Court subsequently ordered that defendants' Motion to Deny Class Certification with Prejudice be denied without prejudice. In addition, we entered a new scheduling order for the parties.

***2** Defendants have returned to the Court requesting that we reconsider our February 7, 2001 Order denying their Motion to Deny Class Certification with Prejudice. We now reach the merits of that Motion.

II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure Rule 59(e), on a party's motion, the court may amend its findings and/or its judgment in a particular matter. The purpose of a motion for reconsideration or a motion to alter or amend the judgment is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171 (1986); *see also Smith v. City of Chester,* 155 F.R.D. 95, 96-97 (E.D.Pa.1994) (Under Rule 59(e), a party must rely on one of three grounds: 1) the availability of new evidence not previously available, 2) an intervening change in controlling law, or 3) the need to correct a clear error of law or to prevent manifest injustice). This motion should not be used to introduce evidence that was available at trial but not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits. *Fontenot v. Mesa Petroleum,* 791 F.2d 1207, 1219 (5th Cir.1986); *Kravco Co. v. Valley Forge Center Assoc.,* Civ. A. No. 91-4932, 1992 WL 5893, *2 (E.D.Pa. Jan. 8, 1992). "It is improper on a motion for reconsideration to 'ask the Court to rethink what [it] had already thought through-rightly or wrongly." ' *Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa.1993) (citing *Ciba-Geigy Corporation v. Alza Corporation,* Civ. A. No. 91-5286, 1993 WL 90412 (D.N.J. March 25, 1993)).

II. DISCUSSION

A. *Reconsideration is Warranted*

Prior to reaching the more substantive issues present in the Motion before the Court, we first must decide whether reconsideration is warranted. Because we discern a manifest error of law in the Order of February 7, 2001, we grant the reconsideration motion.

Federal Rule of Civil Procedure 23(c)(1) states:

> As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

Fed.R.Civ.P. 23(c)(1). Repeatedly, courts have interpreted this Rule to permit either party in a titular class action suit to move for a class determination. *See, e.g., Cook County College Teachers Union v. Byrd,* 456 F.2d 882, 885 (7 th Cir.1972), *cert. denied,* 409 U.S. 848 (1972), *reh'g denied,* 414 U.S. 883 (1973) ("One opposing a class action may move for an order determining that the action may not be maintained as a class suit."); *City of New York v. International Pipe and Ceramics Corp .,* 410 F.2d 295, 297 (2d Cir.1969) (granting defendants' motion to deny class certification); *Saunders v. Bellsouth Advertising & Publishing Corp.,* Civ. A. No. 98-1885, 1998 WL 1051961, *1- *2, n. 1 (S.D.N.Y.1998) (granting defendant's motion to deny class certification because plaintiffs failed to move in a timely fashion); 7B C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 1785, p. 89-90 (1986) (noting that either party may move for a class determination).

***3** In this Court's order of February 7, 2001, we denied defendants' Motion to Deny Class Certification With Prejudice, as follows:

> This motion, while perhaps meritorious, is simply not ripe. As there is no pending motion for class certification, the Court cannot preclude plaintiffs from seeking such certification in the future.

Upon reconsideration of that Order, however, we find that, under Fed.R.Civ.P. 23(c)(1), defendants were entitled to seek a class determination, even in absence of a motion by plaintiffs. As such, the motion was, indeed, ripe for consideration. Consequently, we turn to the merits of the original motion.

B. *Class Action Certification*

Defendants ask the Court to grant their Motion to Deny Class Certification with Prejudice on two grounds: (1) plaintiffs failed to abide by Judge Waldman's deadline for seeking class certification and (2) plaintiffs cannot meet the requirements of a class under Federal Rule of Civil Procedure 23.[1] We find merit in defendants' first argument and, on those grounds, deny class certification with prejudice.

Local Rule of Civil Procedure 23.1(c) provides, in relevant part:

> Within ninety (90) days after the filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Fed.R.Civ.P. 23, as to whether the case is to be maintained as a class action.... Whenever possible, where it is held that the determination should be postponed, a date will be fixed by the Court for renewal of the motion.

