# APPENDIX OF UNPUBLISHED OPINIONS

1. *Chedwick v. UPMC*, No. 07–806, 2011 WL 1559792 (W.D. Pa. Apr. 21, 2011)

2. *Chen v. Amtrak*, No. 18-3617, 2019 WL 5294419 (E.D. Pa. Oct. 18, 2019)

3. *In re Google Inc. Cookie Placement Consumer Privacy Litigation,* No. 1:12-md-02358, 2026 WL 2530241(D. Del. Aug. 27, 2026)

4. *Lemp v. Seterus, Inc.*, No. 2:18-cv-01313, 2022 WL 912960 (E.D. Cal. Mar. 29, 2022)

5. *Markosyan v. Hunter Warfield, Inc*., No. CV 17–5400, 2018 WL 2718089 (C.D. Cal. May 11, 2018)

6. *Ritti v. U-Haul Int., Inc.,* No. 05–4182, 2006 WL 1117878 (E.D. Pa. Apr. 26, 2006)

7. *Siino v. Foresters Life Ins. & Annuity Co*., No. 20-cv-02904, 2022 WL 20184654 (N.D. Cal. July 26, 2022)

8. *Vista Healthplan, Inc v. Cephalon, Inc*., No. 2:06–cv–1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015)

9. *Webb v. Discovery Prop. & Cas. Ins. Co*., No. 3:08 CV 01607, 2014 WL 105608 (M.D. Pa. Jan. 9, 2014)

# 1

KeyCite Yellow Flag
Distinguished by Monaco v. City of Jacksonville, M.D.Fla., September 30, 2014

2011 WL 1559792
United States District Court,
W.D. Pennsylvania.

Gary CHEDWICK, Individually, and on behalf of a group of similarly situated individuals, Plaintiff,
v.
UPMC d/b/a University of Pittsburgh Medical Center, Defendant.

Civil Action No. 07–806.
|
April 21, 2011.

**Attorneys and Law Firms**

Gregory G. Paul, Morgan & Paul, PLLC, R. Bruce Carlson, Stephanie K. Goldin, Carlson Lynch, Sewickley, PA, Gary F. Lynch, Carlson Lynch Ltd, New Castle, PA, for Plaintiff.

Pamela G. Cochenour, Eric P. Reif, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Defendant.

***MEMORANDUM OPINION AND ORDER OF COURT***

McVERRY, District Judge.

***1** Before the Court for disposition are the PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (*Document No. 57* ), the Plaintiff's brief and exhibits in support of class certification (*Document No. 58* ), and the Defendant's brief and appendix in opposition to class certification (*Document No. 62* ). For the reasons that follow, the Plaintiff's Motion for Class Certification will be denied.

***Procedural History***

The procedural background to this controversy dates back to August 1, 2005, when Carole C. Bolden ("Bolden"), a former employee of Magee–Women's Hospital of the University of Pittsburgh Medical Center ("Magee"), commenced an action ("Bolden Action") against Magee under the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*]. Civil Action No. 05–1063, ECF No. 1. Bolden alleged that Magee had unlawfully terminated her employment pursuant to a policy providing that an employee could not remain on medical leave for more than six months. *Id.* at ¶ 36. On May 30, 2006, Bolden sought leave to file an amended complaint in class action based on Magee's alleged violations of both the ADA and the Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*]. Civil Action No. 05–1063, ECF No. 15. The amended complaint proposed by Bolden would have added Valentina Tish ("Tish"), another former employee of Magee, as a plaintiff. Civil Action No. 05–1063, ECF No. 15–2. The Court denied Bolden's request for leave to amend on June 13, 2006. Civil Action No. 05–1063, ECF No. 17. In denying the request, the Court explained that the "proposed transformation" of the case into a class action would "unduly delay" its resolution, and that disability-based discrimination claims of the kind asserted by Bolden were not typically amenable to adjudication within the context of a class action. *Id.* at 1.

Tish responded on June 21, 2006, by filing a separate action ("Tish Action") against Magee, alleging that she had been discharged in violation of the Rehabilitation Act. Civil Action No. 06–820, ECF No. 1. Her complaint included class allegations under both the ADA and the Rehabilitation Act. *Id.* at ¶¶ 20–29. Magee filed a motion to dismiss on July 26, 2006, seeking the dismissal of Tish's ADA claims on the ground that she had not exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Civil Action No. 06–820, ECF No. 3.

During the course of a status conference conducted on August 11, 2006, the Court permitted Bolden to renew her request for leave to file an amended complaint. Four days later, Tish responded to Magee's motion to dismiss by filing a motion for joinder pursuant to Federal Rule of Civil Procedure 20. Civil Action No. 06–820, ECF No. 8. She sought to join her action with the Bolden Action. *Id.* Bolden's renewed motion for leave to amend was filed on August 25, 2006. Civil Action No. 05–1063, ECF No. 23. The Court denied Bolden's motion on October 5, 2006, repeating its earlier admonition that the allegations contained in the proposed amended complaint were "not the sort of claims that would ordinarily be appropriate for resolution in a class action." Civil Action No. 05–1063, ECF No. 27 at 5. In a memorandum order dated October 17, 2006, the Court granted Magee's motion to dismiss Tish's ADA claims and denied Tish's motion for joinder. Civil Action No. 06–820, ECF No. 8.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***2** On October 25, 2006, Tish filed an amended complaint purporting to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett"), and Terri Walsh ("Walsh") as plaintiffs and the University of Pittsburgh Medical Center ("UPMC"), UPMC Shadyside, UPMC St. Margaret and UPMC Montefiore as defendants. Civil Action No. 06–820, ECF No. 11. The UPMC entities filed a motion to strike the amended complaint on November 8, 2006. Civil Action No. 06–820, ECF No. 13. The motion to strike was accompanied by an alternative motion to sever filed pursuant to Federal Rule of Civil Procedure 21. *Id.* Five days later, Magee moved for summary judgment in the Bolden Action. Civil Action No. 05–1063, ECF No. 28.

In a memorandum opinion and order dated April 24, 2007, the Court granted Magee's motion for summary judgment in the Bolden Action. *Bolden v. Magee Women's Hospital,* Civil Action No. 05–1063, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. Apr. 24, 2007). In a separate memorandum opinion and order issued that same day, the Court treated Tish's filing of an amended complaint in the Tish Action as an implied request for leave to amend, granted that request, and denied the motion to strike that had been filed by the UPMC entities. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2007 WL 1221137, at *6–8, 2007 U.S. Dist. LEXIS 30130, at *15–22 (W.D.Pa. Apr. 24, 2007). In order to alleviate any prejudice to the UPMC entities, the Court granted their alternative motion to sever and directed Chedwick, Fowler, Hamlett and Walsh to refile their actions as separate cases. *Id.*

Pursuant to the severance order, Chedwick commenced this action against UPMC on June 15, 2007, alleging violations of the ADA and the Rehabilitation Act. ECF No. 1. His complaint included class allegations. *Id.* at ¶¶ 29–39. On August 28, 2007, UPMC moved to dismiss Chedwick's class allegations, arguing that they were violative of the severance order. ECF No. 3 at ¶¶ 35–41. The Court rejected UPMC's argument on December 12, 2007, holding that the severance order entered in the Tish Action did not preclude Chedwick from seeking class certification in this case. *Chedwick v. UPMC,* 619 F.Supp.2d 172, 187–190 (W.D.Pa.2007).

On June 8, 2008, the United States Court of Appeals for the Third Circuit affirmed this Court's decision which granted summary judgment in favor of Magee in the Bolden Action. *Bolden v. Magee Women's Hospital,* 281 Fed. Appx. 88 (3d Cir.2008). Eight days later, Magee filed a motion for summary judgment in the Tish Action. Civil Action No. 06–820, ECF No. 29. The motion was denied on October 27, 2008. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2008 WL 4790733, 2008 U.S. Dist. LEXIS 87010 (W.D.Pa. Oct. 27, 2008). The parties later stipulated to the dismissal of the Tish Action after advising the Court that they had decided to resolve their dispute through settlement. Civil Action No. 06–820, ECF Nos. 47–49.

***3** *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169 (3d Cir.2009), was decided by the Third Circuit Court of Appeals on July 23, 2009. In *Hohider,* the Court of Appeals reversed a class-certification order which had been entered in a case involving alleged violations of the ADA. *Hohider,* 574 F.3d at 171. Speaking through Chief Judge Scirica, the Court of Appeals explained that a determination as to whether the defendant had engaged in the pattern of unlawful discrimination alleged by the plaintiffs would "encompass inquiries" that were "too individualized and divergent" with respect to the defined class to warrant certification under Federal Rule of Civil Procedure 23. *Id.* at 186.

UPMC filed a motion for partial summary judgment on September 30, 2009, contending that *Hohider* precluded the Court from certifying a class in this case. ECF Nos. 32 & 33. The motion was not accompanied by evidentiary submissions. ECF No. 33 at 1, n. 1. In essence, UPMC argued that cases involving alleged violations of the ADA and the Rehabilitation Act were *categorically* outside of the certification criteria contained in Rule 23, and that *Hohider* had foreclosed any possibility that a class could be certified in this case. *Id.* at 4–6. The Court denied the motion on November 9, 2009, holding that "cases brought under the ADA and the Rehabilitation Act [were] not *categorically* beyond the purview of Rule 23." *Chedwick v. UPMC,* 263 F.R.D. 269, 276 (W.D.Pa.2009) (emphasis in original).

Chedwick filed a motion for class certification on November 30, 2010, seeking to certify a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. That motion is the subject of this memorandum opinion.

***Standard of Review***

The standards for determining whether a class should be certified are governed by Federal Rule of Civil Procedure 23. Subsections (a) and (b) of Rule 23 provide:

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

***4** (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(a)-(b). In order to establish entitlement to class certification, a party must satisfy all four of the prerequisites found in Rule 23(a) and at least one of the criteria found in Rule 23(b). *Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 147 (3d Cir.2008). A motion for class certification does not justify "a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action ." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Nevertheless, there are circumstances in which the issues relevant to class certification are entangled with the merits of a claim. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). A court presented with a motion for class certification may not decline to resolve factual disputes relevant to the applicable class-certification requirements merely because they overlap with the factual issues surrounding an underlying cause of action. *In re: Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 316 (3d Cir.2008). Although the factual findings made by a court in this context are conclusive for the purpose of class certification, they do not bind the trier of fact when the merits of the underlying claims are considered. *Id.* at 318. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

### *Factual Background*

Chedwick allegedly suffers from post-traumatic stress disorder ("PTSD") as a result of his military service during the conflict in Vietnam. ECF No. 1 at ¶ 11. He was employed by UPMC as an Interface Analyst III prior to the events at issue in this case. ECF No. 1 at ¶ 10. On November 19, 2003, Chedwick left his work station without authorization. ECF No. 62–5 at 2. UPMC responded by requiring Chedwick to serve an uncompensated suspension from November 24, 2003, through November 28, 2003. ECF No. 62–5 at 3. John Truxal ("Truxal"), Chedwick's supervisor, and Rhonda Larimore ("Larimore"), UPMC's Human Resources Manager, met with Chedwick on December 8, 2003, to discuss his past conduct and their expectations concerning his future

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

performance. ECF No. 62–19 at 2–4. During the course of a deposition conducted on September 23, 2010, Chedwick acknowledged that he had left his work station without the permission of his superiors, and that UPMC had been justified in suspending him without pay for five days. ECF No. 62–4 at 11–12; Chedwick Dep. at 32, 35.

***5** Chedwick never returned to work after the meeting of December 8, 2003. ECF No. 62–4 at 12; Chedwick Dep. at 35. During the meeting, he attributed his conduct to his PTSD. ECF No. 62–19 at 2. The Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*] provides that an eligible employee is "entitled to a total of 12 workweeks of leave during any 12–month period for ... a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Chedwick formally requested a leave of absence on January 16, 2004, claiming that he was being treated for "severe depression" and PTSD. ECF No. 62–6 at 2. His request was approved, and he started to receive disability benefits pursuant to UPMC's policy with UNUM Provident. ECF No. 1 at ¶ 16.

In a letter dated March 24, 2004, Matthew Rimer ("Rimer"), a UPMC Human Resources Generalist, informed Chedwick that his FMLA leave was about to expire on March 30, 2004, and that he was expected to return to work on that date. ECF No. 62–7 at 2. Rimer's letter also stated that UPMC's corporate policy provided Chedwick with the option to apply for a personal leave of absence lasting up to fourteen weeks if he was not ready to resume his duties following the expiration of his FMLA leave. *Id.* Chedwick exercised this option and remained on leave for an additional fourteen weeks.

On July 2, 2004, Larimore sent Chedwick a letter which stated the following:

> Your 26–week leave of absence (combination of FMLA and personal leave) expires on July 6, 2004. The University of Pittsburgh Medical Center policy states that the total amount of leave may not exceed 26 weeks in any rolling 12–month period. As such, you will be removed from the University of Pittsburgh Medical Center's payroll and your employment terminated effective July 6, 2004. You will continue to receive Short Term Disability or Long Term Disability benefits as approved through UNUM Provident. Information regarding options for post-employment continuation of your health insurance benefits (COBRA) will be forwarded to you as well.
>
> Should you wish to reapply for employment with the University of Pittsburgh Medical Center after you are fully released by your physician, please visit upmc.com to apply online. Please contact me at (412) 647–1955 if you have any questions regarding this matter.
>
> Thank you for your contributions to the University of Pittsburgh Medical Center. I wish you a quick recovery, and the best of luck in the future.

ECF No. 62–9 at 2. UNUM Provident proposed a "return-to-work plan" permitting Chedwick to perform some of his duties at home and some of his duties at UPMC's facility, but UPMC rejected that idea. ECF No. 62–4 at 21; Chedwick Dep. at 49. Chedwick's employment relationship with UPMC was terminated on July 6, 2004.

During the fall of 2005, UNUM Provident determined that Chedwick's medical condition had improved enough to facilitate his return to work. This determination was communicated to UPMC on October 7, 2005, by means of a letter from Stephanie Perry ("Perry"), a Lead Disability Benefits Specialist for UNUM Provident, to Jodi Clark ("Clark"), a UPMC employee. ECF No. 62–12 at 2. UNUM Provident provided Chedwick with three months of advanced benefits and closed his disability claim as of January 1, 2006. *Id.* The advanced benefits were provided in order to give Chedwick sufficient time to secure gainful employment. *Id.* Chedwick was also afforded the benefit of vocational counseling. *Id.*

***6** In October 2005, Chedwick started to submit applications for vacant positions advertised by UPMC. ECF No. 62–4 at 9; Chedwick Dep. at 23. He avers that he applied for at least twenty-eight different positions, including the position that he had previously held. ECF No. 1 at ¶ 20. Chedwick further alleges that UPMC never considered him for these positions because he was suffering from PTSD. *Id.* at ¶ 21.

Chedwick filed a charge of discrimination with the EEOC on August 14, 2006, alleging that UPMC had discharged him, and refused to rehire him, because of his "disability."[1] ECF No. 62–3 at 3–4. After exhausting his administrative remedies with the EEOC, Chedwick sought to become a plaintiff in the Tish Action by means of the amended complaint filed on October 25, 2006. Civil Action No. 06–820, ECF No. 11. He commenced this action against UPMC on June 15, 2007, in accordance with the severance order of April 24, 2007. ECF No. 1 at ¶ 4.

### *Discussion*

**A. Overview**

Title I of the ADA contains provisions which govern the conduct of covered employers in relation to their current and prospective employees. 42 U.S.C. §§ 12101–12117. Title I's anti-discrimination provision, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[2] 42 U.S.C. § 12112(a). The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "discrimination" prohibited by § 12112(a) is defined broadly enough to include a covered entity's failure or refusal to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," or its "den[ial of] employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation[s] to the physical or mental impairments of the employee or applicant ...." 42 U.S .C. § 12112(b)(5)(A)-(B). In this context, "reasonable accommodations" may include "job restructuring," a "part-time or modified" work schedule, or a "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794(a). The standards used for determining whether a recipient of federal funding has violated this statutory provision in the employment setting are identical to those used for determining whether a covered entity has violated Title I of the ADA. 29 U.S.C. § 794(d). Chedwick avers that UPMC is both a "covered entity" within the meaning of the ADA and a recipient of federal financial assistance under the Rehabilitation Act. ECF No. 1 at ¶¶ 7–9; 29 U.S.C. § 794(b); 42 U.S.C. § 12111(2), (5)(A).

***7** The complaint alleges violations of both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 10–28. When he filed his EEOC charge, Chedwick listed October 20, 2005, as the *earliest* date on which he had been subjected to discrimination prohibited under the ADA. ECF No. 62–3 at 3. As the Court has already explained, Chedwick's ADA claims concern only UPMC's conduct relating to the job applications submitted on or after October 20, 2005. *Chedwick,* 619 F.Supp.2d at 178–181. On August 28, 2007, UPMC moved for the dismissal of Chedwick's ADA claims to the extent that they were based on the termination decision of July 6, 2004, contending that they had not been exhausted before the EEOC within the applicable 300–day charging period. ECF No. 3 at ¶¶ 29–34. The Court granted that portion of UPMC's motion "for the sake of clarity," since the language of the complaint was "somewhat confusing" as to whether Chedwick was relying on the ADA to challenge his discharge. *Chedwick,* 619 F.Supp.2d at 180. It was noted that Chedwick's "failure-to-hire" claims had been properly exhausted, since they were based on "separate and distinct" violations of the ADA. *Id.*

In support of its motion to dismiss, UPMC also argued that Chedwick could not challenge his discharge under the Rehabilitation Act, since his complaint had been filed more than two years after the termination decision. ECF No. 4 at 5–7. This argument was squarely rejected. Relying on the decision of the United States Supreme Court in *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Court held that the Rehabilitation Act claims concerning Chedwick's discharge, to the extent that they were based on a "failure-to-transfer" theory that would not have been viable under the pre–1992 version of the Rehabilitation Act, had been properly asserted within the four-year limitations period applicable under 28 U.S.C. § 1658(a). *Chedwick,* 619 F.Supp.2d at 181–187. This Court's reasoning as to that issue was subsequently adopted by the United States Court of Appeals for the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206–209 (3d Cir.2009).[3] Therefore, Chedwick clearly has a claim before the Court relating to UPMC's discharge decision of July 6, 2004.[4]

Throughout the course of this litigation, Chedwick has consistently maintained that UPMC discharged him, and refused to rehire him, because of an actual or perceived

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

disability. ECF No. 1 at ¶¶ 23–24. A plaintiff seeking to establish a *prima facie* case of discrimination under the ADA or the Rehabilitation Act must ordinarily show both that he or she suffers from an actual or perceived "disability" (*i.e.,* "a physical or mental impairment that substantially limits one or more [of his or her] major life activities") and that he or she is "qualified" for the position held or desired (*i.e.,* capable of performing the "essential functions" of the position "with or without reasonable accommodation"). 42 U.S.C. §§ 12102(1)(A), 12111(8); *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998). In *Hohider,* the Court of Appeals concluded that the inquiry as to whether the proposed class members were "qualified" for their respective positions would require too many "individualized and divergent" determinations to facilitate the adjudication of their claims on a classwide basis. *Hohider,* 574 F.3d at 185–186. Nonetheless, the Court of Appeals suggested that a case involving alleged violations of the ADA or the Rehabilitation Act could be maintained as a class action if the class definition contained sufficient "unifying or limiting criteria" to make individualized inquiries unnecessary. *Id.* at 189 ("The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation."). When UPMC moved for partial summary judgment on the ground that *Hohider* had rendered Chedwick incapable of pursuing class certification in this case, the Court determined that Chedwick should be afforded the opportunity to pursue class certification within the parameters outlined in that decision. *Chedwick,* 263 F.R.D. at 276.

**B. The Improper "Use" Theory**

***8** Chedwick now appears to concede that he cannot identify the "unifying or limiting criteria" necessary to obtain class certification under *Hohider.* Expressing an intent to pursue his "discrimination" claims "on an individual basis," he seeks to certify a class "for the sole purpose" of proceeding under 42 U.S.C. § 12112(d), which governs the permissible scope and use of medical examinations and inquiries under the ADA. ECF No. 58 at 2. Chedwick contends that UPMC's policies result in the "improper use of medical examinations and inquiries," and that this "improper use" caused him and other potential class members to lose their jobs. ECF No. 58 at 2.

Before considering whether class certification is appropriate, the Court must briefly review the UPMC policies at issue. UPMC maintains a policy providing for the automatic termination of any employee who remains on leave for more than twenty-six weeks during the course of a given twelve-month period. ECF No. 58–1 at 1, 15, 27, 37, 49, 59, 71. An employee who is unable to return to his or her previous position but nevertheless wishes to remain employed by UPMC can obtain an alternative position only by submitting a formal application. ECF No. 58–2 at 22–23; Croushore Dep. at 122–123. Larimore's letter of July 2, 2004, constitutes direct evidence that Chedwick was discharged pursuant to this policy. ECF No. 62–9 at 2.

UPMC also has a Return to Work ("RTW") Assistance Program designed to assist an employee who is able to return to work in some capacity but temporarily unable to perform all of his or her previous duties. ECF No. 58–1 at 10, 23, 33, 45, 55, 67, 77. An employee who wishes to participate in the RTW program must provide medical documentation from a treating physician detailing his or her functional limitations. ECF No. 58–1 at 10, 23, 34, 45, 56, 67, 77. A returning employee who is able to perform the "essential functions" of his or her previous position "with appropriate modifications" is eligible to participate in the program. *Id.* If an employee cannot immediately return to his or her previous position, he or she may participate in the program by accepting a temporary assignment that is consistent with his or her abilities and limitations. *Id.* In either case, a participating employee must be able to work at least 50% of his or her previously-scheduled hours. *Id.* Participation in the RTW program is limited to twenty-six weeks, at which point an employee who "has not found a regular position at UPMC" will be terminated. ECF No. 58–1 at 11, 24, 34, 46, 56, 68. Linda Croushore ("Croushore"), UPMC's Supervisor of Disability Services, testified on August 11, 2010, that the twenty-six week limitations period applicable to an employee's participation in the RTW program begins on the date that he or she returns to work. ECF No. 58–2 at 15; Croushore Dep. at 66. In other words, an employee who has already been on leave for a full twenty-six weeks may participate in the RTW program for an additional twenty-six weeks. *Id.*

***9** An employee seeking a new position at UPMC must submit a formal application regardless of whether he or she is participating in the RTW program. Croushore testified that a returning employee who was performing the duties of a temporary assignment in connection with the RTW program

would need to apply for the position if he or she wanted to retain it for more than twenty-six weeks. ECF No. 58–2 at 17; Croushore Dep. at 107. Croushore further explained that such an employee would be in competition with other applicants in his or her attempt to secure the position. ECF No. 58–2 at 18; Croushore Dep. at 108. Since UPMC's policy provides for the termination of any RTW program participant who fails to attain a "regular position" after the expiration of the twenty-six week period, an unsuccessful applicant performing the duties of a temporary assignment would ordinarily be terminated after twenty-six weeks. [5] ECF No. 58–1 at 11, 24, 34, 46, 56, 68, 78.

Chedwick argues that UPMC's policy providing for the automatic termination of any employee who has been on leave for more than twenty-six weeks, or who has participated in the RTW program for twenty-six weeks without securing a permanent position, is violative of the ADA pursuant to the decision of the United States Court of Appeals for the Third Circuit in *Shapiro v. Township of Lakewood,* 292 F.3d 356 (3d Cir.2002). ECF No. 58 at 3–7. UPMC disputes Chedwick's argument and contends that its policy conforms to the ADA and the holding in *Shapiro.* ECF No. 62 at 36–42. That issue need not be resolved at this time, since the only question presently before the Court is whether the matter should be adjudicated within the context of a class action. *Eisen,* 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."). The inquiry as to whether class certification is appropriate in this case centers on the extent to which UPMC's policies result in the improper use of medical examinations and inquiries. ECF No. 58 at 2.

Croushore testified that her "Work Partners" office typically assists RTW program participants in their efforts to obtain permanent positions by discussing their abilities and limitations with managers who are seeking to fill vacancies throughout UPMC's various business units. ECF No. 58–2 at 10–11; Croushore Dep. at 57–58. She stated that Work Partners personnel would sometimes try to assure a manager that a returning employee's limitations would not preclude the performance of tasks required under a particular job description. *Id.* Chedwick contends that this form of "assistance" results in the impermissible use of medical information to deny employment opportunities to disabled applicants. ECF No. 58 at 3.

The provisions of the ADA governing medical examinations and inquiries are set forth in § 12112(d), which provides:

***10 (d) Medical examinations and inquiries.**

(1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2) Preemployment.

(A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this Act shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d). The ADA's requirements concerning medical examinations and inquiries are incorporated within the Rehabilitation Act by reference. 29 U.S.C. § 794(d); *Lee v. City of Columbus,* ––– F.3d ––––, ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16 (6th Cir.2011); *Doe v. United States Postal Service,* 317 F.3d 339, 340 (D.C.Cir.2003); *Scott v. Napolitano,* 717 F.Supp.2d 1071, 1082, n. 4 (S.D.Cal.2010). Chedwick intimates that UPMC's refusal to rehire him on or after October 20, 2005, was somehow attributable to the improper use of information pertaining to his medical condition. ECF No. 58 at 3–5.

***11** The plain language of the ADA proscribes the discriminatory use of medical examinations and inquires. 42 U.S.C. § 12112(d)(1), (3)(A). A policy requiring only disabled individuals to undergo medical examinations or respond to medical inquiries would clearly violate this statutory proscription. *Harrison v. Benchmark Electronics Huntsville, Inc.,* 593 F.3d 1206, 1213 (11th Cir.2010) (explaining that § 12112(d)(1) incorporates § 12112(a)'s general ban on disability-based discrimination). The remaining provisions of the ADA concerning medical examinations and inquiries relate to three different stages of an employer's relationship with an applicant or employee. Before an offer of employment is made, an employer may not ask a job applicant to undergo a medical examination or inquire as to whether he or she is disabled. 42 U.S.C. § 12112(d)(2)(A). This prohibition is designed "to curtail all questioning" that would identify individuals with disabilities and exclude them from further consideration for employment. *Griffin v. Steeltek, Inc.,* 160 F.3d 591, 594 (10th Cir.1998). Once an offer of employment has been made, a prospective employee may be asked to undergo a medical examination, provided that "all entering employees are subjected to such an examination regardless of disability," the confidentiality requirements of § 12112(d)(3)(B) are adhered to, and the results of the examination are "used only in accordance with" Title I. 42 U.S.C. § 12112(d) (3). An "[e]mployment entrance examination" of this kind does not have to be "job-related" or "consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). After an employee's duties have commenced, an employer may not ask him or her to undergo a medical examination or inquire as to whether he or she is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The primary purpose of this restriction is to prevent covered employers from using unjustified medical examinations and inquiries to discover or expose medical information that could stigmatize disabled employees. *Brownfield v. City of Yakima,* 612 F.3d 1140, 1146 (9th Cir.2010). The propriety of a medical examination or inquiry under § 12112(d)(4)(A) is determined pursuant to an objective standard rather than by reference to an employer's subjective point of view. *Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 518 (3d Cir.2001). An employee may be subjected to a medical examination or inquiry when a physical or mental impairment adversely affects his or her job performance. *Yin v. California,* 95 F.3d 864, 686 (9th Cir.1996). An employer remains free to inquire as to the ability of an applicant or employee "to perform job-related functions" at all times. 42 U .S.C. § 12112(d)(2)(B), (4)(B).

Chedwick argues that class certification in this case is not impeded by *Hohider* because a plaintiff asserting a claim under § 12112(d) is not required to show that he or she is "qualified" or "disabled" within the meaning of the ADA. ECF No. 58 at 2. This contention "simply paints with too broad of a brush." *Chedwick,* 263 F.R.D. at 276. The question of whether a plaintiff seeking to proceed under § 12112(d) must demonstrate that he or she is "qualified" or "disabled" depends on the precise nature of the claim being asserted.

***12** Unlike § 12112(a), which prohibits only discrimination "against a qualified individual on the basis of disability," § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection.

42 U.S.C. § 12112(a), (d); *Fredenburg v. Contra Costa County Dept. of Health Services,* 172 F.3d 1176, 1182 (9th Cir.1999). An applicant or employee who is subjected to an unlawful medical examination or inquiry need not show that he or she is "disabled" in order to maintain an action under § 12112(d). *Fredenburg,* 172 F.3d at 1182. Instead, such an employee can prevail by demonstrating that he or she suffered harm as a result of the examination or inquiry. For instance, a job applicant who is rejected by an employer on the basis of an illegal pre-offer examination or inquiry may proceed with a claim under § 12112(d)(2)(A) regardless of whether he or she is "disabled." *Griffin,* 160 F.3d at 592–595. In the same vein, an employee need not be "disabled" in order to challenge the propriety or scope of a medical examination or inquiry under § 12112(d)(4)(4). *Conroy v. New York State Dept. of Correctional Services,* 333 F.3d 88, 94–95 (2d Cir.2003); *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1229 (10th Cir.1997). Similarly, harm to an employee resulting from an employer's wrongful disclosure of confidential medical information is actionable under § 12112(d) (3)(B) or (4)(C) irrespective of whether the employee suffers from a "disability." *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 969 (8th Cir.1999); *EEOC v. Ford Motor Credit Co.,* 531 F.Supp.2d 930, 936–943 (M.D.Tenn.2008).

In contrast to claims involving improper medical examinations, unjustified medical inquiries or unauthorized disclosures of confidential medical information, there are claims under § 12112(d) which depend on whether applicants or employees are "qualified" or "disabled" within the meaning of the ADA. For example, § 12112(d) (3)(C) provides that the results of an "[e]mployment entrance examination" may only be used "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C). A covered entity engages in prohibited "discrimination" when it rejects a prospective employee on the basis of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Consequently, an employer may not rely on the results of a lawful medical examination to deny employment to an individual unless the examination reveals that a physical or mental impairment suffered by the individual precludes him or her from performing the "essential functions" of the desired position. *Holiday v. City of Chattanooga,* 206 F.3d 637, 640–648 (6th Cir.2000). If a physical or mental examination reveals that a prospective employee suffers from an impairment that could *potentially* preclude the performance of "essential" work-related tasks, an employer may reject that prospective employee only on the basis of an "individualized determination" that the impairment will *actually* preclude the performance of those tasks. *Id.* at 644, citing *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 193 (3d Cir.1999). An employer which rejects a disabled applicant pursuant to a belief that his or her impairment will render him or her incapable of performing "essential" job duties runs the risk of being wrong and incurring liability. *Taylor,* 177 F.3d at 193 ("If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake."). In this situation, an individual must show that he or she is "qualified" for the relevant position in order to establish that the results of a medical examination were improperly "used" to facilitate discrimination. [6] *Holiday,* 206 F.3d at 645.

***13** Like medical information obtained during the course of an "[e]mployment entrance examination," information "regarding the medical condition or history of any employee" obtained by means of a "voluntary medical examination" or an inquiry as to his or her "ability to perform job-related functions" may be "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). A careful reading of Chedwick's brief reveals that he is basing his motion for class certification on an allegation that UPMC improperly "uses" medical information obtained from disabled employees to deprive them of alternative employment opportunities. ECF No. 58 at 5–10. He attempts to rely on § 12112(d) in order to circumvent the holding in *Hohider.* In support of his position, Chedwick calls the Court's attention to *Garrison v. Baker Hughes Oilfield Operations, Inc.,* 287 F.3d 955 (10th Cir.2002), and *O'Neal v. City of New Albany,* 293 F.3d 998 (7th Cir.2002). ECF No. 58 at 8–9. Those decisions, however, do not support Chedwick's argument.

In *Garrison,* the United States Court of Appeals for the Tenth Circuit recognized that § 12112(d)(3)(C) restricts the ways in which an employer may "use" the results of a permissible medical examination or inquiry to withdraw an offer of employment. *Garrison,* 287 F.3d at 963, n. 7 (citing § 12112(d)(3)(C) for the proposition that "[e]mployers may only withdraw job offers for reasons 'in accordance'

with subchapter I of the Americans with Disabilities Act”). Nonetheless, the Court of Appeals also explained that while a plaintiff is *generally* not required to show that he or she is “disabled” in order to challenge improper medical examinations and inquiries under the ADA, he or she cannot prevail in an improper “use” claim brought pursuant to § 12112(d) (3)(C) without establishing than an employer “used collected medical information to discriminate on the basis of a disability.” *Id.* at 960, n. 4. The United States Court of Appeals for the Seventh Circuit followed this line of reasoning in *O'Neal,* holding that an individual cannot recover under § 12112(d)(3)(C) without establishing that he or she is “disabled” within the meaning of the ADA. *O'Neal,* 293 F.3d at 1009–1010. These decisions are consistent with the plain language of the ADA, which provides that a covered employer “may condition an offer of employment on the results of [a medical] examination” if “the results of such examination are used only in accordance with [Title I].” 42 U.S.C. § 12112(d)(3)(C). In order to show that the results of a lawful medical examination were improperly “used” by an employer to withdraw an offer of employment, a plaintiff must demonstrate both the existence of a statutory “disability” and his or her ability to perform the “essential functions” of the position in question, with or without reasonable accommodations. 29 C.F.R. § 1630.14(b)(3). [7]

The “use” restriction applicable to the results of an “[e]mployment entrance examination” applies with equal force to certain forms of medical information obtained by means of “voluntary medical examinations” and “job-related” medical inquiries involving a covered entity's current employees. 42 U.S.C. § 12112(d)(4)(B)-(C). Chedwick contends that UPMC used medical information related to his disability to deny him alternative employment opportunities. ECF No. 58 at 3. He apparently sought assistance from UNUM Provident personnel when he was trying to get a new job with UPMC. In an email message sent to Croushore on November 1, 2005, Perry asked whether UPMC had a “contact person” who could speak with UNUM Provident's vocational specialist about Chedwick's employment prospects. ECF No. 58–3 at 2. Perry's message indicated that Chedwick was receiving long-term disability benefits. *Id.* The next day, Croushore forwarded the message to Larimore and stated that there was “no set recruiter” for the vocational specialist to contact, and that she could not provide assistance to Chedwick. *Id* . at 1–2. Larimore forwarded the message chain to Rimer, who responded by identifying an Interface Analyst position that was consistent with Chedwick's qualifications. *Id.* at 1. Although Chedwick applied for the position, he never received an interview. ECF No. 62–8 at 8; Croushore Aff. at ¶¶ 35–36. The crux of Chedwick's argument is that UPMC declined to interview him for the position because Croushore had forwarded information to Rimer referencing his receipt of long-term disability benefits. ECF No. 58 at 3–7.

***14** In order to establish a violation of § 12112(d)(4)(C), Chedwick would need to show that UPMC “used” information pertaining to his medical condition in a manner that was not “in accordance with” Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(C). He could do so only by demonstrating that he was both “disabled” within the meaning of the ADA and “qualified” for the Interface Analyst position. *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3d Cir.1999). Chedwick does not allege that he was subjected to an improper medical examination or inquiry that could be actionable under the ADA without regard to his individual status. A freestanding “examination” or “inquiry” claim under § 12112(d) accrues as soon as a covered employer “conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response.” *Green v. Joy Cone Co.,* 107 Fed. Appx. 278, 280 (3d Cir.2004). In contrast, an improper “use” claim does not accrue until an employer *uses* lawfully-obtained medical information to discriminate in a manner that violates § 12112(a). *Garrison,* 287 F.3d at 960, n. 4. The viability of Chedwick's improper “use” claim would depend on questions such as whether he was “disabled” within the meaning of the ADA, whether he was “qualified” for the position in question, and whether there was a causal connection between his status as a “disabled” individual and UPMC's refusal to rehire him. *O'Neal,* 293 F.3d at 1009–1010; *Holiday,* 206 F.3d at 645.

### C. The Application of Rule 23

Chedwick maintains that he can satisfy the requirements of subsections (a), (b)(2) and (b)(3) of Rule 23. ECF No. 58 at 10–19. UPMC attacks Chedwick's motion for class certification from several different angles. UPMC's first argument is that Chedwick cannot pursue a claim under § 12112(d) because he failed to exhaust it before the EEOC and never included it in his complaint. ECF No. 62 at 24–26. With respect to the issue of exhaustion, the Court notes that Chedwick's claims are based on both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 1–2. The Rehabilitation Act incorporates the provisions of the ADA governing medical examinations and inquiries. 29 U. S.C. § 794(d); *Lee,* ––– F.3d at ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16; *Doe,* 317 F.3d at 340;

*Scott,* 717 F.Supp.2d at 1082, n. 4. Chedwick was not required to exhaust his Rehabilitation Act claims before commencing this action. *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 192–194 (3d Cir.2000). Thus, UPMC's argument concerning exhaustion, if meritorious, would defeat only Chedwick's claim arising directly under § 12112(d)(4)(C), and would not impact his parallel claim under the Rehabilitation Act. *Hopkins v. City of Wilmington,* 629 F.Supp.2d 392, 396 (D.Del.2009) (explaining that a plaintiff need not exhaust a claim under the Rehabilitation Act even if he or she "also has a viable claim under the ADA, a statute that does require exhaustion of administrative remedies"). In addition, Chedwick's improper "use" claims are wholly dependent on underlying violations of § 12112(a) and, therefore, arguably the *same* claims asserted in his complaint. *Holiday,* 206 F.3d at 640–648 (analyzing a claim involving the alleged misuse of medical information to withdraw a job offer as a typical "failure-to-hire" claim, even though the medical information had been obtained during the course of a medical examination). In any event, there is no need for the Court to consider these issues, since Chedwick cannot satisfy the requirements of Rule 23 even if it is assumed that he can pursue individual claims stemming from UPMC's alleged misuse of his medical information.

***15** Chedwick did not participate in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. UPMC contends that Chedwick's status as a nonparticipant deprives him of standing to pursue a claim under § 12112(d). ECF No. 62 at 27–28. This argument fails to account for Chedwick's assertion that *his* medical information was improperly used to deny him the Interface Analyst position. ECF No. 58 at 3–7. There is no need for the Court to determine whether UPMC actually violated the ADA or the Rehabilitation Act with respect to Chedwick, since the inquiry concerning standing does not depend on whether UPMC's conduct was legal. [8] *Tandy v. City of Wichita,* 380 F.3d 1277, 1283, n. 10 (10th Cir.2004). While the factors distinguishing Chedwick's situation from the factual scenarios involving other potential class members are certainly relevant to the Court's analysis under Rule 23, they do not defeat Chedwick's standing to vindicate his own rights in this case.

UPMC argues that Chedwick cannot meet the requirements of Rule 23. ECF No. 62 at 30–53. Chedwick implicitly concedes that his evidentiary submissions are not sufficient to warrant class certification by suggesting that further discovery is necessary to facilitate the adjudication of his motion. ECF No. 58 at 1. The Court notes that a class cannot be certified unless each relevant component of Rule 23 is satisfied. *In re: Constar International, Inc., Securities Litigation,* 585 F.3d 774, 780 (3d Cir.2009). Chedwick bears the burden of *proving* each factual prerequisite to class certification by a preponderance of the evidence. *Hydrogen Peroxide,* 552 F.3d at 307. Some degree of discovery is obviously necessary to enable a plaintiff seeking class certification to meet his or her evidentiary burden. Nevertheless, the evidence presently before the Court indicates that this case cannot be maintained as a class action, and that additional discovery concerning the issue of class certification would be futile.

The record contains a list of forty-seven former employees of UMPC's corporate unit who were terminated after having been on leave for more than twenty-six weeks. ECF No. 58–4. Chedwick contends that discovery involving UPMC's other business units would identify hundreds or thousands of other potential class members. ECF No. 58 at 12–13. Accordingly, the Court assumes *arguendo* that Chedwick can satisfy Rule 23(a)(1)'s numerosity requirement. *Stewart v. Abraham,* 275 F.3d 220, 226–227 (3d Cir.2001) (observing that "the first prong of Rule 23(a)" is generally met when the proposed class representative demonstrates that the number of class members exceeds forty). Chedwick need only share "one question of fact or law with the grievances of the prospective class" to surmount Rule 23(a)(2)'s commonality prerequisite. [9] *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Since the claims asserted by all potential class members would relate to whether UPMC's automatic-termination policy violates the ADA and the Rehabilitation Act, Chedwick can presumably satisfy the commonality requirement. ECF No. 57 at ¶ 3.

***16** In order to satisfy Rule 23(a)(3)'s typicality requirement, Chedwick must show that his claims are "typical" of the claims asserted by the other potential class members. FED. R. CIV. P. 23(a)(3). The United States Court of Appeals for the Third Circuit recently articulated the elements of a proper "typicality" analysis by stating as follows:

> [W]e glean the proper consideration in assessing typicality to include three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that

> theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 599 (3d Cir.2009). A careful review of the parties' filings reveals that Chedwick cannot satisfy this standard.

While Chedwick's improper "use" claims under § 12112(d)(4)(C) would most likely proceed pursuant to the same "legal theory" as the claims asserted by other class members, the "factual circumstances underlying" Chedwick's claims would be materially different from those underlying the claims of the RTW program participants. Chedwick never participated in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. The primary basis for his motion for class certification is the alleged misuse of returning employees' medical information by Work Partners personnel in connection with that program. ECF No. 58 at 3. In an affidavit dated December 28, 2010, Croushore stated that she had not been involved with Chedwick's attempt to secure alternative employment during the fall of 2005 because he had never participated in the RTW program and had already been terminated by UPMC. ECF No. 62–8 at 8; Croushore Aff. at ¶ 34. Croushore's declaration is consistent with her November 2, 2005, email message to Larimore, in which she stated that she could not provide assistance to Chedwick. ECF No. 58–3.

Chedwick moves for the certification of a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. The proposed class definition would identify class members by reference to the manner in which they were *terminated.* Chedwick apparently wants to prove that UPMC misuses information relating to the medical conditions of returning employees that is provided to recruiters by Work Partners personnel charged with implementing the RTW program. ECF No. 58 at 3–7. Chedwick's individual "use" claim, however, concerns the manner in which medical information was used to reject his applications for employment on or after October 20, 2005. ECF No. 58 at 3. The Court has already pointed out that Chedwick's "failure-to-hire" claims are separate and distinct from his wrongful discharge claims. *Chedwick,* 619 F.Supp.2d at 178–181. Chedwick's status as a *former* (and *prospective* ) UPMC employee in October 2005 was materially different from the status of individuals who were trying to *remain* UPMC employees by utilizing the RTW program. A disabled employee attempting to return from leave must find a "transitional" work assignment in order to avoid termination after the passage of twenty-six weeks, whereas an applicant for future employment is not directly affected by the automatic-termination policy. ECF No. 58–1 at 11, 23, 34, 45, 56, 67, 77. It is difficult to understand how Chedwick believes that he can represent a class of persons whose medical information was improperly "used" to effectuate their termination based on the improper "use" of his medical information *subsequent* to his own termination. [10]

***17** There is another factor which weighs against a "typicality" finding in this case. Chedwick objects to the fact that he was identified as a former employee receiving long-term disability benefits when Perry's message to Croushore was forwarded to Larimore and Rimer. ECF No. 58 at 3–7; ECF No. 58–3. The provisions of the ADA governing the use of employees' medical information pertain only to information received as a result of specified "medical examinations" and "inquiries." 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). They generally do not apply to information that is voluntarily disclosed by an employee. *Cash v. Smith,* 231 F.3d 1301, 1307–1308 (11th Cir.2000). While the Court expresses no opinion concerning the viability of Chedwick's improper "use" theory, UPMC may argue that the information supplied by Perry (who apparently acted at Chedwick's behest) was beyond the purview of § 12112(d)(4)(C) because it was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345. Although such an argument would not be sufficient to derail Chedwick's more generalized "failure-to-hire" claims under § 12112(a), it could potentially destroy the premise for his argument that UPMC violated his rights under § 12112(d). Given that Chedwick never participated in the RTW program, Croushore's testimony concerning the usual communications between Work Partners personnel and recruiters seeking to fill vacancies throughout UPMC's various business units cannot give rise to an inference that *his* medical information was received and misused by a recruiter. ECF No. 58–2 at 10–15; Croushore Dep. at 57–62. Since the information forwarded to Rimer was arguably *not* subject to the requirements of § 12112(d), Chedwick's individual claim may "be subject to a defense that is both inapplicable to many members of the [proposed] class and likely to become a major

focus of [this] litigation." *Schering Plough,* 589 F.3d at 599. For these reasons, Chedwick cannot satisfy Rule 23(a)(3)'s "typicality" prerequisite to class certification.

The "adequacy" inquiry required under Rule 23(a)(4) accounts for both the ability of the class representative's counsel to "fairly and adequately protect the interests of the [proposed] class" and any potential "conflicts of interest" between the named party and the class that he or she seeks to represent. *In re: Warfarin Sodium Antitrust Litigation,* 391 F.3d 516, 532 (3d Cir.2004). The Court has no doubt that the attorneys retained by Chedwick are competent to handle a class action. FED. R. CIV. P. 23(g). The unique nature of Chedwick's claim, however, renders him an inadequate class representative under these circumstances. Vulnerabilities in the individual claims asserted by a proposed class representative are relevant to the "adequacy" inquiry as well as the "typicality" inquiry. *Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir.2006). Since UPMC may be able to attack Chedwick's improper "use" claim on the ground that his medical information was not provided in response to an "inquiry," there is a danger that Chedwick "will become distracted by the presence of a possible defense applicable only to him," and that the interests of the other class members will suffer. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir.1980). Because Chedwick cannot fulfill the applicable "typicality" and "adequacy" prerequisites, his motion for class certification must be denied regardless of whether he could otherwise satisfy the requirements of either subsection (b)(2) or subsection (b) (3). [11]

***18** Even if Chedwick could surmount the "typicality" and "adequacy" hurdles under Rule 23(a), he would not be able to establish his entitlement to certification under Rule 23(b)(2). As noted earlier, an individual's ability to succeed in an improper "use" claim under § 12112(d)(3)(C) or (4)(C) generally depends on whether he or she can succeed on an underlying "discrimination" claim under § 12112(a). *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. A plaintiff pursuing this type of claim must ordinarily show that lawfully-obtained medical information (*i.e.,* evidence of a medical condition obtained as a result of a lawful medical examination or a permissible medical inquiry) was unlawfully used by an employer to deny him or her a position for which he or she was nevertheless "qualified." *Holiday,* 206 F.3d at 640–648. In this respect, an inquiry into whether the individual plaintiff was "qualified" for the desired position would be necessary to facilitate a determination as to whether disability-based "discrimination against that individual, once proven to have occurred, [was] unlawful" under the ADA and the Rehabilitation Act. *Hohider,* 574 F.3d at 191. A returning employee participating in the RTW program would need to establish both the *existence* of a vacant position and his or her own *qualifications* for the position in order to show that UPMC improperly "used" medical information to reject his or her application for that position. *Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 230 (3d Cir.2000). Only a "qualified" applicant or employee would be able to establish an actionable violation of the ADA or the Rehabilitation Act. *Hohider,* 574 F.3d at 192 (explaining that the ADA "generally requires evaluation of whether a disabled individual is 'qualified' as defined under the statute to determine not only whether discrimination on the basis of disability has occurred, but more fundamentally, whether such discrimination against that individual is unlawful"). An applicant or employee whose disability could not have been accommodated in any event would not be able to succeed in an improper "use" claim, whereas a "qualified" applicant or employee could prevail by demonstrating that UPMC wrongfully relied on medical information to deny him or her a position that was consistent with his or her abilities and limitations. *Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997) (remarking that "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required"); *Willis v. Conopco,* 108 F.3d 282, 285 (11th Cir.1997) (observing that the ADA "is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made"). Since the lawfulness (or unlawfulness) of UPMC's actions with respect to each potential class member would turn on factual characteristics and circumstances unique to each individual, Chedwick cannot show that UPMC "has acted or refused to act on grounds that apply generally to the class," or that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." [12] FED. R. CIV. P. 23(b)(2).

***19** In order to demonstrate that class certification is proper under Rule 23(b)(3), Chedwick would need to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Certification under Rule 23(b)(3) is improper whenever the "essential elements" of the plaintiffs' claims require individualized treatment.

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001). Therefore, the propriety of class certification in this case can only be determined by reference to what the individual class members would have to prove in order to hold UPMC liable under the ADA or the Rehabilitation Act. *Hydrogen Peroxide,* 552 F.3d at 311. The decision in *Hohider* was premised on the fact that individualized assessments would be required to determine whether each member of the class was "qualified" for his or her position. *Hohider,* 574 F.3d at 185–186. As the Court has already explained, the reasoning employed in *Hohider* would apply with equal force to improper "use" claims of the kind discussed in Chedwick's brief. ECF No. 58 at 3–10; *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. Consequently, Chedwick cannot satisfy the requirements of Rule 23(b)(3).

Class certification would be improper in this case for the additional reason that Chedwick cannot show that each member of the proposed class was "disabled" within the meaning of the ADA and the Rehabilitation Act at the time of his or her discharge. *O'Neal,* 293 F.3d at 1010 (affirming a grant of summary judgment in favor of an employer defending a claim under § 12112(d)(3)(C) because the plaintiff was concededly not "disabled"). The determination as to whether a person is statutorily "disabled" requires a highly individualized analysis. "[E]ven if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways." *Emory v. AstraZeneca Pharmaceuticals, LP,* 401 F.3d 174, 182 (3d Cir.2005). Moreover, the ADA Amendments Act of 2008, which became effective on January 1, 2009, broadened the category of individuals entitled to statutory protection from discrimination under the ADA and the Rehabilitation Act by altering the definition of the term "disability." Pub.L. No. 110–325, §§ 4–8, 122 Stat. 3553, 3555–3559 (2008). Several federal courts have determined that the ADA Amendments Act does not apply retroactively. *Becerril v. Pima County Assessor's Office,* 587 F.3d 1162, 1164 (9th Cir.2009); *Thornton v. United Parcel Service, Inc.,* 587 F.3d 27, 35, n. 3 (1st Cir.2009); *Frederickson v. United Parcel Service Co.,* 581 F.3d 516, 521, n. 1 (7th Cir.2009); *Lytes v. DC Water & Sewer Authority,* 572 F.3d 936, 942 (D.C.Cir.2009); *Millholland v. Sumner County Board of Education,* 569 F.3d 562, 565 (6th Cir.2009); *EEOC v. Agro Distribution LLC,* 555 F.3d 462, 469, n. 8 (5th Cir.2009). Chedwick's proposed class would include individuals who were terminated both before and after January 1, 2009. ECF No. 57 at ¶ 3. Thus, the inquiries into whether particular class members were entitled to statutory protection in the first place would have to be conducted under two different legal standards. This reality further illustrates why a class cannot be certified under these circumstances.

### *Conclusion*

***20** The Court acknowledges that a plaintiff can sometimes assert claims under § 12112(d) without establishing his or her "qualifications" for a particular position or the existence of a statutory "disability." For instance, an individual whose injuries are attributable to an *unlawful* medical examination or inquiry can recover under § 12112(d) without showing that his or her employer engaged in a form of "discrimination" proscribed by § 12112(a). *Harrison,* 593 F.3d at 1215–1216; *Griffin,* 160 F.3d at 592–595. Likewise, an employee who is harmed by a covered entity's failure to comply with the ADA's confidentiality requirements can recover for damages resulting from an unauthorized disclosure regardless of whether he or she is "disabled." *Doe,* 317 F.3d at 343–345. These types of violations, however, bear no meaningful relationship to the forms of "discrimination" alleged in Chedwick's complaint or the improper "use" theory advanced in his brief. ECF No. 1 at ¶¶ 10–38; ECF No. 58 at 3–10. Chedwick does not allege that he was subjected to illegal medical examinations or inquiries, or that confidential information pertaining to his "medical condition or history" was wrongfully disclosed. 42 U.S.C. § 12112(d)(2)(A), (3)(B), (4)(A), (C). Instead, he claims that UPMC wrongfully "used" information to perpetrate a form of "discrimination" prohibited by § 12112(a). ECF No. 58 at 3–10. The theory relied upon by Chedwick is subject to the rule established in *Hohider.* Since Chedwick implicitly concedes that he can pursue his underlying "discrimination" claims only "on an individual basis," it is apparent that further discovery involving the issue of class certification would be futile. ECF No. 58 at 2.

Even if the Court were to liberally construe Chedwick's argument to mean that Croushore and Larimore improperly disclosed his receipt of long-term disability benefits to Rimer, thereby obviating the need for him to prove that he was "disabled" within the meaning of the applicable statutory provisions and "qualified" for the Interface Analyst position, Chedwick would nevertheless be an improper representative for the proposed class. UPMC's conduct in relation to Chedwick during the fall of 2005 would still bear no relationship to the automatic-termination policy

referenced in the proposed class definition, since Chedwick had already been discharged by that time. ECF No. 57 at ¶ 3. Furthermore, UPMC could persuasively argue that the information contained in Perry's message was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345; *Cash,* 231 F.3d 1307–1308. After all, it was Perry (a UNUM Provident employee acting on behalf of Chedwick) who disclosed the fact that Chedwick was a former employee receiving long-term disability benefits. ECF No. 58–3. After receiving Perry's email message, Croushore merely *forwarded* the message to Larimore, who proceeded to *forward* the same message to Rimer. *Id.* No employee of UPMC supplied Rimer with *medical information* that had not been voluntarily disclosed by Perry. This fact distinguishes Chedwick from those potential class members whose medical information was allegedly passed on to recruiters by Work Partners personnel. *Schering Plough,* 589 F.3d at 599 (stating that a proposed class representative "must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation"). Moreover, a breach-of-confidentiality theory of this kind would in no way resemble the theories of "discrimination" articulated in Chedwick's complaint. [13] ECF No. 1 at ¶¶ 10–38.

***21** For the foregoing reasons, this case cannot be maintained as a class action. The time has come for the parties to concentrate their efforts on the merits of Chedwick's individual claims. The Court expresses no opinion as to whether Chedwick can establish actionable violations of the ADA and the Rehabilitation Act, or as to whether UPMC's policies are in conformity with federal law.

Chedwick cannot establish his entitlement to class certification under subsections (a)(3), (a)(4), (b)(2) and (b)(3) of Fed.R.Civ .P. 23. Accordingly, the motion for class certification (*Document No. 57* ) will be denied. An appropriate order follows.

***ORDER OF COURT***

AND NOW, this 21st day of April, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the Plaintiffs Motion for Class Certification (*Document No. 57* ) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1559792, 24 A.D. Cases 1222

## Footnotes

1 In his EEOC charge, Chedwick also alleged that UPMC had discriminated against him because of his age. ECF No. 62–3 at 2–4. His complaint in this Court, however, does not allege that UPMC violated his rights under the Age Discrimination in Employment Act of 1967 ("ADEA") [29 U.S.C. § 621 *et seq.*]. ECF No. 1.

2 At the time of Chedwick's termination, § 12112(a) provided that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Pub.L. No. 101–336, § 102; 104 Stat. 327, 331–332 (1990), (previously codified at 42 U.S.C. § 12112(a)). The language of this anti-discrimination provision was changed by the ADA Amendments Act of 2008, which took effect on January 1, 2009. Pub.L. No. 110–325, § 5; 122 Stat. 3553, 3557 (2008); 42 U.S.C. § 12112(a). Chedwick seeks to certify a class consisting of persons who were terminated by UPMC both before and after January 1, 2009. ECF No. 57 at ¶ 3. The Court quotes the current version of the statute in order to speak in the present tense. The linguistic change to § 12112(a) made by the statutory amendment is not germane to the class-certification inquiry. *Chedwick v. UPMC,* 263 F.R.D. 269, 275, n. 8 (W.D.Pa.2009).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

3 *Fowler v. UPMC Shadyside,* Civil Action No. 07–807, like the instant case, resulted from this Court's severance order of April 24, 2007. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206 (3d Cir.2009).

4 The Court points this out because Chedwick's ability (or inability) to act as a class representative in this action largely depends on the extent to which his claims are similar to those of the other potential class members. Nevertheless, it has not gone unnoticed that UPMC wrongfully claimed, during the course of an earlier discovery dispute, that Chedwick's claims concern only matters relating to events occurring on or after October 20, 2005. ECF No. 62–11 at 3–31. It is difficult to fathom how UPMC could have misconstrued this Court's unambiguous pronouncement of December 12, 2007, that Chedwick could challenge his discharge under the Rehabilitation Act, provided that he was proceeding on a “failure-to-transfer” theory. *Chedwick v. UPMC,* 619 F.Supp.2d 172, 181–187 (W.D.Pa.2007). The Court's opinion clearly contemplated that discovery concerning the circumstances of Chedwick's discharge would take place. *Chedwick,* 619 F.Supp.2d at 187, n. 9. Although the Court's order purported to *deny* UPMC's motion to dismiss only with respect to Chedwick's “failure-to-hire” claims, it *granted* the motion only with respect to the *ADA claims* stemming from Chedwick's discharge. *Id.* at 190. The order dismissed *none* of Chedwick's Rehabilitation Act claims, and the opinion clearly explained that Chedwick could challenge his discharge under the Rehabilitation Act. *Id.* at 181–187, 190. UPMC had no legitimate basis for resisting Chedwick's efforts to obtain information about the manner in which his employment was terminated. ECF No. 19 at 2–3; ECF No. 62–11 at 3–31. While the Court left the door open for UPMC to reassert its statute-of-limitations defense if *discovery revealed* that Chedwick's discharge would have been actionable under the pre–1992 version of the Rehabilitation Act, it did not provide UPMC with a license to obstruct the discovery process itself. *Chedwick,* 619 F.Supp.2d at 187, n. 9.

5 The most recent “UPMC Policy and Procedure Manual” contained in the record, which became effective on October 19, 2009, provides that a participating employee who fails to secure a “regular position” after the expiration of the twenty-six week period will be terminated “absent exceptional circumstances and consistent with applicable state and federal regulations.” ECF No. 58–1 at 11. This qualifying language did not appear in the earlier versions of the “UPMC Policy and Procedure Manual.” ECF No. 58–1 at 24, 34, 46, 56, 68, 78.

6 It is not clear whether UPMC requires some or all of its incoming employees to undergo medical examinations prior to the commencement of their duties. Although Chedwick refers only to medical “inquiries” to support his argument, his proposed class would presumably include employees who have been discharged because of UPMC's alleged misuse of medical information obtained during the course of post-offer medical examinations (if such examinations are required under UPMC's internal policies). ECF No. 58 at 2 (stating that “UPMC's policy results in an improper use of medical examinations and inquiries”).

7 The applicable regulation provides:

> Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity. However, if certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part.

29 C.F.R. § 1630.14(b)(3).

8 UPMC argues that there is no “factual basis” for Chedwick's allegation that the results of medical inquiries are used to discriminate against disabled employees who participate in the RTW program. ECF No. 62 at 29–30. In an affidavit dated December 28, 2010, Croushore declared that her Work Partners office does not reveal confidential medical information about returning employees to recruiters working throughout UPMC's business units. ECF No. 62–8 at 5; Croushore Aff. at ¶¶ 19–21. The Court has no occasion to consider the legality of UPMC's policies and practices relating to the RTW program. *Eisen v. Carlisle & Jacquelin,* 417

U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action .").

9 Although Rule 23(a)(2) refers to *"questions* of law or fact common to the class," the plural form of the word "question" has not been construed to require more than one common question in order for a finding of commonality to be sustained. FED. R. CIV. P. 23(a)(2) (emphasis added); *In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 597, n. 10 (3d Cir.2009).

10 Some decisions applying the ADA and the Rehabilitation Act have recognized similarities between a current employee trying to return from a medical leave and a former employee seeking to be rehired. *Harris v. Harris & Hart,* 206 F.3d 838, 839–845 (9th Cir.2000); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 668–678 (1st Cir.1995). The merits of Chedwick's claims, however, are not presently at issue. The only motion before the Court is Chedwick's motion for class certification. Although Chedwick's proposed class definition would identify class members by reference to the circumstances surrounding their *termination,* his own improper "use" claims relate to UPMC's refusal to rehire him rather than to the reasons for his discharge. ECF No. 57 at ¶ 3; ECF No. 58 at 3. There is simply no logical relationship between UPMC's alleged misuse of Chedwick's medical information and the automatic-termination policy referenced in the proposed class definition.

11 Chedwick does not rely on subsection (b)(1) as a basis for seeking class certification. ECF No. 58 at 19.

12 Chedwick cannot satisfy the requirements of Rule 23(b)(2) simply by demonstrating that all members of the proposed class were discharged pursuant to UPMC's automatic-termination policy. *Purdue v. Murphy,* 915 N.E.2d 498, 507 (Ind.Ct.App.2009) (stating that Rule 23(b)(2) is not "relaxed enough to permit class actions when the only unifying criteria for the members of the class are that they are somehow disabled, in need of accommodation, and mutually affected by the policy sought to be enjoined").

13 As noted earlier, Chedwick's claim that UPMC unlawfully "used" his medical information to engage in disability-based discrimination is inextricably intertwined with his original claim that UPMC refused to rehire him because of his "disability." *Holiday v. City of Chattanooga,* 206 F.3d 637, 645 (6th Cir.2000) (applying the anti-discrimination standards applicable under § 12112(a) to an employer's alleged misuse of information obtained during the course of a post-offer medical examination). The same could not be said of a claim involving the improper disclosure of medical information, which cannot be gleaned from a fair reading of Chedwick's complaint. ECF No. 1 at ¶¶ 10–38.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 2

2019 WL 5294419
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Jenny CHEN, et al.
v.
AMTRAK, et al.

CIVIL ACTION No. 18-3617
|
Signed 10/17/2019
|
Filed 10/18/2019

**Attorneys and Law Firms**

Noah I. Axler, Marc A. Goldich, Axler Goldich LLC, Gerald J. Williams, Williams Cedar LLC, Joshua H. Grabar, Grabar Law Office, Philadelphia, PA, for Jenny Chen.

Noah I. Axler, Marc A. Goldich, Axler Goldich LLC, Philadelphia, PA, for Brian Jordan.

Mary Susan Toth, Valerie Kellner, Rawle & Henderson LLP, Philadelphia, PA, for Amtrak, RWC, Inc.

**MEMORANDUM**

Juan R. Sánchez, C.J.

***1** Plaintiffs Jenny Chen and Brian Jordan filed this putative class action against Defendants Amtrak and RWC, Inc. alleging claims for nuisance, trespass, and negligence based on Defendants' spraying of herbicides along Amtrak rail lines. Plaintiffs filed the instant Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Because the Court finds Plaintiffs' experts unreliable, and Plaintiffs relied upon those experts to establish the Rule 23 requirements, the Court will deny Plaintiffs' Motion.

**FACTS** [1]

Amtrak contracts with RWC to receive vegetation management services. *See* Defs.' Ex. B-C (statement of work and specifications for vegetation management program). These services include applying herbicides to Amtrak's rail lines within Philadelphia County, Pennsylvania. *See* Defs.' Ex. D. The contract between Amtrak and RWC includes two different "post-emergent" spray brush programs: on-track and off-track. *See* Defs.' Ex. C, ¶¶ 13, 16. The spray programs include the spraying of AquaNeat—a herbicide—along the rail lines. *See* Defs.' Ex. E. Pursuant to the contract, RWC provided spray treatment services along the Amtrak rail lines in Philadelphia County on at least Five occasions over three years from 2015 through 2017. [2] *See* Defs.' Ex. D.

The post-emergent on-track spray program provides for the "[a]pplication to spot treat any and all vegetation." *See* Defs.' Ex. C, ¶ 16. The post-emergent program also provides for "[f]ollow-up spot treatment as required." *See id.* The off-track spray program involves, hand-spray application. *See id.* Although the spray treatment programs were made using trucks with large gallon tanks, neither of the programs involved the continuous spraying along the entirety of Amtrak's rail lines in Philadelphia County. *See* Defs.' Ex. E (describing use of freightliner truck, spray tank, and herbicides applied); Defs.' Ex. D (providing five daily field reports, three of which were post-emergent on-track spray treatment, two of which were off-track spray treatment).

Plaintiffs Jenny Chen and Brian Jordan live on Mantua Avenue in Philadelphia, Pennsylvania. *See* Compl. ¶ 16. Plaintiffs' home and backyard border Amtrak rail lines. *See id.* ¶ 18. Plaintiffs have an extensive garden in their backyard including herbs, fruits, and vegetables. *See id.* ¶¶ 19-20. On August 16, 2017, RWC, pursuant to its contract with Amtrak, applied AquaNeat "in certain adjacent areas of the right of way" of Amtrak's rail lines. *See* Defs.' Ex. E. After RWC's spraying, the garden in Plaintiffs' backyard began to wilt and present brown leaves. *See* Compl. ¶¶ 30, 33. After a few days, most of the garden appeared dead. *See id.* ¶ 30.

***2** The Pennsylvania Department of Agriculture investigated the incident. The investigation found glyphosate —an active ingredient in AquaNeat—in Plaintiffs' soil. *See* Compl. Ex. B. The Department subsequently issued a notice of warning to RWC. The notice informed RWC the Department found the spraying constituted a trespass and violated 7 Pa. Cons. Stat. § 128.103(g) because it resulted in unwanted residues on the property of another. Pls.' Mot. for Class Certification Ex. 2.

Plaintiffs filed this putative class action, bringing claims for nuisance, trespass, and negligence under Pennsylvania law. *See* Compl. ¶ 52-65. Plaintiffs now seek class certification and propose the following class:

> All owners and lessees of residential properties located within 100 meters of an Amtrak rail line in Philadelphia County, Pennsylvania.

*See* Pls.' Mot. for Class Certification 5. The class members would include the owners of approximately 3,454 residential properties along the Amtrak rail lines in Philadelphia County. *See id.* at 5. The Court held oral argument on the Motion on April 30, 2019. The Motion is now ripe for review.

**DISCUSSION**

The class action device is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). A party seeking to certify an action for class litigation must satisfy the four prerequisites of Rule 23(a) and establish the action can be maintained under at least one subsection of Rule 23(b).

Rule 23(a) requires plaintiffs to establish (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Pursuant to Rule 23(b), Plaintiffs here move for certification of their class under either of subsection (b)(2) or (b)(3). Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(3) permits certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that class action is superior to the other available methods for fairly and efficiently adjudicating the controversy."

Proper analysis under Rule 23 requires "rigorous consideration" of the evidence and arguments of the parties and the Court must make specific findings that each Rule 23 requirement is met. *See In re Hydrogen Peroxide Antitrust Litig*, 552 F.3d 305, 307 (3d Cir. 2008). The Third Circuit has emphasized that "actual, not presumed conformance" with Rule 23 is essential to class certification. *See id.* at 326 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001)). District courts must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits. *See Gates v. Rohm and Haas Co.*, 265 F.R.D. 208, 214 (E.D. Pa. 2010), *aff'd*, 655 F.3d 255 (3d Cir. 2011).

***3** "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *See id.* (internal quotations and citations omitted). In considering the relevant evidence, the Court is required to consider expert testimony. *See id.* "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323.

In their Motion, Plaintiffs rely on the expert opinions of Dr. Lok R. Pokhrel and Esther Needham to establish both the numerosity and commonality requirements under Rule 23(a). *See* Pls.' Mot. 7. Specifically, Dr. Pokhrel concluded "properties within 100 meters of Amtrak rail lines and RWC, were exposed to glyphosate herbicide ... consistent with the glyphosate exposure leading to the death of vegetation within Plaintiffs' property." *See* Pls.' Ex. 8, at 5. Using this conclusion, Ms. Needham determined 3,454 residential parcels "intersect with a 100 meter buffer of Amtrak rail lines." *See* Pls.' Ex. 7, at 8. Defendants challenge both opinions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Because the Court must consider expert testimony at the class certification stage, the Court will first discuss the Plaintiffs' proffered experts before addressing the requirements of Rule 23. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (requiring courts to make a conclusive ruling on a defendant's challenge to experts before addressing Rule 23(a) factors) (citing *Messner v Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). "[A] plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *Id.*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."[3] *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396,404 (3d Cir. 2003). The party offering the expert evidence bears the burden of establishing its admissibility by a preponderance of the evidence. *See Padillas v. Stork-Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir. 1999). To meet the "reliability" requirement, the expert's opinion "must be based on the methods and procedures rather than on 'subjective belief or unsupported speculation.' " *In re TMI Litig.,* 193 F.3d 612, 664 (3d Cir. 1999) (citation omitted). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." *In re Paoli R R Yard PCB Litig*, 35 F.3d 717, 746 (3d Cir. 1994).

When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from *Daubert:*

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

***4** *Id.* at 742 n.8. The Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors. *Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 321 (3d Cir. 2003).

Dr. Pokhrel's expert report describes his methodology as "a systematic scoping review of the publicly available scientific literature on *pesticide drift, drift distance,* and *potential toxicity,* with a focus on *glyphosate-based herbicides*." Pls.' Ex. 8, ¶ 9 (Pokhrel Rep.) (emphasis in original). He also conducted a sampling and analysis of the soils and vegetations from Plaintiffs' yard. *Id.* Other than these two tests, Dr. Pokhrel performed no samplings, calculations, tests, or experiments in making his conclusion.

Defendants argue Dr. Pokhrel's report fails to explain his basis or methodology for arriving at his 100-meter figure and is thus unreliable. The Court agrees. Because Dr. Pokhrel's opinion does not state a methodology used in calculating the 100-meter figure, there is no evidence or support demonstrating his opinion is reliable. Plaintiffs argued Dr. Pokhrel engaged in a rigorous literature analysis to arrive at his conclusion. Even so, Dr. Pokhrel did not provide any methodology, testable theory, or explanation of exactly *what* from the reviewed literature gave rise to his conclusion. For instance, Dr. Pokhrel did not state how the literature may relate to regular drift patterns, standard droplet size, or consistent spraying methods. His expert report, likewise, failed identify any formula used to calculate the relevant drift distance. Dr. Pokhrel's opinion establishes a calculable number, yet, he has not explained how he reached his calculation.

Without Dr. Pokhrel's explanation of his calculation and methodology, a review of the literature Dr. Pokhrel relied on reveals even more questions as to how he reached his conclusion. For example, in *Children's Exposure to Chlorpyrifos and Parathion in an Agricultural Community in Central Washington State,* the researchers conducted a study to determine the levels of certain pesticides in house dust and in the urine of children who lived in specific proximities to agricultural land. *See* Pokhrel Rep. 29 ¶ 12 (Environmental Health Perspective 110:549-553 (2002)). Whatever information Dr. Pokhrel extracted from this study appears inapplicable to determining his 100-meter figure. Dr. Pokhrel does not explain how pesticide drift in the context of house dust and children's urine correlate or provide a reliable method for determining herbicide drift in contaminated soil. Finally, the method of pesticide application is not clear from the study. In some parts, the study discussed some families in which a parent had an agricultural job. In others, it discussed whether parents personally used pesticides in their own gardening. The unrelated pesticide applications in this study appear inapplicable to the facts in this case.

In *A Case-Control Study of Pesticides and Fetal Death Due to Congenital Anomalies,* the researchers discussed the relationship of pesticide exposure in expectant mothers to fetal deaths. *See* Pokhrel Rep. 29 ¶ 5 (Epidemiology

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

12:148-156 (2001)). The researchers noted they lacked certain meteorology factors that might have influenced the extent of drift in each mode of application. In *Dry Deposition and Spray Drift of Pesticides to Nearby Water Bodies,* the authors stated "[s]pray drifting during field spraying is influenced by a number of factors" including droplet size, boom height, driving speed, air-assistance, shielding, dose rate, crop development, wind speed, and temperature and humidity. *See* Pokhrel Rep. 29 ¶ 4 (Danish Environmental Protection Agency – Copenhagen 1–171 (2003)). In a different article, *Spray Drift of Pesticides,* the researchers discussed both vapor drift and particle drift, droplet size, nozzle type, spray pressure, nozzle spray angle, wind speed, spray volume, wind direction, and several other factors which can influence pesticide drift. *See* Pokhrel Rep. 30 ¶ 17 (University of Nebraska, Institute of Agriculture and Natural Resources (2007)).

***5** These articles, and others, support the proposition that several factors affect the extent and distance of pesticide and herbicide drift. Dr. Pokhrel discusses not one of these factors in stating his conclusion. Considering the numerous factors that may affect drift, it is expected Dr. Pokhrel would have explained which factors were present in the facts of this case, how those factors created numbers from which he made his calculation, and the ultimate calculation of those factor numbers. Dr. Pokhrel, however, did not.

Although Dr. Pokhrel's opinion listed almost thirty sources from which he conducted his literature review, the Court addresses the sources above as an example of the gap between the information provided and Dr. Pokhrel's conclusion. Dr. Pokhrel did not state what methodology he pulled from those sources, what information from those sources is relevant to the facts of this case, or whether a review of the literature is a generally accepted methodology in the field to determine drift in a specific case. *See Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.,* 650 F. Supp. 2d 387, 405-07 (E.D. Pa. 2009) (finding expert unreliable after reviewing articles submitted to support expert's methodology). Dr. Pokhrel has provided nothing which could be submitted to peer review, and it is impossible to ascertain any rate of error in his calculation. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 158 (3d Cir. 2000) ("Since [the expert] conducted no tests and failed to attempt to calculate any of the forces on [the plaintiff] or the truck during this accident, he used little, if any, methodology beyond his own intuition."). Because Dr. Pokhrel articulated no methodology in calculating his 100-meter conclusion, he has provided no standards which controlled his analysis and the Court cannot assess his method compared to other known methods or the non-judicial uses to which the method has been put. The Court thus finds Dr. Pokhrel's opinion was not established by reliable methodology. *See id.* (finding expert unreliable because he stated no methodology, conducted no tests, and failed to make certain calculations).

Plaintiffs also cannot rely on Dr. Pokhrel's report because whatever his methodology, it was unreliably applied to the facts in this case. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 742-43 (stating expert "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case' ") (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)). Assuming Dr. Pokhrel's methodology from the relevant literature is reliable, the methods derived from the literature cannot be reliably applied to Defendants' application of herbicides. Defendants argue the literature reviewed discussed only aerial spraying of agricultural pesticides, as opposed to the ground-level spraying of herbicides at issue in this case. Plaintiffs argue "Dr. Pokhrel concluded that aerial spraying of AquaNeat—the process that killed plaintiffs' garden—would likely result in the deposit of the herbicide on all properties within 100 meters of rail lines subjected to the spraying." *See* Pls.' Reply 2. Dr. Pokhrel's methodology could not be consistently applied to Defendants' spraying because the record shows the spray treatment is done on the ground level and on at least three occasions the Defendants' application was spot-treatment spraying. *See* Defs.' Ex. C-D (contract and field reports indicating which spray pattern was used on each relevant date). Defendants' spot-treatment spraying addressed only visible vegetation obstructing the rail lines. *See* Defs.' Ex. C ("Post-emergent Programs – On track – Application to spot treat any and all visible vegetation.").

***6** Dr. Pokhrel did not observe the rail lines at issue in this case such that he could determine what visible vegetation possibly existed during a spray treatment. Dr. Pokhrel also did not review any of the field reports to determine the timing or patterns of the spray applications. In Dr. Pokhrel's report, he did not reference with any certainty how the spot-treatment application of herbicides would affect his analysis. Considering the ad hoc nature of spot treatment spraying, the Court finds Dr. Pokhrel's application of his principles or methodology to the facts in this case unreliable. *See In re TMI Litig.,* 193 F.3d at 670 (finding experts evidence

inadmissible because it lacked fitness and did not provide any true simulation of the accident at issue in the case).

The Court does not suggest, as Plaintiffs contend, Plaintiffs are required to sample every back yard along the rail lines in the county to establish the size of their putative class. The Court does require, however, a stated methodology from which it can assess the reliability of Dr. Pokhrel's conclusion and a more reliable application of that methodology to the facts in this case.

Considering Plaintiffs' second expert, Ms. Needham, relied solely on Dr. Pokhrel's 100-meter conclusion in her own methodology to reach the 3,524-figure, the Court likewise finds Ms. Needham's opinion unreliable. [4] Because the Court finds these two experts unreliable, Plaintiffs cannot rely upon their opinions in proving the Rule 23 elements.

Turning to the Rule 23(a) factors, Plaintiffs have failed to prove numerosity. Numerosity requires a showing that the class is "so numerous that joinder of all members is impracticable." *Marcus v BMW of N. Am., LLC,* 687 F.3d 583, 594 (3d Cir. 2012). "[T]he rule prevents putative class representatives and their counsel, when joinder can be easily accomplished, from unnecessarily depriving members of a small class of their right to a day in court to adjudicate their own claims." *Id.* at 594-95. The record must support the finding of numerosity. *See Center City Periodontists, P.C. v. Dentsply Int'l, Inc.,* 321 F.R.D. 193, 209 (E.D. Pa. 2017) (stating a plaintiff must produce evidence "specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow a court to make a factual finding" (citing *Marcus,* 687 F.3d at 596)). Finally, numerosity must be proven by a preponderance of the evidence. *See Marcus,* 687 F.3d at 595.

The record shows RWC and Amtrak sprayed herbicides along the rail lines in Philadelphia County. It is likely some individuals within Plaintiffs' defined class have experienced some herbicide drift from Defendants' spray programs. Nonetheless, because Dr. Pokhrel and Ms. Needham's opinions are unreliable, the number of class members is speculative at best.

Aside from their unreliable expert opinions, Plaintiffs have presented no evidence demonstrating they meet the numerosity requirement. They produced no evidence showing where the post-emergent on-track spray treatment was applied based on its application to only *visible vegetation.* There is no evidence regarding how much visible vegetation existed at any given date of the spray treatments. Likewise, Plaintiffs have not presented evidence regarding how or where the off-track treatment spray treatments were applied and whether they affected numerous individuals. The record shows neither the on-track nor the off-track treatment entailed a continuous spraying along the entire rail lines in Philadelphia County—precluding a finding of numerosity based on every residential property along the rail lines. There is also no evidence regarding which properties along the rail lines are commercial or residential.

***7** Even if some herbicide drift did occur in the same manner as in Plaintiffs' case, there is no support to ascertain, or even infer, the number of individuals who were subjected to any herbicide drift due to Defendants' spray treatments. [5] Although it is possible others have experienced injury due to Defendants' alleged conduct, there is no evidence in the record showing those potential plaintiffs are so numerous that joinder is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Therefore, Plaintiffs have failed to meet their burden to establish numerosity under Rule 23(a). *See Center City Periodontists, P.C.,* 321 F.R.D. at 209 (finding plaintiff failed to establish numerosity because plaintiff could only speculate how many individuals actually purchased the product at issue).

Even if Plaintiffs had sufficiently proven numerosity, Plaintiffs have also failed to establish predominance of common questions pursuant to Rule 23(b)(3). Commonality is established when "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC,* 802 F.3d 469, 486 (3d Cir. 2015). Rule 23(b)(3)'s predominance element requires "[i]ssues common to the class [to] predominate over individual issues." *Gonzalez v. Cornig,* 885 F.3d 186, 195 (3d Cir. 2018) (alteration in original) (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 313-14 (3d Cir. 2018)). At the class certification stage, predominance is established when the essential elements of the putative class claims "are capable of common proof at trial through evidence that is common to the class rather than individual to its members." *Id.* (citation omitted). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton*, 259 F.3d at 172.

"Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former,

although similar, is 'far more demanding' than the latter." *Reinig v. RBS Citizens, N.A.,* 912 F.3d 115, 127 (3d Cir. 2018). The two elements may be analyzed together "with particular Focus on the more stringent predominance requirement." *Id.* Plaintiffs have proposed the following common questions of law or fact:

1. Whether Class members' properties were exposed to herbicide by Defendants' practices;

2. Whether Defendants' conduct constitutes a nuisance;

3. Whether Defendants' conduct constitutes a trespass; and

4. Whether Defendants' conduct constitutes negligence.

Plaintiffs argue the question of whether class members' properties were exposed to the herbicide will be proven by expert testimony and a review of Defendants' records. *See* Pls.' Mot. for Class Certification 9. Plaintiffs point to Dr. Pokhrel's report to establish the common proof they intend to use. *See id.* Because Plaintiffs cannot rely on Dr. Pokhrel's report, the Court disagrees his report can be used as common proof. To prove the presence of the herbicide on each class member's property, in this case, the evidence will likely need to be individualized. The record establishes Defendants' spraying was not continuous but was subject to spot treatment or by-hand application. *See* Defs.' Ex. D. Defendants did not spray the herbicides evenly along all the rail lines in the county. To show the presence of the herbicides due to Defendants' practices, Plaintiffs must provide individual proof of each class member's property and soil contamination.

***8** Regarding nuisance, Plaintiffs argue the question of whether "freedom from herbicide contamination and destruction of vegetation on one's property [is] a private property right" is a pure question of law applicable to all class members. Although the Court agrees, the other questions on the class nuisance claim are individualized inquiries. A defendant is liable for nuisance if his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land and the invasion is (1) intentional and unreasonable, or (2) unintentional and negligent, reckless, or an abnormally dangerous activity. *See Youst v. Keck's Food Serv.,* 94 A.3d 1057, 1071-72 (Pa. Super. Ct. 2014) (citing Restatement (Second) of Torts § 822). Whether Defendants actually invaded class members' private properties will require the same showing as establishing whether the herbicide is even present on class members' properties. The question of whether any invasion was unreasonable is likewise an individualized inquiry because Defendants' spraying was not done in a uniform manner. Herbicide drift may be an unreasonable interference on one property but not another. For example, Defendants may have excessively sprayed Plaintiffs' property because of the large tree on their property which encroached on the rail lines.

On the question of whether Defendants' conduct constitutes a trespass, the Court finds Plaintiffs have not established they can produce common proof. "[A] person may be liable for trespass 'if he intentionally ... enters land in the possession of [another], or causes a thing or a third person to do so.' " *MD Mall Assocs., LLC v. CSX Transp., Inc.,* 288 F. Supp. 3d 565, 586-87 (E.D. Pa. 2017), *aff'd,* No. 18-1137, 2019 WL 4463787 (3d Cir. Sept. 18, 2019) (citing Restatement (Second) of Torts § 158(a)). Plaintiffs assert they will establish the presence of the herbicide through expert testimony. *See* Pls.' Mot. for Class Certification 11. Plaintiffs state their "experts will show that the methods utilized by Defendants causes spray to drift onto properties within 100-meters of Amtrak rail lines." For the same reasons discussed above, at this stage, the Court will not consider Dr. Pokhrel or Ms. Needham's opinions as common proof to establish trespass. Rather, for Plaintiffs to demonstrate whether Defendants caused the herbicides to enter any class members' property will require Plaintiffs to sample each of the residential property's soil to establish (1) the herbicide is in fact in a class member's soil, and (2) Defendants' spraying caused the herbicide to be in the class member's soil. Although the Court does not require sampling of each property to establish numerosity, evidence as to whether Defendants' conduct—in applying the herbicide on a spot-treatment basis—constituted a trespass necessarily requires a sampling of each class member's property. *See Rowe v. E.I. Dupont De Nemours and Co.,* 262 F.R.D. 451, 463-64 (D.N.J. 2009) (denying class certification for trespass claims because there were individualized inquiries regarding whether each property was contaminated and whether the defendant caused such contamination).

For Plaintiffs' negligence claim, the elements include (1) the defendant owed the plaintiff a duty, (2) the defendant breached the duty, (3) the plaintiff suffered actual harm, and (4) a causal relationship existed between the breach of duty and the harm. *See Adams v Wells Fargo Bank, N.A.,* No. 16-0907, 2017 WL 6619015, at *2 (E.D. Pa. 2017) (citing *Freed v. Geisinger Med. Ctr.,* 910 A.2d 68, 72 (Pa. Super. Ct. 2006)). Although, determining whether Defendants owed a duty to the class members and whether they breached that

duty are common questions to all class members, they do not predominate over the individualized questions of causation and damages necessary for the class negligence claims as discussed below.

Despite any common questions on the nuisance, trespass, and negligence claims, Plaintiffs cannot prove causation for any of their claims on a class-wide basis. If the herbicide is present on all class members' properties, there is no common proof which will show the herbicide was present because of Defendants' spraying or the effect of such presence. *See Gates,* 265 F.R.D. at 233 ("Common evidence may offer one potential source of those contaminants, but many other explanations may exist that are specific to a particular property." (quoting *Fisher v. Ciba Specialty Chems Corp.,* 238 F.R.D. 273, 307 (S.D. Ala. 2006))). It is possible some proposed class members use the herbicide in their own yard for their own purposes, as Plaintiffs have alleged the herbicide is commonly known as "Roundup." It is possible the herbicide's presence arose from another source, considering the articles listed in Dr. Pokhrel's report stated many avenues for contamination. The Court thus finds the issue of causation on the class claims is an individualized inquiry. Although there are some common questions, the Court finds due to the Defendants' ad hoc spray treatment, individual inquiries will predominate.

***9** The Court recognizes Plaintiffs need only produce a "single common question" to meet the commonality requirement in Rule 23(a)(2). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Under the Rule 23(b)(3) requirements, the Court has nonetheless considered the dissimilarities between the putative class members to determine whether common questions predominate. *See id.* Although the Court is free to specify subclasses or certify the class as to certain common questions, the Court is under no obligation to do so *sua sponte*. *See Reyes,* 802 F.3d at 494 ("It is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the plaintiff who is required to submit proposals to the court." (citation omitted)). Because the Court finds Plaintiffs have not met the numerosity requirement, and Plaintiffs have not presented any potential subclasses, the Court declines to define any possible subclasses on the common questions for the Rule 23(b)(3) class.

Plaintiffs also seek certification of the class pursuant to Rule 23(b)(2) for injunctive relief. *See* Pls.' Mot. for Class Certification 6. Class claims under Rule 23(b)(2) must be cohesive. *See Gates,* 655 F.3d at 263-64. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes,* 564 U.S. at 360. A party seeking certification under (b)(2) may be required to show more cohesiveness than a (b)(3) class. *See Gates,* 655 F.3d at 264.

The Court has the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances. *See Gates,* 265 F.R.D. at 230 (internal quotations and citations omitted). "A court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it should under subsection 23(b)(3)." *Id.* Considering the Court finds significant individual issues exist precluding certification under Rule 23(b)(3), the Court likewise finds the individual issues preclude certification under Rule 23(b)(2).

Having found Plaintiffs have failed to establish at least one Rule 23(a) requirement, the Court need not address the other requirements under Rule 23(a), (b)(2), or (b)(3). *See Harnish v. Widener Sch. of Law*, 833 F.3d 298, 313 (3d Cir. 2016) (finding class certification inappropriate under the predominance requirement and declining to address the other requirements).

**CONCLUSION**

Because Plaintiffs have failed to establish numerosity, they have failed to meet their burden under the Rule 23(a) factors. Plaintiffs have also failed to establish the class action can be maintained pursuant to either Rule 23(b)(2) or 23(b)(3). Accordingly, the Court will deny Plaintiffs' Motion for Class Certification.

An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5294419

## Footnotes

1 The Court makes these factual findings in furtherance of its obligation to conduct a rigorous analysis of Plaintiffs' Motion. The Court must resolve all factual disputes relevant to class certification, including disputes touching on the elements of the causes of action being asserted and the merits of the claims. *See Reyes v. Netdeposit, LLC,* 802 F.3d 469, 484 (3d Cir. 2015). The Court must also make explicit findings that Plaintiffs satisfied their burden to prove each of the requirements of Rule 23 by a preponderance of the evidence. *Id.*

2 The parties have both stated RWC and Amtrak sprayed herbicides on six occasions over a three-year period, however, Defendants' Exhibit D provides only five “Daily Field Reports” on five separate dates. The Court thus finds the spray treatment occurred on at least five occasions.

3 Defendants have not challenged, and the Court will not address, the experts' qualifications.

4 The Court does not opine on whether the methodology employed by Ms. Needham is reliable absent its reliance upon Dr. Pokhrel's conclusion.

5 At oral argument, Defendants stated no other individual has come forward with a complaint regarding their application of herbicides along the Amtrak rail lines. While the Court does not rely on this statement in finding Plaintiffs failed to establish numerosity, it does suggest the size of the putative class is speculative and contradicts Plaintiffs' allegations of the “widespread nature” of Defendants' conduct. *See* Pls.' Mot. for Class Certification 3.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

# 3

2026 WL 2530241
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

IN RE: GOOGLE INC. COOKIE PLACEMENT CONSUMER PRIVACY LITIGATION

Case No. 1:12-md-02358-JDW
|
Signed August 27, 2026

**Synopsis**
**Background:** Users of internet browser brought consolidated multidistrict class action against internet advertising provider for intrusion upon seclusion and violation of California Constitution, alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent. Parties both moved for sanctions for spoliation of electronically stored information (ESI) and users moved for class certification.

**Holdings:** The District Court, Joshua D. Wolson, J., held that:

[1] users failed to establish that it was proper for court to hold that class was ascertainable as spoliation sanction;

[2] provider failed to establish that it was proper for court to resolve disputed factual issues in its favor as spoliation sanction;

[3] users failed to satisfy ascertainability requirement for class certification;

[4] individualized issues overwhelmed common ones;

[5] class litigation was not superior to other available methods for fairly and efficiently adjudicating controversy; and

[6] class certification was not appropriate on basis that provider had acted or refused to act on grounds that applied generally to class, so that final injunctive relief or corresponding declaratory relief was appropriate respecting class as whole.

Motions denied.

**Procedural Posture(s):** Motion for Sanctions (Discovery); Motion to Certify Class.

West Headnotes (59)

**[1]** **Federal Civil Procedure**

For purposes of determining whether to impose sanctions for spoliation of electronically stored information (ESI), evaluation of duty to preserve evidence and scope of that duty occur from perspective of reasonable person at time, not with hindsight. Fed. R. Civ. P. 37(e).

**[2]** **Federal Civil Procedure**

Because bad faith is rarely evident on its face and judges cannot directly observe a party's motivation for spoliating, judges may consider circumstantial evidence to determine intent when determining whether to impose sanctions for spoliation of electronically stored information (ESI). Fed. R. Civ. P. 37(e).

**[3]** **Federal Civil Procedure**

Users of internet browser failed to show that encryption keys needed to decrypt portions of internet advertising provider's historical logs were within scope of provider's preservation duty, and thus failed to show that provider's destruction of encryption keys in ordinary course of business constituted spoliation of evidence, with respect to users' putative class action alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent, although users' expert opined that encryption keys might help determine whether class members were ascertainable; it was not clear that any reasonable person would have hypothesized need for encryption keys to ascertain class members 13 years prior, when encryption keys were destroyed. Fed. R. Civ. P. 37(e)(1).

**[4]** **Federal Civil Procedure**

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Users of internet browser failed to show that they suffered prejudice from internet advertising provider's destruction in ordinary course of business of encryption keys needed to decrypt portions of provider's historical logs, as would be required for imposition of spoliation sanctions against provider, in users' putative class action alleging provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent, although users' expert opined that encryption keys might have helped determine whether class members were ascertainable by making it possible to distinguish between users who were affected by circumvention and users who received advertising cookies through other means; such speculation was insufficient to demonstrate prejudice. Fed. R. Civ. P. 37(e)(1).

[5] **Federal Civil Procedure**

Sanctions for spoliation of electronically stored information (ESI) must be based on more than mere speculation. Fed. R. Civ. P. 37(e).

[6] **Federal Civil Procedure**

When determining whether to impose sanctions for spoliation of electronically stored information (ESI), a court cannot presume that the missing evidence would have favored the party seeking sanctions. Fed. R. Civ. P. 37(e).

[7] **Federal Civil Procedure**

When determining whether to impose sanctions for spoliation of electronically stored information (ESI), the parties moving for sanctions bear the burden of proving prejudice, and speculation about what the decrypted information might have revealed cannot satisfy that burden. Fed. R. Civ. P. 37(e).

[8] **Federal Civil Procedure**

Users of internet browser failed to establish that it was proper for court to hold that class was ascertainable as spoliation sanction against internet advertising provider for its destruction in ordinary course of business of encryption keys needed to decrypt portions of provider's historical logs, which users asserted might have enabled them to determine whether class members were ascertainable, in users' putative class action alleging provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; such sanction would excuse users from proving independent prerequisite to class certification without supplying evidence necessary to do so, and there was no evidence that provider acted in bad faith so as to justify such sanction. Fed. R. Civ. P. 23(b)(3), 37(e).

[9] **Federal Civil Procedure**

Ascertainability of class is independent requirement that plaintiff seeking class certification must prove with evidentiary support. Fed. R. Civ. P. 23(b)(3).

[10] **Federal Civil Procedure**

Ascertainability requirement for class certification serves practical purposes: (1) it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members; (2) it protects absent class members by facilitating the best notice practicable; and (3) it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable. Fed. R. Civ. P. 23(b)(3).

[11] **Federal Civil Procedure**

Internet advertising provider failed to establish that appropriate sanction for spoliation by users of internet browser of information from their computers was to resolve disputed factual issues in provider's favor, in users' putative class action alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; such sanction would be greater than necessary to

cure prejudice to provider, as it would not only offset evidentiary disadvantage resulting from loss of information, but would convert absence of evidence into affirmative proof that disputed facts should be resolved in provider's favor. Fed. R. Civ. P. 37(e)(1).

[12] **Federal Civil Procedure**

The key to class certification under the criterion applying where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, is the indivisible nature of the injunctive or declaratory remedy warranted, the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them. Fed. R. Civ. P. 23(b)(2).

[13] **Federal Civil Procedure**

For a class to be certified under the criterion applying where common questions of law or fact predominate and the class action is the superior method for adjudication, the class must be currently and readily ascertainable based on objective criteria. Fed. R. Civ. P. 23(b)(3).

[14] **Federal Civil Procedure**

When conducting the analysis of whether to certify a class, a court must be careful not to certify a class casually; instead, class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the moving party has fulfilled the necessary requirements. Fed. R. Civ. P. 23.

[15] **Federal Civil Procedure**

The inquiry into whether to certify a class will at times require a court to examine issues that overlap, to some extent, with the final merits determination; however, the court should only engage in this overlapping analysis to the extent necessary to resolve the class certification motion, and no more. Fed. R. Civ. P. 23.

[16] **Federal Civil Procedure**

Party seeking class action status bears burden of establishing each element of class action rule by preponderance of evidence, and that party must have evidence to do so at time it seeks class certification. Fed. R. Civ. P. 23.

[17] **Federal Civil Procedure**

While there is no minimum number of plaintiffs necessary to sustain class action, courts generally find that if number of potential plaintiffs exceeds 40 then numerosity requirement is met. Fed. R. Civ. P. 23(a)(1).

[18] **Federal Civil Procedure**

A plaintiff seeking class certification must be prepared to prove that there are in fact sufficiently numerous parties to meet the numerosity requirement. Fed. R. Civ. P. 23(a)(1).

[19] **Federal Civil Procedure**

Although mere speculation cannot meet the plaintiff's burden to establish the numerosity requirement for class certification, the plaintiff does not need to offer direct evidence of the exact number and identities of the class members. Fed. R. Civ. P. 23(a)(1).

[20] **Federal Civil Procedure**

If a plaintiff seeking class certification proffers sufficient circumstantial evidences specific to the problems and parties actually covered by the class definition, then the court can rely on common sense to make a factual finding regarding the size of the class when determining if the numerosity requirement for class certification is satisfied. Fed. R. Civ. P. 23(a)(1).

[21] **Federal Civil Procedure**

Users of internet browser satisfied numerosity requirement for class certification, in users' putative class action alleging that internet advertising provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent, where users alleged that provider's conduct affected millions of browser users during proposed class period and provider did not meaningfully dispute that, if otherwise certifiable class existed, joinder would be impracticable. Fed. R. Civ. P. 23(a)(1).

[22] **Federal Civil Procedure**

The bar for satisfying the commonality requirement for class certification is not a high one; when the defendant's conduct is common as to all of the class members, the standard is met. Fed. R. Civ. P. 23(a)(2).

[23] **Federal Civil Procedure**

To satisfy the commonality requirement for class certification, the proposed class's claim must depend on a common contention whereby determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. Fed. R. Civ. P. 23(a)(2).

[24] **Federal Civil Procedure**

Users of internet browser satisfied commonality requirement for class certification, in users' putative class action alleging that internet advertising provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; users alleged that provider used same mechanism for every proposed class member and, if users proved that allegation, question of whether provider's conduct violated law would present common question that applied equally to every class member. Fed. R. Civ. P. 23(a)(2).

[25] **Federal Civil Procedure**

The existence of individualized issues in a proposed class action does not per se defeat the commonality requirement for class certification. Fed. R. Civ. P. 23(a)(2).

[26] **Federal Civil Procedure**

The commonality requirement for class certification may be satisfied by a single common issue. Fed. R. Civ. P. 23(a)(2).

[27] **Federal Civil Procedure**

The typicality requirement for class certification screens out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present. Fed. R. Civ. P. 23(a)(3).

[28] **Federal Civil Procedure**

In context of the typicality requirement for class certification, if a plaintiff's claim arises from the same event, practice, or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class. Fed. R. Civ. P. 23(a)(3).

[29] **Federal Civil Procedure**

Typicality requirement for class certification does not mandate that all putative class members share identical claims. Fed. R. Civ. P. 23(a)(3).

[30] **Federal Civil Procedure**

Users of internet browser satisfied typicality requirement for class certification, in users' putative class action alleging that internet advertising provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; named plaintiffs and proposed class both sought to assert claims for intrusion upon seclusion under California law and violation of California

Constitution based on provider's placement of cookies on their machines, elements of claims were same for all class members, conduct at issue was same in named plaintiffs' claims as they were for proposed class members, and named plaintiffs sought same relief as proposed class would seek. Fed. R. Civ. P. 23(a)(3).

[31] **Federal Civil Procedure**

A standing analysis focuses on the injury that a plaintiff alleges, not that he can prove.

[32] **Federal Civil Procedure**

Whether adequacy-of-representation requirement for class certification has been satisfied depends on two factors: (1) plaintiff's attorney must be qualified, experienced, and generally able to conduct proposed litigation, and (2) plaintiff must not have interests antagonistic to those of class. Fed. R. Civ. P. 23(a)(4).

[33] **Federal Civil Procedure**

The portion of the analysis of the adequacy-of-representation requirement for class certification providing that the plaintiff must not have interests antagonistic to those of the class seeks to uncover conflicts of interest between named parties and the class they seek to represent. Fed. R. Civ. P. 23(a)(4).

[34] **Federal Civil Procedure**

Users of internet browser satisfied adequacy-of-representation requirement for class certification, in users' putative class action alleging that internet advertising provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; provider did not challenge adequacy of users' counsel, nothing in record suggested users' counsel lacked experience or ability to prosecute case, record did not reveal any conflict between named plaintiffs and absent class members that would prevent named plaintiffs from fairly and adequately representing proposed class, and named plaintiffs had actively participated in case for many years and possessed minimal understanding of case needed to satisfy adequacy-of-representation requirement. Fed. R. Civ. P. 23(a)(4).

[35] **Federal Civil Procedure**

The adequacy-of-representation requirement for class certification asks whether the named plaintiffs' interests are aligned with those of the absent class members—not whether the defendant has identified individualized defenses or factual disputes. Fed. R. Civ. P. 23(a)(4).

[36] **Federal Civil Procedure**

To establish that the proposed class is ascertainable, as required for class certification, a plaintiff must show that (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Fed. R. Civ. P. 23(b)(3).

[37] **Federal Civil Procedure**

When class members are impossible to identify without extensive and individualized fact-finding, then a class action is inappropriate. Fed. R. Civ. P. 23(b)(3).

[38] **Federal Civil Procedure**

The ascertainability inquiry for class certification is narrow and does not require that a plaintiff must be able to identify all class members at class certification; instead, a plaintiff need only show that class members can be identified. Fed. R. Civ. P. 23(b)(3).

[39] **Federal Civil Procedure**

The process of showing that class members can be identified, so as to satisfy the ascertainability requirement for class certification, can include

matching records across multiple computer databases or even cross-referencing a defendant's voluminous records with affidavits from putative class members. Fed. R. Civ. P. 23(b)(3).

**[40] Federal Civil Procedure**

Users of internet browser failed to satisfy ascertainability requirement for class certification, in users' putative class action alleging that internet advertising provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; evidence obtained during discovery did not permit court, parties, or claims administrator to determine which browser users received cookies at issue through challenged workaround, and determining class membership would instead require individualized factual inquiries into each user's browsing history and receipt of cookies. Fed. R. Civ. P. 23(b)(3).

**[41] Federal Civil Procedure**

Objective criteria for members of a proposed class alone do not satisfy the ascertainability requirement for class certification; plaintiffs also must demonstrate a reliable and administratively feasible means of determining whether an individual satisfies that definition. Fed. R. Civ. P. 23(b)(3).

**[42] Federal Civil Procedure**

An "individual question," for purposes of predominance inquiry regarding whether questions of law or fact common to class members predominate over any questions affecting only individual members, so as to support class certification, is one where members of proposed class will need to present evidence that varies from member to member, while common question is one where same evidence will suffice for each member to make prima facie showing or issue is susceptible to generalized, class-wide proof. Fed. R. Civ. P. 23(b)(3).

**[43] Federal Civil Procedure**

The predominance requirement for class certification requires that the common, aggregation-enabling, issues in the case be more prevalent or important than the non-common, aggregation-defeating, individual issues. Fed. R. Civ. P. 23(b)(3).

**[44] Federal Civil Procedure**

The predominance inquiry regarding whether questions of law or fact common to class members predominate over any questions affecting only individual members, so as to support class certification, tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation. Fed. R. Civ. P. 23(b)(3).

**[45] Federal Civil Procedure**

When conducting the predominance inquiry regarding whether questions of law or fact common to class members predominate over any questions affecting only individual members, so as to support class certification, a district court must look first to the elements of the plaintiff's underlying claims and then, through the prism of the class action rule, undertake a rigorous assessment of the available evidence and the method or methods by which the plaintiff proposes to use the evidence to prove those elements. Fed. R. Civ. P. 23(b)(3).

**[46] Federal Civil Procedure**

Individualized issues overwhelmed common ones, and thus class certification was not supported on predominance ground in putative class action brought by users of internet browser against internet advertising provider alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent, even if questions regarding provider's conduct could be answered through common proof; there was no evidence identifying users who challenged

conduct affected, so question of liability could not be resolved through common evidence but would instead require factfinder to determine, user by user, whether provider's conduct affected that individual at all. Fed. R. Civ. P. 23(b)(3).

**[47] Federal Civil Procedure**

The superiority requirement for class certification requires the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

**[48] Federal Civil Procedure**

Factor examining class members' interests in individually controlling prosecution or defense of separate actions favored finding that class litigation was superior to other available methods for fairly and efficiently adjudicating controversy, so as to support class certification in putative class action brought by users of internet browser against internet advertising provider alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; individual claims were relatively modest, so many putative class members would have little practical incentive to litigate them separately. Fed. R. Civ. P. 23(b)(3)(A).

**[49] Federal Civil Procedure**

Factor examining extent and nature of any litigation concerning controversy already begun by or against class members favored finding that class litigation was superior to other available methods for fairly and efficiently adjudicating controversy, so as to support class certification in putative class action brought by users of internet browser against internet advertising provider alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; nothing in record suggested that parallel litigation concerning users' claims was pending elsewhere. Fed. R. Civ. P. 23(b)(3)(B).

**[50] Federal Civil Procedure**

Factor examining desirability or undesirability of concentrating litigation of claims in particular forum favored finding that class litigation was superior to other available methods for fairly and efficiently adjudicating controversy, so as to support class certification in putative class action brought by users of internet browser against internet advertising provider alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; concentrating litigation in forum promoted efficiency because multidistrict litigation had been consolidated in forum and had been pending in forum for more than one decade. Fed. R. Civ. P. 23(b)(3)(C).

**[51] Federal Civil Procedure**

Factor examining likely difficulties in managing class action weighed against finding that class litigation was superior to other available methods for fairly and efficiently adjudicating controversy, as would support class certification in putative class action brought by users of internet browser against internet advertising provider alleging that provider circumvented browser's default privacy settings to place advertising cookies on their browsers without consent; because individualized determinations of both class membership and liability would be required before any class member could recover, class action would not streamline litigation and would not promote fair and efficient resolution of disputes. Fed. R. Civ. P. 23(b)(3)(D).

**[52] Federal Civil Procedure**

Class certification was not appropriate on basis that internet advertising provider had acted or refused to act on grounds that applied generally to class, so that final injunctive relief or corresponding declaratory relief was appropriate respecting class as whole, in putative class action in which users of internet browser alleged that provider circumvented browser's default

privacy settings to place advertising cookies on their browsers without consent; action concerned conduct that ended more than one decade before users moved for class certification, and users only speculated that provider might someday engage in similar conduct and did not identify any ongoing conduct for injunction to prohibit. Fed. R. Civ. P. 23(b)(2).

**[53] Federal Civil Procedure**

Certification on basis that defendant has acted or refused to act on grounds that apply generally to class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting class as whole, is intended for cases in which single injunction or declaratory judgment would provide relief to each member of class. Fed. R. Civ. P. 23(b)(2).

**[54] Federal Civil Procedure**

Classes need not meet additional predominance and superiority requirements of class action rule to be certified on basis that defendant has acted or refused to act on grounds that apply generally to class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting class as whole. Fed. R. Civ. P. 23(b)(2), 23(b)(3).

**[55] Federal Civil Procedure**

Because absent class members receive neither notice nor opportunity to opt out, the rule permitting class certification on basis that defendant has acted or refused to act on grounds that apply generally to class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting class as whole, applies only when proposed class is sufficiently cohesive and requested equitable relief operates indivisibly across class. Fed. R. Civ. P. 23(b)(2).

**[56] Federal Civil Procedure**

Rule permitting class certification on basis that defendant has acted or refused to act on grounds that apply generally to class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting class as whole, authorizes prospective equitable relief; it does not authorize certification to address conduct that has ceased. Fed. R. Civ. P. 23(b)(2).

**[57] Injunction**

Plaintiff seeking prospective equitable relief in form of injunction must demonstrate real and immediate threat of future injury, not merely conjectural or hypothetical harm.

**[58] Injunction**

Past exposure to allegedly unlawful conduct, standing alone, does not establish entitlement to injunctive relief.

**[59] Injunction**

An injunction requiring a defendant to obey the law, a requirement with which it must comply regardless of the injunction, does not satisfy the rule requiring an injunction to describe in reasonable detail the specific acts restrained or required. Fed. R. Civ. P. 65(d)(1).

## MEMORANDUM

JOSHUA D. WOLSON, J.

***1** Sometimes the hardest part of a class action lawsuit is not deciding who wins. It is deciding who belongs in the class in the first place. That question has been the thread running through this litigation for years. Plaintiffs contend that Google bypassed Safari's default privacy settings and placed DoubleClick cookies on users' browsers without their knowledge or consent. Google says it did no such thing. Whatever the merits of those claims, Plaintiffs cannot proceed on behalf of a class unless they have a reliable method of identifying the people who allegedly received those cookies through the challenged conduct.

After years of litigation and extensive discovery, Plaintiffs still don't have such a method. They acknowledge as much but say the fault lies with Google. According to Plaintiffs, Google failed to preserve encryption keys that would have unlocked the information necessary to identify class members. Yet even if I accept Plaintiffs' theory about Google's missing encryption keys, Plaintiffs have not shown that the missing information would identify the members of the class they seek to certify, such that a Rule 23(b)(3) class certification is appropriate. And, in any event, Plaintiffs have not shown that they satisfy other elements of Rule 23. They cannot identify who belongs in the class, and they have not established that injunctive relief is appropriate under Rule 23(b)(2).

Google also posits that Plaintiffs didn't preserve data that it needs to analyze their claims. But even if I accept Google's theory about Plaintiffs' preservation failures, the missing evidence does not prove Google's case any more than Google's missing evidence proves Plaintiffs' case. Rule 37 cannot fill either gap. I will therefore deny both parties spoliation-related motions and Plaintiffs' class certification motion.

## I. RELEVANT BACKGROUND

### A. Factual History

#### 1. Safari, DoubleClick, and Browser Cookies

By 2011, Google had built much of its business around digital advertising. Through its DoubleClick advertising network, Google sold advertisements that advertisers could target to users based, at least in part, on their browsing activity across the internet. To facilitate that process, Google relied on digital cookies. Cookies are small files that websites place on a user's browser for a variety of reasons. Some permit websites to remember users from one visit to the next. Others preserve user preferences or login credentials. According to Plaintiffs, Google's ability to associate browsing activity across different websites made those cookies particularly valuable because it allowed Google to deliver more targeted advertising and command higher advertising prices.

During the relevant period, Apple's Safari browser was the default browser on Apple devices. Sometime around 2011, Apple changed Safari's default settings to block many third-party cookies through a default cookie-blocking setting. As a result, when a Safari user visited a website, the browser ordinarily rejected cookies that advertising networks attempted to place through third party content embedded on the website. Plaintiffs contend that those default settings limited Google's ability to collect browsing information from Safari users and therefore reduced the value of Safari traffic to Google's advertising business.

#### 2. The Doritos cookie

***2** The Parties agree that Google developed and deployed the cookie they refer to as the "Doritos" cookie. They sharply disagree, however, about what that cookie was designed to do and how it interacted with Safari's privacy settings.

According to Plaintiffs, Google designed a method to circumvent Safari's default cookie protections. Plaintiffs contend that Google developed code that caused Safari to accept DoubleClick advertising cookies even though Safari otherwise would have blocked them. In Plaintiffs' view, Google implemented that workaround because Safari users generally did not alter their browser's default privacy settings, making those users particularly valuable to Google's advertising business. Plaintiffs allege that Google's conduct permitted it to continue tracking Safari users' browsing activity without their knowledge or consent.

Google offers a different explanation. Google maintains that the Doritos cookie was not an advertising cookie or a tracking cookie at all. Instead, Google contends that the cookie supported certain Google+ social advertising features that allowed users who had opted into those features to interact with advertisements. Google maintains that the Doritos cookie functioned only as an intermediary cookie necessary to support those social advertising functions. According to Google, the cookie was designed to use only limited, encrypted data so that Google could not associate a user's anonymous browsing history with the user's personal Google account information.

Google further contends that certain versions of Safari contained an undisclosed feature that caused the browser to accept additional cookies from a third-party domain after it had accepted another cookie from that same domain. According to Google, once Safari accepted the Doritos cookie, Safari itself accepted additional DoubleClick cookies associated with the same domain. Google therefore maintains that Safari's own behavior, rather than any deliberate effort by Google to circumvent Apple's privacy protections, caused

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the challenged DoubleClick cookies to appear on some users' browsers.

### 3. The scope of the alleged conduct

The Parties also disagree about the scope of the alleged conduct and the number of users that it affected. Plaintiffs contend that Google's alleged workaround operated broadly across Safari users who maintained the browser's default settings during the class period. Google disputes that characterization and contends that only a relatively small subset of Safari users could have received DoubleClick cookies through the mechanism challenged in this case.

According to Google, many Safari users already possessed DoubleClick advertising cookies before the events at issue in this litigation occurred, and others received those cookies through means unrelated to the conduct alleged in the Complaint, such as interacting with Google services or clicking on advertisements. Google further contends that its historical records demonstrate that the overwhelming majority of Safari browsers already contained DoubleClick cookies before the Doritos cookie could have affected them. Plaintiffs dispute Google's characterization of the available data and maintain that Google's conduct affected a much broader group of Safari users during the class period.

### 4. Public disclosure and government investigations

***3** On February 17, 2012, the *Wall Street Journal* published an article describing Google's placement of DoubleClick cookies on Safari browsers notwithstanding Safari's default cookie settings. The article relied in part on research of Jonathan Mayer, then a graduate student at Stanford University, who analyzed the interaction between Google's advertising systems and Safari's privacy protections. According to the article, Google had identified a means by which Safari would accept cookies that Safari otherwise would have blocked and had used that mechanism in connection with DoubleClick cookies.

The article generated substantial public attention and prompted investigations by the Federal Trade Commission and several state attorneys general. Google resolved those investigations through settlements. Google later removed the challenged cookies from users' browsers.

## B. Procedural History [1]

### 1. The MDL and the initial appeal

After the *Wall Street Journal* published its article about Google's cookie practices, plaintiffs across the country sued Google, alleging that it circumvented privacy settings in Safari and Internet Explorer to place tracking cookies on users' browsers. The Judicial Panel On Multidistrict Litigation consolidated those cases in the District of Delaware and assigned them to Judge Sue Robinson.

On December 19, 2012, Plaintiffs filed a Consolidated Class Action Complaint asserting claims under several federal statutes and California law. Judge Robinson dismissed the complaint in its entirety. Plaintiffs appealed. The Third Circuit affirmed dismissal of Plaintiffs' claims under the Wiretap Act, the Stored Communications Act, the Computer Fraud and Abuse Act, California's Unfair Competition Law, the California Comprehensive Computer Data Access and Fraud Act, the California Invasion of Privacy Act, and the California Consumers Legal Remedies Act. *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 153 (3d Cir. 2015). The Third Circuit revived Plaintiffs' claims for intrusion upon seclusion and violation of the privacy protections of the California Constitution and remanded for further proceedings. *Id.*

### 2. The settlement proceedings

Rather than litigate those remaining claims, the Parties negotiated a nationwide class settlement that would result in a $5.5 million *cy pres*-only settlement. Judge Robinson preliminarily approved the settlement, certified a settlement class under Rule 23(b)(2), and granted final approval.

Ted Frank, a class member, objected and appealed the final settlement approval. The Third Circuit vacated the approval order and remanded the case for further consideration. Although the Third Circuit rejected many of Mr. Frank's arguments, it identified two problems with the settlement. First, it noted that the Parties sought to certify an injunctive class under Rule 23(b)(2) rather than a damages class under Rule 23(b)(3), while still seeking to obtain the benefits of a Rule 23(b)(3)-style release of monetary claims. *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 934 F.3d 316 (3d Cir. 2019). The Court questioned whether the

settlement could extinguish absent class members' damages claims through certification of a Rule 23(b)(2) injunctive class. *Id.* Second, the Third Circuit expressed concern regarding the selection of the proposed *cy pres* recipients and the district court's limited analysis of the settlement's fairness. *Id.*

On remand, the case was reassigned to Judge Robreno because Judge Robinson had retired. In 2020, the Parties filed a renewed motion for preliminary approval of the class action, this time as a damages class pursuant to Federal Rule of Civil Procedure 23(b)(3). In 2021, Judge Robreno granted preliminary certification and approval of the settlement. On July 10, 2023, Judge Robreno denied Plaintiffs' motion for final certification of the settlement class. Although he concluded that the proposed settlement class satisfied Rule 23(a), he held that he could not certify the class under Rule 23(b)(2) because the settlement sought to extinguish absent class members' monetary claims and therefore was not a true injunctive class settlement. He also concluded that the proposed Rule 23(b)(3) settlement class failed because Plaintiffs had not established the class's ascertainability. Plaintiffs appealed but later dismissed that appeal voluntarily. Judge Robreno retired shortly thereafter, and the case came to me.

***4** Plaintiffs then sought interlocutory review under 28 U.S.C. § 1292(b) of issues arising from Judge Robreno's decision. I concluded that Section 1292(b) did not permit me to certify Judge Robreno's order for appeal but certified that legal question itself for interlocutory review because it presented substantial grounds for disagreement. The Third Circuit declined to hear the appeal. I then entered a new scheduling order so that the Parties could proceed with merits and class certification discovery.

### 3. Discovery following the denial of settlement

Because Judge Robreno's decision identified ascertainability as the principal obstacle to Rule 23(b)(3) certification, the Parties devoted much of discovery to ascertainability and whether Plaintiffs could identify the individuals who allegedly received DoubleClick cookies through the mechanism challenged in this case. Plaintiffs pursued discovery concerning Google's historical logging systems, data retention practices, and internal records relating to the placement of DoubleClick cookies on Safari browsers. They sought production of source code, design documents, internal technical materials, and historical log data that they believed would permit them to determine which Safari users received cookies through the challenged mechanism. Google maintained that it could not identify those users and that no preserved records could answer that question.

Those disagreements led to a series of discovery disputes throughout 2025. In June 2025, Plaintiffs moved to compel additional discovery concerning Google's preserved logs and the data fields contained within those logs. Plaintiffs sought descriptions of Google's historical logging systems, sample values for preserved data fields, and information concerning logs that Google had not preserved. I denied that motion without prejudice and directed Google to produce sample values for the requested data fields and to provide sworn information describing its efforts and methodology in locating those samples.

The Parties continued to dispute whether Google's preserved data could support Plaintiffs' effort to prove ascertainability. Following additional conferences during the summer and fall of 2025, I required the Parties to identify with greater precision what information Plaintiffs sought and why they believed it mattered. At a discovery hearing in October 2025, I directed Plaintiffs to provide a written explanation from their expert identifying the specific information required for their ascertainability analysis and directed Google to respond regarding the availability of that information and the burdens associated with producing it.

Plaintiffs submitted a declaration from Dr. Zubair Shafiq explaining that additional information relating to GAIA (Google's ID management system) identifiers, Biscotti identifiers, and certain historical logs might permit him to determine whether a methodology existed to identify members of the proposed class. Google responded that it had preserved no relevant logs containing GAIA identifiers and disputed Dr. Shafiq's assumptions regarding Google's historical systems. Dr. Shafiq submitted a rebuttal declaration disputing Google's representations regarding the existence of such information.

I declined to compel further discovery. I concluded that Dr. Shafiq's declarations rested largely on speculation regarding Google's systems rather than expert analysis grounded in the record before me. I also noted that Plaintiffs had known from the outset of discovery that ascertainability represented a central obstacle to certification but waited until the end of discovery to identify the information they believed was

necessary and to explain how that information would assist their analysis. Even then, Plaintiffs could not say whether the requested information would actually permit identification of class members. Under those circumstances, additional discovery and reopened depositions would have imposed disproportionate burdens while offering little prospect of resolving the underlying problem.

***5** Google also sought discovery concerning Plaintiffs' computers, browser usage, and Safari settings during the class period. The resulting discovery established that Plaintiffs had continued using their computers after this litigation began and that browser software and related files from the relevant period no longer existed on those devices.

#### 4. The Motions at issue

The Parties' disputes concerning historical data and missing evidence has produced cross-motions for sanctions associated with ESI. Plaintiffs contend that Google failed to preserve encryption keys associated with certain historical log data and seek sanctions under Rule 37(e). Google, in turn, contends that Plaintiffs failed to preserve information on their personal devices relating to browser usage and settings during the class period and seeks sanctions of its own. The Parties dispute both the significance of the missing information and whether either side suffered prejudice from its loss.

Plaintiffs have also renewed their motion for class certification under Rules 23(b)(2) and 23(b)(3). They seek certification of two litigation classes. First, under Rule 23(b)(2), Plaintiffs seek to certify a nationwide injunctive class consisting of:

> All persons in the United States who used the Apple Safari web browser, who visited a website from which Google's doubleclick.net cookies were deployed, and whose default Safari browser settings were enabled from June 1, 2011 through February 15, 2012.

Plaintiffs also seek certification under Rule 23(b)(3) of a California damages class consisting of:

> All persons within the State of California who used the Apple Safari web browser, who visited a website from which Google's doubleclick.net cookies were deployed, and whose default Safari browser settings were enabled from June 1, 2011 through February 15, 2012.

Plaintiffs also ask that I appoint the named Plaintiffs as class representatives and appoint Interim Co-Lead Counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g). The Parties' cross-motions for sanctions and Plaintiffs' motion for class certification are ripe for disposition.

## II. DISCUSSION

### A. Rule 37(e) Sanctions

#### 1. Legal standard

**[1]** ESI spoliation occurs when ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be replaced through additional discovery." Fed. R. Civ. P. 37(e). To impose sanctions pursuant to this rule, a judge must find that (a) the spoliating party had a duty to preserve information when the loss occurred; (b) the lost ESI was within the scope of that duty to preserve; (c) the spoliating party's failure to take reasonable steps to preserve the information led to its loss; and (d) the information is truly lost, *i.e.*, it cannot be otherwise recovered. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The evaluation of the duty to preserve evidence and the scope of that duty occur from the perspective of a reasonable person at the time, not with hindsight. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 77-78 (3d Cir. 2012)

The Federal Rules contemplate two remedies for ESI spoliation. When the loss of information prejudices a party, a judge may order "measures no greater than necessary to cure the prejudice." Fed R. Civ. P. 37(e)(1). Appropriate sanctions include "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding

the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

***6** **[2]** When a party destroys electronically stored information "with the intent to deprive another party of the information's use in the litigation," a judge may presume the information was unfavorable to the infracting party, instruct the jury that it may or must presume the information was unfavorable, or dismiss the action. Fed. R. Civ. P. 37(e)(2). Because bad faith is rarely evident on its face and judges cannot directly observe a party's motivation for spoliating, judges may consider circumstantial evidence to determine intent. *See, e.g., Bistrian v. Levi*, 448 F. Supp.3d 454, 475 (E.D. Pa. 2020). Judges in this district have considered (a) the timing of the destruction; (b) the method of destruction; (c) whether destruction was selective or indiscriminate; and (d) the spoliating party's policies for retention and destruction. *See id.* I agree that these factors are instructive, though not exhaustive.

### 2. Plaintiffs' Motion

Plaintiffs contend that Google failed to preserve the encryption keys needed to decrypt portions of its historical logs that contain encrypted cookie data, including encrypted GAIA identifiers. Without those keys, no one can decrypt the preserved data, and Plaintiffs cannot use the data in the manner they propose. However, they have not shown that the destruction of those keys constitutes spoliation, that sanctions are appropriate, or that they seek an appropriate sanction.

**[3]** *First*, Plaintiffs have not shown that Google spoliated evidence. Google does not dispute that it anticipated litigation concerning the Safari issue by early 2012. By then, the *Wall Street Journal* had published its article, government investigations had begun, and private litigation had followed. Google therefore had a duty to preserve information relevant to the claims that ultimately became part of this MDL. Google doesn't argue otherwise. Google also concedes that it did not try to stop the destruction of the encryption keys in the ordinary course of business and that they are truly lost.

However, Plaintiffs have not shown that the encryption keys were within the scope of Google's preservation duty at the time that Google destroyed them. Nothing in the record supports Plaintiffs' assertion that a reasonable person in 2012 would have understood the preservation duty to extend to the encryption keys. Plaintiffs have shown, at most, that an expert who they retained in 2025 thinks that the encryption keys **might** help him figure out whether he can ascertain the members of the class. But that sheds no light on what a reasonable person would have thought about the scope of the duty in 2012. On that score, I note that the Third Circuit decided the cases that form the foundation of the ascertainability doctrine beginning in August 2012, months **after** Google's preservation duty arose. *See Marcus v. BMW of North America, Inc.*, 687 F.3d 583 (3d Cir. 2012). And even then, the doctrine evolved over the next several years following several more decisions from the Circuit. *See, e.g., Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013); *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013); *Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015). Without the benefit of at least some of these decisions, it is not clear that any reasonable person would have hypothesized the need for encryption keys to ascertain the members of the class, as Plaintiffs now suggest. Because the encryption keys were not within the scope of Google's duty of preservation, it did not spoliate evidence by destroying them.

**[4]** *Second*, even if Google's duty had encompassed the encryption keys, Plaintiffs have not shown that they have suffered prejudice to warrant a sanction. According to Plaintiffs, the loss of the encryption keys deprived them of the evidence necessary to identify class members and establish ascertainability. Yet even after extensive discovery into Google's historical log data, Plaintiffs have not established that the information they seek, if available, would distinguish between users who the challenged workaround affected and users who received DoubleClick cookies through other means. As I explained in my Order dated November 10, 2025, Dr. Shafiq has not been able to say whether the additional information Plaintiffs sought would accomplish that task. Instead, all Plaintiffs have established is that the missing information **might** have allowed them to determine if they could answer that question. Google, however, disputes Plaintiffs' premise that decrypting the preserved data would have distinguished users affected by the challenged workaround from users who received DoubleClick cookies through other means.

***7** **[5]** **[6]** **[7]** On this record, Plaintiffs have not established that preservation of the encryption keys would have produced an objectively reliable means of identifying class members or otherwise materially altered their ability to prove the elements of their claims. "Sanctions must be based on more than mere speculation." *Melk v. Congreso De*

*Latinos Unidos*, Civ. A. No. 08-3515, 2010 WL 11558001, at *4 (E.D. Pa. Mar. 3, 2010). I cannot presume that the missing evidence would have favored the party seeking sanctions. *See Bistrian*, 448 F. Supp.3d at 476. Plaintiffs bear the burden of proving prejudice, and speculation about what the decrypted information might have revealed cannot satisfy that burden. *See Accurso v. Infra-Red Servs.*, 169 F. Supp.3d 612, 622 (E.D. Pa. 2016).

Without more certainty from either side, the best I can do is to assume that the dispute about what the encryption keys would show is a 50/50 question—and that's being somewhat generous to Plaintiffs. Under that assumption, it's equally possible that the encryption keys would have (a) permitted Plaintiffs to sort out the question of who received a cookie by improper means and who received it otherwise and (b) not permitted Plaintiffs to have answered that question. But Plaintiffs bear the burden of providing spoliation, including prejudice, by a preponderance of the evidence, and showing a 50/50 possibility does not satisfy that burden.

Plaintiffs respond that Dr. Shafiq could not answer that question precisely because Google failed to preserve the encryption keys. But that simply restates the premise of their motion. Rule 37(e)(1) does not permit me to presume that the missing evidence would have established what Plaintiffs hope it might have established. Plaintiffs still bear the burden of demonstrating that preservation of the encryption keys would have produced information capable of identifying class members in the manner they propose. They have not done so, and I cannot assume that it would have without some evidence beyond Dr. Shafiq's naked speculation.

**[8] [9] [10]** *Third*, Plaintiffs have not established that the sanction they seek—a holding that the class is ascertainable —is proper or even legally permissible. Ascertainability is an independent requirement that a plaintiff must prove with *evidentiary* support. *See Byrd*, 784 F.3d at 163-64. That requirement serves practical purposes: (1) "it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members;" (2) "it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action;" and (3) "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Marcus*, 687 F.3d at 593. Even accepting Plaintiffs' premise that Google's alleged spoliation deprived them of evidence that might have assisted that inquiry, the practical problem remains. The record still contains no objectively reliable and administratively feasible method of determining which users received DoubleClick cookies through the challenged Safari workaround rather than through one of the other undisputed mechanisms reflected in the record. A sanction that deems ascertainability satisfied would not identify a single additional class member or provide a workable means of determining who belongs in the proposed class. It would simply excuse Plaintiffs from proving an independent prerequisite to class certification without supplying the evidence necessary to do so. Rule 37 does not permit me to dispense with an independent requirement for class certification, particularly in this case.

***8** Beyond that problem, though, Plaintiffs have not demonstrated that Google's state of mind justifies such a sanction. A conclusive evidentiary presumption like the one that Plaintiffs seek would arise under Rule 37(e)(2), not (e)(1). Before imposing such a sanction, I'd have to find that Google acted in bad faith when it destroyed the encryption keys. Plaintiffs have come nowhere close to such a showing. Plaintiffs identify no evidence that Google singled out the encryption keys for deletion because of this litigation, selectively preserved favorable information while allowing unfavorable information to disappear, altered its retention practices to obtain a litigation advantage, or otherwise acted to prevent Plaintiffs from using the information in this case. Instead, the record reflects Google's continued application of its ordinary retention practices, which Plaintiffs contend should have been suspended once litigation became reasonably foreseeable. Even assuming Plaintiffs are correct on that point, a failure to depart from ordinary retention practices is not the same as an intent to deprive. *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82-84 (3d Cir. 2019); *Bull*, 665 F.3d at 77. Rule 37(e)(2) requires evidence of purposeful conduct, and this record does not provide it.

At most, Plaintiffs have shown that Google foresaw litigation and did not suspend its litigation practices. Even if the encryption keys were within the scope of Google's preservation duty, Google's failure to preserve them on this record would be negligent, not intentional. And, if foreseeability of litigation and a failure to suspend ordinary retention practices were enough, every negligent preservation failure would become intentional spoliation. *See Bull*, 665 F.3d at 73 (citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)). The Rule draws a sharper

distinction than that. Because Plaintiffs have not established that Google acted with the purpose of depriving them of evidence, I will deny their request for sanctions.

### 3. Google's Motion

**[11]** Google has shown that information missing from Plaintiffs' computers is of some significance because it could have provided contemporaneous, objective evidence bearing on Plaintiffs' allegations. Had Plaintiffs preserved it, Google could have tested Plaintiffs' testimony, evaluated their browser settings, determined which versions of Safari they used, and investigated whether other users accessed the same computers. The loss of that evidence therefore deprives Google of one means of testing Plaintiffs' account of events. But prejudice is different from deciding what the missing evidence would have shown, while Google's requested sanction requires the latter.

Google's proposed sanction depends on two inferential steps. *First*, it requires me to assume that the missing browser artifacts would have resolved disputed factual questions concerning Plaintiffs' Safari versions, browser settings, receipt of the challenged cookies, and other users' access to the devices. *Second*, it asks me to prohibit Plaintiffs from offering contrary evidence on those same issues. Rule 37(e)(1) authorizes neither step. Even assuming a party establishes that electronically stored information should have been preserved, that it was lost because another party failed to take reasonable steps to preserve it, that it cannot be restored or replaced through additional discovery, and that its loss caused prejudice, the Rule authorizes only measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Google's requested sanction exceeds that limit. Google's requested sanction would not only offset an evidentiary disadvantage resulting from the loss of information, but it would also resolve disputed factual questions concerning Plaintiffs' browser settings, Safari versions, receipt of the challenged cookies, and ultimately their standing, membership in the proposed class, and the merits of their claims. Rule 37(e)(1) allows me to address prejudice caused by missing evidence; it does not permit me to decide disputed facts by assuming what that missing evidence would have shown.

Google argues that these factual issues go not only to the merits of Plaintiffs' claims but also to standing and class membership. That may be so. But regardless of how Google characterizes those issues, the requested sanction would decide them by presuming the contents of missing evidence. Rule 37(e)(1) permits courts to address prejudice caused by lost electronically stored information; it does not permit courts to resolve disputed factual questions by assuming what that information would have established.

***9** Nor does denying Google's Motion leave it without any means to challenge Plaintiffs' allegations. Google obtained forensic images of Plaintiffs' computers, deposed both Plaintiffs extensively regarding their browser usage and preservation efforts, retained experts to analyze the available evidence, and remains free to argue that Plaintiffs have not carried their burden of proving they used susceptible versions of Safari, maintained default browser settings, or received the challenged cookies. Google may highlight the gaps in the record, challenge Plaintiffs' credibility, rely on the available forensic evidence, and argue that Plaintiffs have failed to satisfy their burden of proof. What Rule 37(e)(1) does not permit is converting the absence of evidence into affirmative proof that disputed facts should be resolved in Google's favor.

Plaintiffs raise several additional arguments in opposition to Google's Motion. They contend they had no duty to preserve the browser artifacts Google identifies, took reasonable preservation steps by retaining their computers and producing forensic images, and that much of the allegedly missing information can still be reconstructed through forensic analysis, Google's own records, and other discovery. They also argue that Google delayed seeking sanctions after obtaining the forensic images and completing Plaintiffs' depositions. Those arguments raise questions about whether Google satisfies Rule 37(e)'s threshold requirements. I need not resolve them all because, even assuming Google could satisfy those requirements, Rule 37(e)(1) does not authorize the relief it seeks. Google has shown that the loss of evidence complicates its defense. It has not shown that the appropriate remedy is to resolve disputed factual issues in its favor. I will therefore deny Google's Motion.

## B. Class Action Certification

### 1. Legal standard

Federal Rule of Civil Procedure 23(a) requires a plaintiff to establish (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality);

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). If a claim satisfies those four requirements, then a plaintiff must then satisfy one subsection of Rule 23(b).

**[12]** **[13]** In this case, Plaintiffs seek certification pursuant to Rule 23(b)(2) and 23(b)(3). Rule 23(b)(2) applies when a class is seeking injunctive or declaratory relief and requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "[T]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)). On the other hand, certification under Rule 23(b)(3) is appropriate where (1) common questions of law or fact predominate (predominance), and (2) the class action is the superior method for adjudication (superiority). *See Marcus*, 687 F.3d at 591. That class must also be "currently and readily ascertainable based on objective criteria." *Id.* at 593.

**[14]** **[15]** When conducting this analysis, a court must be careful not to certify a class "casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D. Pa. 2015). Instead, class "certification is proper only if the trial court is satisfied, after a rigorous analysis" that the moving party has fulfilled the necessary requirements. *Ferreras v. American Airlines, Inc.*, 946 F.3d 178, 183 (3d Cir. 2019) (citing *Wal-Mart Stores, Inc.*, 564 U.S. 338 at 350-51, 131 S.Ct. 2541, 180 L.Ed.2d 374). This inquiry will at times require a court to examine issues that overlap, to some extent, with the final merits determination. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). However, the court should only engage in this overlapping analysis to the extent necessary to resolve the class certification motion, and no more. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013).

***10** **[16]** The party seeking class action status "bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Marcus*, 687 F.3d at 591. That party must have the evidence to do so at the time it seeks class certification. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318.

### 2. Rule 23(a) factors

#### a. Numerosity

**[17]** **[18]** **[19]** **[20]** While there is no minimum number of plaintiffs necessary to sustain a class action, courts generally find that if the number of potential plaintiffs exceeds 40 then numerosity is met. Marcus, 687 F.3d at 595. The plaintiff "must ... be prepared to prove that there are *in fact* sufficiently numerous parties." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541 (emphasis in original). Although "mere speculation" can't meet the plaintiff's burden, the plaintiff doesn't need to "offer direct evidence of the exact number and identities of the class members." *Marcus*, 687 F.3d at 596. If the plaintiff proffers "sufficient circumstantial evidences specific to the ... problems [and] parties ... actually covered by the class definition[,]" then I can rely on "common sense" to make a factual finding regarding the size of the class. *Id.*

**[21]** Numerosity presents little difficulty here. Plaintiffs allege that Google's conduct affected millions of Safari users during the proposed class period, and Google does not meaningfully dispute that, if an otherwise certifiable class exists, joinder would be impracticable. Plaintiffs have therefore satisfied Rule 23(a)(1).

#### b. Commonality

**[22]** **[23]** Commonality requires a showing that "there are questions of law or fact common the class." Fed. R. Civ. P. 23(a)(2). The bar for commonality is "not a high one." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quotation omitted). When the "defendant's conduct is common as to all of the class members[,]" the standard is met. *Id.* (quotation omitted). The proposed class's claim "must depend on a common contention" whereby "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541.

**[24]** The common question in this case is whether Google employed a mechanism to circumvent Safari's default cookie-

blocking settings and place DoubleClick cookies on users' browsers. Plaintiffs allege that Google used the same mechanism for every proposed class member. If Plaintiffs prove that allegation, whether Google's conduct violated the law presents a common question that applies equally to every class member. The "determination of its truth or falsity" therefore "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

**[25]** **[26]** Google argues that differences in browser settings, Safari versions, cookie placement, and other user-specific circumstances defeat commonality. Those arguments are better suited for the predominance inquiry. As the Third Circuit has explained, "the existence of individualized issues in a proposed class action does not per se defeat commonality." *Brooks v. Educators Mut. Life Ins. Co.*, 206 F.R.D. 96, 101 (E.D. Pa. 2002) (citing *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 191 (3d Cir. 2001)). Indeed, the commonality requirement "may be satisfied by a single common issue ...." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Plaintiffs therefore satisfy Rule 23(a)(2).

### c. Typicality

***11** **[27]** **[28]** **[29]** For class certification, a plaintiff's claims must be typical of those of other class members. Fed. R. Civ. P. 23(a)(3). That requirement "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus*, 687 F.3d at 598. "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*; *see also* *Baby Neal*, 43 F.3d at 58. In short, the typicality requirement does not "mandate[ ] that all putative class members share identical claims." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), as amended (Oct. 16, 2001) (quotation omitted).

**[30]** Plaintiffs' claims are typical of the claims that any class would assert. Both Plaintiffs and the class seek to assert claims for intrusion upon seclusion and violation of the California Constitution based on Google's placement of DoubleClick cookies on their machines. The elements of the claims are the same for all class members, the conduct at issue is the same in the Plaintiffs' claims as they are for class members, and the Plaintiffs seek the same relief as the class would seek. Plaintiffs have therefore satisfied the typicality prong.

**[31]** Google argues that Plaintiffs' claims are not typical because Plaintiffs have not offered evidence to show that they are members of the class, which raises a standing problem. That argument fails for two reasons. *First*, it confuses the standing inquiry with the merits. A standing analysis focuses on the injury that a plaintiff alleges, not that he can prove. *See* *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017). Lots of plaintiffs assert harms but are proven wrong. That means they lose, not that they lacked standing from the start. Plaintiffs in this case assert that Google's placement of cookies on their computers injured that, and that claim gives them standing. *Second*, Google's argument again conflates the typicality analysis with the predominance analysis. The named Plaintiffs, and each member of the class, will have to show that Google's improper conduct impacted him or her. That raises predominance concerns, as I discuss below. But it's not enough to defeat the typicality inquiry because it doesn't change the fact that the claims assert the same legal claims, arising from the same conduct. To hold otherwise would import a requirement from Rule 23(b)(3) into analysis of a factor that arises under Rule 23(a), and that's not proper.

### d. Adequacy

**[32]** **[33]** The final 23(a) factor—adequacy—considers both the plaintiff's and counsel's adequacy to represent the class. "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.' " *McDonough v. Toys R Us, Inc.*, 638 F. Supp.2d 461, 477 (E.D. Pa. 2009) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.' " *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)).

**[34]** Plaintiffs satisfy Rule 23(a)(4). Google does not challenge the adequacy of Plaintiffs' counsel, and nothing in the record suggests counsel lacks the experience or ability to prosecute this case. Nor does the record reveal any conflict between the named Plaintiffs and the absent class members that would prevent Plaintiffs from fairly and adequately

representing the proposed class. Plaintiffs have actively participated in this litigation for many years and possess the minimal understanding of the case that Rule 23(a)(4) requires.

***12** **[35]** Google resists that conclusion for several reasons, but none persuades me otherwise. It argues that Plaintiffs are inadequate because they are subject to individualized defenses concerning their browser usage, consent, and preservation of evidence, because others used their devices during the class period, because Plaintiff Balmayne has a personal relationship with one of Plaintiffs' attorneys, and because Plaintiffs lack sufficient knowledge about the litigation. Those arguments largely miss the mark. Rule 23(a)(4) asks whether the named Plaintiffs' interests are aligned with those of the absent class members—not whether Google has identified individualized defenses or factual disputes. To the extent Google contends Plaintiffs are vulnerable to unique defenses, that argument goes to typicality, not adequacy. Likewise, neither Plaintiff Balmayne's relationship with counsel nor the record concerning Plaintiffs' knowledge of the case demonstrates the type of fundamental conflict of interest that Rule 23(a)(4) is designed to uncover.

### 3. Rule 23(b)(3) factors

#### a. Ascertainability/Class Definition

**[36]** **[37]** **[38]** **[39]** To establish that the proposed class is ascertainable, a plaintiff must show that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citation omitted). When class members "are impossible to identify without extensive and individualized fact-finding[,] ... then a class action is inappropriate." *Marcus*, 687 F.3d at 592-93. But "[t]he ascertainability inquiry is narrow." *Byrd*, 784 F.3d at 165. It does not require that "a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.' " *Id.* at 163 (quotation omitted) (original emphasis). This process can include matching records across multiple computer databases or even cross-referencing a defendant's voluminous records with affidavits from putative class members. *See Kelly v. RealPage, Inc.*, 47 F.4th 202, 223 (3d Cir. 2022) (citations omitted).

**[40]** **[41]** Plaintiffs define the proposed damages class as "[a]ll persons within the State of California who used the Apple Safari web browser, who visited a website from which Google's doubleclick.net cookies were deployed, and whose default Safari browser settings were enabled from June 1, 2011 through February 15, 2012." Those criteria appear to be objective on their face. But objective criteria alone do not satisfy Rule 23. Plaintiffs also must demonstrate a reliable and administratively feasible means of determining whether an individual satisfies that definition. They have not done so.

Plaintiffs concede that they cannot satisfy the ascertainability requirement on the present record. (D.I. 302 at 6.) They do not argue that the evidence obtained during discovery permits me, the Parties, or a claims administrator to determine which Safari users received DoubleClick cookies through the challenged workaround. Instead, Plaintiffs' response is that Google's alleged destruction of the Doritos encryption keys deprived them of the evidence necessary to make that showing. Their argument therefore is not that they have established ascertainability, but that I should excuse them from doing so. But I've already decided that Google did not spoliate evidence, so Plaintiffs' concession about the state of the record defeats certification. Rule 23 places the burden squarely on Plaintiffs to prove every prerequisite to class certification by a preponderance of the evidence. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320. Plaintiffs cannot satisfy that burden by acknowledging that the necessary evidence is unavailable and asking me to overlook the deficiency.

Even putting Plaintiffs' position regarding spoliation aside, the record confirms that no workable methodology exists. The Parties agree that Safari users could receive DoubleClick cookies through multiple mechanisms during the class period. Plaintiffs' claims concern only one of those mechanisms—the alleged workaround that caused Safari to accept DoubleClick cookies despite its default privacy settings. Yet Plaintiffs identify no objective means of distinguishing users who received a DoubleClick cookie through the challenged workaround from users who either never received such a cookie or received one through another, undisputed mechanism. Without a methodology capable of making that distinction, determining class membership would require individualized factual inquiries into each user's browsing history and receipt of cookies. That is precisely the type of inquiry that the ascertainability requirement is designed to avoid. *See Marcus*, 687 F.3d at 592-93.

***13** Plaintiffs' proposed methodology does not solve that problem. They contend that affidavits from putative class members, coupled with GAIA information and Apple device records, provide a sufficiently reliable method of identifying class members. I disagree. At most, that evidence could establish that an individual used Safari during the relevant period, maintained Safari's default settings, owned an Apple device, or maintained a Google account. None of those facts establishes the dispositive question of whether that individual's browser received a DoubleClick cookie through the challenged workaround rather than through one of the other undisputed means reflected in the record. Plaintiffs therefore ask me to infer class membership from evidence that is merely consistent with membership, rather than evidence that objectively establishes it. Rule 23 requires more.

Nor do the cases on which Plaintiffs rely compel a different conclusion. I agree that affidavits may supplement objective records when those records already provide a reliable basis for distinguishing class members from non-class members. That is what *City Select Auto Sales Inc. v. BMW Bank of North America Inc.*, 867 F.3d 434, 441-42 (3d Cir. 2017), *Kelly v. RealPage, Inc.*, 47 F.4th 202, 223-24 (3d Cir. 2022), and *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480-81 (3d Cir. 2020), contemplate. In each of those cases, however, the affidavits supplemented records that already identified the relevant class. In this case, by contrast, Plaintiffs have identified no comparable records capable of distinguishing class members from non-class members. Nor does Dr. Shafiq's opinion fill that gap. After reviewing Google's records, he concluded only that additional Google data ***might*** permit further analysis. Rule 23 requires Plaintiffs to demonstrate that a workable methodology exists, not that one might exist if additional evidence were available. Because Plaintiffs have failed to demonstrate a reliable and administratively feasible means of determining who belongs in the proposed class, they have not established ascertainability.

### b. Predominance

**[42]** **[43]** **[44]** Predominance requires "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (citation omitted). Rule 23(b)(3) requires that "the common, aggregation-enabling, issues in the case [be] more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (citation omitted). In sum, the inquiry "tests whether [the] proposed class[ ] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation omitted).

**[45]** "In practice, this means that a district court must look first to the elements of the [plaintiff's] underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which the plaintiff[ ] propose[s] to use the evidence to prove' those elements." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115 (3d Cir. 2018) (quoting *Marcus*, 687 F.3d at 600).

**[46]** Plaintiffs have not shown that they can establish the central elements of liability through common proof. Whether Google developed and implemented the challenged workaround presents a common question. But answering that question would establish only what Google did, not whether Google is liable to any particular class member. Liability also depends on whether Google's conduct reached the individual asserting the claim. That inquiry requires determining whether a particular user employed one of the relevant versions of Safari during the class period, maintained Safari's default cookie settings, visited websites capable of deploying the challenged cookies, and received a DoubleClick cookie through the alleged workaround rather than through one of the other undisputed means by which a DoubleClick cookie could appear on the browser. Those are not collateral issues because they are necessary in determining whether Google committed the alleged intrusion as to that individual at all.

***14** Plaintiffs contend that common issues nevertheless predominate because Google's alleged workaround was uniform and a factfinder can determine its legality on a classwide basis. I agree that those issues are common. But Rule 23(b)(3) asks whether Plaintiffs can establish the essential elements of liability through evidence common to the class. The present record contains an evidentiary deficiency that prevents Plaintiffs from establishing which

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

users, if any, received DoubleClick cookies through the challenged workaround. That same evidentiary deficiency bears directly on predominance because, without evidence identifying the users who the challenged conduct affected, Plaintiffs cannot prove liability through common evidence.[2] Thus, even if Plaintiffs prevailed on every common issue concerning Google's conduct, the factfinder still would have to determine, user by user, whether Google's conduct affected that individual at all. Because the available evidence does not permit resolution of that question through common proof, the individualized issues overwhelm the common ones. *See Marcus*, 687 F.3d at 604.

Google also identifies individualized issues concerning consent, reasonable expectations of privacy, reliance, injury, and damages. Those issues might present additional obstacles to certification, but I need not decide whether any one of them independently defeats predominance. Plaintiffs have not shown that they can establish liability itself through common evidence. Because the threshold question of whether Google's conduct affected a particular user cannot be resolved on a classwide basis, the individualized issues predominate over the common ones, and Rule 23(b)(3) is not satisfied.

### c. Superiority

**[47]** Plaintiffs must show that class litigation is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To make this determination, I must consider four factors: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D). The superiority requirement requires me to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004). On the whole, I find that the balance does not tip in favor of adjudicating these claims on a class-wide basis.

**[48] [49] [50] [51]** The first three factors favor certification to some degree. The individual claims are relatively modest, so many putative class members would have little practical incentive to litigate them separately. Nothing in the record suggests that parallel litigation concerning these claims is pending elsewhere, and concentrating the litigation in this forum promotes efficiency because this multidistrict litigation has been pending here for more than a decade. If the common issues could resolve the central questions in the case, a class action would likely be the superior means of adjudicating these claims.

They cannot. Unlike a case in which liability may be established through common evidence, this litigation would require individualized determinations before I could decide whether Google is liable to any particular class member. I could not simply decide whether Google implemented the challenged workaround and then apply that answer across the class. Instead, I would have to determine, for each putative class member, whether that individual received a DoubleClick cookie through the alleged workaround rather than through one of the other undisputed means reflected in the record. Those individualized determinations also bear on who belongs in the class in the first place. A class action therefore would not streamline this litigation. It would simply relocate the individualized inquiries into a single proceeding. Rule 23(b)(3) exists to promote the fair and efficient resolution of disputes. Requiring individualized determinations of both class membership and liability before any class member could recover would not accomplish either objective. Considering all four factors together, Plaintiffs have not established that class treatment is superior to other available methods of adjudicating this controversy.

### 4. Rule 23(b)(2)

***15 [52] [53] [54] [55]** Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) is intended for cases in which "a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360, 131 S.Ct. 2541. Rule 23(b)(2) classes need not meet the additional predominance and superiority requirements of Rule 23(b)(3). *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998). But because absent class members in a Rule 23(b)(2) class receive neither notice nor an opportunity to opt out, the rule applies only when the proposed class is sufficiently cohesive and the requested equitable relief operates indivisibly across the class. *Id.* Plaintiffs have not

carried their burden of demonstrating that certification under Rule 23(b)(2) is appropriate.

**[56]** The conduct challenged in this litigation occurred during 2011 and early 2012. Following investigations by the FTC and numerous state attorneys general, Google expired the DoubleClick cookies that form the basis of Plaintiffs' claims and represented that it had discontinued the challenged workaround. Plaintiffs do not dispute that Google removed the challenged cookies. Instead, they contend only that they have no way of knowing whether Google has resumed similar conduct. Nor do Plaintiffs identify evidence that Google currently employs the Safari cookie circumvention technique alleged in the Complaint or that the browser functionality and products at issue continue to exist in the form challenged here. The case concerns conduct that ended more than a decade before Plaintiffs moved for class certification. Rule 23(b)(2) authorizes prospective equitable relief. It does not authorize certification to address conduct that has ceased. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 318-19 (3d Cir. 2011); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996).

**[57]** **[58]** Plaintiffs' contention that Google might someday resume similar conduct does not change that result. A plaintiff seeking prospective equitable relief must demonstrate a "real and immediate" threat of future injury, not merely conjectural or hypothetical harm. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223-26 (3d Cir. 2012); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-05, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Past exposure to allegedly unlawful conduct, standing alone, does not establish entitlement to injunctive relief. *McNair*, 672 F.3d at 225-26. Plaintiffs rely on the secretive nature of Google's past conduct and Google's history of alleged privacy violations to argue that they cannot know whether Google has resumed the challenged practice. But speculation that a defendant might someday engage in similar conduct does not establish a sufficiently immediate threat of future injury. Nor does it satisfy Rule 23(b)(2)'s requirement that final injunctive relief remain appropriate for the class as a whole.

**[59]** The nature of the injunction Plaintiffs seek further demonstrates that Rule 23(b)(2) certification is inappropriate. Plaintiffs ask me to prohibit Google from "using any method to override a browser's third-party cookie-blocking setting without a user's prior notice and express consent." (D.I. 304 at 20.) But Plaintiffs identify no ongoing conduct for an injunction to prohibit. Instead, their proposed injunction amounts to a directive that Google comply with privacy law whenever it designs future products. Rule 65 requires an injunction to describe in reasonable detail the specific acts restrained or required. Fed. R. Civ. P. 65(d)(1). An injunction requiring a defendant to obey the law, a requirement with which they must comply regardless of the injunction, does not satisfy Rule 65(d). *Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003).

***16** Plaintiffs also rely on Judge Robreno's observation, made during the Parties' proposed settlement proceedings, that Rule 23(b)(2)'s requirements appeared to be satisfied because Google allegedly acted on grounds generally applicable to the proposed class. That observation arose in a different procedural posture. At that stage, Judge Robreno was evaluating a proposed settlement, not deciding whether Plaintiffs had established entitlement to certification of a litigation class after the completion of discovery. The present record demonstrates that the equitable relief Plaintiffs seek is no longer appropriate. Plaintiffs therefore have not established that certification under Rule 23(b)(2) is warranted.

## III. CONCLUSION

Plaintiffs have not established that Google spoliated electronically stored information within the meaning of Rule 37(e), and Google has not shown that Plaintiffs failed to preserve evidence in a manner that warrants sanctions. I will therefore deny both motions for sanctions. Plaintiffs also have not met their burden of proving that the proposed classes satisfy Rule 23. They have not established the prerequisites of Rule 23(a), nor have they shown that the proposed damages class is ascertainable or otherwise satisfies Rule 23(b)(3), or that the proposed injunctive class satisfies Rule 23(b)(2). I will therefore deny Plaintiffs' Motion for Class Certification. An appropriate Order follows.

## All Citations

--- F.R.D. ----, 2026 WL 2530241

## Footnotes

1 The procedural history of this case is long and complex. I address only what is necessary to resolve these Motions.

2 Plaintiffs' Motion for Sanctions (D.I. 302) sought Rule 37 relief based on Google's alleged spoliation of the evidence they contend was necessary to establish ascertainability under Rule 23(b)(3). Although the same evidentiary issues also bear on predominance, Plaintiffs did not seek Rule 37 relief directed to that issue. I therefore do not consider whether such a remedy would affect the predominance analysis.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 4

2022 WL 912960
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

MARTIN LEMP, individually and on behalf of all others similarly situated, Plaintiff,
v.
SETERUS, INC., Defendant.

No. 2:18-cv-01313-TLN-KJN
|
Filed 03/29/2022

**ORDER DENYING PLAINTIFF'S MOTION TO CERTIFY CLASS**

Troy L. Nunley United States District Judge

***1** This matter is before the Court on Plaintiff Martin Lemp's ("Plaintiff") Motion to Certify Class. (ECF No. 50.) Defendant Seterus, Inc. ("Defendant") opposed Plaintiff's motion. (ECF No. 54.) Plaintiff replied. (ECF No. 56.) For the reasons set forth below, the Court DENIES Plaintiff's motion. (ECF No. 50).

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

Plaintiff alleges Defendant violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, and the Rosenthal Fair Debt Collections Practices Act ("Rosenthal Act"), California Civil Code § 1788, for charging "unlawful convenience fees" for payments made online or by phone. (ECF No. 51 at 5.) Plaintiff alleges Defendant is a mortgage servicer and has provided services for Plaintiff's loan. (*Id.* at 7, 10.) Defendant charged Plaintiff a convenience fee for paying his mortgage online or by phone. (*Id.* at 10.) Plaintiff seeks to certify the following nationwide class under the FDCPA:

> All individuals in the United States, who, during the applicable limitations period, paid a convenience fee to Seterus for paying over the phone or online in connection with any residential mortgage loan, where the term "convenience fee" was not specifically enumerated in the original agreement and where Defendant's records indicate that the debt had not been current for 30 or more consecutive days at the time Defendant began servicing it. All employees of the Court and Plaintiff's counsel are excluded from this class.

(*Id.* at 10–11.) Plaintiff also seeks to certify the following statewide class under the Rosenthal Act:

> All individuals in the state of California, who, during the applicable limitations period, paid a convenience fee to Seterus for paying over the phone or online in connection with any residential mortgage loan owned or serviced by Seterus. All employees of the Court and Plaintiff's counsel are excluded from this subclass.

(*Id.* at 11.)

Plaintiff filed the instant action on May 21, 2018. (ECF No. 1.) Plaintiff filed the operative Second Amended Complaint ("SAC") on February 4, 2020, which alleges violations under the FDCPA and Rosenthal Act for charging unlawful debt collection fees. (ECF No. 42.) On October 15, 2020, Plaintiff filed his motion to certify class pursuant to Federal Rule of Civil Procedure ("Rule") 23. (ECF No. 50.) Defendant filed an opposition to the motion on October 29, 2020. (ECF No. 54.) Plaintiff filed a reply on November 5, 2020. (ECF No. 56.)

## II. STANDARD OF LAW

Class certification is governed by Rule 23. *See* Fed. R. Civ. P. 23. "Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of [Rule] 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011) (citing *Zinser v.*

*Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001)). Under Rule 23(a), the party seeking certification must establish:

> ***2** (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.' " *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (quoting *Gen. Tel. Co. of Nw. v. E.E.O.C.*, 446 U.S. 318, 330 (1980)).

In addition to satisfying the requirements under Rule 23(a), the party seeking certification must also fulfill the requirements under either Rule 23(b)(1), 23(b)(2), or 23(b)(3). Fed. R. Civ. P. 23(b). Where, as here, the plaintiff seeks certification under Rule 23(b)(3) [2], the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Zinser*, 253 F.3d at 1186. In evaluating predominance and superiority, courts consider four factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

## III. ANALYSIS

Plaintiff argues that all of the requirements of Rule 23(a) and (b)(3) are satisfied for the putative classes. (*See* ECF No. 51.) In opposition, Defendant asserts: (1) Plaintiff fails to establish commonality under Rule 23(a) and predominance under Rule 23(b)(3); (2) a class action is not superior to individual lawsuits under Rule 23(b)(3); (3) Plaintiff cannot prove typicality under Rule 23(a)(3); and (4) the FDCPA and Rosenthal Act do not permit declaratory relief, precluding certification under Rule 23(b)(2). (*See* ECF No. 54.)

Courts often consider predominance and commonality together. *See*, *e.g.*, *Just Film Inc. v. Buono*, 847 F.3d 1108, 1120–22 (9th Cir. 2017); *Morandi v. Nationstar Mortg., LLC*, No. 2:19-cv-06334-MCS-MAA, 2021 WL 1398967, at *2 (C.D. Cal. Apr. 6, 2021). Commonality requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Such common questions of law and fact must predominate over individual questions. Fed. R. Civ. P. 23(b)(3). Commonality exists when class members' claims depend upon a common contention that is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes* (*Dukes*), 564 U.S. 338, 350 (2011). The predominance inquiry assesses whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), *overruled in part on other grounds by Castillo v. Bank of America, NA*, 980 F.3d 723 (9th Cir. 2020) (citation omitted). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation, alterations, and internal quotation marks omitted). The Court will therefore evaluate the elements of commonality and predominance together. Because the Court finds that Plaintiff fails to establish commonality under Rule 23(a) and predominance under 23(b)(3), it declines to address the parties' arguments with respect to the remaining requirements under Rule 23(a) and 23(b)(3).

***3** Plaintiff argues with respect to commonality under Rule 23(a) that the class seeks common answers to questions of law and fact based on Defendant's practice of charging unlawful convenience fees that were not authorized by underlying mortgage documents and contracts. (ECF No. 51 at 15–

16.) Plaintiff states that "[s]uch common questions include[:] whether Defendant systematically imposed fees upon its customers; whether those fees violated the FDCPA and Rosenthal Act; and whether Plaintiff and members of the [c]lasses are entitled to damages as a result." (*Id.* at 16.) Plaintiff argues with respect to predominance under Rule 23(b)(3), the question is "whether the fees that [Defendant] charged, of which it retained the vast majority, violate the FDCPA and Rosenthal Act." (*Id.* at 21.) Plaintiff contends the foregoing is "a single clear and unified theory of liability" stemming from Defendant's conduct. (*Id.*)

In opposition, Defendant addresses commonality and predominance together, and argues the proposed classes "would plunge this Court into detailed fact-finding and legal analysis for each borrower" because the case is replete with the following individualized questions: (1) whether class members are in default; (2) whether class members individual mortgage agreements or modifications authorize the fee; (3) whether class members have "notice-and-cure" provisions; and (4) whether class members have settled claims through other proceedings such that the defenses of waiver, estoppel, and res judicata will apply. (ECF No. 54 at 5–11.) The Court will examine each of Defendant's arguments in turn.

A. Whether a Class Member's Loan is "In Default"

Defendant notes "[t]he FDCPA circumscribes only the conduct of professional 'debt-collectors' " that does not include a mortgage servicing company, but "[a] narrow exception applies ... if a mortgage servicer collects payments from a borrower whose account is 'in default' when the servicer acquired the account." (ECF No. 54 at 6 (internal citations omitted).) Defendant contends determining whether a class member's loan was "in default" when acquired requires a case-by-case analysis of "the language of the original agreement, applicable state law and federal regulations, any subsequent agreements between the borrower and the loan servicer, and the loan servicer's internal policies." (*Id.*) Defendant argues many members of the proposed class that are not "current" under Plaintiff's proposed class definition cannot be labeled as "in default." (*Id.* at 7.)

In reply, Plaintiff argues the FDCPA's requirement that the loan be in default does not defeat a finding of commonality and predominance, as Defendant has already provided a spreadsheet of customers' loans which were acquired in default. (ECF No. 56 at 9; *see* ECF No. 52.) Plaintiff contends Defendant has cited no case nor is it aware of any FDCPA case in which class certification was denied "because the [c]ourt must determine whether the class members' loans were in default when acquired." (ECF No. 56 at 9.) Plaintiff points to cases from the Eastern District and Northern District to demonstrate that similar classes have been certified under the FDCPA. (*Id.* at 6 (citing *Schwarm v. Craighead*, 233 F.R.D. 655, 660–664 (E.D. Cal. 2006); *Gold v. Midland Credit Mgmt. Inc.*, 306 F.R.D. 623, 635 (N.D. Cal. 2014); *Abels v. JBC L. Grp., P.C.*, 227 F.R.D. 541, 549 (N.D. Cal. 2005)).)

The Court finds, however, that Plaintiff's reliance on the aforementioned cases is unavailing. In said cases, the court certified classes of members who had been sent an unlawful letter in violation of the FDCPA. *See Schwarm*, 233 F.R.D. at 661; *Gold*, 306 F.R.D. at 631; *Abels*, 227 F.R.D. at 544–45. In *Schwarm*, for example, "the only significant individual questions ... relate to the identification of the individual class member, whether the individual class member paid 'collection fees,' and whether the individual paid those fees in reliance on defendants' alleged misrepresentation." *Schwarm*, 233 F.R.D. at 663. The court found such questions did not bar predominance because the common questions "can be resolved for all members in a single adjudication." *Id.* Here, a detailed analysis is required to determine whether a putative class member's loan was in default — a far more complicated analysis which is not easily resolved. The spreadsheet Plaintiff touts as evidence of Defendant's records does not "differentiate borrowers who were current on forbearance plans when their loans transferred to [Defendant], borrowers who paid convenience fees after their delinquent loans were brought current, or borrowers whose accounts were not current but not 'in default.' " (*See* ECF No. 52; *see also* ECF No. 54 at 7.)

***4** Based on the foregoing, the Court agrees with Defendant that the FDCPA only applies if Defendant acquired payments from a borrower whose account is "in default." (*See* ECF No. 54 at 6.) Because it cannot be easily determined whether individual accounts are "in default" — an element of the claim — it cannot be easily determined whether the FDCPA applies to each transaction. "Where, as here, individual inquiries are required to prove a core element of liability, courts have found that individual questions predominate over common questions." *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-cv-02219-HSG, 2021 WL 4818945, at *3 (N.D. Cal. Oct. 15, 2021); *Williams v. Apple, Inc.*, 338 F.R.D. 629, 644 (N.D. Cal. 2021) (denying class certification where plaintiff lacked common proof of "essential elements" of the claim).

Therefore, this individualized issue weighs against a finding of predominance and commonality.

B. Whether Individual Agreements or Modifications Authorize the Fee

Defendant states that it services a variety of loans from different mortgage originators, so "different forms underlie borrowers' loans." (ECF No. 54 at 8.) Defendant argues Plaintiff provides no evidence the underlying mortgage agreements of putative class members used a standard form or have any similarities, and therefore certification "would require unearthing and scrutinizing the account file for each contract to determine whether that particular form authorizes convenience fees." (*Id.*) The FDCPA (and, by extension, the Rosenthal Act) permits collection of fees "expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

In reply, Plaintiff argues Defendant does not cite, nor can Plaintiff find, a case in which a mortgage servicer has presented a loan agreement which specifically authorized convenience fees. (ECF No. 56 at 6.) Plaintiff contends "if any of the class's loan documents contained such a provision, [Defendant] would have submitted a declaration or other evidence to that effect" and this inquiry requires "a simple yes/no check from Defendant's records." (*Id.* at 10.)

In *Morandi*, the plaintiffs sought to certify a class of those who were improperly charged a convenience fee for mortgage payments made by phone. 2021 WL 1398967, at *1. The common question hinged on whether the underlying loan agreements authorized such a fee, which is identical to the question herein. *Id.* at *4. The defendants provided the court with one security instrument as an example to illustrate that this question "must be adjudged for each species of agreement" and the court found the record did not indicate how many different types of agreements exist among class members nor did the parties show substantive variations among these agreements. *Id.* The plaintiff did not provide the court with information about how many underlying mortgage agreements required examination, or evidence that no mortgage agreement expressly authorizes such fees. *Id.* Instead, the plaintiffs' counsel "stated they had 'never seen a mortgage agreement specifically authorizing these types of fees,' in this case or any other." *Id.* Thus, the court held the individualized question weighed against a finding of predominance and denied the plaintiffs' certification motion. *See id.*

In the instant case, Plaintiff does not present the Court with any information as to how many types of underlying mortgage agreements must be examined, let alone any evidence substantiating their claim that no mortgage agreement expressly authorizes the convenience fee. Defendant services mortgages from numerous mortgage originators with different mortgage agreements. (ECF No. 54 at 8.) As the parties' briefs show, this inquiry requires intense factual determinations concerning loan agreements which a "simple yes/no" answer would not satisfy. Plaintiff bears the burden of proof here. *See Dukes*, 564 U.S. at 350. As in *Morandi*, "without a further showing, the Court cannot conclude that the question of whether class members' security instruments expressly authorize the phone payment convenience fee may be resolved on a common basis." *Morandi*, 2021 WL 1398967, at *4. Thus, this individualized issue weighs against a finding of predominance and commonality.

C. "Notice-and-Cure" Provisions

***5** Defendant argues many class members, unlike Plaintiff, have agreements with "notice-and-cure" provisions which require the borrower to give written notice of a breach of the agreement and provide the lender an opportunity to cure prior to filing a lawsuit. (ECF No. 54 at 8.) Defendant contends that before this Court could adjudicate the FDCPA and Rosenthal Act claims on the merits, it would "need to conduct detailed fact-finding about each putative class member's eligibility to proceed under his or her individual contract." (*Id.*) Defendant maintains the Court would need to determine the following: "(1) which class members had agreements with notice-and-cure requirements; (2) whether those class members gave notice to [Defendant] in accordance with the specific requirements of the originating document (or any amendment); and (3) whether [Defendant] failed to cure the complained of action (under the terms of the specific document)." (*Id.* at 9.) In reply, Plaintiff argues a "notice-and-cure" provision is not relevant when the borrower's claim has an independent basis in statute, such as the FDCPA and Rosenthal Act, instead of the contract. (ECF No. 56 at 11–12.)

The Court finds Plaintiff's argument persuasive. Plaintiff is challenging a fee that was allegedly not specified in his loan agreement, so the mortgage lender's attempts to impose the fees were clearly not "actions pursuant to" the agreements.

*McShannock v. JP Morgan Chase Bank N.A.*, 354 F. Supp. 3d 1063, 1071–72 (N.D. Cal. 2018), *reversed and remanded on other grounds*, 976 F.3d 881 (9th Cir. 2020) (citing *Gerber v. First Horizon Home Loans Corp.*, No. C05-1554P, 2006 WL 581082, at *3 (W.D. Wash. Mar. 8, 2006) (an action alleging practices independent of those between the parties does not require notice). Thus, the "notice-and-cure" provisions do not impact a class member's ability to bring the claim, even if their agreement contained the provision. *McShannock*, 354 F. Supp. 3d at 1071. However, Plaintiff presents the Court with limited information about the diversity of loan agreements in the proposed class. As such, "the parties' dispute as to the named plaintiff['s] notice-and-cure provision indicates that the parties will need to engage in similar colloquies for every species of notice-and-cure provision in class members' [loan agreements]." *Morandi*, 2021 WL 1398967, at *5. Therefore, the Court finds this individualized issue weighs against a finding of predominance and commonality.

D. Other Proceedings and Defenses

Defendant argues many putative class members have settled their claims through foreclosure, bankruptcy, and other proceedings such that defenses related to waiver, estoppel, and res judicata would apply. (ECF No. 54 at 9.) In reply, Plaintiff argues Defendant fails to cite a case demonstrating that such a hypothetical situation defeats class certification. (ECF No. 56 at 12.) Plaintiff contends "that most certified classes contain at least a few members who would be barred from participating because they settled or discharged their individual claims." (*Id.*)

The Court is unpersuaded by Defendant's proposed defenses as they are "no more than cursory hypotheticals" which, even if they applied to some class members, would not bar certification "as more important questions predominate." *Tortliatt v. Ocwen Loan Servicing, LLC*, No. 19-cv-04303-WHO, 2021 WL 5230755, at *9 (N.D. Cal. Nov. 8, 2021) (quoting *Tyson Foods, Inc.*, 577 U.S. at 453). Therefore, this issue weighs in favor of a finding of predominance and commonality.

In conclusion, the Court finds Plaintiff has not met the commonality or predominance requirement under Rule 23(a) and Rule 23(b)(3), respectively, "[b]ecause individual permutations of fact and law predominate and would overwhelm any common question." (ECF No. 54 at 2.) Plaintiff does not provide any reasonable solution to resolve these questions, other than to examine Defendant's records for each of the potentially tens of thousands of class members. *See Morandi*, 2021 WL 1398967, at *4 (denying class certification where the plaintiff failed to provide evidence that class members' agreements did not authorize convenience fees); *Tortliatt*, 2021 WL 5230755, at *9 ("[A]ll a plaintiff must do at class certification is present a likely method for determining class damages."). Therefore, the Court denies class certification of both classes because Plaintiff has not provided a likely method for determining: (1) whether class members are in default; (2) whether class members' individual mortgage agreements or modifications authorize the fee; and (3) whether class members have "notice-and-cure" provisions. (ECF No. 54 at 5–11.) "The predominance inquiry is dispositive, so the Court declines to address the other requirements of Rule 23." *Morandi*, 2021 WL 1398967, at *6.

## IV. CONCLUSION

***6** For the foregoing reasons, the Court DENIES Plaintiff's Motion to Certify Class. (ECF No. 50).

IT IS SO ORDERED.

**DATED:** March 25, 2022

### All Citations

Not Reported in Fed. Supp., 2022 WL 912960

### Footnotes

1 The following recitation of facts is taken, sometimes verbatim, from the instant motion. (ECF No. 51.)

2 Plaintiff withdrew his request for certification pursuant to Rule 23(b)(2) and seeks certification solely on the basis of Rule 23(b)(3). (ECF No. 56 at 13.)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 5

2018 WL 2718089
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Hovhannes MARKOSYAN, Plaintiff,
v.
HUNTER WARFIELD, INC., et al., Defendants.

Case No. CV 17–5400 DMG (JCx)
|
Signed 05/11/2018

**Attorneys and Law Firms**

Aidan W. Butler, Aidan W. Butler Law Offices, Los Angeles, CA, for Plaintiff.

Charles R. Messer, David J. Kaminski, Shawn Eldridge, Stephen A. Watkins, Carlson and Messer LLP, Los Angeles, CA, for Defendants.

**ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [25]**

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

***1** This matter is before the Court on a motion for summary judgment filed by Defendant Hunter Warfield, Inc. [Doc. # 25.] For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.

## I.

## PROCEDURAL BACKGROUND

On July 21, 2017, Plaintiff Hovhannes Markosyan filed a Complaint against Defendant Hunter Warfield, Inc. [Doc. # 1.] Plaintiff asserts claims under: (1) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; (2) the Rosenthal Act, Cal. Civ. Code § 1788 *et seq.*; (3) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*; and (4) the Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1 *et seq.* Compl. at 5–10 [Doc. # 1].[1] Plaintiff seeks to recover, *inter alia*, statutory damages, actual damages, and punitive damages. *Id.* at 10. On August 21, 2017, Defendant filed an Answer. [Doc. # 11.]

On March 30, 2018, Defendant filed the instant motion for summary judgment ("MSJ"). [Doc. # 25.] The MSJ has since been fully briefed. [Doc. ## 32, 36.]

## II.

## FACTUAL BACKGROUND

### A. Evidentiary Objections

Both sides have filed evidentiary objections. [Doc. ## 32–9, 36–1.] Because several of the objections pertain to evidence that the Court need not consider to decide the MSJ, the Court need not rule on them. The Court addresses the remaining objections as necessary in its discussion below.

### B. Uncontroverted Facts[2]

Plaintiff rented an apartment at the Heritage Apartments ("Heritage") from December 31, 2013 to approximately November 30, 2014, and he paid Heritage a $500 deposit that was required by his lease. *See* Pl.'s Sep. Statement of Gen. Disps. ("PSGD") at ¶ 1 [Doc. # 32–11]; Markosyan Decl. at ¶ 8 [Doc. # 32–1]. On either November 5, 2014 or November 7, 2014, Plaintiff provided Heritage with a Notice of Intent to Vacate the apartment ("Notice"). *See* Machado Decl., Ex. D at 2 (Notice dated November 7, 2014) [Doc. # 25–6]; Markosyan Decl. at ¶ 3 (attesting that Plaintiff hand-delivered the Notice to Heritage on November 5, 2014) [Doc. # 25–6]. On November 5, 2014, Plaintiff submitted an Inspection Request Form to Heritage, wherein he had marked an "x" in a box next to the statement "I want to exercise my/our option to an inspection before I/we move out[.]" *See* Machado Decl., Ex. B at 2 (Inspection Request Form) [Doc. # 25–4]; Markosyan Decl. at ¶ 4 [Doc. # 32–1].[3] The parties dispute whether Plaintiff later informed Heritage that he no longer desired to have such an inspection before the end of his tenancy. *See* PSGD at ¶ 3. They also dispute whether Plaintiff is liable for damage to carpet that Heritage purportedly discovered during an inspection conducted after Plaintiff vacated the unit. *See id.* at ¶¶ 5–6.

***2** In January or February 2015, Plaintiff received a "Final Account Statement" from Heritage showing that the entirety of his $500 deposit had been used to pay for cleaning the

apartment, prorated rent and parking up through December 6, 2014, and 45 months of "unused carpet life." The statement also claimed that Plaintiff still owed Heritage more than $1,630.66 for these costs. *See* Eldridge Decl., Ex. C at 31:16–32:14 (Markosyan Depo.) [Doc. # 25–17]; Markosyan Decl. at ¶ 8 [Doc. # 32–1]; Machado Decl., Ex. C at 21 (Final Account Statement) [Doc. # 25–5]. Plaintiff thereafter contacted Heritage to dispute the debt. *See* Eldridge Decl., Ex. C at 31:16–32:23 (Markosyan Depo.) [Doc. # 25–17]; Markosyan Decl. at ¶ 8 [Doc. # 32–1]. On March 6, 2015, Heritage sent Plaintiff a letter that: (1) demanded that he pay the balance owed by March 23, 2015, and (2) claimed that Plaintiff had told Heritage's management that he did not want an inspection of the apartment. *See* Machado Decl., Ex. C at 2–3 (letter) [Doc. # 25–5].[4] Heritage did not communicate with Plaintiff after March 2015. PSGD at ¶ 10.

At some point thereafter, Heritage referred Plaintiff's alleged debt to Defendant Hunter Warfield. *Id.* at ¶ 11. On September 9, 2016, Defendant sent a letter to Plaintiff in which it sought to collect $1,630.66. *Id.* at ¶ 12; Machado Decl., Ex. G (collection letter) [Doc. # 25–9]. On October 5, 2016, Plaintiff notified Defendant that he disputed the debt and requested that Defendant validate it pursuant to 15 U.S.C. section 1692(b). *See* PSGD at ¶ 13; Machado Decl., Ex. H at 2–3 (Plaintiff's letter) [Doc. # 25–10]. Until it received Plaintiff's letter, Defendant was unaware that Plaintiff disputed the debt. *See* PSGD at ¶ 14.

On October 13, 2016, Defendant notified Plaintiff that it would need additional time to verify the debt. PSGD at ¶ 20. On October 16, 2016, an employee of Defendant noted in Defendant's records that it had ceased all collection and credit reporting activity on Plaintiff's account. *See id.* at ¶ 22.[5] In the course of updating its records, however, Defendant's employee omitted a "credit report flag." As a result, Defendant reported Plaintiff's debt to credit bureaus in December 2016. *See id.* at ¶ 24. On January 10, 2017, Plaintiff sent a letter to Defendant stating that he considered the matter to be closed because Defendant had not validated the debt. *See* Markosyan Decl., Ex. 1 at 1–2 [Doc. # 32–2]. In April 2017, Plaintiff discovered that Defendant had reported the debt. *See* Markosyan Decl. at ¶ 15 [Doc. # 32–1]; Markosyan Decl., Ex. 2 (April 14, 2017 email from Credit Karma) [Doc. # 32–3].

In April and May 2017, Plaintiff filed two disputes with Equifax, one dispute with TransUnion, and one dispute with Experian. *See* PSGD at ¶¶ 25–28. The Automated Credit Dispute Verification form ("ACDV") submitted by Equifax on April 25, 2017 included the following in the "Dispute Code" section: "[N]ot liable for account (*i.e.*, ex-spouse, business). If liable, provide or confirm complete ID and ECOA Code." *See id.* at ¶ 25. The "FCRA Relevant Information" portion of the form read: "The Collection agency has failed to valid [sic] the debt despite the fact that I requested for the agency to do so in October of 2016. I sent a subsequent letter in January of 2017 stating that the debt is deemed invalid to the none [sic] response." *Id.* (alteration in original).

The ACDV that TransUnion submitted on May 24, 2017 included the following in the "Dispute Code" section:

> ***3** Disputes Current Balance, Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, or Original Charge-off Amount, Verify Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, Current Balance, and Original Charge-off Amount.

*Id.* at ¶ 26. The "FCRA Relevant Information" section of this ACDV was blank.

The ACDV that Equifax submitted on May 25, 2017 included the following in the "Dispute Code" section: "Consumer states inaccurate information. Provide or confirm complete ID and account information." *Id.* at ¶ 27. The "FCRA Relevant Information" section of the May 25, 2017 Equifax ACDV was blank. *Id.* With respect to the last ACDV that Experian submitted on June 1, 2017, it included the following in the "Dispute Code" section: "Consumer states inaccurate information. Provide or confirm ID and account information." *Id.* at ¶ 28. The FCRA Relevant Information section of the final ACDV did not include any text. *See id.* Defendant timely responded to each of the four ACDVs, representing that the information it reported was accurate. *See id.* at ¶ 29.

On October 13, 20, and 27, 2016, November 16, 2016, and June 16, 2017, Defendant requested additional information from Heritage to verify the debt. *See* PSGD at ¶¶ 20–21, 23. On June 19, 2017, Defendant received information from Heritage concerning Plaintiff's alleged debt, including copies

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of Heritage's March 6, 2015 demand letter, photographs of the interior of the apartment, the Final Account Statement, an inspection and inventory report dated December 3, 2014, an invoice for the installation of carpet, Plaintiff's lease, his Inspection Request Form, and a letter Plaintiff sent to Heritage on March 16, 2015. *See id.* at ¶ 30; Machado Decl. at ¶ 26 [Doc. # 25–2]; Machado Decl., Exs. A–E [Doc. ## 25–3, 25–4, 25–5, 25–6, 25–7].[6] On June 20, 2017, Defendant mailed Plaintiff a letter representing that it had verified the debt. *See* PSGD at ¶ 31. Enclosed with Defendant's letter was a copy of Plaintiff's lease and a ledger that was presumably prepared by Heritage. *See* Machado Decl., Ex. K at 5–19 [Doc. # 30–1].

***4** Plaintiff claims that he suffered actual damages as a result of Defendant's credit reporting, including his purported inability to finance a real estate purchase and the loss of a promotion. *See* PSGD at ¶¶ 34–35. Although Plaintiff did not actually apply for a loan, he claims that a Neighborhood Assistance Corporation of America ("NACA") counselor told him not to apply to NACA's program because Defendants' credit reporting would cause NACA to reject his application. *See id.* at ¶¶ 35–37. Further, even though Plaintiff asserts that Defendant's credit reporting prevented him from receiving a promotion, he does not know whether his credit was ever considered during the promotion process. *See id.* at ¶¶ 38–39. In fact, Plaintiff's credit reports do not show that his employer reviewed his credit at any point in time. *See id.* at ¶ 40. Additionally, while Plaintiff claims that Defendant's actions caused him to suffer emotional distress, *see, e.g.*, Markosyan Decl. at ¶¶ 23–24, 26 [Doc. # 32–1], it is undisputed that he did not suffer any physical injury or receive medical treatment for that distress. *See* PSGD at ¶ 42.

## III.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord* *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1963) ); *see also* *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## IV.

## DISCUSSION

Defendant moves for summary judgment on all of Plaintiff's claims. MSJ at 8. Specifically, Defendant contends that: (1) the FCRA preempts Plaintiff's Rosenthal Act claims and most of his CCRAA claims, (2) Plaintiff has not advanced sufficient evidence showing that he did not owe the debt, (3) Defendant discharged its obligation under FCRA to reasonably investigate Plaintiff's disputes, (4) Plaintiff's claims arising out of the retrieval of his credit report fail, (5) Plaintiff cannot recover under the CCRAA because Defendant maintained reasonable procedures to comply with that statute, (6) Plaintiff's misrepresentation claims under the FDCPA and the Rosenthal Act fail, (7) the bona fide error defense bars FDCPA and Rosenthal Act claims, (8) Plaintiff fails to show that he suffered actual damages, and (9) Plaintiff cannot recover punitive damages. *See id.* at 11–24. To the extent relevant and necessary to the disposition of the motion, the Court addresses each of these issues.

### A. Preemption of Plaintiff's Rosenthal Act and CCRAA Claims

Defendant argues that 15 U.S.C. section 1681t(b)(1)(F) preempts the entirety of Plaintiff's Rosenthal Act cause of action and all of his CCRAA claims except for those arising

out of California Civil Code section 1785.25(a).[7] *See* MSJ at 24. Title 15 U.S.C. section 1681t(b)(1)(F) provides in pertinent part:

> ***5** No requirement or prohibition may be imposed under the laws of any State ... with respect to any subject matter regulated under ... section 1681s–2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies [ ("CRAs") ], except that this paragraph shall not apply ... with respect to section 1785.25(a) of the California Civil Code (as in effect on September 30, 1996)[.]

"In other words, state-law claims 'based on alleged injury arising purely from the reporting of credit information by a furnisher of credit ... are completely preempted' by [this provision of] the FCRA, with the exception of claims under California Civil Code section 1785.25(a)." *See Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 986 (N.D. Cal. 2014) (quoting *Roybal v. Equifax*, 405 F. Supp. 2d 1177, 1181 (E.D. Cal. 2005) ); *see also Gorman v. Wolpoff & Abrahmson, LLP*, 584 F.3d 1147, 1166 (9th Cir. 2009) ("[Section] 1681t(b)(1)(F) appears to preempt all state law claims based on a creditor's responsibilities under [Section] 1681s–2 ....").

Plaintiff's CCRAA cause of action primarily relies upon Defendant's alleged violation of California Civil Code section 1785.25(a), which is expressly excepted from FCRA's preemption provision. *See* Compl. at ¶ 46; Opp'n at 21 (relying upon this provision); *Gorman*, 584 F.3d at 1173 ("[W]e hold that the private right of action to enforce California Civil Code section 1785.25(a) is not preempted by the FCRA."). Nonetheless, the Complaint suggests that this cause of action is premised on other provisions of the CCRAA as well. *See* Compl. at ¶ 46 ("Defendant[ ] violated the Consumer Credit Reporting Agencies Act ('CCRAA') —in particular, Civil Code section 1785.25, *inter alia* ....") (emphasis added); *id.* at ¶ 51 ("Defendant[ ] initially failed to note that the debts they were furnishing information about were disputed, despite being aware of that fact."); *see also* Cal. Civ. Code § 1785.25(c) ("So long as the completeness or accuracy of any information on a specific transaction or experience furnished by any person to a consumer credit reporting agency is subject to a continuing dispute between the affected consumer and that person, the person may not furnish the information to any consumer credit reporting agency without also including a notice that the information is disputed by the consumer."). Therefore, the FCRA preempts these other aspects of Plaintiff's CCRAA cause of action.

Moreover, Plaintiff concedes in his opposition that part of his Rosenthal Act cause of action arises out of the fact that Defendant "report[ed] the alleged debt to three reporting agencies ...." *See* Opp'n at 12–13. Such a claim is likewise preempted by FCRA. Plaintiff asserts, however, that his Rosenthal Act cause of action also arises out of the letters that Defendant sent directly to him, and not to CRAs. *See id.* at 13–14. Thus, certain Rosenthal Act claims survive preemption.

***6** In sum, the Court **GRANTS** summary judgment on Plaintiff's Rosenthal Act and CCRAA claims (with the exception of any claim premised on a violation of California Civil Code section 1785.25(a) ) arising out of Defendant's role as a furnisher of information to the CRAs.[8] *See, e.g.*, Compl. at ¶ 24.c (alleging that Defendant violated the Rosenthal Act by "[c]ommunicating false information to credit agencies").

**B. Evidence that Plaintiff Did Not Owe the Debt**

Defendant challenges Plaintiff's assertion that he did not owe the debt in question. *See* MSJ at 15–16. Plaintiff argues that because Heritage failed to comply with California Civil Code section 1950.5, it erroneously charged him for cleaning the apartment and replacing the carpet.[9] *See* Opp'n at 6.

California Civil Code section 1950.5(f)(1) provides in pertinent part that "no earlier than two weeks before the termination or the end of lease date, the landlord, or an agent of the landlord, shall, upon the request of the tenant, make an initial inspection of the premises prior to any final inspection the landlord makes after the tenant has vacated the premises." *See* Cal. Civ. Code § 1950.5(f)(1). "The purpose of the initial inspection shall be to allow the tenant an opportunity to remedy identified deficiencies, in a manner consistent with the rights and obligations of the parties under the rental agreement, in order to avoid deductions from the security." *See id.* "Based on the inspection, the landlord shall give the tenant an itemized statement specifying repairs or cleanings that are proposed to be the basis of any deductions from the security the landlord intends to make ...." *See id.* § 1950.5(f)(2). The statute requires the landlord to afford

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the tenant "the opportunity during the period following the initial inspection until termination of the tenancy to remedy identified deficiencies ... in order to avoid deductions from the security." *See id.* § 1950.5(f)(3).

***7** Within 21 days after the tenant vacates the premises, the landlord shall return any portion of the security remaining after deducting "only those amounts as are reasonably necessary for[,]" *inter alia*, "[t]he repair of damages to the premises, exclusive of ordinary wear and tear" and/or "[t]he cleaning of the premises upon termination of the tenancy necessary to return the unit to the same level of cleanliness it was in at the time of the tenancy." *See id.* § 1950.5(b), (e), (g). A landlord's "bad faith" retention of the security in violation of Section 1950.5 subjects it to liability for actual damages, and shifts to the landlord "the burden of proof as to the reasonableness of the amounts claimed ...." *See* Cal. Civ. Code § 1950.5(l); *Granberry v. Islay Invs.*, 9 Cal. 4th 738, 744–49 (1993) (emphasis in original) ("[T]he Legislature provided a remedy ... for *bad faith* retention of a security deposit ....").

Here, Plaintiff attests that he requested an inspection of the apartment on November 5, 2014, and that Heritage did not contact him to schedule the inspection. [10] *See* Markosyan Decl. at ¶¶ 3–5 [Doc. # 32–1]. Before he vacated the apartment, Heritage did not provide him with a list of items to be cleaned or repaired. *See id.* at ¶ 6. He "left the apartment in the same condition it was in when [he] acquired possession of it, aside from ordinary wear and tear." *See id.* [11] A reasonable jury could find that Heritage violated Section 1950.5 in bad faith by retaining the deposit after refusing to give Plaintiff an opportunity to remedy any deficiencies, and that the costs Heritage incurred were therefore not reasonably necessary. It follows that there is a triable issue of fact on whether Plaintiff owed the $1,630.66 that Defendant sought to collect from him. [12]

### C. Whether Defendant Undertook a Reasonable Investigation Under FCRA

Title 15 U.S.C. section 1681s–2(b)(1) provides that "[a]fter receiving notice ... of a dispute with regard to the completeness or accuracy of any information provided by a person to a [CRA], [a furnisher] shall—[ (*inter alia*) ] ... conduct an investigation with respect to the disputed information; ... review all relevant information provided the [CRA] pursuant to section 1681i(a)(2) of this title; [13] [and] ... report the results of the investigation to the [CRA] ...." This provision requires the furnisher receiving such a notice to conduct an investigation that is reasonable in light of the nature and extent of the information that the CRA has provided. *See Gorman*, 584 F.3d at 1155–57.

***8** Defendant claims that the FCRA did not require it to determine the legal validity of Heritage's claim against Plaintiff, and that its investigations of Plaintiff's disputes were reasonable in light of the information the CRAs had provided. *See* MSJ at 11–16; Reply at 10–21. Defendant's first contention relies primarily on *Jones v. Pennsylvania Higher Education Assistance Agency*, No. CV 16–00107–RSWL (AFMx), 2017 WL 4597078 (C.D. Cal. July 24, 2017), *see* MSJ at 14; Reply at 10–17, which suggested that Section 1681s–2(b) does not require furnishers to investigate the legal validity of a debt. *See Jones*, 2017 WL 4597078 at *4–8 ("Plaintiff tries to bootstrap a legal determination of her responsibility for the 2002 loan into this Court through a FCRA 'reasonable investigation' claim."). While the Ninth Circuit recognizes that the FCRA and the CCRAA do not require *CRAs* to ascertain "the legal validity of consumer debts[,]" it has observed that "the creditor *or furnisher* ... 'stands in a far better position to make a *thorough investigation* of a disputed debt than the CRA does on reinvestigation.' " *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891–92 (9th Cir. 2010) (emphasis added) (quoting *Gorman*, 584 F.3d at 1156); *see also id.* at 891 (observing that CRAs "simply collect and report information *furnished by others*") (emphasis added). Therefore, the rationale for excluding legal validity from the scope of a CRA's investigative duty does not extend to a furnisher. *Cf. Gorman*, 584 F.3d at 1159–61 (analyzing whether a furnisher reasonably investigated a consumer's claim that he did not receive the goods promised by a sales contract). Furthermore, a triable issue of fact exists regarding whether Defendant conducted reasonable investigations in response to the credit bureaus' dispute notices. Admittedly, the April 25, 2017 Equifax ACDV did not discuss Plaintiff's claim regarding California Civil Code section 1950.5. *See* Machado Decl., Ex. J at 2–3 ("Not liable for account (*i.e.*, ex-spouse, business). If liable, provide or confirm complete ID or ECOA Code.") [Doc. # 25–12]; PSGD at ¶ 25. Nevertheless, the other three ACDVs were each accompanied by a letter from Plaintiff, which stated in pertinent part:

> [T]he former landlord failed to conduct an initial inspection of the premises with me before I moved out, despite my repeated requests orally

> and in writing that such an inspection be provided. The landlord also failed to furnish me with an itemized statement of damages or repairs prior to termination of my tenancy, in order to allow me an opportunity to rectify the perceived issues. [¶] California law is clear on the point that a landlord may not deduct money from a security deposit in the absence of a landlord's compliance [with] such basic tenant rights laws. (See Civil Code Section 1950.5(f)(4),(5); see Civil Code Section 1950.5(c), etc.) [¶] Further, the landlord has included in the amount it claims is owed fees imposed to cover ordinary wear and tear, in violation of California law.

Macado Decl., Ex. J at 10–11, 13–14, 16 [Doc. # 25–12]; Reply at 14–16 (conceding that Plaintiff's letters were included with the last three ACDVs); *see also* 15 U.S.C. § 1681s–2(b)(1)(B) (requiring furnishers to "review all relevant information provided by the consumer reporting agency").

Although Defendant requested information from Heritage on October 13, 20, and 27, 2016, November 16, 2016, and June 16, 2017, Heritage did not provide documents in response to those requests until June 19, 2017. *See* PSGD at ¶¶ 20–21, 23, 30; MSJ at 14 ("Only on June 19, 2017 did [Defendant] finally receive additional documentation from Heritage in response to its requests."). Yet, before receiving those documents on June 19, 2017, Defendant responded to each of the dispute notices by representing that it had verified the debt. *See* Eldridge Decl., Ex. A at 135:14–16, 138:12–18, 143:3–20, 147:3–24 (Machado Depo.) [Doc. # 25–15]; PSGD at ¶ 29 ("Defendant responded timely to each ACDV ...."); Machado Decl., Ex. J at 2–9 (indicating that the ACDV response deadlines were May 18, 2017, and June 13, 15, and 16, 2017) [Doc. # 25–12]. Thus, at the time Defendant verified the debt to the CRAs, it had only basic account information that it initially received from Heritage—*e.g.*, Plaintiff's Social Security number, his date of birth, his contact information, the date of the delinquency, and the account balance. *See* Butler Decl., Ex. 1 at 86:11–87:20 (Machado Depo.) [Doc. # 32–7]; *see also* MSJ at 14 (conceding that Defendant investigated Plaintiff's disputes "by comparing the information in the ACDV with the information on the Plaintiff's account"). A reasonable factfinder could conclude that Defendant did not have enough information to determine the veracity of Plaintiff's claims that Heritage charged him for ordinary wear and tear, and that it failed to conduct an initial inspection or supply Plaintiff with an itemized statement. Therefore, the Court cannot conclude as a matter of law that Defendant reasonably investigated Plaintiff's disputes. For that same reason, whether Defendant violated the CCRAA presents a triable issue of fact. *See* Cal. Civ. Code § 1785.25(a) (emphasis added) ("A person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or *should know* the information is incomplete or inaccurate.").

**D. Plaintiff's Claims Arising out of the Retrieval of His Credit Report**

***9** Plaintiff alleges that Defendant violated the FCRA by obtaining his consumer report under false pretenses. *See* Compl. at ¶ 38 (citing 15 U.S.C. § 1681q). Defendant contends that it did not retrieve his credit report and, even if it did, it had a "good faith belief" that the debt existed. *See* MSJ at 24–25 (quoting *Ekhlas v. Frontline Asset Strategies, LLC*, No. SACV 13–00745 DOC (ANx), 2014 WL 11398760, at *2 (C.D. Cal. Mar. 31, 2014)* ). The only part of the record that Defendant cites for these propositions is its Compliance Director's attestation that "[Defendant] does not have a record of pulling Plaintiff's credit report, but if it did pull the report, it would have [been] pursuant to its collection efforts." [14] *See* Machado Decl. at ¶ 28 [Doc. # 25–2].

Plaintiff objects to this testimony on the grounds of hearsay and lack of personal knowledge. Pl.'s Evid. Objs. at 3 [Doc. # 32–9]. Although the Compliance Director does not explicitly identify the source of her testimony, she appears to rely on Defendant's "account notes" for this debt, which are attached to her declaration. *See* Machado Decl. at ¶¶ 4, 8 [Doc. # 25–2]; Machado Decl., Ex. F (account notes) [Doc. # 25–8]. The Compliance Director fails to establish, however, that the business records exception to the hearsay rule applies to the account notes. Although she attests that these notes "are maintained in the ordinary course of business[,] ... are updated at or near the time of the acts, conditions, or events to which said records relate[,] [and] [Defendant] relies upon these records in its business[,]" *see* Machado Decl. at ¶ 4 [Doc. # 25–2], she does not state that the notes were made by someone with knowledge, or that making the record was a regular practice of Defendant's activities. The result is the same if Defendant contends that there is *no record* that it pulled

Plaintiff's credit report. *See* Fed. R. Evid. 803(6)(A), (C); *see also* Fed. R. Evid. 803(7) (hearsay exception concerning the absence of a business record); Fed. R. Evid. 803(7) advisory committee's note to 2013 amendment (if a party intends to show the absence of a business record, it must satisfy Rule 803(6)'s requirements). Accordingly, the Court **SUSTAINS** Plaintiff's objections. Furthermore, assuming *arguendo* that a "good faith belief" that Plaintiff owed the debt is sufficient to avoid liability, Defendant does not identify the basis of its professed good faith belief. *See* MSJ at 24–25. As discussed *supra* Part IV.C, whether Defendant conducted a reasonable investigation of Plaintiff's disputes with his landlord presents a triable issue of fact.

For these reasons, the Court concludes that Defendant has not met its initial burden of showing the absence of a genuine dispute of material fact on this FCRA claim.

**E. Defendant's "Reasonable Procedures" Defense to the CCRAA Claim**

Under the CCRAA, "[a] person who furnishes information to a consumer credit reporting agency is liable for failure to comply with [the statute], unless the furnisher establishes by a preponderance of the evidence that ... the furnisher maintained *reasonable procedures* to comply with those provisions." *See* Cal. Civ. Code § 1785.25(g) (emphasis added). Defendant contends that it is entitled to this defense as a matter of law. *See* MSJ at 25–26. Specifically, Defendant claims to have a policy of ceasing collections and credit reporting if it receives a verification request from a consumer *and* it is unable to verify the debt within the 30–day period for doing so. *See* Machado Decl. at ¶¶ 16–18 [Doc. # 25–2] (emphasis added) ("the collection/reporting suppression policy"). [15] Defendant trains its employees to enter an electronic code to suppress credit reporting when it is apparent that Defendant will not receive verifying documents within the 30–day period. *See id.* at ¶¶ 17–18. Defendant does not append any copy of that policy or clarify whether it even exists in written form.

***10** Further, Defendant has a policy of requiring its employees to "investigate and substantiate disputes received by consumers, third parties, or ACDVs." *Id.* at ¶ 14 ("the investigation policy"). "Once the investigation is conducted, the policy dictates that employees are required to take appropriate action, based on the outcome of such investigations, including updating information on the consumer's account." [16] *Id.* at ¶ 15.

Notwithstanding this evidence, there remains a genuine dispute of material fact regarding whether Defendant's policies set forth "reasonable procedures" that comply with the CCRAA. *See* Cal. Civ. Code § 1785.25(g). First, a reasonable jury could find that "the collection/reporting suppression policy," as described by the Compliance Director, is vague and ambiguous. For example, a reasonable jury could find that the policy appears to be unclear what an employee is required to do within the 30–day window before verification of the debt. For example, an employee believes that verification documents could be received on the 10th day or the 29th day of the 30–day window, but how would that employee know *when* to enter the suppression code, if at all, especially if the documents do not ultimately verify the debt? As the facts of this case show, merely training Defendant's employees to enter the code may not be an adequate means of ensuring that all debt collection and/or reporting ceases until Defendant verifies the debt. In this case, not only did Defendant's employee fail to actually enter the suppression code in October 2016, *see* PSGD at ¶ 24; Butler Decl., Ex. 1 at 19:11–23 (Machado Depo.) [Doc. # 32–7], there is no indication that Defendant's other employees detected or corrected the error at any time before June 19, 2017, the date on which Heritage provided Defendant with documents that allegedly "verified" the debt. *See* PSGD at ¶ 29. Yet, Defendant's personnel could have entered the suppression code in the course of reviewing any one of Plaintiff's disputes, or when they received Plaintiff's January 10, 2017 letter disputing the debt. *See* PSGD at ¶¶ 25–29 ("Defendant responded timely to each ACDV [that he submitted in April and May 2017], verifying the account as accurate."); Markosyan Decl., Ex. 1 at 1–2 (January 10, 2017 letter) [Doc. # 32–2].

Second, Defendant's investigation policy which requires its personnel to investigate disputes and "take appropriate action" does not entitle it to summary judgment on Plaintiff's CCRAA claims. Because Defendant supplies no definition of the term "appropriate" or the precise basis and timing for the entry of the suppression code, it is not altogether clear that Defendant's employees even violated its policy when they "verif[ied] the account as accurate" before receiving any documentation from Heritage. *See* PSGD at ¶ 29; *supra* Part IV.C. Further, the Compliance Director's deposition testimony suggests that Defendant's employees could have complied with this policy by simply comparing the basic account information it had on file with information supplied by the creditor. *See* Butler Decl., Ex. 1 at 85:5–87:7, 123:14–124:19

(Machado Depo.) [Doc. # 32–6]. Thus, there is a triable issue of fact as to whether the investigation policy is so vague and ambiguous that it is not a "reasonable policy."

**F. Plaintiff's Misrepresentation Claims Under the FDCPA and the Rosenthal Act**

***11** Defendant claims that Plaintiff's FDCPA and Rosenthal Act claims arising out of alleged violations of 15 U.S.C. sections 1692e(8), 1692e(10), and 1692f(1) fail because Defendant relied on records provided by Heritage and "the FDCPA does not impose upon a [debt] collector a duty to independently investigate a debt[or's] ... reported claims." *See* MSJ at 21. Defendant ignores the fact that the FDCPA is a "strict liability statute." *See Clark v. Capital Credit and Collection Servs., Inc.*, 460 F.3d 1162, 1174–76 & n.11 (9th Cir. 2006) ("[Section] 1692k(c) generally makes the FDCPA a strict liability statute."). Therefore, Defendant's reliance on Heritage's records does not absolve it from liability for falsely representing that Plaintiff was liable for the debt, *see* 15 U.S.C. § 1692e(10); *id.* § 1692f(1), or from failing to communicate to the credit bureaus that Plaintiff had disputed the debt. *See id.* § 1692e(8).

Defendant further contends that its September 9, 2016 collection letter is not actionable because "an initial letter that otherwise complies with [section] 1692g does not violate 1692e if the amount is improper because the recourse is to dispute the debt."[17] *See* Reply at 29–30 (citing *Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, 484 (7th Cir. 1997); *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 940 (9th Cir. 2007) ). Yet, the authorities upon which Defendant relies do not support this proposition. *Jang* held only that "a collection letter cannot be false, misleading or deceptive" merely because it includes a notice that the debt collector will obtain verification of a debt. *See Jang*, 499 F.3d at 483–84. *Guerrero* simply held that section 1692g(b) does not impose "an independent obligation to verify a disputed debt where the collector abandons all collection activity with respect to the consumer." *See Guerrero*, 499 F.3d at 940. Neither decision immunizes debt collectors from liability for attempting to collect on debts that are not owed.

Additionally, Defendant argues that Plaintiff cannot establish a violation of 15 U.S.C. section 1692e(8) because it reported that Plaintiff's debt was disputed. *See* MSJ at 23. The only evidence Defendant offers to support this assertion is the declaration of its Compliance Director, wherein she attests that Defendant "began reporting Plaintiff's debt as disputed in December 2016."[18] *See* Machado Decl. at ¶ 21 [Doc. # 25–2].

Plaintiff objects to this declaration testimony on the grounds of hearsay and lack of personal knowledge. Pl.'s Evid. Objs. at 3 [Doc. # 32–9]. It is unclear whether the account notes lay a proper foundation for this declaration testimony.[19] In any event, for the reasons discussed *supra* Part IV.D, the business records exception does not apply to the account notes. *See* Fed. R. Evid. 803(6)(A), (C). Accordingly, the Court **SUSTAINS** Plaintiff's objections, and rejects Defendant's contention that it is entitled to summary judgment on this FDCPA claim.

**G. Defendant's Bona Fide Error Defense to FDCPA and Rosenthal Act Claims**

***12** Defendant maintains that Plaintiff's FDCPA and Rosenthal Act claims are barred by the bona fide error defense. *See* MSJ at 22–23; Reply at 27–29. "To qualify for the bona fide error defense, the defendant must prove that (1) it violated the FDCPA unintentionally; (2) the violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid the violation." *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948 (9th Cir. 2011). For the reasons discussed *supra* Part IV.E, there is a genuine dispute of fact regarding whether Defendant's policies were reasonably adapted to ensure that all debt collection and reporting activities cease until a debt has been verified and that its personnel refrain from attempting to collect on debts that are not owed. Thus, Defendant is not entitled to summary judgment on this defense.

**H. Actual Damages**

Defendant claims that Plaintiff cannot present sufficient evidence to recover actual damages under the FCRA, the CCRAA, the FDCPA, or the Rosenthal Act. *See* MSJ at 16–19, 21–22. According to Defendant, Plaintiff's assertions that its credit reporting activities prevented him from receiving a promotion and purchasing real property are too speculative. *See id.* at 16–18. Further, Defendant contends that Plaintiff's emotional distress damages are supported by only his self-serving testimony, which supposedly describes his transitory symptoms in a conclusory fashion.[20] *See id.* at 18–19.

Plaintiff appears to have abandoned his claims for actual damages relating to the loss of the promotion and the real

estate purchase because he failed to address them in his opposition. *See* Opp'n at 29–30; *cf. Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (concluding that a plaintiff abandoned his state law claims "by not addressing them in either his Motion for Partial Summary Judgment or his Opposition to Defendants' Motion for Summary Judgment"). Furthermore, it is undisputed that: (1) Plaintiff's credit reports do not show that his employer reviewed his credit at all, PSGD at ¶ 40, (2) Plaintiff does not know if his credit was considered during the promotion process, *id.* at ¶ 39, and (3) Plaintiff did not apply for a loan to purchase real property. [21] *See id.* at ¶ 37. Therefore, the Court **GRANTS** summary judgment on all damages relating to Plaintiff's loss of a promotion and his inability to finance a real estate transaction on favorable credit terms. *See Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001) (internal quotation marks omitted) ("It is black-letter law that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.").

With regard to his request for emotional distress damages, Plaintiff attests that Defendant's conduct caused him to feel "humiliated, degraded, and angry" because Defendant was "portraying [him] as a deadbeat—despite the fact that [he] tried so hard to be financially responsible." *See* Markosyan Decl. at ¶¶ 23–24 [Doc. 32–1]; *see also* Eldridge Decl., Ex. C at 105:3–6 (Markosyan Depo.) ("I was depressed a lot, angry, feel—felt cheated.") [Doc. # 25–17]. He declares that this "intense stress, depression, and anger[ ] seem every bit as palpable to [him] as pain from a wound." *See* Marskosyan Decl. at ¶ 26 [Doc. # 32–1]. [22] He further attests that he suffered "extreme and unwanted weight loss" as a result of "this stress and depression." *See id.* To support this assertion, he submits photographs purportedly showing that he was at his "normal[,] ... proper, [and] healthy weight" before he encountered Defendant, and that he was much thinner "toward the end of the [his] ordeal" with Defendant. *See id.*; Markosyan Decl., Ex. 3 at 1–2 [Doc. # 32–4]. [23]

***13** This evidence is sufficient to create a triable issue of fact. Ninth Circuit case law does not generally require evidence of emotional distress to be permanent, corroborated, and/or "adequately explained." *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003) (internal quotation marks omitted). "While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in ... the Ninth Circuit, or the Supreme Court." *Id.* (alteration in original) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000) ). In fact, a plaintiff's testimony that he or she was "greatly hurt and humiliated" by the defendant's conduct is sufficient to support a claim of emotional distress damages. *See id.* at 1040–41 (holding that such evidence was sufficient in an employment discrimination case); *see also Acton v. Bank One Corp.*, 293 F. Supp. 2d 1092, 1100–01 (D. Ariz. 2003) (applying *Zhang's* approach to a FCRA action). [24]

The district court orders that Defendant cites in support of a more stringent standard are predicated upon non-binding case law from other circuits. *See Edeh v. Equifax Info. Servs, LLC*, 974 F. Supp. 2d 1220, 1244 (D. Minn. 2013) ("[T]he evidence presented by [the plaintiff] does not establish the type of concrete emotional distress that is required to create a genuine injury and actual damages and survive summary judgment under Eighth Circuit law."); *Costa v. Nat'l Action Fin. Servs.*, 634 F. Supp. 2d 1069, 1078 (E.D. Cal. 2007) (citing *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 834 (7th Cir. 2004); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001) ) ("[A] plaintiff must demonstrate more than transitory symptoms of emotional distress and unsupported self-serving testimony by a plaintiff is not sufficient."); *Myers v. Bennett Law Offices*, 238 F. Supp. 2d 1196, 1206 (D. Nev. 2002) (citing *Cousin*, 246 F.3d at 371) ("[A] plaintiff must support a claim for damages based on emotional distress with something more than his or her own conclusory allegations."). The Court does not find these authorities persuasive because they are inconsistent with the Ninth Circuit's approach. Therefore, Defendant is not entitled to summary judgment on Plaintiff's emotional distress claims.

**I. Punitive Damages**

***14** Punitive damages are available under the FCRA and the CCRAA only if a plaintiff shows that a defendant "willfully" violated those statutes. *See* 15 U.S.C. § 1681n(a)(2); Cal. Civ. Code § 1785.31(a)(2)(B). "[W]illfulness reaches actions taken in 'reckless disregard of statutory duty,' in addition to actions 'known to violate the [statute].' " *Syed v. M–I, LLC*, 853 F.3d 492, 503 (9th Cir. 2017) (quoting *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007) ) (FCRA's willfulness standard); *see also* Carvalho, 629 F.3d at 889 (holding that decisions interpreting the FCRA are persuasive authority for construing the CCRAA). A defendant acts with reckless disregard when it "runs a risk of error '*substantially greater than* the risk associated with a reading [of a statute] that was merely careless.' " *See id.* at 504 (emphasis in original) (quoting *Safeco*, 551 U.S. at 69). Further, "where a party's

action violates an unambiguous statutory requirement, that fact alone may be sufficient to conclude that its violation is reckless, and therefore willful." *See id.* at 505 n.7.

Defendant contends that Plaintiff cannot establish willfulness because it relied upon the records in its system when it responded to Plaintiff's disputes. MSJ at 19–21; Reply at 25–27. The evidence suggests that the information Defendant kept in its system, however, was not responsive to the concerns that Plaintiff discussed in the letters that accompanied three of the four ACDVs. *See supra* Part IV.C. Such conduct is inconsistent with Defendant's unambiguous statutory obligations to "review all relevant information provided by the consumer reporting agency[,]" *see* 15 U.S.C. § 1681s–2(b)(1)(B), and to conduct an investigation that is reasonable in light of "the nature of the consumer's challenge to the reported debt[.]" *See Gorman*, 584 F.3d at 1157. Therefore, Defendant fails to establish the absence of a genuine dispute of material fact on the punitive damages claims.

**V.**

**CONCLUSION**

In light of the foregoing, the Court issues the following rulings:

1. The Court **GRANTS** Defendant's motion for summary judgment on all Rosenthal Act and CCRAA claims arising out of Defendant's role as a furnisher of information to the CRAs, with the exception of the CCRAA claim predicated on California Civil Code section 1785.25(a);

2. The Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's claims for actual damages arising out of the loss of a promotion or the opportunity to finance a real estate purchase; and

3. Defendant's motion is otherwise **DENIED**. By May 18, 2018, Plaintiff shall file a summary of the claims remaining for trial, including a very brief legal and factual basis for the remaining claims.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2718089

## Footnotes

1 With the exception of citations to deposition testimony, all page references herein are to page numbers inserted by the CM/ECF system.

2 Unless otherwise indicated, the facts recited in this section are uncontroverted.

3 Defendant objects on foundational grounds to Plaintiff's declaration testimony that he delivered the Notice of Intent to Vacate and the Inspection Request Form to Heritage on November 5, 2014. Def.'s Evid. Objs. at 2–3 [Doc. # 36–1]. The Court **OVERRULES** this objection because Plaintiff has personal knowledge of when he submitted these documents to Heritage.

4 Plaintiff's objections to the Final Account Statement and the March 6, 2015 letter are **OVERRULED** for the reasons discussed *infra* note 6.

5 The parties agreed in the PSGD that Defendant suppressed all collection and credit reporting activity on October 16, *2018*. PSGD at ¶ 22 (emphasis added). This is a typographical error. *See* Machado Decl. at ¶ 19 (attesting that this event occurred on October 16, 2016) [Doc. # 25–2]. Although Plaintiff objects to paragraph

19 of Machado's declaration, there is no indication that Plaintiff disputes Machado's claim that this event transpired on October 16, 2016. *See* Pl.'s Evid. Objs. at 3 [Doc. # 32–9]; PSGD at ¶ 22.

6 Plaintiff objects to these documents on the grounds of lack of authentication and hearsay. *See* Pl.'s Evid. Objs. at 5 [Doc. # 32–9]. The business records exception to the hearsay rule applies to documents that a business receives from others if "those records are kept in the regular course of that business, relied upon by that business, and ... that business has a substantial interest in the accuracy of the records." *See MRT Constr., Inc. v. Hardrives, Inc.*, 158 F.3d 478, 483–84 (9th Cir. 1998) (citing, *inter alia*, Fed. R. Evid. 803(6) ). Defendant's Compliance Director attests that she is familiar with Defendant's policies and procedures relating to credit reporting and consumers' account records, Defendant incorporated the documents from Heritage into its own business records, and Defendant relies upon the records of its creditors in the regular course of its business. *See* Machado Decl. at ¶¶ 4, 26–27 [Doc. # 25–2]; *see also United States v. Childs*, 5. F.3d 1328, 1334 (9th Cir. 1993) ("The phrase 'other qualified witness' [for the purposes of the business records exception] is broadly interpreted to require only that the witness understand the record-keeping system."). Further, although Plaintiff argues that Defendant verified Plaintiff's alleged debt before receiving these documents from Heritage, he has not shown that Defendant does not regularly rely upon creditors' records after they are in Defendant's possession. *See* Pl.'s Evid. Objs. at 5–6 [Doc. # 32–9]. Moreover, the circumstances indicate that Defendant has a substantial interest in obtaining accurate records from creditors to avoid liability under FCRA and other statutes. Therefore, the Court **OVERRULES** Plaintiff's objections to the documents Defendant received from Heritage. *See also* Fed. R. Evid. 902(11) (a document that satisfies the business records exception is self-authenticating).

7 Most provisions of the FDCPA are enforceable under the Rosenthal Act. *See* Cal. Civ. Code § 1788.17 ("[E]very debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."). Plaintiff's Rosenthal Act cause of action is derivative of his FDCPA claims. *See* Compl. at ¶¶ 23–25.

8 Defendant is a "furnisher" for the purposes of the FCRA. *See, e.g.*, 15 U.S.C. § 1681s–2(a)–(b) (imposing duties on "[a] person" who "furnish[es] ... information relating to a consumer to any consumer reporting agency"); Reply at 9 (impliedly conceding that Defendant is a furnisher under the FCRA) (emphasis added); Opp'n at 18–19 (same).

9 Plaintiff also claims that Heritage erroneously charged him for rent and parking fees accruing on December 5 and 6, 2014. *See* Markosyan Decl. at ¶ 19 [Doc. # 32–1]. The Court need not address this assertion further because there is a triable issue of fact regarding whether California Civil Code section 1950.5 barred Heritage from obtaining the cleaning and carpet replacement costs. Further, the letters that Plaintiff submitted to Defendant and the credit bureaus did not challenge the prorated rent and parking fees, *see* Machado Decl., Ex. H at 2–3 (Plaintiff's October 5, 2016 letter to Defendant) [Doc. # 25–10]; Markosyan Decl., Ex. 1 at 1–2 (Plaintiff's January 10, 2017 letter to Defendant) [Doc. # 32–2]; Machado Decl., Ex. J at 2–17 (ACDV forms and letters from Plaintiff that were attached thereto) [Doc. 25–12], and the bulk of the amount that Plaintiff disputes is attributed to replacing the carpet and cleaning the apartment. *See* Machado Decl., Ex. C at 21 (showing that $1,775.00 of the $2,130.69 Plaintiff allegedly owed (before deducting the $500 deposit) was attributed to replacing the carpet and cleaning the apartment) [Doc. # 25–5].

10 Plaintiff did not identify a preferred date and time for the inspection on the form because he "was willing and able to be available for the inspection at any time[.]" *See* Markosyan Decl. at ¶ 4 [Doc. # 32–1].

11 Defendant objects to this portion of Plaintiff's declaration on the ground that it lacks foundation and that Plaintiff engages in speculation by claiming that such wear and tear was "ordinary." *See* Def.'s Evid. Objs. at 2 [Doc. # 36–1]. The Court **OVERRULES** these objections because Plaintiff has personal knowledge of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the condition in which he left the apartment, and his opinion in that regard is based on his perception, even if Defendant disagrees with it. *See* Fed. R. Evid. 602; Fed. R. Evid. 701.

12 Defendant argues that the documents it received from Heritage establish that Plaintiff owed the debt. *See, e.g.*, Def.'s Sep. Statement of Uncontrov. Facts ("DSSUF") at ¶ 3 (claiming that Heritage's March 6, 2015 letter established that "Plaintiff verbally declined the inspection with ... Heritage") [Doc. # 25–1]. At most, these documents undermine the credibility of Plaintiff's version of events. Consequently, they do not establish that Defendant is entitled to judgment as a matter of law. *See Soremekun*, 509 F.3d at 984.

13 Title 15 U.S.C. section 1681i(a)(2) requires the CRA to provide the furnisher with "all relevant information regarding the dispute that the agency has received from the consumer ...."

14 Defendant's reply also cites an excerpt from Plaintiff's supplemental interrogatory responses. *See* Reply at 33 (citing Eldridge Decl., Ex. G [Doc. # 25–21] ). This excerpt has no apparent relevance. *See* Eldridge Decl., Ex. G at 3–5 (stating that Plaintiff believes that Defendant's credit reporting hindered his ability to purchase a condominium) [Doc. # 25–21].

15 Although the Compliance Director's testimony refers to this timeframe as "the 30 day validation period" and "30 days of the dispute from the creditor[,]" *see* Machado Decl. at ¶¶ 16, 18 [Doc. # 25–2], it appears that she intends to reference 15 U.S.C. § 1692g's 30–day period for verifying debts. *See* 15 U.S.C. § 1692g(a)(3)–(4) (the 30–day period begins with the consumer's receipt of the notice required by that section). This ambiguity has no bearing on the Court's disposition of the motion.

16 Plaintiff objects to the Compliance Director's testimony on these policies on the grounds of hearsay and lack of personal knowledge. *See* Pl.'s Evid. Objs. at 2 [Doc. # 32–9]. The hearsay objection is **OVERRULED** because the policy is not offered for its truth. *See* Fed. R. Evid. 801(c)(2). The Court **OVERRULES** Plaintiff's personal knowledge objection because the Compliance Director attests that she is familiar with Defendant's policies and procedures regarding credit reporting. *See* Machado Decl. at ¶¶ 2, 4 [Doc. # 25–2].

17 In addition, Defendant claims that Plaintiff may not recover under this theory because it was not explicitly alleged in the Complaint. *See* Reply at 29. Nonetheless, the Complaint discusses the initial collection letter, *see* Compl. at ¶ 12, and alleges that Defendant violated 15 U.S.C. sections 1692e(10) and 1692f. *See id.* at ¶¶ 21.a–b. Thus, Plaintiff's failure to expressly identify this legal theory is not fatal. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (emphasis in original) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories.").

18 Defendant also proffers an excerpt from the Compliance Director's deposition transcript. *See* DSSUF at ¶ 24 (citing Eldridge Decl., Ex. A at 65:1–14 (Machado Depo.) [Doc. # 25–15] ). Therein, Machado merely testifies that one of Defendant's employees failed to enter a code that would have prevented Defendant from reporting the alleged debt to credit bureaus. *See* Eldridge Decl., Ex. A at 65:1–14 (Machado Depo.) [Doc. # 25–15].

19 It is possible that the Compliance Director's testimony impliedly relies on an October 11, 2016 entry that provides: "Assigned Debtor Account Tag: CBRDisp[.]" *See* Machado Decl., Ex. F at 12 [Doc. # 25–8]. Without further context, however, the precise meaning of this notation is unclear.

20 Defendant argues for the first time in its reply that Plaintiff may not recover for emotional distress resulting from his mere awareness that it had reported the debt to the credit bureaus. *See* Reply at 24. The Court rejects this argument as it is untimely. *See Zamani*, 491 F.3d at 996.

21 Plaintiff's attests that a NACA counselor told him that Defendant's reporting "would make getting a good rate on [a] mortgage impossible[.]" *See* Markosyan Decl. at ¶ 27 [Doc. # 32–1]; *see also* Eldridge Decl. at 89:20–

90:20 (Markosyan Depo.) (same) [Doc. # 25–17]. This evidence constitutes inadmissible hearsay that cannot support Plaintiff's damages claims. *See* Fed. R. Evid. 802.

22 Defendant objects to this passage from Plaintiff's declaration on the grounds of lack of foundation and speculation. Def.'s Evid. Objs. at 4 [Doc. # 36–1]. The Court **OVERRULES** these objections because Plaintiff has personal knowledge of the extent to which he suffered emotional distress, and this testimony is rationally based on his perception. *See* Fed. R. Evid. 602; Fed. R. Evid. 701.

23 Defendant objects to Plaintiff's declaration testimony regarding his weight loss on the grounds of lack of foundation and speculation. *See* Def.'s Evid. Objs. at 4 [Doc. # 36–1]. It also argues that the photographs lack proper authentication. *See id.* At bottom, these objections stem from Defendant's assertion that Plaintiff has not adequately specified the timeframe in which his weight loss allegedly occurred. *See id.* The Court **OVERRULES** these objections because Defendant's concerns pertain to the credibility and veracity of this evidence, and not whether Plaintiff has laid an adequate foundation for it. *See* Fed. R. Evid. 602 (employing the “sufficient to support a finding” standard for personal knowledge); Fed. R. Evid. 901(a) (same for authentication); Fed. R. Evid. 701(a) (providing that lay opinion must be “rationally based on the witness's perception”).

24 For these reasons, Plaintiff's CCRAA, FDCPA, and Rosenthal Act claims for emotional distress damages also survive summary judgment. *See* *Carvalho*, 629 F.3d at 889 (internal quotation marks omitted) (“[B]ecause the CCRAA is substantially based on the Federal Fair Credit Reporting Act, judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions.”); *Riley v. Giguiere*, 631 F. Supp. 2d 1295, 1314–16 (E.D. Cal. 2009) (holding that the FCRA and the FDCPA both use the same legal standard); Cal. Civ. Code § 1788.17 (incorporating the FDCPA's remedial provisions into the Rosenthal Act). Nonetheless, Defendant suggests that Plaintiff cannot recover actual damages under the FDCPA or the Rosenthal Act because he “alleged damages relating to credit reporting—not actual damages related directly to not receiving the verification of debt prior to the collection activities.” *See* MSJ at 21; Reply at 30. The Court disagrees with Defendant's characterization of Plaintiff's actual damages claims. *See* Markosyan Decl. at ¶ 23 (emphasis added) (“[Defendant's] *misconduct* had a major emotional impact on me ....”) [Doc. # 32–1]. Further, the Court rejects Defendant's dubious contention that misconduct related to credit reporting cannot give rise to damages under the FDCPA or the Rosenthal Act. *See, e.g.*, 15 U.S.C. § 1692e(8) (emphasis added) (provision of the FDCPA that prohibits debt collectors from “[c]ommunicating or threatening to communicate to any person *credit information* which is known or should be known to be false, including the failure to communicate that a disputed debt is disputed”).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 6

KeyCite Yellow Flag
Distinguished by Agostino v. Quest Diagnostics Inc., D.N.J., February 11, 2009

2006 WL 1117878
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Edward A. RITTI, Plaintiff
v.
U–HAUL INTERNATIONAL, INC., Defendant.

Civil Action No. 05–4182.
|
April 26, 2006.

**Attorneys and Law Firms**

Sherrie R. Savett, Berger & Montague, PC, Philadelphia, PA, for Plaintiff.

Lance Rogers, Dechert LLP, Philadelphia, PA, for Defendant.

***MEMORANDUM***

DIAMOND, J.

***1** Plaintiff Edward Ritti brings this suit against U–Haul pursuant to the Class Action Fairness Act of 2005. *See* Pub.L. No. 109–2, 119 Stat. 4 (2005) (codified as part of 28 U.S.C.). Plaintiff alleges that although U–Haul promised to make a rental truck available to him on a particular day, it did not do so, causing Plaintiff to incur additional cost when he rented a truck from another company. Plaintiff alleges that U–Haul has engaged in a nationwide "pattern and practice" of breaching its rental contracts in this manner, and asks me to certify a Class of

> all persons in the United States who reserved rental trucks or trailers from U–Haul for specific dates, received written confirmations of their agreements with U–Haul, did not receive trucks or trailers from U–Haul on the specific dates promised, and who were damaged thereby.

*Pl. Mem. for Class Cert. at 1; Mar. 31 Tr. at 4.*

I cannot certify for several reasons. Most significantly, there is no single rental agreement at issue here. Rather, like Ritti himself, each Class member will base his claim on a unique contract comprising terms offered and accepted when the Class member met with, spoke to, or electronically communicated with U–Haul. Moreover, the circumstances relating to each purported breach necessarily differ and so trigger different defenses. In these circumstances, I am compelled to conclude that Plaintiff is not typical of the purported Class and that common issues of law and fact do not predominate.

**BACKGROUND AND PROCEDURAL HISTORY**

In late July, 2005, Plaintiff sought to rent a truck to move furniture from his Pottstown home on July 30, 2005. *Pl. Mem. at 5* . He logged onto the U–Haul web site and learned the rental price and mileage rate for truck rentals. *Def. Br. at Ex. 4 (Ritti Dep.) at 38–41.* Ritti chose not to reserve a truck online. *Id.* Instead, he phoned U–Haul's Reservations number: 1–800–468–4285 (1–800–GO–UHAUL) and reserved a rental truck in Pottstown, Pennsylvania for July 30, 2005. *Ritti Dep. at 41–45; Compl. at ¶ 16.* Plaintiff paid a $5 reservation fee (billed to his credit card), and was told "he would receive a telephone call a couple of days before his move ... informing him of the location where he was to pick up his truck." *Compl. at ¶ 18.* After paying the reservation fee, Ritti—through his wife's e-mail account—received an e-mail from uhaul_ reservations@uhaul.com, stating:

> Your reservation is confirmed, and we thank you for choosing U–Haul.... The rate(s) on the In–Town rental equipment for pickup on 07/30/2005 in the area of Pottstown, PA reserved for you is: 1–14′ Truck [at] $29.95 [ ] $1.69/mile.... Note: 1. Your reservation can be changed or canceled up to the day prior to your pick up date; if you change or cancel on the day of pick up you are subject to a $50.00

> cancellation fee. 2. U–Haul reserves the right to substitute equipment of equal or greater size at no additional charge to you. 3. The rate is valid for the date specified in this letter and is subject to change if you change your pick up date. 4. U–Haul rental periods vary based on availability.

***2** *Compl. at ¶ 17; Def. Br. at Ex. C.* The e-mail ends with the name of its apparent author: “Clay Breece[,] Marketing Company President[,] Phone: (800) 858–5756.” Def. Br. at Ex. C.

When Ritti did not receive a follow-up telephone call from U–Haul on Wednesday, July 27, 2005, he telephoned 800–858–5756, and a customer service representative told him that although “they were running behind with reservations,” he would receive a call on Thursday. *Ritti Dep. at 112–16.* Hearing nothing, Plaintiff telephoned twice on Thursday, July 28th and learned he should expect a call on Friday, July 29th. *Id. at 117–21.* Plaintiff phoned approximately five times on the 29th and was told that “because the computers were down, they were having trouble providing [him] with information.” *Id. at 124.*

Early on Saturday, July 30th, Ritti phoned again and spoke to a customer service representative for approximately two hours. *Id. at 140–42.* The representative tried to assist Ritti, but could not locate an appropriate truck within a 150–mile radius. *Id. at 143.* Plaintiff then found a truck offered by U–Haul competitor Penske Truck Rental in King of Prussia, cancelled his U–Haul reservation, and rented the Penske truck for $145.66. *Id. at 145–46, 161.* He immediately learned that other customers were dissatisfied with U–Haul, and resolved on Sunday, July 31 st, or Monday, August 1 st, to file this Class Action. *Id. at 163, 169–72.* Ritti also filed a Better Business Bureau complaint in Arizona—where U–Haul International, Inc. is headquartered—and contacted the law firm of Berger & Montague. *Id. at 169.*

In response to the BBB complaint, U–Haul refunded the $5 reservation fee and offered Plaintiff a $170 reimbursement to Plaintiff for his expenses. *Id. at 190–92, 208, 224–26.* Plaintiff rejected the reimbursement and filed this Complaint on August 5, 2005—six days after U–Haul's alleged breach of the rental contract. *Id. at 193.* On November 2, 2005, Plaintiff moved to certify his claim as a Class Action. *Mot. for Class Cert. (Doc. No. 13).* Both sides have extensively briefed and argued the certification issue.

Defendant has separately moved for Summary Judgment, raising significant questions as to whether Plaintiff should have brought this suit against U–Haul Company of Pennsylvania, a wholly-owned subsidiary of Pennsylvania. *See Mot. For Summ. J. (Doc. No. 22).* I have assumed for the purposes of certification that Plaintiff has sued the proper party.

## LEGAL STANDARDS

To certify this matter as a Class Action, I must conclude that Ritti satisfies all the prerequisites of FED.R.CIV.P. 23(a) and fulfills at least one of the requirements of Rule 23(b). *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 624 (3d Cir.1996), *aff'd,* 521 U.S. 591 (1997); *Nelson v. Astra Merck, Inc.,* 1998 U.S. Dist. LEXIS 16599 (E.D.Pa.1998). In addition, “[t]hough not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class.” *In re A.H. Robins Co.,* 880 F.2d 709, 728 (4th Cir.1989); 7A C. WRIGHT, A. MILLER & M. KANE, *Federal Practice & Procedure,* § 1760, § 1761 (2005); *see also Commonwealth v. Callahan Land Title Ins. Co.,* 1990 U.S. Dist. LEXIS 14524 (E.D.Pa.1990).

***3** The requirements of Rule 23(a) are numerosity, commonality, adequacy of representation, and typicality. FED.R.CIV.P. 23(a). Ritti seeks certification pursuant to Rule 23(b)(3), which requires that “the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” FED.R.CIV.P. 23(b)(3). It is Ritti's burden to show that the Class should be certified. *See Karnuth v. Rodale, Inc.,* 2005 U.S. Dist. LEXIS 14426 (E.D.Pa.2005) (*citing Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974)).

Rule 23 affords me considerable discretion in determining whether to certify. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 345 (1979). Although I must accept as true all substantive allegations in the Amended Complaint, I may nonetheless look beyond the four corners of the Complaint to the Motion for Certification and to other documents. *See Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir .1996)

("A district court certainly may look past the pleadings to determine whether the requirements of [R]ule 23 have been met."); *Lyon v. Caterpillar Inc.,* 194 F.R.D. 206, 209 (E.D.Pa.2000) (Courts are "not bound by the four corners of the complaint" at certification.); *see also Gen. Tel. Co. of the Southwest,* 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings ... and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."). I may not, however, decide "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal quotations omitted).

## DISCUSSION

Class actions allow large numbers of individuals who have suffered essentially the same wrong to obtain legal redress in a single proceeding. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 403 (1980); *Kramer v. Scientific Control Corp.,* 534 F.2d 1085, 1091 (3d Cir.1976). Class actions provide those holding nominal claims with a cost-effective way of seeking redress: proving the claim of the class representative also proves the claim of every class member. *See Panetta v. SAP Am., Inc.,* 2006 U.S. Dist. LEXIS 17556, at *2–*3 (E.D.Pa.2006); *Federal Practice & Procedure, supra,* at § 1762. Thus, the class action works as intended only if the representative's claim is typical of those held by class members. Similarly, unless the factual and legal commonalities of the class predominate, the class action will deteriorate into an unmanageable mass of individual claims and defenses. *See* FED.R.CIV.P. 23(b)(3); *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 343–44 (4th Cir.1998).

According to his own testimony, Plaintiff's breach of contract claim is not typical of that of the proposed Class. Indeed, given the manner in which U–Haul's truck rental contracts are formed, it is highly doubtful that any "typical" breach of contract claim exists. Rather, it is apparent that this proposed Class Action is in actuality an agglomeration of individual breach of contract claims whose merits must be litigated individually.

### I. Plaintiff Has Not Satisfied The Rule 23(a) Prerequisites For Class Certification.

#### A. Plaintiff Has Met The Numerosity Requirement.

***4** Rule 23 requires "that the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 182 (3d Cir.2001); FED.R.CIV.P. 23(a)(1). Although there is "[n]o magic number ... satisfying the numerosity requirement, the Court of Appeals has generally approved of classes of forty or more." *In re Loewen Group Secs. Litig.,* 233 F.R.D. at 154 (*citing Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001)); *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). I remain obligated to perform a "rigorous analysis" to ensure that Plaintiff has proven each of the Rule 23 requirements even though U–Haul apparently does not dispute numerosity. *See Johnston v. HBO Film Mgmt.,* 265 F.3d 178, 183–84 (3d Cir.2001); *Schwartz v. Dana Corporation/ Parish Div.,* 196 F.R.D. 275, 278 (E.D.Pa.2000) (*citing General Telephone v. Falcon,* 475 U.S. 147, 161 (1982)).

Ritti seems to base his numerosity analysis almost exclusively on U–Haul's size and volume of business. Plaintiff argues that because "U–Haul is the largest truck rental company in the U.S.," and "claims to have moved 47 million families in the last five years," that "common sense dictates a finding of numerosity." *Pl. Mem. at 8.* Plaintiff supports this "common sense" assertion with a Declaration by his Counsel. *See Fantini Decl., filed with Pl. Opp. to Def. Mot. to Dismiss, Oct. 18, 2005 (Doc. No. 8)).* In his Memorandum, however, Plaintiff misstates what is represented in the Declaration.

For instance, Ritti argues that "the internet is filled with *hundreds* of postings by people complaining about U–Haul's failure to provide trucks in accordance with its written confirmations." *Pl. Mem. at 8* (emphasis added). Yet Counsel's Declaration states only that one website (www.dontuseuhaul.com) "contains *many* complaints by persons regarding U–Haul's reservations policies." *Fantini Decl. at* ¶ *7* (emphasis added). Similarly, Plaintiff alleges that UHaul's "membership has been cancelled by the Phoenix [BBB] because of the high volume of consumer complaints relating to the unavailability of equipment." *Pl. Mem. at 8.* Yet, the 1998 ABC News report on which this allegation is based does not discuss reservations at all, focusing instead on problems with "the mechanical condition of [U–Haul's] trucks ... including bad brakes, loose steering, and worn tires." *Fantini Decl. at Ex. E, pp. 2–3. Id. at* ¶ *8; Ex. E.*

Ritti also offers newspaper descriptions of lawsuits brought in 1997 and 1999 by the Kansas and Massachusetts Attorneys

General, both of whom charged that U–Haul's reservations policies were misleading. *See Fantini Decl. at Ex. D.*

Relying on all the materials summarized in Counsel's Declaration, Plaintiff contends:

> Since the proposed Class encompassed U–Haul customers throughout the United States for the past several years, plaintiff estimates that there are hundreds or thousands of persons in the class.

***5** *Pl. Mem. at 8.*

If Ritti's estimate is correct, he satisfies the numerosity requirement. *See Stewart v. Abraham,* 275 F.3d 220, 226–27 (3d Cir.2001) (numerosity is generally satisfied if the number of plaintiffs exceeds forty). In the absence of data supporting Plaintiff's estimate, however, I am compelled to determine whether the materials that actually relate to U–Haul's reservations policy—the 1997 and 1999 Kansas and Massachusetts lawsuits, combined with Counsel's description of "many" website complaints—satisfy Rule 23. I conclude that they do. *See Maxwell v. Arrow Fin. Servs., LLC,* 2004 U.S. Dist. LEXIS 5462, at *7–*8 (N.D.Ill.2004) (it is "reasonable to assume" that numerosity is satisfied where plaintiff alleges Class membership based on standardized forms.); *In re HealthSouth Corp. Sec. Litig.,* 213 F .R.D. 447, 457 (N.D.Ala.2003) (numerosity is met once it can be found that "many" would be in the Class). *But see In re One Meridian Plaza Fire Litig.,* 1993 U.S. Dist. LEXIS 9841 (E.D.Pa.1993) (defendant had "raised some doubt" about numerosity where the only support for numerosity came from newspaper articles).

**B. Plaintiff Has Met The Commonality Requirement.**

Rule 23(a)(2) requires that plaintiffs identify "questions of law or fact common to the members of the proposed class." *Schwartz,* 196 F.R.D. at 279; FED.R.CIV.P. 23(a)(2). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective Class. Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal for & by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Once again, it appears that U–Haul does not dispute that Ritti has met the commonality requirement.

Ritti contends that all Class members would share the following legal and factual questions:

> [W]hether defendant is liable for breach of contract, and whether plaintiff and Class members have suffered damages as a result thereof.

*Pl. Mem.* at 9. These issues meet the commonality requirement. *See Baby Neal,* 43 F.3d at 56; *Stewart v. Avon Prods., Inc.,* 1999 U.S. Dist. LEXIS 17616 (E.D.Pa.1999) (commonality met by breach of contract); *In re Ravisent Techs., Inc. Sec. Litig.,* 2005 U.S. Dist. LEXIS 6680 (E.D.Pa.2005) (common issue of "whether class members sustained damages"); *Contawe v. Crescent Heights of Am., Inc.,* 2004 U.S. Dist. LEXIS 25746 (E.D.Pa.2004) ("single issue" sufficient to satisfy commonality)

**C. Plaintiff Will Fairly And Adequately Represent The Interests Of The Class.**

A class representative must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "This requirement has two components: 1) adequacy of class counsel, and 2) adequacy of the class representative." *Davis v. Kraft Foods N. Am.,* 2006 U.S. Dist. LEXIS 3512 at * 27 (E.D.Pa.2006). Thus, I must determine whether the putative plaintiff "has the ability and incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine v. Jeffes,* 846 F.2d 169, 179 (3d Cir.1988).

***6** U–Haul does not dispute that Ritti will be an adequate Class representative. Plaintiff seeks recovery of his reservation fee and the costs he incurred in renting a truck from U–Haul's competitor: "the same remedy that other potential [C]lass members would seek." *Schwartz,* 196 F.R.D. at 281. Plaintiff does not appear to have any interests "antagonistic to the [C]lass." *Baby* Neal, 43 F.3d at 55. Finally, Plaintiff's Counsel, Berger & Montague, P.C., is a well-known firm with a history of successful litigation of class actions. *See, e.g., In re: Rite Aid Corp. Securities Litigation,* 269 F.Supp.2d 603 (E.D.Pa.2003); *In Re Brand*

*Name Prescription Drugs Antitrust Litigation,* 2000 U.S. Dist. LEXIS 1734 (N.D.Ill.2000). In these circumstances, I believe that Plaintiff satisfies the adequacy requirement of Rule 23.

**D. Plaintiff Cannot Meet Rule 23's Typicality Requirement.**

The class representative satisfies Rule 23(a)(3) if his claims or defenses "are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). "To determine typicality, I must examine whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.' " *Kraft,* 2006 U.S. Dist. LEXIS 3512 at *21 -*22 (*quoting Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)). Although "Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members," there must be "a strong similarity of legal theories" between the class representative and the class. *Hassine,* 846 F.2d at 177; *Baby Neal,* 43 F.3d at 58. "Where the defendant can raise unique defenses to each plaintiff's claim, typicality may not exist if the defenses could threaten to become the focus of the litigation." *Jones v. GPU, Inc.,* 2005 U.S. Dist. LEXIS 18820 at *51 (E.D.Pa.2005); *see Zenith Laboratories, Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1974) ("defenses which would not be applicable to the Class as a whole" may defeat certification).

**1. Plaintiff's Breach Of Contract Claim Is Not Typical Because It Is Based On A Unique Contract.**

U–Haul argues that Ritti is not typical because his deposition testimony conflicts with the theory of liability on which he bases his Class claim: that U–Haul has breached "standard written contracts,"—the e-mail "confirmations of the[ ] rental agreements" received by the purported Class members. *See Def. Mem. at 27–29; Pl. Reply Br. at 19.* Because Ritti has testified that his reservation telephone call and the e-mail confirmation *together* constitute his contract with U–Haul, I agree that he cannot satisfy Rule 23's typicality requirements. *Pl. Reply Br. at 19.*

Plaintiff contends that the written confirmations are "standard, boilerplate, computer-generated forms" and that they "contain the essential terms of the parties' agreements." *Id.* Thus, in Ritti's view, there will be no "need to inquire into any oral conversations that customers may have had with U–Haul. *Id. at 20.* In support, he cites class action decisions involving form-insurance contracts. *See Pl. Br. at 14–15 (citing, e.g., Steinberg v. Nationwide Mutual Ins. Co.,* 224 F.R.D. 67 (E.D.N.Y.2004); *Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683 (N.D.Ga.1983); *Janicik v. Prudential Insurance Co. of America,* 451 A.2d 451 (Pa.Super.1982)).

***7** Ritti's deposition testimony contradicts these contentions and underscores the atypicality of his claim. *See Lyon,* 194 F.R.D. at 209. U–Haul's email confirmation—which Plaintiff contends comprises the entire contract between the parties—explicitly states that "U–Haul reserves the right to substitute equipment of equal or greater size at no additional charge to you." *Def. Br. at Ex. C.* Yet, Plaintiff explained that because his Pottstown home was on "a one-way street with parking on both sides," his rental truck could be no longer than fourteen to sixteen feet. *Ritti Dep. at 48, 64.* It was only in his telephone conversation with U–Haul that Ritti was assured—*contrary* to what is provided in his purportedly complete written contract—that a fourteen to sixteen foot truck would be provided on July 30th. *Id. at 75.* Plaintiff considered this term to be a "deal breaker." *Id.* Accordingly, Plaintiff testified, "I believe that if you put [the written confirmation] together with my [telephone] conversation, it embodies the contract that I had with U–Haul." *Id. at 104.* Plaintiff further stated that "the deal I had with U–Haul [ ] was with the phone conversation and this [e-mail]." *Id. at 107.*

In these circumstances, Ritti himself has confirmed that his claim against U–Haul differs significantly from those of the purported Class. Accordingly, Plaintiff cannot meet Rule 23's typicality requirements. *See Georgine v. Amchem Prods.,* 83 F.3d 610, 631 (3d Cir.1996) (no typicality "where the legal theories of the named plaintiff[ ] potentially conflict[s] with [that] of the absentees"); *Broussard v. Meineke Disc. Muffler Shops,* 155 F.3d 331, 343 (4th Cir.1998) (no typicality where defendant "directed different representations to" named plaintiff and other Class members); *see also Stirman v. Exxon Corp.,* 280 F.3d 554, 562 (5th Cir.2002) (typicality not met where named plaintiff allegedly breached two different types of leases).

**2. Plaintiff's Claim Is Subject To A Unique Defense.**

U–Haul also argues that any breach by U–Haul is excused by the impracticability of performance in the specific circumstances of Plaintiff's rental. *See In re Loewen Group Secs. Litig.,* 233 F.R.D. 154 (E.D.Pa.2005) ( "If the litigation threatens to be dominated by an arguable defense or defenses of a named plaintiff," the typicality prong may not be met.); *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197,

211 (E.D.Pa.2001) (certification inappropriate where "it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff"); *see also* *Zenith Laboratories, Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1976) (rejecting certification where "unique defenses could conceivably become the focus of the entire litigation").

Once again, Plaintiff's deposition testimony confirms the likelihood that his claim will be subject to a "unique defense." Ritti testified that although he was told by the representative at 1–800–GO–UHAUL that he would "receiv[e] a phone call [to] confirm the pickup ... by Wednesday night," U–Haul never made the call. *Ritti Dep. at 110–12.* Rather, when Ritti phoned U–Haul's regional office to confirm his rental, he was "told over multiple times that the computers were down." *Ritti Dep. at 123.* U–Haul argues that these "computer problems were an unexpected contingency" that made the "alleged contract commercially impracticable." *Def. Mem. at 32; see* *Gulf Oil Corp. v. Federal Power Com.,* 563 F.2d 588, 599 (3d Cir.1977) (commercial impracticability doctrine applies where "the cost of performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice"); *cf.* *Zuckerman v. Pacific Savings Bank,* 187 Cal.App.3d 1394 (1986) ("computer error" may be valid contract defense); *Roland Pietropaoli Trucking, Inc. v. Nationwide Mut. Ins. Co.,* 100 A.D.2d 680 (N.Y.App.1984) (same).

***8** Plaintiff equates U–Haul's defense of "impracticability" with "impossibility," arguing that impossibility is inapplicable because U–Haul's computer failure is not "a natural disaster, such as a hurricane or tornado...." *Pl. Reply Br. at 25.* I disagree. First, "impossibility" is not limited to acts of God. Rather, courts have traditionally allowed the defense when there is an "implied condition that the parties shall be excused in case, before breach, performance becomes impossible ... without [fault] of the contractor." *Taylor v. Caldwell,* 3 Best & S. 826, 122 Eng. Rep. 309, 324, 6 R.C. 603 (1863). *See generally* *Opera Co. of Boston, Inc. v. Wolf Trap Foundation for Performing Arts,* 817 F.2d 1094, 1097 (4th Cir.1987) (outlining how *Taylor v.. Caldwell* became the foundation of the doctrine of impossibility in American law).

Moreover, a party may be excused from non-performance not only because of "impossibility" (where performance is "physically and objectively impossible"), but for "impracticability." *See* *Albert M. Greenfield & Co. v. Kolea,* 475 Pa. 351 (1977) (impracticability doctrine extends impossibility defense to situations involving "extreme and unreasonable difficulty, expense, injury, or loss"); *see generally* 14–74 *Corbin on Contracts* § 74.5. Although I may not assess here the merits of U–Haul's claim of impracticability, I agree with U–Haul that this defense could well become a "focus" of the litigation of Ritti's case. Eisen, 417 U.S. at 177 (forbidding inquiry into the merits at the certification stage); *Zenith,* 530 F.2d at 512. Ritti's Complaint and his legal contentions underscore that the claims of most other Class members would not be subject to this defense. *See, e.g., Pl. Reply Br. at 25.* Given that Ritti's claim thus appears to be subject to a unique defense, I do not believe he has met Rule 23's typicality requirement. *See id.;* *Loewen Group,* 233 F.R.D. at 154.

In other circumstances, Ritti's atypicality could be remedied by substituting a new class representative. *See, e.g.,* *Davis v. Thornburgh,* 903 F.2d 212, 233 (3d Cir.1990) (Becker, J., dissenting) ("afford[ing] an opportunity to provide a substitute ... is the common practice"); In *re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. 61, 80 (D.Mass.2005) (class counsel granted opportunity to replace atypical class representative). Given my decision that class issues do not predominate, however, substitution will not change the result here. *See* *Jacobs v. Home Depot U.S.A., Inc.,* 219 F.R.D. 549, 551 (S.D .Fla.2003) (amending complaint "would be futile" where "the fundamental nature of the claims here would require individualized inquiries for virtually every potential plaintiff and putative class member").

### III. Plaintiff Has Not Demonstrated That Common Issues Of Law And Fact Will Predominate In This Action.

Rule 23(b)(3) requires that "questions of law or fact common to members of the Class predominate over any questions affecting only individual members." FED.R.CIV.P. 23(b)(3). "The predominance requirement overlaps considerably" with the commonality and typicality inquiries of Rule 23(a). *In re Vicuron Pharms. Inc. Sec. Litig.,* 2006 U.S. Dist. LEXIS 3861 (E.D.Pa.2006); *see also* *Sommers v. Abraham Lincoln Federal Sav. & Loan Associates,* 66 F.R.D. 581, 590 (E.D.Pa.1975) (overlap with typicality). Predominance is nevertheless "far more demanding" than the commonality and typicality requirements, so "[s]atisfaction of ... any of the Rule 23(a) requirements [ ] is not an indication that 23(b)(3) is likewise satisfied." *Amchem Prods. v. Windsor,* 521 U.S. 591, 623 (1997); *Schwartz,* 196 F.R .D. at 282. The plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a

whole ... predominate over those issues that are subject only to individualized proof." *Wal–Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.),* 280 F.3d 124, 136 (2d Cir.2001).

***9** Although the need for individualized determinations of damages may weigh against a finding of predominance, "the focus of the [predominance] inquiry is directed primarily toward the issue of liability." *Forman v. Data Transfer,* 164 F.R.D. 400, 404 (E.D.Pa.1995); *see In re Microcrystalline Cellulose Antitrust Litig.,* 218 F.R.D. 79 (E.D.Pa.2003).

**A. Determining The Provisions Of Each Class Member's Rental Contract Will Predominate Over Any Common Questions.**

Plaintiff repeatedly asserts that this case "invites the parties' straightforward claim for breach of contract based upon the parties' standard written agreements." *Pl. Mem. at 1.* Yet, the written confirmation plainly is not a complete agreement. Accordingly, this case will necessarily involve a multitude of rental contracts. Plaintiff will thus be required to prove the existence and terms of each Class member's contract with U–Haul. *See, e.g., United States v. Clementon Sewerage Authority,* 365 F .2d 609 (3d Cir.1966) (discussing non-integrated "agreement[s] part of whose terms were in writing and part oral"). In these circumstances, because questions "affecting only individual [Class] members" will obviously predominate, Ritti cannot meet the requirements of Rule 23(b)(3). *See also Klay v. Humana, Inc.,* 382 F.3d 1241, 1263 (11th Cir.2004) ("sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate").

In arguing that Class issues predominate, Plaintiff notes that U–Haul does not dispute that the written confirmation is a standard form. *See Pl. Reply Br. at 19.* That concession hardly ends the integration inquiry, however. Unless the confirmation form is an integrated document, it does not reflect the complete agreement between each renter and U–Haul. *Kehr Packages v. Fidelity Bank, N .A.,* 710 A.2d 1169, 1173 (Pa.Super.Ct.1998) (a written contract is "integrated" only "if it represents a final and complete expression of the parties' agreement"). Numerous factors underscore that the written confirmations are not "final and complete" expressions of the rental contracts.

First, Plaintiff admits that there is no integration clause. *See Ex. C. to Def. Br.; Mar. 31, 2006 Tr. at 6.* An integration clause ensures that a writing "express[es] all of the negotiations, conversations, and agreements made prior to its execution." *Dilworth Paxson v. Asensio,* 2003 U.S. Dist. LEXIS 7719 (E.D.Pa.2003) (*citing 1726 Cherry St. v. Bell Atl. Props., Inc.,* 439 Pa.Super. 141 (1995)). In the absence of an integration clause, I may "examine the text of the agreement to determine its completeness," and consider all evidence that comprises "the entire agreement of the parties." *Kehr Packages,* 710 A.2d at 1173; *Silverstein v. Percudani,* 2005 U.S. Dist. LEXIS 10005 (M.D .Pa.2005).

The loose language and reservations of rights in Ritti's confirmation certainly show that the e-mail is not a "final and complete" agreement. For instance, the confirmation indicates that U–Haul may change the truck size and vary the truck rental period. *Def. Br. at Ex. C.* Even more significantly, the confirmation states that "U–Haul rental periods vary based on availability." *Id.; see also Ritti Dep. at 68* (stating that Ritti "needed the truck for" six hours or "most of the day"). It also provides that the renter may "change [ ] or cancel[ ]" the reservation "up to the day prior" to the pickup date. *Id.* Moreover, as Plaintiff confirms, other material terms are entirely omitted from the confirmation. *See id.; Pl. Reply Br. at 10, 12, 18* ("[T]he rental terms relating to time and location of truck pick up are not contained in the contract and are to be arranged with each customer through a scheduling call...."). These open and ambiguous terms are left to be resolved during the subsequent scheduling telephone conversations between U–Haul and the renter; indeed, the confirmation effectively requires that such a conversation take place. *See Def. Br. at Ex. C., ¶¶ 4–6, 8.*

***10** U–Haul's website also requires that customers assent to specific terms that do not appear in the subsequent e-mail confirmation. *See Def. Br. at Ex. D.* Among these terms is an acknowledgment that a renter's preferred truck size and time-of-day may be unavailable if he or she seeks to pick up the vehicle on a Friday or (like Ritti) on a Saturday, and that final details will be arranged through the follow-up scheduling telephone call. *Id.* Not all renters go on the website and read these terms, however, while some—like Ritti—may go on the website and then book their rental by telephone. *Ritti Dep. at 38–45.* Others may simply go to a U–Haul office, meet with a U–Haul representative, conclude a rental agreement with U–Haul, and pick up their trucks at that time. *Def. Br., Ex. 2, at ¶ 14.* Consequently, a rental contract may include terms from the website as well as conversations and meetings with U–Haul.

In these circumstances, in which every renter's contract is created by U–Haul and the renter, I cannot accept Plaintiff's contention that the predominant legal question here is U–Haul's breach of the same rental contract. Plaintiff has not identified any case in which a court certified a class for breach of contract without such a common contract. *Compare Pl. Mem. at 2, n. 2 (citing* breach of written contract cases, *e.g., Durant v. Servicemaster Co.,* 208 F.R.D. 228 (E.D.Mich.2002); *Friedman v. Lansdale Parking Authority,* 1993 U.S. Dist. LEXIS 12019 (E.D.Pa.1993); *Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683 (N.D.Ga.1983)). In contrast, courts have rejected class action treatment where different contracts are at issue. *See, e.g., Klay,* 382 F.3d at 1263; *Broussard,* 155 F.3d at 343; *Avery v. State Farm Mut. Ins. Co.,* 835 N.E.2d 801 (Ill.2005). Courts have likewise rejected certification of a class of persons with oral contracts. As the Third Circuit has observed, contracts "based substantially on oral rather than written communications" are generally "inappropriate for class action treatment." *Johnston v.. HBO Film Mgmt.,* 265 F.3d 178. 190 (3d Cir.2001); *see also Szczubelek v. Cendant Mortg. Corp.,* 215 F.R.D. 107 (D.N.J.2002).

Plaintiff also argues that my consideration of anything other than the standard form would violate the parol evidence rule. *See Pl. Reply Br. at 17.* Yet, the law provides just the opposite: "The parol evidence rule only applies to written agreements which are integrated." *FDIC v. Barness,* 484 F.Supp. 1134, 1146 (E.D .Pa.1980) (*citing Friestad v. Travelers Indemnity Co.,* 260 Pa.Super. 178 (1978)). The written "contract" here, however, contemplates and practically requires the providing of additional terms. Moreover, (as discussed below), application of the parole evidence rule in these circumstances will require that I determine which of the fifty states' parole evidence rules to apply.

Finally, Plaintiff contends that even if I consider extrinsic evidence, it would relate only to the "ancillary issue" of "incidental oral terms." *Pl. Reply Br. at 20.* Until I actually consider extrinsic evidence as to each rental contract, however, I cannot determine the "importance" of that evidence, whether it relates to terms "incidental" to the contract, or whether it relates to terms that are "deal-breakers" (as the truck size was for Ritti). *See Ritti Dep. at 75.* Obviously, I cannot, at this early stage, determine the "essential" provisions of each Class member's rental contract. *See Eisen,* 417 U.S. at 178.

***11** In sum, it is apparent that if I were to certify the proposed Class, this case would become endlessly mired in disputes over the terms of each Class member's rental contract. In that event, individual legal issues would predominate—the exact opposite of what Rule 23 requires.

### B. Individualized Defenses and Damages Determinations Will Predominate Over Common Issues of Law and Fact.

Although the "mere fact" of affirmative defenses "does not compel a finding that individual issues predominate over common ones," class certification is inappropriate if individual defenses will be widespread through the class and vary significantly among class members. *See In re: LifeUSA Holding,* 242 F.3d 136, 149 (3d Cir.2001) (district courts may decline certification where "individualized claims and individualized defenses" prevent predominance and superiority); *Bratcher v. Nat'l Standard Life Ins. Co.,* 365 F.3d 408, 420 (5th Cir.2004) ("The predominance of individual issues necessary to decide an affirmative defense may preclude class certification."). *But see In re Linerboard Antitrust Litig.,* 305 F.3d 145, 162 (3d Cir.2000) (individual determinations of statute of limitations defense do not preclude certification). U–Haul "ha[s] the right to raise individual defenses against each class member." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 192 (3d Cir.2001).

U–Haul's unique defense to Ritti's claim illustrates the likely predominance of unique defenses in this proposed Class Action. *See supra* pp. 13–15. There can be innumerable explanations for a party's late contract performance: some may be legally significant; others may not. *See, e.g., Le Gare, Inc. v. Brookhaven Residential Sales, Inc.,* 337 Pa.Super. 478 (1985) (affirming and modifying judgment for late performance); *Seaway Painting, Inc. v. D.L. Smith Co.,* 242 B.R. 834 (E.D.Pa.1999) (assessing damages for late performance). *Compare Gimbel Bros., Inc. v. Markette Corp.,* 307 F.2d 91 (3d Cir.1962); with *Gulf Oil Corp. v. Federal Energy Regulatory Com.,* 706 F.2d 444 (3d Cir.1983) (whether *force majeure* is excuse for untimely performance); *Dempsey v. Stauffer,* 312 F.2d 360, 362 (3d Cir.1962) (right to rescind limited in a contract "where time is not of the essence"). *See generally* 15 *Williston on Contracts* § 46:1 (4th ed. 2005) ("When a party to a contract agrees to do a certain act at a certain time, or within a certain period, the promisor's undertaking can conceivably be regarded either as a single, indivisible promise to do the act, with the time frame as merely an aspect of the promise to do it, or instead

as composed of two separate promises—one a promise to do the act, and the second a separate promise that the act shall be done at or within the time specified.").

U–Haul argues that the defense of novation will require an individualized factual determination for each purported Class member. As U–Haul notes, a follow-up conversation (particularly where one party agrees to new, key terms) may be a novation—a new contract substituted for the existing one. *See T & N, PLC v. Pennsylvania Ins. Guar. Ass'n,* 44 F.3d 174, 186 (3d Cir.1994) (citing *Black's Law Dictionary* 1064 (6th ed.1990)). The existence of a novation may be proved by "the facts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties," with the burden of proof on "[t]he party asserting a novation." *Paramount Aviation Corp. v. Agusta,* 178 F.3d 132, 148 (3d Cir.1999); *I.W. Berman Properties v. Porter Brothers, Inc.,* 344 A.2d 65, 70 (Md.1975).

***12** Here, it is undisputed that both parties expected a follow-up telephone call from U–Haul. As Ritti's experience demonstrates, potential "deal-breaker" elements of the rental could well be agreed to when a customer speaks with U–Haul. *See Def. Mem. at 12–13* (describing follow-up calls); *Pl. Reply Br. at 12–13, 18* ("[U–Haul] told [P]laintiff Ritti that he would be contacted before his move.... [R]ental terms relating to time and location of truck pick up ... are to be arranged with each customer through a scheduling call."). As with the oral terms of contracts between renters and U–Haul, the existence or absence of such a novation will have to be proven for each Class member. *See CC Investors Corp. v. Raytheon Co.,* 2005 U.S. Dist. LEXIS 6893 (D.Del.2005) (novation defense "raises several questions which require a plaintiff-by-plaintiff analysis, [and] is not suited for class certification").

U–Haul identifies other fact-specific potential defenses that it will seek to raise, including severe weather, truck accidents, mechanical breakdowns, and delayed returns. *See Pl. Mem. at 32–33* . Significantly, Plaintiff does not allege a deliberate policy causing U–Haul's purported breaches. Rather, Plaintiff has challenged the "pattern or practice" of occasional non-performance itself. Especially in the absence of any allegation that there is a common cause to UHaul's alleged breaches, U–Haul will necessarily seek to excuse each failure to provide a rental truck. U–Haul will have the absolute right to present each such unique defense. *See Broussard,* 155 F.3d 331, 344–45 (4th Cir.1998) (holding that certification cannot be used to abridge defendant's rights to defend each plaintiff's claim and defendant must be allowed "the benefit of deposing or cross-examining the disparate individuals"); *see also Arch v. Am. Tobacco Co.,* 175 F.R.D. 469 (E.D.Pa.1997) (defendants have due process rights to challenge causation and injury as to each plaintiff). In these circumstances, "unique defenses" may well be the rule for the entire Class.

Finally, although I have identified some common issues involved in determining the damages of purported Class members, the damages phase of this litigation will also require extensive, individualized determinations. Significantly, Plaintiff seeks the consequential damages incurred when "[C]lass members had to rent trucks from other companies at higher rates than those agreed to with U–Haul." *Compl. at ¶ 36.* As stated in three of the first five cases listed in Plaintiff's Appendix, consequential damages are available only if "contemplated by the parties at the time they entered the contract." *All Am. Supply Co. v. Slavens,* 609 P.2d 46, 48 (Ariz.1980) (*cited in Pl. Mem.* at *Ex. D); see also Marshall Durbin Farms, Inc. v. Landers,* 470 So.2d 1098, 1102 (Ala.1885); *Native American Reclamation and Pest Control Inc. v. United Bank Alaska,* 685 P.2d 1211, 1219–20 (Ak.1984) (same). This requires an inquiry into individual facts. *See id.* In addition, the calculation of these consequential damages will also require individualized proof and calculation. *See, e.g., Parkhill v. Minn. Mut. Life Ins. Co.,* 188 F.R.D. 332, 345 (D.Minn.1999). Although these individual damages issues are not as central to the litigation as the individual liability issues, they underscore the inadvisability of certification here. *Compare Porter v. Nations Credit Consumer Disc. Co.,* 229 F.R.D. 497, 500 (E.D.Pa.2005) (individual damages calculations create a predominance problem) with *Bradburn Parent/Teacher Store v. 3M,* 2004 U.S. Dist. LEXIS 16193 (E.D.Pa.2005) ("[I]ndividualized determinations of the amount of the damages that each individual class member suffered will be needed does not, in itself, preclude class certification."). This is especially true where Plaintiff alleges that "damages" are one of two issues common to the proposed Class, and the other common issue—U-Haul's breach of the same contract—is non-existent.

### C. State Law Variations And The Necessity For Individualized Choice Of Law Determinations Preclude Predominance.

***13** The "[e]xistence of state law variations is not alone sufficient to preclude class certification." *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 458 (D.N.J.1998). In cases where "numerous state law variations [are] implicated by certification of a nationwide class," however, the movant

"must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.' " *Walsh v.. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) (*quoting In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986)). Where the movant's analysis of the state laws is "overly simplistic," or "state laws vary significantly," the court should deny class certification. *See Carpenter v. BMW of N. Am., Inc.,* 1999 U.S. Dist. LEXIS 9272 at *11 (E.D.Pa.1999).

Plaintiff asserts that "the laws of contracts are uniform throughout the United States," noting that: 1) "all 50 states uniformly require ... an offer, acceptance, consideration, and definite terms" to create a contract; 2) "all 50 states essentially define breach of contract as the failure of a party to a contract to perform"; 3) "all 50 states allow the non-breaching party to recover consequential damages"; and 4) "where the contract is complete ... all 50 states disallow the introduction of parol evidence for the purpose of construing the contract." *Pl. Mem. at 16–17.*

Plaintiff has not offered the "extensive analysis" required to show that the law of all 50 states is "identical." Rather, he offers four very general and unremarkable propositions of contract law, and cites to over two hundred cases ostensibly in support—with no descriptions, quotations, or pinpoint cites. *Compare Steinberg v. Nationwide Mut. Ins. Co.,* 224 F.R.D. 67, 77–78 (E.D.N.Y.2004) (*cited* in *Pl. Mot. at 14)* (describing a thorough analysis of the state law variations). Moreover, he has not even addressed the specific contract law issues on which this litigation may well turn, such as integration, impracticability, novation, and the like. This is hardly the "extensive analysis" the law requires. *See Walsh,* 807 F.2d at 1017. *Compare Carpenter,* 1999 U.S. Dist. LEXIS 9272 at *11.

Significantly, U–Haul identifies state law variations that could well require extensive, individualized examinations. For instance, states apply numerous different versions of the parol evidence rule. *See Def. Mem. at 25–26* (describing a number of variations). Thus, Alaska law provides that "extrinsic evidence is always admissible on the question of the meaning of the words of the contract itself," as long as the "parties disagree about the interpretation of a provision." *See id.* at 25 (*citing Casey v. Semco Energy, Inc.,* 92 P.3d 379, 383 (Ak.2004)). Missouri and Texas, in contrast, permit extrinsic evidence only where language has a "plain and ordinary meaning ... reasonably susceptible to more than one construction." *Rosemann v. Roto Die, Inc.,* 276 F.3d 393, 399 (8th Cir.2002).

***14** Plaintiff responds that variations in extrinsic evidence law are "irrelevant to the issues raised in this case." *Pl. Reply Br. at 17.* Yet the Third Circuit plainly requires the admission of extrinsic evidence where "the written contract is not fully integrated." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010 n. 9 (3d Cir.1980). As I concluded earlier, the written confirmation on which Ritti bases the Class breach of contract claim is *not* fully integrated. *See supra* pp. 16–19. There is "a significant variation in the laws of the states with respect to the use of extrinsic evidence (including the types of extrinsic evidence that may be used) to determine whether, as a matter of law, the contract language is ambiguous." *See Bowers v. Jefferson Pilot Fin. Ins. Co.,* 219 F.R.D. 578, 583 (E.D.Pa.2004). Moreover, there is similar variation among state laws governing the admission of extrinsic evidence "even where the court determines that the language is not ambiguous." *Id.* (collecting cases). Thus, I will be required to apply the laws of numerous states to determine the terms of the class members' contracts.

Further, neither party has claimed that the e-mail confirmation or the telephone conversation between Plaintiff and U–Haul contained a choice of law provision. I would therefore be required to conduct a difficult choice of law analysis—involving a consideration of the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation and place of business of the parties—for each Class member. *See Bowers,* 219 F.R.D. at 582 (choice-of-law analysis required for each individual); *Kruzits v. Okuma Mach. Tool,* 40 F.3d 52, 55 (3d Cir.1994) (Pennsylvania applies Second Restatement approach where contract lacks a choice-of-law clause.); Restatement (Second) of Conflict of Laws § 188 (enumerating factors).

Plainly, allowing this Class Action to proceed will require countless choice-of-law determinations and an unmanageable inquiry into the law governing the existence, terms, and breach of each contract, the availability of defenses to any breach, and the resulting damages for a vast number of the purported Class members. Accordingly, I conclude that common issues do not predominate.

**CONCLUSION**

Plaintiff's claims and defenses are not "typical of the claims or defenses of the class" for which certification is sought, and common questions of law and fact do not "predominate" in this litigation. *See* FED.R.CIV.P. 23(a)(3); 23(b)(3). Accordingly, Plaintiff's Motion for Class Certification is **DENIED .** An appropriate ORDER follows.

***ORDER***

**AND NOW,** this 26th day of April, 2006, upon consideration of Plaintiff's Motion for Class Certification (Doc. No. 13), all related submissions, the Oral Argument held on March 31, 2006, and the reasons set forth in the accompanying Memorandum, the Motion is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1117878

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 7

KeyCite Yellow Flag
Distinguished by LeGrand v. Abbott Laboratories, N.D.Cal., October 10, 2025

2022 WL 20184654
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Pamela SIINO, Plaintiff,
v.
FORESTERS LIFE INSURANCE AND ANNUITY COMPANY, Defendant.

Case No. 20-cv-02904-JST
|
Signed July 26, 2022

**Attorneys and Law Firms**

Alex Michael Tomasevic, Craig McKenzie Nicholas, Nicholas & Tomasevic, LLP, San Diego, CA, Georg Michael Capielo, The Frost Firm, Encinitas, CA, Jack Bruce Winters, Jr., Sarah D. Ball, Winters & Associates, La Mesa, CA, for Plaintiff.

Allison Jean Fernandez, Ogletree Deakins, San Francisco, CA, Elizabeth Wroblewski, Pro Hac Vice, Jarrett E. Ganer, Pro Hac Vice, Thomas F.A. Hetherington, Pro Hac Vice, McDowell Hetherington LLP, Houston, TX, Jodi Krystyn Swick, McDowell Hetherington LLP, Oakland, CA, for Defendant.

**ORDER DENYING PLAINTIFF'S MOTION TO MODIFY THE SCHEDULING ORDER**

Re: ECF No. 114

JON S. TIGAR, United States District Judge

***1** Before the Court is Plaintiff Pamela Siino's motion to modify the scheduling order to allow for a new motion for class certification. ECF No. 114. The Court will deny the motion.

In January 2022, this Court denied Siino's motion seeking class certification under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. The Court denied Siino's motion for class certification under Rule 23(b)(2) because Siino primarily sought money damages and "[c]lass certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." ECF No. 110 at 4 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (citation omitted)). The Court also denied Siino's motion for class certification under Rule 23(b)(3), because Siino offered no cognizable damages model that would enable damages to be calculated on a class-wide basis as required to demonstrate predominance under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). ECF No. 110 at 9 (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014)).

Siino now moves to modify the Court's scheduling order, which set April 30, 2021 as the deadline for Siino to file a class-certification motion, so that she can file a second motion. In contrast to her prior motion, this one would seek "declaratory or injunctive relief ... that says that the terminations of her and her fellow class members' policies were and are void." ECF No. 114-1 at 8.

Siino makes two arguments in support of her request to modify the scheduling order. First, she contends that although "the Ninth Circuit has not ... issued any express guidance dictating when or under what circumstances to allow renewed motions for class certification under Rule 23," ECF No. 114-1 at 5, this Court should follow the Third Circuit, which Siino says allows second motions for certification under these circumstances. Second, Siino argues that she satisfies Rule 16's good-cause standard for modifying scheduling orders.

The Court is not persuaded. To begin with, Siino misstates the law in the Third Circuit. Citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476 (3d Cir. 2020), Siino contends that "[t]he Third Circuit ... expressed a standard" about "when or under what circumstances to allow renewed motions for class certification under Rule 23." ECF No. 114-1 at 5. But *Hargrove* concerned the standard district courts must apply when considering the *merits* of a new motion for class certification. It did not address the issue present here: what circumstances warrant modifying a case scheduling order to permit a plaintiff a second chance at class certification after a first motion has been denied and the deadline for filing such a motion has passed.

That question is governed by Rule 16. Rule 16 requires "good cause" and the consent of the Court to amend a scheduling order. Fed. R. Civ. P. 16(b)(4). The good cause standard "primarily considers the diligence of the party seeking the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). But the Ninth Circuit has explained that "[t]he good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013). Courts within the Ninth Circuit have thus rejected efforts by plaintiffs to modify case scheduling orders to allow for second motions for class certification simply because the Court denied a first motion and the time for filing class-certification motions had passed. *See, e.g.*, *Stockinger v. Toyota Motor Sales, U.S.A.*, Inc., No. 2:17-CV-00035-VAP(KSX), 2020 WL 7314794, at *3 (C.D. Cal. Nov. 30, 2020) ("Plaintiffs do not identify any new evidence or legal theories of which they were not previously aware at no fault of their own. Instead, the only reason for the requested modification is because the Court denied Plaintiffs' motion for class certification. This is insufficient."); *Gustafson v. BAC Home Loans Servicing, LP*, No. 8:11-cv-00915-JLS-AN, 2014 WL 10988335, at *2 (C.D. Cal. Feb. 5, 2014) (same).

***2** Bearing these principles in mind, the Court finds that Siino has not shown good cause to modify the case scheduling order. Siino seeks to modify the scheduling order to correct the legal errors that led the Court to deny her original motion for class certification. But "carelessness is not compatible with a finding of diligence [under Rule 16] and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609. And while Rule 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment," Siino "cite[s] no authority supporting the theory that Rule 23(c)(1)(C) allows [her] to file a second class-certification motion just because [she] received an unfavorable ruling on [her] first one." *Hayes v. Magnachip Semiconductor Corp.*, No. 14-CV-01160-JST, 2017 WL 512777, at *1 (N.D. Cal. Feb. 8, 2017). The Court set April 30, 2021 as the deadline for Siino to file her motion for class certification and Siino could have filed then the motion she seeks to file now. The Court's rejection of her earlier motion does not justify modifying the case schedule to allow her to file a second motion.

Siino's motion to modify the case scheduling order is denied.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 20184654

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# 8

KeyCite Yellow Flag
Declined to Extend by In re Lidoderm Antitrust Litigation, N.D.Cal., February 21, 2017

2015 WL 3623005
United States District Court,
E.D. Pennsylvania.

VISTA HEALTHPLAN, INC., et al., Plaintiffs,
v.
CEPHALON, INC., et al., Defendants.

No. 2:06–cv–1833.
|
Signed June 10, 2015.

**Attorneys and Law Firms**

Joseph H. Meltzer, Terence S. Ziegler, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, Kevin B. Love, Hanzman Criden & Love, P.A., South Miami, FL, Lawrence Kendall Satterfield, Michael McLellan, Finkelstein Thompson LLP, Washington, DC, Theodore M. Lieverman, John A. Macoretta, Jeffrey L. Kodroff, Mary Ann Geppert, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, Robert W. Sink, Law Offices of Robert W. Sink, Fort Washington, PA, William Richard Restis, Finkelstein and Krinsk, San Diego, CA, for Plaintiffs.

Gregory P. Teran, Peter J. Kolovos, Emily R. Whelan, James C. Burling, Mark A. Ford, Michelle D. Miller, Peter A. Spaeth, Yin Zhou, Wilmer Cutler Pickering Hale & Dorr LLP, Boston, MA, Robert J. Gunther, Jr., Wilmer Cutler Pickering Hale Dorr LLP, New York, NY, Frank R. Emmerich, Jr., John A. Guernsey, Nancy J. Gellman, Conrad O'Brien, Philadelphia, PA, Gregory L. Skidmore, John C. O'Quinn, Karen N. Walker, Kirkland Ellis LLP, Washington, DC, Jay P. Lefkowitz, Kirkland & Ellis, New York, NY, Lathrop B. Nelson, III, Richard L. Scheff, Montgomery McCracken Walker and Rhoads, L.L.P., Philadelphia, PA, C. Fairley Spillman, Catherine E. Creely, Paul B. Hewitt, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, David L. Comerford, Jeffery A. Dailey, Katherine M. Katchen, Paul T. McGurkin, Jr., Akin Gump Strauss Hauer & Feld LLP, Philadelphia, PA, David R. Marriott, Evan R. Chesler, Rowan D. Wilson, Cravath Swaine & Moore LLP, New York, NY, Reginald D. Steer, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, Jeffrey B. Korn, William H. Rooney, Willkie Farr Gallagher LLP, New York, NY, Joseph E. Wolfson, Stevens & Lee, King Of Prussia, PA, Danielle R. Foley, J. Douglas Baldridge, Lisa Jose Fales, Vincent E. Verrocchio, Molly Geissenhainer, Catherine E. Creely, Venable LLP, Washington, DC, Anthony S. Volpe, John J. O'Malley, Volpe & Koenig PC, Philadelphia, PA, Monica L. Rebuck, Hangley Aronchich Segal Pudlin & Schiller, Harrisburg, PA, Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA, for Defendants.

***MEMORANDUM OPINION***

GOLDBERG, District Judge.

***1** Presently before me is the End Payor Class Plaintiffs' motion for class certification filed in the consolidated antitrust lawsuit known as the *In re Modafinil Litigation.* [1] The prospective class of End Payor Plaintiffs includes consumers and Third–Party Payors ("TPPs"), such as health insurance plans, which purchased the brand-name pharmaceutical, Provigil, or its generic equivalent for either their own use, their families' use, or their beneficiaries' use between June 1, 2006 and September 30, 2013.

Plaintiffs have brought this antitrust lawsuit against the manufacturer of Provigil, Cephalon, Inc., as well as four generic pharmaceutical companies: Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. ("Teva"); Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy"); Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc. ("Mylan"), [2] and Barr Laboratories, Inc. ("Barr") (collectively "Generic Defendants"). At the center of this case are four Hatch–Waxman reverse-payment settlements, executed in 2005 and 2006 between Cephalon and each of the Generic Defendants, which are alleged to be anticompetitive for delaying the market entry of generic Provigil. Cephalon is also accused of maintaining an illegal monopoly by enforcing its patent on Provigil, which was allegedly obtained by committing fraud on the Patent and Trademark Office ("PTO").

Plaintiffs seek certification of two classes: (1) a class of End Payors bringing claims under the state antitrust and consumer protection laws of twenty-three states and the District of Columbia; and (2) an unjust enrichment class, bringing claims under the laws of twenty-five states and the District of Columbia. Plaintiffs have also articulated numerous class member exclusions. Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3), and assert that all of

the requirements of Rule 23 have been satisfied. Defendants vigorously oppose certification and urge that Plaintiffs have failed to demonstrate the requirements of ascertainability, predominance and superiority.

For the reasons that follow, I find that certification of the End Payor class is not appropriate because Plaintiffs have failed to satisfy the Rule 23 requirements of ascertainability, predominance and superiority by a preponderance of the evidence. Accordingly, Plaintiffs' motion is denied.

## I. *FACTUAL AND PROCEDURAL HISTORY*

### A. *Overview of the In re Modafinil Litigation*

In April 1997, the PTO issued U.S. Patent No. 5,618,845 ("the ′845 patent") to Cephalon, which patented a specific formulation of modafinil known as Provigil, a wakefulness-promoting drug. In 2002, Cephalon was granted a reissue patent on Provigil, U.S. Patent No. RE 37,516 ("the RE ′516 patent"), which was scheduled to expire October 6, 2014. However, as a result of studying the drug's effects on children, Cephalon also received an additional six months of pediatric exclusivity on Provigil, extending Cephalon's exclusivity period through April 6, 2015.

***2** On December 24, 2002, all four Generic Defendants filed Abbreviated New Drug Applications ("ANDAs") for generic Provigil, each certifying that Cephalon's patent was either invalid or would not be infringed by their generic modafinil product. As first-filers, all of the Generic Defendants were entitled to share in 180 days of exclusive marketing upon FDA approval, a characteristic of the Hatch–Waxman Act, Pub.L. No. 98–417. As a result of the Generic Defendants' ANDA filings, Cephalon sued the Generic Defendants for patent infringement on March 28, 2003.

All of the litigation between Cephalon and the Generic Defendants was settled between December 2005 and February 2006, while motions for summary judgment were pending. The settlements each permitted the Generic Defendants to launch their generic Provigil product on a "date certain" prior to the expiration of the RE ′516 patent—April 6, 2012. The agreements further contained "contingent-launch provisions," which permitted each Generic Defendant to market generic Provigil prior to the date certain if any other company marketed generic Provigil, whether through a license or at-risk,[3] or if the RE ′516 patent was declared invalid, unenforceable, or not infringed by generic Provigil. Each of these settlement agreements contained provisions for and/or were signed alongside licenses for intellectual property, active pharmaceutical ingredient supply agreements, and pharmaceutical development agreements. Cephalon agreed to pay a total of approximately $300 million to the Generic Defendants as a result of these agreements.[4] Plaintiffs allege that but-for these payments the Generic Defendants would have launched generic Provigil at risk, and thus lower-cost generic competition would have been brought to the prospective class members by June 2006.

Each of these settlement transactions have been characterized by Plaintiffs as anticompetitive reverse-payment settlement agreements that violate the antitrust laws. *See Federal Trade Commission v. Actavis, Inc.,* ––– U.S. ––––, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013). Furthermore, Cephalon is alleged to have violated the antitrust laws by procuring its Provigil patent by fraud on the PTO, and then enforcing said patent to keep competitors off of the market. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

### B. *Facts Pertinent to Class Certification*

In support of class certification, Plaintiffs presented the expert testimony of Dr. Raymond S. Hartman.[5] Plaintiffs posit that Dr. Hartman's methodology of measuring antitrust impact and aggregate damages demonstrates that the elements of Plaintiffs' claims can be satisfied through proof at trial that is common to the class. Dr. Hartman's methodology will be explored in greater detail herein, but to summarize, his methodology considered the amounts charged to Plaintiffs for branded and generic Provigil in the real world, and compared it to the amounts Plaintiffs would have been charged in the but-for world—that is, the world absent the allegedly anticompetitive conduct. Dr. Hartman opined that but-for the settlement agreements, the Generic Defendants would have launched their generic Provigil products at-risk in June 2006, which would have brought significant savings to TPPs and consumers. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 25–26.) According to Dr. Hartman, these overcharges constitute the relevant anticompetitive harm. (*Id.* at ¶¶ 42–44.) Dr. Hartman also considered the profits gained by Defendants during this time period, and compared them to the profits Defendants would have realized in the but-for world. According to Dr. Hartman, the difference between these two figures is an accurate measurement of Defendants' unjust enrichment. (*Id.* at ¶¶ 47–48.)

***3** To arrive at these figures, Dr. Hartman used yardsticks—data compiled from the generic launches of similar drugs—to calculate the rates of generic substitution and pricing of generic Provigil in the but-for world, and to demonstrate that consumers and TPPs would have paid less for their prescriptions if generic Provigil had entered the market.[6] (Hrg.Tr., Mar. 24, 2015, pp. 76–87.) Dr. Hartman also considered data derived from the real-world launch of generic Provigil, which occurred in April 2012, to support and update his calculations. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ ¶ 6–7.)

Defendants presented competing testimony from Dr. James W. Hughes, who opined that significant variations throughout the pharmaceutical industry prevent Plaintiffs from being able to identify class members or prove antitrust impact and damages without substantial individualized inquiry. (Hughes Exp. Rep., June 10, 2011, ¶ 3.) Regarding TPPs, Dr. Hughes stated that establishing injury and the amount of damages will depend upon the particular contractual relationships each TPP has with its insureds, pharmacies, drug manufacturers, and pharmacy benefit managers ("PBMs"),[7] all of which may vary over time. (*Id.* at ¶ 8.) Dr. Hughes also identified several categories of potentially uninjured persons who might otherwise fall within the class definition: (1) brand loyalists, or persons who choose to purchase the brand despite the availability of a generic; (2) consumers with the same copay for branded and generic drugs; (3) consumers who have not paid out-of-pocket for their prescriptions due to meeting an out-of-pocket maximum or an employer-funded health reimbursement account; (4) patients who would not have been prescribed Provigil in the but-for world due to decreased promotion; and (5) consumers whose insurers would place generic Provigil on a non-preferred tier. (*Id.* at ¶¶ 15–19.) As will be explored below, while some of these categories of uninjured persons have been excluded from the class, some remain.

During the class certification hearing, Dr. Hughes explained that simply excluding uninjured persons from the class definition would not prevent numerous individualized inquiries that would make class treatment inappropriate:

> You're not going to be able to determine on any sort of average basis who the consumers are with flat copays. It's in the contract. You have to go to the contract to see. Certain brand loyal consumers get the question of ... had the generic been available, who would have purchased the brand, who would have purchased the generic? Again, you have to look individually to see what individual consumers would have done.

(Hrg.Tr., Mar. 25, 2015, pp. 38–39.) Dr. Hughes further opined that, without a means of identifying class members, and particularly uninjured persons within the class, Plaintiffs were unable to satisfy the ascertainability and predominance requirements under Rule 23. (*Id.* at pp. 43–44.)

### C. *Proposed Class Definitions*

***4** Plaintiffs seek certification of two groups of End Payors: (1) a class of End Payors asserting claims under state antitrust and consumer protection laws; and (2) a class of End Payors asserting claims for unjust enrichment under state law. The proposed class definitions are as follows:

**State Antitrust/Consumer Protection Class**[8]

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds from June 1, 2006 through September 30, 2013.

**State Unjust Enrichment Class**

> All persons or entities in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Kentucky[9], Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin who purchased Provigil and/or its generic equivalent modafinil, intended for consumption by themselves, their families or their members, employees, plan participants, beneficiaries or insureds from June 1, 2006 through September 30, 2013.

The class definitions exclude the following persons and/or entities: (1) Defendants and their respective subsidiaries, affiliates and employees; (2) all governmental entities (except for government funded employee benefit plans); (3) all persons or entities who purchased modafinil, including Provigil, for purposes of resale or directly from Defendants to the extent and solely to the extent of such purpose for resale or as a direct purchaser; (4) insured individuals covered by plans imposing a flat dollar copay that was the same dollar amount for generic as for brand purchases; (5) individuals who bought only branded Provigil after generic modafinil became available ("brand loyalists"); (6) insured individuals who purchased only generic modafinil (not branded Provigil) pursuant to a fixed copay applicable to generic drugs; (7) fully insured health plans, *i.e.,* plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members; and (8) all PBMs without capitation agreements. (Pls.' Br., pp. 12–13.)

## II. *STANDARD OF REVIEW*

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores v. Dukes,* ––– U.S. ––––, ––––, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)) (quotation marks omitted). In order to certify a class action, the plaintiffs bear the burden of proving by a preponderance of the evidence that the putative class satisfies all of the prerequisites identified in Federal Rule of Civil Procedure 23(a) and one of the subcategories of Rule 23(b). Fed.R.Civ.P. 23; *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 320 (3d Cir.2008). "[P]roper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties." *Hydrogen Peroxide,* 552 F.3d at 321. "[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.* at 307. "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." *Id.* at 323 (citations omitted).

***5** Subsection (a) of Rule 23 contains four prerequisites for any class action:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

For certification under Rule 23(b)(3), the movant must also demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). These requirements are known as predominance and superiority. *In re Flonase Antitrust Litig.,* 284 F.R.D. 207, 215 (E.D.Pa.2012).

In addition to these requirements, there are two "essential prerequisite[s]" to class certification under Rule 23(b)(3): (1) a "clearly defined class and set of claims, issues, or defenses to be given class treatment"; and (2) "the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 59293 (3d Cir.2012) (citations omitted).

## III. *CLASS DEFINITION AND ASCERTAINABILITY*

### A. *Clearly–Defined Class*

"An order that certifies a class action must define the class and the class claims, issues, or defenses." Fed.R.Civ.P. 23(c) (1)(B). "[T]he text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis." *Marcus,* 687 F.3d at 591 (quoting *Wachtel v. Guardian Life Ins. Co.,* 453 F.3d 179, 187 (3d Cir.2006)). Clearly defining the contours of the class ensures that parties have clarity, and that class members understand their rights and make informed opt-out decisions. *Id.* at 591–92.

The parties have not raised any concerns about the class definitions, and my own review reveals that the classes are clearly defined. Plaintiffs have consistently alleged that, with limited exceptions, every person who purchased Provigil or its generic equivalent during the relevant time period and in the relevant jurisdictions suffered an overcharge, in violation

of the state antitrust and consumer protection laws, and are due compensation based upon Defendants' unjust enrichment. As noted above, Plaintiffs have also excluded numerous categories of uninjured class members. Because the class definitions clearly identify the claims at issue, I find that the proposed class definitions satisfy the requirements of Rule 23(c)(1)(B).

**B.** ***Ascertainability***

The United States Court of Appeals for the Third Circuit has recently identified ascertainability as an important prerequisite for class treatment. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.' " *Byrd v. Aaron's Inc.,* 784 F.3d 154, 163 (3d Cir.2015) (quoting *Hayes v. Wal–Mart Stores, Inc.,* 725 F.3d 349, 355 (3d Cir.2013)). "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus,* 687 F.3d at 593. Ascertainability serves several goals: (1) "it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members"; (2) "it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action"; and (3) "it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.* (citations and quotation marks omitted).

***6** The same rigorous analysis that a district court is required to undertake for Rule 23 requirements must be conducted with respect to ascertainability, and the plaintiff bears the burden of proving this element by a preponderance of the evidence. *Carrera v. Bayer Corp. .,* 727 F.3d 300, 306 (3d Cir.2013) (quoting *Marcus,* 687 F.3d at 593). "A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful[,]" and a party's assurance that it will be able to establish ascertainability at some point in the future is insufficient. *Id.* at 306; *see also Shelton v. Bledsoe,* 775 F.3d 554, 559 (3d Cir.2015) (class members must be "identifiable at the moment of certification").

The plaintiffs' method for identifying class members must be "administratively feasible," meaning "that identifying class members is a manageable process that does not require much, if any individual factual inquiry." *Id.* at 307–08 (citations omitted). "Ascertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Id.* at 307. It is insufficient to rely solely on a potential class members' "say so" that they belong within the class through affidavits or declarations. *Marcus,* 687 F.3d at 594.

The Third Circuit has recently issued several opinions on the ascertainability requirement, and last year a district court in Tennessee was confronted with class certification issues in a Hatch–Waxman reverse-payment settlement case very similar to the case before me. An examination of this precedent is instructive to analyzing the complex class certification concerns at issue here.

1. *Recent Precedent–Ascertainability*

The Third Circuit first provided a detailed analysis of the ascertainability requirement in *Marcus v. BMW of North America, LLC,* 687 F.3d 583 (3d Cir.2012), wherein the named plaintiff had brought fraud, breach of warranty, and breach of contract claims against a tire manufacturer and a car company. The plaintiff alleged that the manufacturer's run-flat tires ("RFTs") that had been placed on his leased BMW were defective because the tires were highly susceptible to flats, were unable to be repaired, and were exorbitantly priced. *Id.* at 588. The plaintiff sought to certify a class under Rule 23(b)(3) on behalf of all purchasers and lessees of certain model-year BMWs equipped with the RFTs sold or leased in New Jersey with tires that had gone flat or been replaced. *Id.*

The Third Circuit determined that the plaintiff had failed to demonstrate that the proposed class was ascertainable because there was no database or manifest indicating which BMWs had been sold and driven off of the lot with RFT tires. *Id.* at 593–94. In denying the certification motion the Court found that, even if the cars with the tires at issue could be identified, an individualized inquiry would need to be undertaken to determine whether that consumer's RFTs had gone flat and been replaced, as was required by the class definition. *Id.* at 594. The court further found that simply submitting affidavits from potential class members stating that they belong within the class was not a sufficiently reliable methodology. *Id.*

***7** The Third Circuit expanded upon the ascertainability requirement in *Carrera v. Bayer Corp.,* 727 F.3d 300 (2013). There, an indirect purchaser of Bayer's One–A–Day WeightSmart product brought claims against Bayer under the Florida Deceptive and Unfair Trade Practices Act and sought class certification on behalf of all persons

who purchased WeightSmart in Florida. Bayer argued that it did not maintain a list of class members because the class consisted of indirect purchasers, and potential class members were unlikely to have documentary proof of their purchase. *Id.* at 304. The plaintiff responded that he could identify class members through retailer records of online sales and sales made with store loyalty/rewards cards, or through class member affidavits. *Id.* The Third Circuit rejected this proposal and determined that class certification was inappropriate for lack of ascertainability because the plaintiff had failed to present evidence that the retailers had records of WeightSmart purchases during the relevant period, or that those records would be able to identify purchasers of WeightSmart. *Id.* at 308–09. The *Carrera* court reaffirmed its pronouncement in *Marcus* that affidavits from potential class members were insufficient. *Id.* at 309.

Most recently, in *Byrd v. Aaron's Inc.,* 784 F.3d 154 (3d Cir.2015), the Third Circuit sought to clarify the ascertainability requirement, citing some confusion among district courts and litigants. In *Byrd,* the plaintiffs, lessees of a laptop computer from the defendant, Aaron's Inc., alleged that spyware had been placed on their computer and that the defendants had activated that spyware to obtain pictures from the laptop's camera, as well as screenshots, without the plaintiffs' knowledge or consent. Citing violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, the plaintiffs sought to certify a class containing all persons who leased or purchased a computer from the defendant, as well as their household members, where the computer contained spyware that was activated without the person's consent. *Id.* at 159–60. The district court denied certification for lack of ascertainability, finding that the class was underinclusive, overly broad, and did not adequately define "household member." *Id.* at 160–61.

The Third Circuit reversed, holding that the plaintiffs had met their burden through defendant's records, which provided the identities and addresses of 895 class members. The court clarified that a plaintiff does not need to actually identify all class members at the time of class certification to demonstrate ascertainability, "a plaintiff need only show that 'class members *can* be identified.' " *Id.* at 163, 166–67 (quoting *Carrera,* 727 F.3d at 308 n. 2) (emphasis in original). "Accordingly, there is no records requirement," although a plaintiff must still provide *evidentiary support* that the proposed method of ascertaining the identities of class members will be successful and administratively feasible. *Id.* at 164.

***8** The *Byrd* opinion also found that the district court's concern with underinclusiveness was not an appropriate ascertainability inquiry, and that the class potentially being overbroad was more appropriately considered as a predominance issue. *Id.* at 166–69. Further, the court disagreed with the district court's determination that the "household members" included in the class were not ascertainable, noting that the plaintiffs had presented government documents that could be used to identify those individuals. *Id.* at 169–70. The court remarked that:

> [t]here will always be some level of inquiry required to verify that a person is a member of the class; for example, a person's statement that she owned or leased an Aspen Way computer would eventually require anyone charged with administering the fund resulting from a successful class action to ensure that person is actually among the 895 customers identified by the Byrds. Such a process of identification does not require a "mini-trial," nor does it amount to "individualized fact-finding." ... "[T]he size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification."

*Id.* at 170–71 (quoting *Carrera,* 727 F.3d at 307; *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 539–40 (6th Cir.2012)).

*In re Skelaxin (Metaxalone) Antitrust Litigation,* 299 F.R.D. 555 (E.D.Tenn.2014), closely resembles the facts before me, as it involved antitrust allegations brought by a number of end payors who purchased a branded drug and alleged that the brand manufacturer illegally delayed market entry of the generic drug. Relying in part on the Third Circuit precedent discussed above, the district court noted that "[i]f class members are impossible to identify without extensive and individualized fact-finding or mini-trials then a class action is inappropriate." *Id.* at 567 (quoting *Marcus,* 687 F.3d at 593).[10] The court found that "[g]iven the discrepancy between End Payors' expert's testimony and the class definition, the Court cannot determine which entities or individuals are members of the class and which are not." *Id.* at 560. To make this determination, the court found, would require a transaction-by-transaction inquiry that was incompatible with a Rule 23(b)(3) class action. *Id.*

In reaching these conclusions, the district court noted the various links in the pharmaceutical supply chain, and that numerous entities could contribute all or part of the cost of any

particular prescription. Thus, the court found it impossible to determine whether an end payor belonged within the class without considering "the individual contractual relationships underlying each transaction." *Id.* at 569. Indeed, much like the record before me, the plaintiffs' expert in *Skelaxin* had opined that identifying who was injured in any particular transaction was a claims administration issue. The district court rejected this testimony, finding that "the issue with End Payors' class is not whether a purchaser was damaged in each individual transaction; the issue is whether a purchaser constitutes a class member." *Id.* at 570. "Until proceeding through each transaction and resolving factual disputes about who 'bears the burden' of the price in that transaction, the Court [could not] say who [was] a member of the class." *Id.* at 571. In short, the district court concluded that ascertaining class members would entail "individual inquiry into contracts covering millions of purchases." *Id.* at 570.

2. *Ascertainability of the End Payor Class*

***9** As set forth previously, the proposed class definition essentially includes persons from numerous states who purchased Provigil (or its generic equivalent) from June 1, 2006 through September 30, 2013. Eight categories of persons and entities are specifically excluded from the proposed class.

Defendants raise two primary arguments in support of their position that the proposed class is not ascertainable. [11] The first argument is that Plaintiffs have failed to present any databases or other records that would identify who belongs within the class, let alone who is excluded. Defendants point out that they do not have such records, as the class is comprised of persons who purchased Provigil from other entities in the distribution chain, such as retailers. Defendants stress that Plaintiffs' class certification expert, Dr. Hartman, has clearly acknowledged that he has no methodology for identifying class members. Defendants also assert that even if Plaintiffs had presented a methodology of identifying class members, that process would be overwhelmed by individualized inquiries and would not be administratively feasible.

According to Defendants, the difficulties in identifying class members are further amplified by the multiple entities that may be involved in each pharmaceutical transaction who may have paid for all or a portion of the drug. These possible End Payors could include TPPs, health plan sponsors, PBMs, and the consumers themselves. Defendants stress that many End Payors, particularly consumers, will not have receipts or other ways of proving a purchase of Provigil during the relevant time period.

Plaintiffs respond that they have demonstrated ascertainability by proffering "a well-defined class with certain clearly articulated exclusions." (Pls.' Reply, p. 6.) They maintain that other courts within this district have certified classes of end payors without expressing concerns about ascertainability, and the result here should be the same. Plaintiffs attempt to distinguish *Marcus* and *Carrera* by pointing out that those cases arose in the "products liability context" where a complete lack of reliable and objective records existed to identify class members. According to Plaintiffs, that is not the case here, where "comprehensive records documenting any purchase of Provigil can be easily obtained from any number of reliable, objective sources" such as "IMS–NPA data, insurance companies, healthcare plans, health and welfare funds, pharmacies, as well as consumers." (Pls.' Reply, p. 7, n. 18.)

Despite Plaintiffs' assurances, a careful review of the record before me demonstrates that Plaintiffs have not met their burden of demonstrating ascertainability.

a. *Reliable Methodology for Identifying Class Members*

In support of their position that records are readily available, Plaintiffs point to the customer history of named Plaintiff Shirley Panebianco, which was obtained from Bridge Pharmacy. This document lists the various prescriptions that Panebianco had filled during the relevant time period, as well as the amount paid out of pocket and the amount covered by her health insurance plan. (*See* Pls.' Reply, Meltzer Decl., Ex. 27.) Plaintiffs also point to a short chart of claims data that was attached to their reply brief. This document does not identify any individuals, but rather lists patients by number and identifies the state, pharmacy, and/or city in which the prescription was filled, the submitted cost of the prescription and the copayment paid by the consumer. [12] (*See id.* at Ex. 28.)

***10** Aside from these two exhibits—one which lists the prescriptions of one consumer, and the other, which identifies consumers by number as opposed to including their identities —Plaintiffs have not presented any *evidence* that these records can be utilized to identify class members. While one consumer's prescription history dating back to 2006 has been presented, the record before me contains no evidence

as to whether other pharmacies kept reliable records of this same type of patient data over that time period. Plaintiffs' counsel assures the Court that such records were available. *Carrera* mandates, however, that it is insufficient to simply make assurances that records are readily available without providing evidence that "retailer records in this case can be used to identify class members." *Carrera,* 727 F.3d at 308. And the record before me is certainly different from *Byrd,* where the defendant maintained a list of the 895 persons that belonged within the class.

Dr. Hartman does not cure these deficiencies, and indeed seemed to dispute Plaintiffs' counsel's assurance that readily available records could be used to ascertain the identities of the class members. When asked if a database or other collection of records existed from which the identities of class members could be derived, Dr. Hartman testified that "[w]ithout them coming forward on their own[,]" he was unaware of any such records. (Hrg.Tr., Mar. 24, 2015, p. 182.) [13] Dr. Hartman stated numerous times that "at this stage of [his] analysis, [he] ha[d]n't been asked to" identify the class members and that he could simply verify that they belonged in the class "when class members come forward with their claims." (*See id.* at pp. 149–51; *see also id.* at p. 162 ("The Court: Do you have a methodology to ascertain the members of the class presently? ... [Dr. Hartman]: No, I haven't been asked to do that yet").)

Although Plaintiffs continue to stress that they need not present a methodology at this time, and that such an analysis would be more appropriate during a damages allocation, this argument is contradicted by clear pronouncements from the Third Circuit. Plaintiffs must, *at the time of class certification,* present a methodology to identify class members, and prove by a preponderance of the evidence that such methodology will be effective and will not require extensive individualized inquiry and mini-trials. *See Carrera,* 727 F.3d at 306 (the class must be *"currently* and readily ascertainable based on objective criteria") (emphasis added). Plaintiffs' argument that other courts within this district and elsewhere have certified similar classes of End Payors without being concerned with ascertainability is diminished by the fact that these cases were decided before *Marcus, Carrera* and *Byrd.* Indeed, the two cases cited by Plaintiffs, *In re Flonase Antitrust Litigation,* 284 F.R.D. 207 (E.D.Pa.2012) and *In re Wellbutrin XL Antitrust Litigation,* 282 F.R.D. 126 (E.D.Pa.2011), never even addressed the issue of ascertainability.

***11** Plaintiffs' reliance on *In re Nexium Antitrust Litigation,* 777 F.3d 9 (1st Cir.2015), does not assist their position. It is accurate that the United States Court of Appeals for the First Circuit held that the plaintiffs' failure to identify a methodology for distinguishing between injured and uninjured class members did not preclude class certification. However, in reaching this conclusion, the court found that "[w]hile it is true that a proper mechanism for exclusion of [uninjured] consumers has not yet been proposed, plaintiffs' expert made no concession that such a mechanism could not be developed." *Id.* at 20.

My understanding of Third Circuit precedent, particularly *Hydrogen Peroxide,* and subsequently *Carrera,* is that much more is needed in this Circuit than an expert who did not concede that an ascertainability mechanism could not be developed. *See Hydrogen Peroxide,* 552 F.3d at 318 (Rigorous analysis required, and assurances that a Plaintiff "intends or plans to meet the requirements is insufficient"); *Carrera,* 727 F.3d at 306 (same). Put another way, plans to create a methodology at a later date do not satisfy the rigorous analysis insisted upon by the Third Circuit and I do not read *Byrd* to alter these requirements. Moreover, the First Circuit in *In re Nexium* was satisfied that class member testimony in the form of an affidavit or declaration would meet the ascertainability requirement. As noted above, this method has been squarely rejected in this Circuit. *Compare In re Nexium,* 777 F.3d at 20 (categorizing affidavits and declarations as an acceptable means of identification), *with Marcus,* 687 F.3d at 594 ("Forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications").

For all of the above reasons, I agree with Defendants that Plaintiffs have failed to present evidence of a reliable "mechanism for determining whether putative class members fall within the class definition." *Byrd,* 784 F.3d at 163.

b. *Administratively Feasible Methodology for Identifying Class Members*

Plaintiffs have also not met their burden of establishing that any methodology for identifying class members would be administratively feasible. Dr. Hughes credibly testified that he was unaware of any administratively feasible approach that would allow Plaintiffs to distinguish class members from persons that fell within an exclusion, and that Dr. Hartman's yardstick methodology did not address this concern. (Hrg.Tr.,

Mar. 25, 2015, pp. 43–46, 80–81.) I find Dr. Hughes' analysis on this issue convincing. [14]

At oral argument, Plaintiffs' counsel acknowledged that, in the absence of a database or comprehensive list of class members, sending notice to potential consumer class members would necessitate numerous steps. According to Plaintiffs' counsel, this process would first require a plan to be developed by a consulting company, wherein notices would be sent to TPPs. While Plaintiffs' counsel assured me that a list of TPP class members had been compiled, this list was not offered into evidence and thus its reliability could not be challenged by Defendants or examined by the Court. Plaintiffs' counsel next described setting up a website which would allow the consumer class members to make themselves known to Plaintiffs' counsel. Thereafter, individual records would need to be compiled to determine whether that person actually belongs within the class, or if they fall within an exclusion. (Oral Arg. Tr., May 6, 2015, pp. 7–12.) Dr. Hartman acknowledged that in order to identify consumers and TPPs that fell within the class, he would need to conduct a detailed analysis of the contracts between various entities and also examine the purchasing history of the individual. (*See* Hrg. Tr., Mar. 24, 2015, pp. 175–76, 195–96.)

***12** To the extent that this multi-step notice process acts as a means of identifying class members, it entails "extensive and individualized fact-finding or 'mini-trials' " that *Byrd* stated would make class certification inappropriate. *Byrd,* 784 F.3d at 163 (citation omitted). Indeed, Plaintiffs' ascertainability problems are compounded by the complex nature of the pharmaceutical and insurance industries. Many individualized questions must be answered in order to determine whether an individual falls within the class definition, such as: Was the individual a brand loyalist?; What was the individual's copay for branded as opposed to generic Provigil?; Was the individual a member of a group plan that provided full or partial reimbursement?; What, if any, rebates factored into the consumer payment?

These very same hurdles also caused concern to the district court in *In re Skelaxin.* Under very similar circumstances, the court denied class certification, as it required "consideration of the individual contractual relationships underlying each transaction." *In re Skelaxin,* 299 F.R.D. at 569. I share those concerns and agree with Judge Collier when he stated:

> [U]ntil proceeding through each transaction and resolving factual disputes about who "bears the burden" of the price in that transaction, the Court cannot say who is a member of the class, that is, who has paid or reimbursed a portion of the purchase price. Although the class is circumscribed to only those entities who paid for their own consumption or the consumption of their constituents, End Payors' expert testified that, depending on the circumstances of each transaction, an end payor may be one or more entities or individuals sharing the burden.

*Id.* at 571.

Plaintiffs argue that Defendants are confusing claims administration with ascertainability, and insist that the court in *In re Skelaxin* made this same error. They point to an antitrust case involving allegations of delayed generic entry where class counsel successfully provided settlement checks to 816,000 consumers and 2,500 TPPs during the claims administration of a settlement class. That claims administration was conducted by gathering and analyzing records from insurers and pharmacies to determine who was owed a portion of the settlement. *See In re Tricor Indirect Purchaser Antitrust Litig.,* C.A. No. 05–360 (D.Del.). However, this procedure was used in the context of a settlement, which raises different certification issues. *See Carrera,* 727 F.3d at 308 n. 4 (questioning whether methods used to identify purchasers in a settlement class would be relevant to resolving ascertainability in a litigation class); *see also In re Skelaxin,* 299 F.R.D. at 571–72 ("The proposed 'claims administration' procedure is wholly post-hoc whittling of the class in the context of *settlement.* This methodology does nothing for the individual fact-finding required if this case were put to a jury") (emphasis in original).

***13** I also recognize and have considered *Byrd'* s conclusion that verification of a person's membership in the class for purposes of fund administration does not require a "mini-trial." *See Byrd,* 784 F.3d at 170. But again, fund administration and the rigorous analysis required by the

Third Circuit for establishing ascertainability are separate and distinct. My concerns about ascertainability focus on whether Plaintiffs can reliably identify class members at the outset. By contrast, the fund administration process would occur at the conclusion of litigation, and simply verify that any particular consumer or TPP is indeed one of the previously-identified members of the class. *See id.* (a person's statement that she belongs within the class would need to be verified at the conclusion of successful litigation to ensure she is actually among the previously-identified class members).

In summary, Plaintiffs have failed to present any evidence that they have developed a methodology for ascertaining the identities of class members, aside from simply assuring the court that records of Provigil prescriptions exist. Nor have Plaintiffs presented any evidence to demonstrate that it is possible to ascertain class members in an administratively feasible manner without highly individualized inquiry. Accordingly, Plaintiffs have failed to meet their burden of satisfying the ascertainability requirement.

## IV. *RULE 23(A) REQUIREMENTS*

### A. *Rule 23(a)(1)-Numerosity*

Defendants do not dispute Plaintiffs' ability to meet their burden as to the numerosity requirement, where Plaintiffs must establish that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Whether joinder is impracticable requires consideration of the number of class members, expediency, and the inconvenience of trying individual cases. *Jackson v. Se. Pa. Transp. Auth.,* 260 F.R.D. 168, 186 (E.D.Pa.2009) (citations omitted). While there is no precise number that will meet this requirement, classes in excess of forty members tend to satisfy numerosity. *Id.* Dr. Hartman has identified in excess of five million total Provigil prescriptions filled in the relevant jurisdictions from 2006 through January 2011. (Hartman Damages Exp. Rep., Apr. 26, 2011, Attachment E.1.e.) Therefore, I find that Plaintiffs have satisfied the numerosity requirement. *See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 685 n. 21 (S.D.Fla.2004) ("once the good faith estimate of the class size reaches the thousands, the joinder impracticability test is satisfied").

### B. *Rule 23(a)(2)-Commonality*

The commonality requirement is met where the members of the class's claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. "Because the requirement may be satisfied by a single common issue, it is easily met." *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994).

***14** As in other similar antitrust cases, "[e]ach class member's claims depend on whether or not the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors," which will require evidence common to the class. *In re Wellbutrin XL,* 282 F.R.D. at 137 (citing *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir.2004)). Defendants do not dispute Plaintiffs' ability to establish commonality, and I find that it has been satisfied.

### C. *Rule 23(a)(3)—Typicality*

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57 (citations omitted). Typicality exists "[i]f the representative's claims and those of the absent class members arise from the same course of conduct and are based on the same legal theories ... regardless of factual differences underlying the individual claims." *In re Wellbutrin XL,* 282 F.R.D. at 138 (citing *Baby Neal,* 43 F.3d at 57–58). The court must consider "whether the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1998) (quotation marks and citations omitted). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 631 (3d Cir.1996) (citations omitted).

Plaintiffs argue that typicality has been established because both the named and absent class members maintain the same claims and legal theories—that the allegedly anticompetitive conduct of Cephalon and the Generic Defendants constituted a violation of state antitrust, consumer protection and unjust enrichment laws. Plaintiffs allege that the Defendants' conduct injured both the class representatives and the absent class members through overcharges and unjust enrichment. Defendants respond that a conflict of interest exists between class members that may share an overcharge, and that this

conflict defeats typicality. I do not agree. *See In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 337 (E.D.Mich.2001) (quoting *In re S. Cent. States Bakery Prods. Antitrust Litig.,* 86 F.R.D. 407, 418 (M.D.La.1980)) ("A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit"); (*see also* Section IV. D. *infra).* [15] Plaintiffs' and the absent class members' claims are based on largely identical legal theories and focus heavily on Defendants' course of conduct. *See In re Flonase,* 284 F.R.D. at 218 (finding typicality had been established where the indirect purchasers all alleged "that the same unlawful conduct injured both the class representatives and the absent class members"). Therefore, I find that Plaintiffs have satisfied the typicality requirement.

### D. *Rule 23(a)(4)-Adequacy of Representation*

***15** Adequacy of representation has two prongs: (1) "the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation"; and (2) "the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975) (citation omitted). The adequacy requirement necessitates that the court consider whether conflicts of interest exist between named parties and those they represent. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Defendants do not challenge the adequacy of Plaintiffs' counsel, all of whom have extensive experience handling complex class action litigation, including cases in the antitrust context. (*See* Pls.' Mot., Meltzer Decl., Exs. 15–17.) Defendants do, however, argue that conflicts exist between and among the named Plaintiffs and absent class members that defeat adequacy of representation. First, Defendants argue that conflicts exist between certain class members who actually benefitted from the absence of generic Provigil and those who were allegedly harmed by the absence of generic Provigil. For instance, Dr. Hughes opined that brand loyalists often benefit from a delay in generic entry because their copayment may increase when a generic product becomes available. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 10, 49–51.) Plaintiffs respond, and I agree, that brand loyalists have been excluded from the class definition, and therefore no such conflict exists.

Next, Defendants argue that conflicts exist between the various End Payors who may bear the cost of any particular Provigil prescription through cost-sharing. For example, a consumer may pay a portion of the cost of Provigil through a copay, while his insurer, a TPP, would pay the remainder. Defendants assert that this framework, where alleged overcharges are split among class members, would result in class members battling against each other for recoveries, resulting in a conflict of interest. Plaintiffs respond that shared portions of an overcharge does not constitute a conflict, but is instead an integral part of the damages allocation process.

The court in *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 326 (E.D.Mich.2001), considered a similar argument, and found that a hypothetical conflict regarding apportionment of damages was insufficient to defeat certification. "Each class member has the same interest in maximizing the aggregate amount of classwide damages." *Id.* at 337 (quoting *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 512 (S.D.N.Y.1996)) (quotation marks omitted). "A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit." *Id.* (quoting *In re S. Cent. States Bakery Prods. Antitrust Litig.,* 86 F.R.D. 407, 418 (M.D.La.1980)); *see also Kohen v. Pacific Inv. Mgmt. Co. LLC,* 571 F.3d 672, 680 (7th Cir.2009) ("To deny class certification now, because of a potential conflict of interest that may not become actual, would be premature").

***16** Defendants have not presented evidence to establish a real probability of a conflict of interest among class members. All class members have a common interest in maximizing aggregate classwide damages. As in *In re Cardizem,* I find that the risk of conflicts during a damages allocation is speculative, and in any event, if conflicts were to arise at that stage of the litigation, those conflicts could be alleviated through the creation of subclasses of consumers and insurers. Therefore, I find that Plaintiffs have met the adequacy of representation requirement.

## V. *ANTITRUST CLAIMS–PREDOMINANCE*

The predominance requirement considers "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. In order to certify a class under Rule 23(b)(3), "questions of law or fact common to class members [must] predominate over any questions affecting only individual class members." Fed.R.Civ.P. 23(b)(3). While commonality and predominance present similar considerations, the predominance standard is "far more

demanding." *Hydrogen Peroxide,* 552 F.3d at 311 (citations omitted).

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* ––– U.S. ––––, ––––, 133 S.Ct. 1184, 1191, 185 L.Ed.2d 308 (2013) (emphasis in original). Individual questions need not be absent, so long as common questions predominate. *Id.* at 1196.

When conducting a predominance inquiry, the court must consider the elements of the underlying cause of action. *In re Flonase,* 284 F.R.D. at 219 (quoting *John Fund, Inc. v. Halliburton Co.,* ––– U.S. ––––, ––––, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011)). In order to prevail on their state law antitrust claims, [16] Plaintiffs must prove: (1) a violation of the state antitrust laws; (2) individual injury resulting from the violation, also known as antitrust impact; and (3) measurable damages. *See Hydrogen Peroxide,* 552 F.3d at 311.

Defendants largely do not dispute that the evidence Plaintiffs would present at trial to establish a violation of the state antitrust laws would be common to the class. [17] Instead, Defendants argue that Plaintiffs are not able to demonstrate antitrust impact or damages using class-wide evidence because determining whether a particular purchaser was harmed and the extent of that harm will necessitate individualized inquiries.

**A. *Antitrust Impact***

"In antitrust cases, impact often is critically important for the purposes of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Id.* (citations omitted). "[T]he task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 31112. To resolve this issue, the court must conduct a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312 (citations omitted).

***17** Plaintiffs largely rely upon the reports and testimony of Dr. Hartman in demonstrating that antitrust impact can be established using proof common to the class. Plaintiffs argue that Defendants' actions in unlawfully keeping generic Provigil off of the market caused universal injury to the class in several ways. First, by entering into the reverse-payment settlement agreements, Defendants allegedly kept generic Provigil off of the market through 2012, when Plaintiffs argue it would have otherwise entered the market, bringing lower prices to the class members, in 2006. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 128–29.) Thereafter, when generic Provigil did enter the market in 2012, Plaintiffs allege that those who switched to the generic paid more for generic Provigil than they would have paid in the but-for world—that is, if the generic had come onto the market in 2006. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 7, Attach. E.3.a, b.) Plaintiffs argue that common proof of these overcharges can establish antitrust impact for the class as a whole.

Defendants respond that significant variations within the class and large groups of uninjured class members prevent Plaintiffs from proving antitrust impact on a class-wide basis. I will first address Plaintiffs' evidence of class-wide antitrust impact, and then address Defendants' arguments that individualized evidence of impact would overwhelm common evidence.

1. *Plaintiffs' Class–Wide Evidence of Antitrust Impact*

To meet their burden of demonstrating impact to the class, Plaintiffs must demonstrate that branded and generic Provigil prices would have been lower absent Defendants' conduct, which resulted in overcharges to the class members, and must be able to do so through common evidence. *See In re Flonase,* 284 F.R.D. at 221. Plaintiffs rely on the testimony of Dr. Hartman to meet these standards.

Dr. Hartman reports that by virtue of entering into the settlement agreements with the Generic Defendants, Cephalon was able to maintain a monopoly on the Provigil market and generate monopoly profits for an extended period of time. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 28, 129–30.) Dr. Hartman opined that absent the agreements, all of the Generic Defendants would have launched their generic Provigil products at-risk in 2006. (*Id.* at ¶¶ 35, 129–30.) He further explained that generic pharmaceuticals, including generic Provigil, have a lower cost to consumers and TPPs than their brand-name counterparts. (*Id.* at ¶¶ 62–66.) Dr. Hartman reasoned that this is why the Hatch–Waxman Act was implemented—to increase the availability and procompetitive effects of generic pharmaceuticals. (*Id.* at ¶¶ 55–61.)

Dr. Hartman's reports detail the significant cost savings to end payors when generic pharmaceuticals enter the market, and how those savings increase with each additional generic competitor. (*Id.* at ¶¶ 131–34.) He also examined the real-world effects of generic competition on the Provigil market by reviewing data derived from generic Provigil's market entry in 2012. His evaluation of the data suggests that 99% of consumers switched to the generic version of Provigil, and that they have experienced savings as a result.

***18** According to Dr. Hartman, but-for the settlement agreements by and among Defendants, the savings to consumers who switched to generic Provigil would have been greater. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 7, Attach. E.3.a, b.) This is because the price charged for a generic upon release is impacted by the price of the brand-name drug. As the price of branded Provigil increased from 2006 through 2012, the amount charged by generic manufacturers in 2012 also increased to a higher level than it would have been in 2006. Therefore, according to Dr. Hartman, even those consumers who were able to purchase generic Provigil in 2012 suffered overcharges. (Hrg.Tr., Mar. 24, 2015, pp. 66–68, 87–91.) To demonstrate the difference between the but-for cost of Provigil and the prices paid by consumers for branded and generic Provigil in the actual world, Dr. Hartman used the yardstick method described above, which has been utilized in other antitrust cases. *See In re Linerboard Antitrust Litig.,* 305 F.3d 145, 153–55 (3d Cir.2002) (accepting the use of the yardstick method for antitrust impact and damages on a class-wide basis); *In re Flonase,* 284 F.R.D. at 220 (same); *In re Wellbutrin XL,* 282 F.R.D. at 140–41 (same).

Plaintiffs assert that these facts are common to all class members and are sufficient to establish antitrust impact on a class-wide basis. (Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶ 135.)

2. *Defendants' Challenges to Class–Wide Evidence of Antitrust Impact*

Defendants argue that individualized evidence regarding antitrust impact overwhelms common evidence because the class includes numerous categories of purchasers that suffered no injury, and that there is no class-wide methodology for identifying or distinguishing between those persons and otherwise injured class members.

Dr. Hughes described several categories of uninjured consumers, which include: (1) consumers who purchased Provigil after meeting an annual out-of-pocket maximum or deductible; (2) consumers whose insurer placed generic modafinil on the same formulary tier as Provigil, and thus would have the same copay for generic and branded Provigil; and (3) brand loyal consumers who would have bought branded Provigil even if a generic had been available. (*See* Hughes Exp. Rep., June 10, 2011, ¶¶ 90–110, 105–110, 126–27; Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 10, 11.) Dr. Hughes further identified categories of institutional payors that would otherwise fall within the class definition but who were not injured, such as: (1) institutional payors that shared risk with pharmacies through capitation agreements; and (2) institutional payors that paid more for generic Provigil due to aggressive promotion of generic substitution through their copayment structure. (Hughes Exp. Rep., June 10, 2011, ¶¶ 70, 75.) Due to these categories of uninjured class members, Dr. Hughes opined that determining whether individuals would have suffered harm, or would instead fall into one of these no-injury categories, would require individualized inquiry into the contracts that govern the relationships between entities and consumers, as well as the consumer's purchasing history. (*Id.* at ¶¶ 70, 75, 98, 110, 126.)

***19** Based upon Dr. Hughes' experience and training and the reliable data he reviewed, I credit his testimony regarding the numerous categories of uninjured consumers and the extensive individualized inquiries that would follow.[18] I thus conclude that a significant number of uninjured class members remain within the class definition, and that Plaintiffs have not identified a methodology that would identify and remove those persons on a class-wide basis. This conclusion is supported by Plaintiffs' own expert Dr. Hartman, who acknowledged that in order to identify uninjured persons or entities, whether they fall within an exclusion or not, would require a fact-intensive, individualized analysis of the contracts between various entities and the consumer, as well as the purchasing history of a particular consumer. (Hrg.Tr., Mar. 24, 2015, pp. 183–87.) While Dr. Hartman indicated that "[y]ou have to look at individualized records in that case for a few number—for a number of consumers" (*id.* at 186), there is no escaping that every potential class member would need to be subject to individualized inquiries. Indeed, when every class member has the potential to be a brand loyalist, a person with a flat copay or a consumer who never paid out-of-pocket for their prescriptions, and the only way to identify persons who fall within those groups is individualized inquiry, individualized inquiries would predominate.

Additionally, despite Dr. Hartman's assurances that only a de minimis number of class members are uninjured, and that

by excluding certain categories of uninjured class members, impact is capable of class-wide proof, the exclusions proposed by Plaintiffs do not resolve the predominance issue. In fact, the many exclusions proposed by Plaintiffs appear to be part of the problem.

As described above, Dr. Hughes established that Plaintiffs have not offered a class-wide methodology for identifying those persons who purchased Provigil or its generic equivalent, but who fall within an exclusion, such as brand loyalists and persons with flat copays. When the identification and exclusion of these consumers cannot be managed without considering the highly individualized purchasing history of individuals and their specific insurance plans, simply stating that they are excluded from the class definition is not sufficient to show that common issues will predominate.

Further, I find that unrebutted testimony from Dr. Hughes credibly demonstrates that more than a de minimis number of uninjured persons remain within the class, despite Plaintiffs' assurances to the contrary. Dr. Hughes has identified several categories of consumers and TPPs that have not been excluded from the class definition, but would be uninjured. One such category of institutional payors includes TPPs that are uninjured due to capitation agreements between TPPs and pharmacies. For example, TPPs may have agreements with pharmacies whereby the TPP would reimburse the pharmacy a set fee for a certain therapeutic class of drug, whether the drug was brand or generic. Therefore, pharmacies can insulate TPPs from injury. (Hughes Exp. Rep., June 10, 2011, ¶ 70.)

***20** Another possible category of uninjured parties includes TPPs that pay more for the generic than branded Provigil because they aggressively promote generic substitution through their copayment structure. For example, when a generic is priced slightly, but not substantially, below the price of the branded drug, and the TPP requires a much higher copay for the brand-name drug than the generic, the TPP may actually pay more for the generic because they are receiving a much lesser copay contribution from the consumer. This category of TPPs could also be uninjured. (*Id.* at ¶ 75.)

Consumers with no out-of-pocket payment are another category of persons who could be uninjured, but have not been excluded from the class definition. Plaintiffs have not disputed Dr. Hughes' finding that, based upon employer claims data, five percent of all consumers prescribed Provigil never paid out-of-pocket for the drug from January 2005 through March 2010. (*Id.* at ¶ 106, Ex. 6.) According to Dr. Hughes, this result is derived from two groups of people: (1) consumers who have reached their annual out-of-pocket maximum for prescriptions prior to purchasing Provigil; and (2) consumers that are covered by an exclusively employer-funded health reimbursement arrangement or health savings account. If these consumers never paid out-of-pocket for their branded or generic Provigil prescription, they are uninjured by any delay in generic entry. (*Id.* at ¶¶ 105–10.)

Dr. Hughes also described consumers who received no cost-benefit from switching to the generic. For example, some health plans place non-preferred brands of generics in the highest copayment tier. If a consumer's TPP lists generic Provigil in the same or a higher copayment tier than that of branded Provigil, that consumer would not pay any less for generic Provigil, and thus would not be injured by delayed generic entry. (*Id.* at ¶¶ 126–27.) In fact, Dr. Hughes' supplemental expert report, which was completed following generic entry, actually demonstrates that some of the plans associated with named Plaintiff Vista Healthplan covered both branded and generic Provigil on tier three. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 57–58.) Dr. Hughes further noted that, of the plans he reviewed, nine percent of three-tier non-Medicare plans, eighteen percent of four-tier Medicare plans, and thirty-five percent of five-tier Medicare plans placed generic Provigil on a non-preferred tier, which can result in no injury to consumers. (*Id.* at ¶ 59, Ex. 4.) [19]

While Dr. Hughes could not quantify the prevalence of many of these groups of uninjured class members among purchasers of Provigil, he testified that in his experience, these categories of TPPs and consumers exist within the pharmaceutical market place, a point not disputed by Plaintiffs. Dr. Hughes reliably and credibly stated that at least five percent of consumers had no out-of-pocket payment, and thus were uninjured, from 2005 to 2010. I find that this five percent, combined with the substantial likelihood that some of the other categories mentioned above of uninjured class members identified by Dr. Hughes would be within the proposed class, indicates that the prevalence of uninjured class members is more than de minimis.

***21** This case is similar to *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 2010 WL 3855552 (E.D.Pa. Sept.30, 2010), where Judge Lawrence Stengel of this district denied class certification for a group of end payors in a case involving delayed generic entry. There, Judge Stengel found that the class contained several categories of uninjured class members, such as brand loyalists

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and those whose insurance plan terms insulated them from overcharges. *Id.* at *26. Judge Stengel commented that "I cannot fathom, and the plaintiffs have not put forth, a method for identifying which individual purchasers would [be uninjured] through analysis of common information." *Id.* at *25. The plaintiffs' evidence did "not show that *all* class members paid supra-competitive prices for generic or branded [Wellbutrin SR], or that this determination c[ould] be made with common proof." *Id.* at *27. Accordingly, the plaintiffs were unable to meet the predominance standard in light of *Hydrogen Peroxide 's* rigorous analysis requirement. I reach the same conclusion here. Without a means of identifying these uninjured persons using common evidence, every class member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' alleged anticompetitive actions.

In summary, Plaintiffs have not sufficiently proven that they are able to demonstrate antitrust impact on a class-wide basis. This is due to various groups of uninjured persons that remain within the class, and because identifying and removing these uninjured class members would require extensive individualized inquiry.

**B. *Damages***

Plaintiffs argue that they have demonstrated predominance with respect to antitrust damages through Dr. Hartman's yardstick methodology. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶ 42.) For overcharge damages, Dr. Hartman subtracts the but-for price of generic Provigil from the prices of branded and generic Provigil in the actual world during the relevant time period. He then multiplies that price difference by the number of prescriptions written. (*Id.* at ¶¶ 43–44.) The aggregate amount of overcharges to the Class, as calculated by Dr. Hartman, is $2.449 billion. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 4.) In calculating unjust enrichment damages, Dr. Hartman subtracts the profits that Defendants would have realized in the but-for world from the amount of profits Defendants realized in the actual world during the relevant time period. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 47–48; Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 12.) Dr. Hartman opined that the amount of unjust enrichment owed to the class, in the aggregate, is $2.507 billion. (Hartman Supp. Exp. Rep., Dec. 20, 2013, ¶ 11.)

Defendants argue that Plaintiffs are unable to demonstrate predominance as to damages for several reasons. First, citing *Comcast Corp. v. Behrend,* ––– U.S. ––––, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013), Defendants argue that "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." (Defs.' Resp., p. 24.) Second, in supplemental briefing, Defendants assert that Plaintiffs' damages calculation did not match their theory of antitrust impact. For the reasons that follow on this point, I disagree with Defendants' arguments.

***22** "At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." *In re Wellbutrin XL,* 282 F.R.D. at 144 (citing *In re Neurontin Antitrust Litig.,* 2011 WL 286118, at *9 (D.N.J. Jan.25, 2011)). Courts have held that proof of aggregate damages is appropriate in class actions. *In re Pharm. Indus. Average Wholesale Price Litig.,* 582 F.3d 156, 197 (1st Cir.2009) ("The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself").

"Some variation of damages among class members does not defeat certification," *In re Flonase,* 284 F.R.D. at 232 (quoting *Behrend v. Comcast Corp.,* 655 F.3d 182, 204 (3d Cir.2011)), and damages "calculations need not be exact." *Comcast,* 133 S.Ct. at 1433 (citing *Story Parchment Co. v. Paterson Parchment Paper Co. .,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)). Once injury has been established, "the jury is permitted to calculate the actual damages suffered using a reasonable estimation, as long as the jury verdict is not the product of speculation or guess work." *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 484 (3d Cir.1998) (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1176 (3d Cir.1993)) (quotation marks omitted).

In *Comcast,* the Supreme Court addressed the issue of predominance as it relates to antitrust damages. The district court had certified the class, but had only accepted one out of four of the plaintiffs' theories of antitrust impact as capable of class-wide proof—"the theory that Comcast engaged in anticompetitive clustering conduct, the effect of which was to deter the entry of overbuilders" in the Philadelphia area. *Comcast,* 133 S.Ct. at 1431. However, the damages model the plaintiffs' expert had used to calculate damages for the class included damages from all of the various theories of antitrust impact, including the ones not certified for class treatment. *Id.* The Supreme Court reversed class certification, finding that plaintiffs had not shown that damages were capable of measurement on a class-wide basis, as required to establish predominance. *Id.* at 1433. The primary takeaway

from *Comcast* has been that a "plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Id.*

In the wake of *Comcast,* some defendants, including those here, argue that plaintiffs cannot have variations in damages calculations, and that diverse individual damages calculations prohibit class treatment. This is because in *Comcast,* the district court held (without a challenge on appeal) that in order to meet the predominance requirement, plaintiffs had to show "that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.' " *Id.* at 1430. Furthermore, the Supreme Court stated that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*

***23** Circuit courts have largely rejected the interpretation urged by Defendants—that variations in damages calculations between and among class members defeat predominance. *See Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir.2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought ... to require that every member of the class have identical damages"); *see also In re Nexium Antitrust Litig.,* 777 F.3d 9, 18–19 (1st Cir.2015) (limiting its interpretation of *Comcast* to the principle that the plaintiff's theory of impact must match his damages model); *In re Deepwater Horizon,* 739 F.3d 790, 817 (5th Cir.2014) (same); *In re Whirlpool Corp. Front Loading Washer Prods. Liab. Litig.,* 722 F.3d 838, 860 (6th Cir.2013) (same); *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir.2013) (same). Indeed, "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler,* 727 F.3d at 801. Accordingly, *Comcast* has largely been limited to its unique set of facts, and interpreted as precluding class treatment where the class-wide measure of damages does not match the theory of antitrust impact.

In response to Defendants' argument that variations in damages calculations overwhelm questions common to the class, Dr. Hartman demonstrated that his aggregate damages model is able to account for the variations between and among class members. To establish this point, Dr. Hartman compiled a list of individuals with copays for branded and generic Provigil ranging from $0 to $180. Some members of the sample had a flat copay, and some experienced significant savings from purchasing generic Provigil. Dr. Hartman added up the total injury to this small sample individual-by-individual—that is, he computed the overcharge experienced by each individual, and added those numbers together to find a total overcharge for the sample. He then used his averages formula to calculate the average overcharge to the sample, and multiplied that figure by the number of persons in the sample. Whether Dr. Hartman added up the overcharges individual-by-individual or took the average overcharge and multiplied it by the total number of class members, Dr. Hartman reached the same exact amount of total damages to the sample. Through this demonstration, Plaintiffs have satisfied me that their damages were derived using a reliable method that took individual variations among class members into consideration. [20] (Hrg.Tr., Mar. 24, 2015, pp. 95–103.) Therefore, I do not find that individual variations in Plaintiffs' damages calculations prevent a finding of predominance.

Defendants separately urge that when this Court granted Defendants' motions for summary judgment on Plaintiffs' overall conspiracy claims, Dr. Hartman's damages model suffered the same defect that the Court addressed in *Comcast,* in that his damages model no longer fit Plaintiffs' theory of liability and antitrust impact.

***24** In a prior Opinion, I considered whether Plaintiffs had provided sufficient evidence to survive summary judgment on a claim for one overall antitrust conspiracy among all Defendants. *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* 2014 WL 2813312 (E.D.Pa. June 23, 2014). In their complaint, Plaintiffs had alleged that Cephalon and the Generic Defendants had all conspired together to keep generic Provigil off of the market and to share in the generated monopoly profits. *Id.* at *4. In support of their claim for overall conspiracy, Plaintiffs pointed to the 180–day period of exclusivity shared by the Generic Defendants, as well as the substantially identical contingent launch provisions found within each of the settlement agreements. *Id.* Defendants had argued that each Generic had an individual incentive to demand a contingent launch provision, and that Plaintiffs' circumstantial evidence was insufficient to establish an overarching conspiracy as a matter of law. *Id.* I agreed with Defendants, holding that the Private Plaintiffs had not provided direct evidence of an overall agreement encompassing Cephalon and all of the Generic Defendants, nor had they presented circumstantial evidence that supported "an inference of concerted, as opposed to independent, action." *Id.* at *14. Accordingly, summary judgment was

granted in favor of the Defendants as to the Private Plaintiffs' claims of overall conspiracy. *Id.*

As a result of this decision, which was issued after briefing had been completed on the instant motion for class certification, Defendants submitted a supplemental argument under *Comcast* urging that Plaintiffs' damages model did not match their remaining theories of liability. Defendants argue that Dr. Hartman's damages model presents aggregate damages to the entire market, which he attributes collectively to all Defendants. To match Plaintiffs' remaining theories of liability, Defendants posit that Dr. Hartman needed to analyze the potential damages attributable to each of the separate agreements between Cephalon and a Generic Defendant standing on its own. Such an analysis would allow a jury to determine, if only one or two Defendants were ultimately found liable, the amount of damages attributable to those specific parties' conduct. (Doc. No. 425, pp. 4–5.)

Plaintiffs respond that their damages calculation does not run afoul of *Comcast* because their "damage analysis is exactly the same whether there is one conspiracy or four." (Doc. No. 429, pp. 1–2.) This is due to the contingent launch provisions in each settlement agreement, urge Plaintiffs, which allowed the Generic Defendant bound by that settlement agreement to enter the market earlier than 2012 if any other generic Provigil product entered the market. Therefore, "[i]f any one of the Generic Defendants had not accepted a payment from Cephalon to stay off the market then that company would have launched a generic, all other Generic Defendants would have entered and prices would fall for the entire class." (*Id.* at p. 2.)

***25** I agree with Plaintiffs and find that Dr. Hartman's damages model comports with the remaining theories of liability. Dr. Hartman opines that but for the settlement agreements, the following would have occurred: (1) the four Generic Defendants would have launched on June 24, 2006; (2) Apotex would have launched a generic Provigil product on December 24, 2006; and (3) Cephalon would have launched its own authorized Generic on June 24, 2006, which would lead to six generic Provigil products on the market. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶ 26.)

According to Dr. Hartman:

> But-for the settlement agreements between Cephalon and *each* Defendant, generic launch would have occurred as posed above.... If Cephalon had settled with only a subset of the Generic Defendants, those settling [G]eneric Defendants would likely have launched by triggering the clause that allowed each settling Generic Defendant to launch if another generic launched.

(*Id.* at ¶ 27 (emphasis in original).) Dr. Hartman then measures the difference between what the price would have been with six generic entrants in 2006 and the price actually paid by consumers and TPPs in the actual world. [21] (*Id.* at ¶¶ 42–46.) A hypothetical provided by Plaintiffs helps to illustrate this issue:

> If End–Payors prove at trial that Ranbaxy accepted a payment from Cephalon for the purpose of staying off the market in violation of the various state antitrust[,] consumer protection and unjust enrichment laws, End–Payors' damage model assumes that, but for the illegal agreement, Ranbaxy would have entered the market in 2006. The damage model also assumes that other generic competitors would have followed Ranbaxy's entry shortly thereafter.

(Doc. No. 429, p. 3.) Therefore, I do not agree with Defendants' *Comcast* argument, and I find that Plaintiffs' damages model matches their remaining theories of liability and impact. Accordingly, although I find that Plaintiffs have not been able to establish predominance as to antitrust impact, I disagree with Defendants' arguments regarding Plaintiffs' damages calculations. [22]

## VI. *UNJUST ENRICHMENT CLAIMS—PREDOMINANCE & SUPERIORITY*

### A. *Choice of Law*

I must first determine which laws apply to the unjust enrichment claims of the proposed class. "A necessary precondition to deciding Rule 23 issues is a determination of the state whose law will apply." *Powers v. Lycoming Engines,* 328 Fed. Appx. 121, 124 (3d Cir.2009). A court "must apply an individualized choice of law analysis to each plaintiff's claims" raised by a proposed class action. *Georgine,* 83 F.3d at 627 (citing *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 823, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

Despite being a necessary prerequisite to the Rule 23 inquiry, Plaintiffs failed to brief the relevant choice-of-law analysis with respect to which laws should govern the state antitrust, consumer protection and unjust enrichment claims of the proposed classes. As such, Plaintiffs failed to meet their burden of showing that common questions of law predominate. *See Spence v. Glock, Ges.m.b.H.,* 227 F.3d 308, 313 (5th Cir.2000) ("The burden of proof lies with the plaintiffs; in not presenting a sufficient choice of law analysis they have failed to meet their burden of showing that common questions of law predominate").

***26** I will nonetheless undertake a choice of law analysis because it is a prerequisite to an evaluation of the Rule 23(b)(3) factors. *See In re LifeUSA Holding Inc.,* 242 F.3d 136, 147 (3d Cir.2001) (finding error where the "District Court failed to consider how individualized choice of law analysis of the forty-eight different jurisdictions would impact Rule 23's predominance requirement").

When a federal court is sitting in diversity, the court must apply the choice of law rules of the forum state to determine what substantive state law will govern. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). This action was commenced in the United States District Court for the Eastern District of Pennsylvania. As such, I will apply Pennsylvania's choice of law rules.

Under Pennsylvania's choice of law rules, the first step is to determine whether there is an actual or true conflict between the potentially applicable laws. *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 229–30 (3d Cir.2007). If there are no relevant differences or the laws would produce the same result, the court need not engage in a choice of law analysis and may refer to the laws "interchangeably." *Id.* at 229.

However, if there are relevant differences, then the court must examine the governmental policies which underlie the laws. *Id.* at 230. Based on the result of that analysis, the court then characterizes the case as a "true conflict, false conflict, or unprovided-for case." *Id.* (citations omitted). If the relevant policy interests of both jurisdictions would be impaired by application of the other jurisdiction's law, there is a true conflict. *Id.* Where there is a true conflict, the court must then determine which state has the "greater interest in the application of its law." *Id.* at 230–31.

Pennsylvania requires that courts making such a determination use a "combination of the approaches of both [the] Restatement II (contacts establishing significant relationships) and interests analysis (qualitative appraisal of the relevant States' policies with respect to the controversy)." *Id.* at 231 (citing *Melville v. Am. Home Assur. Co.,* 584 F.2d 1306, 1311 (3d Cir.1978) (quotation marks omitted)). The interest analysis requires a weighing of "the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue." *Id.* at 231 (citing *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir.1987) (alterations in original)).

A false conflict exists when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir.1991). If there is a false conflict, the court applies the law of the only interested jurisdiction. *Id.* Finally, a case is unprovided-for where neither jurisdiction's interests would be impaired if its laws are not applied. *Garcia v. Plaza Oldsmobile Ltd.,* 421 F.3d 216, 220 (3d Cir.2005). In unprovided-for cases, "the principle of lex loci delicti, the law of the place of the wrong, supplies the substantive law to be applied." *Id.*

***27** Applying the above choice of law framework, I must first determine whether there is a true conflict between the twenty-six unjust enrichment laws under which Plaintiffs seek certification as well as any other potentially applicable unjust enrichment laws. Several courts in this circuit that have been confronted with the issue have determined that no material differences distinguish the various states' unjust enrichment laws and, therefore, no conflict exists. *See Pennsylvania Employee, Benefit Trust Fund v. Zeneca, Inc.,* 710 F.Supp.2d 458, 477 (D.Del.2010) (concluding that the "basic elements" required under various unjust enrichment laws do not create an actual conflict); *Agostino v. Quest Diagnostics Inc.,* 256 F.R.D. 437, 464 (D.N.J.2009) ("the Court concludes that there are no actual conflicts among the laws of unjust enrichment"); *Powers v. Lycoming Engines,* 245 F.R.D. 226, 231 (E.D.Pa.2007), rev'd on other grounds, 328 Fed. Appx. 121 (3d Cir.2009) ("there are few real differences amongst the unjust enrichment cause of action in the various states and no conflict exists").

However, other courts in this circuit have reached the opposite conclusion and determined that the elements necessary to establish an unjust enrichment cause of action in various jurisdictions differ in material ways and, therefore, give rise to a conflict. *See In re Actiq Sales & Mktg. Practices Litig.,* 2015 WL 1312015, at *11–12 (E.D.Pa. Mar.23, 2015) (concluding

that a true conflict exists as the variances in the states' unjust enrichment law could lead to differential treatment of the claims of the proposed nationwide class).

The conclusion that a conflict exists finds support in courts outside of this circuit. *See, e.g., Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 591 (9th Cir.2012) ("[t]he elements necessary to establish a claim for unjust enrichment also vary materially from state to state"); *Thompson v. Bayer Corp.,* 2009 WL 362982, at *4 (E.D.Ark. Feb.12, 2009) ("[a]fter an extensive review of the law, the Court finds that the states' different approaches to, or elements of, unjust enrichment are significant"); *In re Aqua Dots Products Liab. Litig.,* 270 F.R.D. 377, 386 (N.D.Ill.2010) (the law of unjust enrichment "varies too much" from state to state and poses "insurmountable choice-of-law problems"); *Clay v. Am. Tobacco Co.,* 188 F.R.D. 483, 501 (S.D.Ill.1999) ("variances exist in state common laws of unjust enrichment"); *Thompson v. Jiffy Lube Intern., Inc.,* 250 F.R.D. 607, 627 (D.Kan.2008) (finding a conflict between state unjust enrichment laws).

In considering a proposed nationwide unjust enrichment class, the *In re Actiq* opinion catalogues some of the many material ways in which unjust enrichment laws vary. First, states apply statutes of limitations of varying lengths to unjust enrichment claims. 2015 WL 1312015, at *11. Second, states have different rules as to when and how the statute of limitations accrues. *Id.* Third, some states do not recognize unjust enrichment as an independent cause of action. *Id.* at *12. Fourth, some but not all states require a plaintiff to demonstrate that they lack an adequate remedy at law. *Id.* Fifth, some states require that a plaintiff establish that the benefit was directly conferred on the defendant. *Id.* Sixth, the states also vary as to the level of misconduct, if any, a plaintiff must prove. *Id.* Lastly, the states follow different rules as to the availability of defenses, including laches and unclean hands. *Id.*

***28** According to Plaintiffs, the "basic elements" common to the relevant unjust enrichment laws are as follows: "(1) Plaintiff confers benefit on defendant; (2) defendant accepts/retains benefit; (3) circumstances make it unjust for defendant to do so." (Pls.' Mot., Meltzer Decl., Ex. 25.) However, although Plaintiffs do not seek certification of a nationwide class, several of the differences catalogued in *In re Actiq* distinguish the unjust enrichment laws relevant to Plaintiffs' class proposal. In fact, the state law chart submitted by Plaintiffs in support of their motion for class certification demonstrates the presence of three such material jurisdictional differences. (*See id.*)

First, according to Plaintiffs' chart, Arizona, Louisiana, Massachusetts, New York, North Carolina, North Dakota, Tennessee and Utah require that a plaintiff demonstrate that there is not an adequate remedy at law in addition to the "basic elements" which compromise an unjust enrichment claim. (*Id.*)

My review of the case law confirms that these states do indeed recognize this requirement. *Trustmark Ins. Co. v. Bank One, Ariz., NA,* 202 Ariz. 535, 48 P.3d 485, 491 (Ariz.Ct.App.2002) (to establish unjust enrichment a party must show "the absence of a legal remedy"); La. Civ.Code Ann. art. 2298 (unjust enrichment "shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule"); *Santagate v. Tower,* 64 Mass.App.Ct. 324, 833 N.E.2d 171, 176 (Mass.App.Ct.2005) ("equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law"); *Samiento v. World Yacht Inc.,* 10 N.Y.3d 70, 854 N.Y.S.2d 83, 883 N.E.2d 990, 996 (N.Y.2008) (cause of action for unjust enrichment "does not lie as plaintiffs have an adequate remedy"); *Jones Cooling & Heating, Inc. v. Booth,* 99 N.C.App. 757, 394 S.E.2d 292, 294 (N.C.App.1990) (plaintiff may not recover under a theory of unjust enrichment where an adequate remedy at law exists); *Lochthowe v. C.F. Peterson Estate,* 692 N.W.2d 120, 124 (N.D.2005) (to establish unjust enrichment a party must demonstrate "an absence of a remedy provided by law"); *Thorpe v. Washington City,* 243 P.3d 500, 507 (Utah App.2010) (plaintiff must show absence of an adequate remedy at law); *Freeman Industries, LLC v. Eastman Chem. Co.,* 172 S.W.3d 512, 525 (Tenn.2005) (a plaintiff must demonstrate the absence of a legal remedy).

Additionally, although not mentioned in Plaintiffs' chart, a review of the case law also discloses that Hawaii and Minnesota recognize the same no adequate remedy requirement. *Porter v. Hu,* 116 Hawai'i 42, 169 P.3d 994, 1007–08 (Haw.Ct.App.2007) (unjust enrichment is only appropriate in the absence of an adequate remedy at law); *Caldas v. Affordable Granite & Stone, Inc.,* 820 N.W.2d 826, 842 (Minn.2012) (citing *Service Master of St. Cloud v. GAB Bus. Servs. ., Inc.,* 544 N.W.2d 302, 305 (Minn.1996) ("A party may not have equitable relief where there is an adequate remedy at law available")). Pennsylvania does as well. *Meehan v. Cheltenham Twp.,* 410 Pa. 446, 189 A.2d 593, 595 (1963) (holding that unjust enrichment is not available where an adequate remedy at law exists).

***29** Second, according to Plaintiffs' chart, in addition to the "basic elements," California, Florida, Kansas, Maine, Massachusetts, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, Utah and Wisconsin require that a plaintiff establish that the defendant appreciates or has knowledge of the benefit conferred. (Pls.' Mot., Meltzer Decl., Ex. 25.)

My review of the case law confirms Plaintiffs' assertion regarding the foregoing jurisdictions. *See Ghirardo v. Antonioli,* 14 Cal.4th 39, 57 Cal.Rptr.2d 687, 924 P.2d 996, 1003 (Cal.1996) (plaintiff must demonstrate that the defendant knew of the benefit); *Hillman Const. Corp. v. Wainer,* 636 So.2d 576, 577 (Fla. 4th Dist.App.1994) (must establish that the "plaintiff has conferred a benefit on the defendant, who has knowledge thereof"); *J.W. Thompson Co. v. Welles Products Corp.,* 243 Kan. 503, 758 P.2d 738, 745 (Kan.1988) (plaintiff must establish "an appreciation or knowledge of the benefit by the defendant"); *In re Est. of Anderson,* 988 A.2d 977, 980 (Me.2010) (plaintiff must establish that receiving party "had appreciation or knowledge of the benefit"); *Stevens v. Thacker,* 550 F.Supp.2d 161, 165 (D.Mass.2008) (plaintiff must establish "appreciation or knowledge of the benefit by the defendant"); *Certified Fire Prot. Inc. v. Precision Constr.,* 283 P.3d 250, 257 (Nev.2012) (plaintiff must establish that the defendant "appreciates" the benefit); *Ontiveros Insulation Co., Inc. v. Sanchez,* 129 N.M. 200, 3 P.3d 695, 698 (N.M.App.2000) (plaintiff must establish that "another has been knowingly benefitted at one's expense"); *D.W.H. Painting Co., Inc. v. D.W. Ward Const. Co., Inc .,* 174 N.C.App. 327, 620 S.E.2d 887, 893 (N.C.App.2005) (the defendant must have "consciously" accept the benefit); *Action Mech., Inc. v. Deadwood Historic Preservation Commn.,* 652 N.W.2d 742, 750 (S.D.2002) (defendant must be "aware" that he is receiving a benefit); *Freeman Industries, LLC,* 172 S.W.3d at 525 (plaintiff must establish "appreciation by the defendant of such benefit"); *Rawlings v. Rawlings,* 240 P.3d 754, 763 (Utah 2010) (plaintiff must establish "an appreciation or knowledge by the conferee of the benefit"); *Puttkammer v. Minth,* 83 Wis.2d 686, 266 N.W.2d 361, 363 (Wis.1978) (plaintiff must establish "an appreciation or knowledge by the defendant of the benefit"). Pennsylvania does as well. *Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.1999) (appreciation of the benefit by defendant is a necessary element of unjust enrichment).

Third, Plaintiffs' chart notes that Minnesota requires a showing of defendant's wrongful conduct in addition to the "basic elements." *See Service Master,* 544 N.W.2d at 306 ("it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.")

Plaintiffs' chart stops short of offering a full analysis of all the ways that the various unjust enrichment laws vary. For example, Plaintiffs fail to note that New York requires a plaintiff to demonstrate a "relationship or connection between the parties that is not too attenuated," *Georgia Malone & Co., Inc. v. Rieder,* 19 N.Y.3d 511, 950 N.Y.S.2d 333, 973 N.E.2d 743, 746 (N.Y.2012), or that North Dakota, Arizona and Louisiana have a similar yet distinct requirement that a plaintiff must demonstrate a "connection between the enrichment and the impoverishment." *Zuger v. N. Dakota Ins. Guar. Ass'n,* 494 N.W.2d 135, 138 (N.D.1992); *City of Sierra Vista v. Cochise Enter. ., Inc.,* 144 Ariz. 375, 697 P.2d 1125, 1131 (Ariz.Ct.App.1984); *USA Disaster Recovery, Inc. v. St. Tammany Parish Govt.,* 145 So.3d 235, 236 n. 1 (La.2013). Plaintiffs' failure to account for these additional variations underscores the divergent nature of the body of relevant state law.

***30** The foregoing variances are significant as some, if not all, could result in differential treatment of Plaintiffs' claims. *See In re Actiq,* 2015 WL 1312015, at *12. The resulting differential treatment is not accidental—the unique tailoring of the unjust enrichment laws reflects the policy choices of the state as to when the equitable remedy should be made available. As such, imposition of another state's more permissive law could impair the interests of a state with a more stringent law. In light of these material differences which implicate the states' interests in providing a forum for redress, I conclude that a true conflict exists amongst the relevant unjust enrichment laws.

Having found that a true conflict exists, I must determine which state or states have a greater interest in application of its unjust enrichment law. Pursuant to Pennsylvania's choice of law rules, the first step is to consider the relevant Restatement factors.

The Restatement instructs that the following contacts are to be considered when assessing which jurisdiction has the most significant relationship to the occurrence giving rise to an unjust enrichment cause of action:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement (Second) of Conflict of Laws § 221(2) (1971); *Powers,* 328 Fed. Appx. at 126 (applying § 221(2) to an unjust enrichment claim under Pennsylvania's choice of law rules).

Regarding the first factor, the relationship between the parties was centered in the state in which Plaintiffs purchased, paid and/or reimbursed for Provigil or its generic equivalent. The class members allegedly conferred the benefit on Defendants in the state where the purchase was made. Since unjust conferral of a benefit is the gravamen of the unjust enrichment cause of action, the first factor weighs strongly in favor of applying the unjust enrichment law of the purchase state to each claim raised. Additionally, this factor is generally "given the greatest weight in determining the state of the applicable law." Restatement (Second) of Conflict of Laws § 221 cmt. d.

Regarding, the second factor, where the benefit was received, Cephalon and Teva's principal places of business are located in Pennsylvania, Barr's principal place of business is located in New York, and Ranbaxy's principal place of business is located in Florida. (*See* Answers, Doc. Nos. 118, 129, 131 and 134). Therefore, Defendants likely received the alleged overpayments in Pennsylvania, New York and Florida. As such, the second factor weighs in favor of applying Pennsylvania law to the unjust enrichment claims against Cephalon and Teva, New York law to the unjust enrichment claims against Barr and Florida law to the unjust enrichment claims against Ranbaxy.

***31** However, the third factor militates in favor of application of the law of the purchase state because the "act bestowing the enrichment" is payment and/or reimbursement of Provigil or its general equivalent. As noted above, this act occurred in the state in which Plaintiffs made the relevant purchases.

The fourth factor also weighs in favor of application of the law of purchase states. Although Defendants' principal places of business are Pennsylvania, Florida and New York, purchases were allegedly made in all jurisdictions in which Plaintiffs seek certification. As such, no single state has a greater connection to the case than any other state.

Lastly, the fifth factor weighs in favor of applying the law of the purchase states as well because that is where the Provigil or its generic equivalent—the "physical thing" substantially related to the enrichment—was located at the time of the alleged unjust enrichment.

In sum, four out of five of the relevant Restatement factors, including the first factor which is often the most significant, *see* § 221 cmt. d, demonstrate that the state in which the particular purchase was made has the most significant connection to the related claim. As such, I find that the Restatement factors weigh in favor of applying the laws of the purchase states.

Pursuant to Pennsylvania's choice of law rules, I must also consider the relevant state policies at issue to determine which state has the greatest interest in application of its law. This "qualitative appraisal" also suggests that application of the laws of the purchase states is appropriate. Regarding the relevant state policies at issue, Pennsylvania, Florida and New York have a clear interest in regulating the conduct of corporations transacting business within their borders. However, the states in which the purchases were made "also have an interest in ensuring that corporations conducting business within their borders are doing so fairly." *In re Actiq,* 2015 WL 1312015, at *13.

In addition to these interests in regulating business, the purchase states have a strong interest in providing a forum for redress to their citizens. Furthermore, "those states with more protective unjust-enrichment laws have an interest in ensuring that their citizens have full recourse to those laws." *Rapp v. Green Tree Servicing, LLC,* 302 F.R.D. 505, 518 (D.Minn.2014).

I agree with other courts which have concluded that a state's interest in providing its citizens with the level and type of redress set forth in its unique unjust enrichment law "outweigh a state's interest in regulating a resident

corporation." *In re Actiq,* 2015 WL 1312015, at *13 (citing *Rapp,* 302 F.R.D. at 518) (finding "no reason to believe that the unjust-enrichment laws of [the non-forum state] could not equally or more effectively hold corporations accountable")). As such, I find that the relevant policy concerns at issue weigh in favor of applying the unjust enrichment laws of the purchase states.

***32** In light of the preceding choice of law analysis, I conclude that the laws of the purchase states govern the proposed class' unjust enrichment claims. Having identified the law applicable to the claims of the proposed class, I now turn to whether Plaintiffs have satisfied the predominance and superiority requirements of Rule 23(b)(3).

**B. *Predominance***

Despite Plaintiffs' attempt to characterize the variances between the various unjust enrichment laws of the purchase states as "minor," the laws are distinguished by the substantive and nuanced differences discussed above. Plaintiffs respond that these differences can be "easily addressed through a limited number of jury instructions."

Plaintiffs urge that this conclusion finds support in *In re Flonase Antitrust Litig.,* 284 F.R.D. 207 (E.D.Pa.2012), *In re Wellbutrin XL Antitrust Litig.,* 282 F.R.D. 126 (E.D.Pa.2011) and *Sullivan v. DB Investments, Inc.,* 667 F.3d 273 (3d Cir.2011). Plaintiffs contend that these cases demonstrate a willingness of courts in this circuit to certify "indirect purchaser classes under multiple state laws."

The proposed classes at issue in *In re Flonase, In re Wellbutrin XL* and *Sullivan* are distinguishable from the proposed classes before me. *In re Flonase* involved a proposed class of indirect purchasers pursuing claims under seven different state laws (antitrust, consumer protection, and unjust enrichment) of four states. 284 F.R.D. at 210–11. In granting certification, the court held that the predominance requirement had been met because the evidence would be the same with regard to each of the plaintiffs' state law claims. *Id.* at 219–20. However, in reaching this conclusion, the court noted and relied upon the fact that the defendants had conceded that the plaintiffs' claims were subject to common proof. *Id.* That is not the case here.

Likewise, *In re Wellbutrin XL* involved a proposed class of indirect purchasers pursuing claims under seven different antitrust and consumer protection laws of six states. 282 F.R.D. at 131. The court found that the predominance requirement had been met because "[t]he issues of relevant market, monopoly power, and exclusionary conduct can be proven using common, class-wide evidence because such issues focus on the defendants' conduct rather than individual class members." *Id.* at 140.

*Sullivan,* on the other hand, involved proposed certification of a nationwide settlement class. The Third Circuit stated:

> Because we are presented with a settlement class certification, we are not as concerned with formulating some prediction as to how [variances in state law] would play out at trial, for the proposal is that there be no trial. As such, we simply need not inquire whether the varying state treatments of indirect purchaser damage claims at issue would present the type of "insuperable obstacles" or "intractable management problems" pertinent to certification of a litigation class.... The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and the difference is key.

***33** *Sullivan,* 667 F.3d at 303–04 (internal citations omitted).

The cases relied on by Plaintiffs are distinguishable from the instant case on multiple grounds. Both *In re Flonase* and *In re Wellbutrin* involved significantly fewer state laws than are at issue in Plaintiffs' proposed classes. Additionally, neither certification decision involved a substantive analysis of the variances in the elements of the relevant state laws. And, unlike *In re Flonase,* Defendants here dispute Plaintiffs' ability to demonstrate that common issues of fact or law predominate.

*Sullivan* also involved a settlement class and is of limited relevance to certification of a litigation class. *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 529 (3d Cir.2004) (variations in state law are "irrelevant to certification of a settlement class"); *Amchem,* 521 U.S. at 620 (in a settlement-only class certification, "a district court

need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial").

Moreover, nothing in *In re Flonase, In re Wellbutrin* or *Sullivan* relieves Plaintiffs of their burden of demonstrating that common questions of law or fact predominate. This burden includes providing the Court with an extensive analysis which demonstrates that the variations in the applicable state laws do not defeat predominance. *See In re Sch. Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986).

I recognize that the existence of variations in state law does not automatically foreclose Plaintiffs ability to satisfy the predominance requirement. The Third Circuit has "endorsed the general procedure of grouping multiple state laws into a few categories for the purposes of class litigation." *Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 183 (3d Cir.2014). Grouping is permissible where differences in state law fall "into a limited number of predictable patterns, and any deviations could be overcome at trial by grouping similar state laws together and applying them as a unit." *Id.* However, when taking such an approach, "plaintiffs face a significant burden to demonstrate that grouping is a workable solution." *Id.*

After careful consideration, I conclude that Plaintiffs' unjust enrichment claims under the laws of the purchase states are not amenable to concise explanation. *See In re Actiq,* 2015 WL 1312015, at *14 ("[t]he elements of Plaintiffs' unjust enrichment claim cannot be succinctly identified because ... the law of each [plaintiffs'] home state will govern"). Some states require that a plaintiff satisfy five elements to prevail on a claim of unjust enrichment. *See, e.g., Freeman v. Sorchych,* 226 Ariz. 242, 245 P.3d 927, 936 (Ariz.App. 1st Div.2011) (a plaintiff must demonstrate "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law"). Other states require a plaintiff to satisfy three or four elements. *See, e.g., Stevens,* 550 F.Supp.2d at 165 ("a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable"); *Com. Partn. 8098 Ltd. Partn. v. Eq. Contracting Co., Inc.,* 695 So.2d 383, 386 (Fla. 4th Dist.App.1997) (a plaintiff must prove "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it").

***34** In an attempt to reconcile these variations, Plaintiffs' proposed jury instructions organize the state laws into a limited number of permutations. (*See* Pls.' Reply, Meltzer Decl., Ex. 35.) However, as noted above, Plaintiffs' accounting of the state variations is not comprehensive and glosses over important differences. As such, Plaintiffs have not met their burden of demonstrating that grouping is a feasible method for addressing the variations amongst the purchase states' unjust enrichment laws. Consequently, I conclude that Plaintiffs have failed to meet their burden of demonstrating that common questions of law predominate.

Notwithstanding the variances in the applicable state law, the equitable nature of the unjust enrichment remedy also compounds the predominance issues with Plaintiffs' proposed unjust enrichment class. When considering an unjust enrichment claim, "a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1274 (11th Cir.2009); *Grandalski,* 767 F.3d at 185 ("individual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member"); *Hernandez v. Ashley Furniture Indus., Inc.,* 2013 WL 2245894, at *9 (E.D.Pa. May 22, 2013) (unjust enrichment claim demands inquiry into the unique factual circumstances of each case to determine whether inequity would result). "Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts ... have found unjust enrichment claims inappropriate for class action treatment." *Vega,* 564 F.3d at 1274.

In light of this necessary inquiry, the Eleventh Circuit concluded "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Id.* Other courts have reached similar conclusions. *See Grandalski,* 767 F.3d at 185 ("District Court properly found that individual inquiries would be required to determine whether an alleged overbilling constituted unjust enrichment for each class member"); *In re Actiq Sales,* 2015 WL 1312015, at *17; *Hernandez,* 2013 WL 2245894, at *9.

Nonetheless, Plaintiffs urge that common questions of fact predominate because Defendants' alleged common course of misconduct lies at the heart of the proposed class' unjust enrichment claims. Although Plaintiffs' claims do rely on some common proof, the existence of some common evidence as to Defendants' conduct does not dispose of the need for individualized inquiry into the equities surrounding the claims of individual Plaintiffs. *See Commander Properties Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 540 (D.Kan.1995) ( "Even if it could be said that [the] general theory of liability for unjust enrichment ... is uniform among class members, individual questions remain about whether" any plaintiff actually conferred a benefit).

***35** As such, even if Plaintiffs had offered a sufficient analysis accounting for the variations in state law, I find that common factual issues do not predominate as to Plaintiffs' proposed unjust enrichment class.

### C. *Superiority*

The second inquiry under Rule 23(b)(3) is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) enumerates the following factors for assessing superiority:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

In establishing superiority, a plaintiff must demonstrate that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 615. The court must "balance in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *In re Flonase,* 284 F.R.D. at 234 (quoting *Georgine.,* 83 F.3d at 632).

Where there are numerous state law causes of action at play, I must consider "whether variations in state laws present the types of insuperable obstacles which render class litigation unmanageable." *In re Warfarin Sodium,* 391 F.3d at 529. However, the superiority requirement may be satisfied where "varying state laws can be grouped by shared elements and applied as a unit in such a way that the litigation class is manageable." *Id.*

Plaintiffs argue that class litigation is superior to individual litigation because absent a class action, the same facts pertaining to Defendants' alleged course of conduct would have to be proven repeatedly in numerous cases. Plaintiffs urge that individual litigation would, therefore, waste resources and potentially cause inconsistent results.

Plaintiffs' concerns are not immaterial. However, for the reasons discussed above in the context of the predominance analysis, I find that the variations in state law also render class litigation unmanageable. Other courts have reached similar conclusions regarding the manageability of proposed multi-state unjust enrichment classes. *See, e.g., Lilly v. Ford Motor Co.,* 2002 WL 507126, at *2 (N.D.Ill. Apr.3, 2002) ("variations in state common laws of unjust enrichment demonstrate that class certification of such a claim would be unmanageable").

As noted above, Plaintiffs' proposed jury instructions do not address all of the variations which distinguish the unjust enrichment laws of the purchase states, nor do Plaintiffs' proposed jury instructions adequately account for the nuanced ways in which different states explain even seemingly similar elements. Therefore, Plaintiffs have failed to satisfy Rule 23(b)(3)'s superiority requirement as to their unjust enrichment claims.

## VII. *CONSUMER PROTECTION CLAIMS—PREDOMINANCE & SUPERIORITY*

### A. *Choice of Law*

***36** Applying Pennsylvania's choice of law framework, I must first consider whether there is a true conflict between the relevant consumer protection laws. I begin by noting that other courts in this circuit confronted with proposed multi-state consumer protection classes have concluded that the laws vary in significant ways. *See, e.g., Karnuth v. Rodale, Inc.,* 2005 WL 1683605, at *4 (E.D.Pa. July 18, 2005) ("[t]he consumer fraud statutes of the various states are not uniform"); *Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 219

(E.D.Pa.2000) ("consumer protection acts vary on a range of fundamental issues"). Similarly, the Supreme Court has remarked that "no one doubts that a state may protect its citizens by prohibiting deceptive trade practices.... But the states need not, and in fact do not, provide such protection in a uniform manner." *BMW of N. Am., Inc., v. Gore,* 517 U.S. 559, 568–69, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Plaintiffs assert that the consumer protection laws share a few common "basic elements," which are as follows: "it is unlawful for a person to commit a deceptive or unfair act or practice, misrepresentation, false statement, or make an omission or material fact in connection with the sale or advertisement of merchandise." (Pls.' Mot, Meltzer Dec., Ex. 25.) Despite the foregoing characterization, the state consumer protection laws under which the proposed class pursues claims vary in material ways.

Some consumer protection laws require that a plaintiff prove that the defendant undertook the prohibited act with some level of intention. Where such a requirement is recognized, the states articulate the intent element in a variety of ways.

For example, Arizona, Minnesota and North Dakota require a plaintiff to establish that the defendant undertook the unfair conduct or deceptive practice with the intent that persons would rely on the prohibited act. Ariz.Rev.Stat. Ann. § 44–1522 (prohibited act must be done "with intent that others rely"); Minn.Stat. Ann. § 325F.69 (prohibited act must be done "with the intent that others rely thereon"); N.D. Cent.Code Ann. § 51–15–02 (prohibited act must be done "with the intent that others rely thereon"). Utah requires that the prohibited act be done knowingly or intentionally. Utah Code Ann. § 13–11–4 (prohibited act must be done knowingly or intentionally). New Mexico and South Dakota require that the prohibited act be done knowingly. *Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 811 P.2d 1308, 1311 (N.M.1991) (prohibited act must be done knowingly); S.D. Codified Laws § 37–24–6 (prohibited act must be done knowingly). Kansas requires that the prohibited act be done "knowingly or with reason to know." Kan. Stat. Ann. § 50–626. Lastly, Vermont requires that the act be done intentionally. *Winton v. Johnson & Dix Fuel Corp.,* 147 Vt. 236, 515 A.2d 371, 376 (Vt.1986).

Massachusetts and Hawaii require plaintiffs to prove that the alleged unfair act or deceptive practice was "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Balthazar v. Verizon Haw., Inc.,* 109 Hawai'i 69, 123 P.3d 194, 202 (Haw.2005); *Renovator's Supply, Inc. v. Sovereign Bank,* 72 Mass.App.Ct. 419, 892 N.E.2d 777, 786–87 (Mass.App.2008) (conduct is unfair if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness; ... it is immoral, unethical, oppressive, or unscrupulous; [and] ... whether it causes substantial injury to consumers, competitors, or other business") (alterations in original). Defendants also state that Florida recognizes this requirement but that contention appears to be in dispute. *See Porsche Cars N.A., Inc. v. Diamond,* 140 So.3d 1090, 1098 (Fla.3d Dist.App.2014) review denied, 157 So.3d 1042 (Fla.2014) (holding that this requirement no longer defines the term "unfair" as used in Florida's consumer protection law).

***37** Additionally, Nebraska and Florida require a plaintiff to prove that the unfair act or deceptive practice affected public policy or the public interest. *Nelson v. Lusterstone Surfacing Co.,* 258 Neb. 678, 605 N.W.2d 136, 142 (Neb.2000) (to be actionable "the unfair or deceptive act or practice must have an impact upon the public interest"); *PNR, Inc. v. Beacon Prop. Mgt., Inc.,* 842 So.2d 773, 777 (Fla.2003) (prohibited act must offend "established public policy"). [23]

Further complicating matters, Florida, Maine and Vermont require an additional showing that the unfair act or deceptive practice was likely to mislead consumers. *State v. Beach Blvd Automotive Inc.,* 139 So.3d 380, 387 (Fla. 1st Dist.App.2014), *reh'g denied* (June 12, 2014) ("Deception occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances"); *State v. Weinschenk,* 868 A.2d 200, 206 (Me.2005) (an act is deceptive if it is "likely to mislead consumers acting reasonably under the circumstances"); *Greene v. Stevens Gas Serv.,* 177 Vt. 90, 858 A.2d 238, 244 (Vt.2004) (act must be "likely to mislead the consumer").

Wisconsin also mandates that a plaintiff prove that the unfair act or practice was made to the public. *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.,* 301 Wis.2d 109, 732 N.W.2d 792, 798–99 (Wis.2007).

States further vary as to whether a plaintiff must prove that they relied on the defendant's prohibited act. Pennsylvania requires a plaintiff to demonstrate that he relied on the defendant's act and that the reliance was justified. *Kern v. Lehigh Valley Hosp., Inc.,* 108 A.3d 1281, 1289 (Pa.Super.2015). Arizona also requires reliance but, unlike Pennsylvania, the reliance need not be reasonable, let alone justified. *Correa v. Pecos Valley Dev. Corp.,* 126 Ariz. 601,

617 P.2d 767, 771 (Ariz.App.2d Div.1980). In Michigan, class litigants "need not individually prove reliance on the alleged misrepresentations," as it is sufficient if the class can establish that "a reasonable person would have relied on the representations." *Dix v. Am. Bankers Life Assur. Co. of Florida,* 429 Mich. 410, 415 N.W.2d 206, 209 (Mich.1987). Other states, such as Florida, do not require any showing of reliance. *Davis v. Powertel, Inc.,* 776 So.2d 971, 974 (Fla. 1st Dist.App.2000).

Although not exhaustive, the foregoing list illustrates the many varying elements and nuanced articulations that distinguish the state consumer protection laws. Contrary to Plaintiffs' characterization, these laws cannot be neatly distilled into a core set of elements with only minor distinctions.

Furthermore, these differences are of such a nature that a state's interests would be impaired by application of another state's law. For example, some consumer protection laws require proof of the defendant's intent and others do not. The states without an intent requirement or even those states with a less searching intent requirement create a lower evidentiary hurdle for the plaintiffs than states with a strict intent requirement. The particular formulation of these variables reflects a state's policy decisions regarding how and when redress should be available to consumers. As such, I find that a conflict exists between the relevant state consumer protection laws.

***38** Other courts have reached similar conclusions. *See In re Actiq Sales and Mktg. Practices Litig.,* 790 F.Supp.2d 313, 321 (E.D.Pa.2011) (finding a true conflict between the consumer protection laws of Indiana and Pennsylvania in light of differences in the range of prohibited acts and intent requirements); *Zeneca,* 710 F.Supp.2d at 471 (finding "an actual conflict exists between the laws of Delaware and Pennsylvania on the issue of whether reliance is a necessary element under the respective consumer fraud statutes").

Having found that a true conflict exists, I must determine which state or states have a greater interest in application of its consumer protection laws. Pursuant to Pennsylvania's choice of law rules, the first step is to consider the relevant Restatement factors.

The Restatement (Second) of Conflict of Laws § 148 sets forth contacts that are to be considered when assessing which jurisdiction has the most significant relationship to the occurrence giving rise to a fraud or misrepresentation claim. *See Lyon,* 194 F.R.D. at 214 (applying § 148 to a consumer protection claim under Pennsylvania's choice of law rules).

Section 148 provides that "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made," courts should weigh the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2).

Factors (a) and (b) weigh in favor of applying the laws of the purchase states. Plaintiffs received and acted in reliance on Defendants' representations in the state in which Plaintiffs purchased, paid and/or reimbursed for Provigil or its generic equivalent.

Regarding factor (c), a representation is "made" in the "location from which the representation emanated." *Maniscalco v. Bro. Intern. (USA) Corp.,* 709 F.3d 202, 208 (3d Cir.2013). Defendants likely made the representations from their principal places of business, Pennsylvania, Florida and New York. As such, this factor weighs against application of the consumer protection laws of the purchase states.

Regarding factor (d), Defendants' principal places of business are located in Pennsylvania, Florida and New York. On the other hand, Plaintiffs likely reside or conduct business in all states in which Plaintiffs pursue claims. At first glance, factor (d) appears neutral However, the Restatement notes that "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the

defendant." Restatement (Second) of Conflict of Laws § 148 cmt. 2(i). As such, factor (d) also weighs in favor of applying the consumer protection of laws of the purchase states.

***39** The relative importance of the foregoing factors should be further assessed in light of the following principles set forth in Section 6 of the Restatement: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Restatement (Second) of Conflict of Laws § 6 cmt 2(e).

Regarding the second and third principles, the basic policies underlying the particular field of law are those of "consumer protection, suggesting that any balancing of the parties' contacts or expectations should be weighted toward those of consumers." *In re Relafen Antitrust Litig.,* 221 F.R.D. 260, 277–78 (D.Mass.2004). As such, the location of consumers' purchases assumes "special significance." *Id.* Regarding the first and fifth factors, "[s]tates have a strong interest in protecting consumers with respect to sales within their borders ... but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states." *Id.*

As such, the Restatement factors viewed through the prism of the Section 6 principles weigh in favor of applying the law of the purchase state. However, under Pennsylvania's choice of law rules, I must also examine the relevant state policies at issue to determine which state has the greatest interest in application of its law.

A "qualitative appraisal" of the relevant states' policies at issue also suggests that application of the law of the purchase states is appropriate. Consumer protection laws "are intended to protect consumers from being overcharged." *In re Flonase,* 815 F.Supp.2d at 883. Therefore, "the purchase states have a serious interest in applying their law to allow consumers ... to recover the money that they were overcharged in a transaction occurring in their states." *Id.*

However, states also clearly have "an independent interest in preventing deceptive or fraudulent practices by companies operating within their borders." *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 946–47 (6th Cir.2011). Nonetheless, the "primary aim of antitrust and consumer protection laws generally—and those of indirect purchaser states particularly—is compensating consumers, not policing corporate conduct." *In re Relafen,* 221 F.R.D. at 277.

I agree, that given that the primary policy interest is consumer protection, the state with the strongest interest in regulating such conduct is the state "where the consumers—the residents protected by *its consumer*-protection laws—are harmed by it." *Pilgrim,* 660 F.3d at 946–47 (emphasis in original). As such, I find that the purchase states' interest in application of their own consumer protection law to be the greatest.

**B. *Predominance***

For reasons similar to those discussed in the context of Plaintiffs' unjust enrichment claims, Plaintiffs have not demonstrated that common questions of law predominate as to their consumer protection claims. Again, Plaintiffs failed to provide the extensive analysis of the variations in the consumer protection laws necessary for determining whether there are insuperable obstacles to class certification.

***40** Rather, Plaintiffs attempt to meet their burden by distilling a common core of "basic elements" from the various consumer protection laws. Plaintiffs then annotate these purported "basic elements" with additional elements where recognized by a particular state.

However, Plaintiffs' state law charts and proposed jury instructions gloss over material differences. For example, one of Plaintiffs' proposed jury instructions states:

> The consumer protection laws of Arizona, Maine, Minnesota, New Mexico, North Dakota, South Dakota, Utah and Vermont additionally require that the defendant know or intend that the unfair deceptive act, practice or omission was likely to mislead others, or that others would rely on, or be deceived by, said act, practice or omission.

(Pls.' Reply, Meltzer Dec., Ex. 35.)

As noted above, the states vary considerably in their formulation of the intent a plaintiff must prove. The jury instruction proposed by Plaintiffs fails to distinguish

which state requires which particular intent formulation and disregards important differences amongst those formulations. The proposed jury instruction also fails to explain how each state defines operative terms. Plaintiffs' effort to explain away these differences through a generalized explanation is overly simplistic. Therefore, I find that Plaintiffs failed to provide a basis for concluding that common legal questions will predominate as to their consumer protection claims.

Other courts have reached similar conclusions regarding proposed multi-state or nationwide consumer protection classes. *See Pilgrim,* 660 F.3d at 946–48 ("the consumer-protection laws of the affected States vary in material ways, no common legal issues favor a class-action approach to resolving this dispute"); *Karnuth,* 2005 WL 1683605, at *5 (declining to certify a nationwide consumer protection class in light of the variations in state law); *Lyon,* 194 F.R.D. at 220 (denying certification under forty-one state consumer protection laws in light of variations in the applicable law).

### C. *Superiority*

As discussed above, Plaintiffs failed to offer the requisite extensive analysis of how the differences in the state consumer protection laws would be overcome. Relevant to the manageability inquiry, Plaintiffs have failed to demonstrate how the jury could be instructed in a manageable and accurate fashion. *See Powers,* 328 Fed. Appx. at 127 ("[a]ttempting to apply the law of a multiplicity of jurisdictions can present problems of manageability for class certification under Rule 23(b)(3)").

Plaintiffs state that a jury could be instructed as to each state's relevant laws individually or as to the laws of grouped states. Plaintiffs contend that "[r]egardless of which of these two approaches the Court adopts, the instruction process is manageable, and the jury is not likely to be confused." (Pls.' Mot ., Meltzer Dec., Ex. 24, p. 7.) However, Plaintiffs have not offered a plan of how that grouping may be accomplished in a manner that does not gloss over important substantive differences between the laws. Plaintiffs' assurance that such an instruction process is manageable and not likely to confuse the jury is insufficient. As such, I find that Plaintiffs have also failed to demonstrate that a class action is a fair and efficient method for adjudicating the consumer protection law claims of the proposed class.

## VIII. *CONCLUSION*

***41** For the reasons stated above, I find that certification of the End Payor class is not appropriate because Plaintiffs have failed to establish the Rule 23 requirements of ascertainability, predominance and superiority by a preponderance of the evidence. Accordingly, Plaintiffs' motion for class certification is denied. (*See* Doc. No. 433.)

### All Citations

Not Reported in F.Supp.3d, 2015 WL 3623005, 2015-1 Trade Cases P 79,203

## Footnotes

1 The other cases consolidated within the *In re Modafinil Litigation* are: *King Drug Co. of Florence, Inc. v. Cephalon, Inc .* (Dkt. No. 06–1797); *Apotex, Inc. v. Cephalon, Inc.* (Dkt. No. 062768); and *Federal Trade Commission v. Cephalon, Inc.* (Dkt. No. 08–2141) (settlement agreement reached, pending court approval). Only the End Payors' case is implicated by the instant motion for class certification. Therefore, I will refer to End Payors as Plaintiffs.

2 The End Payor Plaintiffs and Mylan have reached an agreement in principle for settlement.

3 Launching "at risk" means that a company has chosen to market its generic product, despite the fact that it is actively being accused of patent infringement and the court has not yet determined whether the patent is valid or has been infringed. Under the Hatch–Waxman Act, when a patent holder files an infringement lawsuit within forty-five days of an ANDA containing a certification that the patent is invalid or not infringed, the FDA may not approve the ANDA for thirty months. If the case is resolved during the thirty-month stay, the FDA

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

will take action on the ANDA consistent with the court's judgment. However, if the case is still ongoing at the end of the thirty-month stay, the FDA may approve the ANDA, at which point the generic company may choose to launch at risk. If the infringement lawsuit is eventually resolved in favor of the patent holder, the generic company may owe damages for its at-risk launch. *King Drug Co. of Florence, Inc.,* 2015 WL 356913, at *2 (citing 21 U.S.C. § 355(j)(5)(B)(iii); *Federal Trade Commission v. Actavis, Inc.,* ––– U.S. ––––, ––––, 133 S.Ct. 2223, 2228, 186 L.Ed.2d 343 (2013)).

4 Additional details regarding these settlement agreements and the Hatch–Waxman administrative framework may be found at this Court's Memorandum Opinion addressing Defendants' motions for summary judgment on Plaintiffs' *Actavis* claims. *See King Drug Co. of Florence, Inc.,* 2015 WL 356913, at *1–5.

5 At the class certification hearing, the parties jointly agreed that, although various aspects of both Dr. Hartman's and Defendants' expert, Dr. Hughes' testimony were challenged by way of *Daubert* motions, those challenges would not be pressed for purposes of class certification. (Hrg.Tr., Mar. 24, 2015, pp. 5–9.)

6 Dr. Hartman explained that the use of yardsticks “is accepted everywhere in the industry, government research, academic research and litigation.” (Hrg.Tr., Mar. 24, 2015, p. 77.) In fact, many of the yardstick drugs examined by Dr. Hartman were actually used by Cephalon to predict the impact of generic launch at or around the time of the settlement agreements. (Hartman Damages Exp. Rep., Apr. 26, 2011, ¶¶ 36–38.) Defendants do not challenge the use of yardsticks as a general matter.

7 Dr. Hartman described PBMs as entities that largely act as middlemen in managing pharmacy benefits. PBMs “organize, negotiate, manage contracts, [and] govern reimbursement” between and among TPPs and retail pharmacies. They may also, in rare instances, act as an insurer through a subsidiary. Where a PBM acts as a TPP, Dr. Hartman opined it would fall within the class definition. (Hrg.Tr., Mar. 24, 2015, pp. 72–75.)

8 In their reply memorandum in support of their motion for class certification, Plaintiffs withdrew their claim under the Tennessee Consumer Protection Act and the Wisconsin Deceptive Trade Practices Act. (Pls.' Rep., p. 17 n. 48.) Additionally, Plaintiffs state that they are not presenting consumer protection claims in the District of Columbia, Iowa, or Mississippi or antitrust claims in Florida, Massachusetts or Nebraska. (Pls.' Mot. for Class Cert., p. 12 n. 25.)

9 Plaintiffs do not include Kentucky's unjust enrichment law in their proposed jury instructions or state law charts. However, Plaintiffs do not state that they are abandoning their unjust enrichment claims under Kentucky law. Therefore, it appears that the omission is an oversight and I will include Kentucky's unjust enrichment law in my consideration.

10 The court described the “end payor” class as persons who purchased the brand drug “for consumption and other than for resale .” In other words, end payors were persons or entities who purchased the brand drug “for their own use and by logical extension were the final consumers who absorbed the overcharge[.]” *Id.* at 562.

11 Defendants note that Plaintiffs failed to address the prerequisite of ascertainability in their opening brief in support of class certification, and urge that this should amount to a waiver. (Defs.' Br., p. 13 n. 3.) While I agree with Defendants that Plaintiffs did not sufficiently address ascertainability in their opening brief, I will not resolve this motion on the basis of a waiver and will carefully consider the arguments Plaintiffs raise in their reply brief, supplemental briefing, and at oral argument.

12 This chart was also submitted to rebut Defendants' assertion that Plaintiffs only have standing to sue in New York and Pennsylvania. However, Plaintiffs only provided evidence of standing through purchases and reimbursements in fourteen out of the twenty-six states, which may raise some standing concerns. In any

event, because I find that class certification should be denied for a variety of other reasons, I need not address this issue further.

13 Dr. Hartman's testimony on this issue was as follows:

Q. Sir, are you aware of any records from which the identity of the members of the class can be derived?

A. Without them coming forward on their own?

Q. Without them coming forward on their own.

A. I would have to investigate that. None that could be easily linked to mine.

Q. So the IMS system doesn't—

A. The IMS system does not—it does it by type of payer. I can break out copay, co-insurance, but individual plans, it does not identify those that I know of. There may be product lines that have that, but I have not used them.

Q. As you sit here now, you're not aware of those records?

A. As I sit here now, they may exist. IMS is always improving its product lines. But I've never used them if they do exist.

(Hrg.Tr., Mar. 24, 2015, p. 182.)

14 I have carefully considered the guidance provided in *Byrd* that overbreadth of a class raises questions of predominance as opposed to ascertainability. *Byrd,* 784 F.3d at 168; *see also* *Grandalski v. Quest Diagnostics Inc.,* 767 F.3d 175, 184–85 (3d Cir.2014) (by focusing on the individualized inquiry required to establish harm in its ascertainability analysis, the district court conflated predominance with ascertainability). However, by choosing to define its class with eight specific exclusions, Plaintiffs have created the need for a structured, multi-stepped, individualized fact-finding process in order to determine which individuals would fall within the class definition and which would fall within one of the eight exclusions. *See* *In re Skelaxin,* 299 F.R.D. at 570 (similar considerations raised questions about "whether a purchaser *constitutes a class member"* ) (emphasis in original).

15 Conflicts of interest between and among class members are often addressed in the context of adequacy of representation. *See* *Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170, 183–84 (3d Cir.2012) ("Certain intra-class conflicts may cause the interests of the representative plaintiffs to diverge from those of the unnamed class members. The adequacy requirement is designed to ferret out such conflicts of interest.") (citation and quotation marks omitted). Accordingly, I will address Defendants' conflict arguments in more detail in section IV. D. *infra.*

16 As noted below, Plaintiffs failed to address the question of which states' antitrust laws should govern. However, under any potentially applicable law, Plaintiffs must demonstrate antitrust impact. *See* *Hydrogen Peroxide,* 552 F.3d at 311. As I have concluded that Plaintiffs have not demonstrated that antitrust impact is capable of proof through common, class-wide evidence, I need not reach the choice of law question.

17 I agree with Plaintiffs that evidence of Defendants' alleged violations of the state antitrust laws would be common to the class. *See* *In re Wellbutrin XL,* 282 F.R.D. at 140 ("If each class member pursued its claims individually, the class member would have to prove the same antitrust and consumer protection violations using the same documents, witnesses, and other evidence").

18 In reaching his opinions, Dr. Hughes stated that nearly seventeen percent of consumers and nearly half of the employer groups paid the same or more for generic modafinil than they had paid for branded Provigil prior to generic entry, and therefore were not injured. (Hughes Supp. Exp. Rep., Dec. 20, 2013, ¶¶ 45, 69.) This figure was vigorously challenged by Plaintiffs. After considering this testimony, I find that Dr. Hartman convincingly refuted Dr. Hughes' seventeen percent non-impact number. Dr. Hughes obtained these percentages by comparing the amount paid for Provigil by consumers and TPPs in the year prior to generic entry—2011—to the amount paid by class members for generic Provigil in the year following generic entry—2013. (*See id.*) Dr. Hartman explained that in order to accurately determine whether there was an overcharge, one should take the but-for price of generic Provigil and compare it to either the price of branded Provigil, or, after generic entry, the actual price of generic Provigil, *during the same time period.* (Hrg.Tr., Mar. 24, 2015, pp. 136–44.) According to Dr. Hartman, when comparing the prices of these products during the same quarter, the data reflects an overcharge to virtually all class members. (*Id.;* Hartman Market Def. & Impact Exp. Rep., Apr. 26, 2011, ¶¶ 128–35.) Based upon this analysis, I do not accept that the number of uninjured consumer class members reaches seventeen percent, as Dr. Hughes suggested.

19 Dr. Hughes also opined that ten percent of three-tier non-Medicare plans, nineteen percent of Medicare four-tier plans, and forty-seven percent of Medicare five-tier plans placed generic modafinil on the same or higher formulary tier after generic entry than Provigil had occupied *prior to generic entry.* (*Id.* at ¶ 60, Ex. 5.) I reject Dr. Hughes' opinion that these consumers are all uninjured for the same reason I rejected Dr. Hughes' opinion that seventeen percent of the class is uninjured. Dr. Hughes appears to have improperly compared data from the year prior to generic entry to data derived from the year after generic entry, as opposed to data from the same quarter.

20 In fact, Defendants do not seem to dispute that the use of yardsticks and averages to compile aggregate damages numbers is a reliable method. During the hearing, defense counsel sought to stipulate that "one and one equals two" and stated that he was "not going to be attacking the individual calculation to get to the total number." (Hrg.Tr., Mar. 24, 2015, p. 99.)

21 Defendants do not squarely attack Dr. Hartman's calculations for unjust enrichment damages; however, similar logic would apply. According to Dr. Hartman's analysis, Defendants' profits would have dropped by the same amount in the but-for world, whether one or all of the settlement agreements were anticompetitive, due to the contingent launch provisions. (*See id.* at ¶¶ 47–48.)

22 Because I find that numerous individualized inquiries prevent Plaintiffs from establishing predominance for the element of antitrust impact, I also find that superiority has not been established as to the state antitrust claims. A class action would not be superior to other available methods for trying these claims because the prevalence of individualized inquiries would make the case unmanageable on a collective basis. *See* Fed.R.Civ.P. 23(b)(3). Further, conflicts between the various states' consumer protection laws, which will be discussed *infra,* defeat superiority for the antitrust/consumer protection law class.

23 Defendants assert that Hawaii also recognizes this requirement. However, the Hawaii law expressly provides "[n]o showing that the proceeding or suit would be in the public interest ... is necessary in any action brought under this section." Haw.Rev.Stat. § 480–2.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**9**

2014 WL 105608
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Leroy WEBB, et al., Individually and on Behalf of all Others Similarly Situated, Plaintiffs,
v.
DISCOVERY PROPERTY & CASUALTY INSURANCE CO., et al., Defendants.

No. 3:08 CV 01607.
|
Jan. 9, 2014.

**Attorneys and Law Firms**

Eric L. Keepers, Howard G. Silverman, Kane & Silverman, P.C., Philadelphia, PA, Girard J. Mecadon, Pittston, PA, for Plaintiffs.

Bradley J. Vance, Robert J. Foster, Thomas J. Wehner, Reger & Rizzo & Darnall, Matthew A. Goldberg, Nathan P. Heller, DLA Piper, US LLP, Philadelphia, PA, Brett Ingerman, DLA Piper LLP, Baltimore, MD, for Defendants.

***MEMORANDUM OPINION***

ROBERT D. MARIANI, District Judge.

**I. *Procedural History***

***1** Presently before the Court is Plaintiff's Motion for Class Certification and for Appointment of Class Counsel by which they aspire to class action status. (*See* Pls.' Mot for Class Certification and Appointment of Howard G. Silverman, Esq. and Kane & Silverman, P.C. as Class Counsel, Doc. 95.) The gravamen of the underlying action concerns the adequacy of certain waiver forms that the Defendant insurance company supplied to policyholders when those policyholders had the option to accept or reject underinsured motorist protection ("UIM"). (*See* Pls.' Mem. in Supp. of Mot. for Class Certification, Doc. 95–1, at 2–3.)

Pennsylvania law requires that, to be valid, a UIM waiver must read as follows:

> **REJECTION OF UNDERINSURED MOTORIST PROTECTION**
>
> By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household. Underinsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for all losses and damages. I knowingly and voluntarily reject this coverage.

75 Pa. Cons.Stat. Ann. § 1731(c).

By contrast, Defendant's UIM waiver form reads as follows:

> *I reject Underinsured Motorists Coverage under this policy.* By signing this waiver I am rejecting Underinsured *Motorists* Coverage under this policy, for myself and all relatives residing in my household. Underinsured *Motorists* protects me and all relatives *residing* in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have enough insurance to pay for ["all" omitted] losses and damages. I knowingly and voluntarily reject this coverage.

(Doc. 95–2 at 1 (Form No. UA 237 ED 0100); Doc. 95–7 at 2 (Form UA 137 ED 1104).) [1]

Though these changes may appear minor, the Pennsylvania Superior Court ruled in the case of *American International Life Insurance Co. v. Vaxmonsky,* 916 A.2d 1106 (Pa.Super.Ct.2006) that any departure from the statutory form —even the most minor—will render the waiver void. *See id.* at 1109–1111; *see also Jones v. Unitrin Auto and Home Ins. Co.,* 40 A.3d 125, 131 (Pa.Super.Ct.2012) (holding that additions to the statutory language, and not just deletions from it, "fail to specifically comply with the statute" and render the form "completely void"). In a prior decision in the instant case, then-presiding Judge Munley ruled that *Vaxmonsky* applied to void Defendant's waivers. (*See* Opinion of Aug. 12, 2011, Doc. 67, at 13.) Accordingly, for purposes of the law of this case, the invalidity of Defendant's waivers is no longer in question. Rather, the only question to resolve at this stage is whether the Plaintiffs may seek redress for their injuries through a class action, or whether they must do so through individual claims.

In this regard, Plaintiffs' most recent [2] proposed class definition reads as follows:

***2** All those persons injured in motor vehicle accidents as the result of the negligence of an underinsured driver as defined at 75 Pa.C.S.A. 1701 et seq. from May 8, 2000 to the present while occupants of motor vehicles registered in Pennsylvania and insured under a motor vehicle policy of insurance issued by Discover Property and Casualty Insurance Company providing coverage under, inter alia, Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.A. 1701 et seq. where Rejection of Underinsured Motorist Protection form No. UA 237 ED 0100 or No. UA 137 Ed 0104 was executed before an accident with an underinsured motorist.

The class shall be limited to those individuals whose UIM claims accrued on or after August 5, 2004, provided that this limitation shall not apply to a minor or incompetent whose claim for UIM coverage would not be otherwise barred by the Pennsylvania statute of limitations

The Class does not include any insured under a policy for which the named insured signed a subsequent rejection form that is compliant with 75 Pa.C.S.A. § 1731(c) prior to the insured's motor vehicle accident, or whose UIM claim has already been adjusted up to the bodily injury limits in the applicable policy.

(Doc. 110 at 4–5.)

## II. *Class Action Certification*

### a. In General

The Federal Rules of Civil Procedure require Plaintiffs to establish two sets of facts before proceeding with a class action. First, Rule 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if;

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). If these requirements are satisfied, then the Court moves to Rule 23(b), which provides, in relevant part, that;

A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of;

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

***3** (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action,

*Id.* at 23(b).

Defendants contest the applicability of Rule 23(a)(1) ("numerosity"), (a)(2) ("commonality"), and (a)(3) ("typicality"), as well as the requirements set forth in Rule 23(b)(1), and (b)(3), to the facts of this case.[3] (*See* Def.'s Mem. of Law in Opp. to Mot. for Class Certification, Doc. 109, at 6–19.)[4]

As the Supreme Court stated, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule-that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). The *Dukes* Court also noted both that " 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " *Id.* (quoting *Gen Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 160–161, 102 S.Ct. 2364, 2372, 72 L.Ed. 740 (1982)). With these directives in mind, the Court will now turn to the Rule 23(a) factors.

**b. Numerosity**

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1).

> While the law is well-established that a plaintiff "need not show the exact number of potential [members] in order to satisfy the [numerosity] requirement," it is equally well-established that "the plaintiffs do have the burden of showing that the size is such that the joinder of all members is impracticable. Mere speculation as to the number of members who may be involved is not sufficient to satisfy Rule 23(a)(1)."

*Jackson v. Se. Pa. Transp. Auth.,* 260 F.R.D. 168, 187 (E.D.Pa.2009) (quoting *Delgado v. McTighe,* 91 F.R.D. 76, 78 (E.D.Pa.1981)).

In the present case, Plaintiffs argue that the numerosity requirement is satisfied because Defendant issued policies with invalid waivers "to a total of approximately 235 separate named individuals Further, since these are *all* commercial policies, there are *multiple* insured persons under *each* of the 235 named insureds' policies. Thus, the number of potential class members may be in the thousands." (Doc. 95–1 at 7.)

However, even if the Court were to assume that thousands of people drove vehicles subject to invalid waiver forms, this would not be sufficient to establish numerosity. Under Plaintiffs' own proposed class definition, class members must also be "persons injured in motor vehicle accidents as the result of the negligence of an underinsured driver as defined at 75 Pa.C.S.A. 1701 et seq." Defendant avers—and Plaintiffs do not deny—that

> ***4** [d]iscovery so far has revealed only four prospective class members [as well as a "fifth possible claim" that does not appear to have "developed into an underinsured motorist claim"], one of which was a former Plaintiff in this action who withdrew his claim with prejudice when he was forced to concede he was not entitled to coverage. The other two claimants are separately represented by counsel.

(Doc. 109 at 7.)

Plaintiffs respond by arguing that "[t] he class cannot be limited, as Defendants contends [*sic* ], to those persons who have already made UIM claims and have already sought reformation of the policy." (Doc. 110 at 5.) That is because a "UIM claim may arise years after an insured has been injured in an accident and made a claim against the tortfeasor." (*Id.*) Essentially, t hen, Plaintiffs ask this Court to use the total number of insurance policies containing invalid waiver forms as the proper reference for numerosity, simply because some of these insureds might later bring claims for UIM coverage.

But whether new class members might materialize in the future is irrelevant to a finding of numerosity. While Plaintiffs are not required to prove the exact number of class members, they "must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding ." *Marcus v. BMW of N. Am.,* 687 F.3d 583, 596 (3d Cir.2012). Common-sense, guesswork, or even reliance on what the Third Circuit called "a bet worth making" cannot circumvent Plaintiffs' burden to show sufficient evidence of numerosity under Rule 23(a)(1). *See id.* at 596–97. As the Supreme Court emphasized in *Dukes,* it is the Plaintiffs' burden to "affirmatively demonstrate" compliance with Rule 23. *Dukes,* 131 S.Ct. at 2551. The mere possibility that more people might later satisfy the conditions necessary to become class members obviously falls far short of this affirmative demonstration.

Therefore, putting aside Plaintiffs' speculative conclusions, the Court only has evidence of at most five class members, some of whom may actually be barred from bringing claims. Joinder of such a small number would not be impracticable; rather, it would be an efficient means of resolving these issues. Accordingly, the Court finds that the numerosity requirement is not satisfied.

**c. Commonality and Predominance**

The requirements in Rule 23(a) are inclusive, meaning that, if one requirement is not satisfied certification, must be denied. Nonetheless, as an independent basis of its decision, the Court finds that the commonality and predominance analysis would bar class certification even if numerosity did not.

Under what is called the "commonality" requirement of Rule 23, the Plaintiffs must show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Ordinarily, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994), However, as the Supreme Court recently held, the commonality requirement is not met even if the Plaintiffs raise "droves" of common questions, if these common questions are not the kind that would be of such a nature as to lead to *classwide resolution* of the claims at issue. *See Dukes,* 131 S.Ct. at 2551 ("[The Plaintiffs'] claims must depend on a common contention.... That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

***5** Here, the only common question concerns the validity of the waiver forms that all class members signed. This is arguably a relevant issue of common contention under *Dukes* because the invalidity of the waiver forms is central to all of the class members' claims—in other words, none of the class members could proceed at all if the waivers were valid.

However, the Court need not dwell on the commonality requirement because it finds that the proposed class clearly fails Rule 23's "predominance" requirement. Because the predominance requirement covers the same subject matter as commonality, but does so in a more broadly-defined manner, it is often found to "subsume" commonality. *See, e.g., Georgine v. Amc hen Products, Inc.,* 83 F.3d 610, 627 (3d Cir.1996) ("[W]e do not hold that this class fails the commonality requirement because the test of commonality is subsumed by the predominance requirement, which this class cannot conceivably meet.").[5] The predominance requirement, found in Rule 23(b) (3), states that, for a class action to go forward, the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

The Advisory Commit tee Notes to Rule 23 provide guidance as to what kinds of cases may be found to satisfy the predominance requirement. For instance, "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." Fed R. Civ. P. 23(b)(3) advisory committee's notes. Despite superficial similarities to such cases of misrepresentation, the Court finds that the present case is much more similar to the Advisory Committee's guidance on mass tort cases. The Committee stated that a " 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." *Id.* In other words, "[t]he Committee's warning ... continues to call for caution when individual stakes are high and disparities among class members great." *Amchem Products v. Windsor,* 521 U.S. 591, 625,117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997).

Here, as Defendant correctly notes, disparities among class members may very well be great, making this case analogous to a mass tort inappropriate for classwide resolution:

> The question of the existence of coverage is only one issue in a UIM proceeding. Each UIM claim would require an investigation into the circumstances of the accident. Conflicting witness statements would have to be resolved. Liability experts may be necessary to determine if the class member is even eligible to recover benefits. The nature and extent of the injuries would then have to be evaluated. Medical records would need to be reviewed and analyzed, and a medical examination of the insured would likely be required. A statement under oath to determine the subjective

impact of the injuries on the claimant
would need to be obtained.

***6** (Doc. 109 at 10.)

Thus, even though the insurance waivers may be "standardized," this Court cannot agree in this case with the reasoning in *Briggs v. Hartford Fin. Services Group, Inc.,* 2009 WL 2370061 (E.D.Pa.2009), that the mere existence of "standardized insurance waiver forms that are contractual in nature" is sufficient to satisfy the predominance requirement. *See id.* at *6. While the invalidity of the waiver forms may well be one of several necessary conditions to recovering UIM coverage, it is certainly not sufficient by itself. Indeed, even though UIM coverage was not validly waived, each individual class member's entitlement to actually receive benefits will depend on a host of individualized considerations pertaining to the facts of each policyholder's accident, and injuries, as noted above. These issues do not solely concern the calculation of individual damages, as Plaintiffs assert. (*See* Doc. 110 at 11.) Instead, they concern the very existence of Defendant's *liability* to pay any coverage to individual policyholders, which the Advisory Committee Notes caution against resolving through the class action mechanism.

Moreover, the stakes for each individual class member are indeed high. By definition, the class members are policyholders whose damages were large enough that the other party's insurance coverage was not enough to make them whole. As such, they are people who have a strong incentive to bring their own claims directly, outside of the class action mechanism. In the absence of any evidence that these claims would not be litigated individually, the Court finds no need to bind these policyholders to the determination of an action that they have not manifested any desire to join. Nor can the Court find any reason to accept the Plaintiffs' conclusory statement that "in the absence of a class action on this issue, many class members, especially those not represented by counsel, would likely rely on the invalid waiver forms and/or the denial of their claims by the Defendants, and simply give up without ever learning that the waiver forms are invalid." (Doc. 95–1 at 14.) Given the likely extent of any potential plaintiff's injuries, the Court cannot simply assume that they will blithely forego their own means of redress or proceed in any manner different from the Webb and Douglas Plaintiffs, who have apparently retained counsel to defend their interests before this Court.

**d. Remaining Considerations**

Based on the foregoing, the Court need not address Rule 23's "typicality" requirement. *See generally* Fed.R.Civ.P. 23(a)(3). The typicality requirement is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal,* 43 F.3d at 57. It "entails an inquiry whether the named plaintiff's individual circumstances are markedly different or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Id.* at 57–58 (internal quotations and alterations omitted). Moreover, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id.* at 58 (internal quotations and alterations omitted). The Court finds no reason to believe that these concerns apply to the present case: the legal theories that the named Plaintiffs and any other purported class members might rely on are sufficiently similar to support a finding of typicality. However, the defects in the other Rule 23 requirements, discussed at length above, are sufficient to make compliance with the typicality requirement a moot point.

***7** Likewise, Plaintiffs' request to appoint class counsel, (*see* Doc. 95–1 at 15–17), has been rendered moot by the disposition of this case, because there shall be no class action.

**III. *Conclusion***

Based on the foregoing considerations, Plaintiffs' Motion for Class Certification (Doc. 95) is **DENIED.** A separate Order follows.

***ORDER***

**AND NOW, THIS 9TH DAY OF JANUARY, 2014,** in accordance with the Court's Memorandum Opinion, **IT IS HEREBY ORDERED THAT** Plaintiffs Motion for Class Certification and for Appointment of Counsel (Doc. 95) is **DENIED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 105608

## Footnotes

1 Both of the forms at issue use identical language. The differences between Defendants' waiver form and the text laid out in 75 Pa. Cons.Stat. Ann. § 1731(c) are italicized or noted parenthetically as appropriate.

2 Plaintiffs' Motion for Class Certification states a slightly different class definition, Plaintiffs proposed the following definition in their Reply Brief in order to answer some of the issues raised in Defendants' Brief in Opposition to class certification. (*See* Pls." Reply Mem. in Supp. of Mot. for Class Certification and Appointment, Doc. 110, at 1, 4.)

3 Plaintiffs do not raise Rule 23(b)(2) as a grounds for certification in their Motion, but only do so later in their Reply Brief. (*See* Doc. 110 at 9–10.) Therefore, the Court will not rule on the applicability of Rule 23(b)(2), as not being properly before the Court. As this Court stated in a recent case, it is improper to rule on issues raised for the first time in a Reply Brief:

> In ruling on a motion, "a district court need not address issues raised for the first time in a reply brief." *Dreyer v. Sheaffer,* 2009 WL 917829, at *3 (M.D.Pa.2009). That is because "[a] reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin,* 454 F.Supp.2d 278, 281 n. 3 (E.D.Pa.2006) (collecting cases).

*Matthews v. Runco's Tavern & Grill, Inc.,* 2013 WL 6055219, at *2 (M.D.Pa.2013).

4 Though Defendant refers to Rule "23(b)(2)" and "23(b)(3)" in its Brief in Opposition when it discusses the commonality and typicality requirements, it is clear from the nature of Defendant's legal analysis that it actually means to refer to Rule 23(a)(2) and 23(a)(3). (*See* Doc. 109 at 8–13.) These latter subsections are the only ones where the commonality and typicality rules are found.

5 Theoretically, even if predominance subsumed commonality and then failed, the test laid out in Rule 23(b)(1) could still allow a class action to go forward if all the prerequisites in Rule 23(a) were met. However, even if all of the prerequisites were met, the requirements of Rule 23(b)(1) have not been met.

First, this case presents no risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." *See* Fed.R.Civ.P. 23(b)(1)(A). Just because a Defendant who is sued by several different but similarly-situated Plaintiffs may be found liable to some and not liable to others does not mean that "incompatible standards of conduct" are being demanded; it only means that the Defendant would have to pay some claims and not others under state law tort and damage assessment principles of general application. Litigation will always be uncertain and capable of generating varying conclusions. This does not justify pulling all potential Plaintiffs together into one binding class.

Second, there is no risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." *See id.* at 23(b) (1)(B). Indeed, Plaintiffs' only argument to this effect is that any individual action "would create precedent that would

presumably be followed by other courts and would direct Defendant's future claims handling." (Doc. 95–1 at 12.) But any adjudication can create precedent; this does not mean that any judicial decision that might be precedential to third parties creates the need for a class action.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.