# APPENDIX OF UNPUBLISHED OPINIONS

1. *Campbell v. County of Mercer,* No. 2:23-cv-00099-CB-KT, 2025 WL 965181 (W.D. Pa. Mar. 31, 2025)

2. *Caporale v. EIDP, Inc.*, Civil Action No. 19-1672-JLH-SRF, 2026 WL 967253 (D. Del. Feb. 10, 2026)

3. *Chedwick v. UPMC*, Civil Action No. 07–806, 2011 WL 1559792 (W.D. Pa. Apr. 21, 2011)

4. *Philbin v. Brett Dinovi & Assoc., LLC*, No. 31-cv-20402, 2024 WL 1907192 (D.N.J. Jan. 10, 2024)

5. *Taylor v. Midland Nat'l Life Ins. Co.*, Case No. 4:16-cv-00140-SMR-HCA, 2019 WL 13169890 (S.D. Iowa Sept. 27, 2019)

6. *Walden v. Bank of N.Y. Mellon Corp.*, Civil Action No. 2:20-cv-01972-CBB, 2025 WL 2696463 (W.D. Pa. Sept. 22, 2025)

1

2025 WL 965181
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Joyelle CAMPBELL, et al., Plaintiffs,
v.
The COUNTY OF MERCER, Defendant.

2:23-cv-00099-CB-KT
|
Signed March 31, 2025

**Attorneys and Law Firms**

D. Aaron Rihn, Sara J. Watkins, Robert Peirce & Associates, P.C., Pittsburgh, PA, for Plaintiffs.

Erika Vasques, Paul D. Krepps, Marshall, Dennehey, Warner, Coleman & Goggin, Pittsburgh, PA, Nathan Marinkovich, Cohen Seglias Pallas Greenhall & Furman, Pittsburgh, PA, G. Michael Garcia II, MacDonald, Illig, Jones & Britton LLP, Erie, PA, for Defendant.

## MEMORANDUM ORDER

Cathy Bissoon, United States District Judge

***1** This case has been referred to United States Magistrate Judge Magistrate Kezia O. L. Taylor for pretrial proceedings in accordance with the Magistrates Act, 28 U.S.C. §§ 636(b)(1)(A) and (B), and Local Rule of Civil Procedure 72.

On March 3, 2025, the Magistrate Judge issued a Report (Doc. 51) recommending that Plaintiffs' Motion for class certification (Doc. 36) be denied. Service of the Report and Recommendation ("R&R") was made on the parties, and Plaintiffs have filed Objections. *See* Doc. 52. Defendant timely has submitted a Response, filed at Doc. 54.

Having conducted a de novo review, the Court will adopt the R&R and deny Plaintiffs' Motion. The Magistrate Judge's reasoning is thorough and sound, and it compels a denial of class certification. For the sake of clarity moving forward, the Court adds the following.

Footnote 1 of the Report highlights the oddity of Defendant's assertion of merits arguments, typically made under Rule 12 or Rule 56, in opposing class certification. The Court agrees with the sentiment, and - during case management discussions - Defendant might have urged that a dispositive motion be considered at the fore. This may have been proposed, but Judge Taylor and undersigned are not privy to the case management discussions. Those were had by Magistrate Judge Lisa Pupo Lenihan, before she left the bench. To her credit, Judge Lenihan's Minutes note that she raised *Florence* [1] at the Initial Conference; and the case management plan was agreed on by the parties. *See* Doc. 22. In any event, Judge Taylor was correct to adjudicate only the Motion presented.

The analyses in *Florence* and its progeny significantly bolster her rejection of the class vehicle. Plaintiffs' central premise is fatally inconsistent with binding legal authority. The first paragraph of the operative Complaint reads:

> This is a class action brought to redress the [allegedly unconstitutional] uniform practice and procedure of strip searching all individuals who enter the [Jail] ... *regardless of the crime upon which they are charged* and whether or not the detainees are pre-arraignment.

Am. Compl. (Doc. 15) at ¶ 1 (cleaned up, emphasis added). Although not addressed in the class definition, counsel also note that the policy applies regardless of whether there is "suspicion that [a detainee] might be carrying contraband," or whether a detainee's characteristics affect risk-level. *Id.* at ¶ 2. Counsel also claim, on information and belief, that a strip search is conducted "even if [a detainee is] to be held alone without any contact with other detainees." *Id.* But the putative class definition excludes reference to anything but the seriousness of the criminal charges:

> [The proposed class consists of all] persons who have been or will be placed into the custody of the Mercer County Jail after being charged with misdemeanors, summary offenses, violations of probation or parole, traffic infractions, civil commitments, or other minor crimes and were or will be subjected to strip searches prior to being arraigned and/or provided with a reasonable opportunity to post bail ....

***2** *Id.* at ¶ 11.[2]

Plaintiffs' class definition targets an aspect expressly prohibited from consideration. This is most evident from the decision in J.B. ex rel. Benjamin v. Fassnacht, 801 F.3d 336 (3d Cir. 2015). There, the plaintiff challenged a policy materially similar to the one here, in all but one respect. Detainees were strip-searched, prior to a judicial hearing, regardless of the seriousness of their charges or their threat-level. The lone distinction: the policy in *Benjamin applied to juvenile detainees.*

If ever there was reason to deviate from *Florence*, an application involving minors would seem a compelling case. Yet the *Benjamin* Court found the policy constitutional, and it expressly rejected Plaintiffs' central premise here:

> Because officers in any detention facility have an essential interest in readily administrable rules, blanket strip search policies upon admission to the general population of a jail, regardless of whether the detainee is a juvenile or adult, make good sense. Any other policy would limit the intrusion on the privacy of some detainees but at the risk of increased danger to everyone in the facility.... [T]he Supreme Court addressed this type of inquiry in rejecting the ... argument for an exclusion for non-serious offenders, [and] we similarly reject [the] argument that juveniles are to be excluded, or ... that non-serious juvenile offenders be excluded.

*Id.* at 345-46 (emphasis added, internal quotations and citations to quoted and other sources omitted).

The only avenues available to Plaintiffs, *individually*, are the hypothetical exceptions contemplated in *Florence. Benjamin* at 341. They might apply when a detainee will have no "substantial contact with other detainees"; or when he or she "could be held in available facilities apart from the general population." *Id.*

Plaintiffs' class definition does not include aspects supporting a *Florence* exception, and this does not seem accidental. It is fairly obvious that potential exceptions require individualized inquiries, threatening a degeneration into mini-trials. Accounting for *Florence* and *Benjamin*, the impropriety of class treatment is all the more apparent.[3]

***3** These things being said, the individual Plaintiffs have included enough allegations to pursue *Florence* exception(s). *See* Doc. 15 at ¶ 51 (Ms. Campbell never was assigned to the Jail's general population) *and id.* at ¶¶ 65-67 (the same for Mr. Boyd, and there are additional allegations regarding his time in a "classification block"). The denial of class certification is without prejudice to the named Plaintiffs' pursuit of individual claims.

Finally, the Court makes clear one point, and one expectation. The point: Plaintiffs will not be granted leave to amend their class allegations. This case was filed over two years ago, and Plaintiffs already once

have amended their pleadings. They clearly articulated their theory for class treatment, and it is precluded under binding legal authority. Litigation, generally, and the class vehicle, specifically, do not invite games of “hunt the peanut.” Counsel were aware of the *Florence* exceptions, or they would not have included such allegations on behalf of the individual Plaintiffs. Allowing additional amendment also would result in unfair prejudice to Defendant, and the delay is unexcused. The case may proceed only with individual claims. The class aspects are over.

The Court's expectation is that this case will proceed expeditiously on Plaintiffs’ individual claims. The parties already have enjoyed an extended period for class discovery, which required investigation into the individual Plaintiffs’ circumstances, for the purposes of adequacy and typicality. Although the Court doubts that additional discovery is - or should be - necessary, any additional period must be brief, and counsel's efforts, expedited.

Consistent with the above, Plaintiffs’ Motion for class certification (**Doc. 36**) is **DENIED**, and the R&R (**Doc. 51**) is adopted as the Opinion of the District Court as supplemented above.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 965181

## Footnotes

1 Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 566 U.S. 318 (2012).

2 The class definition's references to putative members’ pre-arraignment status and inability to post bail are subsumed in the relevant *Florence* analyses, below, and thus are inapposite.

3 The fact-intensive, individualized inquiries required by the putative *Florence* exceptions likely informed Defendant's decision not to file a motion under Rule 12. A way around this might be to seek conversion to summary judgment, and urge that it be resolved ahead of the class aspects. To be sure, these are not casual “asks.” *Cf.* Fed. R. Civ. P. 23(c)(1)(A) (class issues must be determined as “early [as] practicable”). To be convincing, counsel would have to account for the time-sensitivity (e.g., limited, expedited discovery) and demonstrate the superiority of their plan (e.g., discovery on the named plaintiffs would shed light on their adequacy and typicality as putative class representatives).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2

2026 WL 967253
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

Candy CAPORALE, Bruce Davis, Gene Sullenberger, and Christine Wootten, for themselves and on behalf of all others similarly situated, Plaintiffs,
v.
EIDP, INC., the 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), Atotech USA, LLC, MacDermid, Inc., Procino Plating, Inc., a/k/a Procino Enterprises, a/k/a Procino, and Blades Development LLC, Defendants.

Civil Action No. 19-1672-JLH-SRF
|
Signed 02/10/2026

**Attorneys and Law Firms**

Thomas C. Crumplar, Jacobs & Crumplar, P.A., Wilmington, DE, Andrew W. Croner, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, David Thomas Crumplar, Patrick Christopher Gallagher, Jacobs & Crumplar, New Castle, DE, Andrew W. Croner, Pro Hac Vice, Eric F. Citron, Pro Hac Vice, Gabriel M. Vazquez, Pro Hac Vice, Kathleen Foley, Pro Hac Vice, Patrick Haines, Pro Hac Vice, Patrick J. Lanciotti, Pro Hac Vice, Veronica Vazquez Santiago, Pro Hac Vice, for Plaintiffs Candy Caporale, Bruce Davis.

Thomas C. Crumplar, Jacobs & Crumplar, P.A., Wilmington, DE, Andrew W. Croner, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, David Thomas Crumplar, Patrick Christopher Gallagher, Jacobs & Crumplar, New Castle, DE, Andrew W. Croner, Pro Hac Vice, Eric F. Citron, Pro Hac Vice, Gabriel M. Vazquez, Pro Hac Vice, Kathleen Foley, Pro Hac Vice, Patrick Haines, Pro Hac Vice, Patrick J. Lanciotti, Pro Hac Vice, Veronica Vazquez Santiago, Pro Hac Vice, Coral M. Odiot Rivera, Pro Hac Vice, for Plaintiffs Gene Sullenberger, Christine Wootten.

Gerard F. Gray, Doroshow, Pasquale, Krawitz, & Bhaya, Wilmington, DE, William Joseph Kassab, Parkowski, Guerke & Swayze, Wilmington, DE, for Defendant Procino Plating, Inc.

Brian Tome, Fisher Broyles, LLP, Wilmington, DE, Victoria Ashley Partington, Reilly, McDevitt & Henrich, P.C., Center Valley, PA, for Defendant Blades Development LLC.

Andrew Colin Mayo, Catherine A. Gaul, Ashby & Geddes, Wilmington, DE, Brian A. Biggs, Biggs Law Firm, LLC, Wilmington, DE, Alexandra B. Cunningham, Pro Hac Vice, Madison W. Sherrill, Pro Hac Vice, Michael J. Bisceglia, Pro Hac Vice, Neil K. Gilman, Pro Hac Vice, Thomas R. Waskom, Pro Hac Vice, for Defendant Atotech USA, LLC.

## REPORT AND RECOMMENDATION

Sherry R. Fallon, UNITED STATES MAGISTRATE JUDGE

***1** Presently before the court in this putative class action are the following motions: (1) the motion to exclude the testimony of Dr. Richard Laton, filed by defendants 3M Company ("3M"); EIDP, Inc. ("EIDP"); Atotech USA, LLC ("Atotech"); MacDermid, Inc. ("MacDermid"); Procino Plating, Inc. ("Procino"); and Blades Development LLC ("Blades Development"),[1] (D.I. 437);[2] (2) the motion for class certification under Federal Rule of Civil Procedure 23, filed by plaintiffs Candy Caporale, Bruce Davis, Gene Sullenberger, Christine Wootten, and all others similarly situated (collectively, "Plaintiffs"), (D.I. 464);[3] and (3) Blades Development's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (D.I. 459).[4] For the following reasons, I recommend that the court DENY Defendants' motion to exclude Dr. Laton's testimony, DENY Plaintiffs' motion for certification of an issue class, and DENY Blades Development's motion for summary judgment.

## I. BACKGROUND

As described in more detail at Sections I.B and II.B.1, *infra*, this is an unusual case beset by numerous delays before, during, and after the briefing on Plaintiffs' motion for class certification. Both sides expended significant time and resources briefing Plaintiffs' motion to certify proposed personal injury and property damage classes under Rule 23(b)(3). (D.I.

356; D.I. 431; D.I. 463) Nearly a year later, Plaintiffs abandoned the proposed Rule 23(b)(3) classes and replaced them with a proposed issue class under Rule 23(c)(4).[5] (D.I. 481) Plaintiffs couched this shift as "an effort to simplify the matters that are currently pending" and did not initially request supplemental briefing on the proposed issue class. (*Id.*) Only after further court-initiated inquiries did Plaintiffs offer a revised class definition and state their position in support of certification under Rule 23(c)(4).[6] (D.I. 487; D.I. 492) Rather than simplifying the issues, these filings suggest Plaintiffs belatedly appreciated the weaknesses in their proposed Rule 23(b)(3) classes and expert testimony and shifted strategies at the eleventh hour without a fully developed certification theory under Rule 23(c)(4).

***2** Due to the unique procedural history of this case, the court's recommendations are largely driven by developments postdating the completion of the original briefing on the pending motions. Consequently, the recommendations herein are limited to the unique factual circumstances of this case.

### A. Facts

This case arises from activities at the sites of two manufacturing facilities located in Blades, Delaware that specialized in chrome plating. Procino was established in 1983 and continues operating today. (D.I. 160 at ¶ 155) Peninsula Plating ("Peninsula") operated an electroplating facility from 1993 to 1995, when it was forced to cease operations due to a history of noncompliance with industrial waste discharge permits and regulations. (D.I. 462, Ex. A at 4) The operative pleading alleges that the operators of both facilities used and stored products containing perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonate ("PFOS;" together with PFOA, "PFAS"), which are used in hard chrome plating processes and the manufacture of nonstick cookware. (D.I. 160 at ¶¶ 1-2, 5, 18-19, 33) The Procino and Peninsula facilities are close to the Nanticoke River and municipal and private water supply wells in Blades, Delaware. (*Id.* at ¶ 70)

Blades Development acquired the former Peninsula site for development after entering into a Brownfields Development Agreement ("BDA")[7] with the Delaware Department of Natural Resources and Environmental Control ("DNREC") in December of 2006.[8] (D.I. 460, Ex. B) The purpose of the BDA was "to assess and respond to the actual, threatened, or perceived release of hazardous substances at the Site and settle and resolve" Blades Development's "potential liability ... for the Existing Environmental Condition at the Site which might otherwise result" under the Hazardous Substance Cleanup Act ("DHSCA"). (*Id.*, Ex. B at 1) A Phase II Site Investigation Report was published in February of 2007. (D.I. 462, Ex. C) Blades Development formally acquired the Peninsula property in April of 2007. (D.I. 160 at ¶ 166) The following month. DNREC adopted a final remediation plan for the former Peninsula site which stated that no further remedial action was required. (D.I. 460, Ex. C) In December of 2007, DNREC issued a Certification of Completion of Remedy ("COCR") confirming that remediation of the former Peninsula site was complete. (*Id.*, Ex. D)

The Procino site also has a history of environmental contamination. In 2013, Procino's owner pleaded guilty to violations of the Clean Water Act and illegal storage of hazardous waste without a permit stemming from the storage of a tank containing liquid hazardous waste, processing of stored chemicals through Procino's wastewater treatment plant, and discharge of the resulting wastewater. (D.I. 160 at ¶ 162) DNREC issued a Final Plan of Remedial Action to address environmental contamination at the Procino site in 2016. (*Id.* at ¶ 163)

***3** In February of 2018, sample testing by DNREC and the Environmental Protection Agency ("EPA") revealed that the public supply wells in Blades, Delaware were contaminated with PFOA and PFOS at levels exceeding the combined EPA health advisory level ("HAL"). (D.I. 356, Ex. 1 at § 2.3.3) Approximately 1,600 Blades residents began receiving alternative water, and a carbon filtration system was installed on the Blades municipal water supply system. (*Id.*, Ex. 1 at §§ 2.3.3, 4.6) By February 28, 2018, follow-up sampling of the treated municipal water supply "showed non-detect levels for PFAS[.]" (*Id.*, Ex. 1 at § 2.3.3)

Sampling of private domestic well water outside of Blades was performed in February, March, and April of

2018. (*Id.*, Ex. 1 at § 2.3.4) Of the fifty-four domestic wells that were tested for PFAS contamination, seven exceeded the combined HAL. DNREC provided and installed carbon filter units to all residents with private wells impacted by PFAS above 75% of the HAL, and filters were provided to a total of eight residences. (*Id.*) Samples collected after the filter installation had no detected levels of PFAS. (*Id.*, Ex. 12)

On September 1, 2020, the EPA added the Blades Groundwater Site to the Superfund National Priorities List, rendering Blades eligible for federal funds to facilitate remedial action.[9] Between 2021 and 2023, testing of unfiltered groundwater samples from wells in and around Blades continued to show elevated levels of PFAS, particularly in shallow wells. (D.I. 356, Exs. 9, 13)

**B. Procedural History**

Plaintiffs initially brought this putative class action complaint in Delaware Superior Court on May 17, 2019, asserting causes of action relating to the contamination of public and private water supplies in Blades, Delaware. (D.I. 1, Ex. A) On September 6, 2019, 3M removed the action to this court under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). (D.I. 1) Plaintiffs responded with a motion for remand challenging the court's subject matter jurisdiction under 28 U.S.C. § 1332(d)(3) and (4), but they subsequently withdrew the motion pursuant to an agreement reached among the parties. (D.I. 8) The court initiated its own inquiry into the basis for the court's subject matter jurisdiction under CAFA and issued a Memorandum Opinion on December 2, 2021 holding that jurisdiction was proper. (D.I. 86; D.I. 104)

Following several rounds of briefing on motions to dismiss, Plaintiffs filed the third amended complaint ("TAC") on November 21, 2022. (D.I. 160) The TAC sets forth seven causes of action: (1) negligence as to defendant Procino (Count I); (2) negligence as to defendants 3M, EIDP, Atotech, and MacDermid (Count II); (3) breach of implied warranty as to defendants 3M, EIDP, Atotech, and MacDermid (Count III); (4) trespass as to all Defendants (Count IV); (5) private nuisance as to all Defendants (Count V); (6) fraudulent concealment as to defendants 3M, EIDP, Atotech, and MacDermid (Count VI); and (7) conspiracy as to defendants 3M, EIDP, Atotech, and MacDermid (Count VII). (*Id.*) Defendants Atotech, 3M, EIDP, and MacDermid moved to dismiss the TAC, and the court issued a Report and Recommendation from the bench recommending dismissal of all causes of action against the movants except for the negligence claim at Count II of the TAC. (D.I. 200) On August 15, 2023, the Report and Recommendation was adopted. (D.I. 202) After the resolution of the motion to dismiss the TAC, the following causes of action remained:

| CAUSE OF ACTION | DEFENDANT(S) |
|---|---|
| Count I: Negligence | Procino |
| Count II: Negligence | Atotech, 3M, EIDP, MacDermid |
| Count IV: Trespass | Procino, Blades Development |
| Count V: Private Nuisance | Procino, Blades Development |

***4** During the successive challenges to the pleadings, the parties requested multiple extensions to delay the issuance of a scheduling order. (D.I. 99; D.I. 149; D.I. 152; D.I. 153; D.I. 155; D.I. 158; D.I. 161; D.I. 165; D.I. 182; D.I. 203) As a result, a scheduling order was not entered until October 11, 2023, more than four years after the case was filed. (D.I. 218) Under the original scheduling order, the deadline for the completion of class certification discovery was April 26, 2024 and Plaintiffs' motion for class certification was due by June 21, 2024. (*Id.* at ¶¶ 7, 9) The scheduling order provided that the remaining deadlines in the case schedule would be set after the motion for class certification was decided. (*Id.* at ¶ 12)

On May 3, 2024, the parties filed a joint motion to amend the scheduling order because they needed additional time to complete class certification discovery. (D.I. 285) The court granted the motion, extending the class certification discovery deadline to June 25, 2024 and setting a deadline of July 19, 2024 for filing a motion for class certification. (D.I. 286) This extension proved to be insufficient, and Plaintiffs moved for an additional extension of 90 days to complete class certification discovery. (D.I. 298) The court denied the motion for an extension of the June 25, 2024 class certification discovery deadline, but it granted a 30-day extension for all briefing on the motion for class certification. (D.I. 327) With this modification, briefing on the motion for class certification was scheduled to begin on August 19, 2024. (*Id.* at ¶ 5; D.I. 333) On that date, however, the parties stipulated to another extension of the briefing deadlines. (D.I. 350) The court granted the requested extension, setting a deadline of August 26, 2024 for Plaintiffs' motion for class certification and setting a deadline of February 4, 2025 for the completion of briefing. (D.I. 352)

In accordance with the extended briefing schedule, Plaintiffs filed their motion for class certification on August 26, 2024, seeking to certify two classes: (1) a personal injury, liability issues only class, and (2) a property damage class. (D.I. 355; D.I. 356 at 7) Plaintiffs' proposed class definitions were as follows:

> **Personal Injury, Liability Issues Only Class** (Class 1), for both persons who resided in the Town of Blades, Delaware, from 1985 to present, and consumed water from the Town's public water system and as a result were exposed to hazardous chemicals due to Defendants actions; and for persons who resided in or near the Town (Exhibit 1 shows the proposed class boundary), from 1985 to present, and consumed water from private wells and as a result were exposed to hazardous chemicals due to Defendants' actions.

> **Property Damage Class** (Class 2), for persons who currently own properties in or near the Town of Blades, Delaware, whose water is supplied by the Town's public water system, or who own properties with private drinking water wells in or near the town (Exhibit 1 shows the proposed class boundary), whose property values have been diminished due to Defendants' actions.