Local Rule of Civ. P. 23.1(c). The Third Circuit has held that the denial of a class certification motion as untimely under the local rule falls within the court's discretion. *Walton v. Eaton Corporation,* 563 F.2d 66, 75 n. 11 (3d Cir.1977). Decisions issuing from this district, though, reveal a reluctance to deny a motion for class certification solely for failure to seek timely certification under Rule 23.1(c), absent some additional showing of prejudice to the defendants or members of the class resulting from the delay. *See, e.g., Stevens v. Citigroup, Inc.,* Civ. A. No. 00-3815, 2000 WL 1848593, *6 (E.D.Pa. Dec. 15, 2000) ("failure to comply with the Local Rule in and of itself does not constitute grounds for denying a motion to certify a class action."); *McHenry v. Bell Atlantic Corp.,* Civ. A. No. 97-6556, 1998 WL 512942, *8 (E.D.Pa., Aug 19, 1998) (refusing to deny class certification on grounds of failure to comply with the Local Rule when other prerequisites for class certification were met); *Robert Alan Insurance Agency v. Girard Bank,* 107 F.R.D. 271, 274 (E.D.Pa.1985) (requiring some showing of prejudice before denying class certification on timeliness grounds under the local rule); *Muth v. Dechert, Price & Rhoads,* 70 F.R.D. 602, 606 (E.D.Pa.1976) (same).

However, in cases where the plaintiffs have violated a court order setting a deadline, as opposed to simply missing the time set forth by Local Rule 23.1, courts have been more apt to deny class certification. For example, in the case of *Glass v. Philadelphia Elec. Co.,* 64 F.R.D. 559 (E.D.Pa.1974), plaintiffs, who had failed to move for a class determination within the 90-day period set by the local rules, sought an extension of time in which to file for class certification. *Id.* at 560. The court directed plaintiffs to complete discovery and then seek certification within 45 days of the date of the order. *Id.* One week after the deadline passed, plaintiffs, having failed to file motion for class certification, sought an extension of time, citing defendant's inadequate responses to its interrogatories. *Id.* at 561. The court rejected this argument and denied plaintiffs' request for an extension. *Id.*

***4** Other courts, facing similar circumstances, have taken an identical route. *See, e.g., Scott v. Snider,* Civ. A. No. 91-7080, 1994 WL 388959, *2 (E.D.Pa. July 26, 1994) (denying a motion for class certification wherein plaintiffs failed to file a motion until two years after the court-ordered deadline); *Dudo v. Schaffer,* 91 F.R.D. 128, 136 (E.D.Pa.1981), *reconsid. denied,* 93 F.R.D. 525 (E.D.Pa.1982) (eleven and a half month delay between close of class discovery to resubmission of motion for class certification is grounds for denial of class certification). *Burkhalter v. Montgomery Ward and Co.,* 676 F.2d 291, 294 (8th Cir.1992) (affirming dismissal of class allegations where, two months after court-ordered deadline, plaintiff had yet to file class certification motion). These courts have been especially motivated to deny class action certification on timeliness grounds when the case has aged considerably. *See, e.g., Walton v. Eaton Corporation,* 563 F.2d 66 (3rd Cir.1977) (denying certification where plaintiffs failed to seek class certification until two years after filing of first complaint); *Hall v. Burger King Corp.,* Civ. A.

No. 89-0260, 1992 WL 372354, * 14 (S.D.Fla.1992) (denying class certification where plaintiffs sought it nearly three years after the filing of their initial complaint and almost a year after the expiration of their last extension of time to move for class certification).

Aside from the fact that a delay in moving may violate local rules and/or a court order, failure to move in a timely fashion for certification of a class "bears strongly on the adequacy of representation that those class members might expect to receive." *East Texas Motor Freight v. Rodriguez,* 431 U.S. 395, 405 (1977). Federal Rule of Civil Procedure 23 requires, as one of the prerequisites of class certification, that the representative parties be able to fairly and adequately protect the interests of the class. "Class certification has been denied on the basis of delays in seeking certification even if that was the sole indicia of inadequate representation and regardless of whether certification finally was sought before or after trial." *In Re Folding Carton Litigation,* 88 F.R.D. 211, 214 (N.D.Ill.1980) (citing cases); *see also Flora v. Moore,* 78 F.R.D. 358, 361 (N.D.Miss.1979) (denying motion for class certification filed more than four months after court-established deadline because such delay in filing evidences inadequate representation).