***5** (D.I. 356 at 7) Plaintiffs' motion for class certification was supported by the reports of three expert witnesses (Dr. Alan Ducatman, Dr. Richard Laton, and Dr. Kevin J. Boyle) and the report of a fourth witness not designated as an expert (Dr. Stephen King). (*Id.*, Exs. 7-8, 11, 14)

After Plaintiffs filed their motion for class certification, progress in this action stalled again due to delays in Plaintiffs' production of materials pertaining to their class experts' reports. (D.I. 375) Pursuant to the parties' stipulation to extend the class certification deadlines, the court entered an amended scheduling order on November 20, 2024 extending the deadline for completion of briefing to May 2, 2025. (*Id.*; D.I. 377) Briefing was completed in accordance with the extended schedule when Plaintiffs filed their reply brief on May 2, 2025. (D.I. 463)

In the meantime, defendants EIDP, MacDermid, and 3M filed motions for summary judgment. (D.I. 346; D.I. 384; D.I. 393) In a Report and Recommendation issued on January 29, 2025, the court recommended granting the motions for summary judgment because Plaintiffs offered no evidence to establish a nexus between EIDP, MacDermid, and 3M's products and the PFAS-containing chemicals used at Procino and Peninsula. (D.I. 412) On March 19, 2025, the court adopted the Report and Recommendation and terminated EIDP, MacDermid, and 3M from the case. (D.I. 451) Following the resolution of the motions for summary judgment, the remaining causes of action in this case are as follows:

| CAUSE OF ACTION | DEFENDANT(S) |
|---|---|
| Count I: Negligence | Procino |
| Count II: Negligence | Atotech |

| | |
|---|---|
| Count IV: Trespass | Procino, Blades Development |
| Count V: Private Nuisance | Procino, Blades Development |

On August 21, 2025, nearly a year after filing their motion for class certification and more than three months after the completion of briefing, Plaintiffs filed a letter voluntarily withdrawing their proposed personal injury and property damage classes and stating their intention to "proceed solely with their request for certification of an issues class under Fed. R. Civ. P. 23(c)(4)." (D.I. 481) In lieu of requesting additional briefing on a proposed issue class, Plaintiffs referred to their alternative argument for certification of a Rule 23(c)(4) issue class in their opening and reply briefs. (*Id.*) (citing D.I. 356 at 23-25; D.I. 463 at 13-15). Plaintiffs did not propose a new class definition, but they identified the common issues as: (1) whether Defendants discharged PFAS into the environment, (2) whether those discharges contaminated municipal and private water systems, and (3) whether Defendants' conduct breached applicable duties of care. (*Id.*) Plaintiffs also withdrew three of the four declarations submitted in support of the class certification motion which were the subject of pending *Daubert* motions and a motion to strike. (*Id.*)

The court ordered the parties to submit a joint status letter on September 3, 2025 addressing the impact of Plaintiffs' voluntary withdrawals on the status of the pending motions. (8/25/2025 Oral Order) Plaintiffs offered the following definition of their proposed issue class for the first time in the joint status letter: "Persons who currently own property within the proposed class area and persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure." (D.I. 487 at 1) Plaintiffs acknowledged that the existing class certification briefing "was focused almost entirely on the non-issues classes" and requested leave to re-brief the class certification motion to address the merits of the proposed issue class. (*Id.* at 1 n.1) Defendants opposed Plaintiffs' request to re-brief the motion, emphasizing the delays that have already beset this litigation and the lack of good cause to restart class certification briefing beyond the deadlines in the scheduling order. (*Id.* at 2) Defendants also offered substantive arguments in opposition to the proposed issue class. (*Id.* at 3-4)

***6** The court gave Plaintiffs an opportunity to respond to Defendants' substantive arguments in a letter brief of equivalent length, which was due on October 8, 2025. (D.I. 491) Plaintiffs' responsive letter confirms a distinction within the proposed issue class between personal injury plaintiffs "who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure," and property damage plaintiffs "who currently own property within the proposed class area." (D.I. 492 at 2) The responsive letter also represents for the first time that the proposed class area "is described in the affidavit of Dr. Laton." (D.I. 492 at 2; D.I. 356, Ex. 11)

## II. DISCUSSION

### A. Motion to Exclude the Testimony of Dr. Laton

As explained at § I.B, *supra*, Plaintiffs have voluntarily withdrawn the testimony of Dr. Ducatman, Dr. Boyle, and Dr. King for purposes of class certification. (D.I. 487 at 1) Plaintiffs continue to rely on Dr. Laton's expert testimony in support of their motion for class certification, and Defendants' motion to exclude Dr. Laton's testimony remains pending. (*Id.*; D.I. 437) The Third Circuit has held that a plaintiff cannot use challenged expert testimony to satisfy the requirements of class certification unless the plaintiff first shows that the expert testimony satisfies the *Daubert* standard. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). Consequently, the court addresses Defendants' motion to exclude Dr. Laton's testimony before considering Plaintiffs' class certification motion.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" to "ensur[e] that an expert's testimony both rests on a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Rule 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In this regard, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003). Here, Defendants challenge the reliability of Dr. Laton's testimony. (D.I. 438 at 10-15)

The court considers "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion" in evaluating whether each step of an expert's analysis is reliable. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (internal citations and quotation marks omitted). "The standard for reliability is not that high. It is lower than the merits standard of correctness." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (internal citations and quotation marks omitted). Expert testimony is considered reliable if it is supported by "good grounds," even if it is not necessarily supported by "the best methodology or unassailable research."[10] *Id.* In keeping with these tenets, Rule 702 "has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal citations and quotation marks omitted).

***7** Plaintiffs emphasize the narrow purpose for which Dr. Laton's testimony is offered: "to define an outer class boundary" in support of Plaintiffs' proposed issue class under Rule 23(c)(4). (D.I. 467 at 5; D.I. 492) Plaintiffs expressly concede that "Dr. Laton's testimony was not presented for the purpose of proving the *source* the PFAS contamination" or "the cause of the plume." (D.I. 467 at 1) (emphasis in original). These representations correctly confirm that Dr. Laton's testimony is insufficient to sustain Plaintiff's ultimate burden on causation or the merits of the case. Plaintiffs posit that allowing Dr. Laton's testimony at the class certification stage "in no way commits one to view that use of such a methodology would be appropriate at the liability stage." (*Id.* at 5) Even considering the limited purpose for which Dr. Laton's testimony is offered and the liberal policy of admissibility under Rule 702 and Third Circuit precedent, Defendants' motion to exclude Dr. Laton's testimony presents a close question.

As it pertains to Plaintiffs' proposed issue class, Dr. Laton's testimony is relevant to establishing the proposed "class area" based on the scope of the contamination plume. (D.I. 492 at 2; D.I. 356, Ex. 11 at ¶ 10) To determine the class area, Dr. Laton reviewed DNREC's sampling data from public supply wells in Blades in January of 2018, EPA testing data from 54 domestic water wells in February of 2018, the results of testing from monitoring wells installed by the EPA in October of 2018, and the results of PFAS analyses on treated drinking water samples from Blades in June and October of 2022. (D.I. 356, Ex. 11 at ¶¶ 13-18) Using this data, Dr. Laton prepared maps[11] showing the maximum recorded levels of PFOA and PFOS concentrations in and around Blades, Delaware:






(D.I. 356, Ex. 11 at ¶¶ 9-22 & Exs. H-1) Dr. Laton then prepared another map delineating the boundaries of the contaminated area based on the locations where concentrations of PFOA and PFOS were found in the groundwater:




(*Id.*, Ex. 11 at Ex. J)

Defendants contend that Dr. Laton's map of the "Impacted Area" is unreliable for three reasons: (1) Dr. Laton cherry-picked data reflecting the highest PFAS concentration from a larger pool of data, (2) Dr. Laton did not account for the effectiveness of filtration in removing PFAS from the Blades drinking water supply, and (3) Dr. Laton docs not explain how the "Impacted Area" boundary line was drawn, (D.I. 438 at 10-15) The first and second issues raised by Defendants have no clear application to Plaintiffs' proposed issue class definition.[12] Both arguments are based on the premise that Dr. Laton's analysis is unreliable because it fails to account for varying levels of PFAS exposure experienced by Plaintiffs across a period of time. As Plaintiffs explain, however, Dr. Laton's analysis does not touch on the ultimate liability issue of exposure levels in residents. (D.I. 467 at 5)

Defendants' third argument presents a closer question. Dr. Laton explains that he relied on objective testing data by DNREC and the EPA to define the "Impacted Area." (D.I. 356, Ex. 11 at ¶¶ 11-19) The "Methodology" portion of Dr. Laton's expert report indicates that he mapped the DNREC and EPA testing data and drew a perimeter around it. (*Id.*, Ex. 11 at ¶¶ 20-25) He acknowledges that certain well samples within the boundary reported non-detect levels of PFAS, but he infers that PFAS contamination nonetheless reached those wells due to their proximity to a well with detected PFAS levels. (*Id.*, Ex. 11 at ¶ 21) Dr. Laton does not name a specific scientific methodology or existing standard governing his analysis. In this regard, his assessment approaches the realm of "unsupported speculation" and "haphazard, intuitive inquiry." *Karlo*, 849 F.3d at 80-81; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

***8** Nonetheless, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." (internal citations and quotation marks omitted)). The boundary drawn by Dr. Laton in Exhibit J is based on objective data corresponding to the Blades town limits and the area outside of Blades where private wells tested positive for PFAS contamination in Exhibits H and I. (D.I. 356, Ex. 11 at Ex. J) Defendants challenge Dr. Laton's inclusion of an area containing wells with non-detectable or minimal levels of PFAS contamination interspersed with others containing meaningful levels of PFAS contamination. (D.I. 438 at 14; D.I. 476 at 10; D.I. 356, Ex. 11 at Exs. H-I) But this argument describes potential methodological flaws that go to the weight of the evidence, not its admissibility. *See Karlo*, 849 F.3d at 83.

The non-binding case authority Defendants cite in their reply brief weighs against their argument to exclude Dr. Laton's report. (D.I. 476 at 10) Both environmental contamination cases arose in the context of a motion for class certification, as opposed to a motion to exclude expert testimony. *See Cox v. American Synthetic Rubber Co.*, 2008 WL 5381909, at *2 (W.D. Ky. Dec. 18, 2008); *Cotromano v. United Techs. Corp.*, 2018 WL 2047468, at *11 (S.D. Fla. May 2, 2018). In both cases, the court accepted expert testimony supporting the proposed class area and proceeded to

rule on the sufficiency of that evidence to satisfy the class certification requirements under Rule 23. *Id.* For example, in *Cotromano*, the court assumed without deciding that the testimony of plaintiffs' groundwater and real estate appraisal experts was admissible before concluding that the expert evidence did not support the ascertainability of the proposed class area. 2018 WL 2047468, at *10-11 (finding both class boundary definitions "to be over-inclusive ... even assuming the admissibility of expert liability evidence on groundwater and soil migration[.]").

In *Cox v. American Synthetic Rubber Co.*, the district court explained that that the plaintiffs must produce "scientific or objective" evidence linking the proposed boundary to the environmental hazard to prevail on class certification. 2008 WL 5381909, at *2 (W.D. Ky. Dec. 18, 2008). To meet this standard, the plaintiffs produced evidence from their expert, who took samples at seventeen sites within a limited geographic area that did not extend to the proposed class boundary. *Id.* The court determined that the expert's testing was insufficient to define the class area because the sampling "fail[ed] completely to cover the breadth of the proposed class. Without testing the boundaries, there is no basis for linking the boundaries to Defendant's actions at all." *Id.* The court rejected the class boundary not because the expert used sampling data to locate contamination, but rather because the contaminated locations bore little relation to the proposed class boundary. Here, Defendants do not suggest that the testing data used by Dr. Laton fails to encompass "large swaths" of the proposed class area. (D.I. 438 at 14-15; D.I. 476 at 10)

Defendants cite another case where Dr. Laton's expert testimony was partially excluded. (D.I. 438 at 6) In *Goldstein v. Exxon Mobil Corp.*, Dr. Laton evaluated air samples to assess the concentrations of certain contaminants, and he suggested that the contamination emanated from a particular source despite acknowledging the need for further testing to verify the source. 2019 WL 4575569, at *3 (C.D. Cal. Mar. 19, 2019). The court sustained a narrow objection to Dr. Laton's statement on a potential source of the contamination, while also observing that "this is not the kind of evidence that would have a meaningful impact on the outcome of Plaintiff's motion for class certification." *Id.* at *3 n.2. The same is true here. For purposes of Plaintiffs' class certification motion, the relevance of Dr. Laton's testimony is limited to the boundary of the class area. The weight assigned to that opinion is a separate matter addressed in the court's class certification analysis under Rule 23:

> ***9** [O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason.... Like any evidence, admissible expert opinion may persuade its audience, or it may not.

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) (citations and footnote omitted). Accordingly, I recommend that the court DENY the motion to exclude Dr. Laton's testimony to the extent the opinion is offered for the sole purpose of establishing the boundary of the impacted area with respect to the proposed issue class.

**B. Motion for Class Certification** [13]

As described at § I.B, *supra*, Plaintiffs no longer seek certification of the personal injury and property damage classes under Rule 23(b)(3) and instead request certification of their proposed issue class under Rule 23(c)(4). Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). A party seeking to certify "particular issues" for class treatment under Rule 23(c)(4) must show that the prerequisites of Rule 23(a) and (b) are satisfied. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 266-67 (3d Cir. 2021). First, the movant bears the burden of showing by a preponderance of the evidence that the four threshold requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 391 (3d Cir. 2015). Next, the movant must

show that the issues (as opposed to the cause of action as a whole) are maintainable under the predominance and superiority requirements of Rule 23(b)(3). [14] *Russell*, 15 F.4th at 267, 273-74 (internal citations omitted). In the Third Circuit, putative class members must also be "currently and readily ascertainable based on objective criteria." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129, 138 (3d Cir. 2023) (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020)).

If the proposed issue class satisfies the ascertainability requirement and the requirements of Rule 23(a) and (b), the court must next determine whether it is "appropriate" to certify the issues as a class. *See Russell*, 15 F.4th at 270. An issue class should only be certified if class resolution of the issues "will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272–73 (3d Cir. 2011). In reaching this determination, the trial court may consider the following non-exclusive *Gates* factors: (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification; (4) the substantive law underlying the claim(s); (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). *See Russell*, 15 F.4th at 268.

### 1. Status of Briefing on Rule 23(c)(4) Issue Class

***10** Before turning to the merits of Plaintiffs' motion for class certification, the court addresses the status of the briefing on the pending class certification motion. As set forth at Section I.B, *supra*, Plaintiffs briefed their motion for class certification over the course of nearly a year, focusing on a proposed personal injury class and a proposed property damage class under Rule 23(b)(3). (D.I. 356 at 7; D.I. 463) Although Plaintiffs' original class certification briefing raised the potential for certifying an issue class under Rule 23(c)(4) as an alternative remedy, the matter "ha[d] not been fulsomely briefed." (D.I. 356 at 23-25; D.I. 463 at 13-15; D.I. 487 at 1) Nonetheless, Plaintiffs did not request additional briefing or propose an issue class definition when they withdrew their personal injury and property damage classes and decided to proceed only on the Rule 23(c)(4) issue class. (D.I. 481); *see* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class *and* the class claims, issues, or defenses[.]" (emphasis added)). Instead, Plaintiffs referred to the Rule 23(c)(4) arguments raised in their original briefing. (D.I. 481)

Plaintiffs' position on the status of class certification briefing began to shift only after the court inquired about the definition of the proposed issue class and the applicability of the existing briefing. (8/25/2025 Oral Order) In response to the court's order, Plaintiffs provided an issue class definition and proposed the submission of "new, tailored class-certification briefing .... focused on what is most relevant to the Court for the class currently proposed[.]" (D.I. 487 at 1) Plaintiffs represented that any additional briefing "could be substantially shorter," suggesting page limits "of half the length contemplated by Local Rule 7.1.3(4) [,]" which equates to ten double-spaced pages or five single-spaced pages. (*Id.*); *see* D. Del. LR 7.1.3(2), (4). Defendants opposed Plaintiffs' request to re-brief the class certification motion, characterizing it as a motion to amend the class certification schedule without a showing of good cause under Rule 16(b)(4). (D.I. 487 at 2) Defendants also raised substantive challenges to Plaintiffs' proposed issue class. (*Id.* at 3-4)

Following a review of the parties' joint status letter, the court partially granted Plaintiffs' request for further briefing on the proposed issue class. Specifically, the court permitted Plaintiffs to file a single-spaced, three-page letter in response to the substantive arguments raised by Defendants in the parties' joint status letter. (D.I. 491) The court declined to grant Plaintiffs the requested equivalent of five single-spaced pages and/or a new, expedited briefing schedule because: (1) Plaintiffs' Rule 23(c)(4) argument was available to them at the time the class certification motion was

originally filed, (D.I. 356 at 23-25); (2) Plaintiffs previously represented that certification of the Rule 23(c)(4) issue class could be resolved on the papers submitted, (D.I. 481); (3) Plaintiffs did not support their request for further briefing with citations to changes in the record or the discovery of new evidence, (D.I. 487 at 1); and (4) the scope of briefing requested by Plaintiffs posed an untenable risk of further delays in this aging case.

A review of Plaintiffs' supplemental letter confirms that the full scope of briefing requested by Plaintiffs would not advance the court's resolution of the class certification motion. (D.I. 492) Instead of maximizing their use of the allotted pages, Plaintiffs began their substantive response to Defendants' arguments on the second page of the three-page letter. (*Id.*) Plaintiffs' own conduct demonstrates that they had an adequate opportunity to raise their arguments in support of the proposed issue class under Rule 23(c)(4), and further briefing is not warranted. *See* *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 138 (3d Cir. 2007) (finding that the district court did not abuse its discretion by denying the plaintiff's request to file an overlength brief because the plaintiff had an adequate opportunity to raise his arguments in the standard briefing).

### 2. Ascertainability

***11** In the Third Circuit, an "essential prerequisite of a class action ... is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012). To establish ascertainability, the movant must show that "there [is] a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition," and the class can be defined "with reference to objective criteria." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013). The purpose of the ascertainability requirement is to "assure[ ] that a court will not need to engage in extensive fact-finding to identify the members of the class." *In re Intel Corp. Microprocessor Antitrust Litig.*, 05-1717-LPS, 2014 WL 6601941, at *12 (D. Del. Aug. 6, 2014) (citing *Marcus*, 687 F.3d at 592-93). The movant bears the burden of showing ascertainability by a preponderance of the evidence. *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 477 (3d Cir. 2020).

Plaintiffs have not met their burden to show the ascertainability of the personal injury portion of their issue class definition, which includes "persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure." (D.I. 487 at 1) Plaintiffs argue that this definition resolves Defendants' concerns about the ascertainability of the personal injury class because it is no longer premised on water consumption and attendant exposure, and it is now limited only to those whose exposure "objectively resulted in injury." (D.I. 492 at 2) According to Plaintiffs, members of the issue class can be identified through objective criteria such as water billing records, water sampling reports, property ownership databases, census data and other unspecified records. (D.I. 356 at 11; D.I. 463 at 2; D.I. 492 at 2)

The objective criteria identified by Plaintiffs are not sufficient to ascertain members of the proposed personal injury issue class. Property ownership databases and municipal water billing records may identify owners of the impacted properties, but Plaintiffs have not shown how these records will identify non-owners who resided within the proposed class area. Moreover, Plaintiffs do not identify a form of census data collected with sufficient frequency to accurately identify all individuals who resided in the proposed class area "for six months or more." It is also not clear from Plaintiffs' briefing that water sampling reports will capture all residences with private wells in the proposed class area. Plaintiffs do not identify any method for ascertaining which residents "have been diagnosed with an ailment associated with PFAS exposure."[15] (D.I. 487 at 1)

On this record, Plaintiffs have not met their burden to "propose a classification method with evidentiary support to meet the ascertainability requirement[.]" *In re Niaspan*, 67 F.4th 129-30; *see also* *Campbell v. County of Mercer*, 2025 WL 1358529, at *3 (W.D. Pa. Mar. 3, 2025) ("The class must be ascertainable in the here and now, the method must be spelled out, and if there is any doubt, class certification is

denied[.]"). Consequently, I recommend that the court DENY Plaintiffs' motion to certify an issue class of "persons who resided within the proposed class area for six months or more from 1985 to present and who have been diagnosed with an ailment associated with PFAS exposure." (D.I. 487 at 1)

***12** Plaintiffs have also failed to show by a preponderance of the evidence that the proposed issue class of "[p]ersons who currently own property within the proposed class area" is ascertainable. The proposed "class area" is not clearly defined in Plaintiffs' issue class definition. Initially, Plaintiffs implied that the proposed "class area" of the issue class was consistent with the class boundary associated with the original personal injury and property damage class definitions.[16] (D.I. 481; *see* D.I. 356 at 7, 23-25) Those definitions stated that "Exhibit 1 shows the proposed class boundary[.]" (D.I. 356 at 7) Exhibit 1 to Plaintiffs' opening brief is more than 2,000 pages in length. (*Id.*; D.I. 356-1) Plaintiffs' reply brief clarifies that "[t]he geographic boundaries are defined by documented EPA plume maps' " in Exhibit 1. (D.I. 463 at 2) These maps identify the boundaries of the Procino and Peninsula sites and the Blades perimeter, but they do not establish a perimeter around private wells located outside the town limits of Blades:



(D.I. 356-1 at 50) Current property owners "within the proposed class area" are not objectively ascertainable based on this evidence.

For the first time in their three-page letter brief filed on October 8, 2025, Plaintiffs allege that "[t]he class area is described in the affidavit of Dr. Laton. D.I. 356-19. which Plaintiffs have not withdrawn." (D.I. 492 at 2) Plaintiffs do not provide a more specific citation to this 55-page exhibit, which was filed on August 26, 2024 as an attachment to Plaintiffs' opening brief on class certification but was not cited in the accompanying brief to establish the proposed class boundary. (D.I. 356, Ex. 11) Even assuming Plaintiffs' new argument regarding the definition of the "class area" is not forfeited,[17] *see In re Niaspan*, 67 F.4th at 135, Plaintiffs' citation to Dr. Laton's affidavit in its entirety requires the court to draw inferences about which portions of the affidavit define Plaintiffs' proposed class area. Plaintiffs' passing reference to Dr. Laton's affidavit does not satisfy their burden to show by a preponderance of the evidence that the "class area" is ascertainable.