As of October 25, 1999-over six months after the filing of the complaint and over three months beyond the deadline set forth in the local rule-plaintiffs, in the case at bar, had taken no action on class certification. Finally, and only in response to defendants' motion to strike the class action allegations, plaintiffs sought an extension of time in which to file their class certification motion. Notwithstanding the late request, the Court, exercising its discretion, granted plaintiffs an extension of time until January 31, 2000. Plaintiffs thereafter filed their certification motion on that date. Considering the motion on its merits, the Court denied it, but held that the denial was without prejudice due to certain outstanding discovery, relevant to class issues, that was to be produced to plaintiffs by June 30, 2000. At that time, the court set the deadline for renewal as within "twenty days of the completion of court ordered class certification discovery." Plaintiff, thus, had twenty days from June 30, 2000-the date set for production of court-ordered discovery-to renew their class certification motion . [2] Notwithstanding that deadline, plaintiffs have failed, to date, to take any steps towards class certification.

***5** In light of these circumstances, the Court finds itself compelled to deny class certification. As of the February 1, 2001 Rule 16 conference before the undersigned, the motion was over six months late. Following the original denial of certification, the Court had given plaintiffs ample time to either renew their motion or seek an extension of time. Defendants granted plaintiffs another five months from the lapse of the deadline prior to seeking a denial of class certification without prejudice. Another two months has passed since they so moved. The case is now almost two years old. With only one month remaining in the rather lengthy, substantive discovery period, defendants are certainly entitled to a determination so as to allow them properly prepare this case either as a class action suit or as an individual action.

Moreover, as of yet, the plaintiffs have put forth absolutely no excuse for their noncompliance with the deadlines. Certainly, the Court has the right, indeed the duty under Fed.R.Civ.P. 23, to fix a time limit for class determination. [3] Plaintiffs cannot simply ignore such orders without providing some justification. [4] Their inaction bears heavily on the adequacy of the representation and suggests to us that the case has not been diligently prosecuted to protect the interests of the class. [5] Denial of class certification on timeliness grounds falls well within this Court's discretion. *See Walton,* 563 F.2d at 75, n. 11. Exercising that discretion, we will so deny class certification with prejudice.

An appropriate order follows.

*ORDER*

AND NOW, this 7th day of *March,* 2001, upon consideration of Defendants' Motion for Reconsideration of the Order Denying Without Prejudice the Cross-Motion to Deny Class Certification with Prejudice, and Plaintiffs' Response thereto, it is hereby ORDERED that the Motion for Reconsideration is GRANTED and that class certification is DENIED WITH PREJUDICE.

It is so ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 484193

## Footnotes

1 We do not even consider defendants' second argument as it was not advanced in the original Motion to Deny Class Certification with Prejudice. A reconsideration motion may not be used to advance new arguments.

2 Although substantive discovery was set for completion on October 16, 2000, the Court interprets the phrase "court ordered class certification discovery" to refer to the June 30, 2000 date on which defendants were required to produce certain information and documents directly related to certification issues. In any event, even if we were to construe the October 16, 2000 close of substantive discovery date as the date referred to in the prior order, plaintiffs would have missed that date as well.

3 *See In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 785 (3d Cir.), *cert. denied,* 516 U.S. 824 (1995) ("the requirement in Rule 23(c) that the court decide certification motions 'as soon as practicable,' ... aims to reduce even further the possibility that a party could use the ill-founded threat of a class action to control negotiations or the possibility that absentees' interests could be unfairly bound.").

4 Had plaintiffs put forth at least some reason that they could not have previously moved for class certification or, at minimum, sought an extension of time, the Court would have perhaps been more lenient with the time restrictions. Having received no justification for such delay, though, the Court cannot act as plaintiffs' advocate and search for some reason to maintain the class action.

5 While plaintiffs may argue (although they have not done so in their briefing on this motion) that they were still attempting to gain full compliance from defendants on the court-ordered discovery, Judge Rapoport found that their motion to compel had no merit.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.