In the interest of resolving Plaintiffs' class certification motion on the merits, the court considers paragraph 22 of Dr. Laton's affidavit, which indicates that "Exhibit 'J' shows the area of groundwater impacted by PFOS and PFOA which was prepared by combining the regions that encompass the '*Blades Water Service Area*' and '*Private Well Area*.' " (D.I. 356, Ex. 11 at ¶ 22) Exhibit J to Dr. Laton's affidavit sets forth a perimeter for the "Impacted Area" in and around Blades, Delaware:




(*Id.*, Ex. 11 at Ex. J) Public property records may objectively establish the current owners of residences falling within this boundary. *See Brown v. Saint-Gobain Performance Plastics*, 2023 WL 9023158, at *10 (D.N.H. Dec. 29, 2023) (explaining that current property owners could be ascertained using state property records and tax bills). Operating under this definition of the proposed "class area," the court proceeds to assess Plaintiffs' proposed issue class of "[p]ersons who currently own property within the proposed class area" under the requirements of Rule 23(a) and (b) and the *Gales* factors applied to the Rule 23(c)(4) analysis.

**3. Requirements Under Rule 23(a) and (b)**

***13** A party seeking certification of an issue class under Rule 23(c)(4) must demonstrate that the requirements of Rule 23(a) and (b) are satisfied. *Russell*, 15 F.4th at 266-67. The Third Circuit has recognized the challenges inherent in this inquiry, acknowledging that "[t]he interaction between the requirements for class certification under Rule 23(a) and (b) and the authorization of issue classes under Rule 23(c)(4) is a difficult matter that has generated divergent interpretations among the courts." *Gates*, 655 F.3d at 272 (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200 n.25 (3d Cir. 2009)). The parties' briefing on these issues following Plaintiffs' assertion of the proposed issue class does little to address those difficulties. (D.I. 487; D.I. 492) For purposes of proceeding to the next step in this analysis, the court assumes without deciding that Plaintiffs' proposed issue class of "[p]ersons who currently own property within the proposed class area" satisfies the requirements of Rule 23(a) and (b).

#### 4. Rule 23(c)(4) *Gates* Factors: Appropriateness

As previously discussed, courts assessing a motion to certify an issue class under Rule 23(c)(4) consider the following *Gates* factors: (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification; (4) the substantive law underlying the claim(s); (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). *See Russell*, 15 F.4th at 268.

Plaintiffs have not shown that certification of the proposed issue class would materially advance the resolution of the class members' claims under the *Gates* factors. The common issues identified by Plaintiffs are: (1) "whether Defendants discharged PFAS into the environment," (2) "whether those discharges contaminated municipal and private water systems," and (3) "whether Defendants' conduct breached applicable duties of care." (D.I. 481) Plaintiffs concede that both the fact and amount of damages will require resolution on an individualized basis after a class-wide determination of these common issues. (D.I. 492 at 3) Plaintiffs also acknowledge that individualized questions of causation will remain after the resolution of common issues. (*Id.* at 2; D.I. 463 at 15) Under similar circumstances, the Third Circuit declined to certify a Rule 23(c)(4) issue class in a groundwater contamination case because "resolution of [common] questions leaves significant and complex questions unanswered." *Gates*, 655 F.3d at 273.

In *Gates*, the residents of a village sought certification of a medical monitoring class and a property damage class for injuries sustained after the defendant allegedly released contaminants into a lagoon that seeped into an underground aquifer, where those contaminants degraded into vinyl chloride. *Id.* at 258. After denying certification of the medical monitoring and property damage classes, the district court alternatively considered certification of an "issue only" class on liability to address common issues, such as whether vinyl chloride was released from the defendant's facility or whether exposure to vinyl chloride can increase the risk of developing brain cancer. *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208, 234 (E.D. Pa. 2010). Ultimately, the district court declined to certify a liability-only issue class because the common evidence would not establish the fact or amount of damages, causation, and the extent of contamination. *Gates*, 655 F.3d at 262, 272. The Third Circuit affirmed. *Id.* at 274.

***14** Here, as in *Gates*, the certification of a liability-only issue class is not warranted due to the complexity of the case and the limited efficiencies to be gained by granting partial certification. Answering the questions of "whether Defendants discharged PFAS into the environment" and "whether those discharges contaminated municipal and private water systems" will not fully establish causation where, as here, there are multiple Defendants, multiple contaminants, and likely alternative sources of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

contamination. Recognizing the complexities involved in environmental contamination cases, the Third Circuit has explained that “[s]ingle instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways.” *Gates*, 655 F.3d at 271; *see also* *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F. Supp. 3d 646, 657 (E.D. Pa. 2022) (denying issue class certification where the case “involve[d] multiple instances of exposure and injuries that will vary significantly from property to property” and the “theories of causation and extent of injury also turn[ed] on several complex factors” that could not be established on a class-wide basis).

Similarly, determining “whether Defendants' conduct breached applicable duties of care” will require separate analyses for each Defendant to account for Defendants' disparate geographic locations and roles in the alleged contamination. [18] Defendants' alleged breach “does not easily separate from the individual issues of injury, causation, and damages.” *See* *Derrick v. Glen Mills Schs.*, 2024 WL 2134340, at *15 (E.D. Pa. May 13, 2024) (citing *Gates*, 655 F.3d at 273). To the extent that Plaintiffs establish a common legal duty applicable to all Defendants, Plaintiffs have not shown that resolution of the issue would result in significant efficiency gains. And certification of an issue class on matters of duty and breach is also likely to adversely impact the effectiveness and fairness of resolving the remaining issues. For example, if it is determined that a particular Defendant breached a duty, that Defendant may be pressured to settle even if the breach did not ultimately cause the alleged harm. *See* *Russell*, 15 F.4th at 272.

On balance, the *Gates* factors weigh against certification of the proposed issue class. Plaintiffs have not shown that certification of the issue class would meaningfully advance the litigation. Moreover, Plaintiffs' eleventh hour pivot to seek certification of the proposed issue class suggests Rule 23(c)(4) is being invoked “merely to postpone confronting difficult certification questions.” 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1790 (3d ed. 2025). “Unlike a situation in which a Rule 23(c)(4) class might be appropriate because liability is capable of classwide treatment but damages are not, Plaintiffs offer no theories of liability for which classwide treatment is apt.” *Gonzalez v. Corning*, 885 F.3d 186, 202-03 (3d Cir. 2018). Consequently, I recommend that the court DENY Plaintiffs' motion for certification of an issue class under Rule 23(c)(4).

### C. Blades Development's Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, “[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and “a dispute about a material fact is ‘genuine’ if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.” *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

***15** The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See* *Celotex*, 477 U.S. at 322–23. The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989). The court must draw all reasonable inferences in favor of the nonmoving party without weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

Before filing the pending motion for summary judgment, Blades Development moved to dismiss for failure to state a claim on December 23, 2021. (D.I. 115) In pertinent part, Blades Development argued that its entry into the BDA with DNREC immunized it from liability for trespass and nuisance arising from the site under 7 *Del. C.* § 9125 of the Delaware Hazardous Substances Cleanup Act (“DHSCA”). (D.I. 116 at 4-6) On August 4, 2022, the court issued a Report and Recommendation rejecting Blades Development's immunity argument. (D.I. 135) Specifically, the court questioned whether 7 *Del. C.* § 9125 could immunize a Brownfields Developer

from tort liability to private parties resulting from the developer's ownership and use of its land. (*Id.* at 23) The court indicated that the immunity provided by Section 9125 appeared to be limited to immunity from liability for claims arising under the DHSCA, and Blades Development cited no authority to suggest that the DHSCA preempts common law actions for trespass or nuisance. (*Id.*) Nonetheless, the court confirmed that Blades Development could challenge liability for trespass and nuisance in case dispositive motions at the appropriate time, so long as it supported those arguments with evidence:

> One might question whether Plaintiffs are likely to prevail against Blades Development given that DNREC apparently thought in 2007 that the Peninsula site required no further cleanup action. But it is not the role of the Court to assess likelihood of success at the motion to dismiss stage. All I can say now is that Blades Development has not persuaded me that it is immune from liability to Plaintiffs under 7 *Del. C.* § 9125. Blades Development is free to reraise its arguments against liability —and to cite evidence in support of its arguments—at the appropriate time in a later stage of the case.

(*Id.*) On August 19, 2022, the Report and Recommendation was adopted. (D.I. 137)

Instead of overcoming the deficiencies previously identified by the court at the pleading stage, Blades Development raises the same immunity argument in its motion for summary judgment. (D.I. 460 at 4-7) The argument is largely copy/pasted from Blades Development's brief in support of its motion to dismiss, and it references the same exhibits cited in support of the motion to dismiss. (*Compare* D.I. 460 at 4-7 *with* D.I. 116 at 4-6) [19] Blades Development does nothing to address or resolve the court's concern that "[t]he texts of §§ 9105 and 9125, and their placement in the DHSCA, suggest that the immunity provided by § 9125 might be limited to immunity from liability for claims arising under the DHSCA." [20] (D.I. 135 at 23)

***16** Blades Development contends that the court invited it to revisit this argument at a later stage in the litigation. (D.I. 460 at 2-3) Nothing in the prior Report and Recommendation suggests that Blades Development was free to recycle the same immunity argument on summary judgment without further development of the factual record or citation to supporting legal authority. In fact, the court expressly instructed Blades Development "to cite evidence in support of its arguments" if it chose to "reraise its arguments against liability[.]" (D.I. 135 at 23) Denial of Blades Development's motion for summary judgment is warranted on this basis alone. *See Price v. Kozak*, 569 F. Supp. 2d 398, 407 (D. Del. 2008) (denying motion for summary judgment that raised same exhaustion argument previously raised in support of a motion to dismiss, without the presentation of additional evidence).

Consideration of the immunity argument on the merits does not alter the court's recommendation. Case authority cited by Plaintiffs supports the court's prior assessment of Blades Development's immunity argument. In *Garvin v. Booth*, the Delaware Superior Court explained that the intent of the DHSCA is to "requir[e] the prompt cleanup of hazardous substances to protect Delaware's citizens' welfare and environment." 2022 WL 247696, at *9 (Del. Super. Ct. Jan. 27, 2022). [21] To achieve this goal, the DHSCA "permits DNREC to identify a site, create a plan for cleanup, and then contract with private parties to remediate the site so ... those parties can develop them." *Id.* at *10. The purpose of the DHSCA, as articulated by *Garvin*, is to govern the remediation of contaminated sites and the recovery of remedial costs incurred in the restoration process. *Id.*; *see also Clark v. Teveen Holding Co., Inc.*, 625 A.2d 869, 879 (Del. Ch. 1992) ("7 *Del. C.* § 9105(d) provides an express private right to contribution or reimbursement against other responsible parties on behalf of a claimant who expended money performing a remedial action in satisfaction of the substantive requirements of the statute."). Blades Development has


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

still cited no authority supporting an expansion of the DHSCA's immunity provision to govern liability for common law tort claims.

Even if the DHSCA could be read to immunize a property owner from common law claims for trespass and nuisance, Blades Development cites no evidence that the BDA or the COCR covers liability for the alleged PFAS contamination at issue here. Plaintiffs' statement of facts states that "[t]he remedial action carried out by DNREC at the site did not test for or address PFAS contamination" and, consequently, neither the COCR nor the BDA addressed PFAS contamination discovered after the COCR was issued. (D.I. 462-16 at ¶¶ 5-7) The accompanying evidence shows that the alleged PFAS contamination was not among the "existing environmental conditions" addressed by the BDA. (D.I. 462 at 8-11; *see* D.I. 460, Ex. at ¶ 6) Specifically, the Phase II Site Investigation Report issued in February of 2007 shows sampling results tested for various metals, cyanide, certain specified volatile and semi-volatile compounds, pesticides, poly chlorinated biphenyls, and poly cyclic aromatic hydrocarbons, but not for PFAS. (D.I. 462, Ex. C at 7-10, 18) The EPA Superfund Program proposed plan from June of 2023 further confirmed that "[i]nvestigations prior to 2018 did not include the collection or analysis of PFAS." (*Id.*, Ex. F at 4) Blades Development cites no evidence contradicting Plaintiffs' representation that the BDA did not contemplate PFAS contamination. (D.I. 460)

***17** Blades Development appears to abandon the argument that the BDA and/or the COCR immunize it from liability in its reply brief (D.I. 469) Instead, Blades Development raises new arguments in reply. Specifically, Blades Development contends that it is not responsible for contamination that occurred before it assumed ownership of the site and faults Plaintiffs for failing to provide evidence that the PFAS contamination originated from the property owned by Blades Development. (*Id.* at 1-5) Blades Development is not permitted to reserve material for a reply brief that could and should have been included in the opening brief. *Fed. Election Comm'n v. O'Donnell*, 209 F. Supp. 3d 727, 737 (D. Del. 2016) (citing D. Del. LR 7.1.3(c)(2)); *see also In re Niaspan*, 67 F.4th at 135 ("Arguments raised for the first time before a district court in a reply brief are deemed forfeited.").

Even if the court were to consider the new arguments raised in Blades's reply brief, the recommended outcome would remain the same. In their concise statement of facts, Plaintiffs cite evidence supporting their assertions that: (i) the EPA identified the presence of PFAS at the Peninsula site and designated the site as a likely source of groundwater contamination in Blades; (ii) the remedial action carried out by DNREC at the Peninsula site did not test for or address PFAS contamination; and (iii) Blades Development has not undertaken any action to remediate the PFAS contamination on the Peninsula site despite knowledge of PFAS migration from its site into the groundwater in Blades. (D.I. 462-16) Blades Development does not provide a counterstatement of facts and cites no evidence in support of the new arguments in its reply brief. Instead, Blades Development alleges that "Plaintiffs provide no evidence that PFAS originated from Blades Development's site and infiltrated the groundwater of the Town of Blades—let alone that such contamination occurred after Blades Development owned the property at issue." (D.I. 469 at 1) These allegations confirm the existence of genuine issues of material fact, including whether the PFAS groundwater contamination can be attributed to the Peninsula site, whether the PFAS contamination continued to migrate from the Peninsula site after Blades Development acquired the property, and/or whether any such migration or continued contamination is attributable to Blades Development's failure to remediate known PFAS contamination at the site. The existence of disputed issues of fact precludes the entry of summary judgment.

## III. CONCLUSION

For the foregoing reasons, I recommend that the court: (1) DENY Defendants' motion to exclude Dr. Laton's testimony, (D.I. 437); (2) DENY Plaintiffs' motion for class certification, (D.I. 464); and (3) DENY Blades Development's motion for summary judgment, (D.I. 459).

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties

shall jointly submit a proposed redacted version by no later than **February 17, 2026**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549. 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Report and Recommendation issued.

***18** This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ, P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

**All Citations**

Slip Copy, 2026 WL 967253

## Footnotes

1 Since the pending motion to exclude was filed, defendants 3M, EIDP, and MacDermid have been terminated from this action. (D.I. 412; D.I. 451) As used herein, the term "Defendants" refers to remaining defendants Atotech, Procino, and Blades Development.

2 The briefing and filings associated with Defendants' motion to exclude the testimony of Dr. Laton are found at D.I. 438, D.I. 467, D.I. 476, and D.I. 477.

3 The briefing and filings associated with the pending motion for class certification are found at D.I. 356, D.I. 431, D.I. 432, D.I. 463, D.I. 481, D.I. 482, D.I. 487, and D.I. 492.

4 The briefing and filings associated with Blades Development's motion for summary judgment are found at D.I. 460, D.I. 462, and D.I. 469.

5 Plaintiffs did not include certification of the issue class among the requested relief in their motion for class certification. (D.I. 355; D.I. 464) However, they discussed a Rule 23(c)(4) issue class in their original briefing on class certification as an alternative argument. (D.I. 356 at 23-25; D.I. 463 at 13-15) On this record, the court declines to find that Plaintiffs waived or forfeited their argument under Rule 23(c)(4) in this case.

6 Plaintiffs distinguish two precedential Third Circuit cases on their facts without discussing how any of the factors applicable to a Rule 23(c)(4) issue class are satisfied in this case. (D.I. 492 at 3) (distinguishing *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259 (3d Cir. 2021)). Plaintiffs highlight the Third Circuit's critique of the district court's failure to analyze the issue class factors in *Russell*

without offering any meaningful discussion of whether and how the court should consider those factors in the instant case. (*Id.*)

7 According to the Environmental Protection Agency's website, "[a] brownfield is a property where expansion, redevelopment or reuse may be complicated by the presence or potential presence of a hazardous substance, pollutant or contaminant." *Overview of EPA's Brownfields Program*, EPA, https://www.epa.gov/brownfields/about (last visited February 9, 2026).

8 Although the BDA was executed by DNREC and "The Putnam Group and/or its assigns," the parties do not appear to dispute that Blades Development is subject to the terms of the BDA. (D.I. 460 at 2, 4, Ex. B at 1; D.I. 462 at 2)

9 *See* DNREC, "Blades Groundwater Site" (https://dnrec.delaware.gov/waste-hazardous/remediation/bladesgroundwater-site) (https://archive.is/shQHY) (last visited February 9, 2026).

10 The Third Circuit has articulated numerous non-dispositive factors to assist in determining whether "good grounds" support an expert's potential testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 520 F.3d at 247-48.

11 The maps included in this Report and Recommendation are included to show the colored dots indicating the location of alleged PFOA and PFOS contamination in relation to the class boundary proposed by Dr. Laton, indicated in pink in the third map. Although the text in the maps and corresponding legends is not legible due to the scaling of the images, that text does not reflect the primary purpose for which the maps are included.

12 In response to the court's inquiry after Plaintiffs introduced their proposed Rule 23(c)(4) issue class, Defendants represented that they were "not withdrawing any parts of their briefing on the ... motion to exclude the testimony of Dr. Laton." (D.I. 487 at 4)

13 Although Plaintiffs' proposed issue classes were not raised in the original complaint or the notice of removal, jurisdiction under 28 U.S.C. § 1332(d) is determined at the time a claim is filed or removed. *Coba v. Ford Motor Co.*, 932 F.3d 114, 119 (3d Cir. 2019). Thus, Plaintiffs' modification of the class definition and/or the recommendation to deny Plaintiffs' motion for class and/or issue certification do not divest the court of subject matter jurisdiction under CAFA, which was previously established by the court in this matter. *Id.*; (D.I. 200; D.I. 202).

14 In the briefing on their motion for class certification, Plaintiffs did not present any argument under Rule 23(b)(1) or (2) and instead limited their argument to the application of Rule 23(b)(3). (D.I. 356 at 19-23; D.I. 463 at 8-13) Plaintiffs did not separately address any of the requirements under Rule 23(a) or (b) in their submissions made in support of the proposed issue class under Rule 23(c)(4). (D.I. 487 at 1; D.I. 492)

15 Plaintiffs withdrew the testimony of their toxicology expert, Dr. Ducatman, who identified a list of ailments allegedly associated with PFAS exposure. (D.I. 356, Ex. 8 at 2; D.I. 487 at 1) Plaintiffs

also fail to identify any evidence of record associating Caporale's ailments with PFAS exposure. (*Cf.* D.I. 432, Ex. G at 12)

16 Plaintiffs did not redefine the class area when they withdrew their proposed personal injury and property classes, nor did they include a new definition of the class boundary when they first articulated their proposed issue class definition pursuant to the court's August 25, 2025 Oral Order. (D.I. 481; D.I. 487 at 1; 8/25/2025 Oral Order)

17 Plaintiffs had the opportunity to support their proposed "class area" by referring to Dr. Laton's affidavit in their definition of the "proposed class boundary" in the original proposed class definitions, in their initial letter asserting the proposed issue class, and/or in the joint letter setting forth their proposed issue class definition. (D.I. 356 at 7; D.I. 481; D.I. 487) They did not do so. Plaintiffs cite to Dr. Laton's affidavit twice in their opening brief on class certification. Neither citation refers to the map at Exhibit J purportedly identifying the "Impacted Area." (D.I. 356 at 8 & n.26, 19 & n.42)

18 The briefing on Blades Development's motion for summary judgment, discussed at Section II.C, *infra*, illustrates some of these distinctions. (D.I. 460; D.I. 462; D.I. 469) Unlike Procino, Blades Development allegedly acquired the Peninsula site as a Brownfields Developer after the PFAS contamination occurred. (D.I. 462-16 at ¶¶ 4, 7-10)

19 The only new portion of Blades Development's argument on summary judgment is its citation to 7 *Del. C.* § 9105(c)(2), which provides that the operator of a facility is immune from liability when it "had no knowledge or reason to know of any release or imminent threat of release" at the time it acquired the facility. (D.I. 460 at 6) For the reasons described herein, Blades Development has not established that Section 9105(c)(2), or any other provision of the DHSCA, governs liability for any claim beyond the costs of remediation of a contaminated site.

20 Blades Development asserts that "the BDA agreement ... immunizes Blades Development from claims arising under [the DHSCA]," but Plaintiffs have not brought a cause of action against Blades Development for violations of the DHSCA. (D.I. 460 at 4)

21 Although Plaintiffs cited *Garvin* in their answering briefs to both the motion to dismiss and the pending motion for summary judgment, Blades Development did not address *Garvin* in any of its briefing on those two motions. (D.I. 121 at 14; D.I. 129; D.I. 460; D.I. 462 at 6-7; D.I. 469)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

3

KeyCite Yellow Flag
Distinguished by Monaco v. City of Jacksonville, M.D.Fla., September 30, 2014

2011 WL 1559792
United States District Court,
W.D. Pennsylvania.

Gary CHEDWICK, Individually, and on behalf of a group of similarly situated individuals, Plaintiff,
v.
UPMC d/b/a University of Pittsburgh Medical Center, Defendant.

Civil Action No. 07–806.
|
April 21, 2011.

**Attorneys and Law Firms**

Gregory G. Paul, Morgan & Paul, PLLC, R. Bruce Carlson, Stephanie K. Goldin, Carlson Lynch, Sewickley, PA, Gary F. Lynch, Carlson Lynch Ltd, New Castle, PA, for Plaintiff.

Pamela G. Cochenour, Eric P. Reif, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for Defendant.

***MEMORANDUM OPINION AND ORDER OF COURT***

McVERRY, District Judge.

***1** Before the Court for disposition are the PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (*Document No. 57* ), the Plaintiff's brief and exhibits in support of class certification (*Document No. 58* ), and the Defendant's brief and appendix in opposition to class certification (*Document No. 62* ). For the reasons that follow, the Plaintiff's Motion for Class Certification will be denied.

***Procedural History***

The procedural background to this controversy dates back to August 1, 2005, when Carole C. Bolden ("Bolden"), a former employee of Magee–Women's Hospital of the University of Pittsburgh Medical Center ("Magee"), commenced an action ("Bolden Action") against Magee under the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12101 *et seq.*]. Civil Action No. 05–1063, ECF No. 1. Bolden alleged that Magee had unlawfully terminated her employment pursuant to a policy providing that an employee could not remain on medical leave for more than six months. *Id.* at ¶ 36. On May 30, 2006, Bolden sought leave to file an amended complaint in class action based on Magee's alleged violations of both the ADA and the Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*]. Civil Action No. 05–1063, ECF No. 15. The amended complaint proposed by Bolden would have added Valentina Tish ("Tish"), another former employee of Magee, as a plaintiff. Civil Action No. 05–1063, ECF No. 15–2. The Court denied Bolden's request for leave to amend on June 13, 2006. Civil Action No. 05–1063, ECF No. 17. In denying the request, the Court explained that the "proposed transformation" of the case into a class action would "unduly delay" its resolution, and that disability-based discrimination claims of the kind asserted by Bolden were not typically amenable to adjudication within the context of a class action. *Id.* at 1.

Tish responded on June 21, 2006, by filing a separate action ("Tish Action") against Magee, alleging that she had been discharged in violation of the Rehabilitation Act. Civil Action No. 06–820, ECF No. 1. Her complaint included class allegations under both the ADA and the Rehabilitation Act. *Id.* at ¶¶ 20–29. Magee filed a motion to dismiss on July 26, 2006, seeking the dismissal of Tish's ADA claims on the ground that she had not exhausted her administrative remedies with the Equal Employment Opportunity Commission ("EEOC"). Civil Action No. 06–820, ECF No. 3.

During the course of a status conference conducted on August 11, 2006, the Court permitted Bolden to renew her request for leave to file an amended complaint. Four days later, Tish responded to Magee's motion to dismiss by filing a motion for joinder pursuant to Federal Rule of Civil Procedure 20. Civil Action No. 06–820, ECF No. 8. She sought to join her action with the Bolden Action. *Id.* Bolden's renewed motion

for leave to amend was filed on August 25, 2006. Civil Action No. 05–1063, ECF No. 23. The Court denied Bolden's motion on October 5, 2006, repeating its earlier admonition that the allegations contained in the proposed amended complaint were "not the sort of claims that would ordinarily be appropriate for resolution in a class action." Civil Action No. 05–1063, ECF No. 27 at 5. In a memorandum order dated October 17, 2006, the Court granted Magee's motion to dismiss Tish's ADA claims and denied Tish's motion for joinder. Civil Action No. 06–820, ECF No. 8.

***2** On October 25, 2006, Tish filed an amended complaint purporting to add Gary Chedwick ("Chedwick"), Barbara Fowler ("Fowler"), Gloria Hamlett ("Hamlett"), and Terri Walsh ("Walsh") as plaintiffs and the University of Pittsburgh Medical Center ("UPMC"), UPMC Shadyside, UPMC St. Margaret and UPMC Montefiore as defendants. Civil Action No. 06–820, ECF No. 11. The UPMC entities filed a motion to strike the amended complaint on November 8, 2006. Civil Action No. 06–820, ECF No. 13. The motion to strike was accompanied by an alternative motion to sever filed pursuant to Federal Rule of Civil Procedure 21. *Id.* Five days later, Magee moved for summary judgment in the Bolden Action. Civil Action No. 05–1063, ECF No. 28.

In a memorandum opinion and order dated April 24, 2007, the Court granted Magee's motion for summary judgment in the Bolden Action. *Bolden v. Magee Women's Hospital,* Civil Action No. 05–1063, 2007 WL 1228479, 2007 U.S. Dist. LEXIS 30127 (W.D.Pa. Apr. 24, 2007). In a separate memorandum opinion and order issued that same day, the Court treated Tish's filing of an amended complaint in the Tish Action as an implied request for leave to amend, granted that request, and denied the motion to strike that had been filed by the UPMC entities. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2007 WL 1221137, at *6–8, 2007 U.S. Dist. LEXIS 30130, at *15–22 (W.D.Pa. Apr. 24, 2007). In order to alleviate any prejudice to the UPMC entities, the Court granted their alternative motion to sever and directed Chedwick, Fowler, Hamlett and Walsh to refile their actions as separate cases. *Id.*

Pursuant to the severance order, Chedwick commenced this action against UPMC on June 15, 2007, alleging violations of the ADA and the Rehabilitation Act. ECF No. 1. His complaint included class allegations. *Id.* at ¶¶ 29–39. On August 28, 2007, UPMC moved to dismiss Chedwick's class allegations, arguing that they were violative of the severance order. ECF No. 3 at ¶¶ 35–41. The Court rejected UPMC's argument on December 12, 2007, holding that the severance order entered in the Tish Action did not preclude Chedwick from seeking class certification in this case. *Chedwick v. UPMC,* 619 F.Supp.2d 172, 187–190 (W.D.Pa.2007).

On June 8, 2008, the United States Court of Appeals for the Third Circuit affirmed this Court's decision which granted summary judgment in favor of Magee in the Bolden Action. *Bolden v. Magee Women's Hospital,* 281 Fed. Appx. 88 (3d Cir.2008). Eight days later, Magee filed a motion for summary judgment in the Tish Action. Civil Action No. 06–820, ECF No. 29. The motion was denied on October 27, 2008. *Tish v. Magee–Women's Hospital,* Civil Action No. 06–820, 2008 WL 4790733, 2008 U.S. Dist. LEXIS 87010 (W.D.Pa. Oct. 27, 2008). The parties later stipulated to the dismissal of the Tish Action after advising the Court that they had decided to resolve their dispute through settlement. Civil Action No. 06–820, ECF Nos. 47–49.

***3** *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169 (3d Cir.2009), was decided by the Third Circuit Court of Appeals on July 23, 2009. In *Hohider,* the Court of Appeals reversed a class-certification order which had been entered in a case involving alleged violations of the ADA. *Hohider,* 574 F.3d at 171. Speaking through Chief Judge Scirica, the Court of Appeals explained that a determination as to whether the defendant had engaged in the pattern of unlawful discrimination alleged by the plaintiffs would "encompass inquiries" that were "too individualized and divergent" with respect to the defined class to warrant certification under Federal Rule of Civil Procedure 23. *Id.* at 186.

UPMC filed a motion for partial summary judgment on September 30, 2009, contending that *Hohider* precluded the Court from certifying a class in this case. ECF Nos. 32 & 33. The motion was not accompanied by evidentiary submissions. ECF No. 33 at 1, n. 1. In essence, UPMC argued that cases


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

involving alleged violations of the ADA and the Rehabilitation Act were *categorically* outside of the certification criteria contained in Rule 23, and that *Hohider* had foreclosed any possibility that a class could be certified in this case. *Id.* at 4–6. The Court denied the motion on November 9, 2009, holding that "cases brought under the ADA and the Rehabilitation Act [were] not *categorically* beyond the purview of Rule 23." *Chedwick v. UPMC,* 263 F.R.D. 269, 276 (W.D.Pa.2009) (emphasis in original).

Chedwick filed a motion for class certification on November 30, 2010, seeking to certify a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. That motion is the subject of this memorandum opinion.

### *Standard of Review*

The standards for determining whether a class should be certified are governed by Federal Rule of Civil Procedure 23. Subsections (a) and (b) of Rule 23 provide:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> ***4** (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(a)-(b). In order to establish entitlement to class certification, a party must satisfy all four of the prerequisites found in Rule 23(a) and at least one of the criteria found in Rule 23(b). *Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 147 (3d Cir.2008). A motion for class certification does not justify "a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action ." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732

(1974). Nevertheless, there are circumstances in which the issues relevant to class certification are entangled with the merits of a claim. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). A court presented with a motion for class certification may not decline to resolve factual disputes relevant to the applicable class-certification requirements merely because they overlap with the factual issues surrounding an underlying cause of action. *In re: Hydrogen Peroxide Antitrust Litigation,* 552 F.3d 305, 316 (3d Cir.2008). Although the factual findings made by a court in this context are conclusive for the purpose of class certification, they do not bind the trier of fact when the merits of the underlying claims are considered. *Id.* at 318. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

### *Factual Background*

Chedwick allegedly suffers from post-traumatic stress disorder ("PTSD") as a result of his military service during the conflict in Vietnam. ECF No. 1 at ¶ 11. He was employed by UPMC as an Interface Analyst III prior to the events at issue in this case. ECF No. 1 at ¶ 10. On November 19, 2003, Chedwick left his work station without authorization. ECF No. 62–5 at 2. UPMC responded by requiring Chedwick to serve an uncompensated suspension from November 24, 2003, through November 28, 2003. ECF No. 62–5 at 3. John Truxal ("Truxal"), Chedwick's supervisor, and Rhonda Larimore ("Larimore"), UPMC's Human Resources Manager, met with Chedwick on December 8, 2003, to discuss his past conduct and their expectations concerning his future performance. ECF No. 62–19 at 2–4. During the course of a deposition conducted on September 23, 2010, Chedwick acknowledged that he had left his work station without the permission of his superiors, and that UPMC had been justified in suspending him without pay for five days. ECF No. 62–4 at 11–12; Chedwick Dep. at 32, 35.

***5** Chedwick never returned to work after the meeting of December 8, 2003. ECF No. 62–4 at 12; Chedwick Dep. at 35. During the meeting, he attributed his conduct to his PTSD. ECF No. 62–19 at 2. The Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*] provides that an eligible employee is "entitled to a total of 12 workweeks of leave during any 12–month period for ... a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Chedwick formally requested a leave of absence on January 16, 2004, claiming that he was being treated for "severe depression" and PTSD. ECF No. 62–6 at 2. His request was approved, and he started to receive disability benefits pursuant to UPMC's policy with UNUM Provident. ECF No. 1 at ¶ 16.

In a letter dated March 24, 2004, Matthew Rimer ("Rimer"), a UPMC Human Resources Generalist, informed Chedwick that his FMLA leave was about to expire on March 30, 2004, and that he was expected to return to work on that date. ECF No. 62–7 at 2. Rimer's letter also stated that UPMC's corporate policy provided Chedwick with the option to apply for a personal leave of absence lasting up to fourteen weeks if he was not ready to resume his duties following the expiration of his FMLA leave. *Id.* Chedwick exercised this option and remained on leave for an additional fourteen weeks.

On July 2, 2004, Larimore sent Chedwick a letter which stated the following:

> Your 26–week leave of absence (combination of FMLA and personal leave) expires on July 6, 2004. The University of Pittsburgh Medical Center policy states that the total amount of leave may not exceed 26 weeks in any rolling 12–month period. As such, you will be removed from the University of Pittsburgh Medical Center's payroll and your employment terminated effective July 6, 2004. You will continue to receive Short Term Disability or Long Term Disability benefits as approved through UNUM Provident. Information regarding options for post-employment continuation of your health insurance benefits (COBRA) will be forwarded to you as well.
>
> Should you wish to reapply for employment with the University of Pittsburgh Medical Center after you are fully released by your physician, please visit upmc.com to apply online. Please contact me at (412) 647–1955 if you have any questions regarding this matter.

Thank you for your contributions to the University of Pittsburgh Medical Center. I wish you a quick recovery, and the best of luck in the future.

ECF No. 62–9 at 2. UNUM Provident proposed a "return-to-work plan" permitting Chedwick to perform some of his duties at home and some of his duties at UPMC's facility, but UPMC rejected that idea. ECF No. 62–4 at 21; Chedwick Dep. at 49. Chedwick's employment relationship with UPMC was terminated on July 6, 2004.

During the fall of 2005, UNUM Provident determined that Chedwick's medical condition had improved enough to facilitate his return to work. This determination was communicated to UPMC on October 7, 2005, by means of a letter from Stephanie Perry ("Perry"), a Lead Disability Benefits Specialist for UNUM Provident, to Jodi Clark ("Clark"), a UPMC employee. ECF No. 62–12 at 2. UNUM Provident provided Chedwick with three months of advanced benefits and closed his disability claim as of January 1, 2006. *Id.* The advanced benefits were provided in order to give Chedwick sufficient time to secure gainful employment. *Id.* Chedwick was also afforded the benefit of vocational counseling. *Id.*

***6** In October 2005, Chedwick started to submit applications for vacant positions advertised by UPMC. ECF No. 62–4 at 9; Chedwick Dep. at 23. He avers that he applied for at least twenty-eight different positions, including the position that he had previously held. ECF No. 1 at ¶ 20. Chedwick further alleges that UPMC never considered him for these positions because he was suffering from PTSD. *Id.* at ¶ 21.

Chedwick filed a charge of discrimination with the EEOC on August 14, 2006, alleging that UPMC had discharged him, and refused to rehire him, because of his "disability."[1] ECF No. 62–3 at 3–4. After exhausting his administrative remedies with the EEOC, Chedwick sought to become a plaintiff in the Tish Action by means of the amended complaint filed on October 25, 2006. Civil Action No. 06–820, ECF No. 11. He commenced this action against UPMC on June 15, 2007, in accordance with the severance order of April 24, 2007. ECF No. 1 at ¶ 4.

***Discussion***

**A. Overview**

Title I of the ADA contains provisions which govern the conduct of covered employers in relation to their current and prospective employees. 42 U.S.C. §§ 12101–12117. Title I's anti-discrimination provision, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[2] 42 U.S.C. § 12112(a). The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "discrimination" prohibited by § 12112(a) is defined broadly enough to include a covered entity's failure or refusal to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity," or its "den[ial of] employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation[s] to the physical or mental impairments of the employee or applicant ....“ 42 U.S .C. § 12112(b)(5)(A)-(B). In this context, "reasonable accommodations" may include "job restructuring," a "part-time or modified" work schedule, or a "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Section 504 of the Rehabilitation Act, which is codified at 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....“ 29 U.S.C. § 794(a). The standards used for determining whether a recipient

of federal funding has violated this statutory provision in the employment setting are identical to those used for determining whether a covered entity has violated Title I of the ADA. 29 U.S.C. § 794(d). Chedwick avers that UPMC is both a "covered entity" within the meaning of the ADA and a recipient of federal financial assistance under the Rehabilitation Act. ECF No. 1 at ¶¶ 7–9; 29 U.S.C. § 794(b); 42 U.S.C. § 12111(2), (5)(A).

***7** The complaint alleges violations of both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 10–28. When he filed his EEOC charge, Chedwick listed October 20, 2005, as the *earliest* date on which he had been subjected to discrimination prohibited under the ADA. ECF No. 62–3 at 3. As the Court has already explained, Chedwick's ADA claims concern only UPMC's conduct relating to the job applications submitted on or after October 20, 2005. *Chedwick,* 619 F.Supp.2d at 178–181. On August 28, 2007, UPMC moved for the dismissal of Chedwick's ADA claims to the extent that they were based on the termination decision of July 6, 2004, contending that they had not been exhausted before the EEOC within the applicable 300–day charging period. ECF No. 3 at ¶¶ 29–34. The Court granted that portion of UPMC's motion "for the sake of clarity," since the language of the complaint was "somewhat confusing" as to whether Chedwick was relying on the ADA to challenge his discharge. *Chedwick,* 619 F.Supp.2d at 180. It was noted that Chedwick's "failure-to-hire" claims had been properly exhausted, since they were based on "separate and distinct" violations of the ADA. *Id.*

In support of its motion to dismiss, UPMC also argued that Chedwick could not challenge his discharge under the Rehabilitation Act, since his complaint had been filed more than two years after the termination decision. ECF No. 4 at 5–7. This argument was squarely rejected. Relying on the decision of the United States Supreme Court in *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Court held that the Rehabilitation Act claims concerning Chedwick's discharge, to the extent that they were based on a "failure-to-transfer" theory that would not have been viable under the pre–1992 version of the Rehabilitation Act, had been properly asserted within the four-year limitations period applicable under 28 U.S.C. § 1658(a). *Chedwick,* 619 F.Supp.2d at 181–187. This Court's reasoning as to that issue was subsequently adopted by the United States Court of Appeals for the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206–209 (3d Cir.2009).[3] Therefore, Chedwick clearly has a claim before the Court relating to UPMC's discharge decision of July 6, 2004.[4]

Throughout the course of this litigation, Chedwick has consistently maintained that UPMC discharged him, and refused to rehire him, because of an actual or perceived disability. ECF No. 1 at ¶¶ 23–24. A plaintiff seeking to establish a *prima facie* case of discrimination under the ADA or the Rehabilitation Act must ordinarily show both that he or she suffers from an actual or perceived "disability" (*i.e.,* "a physical or mental impairment that substantially limits one or more [of his or her] major life activities") and that he or she is "qualified" for the position held or desired (*i.e.,* capable of performing the "essential functions" of the position "with or without reasonable accommodation"). 42 U.S.C. §§ 12102(1)(A), 12111(8); *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998). In *Hohider,* the Court of Appeals concluded that the inquiry as to whether the proposed class members were "qualified" for their respective positions would require too many "individualized and divergent" determinations to facilitate the adjudication of their claims on a classwide basis. *Hohider,* 574 F.3d at 185–186. Nonetheless, the Court of Appeals suggested that a case involving alleged violations of the ADA or the Rehabilitation Act could be maintained as a class action if the class definition contained sufficient "unifying or limiting criteria" to make individualized inquiries unnecessary. *Id.* at 189 ("The class, as defined, contains no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation."). When UPMC moved for partial summary judgment on the ground that *Hohider* had rendered Chedwick incapable of pursuing class certification in this case, the Court determined that Chedwick should be afforded the opportunity to pursue class certification within the parameters outlined in that decision. *Chedwick,* 263 F.R.D. at 276.

**B. The Improper "Use" Theory**

***8** Chedwick now appears to concede that he cannot identify the "unifying or limiting criteria" necessary to obtain class certification under *Hohider.* Expressing an intent to pursue his "discrimination" claims "on an individual basis," he seeks to certify a class "for the sole purpose" of proceeding under 42 U.S.C. § 12112(d), which governs the permissible scope and use of medical examinations and inquiries under the ADA. ECF No. 58 at 2. Chedwick contends that UPMC's policies result in the "improper use of medical examinations and inquiries," and that this "improper use" caused him and other potential class members to lose their jobs. ECF No. 58 at 2.

Before considering whether class certification is appropriate, the Court must briefly review the UPMC policies at issue. UPMC maintains a policy providing for the automatic termination of any employee who remains on leave for more than twenty-six weeks during the course of a given twelve-month period. ECF No. 58–1 at 1, 15, 27, 37, 49, 59, 71. An employee who is unable to return to his or her previous position but nevertheless wishes to remain employed by UPMC can obtain an alternative position only by submitting a formal application. ECF No. 58–2 at 22–23; Croushore Dep. at 122–123. Larimore's letter of July 2, 2004, constitutes direct evidence that Chedwick was discharged pursuant to this policy. ECF No. 62–9 at 2.

UPMC also has a Return to Work ("RTW") Assistance Program designed to assist an employee who is able to return to work in some capacity but temporarily unable to perform all of his or her previous duties. ECF No. 58–1 at 10, 23, 33, 45, 55, 67, 77. An employee who wishes to participate in the RTW program must provide medical documentation from a treating physician detailing his or her functional limitations. ECF No. 58–1 at 10, 23, 34, 45, 56, 67, 77. A returning employee who is able to perform the "essential functions" of his or her previous position "with appropriate modifications" is eligible to participate in the program. *Id.* If an employee cannot immediately return to his or her previous position, he or she may participate in the program by accepting a temporary assignment that is consistent with his or her abilities and limitations. *Id.* In either case, a participating employee must be able to work at least 50% of his or her previously-scheduled hours. *Id.* Participation in the RTW program is limited to twenty-six weeks, at which point an employee who "has not found a regular position at UPMC" will be terminated. ECF No. 58–1 at 11, 24, 34, 46, 56, 68. Linda Croushore ("Croushore"), UPMC's Supervisor of Disability Services, testified on August 11, 2010, that the twenty-six week limitations period applicable to an employee's participation in the RTW program begins on the date that he or she returns to work. ECF No. 58–2 at 15; Croushore Dep. at 66. In other words, an employee who has already been on leave for a full twenty-six weeks may participate in the RTW program for an additional twenty-six weeks. *Id.*

***9** An employee seeking a new position at UPMC must submit a formal application regardless of whether he or she is participating in the RTW program. Croushore testified that a returning employee who was performing the duties of a temporary assignment in connection with the RTW program would need to apply for the position if he or she wanted to retain it for more than twenty-six weeks. ECF No. 58–2 at 17; Croushore Dep. at 107. Croushore further explained that such an employee would be in competition with other applicants in his or her attempt to secure the position. ECF No. 58–2 at 18; Croushore Dep. at 108. Since UPMC's policy provides for the termination of any RTW program participant who fails to attain a "regular position" after the expiration of the twenty-six week period, an unsuccessful applicant performing the duties of a temporary assignment would ordinarily be terminated after twenty-six weeks.[5] ECF No. 58–1 at 11, 24, 34, 46, 56, 68, 78.

Chedwick argues that UPMC's policy providing for the automatic termination of any employee who has been on leave for more than twenty-six weeks, or who has participated in the RTW program for twenty-six weeks without securing a permanent position, is violative of the ADA pursuant to the decision of the United States Court of Appeals for the Third Circuit in *Shapiro v. Township of Lakewood,* 292 F.3d 356 (3d Cir.2002). ECF No. 58 at 3–7. UPMC disputes Chedwick's argument and contends that its policy conforms to the ADA and the holding in *Shapiro.* ECF No. 62 at 36–42. That issue need not be resolved at this time, since the only question presently before the Court is whether the matter should be adjudicated within

the context of a class action. *Eisen,* 417 U.S. at 177 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."). The inquiry as to whether class certification is appropriate in this case centers on the extent to which UPMC's policies result in the improper use of medical examinations and inquiries. ECF No. 58 at 2.

Croushore testified that her "Work Partners" office typically assists RTW program participants in their efforts to obtain permanent positions by discussing their abilities and limitations with managers who are seeking to fill vacancies throughout UPMC's various business units. ECF No. 58–2 at 10–11; Croushore Dep. at 57–58. She stated that Work Partners personnel would sometimes try to assure a manager that a returning employee's limitations would not preclude the performance of tasks required under a particular job description. *Id.* Chedwick contends that this form of "assistance" results in the impermissible use of medical information to deny employment opportunities to disabled applicants. ECF No. 58 at 3.

The provisions of the ADA governing medical examinations and inquiries are set forth in § 12112(d), which provides:

***10 (d) Medical examinations and inquiries.**

(1) In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2) Preemployment.

(A) Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B) Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3) Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if—

(A) all entering employees are subjected to such an examination regardless of disability;

(B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this Act shall be provided relevant information on request; and

(C) the results of such examination are used only in accordance with this title.

(4) Examination and inquiry.

(A) Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C) Requirement. Information obtained under subparagraph (B) regarding the medical condition

or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

42 U.S.C. § 12112(d). The ADA's requirements concerning medical examinations and inquiries are incorporated within the Rehabilitation Act by reference. 29 U.S.C. § 794(d); *Lee v. City of Columbus,* ––– F.3d ––––, ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16 (6th Cir.2011); *Doe v. United States Postal Service,* 317 F.3d 339, 340 (D.C.Cir.2003); *Scott v. Napolitano,* 717 F.Supp.2d 1071, 1082, n. 4 (S.D.Cal.2010). Chedwick intimates that UPMC's refusal to rehire him on or after October 20, 2005, was somehow attributable to the improper use of information pertaining to his medical condition. ECF No. 58 at 3–5.

***11** The plain language of the ADA proscribes the discriminatory use of medical examinations and inquires. 42 U.S.C. § 12112(d)(1), (3)(A). A policy requiring only disabled individuals to undergo medical examinations or respond to medical inquiries would clearly violate this statutory proscription. *Harrison v. Benchmark Electronics Huntsville, Inc.,* 593 F.3d 1206, 1213 (11th Cir.2010) (explaining that § 12112(d)(1) incorporates § 12112(a)'s general ban on disability-based discrimination). The remaining provisions of the ADA concerning medical examinations and inquiries relate to three different stages of an employer's relationship with an applicant or employee. Before an offer of employment is made, an employer may not ask a job applicant to undergo a medical examination or inquire as to whether he or she is disabled. 42 U.S.C. § 12112(d)(2)(A). This prohibition is designed "to curtail all questioning" that would identify individuals with disabilities and exclude them from further consideration for employment. *Griffin v. Steeltek, Inc.,* 160 F.3d 591, 594 (10th Cir.1998). Once an offer of employment has been made, a prospective employee may be asked to undergo a medical examination, provided that "all entering employees are subjected to such an examination regardless of disability," the confidentiality requirements of § 12112(d)(3)(B) are adhered to, and the results of the examination are "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3). An "[e]mployment entrance examination" of this kind does not have to be "job-related" or "consistent with business necessity." 29 C.F.R. § 1630.14(b)(3). After an employee's duties have commenced, an employer may not ask him or her to undergo a medical examination or inquire as to whether he or she is disabled "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The primary purpose of this restriction is to prevent covered employers from using unjustified medical examinations and inquiries to discover or expose medical information that could stigmatize disabled employees. *Brownfield v. City of Yakima,* 612 F.3d 1140, 1146 (9th Cir.2010). The propriety of a medical examination or inquiry under § 12112(d)(4)(A) is determined pursuant to an objective standard rather than by reference to an employer's subjective point of view. *Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 518 (3d Cir.2001). An employee may be subjected to a medical examination or inquiry when a physical or mental impairment adversely affects his or her job performance. *Yin v. California,* 95 F.3d 864, 686 (9th Cir.1996). An employer remains free to inquire as to the ability of an applicant or employee "to perform job-related functions" at all times. 42 U .S.C. § 12112(d)(2)(B), (4)(B).

Chedwick argues that class certification in this case is not impeded by *Hohider* because a plaintiff asserting a claim under § 12112(d) is not required to show that he or she is "qualified" or "disabled" within the meaning of the ADA. ECF No. 58 at 2. This contention "simply paints with too broad of a brush." *Chedwick,* 263 F.R.D. at 276. The question of whether a plaintiff seeking to proceed under § 12112(d) must demonstrate that he or she is "qualified" or "disabled" depends on the precise nature of the claim being asserted.

***12** Unlike § 12112(a), which prohibits only discrimination "against a qualified individual on the basis of disability," § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection. 42 U.S.C. § 12112(a), (d); *Fredenburg v. Contra Costa County Dept. of Health Services,* 172 F.3d 1176, 1182 (9th Cir.1999). An applicant or employee who is subjected to an unlawful medical examination or inquiry need not show that he or she is "disabled" in order to maintain an action under § 12112(d). *Fredenburg,* 172 F.3d at 1182. Instead, such an employee can prevail by demonstrating that he or she suffered harm as a result of the examination or inquiry. For instance,

a job applicant who is rejected by an employer on the basis of an illegal pre-offer examination or inquiry may proceed with a claim under § 12112(d)(2)(A) regardless of whether he or she is "disabled." *Griffin,* 160 F.3d at 592–595. In the same vein, an employee need not be "disabled" in order to challenge the propriety or scope of a medical examination or inquiry under § 12112(d)(4)(4). *Conroy v. New York State Dept. of Correctional Services,* 333 F.3d 88, 94–95 (2d Cir.2003); *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1229 (10th Cir.1997). Similarly, harm to an employee resulting from an employer's wrongful disclosure of confidential medical information is actionable under § 12112(d)(3)(B) or (4)(C) irrespective of whether the employee suffers from a "disability." *Cossette v. Minnesota Power & Light,* 188 F.3d 964, 969 (8th Cir.1999); *EEOC v. Ford Motor Credit Co.,* 531 F.Supp.2d 930, 936–943 (M.D.Tenn.2008).

In contrast to claims involving improper medical examinations, unjustified medical inquiries or unauthorized disclosures of confidential medical information, there are claims under § 12112(d) which depend on whether applicants or employees are "qualified" or "disabled" within the meaning of the ADA. For example, § 12112(d) (3)(C) provides that the results of an "[e]mployment entrance examination" may only be used "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C). A covered entity engages in prohibited "discrimination" when it rejects a prospective employee on the basis of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6). Consequently, an employer may not rely on the results of a lawful medical examination to deny employment to an individual unless the examination reveals that a physical or mental impairment suffered by the individual precludes him or her from performing the "essential functions" of the desired position. *Holiday v. City of Chattanooga,* 206 F.3d 637, 640–648 (6th Cir.2000). If a physical or mental examination reveals that a prospective employee suffers from an impairment that could *potentially* preclude the performance of "essential" work-related tasks, an employer may reject that prospective employee only on the basis of an "individualized determination" that the impairment will *actually* preclude the performance of those tasks. *Id.* at 644, citing *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 193 (3d Cir.1999). An employer which rejects a disabled applicant pursuant to a belief that his or her impairment will render him or her incapable of performing "essential" job duties runs the risk of being wrong and incurring liability. *Taylor,* 177 F.3d at 193 ("If an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job, with or without accommodation, the employer must be correct about the affected employee's ability to perform the job in order to avoid liability; there is no defense of reasonable mistake."). In this situation, an individual must show that he or she is "qualified" for the relevant position in order to establish that the results of a medical examination were improperly "used" to facilitate discrimination. [6] *Holiday,* 206 F.3d at 645.

***13** Like medical information obtained during the course of an "[e]mployment entrance examination," information "regarding the medical condition or history of any employee" obtained by means of a "voluntary medical examination" or an inquiry as to his or her "ability to perform job-related functions" may be "used only in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). A careful reading of Chedwick's brief reveals that he is basing his motion for class certification on an allegation that UPMC improperly "uses" medical information obtained from disabled employees to deprive them of alternative employment opportunities. ECF No. 58 at 5–10. He attempts to rely on § 12112(d) in order to circumvent the holding in *Hohider.* In support of his position, Chedwick calls the Court's attention to *Garrison v. Baker Hughes Oilfield Operations, Inc.,* 287 F.3d 955 (10th Cir.2002), and *O'Neal v. City of New Albany,* 293 F.3d 998 (7th Cir.2002). ECF No. 58 at 8–9. Those decisions, however, do not support Chedwick's argument.

In *Garrison,* the United States Court of Appeals for the Tenth Circuit recognized that § 12112(d)(3)(C) restricts the ways in which an employer may "use" the results of a permissible medical examination or inquiry to withdraw an offer of employment. *Garrison,*

287 F.3d at 963, n. 7 (citing § 12112(d)(3)(C) for the proposition that "[e]mployers may only withdraw job offers for reasons 'in accordance' with subchapter I of the Americans with Disabilities Act"). Nonetheless, the Court of Appeals also explained that while a plaintiff is *generally* not required to show that he or she is "disabled" in order to challenge improper medical examinations and inquiries under the ADA, he or she cannot prevail in an improper "use" claim brought pursuant to § 12112(d) (3)(C) without establishing than an employer "used collected medical information to discriminate on the basis of a disability." *Id.* at 960, n. 4. The United States Court of Appeals for the Seventh Circuit followed this line of reasoning in *O'Neal,* holding that an individual cannot recover under § 12112(d)(3)(C) without establishing that he or she is "disabled" within the meaning of the ADA. *O'Neal,* 293 F.3d at 1009–1010. These decisions are consistent with the plain language of the ADA, which provides that a covered employer "may condition an offer of employment on the results of [a medical] examination" if "the results of such examination are used only in accordance with [Title I]." 42 U.S.C. § 12112(d)(3)(C). In order to show that the results of a lawful medical examination were improperly "used" by an employer to withdraw an offer of employment, a plaintiff must demonstrate both the existence of a statutory "disability" and his or her ability to perform the "essential functions" of the position in question, with or without reasonable accommodations. 29 C.F.R. § 1630.14(b)(3).[7]

The "use" restriction applicable to the results of an "[e]mployment entrance examination" applies with equal force to certain forms of medical information obtained by means of "voluntary medical examinations" and "job-related" medical inquiries involving a covered entity's current employees. 42 U.S.C. § 12112(d)(4)(B)-(C). Chedwick contends that UPMC used medical information related to his disability to deny him alternative employment opportunities. ECF No. 58 at 3. He apparently sought assistance from UNUM Provident personnel when he was trying to get a new job with UPMC. In an email message sent to Croushore on November 1, 2005, Perry asked whether UPMC had a "contact person" who could speak with UNUM Provident's vocational specialist about Chedwick's employment prospects. ECF No. 58–3 at 2. Perry's message indicated that Chedwick was receiving long-term disability benefits. *Id.* The next day, Croushore forwarded the message to Larimore and stated that there was "no set recruiter" for the vocational specialist to contact, and that she could not provide assistance to Chedwick. *Id* . at 1–2. Larimore forwarded the message chain to Rimer, who responded by identifying an Interface Analyst position that was consistent with Chedwick's qualifications. *Id.* at 1. Although Chedwick applied for the position, he never received an interview. ECF No. 62–8 at 8; Croushore Aff. at ¶¶ 35–36. The crux of Chedwick's argument is that UPMC declined to interview him for the position because Croushore had forwarded information to Rimer referencing his receipt of long-term disability benefits. ECF No. 58 at 3–7.

***14** In order to establish a violation of § 12112(d) (4)(C), Chedwick would need to show that UPMC "used" information pertaining to his medical condition in a manner that was not "in accordance with" Title I. 42 U.S.C. § 12112(d)(3)(C), (4)(C). He could do so only by demonstrating that he was both "disabled" within the meaning of the ADA and "qualified" for the Interface Analyst position. *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3d Cir.1999). Chedwick does not allege that he was subjected to an improper medical examination or inquiry that could be actionable under the ADA without regard to his individual status. A freestanding "examination" or "inquiry" claim under § 12112(d) accrues as soon as a covered employer "conducts an improper medical examination or asks an improper disability-related question, regardless of the results or response." *Green v. Joy Cone Co.,* 107 Fed. Appx. 278, 280 (3d Cir.2004). In contrast, an improper "use" claim does not accrue until an employer *uses* lawfully-obtained medical information to discriminate in a manner that violates § 12112(a). *Garrison,* 287 F.3d at 960, n. 4. The viability of Chedwick's improper "use" claim would depend on questions such as whether he was "disabled" within the meaning of the ADA, whether he was "qualified" for the position in question, and whether there was a causal connection between his status as a "disabled" individual and UPMC's refusal to rehire him. *O'Neal,* 293 F.3d at 1009–1010; *Holiday,* 206 F.3d at 645.

### C. The Application of Rule 23

Chedwick maintains that he can satisfy the requirements of subsections (a), (b)(2) and (b)(3) of Rule 23. ECF No. 58 at 10–19. UPMC attacks Chedwick's motion for class certification from several different angles. UPMC's first argument is that Chedwick cannot pursue a claim under § 12112(d) because he failed to exhaust it before the EEOC and never included it in his complaint. ECF No. 62 at 24–26. With respect to the issue of exhaustion, the Court notes that Chedwick's claims are based on both the ADA and the Rehabilitation Act. ECF No. 1 at ¶¶ 1–2. The Rehabilitation Act incorporates the provisions of the ADA governing medical examinations and inquiries. 29 U. S.C. § 794(d); *Lee,* ––– F.3d at ––––, 2011 WL 611904, at *5, 2011 U.S.App. LEXIS 3508, at *16; *Doe,* 317 F.3d at 340; *Scott,* 717 F.Supp.2d at 1082, n. 4. Chedwick was not required to exhaust his Rehabilitation Act claims before commencing this action. *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 192–194 (3d Cir.2000). Thus, UPMC's argument concerning exhaustion, if meritorious, would defeat only Chedwick's claim arising directly under § 12112(d)(4)(C), and would not impact his parallel claim under the Rehabilitation Act. *Hopkins v. City of Wilmington,* 629 F.Supp.2d 392, 396 (D.Del.2009) (explaining that a plaintiff need not exhaust a claim under the Rehabilitation Act even if he or she "also has a viable claim under the ADA, a statute that does require exhaustion of administrative remedies"). In addition, Chedwick's improper "use" claims are wholly dependent on underlying violations of § 12112(a) and, therefore, arguably the *same* claims asserted in his complaint. *Holiday,* 206 F.3d at 640–648 (analyzing a claim involving the alleged misuse of medical information to withdraw a job offer as a typical "failure-to-hire" claim, even though the medical information had been obtained during the course of a medical examination). In any event, there is no need for the Court to consider these issues, since Chedwick cannot satisfy the requirements of Rule 23 even if it is assumed that he can pursue individual claims stemming from UPMC's alleged misuse of his medical information.

***15** Chedwick did not participate in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. UPMC contends that Chedwick's status as a nonparticipant deprives him of standing to pursue a claim under § 12112(d). ECF No. 62 at 27–28. This argument fails to account for Chedwick's assertion that *his* medical information was improperly used to deny him the Interface Analyst position. ECF No. 58 at 3–7. There is no need for the Court to determine whether UPMC actually violated the ADA or the Rehabilitation Act with respect to Chedwick, since the inquiry concerning standing does not depend on whether UPMC's conduct was legal. [8] *Tandy v. City of Wichita,* 380 F.3d 1277, 1283, n. 10 (10th Cir.2004). While the factors distinguishing Chedwick's situation from the factual scenarios involving other potential class members are certainly relevant to the Court's analysis under Rule 23, they do not defeat Chedwick's standing to vindicate his own rights in this case.

UPMC argues that Chedwick cannot meet the requirements of Rule 23. ECF No. 62 at 30–53. Chedwick implicitly concedes that his evidentiary submissions are not sufficient to warrant class certification by suggesting that further discovery is necessary to facilitate the adjudication of his motion. ECF No. 58 at 1. The Court notes that a class cannot be certified unless each relevant component of Rule 23 is satisfied. *In re: Constar International, Inc., Securities Litigation,* 585 F.3d 774, 780 (3d Cir.2009). Chedwick bears the burden of *proving* each factual prerequisite to class certification by a preponderance of the evidence. *Hydrogen Peroxide,* 552 F.3d at 307. Some degree of discovery is obviously necessary to enable a plaintiff seeking class certification to meet his or her evidentiary burden. Nevertheless, the evidence presently before the Court indicates that this case cannot be maintained as a class action, and that additional discovery concerning the issue of class certification would be futile.

The record contains a list of forty-seven former employees of UMPC's corporate unit who were terminated after having been on leave for more than twenty-six weeks. ECF No. 58–4. Chedwick contends that discovery involving UPMC's other business units would identify hundreds or thousands of other potential class members. ECF No. 58 at 12–13. Accordingly, the Court assumes *arguendo* that Chedwick can satisfy Rule 23(a)(1)'s numerosity requirement. *Stewart v. Abraham,* 275 F.3d 220, 226–227 (3d Cir.2001) (observing that "the first prong of Rule 23(a)" is generally met when the proposed class representative demonstrates that the number of

class members exceeds forty). Chedwick need only share "one question of fact or law with the grievances of the prospective class" to surmount Rule 23(a)(2)'s commonality prerequisite.[9] *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). Since the claims asserted by all potential class members would relate to whether UPMC's automatic-termination policy violates the ADA and the Rehabilitation Act, Chedwick can presumably satisfy the commonality requirement. ECF No. 57 at ¶ 3.

***16** In order to satisfy Rule 23(a)(3)'s typicality requirement, Chedwick must show that his claims are "typical" of the claims asserted by the other potential class members. FED. R. CIV. P. 23(a)(3). The United States Court of Appeals for the Third Circuit recently articulated the elements of a proper "typicality" analysis by stating as follows:

> [W]e glean the proper consideration in assessing typicality to include three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 599 (3d Cir.2009). A careful review of the parties' filings reveals that Chedwick cannot satisfy this standard.

While Chedwick's improper "use" claims under § 12112(d)(4)(C) would most likely proceed pursuant to the same "legal theory" as the claims asserted by other class members, the "factual circumstances underlying" Chedwick's claims would be materially different from those underlying the claims of the RTW program participants. Chedwick never participated in the RTW program. ECF No. 62–8 at 6; Croushore Aff. at ¶ 25. The primary basis for his motion for class certification is the alleged misuse of returning employees' medical information by Work Partners personnel in connection with that program. ECF No. 58 at 3. In an affidavit dated December 28, 2010, Croushore stated that she had not been involved with Chedwick's attempt to secure alternative employment during the fall of 2005 because he had never participated in the RTW program and had already been terminated by UPMC. ECF No. 62–8 at 8; Croushore Aff. at ¶ 34. Croushore's declaration is consistent with her November 2, 2005, email message to Larimore, in which she stated that she could not provide assistance to Chedwick. ECF No. 58–3.

Chedwick moves for the certification of a class consisting of "all former employees of UPMC for all business units from 2004 through the present who were on a medical leave of absence and automatically terminated after twenty-six weeks." ECF No. 57 at ¶ 3. The proposed class definition would identify class members by reference to the manner in which they were *terminated.* Chedwick apparently wants to prove that UPMC misuses information relating to the medical conditions of returning employees that is provided to recruiters by Work Partners personnel charged with implementing the RTW program. ECF No. 58 at 3–7. Chedwick's individual "use" claim, however, concerns the manner in which medical information was used to reject his applications for employment on or after October 20, 2005. ECF No. 58 at 3. The Court has already pointed out that Chedwick's "failure-to-hire" claims are separate and distinct from his wrongful discharge claims. *Chedwick,* 619 F.Supp.2d at 178–181. Chedwick's status as a *former* (and *prospective* ) UPMC employee in October 2005 was materially different from the status of individuals who were trying to *remain* UPMC employees by utilizing the RTW program. A disabled employee attempting to return from leave must find a "transitional" work assignment in order to avoid termination after the

passage of twenty-six weeks, whereas an applicant for future employment is not directly affected by the automatic-termination policy. ECF No. 58–1 at 11, 23, 34, 45, 56, 67, 77. It is difficult to understand how Chedwick believes that he can represent a class of persons whose medical information was improperly "used" to effectuate their termination based on the improper "use" of his medical information *subsequent* to his own termination. [10]

***17** There is another factor which weighs against a "typicality" finding in this case. Chedwick objects to the fact that he was identified as a former employee receiving long-term disability benefits when Perry's message to Croushore was forwarded to Larimore and Rimer. ECF No. 58 at 3–7; ECF No. 58–3. The provisions of the ADA governing the use of employees' medical information pertain only to information received as a result of specified "medical examinations" and "inquiries." 42 U.S.C. § 12112(d)(3)(C), (4)(B)-(C). They generally do not apply to information that is voluntarily disclosed by an employee. *Cash v. Smith,* 231 F.3d 1301, 1307–1308 (11th Cir.2000). While the Court expresses no opinion concerning the viability of Chedwick's improper "use" theory, UPMC may argue that the information supplied by Perry (who apparently acted at Chedwick's behest) was beyond the purview of § 12112(d)(4)(C) because it was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345. Although such an argument would not be sufficient to derail Chedwick's more generalized "failure-to-hire" claims under § 12112(a), it could potentially destroy the premise for his argument that UPMC violated his rights under § 12112(d). Given that Chedwick never participated in the RTW program, Croushore's testimony concerning the usual communications between Work Partners personnel and recruiters seeking to fill vacancies throughout UPMC's various business units cannot give rise to an inference that *his* medical information was received and misused by a recruiter. ECF No. 58–2 at 10–15; Croushore Dep. at 57–62. Since the information forwarded to Rimer was arguably *not* subject to the requirements of § 12112(d), Chedwick's individual claim may "be subject to a defense that is both inapplicable to many members of the [proposed] class and likely to become a major focus of [this] litigation." *Schering Plough,* 589 F.3d at 599. For these reasons, Chedwick cannot satisfy Rule 23(a)(3)'s "typicality" prerequisite to class certification.

The "adequacy" inquiry required under Rule 23(a)(4) accounts for both the ability of the class representative's counsel to "fairly and adequately protect the interests of the [proposed] class" and any potential "conflicts of interest" between the named party and the class that he or she seeks to represent. *In re: Warfarin Sodium Antitrust Litigation,* 391 F.3d 516, 532 (3d Cir.2004). The Court has no doubt that the attorneys retained by Chedwick are competent to handle a class action. FED. R. CIV. P. 23(g). The unique nature of Chedwick's claim, however, renders him an inadequate class representative under these circumstances. Vulnerabilities in the individual claims asserted by a proposed class representative are relevant to the "adequacy" inquiry as well as the "typicality" inquiry. *Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir.2006). Since UPMC may be able to attack Chedwick's improper "use" claim on the ground that his medical information was not provided in response to an "inquiry," there is a danger that Chedwick "will become distracted by the presence of a possible defense applicable only to him," and that the interests of the other class members will suffer. *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir.1980). Because Chedwick cannot fulfill the applicable "typicality" and "adequacy" prerequisites, his motion for class certification must be denied regardless of whether he could otherwise satisfy the requirements of either subsection (b)(2) or subsection (b) (3). [11]

***18** Even if Chedwick could surmount the "typicality" and "adequacy" hurdles under Rule 23(a), he would not be able to establish his entitlement to certification under Rule 23(b)(2). As noted earlier, an individual's ability to succeed in an improper "use" claim under § 12112(d)(3)(C) or (4)(C) generally depends on whether he or she can succeed on an underlying "discrimination" claim under § 12112(a). *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. A plaintiff pursuing this type of claim must ordinarily show that lawfully-obtained medical information (*i.e.,* evidence of a medical condition obtained as a result of a lawful medical examination or a permissible medical inquiry) was unlawfully used by an employer to deny him or her a position

for which he or she was nevertheless "qualified." *Holiday,* 206 F.3d at 640–648. In this respect, an inquiry into whether the individual plaintiff was "qualified" for the desired position would be necessary to facilitate a determination as to whether disability-based "discrimination against that individual, once proven to have occurred, [was] unlawful" under the ADA and the Rehabilitation Act. *Hohider,* 574 F.3d at 191. A returning employee participating in the RTW program would need to establish both the *existence* of a vacant position and his or her own *qualifications* for the position in order to show that UPMC improperly "used" medical information to reject his or her application for that position. *Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 230 (3d Cir.2000). Only a "qualified" applicant or employee would be able to establish an actionable violation of the ADA or the Rehabilitation Act. *Hohider,* 574 F.3d at 192 (explaining that the ADA "generally requires evaluation of whether a disabled individual is 'qualified' as defined under the statute to determine not only whether discrimination on the basis of disability has occurred, but more fundamentally, whether such discrimination against that individual is unlawful"). An applicant or employee whose disability could not have been accommodated in any event would not be able to succeed in an improper "use" claim, whereas a "qualified" applicant or employee could prevail by demonstrating that UPMC wrongfully relied on medical information to deny him or her a position that was consistent with his or her abilities and limitations. *Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997) (remarking that "if reasonable accommodation is impossible, nothing more than communication to the employee of this fact is required"); *Willis v. Conopco,* 108 F.3d 282, 285 (11th Cir.1997) (observing that the ADA "is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made"). Since the lawfulness (or unlawfulness) of UPMC's actions with respect to each potential class member would turn on factual characteristics and circumstances unique to each individual, Chedwick cannot show that UPMC "has acted or refused to act on grounds that apply generally to the class," or that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." [12] FED. R. CIV. P. 23(b)(2).

***19** In order to demonstrate that class certification is proper under Rule 23(b)(3), Chedwick would need to show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Certification under Rule 23(b)(3) is improper whenever the "essential elements" of the plaintiffs' claims require individualized treatment. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d Cir.2001). Therefore, the propriety of class certification in this case can only be determined by reference to what the individual class members would have to prove in order to hold UPMC liable under the ADA or the Rehabilitation Act. *Hydrogen Peroxide,* 552 F.3d at 311. The decision in *Hohider* was premised on the fact that individualized assessments would be required to determine whether each member of the class was "qualified" for his or her position. *Hohider,* 574 F.3d at 185–186. As the Court has already explained, the reasoning employed in *Hohider* would apply with equal force to improper "use" claims of the kind discussed in Chedwick's brief. ECF No. 58 at 3–10; *O'Neal,* 293 F.3d at 1009–1010; *Garrison,* 287 F.3d at 960, n. 4. Consequently, Chedwick cannot satisfy the requirements of Rule 23(b)(3).

Class certification would be improper in this case for the additional reason that Chedwick cannot show that each member of the proposed class was "disabled" within the meaning of the ADA and the Rehabilitation Act at the time of his or her discharge. *O'Neal,* 293 F.3d at 1010 (affirming a grant of summary judgment in favor of an employer defending a claim under § 12112(d)(3)(C) because the plaintiff was concededly not "disabled"). The determination as to whether a person is statutorily "disabled" requires a highly individualized analysis. "[E]ven if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways." *Emory v. AstraZeneca Pharmaceuticals, LP,* 401 F.3d 174, 182 (3d Cir.2005). Moreover, the ADA Amendments Act of 2008, which became effective on January 1, 2009, broadened the category of individuals entitled to statutory protection from discrimination under the ADA and the

Rehabilitation Act by altering the definition of the term "disability." Pub.L. No. 110–325, §§ 4–8, 122 Stat. 3553, 3555–3559 (2008). Several federal courts have determined that the ADA Amendments Act does not apply retroactively. *Becerril v. Pima County Assessor's Office,* 587 F.3d 1162, 1164 (9th Cir.2009); *Thornton v. United Parcel Service, Inc.,* 587 F.3d 27, 35, n. 3 (1st Cir.2009); *Frederickson v. United Parcel Service Co.,* 581 F.3d 516, 521, n. 1 (7th Cir.2009); *Lytes v. DC Water & Sewer Authority,* 572 F.3d 936, 942 (D.C.Cir.2009); *Millholland v. Sumner County Board of Education,* 569 F.3d 562, 565 (6th Cir.2009); *EEOC v. Agro Distribution LLC,* 555 F.3d 462, 469, n. 8 (5th Cir.2009). Chedwick's proposed class would include individuals who were terminated both before and after January 1, 2009. ECF No. 57 at ¶ 3. Thus, the inquiries into whether particular class members were entitled to statutory protection in the first place would have to be conducted under two different legal standards. This reality further illustrates why a class cannot be certified under these circumstances.

### *Conclusion*

***20** The Court acknowledges that a plaintiff can sometimes assert claims under § 12112(d) without establishing his or her "qualifications" for a particular position or the existence of a statutory "disability." For instance, an individual whose injuries are attributable to an *unlawful* medical examination or inquiry can recover under § 12112(d) without showing that his or her employer engaged in a form of "discrimination" proscribed by § 12112(a). *Harrison,* 593 F.3d at 1215–1216; *Griffin,* 160 F.3d at 592–595. Likewise, an employee who is harmed by a covered entity's failure to comply with the ADA's confidentiality requirements can recover for damages resulting from an unauthorized disclosure regardless of whether he or she is "disabled." *Doe,* 317 F.3d at 343–345. These types of violations, however, bear no meaningful relationship to the forms of "discrimination" alleged in Chedwick's complaint or the improper "use" theory advanced in his brief. ECF No. 1 at ¶¶ 10–38; ECF No. 58 at 3–10. Chedwick does not allege that he was subjected to illegal medical examinations or inquiries, or that confidential information pertaining to his "medical condition or history" was wrongfully disclosed. 42 U.S.C. § 12112(d)(2)(A), (3)(B), (4)(A), (C). Instead, he claims that UPMC wrongfully "used" information to perpetrate a form of "discrimination" prohibited by § 12112(a). ECF No. 58 at 3–10. The theory relied upon by Chedwick is subject to the rule established in *Hohider.* Since Chedwick implicitly concedes that he can pursue his underlying "discrimination" claims only "on an individual basis," it is apparent that further discovery involving the issue of class certification would be futile. ECF No. 58 at 2.

Even if the Court were to liberally construe Chedwick's argument to mean that Croushore and Larimore improperly disclosed his receipt of long-term disability benefits to Rimer, thereby obviating the need for him to prove that he was "disabled" within the meaning of the applicable statutory provisions and "qualified" for the Interface Analyst position, Chedwick would nevertheless be an improper representative for the proposed class. UPMC's conduct in relation to Chedwick during the fall of 2005 would still bear no relationship to the automatic-termination policy referenced in the proposed class definition, since Chedwick had already been discharged by that time. ECF No. 57 at ¶ 3. Furthermore, UPMC could persuasively argue that the information contained in Perry's message was not provided in response to an "inquiry" made by UPMC. *Doe,* 317 F.3d at 343–345; *Cash,* 231 F.3d 1307–1308. After all, it was Perry (a UNUM Provident employee acting on behalf of Chedwick) who disclosed the fact that Chedwick was a former employee receiving long-term disability benefits. ECF No. 58–3. After receiving Perry's email message, Croushore merely *forwarded* the message to Larimore, who proceeded to *forward* the same message to Rimer. *Id.* No employee of UPMC supplied Rimer with *medical information* that had not been voluntarily disclosed by Perry. This fact distinguishes Chedwick from those potential class members whose medical information was allegedly passed on to recruiters by Work Partners personnel. *Schering Plough,* 589 F.3d at 599 (stating that a proposed class representative "must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation"). Moreover, a breach-of-confidentiality theory of this kind would in no way resemble the theories of "discrimination" articulated in Chedwick's complaint. [13] ECF No. 1 at ¶¶ 10–38.

***21** For the foregoing reasons, this case cannot be maintained as a class action. The time has come for the parties to concentrate their efforts on the merits of Chedwick's individual claims. The Court expresses no opinion as to whether Chedwick can establish actionable violations of the ADA and the Rehabilitation Act, or as to whether UPMC's policies are in conformity with federal law.

Chedwick cannot establish his entitlement to class certification under subsections (a)(3), (a)(4), (b)(2) and (b)(3) of Fed.R.Civ .P. 23. Accordingly, the motion for class certification (*Document No. 57* ) will be denied. An appropriate order follows.

***ORDER OF COURT***

AND NOW, this 21st day of April, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the Plaintiffs Motion for Class Certification (*Document No. 57* ) is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1559792, 24 A.D. Cases 1222

## Footnotes

1 In his EEOC charge, Chedwick also alleged that UPMC had discriminated against him because of his age. ECF No. 62–3 at 2–4. His complaint in this Court, however, does not allege that UPMC violated his rights under the Age Discrimination in Employment Act of 1967 (“ADEA”) [29 U.S.C. § 621 *et seq.*]. ECF No. 1.

2 At the time of Chedwick's termination, § 12112(a) provided that “[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.” Pub.L. No. 101–336, § 102; 104 Stat. 327, 331–332 (1990), (previously codified at 42 U.S.C. § 12112(a)). The language of this anti-discrimination provision was changed by the ADA Amendments Act of 2008, which took effect on January 1, 2009. Pub.L. No. 110–325, § 5; 122 Stat. 3553, 3557 (2008); 42 U.S.C. § 12112(a). Chedwick seeks to certify a class consisting of persons who were terminated by UPMC both before and after January 1, 2009. ECF No. 57 at ¶ 3. The Court quotes the current version of the statute in order to speak in the present tense. The linguistic change to § 12112(a) made by the statutory amendment is not germane to the class-certification inquiry. *Chedwick v. UPMC,* 263 F.R.D. 269, 275, n. 8 (W.D.Pa.2009).

3 *Fowler v. UPMC Shadyside,* Civil Action No. 07–807, like the instant case, resulted from this Court's severance order of April 24, 2007. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206 (3d Cir.2009).

4 The Court points this out because Chedwick's ability (or inability) to act as a class representative in this action largely depends on the extent to which his claims are similar to those of the other potential class members. Nevertheless, it has not gone unnoticed that UPMC wrongfully claimed, during the course of an earlier discovery dispute, that Chedwick's claims concern only matters relating to events occurring on or after October 20, 2005. ECF No. 62–11 at 3–31. It is difficult to fathom how UPMC could have misconstrued this Court's unambiguous pronouncement of December 12, 2007, that Chedwick could challenge his discharge under the Rehabilitation Act, provided that he was proceeding on a “failure-to-transfer” theory. *Chedwick v. UPMC,*

619 F.Supp.2d 172, 181–187 (W.D.Pa.2007). The Court's opinion clearly contemplated that discovery concerning the circumstances of Chedwick's discharge would take place. *Chedwick,* 619 F.Supp.2d at 187, n. 9. Although the Court's order purported to *deny* UPMC's motion to dismiss only with respect to Chedwick's "failure-to-hire" claims, it *granted* the motion only with respect to the *ADA claims* stemming from Chedwick's discharge. *Id.* at 190. The order dismissed *none* of Chedwick's Rehabilitation Act claims, and the opinion clearly explained that Chedwick could challenge his discharge under the Rehabilitation Act. *Id.* at 181–187, 190. UPMC had no legitimate basis for resisting Chedwick's efforts to obtain information about the manner in which his employment was terminated. ECF No. 19 at 2–3; ECF No. 62–11 at 3–31. While the Court left the door open for UPMC to reassert its statute-of-limitations defense if *discovery revealed* that Chedwick's discharge would have been actionable under the pre–1992 version of the Rehabilitation Act, it did not provide UPMC with a license to obstruct the discovery process itself. *Chedwick,* 619 F.Supp.2d at 187, n. 9.

5 The most recent "UPMC Policy and Procedure Manual" contained in the record, which became effective on October 19, 2009, provides that a participating employee who fails to secure a "regular position" after the expiration of the twenty-six week period will be terminated "absent exceptional circumstances and consistent with applicable state and federal regulations." ECF No. 58–1 at 11. This qualifying language did not appear in the earlier versions of the "UPMC Policy and Procedure Manual." ECF No. 58–1 at 24, 34, 46, 56, 68, 78.

6 It is not clear whether UPMC requires some or all of its incoming employees to undergo medical examinations prior to the commencement of their duties. Although Chedwick refers only to medical "inquiries" to support his argument, his proposed class would presumably include employees who have been discharged because of UPMC's alleged misuse of medical information obtained during the course of post-offer medical examinations (if such examinations are required under UPMC's internal policies). ECF No. 58 at 2 (stating that "UPMC's policy results in an improper use of medical examinations and inquiries").

7 The applicable regulation provides:

> Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity. However, if certain criteria are used to screen out an employee or employees with disabilities as a result of such an examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part.

29 C.F.R. § 1630.14(b)(3).

8 UPMC argues that there is no "factual basis" for Chedwick's allegation that the results of medical inquiries are used to discriminate against disabled employees who participate in the RTW program. ECF No. 62 at 29–30. In an affidavit dated December 28, 2010, Croushore declared that her Work Partners office does not reveal confidential medical information about returning employees to recruiters working throughout UPMC's business units. ECF No. 62–8 at 5; Croushore Aff. at ¶¶ 19–21. The Court has no occasion to consider the legality of UPMC's policies and practices relating to the RTW program. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action .").

9 Although Rule 23(a)(2) refers to *"questions* of law or fact common to the class," the plural form of the word "question" has not been construed to require more than one common question in order for a finding of commonality to be sustained. FED. R. CIV. P. 23(a)(2) (emphasis added); *In re: Schering Plough Corp. ERISA Litigation,* 589 F.3d 585, 597, n. 10 (3d Cir.2009).

10 Some decisions applying the ADA and the Rehabilitation Act have recognized similarities between a current employee trying to return from a medical leave and a former employee seeking to be rehired. *Harris v. Harris & Hart,* 206 F.3d 838, 839–845 (9th Cir.2000); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 668–678 (1st Cir.1995). The merits of Chedwick's claims, however, are not presently at issue. The only motion before the Court is Chedwick's motion for class certification. Although Chedwick's proposed class definition would identify class members by reference to the circumstances surrounding their *termination,* his own improper "use" claims relate to UPMC's refusal to rehire him rather than to the reasons for his discharge. ECF No. 57 at ¶ 3; ECF No. 58 at 3. There is simply no logical relationship between UPMC's alleged misuse of Chedwick's medical information and the automatic-termination policy referenced in the proposed class definition.

11 Chedwick does not rely on subsection (b)(1) as a basis for seeking class certification. ECF No. 58 at 19.

12 Chedwick cannot satisfy the requirements of Rule 23(b)(2) simply by demonstrating that all members of the proposed class were discharged pursuant to UPMC's automatic-termination policy. *Purdue v. Murphy,* 915 N.E.2d 498, 507 (Ind.Ct.App.2009) (stating that Rule 23(b)(2) is not "relaxed enough to permit class actions when the only unifying criteria for the members of the class are that they are somehow disabled, in need of accommodation, and mutually affected by the policy sought to be enjoined").

13 As noted earlier, Chedwick's claim that UPMC unlawfully "used" his medical information to engage in disability-based discrimination is inextricably intertwined with his original claim that UPMC refused to rehire him because of his "disability." *Holiday v. City of Chattanooga,* 206 F.3d 637, 645 (6th Cir.2000) (applying the anti-discrimination standards applicable under § 12112(a) to an employer's alleged misuse of information obtained during the course of a post-offer medical examination). The same could not be said of a claim involving the improper disclosure of medical information, which cannot be gleaned from a fair reading of Chedwick's complaint. ECF No. 1 at ¶¶ 10–38.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

4

2024 WL 1907192
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Rachel Ann PHILBIN., Plaintiff,
v.
BRETT DINOVI &
ASSOCIATES, LLC, Defendant.

No. 21-cv-20402
|
Filed January 10, 2024

**Attorneys and Law Firms**

Christopher Markos, Gerald J. Williams, Williams Cedar, LLC, Philadelphia, PA, David M. Cedar, Williams Cedar, LLC, Haddonfield, NJ, for Plaintiff.

Paul S. Grossman, Christopher John Seelinger, Weiner Law Group LLP, Parsippany, NJ, for Defendant.

**ORDER**

O'HEARN, District Judge.

***1 THIS MATTER** comes before the Court upon Plaintiff Rachel Ann Philbin's Motion for Conditional Certification of F.L.S.A. Claims Pursuant to 29 U.S.C. § 216(b) and for Class Certification of State Law Claims Pursuant to Fed. R. Civ. P. 23 (the "Motion to Certify Class"), (ECF No. 40); and

**WHEREAS**, on May 5th, 2023, the Honorable Ann M. Donio issued an Amended Scheduling Order requiring that "any motion for class certification or to certify a collective action shall be filed by no later than June 30, 2023," (ECF No. 39); and

**WHEREAS**, Plaintiff filed the Motion to Certify Class now before the Court, (ECF No. 40), on August 17, 2023—forty-eight days after the expiration of the filing deadline for such motions established in the Amended Scheduling Order, (ECF No. 39); and

**WHEREAS**, Plaintiff asserts in her Reply Brief (ECF No. 46) that "the complete set of necessary deposition testimony was not available to accompany her motion until August 1, and of course once available it had to be reviewed ..." and that there is for that reason no prejudice to Defendant, (ECF No. 46 at 1); but

**WHEREAS**, Rule 16(b) of the Federal Rules of Civil Procedure provides that a scheduling order "may be modified only for good cause and with the judge's consent," Fed. R. Civ. P. 16(b); and

**WHEREAS**, Rule 6(b) of the Federal Rules of Civil Procedure provides that when a filing "may or must be [submitted] within a specified time, the court may, for good cause, extend the time ... on motion made after the time has expired if the party failed to act because of excusable neglect," Fed. R. Civ. P. 6(b); and

**WHEREAS**, after a deadline established by a scheduling order has expired, the higher 'excusable neglect' standard of Rule 6(b) applies, and not the lower 'good cause' standard of Rule 16(b), *see Bradley v. Harrah's Atl. City Operating Co., LLC*, No. 21-10485, 2023 WL 5530495, at *2 (D.N.J. Feb. 27, 2023) ("[W]here the motion for an extension of time is made after the deadline has expired, the moving party must show excusable neglect, which is a more difficult and particular showing than the good cause standard under Rule 16) (internal citations and quotation marks omitted); and

**WHEREAS**, in order to seek an extension of time after a deadline has expired, "a party must make a formal motion for extension of time and the district court must make a finding of 'excusable neglect' under the *Pioneer* factors, before permitting an untimely motion," *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010) (referencing factors to evaluate 'excusable neglect' set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)); *see also Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 896 (1990) ("[A]ny post deadline extension must be upon motion made, and is permissible only where the failure to meet the deadline was the result of excusable neglect.") (internal quotation marks and citations omitted); and

**WHEREAS**, Plaintiff did not file a motion to amend the scheduling order before the expiration of the deadline to file a Motion to Certify Class, and did not

file a formal motion for extension of time thereafter; and

***2 WHEREAS**, Plaintiff therefore failed to comply with Rule 6(b), and Plaintiff's Motion to Certify Class is untimely, *Drippe*, 604 F.3d at 785; now therefore, for the reasons substantially stated herein,

**IT IS HEREBY** on this 9th day of January, 2024,

**ORDERED** that Plaintiff's Motion to Certify Class, (ECF No. 40), is **DENIED WITHOUT PREJUDICE** as untimely; and it is further

**ORDERED** that this matter is referred to the Magistrate Judge to address issues with respect to the previously issued Scheduling Order.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1907192

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

5

2019 WL 13169890
Only the Westlaw citation is currently available.
United States District Court,
S.D. Iowa, Central Division.

Frederick D. TAYLOR, individually and on behalf of all others similarly situated, Plaintiff,
v.
MIDLAND NATIONAL LIFE INSURANCE COMPANY, Defendant.

Case No. 4:16-cv-00140-SMR-HCA
|
Signed 09/27/2019

**Attorneys and Law Firms**

J. Barton Goplerud, Brian O. Marty, Shindler, Anderson, Goplerud & Weese P.C., West Des Moines, IA, Bradley Wilders, Pro Hac Vice, David Allen Hickey, Pro Hac Vice, Ethan M. Lange, Pro Hac Vice, Norman E. Siegel, Pro Hac Vice, Patrick J. Stueve, Pro Hac Vice, Stueve Siegel Hanson LLP, John J. Schirger, Pro Hac Vice, Joseph M. Feierabend, Pro Hac Vice, Matthew W. Lytle, Pro Hac Vice, Miller Schirger, LLC, Kansas City, MO, for Plaintiff.

Michael A. Dee, Brian S. McCormac, Brown Winick Graves Gross and Baskerville P.L.C., Des Moines, IA, Allison S. Thompson, Pro Hac Vice, Andrew J. Tuck, Pro Hac Vice, Tejas Patel, Pro Hac Vice, Alston & Bird LLP, Atlanta, GA, Robert D Phillips, Jr., Pro Hac Vice, Alston & Bird LLP, San Francisco, CA, Samuel J. Park, Pro Hac Vice, Alston & Bird LLP, Los Angeles, CA, William H. Higgins, Pro Hac Vice, Alston & Bird LLP, Charlotte, NC, for Defendant.

ORDER ON MOTION FOR LEAVE TO FILE SECOND MOTION FOR CLASS CERTIFICATION

STEPHANIE M. ROSE, JUDGE UNITED STATES DISTRICT COURT

***1** Before the Court is Plaintiff Frederick Taylor's Motion for Leave to File a Second Motion for Class Certification. [ECF No. 195]. Plaintiff requests oral argument on his motion, but the Court finds the issues can be resolved without it. *See* LR 7(c). The matter is fully submitted and ready for decision. For the reasons stated herein, Plaintiff's motion is DENIED.

I. BACKGROUND

Plaintiff commenced this action in 2016 against Defendant Midland Life Insurance Company ("Midland" or the "Company"). Plaintiff's claims center on Midland's determination of the "Risk Rates" used to calculate certain charges in thirteen universal life insurance policies the Company sold between 1984 and 2006 (the "Class Policies"). Plaintiff contends the Risk Rate is effectively a mortality rate, and Defendant may only consider age and other mortality-based factors when setting that rate. It is undisputed that Defendant considers non-mortality factors when setting its Risk Rates, such as variations in funding patterns, surrender behavior, and the Company's operating expenses. Plaintiff claims this breaches the terms of the Class Policies. He claims he and a class of similarly situated Midland policyholders are entitled to damages based on the difference between the Risk Rates Midland used and whatever the Risk Rates would have been had Midland used only mortality-based factors when calculating the rates. Plaintiff's Complaint asserted breach of contract claims in three counts (Counts I–III), a claim for conversion (Count IV), and a claim for declaratory and injunctive relief (Count V).

On July 27, 2018, Plaintiff filed a Motion for Class Certification on his breach of contract claims in Counts I and III, and his claim in Count V for declaratory and injunctive relief. [ECF No. 124]. He sought to certify a nationwide class of individuals who own or owned a Class Policy and who did not have a premium class designation of "smoker." Plaintiff estimated that the class consisted of roughly 210,000 people, approximately seventy-eight percent of whom no longer held their polices (due to death, lapse, or surrender). In his brief in support of his motion, Plaintiff acknowledged that this case implicated choice of law issues as to the substance of the breach of contract claims and Defendant's potential statute of limitations defense. However, he presented his analysis of these issues in a summary fashion without analyzing the applicable choice of law principles. Plaintiff presented a more detailed analysis in his

reply brief but, upon Defendant's motion, the Court disregarded this analysis after finding it violated Local Rule 7(g)'s proscription on presenting new arguments for the first time in a reply brief.

Ultimately, the Court denied Plaintiff's motion. [ECF No. 192] (the "Class Certification Order"). Relevant here, the Court found Plaintiff could not satisfy Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement on the class's breach of contract claims. The Court found the law of each state in which a class member resided would apply to his or her respective claim. Due to differences in state laws regarding the admission of extrinsic evidence to interpret contract provisions and evidence in the record that sales presentations of the Class Policies varied by sales agent, the Court found individual issues would predominate as to the breach of contract claims.

***2** It was also undisputed that, because Midland stopped selling the Class Policies in 2006 and over three quarters of the class no longer held their polices, "the entire Class must overcome Midland's statute of limitations defense, whether it would act as a complete bar to their claims or because it would reduce the damages they can recover." [ECF No. 172 at 11]. But Plaintiff argued the defense could be overcome under the doctrine of equitable tolling—in particular, fraudulent concealment—and common evidence could be used to establish this exception. The Court determined Iowa's statute of limitations applied and concluded that this, too, created individual issues that predominated over common ones. Specifically, to establish fraudulent concealment under Iowa law, each individual class member would have to show, *inter alia*, that he or she lacked knowledge of the true facts (i.e., how Risk Rates were determined) and that he or she did, in fact, rely on Midland's misrepresentations. The Court found there was no common evidence in the record to satisfy these elements.

Plaintiff now seeks leave to file a second motion for class certification. [ECF No. 195]. Rather than a nationwide class of Midland policyholders, he seeks to certify a class of Virginia-resident policyholders (the "Virginia Class"). He argues Virginia law would apply to the substance of the class's breach of contract claims. He acknowledges that Iowa law will still apply to any statute of limitations defense but argues the resulting individual issues posed by that defense do not preclude the Court from determining Midland's contractual liability on a class-wide basis. Defendant resists the motion.

## II. STANDARD OF REVIEW

The parties appear to disagree on which of the Federal Rules of Civil Procedure governs the instant motion. Plaintiff suggests the motion is governed by a combination of Rule 23(c)(1)(C), which allows the Court to amend an order granting or denying class certification any time before final judgment, and Rule 16(b)(4), which provides that a scheduling order may be modified only for good cause and with the judge's consent. Fed. R. Civ. P. 23(c)(1)(C), 16(b)(4). Defendant argues the latter alone controls this case.

Both rules are implicated here. Even though Plaintiff proposes a new class for certification, the Class Certification Order denied him the ability to proceed with this case as a class action. Although perhaps not altering that Order *per se*, a later order granting certification of a narrower class alters the Court's original, broader denial. Additionally, the second motion for class certification would be untimely under the Court's Scheduling Order, which set a July 2018 deadline for Plaintiff to file a motion for class certification. *See* [ECF No. 33] (original Scheduling Order); [ECF No. 112 at 9] (resetting the deadline for Plaintiff to file a motion for class certification to July 27, 2018). Because Plaintiff seeks leave to file a motion for class certification well beyond that deadline, an amendment to the Scheduling Order is necessary.

The question of whether a plaintiff should be permitted to file a renewed motion for class certification is generally analyzed under Rule 23(c)(1)(C). *See generally*, Michael G. McLellan, *If at First You Don't Succeed: The Varying Standards Applicable to Renewed Motions for Class Certification*, 30 A.B.A. Antitrust 89 (Summer 2016); *see also D.C. ex rel. Garter v. Cty. of San Diego*, No. 15cv1868-MMA (NLS), 2018 WL 692252, at *1 (S.D. Cal. Feb. 1, 2018) (analyzing under Rule 23(c)(1)(C) a renewed motion for class certification proposing a liability-only class, where the court previously denied a motion to certify a broader class); *Anderson Living Tr. v. WPX*

*Energy Prod., LLC*, No. CIV 12-0040 JB/KBM, 2016 WL 5376325, at *9 (D.N.M. Aug. 27, 2016) (collecting cases and observing that many courts exercise their discretion under Rule 23(c)(1)(C) to "allow plaintiffs to propose a refined class definition ... in an attempt to certify a different class" after courts "have denied a plaintiff's first attempt at class certification"); *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 596–97 (W.D. Wash. 2013) (noting that "it is not uncommon for district courts," under Rule 23(c)(1)(C), "to permit renewed certification motions that set out a narrower class or that rely upon different evidence or legal theories"). However, whether Rule 16(b)(4) also applies seems to vary by court. *See* McLellan, *supra*, at 89 ("[C]ourts also disagree as to whether a party seeking certification under Rule 23(c)(1)(C) must also satisfy Rule 16(b)(4) ....Some courts hold that Rule 16 is irrelevant to a Rule 23(c)(1)(C) motion. Other courts seem to require a party seeking modification of a certification order to meet both standards." (footnotes omitted)).

***3** Within this circuit, district courts have acknowledged that motions to alter or amend a prior class certification order implicate both Rule 23(c)(1)(C) and Rule 16(b)(4), but they have applied the rules in different ways. *See, e.g., In re St. Jude Med. Inc. Secs. Litig.*, No. 10-cv-0851 (SRN/TNL), 2014 WL 6908434, at *4–9 (D. Minn. Dec. 8, 2014) (denying the defendants' motion for leave to seek decertification of a class after analyzing under Rule 23(c)(1)(C) the futility of the motion and, separately, analyzing under the local-rule analogue to Rule 16(b)(4) the defendants' diligence and the prejudice to the plaintiffs); *Ruppert ex rel. Fairmount Park, Inc. Ret. Sav. Plan v. Principal Life Ins. Co.*, No. 4:07-cv-00344-JAJ-TJS, 2010 WL 11613983, at *4–5 (S.D. Iowa Mar. 31, 2010) (noting that it was within the court's discretion to grant leave to file a second motion for class certification, but ultimately finding the plaintiff failed to show good cause under Rule 16(b)(4)).

This malleability suggests that when a motion for leave to file a successive motion for class certification requires amending a scheduling order, the motion must satisfy both Rule 23(c)(1)(C) and Rule 16(b)(4). This conclusion is consistent with the rules themselves. Rule 23(c)(1)(C) allows a district court to take a particular action in its discretion (i.e., amending a previous class certification order). It does not require a court to do anything and thus does not provide means to circumvent Rule 16(b)(4)'s requirements. If a court finds a scheduling order may be amended under Rule 16(b)(4) so as to allow a successive motion for class certification, Rule 23(c)(1)(C) does not bar the court from doing so. However, even if Rule 16(b)(4) is satisfied, the court retains its discretion under Rule 23(c)(1)(C) to deny the motion.

Because the instant motion does not present adequate grounds for the Court to exercise its discretion and allow Plaintiff to file a second motion for class certification, the Court will focus its analysis on Rule 23(c)(1)(C). As noted above, that rule allows a court, before entry of final judgment, to alter or amend "[a]n order that grants or denies class certification." Fed. R. Civ. P. 23(c)(1)(C). "District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial." *In re Initial Pub. Offering Secs. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007). Although it is "not uncommon for district courts to permit renewed certification motions that set out a narrower class definition[,] ... [r]econsideration of an original class ruling typically occurs as a result of a change in circumstances." *Hartman*, 291 F.R.D. at 597. Thus, "[i]n the absence of materially changed or clarified circumstances ... courts should not condone a series of reargument on the class issues by either the proponent or the opponent of the class." *Id.* (alteration in original) (quoting 3 W. Rubenstein et al., *Newberg on Class Actions* § 7:47 (4th ed. 2011)); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it *in the light of subsequent developments in the litigation.*" (emphasis added)).

Generally, developments in the relevant facts or law qualify as a change in circumstances that may warrant leave to file a successive motion for class certification. *See Hayes v. Magnachip Semiconductor Corp.*, No. 14-cv-01160-JST, 2017 WL 512777, at *2 (N.D. Cal. Feb. 8, 2017) (denying leave to file a second motion to certify a class where the plaintiffs presented "no new arguments" and relied on "no new evidence."); *Barton v. RCI, LLC*, No. 10-cv-03657 (PGS), 2014 WL 5762214, at *2 (D.N.J. Nov. 5, 2014) (finding no change in circumstances where no new facts were

disclosed in discovery and there were "no material updates in the law"); *Friend v. Hertz Corp.*, No. C-07-5222 MMC, 2014 WL 4415988, at *3 (N.D. Cal. Sept. 8, 2014) (denying leave to file a second motion for class certification where "plaintiffs identified no change of law, or other change in circumstance, applicable to the instant action"); *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Secs. Litig.*, Nos. 09 Civ. 832(MGC), 09 MD 2072(MGC), 2012 WL 4435292, at *1 (S.D.N.Y. Sept. 26, 2012) (denying leave where "the facts" had "not materially changed" and plaintiff did not make a showing of changed circumstances).

***4** Conversely, failed tactical decisions and the denial of a prior motion for class certification do not typically constitute changed circumstances. *See Friend*, 2014 WL 4415988, at *3 (denying leave to file an issue class under Rule 23(c)(4) where the plaintiffs' decision not to seek issue certification in their first motion had been a tactical one not impacted by an alleged change in the law); *Hartman*, 291 F.R.D. at 597 (finding that "the court's denial of [the plaintiffs'] first motion for class certification" was not a changed circumstance for purposes of leave to file a successive motion). Courts will also deny leave to file a successive motion where the proposed changes to the class do not address the deficiencies of the original class proposal. *See Hartman*, 291 F.R.D. at 597–600.

## III. ANALYSIS

Plaintiff argues the Court's findings in the Class Certification Order "provide the 'clarified circumstances' that justify [his] request" to file a motion to certify the Virginia Class. [ECF No. 195 at 5] (footnote omitted). He claims he "could not have reasonably fully developed each potential avenue for certification that depended on subsequent findings by the Court in his initial motion for certification of a nationwide class" because "[n]umerous combinations of potential findings would have supported different certifiable classes." *Id.* at 4. He also argues that "[a] plaintiff should not be charged with arguing for every possible eventuality in his or her opening motion. Such a requirement would result in diluted treatment for each certifiable class, or complicated and extensive briefing on issues that may end up being irrelevant." *Id.* at 4–5.

Plaintiff thus presents two changed circumstances in support of the instant motion: (1) the Court's denial of his earlier motion for class certification; and (2) his resulting change in tactics for obtaining class certification in this action. He does not cite new facts or a change in the law. Indeed, it is Plaintiff's position that he needs no further discovery to support certification of the Virginia Class. *Id.* at 6. As discussed above, the circumstances Plaintiff cites do not typically justify leave to file a successive motion for class certification.

The Court is not persuaded it should deviate from that general rule. Plaintiff was not required to "develop[ ] each potential avenue for certification" or to "argu[e] for every possible eventuality in his or her opening motion." *Id.* at 4–5. Plaintiff was tasked with proposing a class of plaintiffs that could be certified under the applicable law based on the facts of the case, as developed through months of discovery. That is no different from the task of every plaintiff seeking to litigate his or her case as a class action. The Court's decision denying Plaintiff's motion was predicated on findings as to various choice of law issues, but Plaintiff was aware of those issues and addressed them in his briefing. In his opening brief, he presented choice of law arguments as to the substance of the class's breach of contract claims, rules on admitting extrinsic evidence, and statute of limitations defenses (including tolling and fraudulent concealment doctrines). [ECF No. 124-1 at 25–29]. At that time, it was his unqualified position that, whatever the applicable law, the class could be certified. Nothing about the class he chose to certify or the arguments he presented were contingent on any findings of the Court except for—as is the case in any motion—the Court ultimately agreeing with his position. That Plaintiff argued these issues at all demonstrates his awareness that they posed potential obstacles to certifying his nationwide class. But that was the class he chose to certify. It is not a change in circumstances that the Court ultimately found he could not do so.

***5** The Court also finds it inappropriate to grant Plaintiff leave to file a second motion for class certification because the Virginia Class does not remedy the problems identified in the Class

Certification Order. Even assuming Virginia law applies to the Virginia Class's breach of contract claims, and extrinsic evidence would not be admissible to interpret the relevant contract provisions in this case, the proposed Virginia Class does not mitigate the Court's concerns over Defendant's statute of limitations defense.

As the Court explained in the Class Certification Order, under the 1988 Amendments to the Restatement (Second) of Conflict of Laws, the Court will apply Iowa's statute of limitations if it would bar the class members' claims. [ECF No. 192 at 23–24]. Plaintiff has consistently and unambiguously stated that "Midland's statute of limitations defense applies to everyone in the Class." [ECF No. 172 at 10]. He also argues that the class members can defeat this defense because Midland fraudulently concealed the factors that make up its Risk Rates, and thus the limitations period should be equitably tolled. [ECF No. 124-1 at 29]. However, to establish fraudulent concealment under Iowa law, each class member would have to show by clear and convincing evidence, in relevant part, that he or she lacked knowledge of the true facts and that he or she actually relied on Midland's misrepresentations. *Meier v. Alfa-Laval, Inc.*, 454 N.W. 576, 578–79 (Iowa 1990). The Court previously found that the individual understandings and reliance of each class member created "a substantial individual issue" that would "predominate over the common issues in this litigation." [ECF No. 192 at 25].

Plaintiff does not argue that Iowa law should not apply to Defendant's statute of limitations defense as to the Virginia Class. Rather, he argues the issues of Midland's breach and any resulting damages are the predominating issues in this case. Thus, he argues, the Virginia Class can be certified under Rule 23(b)(3) notwithstanding the individual issues presented by Midland's statute of limitations defense. The Court disagrees.

Relevantly, under Rule 23(b)(3), a class may be certified where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). An individual issue is one that will require "the members of a proposed class ... to present evidence that varies from member to member," whereas a common issue is one for which "the same evidence will suffice for each member." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' " *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted).

Because the question is one of predominance, it is not necessary that a Rule 23(b)(3) class present only common issues. As the United States Supreme Court has noted, and which Plaintiff quotes in his brief in support of his motion, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' " *Id.* (quoting 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1778, pp. 123–24 (3d ed. 2005)).

***6** However, Midland's affirmative defense is not "peculiar to some individual class members." *Id.* It applies to every class member. "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Wright, *supra*, § 1778, p. 134. That is the case here. There are approximately 3,000 Virginia Class members. [ECF No. 172 at 13 n.16]. Having to hear individual evidence as to each class member's understanding of the term Risk Rate at the time he or she entered into a Class Policy (possibly decades ago for some class members) would be unmanageable. It is not the type of inquiry that can be resolved by application of objective, readily applied criteria. It requires the Court to weigh varying evidence, make credibility determinations, and the Court assumes, as it must, that Defendant will challenge every claim. *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its ... defenses to individual claims.").

Plaintiff argues that, because some of Defendant's alleged breaches occurred within the limitations

period, “it is appropriate to resolve class members' claims through class-wide adjudication even though many class members will have to prove their fraudulent concealment allegations individually to recover their full damages.” [ECF No. 199 at 5]. Based on Plaintiff's earlier assertions about Midland's statute of limitations defense, however, it is in fact every class member who will need to prove their fraudulent concealment allegations. Thus, although the Court may be able to award some damages through the resolution of common issues, the Court would still need to individually litigate 3,000 affirmative defense claims. Even if the Court can resolve certain issues on a class-wide basis, the resolution of Midland's statute of limitations defense would predominate over the common issues in this lawsuit. [1]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to File a Second Motion for Class Certification, [ECF No. 195], is DENIED.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2019 WL 13169890

## Footnotes

1 To the extent Plaintiff seeks to certify the Virginia Class under Rule 23(c)(4) on the issue of Defendant's liability, this would also be inappropriate. Rule 23(c)(4) states that, “[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues.” The United States Court of Appeals for the Eighth Circuit has not expressly ruled on whether an issue class can be certified in the absence of predominance. *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). However, it has also observed that “[e]ven courts that have approved ‘issue certification’ have declined to certify such classes where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation.” *Id.* The certification of the Virginia Class on the issue of Defendant's liability would not increase the efficiency of the litigation because it would not relieve the Court of having to individually determine the applicability of Midland's statute of limitations defense.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

6

KeyCite Blue-Striped Flag
Appeal Filed by Stephen Walden, et al v. Bank of New York Mellon Corp, et al, 3rd Cir., August 17, 2026

2025 WL 2696463
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania, Pittsburgh Division.

Stephen WALDEN, Leslie Walden, Plaintiffs,
v.
The BANK OF NEW YORK MELLON CORPORATION, BNY Mellon, N.A., Defendants.

Civil Action No. 2:20-cv-01972-CBB
|
Signed September 22, 2025

**Attorneys and Law Firms**

Adam J. Levitt, Pro Hac Vice, DiCello Levitt & Casey, Chicago, IL, Elijah Savage, Pro Hac Vice, Chicago, IL, Robert F. DiCello, DiCello Levitt Gutzler LLC, Mentor, OH, Bruce D. Bernstein, Pro Hac Vice, DiCello Levitt Gutzler LLC, Washington, DC, Charles Dender, Pro Hac Vice, DiCello Levitt LLP, New York, NY, Li Yu, Pro Hac Vice, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Jonathan Chally, Pro Hac Vice, Joshua P. Gunnemann, Pro Hac Vice, Katherine L. D'Ambrosio, Pro Hac Vice, Stephen D. Councill, Pro Hac Vice, Councill, Gunnemann & Chally, LLC, Atlanta, GA, for Plaintiffs.

Perry A. Napolitano, Alex Mahfood, Brad A. Funari, Justin J. Kontul, Reed Smith LLP, Pittsburgh, PA, for Defendants.

**MEMORANDUM OPINION [1] ON MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT ECF No. 191**

Christopher B. Brown, United States Magistrate Judge.

## I. Introduction

***1** This action was initiated on December 21, 2020 by Plaintiffs Stephen and Leslie Walden (collectively "the Waldens"). The Waldens sought to maintain a class action against Defendants Bank of New York Mellon Corporation and BNY Mellon, N.A. (collectively "BNY") for breach of contract and claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. § 201-1 *et seq.* ("UTPCPL"). This matter centers on investment management services BNY Mellon provided to the Waldens and the putative class as a fiduciary under investment management agreements.

In December 2024, the Court granted BNY's motion to dismiss the Waldens' class claims for lack of subject matter jurisdiction, finding the treatment of the Waldens' claims as a class were preempted by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA"). ECF No. 189. In that decision, the Court found the Waldens raised a novel theory of liability and facts in support which they had not included in their operative pleading. *Id.* at 24-25. The Court informed the Waldens that should they want to advance this novel theory, they could file a motion requesting leave to amend their complaint, or, in the alternative, they could file a notice that they intended to proceed with their claims against BNY in their individual capacities. *Id.* at 25; ECF No. 190 at 1-2. The Waldens chose the first option, and timely filed the present motion for leave to file a second amended complaint. ECF No. 191. BNY opposes the motion, and it is fully briefed and ripe for consideration. ECF Nos. 192, 194, 196, 203.

For the reasons that follow, the Waldens' motion for leave to file a second amended complaint is denied.

## II. Background

Because the Court writes primarily for the parties, only the factual background necessary to resolve the instant motion is discussed.

The Waldens contracted with BNY to provide them with investment management services under a fiduciary standard. The Waldens' original complaint alleged BNY breached their contracts, fiduciary duties, and violated several state laws by investing client assets into BNY-affiliated mutual funds and sought class treatment of their claims. ECF No. 35 at 2-3. By doing so, the Waldens claimed BNY and its employees received additional fees and compensation which was, *inter alia*, a breach of BNY's fiduciary duty

because the affiliated investments created a conflict of interest which should have been disclosed to the Waldens, but were not. *Id*. The Court granted in part and denied in part BNY's motion to dismiss the original complaint, and the Waldens filed the operative amended complaint on June 28, 2021. ECF No. 40. The amended complaint again sought to proceed as a class and again focused on BNY's failure to disclose conflicts of interest for investing client assets in BNY-affiliated mutual funds as well as for failure to disclose that BNY used a predetermined program to make investment decisions that preferred underperforming affiliated funds instead of making individualized investment decisions on its clients' behalf. ECF No. 40 at ¶ 50; ECF No. 48 at 2-3.

***2** After a second round of motions to dismiss, the Court dismissed some of the Waldens' claims, and the parties began class discovery on the remaining claims for breach of contract and violations of state law consumer protection laws related to BNY's alleged failure to disclose these conflicts of interest. ECF Nos. 48, 57. The Court also imposed a deadline of March 1, 2022 for the parties to amend their pleadings. ECF No. 89. The Waldens never moved to amend their complaint before this deadline.

More than one year later, on July 31, 2023 and following the close of class discovery, BNY filed a pre-class motion for summary judgment and on its heels, the Waldens filed a motion for class certification.[2] ECF Nos. 98, 106. The Waldens' motion for class certification included a class definition that varied from the one set forth in their amended complaint. The Waldens sought to certify, for the first time, a sub-class of individuals who deposited cash into BNY bank accounts and whose assets were placed in cash sweep accounts despite their amended complaint having no facts suggesting they intended to proceed with class claims related to BNY's practices related to cash sweep accounts. *Compare* ECF No. 40 at ¶ 106 *with* ECF No. 106 at ¶ 1.[3] Nevertheless, the Waldens argued in their motion for class certification that along with their original breach of fiduciary legal theories, BNY also breached its fiduciary duties by placing its clients' cash balances into BNY-owned cash sweep accounts which had higher fees and lower interest rates compared with other investment options – like investing in affiliated money market funds where such fees are waived – BNY and its employees financially benefitted from this allocation, and BNY failed to disclose it placed cash balances into the cash sweep accounts to its clients (the "cash sweep account theory."). *See* ECF No. 106-1 at 12-13. This appears to be the first time the Waldens introduced the cash sweep account theory to the Court and their amended complaint does not appear to include facts suggesting they intended to allege any claims related to BNY's use of cash sweep accounts.

BNY filed its motion for summary judgment the same day as the Waldens filed their class certification motion first raising the cash sweep account theory and thus BNY did not address the newly raised cash sweep account theory in its request for summary judgment. ECF No. 100. However, in its response to the Waldens' class certification motion filed in September 2023, BNY argued the Waldens had not pleaded the cash sweep account theory in their amended complaint and construed this novel claim as inconsistent with the Waldens' original theory of the case that BNY breached duties by investing in affiliate mutual funds. ECF No. 125 at 30 n. 6. The Waldens similarly incorporated its cash sweep account theory into its response to BNY's summary judgment motion. ECF No. 152 at 6; 18-19.

***3** While both motions were pending, the Court held oral argument on the class certification motion on March 21, 2024. ECF No. 171. At oral argument, the Waldens confirmed they intended to proceed solely on the grounds that BNY breached its fiduciary duties and violated state law by failing to disclose it was a conflict of interest for it to invest client assets in BNY-affiliated mutual funds.[4] ECF No. 172 at p. 3: 16-22; p.6: 1-7; p. 8: 9-12; 20-24. The Waldens also mentioned the cash sweep account theory at oral argument, characterizing it as an issue "discussed in the papers" but one they had not "spend much time talking with the court about before," or had given the Court "an opportunity to focus on before" and as "not something we have really highlighted in the case before[.]" ECF No. 172 at p. 12:20-25; 13:1-25; 15:9-14. BNY maintained its position at oral argument that the Waldens failed to plead this cash sweep account theory and that the theory was inconsistent with the Waldens' original theory of the case. *Id*. at p. 31:6-25; 32:1-6.

On April 10, 2024, the Court then issued a decision granting in part, deferring in part and denying in part BNY's summary judgment motion. In its decision, the Court denied summary judgment related to, *inter alia*, the cash sweep account theory but did not address whether it had been properly raised. ECF No. 178 at 20, 21, 34.

On April 29, 2024, upon learning at the class certification oral argument that the Waldens abandoned several of its original claims related to BNY's alleged underperformance and imprudent investment decisions and instead narrowed the focus of their claims upon whether BNY failed to disclose conflicts of interest, BNY moved to dismiss the Waldens' class claims on the basis that the Court lacked subject matter jurisdiction to consider those claims under the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1) ("SLUSA"). ECF Nos. 180; 181 at 2-3. BNY argued these remaining failure-to-disclose claims involved misrepresentations or omissions of material facts made in connection with the purchase or sale of a covered security, fell within SLUSA's preemption and class treatment of these claims was barred. *See* ECF No. 181. During that briefing, the Waldens reasserted their cash sweep account theory arguing SLUSA did not preempt those claims from class treatment because placing clients' assets into bank accounts did not involve trading securities. ECF No. 184 at 9. The Court agreed with BNY that the Waldens' class claims related to BNY's failure to disclose conflicts of interest for investing in affiliated mutual funds involved a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security and were preempted by SLUSA. ECF No. 189. The Court did not address the Waldens' argument that their cash sweep account theory was not barred by SLUSA finding they had not pleaded that theory in their amended complaint, and it was not properly before the Court. *Id.* at 23-25. In granting BNY's motion to dismiss the Waldens' class claims for lack of subject matter jurisdiction, the Court denied the Waldens' pending motion for class certification as moot. ECF No. 190. The Court informed the Waldens if they sought "to litigate [the cash sweep account] claims further, they may file the appropriate motion." ECF No. 189 at 23-25. The Waldens took that opportunity and filed the present motion for leave to file a second amended complaint on January 31, 2025. ECF No. 191.

## III. Discussion

### a. Expanding Theories of Liability Through a Modified Class Definition

***4** As an initial matter, the Waldens fundamentally expanded their theories of BNY's liability by asserting their cash sweep theory as part of their modified class definition. While the parties did not address the impact of the Waldens proposing a broader class definition in their class certification motion from what was pleaded in their amended complaint, because the Waldens first included this new legal theory in their amended class definition, the Court believes this topic merits discussion.

Courts in this circuit are not bound by the class definition proposed in a complaint and enjoy significant discretion to amend a class definition *sua sponte* to assure proper certification and administration of the class. *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004)(unpublished). Similarly, a plaintiff is not prevented from redefining a putative class from what was originally pleaded to meet the needs of the case. *Deutsch v. My Pillow, Inc.*, No. 20CV00318SRNECW, 2023 WL 3125549, at *31 (D. Minn. Apr. 27, 2023); *Johansson v. Nelnet, Inc.*, No. 4:20CV3069, 2022 WL 6232089, at *5 (D. Neb. July 21, 2022), *report and recommendation adopted*, No. 20-CV-3069, 2022 WL 6149989 (D. Neb. Oct. 7, 2022); *In re Homaidan*, 640 B.R. 810, 867 (Bankr. E.D.N.Y. 2022).

But, when a modified class definition seeks to expand, instead of narrow, the scope of a putative class by adding more putative class members, new causes of action or claims not included in the complaint, courts may limit that practice where expansion would unfairly prejudice a defendant. *Douglas v. EF Inst. for Cultural Exch., Inc.*, No. 20-CV-11740-DJC, 2024 WL 3070251, at *4 (D. Mass. June 20, 2024) (collecting cases). Courts have found defendants are unfairly prejudiced by an expanded class definition where it would result in a lack of notice to defendants regarding the nature and scope of the claims asserted, and where discovery has already been conducted. *See Douglas*, 2024 WL 3070251, at *5 (refusing to

expand class definition where the expanded definition was "broader with respect to the alleged scope of [d]efendants' liability"); *Rivera v. Invitation Homes, Inc.*, No. 18-CV-03158-JSW, 2022 WL 504161, at *4 (N.D. Cal. Feb. 18, 2022) (refusing to allow plaintiffs to include a new theory of liability in a class definition because defendant "has not had sufficient notice of this theory of liability" and "the length of time this case has been pending" when the "Plaintiff's allegations and arguments have focused [on a different theory of liability]"); *Smith v. Seeco, Inc.*, No. 4:15CV00147 BSM, 2016 WL 3541412, at *3 (E.D. Ark. Mar. 11, 2016) (not allowing an expanded class definition where parties conducted months of discovery and submitted expert disclosures); *Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (refusing to consider an expanded class definition "without any motion to amend the [c]omplaint" and even if additional discovery was not necessary, the modified class definition improperly expanded the class to include members whose claims were untimely and prejudiced defendants); *Bouton v. Ocean Props., Ltd*, 322 F.R.D. 683, 693 (S.D. Fla. 2017) (not permitting an expanded class definition noting that "[a]lthough a plaintiff may seek to certify a class definition narrower than the one proposed in the operative pleading without a new claim for relief, the converse is not allowed") (emphasis omitted). Simply stated, "[c]lass certification is not a time for asserting new legal theories that were not pleaded in the complaint." *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011).

***5** The Waldens impermissibly expanded their class definition by first presenting their unpleaded cash sweep account theory of liability in their motion for class certification. While BNY may have had notice of the cash sweep account theory because the Waldens mentioned it in their expert report and BNY deposed the Waldens' expert on this theory, *see infra* n. 8, it remains that this legal theory contradicts the Waldens' theory of the case from its inception – which is that BNY breached its fiduciary duties to its clients when it invested their assets in affiliated mutual funds and is grounded in new unpleaded claims. *See infra* pp. 16-18. Given that discovery is often broader than the claims and defenses actually litigated, Fed. R. Civ. P. 26(b)(1) ("discovery need not be admissible in evidence to be discoverable"), BNY cannot be said to have had fair notice of this theory until the Waldens first unmistakably placed it into litigation through their expanded class definition in their motion for class certification, and likewise cannot be said to have waived any defense by performing a comprehensive deposition on all grounds raised in an expert report. Ultimately, the cash sweep theory of liability was not pleaded in the amended complaint. Even if the Court were to construe the Waldens' cash sweep theory in the context of whether to allow an expanded class definition, because this is a novel legal theory of liability that impermissibly expands the class definition, it is improper to do so by simply redefining the class. Instead, the Waldens must move to amend their complaint to include such a claim and are subject to the standards set forth in Fed. R. Civ. P. 16 and 15 for doing so.

**b. Fed. R. Civ. P. 16**

Fed. R. Civ. P. 16(b)(4) controls the court's authority to enter scheduling orders and provides: "[a] schedule may be modified only for good cause and with the judge's consent." This applies to deadlines set by the court for the parties to amend pleadings and this "good cause" standard insures "that at some point...the pleadings will be fixed[.]" Fed. R. Civ. P. 16, Advisory Committee Note (1983). Similarly, Fed. R. Civ. P. 15(a)(2) controls a party's ability to amend pleadings and provides: "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

The Waldens maintain that "[d]iscovery revealed that one such breach of BNY's fiduciary duties involved BNY placing customers' cash into BNY-owned cash sweep accounts – bank accounts that earned fees for BNY from [the Waldens] and otherwise benefitted [BNY]. BNY placed customer cash into BNY-owned bank accounts creating a financial benefit for [BNY] and their employees. BNY never disclosed this conflict of interest to [the Waldens] and BNY's self-dealing caused [the Waldens] to suffer financial harm." ECF No. 192 at 2 (emphasis omitted). The Waldens maintain these facts involving cash-sweep accounts were disclosed on January 19, 2023 during the deposition of BNY's corporate designee, Patrick Crowe. *Id.* at 5. The Waldens did not, however, move to amend their complaint to add these new facts and

theories until January 31, 2025, and instead maintain their expert "cited to and relied heavily on the conflicts arising from BNY's practice of allocating clients' cash to bank accounts at BNY in his report." *Id.*

It is undisputed that the Waldens did not move to amend their complaint to add their novel theory related to cash sweep accounts until three years after the Court imposed deadline for amending pleadings lapsed. When a party moves to amend a pleading after the deadline in the court's scheduling order has passed, the party must first establish "good cause" for doing so under the standard set forth in Fed. R. Civ. P. 16(b)(4) before the court considers whether the party has met the more liberal standard for amendment set forth in Fed. R. Civ. P. 15. *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020).

Whether "good cause" exists to support a plaintiff's request to amend a pleading outside of a court-imposed deadline "depends in part on a plaintiff's diligence." *Id.* Several courts recognize if a plaintiff "knows or is in possession of the information that forms the basis of the later motion to amend at the outset of the litigation, the party is presumptively not diligent." *Jackson v. Locust Med., LLC*, No. 4:22-CV-00424, 2024 WL 2701695, at *1 (M.D. Pa. May 24, 2024). "This principle, however, may be rebutted by a clear and cognizable explanation why the proposed amendment was not included in the original pleading." *Chan. v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 702 (E.D. Pa. 2007).

***6** The Waldens argue they have met both the good cause standard set forth in Fed. R. Civ. P. 16(b) and the more liberal standard in Fed. R. Civ. P. 15. As for "good cause," the Waldens argue "despite their diligence, [the Waldens] could not have reasonably amended before the Court's deadline" because "the operative facts" related to their cash sweep theory "were only confirmed through the depositions" during discovery that occurred on January 19, 2023, ten months after the Court's March 1, 2022 deadline to amend pleadings. ECF No. 192 at 4-5. While newly discovered evidence can support a finding of good cause under Fed. R. Civ. P. 16 to allow amendment, *see Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 119 (W.D. Pa. 2010), good cause is not shown when a plaintiff is not diligent in seeking the discovery that led to their motion to amend or when the evidence is not actually "newly" discovered. *Karlo v. Pittsburgh Glass Works, LLC*, No. CIV.A. 10-1283, 2011 WL 5170445, at *3 (W.D. Pa. Oct. 31, 2011) (finding no good cause to amend complaint under Fed. R. Civ. P. 16 where plaintiffs did not conduct discovery for six months after initiating the suit, received discovery that they alleged supported amendment and did not seek to amend or extend the deadline to amend for "several weeks"); *Graham*, 271 F.R.D. at 119–20 (no good cause where evidence is not actually newly discovered).

Assuming the Waldens are correct in asserting the first time they could have reasonably discovered their new cash sweep account theory was in January 2023 through BNY's corporate designee's deposition testimony, they do not explain why they waited more than two years to move to amend their complaint after having that information nor do they justify their lack of diligence in doing so. The fact remains that the Waldens moved to amend the complaint on January 31, 2025, only after the Court rejected their attempt to incorporate the cash sweep theory in their brief in opposition to BNY's motion to dismiss for lack of subject matter jurisdiction, and after the Court further prompted that should they seek to litigate such claims they would need to seek leave to do so. [5] ECF No. 189.

The Waldens also argue they reasonably believed the cash sweep account theory was pleaded in the first amended complaint. ECF No. 192 at 5. Despite the fact the Waldens do not cite to any allegations in their amended complaint they believe supports their cash sweep account theory, and this Court independently having found none, this argument contradicts their assertion that they did not know about the cash sweep account theory until discovery revealed it in January 2023. The amended complaint was filed a year and a half earlier in June 2021. ECF No. 40. The Waldens cannot have both adequately pleaded this novel theory of liability in June 2021 and not have known of the facts supporting it (and therefore could not have sought amendment) until January 2023.

Moreover, the Waldens concede that their own expert, Edward D. O'Neal, Ph.D., "cited to and relied heavily on the conflicts arising from BNY's practice of allocating clients' cash to bank accounts at BNY in his report." ECF No. 192 at 5. Dr. O'Neal's report was

authored on March 17, 2023. By their own admission, the Waldens possessed the relevant knowledge upon which the cash sweep account theory rested, if not during BNY's corporate designee deposition, by at least March 2023. Their own expert confirmed their theory of liability in his expert report, yet the Waldens did not move to amend their complaint to include it for almost another two years. Such a lengthy delay does not support a showing that the Waldens acted diligently.

The Waldens also argue they were diligent because the cash sweep account theory was actively litigated at the pre-class certification summary judgment stage and allowing amendment to include this theory now would "not infringe upon the Court's ability to efficiently adjudicate this matter." ECF No. 192 at 6. Whether the cash sweep account theory became part of the litigation by virtue of reference to these claims during a pre-class certification motion for summary judgment and related decision is in essence an argument for implied consent of amendment under Fed. R. Civ. P. 15(b)(2), which the Waldens have again [6] not raised in their briefing, have not otherwise presented any legal authority for, and the Court will not address *sua sponte*. [7] *Mullen v. Ashirward Hosp., LLC*, No. 2:23-CV-01277, 2024 WL 936322, at *6 (W.D. Pa. Mar. 5, 2024) (failure to raise an argument "means that argument is forfeited.") (collecting cases).

***7** The Waldens' arguments that allowing amendment would not impact this Court's ability to efficiently adjudicate this matter and would not meaningfully change the litigation because their new theory is still based on BNY's alleged failure to disclose conflicts to its clients are also without merit. ECF No. 192 at 8. While on the surface, both theories involve conflicts of interest, the Waldens' new cash sweep account theory contradicts claims originally pleaded in their amended complaint. The Waldens' proposed claim that BNY *should have* invested in BNY-affiliated funds instead of placing clients' assets in cash sweep accounts with low interest rates and fees contradicts the Waldens' theory of the case from its inception: BNY *should not have* invested in BNY-affiliated funds due to undisclosed conflicts of interest and the affiliated funds' underperformance.

Even if the facts underlying the cash sweep account theory do not substantively contradict the Waldens' original theory related to investing in affiliated funds, it remains that the cash sweep account theory is grounded on new facts, based on a novel legal theory, not previously pleaded, for which the Waldens had knowledge of years before seeking to amend. Allowing the Waldens to amend to proceed with this claim would start this litigation anew and hamstring this Court's ability to efficiently adjudicate this matter. From the inception of this litigation almost five years ago, the parties focused class and expert discovery based on the Waldens' theories set forth in their amended complaint that BNY breached its fiduciary duties by not disclosing it purchased underperforming affiliated mutual funds it had a financial interest in and implemented employee compensation policies that rewarded BNY advisors to invest in these affiliate funds. ECF No. 40 at ¶ 6. Whether BNY's placement of clients' cash into bank accounts instead of BNY-affiliated money market funds violated its fiduciary duty has thus far not been – as acknowledged by the Waldens – a focal point of this litigation. *See supra* at p. 6.

Moreover, the Waldens admit that their proposed second amended complaint, which focuses solely on the cash sweep account theory, "removes all allegations related to securities[,]" *i.e.*, it removes the fundamental crux of the case that BNY breached fiduciary duties by not disclosing potential conflicts of interest when it invested in affiliated mutual funds. ECF No. 192 at 3. *See also* ECF No. 192-2 (comparing the Waldens' amended complaint with their proposed second amended complaint). Thus, the Court is not convinced if amendment were permitted, the parties (and the Court) would be able to essentially pick up where they left off in litigation. Despite the class certification and pre-class summary judgment motions referencing the cash sweep account theory, because that was only one of several theories that the Waldens advanced and was not the focus of litigation until that point, the Court finds it more likely that it would be necessary for the parties to conduct a fresh round of class and expert discovery focused on this new theory [8] and undergo another round of dispositive motions practice, including re-briefing the motion for class certification, after almost five years of litigation

and two years after the Waldens had notice of these facts.[9]

***8** Ultimately, the Waldens were not diligent in seeking to amend their complaint to include their cash sweep account theory after discovery revealed their theory of liability over two years before they sought to amend their complaint and have failed to rebut the presumption by a clear and cognizable explanation of why they did not diligently move to amend their complaint after learning of this new information. They have therefore not shown good cause under Fed. R. Civ. P. 16 and because they failed to meet this threshold showing, the Court need not address the additional arguments made for amendment under the more liberal standard of Fed. R. Civ. P. 15. *Premier Comp Sols., LLC*, 970 F.3d at 319.

**IV. Conclusion**

Based on the foregoing, the Waldens' motion for leave to file a second amended complaint ECF No. 191 is DENIED. An appropriate Order follows.

**All Citations**

Slip Copy, 2025 WL 2696463

## Footnotes

1 All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

2 The Court held the motion for class certification in abeyance pending the decision on BNY's motion for summary judgment. ECF No. 160; ECF No. 178 at 17.

3 Specifically, the Waldens defined the putative class in their amended complaint filed on June 28, 2021 as follows:

> 106. Plaintiffs seek to represent the following class ("the Class"):
>
> All persons or entities, for whom: (a) BNY Mellon had investment discretion over assets that they provided to the Bank, pursuant to an investment advisory agreement or similar agreement; and (b) BNY Mellon used its discretionary authority to invest in investment vehicles that were financially affiliated with BNY Mellon or BNY Corp.

ECF No. 40 at ¶ 106. By comparison, the Waldens defined the putative class in their motion for class certification filed on July 31, 2023 as follows:

> (1) Certifying this action as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, for a class defined as:
>
> All persons who, or entities that, during the period 2014 to the present (the "Class Period"), contracted with BNY Mellon to receive investment advice for their investment assets and for whom BNY Mellon used its discretionary authority to purchase, or recommended, or otherwise caused, the purchase of, investment fund vehicles that were financially affiliated with BNY Mellon or BNY Corp. or the deposit of cash into bank accounts at BNY Mellon or related banks.[1]

ECF No. 106 at ¶ 1 (adding language to the class definition to include "deposit of cash into bank accounts" at BNY).

4 The Court later found in its decision on BNY's summary judgment motion that the Waldens' abandoned their claims that BNY breached the investment agreements or violated state law by purchasing BNY Securities for their clients, and abandoned their claims that BNY breached the investment agreements by failing to make individualized assessments of the Waldens' financial needs by using a predetermined program to make investment decisions and that


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

program preferred underperforming and conflicted affiliated funds that charged excess fees and underperformed other non-affiliated investment options. ECF No. 178 at 23-25.

5 The Court also notes the Waldens had notice they had not adequately pleaded this claim in September 2023 when BNY challenged whether the cash sweep account theory was pleaded in the amended complaint in its response to the Waldens' motion for class certification, and still did not move to amend the complaint.

6 In its decision granting BNY's motion to dismiss the class claims as preempted by SLUSA, the Court invited the Waldens to file the present motion and specifically noted the Waldens had not made any "argument for constructive amendment or implied consent of such amendment" for their cash sweep account theory claims in response to BNY's motion to dismiss. ECF No. 189 at 25.

7 The Court notes that the Court of Appeals for the Third Circuit has not yet addressed whether implied consent to amend a pleading under Fed. R. Civ. P. 15(b) applies at the summary judgment stage. *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 326–27 (3d Cir. 2012) (n. 7 noting the circuit split).

8 While it appears at least some discovery was conducted related to the cash sweep account theory, as it was briefly mentioned in Dr. O'Neal's expert report and BNY deposed Dr. O'Neal on this theory, *see* ECF Nos. 121-1 at ¶¶ 47-49; 121-3 at 244:13-270:20 – it does not appear the discovery conducted went any further than that, nor does it appear in the record that the parties fully engaged in discovery on this topic.

9 Whether the reason for the Waldens' delay in seeking amendment is attributable to attorney oversight or, in the alternative, is a litigation tactic after an unfavorable ruling on summary judgment which foreclosed their class claims as pleaded matters not – neither reason justifies "good cause" under Fed. R. Civ. P. 16(b). *Graham*, 271 F.R.D. at 121.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.